**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

          **-against-**

**COINBASE, INC. AND COINBASE GLOBAL, INC.**

                              **Defendants.**

---

**23 Civ. 4738**

**ECF Case**

<u>**Complaint**</u>
**Jury Trial Demanded**

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") for its Complaint against Defendants Coinbase, Inc. ("Coinbase") and Coinbase Global, Inc. ("CGI") (collectively, "Defendants") alleges as follows:

<u>SUMMARY</u>

1.      Coinbase operates a trading platform (the "Coinbase Platform") through which U.S. customers can buy, sell, and trade crypto assets. The assets that Coinbase makes available include crypto asset securities. Coinbase is the largest crypto asset trading platform in the United States and has serviced over 108 million customers, accounting for billions of dollars in daily trading volume in hundreds of crypto assets. The Coinbase Platform merges three functions that are typically separated in traditional securities markets—those of brokers, exchanges, and clearing agencies. Yet, Coinbase has never registered with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets. All the while, Coinbase has earned billions of dollars in revenues by, among other things, collecting transaction fees from investors whom Coinbase has deprived of the disclosures and protections that registration entails and thus exposed to significant risk.

2.      Congress enacted the Securities Exchange Act of 1934 (the "Exchange Act") in part to provide for the regulation of the national securities markets.  And Congress charged the SEC with protecting investors, preserving fair and orderly markets, and facilitating capital formation, in part through a series of registration, disclosure, recordkeeping, inspection, and anti-conflict-of-interest provisions.  These provisions have led to the separation of key functions in the securities markets— including those carried out by brokers, exchanges, and clearing agencies—in part to protect investors and their assets from the conflicts of interest that can arise when these functions merge.

3.      Since at least 2019, through the Coinbase Platform, Coinbase has operated as: an unregistered broker, including by soliciting potential investors, handling customer funds and assets, and charging transaction-based fees; an unregistered exchange, including by providing a market place that, among other things, brings together orders of multiple buyers and sellers of crypto assets and matches and executes those orders; and an unregistered clearing agency, including by holding its customers' assets in Coinbase-controlled wallets and settling its customers' transactions by debiting and crediting the relevant accounts.  By collapsing these functions into a single platform and failing to register with the SEC as to any of the three functions, and not having qualified for any applicable exemptions from registration, Coinbase has for years defied the regulatory structures and evaded the disclosure requirements that Congress and the SEC have constructed for the protection of the national securities markets and investors.

4.      In addition, during the same period, Coinbase has operated as an unregistered broker through two other services it has offered to investors: Coinbase Prime ("Prime"), which Coinbase markets as a "prime broker for digital assets" that routes orders for crypto assets to the Coinbase Platform or to third-party platforms; and Coinbase Wallet ("Wallet"), which routes orders through third-party crypto asset trading platforms to access liquidity outside the Coinbase Platform.

5.      Coinbase has carried out these functions despite the fact that the crypto assets it has

made available for trading on the Coinbase Platform, Prime, and Wallet have included crypto asset securities, thus bringing Coinbase's operations squarely within the purview of the securities laws. CGI—Coinbase's parent company to which Coinbase's revenues flow—is a control person of Coinbase and thus violated the same Exchange Act provisions as Coinbase.

6.      For years, Coinbase has made calculated business decisions to make crypto assets available for trading in order to increase its own revenues, which are primarily based on trading fees from customers, even where those assets, as offered and sold, had the characteristics of securities. Since at least 2016, Coinbase has understood that the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and its progeny set forth the relevant test for determining whether a crypto asset is part of an investment contract that is subject to regulation under the securities laws. And, as part of its public marketing campaign to position itself as a "compliant" actor in the crypto asset space, Coinbase has for years touted its efforts to analyze crypto assets under the standards set forth in *Howey* before making them available for trading.  But while paying lip service to its desire to comply with applicable laws, Coinbase has for years made available for trading crypto assets that are investment contracts under the *Howey* test and well-established principles of the federal securities laws.  As such, Coinbase has elevated its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets.

7.      In addition, since 2019, Coinbase has offered and sold a crypto asset staking program (the "Staking Program") that allows investors to earn financial returns through Coinbase's managerial efforts with respect to certain blockchain protocols.  Through the Staking Program, investors' crypto assets are transferred to and pooled by Coinbase (segregated by asset), and subsequently "staked" (or committed) by Coinbase in exchange for rewards, which Coinbase distributes *pro rata* to investors after paying itself a 25-35% commission.  Investors understand that

Coinbase will expend efforts and leverage its experience and expertise to generate returns.  The

Staking Program includes five stakeable crypto assets, and the Staking Program as it applies to each

of these five assets is an investment contract, and therefore a security.  Yet, Coinbase has never had

a registration statement filed or in effect with the SEC for its offers and sales of its Staking Program,

thereby depriving investors of material information about the program, undermining investors'

interests, and violating the registration provisions of the Securities Act of 1933 ("Securities Act").

## **VIOLATIONS**

8.     By engaging in the conduct set forth in this Complaint, Coinbase has acted as an

exchange, a broker, and a clearing agency, without registering as an exchange, broker, or clearing

agency, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a),

and 78q-1(b)(1)], and for purposes of Coinbase's violations of the Exchange Act, CGI was a control

person of Coinbase under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].  In addition, through its

Staking Program, Coinbase has offered and sold securities without registering its offers and sales, in

violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

9.     Unless Defendants are permanently restrained and enjoined, there is a reasonable

likelihood that they will continue to engage in the acts, practices, transactions, and courses of

business set forth in this Complaint and in acts, practices, transactions, and courses of business of

similar type and object in violation of the federal securities laws.

## **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

10.     The Commission brings this action pursuant to Section 20(b) of the Securities Act

[15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

11.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from

violating Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a) and 78q-

1(b)(1)], and permanently enjoining Coinbase from violating Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§ 77e(a) and 77e(c)]; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, pursuant to Sections 20(a), 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(a), 78u(d)(3), (5), and (7)]; (c) imposing civil money penalties on Coinbase pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and granting any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Among other things, Coinbase conducts its business operations in this District, including providing brokerage, trading, and other services to investors located in this District, and holding licenses to conduct crypto asset and money transmitting business activities in this District.

**DEFENDANTS**

15. **Coinbase** is a Delaware corporation founded in 2012. Coinbase has operated a crypto asset trading platform servicing U.S. customers since 2012. In April 2014, Coinbase became a wholly-owned subsidiary of CGI. Coinbase purports to be "a remote-first company" that maintains no principal executive office.

16.     **CGI** is a Delaware corporation founded in January 2014 to act as a holding company for Coinbase.  CGI's principal asset is its equity interest in Coinbase.  Like Coinbase, CGI purports to have no principal place of business and is a "remote-first company."  CGI filed a Form S-1 registration statement with the SEC that was declared effective, and on April 14, 2021 CGI listed its common stock—registered with the SEC pursuant to Section 12(b) of the Exchange Act and trading under the symbol "COIN"—on the Nasdaq Global Select Market.

## BACKGROUND

### I.     STATUTORY AND LEGAL FRAMEWORK

17.     As the Supreme Court has recently reemphasized, the Securities Act and the Exchange Act "form the backbone of American securities laws."  *Slack Tech., LLC v. Pirani*, 598 U.S. ___, 2023 WL 3742580, at *1 (June 1, 2023).  These acts define "security" broadly, to include a wide range of assets, including "investment contracts."

18.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  As the United States Supreme Court noted in *Howey*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  Courts have found novel or unique investment vehicles to be investment contracts, including those involving orange groves, animal breeding programs, cattle embryos, mobile phones, enterprises that exist only on the internet, and crypto assets (which crypto asset market participants at times also label "cryptocurrencies").

#### A.     The Securities Act's Registration and Disclosure Requirements

19.     Congress enacted the Securities Act to regulate the offer and sale of securities.

20.     Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] require

registering offers and sales of securities with the SEC.

21.     Registration statements provide public investors with material, sufficient, and accurate information to make informed investment decisions, in particular about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

**B.     The Exchange Act's Registration and Other Requirements**

22.     To fulfill the purposes of the Exchange Act, Congress imposed registration and disclosure obligations on certain defined participants in the national securities markets, including but not limited to broker-dealers, exchanges, and clearing agencies.  The Exchange Act empowers the SEC to write rules to protect investors who use the services of those intermediaries.

23.     In the Exchange Act, Congress explained that such oversight is essential to the proper functioning of the national securities markets and the national economy:

> [T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto … [to] perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b.

24.     Congress also determined that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors."  15 U.S.C. § 78q-1.

### i.   Registration of Exchanges

25.     In enacting registration provisions for national securities exchanges, Congress found

in Section 2(3) of the Exchange Act [15 U.S.C. §78b(3)] that:

> Frequently the prices of securities on such exchanges and markets are
> susceptible to manipulation and control, and the dissemination of such
> prices gives rise to excessive speculation, resulting in sudden and
> unreasonable fluctuations in the prices of securities which (a) cause
> alternately unreasonable expansion and unreasonable contraction of
> the volume of credit available for trade, transportation, and industry in
> interstate commerce, (b) hinder the proper appraisal of the value of
> securities and thus prevent a fair calculation of taxes owing to the
> United States and to the several States by owners, buyers, and sellers
> of securities, and (c) prevent the fair valuation of collateral for bank
> loans and/or obstruct the effective operation of the national banking
> system and Federal Reserve System.

26.     Accordingly, Section 5 of the Exchange Act [15 U.S.C. § 78e] requires an

organization, association, or group of persons that meets the definition of "exchange" under Section

3(a)(1) of the Exchange Act, unless otherwise exempt, to register with the Commission as a national

securities exchange pursuant to Section 6 of the Exchange Act.

27.     Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)] defines "exchange" to

mean "any organization, association, or group of persons, whether incorporated or unincorporated,

which constitutes, maintains, or provides a market place or facilities for bringing together purchasers

and sellers of securities or for otherwise performing with respect to securities the functions

commonly performed by a stock exchange as that term is generally understood, and includes the

market place and the market facilities maintained by such exchange."

28.     Exchange Act Rule 3b-16(a) [17 C.F.R. § 240.3b-16(a)] further defines certain terms

in the definition of "exchange" under Section 3(a)(1) of the Exchange Act, including "[a]n

organization, association, or group of persons," as one that: "(1) [b]rings together the orders for

securities of multiple buyers and sellers; and (2) [u]ses established, non-discretionary methods

(whether by providing a trading facility or by setting rules) under which such orders interact with

each other, and the buyers and sellers entering such orders agree to the terms of a trade."

29.    Registration of a trading platform as an "exchange" under the Exchange Act is a bedrock Congressional requirement that permits the SEC to carry out its role of oversight over the national securities markets.

30.    For example, properly registered exchanges must enact rules to govern their and their members' behavior.  Under Section 6 of the Exchange Act, the rules, among other things, must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade … and, in general, to protect investors and the public interest."

31.    These rules are subject to review by the SEC under Section 19 of the Exchange Act [15 U.S.C. § 78s], including before an exchange can be registered and begin operating.  This review process is designed to ensure that securities marketplaces operate in a manner consistent with the Exchange Act as its practices and procedures evolve over time, in part to protect investors and the integrity of securities markets that affect national commerce and the economy.

## ii.  Registration of Broker-Dealers

32.    Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] generally requires brokers and dealers to register with the SEC, and a broker or dealer must also become a member of one or more "self-regulatory organizations" ("SROs"), which in turn require members to adhere to rules governing the SRO's members' activities.

33.    Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."

34.    The regulatory regime applicable to broker-dealers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants.  Registered broker-dealers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examination, and general and specific requirements aimed at addressing certain conflicts of interest, among other things.  All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets who interact with broker-dealers.

35.     To preserve the maintenance of fair and orderly markets, avoid conflicts of interests, and protect investors, Section 11(a) of the Exchange Act [15 U.S.C. § 78k(a)] prohibits broker-dealers that are members of exchanges from effecting transactions on that exchange for their accounts.

### iii. Registration of Clearing Agencies

36.     Section 17A(b) of the Exchange Act [15 U.S.C. § 78q-1(b)] generally makes it unlawful "for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security."

37.     Section 3(a)(23)(A) of the Exchange Act [15 U.S.C. § 78c(a)(23)(A)] defines the term "clearing agency" as "any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," as well as "any person … who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."

38.     Registered clearing agencies are subject to comprehensive regulation—including recordkeeping requirements and SEC examination—under the Exchange Act and the rules thereunder, providing important safeguards to investors and market participants, and to the maintenance of fair competition.  Moreover, properly registered clearing agencies must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC.

**C.**     **Registration of Exchanges, Broker-Dealers, and Clearing Agencies is Essential to the Proper Functioning of the U.S. Securities Markets and to the Protection of Investors.**

39.     In U.S. securities markets, the functions of "exchanges," "broker-dealers," and "clearing agencies" described above are typically carried out by separate legal entities that are independently registered and regulated by the SEC.  Separation of these core functions aims to minimize conflicts between the interests of securities intermediaries and the investors they serve. Registration and concomitant disclosure obligations allow the SEC to oversee the business of intermediaries and their relationship with investors, in order to, among other things, protect investors from manipulation, fraud, and other abuses.

40.     Investors in securities markets do not interact directly with exchanges or clearing agencies but instead are customers of broker-dealers who effect transactions on investors' behalf. Only broker-dealers (or natural persons associated with a broker-dealer) may become members of a national securities exchange.  In addition, broker-dealers who have customers must become members of the Financial Industry Regulatory Authority ("FINRA"), an SRO that imposes its own rules and oversight over broker-dealers, particularly as to protecting retail investors.

41.     Registered national securities exchanges and clearing agencies are also SROs, and therefore must submit all of their proposed rules and rule changes to the SEC for review.

42.     As noted, the Exchange Act also subjects registered intermediaries to important record keeping and inspection requirements.  For example, Section 17 of the Exchange Act [15 U.S.C. § 78q] requires registered national securities exchanges, broker-dealers, and clearing agencies to make and keep records as the SEC prescribes by rule, and subjects those records to reasonable periodic, special, or other examinations by representatives of the SEC.

43.     These provisions are designed to ensure that intermediaries follow the rules designed to protect investors and to promote fair and efficient operation of the securities markets, given their

importance to the economic health of the nation.  These provisions also seek to ensure, among other things, that investors' securities orders are handled fairly and transparently, that securities transactions result in settlement finality, and that investors' assets are protected and can be recovered if necessary.

## II.     BACKGROUND ON CRYPTO ASSETS AND CRYPTO TRADING PLATFORMS

### A.     Crypto Assets

44.     As used herein, the terms "crypto asset," "digital asset," or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

45.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  These systems typically rely on cryptographic techniques to secure recording of transactions.

46.     Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain—though other crypto assets may also be represented on that same blockchain.

47.     Crypto asset owners typically store the software providing them control over their crypto assets on a piece of hardware or software called a "crypto wallet."  Crypto wallets offer a method to store and manage critical information about crypto assets, *i.e.*, cryptographic information necessary to identify and transfer those assets.  The primary purpose of a crypto wallet is to store the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain.  The public key is colloquially known as the user's blockchain "address" and can be freely shared with others.  The private key is analogous to a password and confers the ability to transfer a crypto asset.  Whoever controls the private key

controls the crypto asset associated with that key.  Crypto wallets can reside on devices that are connected to the internet (sometimes called a "hot wallet"), or on devices that are not connected to the internet (sometimes called a "cold wallet" or "cold storage").  All wallets are at risk of being compromised or "hacked," but internet connectivity makes hot wallets easier to access and, therefore, puts them at greater risk from certain hacks.

**B.     Consensus Mechanisms and Validation of Transactions on a Blockchain**

48.     Blockchains typically employ a "consensus" mechanism that, among other things, aims to achieve agreement among users as to a data value or as to the state of the ledger.

49.     A consensus mechanism describes the particular protocol used by a blockchain to agree on, among other things, which ledger transactions are valid, when and how to update the blockchain, and potentially to compensate certain participants for validating transactions and adding new blocks.  There can be multiple sources for compensation under the terms of the blockchain protocol, including from fees charged to those transacting on the blockchain, or through the creation or "minting" of additional amounts of the blockchain's native crypto asset.

50.     "Proof of work" and "proof of stake" are the two major "consensus mechanisms" used by blockchains.  Proof of work, the mechanism used by the Bitcoin blockchain, involves computers, known as "validator nodes," attempting to "mine" a "block" of transactions, in part by guessing a predetermined number.  The first "miner" to successfully guess this number earns the right to update the blockchain and is rewarded with the blockchain's native crypto asset.  Proof of stake, the consensus mechanism currently used on Ethereum, involves selecting block validators from crypto asset holders who have committed or "staked" a minimum number of crypto assets.

**C.     The Offer and Sale of Crypto Assets**

51.     Persons have offered and sold crypto assets in capital-raising events in exchange for consideration, including but not limited to through so-called "initial coin offerings" or "ICOs,"

"crowdsales," or public "token sales."  In some instances, the entities offering or selling the crypto assets may release a "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of the offering, and any rights associated with the asset.

52.     Some issuers continue to sell the crypto assets after the initial offer and sale, including directly or indirectly by selling them on crypto asset trading platforms.

**D.     Crypto Asset Trading Platforms**

53.     Crypto asset trading platforms—like the Coinbase Platform, which is described in more detail below—are marketplaces that generally offer a variety of services relating to crypto assets, often including brokerage, trading, and settlement services.

54.     Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-chain" transactions involve the transfer of a crypto asset from one blockchain address to another.

55.     Crypto asset trading platforms typically possess and control the crypto assets deposited and/or traded by their customers and, thus, function as a central depository.  The customers' entitlements are then typically tracked and maintained on the crypto asset trading platform's internal ledgers.  Consistent with Coinbase's failures to register with the SEC in any capacity and follow rules applicable to registered intermediaries, the Coinbase Platform does not segregate a customer's crypto assets from other customers' or the firm's assets.

56.     The graphic user interfaces employed by crypto asset trading platforms—such as on websites, mobile apps, or other software—typically emulate and function like traditional securities trading screens:  they show order books of the various assets available to trade, and historical trading information like high and low prices, trading volumes, and capitalizations.

57.     However, unlike in traditional securities markets, crypto asset trading platforms (including the Coinbase Platform) typically solicit, accept, and handle customer orders for securities; allow for the interaction and intermediation of multiple bids and offers resulting in purchases and

sales; act as an intermediary in making payments or deliveries, or both; and maintain a central securities depository for the settlement of securities transactions.

58.     By contrast, a registered national securities exchange submits information regarding executed trades to a registered clearing agency that takes responsibility for ensuring settlement finality and safekeeping of the assets being traded and, in doing so, protects investors' interests. Thus, registered national securities exchanges typically do not assume possession or control of the underlying assets being traded.  Moreover, crypto asset trading platforms usually settle transactions by updating internal records with each investor's positions, a function typically carried out by clearing agencies in compliant securities markets.

59.     Likewise, crypto asset trading platforms typically perform roles traditionally assigned to broker-dealers in compliant securities markets, without following or even recognizing the legal obligations and restrictions on activities that accompany status as a broker-dealer.

**E.     The DAO Report**

60.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in the DAO Report were offerings of securities.

61.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration," and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces."  The DAO Report also found that the trading platforms at issue there "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

<u>**FACTS**</u>

**I.     COINBASE'S OPERATIONS AND RELATIONSHIP WITH CGI**

62.     In 2012, Coinbase launched the original version of its trading platform, which, according to Coinbase, allowed "anyone, anywhere [to] be able to easily and securely send and receive Bitcoin."  Today, the Coinbase Platform has evolved into an expansive online trading platform that allows customers to buy, sell, and trade hundreds of crypto assets.  Publicly, Coinbase refers to its trading platform as an "exchange."  In addition to the Coinbase Platform, Coinbase offers a host of other services to customers in the United States and abroad, including Prime and Wallet.

63.     Since at least May 2021, Coinbase has offered Prime, a service Coinbase has marketed to its institutional customers as a "prime broker" (a broker that offers certain services to institutional clients) for digital assets.  Prime routes orders to the Coinbase Platform and to third-party platforms, thereby providing customers with what Coinbase describes as "access [to] the broader crypto marketplace rather than relying solely on prices from Coinbase's exchange."

64.     Wallet, which Coinbase has made available to both retail and institutional customers since 2017, routes customer orders through third-party so-called "decentralized" trading platforms (often referred to as "decentralized exchanges" or "DEXs") to access liquidity outside the Coinbase Platform.  Unlike with orders placed directly for routing to and execution on the Coinbase Platform or through Prime, Coinbase does not maintain custody over the crypto assets traded through Wallet.  Rather, the assets are "self-custodied" in that "private keys (that represent ownership of the crypto) are stored directly on [the customer's] device."  Crypto assets from numerous blockchains are available to buy, sell, receive, "swap," or "bridge" via Wallet.

65.     In addition to facilitating secondary market transactions through crypto asset trading, Coinbase allows issuers to offer crypto assets for sale for the first time through the Coinbase "Asset

Hub." Coinbase describes Asset Hub on its website as the place "[w]here asset issuers list, launch, and grow … [their] asset across Coinbase products." Coinbase touts that Asset Hub gives issuers the ability to "[u]se a single application to list on the Exchange, Custody, and all our trading interfaces." Furthermore, Coinbase typically does not limit or restrict the ability of crypto asset issuers or promoters (or their agents) to trade on the Coinbase Platform.

66.     Coinbase describes the services it offers as "safe, trusted, easy-to-use technology and financial infrastructure products and services that enable any person or business with an internet connection to discover, transact, and engage with crypto assets and decentralized applications." As Coinbase touts on its website, "we offer a trusted and easy-to-use platform for accessing the broader cryptoeconomy."

67.     The Coinbase Platform and Prime are both available through Coinbase's website (coinbase.com) and mobile application. Customers can open accounts, deposit funds and crypto assets, enter orders, and trade crypto assets 24 hours a day, seven days a week. Wallet is marketed on coinbase.com but customers need to download a separate program to access its services and the crypto assets it supports.

68.     Coinbase claims to service over 108 million customers, including U.S. customers, accounting for billions of dollars in daily trading volume. Today, the Coinbase Platform is one of the largest crypto asset trading platforms in the world and the largest in the United States, with exponential growth in the last few years: In April 2021, Coinbase made available approximately 55 crypto assets for trading on the Coinbase Platform; that number had increased to approximately 254 assets by March 2023. In addition, as of December 2022, Coinbase allowed users to trade more than 16,000 crypto assets via Wallet.

69.     Coinbase generates most of its revenue from transaction fees collected on crypto asset trades made through the Coinbase Platform, Prime, and Wallet. For example, in 2021,

Coinbase generated $6.8 billion in "transaction revenue," out of a total net revenue of $7.4 billion. Likewise, in 2022, Coinbase generated over $2.2 billion in transaction revenue out of a total net revenue of $3.1 billion.

70.     The revenue and expenses generated by Coinbase flow up to Coinbase's parent company, CGI.  For instance, CGI's consolidated balance sheets and statements of operations for 2022 include, among other items: funds and crypto assets and liabilities associated with Coinbase's services; total revenue produced by Coinbase's services; Coinbase's technology and development expenses; and Coinbase's sales and marketing expenses.

71.     Coinbase and CGI share the same board of directors and the majority of CGI's executive officers hold the same executive positions at Coinbase, including Brian Armstrong, who acts as CEO for both Coinbase and CGI.  Both entities operate through the same website (coinbase.com) and disseminate public information through the same blog, Twitter feed, Facebook page, LinkedIn page, and YouTube channel.

72.     Indeed, in their public statements, Coinbase and CGI do not distinguish between themselves.  For example, for the year 2022 in its Form 10-K—a comprehensive report filed annually by public companies with the SEC about their financial performance—CGI defines its "Company" to include Coinbase and its other consolidated subsidiaries, and its "Business" as offering "a safe, trusted, easy-to-use platform that serves as a gate to the cryptoeconomy for [its] three customer groups via both custodial and self-custodial solutions: consumers, institutions, and developers."  Furthermore, CGI's Form 10-K includes the following statements, among many other similar statements, regarding the nature of its business:

- "We serve as the consumers' primary crypto account, offering both a custodial solution with the Coinbase application and self-custodied solution with Coinbase Wallet."

- Defining "Supported crypto assets" as "[t]he Crypto assets we support for trading

and custody on our platform, which include crypto assets for trading and crypto assets under custody."

- "The Coinbase app provides customers a single platform to discover, trade, stake, store, spend, earn, borrow, and use their crypto assets in both our own proprietary and third party product experiences as we enable access to decentralized applications via an integrated web3 wallet."

- "In connection with our Prime trading service, we routinely route customer orders to third-party exchanges or other trading venues."

- "We have a digital asset support committee that is composed of senior leaders from our product, legal, compliance, finance, and accounting departments.  The digital asset support committee reviews the relevant aspects of any asset escalated to it in connection with a listing on our trading platform in accordance with our digital asset support policies and procedures that are designed to mitigate conflicts. Only the digital asset support committee decides which of these escalated assets we can and cannot list on our platform, and it does not coordinate such decisions with anyone outside of the committee."

73.     Finally, CGI's Code of Business Conduct & Ethics (also found on coinbase.com) governs CGI as well as Coinbase and refers to both collectively as "Coinbase," the "Company," "we," or "our."

## II.     THROUGH THE COINBASE PLATFORM, COINBASE PROVIDES EXCHANGE, BROKERAGE, AND CLEARING AGENCY SERVICES TO U.S. CUSTOMERS, AND COINBASE ALSO OFFERS BROKERAGE SERVICES THROUGH PRIME AND WALLET.

74.     Coinbase has never registered with the Commission as a national securities exchange, a broker-dealer, or a clearing agency, and no exemption from registration applies.  Nonetheless, from at least 2019 to the present (the "Relevant Period"), Coinbase has acted as an exchange, a broker, and a clearing agency with regard to crypto asset securities available for trading on the Coinbase Platform (as demonstrated in Section III.C below), including through the following conduct:

### A.     Coinbase Solicits Customers and Facilitates Trading.

75.     Coinbase regularly solicits customers by advertising on its website and social media the features of the Coinbase Platform, Prime, and Wallet—especially those that allow customers to

trade in crypto assets.  Coinbase facilitates trading in crypto assets by assisting customers in opening and using trading accounts, handling customer funds and crypto assets, and routing and handling customer orders.

76.     On its website, Coinbase markets its services to "individuals who want to trade, send and receive crypto" and "businesses … who want to accept, custody, [and] trade crypto," while touting the advantages of trading on the Coinbase Platform.  For instance, Coinbase's website (coinbase.com) advertises that: "[o]ver 108 million people and businesses trust us to buy, sell, and manage crypto;" the Coinbase Platform provides "[a]ccess to hundreds of cryptocurrencies" in a "safe & secure" manner; and by using the Coinbase mobile application, trading in crypto assets is available "[a]nytime, anywhere."

77.     In addition, Coinbase uses the Coinbase blog and its Twitter account—which has over five million followers—to announce when Coinbase first makes a crypto asset available for trading through the Coinbase Platform.  For example, on or about March 19, 2021, Coinbase announced on its blog that "Cardano (ADA) is now available on Coinbase," and stated that "customers can now buy, sell, convert, send, receive, or store ADA."  The blog post included a link to an "informal asset page[]" for Cardano and instructions for opening a Coinbase account.  As of February 2023, the page for Cardano (ADA) included a price chart, "market stats," information about Cardano, such as links to its official website and whitepaper, and information about buying and storing Cardano on Coinbase.  The page also included a list of "Related Assets," "Trending assets," "Popular crypto currencies," and frequently asked questions ("FAQs") about Cardano.

78.     Indeed, Coinbase expends hundreds of millions of dollars a year on marketing and sales to maintain and recruit new investors.  According to CGI's 2022 Form 10-K filing, Coinbase's "success depends on our ability to retain existing customers and attract new customers, including developers, to increase engagement with our products, services, and platform."  To that end, the

Coinbase website is replete with links to open a Coinbase account as well as advertisements marketing monetary incentives and promotions, aimed at attracting more investors to the Coinbase Platform, such as: offers of $5 in bitcoin as a "first trade incentive"; "50% of each referral's trading fees for their first 3 months"; "Get up to $400 in rewards with Coinbase"; and "Get up to $200 for getting started.  Earn free crypto after making your first purchase."

79.     Moreover, the Coinbase website features a "Learn" page, which includes "Beginner guides, practical tips, and market updates for first-timers, experienced investors, and everyone in between," as well as answers to "Crypto questions."  The "Learn" page also features articles and video tutorials entitled "When is the best time to invest in crypto?," "How to earn crypto rewards," and "How to invest in crypto via your retirement account."

80.     Coinbase's "Learning Rewards" program, which is within Coinbase's "Asset Hub" on its website, allows crypto asset issuers and promoters to deliver their content to Coinbase customers, and enables customers to earn crypto assets in exchange for engaging with the content. Coinbase touts the "Worldwide reach" of the program, allowing issuers to "[l]aunch campaigns to our 90m+ user base."

81.     In fact, Coinbase holds itself out as providing brokerage services.  For example, Coinbase markets Prime as a "[a] full-service prime brokerage platform with everything that institutions need to execute trades and custody assets at scale."  According to Coinbase's website, Prime "delivers an institutional-grade trading platform that aggregates multi-venue liquidity, empowers advanced trading strategies, and helps you deploy capital at scale."  Coinbase provides Prime users with the ability to view a pricing feed that aggregates prices from the Coinbase Platform and third-party trading venues (which Coinbase anonymizes, *e.g.*, "Exchange A" or "Exchange B") and allows users to select from a number of order types they can utilize to submit orders through Prime to those venues.  Coinbase also provides analytics and promotes them as a resource to "[s]tay

ahead of the market with this comprehensive analytics toolkit built to meet the needs of sophisticated investors and market participants."  For instance, Coinbase advertises its "agency trading desk," which "provide[s] insight into the market environment, liquidity characteristics, and trading activity in order to help you plan or execute your trade."

82.     Similarly, on its public blog, Coinbase boasts that "Coinbase Wallet brings the expansive world of DEX trading to your fingertips, where you can easily swap thousands of tokens, trade on your preferred network, and discover the lowest fees" and "makes it easy to access [] tokens through its trading feature, which compares rates across multiple exchanges."

**B.     Coinbase Holds and Controls Customers' Funds and Crypto Assets.**

83.     Coinbase requires that customers seeking to buy, sell, or trade through the Coinbase Platform and Prime create an account on coinbase.com and transfer their crypto assets or fiat currency to Coinbase.  Once assets are transferred to Coinbase, Coinbase credits the customer account with the corresponding amounts in Coinbase's internal ledger.  The Coinbase internal ledger individually tracks each deposit and withdrawal of crypto assets and fiat currency for each customer, but Coinbase otherwise commingles customer funds and crypto assets that are similar in nature.

84.     The Coinbase user agreement ("User Agreement"), which applies to some of Coinbase's services (including the Coinbase Platform and Staking Program), states that crypto assets and fiat currency transferred by a customer to Coinbase are "custodial assets held by Coinbase for [the customer's] benefit."

85.     Specifically, the User Agreement provides that customers' crypto assets are held by Coinbase in digital wallets that, according to Coinbase, allow customers to "store, track, transfer, and manage" the balances of their crypto assets.  However, Coinbase "store[s] Digital Asset private keys, which are used to process transactions, in a combination of online and offline storage."  And Coinbase uses "shared blockchain addresses" (*i.e.*, omnibus wallets on the relevant blockchains),

controlled by Coinbase, to hold customers' crypto assets in Coinbase's digital wallets.  Coinbase does not create a "segregated blockchain address" for each customer's crypto assets and treats crypto assets held in its wallets—that are the same type and made available across multiple blockchain protocols—as "fungible and the equivalent of each other."

86.     Fiat currency deposited with Coinbase is held in what Coinbase describes as a "US Dollars wallet" ("USD Wallet").  The Coinbase User Agreement notes that the balance of a customer's "USD Wallet is maintained in pooled custodial accounts" controlled by Coinbase.

**C.     Through the Coinbase Platform, Coinbase Maintains and Provides a Marketplace and Facilities for Trading Crypto Assets.**

87.     According to Coinbase's website, the Coinbase Platform allows customers to "buy, sell, and spend crypto on the world's most trusted crypto exchange."  The Coinbase Platform displays current and historical pricing information and other information relevant for trading crypto assets that is akin to what users see on traditional securities platforms (such as those that display aggregate stock market data) on which they can transact in stocks and bonds.



88.	Coinbase allows multiple buyers and sellers to enter orders (any firm indication of a willingness to buy or sell a security, as either principal or agent, including any bid or offer quotation, market order, limit order, or other priced order) for crypto assets into the Coinbase Platform. Buyers and sellers can enter orders for crypto assets in any available "trading pair," which typically involves two crypto assets that can be exchanged directly for each other using their relative price or a crypto asset exchanged for a fiat currency.  Coinbase maintains and provides individual order books for each trading pair, *e.g.*, an ADA-USD order book, and all order books reside on a centralized server maintained by Coinbase.

89.	Coinbase makes clear that when customers buy or sell crypto assets through Coinbase, they are not buying from Coinbase or selling to Coinbase.  Rather, the Coinbase User Agreement states that Coinbase acts as "the agent," transacting on the customers' behalf, to facilitate the purchase and sale of crypto assets between the customers.

90.	As demonstrated below, the design and functionality of the unregistered Coinbase Platform is similar to those of properly registered national securities exchanges, including its (i) display of orders, (ii) order book and order types, and (iii) order matching and trading rules.

### i. *Display*

91.	A subpage within the Coinbase website called "Explore" leads customers to a list of "Crypto prices" for more than 16,000 crypto assets.  A customer that selects the filter "Tradable" on this page can consolidate this list (by removing those assets only available through Wallet) into approximately 260 crypto assets available for "trade" on the Coinbase Platform (the "Trading Page").  The Trading Page provides customers with the current price of each crypto asset in U.S. dollars (or other fiat currencies), the current "Market cap," traded volume for that asset over the past 24 hour period, and circulating supply of the crypto asset, as well as the option to view historical data for each asset (by previous hour, day, week, month, or year) in the form of price

trends represented by a graph and the percentage change in price of the asset during the chosen period.

92.     The crypto assets on the Trading Page appear by full name and ticker symbol and are displayed in descending order from largest to smallest based on "Market cap" (or market capitalization—purportedly measured by the total supply of a crypto asset available in the secondary market multiplied by its price, as in markets for traditional equity securities).  Below is an example of how the crypto asset securities set forth in Section III.C herein are displayed on the user interface of the Trading Page of Coinbase's website:



93.     Upon clicking the "Trade" button associated with a crypto asset, and logging in to an account with the Coinbase Platform, customers can view their account balances, and the Coinbase Platform provides fields for customers to enter orders in any available trading pair—including the ability to trade with other customers for the crypto asset selected from the Trading Page.

94.     Through the Coinbase Platform, Coinbase displays open orders for each crypto asset trading pair resting on the order book and real time data with respect to those open orders in terms of bid and ask prices, trading volume, and trade history.  Additionally, Coinbase displays historical trade data (in price, quantity, and time) for each crypto asset available for trading on the Coinbase Platform and allows customers to compare data relating to the terms of crypto asset transactions (*i.e.*, a comparison of the value of proposed crypto asset trading pairs).

### ii.     *Order Types and Order Book*

95.     On the Coinbase Platform, customers can place various types of buy and sell orders, including: (1) a market order (*i.e.*, an order to buy or sell a specified quantity of a crypto asset at the current best available market price); (2) a limit order (*i.e.*, an order to buy or sell a specified quantity of a crypto asset at a specified price or better); or (3) a stop limit order (*i.e.*, an instruction to post an order to buy or sell a specified quantity of a crypto asset but only if and when the best price quotation reaches or passes the selected stop price).  Once placed, these orders appear on Coinbase's order book.  To place an order to buy, a customer must have sufficient funds in their Coinbase account to cover the value of the order (and similarly, to place an order to sell, the customer must have the asset available in their account) plus any applicable fees.

96.     Orders that can execute immediately (*i.e.*, orders posted to the order book at the same price as one or more existing orders) are referred to as "taker orders" because they "take" liquidity from the Coinbase Platform.  Orders that do not execute immediately (*i.e.*, orders posted to the order book at a different price than all existing orders) are referred to as "maker orders" because

they "make" liquidity in the market. A maker order will rest on the order book at that price until: (1) it is cancelled by the customer; (2) it expires due to a time limit instruction by the customer; or (3) it is completely filled by one or more taker orders by another customer at the same price.

### iii.   Order Matching and Trading Rules

97.     Coinbase provides a trading facility through the electronic automated matching engine that it operates on the Coinbase Platform. According to the "Trading Rules" Coinbase publishes on its website, the matching engine is programmed with rules that determine how orders will interact and how the users entering such orders agree to the terms of a trade. For instance, according to Coinbase, the matching engine matches orders based on a price-time priority. Moreover, neither the buyer nor the seller knows the identity of the counterparty to the trade.

98.     Under its price-time priority rule, Coinbase matches orders first based on the best price for the order, and if there are multiple orders at the same price, the order with the earlier time will be matched against the corresponding opposite order first. When a customer enters an order into the order book that is marketable (*i.e.*, the order can match with one or more orders on the opposite side and thus is a taker order), it will be matched with the earliest in time maker order, at the best price on the order book. If the taker order is not completely filled by the first maker order, the taker order will match with the next marketable maker order(s) resting on the book until the taker order is exhausted or there are no more maker orders with which the taker order can match.

99.     A customer may cancel an entered order up until the order matches. If there is a match, Coinbase removes the orders from the order book and updates the accounts of the customers who placed the executed orders to reflect their new positions.

**D.   Coinbase Settles Customers' Trades.**

100.    After the matching engine matches orders between customers trading on the Coinbase Platform, Coinbase's Trading Rules state that Coinbase settles the transaction immediately

by making corresponding debits and credits in each customer's account on the internal ledgers it maintains to track customers' balances in crypto assets and fiat currency.  According to Coinbase, these debits and credits occur "off-chain," meaning the transaction is recorded on Coinbase's internal ledgers, not on any blockchain.  Subject to daily withdrawal limits, a customer may immediately arrange to withdraw the assets in their account by instructing Coinbase to transfer the customer's assets to another blockchain wallet (or fiat currency to the customer's bank account) after a transaction is settled.

> **E.**      **Coinbase Charges Fees on Executed Trades.**

101.      Coinbase charges fees for trades executed through the Coinbase Platform and Prime. For trades on the Coinbase Platform, the fee is either a percentage of the order quantity ranging up to 0.60%, or a flat fee based upon the value of the trade.  Coinbase charges transaction-based fees for its Prime order routing and execution services, with customers having the option of a single all-in fee or a "[t]ransparent, flat commission in addition to pass-through exchange fees."  During the relevant period and through at least March 2023, Coinbase charged a flat fee of 1% of the principal amount for each transaction executed through the swap/trade feature in Wallet.

## III.      THE CRYPTO ASSETS TRADED ON THE COINBASE PLATFORM AND THROUGH PRIME AND WALLET INCLUDE ASSETS THAT ARE OFFERED AND SOLD AS SECURITIES.

102.      Throughout the Relevant Period, Coinbase—through the Coinbase Platform, Prime, and Wallet—has made available for trading crypto assets that are offered and sold as investment contracts, and thus as securities.  This includes, but is not limited to, the 13 crypto asset securities discussed in Section III.C below—a non-exhaustive list of such crypto asset securities.

A. **Before Making Crypto Assets Available, Coinbase Has Conducted Risk Assessments that Acknowledge the Potential Application of the Federal Securities Laws to Its Products and Services.**

103.     Even before the SEC issued the DAO Report in 2017, Coinbase understood that crypto assets could be offered and sold as securities under the federal securities laws—and the implications for Coinbase if it made such securities available for trading to the investing public.  For example, in or around December 2016, Coinbase released on its website a document entitled, "A Securities Law Framework for Blockchain Tokens."  This document included a section on "How to determine if a token is a security," and explained: "The US Supreme Court case of *SEC v Howey* established the test for whether an arrangement involves an investment contract.  An investment contract is a type of security."  This "Framework" acknowledged that "[f]or many blockchain tokens, the first two elements of the Howey test"—*i.e.*, investment of money and common enterprise—"are likely to be met."

104.     Recognizing that at least certain crypto assets were being offered, sold, and otherwise distributed by an identifiable group of persons or promoters, in or around September 2018, Coinbase publicly released the "Coinbase Crypto Asset Framework," which included a listing application form for crypto asset issuers and promoters seeking to make their crypto assets available on the Coinbase Platform.

105.     Coinbase's listing application required issuers and promoters to provide information about their crypto assets and blockchain projects.  It specifically included requests for information relevant to a *Howey* analysis of the crypto asset.  For example, the application asked the relevant issuer to identify and/or describe: (i) the "project team" and its involvement in the "development, promotion or function of the [relevant] network"; (ii) any "token sale"; (iii) "the allocation of tokens" to "founders, advisors, employees, a foundation" and others; (iv) "any statements … made about the token/network noting the potential to realize returns, profits or other financial gain"; and (v) "any

efforts to affect the token supply or impact token price (including supply caps, buybacks, repurchases, [and] burning … ).”

106.    Additionally, in or around September 2019, Coinbase and other crypto asset businesses founded the Crypto Rating Council ("CRC").  The CRC subsequently released a framework for analyzing crypto assets that "distilled a set of yes or no questions which are designed to plainly address each of the four *Howey* test factors" and assigned to the crypto asset a score ranging from 1 to 5, with a score of 1 indicating that an "asset has few or no characteristics consistent with treatment as an investment contract," and a score of 5 meaning that an "asset has many characteristics strongly consistent with treatment as a security."

107.    In announcing the CRC's creation, Coinbase stated, "[a]lthough the U.S. Securities and Exchange Commission has issued helpful guidance, whether any given crypto asset is a security ultimately requires a fact-intensive analysis."  In referencing the SEC staff's "helpful guidance," Coinbase provided a hyperlink to that guidance, entitled "Framework for 'Investment Contract' Analysis of Digital Assets," which was and remains publicly available on the SEC's website at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

108.    Starting in 2019, Coinbase used and relied on the CRC framework to assess certain crypto assets in determining whether to make them available for trading on the Coinbase Platform. Meanwhile, between late 2019 and the end of 2020, Coinbase more than doubled the number of crypto assets available for trading on the Coinbase Platform, and it more than doubled that number again in 2021.  During this period, Coinbase made available on the Coinbase Platform crypto assets with high "risk" scores under the CRC framework it had adopted.  In other words, to realize exponential growth of the Coinbase Platform and boost its own trading profits, Coinbase made the strategic business decision to add crypto assets to the Coinbase Platform even where it recognized the crypto assets had the characteristics of securities.

109.     As part of these efforts, Coinbase worked closely with issuers of crypto assets who sought to have their crypto assets listed on the Coinbase Platform.  Coinbase's "Listings Team" engaged in a dialogue with issuers focused on identifying potential "roadblocks" under *Howey*.  For example, on one occasion, Coinbase identified "problematic statements" by an issuer that described its crypto asset "with language traditionally associated with securities," "imply[ing] that the asset is an investment or way to earn profit," "emphasizing the profitability of a project and/or the historic or potential appreciation of the value of [the] asset[s]," "attempts by the project team to have the asset listed on exchanges," and "using terms referring to the asset[s] that are commonly associated with securities such as 'dividend,' 'interest,' 'investment' or 'investors.'"  As "possible mitigation[]," Coinbase suggested that the issuer "[r]emove any existing problematic statements, and refrain from making problematic statements in the future."

110.     Coinbase was thus aware of the risk that it could be making available for trading on the Coinbase Platform crypto assets that were being offered and sold as securities.  Indeed, Coinbase touted to the investing public its familiarity with the relevant legal analysis governing the offer and sale of securities.  Coinbase also understood that an evaluation of whether an offer and sale of crypto assets is an offer and sale of securities is dependent on individualized facts and circumstances.  And Coinbase acknowledged that the different facts and circumstances that accompanied each offer and sale of crypto assets had to be separately weighed, and that such an exercise necessarily involved an assessment of the risk that the offer and sale involved securities.

**B.     CGI Has Publicly Disclosed the Risks of Coinbase's Unregistered Business Operations.**

111.     As part of its effort to become a public company, CGI publicly filed with the SEC a Form S-1 on February 25, 2021, to register an offering of its Class A Common Stock.  SEC staff reviewed that registration statement (and earlier confidential draft versions and subsequent publicly filed amendments) with respect to applicable disclosure and accounting requirements.  As part of

that review process, SEC staff issued comments and CGI submitted response letters and amended

registration statements.  On April 1, 2021, CGI's Form S-1 was declared effective.  Declaring

effective a Form S-1 registration statement does not constitute an SEC or staff opinion on, or

endorsement of, the legality of an issuer's underlying business.

112.     In its Form S-1, CGI acknowledged the risks that the crypto assets Coinbase makes

available for trading could be deemed securities and thus that Coinbase could be found to be

engaging in unregistered brokerage, exchange, and/or clearing-agency activity.  Specifically, CGI

stated the following in the "Risk Factors" section of its Form S-1 (emphases added):

> *A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty* and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.  *The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws*.  The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict.  *The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security.*  Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any continuing evolution.  It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff … With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions we may draw based on our risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws.
>
> * * * * *
>
> *The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and clearing of such assets* … Persons that effect transactions in crypto assets that are securities in the United States may be *subject to registration with the SEC as a "broker"* or "dealer."  Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally *subject to registration as national securities exchanges*, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, or ATS, in compliance with rules for ATSs.  Persons facilitating clearing and settlement of securities may be *subject to registration with the SEC as a clearing agency*.

113.    CGI has made the same disclosures, almost verbatim, in each of its annual and quarterly reports (on Forms 10-K and 10-Q, respectively) filed with the SEC since its Form S-1 became effective.

**C.    Coinbase Has Made Available for Trading Assets that Are Offered and Sold as Securities.**

114.    Throughout the Relevant Period, Coinbase has made available for trading crypto assets that are being offered and sold as investment contracts, and thus as securities.  This includes, but is not limited to, the units of each of the crypto asset securities further described below—with trading symbols SOL, ADA, MATIC, FIL, SAND, AXS, CHZ, FLOW, ICP, NEAR, VGX, DASH, and NEXO—(the "Crypto Asset Securities").

115.    The crypto assets on the Coinbase Platform, or made available through Prime or Wallet, including but not limited to each of the Crypto Asset Securities, may be bought, sold, or traded for consideration, including U.S. dollars, fiat currencies, or other crypto assets.

116.    Each unit of a particular crypto asset on the Coinbase Platform, or made available through Prime or Wallet, including but not limited to each of the Crypto Asset Securities, trades at the same price as another unit of that same asset.

117.    These assets, including but not limited to each of the Crypto Asset Securities, are interchangeable (*e.g.*, any ADA or fraction thereof is just like any other).  Accordingly, to the extent the assets change in price, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a *pro rata* basis.

118.    The purchase of any particular asset, including but not limited to each of the Crypto Asset Securities, does not appear to give an investor any special rights not available to any other investor in that asset, such as separately managed accounts, or different capital appreciation as to the value of the crypto assets that other investors in the same assets hold.

119.    The crypto assets on the Coinbase Platform, including but not limited to each of the Crypto Asset Securities (but excluding NEXO which is available only via Wallet), are available for sale broadly to any person who creates an account with Coinbase, and Coinbase's website displays information (like asset price changes) in a format highly similar to trading platforms offered by registered broker-dealers in the traditional securities markets, who permit investors to transact in securities.  Coinbase makes these crypto assets available for trading without restricting transactions to those who might acquire or treat the asset as anything other than as an investment.

120.    For example, the below page on Coinbase's website provides price movement and other "Market Stats" for ADA (Cardano):



121.     Coinbase customers can access the page for ADA and other asset-specific pages from the "Explore" page on Coinbase's website; they simply click on the name of a particular crypto asset and are redirected to a page where Coinbase provides additional information about that crypto asset.  The information on each asset-specific page is typically provided by an identifiable set of asset promoters and/or developers, and it includes, but is not limited to: (i) the persons who "developed," "launched," or "created" the crypto asset; (ii) links to any "whitepaper" for the asset's original or ongoing sales; (iii) links to the "website" associated with the asset and its developers or creators; (iv) a compendium of public statements (including on social media) about the asset by its developers or creators and additional information about the asset and its creators that may be available such as the issuer's homepage; (v) information about whether market participants are "bearish," "neutral," or "bullish" about the asset (referring to terms typically associated with whether an investor thinks the price of securities such as stocks are going to go down, stay the same, or go up); (vi) historical information about the "price" of the asset including its "all-time high" price and the "price change" over the last seven days stated as a percentage return on investment; and (vii) "detailed instructions" for "how to buy" the asset on the Coinbase Platform.  Because Coinbase has not registered as a broker, national securities exchange, or clearing agency, there is no formal mechanism to ensure the accuracy or consistency of the information Coinbase now selectively discloses about the crypto assets it makes available for trading, including each of the Crypto Asset Securities.

122.     Coinbase does not restrict how many units of a crypto asset, including but not limited to each of the Crypto Asset Securities, any given investor may purchase.  Moreover, investors are not required to purchase quantities tied to a purported non-investment "use" that may exist for the asset, if any.  To the contrary, investors may and typically do purchase these assets in any amount.

123.     The assets available for sale on the Coinbase Platform, and through Prime and

Wallet, including but not limited to each of the Crypto Asset Securities, are transferable and immediately eligible for resale on the Coinbase Platform, Wallet, or other crypto asset trading platforms without any apparent restrictions on resale (including as to the prices or amounts of resale, or the identity of the new buyers).

124.    During the Relevant Period, Coinbase has made available for trading on the Coinbase Platform, and through Prime and Wallet, crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities.  Those crypto assets include but are not limited to the following assets that Coinbase has made available for trading on the Coinbase Platform: AMP (the AMP token, available since June 2021), DDX (the DerivaDAO token, available since September 2021), LCX (the LCX token, available since October 2019), OMG (the OMG Network token, available from May 2020 to March 2023), POWR (the Powerledger token, available since November 2021), RLY (the Rally token, available from July 2021 to March 2023), and XYO (the XYO token, available since September 2021).

125.    For purposes of prevailing on the Exchange Act claims set forth herein, the SEC need only establish that Coinbase has engaged in activities relating to a single crypto asset security during the Relevant Period.  Nevertheless, set forth below are additional details regarding a non-exhaustive list of 13 Crypto Asset Securities—12 available on the Coinbase Platform (and through Prime and Wallet) and one available only via Wallet (NEXO).

126.    From the time of their first offer or sale, each of these Crypto Asset Securities was offered and sold, and continues to be offered and sold today, as an investment contract and thus a security.  For each of the Crypto Asset Securities, statements by the crypto asset issuers and promoters have led investors reasonably to expect profits based on the managerial or entrepreneurial efforts of such issuers and promoters (and associated third persons).  This was investors' reasonable expectation whether they acquired the Crypto Asset Securities in their initial offering, from prior

investors, or on crypto asset trading platforms including the Coinbase Platform (or through Prime or Wallet).  For each of the Crypto Asset Securities, such statements by issuers and promoters include statements made and/or available to the investing public during the period when those Crypto Asset Securities were available for trading on the Coinbase Platform or via Prime or Wallet, as well as other statements described below.

### i.   SOL

127.    "SOL" is the native token of the Solana blockchain.  The Solana blockchain was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco that was founded in 2018 by Anatoly Yakovenko ("Yakovenko") and Raj Gokal (Solana Labs' current CEO and COO, respectively).  According to Solana's website, www.solana.com, the Solana blockchain is a network upon which decentralized apps ("dApps") can be built, and is comprised of a platform that aims to improve blockchain scalability and achieve high transaction speeds by using a combination of consensus mechanisms.

128.    According to Solana's website, SOL may be "staked" on the Solana blockchain to earn rewards, and a certain infinitesimal amount of SOL must be "burned" to propose a transaction on the Solana blockchain, a common function for native tokens on blockchains that constitutes a method for cryptographically distributed ledgers to avoid a potential bad actor from "spamming" a blockchain by overwhelming it with an infinite number of proposed transactions.

129.    Between May 2018 and early March 2020, Solana Labs filed with the SEC multiple forms claiming that its offers and sales of securities—what Solana described in those forms as the "sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a Simple Agreement for Future Tokens (SAFTs)"—were exempt from registration under Rule 506(c) of Regulation D under the Securities Act.  Through these offers and sales of securities, Solana sold approximately 177 million SOL, raising over $23 million.

130.     Later in March 2020, Solana Labs conducted additional SOL sales on the CoinList trading platform (www.coinlist.co) in a "Dutch auction" (wherein investors place bids and the entire offering occurs at the price with the highest number of bidders).  During this offering, Solana Labs sold approximately 8 million SOL, at an average price of $0.22 per SOL, raising approximately $1.76 million.  In August 2021, Solana Labs completed another, purportedly private sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency and was required to sign a purchase agreement.

131.     Beginning in February 2020, Solana Labs took steps to make SOL available for trading on crypto asset trading platforms.  For example, in a September 17, 2020, Twitter post, Solana Labs stated: "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come.  SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us."  In another Twitter post later the same day, Solana Labs stated: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."

132.     SOL has been available for buying, selling, and trading on the Coinbase Platform since approximately June 2021.

133.     The information Solana Labs publicly disseminated, including since the initial sales of SOL, led SOL holders, including those who purchased SOL since June 2021, reasonably to view SOL as an investment in and expect to profit from Solana Labs' efforts to grow the Solana protocol, which, in turn, would increase the demand for and the value of SOL.

134.     Solana Labs stated publicly that it would pool the proceeds from its private and public SOL sales in omnibus crypto asset wallets that it controlled, and that it would use those proceeds to fund the development, operations, and marketing efforts with respect to the Solana blockchain in order to attract more users to that blockchain (potentially increasing the demand for,

and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL).  For example, in connection with the 2021 private sale of SOL, Solana Labs stated publicly that it would use investor funds to: (i) hire engineers and support staff to help grow Solana's developer ecosystem; (ii) "accelerate the deployment of market-ready applications focused on onboarding the next billion users into crypto"; (iii) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana"; and (iv) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

135.    As Solana Labs stated publicly, of the 500 million SOL tokens initially minted, 12.5% were allocated to Solana Labs' founders, including Yakovenko and Gokal, and another 12.5% were allocated to the Solana Foundation, a non-profit organization headquartered in Zug, Switzerland "dedicated to the decentralization, growth, and security of the Solana network."  In fact, on April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement of the Solana Foundation's formation, Solana Labs stated that "[t]he Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol."

136.    Solana Labs' two original founders have worked for the Solana Foundation.  Gokal currently serves as a member of the Solana Foundation Council.  And Yakovenko was a member and President of the Solana Foundation Council from its founding until December 2021, when he stepped down to focus on his work at Solana Labs.

137.    In public statements on its website and social media pages, including statements made and available during the period when SOL was available to trade on the Coinbase Platform, Solana specified its expertise in developing blockchain networks and described the efforts Solana and its founders had made and would continue to make to develop the Solana blockchain protocol and attract users to the technology, which, again, required those utilizing the technology to demand some amount of SOL.

138.    Solana Labs undertook other promotional efforts to increase participation in its

network and thus demand for SOL, including with: (a) a Solana podcast of which there have been at

least 90 episodes since July 2019, with interviews of key Solana Labs management and other key

personnel, including Yakovenko; (b) a YouTube channel with over 37,000 subscribers; and (c)

dedicated Telegram, Twitter, Reddit, Solana Forums, Discord, GitHub, Meetup, and Weibo

channels, with links to each available on Solana's website.

139.    These promotional statements that Solana Labs made in these fora with respect to

SOL and Solana Labs' efforts to increase demand and value for SOL included, for example:

- A July 28, 2019 post on Solana Labs' Medium blog in which Yakovenko stated that
  "Solana … supports upwards of 50,000 TPS" (transactions per second) "making it
  the most performant blockchain and the world's first web-scale decentralized
  network" and that the "Solana team—comprised of pioneering technologists from
  [several high-profile technology companies]—has focused on building the tech
  required for Solana to function with these groundbreaking performance standards";

- Solana's website statement that "Solana is engineered for widespread, mainstream
  use by being energy efficient, lightning fast, and extremely inexpensive" and that
  "[m]any of the core Solana builders, like co-founder Anatoly Yakovenko, have a
  background in building cell phone networks," which "means that they are singularly
  focused on building for scalability (the ability to grow) and efficiency (the ability to
  get the most information across with the least amount of resources)";

- An April 14, 2021 post on gemini.com in which Yakovenko touted the Solana
  network's ability to "support a theoretical peak capacity of 65,000 transactions per
  second, currently" ("around 10,000 times faster than Bitcoin, 4,000 times faster than
  Ethereum, and 35 times faster than Ripple—even around 2.5 times faster than Visa")
  and projecting that such speed would "doubl[e] in capacity every two years with
  improvements in hardware and bandwidth"; and

- A December 23, 2022 post on Solana's website marketing various "upgrades" that
  Solana and its engineers would undertake, including "turbine optimizations"
  introduced by the "core engineering team," which Yakovenko described as the
  "coolest piece of technology that we built that nobody knows about."

140.    Further, Solana Labs markets that it "burns" (or destroys) SOL tokens as part of a

"deflationary model."  As Yakovenko explained in an April 14, 2021 article entitled "Solana (SOL):

Scaling Crypto to the Masses" posted on gemini.com, "Solana transaction fees are paid in SOL and

burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price."  As explained on the Solana website, since the Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event."  This marketed burning of SOL as part of the Solana network's "deflationary mechanism" has led investors reasonably to view their purchase of SOL as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of SOL.

### ii. ADA

141.    "ADA" is the native token of the Cardano blockchain.  The Cardano blockchain was created in 2015 by an Ethereum co-founder, Charles Hoskinson, and an Ethereum operations manager, Jeremy Wood.  As described on Cardano's website, the Cardano blockchain protocol is built on its own proof-of-stake consensus protocol called Ouroboros, which is purportedly energy efficient.  Hoskinson and Wood created ADA and purported to limit the supply of ADA to 45 billion.  From 2015 to 2017, Input Output Hong Kong ("IOHK"), a company founded by Hoskinson and Wood, conducted a token sale during which they sold approximately 25.9 billion ADA in exchange for bitcoin, at what equates to an average price of $0.0024 per token, raising approximately $62 million for Cardano.

142.    Today, three entities are responsible for Cardano: (1) the Cardano Foundation, a Swiss entity that is the legal custodian of the Cardano protocol and owner of its brand; (2) IOHK, an engineering company controlled by Hoskinson and Wood responsible for designing, building, and maintaining the Cardano blockchain; and (3) Emurgo, an entity with offices in New York and California that, according to its website, is "essentially the for-profit arm of Cardano," endeavoring "to advance the platform and drive adoption through commercial ventures."  As explained on the Cardano website, "IOHK develops the technology, the Cardano Foundation is responsible for

supervising development and promoting Cardano, while Emurgo drives commercial adoptions."

These three entities collectively received 5.2 billion ADA following the initial mining of ADA, or

approximately 16.7% of the initial token supply of 31.1 billion ADA.

143.    These three entities have used the proceeds from ADA sales to fund the

development, marketing, business operations, and growth of the Cardano protocol.  For example,

investor funds were used to enact the Cardano Roadmap created by IOHK—specifically, to develop

each of the Cardano development "eras" as shown in the following screenshot from the Cardano

website:



144.    ADA has been available for buying, selling, and trading on the Coinbase Platform

since approximately March 2021.

145.    The information publicly disseminated by Cardano, IOHK, and Emurgo—including

since the initial sales of ADA—have led ADA holders, including those who purchased ADA since

March 2021, reasonably to view ADA as an investment in and expect to profit from the Cardano

Foundation's, IOHK's, and Emurgo's efforts to grow the Cardano platform, which, in turn, would

increase the demand for and the value of ADA.

146.    In public statements on Twitter and other social media, as well as on their respective

websites, including statements made and available during the period when ADA was available to

trade on the Coinbase Platform, the Cardano Foundation, IOHK, and Emurgo have specified their

expertise in developing blockchain networks and described the efforts they have made and will continue to make to develop the Cardano protocol and blockchain and attract users to the technology, including but not limited to: (a) an announcement by IOHK in or around September 2021 about the creation of smart contracts on the protocol, which supposedly would "pav[e] the way" for additional demand for the blockchain protocol; (b) a blog post by IOHK in or around November 2022 describing its efforts to introduce "innovations, new functionality, and new features" to the blockchain; and (c) a blog post by IOHK on or around November 17, 2022 touting ADA being "hosted on more than 30 cryptocurrency exchanges," and outlining IOHK's plans to "improv[e] the underlying performance of the Cardano network to better support growth and adoption of thousands of applications with high transaction volumes" while giving specific examples of how this would be achieved.

### iii.   MATIC

147.     "MATIC" is the native token of the Polygon blockchain.  Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun.  Since its creation, Polygon's founders have remained actively involved with Polygon through "Polygon Labs" ("Polygon"), an entity they also founded for "the development and growth of Polygon."

148.     According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

149.     Polygon issued a fixed supply of 10 billion MATIC tokens.  MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a validator,

from delegating their MATIC to other validators in return for a portion of the fees collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

150.     According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives … of the Matic Network [now Polygon] … [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

151.     In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC.  In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO"— essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com crypto asset trading platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

152.     The information Polygon publicly disseminated has led MATIC holders, including those who purchased MATIC since March 2021, reasonably to expect to profit from Polygon's efforts to grow the Polygon protocol, which, in turn, would increase the demand for and the value of MATIC.

153.     For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

154.     Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network. On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture

capital firms.  Polygon reported, "[w]ith this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

155.    Polygon has also reported fundraising from other marquee and celebrity investors.

156.    Polygon also stated that it would reserve roughly 67% of MATIC to support the Polygon ecosystem, the Foundation, and network operations.  Another 20% of MATIC was further reserved to compensate the Polygon team members and advisors, aligning their fortunes with investors' with respect to MATIC.

157.    In addition, the Polygon blog provides frequent updates on network growth and developments at Polygon, including weekly statistics on active wallets and transactions per day, as well as financial metrics such as revenue per day and total network revenue.

158.    Polygon has also routinely announced when crypto asset trading platforms have made MATIC available for trading, such as the Coinbase Platform in or around March 2021.

159.    Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways.  For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



160.    Also, on November 3, 2022, Nailwal stated on Twitter: "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH.  No other project comes

even close."  In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described

part of "what's different about Polygon" as: "[w]e are as a team very, very committed, we have a

very hands on approach with all the projects out there, we are working around the clock on

adoption and that is why we are currently the most adopted scaling infrastructure platform."

Currently, the founders of Polygon continue to promote the platform through various social media.

For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown

exponentially.  To continue on this path of stupendous growth we have crystallized our strategy for

the next 5 yrs to drive mass adoption of web3 by scaling Ethereum.  Our treasury remains healthy

with a balance of over $250 million and over 1.9 billion MATIC."

161.    Since January 2022, Polygon has also marketed that it "burns" MATIC tokens

accumulated as fees, indicating that the total supply of MATIC would decrease.  For example, in

January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog

post titled, "Burn, MATIC, Burn!"  As Polygon explained in another blog post on its website around

the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number

of available tokens will have a deflationary effect."  As of March 28, 2023, Polygon had burned

approximately 9.6 million MATIC tokens.  This marketed burning of MATIC as part of the

Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of

MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the

supply and therefore increase the price of MATIC

     iv. **FIL**

162.    "FIL" is the native crypto asset of the Filecoin network.  The Filecoin network is an

open-source data storage network that runs on a blockchain, created by Protocol Labs, Inc.

("Protocol Labs"), which describes itself as a research, development, and deployment lab for

network protocols.

163.    In or around July 2014, Protocol Labs and its founder and CEO, Juan Batiz-Benet ("Benet"), published a whitepaper entitled "Filecoin: A Cryptocurrency Operated File Storage Network," which Protocol Labs updated approximately three years later, setting forth a "path toward the construction of the Filecoin network."

164.    In 2017, Protocol Labs conducted a two-part token sale: first, an "Advisor Sale" for advisors of Protocol Labs and Filecoin, and, second, a "Public Sale" for the broader community, but supposedly limited to "accredited investors" (collectively, "2017 FIL Sales").  Investors could use U.S. Dollars and certain crypto assets to buy Filecoin.

165.    Protocol Labs ran the Advisor Sale from July 21 to July 24, 2017, and sold FIL to approximately 150 investors, which included individuals, institutional investors, trusts, and established syndicate investors.  These investors paid $.075 per FIL and were offered "vesting/discount choices of 1-3 years and 0-30% discount."

166.    In the August 2017 Public Sale, the FIL price was set based on a "public sale price function," described as "price = max ($1, amountRaised / $40,000,000) USD/FIL" and increased thereafter based on the amount sold.  For the Public Sale, like the Advisor Sale, investors received discounted pricing for agreeing to longer vesting periods.

167.    In connection with the 2017 FIL Sales, which were effected pursuant to SAFTs, Protocol Labs filed forms with the SEC claiming an exemption from registration for the offerings of FIL pursuant to SAFTs.

168.    Protocol Labs reported that they raised more than $205 million for the development of Filecoin in the 2017 FIL Sales, which value increased in the days following the close of the sale based on the fluctuation in value of certain invested crypto assets.

169.    Protocol Labs pooled investment proceeds from the token sales to fund the development and growth of the Filecoin network.

170.     On October 15, 2020, Protocol Labs launched the mainnet (a publicly accessible version of the network) of the Filecoin network, and FIL began being minted and distributed. There was a stated maximum circulating supply of 2,000,000,000 FIL, meaning that no more than 2 billion FIL will ever be created, with issuance aligning with network growth.

171.     FIL has been available for buying, selling, and trading on the Coinbase Platform since approximately December 2020.

172.     Since the October 2020 launch, Protocol Labs has continued to use funds from the sale of FIL to develop, expand, and promote the Filecoin network.

173.     The information Protocol Labs publicly disseminated, including after the initial FIL sales, has led FIL holders, including those who have purchased FIL since December 2020, reasonably to view FIL as an investment in and to expect to profit from Protocol Lab's efforts to grow its protocol, which, in turn, would increase the demand for and the value of FIL.

174.     The Protocol Labs Filecoin team posted about the sale: "The Filecoin Sale was a critical milestone in the lifetime of the project.  It raised the funding necessary to grow our team, to create the network, and build all the software tools needed to operate and use the network."  They further stated, "Filecoin success will reward the investment of supporters like you by simultaneously driving down the cost of storage and increasing the value of the Filecoin tokens that incentivize miners to provide storage.  We're thrilled by your widespread, enthusiastic interest and look forward to staying engaged and including you in our success."

175.     In addition, Benet and the Filecoin team released a document titled, "Filecoin Token Sale Economics," that provided information about the 2017 FIL Sales and the Filecoin network, stating:

> Protocol Labs requires significant funding to develop, launch, and grow the Filecoin network.  We must develop all the software required: the mining software, the client software, user interfaces and apps, network infrastructure and monitoring, software that third-party

wallets and exchanges need to support Filecoin, integrations with other data storage software, tooling for web application and dapps to use Filecoin, and much more.   We must deploy the network, facilitate its growth to large scale, market to and onboard miners and clients, bring key partners into the eco system, and much more.

176.   That document also stated that FIL was to be distributed to groups "critical to the network's creation, development, growth, and maintenance" with an allocation, described as follows, that tied Protocol Labs' profits to those of FIL holders:

- 70% to Filecoin miners – "For providing data storage service, maintaining the blockchain, distributing data, running contracts, and more."

- 15% to Protocol Labs – "For research, engineering, deployment, business development, marketing, distribution, and more."

- 10% to Investors – "For funding network development, business development, partnerships, support, and more."

- 5% to a "Filecoin Foundation" – "For long-term network governance, partner support, academic grants, public works, community building, etc."

177.   The "Filecoin Token Sale Economics" document further explained: "We have structured the token sale to reward a large group of people that can help us build the [Filecoin] network, by selling Filecoin at what we think is a much lower price than it will be worth some day (caveat: as with any risky investment of course we cannot make guarantees or predictions)."  As described in a July 2017 blog post, the Advisor Sale in particular was intended, in part, to secure "long-term commitment to and alignment with the Filecoin network" and "to reward their contributions so far and/or future potential with the capability to invest early."

178.   The "Filecoin Token Sale Economics" and another document made available to investors ahead of the 2017 FIL Sales, the Filecoin Primer, stated that Filecoin purchasers would be able to sell the token on crypto asset trading platforms in the future.

179.   The Filecoin Primer also touted "Large Scale Value Creation," explaining:  Filecoin Network "will create value in a number of ways, and the total impact of the network can be

tremendous.  Growth of the network will drive demand for the token.  The more value created by the Filecoin Network, the more things people and organizations spend Filecoin on, and the greater the value and worth of the token."

180.    Similarly, a Confidential Private Placement Offering Memorandum in connection with the 2017 FIL Sales stated: "[a] significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to build-out a decentralized storage network, powered by a blockchain and the Filecoin protocol token."

181.    Moreover, both before and after the 2017 FIL Sales, Protocols Labs consistently touted its expertise and ability, and led the work to develop the Filecoin network for launch.  In an August 2, 2017 Q&A, Benet stated: "Over the last few years, Protocol Labs has proved to the world that we know how to deploy capital to create valuable projects, valuable technology, and valuable software … We know how to deploy capital effectively.  We have great plans for the Filecoin network and its surrounding ecosystem, at many levels of funding.  We plan to deploy 100s of millions of dollars over the next few years to make Filecoin the world's best storage network, not just the best decentralized storage network."

182.    Benet also addressed the funding needs, pricing, and economics of FIL in that August 2017 Q&A, stating: "[s]ince we think and are working for Filecoin to be worth a lot more in the future, then we naturally want to sell it at the highest price the market will bear.  Subject to reason, if we can sell it higher, then we should."

183.    Benet also explained publicly that Filecoin needed funding in order to be able to compete: "Our (collective) competition is the massive, centralized cloud storage companies.  We are talking about the tech titans – AWS, Google Cloud, and Microsoft Azure – the three biggest companies in the world have cloud businesses with BILLIONS of dollars in *revenues*, not just funding.  In order to put up this fight, we will need *significant* resources.  Yes, resources in the

hundreds of millions will empower us to develop Filecoin as fast as we can, as well as the dozens of other tools and services required to make Filecoin a service and ecosystem remotely close to competitive with the centralized counterparts."

184.    The economic structure of FIL distribution and public statements about that structure further invited investors to view FIL as an investment in Protocol Labs' and the Filecoin Foundation's efforts and to conclude that FIL investors' interests were aligned with those of FIL's developers.  Specifically, the tokens allocated to Protocol Labs and Filecoin Foundation were to vest over a six-year period beginning after the network launch.  As stated in the "Filecoin Token Sale Economics" document, Protocol Labs and the Filecoin Foundation "aim[ed] to make Filecoin massively valuable in the long-term, and we want to attract investors similarly interested in long-term value creation and growth" and "[v]esting creates long-term alignment" because "Protocol Labs and the Filecoin Foundation are deeply committed for the long-term, and 6-year vesting boldly proves that to all other network participants."

185.    Filecoin has also implemented a process to burn FIL tokens, thereby reducing the FIL supply.  As with the "burn" mechanisms of other crypto asset securities set forth herein, this marketed burning of FIL as part of Filecoin's economic features has led investors reasonably to view their purchase of FIL as having the potential for profit.

186.    Following the release of the protocol in October 2020, Protocol Labs continued to be heavily involved in the development and promotion of the Filecoin network and its pursuit of success.

187.    In late 2021, Raul Kripalani, a Protocol Labs Researcher, introduced the "Filecoin Virtual Machine" ("FVM"), described as a "core pillar in the next evolution of the decentralized storage ecosystem."  On November 6, 2022, Kripalani tweeted, "These were amazing weeks for the #FVM + team.  Momentum and expectation are through the roof.  100s of teams building on the

Wallaby testnet.  Many promising @Filecoin apps to launch on mainnet the minute FEVM kicks in. Pumped to be building the future of $FIL with these rockstars!"  The Protocol Labs Twitter account has posted updates regarding FVM, including through April 2023.

188.    The Protocol Labs team has continued to release "roadmaps" or "master plans," available online and through recorded video presentations, that showcase future development plans for the Filecoin network.  For example, in September 2022, Benet delivered the keynote address at FIL-Singapore, which "gathered builders from around the world to build, share experiences, and hear from other community members on what's next for the network."  In his address, Benet presented "The Filecoin Masterplan" which included building the world's largest decentralized storage network.

189.    In a February 3, 2023 Protocol Labs Blog post addressing the impact of the "crypto winter" economic downturn, Benet touted the Filecoin team's supposed successes to date in growing the Filecoin ecosystem, stating: "[w]e've achieved a tremendous amount in the past several years - from Filecoin launch; to scaling IPFS to millions of users; building one of the fastest growing developer ecosystems; supporting 300+ companies across the network; growing movements like SBS and FTC; launching testnets for FVM, Saturn, SpaceNet, and Bacalhau just last quarter; and much more."

### v.    SAND

190.    "SAND" was created on the Ethereum blockchain as the native token of the Sandbox platform, a virtual gaming platform first released in 2012 by Pixowl, Inc. ("Pixowl") as a game for download on mobile phones.  Pixowl, which is headquartered in San Francisco, was founded in 2011 by Arthur Madrid ("Madrid") and Sebastien Borget ("Borget").  In 2018, Animoca Brands, Inc. ("Animoca"), headquartered in Hong Kong, acquired Pixowl and announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology.  After

Pixowl's acquisition, the Sandbox's intellectual property, along with the rest of Pixowl's assets, were transferred to TSB Gaming Ltd ("TSB"), a wholly owned subsidiary of Animoca.  Madrid is CEO of TSB, and Borget is the COO.

191.    According to Sandbox's website, SAND is required to access the Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform.

192.    On or about May 23, 2019, before the minting of SAND in July 2019, Animoca raised approximately $2.5 million in cash and crypto assets through TSB via the issuance of Simple Agreements for Future Equity ("SAFEs") and SAND tokens, to "fund the development of the upcoming blockchain version of The Sandbox."  According to Animoca's May 23, 2019 press release, the majority of investors allocated their investment to the purchase of both SAND tokens and future equity in TSB via the SAFE agreements (in the amount of $2 million), while some investors allocated their investment exclusively to the purchase of SAND tokens ($500,000).  Per the release, the funding round was led by Hashed, for approximately $1 million, and also included a number of other crypto venture capital investors.

193.    TSB then minted a total supply of 3 billion SAND on the Ethereum blockchain in or around July 2019 and offered and sold SAND through purportedly private sales and in an IEO that raised $3 million on the Binance.com crypto asset trading platform starting August 13, 2020.

194.    SAND has been available for buying, selling, and trading on the Coinbase Platform since approximately May 2022.

195.    The information TSB publicly disseminated has led SAND holders, including those who have purchased SAND since May 2022, reasonably to view SAND as an investment in and to expect to profit from TSB's efforts to grow the Sandbox protocol, which, in turn, would increase the demand for and the value of SAND.

196.     On its blog posts announcing "exchange listings," Sandbox touted its efforts to obtain "listings" and the SAND token's liquidity in the secondary market.  For example, in a September 21, 2021 Medium blog post, Sandbox stated that "$SAND is listed on over 60 global cryptocurrency exchanges, including a dozen of the top exchanges by market capitalization."

197.     In addition, the Sandbox stated that it would pool the proceeds from the private token sales and the IEO to develop and promote use of the platform.  For example, the May 23, 2019 press release stated: "[t]he funds raised through this transaction will be used to grow the development team and infrastructure for the [Sandbox] Game Platform, support marketing efforts through the acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs."  The Sandbox Whitepaper similarly described identical uses for the $3 million in funds intended to be raised during the IEO.

198.     Moreover, according to the Sandbox Whitepaper, of the 3 billion SAND tokens that were initially minted, 19% were to be allocated to the Sandbox founders and team, and another 25.8% were to be allocated to the Company Reserve.

199.     In addition, the Sandbox's Medium blog post on July 25, 2019 stated that "an interesting feature of [the $SAND] token is that it can accrue in value over time, due to the fact that it is scarce.  There will be a limited supply of 3 billion units of $SAND available."

200.     Moreover, TSB stated publicly that it would take steps to manage the market for SAND, including the SAND Whitepaper stating that the Sandbox team controls the supply of SAND tokens and has implemented a "controllable supply mechanism, such as purchasing SAND from multiple exchanges," and that "while the total supply of SAND is fixed, the initial amount of SAND offered will provide a scarcity effect reducing the SAND available per capita and therefore fostering demand."

201.    Additionally, in many instances, Animoca has touted the backgrounds of Pixowl, TSB, and the Sandbox core members, including Madrid and Borget, in describing the success and future development of the Sandbox:

- After the acquisition of Pixowl, Yat Siu, the co-founder and director of Animoca, stated in a press release, dated August 27, 2018 (the "2018 Press Release") that "Pixowl's experienced developers will significantly increase our development capabilities. Its founders are highly respected game industry veterans who have developed multimillion dollar franchises. We believe the blockchain version of *The Sandbox* has incredible potential … We look forward to utilising the many opportunities for growth conferred by this acquisition."

- In the 2018 Press Release, Madrid also commented: "'Animoca Brands is a perfect fit for Pixowl and we are happy to add our brand relationships to its portfolio while accelerating growth for our key IP, *The Sandbox* …"

- The 2018 Press Release also touted that "Ed Fries, the creator of Microsoft Game Studios and co-founder of the Xbox project, is a special advisor to *The Sandbox's* original game developer Pixowl" and will therefore continue to serve on the advisory team.

- The Sandbox Whitepaper further provided: "We have a strong product roadmap ahead and a top team to execute a strong vision to build a unique virtual world gaming platform where players can build, own, and monetize their gaming experiences and spread the power of blockchain as the lead technology in the gaming industry."

202.    Moreover, the Sandbox Whitepaper describes that the role of the "Sandbox Foundation" is to support the ecosystem of the Sandbox by, among other things, offering grants to incentivize high quality content and game production on the platform and further notes that the "overall valuation of the metaverse grows through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games."  The Sandbox's Gitbook also notes that the Sandbox Foundation has, among other things, (a) supported play-to-earn tournaments and cross-gaming to encourage the broader adoption of SAND and (b) supported marketing activities contributing to the growth of awareness about NFTs, Metaverse and SAND adoption, including co-marketing with exchanges and influencers.

vi.    **AXS**

203.    Axie Infinity Shards ("AXS") are Ethereum tokens that are native to the Axie Infinity ("Axie") game, a blockchain game that allows players to interact in a virtual world through digital pets called "Axies."

204.    Axie was created by Sky Mavis PTE LTD ("Sky Mavis") and launched in 2018.  The Sky Mavis team has 40 full-time employees, which include CEO Trung Nguyen and COO Aleksander Leonard Larsen, who are part of the founding team responsible for key decisions regarding Axie, such as product development, marketing, digital design, and software engineering.

205.    Players of the Axie game can earn AXS for successfully playing the Axie game and can use AXS to make in-game purchases.  AXS can also be staked through Axie.  The total AXS token supply is 270 million with over 100 million in circulation.

206.    In 2020, Sky Mavis raised about $864,000 in a purportedly private sale of AXS tokens to "strategic investors."  That same year, Sky Mavis conducted a public sale of AXS, resulting in the distribution of 29.7 million AXS tokens, raising $2.9 million for Axie.  The AXS tokens sold to "strategic investors" were offered at a 20 percent discount to those sold in the public offering and were subject to a quarterly unlocking schedule over a two-year period.

207.    AXS has been available for buying, selling, and trading on the Coinbase Platform since approximately August 2021.

208.    The information Sky Mavis publicly disseminated has led AXS holders, including those who have purchased AXS since August 2021, reasonably to view AXS as an investment in and to expect to profit from Sky Mavis's efforts to grow the Axie protocol, which, in turn, would increase the demand for and the value of AXS.

209.    For example, Sky Mavis explained publicly that funds raised in the AXS 2020 offerings were pooled and used to develop and improve the Axie platform.  An October 26, 2020

56

article explains that the "team has used funds raised according to the allocations below: 85% [d]evelopmental expenses; 10% [a]dministrative costs; 5% [b]usiness development and marketing."

210.    Also, on November 19, 2020, the Axie Twitter account stated: "Today, we're proud to share more info on the $AXS strategic sale!  The participants will help open amazing new doors. The capital will help us scale the team so we can better deliver on the gameplay and feature updates you're all patiently waiting for!"  To keep the Sky Mavis team "incentivized to keep building after a successful token sale," 21 percent of the total AXS tokens—56.7 million AXS—were issued to these individuals, which will be gradually unlocked over a 4.5 year period to ensure that "the team, community and investors have aligned incentives."

211.    An Axie whitepaper further explained that the Sky Mavis team will use its experience and efforts to develop and grow the Axie game.  For example, it lists the Axie founding team, their roles, and background experience and touts that "we've established a core team to lead product development and oversee most decisions related to the progress of the game.  This allows us to build and iterate quickly towards product-market fit."

212.    At the time of the initial sale of AXS, the Axie platform was not complete, and several features of the platform have been implemented since 2020 and others are still in the development phase today.  Further, the whitepaper explicitly set growth goals in terms of daily average users of Axie Infinity and average weekly growth rates, that if "not met by the end of 2023, Sky Mavis will lead the formation of a steering committee or similar vehicle to discuss a path forward."

### vii.    CHZ

213.    CHZ is a token on the Ethereum blockchain, advertised as the "native digital token for the Chiliz sports & entertainment ecosystem currently powering Socios.com," a sports fan engagement platform built on the Chiliz blockchain.  The Chiliz blockchain was introduced in early

2018 by protocol founder and current CEO Alexandre Dreyfus, under a Maltese entity named HX Entertainment Ltd.  The Chiliz whitepaper describes the Chiliz protocol as "a platform where fans get a direct Vote in their favorite sports organizations, connect and help fund new sports and esports entities."

214.    The CHZ token purportedly allows "fans to acquire branded Fan Tokens from any team or organization partnered with the Socios.com platform and enact their voting rights as their fan influencers."  Examples of voting polls that allow holders of "Fan Tokens" (purchased with CHZ tokens) to influence team decisions with their vote include selecting player warm-up apparel and choosing team pennant designs.

215.    According to the Chiliz whitepaper dated November 2018, during the second quarter of 2018 the Chiliz team completed fund raising of approximately $66 million in exchange for approximately 3 billion CHZ in "Chiliz's Token Generation Event" purportedly "executed via private placement."  CHZ were originally minted in 2018, and there is a maximum supply of 8,888,888,888 CHZ tokens. However, it was not until the second quarter of 2019 that Chiliz made "Fan Tokens" on Socios.com available for purchase with CHZ.

216.    CHZ has been available for buying, selling, and trading on the Coinbase Platform since approximately June 2021.

217.    From the initial "private" offering of CHZ tokens in 2018, through public statements made in 2023, the Chiliz team has disseminated information and made statements, including statements made and available during the period when CHZ was available to trade on the Coinbase Platform, that have led CHZ holders reasonably to view CHZ as an investment in and to expect profits from the team's efforts to develop, expand, and grow the platform, which, in turn, would increase the demand for and the value of CHZ.

218.    For example, the Chiliz website, www.chiliz.com, introduces the Chiliz team, which is "comprised of nearly 350+ cross-industry professionals across 27 different nationalities and is constantly growing."  The Chiliz team operates both the Chiliz protocol and Socios.com.

219.    In fact, the whitepaper and other public statements by Chiliz also identify several members of the Chiliz leadership team, the bios of these "Leadership" or "Advisory" teams, and their past entrepreneurial and technology experiences and successes.  The Chiliz website touts that the Chiliz team is "building the web3 infrastructure for sports and entertainment."

220.    The Chiliz team also stated publicly that it would use the proceeds from CHZ sales to fund the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol.  For example, the whitepaper explains that funding raised through token sales would be allocated as follows: 58% to Operational Expenses ("A majority of funds will be passed on from the Issuer to an affiliate to develop the Socios.com platform, secure partnerships & realize the platform's digital infrastructure."); 20% to User Acquisition ("Funds will be used to acquire new users for the Socios.com platform and grow engagement in its voting utilities."); 10% to Corporate Structuring; 5% to Security and Legal; and 7% to Ecosystem Support.

221.    Moreover, 5% and 3% of the total CHZ tokens distributed were allocated to the Chiliz team and an advisory board, respectively—the two groups responsible for the creation and development of the platform—aligning the fortunes of management with those of CHZ investors.

222.    The CHZ whitepaper further makes evident the mutuality of interest (and the alignment of fortunes) between promoter and investor when it cautions that "if the value of BTC, ETH and/or Chiliz fluctuates, the Company may not be able to fund development to the extent necessary, or may not be able to develop or maintain the Socios.com Platform in the manner that it intended."

223.    The Chiliz team also frequently touts the growth potential in the sports and esports industry that it seeks to monetize through the Chiliz team's efforts to expand its platform.  For example, the CHZ whitepaper highlighted the size of the gaming industry and potential for esports revenue as well as the use of CHZ to drive and monetize fan engagement for traditional sports.  In reference to the June 2018 "Token Generation Event," the whitepaper stated:  "[w]e are no longer pursuing fundraising measures, instead focusing our efforts on leveraging accrued resources to realize the Chiliz/Socios.com vision."  The whitepaper continued:  "[w]ith foundations set, Chiliz and the Socios.com platform it powers will look to use Football as a benchmark to expand our Tokenized Fan Voting model to other sports in order to cater to a global marketplace where different competitive verticals are dominant – prime examples of diversification are Cricket in the Indian market, Baseball for Japan, and the like."

224.    Public statements that the Chiliz team and its executives made indicate that CHZ tokens are primarily deployed for purchasing "Fan Tokens" on Socios.com and that the demand for and price of CHZ tokens is directly reliant on demand for Socios fan tokens and their benefits.

225.    The Chiliz team also made other public statements that emphasize the economic reality inherent in the design of the Chiliz blockchain's reliance on CHZ to function—that as Chiliz is able to grow its platform by partnering with more teams, and those teams grant attractive opportunities to token holders, the value of the respective "Fan Tokens" will increase, and in turn, the value of CHZ will also increase.

226.    For instance, the FAQ section located on the Chiliz website, which was publicly available from at least December 2021 to December 2022, provided:  "Demand for the Chiliz token will increase as more esports teams, leagues and game titles are added to the platform, and as more fans want voting rights."

227.     Chiliz' CEO has echoed this same sentiment in other public statements.  In February 2020, he stated:  "Tens of thousands of regular football fans have already started to use crypto, purchasing $CHZ in order to buy Fan Tokens, and in time we expect millions more to do so as we continue to add more partners to the platform and increase our reach and grow the brand."  In March 2021, he tweeted:  "Monthly Active Users (MAU) of the @socios app, powered by $CHZ.  You can see how the demand for $CHZ (exchanges, Etherscan wallets, …) exploded.  Everything is correlated.  We are building a mainstream consumer-facing product, powered by @chiliz blockchain."  And in February 2023, he tweeted:  "I'm biased but I'm very confident that the Chiliz ecosystem is gonna bring a lot of value to fans, sports properties, and innovation in general.  Long journey ahead of us. $CHZ."

228.     The Chiliz team has also made efforts to drive secondary trading of CHZ by offering the token on crypto asset trading platforms.  For example, an earlier version of the whitepaper highlighted "ongoing discussions" to offer CHZ on trading platforms across Asia, and the Chiliz website features a "Listing Content and Q&A" document reflecting a proposal to offer CHZ on the Binance DEX platform.

229.     The Chiliz team also tells investors that it plans to engage in "burning" (or destroying) CHZ tokens as a mechanism to support the price of CHZ by reducing their total supply.  For instance, in 2020, the Chiliz team announced through its Fan Token exchange that it would burn 20% received in net trading fees, 10% of proceeds from "Fan Token" offering sales, and 20% of net proceeds of NFT & Collectibles.  As with other crypto asset securities set forth herein, this marketed burning of CHZ has led investors reasonably to view their purchase of CHZ as having the potential for profit.

### viii.    FLOW

230.    FLOW is the native token for the Flow blockchain, a purportedly developer-friendly blockchain called Flow that Dapper Labs, an entity incorporated in Canada, developed and eventually launched in 2020.  Flow was purportedly designed as "the foundation for a new generation of games, applications, and the digital assets that power them."

231.    The Flow website boasts that the Flow proof-of-stake blockchain is designed in a manner that makes it different, faster, and more efficient than other blockchain networks due to, among other things, its "multi-node architecture," which separates the functions traditionally performed by one validator (collection, consensus, execution, and verification) across multiple validator nodes.

232.    Between 2019 and 2020, Dapper Labs raised approximately $24.6 million in "pre-launch" funding in two purportedly private fundraising rounds, including from Coinbase Ventures (the investment/venture capital arm of CGI) and other venture capital firms, in return for convertible notes that were expected to convert to FLOW tokens, subject to 24-month lock-up periods during which they could not be transferred, sold, or used in transactions.

233.    Subsequently, Dapper Labs held another token sale consisting of two phases which raised approximately $19 million.  Additionally, Dapper Labs conducted other sales of FLOW for which it filed forms with the SEC claiming that the sales were exempt from registration under Rule 506(b) of Regulation D, including one on September 12, 2019 covering sales to 31 investors in the total amount of approximately $11.2 million, and two others on December 9 and 15, 2021, each for sales to a single investor in the amount of approximately $6.47 million and $23 million, respectively.

234.    Since approximately May 2022, FLOW has been available for buying, selling, and trading on the Coinbase Platform.

235.    According to the FAQ page on the Flow website: "[FLOW] is the exclusive token

for staking, delegating, paying transaction fees, and paying storage fees. It is also the primary token used for buying, selling, and trading assets and experiences on Flow." Approximately 1.25 billion FLOW tokens were initially created, and, as of May 2023, approximately 72% of all FLOW is in circulation.

236. Given that FLOW are required to interact with the Flow blockchain, the demand for and the value of the FLOW token would increase as a result of Dapper Labs' and the Flow development team's efforts to develop the Flow blockchain network and increase demand for its features and, thus, for the FLOW token itself. The increase in value of FLOW would inure to all FLOW holders—investors and the Dapper Labs/Flow development team alike. Dapper Labs and the Flow development team have promoted this dynamic through the publicly available information they disseminated.

237. The information Dapper Labs and the Flow development team publicly disseminated has led FLOW holders, including those who purchased FLOW since May 2022, reasonably to view FLOW as an investment in and to expect to profit from Dapper Labs' and the Flow development team's efforts to grow the Flow protocol, which, in turn, would increase the demand for and the value of FLOW.

238. For example, Flow's website stated that of the total FLOW supply, Dapper Labs and the Flow development team collectively received 38%; pre-launch backers and participants in the 2020 token sale received 30%; and 32% was set aside for "ecosystem development" and remains under the control of Flow's management. This last group of tokens, according to the website, are used to "bootstrap adoption and reward early participants in the network."

239.    Below is a graph depicting the initial or "Genesis Block" token distribution of

FLOW:



240.    This stated distribution of FLOW tied the fortunes of FLOW holders to each other

and to the fortunes of the Flow development team.

241.    Flow's website further highlights its development team and its ability to grow and

develop the Flow blockchain and the value of the FLOW token.  For example, it states that Flow

was "[d]eveloped by the team behind some of the most successful crypto applications on the

Ethereum network" and "Flow has been developed and brought to market by one of the most

innovative and interdisciplinary teams in the world."

242.    Indeed, according to the Flow website, since the launch of the Flow blockchain in or

around December 2020, due to Dapper Labs' and others' efforts, "Flow's ecosystem has grown

from a small group of enthusiasts to a global community of over 10,000 developers, over 17 million

user accounts, and over 2 million monthly active wallets."

243.     In addition, in its announcement of the Flow blockchain in or around September 2019, Dapper Labs highlighted its involvement with other successful crypto projects and funding support it had received from various investors.  And, at a 2022 town hall, Dapper Labs and the Flow development team explained planned development activities for 2023, including continued development to support the consumer-scale adoption of blockchain technology.

244.     Further, the Flow website describes the FLOW token as a "low-inflation" asset— meaning that the only new tokens that would purportedly be issued would be distributed to stakers of the token so that FLOW investors' holdings would not be diluted.

### ix.     ICP

245.     "ICP," previously called "DNF" and rebranded as ICP in 2021, is the native token of the "Internet Computer Protocol," a blockchain-based protocol, conceived in 2016 by Swiss not-for-profit DFINITY Foundation ("DFINITY"), which has offices in Palo Alto and San Francisco.

246.     DFINITY describes the Internet Computer as a set of protocols that allow independent data centers around the world to band together and offer a decentralized alternative to the current centralized internet cloud providers and ICP as the token designed to interact with these systems, including to provide for processing power, data storage, and network bandwidth.

247.     In an April 8, 2017 Medium post, DFINITY's founder, Dominic Williams, referred to the Internet Computer as an "intelligent decentralized cloud."  At a 2020 Blockchain conference, he further touted the protocol as a more efficient replacement for big tech cloud services, servers, databases, firewalls, VPNs and other services.

248.     Between 2017 and 2018, DFINITY engaged in three funding rounds: (1) a "Seed" round in 2017; (2) a "Strategic" round in early 2018; and (3) a "Presale" round in late 2018.  In these rounds, DFINITY raised the equivalent of approximately $170 million by selling rights to receive future ICP tokens, which did not yet exist, for fiat currencies, ether (ETH) and bitcoin (BTC).

According to a post released by DFINITY on its website on or about May 10, 2021, when the network launched, the rights to "access" the ICP received in the seed round funds were staggered from 0 to 90-plus days.  On or about November 19, 2022, Williams tweeted that purchasers in the initial Seed fundraiser "made out like bandits" when they purchased ICP for $0.03.

249.    ICP tokens first became available on multiple crypto asset trading platforms on or about May 10, 2021, when the network launched.  At launch, DFINITY minted a total of 469 million ICP tokens.

250.    Since approximately May 2021, ICP has been available for buying, selling, and trading on the Coinbase Platform.

251.    The publicly available information and statements disseminated by DFINITY and its founder, including statements made and available during the period when ICP was available to trade on the Coinbase Platform, have led ICP holders reasonably to view ICP as an investment in and to expect to profit from DFINITY's efforts to grow the protocol, which, in turn, would increase the demand for and the value of ICP.

252.    For example, DFINITY stated publicly that it would use the proceeds from ICP sales to fund development, marketing, business operations, and growth and promotion of the Internet Computer protocol, and thus demand for its ICP token.  In fact, DFINITY distributed approximately 24% of the ICP issued in the public launch to support the Internet Computer platform and to pay staking rewards through the Internet Computer ecosystem.  Another 18% of ICP was distributed to compensate the DFINITY team members, aligning their financial fortunes with those of ICP investors.

253.    Moreover, in an April 4, 2018 Medium post leading up to the 2018 funding rounds, Williams touted: "DFINITY has received inbound interest from hundreds of private accredited entities such as hedge funds."  Indeed, a number of venture capital firms invested in ICP.

254.     Furthermore, from ICP's inception through today, DFINITY has publicly stated that

its key developers, including Williams, have been and continue to be heavily involved in Internet

Computer and have promoted their dedication to grow the network and increase the value of ICP.

255.     For example:

- On June 27, 2020 Williams tweeted: "[t]he Internet Computer proj is propelled by extraordinary investments in R&D. DFINITY has assembled one of the strongest science & engineering teams in tech, across several research centers worldwide. This team has been relentlessly pushing blockchain ambition to new levels."

- On December 19, 2021, Williams tweeted: "[t]here's nothing we can do to control the price, but we feel the pain same as everyone else.  There has been a lot of market manipulation by bad people but we remain focused on taking #ICP to the #1 spot."

- On January 25, 2023, Williams tweeted: "[w]hen I look at [crypto asset pricing services], I don't look at the $ price, I look position.  $ICP needs to be in the top 3, and I will work tirelessly to help get it there."

256.     A month after it was launched for public trading, ICP's price reached an intraday

high of $700.  One month later, the price of ICP had plummeted to $72 and Williams began making

public statements indicating the price of ICP would increase again.  For example, on June 10, 2021,

Williams tweeted, "Major [venture capital] firms … hv [sic] long-term strategies & generally don't

panic dump. Their focus is on moonshots because that's what generates their primary returns.  We

all need to keep our focus on horizon.  Watch what happens in +6/9 months."  And, on September

3, 2021, Williams tweeted, "ICP seed investors' 2000X gains; crypto's largest research org; most

advanced blockchain; ferocious growth."

257.     In an ICP whitepaper released in January 2022, DFINITY promotes that it burns

ICP tokens as a mechanism to support the price of ICP by reducing their total supply.  On January

20, 2023, Williams tweeted, "$ICP will eventually become deflationary"—meaning its supply will be

reduced over time.  On its website, DFINITY posts a Dashboard that calculates the ongoing cycle

burn rate, reflecting the number of ICP tokens burned.  As with other crypto asset securities set

forth herein, this marketed burning of ICP as part of the system's "deflationary" mechanism has led investors reasonably to view their purchase of ICP as having the potential for profit.

### x.    NEAR

258.    "NEAR" is the native token of the NEAR blockchain protocol, a proof-of-stake blockchain conceived in 2018 by Delaware corporation Near, Inc. ("Near") and its founders Alexander Skidanov and Illia Polosukhin.  According to the NEAR whitepaper, the NEAR protocol uses a technology dubbed "Nightshade" that allows the volume of transactions on the network to grow indefinitely without hurting its performance, measured in speed and transaction fees.

259.    In 2019, Skidanov and Polosukhin founded the NEAR Foundation, a non-profit organization under Swiss law that claims to be "responsible for contracting protocol maintainers, funding ecosystem development, and shepherding core governance of the NEAR protocol."

260.    From Q3 2017 to Q1 2020, Near raised approximately $34.1 million through the offer and sale of notes that were convertible into then-nonexistent NEAR tokens.  In July 2019, Near filed forms with the SEC claiming its offer and sales of convertible notes was exempt from registration and stating Near "intended to use the proceeds [of the sales] for the development of the Near protocol."  In August 2020, Near held an additional sale of approximately 120 million NEAR tokens.  In January 2022, the NEAR Foundation raised an additional $150 million through a purportedly "private" sale of NEAR tokens to venture capital investors.

261.    Although U.S. investors purportedly were prohibited from participating in the early seed funding rounds or NEAR's initial minting, NEAR has been available for purchase and sale in the United States since at least October 2020, including since September 2022 on the Coinbase Platform.

262.    Since the launch of the NEAR protocol in 2020, including during the period when NEAR was made available on the Coinbase Platform, publicly available information and statements

disseminated by Near, the NEAR Foundation, and their common founders have led NEAR holders reasonably to view NEAR as an investment in and to expect profits from Near's and the NEAR Foundation's efforts to grow the protocol, which, in turn, would increase the demand for and the value of NEAR.

263.    Approximately 35.7% of the one billion NEAR tokens initially minted were transferred to early investors that held convertible notes.  Of the remaining initial supply of NEAR tokens, 14% were allocated to the "Core Contributors," 11.7% to "Early Ecosystem" developers, 10.0% to the NEAR "Foundation Endowment," 17.2% to "Community Grants and Programs," and 11.4% to "Operations Grants."  Accordingly, the financial incentives and fortunes of Near's core team members and those of early developers (who collectively owned approximately 25.7% of the initial supply of NEAR) were aligned with those of other NEAR investors (who owned approximately 35.7% of the initial NEAR supply).

264.    For example, Near stated in its SEC filings that it would pool investment proceeds from the sale of notes convertible into NEAR tokens to develop the NEAR protocol and grow Near's business and, as recently as January of 2022, that it further pooled proceeds from the sale of $150,000 in NEAR tokens that month for the same purposes.

265.    And, as the NEAR Foundation publicly touted, it did in fact use its allocation of NEAR tokens to support the development of the NEAR protocol and ecosystem.  For example, in October 2021, the NEAR Foundation announced "$800 million in funding initiatives targeted at accelerating growth" of the NEAR ecosystem.  Subsequently, in a "transparency report" blog post on the Near website, the NEAR Foundation stated that it had "deployed $540M in fiat and tokens during [the last quarter of 2021 and the first two quarters of 2022]" to support "NEAR ecosystem projects" and launch "regional hubs" around the world, among other efforts to help grow the ecosystem.

266.     NEAR's founders remain actively involved with the NEAR protocol today through the NEAR Foundation.  In fact, Polosukhin sat on the NEAR Foundation Council (its governing group) until March 2023 and has served as its Chair for the past two years.

267.     In a post on one of the NEAR Foundation's blogs discussing the role of the NEAR ecosystem in funding projects to continue growing the NEAR protocol, Polosukhin likened the NEAR ecosystem to a venture capitalist picking an investment strategy and likened the NEAR community to investors in the NEAR ecosystem:



268.     Similarly, as an indicator of investor demand, Near has touted its high-profile venture capital partners.  For example, until March 2023, Near's website stated that NEAR is "[b]acked by the best," followed by the logos of 10 venture capital firms and the following quotation from one of those firms' partners: "NEAR is poised to be a leading smart contract blockchain platform, combining first-rate technology with a fast-growing developer ecosystem.  We are excited to support NEAR as we ramp up our investments in the digital asset space."

269.     Near has also marketed the feature of the NEAR protocol that automatically burns 70% of all NEAR tokens accumulated as fees.  Accordingly, the greater the number of transactions that occur on the NEAR protocol, the greater the number of NEAR tokens that are burned, reducing their total supply.  As with other crypto asset securities set forth herein, this marketing burning of NEAR has led investors reasonably to view their purchase of NEAR as having the potential for profit.

### xi.    VGX

270.    "VGX" is the native token of the crypto asset platform known as Voyager, which is owned and operated by Voyager Digital, LLC, a New Jersey-based Delaware corporation founded in 2018.  The Voyager platform allowed customers to buy and sell crypto assets as well as earn interest by participating in the Voyager Earn Program, which allowed investors to tender crypto assets to Voyager through the Voyager platform in exchange for Voyager's promise to provide a variable interest payment.

271.    Voyager's website, www.investvoyager.com, has advertised that its "commission-free" "broker model" utilized "Smart Order Routing" to connect more than a dozen crypto asset trading platforms and market makers "to offer investors unparalleled speed, liquidity, and pricing – all in one app."  According to its website, as of March 2022, the Voyager platform supported more than 100 crypto assets.

272.    In October 2020, Voyager acquired LGO Markets, a French crypto asset trading platform and its native token LGO.  As part of the acquisition, VGX and LGO tokens both were swapped into newly minted tokens that Voyager referred to in its whitepaper as VGX 2.0 tokens, although the new integrated tokens continued to trade on both Voyager and third-party crypto trading platforms simply as "VGX."

273.    VGX is an "exchange token" (the crypto asset associated with a crypto trading platform) for the Voyager platform.  Specifically, Voyager describes VGX as "designed to reward Voyager customers for their loyalty, for holding VGX in their Voyager accounts and to motivate community members for their participation in the multifaceted rewards functions of VGX."

274.    Since approximately November 2021, VGX has been available for buying, selling, and trading on the Coinbase Platform.

275.    From approximately October 2019 until October 2022, Voyager was the majority owner of VGX tokens, holding approximately 60.38% as of October 2022.  As of June 2023, Voyager owns approximately 17% of all VGX tokens.  Accordingly, Voyager's fortunes were, and remain, aligned with VGX investors' fortunes.

276.    The information publicly disseminated, and statements made, by Voyager, as well as the economic incentives that Voyager has offered with respect to VGX, have led VGX holders, including those who purchased VGX since November 2021, reasonably to view VGX as an investment in and to expect to profit from Voyager's efforts to develop its trading platform, loyalty program, and other touted features of its business, which, in turn, would increase the demand for and the value of VGX.

277.    For example, Voyager has touted the experience of its founders in both the original VGX and subsequent VGX 2.0 whitepapers, and has also highlighted the continued role that Voyager would have in ensuring the success of VGX, including the following examples:

- The original whitepaper stated: "Voyager's team consists of finance and technology industry veterans dedicated to empowering and servicing investors in the most exciting asset class to date—crypto.  Our founders have combined their decades worth of experience from leading organizations."

- The VGX 2.0 whitepaper set forth that in the first three years following the integration of VGX and LGO, Voyager would mint an additional 70 million VGX for the "growth pool . . . to power Voyager Loyalty rewards, as well as fund promotional campaigns."

278.    Moreover, Voyager has incentivized all of its platform customers to buy, hold and encourage others to purchase VGX.  For example, by holding VGX on the Voyager platform, customers could earn interest in-kind as well as interest rate "boosts" on certain other crypto assets loaned to Voyager.  Customers could also earn VGX by referring friends to the Voyager platform.

279.    Voyager further incentivized its customers to buy and hold VGX with its "Loyalty Program," launched in or around September 2021, under which customers achieved higher reward

"tiers" based on the amount of VGX they held on the platform.  Each tier offered progressively higher rewards with respect to staking as well as higher discounts on crypto withdrawal fees and rewards on Voyager debit card charges.  (In June 2022, Voyager announced it was expanding its Loyalty Program to six tiers.)

280.    The July 2021 VGX 2.0 whitepaper introduced and touted even more features that Voyager was developing for the VGX loyalty program, including VGX cashback rewards on a Voyager debit card, auto-staking of various crypto assets, and continued international expansion of the Voyager platform.

281.    Further, on or about May 1, 2021, Voyager introduced a 25% burn of all VGX used to pay withdrawal fees on the Voyager app "in an effort to help reduce the circulating supply of tokens."  As with the "burn" mechanisms of other crypto asset securities set forth herein, this marketed burning of VGX led investors reasonably to view their purchase of VGX as having the potential for profit.

282.    On or about July 1, 2022, following a number of crypto market disruptions and a large customer default on a multi-hundred million-dollar loan, Voyager suspended all trading and interest programs on the Voyager platform.  On or about July 5, 2022, Voyager and its parent companies filed for Chapter 11 bankruptcy.  Consequently, as of May 23, 2023, VGX trades at $0.15.  From its October 2019 rebrand through the present, VGX has been traded on U.S.-based crypto asset trading platforms, including on the Coinbase Platform, fluctuating significantly between its August 2021 high of $7.50 and its December 2019 low of $0.02.

### xii.   DASH

283.    "DASH" is the native token of the Dash blockchain and the token used for financial transactions on the Dash platform, including payment of transaction fees required to propose transactions on the blockchain.  The Dash blockchain is a protocol launched in or about January

2014 by founder Evan Duffield.  According to its website, www.dash.org, Dash is a crypto payment platform "forked" (or split off) from the Bitcoin source code.

284.    DASH has been available for trading on the Coinbase Platform since approximately September 2019.

285.    The initial distribution of DASH was as rewards to miners that provided value to the Dash network by mining blocks for the blockchain.  Today, the Dash network is purportedly run by a subset of its users, which are called "Masternodes," servers that provide a second layer of services and governance on the Dash blockchain on top of the services provided by standard nodes.  Ninety percent of the block rewards—in the form of DASH tokens—generated through blockchain mining are split between the Masternodes and the regular nodes.  At the end of every month, the remaining 10% of the block rewards are sent to the Dash Treasury to fund operation of, and improvements to, the Dash platform and DASH token.  Below is a breakdown of how rewards are purportedly distributed on the Dash platform:



286.    The DCG (Dash Core Group), an entity controlled by the Masternodes and funded by the Dash Treasury, is responsible for making budget proposals meant to improve and advance the Dash network.  The Masternodes vote on all funding proposals submitted to the Dash Treasury,

including DCG proposals.  The Masternodes also indirectly control the DCG through the

Masternodes' voting control over the Dash Trust, which is the sole shareholder of DCG.  The

DCG's improvements to the Dash platform and the DASH token increase the DASH token's value,

thereby benefitting all token holders.  Accordingly, the fortunes of the investors (*i.e.*, the non-

Masternodes token holders) are tied to the fortunes of the Masternodes and the DCG.

287.    From the founding of the Dash platform, the Masternodes and the DCG have

disseminated information that has led DASH holders, including those who purchased DASH since

September 2019, reasonably to view DASH as an investment in and to expect to profit from the

DCG's and the Masternodes' efforts to develop, expand, and grow the protocol, which, in turn,

would increase the demand for and the value of DASH.

288.    For instance, Duffield purportedly launched DASH to improve on Bitcoin's

relatively slow transaction times and privacy issues.  To address this, he invented an algorithm used

for calculations on the DASH blockchain, which the DCG touts as "one of the safest and more

sophisticated cryptographic hashes in use by modern cryptocurrencies."  Subsequently, Duffield also

invented "InstantSend" and "PrivateSend," which the Dash website describes, respectively, as

enhancing DASH's speed and privacy by allowing users to transfer DASH without waiting for the

transactions to be confirmed on the blockchain and by making transactions more difficult to trace.

289.    Further, the DCG uses the DASH it receives from the Dash treasury to fund

performance enhancements and to add features to the Dash platform.  For instance, the DCG

works to advance DASH as a medium of payment.  Dash's website states that DASH can be spent

at thousands of retailers through the "DashDirect" consumer app and, in or around May 2022,

@DashInformation tweeted, "DCG is a [Dash Funded Organization] with a dedicated team

working for the Dash network that is responsible for the main development of Dash.  Its mission is

to provide greater financial freedom by delivering and improving financial solutions which are secure, reliable, decentralized, and usable for all."

290.   The DCG also promotes DASH's supposed superiority over other tokens due to the attributes Duffield has developed for it, namely greater scalability of the protocol (which increases usability), short processing times, and low transaction costs.

291.   Finally, the value of DASH is further enhanced by the fact that the token has a limited supply and is deflationary in nature.  For example, the Dash website explains that the block reward is reduced by approximately 7% every 210,240 blocks (approximately every 380 days).

### xiii.   NEXO

292.   "NEXO" is the native or "exchange" token for the Nexo platform, a crypto asset trading and lending platform created by Nexo Capital, Inc. ("Nexo"), a Cayman Islands corporation formed in 2018 with its principal place of business in Grand Cayman, Cayman Islands.

293.   The Nexo platform provides crypto asset-related financial products and services, including purchasing, lending, borrowing, trading, and storing.  According to Nexo's website, www.nexo.com, and as also described on Coinbase's website, the Nexo platform leverages blockchain technology to provide crypto asset holders access to currency and high-yield idle assets and to allow its users to participate in sophisticated and over-the-counter trading.

294.   From February through May 2018, Nexo conducted a public offering of NEXO and sold NEXO to 129 investors globally in exchange for bitcoin and ETH, raising approximately $52.5 million.  Nexo's self-described "Token Sale" consisted of an initial airdrop distribution in February 2018, an ICO "pre-sale" in March 2018, and ICO from April to May 2018.  In 2018, Nexo filed forms with the SEC claiming that its offers and sales of NEXO were offers and sales of securities exempt from the federal securities' laws registration requirements.

295.   Since at least March 2019, NEXO has been available for buying, selling, and trading

on crypto asset trading platforms in exchange for fiat currency (including, U.S. dollars) or other crypto assets (including bitcoin), including on Coinbase Wallet since at least August 2021.

296.    The publicly available information disseminated by Nexo, as well as the economic incentives that Nexo has offered with respect to NEXO, have led investors—including those who purchased NEXO via Coinbase Wallet since August 2021—reasonably to view NEXO as an investment in and to expect profits from Nexo's efforts to develop its lending business and grow the Nexo platform, which in turn would increase the demand for and the value of NEXO.

297.    For example, Nexo took and touted steps to make NEXO available for trading on crypto asset trading platforms.  In a July 7, 2021 blog post on its website, Nexo—in announcing NEXO's listing on the Bitfinex crypto asset trading platform—stated:  "[o]ne of the Nexo community's repeated requests has been that we list our native asset [NEXO] on more and more bigger exchanges. Our team wasted no time addressing these requests."  In a May 29, 2022 blog post Nexo made similar statements with respect to NEXO's listing on the crypto asset trading platform Bitstamp.  Both of these blog posts emphasized that the relevant listings had the potential to augment NEXO token usage and boost its price.

298.    In addition, Nexo's website has stated that Nexo pools and uses the proceeds from NEXO sales to fund and develop Nexo's lending and investment activities to generate Nexo profits, which in turn are used to make "interest rate payments" (which Nexo described at the time of its Token Sale as "dividends") to NEXO investors on a *pro rata* basis.  Similarly, in a post on its Medium blog on or around November 23, 2018, Nexo touted that it had "raised funds in a token offering and [had] been able to develop a user-friendly crypto lending wallet and a profitable business model in less than 6 months."

299.    In the NEXO whitepaper, Nexo stated that "52.50% of NEXO tokens will be distributed to investors from the Nexo Token Sale" and "25% of NEXO tokens will be allocated

towards the growth of the loan portfolio."  In addition, as disclosed in the whitepaper, 11.25% of

NEXO tokens were distributed to Nexo's founders and the team with a vesting structure to "ensure

that the team's interests are aligned with those of the investors and that the team's efforts will be

channeled to towards the creation of a profitable and sustainable business"—with an additional

5.25% for Nexo's advisors.  An additional 6% of NEXO was retained by Nexo to use for

"community building and Airdrops" to "promote the Nexo loan services by engaging the crypto

community, thus ensuring the long-term success of the Nexo enterprise."

300.    In its 2018 Interim Report, Nexo further highlighted the alignment between NEXO

purchasers and Nexo's management team, stating: "[n]one of Nexo's managers has sold a single

NEXO token; rather, everyone is motivated to deliver the strongest possible performance and

pursue long-term higher returns in accordance with successful company growth."

301.    In public statements on its website and social media pages, including statements

made and available during the period when NEXO was available to trade via Coinbase Wallet, Nexo

specified its expertise and described the efforts it has made and will continue to make to develop its

lending business and the Nexo platform and to attract customers and users, for example:

- the NEXO whitepaper statement touting Nexo's "experienced", "award-winning", and "[s]uccessful FinTech Team serving millions of people for over 10 years under strict European Banking and Financial Services Supervision" and that "the team's efforts will be channeled towards the creation of a profitable and sustainable business";

- Nexo website's "About Us" page, which highlighted the expertise of its team and described Nexo as "[l]everaging the best of the team's years of experience in FinTech along with the power of blockchain"; and

- Nexo's statement in its 2018 Interim Report that "[g]iven the executive management's institutional background, Nexo is always assessing new and constructive partnerships" and that Nexo is "keen to pursue further productive collaborations, which would facilitate Nexo's continuous loan portfolio growth and platform functionalities."

302.    Further, Nexo explicitly promised returns to investors in public statements on its

website and social media pages.  For example, in the NEXO whitepaper and on its Medium blog, Nexo told NEXO holders that it would provide them with dividends of 30% of Nexo's profits generated from loan interest paid by Nexo customers, among other business lines.  Specifically, as Nexo explained in a Medium blog post on or around November 23, 2018, a "base dividend" is "paid out to all eligible token holders proportionally to their NEXO Token holdings" and, in addition, at least one-third of the total dividend amount goes towards a "loyalty dividend" that is "paid out individually for each NEXO Token based on how long it has been in the Nexo Wallet from one ex-dividend date to the next."

303.     In addition, Nexo's website touts the special economic incentives and benefits Nexo provides to NEXO holders, including daily "interest payments" (returns) and lower interest rates on loans.  Specifically, as marketed on Nexo's website, NEXO "[h]olders receive up to 12% interest per annum on the NEXO Tokens held in both the Savings and Credit Line wallets of their Nexo accounts."  Nexo's website has also told investors that "holding NEXO Tokens automatically makes you a part of Nexo's Loyalty Program which gives you: [u]p to 50% higher yields with our Earn on Crypto suite", "[u]p to 0.5% back in crypto rewards on purchases or swaps via the Nexo Exchange", "[b]orrowing rates starting from just 0% APR", and "[u]p to 5 free crypto withdrawals."

304.     Moreover, the Nexo website tells investors they can use NEXO to "[s]wap any asset for NEXO with zero fees and fixed-price execution"; "[b]orrow instantly" ("from 0% APR"); "[s]pend the value of your NEXO Token without selling it"; and "[k]eep more NEXO in your portfolio to get higher yields, lower borrower rates, and more crypto rewards."

305.     Finally, beginning in December 2020, Nexo conducted multiple NEXO token "buyback" programs, pursuant to which Nexo repurchased from investors over $150 million worth of NEXO.  As Nexo explained on its website, these buybacks were designed to "boost [NEXO] token liquidity, thus reducing price volatility" and to "give token holders additional security that the

token's value will continue to rise."

## IV.   COINBASE WAS REQUIRED TO, BUT DID NOT, REGISTER AS A NATIONAL SECURITIES EXCHANGE, BROKER, AND CLEARING AGENCY.

306.    Coinbase, through the Coinbase Platform, used the means and instrumentalities of interstate commerce to bring together the orders of multiple buyers and sellers of crypto assets that were offered and sold as securities using a trading facility programmed with non-discretionary rules for orders to interact and buyers and sellers to agree upon the terms of trades in these securities. Coinbase was therefore required to register with the SEC as a national securities exchange or operate pursuant to an exemption to such registration, but did not do so.

307.    Coinbase, through the Coinbase Platform, Prime, and Wallet, used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding itself out as a place to buy and sell crypto asset securities, facilitating trading in crypto asset securities by opening customer accounts and handling customer funds and crypto asset securities (which it commingled and treated as fungible) through Coinbase-controlled accounts and digital wallets, and being compensated for doing so.  Coinbase was therefore required to register with the SEC as a broker or operate pursuant to an exemption, but did not do so.

308.    Coinbase served as an intermediary in settling transactions in crypto asset securities occurring on the Coinbase Platform.  Coinbase also acted as a custodian of securities by requiring customers to deposit their crypto asset securities in Coinbase-controlled wallets, creating a system for the central handling of securities whereby securities deposited and traded on the Coinbase Platform were treated as fungible and customer accounts debited and credited by Coinbase to settle customers' transactions.  Coinbase was therefore required to register with the SEC as a clearing agency or operate pursuant to an exemption, but did not do so.

## V.   THROUGH ITS STAKING PROGRAM, COINBASE HAS ENGAGED IN THE UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTION 5 OF THE SECURITIES ACT.

309.    Coinbase has violated, and continues to violate, Sections 5(a) and 5(c) of the

Securities Act by engaging in the unregistered offer and sale of securities in connection with its

Staking Program.  In so doing, Coinbase has deprived investors of material information about

Coinbase and its Staking Program offerings, including how Coinbase uses the offering proceeds and

the risks and trends that affect the enterprise and an investment in these securities.

310.    Coinbase began offering its Staking Program to U.S. investors in or around

November 2019, as a means to participate in, and profit from, the "proof-of-stake" consensus

mechanism of the Tezos blockchain.  Today, the Staking Program enables investors to stake five

different assets: XTZ (Tezos), ATOM (Cosmos), ETH (Ethereum), ADA (Cardano), and SOL

(Solana).  Coinbase describes all aspects of the Staking Program—including the services it provides

and the efforts it undertakes—as being applicable to each of the five stakeable assets.  For each of

these five assets, Coinbase pools the assets provided to Coinbase by investors in the Staking

Program in omnibus crypto asset wallets controlled by Coinbase (and segregated by asset), and then

performs all of the efforts necessary and expected by investors to obtain investment returns

marketed by Coinbase, including staking those assets in order to obtain rewards, which Coinbase

distributes *pro rata* to investors after paying itself a 25 or 35% commission.

311.    To participate in the Coinbase Staking Program, investors need only have or open an

account at coinbase.com and purchase staking-eligible crypto assets on the Coinbase Platform, or

transfer their existing staking-eligible crypto assets to their Coinbase account.  Investors then sign up

for the Coinbase Staking Program and transfer their crypto assets (including the private keys thereto)

to Coinbase's possession and control.  Prior to April 2023, customers holding staking-eligible crypto

assets at Coinbase were automatically enrolled in, but could opt out of, the Staking Program.  Now,

investors must opt in through the Coinbase website or mobile application to participate in the Staking Program.

### A.      Staking Background

312.    Coinbase's Staking Program capitalizes on the reward structure of the "proof of stake" consensus mechanism used by some blockchains to reach agreement about which transactions are valid, to update the blockchain accordingly, and to reward participants with additional crypto assets.  A blockchain using the proof of stake consensus mechanism selects a "validator" from a group of blockchain participants who have agreed to certain requirements necessary to maintain the blockchain and construct new blocks.

313.    To be considered for selection into the group or pool of validators, a potential validator must commit, or "stake," a set amount of the blockchain's native asset (*e.g.*, ETH for Ethereum).  These staked assets are held as collateral in the protocol to incentivize validators to perform required functions.  In addition, certain protocols charge crypto asset validators fees to stake and unstake crypto assets and require an upfront refundable deposit (in addition to the crypto assets staked).  A "correction penalty" is deducted, or "slashed," from the staked crypto assets of validators who underperform.  Conversely, validators earn rewards, in the form of additional amounts of the native asset, by timely voting on proposed blocks, proposing new blocks, and participating in other consensus activities.

314.    To create a new block to add to the chain of blocks, the protocol chooses a validator from among those that have staked.  The more the holder stakes, and the less server downtime a potential validator exhibits, the more likely that holder is to be selected as a validator and receive the maximum staking reward.  Thus, the most successful staking operations maximize the chances of being selected by staking a large number of assets and having better computer resources to minimize server downtime.

315.     The amount of time set by a protocol for a crypto asset to be staked by a validator before earning rewards is referred to as the "bonding period."  And the "unbonding period" is the length of time set by the protocol to release staked crypto assets back to the validator.  In certain cases, a bonding period may mean that it can take weeks before a validator can begin earning rewards.  The unbonding period may mean it can take weeks for a crypto asset validator to unstake crypto assets (or release them from staking) and transfer or use them for other purposes.  During the time the crypto assets are bonded to a protocol, the crypto asset owners are unable to transact in them, for example, to react to market price fluctuations of the crypto assets.

**B.     Coinbase Offers Investors in the Coinbase Staking Program Unique Features that May Not Be Available to Investors Staking on Their Own.**

316.     Through its Staking Program, Coinbase offers and markets an investment opportunity to receive rewards from proof-of-stake blockchains and gain benefits that may not be available to those investors if they were to stake crypto assets on their own.  In particular, the Staking Program offers investors the ability, through Coinbase's efforts, to obtain returns based on Coinbase's participation in proof-of-stake activities for the five staking-eligible crypto assets. Indeed, in a YouTube video marketing its Staking Program, Coinbase stated, "[w]hile it's possible to stake crypto on your own, this can be confusing, complicated, and costly" and touted that "Coinbase is changing all that."

317.     Specifically, the Coinbase Staking Program offers and markets several features that differentiate it from what staking investors would be able to do by staking and earning rewards on their own.

318.     For one, the Coinbase Staking Program offers no, or low, staking minimums or deposits.  Staking protocols typically require a certain threshold number of crypto assets, or an additional refundable deposit, to be able to participate in staking, and investors who stake on their own—not with Coinbase—are subject to those minimum thresholds.  For example, the Ethereum

blockchain requires users to stake a minimum of 32 ETH (currently approximately $60,000) to run a validator node.  But the Coinbase Staking Program allows investors to participate in staking without having to meet such thresholds; as Coinbase touts, investors can "[s]tart earning with as little as $1."

319.    Relatedly, running a validator node is often expensive, for example due to equipment and/or software needed to stake.  Through the Coinbase Staking Program, investors avoid paying those expenses because Coinbase operates its own validator nodes to earn and pay investor rewards. For example, CGI's February 21, 2023 annual report on Form 10-K filed with the SEC and available on Coinbase's website stated: "Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time.  We provide a service known as 'Delegated Proof of Stake,' which reduces the complexities of staking."  Similarly, Coinbase acknowledged on its website that "[b]ecoming a validator is a major responsibility and requires a fairly high level of technical knowledge."

320.    Further, until approximately April 2023, the Coinbase Staking Program maintained a "liquidity pool" of crypto assets—for each of the five stakeable assets—that were held in reserve, which enabled Coinbase to provide investors faster liquidity in connection with unstaking requests. Effective April 1, 2023, Coinbase purports to no longer maintain reserves of stakeable assets.  In or around October 2022, in response to an FAQ on its website ("Can I trade or send funds while they're earning rewards"), Coinbase stated: "You'll typically be able to cash out your cryptocurrency that's earning rewards on Coinbase as you would any other cryptocurrency.  Cashing out may be subject to factors including, but not limited to, your account history, transaction history, and banking history.  In rare circumstances, trades and cash-outs may be delayed while we wait for staked funds to be unlocked."  As a result, during the Relevant Period, Coinbase was able to offer investors enhanced liquidity and quicker reward payments compared to staking on their own. (Currently, in response to the same FAQ, Coinbase's website states: "Funds can't be traded or sent

while they're staked and earning rewards.  You'll need to unstake them first.")

321.    Coinbase has also offered bonuses to Staking Program participants during the Relevant Period.  For example, in or around June 2022, in a marketing email soliciting staking investors for ETH, Coinbase promised: "Stake at least $100 to earn [a] $10 bonus … We'll deposit the $10 ETH bonus to your account within 45 days.  That's it!  You don't have to do anything else." As set forth in Coinbase's User Agreement, Coinbase also offers, on a promotional basis, "Boosted Staking Rewards" where specified investors ("Coinbase One members") are offered "higher net reward rates" (as a result of Coinbase taking "lower commissions") for certain stakeable assets.

**C.    Coinbase Has Marketed the Coinbase Staking Program as an Investment Opportunity.**

322.    Coinbase has marketed and continues to market the Coinbase Staking Program to the general public—through its website, social media pages, and blog, and in Google and other advertisements—as an investment opportunity to "*[e]arn on as much as you want.*"  (Emphasis added.)

323.    Specifically, Coinbase markets the possibility of profits through an expected rate of investment return.  For example, during the Relevant Period, Coinbase's website, an image of which is shown below, stated that investors can "[e]arn up to 6.00% APY on your crypto."



324.     On its website, Coinbase also markets the "estimated reward rate" for each of the five staking-eligible crypto assets (ranging between approximately 2% and 6.12%) and provides the "Staking Market Cap" for each of those assets (ranging from approximately $568 million for XTZ to $33.4 billion for ETH.  Although the Coinbase User Agreement states that staking "[r]ewards are determined by the protocols of the applicable [blockchain] network," Coinbase has acknowledged publicly its ability to change the reward payout amount at its discretion.  For example, in response to questions about Coinbase's Staking Program during a quarterly analyst call on or about November 3, 2022, CGI's CFO stated, "we haven't changed the reward payout rate on our retail [staking] product within the year, that has been held consistent."

325.     Historically, Coinbase has made other statements and issued marketing materials advertising investor returns from the Coinbase Staking Program, including, for example:

- In a post on or about September 29, 2020 on its Twitter page, Coinbase stated, "[t]oday you can start earning 5% APY with Cosmos Staking Rewards on Coinbase."

- In a tweet on or about February 16, 2021, Coinbase stated, "ETH2 staking is coming soon" and told investors they could "earn up to 7.5% APR."

- In a post on or about June 29, 2022 on its Twitter page, Coinbase stated, "@Solana staking is rolling out on Coinbase!  Start earning up to 3.85% APY."  In a video embedded in that post, Coinbase stated, "Earn crypto with your crypto.  Grow your crypto with stakeable assets on Coinbase."

- As of approximately March 2023, Coinbase's website encouraged investors to stake their ETH with the Coinbase Staking Program and "get" or "earn 4.07% APY on all [their] staked ETH" in addition to a 10% bonus for staking at least $100 in ETH.

326.     Coinbase has also made statements marketing its Staking Program as an opportunity to invest in Coinbase's managerial and entrepreneurial efforts, including statements touting the growth of Coinbase's Staking Program and Coinbase's success in generating investor returns.

327.     For example, in a post on its Twitter account on or about May 28, 2020, Coinbase promoted the returns that investors could earn by investing in the Coinbase Staking Program to

stake Tezos, by stating that, "[s]ince launching in the US last fall, customers have earned over $2 million in Tezos staking rewards."

328.   Coinbase also posted on its website a CGI shareholder letter dated on or about August 10, 2021 stating, "we ended Q2 with 1.7 million customers earning yield on their crypto assets with Coinbase" and touting that adoption of Coinbase's "Blockchain rewards – primarily comprised of staking [had] increase[d] more than 300% in Q2 compared to Q1."

329.   Similarly, a CGI shareholder letter posted on Coinbase's website on or about November 3, 2022 provided: "We have grown the number of assets supported for staking, including adding Cardano in Q1 and Solana at the end of Q2 which impacted Q3 results.  These new products help attract new customers onto the platform but are also engaging older vintages of customers on the platform who find value in these products."

330.   CGI has also acknowledged the Coinbase Staking Program's "earning" and "yield" potential and highlighted the program's growth and success in other SEC public filings and during quarterly earnings and analyst calls—transcripts of which are available on Coinbase's website.

331.   For example, during CGI's quarterly earnings call on or about November 3, 2022, Coinbase's founder and CEO, when emphasizing investors' "love" of the company's "portfolio of different products," highlighted the ability of customers who "already have their crypto stored with [Coinbase]"—through "just one more click"—to "stake and earn yield on their crypto."

332.   Also, in its November 3, 2022 quarterly report on Form 10-Q, CGI stated that it "saw strong growth in our subscription and services revenue, driven by … growth in staking."  In the same filing, CGI indicated that its 2022 "[s]ubscription and services revenue increased by $205.6 million compared to the same period for 2021, due, at least in part, to "an increase in blockchain rewards of $92.4 million" in 2022 "due to the addition of new assets available for staking and increased staking activity with higher native tokens staked."

**D.    Coinbase Has Profited as a Result of the Coinbase Staking Program.**

333.    Throughout the Relevant Period, Coinbase has offered the Staking Program to all U.S. residents, excluding Hawaii and New York residents.  Through the Coinbase Staking Program, these U.S. investors have been able to stake (and earn staking rewards in the form of) XTZ, ATOM, ETH, ADA, and SOL, as summarized in the following table:

| Protocol | Asset | Approximate Date Available as Part of the Coinbase Staking Program |
|---|---|---|
| Tezos | XTZ | November 6, 2019 |
| Cosmos | ATOM | September 29, 2020 |
| Ethereum | ETH | April 16, 2021 |
| Cardano | ADA | March 23, 2022 |
| Solana | SOL | June 29, 2022 |

334.    As of July 2022, over 4 million U.S. customers were invested in the Coinbase Staking Program—an increase from 1.725 million U.S. investors at the end of 2021.  And, as of the end of 2021, the total value of crypto assets committed by investors to the Staking Program was approximately $28.7 billion.

335.    Revenue earned by Coinbase by or through its Staking Program is recognized by CGI and included on CGI's consolidated financial statements.

336.    In its annual report on Form 10-K for 2022, CGI reported $275.5 million in revenue recognized for Coinbase's blockchain rewards, consisting primarily of staking revenue.  CGI also reported blockchain reward revenue for 2021 of approximately $223 million, and of $10.5 million for 2020.  These figures include only the gross, not net, revenue generated by the Coinbase Staking Program because CGI records staking rewards paid to investors as a "transaction expense."

337.    In its May 10, 2022 Form 10-Q, CGI explained that Coinbase "presents [its staking and other blockchain protocol] rewards on a gross basis" because Coinbase "considers itself the

principal" in staking and other "transactions with blockchain networks."

338.     CGI does not disclose Coinbase's itemized transaction expenses (including staking

rewards paid to investors) in its financial statements or elsewhere.

   **E.     The Coinbase Staking Program as It Applies to Each of the Five Stakeable Crypto Assets Is a Security.**

339.     At all relevant times, the Coinbase Staking Program, as it applied to each of the five

stakeable assets, was an investment contract under *Howey*, and therefore a security, whose offers and

sales were subject to registration under the Securities Act.  Coinbase describes all aspects of the

Staking Program as being the same for, or applicable to, each of the five stakeable assets, with the

only differences being the asset that is staked, the reward that is paid, and the percentage

commission Coinbase pays itself as to each asset.  As discussed below in Section V.E.ii, Coinbase

segregates, pools, and stakes investor assets by asset class.  In other words, Staking Program

investors' XTZ, ATOM, ETH, ADA, and SOL are not all pooled together, but the assets of all

Staking Program investors who stake, for example, XTZ, *are* pooled together with the assets of all

other Staking Program investors who stake XTZ.

   *i.     Participants in the Coinbase Staking Program Invest Money.*

340.     Coinbase's offer and sale of the Coinbase Staking Program for each of the five

stakeable assets involves an investment of money, in the form of staking-eligible crypto assets.

Here, investors tender their crypto assets to Coinbase in order to participate in the Coinbase Staking

Program, by either purchasing staking-eligible crypto assets from Coinbase or transferring their own

crypto assets to their Coinbase account for staking.

341.     Customers give up control of their crypto assets while they participate in the Staking

Program and cannot use them for any purposes, such as trading or transferring them to another

account.  Coinbase has control over all of the crypto assets invested in the Coinbase Staking

Program, including through Coinbase's omnibus crypto asset wallets.

342.     Investors put their crypto assets at risk as part of the Coinbase Staking Program.

343.     For one, once an investor's crypto assets are staked to the underlying blockchain protocol, those assets are at risk of being slashed (or destroyed).  While Coinbase pledges to reimburse investors for any slashing-related losses, its User Agreement describes how customers' assets are subject to all of Coinbase's custodial and operational risk, stating, for example, that "[a]ny bond or trust account maintained by Coinbase for the benefit of its customers may not be sufficient to cover all losses incurred by customers."

344.     Relatedly, once an investor's crypto assets are staked to the underlying blockchain protocol, those assets are at risk of being lost, for example in the event the relevant blockchain is forced or chooses to shut down or cease operations.

345.     Further, in its SEC filings, CGI has disclosed the staking-related risk that "customers' assets may be irretrievably lost" due to cybersecurity attacks, loss of customers' private keys, or other security issues, or if Coinbase's node "validator, any third-party service providers, or smart contracts fail to behave as expected."  In addition, CGI's September 30, 2022 Form 10-Q provided that customers' crypto assets "are not insured or guaranteed by any government or government agency"; that Coinbase is "dependent on [its] partners' operations, liquidity and financial condition for proper … safekeeping of customer assets"; that Coinbase's liabilities are not limited for certain customer contracts; and that insurance coverage in certain instances is limited and "may not cover the extent of loss nor the nature of such loss, in which case [Coinbase] may be liable for the full amount of losses suffered, which could be greater than all of [its] assets."

### ii. *Coinbase Staking Investors Participate in a Common Enterprise.*

346.     Investors in the Coinbase Staking Program participate in a common enterprise with Coinbase and with other Staking Program investors in the same staked asset.

347.     *First*, the fortunes of investors in the Coinbase Staking Program are tied together

with those of other investors staking the same asset—including Coinbase.

348.     Coinbase controls and pools Staking Program investors' crypto assets, together with Coinbase's own crypto assets, in wallets controlled by Coinbase and segregated by asset.  And Coinbase stakes its own crypto assets alongside those of Staking Program investors, including as part of the same staking pools on each of the five protocols.

349.     Specifically, as set forth in its User Agreement, Coinbase pools investors' crypto assets in omnibus wallets and is under no obligation to segregate individual investors' crypto assets in exchange for the advertised staking returns.  Coinbase accounts for investors' crypto assets through entries on its internal ledger system.  The User Agreement provides: "Coinbase shall retain control over electronic private keys associated with blockchain addresses operated by Coinbase, including the blockchain addresses used to hold the Supported Digital Assets credited to [customers'] Digital Asset Wallet."  The User Agreement continues: "Coinbase may use shared blockchain addresses, controlled by Coinbase, to hold Supported Digital Assets for Digital Asset Wallets on behalf of customers and/or held on behalf of Coinbase.  Although we maintain separate ledgers for users' Coinbase Accounts and Coinbase accounts held by Coinbase for its own benefit, Coinbase shall have no obligation to create a segregated blockchain address for your Supported Digital Assets."

350.     In addition, Coinbase treats all crypto assets—tendered to it by investors and segregated by stakeable asset—as fungible.  As the User Agreement tells investors: "You agree that all forms of the same Digital Asset that are held and made available across multiple blockchain protocols may be treated as fungible and the equivalent of each other."

351.     Coinbase's pooling of investors' crypto assets, and the correspondingly larger number of crypto assets to be staked at or with each of the five proof-of-stake protocols, increases the likelihood that a blockchain network will select Coinbase to validate transactions, and thus

enables Coinbase to more reliably earn rewards and distribute returns to investors.  In fact, as Coinbase disclosed on its website as recently as October 2022, the staking "reward rate can also be influenced by factors including, but not limited to, validator performance" and the "amount staked/stakers"—not just the "rates set by the network."

352.     As disclosed to investors, Coinbase distributes investor returns for each of the five stakeable assets on a *pro rata* basis depending on the amount of crypto assets investors have staked. Coinbase's User Agreement tells investors: "Rewards will be credited to your account by taking into account the amount of your principal and previously accrued rewards that remain staked with Coinbase."  Likewise, during the Relevant Period, Coinbase stated on its website: "Rewards are calculated based on the amount of cryptocurrency you hold in that particular balance.  Meaning, the more you hold of the cryptocurrency, the more Coinbase can stake on your behalf; and the more potential rewards you receive."

353.     *Second*, the fortunes of investors for each of the five stakeable assets and of Coinbase are also tied together.  The revenue and profits that Coinbase stands to receive—the portion of the staking rewards from each of the five protocols that Coinbase keeps as a commission—grows as more investors participate in the Coinbase Staking Program.

354.     Once Coinbase earns rewards from a particular protocol but before it credits rewards to Staking Program investors' accounts on a *pro rata* basis, it takes a commission for the services it provides to investors.  Coinbase takes a 35% commission on ADA and SOL staking rewards, and 25% for ETH, XTZ, and ATOM.  Coinbase determines the amount or rate of the commissions it takes, and during the Relevant Period Coinbase stated in its User Agreement that it had the ability to change its commission rate "at its discretion and without notice."  On or about March 10, 2023, Coinbase revised its User Agreement to tell investors: "Coinbase may change [its] published commissions at any time, including after your assets have been staked."

355.     In addition, as explained above, the larger the pool of assets for staking on each of the five protocols, the higher the likelihood of obtaining rewards from a respective protocol, which benefits all investors *and* Coinbase.

356.     Further, because the commission Coinbase receives is profit-based, if Coinbase fails to produce staking rewards on the invested crypto assets, neither Coinbase nor investors receive any returns.  In other words, investors pay Coinbase a commission from the staking rewards only if Coinbase generates the marketed returns using investors' funds.

### iii. Coinbase Staking Program Investors Reasonably Expect to Profit from Coinbase's Efforts.

357.     Investors in the Coinbase Staking Program reasonably expect to profit from Coinbase's efforts.

358.     From the Staking Program's inception, Coinbase has marketed it as an investment opportunity, telling investors that its Staking Program offers an "easy" and "passive" way to put their "assets to work" and "earn rewards for crypto that would otherwise be sitting around."

359.     As noted, Coinbase has promoted the Coinbase Staking Program—on its website, blog, and social media pages, and in advertisements—as a means for investors to earn high, fixed investment returns.  And, based on those representations by Coinbase, investors have reasonably expected to profit from participating in the Coinbase Staking Program.

360.     Further, as described above, Coinbase has publicly touted its efforts to create the advantages of the Coinbase Staking Program over staking independently, which according to Coinbase can be "confusing, complicated, and costly."  For example, on its website (as recently as early 2022), Coinbase told potential staking investors: "[S]taking your own crypto is a challenge for most *investors*.  To stake on your own requires running a node on your own hardware, syncing it to the blockchain, and funding the node with enough cryptocurrency to meet minimum thresholds, including providing a sizable deposit and bond.  On Coinbase, *we do all this for you*."  (Emphases

added.)  Similarly, as Coinbase's founder and CEO acknowledged in an interview with Bloomberg on or about March 6, 2023, the "average person doesn't really know what a private key is," adding: "crypto is still being treated like a growth asset."  According to Coinbase, the advantages of its Staking Program, relative to investors staking on their own, include Coinbase taking steps to, among other things, make an otherwise complex staking process "simple and seamless" and "easy and secure."

361.    Investors are led by Coinbase to reasonably expect that they may obtain investment returns generated by Coinbase's efforts with respect to the Staking Program.

362.    For example, during an analyst call on or about May 10, 2022, CGI's CFO, addressing questions concerning the Coinbase Staking Program, highlighted the extent to which investor returns result from Coinbase's efforts: "The model that we offer to our retail users is effectively called delegated proof-of-stake, where **we** are staking on behalf of our users directly at the protocol, **we're** controlling those keys, **we** receive the reward and **we** pay out a portion of that reward to our users and retain the balance as a commission for ***our services***." (Emphases added.)

363.    Coinbase controls all Staking Program efforts.  Coinbase (not investors) determines how and when investors' crypto assets will be staked with each of the five protocols—for example, by implementing software systems it developed to stake investor assets, and also by using its liquidity pools of staking-eligible assets during the Relevant Period.

364.    Coinbase marshals its technical expertise and experience to stake investor crypto assets and operate nodes on each of the five blockchain protocols to validate transactions and obtain the rewards from which investors returns are paid.  In doing so, Coinbase engages in additional efforts to prevent malicious behavior or hacks, protect keys to staked assets, and increase server uptime (the percentage of the time a validating node or server is online).  This is consistent with what Coinbase tells investors when promoting its Staking Program—that Coinbase, not investors,

possesses the "fairly high level of technical knowledge" and "state-of-the-art encryption and security" required to stake successfully and safely.  For example, in its Form S-1 filed with the SEC on February 25, 2021, CGI stated, "[o]ur experience allows us to … safely support new products like staking."  Similarly, in or around January 2020, Coinbase posted a video to its YouTube channel stating: "At Coinbase, we're focused on offering more ways for customers to earn money with crypto.  Now, we're going to make it easy and safe to earn staking rewards."

365.    Thus, customers who participate in the Staking Program understand that Coinbase's efforts are essential to the success or failure of the enterprise.  Participants in the Staking Program, on the other hand, are quintessentially passive investors who do not exert their own efforts.

366.    Further, because Coinbase discloses that it retains a portion of the staking rewards as commissions, investors understand that Coinbase has a strong financial incentive to engage in the efforts required to make the enterprise successful.

367.    Coinbase's statements and actions, and the economic reality of the arrangements with respect to the Coinbase Staking Program, have led and will continue to lead investors reasonably to expect profits based on Coinbase undertaking significant and essential technical, managerial, and entrepreneurial efforts.

F.    **Coinbase Has Failed to Register Its Offers and Sales of the Coinbase Staking Program as It Applies to Each of the Five Stakeable Crypto Assets.**

368.    Coinbase has used interstate commerce to offer and sell the Coinbase Staking Program by, among other things, engaging in general solicitation through its website and other promotional materials, including Google advertisements and social media.

369.    Coinbase has never had a registration statement filed or in effect with the SEC for its offers and sales of the Coinbase Staking Program as it applies to each of the five stakeable crypto assets.  No exemption from registration applied or applies.

370.    Coinbase's and CGI's public disclosures have contained selective or limited

information about Coinbase's Staking Program and have lacked full and detailed information.  For example, CGI does not disclose staking-related expenses in its financial statements or otherwise, including the actual amount of Staking Program rewards paid to investors.  Nor does Coinbase disclose whether and to what extent: (i) it exercises discretion in determining whether and when to stake investors' crypto assets; (ii) retail customer assets are used by Coinbase to fund security deposits required by any of the staking-eligible blockchain protocols; (iii) Coinbase, during the Relevant Period, held any of its or investors' crypto assets in reserve to provide liquidity for its Staking Program, including to more quickly generate rewards payouts and/or process investors' unstaking requests; and (iv) Coinbase and investors are receiving equal staking reward rates.

371.     In its March 23, 2021 amended registration statement on Form S-1/A filed with the SEC, CGI stated: "there is regulatory uncertainty regarding the status of our staking activities under the U.S. federal securities laws.  While we have implemented policies and procedures designed to help monitor for and ensure compliance with existing and new laws and regulations, there can be no assurance that we and our employees, contractors, and agents will not violate or otherwise fail to comply with such laws and regulations."

### FIRST CLAIM FOR RELIEF
### Violations of Section 5 of the Exchange Act
### (Coinbase)

372.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

373.     By engaging in the acts and conduct described in this Complaint, Coinbase met the definition of "exchange" and, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States, to effect transactions in a security, or to report any such transaction, without registering as a national securities exchange under Exchange Act Section 6

[15 U.S.C. § 78f], and without being exempted from such registration.

374.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined will continue to violate Exchange Act Section 5 [15 U.S.C. § 78e].

## SECOND CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
### (Coinbase)

375.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

376.    By engaging in the acts and conduct described in this Complaint, Coinbase, a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering as a broker, and without being exempted from such registration.

377.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 17A(b) of the Exchange Act
### (Coinbase)

378.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

379.    By engaging in the acts and conduct described in this Complaint, Coinbase, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance to Section 17A(b) of the Exchange Act and without being exempted or excluded from such registration.

380.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b) [15 U.S.C. § 78q-1(b)].

## FOURTH CLAIM FOR RELIEF
### Violations of Sections 5, 15(a), and 17A(b) of the Exchange Act
### (CGI as Control Person of Coinbase)

381.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 371.

382.    As alleged above, Coinbase has violated Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].

383.    CGI is, and was during the Relevant Period, a control person of Coinbase for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

384.    At all relevant times, CGI exercised power and control over its wholly-owned subsidiary, Coinbase, including by managing and directing Coinbase, and by directing and participating in the acts constituting Coinbase's Exchange Act violations.

385.    By reason of the foregoing, CGI is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Coinbase's violations of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].  Therefore, CGI is jointly and severally liable with and to the same extent as Coinbase for those Exchange Act violations.

## FIFTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Coinbase)

386.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

387.    By virtue of the foregoing, Coinbase, through its offers and sales of the Coinbase Staking Program, directly and indirectly: (a) without a registration statement in effect as to those

securities, (1) made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use or medium of any prospectus or otherwise, and (2) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

388.    By reason of the conduct described above, Coinbase, directly or indirectly violated, is violating, and, unless enjoined will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)];

## II.

Permanently enjoining Coinbase and each of its respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Ordering Defendants to disgorge on a joint and several basis all ill-gotten gains resulting from their Exchange Act violations, and ordering Coinbase to disgorge all ill-gotten gains resulting from its Securities Act violations, with prejudgment interest thereon, pursuant to Sections 20(a), 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(a) and 78u(d)(3), (5) and (7)];

### IV.

Ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and ordering Coinbase to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)]; and

### V.

Granting any other and further relief this Court may deem appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## **JURY DEMAND**

The Commission demands trial by jury.

Dated:  New York, New York
        June 6, 2023

*/s Jorge G. Tenreiro*
Jorge G. Tenreiro
Ladan F. Stewart
Nicholas C. Margida*
Peter A. Mancuso
Ben N. Kuruvilla
Elizabeth Goody
*\*Pro hac vice application forthcoming*

SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
(212) 336-1100
Email: tenreiroj@sec.gov

*Attorneys for the Plaintiff*

Of Counsel
Jason J. Burt
David L. Hirsch