**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

v.

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants*.

23 Civ. 4738 (KPF)

**COINBASE'S ANSWER TO PLAINTIFF'S COMPLAINT**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*

Dated:  June 28, 2023

## PRELIMINARY STATEMENT

1.      Coinbase is the largest U.S. digital asset exchange. It operates a secondary market in certain digital assets known as "tokens" or "crypto assets" or "cryptocurrencies." It is not, and has never been, a securities exchange, or a broker, or a clearing agency under the federal securities laws.[1]

2.      In April 2021, Plaintiff the Securities and Exchange Commission (the "SEC" or the "Commission") declared effective Coinbase Global, Inc.'s registration statement, allowing Coinbase's shares to be sold to millions of retail and institutional investors. That declaration followed years of discussions with Coinbase and a months-long process of extensive review and comment on Coinbase's registration statement. Coinbase had opened its business to the SEC, explaining its listing of digital assets, provision of trading and staking services, and self-custody wallet software — core aspects of Coinbase's operations, then as now. The SEC, fulfilling its mandate to consider "the public interest and the protection of investors," 15 U.S.C. § 77h(a); 17 C.F.R. § 230.461(b), permitted Coinbase's public offering without once suggesting that Coinbase must register its operations.

3.      Two years on, the SEC brings this action accusing Coinbase of having failed since 2019 to do just that: register as a national securities exchange, broker, and clearing agency. The Commission grounds its suit in allegations that 12 of the more than 240 tokens traded on Coinbase's spot exchange are "securities." Six of these 12 assets were already on Coinbase when the SEC declared the Company's registration statement effective. The SEC called none of them securities in 2021.

---

[1]    Unless otherwise noted, "Coinbase" as used herein refers to defendants Coinbase, Inc. and Coinbase Global, Inc.

4.      The SEC's about-face is not a product of material changes to Coinbase's business since 2021; none are alleged. Nor is it due to new information. Nowhere in its Complaint does the SEC suggest that Coinbase hid anything in the many years of cooperative discussion that preceded it becoming a public company. Nor is the reversal a product of legislative change. Congress has considered and continues to actively consider multiple regulatory proposals governing digital assets — but no statute enacted since April 2021 gives the SEC any powers to regulate digital asset exchanges, much less retroactively.

5.      The only change is in the SEC's position regarding its powers.

6.      That position is untenable as a matter of law, and its assertion through this enforcement action offends due process and the constitutional separation of powers.

7.      In May 2021, weeks after Coinbase went public, SEC Chair Gary Gensler testified before Congress that the Commission lacked statutory authority to regulate businesses like Coinbase. He said that "only Congress" could address the regulatory gap that Commission officials had long recognized, "because right now the exchanges trading in these crypto assets do not have a regulatory framework."[2] Underscoring the point, Chair Gensler added that "there is not a market regulator around these crypto exchanges."[3]

8.      The assets trading on Coinbase's secondary market platform are not within the SEC's authority because, contrary to the SEC's assertion, they are not "investment contracts" and therefore not "securities." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). The investment contract is a device conceived in the Taft Administration. It identifies an arrangement in which a promoter sells an

---

[2]    *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gary Gensler), https://tinyurl.com/mtrnkbn2.

[3]    *Id.*

asset (imagine, in the classic exemplar, part of an orange grove) stapled to a contractual undertaking to pool that asset with other assets purchased by other investors and operate a business (think an orange sales-and-distribution business) to generate profits for all of the investors. Like all securities, an economic arrangement can qualify as an investment contract only if it involves an ongoing business enterprise whose management owes enforceable obligations to investors. Absent such obligations, the contract is just an asset sale.[4]

9.      Because no such obligations are carried in the transactions over Coinbase's secondary market exchange, and because the value that Coinbase purchasers receive through these transactions inheres in the things bought and traded rather than in the businesses that generated them, the transactions are not securities transactions. Chair Gensler's May 2021 testimony reflected that understanding. It echoed the SEC Staff's now-public internal discussions in 2018 acknowledging a fundamental "regulatory gap" and limits on the SEC's authority in the digital assets space. Before the SEC's recent regulatory overreach, no court had ever interpreted "investment contract" to apply to a stand-alone asset sale. Nor to any arrangement lacking an obligation upon the seller to operate a business for the buyer's benefit.

10.     Yet by the end of 2022, nothing having changed except the SEC's position, Chair Gensler was proclaiming, "I feel that we have enough authority, I really do, in this space" to require crypto companies to register as national securities exchanges.[5] As evidenced by this lawsuit, the

---

[4]   *See SEC* v. *W.J. Howey & Co.*, 328 U.S. 293, 299 (1946) (stating that respondents "offer[ed] something more than fee simple interests in land, . . . [t]hey [] offer[ed] an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise"); *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (explaining that an investment contract requires "something more" than the mere sale of an asset; it requires "the opportunity to join in a 'common enterprise'"); *see also Rodriguez* v. *Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) ("what was purchased in this case was not a share of a business enterprise and so not a security . . . [neither] the promoter [n]or any other obligated person or entity was promising the buyers to . . . provide anything").

[5]   *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News (Dec. 7, 2022), https://tinyurl.com/5n9ytfys.

SEC also now asserts the authority to extract punitive retroactive penalties from companies for failure to recognize powers its own Chair was disclaiming two years ago.

11.     Coinbase welcomes regulation. Since its inception, Coinbase has sought to comply with all applicable laws and regulations and to work cooperatively with U.S. regulators of all kinds. It has operated for many years under a BitLicense from New York's Department of Financial Services ("DFS") and money transmitter licenses issued by 45 states.[6] Coinbase has even acceded to the SEC's assertion of some authority in the digital asset space. When the SEC first began suggesting that some crypto assets might be investment contracts and therefore securities under *SEC* v. *W.J. Howey & Co.*,[7] Coinbase adopted an internal asset review process to guard against the risk that assets it listed might trip the SEC's conception of an investment contract. Coinbase discussed that process with the SEC on numerous occasions over several years, sharing its approach and thinking. And, with a goal of participating in a market for digital asset securities that Coinbase hoped would someday develop, Coinbase went to great efforts to acquire and reactivate a registered broker and alternative trading system ("ATS").

12.     But in the past year in particular the SEC has dramatically expanded its definition of investment contract and, therefore, its own authority to regulate digital assets. It has done so by decree, arbitrarily, and without congressional mandate. Even as Chair Gensler advanced this agenda, Coinbase sought repeatedly to engage with the agency to understand and address its new position. Coinbase even petitioned the SEC in July 2022 for rulemaking to explain, among other things, what assets the Commission believed were securities.[8] That petition remains unanswered,

---

[6]   *See* Coinbase Global, Inc., Annual Report (Form 10-K) at 15 (Feb. 21, 2023) [hereinafter *Coinbase 2022 Annual Report*], https://tinyurl.com/yv6hhbrw.

[7]   328 U.S. 293 (1946).

[8]   Order, *In re Coinbase, Inc.*, No. 23-1779 (3d Cir. June 20, 2023).

and Coinbase's efforts to compel a decision on it through the avenue of mandamus have generated only requests for further time to consider a position.[9] The agency's dissembling stands in stark contrast to the ready hammer of retroactive enforcement the Commission has meanwhile brought down this year in rapid succession on crypto exchanges Kraken, Beaxy, Bittrex, Binance, Binance.US, and now Coinbase.[10]

13.     On March 22, 2023, the SEC gave Coinbase a Wells Notice alleging that unspecified transactions on its exchange were unregistered securities transactions. This followed only cursory fact-gathering about Coinbase, and arrived while Coinbase was still producing documents to the SEC. SEC Staff had taken testimony from just two mid-level Coinbase employee witnesses. When, upon issuance of the Wells Notice, Coinbase asked, "which digital assets traded on our exchange do you believe constitute securities?," the SEC said it was "not in a position to identify them."

14.     The SEC did not identify any such assets to Coinbase until it filed the Complaint in this action. This was so despite Coinbase's repeated offers throughout the SEC's investigation to discuss, at any time, any specific asset.

15.     None of the assets the SEC has now identified are in fact securities, and for that and other reasons, secondary transactions in those assets are also not securities. Nor are Coinbase's "staking" services a securities offering. None of these satisfy *Howey*'s definition of an "investment contract" — the only type of "security" the SEC says is at issue here. In arguing otherwise, the SEC has advanced a novel construction of the operative term that is divorced from its plain

---

9     Br. for Resp. SEC, *In re Coinbase, Inc.*, No. 23-1779, Dkt. 26 (3d Cir. May 15, 2023).

10    *See SEC* v. *Payward Ventures, Inc. (d/b/a Kraken)*, No. 3:23-cv-00588-JSC (N.D. Cal. Feb. 9, 2023); *SEC* v. *Beaxy Digital, Ltd.*, No. 1:23-cv-01962-LCJ (N.D. Ill. Mar. 29, 2023); *SEC* v. *Bittrex, Inc.*, No. 2:23-cv-00580-RSM (W.D. Wash. Apr. 17, 2023); *SEC* v. *Binance Holdings Ltd.*, No. 1:23-cv-01599-ABJ (D.D.C. June 5, 2023).

meaning and contrary to the historical and statutory context the Supreme Court and the Commission itself long ago agreed must inform the term's meaning.

16.     Even if the SEC's construction were colorable, the major questions doctrine would require its rejection in deference to Congress's prerogative to choose for itself how to regulate "a significant portion of the American economy."[11] That is because courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies."[12] And when an agency "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy,"[13] absent "clear congressional authorization" the courts will not accept an agency's "novel" statutory construction — even if "colorable" or "plausible."[14]

17.     Digital assets are an innovative, trillion-dollar global industry. Congress has for years been debating how best to fill the "regulatory gap" over the industry that the Commission itself identified since at least 2018 and then in Chair Gensler's May 2021 testimony.[15] The very morning the SEC filed its Complaint, Coinbase's Chief Legal Officer appeared before Congress to testify in connection with proposed legislation that would grant shared regulatory authority over digital assets between the SEC and the Commodity Futures Trading Commission ("CFTC") — a reflection that the gap has not already been filled.[16] As one SEC Commissioner stated: "[I]f we

---

[11]    *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2608, 2609 (2022) (*quoting Util. Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)) (cleaned up).

[12]    *West Virginia*, 142 S. Ct. at 2609 (cleaned up).

[13]    *Util. Air Regul. Grp.*, 573 U.S. at 324 (cleaned up).

[14]    *West Virginia*, 142 S. Ct. at 2605, 2609.

[15]    *SEC* v. *Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN, ECF No. 830-46, at 10 (S.D.N.Y. June 13, 2023) (June 12, 2018 e-mail from V. Szczepanik to W. Hinman et al. (attaching comments to "DRAFT Digital Assets Speech")); *see* William Hinman, SEC Dir. Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018) [hereinafter "Hinman Speech"], https://tinyurl.com/9k6hbh3m; *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., *supra* n.2.

[16]    Chief Legal Officer Paul Grewal, Coinbase Global, Inc., *Testimony Before the U.S. House Committee on Agriculture* (June 6, 2023), https://tinyurl.com/yj6uympz.

seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else."[17]

18.     Finally, even if the SEC had the requisite statutory authority, an agency's new interpretation of "investment contract" would require formal rulemaking by that agency. Announcing that purported regulatory authority by means of punitive enforcement actions, rather than by notice-and-comment rulemaking, is a violation of due process and an abuse of the agency's discretion that independently warrants rejection of the claims asserted. That is especially true here, in light of Coinbase's rulemaking petition last summer to the SEC, a petition that the SEC just told a federal appellate court it continues to actively consider.[18]

19.     Confronted with the SEC's improper claims of authority to fill the existing regulatory gap, federal courts have acknowledged the confusion the SEC has created for market participants. As one court recently observed, "[r]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities . . . subject to securities laws, or neither, or even on what criteria should be applied in making the decision."[19] And as another court asked recently, "Why is it prudent,

---

[17]   SEC Comm'r Hester M. Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/2p8z7f2r.

[18]   *See* Coinbase Global, Inc., *Petition for Rulemaking – Digital Asset Securities Regulation* (July 21, 2022) [hereinafter *Coinbase Rulemaking Petition*], https://tinyurl.com/yw63bh43; Coinbase Inc.'s Pet. for Writ of Mandamus, *In re Coinbase, Inc.*, No. 23-1779, ECF No. 1 at 5 (3d Cir. Apr. 26, 2023); Br. for Resp. SEC, *In re Coinbase, Inc.*, No. 23-1779, ECF No. 26 at 2 (3d Cir. May 15, 2023).

[19]   *See In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. Mar. 11, 2023).

from the Commission's point of view, to assign the determination that would have such far-reaching [e]ffects in a billion dollar industry to a lone federal district judge . . . ?"[20]

20.     The answer is that it is neither prudent nor lawful, and the SEC's claims must fail.

## Digital Assets

21.     Digital assets referred to as "cryptocurrencies," "crypto assets," and "tokens," are essentially computer code entries on "blockchain" technology that record the owners' rights to access an application or service on a computer network. A blockchain is a public, encoded electronic ledger that tracks every transaction on a given network, including token transfers if applicable.[21] One in five adults in the United States has owned a cryptocurrency.[22] Digital assets have achieved a market capitalization of over $1 trillion.[23] Hundreds of millions of people globally use cryptocurrency for financial and non-financial purposes.[24]

22.     The first cryptocurrency, Bitcoin, was invented in 2008. Its blockchain-based network allows users to send and receive payments denominated in Bitcoin as the native token.[25] Bitcoin has developed into an important form of international currency. Another major digital asset

---

[20]   Hr'g Tr. for TRO, *SEC* v. *Binance Holdings Ltd.*, No. 1:23-cv-01599-ABJ, ECF No. 69 at 28:12-16 (D.D.C. June 13, 2023).

[21]   There also exist so-called "permissioned," private blockchains that are not open to public use, but Coinbase's business does not implicate these platforms.

[22]   Thomas Franck, *One in Five Adults Has Invested in, Traded or Used Cryptocurrency, NBC News Poll Shows*, CNBC News (Mar. 31, 2022), https://tinyurl.com/2n2bayj9.

[23]   *Cryptocurrency Prices by Market Cap*, CoinGecko (last accessed June 28, 2023) (calculating "global cryptocurrency market cap" at $1.22 trillion), https://tinyurl.com/45aas3hs; *see also* SEC Chair Gary Gensler, *Prepared Remarks of Gary Gensler on Crypto Markets at the Penn Law Capital Markets Association* (Apr. 4, 2022), https://tinyurl.com/3vj9yyfk.

[24]   *Cryptocurrency Owners Grow to 425 Million Through 2022*, Crypto.com (Jan. 19, 2023), https://tinyurl.com/42z5tj46; *see also* S&P Global, *A Deep Dive Into Crypto Valuation* (Nov. 10, 2022), https://tinyurl.com/sfu8jw9k.

[25]   Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008), https://tinyurl.com/4536hnsv. Each blockchain has its own "native" or "base" token — *i.e.*, a digital currency designed to interact directly with the blockchain and ensure the proper function of the blockchain's protocol.

network, Ethereum, was launched in 2015.[26] Like the Bitcoin network, Ethereum uses blockchain technology to facilitate transactions in its native token, Ether. In the years since the Bitcoin and Ethereum platforms launched, thousands of new cryptocurrencies have been developed, with a wide variety of functions and uses.[27] While Bitcoin and Ether remain the two most popular digital assets, there are now over 25,000 other digital assets in circulation.[28]

23.     Digital asset networks rely on decentralized technology. Decentralization marks an important point of distinction between crypto and conventional currencies. When someone pays for a product or service in conventional currency using a bank or credit card company, a centralized intermediary or a series of them records the payment transaction and verifies its legitimacy. With a digital asset transfer, by contrast, transactions are recorded and verified by network users — often thousands of them — running open-source software that updates the ledger. These users are often referred to as "validators."

24.     The security of any blockchain network depends on the legitimacy of validators. Cryptocurrency networks generally use one of two methods to check the validators: "proof of work" or "proof of stake." In a proof-of-work network, like Bitcoin, validators compete to solve a computational puzzle to earn the right to validate the transaction. In a proof-of-stake network, like Ethereum, validators are created by cryptocurrency owners posting some of their tokens in a process called "staking." Validators are responsible for validating transactions on and updating the blockchain. If a validator fails to faithfully follow the rules of the network, it risks losing some or all of its staked assets. Under both proof-of-work and proof-of-stake programs, validators earn

---

[26]   *What is Ethereum?*, The Ethereum Foundation, (last accessed June 28, 2023), https://tinyurl.com/bdfk5f8y.

[27]   *Historical Snapshot – 25 June 2023*, CoinMarketCap, https://tinyurl.com/35zc65mn.

[28]   *Id.*

additional cryptocurrency as compensation for validating other users' transactions and maintaining consensus on the blockchain.

25.     Digital asset tokens offer different kinds of utility to their owners. Many supply a means to transfer funds or pay for products and services without an intermediary like a bank. Payment tokens like these provide access to financial services to many of the nearly 20% of American adults who have no or very limited access to banking.[29] Digital assets also offer those with dependents living abroad a way to send cross-border remittance payments — a form of financial support relied upon by one billion people globally — at a significantly reduced cost.[30]

26.     Other digital assets have utility linked to their specific networks. The token SAND, for example, can be used on a virtual reality platform to purchase virtual properties. FIL is used to buy computing storage space made accessible through its associated platform, the Filecoin Network. Other tokens, like ADA, SOL, FLOW, and MATIC, can be used to pay transaction fees for the various services offered on their respective platforms. Tokens with so-called "governance" attributes — AXS and ICP are examples — can be used to cast votes for changes to a platform's code and thus its functionality.

27.     Once issued by its developer, a token can be traded on a secondary exchange. One customer's offer to buy or trade an asset at a particular price is matched with another customer's offer to sell or trade the asset at that price — the parties exchange (i) one digital asset for (ii) another digital asset or fiat currency. That's it. There are no additional promises involved — not

---

[29]   *See* Bd. of Governors of the Fed. Rsrv. Sys., *Economic Well-Being of U.S. Households in 2021*, at 43-44 (May 2022), https://tinyurl.com/yr53p9f3; *see also* Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stanford Soc. Innovation Rev. (Nov. 24, 2021), https://tinyurl.com/4xhjrxpy.

[30]   *See Crypto could help save people in the US billions of dollars a year in remittance fees*, Coinbase (Apr. 3, 2023), https://tinyurl.com/msj3mxjk.

between the parties to the transaction, and not by the issuer(s) of the asset(s) involved in the transaction. Each transaction is a simple asset sale or trade of the token at issue.

### Coinbase's Business

28.     Coinbase is the largest and only publicly traded digital asset trading platform in the United States. The Company's core mission is to promote economic freedom worldwide through increased access to digital assets.[31]

29.     In October 2020, Coinbase submitted a draft registration statement to the SEC to allow the Company to become publicly traded through a direct public offering ("DPO").[32] After a six-month review of Coinbase's disclosures, the SEC declared the registration statement effective, allowing the Company's common stock to be sold to the general public.[33] That action necessarily reflected the SEC Staff's findings that Coinbase's public listing was consistent with "the public interest and the protection of investors" and that "adequa[te]" information about Coinbase was "available to the public." 15 U.S.C. § 77h(a); 17 C.F.R. § 230.461(b).

30.     The business described in detail to the SEC in 2020 and 2021 is the same business Coinbase operates today. The Company offers four services relevant here — all discussed in the registration statement the SEC declared effective in April 2021.

31.     ***Digital Asset Spot Exchange.*** Customers use Coinbase's platform, called a "spot exchange," to buy, sell, and trade digital assets in exchange for other tokens or for traditional government-backed ("fiat") currency. Coinbase operates a secondary market, matching buy and sell orders for preexisting tokens. The digital asset exchange serves millions of Americans and

---

[31] *Coinbase 2022 Annual Report*, *supra* n.6, at 7.

[32] Coinbase Global, Inc., Draft Registration Statement on Form S-1 (Form DRS) (Oct. 9, 2020), https://tinyurl.com/3nhp4mjr.

[33] Coinbase Global, Inc., Notice of Effectiveness (Apr. 1, 2021), https://tinyurl.com/bde7p3wk.

supports hundreds of billions of dollars' worth of these asset-sale transactions annually.[34] In 2022, trading volume on Coinbase was $830 billion, reflecting its status as a platform trusted by users in more than 100 countries.[35] At least 48 of the more than 240 digital assets traded on Coinbase today were trading on the platform at the time Coinbase went public, and these represent the overwhelming majority of daily trading volume on Coinbase.

32.    *Prime.* Institutional customers can use Coinbase Prime to execute trades at scale. Like Coinbase's exchange, Prime facilitates secondary-market transactions, routing buy and sell orders for already-issued tokens that have been approved for listing on Coinbase's platform. Trades conducted through Prime are routed on an automated basis not only through Coinbase's exchange, but also through a network of other trading venues, allowing users to access effective execution for large-volume trades across a broader array of digital asset markets.[36]

33.    *Wallet.* Coinbase makes publicly available a self-custodial "digital wallet," called Coinbase Wallet.[37] Wallet is free software available in the form of a mobile application or browser extension. The software allows users to store and access their crypto assets on their own computers or mobile devices. Users control access through both a "recovery phrase" and password (called a "private key"), neither of which Coinbase can access, and their assets are never within Coinbase's custody or control.[38] Users can choose to connect their Wallets to third-party decentralized protocols, exchanges, and applications — those third-party platforms make possible the sending,

---

[34]   *Coinbase 2022 Annual Report*, *supra* n.6, at 99.

[35]   *Id.* at 8, 99.

[36]   *Id.* at 9-10.

[37]   Coinbase Wallet is offered by Coinbase Global, Inc.'s wholly-owned, Singapore-based subsidiary, Toshi Holdings. *See Coinbase Web3 Wallet Terms of Service*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/yc75dba3.

[38]   *Coinbase 2022 Annual Report*, *supra* n.6, at 9; *Recovery Phrase*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/3rbyuyxs.

receiving, and swapping of crypto assets, among other decentralized application functions, without using intermediaries such as centralized trading platforms.

34.     ***Staking.*** Coinbase makes available to its users "staking" services by which it facilitates their participation as validators for certain proof-of-stake networks.[39] As noted, proof-of-stake blockchain networks depend for their functionality on token holders' validation through staking, which involves running public open-source software on a computer to validate transactions. Holders who stake their assets receive compensation, paid out by applicable blockchain protocols, in the form of the network's digital asset. This system of staking and attendant rewards has existed since at least 2012, and Ethereum has since emerged as the world's largest proof-of-stake network. Coinbase runs software and provides certain administrative services to allow customers to stake Ether and other select digital assets that operate on a proof-of-stake network. As a fee for this service, Coinbase receives a fixed percentage of participating customers' staking rewards.[40] Three of the five assets available for staking mentioned in the Complaint were offered by Coinbase or discussed with the SEC prior to the DPO.

35.     After the SEC declared Coinbase's registration statement effective, public investors welcomed the opportunity to invest in Coinbase. Today, the Company has a market capitalization of over $16 billion and its equity ownership represents a broad range of stakeholders, including a large contingent of retail investors (over 30% of Coinbase's ownership) and leading asset managers like Vanguard and BlackRock.[41]

---

[39]   Coinbase offers staking services to individual users through its Coinbase Earn program, referred to in the Complaint as the "Staking Program," and referred to herein as Coinbase's "staking services."

[40]   *Coinbase 2022 Annual Report*, *supra* n.6, at 8.

[41]   *See Coinbase Global, Inc. (Coin)*, Yahoo! Fin. (last accessed June 28, 2023), https://tinyurl.com/58tfrrh3; *COIN Institutional Holdings*, Nasdaq (last accessed June 28, 2023), https://tinyurl.com/jv9hmbpr.

## **Coinbase's Voluntary Submission to Regulation**

36.     While most large digital asset platforms have domiciled offshore, Coinbase has from day one voluntarily sought out and subjected itself to U.S. government regulation — including by more than 50 federal and state authorities. Coinbase's founders opted to locate the Company in the United States because of their faith in the American legal system and its ability to provide fair and consistent rules. In accordance with this philosophy, Coinbase has actively engaged with every appropriate U.S. regulator:

37.     ***New York Department of Financial Services (DFS).*** Coinbase has held both a BitLicense and a money transmitter license from DFS since 2017.[42] Because Coinbase is a DFS-regulated virtual currency business, its asset listing process is overseen by DFS and subject to DFS approval.[43] Every digital asset Coinbase lists in New York must be approved by DFS or cleared through a DFS-approved process.[44] Coinbase is also subject to other DFS-monitored regulations, including consumer protection, financial disclosure, anti-money laundering, and cybersecurity requirements.[45]

38.     ***Financial Crimes Enforcement Network (FinCEN).*** Coinbase is regulated by FinCEN as a registered Money Services Business (MSB). As a MSB, Coinbase is subject to anti-money laundering, transaction reporting, and recordkeeping requirements.

39.     ***U.S. Commodity Futures Trading Commission (CFTC).*** Over 70% of the daily trading volume on Coinbase's spot exchange is in tokens the CFTC has publicly stated are commodities. These include Bitcoin, Ether, and a variety of "stablecoins" whose value is pegged

---

[42]   *See Virtual Currency Businesses*, N.Y. Dep't of Fin. Servs., https://tinyurl.com/58r32xnj.

[43]   *Id.*

[44]   *See id.*

[45]   NYCRR Title 23, Ch. I, Pt. 200.

to a reserve asset like the U.S. dollar.[46] The CFTC oversees Coinbase and other platforms that list digital asset commodities to combat fraud and manipulation. In addition to this authority, the CFTC regulates Coinbase's derivatives exchange subsidiary, Coinbase Derivatives, as a CFTC-registered Designated Contract Market.[47]

40.    ***Other State Agencies.*** Coinbase holds money transmitter licenses or their equivalent in 45 states, the District of Columbia, and Puerto Rico — that is, everywhere such a license is required in the United States.

## SEC and Crypto

41.    The Commission's authority under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") extends only to instruments these Acts define as "securities."[48]

42.    The Securities Act defines a "security" as any:

note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, ***investment contract***, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest

---

[46]  *See* Compl., *CFTC* v. *Zhao*, No. 1:23-cv-01887-MSS, ECF No. 1 at ¶¶ 2, 24 (N.D. Ill. Mar. 27, 2023) (alleging that Bitcoin, Ether, Litecoin, Tether, and some "other virtual currencies" are "commodities" under the Commodity Exchange Act); Compl., *CFTC* v. *Russell*, No. 23-cv-2691-EK-TAM, ECF No. 1 at ¶ 12 (E.D.N.Y. Apr. 11, 2023) (alleging that Bitcoin, Ether, and some other cryptocurrencies (*e.g.*, the USD Coin stablecoin) are "commodities" under the Commodity Exchange Act); *see also* CFTC Chair Rostin Behnam, *Testimony Before the U.S. House of Representatives Subcomm. on Agriculture Rural Dev., Food and Drug Administration & Related Agencies* (Mar. 28, 2023) ("I believe [Ether and Bitcoin] are [a] commodity."); CFTC Chair Heath Tarbert, *Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit* (Oct. 10, 2019) ("It is my view as Chairman of the CFTC that [E]ther is a commodity, and therefore it will be regulated under the CEA."), https://tinyurl.com/vrncbmed.

[47]  *See Derivatives Exchange – Regulatory Filings*, Coinbase, https://tinyurl.com/2439awxk.

[48]  *See* 15 U.S.C. §§ 77a *et seq.*; 15 U.S.C. §§ 78a *et seq.*

or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1) (emphasis added).

43.     The Exchange Act defines a "security" as any:

note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, **_investment contract_**, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphasis added).

44.     These similar statutory definitions thus contain 28-plus enumerated items, followed by a catch-all provision. Except for terms involving foreign currency added to the definitions in 1982, every one of the listed items involves the investment of capital in an ongoing managed enterprise, where the return on investment is tied to the performance of management. The classic statutory definitions thus capture what a security is: an investment in a business enterprise backed by a managerial commitment. Securities are thus fundamentally distinguishable from commodities — which are not interests in a business enterprise but generally are just things of some or occasional utility (like gold, or soybeans, or currencies) that trade on markets.

45.     This distinction accounts for the divergent regulatory regimes. The securities laws impose substantial disclosure requirements on issuers because investors in securities need information about the plans, views, and qualifications of the managers who will operate an ongoing

business enterprise. No such issuer disclosures apply to commodities, because their value turns on the operation of markets, not the performance or reliability of management.

46.     For years after Bitcoin arrived on the scene in 2008, the SEC claimed no authority to regulate cryptocurrencies. Bitcoin traded for nearly a decade, and many cryptocurrencies were in broad circulation, before the SEC even suggested that the initial offering of a digital asset by its developer might be a security within the agency's regulatory jurisdiction.

47.     In July 2017, in reporting its investigation of DAO tokens, the Commission first announced its view that certain digital assets sold in initial coin offerings ("ICOs") and immediately thereafter could be "investment contracts" — one of the 28-plus instruments identified in the federal securities statutes.[49] The founders of DAO, which the SEC alleged was not a truly decentralized organization, had sold DAO tokens, which the SEC alleged lacked "meaningful" utility, directly to the public to fund their nascent enterprise.[50] The Commission deemed the resulting arrangement an "investment contract."[51]

48.     But the following year, in June 2018, Division of Corporation Finance Director Bill Hinman gave a landmark speech stating that while a digital asset representing a "financial interest in an enterprise" — *i.e.*, a promise of a token issuance as part of an ICO — might be a security, a token could evolve after an ICO such that "there is no longer any central enterprise being invested in," and the "security" label no longer is apt.[52] As Hinman put it, a "token . . . all by itself is not a security."[53] SEC Staff contemporaneously recognized that such tokens posed a

---

[49]   *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, SEC (July 25, 2017), https://tinyurl.com/2cpax2b4.

[50]   *Id.* at 14-15.

[51]   *Id.* at 11-15.

[52]   Hinman Speech, *supra* n.15.

[53]   *Id.*

"regulatory gap," because they were "no longer securities" — and thus no longer within the ambit of the SEC's regulatory authority.[54] According to Hinman, under this framework, neither of the two most prominent cryptocurrencies, Bitcoin and Ether, were securities as of 2017.[55]

49.     Hinman's remarks were endorsed by then-SEC Chair Jay Clayton[56] and other Commissioners.[57] Then-professor Gary Gensler echoed Hinman's statements when he told his students that "three quarters of the [crypto asset] market is non-securities. It's just a commodity, a cash crypto."[58] And the SEC Staff embraced Hinman's framework in April 2019, when the Strategic Hub for Innovation and Financial Technology published its "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework").[59] The Framework made many of the points outlined in the Hinman Speech, and enumerated factors to consider when assessing whether a digital asset constituted a security — *e.g.*, whether the "holders are then able to use the digital asset for its intended functionality, such as to acquire goods or services on or through the network or platform."[60]

50.     Before assuming the position of SEC Chair in April 2021, Mr. Gensler again recognized the Commission's limited and questionable authority over cryptocurrencies. He called

---

[54]   *SEC* v. *Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN, ECF No. 830-46 at 10 (S.D.N.Y. June 13, 2023) (June 12, 2018 e-mail from V. Szczepanik to W. Hinman et al. (attaching comments to "DRAFT Digital Assets Speech").

[55]   Hinman Speech, *supra* n.15.

[56]   SEC Chair Jay Clayton, *Remarks on Capital Formation at the Nashville 36|86 Entrepreneurship Festival* (Aug. 29, 2018), https://tinyurl.com/58wn8rz2.

[57]   SEC Comm'r Hester Peirce, *Regulation: A View from Inside the Machine* (Feb. 8, 2019), https://tinyurl.com/2dmt2u47.

[58]   Gary Gensler, Lecture Transcript: Blockchain and Money, MIT (Fall 2018), https://tinyurl.com/3jpnxysn.

[59]   SEC FinHub, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019), https://tinyurl.com/2w8u7t6j.

[60]   *Id.* Even as the so-called Hinman factors were elaborated upon in the Framework, SEC Staff had recognized that the factors "appear[ed] to include things that go beyond the typical *Howey* analysis . . . [and] might lead to greater confusion as to what is a security." *SEC* v. *Ripple Labs, Inc.*, No. 1:20-cv-10832-AT-SN, ECF No. 831-70, at 20 (S.D.N.Y. June 13, 2023) (June 12, 2018 e-mail from B. Redfearn to W. Hinman et al. (attaching comments to "DRAFT Digital Assets Speech")).

for "[c]lear rules of the road" to "promot[e] innovation" in the digital asset industry.[61] His early public statements as Chair likewise confirmed his understanding that the SEC lacked broad regulatory authority over crypto assets. In May 2021, Chair Gensler testified before Congress that "only Congress" could address the regulatory gap that Commission officials had long recognized, "because right now the exchanges trading in these crypto assets do not have a regulatory framework."[62] Underscoring the point, Chair Gensler added that "there is not a market regulator around these crypto exchanges."[63]

## Congress and Crypto

51.     Congress, too, has recognized that regulatory authority remains unassigned as to digital assets. Heeding Chair Gensler's call to develop "[c]lear rules of the road,"[64] Congress has created subcommittees of both the House Financial Services Committee, which has jurisdiction over the SEC, and the House Agriculture Committee, which has jurisdiction over the CFTC, focused on digital assets.[65] So far in 2023, Congress has held at least ten hearings in six committees or subcommittees in both the House and the Senate specific to digital assets and blockchain

---

[61]   *Cryptocurrencies: Oversight of New Assets in the Digital Age*, Hr'g Before the U.S. H. Comm. on Agric. at 28 (July 18, 2018) (statement of Gary Gensler) [hereinafter *Gensler 2018 Testimony*], https://tinyurl.com/2c57act4.

[62]   *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, *supra* n.2.

[63]   *Id.*

[64]   *Gensler 2018 Testimony*, *supra* n.61, at 28.

[65]   *See* Subcomm. on Dig. Assets, Fin. Tech. & Inclusion, U.S. House of Representatives – Fin. Servs. Comm., https://tinyurl.com/yc8faxy6; Subcomm. on Commodity Markets, Dig. Assets, and Rural Dev., U.S. House of Representatives – Fin. H. Comm. on Agric., https://tinyurl.com/yhrh6t2p.

technology.[66] Congress has turned this substantial record into proposed legislation: in recent years it has considered no fewer than 15 legislative proposals concerning digital assets, efforts that have seen bipartisan support. Some of these initiatives require the SEC and CFTC to coordinate with each other to recommend a viable federal regulatory regime and enforcement authority for cryptocurrencies.[67] Others affirmatively vest regulatory jurisdiction with the CFTC,[68] or provide expressly that the SEC lacks such regulatory authority.[69] Still others apportion regulatory oversight across multiple agencies. The Crypto-Currency Act of 2020, for example, defines "crypto-commodity," "crypto-currency," and "crypto-security," and assigns primary regulatory authority over such assets to the CFTC, the Secretary of Treasury, and the SEC, respectively.[70] The Digital

---

[66]   *Crypto Crash: Why Financial System Safeguards are Needed for Digital Assets,* Hr'g Before the U.S. S. Comm. on Banking, Housing, and Urb. Aff. (Feb. 14, 2023), https://tinyurl.com/3dve2mnt; *Coincidence or Coordinated? The Administration's Attack on the Digital Asset Ecosystem*, Hr'g Before the U.S. H. Subcomm. on Dig. Assets, Fin. Tech. & Inclusion (Mar. 9, 2023), https://tinyurl.com/5ydb4hya; *Understanding Stablecoins' Role in Payments and the Need for Legislation*, Hr'g Before the U.S. H. Subcomm. on Dig. Assets, Fin. Tech. & Inclusion (Apr. 19, 2023), https://tinyurl.com/anexx3rt; *The Future of Digital Assets: Identifying the Regulatory Gaps in Digital Asset Market Structure*, Hr'g Before the U.S. H. Subcomm. on Dig. Assets, Fin. Tech. & Inclusion (Apr. 27, 2023), https://tinyurl.com/4ytksm4h; *The Future of Digital Assets: Identifying the Regulatory Gaps in Spot Market Regulation*, Hr'g Before the U.S. H. Subcomm. on Commodity Mkts, Dig. Assets, and Rural Dev. (Apr. 27, 2023), https://tinyurl.com/bdzck9mf; *The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Asset Markets*, Joint Hr'g Before the U.S. H. Fin. Servs. Comm. & Agric. Comm. (May 10, 2023), https://tinyurl.com/mr2eddcs; *Putting the 'Stable' in 'Stablecoins': How Legislation Will Help Stablecoins Achieve Their Promise*, Hr'g Before the U.S. H. Subcomm. on Dig. Assets, Fin. Tech. & Inclusion (May 18, 2023), https://tinyurl.com/4shc9wwh; *The Future of Digital Assets: Providing Clarity for Digital Asset Spot Markets*, Hr'g Before the U.S. H. Comm. on Agric. (June 6, 2023), https://tinyurl.com/z44sz9ru; *Building Blockchains: Exploring Web3 and Other Applications for Distributed Ledger Technologies*, Hr'g Before the U.S. H. Subcomm. on Innovation, Data & Commerce (June 7, 2023), https://tinyurl.com/yc7j25yc; *The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem*, Hr'g Before the U.S. H. Fin. Servs. Comm. (June 13, 2023), https://tinyurl.com/9wm2jzn6.

[67]   *See, e.g.*, U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019), https://tinyurl.com/3hscvaj2; Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021), https://tinyurl.com/2mx3mt8m.

[68]   *See, e.g.*, Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022), (defining "digital commodity" and providing CFTC regulatory jurisdiction over digital commodity markets), https://tinyurl.com/45cnjwyd; Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022), (amending Commodities Exchange Act to provide CFTC regulatory jurisdiction over the digital commodity spot market), https://tinyurl.com/bdd7r5p3.

[69]   *See, e.g.*, The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021) (defining "digital token" under the Securities Act and excluding it from the definition of "security"), https://tinyurl.com/bezac866.

[70]   Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020), https://tinyurl.com/589kheax.

Asset Market Structure and Investor Protection Act of 2021 likewise defines "digital asset" and "digital asset security" and vests regulatory jurisdiction with the CFTC and SEC, respectively.[71]

52.     Draft legislation unveiled just this month by the Chairs of the House Committees on Financial Services and Agriculture similarly delineates between "digital commodities" and "restricted digital assets," apportioning jurisdictional authority over digital assets as between the CFTC and SEC — and, like the legislation proposed before it, denies the SEC the expansive jurisdiction it asserts.[72]

53.     Underlying every single one of these congressional efforts are two recognitions. First, that digital assets defy easy or categorical regulatory taxonomy. Second, that the SEC does not have the authority it asserts in this action.

54.     Digital assets are a trillion-dollar industry with the potential to influence every segment of the U.S. economy. Whether, how, and by whom this massive new industry should be regulated implicates a major, unresolved question of government policy. In the face of such uncertainty, and lacking a mandate, regulators may not seize power for themselves. That is the province of the legislature.

## Coinbase's Digital Asset Listing Review Process

55.     Notwithstanding the lack of any congressionally-authorized regulator or actionable regulatory guidance, Coinbase has endeavored to eliminate any risk of running afoul of the securities laws. Recognizing that the DAO report, the Hinman Speech, and FinHub's Framework reflected the SEC's view that *some* crypto assets *could be* securities, Coinbase established a

---

[71] Digital Asset Market Structure and Investor Protection Act, H.R. 4741, 117th Cong. (2021), https://tinyurl.com/yck7dk7j.

[72] *See* Reps. McHenry, Thompson, Hill & Johnson, "Discussion Draft," (June 2, 2023), https://tinyurl.com/3bxcukdf; *see also McHenry, Thompson, Hill, Johnson Release Digital Asset Market Structure Proposal*, U.S. H. Fin. Servs. Comm. (June 2, 2023), https://tinyurl.com/3cf7ydfr.

systematic analytical process for reviewing crypto assets and screening from listing those that could be deemed "securities" under the SEC's definition.

56.     Coinbase's asset listing process has been refined over the years, but the core components have remained constant. Before any token may be listed, it must be approved by the Company's Digital Asset Support Group ("DASG"), previously known as the Digital Asset Listing Group. The DASG's review protocol, developed with the advice of outside legal counsel, focuses on factors the SEC Staff itself has identified as pertinent — including the facts deemed relevant in FinHub's Framework, no-action letters, speeches, and other statements. For each digital asset under consideration to be listed, this process also includes an analysis of regulatory compliance (focused on anti-money laundering) and information security (assessing whether the technology protects consumers from cybersecurity risks).

57.     Reflecting Coinbase's conservative approach, most assets proposed for listing are rejected for legal, security, or compliance reasons — out of thousands considered only around 10% have been approved.

58.     The DASG review process is designed to identify and screen assets posing a high risk that the SEC might deem them "securities." The assets that pass the process exhibit none of the characteristics inherent in a security; they involve no continuing promises from the issuer or developer to the token holder, impose no post-sale obligations on the issuer or developer, and involve no profit-sharing between the issuer or developer and the holders. As Director Hinman explained in his 2018 speech, a digital asset like this "all by itself is not a security."[73]

59.     The DASG process is well known to the SEC, because Coinbase has provided the Staff a window into it over many years. Between June 2018 and August 2020, "in an attempt to be

---

[73] Hinman Speech, *supra* n.15.

as transparent as possible" and to "give [the Staff] an opportunity to raise any questions," Coinbase shared on at least seven occasions its detailed analyses of digital asset candidates, and provided more than a dozen examples of Coinbase's analyses for digital assets it lists.[74] Among the listed assets subject to these presentations were FIL, RGT, and MANA — assets the SEC has now claimed in this action and others are securities.[75] Not once in these many engagements did the Staff respond by questioning Coinbase's digital asset listing decisions or by indicating any disagreement with the analysis that Coinbase shared with the agency in advance of listing.

### Coinbase's Other Engagement with the SEC

60.     Over the years preceding its DPO, Coinbase did not just implement and read the SEC in on its digital asset listing process, but also served as a resource to SEC Commissioners and Staff as they sought to learn more about the crypto industry, and engaged with them on issues beyond asset listing.

61.     For example, in 2019 and 2020, Coinbase undertook extensive efforts with the SEC to develop a path to register an SEC-regulated ATS so it could support trading in certain of those digital assets that might fail its DASG review and thus potentially be viewed as securities. Specifically, in December 2019, Coinbase presented a detailed action plan to the Staff on its efforts to activate its two dormant broker-dealers and to obtain necessary approval from the agency and from the Financial Industry Regulatory Authority ("FINRA"). Coinbase updated the Staff on these efforts in June of 2020 and sought further guidance on how to get the registered platform operative. Coinbase never received such guidance and ultimately withdrew its applications.

---

[74]   Wells Submission on Behalf of Coinbase Global, Inc. and Coinbase, Inc. ("Wells Submission") App'x A at 1 (Apr. 19, 2023) (quoting email from M. Lempres (Coinbase) to V. Szczepanik et al. (SEC), June 28, 2018), https://tinyurl.com/ysxf6vkn.

[75]   *See* Compl. ¶¶ 162-89 (FIL); *SEC* v. *Binance Holdings Ltd.*, No. 1:23-cv-01599-ABJ (D.D.C. June 5, 2023), ECF No. 1 ¶¶ 451-64 (MANA); *SEC* v. *Wahi*, No. 2:22-cv-01009-TL (W.D. Wash. July 21, 2022), ECF No. 1 ¶¶ 145-60 (RGT).

62.     In other cooperative discussions between December 2019 and April 2021, Coinbase gave four presentations to SEC Staff on the Company's staking services. Coinbase explained that it offers its customers the ability to stake their tokens for a "bonding" period set by the particular token's protocol in return for a share of the rewards from the protocol. In availing themselves of these staking services, Coinbase customers "invest" nothing with Coinbase; they just agree to stake their tokens to participate in the process of validating transactions on a blockchain network, and earn rewards from the network for doing so. Nor do they suffer any risk of loss. Normally, a staker who fails to validate properly suffers a "slashing" penalty — a loss of staked tokens. But Coinbase undertakes to cover slashing penalties resulting from the services it provides, and has never experienced a slashing event. The fee that Coinbase receives in connection with customers' staking is for the IT services it provides. For these reasons, Coinbase explained, Coinbase's staking program bears none of the hallmarks of a security. SEC Staff expressed no contrary view.

## Coinbase's DPO Review

63.     Over the six months before it declared Coinbase's registration statement effective in April 2021, the SEC scrutinized Coinbase's proposed disclosures on all aspects of its business. In reviewing the disclosures, the Staff issued three comment letters containing 81 questions and information requests.[76] Coinbase answered all of them.[77]

---

[76]   SEC, Comment Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Dec. 7, 2020), https://tinyurl.com/mp2v4ztf; SEC, Comment Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Feb. 5, 2021), https://tinyurl.com/mu96rx7r; SEC, Comment Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Mar. 12, 2021), https://tinyurl.com/dt5h97bc.

[77]   Coinbase Global, Inc., Response Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Dec. 21, 2020), https://tinyurl.com/mryyy6n4; Coinbase Global, Inc., Response Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Feb. 12, 2021), https://tinyurl.com/yewb6a35; Coinbase Global, Inc., Response Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Mar. 17, 2021), https://tinyurl.com/mrpdanu3.

64.     Among other topics, the disclosures covered Coinbase's asset review process and other measures to ensure the Company does not provide a market for trading in securities. In addition to describing Coinbase's spot exchange, the registration statement contained six references to its Wallet program and 57 references to its staking program. Coinbase's institutional prime services were likewise discussed in the S-1, though they had not yet been launched as a cohesive program.

65.     At no point did the SEC suggest to Coinbase that the business it was describing was an unregistered securities exchange, broker, or clearing agency. Regarding the assets traded on the platform, the Staff just asked Coinbase "to clarify that Bitcoin and Ether are the only digital assets as to which senior officials at the SEC have publicly expressed [the] view" that they are not securities, and further to clarify that "there is currently no certainty" as to whether other digital assets are securities.[78] Likewise, as to staking, the Staff asked Coinbase to "acknowledge that the Staff neither agreed *nor disagreed*" with the Company's analysis and to disclose "that there is regulatory uncertainty" as to the status of these services.[79] In other words, the Staff asked Coinbase to acknowledge that there was a regulatory gap. The same gap that Chair Gensler acknowledged in May 2021, just weeks after Coinbase became a public company, when he testified to Congress that "right now the exchanges trading in these crypto assets do not have a regulatory framework."[80]

66.     The Staff raised no questions about either Wallet or Coinbase's Prime services.

---

[78]   SEC, Comment Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Dec. 7, 2020), https://tinyurl.com/mp2v4ztf.

[79]   SEC, Comment Letter Re: Coinbase Global, Inc. Draft Registration Statement on Form S-1 (Feb. 5, 2021) (emphasis added), https://tinyurl.com/mu96rx7r.

[80]   *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, *supra* n.2.

67.     The securities laws are of course squarely within the SEC's expertise. If the SEC believed that Coinbase's core businesses were illegal under the securities laws, the SEC could have declined to allow Coinbase's registration statement to go effective. Or it could have demanded that Coinbase disclose in the S-1 any legal violations it believed might exist. That is what the SEC has done when other companies whose business was of questionable legality have sought to go public.[81] The SEC did none of those things.

## The SEC Expands Its Own Regulatory Sphere

68.     Not long after Coinbase went public, the SEC's regulatory appetite began to change. Within months of Coinbase's DPO, Chair Gensler, while still acknowledging the limits of the SEC's existing authority in the space, was vowing to "take our [legal] authorities as far as they go" in pursuit of crypto exchanges.[82] The SEC doubled the size of its crypto enforcement unit, and ramped up investigations of digital asset players, including by issuing several subpoenas to Coinbase.[83]

69.     Recognizing the SEC's new focus on digital asset platforms, between April 2021 and July 2022, Coinbase met with the SEC no fewer than 11 times to try to understand its changing position, identify any implications for Coinbase's business, and discuss practical solutions. At six of these meetings — including one with Chair Gensler personally — Coinbase specifically sought the SEC's guidance on registration issues. These efforts spanned more than a year; they yielded no path forward.

---

[81]   *See, e.g.*, Trulieve Cannabis Corp., Registration Statement on Form S-1, at 12 (Jan. 21, 2022) ("***Cannabis is illegal under United States federal law***." (emphasis original)), https://tinyurl.com/3zusbrta.

[82]   *See* SEC, Chair Gary Gensler Letter to Sen. Warren (Aug. 5, 2021), https://tinyurl.com/4c9tfn3t.

[83]   SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://tinyurl.com/w8aap5cn.

70.     By July 2022, Coinbase had heard and watched the SEC claim broader and broader authority to regulate digital assets, but still had been provided no formal rules or guidance as to the standards underlying that position. So, on July 21, 2022, to obtain the notice of the SEC's changed position to which it was entitled, Coinbase formally petitioned the Commission for rulemaking concerning digital asset securities.[84] Coinbase's petition sought among other things a clear position by the SEC on *what* digital assets the SEC believed were securities and needed to be registered, and *how* industry players needed to go about registering them.[85]

71.     The same day Coinbase submitted its petition, the SEC brought a lawsuit — *SEC v. Wahi* — against a 32-year-old former Coinbase employee and his brother for "securities" fraud based on their theft and use of Coinbase's confidential information to front-run purchases of nine tokens traded on Coinbase's platform.[86] The U.S. Department of Justice, in its parallel action, did not allege the tokens were securities.[87] But the SEC did — in a suit that did not name Coinbase or any of the issuers or developers of the tokens at issue. The SEC was thus engaging with Coinbase not through any regulatory process, but instead through litigation-by-proxy — in which Coinbase's asset-listing decisions, its extensive efforts at compliance, and its years of engagement with the SEC were all left to be defended by the ill-equipped, unsympathetic criminals who harmed the Company. Confronted with the defendants' motions to dismiss as well as a host of detailed supporting briefs filed by Coinbase and other *amici* positioned to expose how the suit exceeded the SEC's statutory authority and violated due process (the same foundational infirmities that

---

[84]   *See Coinbase Rulemaking Petition*, *supra* n.18.

[85]   *Id.*

[86]   *See SEC* v. *Wahi*, No. 2:22-cv-01009-TL (W.D. Wash. July 21, 2022).

[87]   *See United States* v. *Wahi*, No. 1:22-cr-00392-LAP (S.D.N.Y. July 19, 2022).

Coinbase again raises in the instant action), the Commission summarily ended the *Wahi* action in a zero-dollar, no-admit-no-deny settlement.[88]

72.     The *Wahi* action, it soon became clear, was part of the SEC's broader campaign to impose backwards-looking liability for the crypto industry rather than forward-looking guidance. A slew of other enforcement actions followed. As the actions mounted, SEC Commissioner Hester Pierce noted the unfairness of regulating by enforcement rather than rulemaking: "Using enforcement actions to tell people what the law is in an emerging industry," she observed, is not a "fair way of regulating" — "one-off enforcement actions and cookie-cutter analysis does not cut it."[89]

73.     By December 2022, Chair Gensler was telling a reporter he felt the SEC had "enough authority" to fully regulate digital asset platforms.[90] This was directly contrary to Chair Gensler's previous recognition that Congress had *not* authorized broad SEC control over digital platforms. And nothing in the law had changed during the intervening 18 months. Yet Mr. Gensler announced that digital asset platforms could and must immediately "come in, talk to us, and register."[91] But Coinbase had met with the SEC dozens of times, and petitioned the SEC for rulemaking, precisely because there were no existing rules for the regulation of digital asset securities and the registration of digital asset exchanges.[92] One significant obstacle lay in the SEC's

---

[88]   *See SEC* v. *Wahi*, No. 2:22-cv-01009-TL, ECF Nos. 109 & 110 (W.D. Wash. June 1, 2023).

[89]   SEC Comm'r Hester Peirce, *Kraken Down*: *Statement on SEC v. Payward Ventures, Inc., et al.* (Feb. 9, 2023), https://tinyurl.com/2mwnuppr.

[90]   Jennifer M. Schonberger, *SEC's Gensler: The 'runway is getting shorter' for non-compliant crypto firms*, Yahoo! Fin. (Dec. 7, 2022), https://tinyurl.com/3yfxn9au.

[91]   SEC Chair Gary Gensler, *Kennedy and Crypto* (Sept. 8, 2022), https://tinyurl.com/595n6xjz.

[92]   *See Coinbase Rulemaking Petition*, *supra* n.18.

own pronouncement that "the venues the SEC oversees solely trade in securities."[93] As even senior SEC officials have admitted that Bitcoin and Ether are commodities rather than securities, there was (and is) no way for an exchange that trades both commodities and securities to register.[94] That is one of the reasons why Coinbase's listing process is designed to preclude listing assets that the SEC might designate as securities based on its prior statements.

74.     Ever open to working with its regulators, Coinbase continued throughout late 2022 and into early 2023 to engage with the SEC. In over a dozen presentations and more than 27 phone calls, Coinbase shared with the SEC its views on a potential structure for registered digital asset securities trading platforms, as well as the feasibility of trading securities and non-securities on a single platform. The day before a scheduled meeting for the Staff to provide its first substantive responses to Coinbase, the Staff canceled the meeting and told Coinbase it would proceed to enforcement instead. Discussions were over.

75.     On March 22, 2023, the SEC Staff issued a Wells Notice informing Coinbase that the Staff intended to recommend that the Commission pursue an enforcement action against the Company. The Wells Notice arrived while Coinbase was still producing documents to the SEC, and after the Staff had taken the testimony of just two mid-level Coinbase employee witnesses. The SEC did not disclose the specifics of its claims against Coinbase. Coinbase asked directly in the Wells Notice phone call: Which assets that trade on our platform are securities? The Staff averred that it was "not in a position" to identify specific assets.

76.     Faced with an imminent enforcement action of uncertain contours and timing, and no decision from the SEC concerning the Company's then nine-month-old petition for rulemaking,

---

[93]   SEC Chair Gary Gensler, *Prepared Remarks of Gary Gensler on Crypto Market to the Penn Law Capital Markets Association* (Apr. 3, 2022), https://tinyurl.com/3vj9yyfk.

[94]   *See* Hinman Speech, *supra* n.15; *see also Gensler 2018 Testimony*, *supra* n.61 (stating that Bitcoin and Ether have "been designated by the SEC as *not securities*" (emphasis added)).

much less any formal guidance concerning the basis for the agency's new regulatory land-grab, Coinbase again sought notice of the SEC's position by moving for mandamus against the Commission in the U.S. Court of Appeals for the Third Circuit.[95] The request was simple. Because the SEC had "repeatedly demonstrated that its mind [wa]s made up to deny [Coinbase's] petition," Coinbase asked the Third Circuit to order the SEC to "state on the record whether or not it would initiate proceedings to establish the ground rules that it has charged others and may soon charge Coinbase with failing to follow."[96] The reason for seeking such relief was plain: the SEC was enforcing new and never-before disclosed standards for regulating digital assets, which were at odds with SEC officials' prior statements and Coinbase's DPO process. Coinbase was entitled to know, as a matter of proper administrative procedure and due process, the SEC's claimed basis for its newly found expansive authority, or to challenge the SEC in court if the SEC refused to provide it.

77.     In its May 15, 2023 response to the mandamus petition, the SEC balked. It said that it had not "secretly decided to deny" Coinbase's petition.[97] Coinbase's suggestion to the contrary, the SEC represented to the court, was "baseless."[98] But in public remarks the very same day, Chair Gensler said the opposite — that there was no need to provide additional guidance and that the "rules have already been published."[99]

---

[95]   *In re Coinbase, Inc.*, No. 23-1779 (3d Cir. Apr. 26, 2023).

[96]   Coinbase Inc.'s Pet. for Writ of Mandamus, *In re Coinbase, Inc.*, No. 23-1779, ECF No. 1 at 5 (3d Cir. Apr. 26, 2023).

[97]   Br. for Resp. SEC, *In re Coinbase, Inc.*, No. 23-1779, ECF No. 26 at 2 (3d Cir. May 15, 2023).

[98]   *Id.*

[99]   Pedro Solimano, *Gensler: SEC 'Stands Ready to Help' as Crypto Startups Face Wave of Enforcement Actions'*, Yahoo! Fin. (May 15, 2023), https://tinyurl.com/3n94axds; *see also* SEC Chair Gary Gensler, *Testimony Before the House Appropriations Subcommittee on Financial Service and General Government* (Mar. 29, 2023) (stating the rules "already exist[,] . . . [t]hey're called the securities regulations"), https://tinyurl.com/mpbjeevj.

78.     Three weeks later, on June 5, 2023, the SEC filed a 136-page complaint against Binance, the world's largest digital asset exchange, and Binance.US.[100]

79.     The next day, on June 6, 2023, the SEC filed this 101-page action against Coinbase, Inc. and Coinbase Global, Inc. Less than 48 hours later, Chair Gensler affirmed that the SEC's expansive, extra-statutory assertion of regulatory authority would continue apace until rebuffed by the courts — in Chair Gensler's estimation, "[i]f you're winning all your cases . . . you're not bringing enough cases."[101]

80.     Later that day, noting the SEC's Complaint against Coinbase, the Third Circuit ordered the SEC to update the court on the status of the Staff's expected "final recommendation . . . on Coinbase's petition for rulemaking," and retained jurisdiction over the matter.[102]

### This Action

81.     The SEC alleges that Coinbase's staking program and 12 digital assets traded on the spot exchange or through Prime — half of which were custodied and/or traded on Coinbase's platform at the time the SEC declared Coinbase's S-1 effective — are securities.[103] The Commission further claims that the free Wallet software is a "broker" of the 12 Coinbase-listed assets and one other, NEXO. Coinbase, the SEC thus asserts, offers and sells unregistered securities and is operating an unregistered exchange, broker, and clearing agency.[104] For these purported transgressions, the SEC seeks an order permanently enjoining aspects of Coinbase's

---

[100]  *SEC* v. *Binance Holdings Ltd.*, No. 1:23-cv-01599-ABJ (D.D.C. June 5, 2023).

[101]  Dave Michaels & Paul Kiernan, *SEC's Gary Gensler Had Crypto in His Sights for Years. Now He's Suing Binance and Coinbase*, Wall St. J. (June 8, 2023), https://tinyurl.com/4743c26j.

[102]  Order, *In re Coinbase, Inc.*, No. 23-1779 (3d Cir. June 20, 2023).

[103]  Compl. ¶¶ 8, 114.

[104]  *Id.* ¶ 8.

operations.[105] It does not offer, and has never offered, a path forward for the industry outside of litigation.

82.     The SEC's claims lack all merit. Its still-evolving legal position rests on a novel, atextual, and acontextual construction of the word "investment contract" in the federal securities statutes that runs directly contrary to SEC officials' public admissions about the limits of their agency's statutory authority. Even were the proffered construction colorable, the major questions doctrine would counsel against its adoption by this Court and in favor of deference to Congress's legislative prerogative to tackle for itself major policy decisions affecting substantial industry segments.

83.     These critical flaws underpin all of the Commission's claims, under the Exchange Act as well as the Securities Act, affecting Coinbase's spot exchange, Prime, Wallet, and staking services. None of these services implicate the offering, listing, brokering, or clearing of securities transactions. Coinbase is still operating today the same business it was operating in April 2021, when the SEC allowed the Company to go public without first registering as a national securities exchange or broker or clearing agency, and without first registering its staking services as an investment contract. Nothing of legal significance has changed since then.

84.     Finally, even were the SEC correct that the assets and services it identifies are within the scope of its existing regulatory authority, this action must be dismissed on the independent grounds that it violates Coinbase's due process rights and constitutes an extraordinary abuse of process. For years, Coinbase has voluntarily submitted to regulation by multiple overlapping regulatory bodies, has adhered to the public and limited formal guidance from the SEC, senior SEC Staff, and the courts about the application of securities law to its industry, and

---

[105] *Id.* at 99-100.

has begged the SEC for guidance about how it thinks the federal securities laws map onto the digital asset industry as the SEC's actions reflected an escalating but undisclosed change in its own view of its authority. Rather than test its new view through notice-and-comment rulemaking, the SEC has chosen to roll out its ever-aggressive agenda through punitive retroactive enforcement actions. Agency enforcement authority is important but not boundless. The SEC's action here is beyond those bounds and unlawful.

## **RESPONSES TO PLAINTIFF'S ALLEGATIONS**

Coinbase, by and through its undersigned counsel, hereby responds to the numbered allegations in the Complaint. All allegations not expressly admitted herein, including those contained in the structural headings or footnotes of the Complaint, are denied. By acknowledging the existence of or referring the Court to documents, reports, or testimony, Coinbase makes no admission as to the truth of the contents of such documents, reports, or testimony, and reserves all rights (and waives no rights) to argue that such documents, reports, or testimony, or any documents, reports, or testimony referenced therein, are objectionable as hearsay or on any other ground.

1.      Coinbase operates a trading platform (the "Coinbase Platform") through which U.S. customers can buy, sell, and trade crypto assets. The assets that Coinbase makes available include crypto asset securities. Coinbase is the largest crypto asset trading platform in the United States and has serviced over 108 million customers, accounting for billions of dollars in daily trading volume in hundreds of crypto assets. The Coinbase Platform merges three functions that are typically separated in traditional securities markets—those of brokers, exchanges, and clearing agencies. Yet, Coinbase has never registered with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets. All the while, Coinbase has earned billions of dollars in revenues by, among other things, collecting transaction fees from investors whom Coinbase has deprived of the disclosures and protections that registration entails and thus exposed to significant risk.

**RESPONSE:** Coinbase admits that it operates a trading platform through which U.S. customers can buy, sell, or trade crypto assets, and that Coinbase's platform is the largest in the United States. The remaining allegations in the third sentence of Paragraph 1 appear to characterize

Coinbase Global, Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2022, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase further admits that it has not registered with the SEC as a broker, national securities exchange, or clearing agency, and avers that it has not done so because it is none of those things. Coinbase further avers that multiple broker-dealers today operate ATSs through which they provide trading platform, brokerage, and custody services directly to retail customers, and denies that exchange, broker, and clearing services are typically separated. Coinbase denies that any of the assets it makes available on its platform include crypto asset securities, that it has deprived anyone of required disclosures or protections, and that it has exposed anyone to significant risk. Coinbase otherwise denies the allegations in Paragraph 1.

2.      Congress enacted the Securities Exchange Act of 1934 (the "Exchange Act") in part to provide for the regulation of the national securities markets. And Congress charged the SEC with protecting investors, preserving fair and orderly markets, and facilitating capital formation, in part through a series of registration, disclosure, recordkeeping, inspection, and anti-conflict-of-interest provisions. These provisions have led to the separation of key functions in the securities markets—including those carried out by brokers, exchanges, and clearing agencies—in part to protect investors and their assets from the conflicts of interest that can arise when these functions merge.

**RESPONSE:** Coinbase admits that Congress enacted the Exchange Act in part to provide for the regulation of the national securities markets, and admits that the Exchange Act grants the SEC authority to regulate transactions of securities in the secondary market. Coinbase denies that the SEC has general authority concerning "investors," denies that either the law or the SEC requires a separation of functions in the securities markets, and otherwise denies the remaining allegations in Paragraph 2.

3.      Since at least 2019, through the Coinbase Platform, Coinbase has operated as:  an unregistered broker, including by soliciting potential investors, handling customer funds and assets, and charging transaction-based fees; an unregistered exchange, including by providing a market place that, among other things, brings together orders of multiple buyers and sellers of crypto assets and matches and executes those orders; and an unregistered clearing agency, including by holding its customers' assets in Coinbase-controlled wallets and settling its

customers' transactions by debiting and crediting the relevant accounts. By collapsing these functions into a single platform and failing to register with the SEC as to any of the three functions, and not having qualified for any applicable exemptions from registration, Coinbase has for years defied the regulatory structures and evaded the disclosure requirements that Congress and the SEC have constructed for the protection of the national securities markets and investors.

**RESPONSE:** Denied. Coinbase avers that it is not, and was never, required to register with the SEC as a broker, national securities exchange, or clearing agency, as it is none of those things. Coinbase further avers that had it been operating as an unregistered national securities exchange, broker, or clearing agency "[s]ince at least 2019," the Commission presumably would have alerted it to that fact during the review of the Company's registration statement in 2020 and 2021, *two years* into this purported defiance.

4.     In addition, during the same period, Coinbase has operated as an unregistered broker through two other services it has offered to investors:  Coinbase Prime ("Prime"), which Coinbase markets as a "prime broker for digital assets" that routes orders for crypto assets to the Coinbase Platform or to third-party platforms; and Coinbase Wallet ("Wallet"), which routes orders through third-party crypto asset trading platforms to access liquidity outside the Coinbase Platform.

**RESPONSE:**  Denied. Coinbase avers that neither Prime nor Wallet[106] constitutes broker services under the securities laws.

5.     Coinbase has carried out these functions despite the fact that the crypto assets it has made available for trading on the Coinbase Platform, Prime, and Wallet have included crypto asset securities, thus bringing Coinbase's operations squarely within the purview of the securities laws. CGI—Coinbase's parent company to which Coinbase's revenues flow—is a control person of Coinbase and thus violated the same Exchange Act provisions as Coinbase.

**RESPONSE:** Coinbase denies the allegations in the first sentence of Paragraph 5. The second sentence of Paragraph 5 sets forth a legal conclusion to which no response is required. Coinbase admits that Coinbase, Inc. is a wholly owned subsidiary of Coinbase Global, Inc. and otherwise denies the allegations in the second sentence of Paragraph 5.

---

[106] Coinbase Wallet is offered by Coinbase Global, Inc.'s wholly-owned, Singapore-based subsidiary, Toshi Holdings. *See Coinbase Web3 Wallet Terms of Service*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/yc75dba3.

6.      For years, Coinbase has made calculated business decisions to make crypto assets available for trading in order to increase its own revenues, which are primarily based on trading fees from customers, even where those assets, as offered and sold, had the characteristics of securities. Since at least 2016, Coinbase has understood that the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and its progeny set forth the relevant test for determining whether a crypto asset is part of an investment contract that is subject to regulation under the securities laws. And, as part of its public marketing campaign to position itself as a "compliant" actor in the crypto asset space, Coinbase has for years touted its efforts to analyze crypto assets under the standards set forth in *Howey* before making them available for trading. But while paying lip service to its desire to comply with applicable laws, Coinbase has for years made available for trading crypto assets that are investment contracts under the *Howey* test and well-established principles of the federal securities laws. As such, Coinbase has elevated its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets.

**RESPONSE:** Denied. Coinbase avers that in the years that preceded Coinbase's DPO, Coinbase proactively and extensively engaged with the SEC, including by providing it with detailed analyses of the digital assets accepted for listing on Coinbase's platform. Coinbase further avers that the SEC did not object to those analyses, did not assert that Coinbase was operating an unregistered national securities exchange or offering unregistered securities, and did not prevent Coinbase from offering its shares to the public. Coinbase further avers that, after the SEC allowed Coinbase to go public, Coinbase made continuous yet fruitless attempts to engage the SEC in discussions about sensible regulation of crypto assets that fall within the SEC's previously articulated — but since abandoned — conception of *Howey*, and has even petitioned the SEC for rulemaking in this area. All to no avail. Coinbase further avers that its efforts to incorporate the SEC's earlier conception of *Howey* into its asset listing process were not "lip service"; out of thousands of digital assets considered by Coinbase, only around 10% have been approved. Were it true that Coinbase "has for years" been offering unregistered securities, the SEC presumably would have said so during the review of the Company's S-1 in 2020 and 2021 and would have deigned to identify for Coinbase before filing this lawsuit the assets it considered to be "securities" that were trading on Coinbase's platform.

7.     In addition, since 2019, Coinbase has offered and sold a crypto asset staking program (the "Staking Program") that allows investors to earn financial returns through Coinbase's managerial efforts with respect to certain blockchain protocols. Through the Staking Program, investors' crypto assets are transferred to and pooled by Coinbase (segregated by asset), and subsequently "staked" (or committed) by Coinbase in exchange for rewards, which Coinbase distributes *pro rata* to investors after paying itself a 25-35% commission. Investors understand that Coinbase will expend efforts and leverage its experience and expertise to generate returns. The Staking Program includes five stakeable crypto assets, and the Staking Program as it applies to each of these five assets is an investment contract, and therefore a security. Yet, Coinbase has never had a registration statement filed or in effect with the SEC for its offers and sales of its Staking Program, thereby depriving investors of material information about the program, undermining investors' interests, and violating the registration provisions of the Securities Act of 1933 ("Securities Act").

**RESPONSE:** Denied. Coinbase avers that rewards for staking are determined by the

blockchain protocol to which a digital asset is staked, not Coinbase. Coinbase further avers that

the fees it earns for its staking services are for administration and IT services, not managerial

expertise or effort; there is no "investment contract" here.

## VIOLATIONS

8.     By engaging in the conduct set forth in this Complaint, Coinbase has acted as an exchange, a broker, and a clearing agency, without registering as an exchange, broker, or clearing agency, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)(1)], and for purposes of Coinbase's violations of the Exchange Act, CGI was a control person of Coinbase under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)]. In addition, through its Staking Program, Coinbase has offered and sold securities without registering its offers and sales, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**RESPONSE:** Denied.

9.     Unless Defendants are permanently restrained and enjoined, there is a reasonable likelihood that they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object in violation of the federal securities laws.

**RESPONSE:** Denied.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

10.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

**RESPONSE:** Denied. Coinbase avers that the Commission lacks authority to bring this action.

11.     The Commission seeks a final judgment:  (a) permanently enjoining Defendants from violating Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a) and 78q-1(b)(1)], and permanently enjoining Coinbase from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon, pursuant to Sections 20(a), 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(a), 78u(d)(3), (5), and (7)]; (c) imposing civil money penalties on Coinbase pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and granting any equitable relief that may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**RESPONSE:** Coinbase admits that the Commission seeks the specified relief. Coinbase denies that the Commission has authority to seek any of it.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

**RESPONSE:** Denied. Coinbase avers that the SEC lacks authority to bring this action.

13.     Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

**RESPONSE:** Coinbase admits that it deploys the identified means or instruments in connection with its business, but denies that any part of its business runs afoul of the securities laws and otherwise denies the allegations in Paragraph 13.

14.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Among other things, Coinbase conducts its business operations in this District, including providing brokerage, trading, and other services to investors located in this District, and holding licenses to conduct crypto asset and money transmitting business activities in this District.

**RESPONSE:** Coinbase admits that venue is proper in this District and that it conducts business in this District. Coinbase otherwise denies the allegations of Paragraph 14.

## DEFENDANTS

15.     **Coinbase** is a Delaware corporation founded in 2012. Coinbase has operated a crypto asset trading platform servicing U.S. customers since 2012. In April 2014, Coinbase became a wholly-owned subsidiary of CGI. Coinbase purports to be "a remote-first company" that maintains no principal executive office.

**RESPONSE:** Admitted. Coinbase avers that it in fact maintains no principal executive

office.

16.     **CGI** is a Delaware corporation founded in January 2014 to act as a holding company for Coinbase. CGI's principal asset is its equity interest in Coinbase. Like Coinbase, CGI purports to have no principal place of business and is a "remote-first company." CGI filed a Form S-1 registration statement with the SEC that was declared effective, and on April 14, 2021 CGI listed its common stock—registered with the SEC pursuant to Section 12(b) of the Exchange Act and trading under the symbol "COIN"—on the Nasdaq Global Select Market.

**RESPONSE:** Admitted. Coinbase avers that Coinbase Global, Inc. in fact maintains no

principal executive office.

## BACKGROUND

### I.     STATUTORY AND LEGAL FRAMEWORK

17.     As the Supreme Court has recently reemphasized, the Securities Act and the Exchange Act "form the backbone of American securities laws." *Slack Tech., LLC v. Pirani*, 598 U.S. ____, 2023 WL 3742580, at *1 (June 1, 2023). These acts define "security" broadly, to include a wide range of assets, including "investment contracts."

**RESPONSE:** Paragraph 17 purports to quote from and characterize the Supreme Court's

opinion in *Slack Technologies, LLC* v. *Pirani*, 598 U.S. ____, 2023 WL 3742580 (June 1, 2023),

to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase

admits that the Securities Act and the Exchange Act define "security" to include an "investment

contract" as among dozens of enumerated items. Coinbase otherwise denies the allegations in

Paragraph 17.

18.     Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. As the United States Supreme Court noted in *Howey*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable

of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299. Courts have found novel or unique investment vehicles to be investment contracts, including those involving orange groves, animal breeding programs, cattle embryos, mobile phones, enterprises that exist only on the internet, and crypto assets (which crypto asset market participants at times also label "cryptocurrencies").

**RESPONSE:** To the extent Paragraph 18 purports to quote from and characterize the Supreme Court's opinion in *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946), and to characterize other judicial opinions, Coinbase respectfully refers the Court to those opinions for their complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 18.

### A.    The Securities Act's Registration and Disclosure Requirements

19.    Congress enacted the Securities Act to regulate the offer and sale of securities.

**RESPONSE:** Admitted.

20.    Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] require registering offers and sales of securities with the SEC.

**RESPONSE:** Admitted.

21.    Registration statements provide public investors with material, sufficient, and accurate information to make informed investment decisions, in particular about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

**RESPONSE:** Admitted. Coinbase further avers that its own registration statement, which described the aspects of its business with which the SEC now purports to take issue, was reviewed by the SEC in 2021 under these standards.

### B.    The Exchange Act's Registration and Other Requirements

22.    To fulfill the purposes of the Exchange Act, Congress imposed registration and disclosure obligations on certain defined participants in the national securities markets, including but not limited to broker-dealers, exchanges, and clearing agencies. The Exchange Act empowers the SEC to write rules to protect investors who use the services of those intermediaries.

**RESPONSE:** Paragraph 22 purports to characterize the purposes and effects of the Exchange Act, to which Coinbase respectfully refers the Court for its complete and accurate contents.

23.     In the Exchange Act, Congress explained that such oversight is essential to the proper functioning of the national securities markets and the national economy:

> [T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto ... [to] perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b.

**RESPONSE:**  Paragraph 23 purports to quote from and characterize 15 U.S.C. § 78b, to which Coinbase respectfully refers the Court for its complete and accurate contents.

24.     Congress also determined that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors." 15 U.S.C. § 78q-1.

**RESPONSE:** Paragraph 24 purports to quote from and characterize 15 U.S.C. § 78q-1, to which Coinbase respectfully refers the Court for its complete and accurate contents.

### i.   *Registration of Exchanges*

25.     In enacting registration provisions for national securities exchanges, Congress found in Section 2(3) of the Exchange Act [15 U.S.C. §78b(3)] that:

> Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation, resulting in

sudden and unreasonable fluctuations in the prices of securities which (a) cause alternately unreasonable expansion and unreasonable contraction of the volume of credit available for trade, transportation, and industry in interstate commerce, (b) hinder the proper appraisal of the value of securities and thus prevent a fair calculation of taxes owing to the United States and to the several States by owners, buyers, and sellers of securities, and (c) prevent the fair valuation of collateral for bank loans and/or obstruct the effective operation of the national banking system and Federal Reserve System.

**RESPONSE:** Paragraph 25 purports to quote from and characterize 15 U.S.C. § 78b(3),

to which Coinbase respectfully refers the Court for its complete and accurate contents.

26.     Accordingly, Section 5 of the Exchange Act [15 U.S.C. § 78e] requires an organization, association, or group of persons that meets the definition of "exchange" under Section 3(a)(1) of the Exchange Act, unless otherwise exempt, to register with the Commission as a national securities exchange pursuant to Section 6 of the Exchange Act.

**RESPONSE:** Paragraph 26 purports to quote from and characterize 15 U.S.C. § 78e, to

which Coinbase respectfully refers the Court for its complete and accurate contents.

27.     Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)] defines "exchange" to mean "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange."

**RESPONSE:** Paragraph 27 purports to quote from and characterize 15 U.S.C. § 78c(a)(1),

to which Coinbase respectfully refers the Court for its complete and accurate contents.

28.     Exchange Act Rule 3b-16(a) [17 C.F.R. § 240.3b-16(a)] further defines certain terms in the definition of "exchange" under Section 3(a)(1) of the Exchange Act, including "[a]n organization, association, or group of persons," as one that:  "(1) [b]rings together the orders for securities of multiple buyers and sellers; and (2) [u]ses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."

**RESPONSE:** Paragraph 28 purports to quote from and characterize 17 C.F.R. § 240.3b-

16(a), to which Coinbase respectfully refers the Court for its complete and accurate contents.

29.     Registration of a trading platform as an "exchange" under the Exchange Act is a bedrock Congressional requirement that permits the SEC to carry out its role of oversight over the national securities markets.

**RESPONSE:**  Paragraph 29 appears to characterize the requirements of the Exchange Act,

to which Coinbase respectfully refers the Court for its complete and accurate contents.

30.     For example, properly registered exchanges must enact rules to govern their and their members' behavior. Under Section 6 of the Exchange Act, the rules, among other things, must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade ... and, in general, to protect investors and the public interest."

**RESPONSE:**  Paragraph 30 purports to quote from and characterize Section 6 of the

Exchange Act, to which Coinbase respectfully refers the Court for its complete and accurate

contents.

31.     These rules are subject to review by the SEC under Section 19 of the Exchange Act [15 U.S.C. § 78s], including before an exchange can be registered and begin operating. This review process is designed to ensure that securities marketplaces operate in a manner consistent with the Exchange Act as its practices and procedures evolve over time, in part to protect investors and the integrity of securities markets that affect national commerce and the economy.

**RESPONSE:**  Paragraph 31 purports to characterize 15 U.S.C. § 78s, to which Coinbase

respectfully refers the Court for its complete and accurate contents.

### ii.     *Registration of Broker-Dealers*

32.     Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] generally requires brokers and dealers to register with the SEC, and a broker or dealer must also become a member of one or more "self-regulatory organizations" ("SROs"), which in turn require members to adhere to rules governing the SRO's members' activities.

**RESPONSE:**  Paragraph 32 purports to characterize laws and rules governing securities

brokers and dealers, to which Coinbase respectfully refers the Court for their complete and

accurate contents.

33.     Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others."

**RESPONSE:** Paragraph 33 purports to quote and characterize 15 U.S.C. § 78c(a)(4), to which Coinbase respectfully refers the Court for its complete and accurate contents.

34.     The regulatory regime applicable to broker-dealers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants. Registered broker-dealers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examination, and general and specific requirements aimed at addressing certain conflicts of interest, among other things. All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets who interact with broker-dealers.

**RESPONSE:** Paragraph 34 purports to characterize rules and regulations governing securities brokers and dealers, to which Coinbase respectfully refers the Court for their complete and accurate contents.

35.     To preserve the maintenance of fair and orderly markets, avoid conflicts of interests, and protect investors, Section 11(a) of the Exchange Act [15 U.S.C. § 78k(a)] prohibits broker-dealers that are members of exchanges from effecting transactions on that exchange for their accounts.

**RESPONSE:** Paragraph 35 purports to characterize 15 U.S.C. § 78k(a), to which Coinbase respectfully refers the Court for its complete and accurate contents.

### iii.     *Registration of Clearing Agencies*

36.     Section 17A(b) of the Exchange Act [15 U.S.C. § 78q-1(b)] generally makes it unlawful "for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security."

**RESPONSE:** Paragraph 36 purports to quote and characterize 15 U.S.C. § 78q-1(b), to which Coinbase respectfully refers the Court for its complete and accurate contents.

37.     Section 3(a)(23)(A) of the Exchange Act [15 U.S.C. § 78c(a)(23)(A)] defines the term "clearing agency" as "any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," as well as "any person … who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or

(ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."

**RESPONSE:** Paragraph 37 purports to quote and characterize 15 U.S.C. § 78c(a)(23)(A),

to which Coinbase respectfully refers the Court for its complete and accurate contents.

38.     Registered clearing agencies are subject to comprehensive regulation—including recordkeeping requirements and SEC examination—under the Exchange Act and the rules thereunder, providing important safeguards to investors and market participants, and to the maintenance of fair competition. Moreover, properly registered clearing agencies must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC.

**RESPONSE:** Paragraph 38 purports to characterize laws and rules governing clearing

agencies, to which Coinbase respectfully refers the Court for their complete and accurate contents.

**C.      Registration of Exchanges, Broker-Dealers, and Clearing Agencies is Essential to the Proper Functioning of the U.S. Securities Markets and to the Protection of Investors.**

39.     In U.S. securities markets, the functions of "exchanges," "broker-dealers," and "clearing agencies" described above are typically carried out by separate legal entities that are independently registered and regulated by the SEC. Separation of these core functions aims to minimize conflicts between the interests of securities intermediaries and the investors they serve. Registration and concomitant disclosure obligations allow the SEC to oversee the business of intermediaries and their relationship with investors, in order to, among other things, protect investors from manipulation, fraud, and other abuses.

**RESPONSE:** Coinbase denies that exchange, broker, and clearing services are typically

separated, but otherwise lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 39, and therefore denies them on that basis.

40.     Investors in securities markets do not interact directly with exchanges or clearing agencies but instead are customers of broker-dealers who effect transactions on investors' behalf. Only broker-dealers (or natural persons associated with a broker-dealer) may become members of a national securities exchange. In addition, broker-dealers who have customers must become members of the Financial Industry Regulatory Authority ("FINRA"), an SRO that imposes its own rules and oversight over broker-dealers, particularly as to protecting retail investors.

**RESPONSE:** Paragraph 40 purports to characterize laws and rules governing national securities exchanges, brokers, and clearing agencies, to which Coinbase respectfully refers the Court for their complete and accurate contents.

41.     Registered national securities exchanges and clearing agencies are also SROs, and therefore must submit all of their proposed rules and rule changes to the SEC for review.

**RESPONSE:** Paragraph 41 purports to characterize laws and rules governing national securities exchanges and clearing agencies, to which Coinbase respectfully refers the Court for their complete and accurate contents.

42.     As noted, the Exchange Act also subjects registered intermediaries to important record keeping and inspection requirements. For example, Section 17 of the Exchange Act [15 U.S.C. § 78q] requires registered national securities exchanges, broker-dealers, and clearing agencies to make and keep records as the SEC prescribes by rule, and subjects those records to reasonable periodic, special, or other examinations by representatives of the SEC.

**RESPONSE:** Paragraph 42 purports to characterize laws and rules governing registered intermediaries, including 15 U.S.C. § 78q, to which Coinbase respectfully refers the Court for their complete and accurate contents.

43.     These provisions are designed to ensure that intermediaries follow the rules designed to protect investors and to promote fair and efficient operation of the securities markets, given their importance to the economic health of the nation. These provisions also seek to ensure, among other things, that investors' securities orders are handled fairly and transparently, that securities transactions result in settlement finality, and that investors' assets are protected and can be recovered if necessary.

**RESPONSE:** Paragraph 43 purports to characterize laws and rules governing registered intermediaries, to which Coinbase respectfully refers the Court for their complete and accurate contents.

## II.     BACKGROUND ON CRYPTO ASSETS AND CRYPTO TRADING PLATFORMS

### A.     Crypto Assets

44.     As used herein, the terms "crypto asset," "digital asset," or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

**RESPONSE:** Paragraph 44 defines the terms "crypto asset," "digital asset," and "token"

as used in the Complaint, and thus no response is required.

45.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques to secure recording of transactions.

**RESPONSE:** Admitted.

46.     Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain—though other crypto assets may also be represented on that same blockchain.

**RESPONSE:** Admitted.

47.     Crypto asset owners typically store the software providing them control over their crypto assets on a piece of hardware or software called a "crypto wallet." Crypto wallets offer a method to store and manage critical information about crypto assets, *i.e.*, cryptographic information necessary to identify and transfer those assets. The primary purpose of a crypto wallet is to store the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain. The public key is colloquially known as the user's blockchain "address" and can be freely shared with others. The private key is analogous to a password and confers the ability to transfer a crypto asset. Whoever controls the private key controls the crypto asset associated with that key. Crypto wallets can reside on devices that are connected to the internet (sometimes called a "hot wallet"), or on devices that are not connected to the internet (sometimes called a "cold wallet" or "cold storage"). All wallets are at risk of being compromised or "hacked," but internet connectivity makes hot wallets easier to access and, therefore, puts them at greater risk from certain hacks.

**RESPONSE:** Coinbase admits the allegations in the first seven sentences of Paragraph

47. Coinbase denies the allegations in the last sentence of Paragraph 47, and specifically denies

the allegation that all digital asset wallets are at risk of being compromised.

**B.     Consensus Mechanisms and Validation of Transactions on a Blockchain**

48.     Blockchains typically employ a "consensus" mechanism that, among other things, aims to achieve agreement among users as to a data value or as to the state of the ledger.

**RESPONSE:** Admitted.

49.     A consensus mechanism describes the particular protocol used by a blockchain to agree on, among other things, which ledger transactions are valid, when and how to update the blockchain, and potentially to compensate certain participants for validating transactions and

adding new blocks. There can be multiple sources for compensation under the terms of the blockchain protocol, including from fees charged to those transacting on the blockchain, or through the creation or "minting" of additional amounts of the blockchain's native crypto asset.

**RESPONSE:** Admitted.

50.     "Proof of work" and "proof of stake" are the two major "consensus mechanisms" used by blockchains. Proof of work, the mechanism used by the Bitcoin blockchain, involves computers, known as "validator nodes," attempting to "mine" a "block" of transactions, in part by guessing a predetermined number. The first "miner" to successfully guess this number earns the right to update the blockchain and is rewarded with the blockchain's native crypto asset. Proof of stake, the consensus mechanism currently used on Ethereum, involves selecting block validators from crypto asset holders who have committed or "staked" a minimum number of crypto assets.

**RESPONSE:** Admitted.

**C.     The Offer and Sale of Crypto Assets**

51.     Persons have offered and sold crypto assets in capital-raising events in exchange for consideration, including but not limited to through so-called "initial coin offerings" or "ICOs," "crowdsales," or public "token sales."  In some instances, the entities offering or selling the crypto assets may release a "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of the offering, and any rights associated with the asset.

**RESPONSE:** Coinbase admits that in some circumstances, developers of crypto assets or their affiliates have offered and sold crypto assets in processes sometimes referred to as "initial coin offerings," "ICOs," "crowdsales," or "token sales," and that some crypto asset developers or affiliates have released informational material regarding the crypto asset, sometimes referred to as a "whitepaper." Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, and therefore denies them on that basis.

52.     Some issuers continue to sell the crypto assets after the initial offer and sale, including directly or indirectly by selling them on crypto asset trading platforms.

**RESPONSE:** Coinbase admits that some issuers of digital assets have been publicly reported to have made multiple sales of their digital assets. Coinbase further admits that some such sales have been publicly reported to have been through digital asset trading platforms. Coinbase

lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 52, and therefore denies them on that basis.

### D.    Crypto Asset Trading Platforms

53.    Crypto asset trading platforms—like the Coinbase Platform, which is described in more detail below—are marketplaces that generally offer a variety of services relating to crypto assets, often including brokerage, trading, and settlement services.

**RESPONSE:** Coinbase admits that the Coinbase platform offers customers the ability to buy, sell, or trade crypto assets in secondary market transactions. Coinbase denies that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53, and therefore denies them on that basis.

54.    Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets. "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-chain" transactions involve the transfer of a crypto asset from one blockchain address to another.

**RESPONSE:** Coinbase admits that the Coinbase platform allows customers to buy, sell, or trade crypto assets in exchange for certain other crypto assets or for fiat currency. Coinbase further admits that some crypto asset transactions conducted on the Coinbase platform involve the transfer of crypto assets from one blockchain address to another, and other crypto asset transactions do not, and that all crypto asset transactions are tracked in Coinbase's internal ledgering system. Coinbase avers that not every on-chain transfer or ledger entry is a transaction — for example, when assets are transferred between two wallet addresses with the same owner. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 concerning other digital asset platforms, and therefore denies them on that basis. Coinbase denies any remaining allegations in Paragraph 54.

55.     Crypto asset trading platforms typically possess and control the crypto assets deposited and/or traded by their customers and, thus, function as a central depository. The customers' entitlements are then typically tracked and maintained on the crypto asset trading platform's internal ledgers. Consistent with Coinbase's failures to register with the SEC in any capacity and follow rules applicable to registered intermediaries, the Coinbase Platform does not segregate a customer's crypto assets from other customers' or the firm's assets.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in the first and second sentences of Paragraph 55 concerning other

digital asset platforms, and therefore denies them on that basis. Coinbase admits that it holds some

customers' digital assets on their behalf, that customer crypto asset balances are maintained

through the Company's internal ledgering processes, and that Coinbase may use shared blockchain

addresses, controlled by Coinbase, to hold digital assets on behalf of customers and/or on behalf

of Coinbase. Coinbase denies any allegation that customers' digital assets are the property of, or

are "possess[ed] and control[led]" by, Coinbase, denies any allegation that Coinbase operates a

national securities exchange, broker, or clearing agency within the meaning of the federal

securities laws, and denies any remaining allegations in Paragraph 55.

56.     The graphic user interfaces employed by crypto asset trading platforms—such as on websites, mobile apps, or other software—typically emulate and function like traditional securities trading screens:  they show order books of the various assets available to trade, and historical trading information like high and low prices, trading volumes, and capitalizations.

**RESPONSE:** Coinbase admits that the Coinbase platform's graphical customer interfaces

display digital assets available for trading and historical trading information for such assets.

Coinbase denies that the provision of basic historical information sometimes also provided by

securities trading platforms transforms the provider of such information into a securities trading

platform or the subject assets into securities. Coinbase further denies any allegation that the

Coinbase platform's graphical user interfaces are designed to emulate and function like a

"traditional securities trading screen." Coinbase otherwise lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 56 with respect to other

digital asset trading platforms, and therefore denies them on that basis. Coinbase denies any

remaining allegations in Paragraph 56.

57.    However, unlike in traditional securities markets, crypto asset trading platforms (including the Coinbase Platform) typically solicit, accept, and handle customer orders for securities;  allow for the interaction and intermediation of multiple bids and offers resulting in purchases and sales;  act as an intermediary in making payments or deliveries, or both;  and maintain a central securities depository for the settlement of securities transactions.

**RESPONSE:** Coinbase admits that the Coinbase platform offers customers the ability to

buy, sell, or trade approved digital assets in secondary market transactions. Coinbase lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

57 with respect to other digital asset trading platforms, and therefore denies them on that basis.

Coinbase denies that it solicits, accepts, or handles orders for securities. Coinbase further denies

the remaining allegations in Paragraph 57 with respect to Coinbase, and specifically denies that

the Coinbase platform offers customers the ability to buy, sell, or trade digital assets that are

securities or that Coinbase operates a national securities exchange, broker, or clearing agency

within the meaning of the federal securities laws.

58.    By contrast, a registered national securities exchange submits information regarding executed trades to a registered clearing agency that takes responsibility for ensuring settlement finality and safekeeping of the assets being traded and, in doing so, protects investors' interests. Thus, registered national securities exchanges typically do not assume possession or control of the underlying assets being traded. Moreover, crypto asset trading platforms usually settle transactions by updating internal records with each investor's positions, a function typically carried out by clearing agencies in compliant securities markets.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in the first and second sentences of Paragraph 58, and therefore denies

them on that basis. With respect to the third sentence of Paragraph 58, Coinbase admits that the

Company tracks customers' ownership of digital assets deposited and/or traded on the Coinbase

platform. Coinbase denies any allegation that the Coinbase platform offers customers the ability

to buy, sell, or trade digital assets that are securities or that it operates a national securities

exchange, broker, or clearing agency within the meaning of the federal securities laws, and denies any remaining allegations as to Coinbase in Paragraph 58. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 58 concerning other digital asset trading platforms, and therefore denies them on that basis.

59.     Likewise, crypto asset trading platforms typically perform roles traditionally assigned to broker-dealers in compliant securities markets, without following or even recognizing the legal obligations and restrictions on activities that accompany status as a broker-dealer.

**RESPONSE:** Denied.

**E.      The DAO Report**

60.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO* (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in the DAO Report were offerings of securities.

**RESPONSE:** Paragraph 60 purports to quote from and characterize the 2017 DAO Report, to which Coinbase respectfully refers the Court for its complete and accurate contents.

61.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration," and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces."  The DAO Report also found that the trading platforms at issue there "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

**RESPONSE:** Paragraph 61 purports to quote from and characterize the 2017 DAO Report, to which Coinbase respectfully refers the Court for its complete and accurate contents.

**FACTS**

**I.     COINBASE'S OPERATIONS AND RELATIONSHIP WITH CGI**

62.     In 2012, Coinbase launched the original version of its trading platform, which, according to Coinbase, allowed "anyone, anywhere [to] be able to easily and securely send and receive Bitcoin."  Today, the Coinbase Platform has evolved into an expansive online trading platform that allows customers to buy, sell, and trade hundreds of crypto assets. Publicly, Coinbase refers to its trading platform as an "exchange."  In addition to the Coinbase Platform, Coinbase offers a host of other services to customers in the United States and abroad, including Prime and Wallet.

**RESPONSE:**  Coinbase admits that the Coinbase platform was launched in 2012. The first

sentence of Paragraph 62 purports to quote from and characterize Coinbase's website, to which

Coinbase respectfully refers the Court for its complete and accurate contents.[107] Coinbase admits

that the Coinbase platform, which the Company sometimes refers to as a "platform," a "spot

market," or an "exchange," offers customers the ability to buy, sell, or trade digital assets listed on

the platform in secondary market transactions and that more than 240 tokens are currently listed

for trading on the Coinbase platform. Coinbase further admits that the Company offers other

products and services, including Prime and Wallet, to customers in the United States and abroad.

Coinbase otherwise denies the allegations in Paragraph 62.

63.     Since at least May 2021, Coinbase has offered Prime, a service Coinbase has marketed to its institutional customers as a "prime broker" (a broker that offers certain services to institutional clients) for digital assets. Prime routes orders to the Coinbase Platform and to third-party platforms, thereby providing customers with what Coinbase describes as "access [to] the broader crypto marketplace rather than relying solely on prices from Coinbase's exchange."

**RESPONSE:**  Coinbase admits that the Company began offering Prime in May 2021, and

avers that before May 2021 it offered institutional prime services that became Prime and that were

described in the registration statement the SEC declared effective in April 2021. Coinbase further

admits  that  Prime  offers  institutional  customers  the  ability  to  execute  secondary  market

---

[107] *See About Coinbase*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/54aa9vtm.

transactions in approved digital assets across multiple trading venues, including the Coinbase platform and third-party platforms. Paragraph 63 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 63.

64.    Wallet, which Coinbase has made available to both retail and institutional customers since 2017, routes customer orders through third-party so-called "decentralized" trading platforms (often referred to as "decentralized exchanges" or "DEXs") to access liquidity outside the Coinbase Platform. Unlike with orders placed directly for routing to and execution on the Coinbase Platform or through Prime, Coinbase does not maintain custody over the crypto assets traded through Wallet. Rather, the assets are "self-custodied" in that "private keys (that represent ownership of the crypto) are stored directly on [the customer's] device."  Crypto assets from numerous blockchains are available to buy, sell, receive, "swap," or "bridge" via Wallet.

**RESPONSE:** Coinbase admits that Wallet, which launched in 2017, is free software that allows users to store and access their digital assets on their mobile devices and/or their computers. Coinbase further admits that Wallet allows users to access third-party decentralized protocols, exchanges, and applications. Coinbase further admits that Wallet is a self-custody wallet, meaning that users control access to their Wallet using a private key, which Coinbase cannot access, and that users' assets are never within Coinbase's custody or control. Coinbase further admits that by connecting their Wallet to third-party decentralized protocols, customers are able to use the functionality of those third-party decentralized protocols and are also able to use their assets in additional ways made possible by third-party applications. The third and fourth sentences of Paragraph 64 purport to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[108] Coinbase otherwise denies the allegations in Paragraph 64.

---

[108] *See Wallet: What's the difference between Coinbase.com and Coinbase Wallet?*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/yvw44y49; *Wallet: Swap*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/ywbnfsmr; *Wallet: Bridging your crypto* (last accessed June 28, 2023), https://tinyurl.com/49ntkb34.

65.    In addition to facilitating secondary market transactions through crypto asset trading, Coinbase allows issuers to offer crypto assets for sale for the first time through the Coinbase "Asset Hub."  Coinbase describes Asset Hub on its website as the place "[w]here asset issuers list, launch, and grow ... [their] asset across Coinbase products."  Coinbase touts that Asset Hub gives issuers the ability to "[u]se a single application to list on the Exchange, Custody, and all our trading interfaces."  Furthermore, Coinbase typically does not limit or restrict the ability of crypto asset issuers or promoters (or their agents) to trade on the Coinbase Platform.

**RESPONSE:** Coinbase denies that it permits digital asset issuers to engage in primary

offerings on the Coinbase platform, and avers that had the SEC ever asked Coinbase about "Asset

Hub" before filing the Complaint the Company would have disabused the agency of this

misperception. Coinbase further denies the allegation in the first sentence of Paragraph 65 that

Coinbase allows any trading activity on its platform "in addition to facilitating secondary market

transactions through crypto asset trading." Coinbase admits that digital asset issuers can apply to

Coinbase for the Company to list their proposed digital assets for secondary market trading on the

Coinbase platform after approval through Coinbase's digital asset listing approval process.

Coinbase further admits that an individual or entity may apply for Coinbase's DASG team to

review a digital asset for potential listing on Coinbase's platform, the digital asset listing

application for which is available on Coinbase's public website on a webpage titled "Asset

Hub."[109] The second and third sentences of Paragraph 65 purport to quote from and characterize

Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate

contents.[110] Coinbase admits that, like any other prospective customer who seeks to buy, sell, or

trade digital assets that Coinbase has chosen to list on the Coinbase platform, digital asset issuers

and their affiliates may be permitted, subject to certain restrictions, to create a Coinbase customer

---

[109] *See Asset Hub*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/mudmch7c.

[110] *See id*.

account and engage in secondary market transactions on the Coinbase platform. Coinbase

otherwise denies the allegations in Paragraph 65.

66.     Coinbase describes the services it offers as "safe, trusted, easy-to-use technology
and financial infrastructure products and services that enable any person or business with an
internet connection to discover, transact, and engage with crypto assets and decentralized
applications."  As Coinbase touts on its website, "we offer a trusted and easy-to-use platform for
accessing the broader cryptoeconomy."

**RESPONSE:** The first sentence of Paragraph 66 appears to quote from and characterize

Coinbase Global, Inc.'s 2022 Annual Report on Form 10-K, to which Coinbase respectfully refers

the Court for its complete and accurate contents. The second sentence of Paragraph 66 purports to

quote from and characterize Coinbase's public website, to which Coinbase respectfully refers the

Court for its complete and accurate contents.[111] Coinbase otherwise denies the allegations in

Paragraph 66.

67.     The Coinbase Platform and Prime are both available through Coinbase's website
(coinbase.com) and mobile application. Customers can open accounts, deposit funds and crypto
assets, enter orders, and trade crypto assets 24 hours a day, seven days a week. Wallet is marketed
on coinbase.com but customers need to download a separate program to access its services and the
crypto assets it supports.

**RESPONSE:** Coinbase admits that customers can access the Coinbase platform and Prime

through Coinbase's website or through a mobile application, 24 hours a day, seven days a week.

Coinbase further admits that customers of the Coinbase platform and Prime are, within the confines

of those services, generally able to open accounts, deposit fiat currency and approved digital assets,

and buy and sell approved digital assets. Coinbase further admits that the Company provides

information regarding Wallet on its website and that customers can access Wallet through a mobile

application or desktop browser extension. Coinbase otherwise denies the allegations in

Paragraph 67.

---

[111] *See About Coinbase*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/54aa9vtm.

68.     Coinbase claims to service over 108 million customers, including U.S. customers, accounting for billions of dollars in daily trading volume. Today, the Coinbase Platform is one of the largest crypto asset trading platforms in the world and the largest in the United States, with exponential growth in the last few years:  In April 2021, Coinbase made available approximately 55 crypto assets for trading on the Coinbase Platform; that number had increased to approximately 254 assets by March 2023. In addition, as of December 2022, Coinbase allowed users to trade more than 16,000 crypto assets via Wallet.

**RESPONSE:** The first sentence of Paragraph 68 appears to characterize Coinbase Global, Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2022, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase further admits that the Coinbase platform is one of the largest digital asset trading platforms in the world and the largest such platform in the United States. Coinbase further admits that 55 digital assets were available for trading on the Coinbase platform in April 2021 and that 236 assets were available for trading on the Coinbase platform in March 2023. Coinbase further admits that as of December 2022, approximately 16,000 digital assets were able to be self-custodied using Wallet, and that by connecting their Wallet to third-party decentralized protocols customers are able to use the functionality of those third-party decentralized protocols and are also able to use their assets in additional ways made possible by third-party applications. Coinbase otherwise denies the allegations in Paragraph 68.

69.     Coinbase generates most of its revenue from transaction fees collected on crypto asset trades made through the Coinbase Platform, Prime, and Wallet. For example, in 2021, Coinbase generated $6.8 billion in "transaction revenue," out of a total net revenue of $7.4 billion. Likewise, in 2022, Coinbase generated over $2.2 billion in transaction revenue out of a total net revenue of $3.1 billion.

**RESPONSE:** Coinbase admits that a portion of its total revenue is generated from transaction fees in connection with the purchase, sale, and trading of digital assets by Coinbase's customers. Coinbase further admits that in fiscal year 2021, Coinbase generated over $6.8 billion in transaction revenue and over $7.3 billion in total net revenue, and in fiscal year 2022, Coinbase generated over $2.3 billion in transaction revenue and over $3.1 billion in total net revenue.

Coinbase avers that since April 15, 2023, Coinbase has not charged a transaction fee or any other fee for Wallet. Coinbase otherwise denies the allegations in Paragraph 69.

70.    The revenue and expenses generated by Coinbase flow up to Coinbase's parent company, CGI. For instance, CGI's consolidated balance sheets and statements of operations for 2022 include, among other items:   funds and crypto assets and liabilities associated with Coinbase's services; total revenue produced by Coinbase's services; Coinbase's technology and development expenses; and Coinbase's sales and marketing expenses.

**RESPONSE:** Paragraph 70 purports to characterize Coinbase's financial statements, to which Coinbase respectfully refers the Court for their complete and accurate contents.

71.    Coinbase and CGI share the same board of directors and the majority of CGI's executive officers hold the same executive positions at Coinbase, including Brian Armstrong, who acts as CEO for both Coinbase and CGI. Both entities operate through the same website (coinbase.com) and disseminate public information through the same blog, Twitter feed, Facebook page, LinkedIn page, and YouTube channel.

**RESPONSE:** Coinbase denies that Coinbase, Inc. and Coinbase Global, Inc. share the same board of directors. Coinbase further denies that Brian Armstrong is the CEO of Coinbase, Inc. and avers that Alesia Haas is the CEO and President of Coinbase, Inc. Coinbase admits that some of the Company's executive officers hold the same executive positions with respect to Coinbase, Inc. and Coinbase Global, Inc. Coinbase further admits that both entities make information available to the public through Coinbase's website, blog, Twitter account, Facebook page, LinkedIn page, and YouTube channel. Coinbase otherwise denies the allegations in Paragraph 71.

72.    Indeed, in their public statements, Coinbase and CGI do not distinguish between themselves. For example, for the year 2022 in its Form 10-K—a comprehensive report filed annually by public companies with the SEC about their financial performance—CGI defines its "Company" to include Coinbase and its other consolidated subsidiaries, and its "Business" as offering "a safe, trusted, easy-to-use platform that serves as a gate to the cryptoeconomy for [its] three customer groups via both custodial and self-custodial solutions: consumers, institutions, and developers."  Furthermore, CGI's Form 10-K includes the following statements, among many other similar statements, regarding the nature of its business:

- "We serve as the consumers' primary crypto account, offering both a custodial solution with the Coinbase application and self-custodied solution with Coinbase Wallet."

- Defining "Supported crypto assets" as "[t]he Crypto assets we support for trading and custody on our platform, which include crypto assets for trading and crypto assets under custody."

- "The Coinbase app provides customers a single platform to discover, trade, stake, store, spend, earn, borrow, and use their crypto assets in both our own proprietary and third party product experiences as we enable access to decentralized applications via an integrated web3 wallet."

- "In connection with our Prime trading service, we routinely route customer orders to third-party exchanges or other trading venues."

- "We have a digital asset support committee that is composed of senior leaders from our product, legal, compliance, finance, and accounting departments. The digital asset support committee reviews the relevant aspects of any asset escalated to it in connection with a listing on our trading platform in accordance with our digital asset support policies and procedures that are designed to mitigate conflicts. Only the digital asset support committee decides which of these escalated assets we can and cannot list on our platform, and it does not coordinate such decisions with anyone outside of the committee."

**RESPONSE:** Coinbase denies the allegation that Coinbase, Inc. and Coinbase Global, Inc. do not distinguish between themselves in their public statements. Paragraph 72 purports to quote from Coinbase Global, Inc.'s 2022 Annual Report on Form 10-K, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 72.

73.    Finally, CGI's Code of Business Conduct & Ethics (also found on coinbase.com) governs CGI as well as Coinbase and refers to both collectively as "Coinbase," the "Company," "we," or "our."

**RESPONSE:** Paragraph 73 purports to quote from and characterize Coinbase Global, Inc.'s Code of Business Conduct & Ethics, which is available on Coinbase's website, and to which Coinbase respectfully refers the Court for its complete and accurate contents.[112]

## II.   THROUGH THE COINBASE PLATFORM, COINBASE PROVIDES EXCHANGE, BROKERAGE, AND CLEARING AGENCY SERVICES TO U.S. CUSTOMERS, AND COINBASE ALSO OFFERS BROKERAGE SERVICES THROUGH PRIME AND WALLET.

74.    Coinbase has never registered with the Commission as a national securities exchange, a broker-dealer, or a clearing agency, and no exemption from registration applies. Nonetheless, from at least 2019 to the present (the "Relevant Period"), Coinbase has acted as an exchange, a broker, and a clearing agency with regard to crypto asset securities available for trading on the Coinbase Platform (as demonstrated in Section III.C below), including through the following conduct:

**RESPONSE:**  Coinbase admits that it is not registered with the SEC as a national securities exchange, broker, or clearing agency because the federal securities laws do not require Coinbase to so register. Coinbase otherwise denies the allegations in Paragraph 74, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

### A.    Coinbase Solicits Customers and Facilitates Trading.

75.    Coinbase regularly solicits customers by advertising on its website and social media the features of the Coinbase Platform, Prime, and Wallet—especially those that allow customers to trade in crypto assets. Coinbase facilitates trading in crypto assets by assisting customers in opening and using trading accounts, handling customer funds and crypto assets, and routing and handling customer orders.

**RESPONSE:** Coinbase admits that it has published information regarding the Coinbase platform, Prime, and Wallet on its website. Coinbase further admits that the Coinbase platform offers customers the ability to buy, sell, or trade digital assets in secondary market transactions. Coinbase otherwise denies the allegations in Paragraph 75, and specifically denies any allegation

---

[112] *See Code of Business Conduct & Ethics*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/2e74hy5k.

that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

76.     On its website, Coinbase markets its services to "individuals who want to trade, send and receive crypto" and "businesses ... who want to accept, custody, [and] trade crypto," while touting the advantages of trading on the Coinbase Platform. For instance, Coinbase's website (coinbase.com) advertises that: "[o]ver 108 million people and businesses trust us to buy, sell, and manage crypto;" the Coinbase Platform provides "[a]ccess to hundreds of cryptocurrencies" in a "safe & secure" manner; and by using the Coinbase mobile application, trading in crypto assets is available "[a]nytime, anywhere."

**RESPONSE:** Paragraph 76 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[113] Coinbase otherwise denies the allegations in Paragraph 76, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

77.     In addition, Coinbase uses the Coinbase blog and its Twitter account—which has over five million followers—to announce when Coinbase first makes a crypto asset available for trading through the Coinbase Platform. For example, on or about March 19, 2021, Coinbase announced on its blog that "Cardano (ADA) is now available on Coinbase," and stated that "customers can now buy, sell, convert, send, receive, or store ADA." The blog post included a link to an "informal asset page[]" for Cardano and instructions for opening a Coinbase account. As of February 2023, the page for Cardano (ADA) included a price chart, "market stats," information about Cardano, such as links to its official website and whitepaper, and information about buying and storing Cardano on Coinbase. The page also included a list of "Related Assets," "Trending assets," "Popular crypto currencies," and frequently asked questions ("FAQs") about Cardano.

**RESPONSE:** Coinbase admits that it has used its blog and Twitter account to publicly announce when a digital asset has been made available for trading in secondary market transactions on the Coinbase platform and through Prime. Coinbase further admits that the Company's Twitter account has over five million followers. The second, third, fourth, and fifth sentences of Paragraph 77 purport to quote from and characterize Coinbase's website, to which Coinbase respectfully

---

[113] *See Welcome to Coinbase*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/bdfy555d.

refers the Court for its complete and accurate contents, except that Coinbase denies that the blog post referenced includes the quote "informal asset page[]."[114] Coinbase otherwise denies the allegations in Paragraph 77, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

78.     Indeed, Coinbase expends hundreds of millions of dollars a year on marketing and sales to maintain and recruit new investors. According to CGI's 2022 Form 10-K filing, Coinbase's "success depends on our ability to retain existing customers and attract new customers, including developers, to increase engagement with our products, services, and platform."  To that end, the Coinbase website is replete with links to open a Coinbase account as well as advertisements marketing monetary incentives and promotions, aimed at attracting more investors to the Coinbase Platform, such as:  offers of $5 in bitcoin as a "first trade incentive"; "50% of each referral's trading fees for their first 3 months"; "Get up to $400 in rewards with Coinbase"; and "Get up to $200 for getting started. Earn free crypto after making your first purchase."

**RESPONSE:**  Coinbase admits that in fiscal year 2022, the Company incurred over $510 million in sales and marketing expenses. Coinbase avers that its S-1, which the SEC declared effective in April 2021, included over a dozen references to the sales and marketing aspects of Coinbase's business. The second sentence of Paragraph 78 purports to quote from and characterize Coinbase Global, Inc.'s 2022 Annual Report on Form 10-K, to which Coinbase respectfully refers the Court for its complete and accurate contents. The third sentence of Paragraph 78 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[115] Coinbase otherwise denies the allegations in Paragraph 78, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

79.     Moreover, the Coinbase website features a "Learn" page, which includes "Beginner guides, practical tips, and market updates for first-timers, experienced investors, and everyone in between," as well as answers to "Crypto questions."  The "Learn" page also features articles and

---

[114] *See Cardano (ADA) is now available on Coinbase*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/2s3hpb7j; *Cardano*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/kyk54an8.

[115] *See generally Coinbase – Buy and Sell Bitcoin, Ethereum, and more*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/22y4bmxr.

video tutorials entitled "When is the best time to invest in crypto?," "How to earn crypto rewards," and "How to invest in crypto via your retirement account."

**RESPONSE:** Paragraph 79 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[116]

80.     Coinbase's "Learning Rewards" program, which is within Coinbase's "Asset Hub" on its website, allows crypto asset issuers and promoters to deliver their content to Coinbase customers, and enables customers to earn crypto assets in exchange for engaging with the content. Coinbase touts the "Worldwide reach" of the program, allowing issuers to "[l]aunch campaigns to our 90m+ user base."

**RESPONSE:** Paragraph 80 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[117]

81.     In fact, Coinbase holds itself out as providing brokerage services. For example, Coinbase markets Prime as a "[a] full-service prime brokerage platform with everything that institutions need to execute trades and custody assets at scale."  According to Coinbase's website, Prime "delivers an institutional-grade trading platform that aggregates multi-venue liquidity, empowers advanced trading strategies, and helps you deploy capital at scale."  Coinbase provides Prime users with the ability to view a pricing feed that aggregates prices from the Coinbase Platform and third-party trading venues (which Coinbase anonymizes, *e.g.*, "Exchange A" or "Exchange B") and allows users to select from a number of order types they can utilize to submit orders through Prime to those venues. Coinbase also provides analytics and promotes them as a resource to "[s]tay ahead of the market with this comprehensive analytics toolkit built to meet the needs of sophisticated investors and market participants."  For instance, Coinbase advertises its "agency trading desk," which "provide[s] insight into the market environment, liquidity characteristics, and trading activity in order to help you plan or execute your trade."

**RESPONSE:** Paragraph 81 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[118] Coinbase admits that Prime offers institutional customers the ability to view digital asset prices and to execute secondary market transactions in digital assets using different order types and across multiple trading venues, including the Coinbase platform and third-party trading venues. Coinbase

---

[116] *See Learn – Crypto questions, answered*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/5e6ats35.

[117] *See Asset Hub – Learning Rewards*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/2nwr29s8.

[118] *See Prime*, Coinbase (last accessed June 28, 2023); *Coinbase Prime – Trading*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/yaf4wtyz.

otherwise denies the allegations in Paragraph 81, and specifically denies any allegation that it

operates a national securities exchange, broker, or clearing agency within the meaning of the

federal securities laws.

82.     Similarly, on its public blog, Coinbase boasts that "Coinbase Wallet brings the
expansive world of DEX trading to your fingertips, where you can easily swap thousands of tokens,
trade on your preferred network, and discover the lowest fees" and "makes it easy to access []
tokens through its trading feature, which compares rates across multiple exchanges."

**RESPONSE:** Paragraph 82 purports to quote from and characterize Coinbase's website,

to which Coinbase respectfully refers the Court for its complete and accurate contents.[119] Coinbase

otherwise denies the allegations in Paragraph 82, and specifically denies any allegation that it

operates a national securities exchange, broker, or clearing agency within the meaning of the

federal securities laws.

## B.     Coinbase Holds and Controls Customers' Funds and Crypto Assets.

83.     Coinbase requires that customers seeking to buy, sell, or trade through the Coinbase
Platform and Prime create an account on coinbase.com and transfer their crypto assets or fiat
currency to Coinbase. Once assets are transferred to Coinbase, Coinbase credits the customer
account with the corresponding amounts in Coinbase's internal ledger. The Coinbase internal
ledger individually tracks each deposit and withdrawal of crypto assets and fiat currency for each
customer, but Coinbase otherwise commingles customer funds and crypto assets that are similar
in nature.

**RESPONSE:** Coinbase admits that customers seeking to buy, sell, or trade digital assets

on the Coinbase platform must create a Coinbase account, and customers may then choose to

transfer digital assets or fiat currency in their account to be held by Coinbase on their behalf, in

accordance with Coinbase's User Agreement. Coinbase further admits that the Company tracks

customers' ownership of digital assets and fiat currency deposited in and withdrawn from their

Coinbase accounts, and that customer cash and crypto asset balances are maintained through

---

[119] *See Trade thousands of tokens on your choice of network in Coinbase Wallet*, Coinbase (May 23, 2022),
https://tinyurl.com/sa8pdex2.

Coinbase's internal ledgering processes. Coinbase further admits that it may use shared blockchain addresses, controlled by Coinbase, to hold digital assets on behalf of customers and/or on behalf of Coinbase, and that customer cash is maintained in segregated Company bank accounts that are held for the exclusive benefit of customers with Coinbase's financial institution banking partners. Coinbase denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws. Coinbase denies any remaining allegations in Paragraph 83.

84.     The Coinbase user agreement ("User Agreement"), which applies to some of Coinbase's services (including the Coinbase Platform and Staking Program), states that crypto assets and fiat currency transferred by a customer to Coinbase are "custodial assets held by Coinbase for [the customer's] benefit."

**RESPONSE:** Paragraph 84 purports to quote from and characterize the Coinbase User Agreement, to which Coinbase respectfully refers the Court for its complete and accurate contents.[120] Coinbase admits that the Coinbase User Agreement applies to certain of Coinbase's products and services, including the Coinbase platform and Coinbase's staking services. Coinbase avers that the Coinbase User Agreement makes clear that staking "does not affect the ownership of [users'] digital assets in any way."

85.     Specifically, the User Agreement provides that customers' crypto assets are held by Coinbase in digital wallets that, according to Coinbase, allow customers to "store, track, transfer, and manage" the balances of their crypto assets. However, Coinbase "store[s] Digital Asset private keys, which are used to process transactions, in a combination of online and offline storage." And Coinbase uses "shared blockchain addresses" (*i.e.*, omnibus wallets on the relevant blockchains), controlled by Coinbase, to hold customers' crypto assets in Coinbase's digital wallets. Coinbase does not create a "segregated blockchain address" for each customer's crypto assets and treats crypto assets held in its wallets—that are the same type and made available across multiple blockchain protocols—as "fungible and the equivalent of each other."

---

[120] *See Coinbase User Agreement*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/2kkppwv6.

**RESPONSE:** Paragraph 85 purports to quote from and characterize the Coinbase User Agreement, to which Coinbase respectfully refers the Court for its complete and accurate contents.[121] Coinbase otherwise denies the allegations in Paragraph 85.

86.     Fiat currency deposited with Coinbase is held in what Coinbase describes as a "US Dollars wallet" ("USD Wallet").  The Coinbase User Agreement notes that the balance of a customer's "USD Wallet is maintained in pooled custodial accounts" controlled by Coinbase.

**RESPONSE:** Paragraph 86 purports to quote from and characterize the Coinbase User Agreement, to which Coinbase respectfully refers the Court for its complete and accurate contents.[122]

### C.     Through the Coinbase Platform, Coinbase Maintains and Provides a Marketplace and Facilities for Trading Crypto Assets.

87.     According to Coinbase's website, the Coinbase Platform allows customers to "buy, sell, and spend crypto on the world's most trusted crypto exchange."  The Coinbase Platform displays current and historical pricing information and other information relevant for trading crypto assets that is akin to what users see on traditional securities platforms (such as those that display aggregate stock market data) on which they can transact in stocks and bonds.

---

[121] *See id.*

[122] *See id.*



**RESPONSE:** The first sentence of Paragraph 87 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[123] Coinbase admits that the Coinbase platform's customer interfaces display digital assets available for trading as well as pricing information and historical trading information for such assets. Coinbase further admits that Paragraph 87 includes what appears to be a screenshot of a purported version of this interface as of an unspecified date. Coinbase denies that the provision of basic historical information sometimes also provided by securities trading platforms in connection with the sale of securities transforms the provider of such information into a securities trading platform or the subject assets into securities. Coinbase otherwise denies the allegations in Paragraph 87, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

---

[123] *See generally Coinbase – Buy and Sell Bitcoin, Ethereum, and more*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/22y4bmxr.

88.     Coinbase allows multiple buyers and sellers to enter orders (any firm indication of a willingness to buy or sell a security, as either principal or agent, including any bid or offer quotation, market order, limit order, or other priced order) for crypto assets into the Coinbase Platform. Buyers and sellers can enter orders for crypto assets in any available "trading pair," which typically involves two crypto assets that can be exchanged directly for each other using their relative price or a crypto asset exchanged for a fiat currency. Coinbase maintains and provides individual order books for each trading pair, *e.g.*, an ADA-USD order book, and all order books reside on a centralized server maintained by Coinbase.

**RESPONSE:**   Paragraph 88 appears to quote from and characterize the Coinbase Markets Trading Rules,[124] to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies any allegation in Paragraph 88 that is inconsistent with its Trading Rules, and further denies that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

89.     Coinbase makes clear that when customers buy or sell crypto assets through Coinbase, they are not buying from Coinbase or selling to Coinbase. Rather, the Coinbase User Agreement states that Coinbase acts as "the agent," transacting on the customers' behalf, to facilitate the purchase and sale of crypto assets between the customers.

**RESPONSE:** Coinbase admits that the Company does not buy digital assets from customers or sell digital assets to customers, and that Coinbase discloses this fact to its customers. The second sentence of Paragraph 89 purports to quote from and characterize the Coinbase User Agreement, to which Coinbase respectfully refers the Court for its complete and accurate contents.[125] Coinbase otherwise denies the allegations in Paragraph 89, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

90.     As demonstrated below, the design and functionality of the unregistered Coinbase Platform is similar to those of properly registered national securities exchanges, including its (i) display of orders, (ii) order book and order types, and (iii) order matching and trading rules.

---

[124] *See Trading Rules*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/3ujk8a7d.

[125] *See Coinbase User Agreement*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/2kkppwv6.

**RESPONSE:** Coinbase denies the allegations in Paragraph 90, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

### i.   *Display*

91.     A subpage within the Coinbase website called "Explore" leads customers to a list of "Crypto prices" for more than 16,000 crypto assets. A customer that selects the filter "Tradable" on this page can consolidate this list (by removing those assets only available through Wallet) into approximately 260 crypto assets available for "trade" on the Coinbase Platform (the "Trading Page"). The Trading Page provides customers with the current price of each crypto asset in U.S. dollars (or other fiat currencies), the current "Market cap," traded volume for that asset over the past 24 hour period, and circulating supply of the crypto asset, as well as the option to view historical data for each asset (by previous hour, day, week, month, or year) in the form of price trends represented by a graph and the percentage change in price of the asset during the chosen period.

**RESPONSE:** Paragraph 91 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[126] Coinbase otherwise denies the allegations in Paragraph 91, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

92.     The crypto assets on the Trading Page appear by full name and ticker symbol and are displayed in descending order from largest to smallest based on "Market cap" (or market capitalization—purportedly measured by the total supply of a crypto asset available in the secondary market multiplied by its price, as in markets for traditional equity securities). Below is an example of how the crypto asset securities set forth in Section III.C herein are displayed on the user interface of the Trading Page of Coinbase's website:

---

[126] *Crypto prices*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/3k56nvc2.



**RESPONSE:** Paragraph 92 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[127] Coinbase admits that Paragraph 92 includes a purported "example" of a version of this webpage as of an unspecified date. Coinbase otherwise denies the allegations in Paragraph 92.

93.     Upon clicking the "Trade" button associated with a crypto asset, and logging in to an account with the Coinbase Platform, customers can view their account balances, and the Coinbase Platform provides fields for customers to enter orders in any available trading pair—including the ability to trade with other customers for the crypto asset selected from the Trading Page.

---

[127]  *Id.*

**RESPONSE:** Paragraph 93 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[128] Coinbase admits that customers of the Coinbase platform are able to access their account via Coinbase's website, including by clicking the "Trade" button for a digital asset on the "Explore" webpage and logging into their account. Coinbase further admits that the Coinbase platform account interfaces allow customers to view their account balances and enter orders in any available trading pair. Coinbase otherwise denies the allegations in Paragraph 93.

94.     Through the Coinbase Platform, Coinbase displays open orders for each crypto asset trading pair resting on the order book and real time data with respect to those open orders in terms of bid and ask prices, trading volume, and trade history. Additionally, Coinbase displays historical trade data (in price, quantity, and time) for each crypto asset available for trading on the Coinbase Platform and allows customers to compare data relating to the terms of crypto asset transactions (*i.e.*, a comparison of the value of proposed crypto asset trading pairs).

**RESPONSE:** Paragraph 94 purports to characterize the information available on Coinbase's website and through its user interfaces, to which Coinbase respectfully refers the Court for their complete and accurate contents.

### ii.     *Order Types and Order Book*

95.     On the Coinbase Platform, customers can place various types of buy and sell orders, including:  (1) a market order (*i.e.*, an order to buy or sell a specified quantity of a crypto asset at the current best available market price); (2) a limit order (*i.e.*, an order to buy or sell a specified quantity of a crypto asset at a specified price or better); or (3) a stop limit order (*i.e.*, an instruction to post an order to buy or sell a specified quantity of a crypto asset but only if and when the best price quotation reaches or passes the selected stop price). Once placed, these orders appear on Coinbase's order book. To place an order to buy, a customer must have sufficient funds in their Coinbase account to cover the value of the order (and similarly, to place an order to sell, the customer must have the asset available in their account) plus any applicable fees.

**RESPONSE:**  Paragraph 95 appears to characterize the Coinbase Markets Trading Rules, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies any allegation in Paragraph 95 that is inconsistent with its Trading Rules.

---

[128] *Id.*

96.     Orders that can execute immediately (*i.e.*, orders posted to the order book at the same price as one or more existing orders) are referred to as "taker orders" because they "take" liquidity from the Coinbase Platform. Orders that do not execute immediately (*i.e.*, orders posted to the order book at a different price than all existing orders) are referred to as "maker orders" because they "make" liquidity in the market. A maker order will rest on the order book at that price until:  (1) it is cancelled by the customer; (2) it expires due to a time limit instruction by the customer; or (3) it is completely filled by one or more taker orders by another customer at the same price.

**RESPONSE:** Admitted.

###     iii.     *Order Matching and Trading Rules*

97.     Coinbase provides a trading facility through the electronic automated matching engine that it operates on the Coinbase Platform. According to the "Trading Rules" Coinbase publishes on its website, the matching engine is programmed with rules that determine how orders will interact and how the users entering such orders agree to the terms of a trade. For instance, according to Coinbase, the matching engine matches orders based on a price-time priority. Moreover, neither the buyer nor the seller knows the identity of the counterparty to the trade.

**RESPONSE:** Coinbase admits that the Company facilitates trading of digital assets through the matching engine that it operates on the Coinbase platform. The second, third, and fourth sentences of Paragraph 97 purport to quote from and characterize the Coinbase Markets Trading Rules available on Coinbase's website, to which Coinbase respectfully refers the Court for their complete and accurate contents.[129] Coinbase otherwise denies the allegations in Paragraph 97, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

98.     Under its price-time priority rule, Coinbase matches orders first based on the best price for the order, and if there are multiple orders at the same price, the order with the earlier time will be matched against the corresponding opposite order first. When a customer enters an order into the order book that is marketable (*i.e.*, the order can match with one or more orders on the opposite side and thus is a taker order), it will be matched with the earliest in time maker order, at the best price on the order book. If the taker order is not completely filled by the first maker order, the taker order will match with the next marketable maker order(s) resting on the book until the taker order is exhausted or there are no more maker orders with which the taker order can match.

---

[129] *See Coinbase Markets Trading Rules*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/3ujk8a7d.

**RESPONSE:** Paragraph 98 appears to characterize the Coinbase Markets Trading Rules available on Coinbase's website, to which Coinbase respectfully refers the Court for their complete and accurate contents.[130]

99.    A customer may cancel an entered order up until the order matches. If there is a match, Coinbase removes the orders from the order book and updates the accounts of the customers who placed the executed orders to reflect their new positions.

**RESPONSE:** Paragraph 99 appears to characterize the Coinbase Markets Trading Rules available on Coinbase's website, to which Coinbase respectfully refers the Court for their complete and accurate contents.[131]

### D.    Coinbase Settles Customers' Trades.

100.    After the matching engine matches orders between customers trading on the Coinbase Platform, Coinbase's Trading Rules state that Coinbase settles the transaction immediately by making corresponding debits and credits in each customer's account on the internal ledgers it maintains to track customers' balances in crypto assets and fiat currency. According to Coinbase, these debits and credits occur "off-chain," meaning the transaction is recorded on Coinbase's internal ledgers, not on any blockchain. Subject to daily withdrawal limits, a customer may immediately arrange to withdraw the assets in their account by instructing Coinbase to transfer the customer's assets to another blockchain wallet (or fiat currency to the customer's bank account) after a transaction is settled.

**RESPONSE:** Paragraph 100 purports to characterize the Coinbase Markets Trading Rules available on Coinbase's website, to which Coinbase respectfully refers the Court for their complete and accurate contents.[132]

### E.    Coinbase Charges Fees on Executed Trades.

101.    Coinbase charges fees for trades executed through the Coinbase Platform and Prime. For trades on the Coinbase Platform, the fee is either a percentage of the order quantity ranging up to 0.60%, or a flat fee based upon the value of the trade. Coinbase charges transaction-based fees for its Prime order routing and execution services, with customers having the option of a single all-in fee or a "[t]ransparent, flat commission in addition to pass-through exchange fees."

---

[130] *Id.*

[131] *Id.*

[132] *Id.*

During the relevant period and through at least March 2023, Coinbase charged a flat fee of 1% of the principal amount for each transaction executed through the swap/trade feature in Wallet.

**RESPONSE:** Coinbase admits the allegations in the first sentence of Paragraph 101. The second sentence of Paragraph 101 appears to characterize the "Exchange fees" section of Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[133] The third sentence of Paragraph 101 appears to quote from and characterize Coinbase's "Coinbase Prime Product Guide," to which Coinbase respectfully refers the Court for its complete and accurate contents.[134] Coinbase avers that since April 15, 2023, Coinbase has not charged a transaction fee or any other fee for Wallet. Coinbase denies any remaining allegations in Paragraph 101, and specifically denies any allegation that it operates a national securities exchange, broker, or clearing agency within the meaning of the federal securities laws.

## III. THE CRYPTO ASSETS TRADED ON THE COINBASE PLATFORM AND THROUGH PRIME AND WALLET INCLUDE ASSETS THAT ARE OFFERED AND SOLD AS SECURITIES.

102. Throughout the Relevant Period, Coinbase—through the Coinbase Platform, Prime, and Wallet—has made available for trading crypto assets that are offered and sold as investment contracts, and thus as securities. This includes, but is not limited to, the 13 crypto asset securities discussed in Section III.C below—a non-exhaustive list of such crypto asset securities.

**RESPONSE:** Denied.

### A. Before Making Crypto Assets Available, Coinbase Has Conducted Risk Assessments that Acknowledge the Potential Application of the Federal Securities Laws to Its Products and Services.

103. Even before the SEC issued the DAO Report in 2017, Coinbase understood that crypto assets could be offered and sold as securities under the federal securities laws—and the implications for Coinbase if it made such securities available for trading to the investing public. For example, in or around December 2016, Coinbase released on its website a document entitled, "A Securities Law Framework for Blockchain Tokens." This document included a section on "How to determine if a token is a security," and explained: "The US Supreme Court case of *SEC v Howey* established the test for whether an arrangement involves an investment contract. An

---

[133] *Exchange fees*, Coinbase (last accessed June 28, 2023), https://tinyurl.com/yttnawmf.

[134] *Coinbase Prime Product Guide*, Coinbase (2022), https://tinyurl.com/mu89cran.

investment contract is a type of security."  This "Framework" acknowledged that "[f]or many blockchain tokens, the first two elements of the Howey test"—*i.e.*, investment of money and common enterprise—"are likely to be met."

**RESPONSE:** Coinbase admits that in December 2016, Coinbase, together with several other entities, published a document entitled "A Security Law Framework for Blockchain Tokens," which outlined certain factors the SEC had, at that time, identified as relevant to the SEC's securities law analysis with respect to digital assets, and which was described as a "general guide for developers and users of tokens"; the document further specified that it was "for general informational purposes only" and should not be relied upon as legal advice. The second, third, fourth, and fifth sentences of Paragraph 103 purport to quote from and characterize "A Security Law Framework for Blockchain Tokens," to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 103.

104.    Recognizing that at least certain crypto assets were being offered, sold, and otherwise distributed by an identifiable group of persons or promoters, in or around September 2018, Coinbase publicly released the "Coinbase Crypto Asset Framework," which included a listing application form for crypto asset issuers and promoters seeking to make their crypto assets available on the Coinbase Platform.

**RESPONSE:** Coinbase admits that in September 2018, it published a blog post on its website titled "Coinbase's New Asset Listing Process," to which Coinbase respectfully refers the Court for its complete and accurate contents.[135] Coinbase avers that the blog post described Coinbase's process for reviewing and determining whether to list digital assets on the Coinbase platform, and that Coinbase had shared and discussed the blog post with the SEC Staff before publishing it on its website. Coinbase denies that the referenced blog post includes the quote "Coinbase Crypto Asset Framework," because the relevant text is "Coinbase Digital Asset Framework." Coinbase admits that the blog post included a link to the Company's digital asset

---

[135] *Coinbase's New Asset Listing Process*, Coinbase (Sept. 25, 2018), https://tinyurl.com/4f9vuuu9.

listing application in addition to other informational links, but denies that its listing application for digital assets is available only to "crypto asset issuers and promoters," and otherwise denies the allegations in Paragraph 104.

105.    Coinbase's listing application required issuers and promoters to provide information about their crypto assets and blockchain projects. It specifically included requests for information relevant to a *Howey* analysis of the crypto asset. For example, the application asked the relevant issuer to identify and/or describe: (i) the "project team" and its involvement in the "development, promotion or function of the [relevant] network"; (ii) any "token sale"; (iii) "the allocation of tokens" to "founders, advisors, employees, a foundation" and others; (iv) "any statements ... made about the token/network noting the potential to realize returns, profits or other financial gain"; and (v) "any efforts to affect the token supply or impact token price (including supply caps, buybacks, repurchases, [and] burning ... )."

**RESPONSE:** Paragraph 105 purports to quote from and characterize Coinbase's listing application, to which Coinbase respectfully refers the Court for its complete and accurate contents.

106.    Additionally, in or around September 2019, Coinbase and other crypto asset businesses founded the Crypto Rating Council ("CRC"). The CRC subsequently released a framework for analyzing crypto assets that "distilled a set of yes or no questions which are designed to plainly address each of the four *Howey* test factors" and assigned to the crypto asset a score ranging from 1 to 5, with a score of 1 indicating that an "asset has few or no characteristics consistent with treatment as an investment contract," and a score of 5 meaning that an "asset has many characteristics strongly consistent with treatment as a security."

**RESPONSE:** Coinbase admits that in September 2019, Coinbase and other digital asset businesses founded the Crypto Rating Council, and that the Crypto Rating Council subsequently released a framework based on factors the SEC had identified as relevant to the Commission's securities law analysis with respect to digital assets. The second sentence of Paragraph 106 purports to quote from and characterize the Crypto Rating Council's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

107.    In announcing the CRC's creation, Coinbase stated, "[a]lthough the U.S. Securities and Exchange Commission has issued helpful guidance, whether any given crypto asset is a security ultimately requires a fact-intensive analysis."  In referencing the SEC staff's "helpful guidance," Coinbase provided a hyperlink to that guidance, entitled "Framework for 'Investment Contract' Analysis of Digital Assets," which was and remains publicly available on the SEC's website at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

**RESPONSE:** Paragraph 107 purports to quote from and characterize a September 30, 2019 blog post on Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.[136]

108.    Starting in 2019, Coinbase used and relied on the CRC framework to assess certain crypto assets in determining whether to make them available for trading on the Coinbase Platform. Meanwhile, between late 2019 and the end of 2020, Coinbase more than doubled the number of crypto assets available for trading on the Coinbase Platform, and it more than doubled that number again in 2021. During this period, Coinbase made available on the Coinbase Platform crypto assets with high "risk" scores under the CRC framework it had adopted. In other words, to realize exponential growth of the Coinbase Platform and boost its own trading profits, Coinbase made the strategic business decision to add crypto assets to the Coinbase Platform even where it recognized the crypto assets had the characteristics of securities.

**RESPONSE:** Coinbase admits that, through the Company's digital asset listing approval process, Coinbase approved 21 digital assets for listing on the Coinbase platform in 2020 and 95 digital assets in 2021. Coinbase further admits that, at the time of its DPO, it listed 55 digital assets on its platform, none of which the SEC Staff asserted were securities prior to or during the review of Coinbase's registration statement or during the course of the SEC's investigation. Coinbase otherwise denies the allegations in Paragraph 108.

109.    As part of these efforts, Coinbase worked closely with issuers of crypto assets who sought to have their crypto assets listed on the Coinbase Platform. Coinbase's "Listings Team" engaged in a dialogue with issuers focused on identifying potential "roadblocks" under *Howey*. For example, on one occasion, Coinbase identified "problematic statements" by an issuer that described its crypto asset "with language traditionally associated with securities," "imply[ing] that the asset is an investment or way to earn profit," "emphasizing the profitability of a project and/or the historic or potential appreciation of the value of [the] asset[s]," "attempts by the project team to have the asset listed on exchanges," and "using terms referring to the asset[s] that are commonly associated with securities such as 'dividend,' 'interest,' 'investment' or 'investors.'" As "possible mitigation[]," Coinbase suggested that the issuer "[r]emove any existing problematic statements, and refrain from making problematic statements in the future."

**RESPONSE:** Coinbase admits that it interacts with individuals providing information about a digital asset that Coinbase is evaluating for listing on its platform, including when needed

---

[136] *See Introducing the Crypto Rating Counsel*, Coinbase (Sept. 30, 2019), https://tinyurl.com/4kkvk7yp.

to collect information Coinbase requires for its listing review process. The third and fourth sentences of Paragraph 109 purport to quote from and characterize alleged communications between Coinbase and an unidentified issuer, to which Coinbase respectfully refers the Court for the complete and accurate contents of any such communications. To the extent a further response is required, Coinbase denies the allegations in Paragraph 109.

110.    Coinbase was thus aware of the risk that it could be making available for trading on the Coinbase Platform crypto assets that were being offered and sold as securities. Indeed, Coinbase touted to the investing public its familiarity with the relevant legal analysis governing the offer and sale of securities. Coinbase also understood that an evaluation of whether an offer and sale of crypto assets is an offer and sale of securities is dependent on individualized facts and circumstances. And Coinbase acknowledged that the different facts and circumstances that accompanied each offer and sale of crypto assets had to be separately weighed, and that such an exercise necessarily involved an assessment of the risk that the offer and sale involved securities.

**RESPONSE:**  Denied. Coinbase avers that it — through collaboration with and review by the SEC — developed a systematic analytical process for reviewing digital assets and screening from listing those that could be deemed "securities" under the SEC's definition. Coinbase further avers that its asset listing process has been refined over the years, but the core components have remained constant: before any token may be listed, it must be approved by the Company's DASG; the DASG's review protocol, developed with the advice of outside legal counsel, focuses on factors the SEC itself has identified as pertinent — including the facts deemed relevant in FinHub's Framework, no-action letters, statements, speeches, and other guidance. Coinbase further avers that out of thousands of digital assets considered by Coinbase, only around 10% have been approved. Coinbase otherwise denies the allegations in Paragraph 110.

**B.    CGI Has Publicly Disclosed the Risks of Coinbase's Unregistered Business Operations.**

111.    As part of its effort to become a public company, CGI publicly filed with the SEC a Form S-1 on February 25, 2021, to register an offering of its Class A Common Stock. SEC staff reviewed that registration statement (and earlier confidential draft versions and subsequent publicly filed amendments) with respect to applicable disclosure and accounting requirements. As part of that review process, SEC staff issued comments and CGI submitted response letters and

amended registration statements. On April 1, 2021, CGI's Form S-1 was declared effective. Declaring effective a Form S-1 registration statement does not constitute an SEC or staff opinion on, or endorsement of, the legality of an issuer's underlying business.

> **RESPONSE:** Coinbase admits the allegations in the first, second, third, and fourth

sentences of Paragraph 111. Coinbase denies the allegations in the last sentence of Paragraph 111.

112.    In its Form S-1, CGI acknowledged the risks that the crypto assets Coinbase makes available for trading could be deemed securities and thus that Coinbase could be found to be engaging in unregistered brokerage, exchange, and/or clearing-agency activity. Specifically, CGI stated the following in the "Risk Factors" section of its Form S-1 (emphases added):

> ***A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty*** and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition. ***The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws.*** The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict. ***The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security.*** Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any continuing evolution. It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff ... With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions we may draw based on our risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws.

> * * * * *

> ***The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and clearing of such assets*** ... Persons that effect transactions in crypto assets that are securities in the United States may be ***subject to registration with the SEC as a "broker"*** or "dealer."  Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the

United States are generally **subject to registration as national securities exchanges**, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, or ATS, in compliance with rules for ATSs. Persons facilitating clearing and settlement of securities may be **subject to registration with the SEC as a clearing agency**.

**RESPONSE:** Paragraph 112 purports to quote from and characterize Coinbase Global, Inc.'s registration statement on Form S-1, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 112.

113.    CGI has made the same disclosures, almost verbatim, in each of its annual and quarterly reports (on Forms 10-K and 10-Q, respectively) filed with the SEC since its Form S-1 became effective.

**RESPONSE:** Paragraph 113 purports to characterize Coinbase Global, Inc.'s public filings with the SEC, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 113.

**C.    Coinbase Has Made Available for Trading Assets that Are Offered and Sold as Securities.**

114.    Throughout the Relevant Period, Coinbase has made available for trading crypto assets that are being offered and sold as investment contracts, and thus as securities. This includes, but is not limited to, the units of each of the crypto asset securities further described below—with trading symbols SOL, ADA, MATIC, FIL, SAND, AXS, CHZ, FLOW, ICP, NEAR, VGX, DASH, and NEXO—(the "Crypto Asset Securities").

**RESPONSE:** Coinbase admits that digital assets with trading symbols SOL, ADA, MATIC, FIL, SAND, AXS, CHZ, FLOW, ICP, NEAR, VGX, and DASH are available for customers to buy, sell, or trade on the Coinbase platform. Coinbase denies that NEXO is available for trading on the Coinbase platform. Coinbase further avers that half of the tokens traded on Coinbase's platform that the SEC alleges to be securities — ADA, CHZ, DASH, FIL, MATIC, and SOL — were custodied or traded on the Coinbase platform by April 2021, when the SEC declared Coinbase's registration statement effective. None of the tokens were identified as investment contracts or securities by the SEC at that time; nor did the SEC assert or allege at that

time that Coinbase was operating a purportedly unregistered exchange, broker, and clearing agency within the meaning of the federal securities laws. Coinbase denies that any digital asset listed on its platform constitutes an investment contract or a security, that the term "Crypto Asset Securities" fairly or accurately describes the digital assets identified by that term, and otherwise denies the allegations in Paragraph 114.

115.    The crypto assets on the Coinbase Platform, or made available through Prime or Wallet, including but not limited to each of the Crypto Asset Securities, may be bought, sold, or traded for consideration, including U.S. dollars, fiat currencies, or other crypto assets.

**RESPONSE:** Coinbase admits that digital assets may be bought, sold, or traded for consideration on the Coinbase platform or through Prime. Coinbase further admits that Wallet allows customers to access third-party decentralized protocols, exchanges, and applications, some of which protocols, exchanges, and applications make possible the buying, selling, and trading of digital assets. Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 115.

116.    Each unit of a particular crypto asset on the Coinbase Platform, or made available through Prime or Wallet, including but not limited to each of the Crypto Asset Securities, trades at the same price as another unit of that same asset.

**RESPONSE:**  Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 116.

117.    These assets, including but not limited to each of the Crypto Asset Securities, are interchangeable (*e.g.*, any ADA or fraction thereof is just like any other). Accordingly, to the extent the assets change in price, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a *pro rata* basis.

**RESPONSE:** Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 117.

118.    The purchase of any particular asset, including but not limited to each of the Crypto Asset Securities, does not appear to give an investor any special rights not available to any other

investor in that asset, such as separately managed accounts, or different capital appreciation as to the value of the crypto assets that other investors in the same assets hold.

**RESPONSE:** Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 118.

119.    The crypto assets on the Coinbase Platform, including but not limited to each of the Crypto Asset Securities (but excluding NEXO which is available only via Wallet), are available for sale broadly to any person who creates an account with Coinbase, and Coinbase's website displays information (like asset price changes) in a format highly similar to trading platforms offered by registered broker-dealers in the traditional securities markets, who permit investors to transact in securities. Coinbase makes these crypto assets available for trading without restricting transactions to those who might acquire or treat the asset as anything other than as an investment.

**RESPONSE:** Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 119.

120.    For example, the below page on Coinbase's website provides price movement and other "Market Stats" for ADA (Cardano):



## Market

**Market stats**

| | | |
|---|---|---|
| MARKET CAP ⓘ | VOLUME (24H) ⓘ | CIRCULATING SUPPLY ⓘ |
| $15.5B | $343.1M | 34.8B ADA |
| TYPICAL HOLD TIME ⓘ | POPULARITY ⓘ | ALL TIME HIGH ⓘ |
| 203 days | #5 | $3.10 |
| PRICE CHANGE (1H) ⓘ | PRICE CHANGE (24H) ⓘ | PRICE CHANGE (7D) ⓘ |
| -0.11% | +2.2% | +8.72% |

**RESPONSE:** Paragraph 120 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

121.     Coinbase customers can access the page for ADA and other asset-specific pages from the "Explore" page on Coinbase's website; they simply click on the name of a particular crypto asset and are redirected to a page where Coinbase provides additional information about that crypto asset. The information on each asset-specific page is typically provided by an identifiable set of asset promoters and/or developers, and it includes, but is not limited to:  (i) the persons who "developed," "launched," or "created" the crypto asset;  (ii) links to any "whitepaper" for the asset's original or ongoing sales; (iii) links to the "website" associated with the asset and its developers or creators; (iv) a compendium of public statements (including on social media) about the asset by its developers or creators and additional information about the asset and its creators that may be available such as the issuer's homepage; (v) information about whether market participants are "bearish," "neutral," or "bullish" about the asset (referring to terms typically associated with whether an investor thinks the price of securities such as stocks are going to go down, stay the same, or go up); (vi) historical information about the "price" of the asset including its "all-time high" price and the "price change" over the last seven days stated as a percentage return on investment; and (vii) "detailed instructions" for "how to buy" the asset on the Coinbase Platform. Because Coinbase has not registered as a broker, national securities exchange, or clearing agency, there is no formal mechanism to ensure the accuracy or consistency of the information Coinbase now selectively discloses about the crypto assets it makes available for trading, including each of the Crypto Asset Securities.

**RESPONSE:** Coinbase denies that the information on each digital asset's page on Coinbase's website was provided to Coinbase by "asset promoters and/or developers," denies that Coinbase "selectively discloses" information about digital assets, and avers that each such page states that "Coinbase makes no representation on the accuracy, suitability, or validity of any information provided or for a particular asset." The first and second sentences of Paragraph 121 purport to quote from and characterize the contents of Coinbase's website, to which Coinbase

respectfully refers the Court for its complete and accurate contents. Coinbase avers that the digital-asset-specific pages on its website, an example of which is the page for Cardano's ADA, reproduced as the first image below, are substantially similar to the listing pages for everyday commodities markets — like trading cards or sneakers, an example for the latter of which ("Jordan 4 Retro" basketball shoes) is reproduced as the second image below.[137]

[Remainder of page intentionally left blank]

---

[137] *Jordan 4 Retro: Thunder (2023) (GS)*, StockX (last accessed June 28, 2023), https://tinyurl.com/y7azke3d





Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 121.

122.    Coinbase does not restrict how many units of a crypto asset, including but not limited to each of the Crypto Asset Securities, any given investor may purchase. Moreover, investors are not required to purchase quantities tied to a purported non-investment "use" that may exist for the asset, if any. To the contrary, investors may and typically do purchase these assets in any amount.

**RESPONSE:** Coinbase admits that, once a customer has created a Coinbase account, and deposited fiat or crypto currency into the account, the customer may purchase for their use digital assets with such deposited funds. Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations of Paragraph 122.

123.    The assets available for sale on the Coinbase Platform, and through Prime and Wallet, including but not limited to each of the Crypto Asset Securities, are transferable and immediately eligible for resale on the Coinbase Platform, Wallet, or other crypto asset trading platforms without any apparent restrictions on resale (including as to the prices or amounts of resale, or the identity of the new buyers).

**RESPONSE:** Coinbase admits that its customers can buy, sell, or trade digital assets on Coinbase's exchange or through Prime. Coinbase specifically denies that any digital assets are bought, sold, or transferred "on" or "through" Wallet, denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term, and denies any remaining allegations in Paragraph 123.

124.    During the Relevant Period, Coinbase has made available for trading on the Coinbase Platform, and through Prime and Wallet, crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities. Those crypto assets include but are not limited to the following assets that Coinbase has made available for trading on the Coinbase Platform:  AMP (the AMP token, available since June 2021), DDX (the DerivaDAO token, available since September 2021), LCX (the LCX token, available since October 2019), OMG (the OMG Network token, available from May 2020 to March 2023), POWR (the Powerledger token, available since November 2021), RLY (the Rally token, available from July 2021 to March 2023), and XYO (the XYO token, available since September 2021).

**RESPONSE:** Coinbase admits that digital assets with the trading symbols AMP, DDX, LCX, POWR, and XYO are available for trading on the Coinbase platform and through Prime, and that OMG and RLY were previously available for such trading. Coinbase further admits that it made AMP, DDX, OMG, POWR, RLY, and XYO available for trading in June 2021, September 2021, May 2020, November 2021, July 2021, and September 2021, respectively. In addition, Coinbase admits that such tokens were identified by the SEC as purported "crypto asset securities" in *Securities and Exchange Commission* v. *Wahi*, No. 2:22-cv-01009-TL (W.D. Wash. July 21, 2022), a case brought by the SEC against a former Coinbase employee and two others for insider trading. Coinbase avers that the *Wahi* litigation ended in a no-admit-no-deny settlement for $0 that avoided the SEC having to submit its claims to proof before a judge or jury, including on the issue of whether any of the alleged assets can be considered securities under existing law.[138] Coinbase denies that the LCX token has been available on its platform since October 2019. Coinbase further denies that any digital assets traded on its platform or through Prime constitute "crypto asset securities." Coinbase further denies that any digital assets are bought, sold, or transferred "through" Wallet. Coinbase otherwise denies the allegations in Paragraph 124.

125.     For purposes of prevailing on the Exchange Act claims set forth herein, the SEC need only establish that Coinbase has engaged in activities relating to a single crypto asset security during the Relevant Period. Nevertheless, set forth below are additional details regarding a non-exhaustive list of 13 Crypto Asset Securities—12 available on the Coinbase Platform (and through Prime and Wallet) and one available only via Wallet (NEXO).

**RESPONSE:** Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 125.

126.     From the time of their first offer or sale, each of these Crypto Asset Securities was offered and sold, and continues to be offered and sold today, as an investment contract and thus a security. For each of the Crypto Asset Securities, statements by the crypto asset issuers and promoters have led investors reasonably to expect profits based on the managerial or entrepreneurial efforts of such issuers and promoters (and associated third persons). This was

---

[138] *See SEC* v. *Wahi*, No. 2:22-cv-01009-TL, ECF Nos. 109 & 110 (W.D. Wash. June 1, 2023).

investors' reasonable expectation whether they acquired the Crypto Asset Securities in their initial offering, from prior investors, or on crypto asset trading platforms including the Coinbase Platform (or through Prime or Wallet). For each of the Crypto Asset Securities, such statements by issuers and promoters include statements made and/or available to the investing public during the period when those Crypto Asset Securities were available for trading on the Coinbase Platform or via Prime or Wallet, as well as other statements described below.

**RESPONSE:** Coinbase denies that the term "Crypto Asset Securities" fairly or accurately describes the assets identified by that term and otherwise denies the allegations in Paragraph 126.

### i.   SOL

127.   "SOL" is the native token of the Solana blockchain. The Solana blockchain was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco that was founded in 2018 by Anatoly Yakovenko ("Yakovenko") and Raj Gokal (Solana Labs' current CEO and COO, respectively). According to Solana's website, www.solana.com, the Solana blockchain is a network upon which decentralized apps ("dApps") can be built, and is comprised of a platform that aims to improve blockchain scalability and achieve high transaction speeds by using a combination of consensus mechanisms.

**RESPONSE:** Coinbase admits that SOL is the native token of the Solana blockchain. Coinbase further admits that the Solana blockchain was created by Solana Labs, Inc., a Delaware corporation reportedly founded by Messrs. Yakovenko and Gokal, its current CEO and COO, respectively, formed in 2018, and headquartered in San Francisco. Coinbase denies any remaining allegations in the first two sentences of Paragraph 127. The third sentence of Paragraph 127 purports to characterize the website www.solana.com, to which Coinbase refers the Court for its complete and accurate contents.

128.   According to Solana's website, SOL may be "staked" on the Solana blockchain to earn rewards, and a certain infinitesimal amount of SOL must be "burned" to propose a transaction on the Solana blockchain, a common function for native tokens on blockchains that constitutes a method for cryptographically distributed ledgers to avoid a potential bad actor from "spamming" a blockchain by overwhelming it with an infinite number of proposed transactions.

**RESPONSE:** Paragraph 128 purports to quote from and characterize Solana's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

129.   Between May 2018 and early March 2020, Solana Labs filed with the SEC multiple forms claiming that its offers and sales of securities—what Solana described in those forms as the

"sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a Simple Agreement for Future Tokens (SAFTs)"—were exempt from registration under Rule 506(c) of Regulation D under the Securities Act. Through these offers and sales of securities, Solana sold approximately 177 million SOL, raising over $23 million.

**RESPONSE:** Coinbase admits that nearly four years ago, between 2018 and 2019, Solana

Labs filed Forms D with the SEC. Paragraph 129 purports to quote from and characterize those

filings, to which Coinbase respectfully refers the Court for their complete and accurate contents.

To the extent a further response is required, Coinbase lacks knowledge or information sufficient

to form a belief as to the truth of any remaining allegations in Paragraph 129, and therefore denies

them on that basis.

130.    Later in March 2020, Solana Labs conducted additional SOL sales on the CoinList trading platform (www.coinlist.co) in a "Dutch auction" (wherein investors place bids and the entire offering occurs at the price with the highest number of bidders). During this offering, Solana Labs sold approximately 8 million SOL, at an average price of $0.22 per SOL, raising approximately $1.76 million. In August 2021, Solana Labs completed another, purportedly private sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency and was required to sign a purchase agreement.

**RESPONSE:** Coinbase admits it was publicly reported that Solana Labs sold through a

Dutch auction approximately eight million SOL in March 2020 for approximately $1.76 million.

Coinbase further admits it was publicly reported that Solana Labs completed an approximately

$314 million private token sale in 2021. Coinbase lacks knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 130, and therefore denies

them on that basis.

131.    Beginning in February 2020, Solana Labs took steps to make SOL available for trading on crypto asset trading platforms. For example, in a September 17, 2020, Twitter post, Solana Labs stated:  "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us."  In another Twitter post later the same day, Solana Labs stated:  "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 131, and therefore denies them on that basis. The second and third sentences of Paragraph 131 purport to quote from and characterize posts on Solana Lab's Twitter account, to which Coinbase respectfully refers the Court for their complete and accurate contents.

132.   SOL has been available for buying, selling, and trading on the Coinbase Platform since approximately June 2021.

**RESPONSE:** Admitted.

133.   The information Solana Labs publicly disseminated, including since the initial sales of SOL, led SOL holders, including those who purchased SOL since June 2021, reasonably to view SOL as an investment in and expect to profit from Solana Labs' efforts to grow the Solana protocol, which, in turn, would increase the demand for and the value of SOL.

**RESPONSE:** Denied.

134.   Solana Labs stated publicly that it would pool the proceeds from its private and public SOL sales in omnibus crypto asset wallets that it controlled, and that it would use those proceeds to fund the development, operations, and marketing efforts with respect to the Solana blockchain in order to attract more users to that blockchain (potentially increasing the demand for, and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL). For example, in connection with the 2021 private sale of SOL, Solana Labs stated publicly that it would use investor funds to:  (i) hire engineers and support staff to help grow Solana's developer ecosystem; (ii) "accelerate the deployment of market-ready applications focused on onboarding the next billion users into crypto"; (iii) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana";  and (iv) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

**RESPONSE:** Paragraph 134 appears to quote from and characterize a press release by Solana Labs approximately two years ago, on June 9, 2021, to which Coinbase respectfully refers the Court for its complete and accurate contents.

135.   As Solana Labs stated publicly, of the 500 million SOL tokens initially minted, 12.5% were allocated to Solana Labs' founders, including Yakovenko and Gokal, and another 12.5% were allocated to the Solana Foundation, a non-profit organization headquartered in Zug, Switzerland "dedicated to the decentralization, growth, and security of the Solana network."  In fact, on April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement of the Solana Foundation's formation, Solana Labs stated that

"[t]he Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol."

**RESPONSE:** Coinbase admits that it has been publicly reported that 125 million of the 500 million SOL initially minted were allocated to Solana Labs' team and the Solana Foundation. The remaining allegations in Paragraph 135 purport to quote from and characterize blog posts on the Solana website from January 7, 2022 and June 7, 2022, to which Coinbase respectfully refers the Court for their complete and accurate contents.

136.   Solana Labs' two original founders have worked for the Solana Foundation. Gokal currently serves as a member of the Solana Foundation Council. And Yakovenko was a member and President of the Solana Foundation Council from its founding until December 2021, when he stepped down to focus on his work at Solana Labs.

**RESPONSE:** Coinbase admits that it has been publicly reported that Messrs. Gokal and Yakovenko have served as members of the Solana Foundation Council, and that Mr. Yakovenko relinquished his role as member and President in December 2021. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 136, and therefore denies them on that basis.

137.   In public statements on its website and social media pages, including statements made and available during the period when SOL was available to trade on the Coinbase Platform, Solana specified its expertise in developing blockchain networks and described the efforts Solana and its founders had made and would continue to make to develop the Solana blockchain protocol and attract users to the technology, which, again, required those utilizing the technology to demand some amount of SOL.

**RESPONSE:** Denied.

138.   Solana Labs undertook other promotional efforts to increase participation in its network and thus demand for SOL, including with:  (a) a Solana podcast of which there have been at least 90 episodes since July 2019, with interviews of key Solana Labs management and other key personnel, including Yakovenko; (b) a YouTube channel with over 37,000 subscribers; and (c) dedicated Telegram, Twitter, Reddit, Solana Forums, Discord, GitHub, Meetup, and Weibo channels, with links to each available on Solana's website.

**RESPONSE:** Coinbase admits that the Solana Foundation's podcast "Validated" has released more than 90 episodes, the first five of which aired in July and August 2019 and featured

interviews with members of Solana Labs management. Coinbase further admits that Solana Lab's YouTube channel has over 37,000 subscribers. Section (c) of Paragraph 138 purports to characterize Solana Lab's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 138.

139.    These promotional statements that Solana Labs made in these fora with respect to SOL and Solana Labs' efforts to increase demand and value for SOL included, for example:

- A July 28, 2019 post on Solana Labs' Medium blog in which Yakovenko stated that "Solana ... supports upwards of 50,000 TPS" (transactions per second) "making it the most performant blockchain and the world's first web-scale decentralized network" and that the "Solana team—comprised of pioneering technologists from [several high-profile technology companies]—has focused on building the tech required for Solana to function with these groundbreaking performance standards";

- Solana's website statement that "Solana is engineered for widespread, mainstream use by being energy efficient, lightning fast, and extremely inexpensive" and that "[m]any of the core Solana builders, like co-founder Anatoly Yakovenko, have a background in building cell phone networks," which "means that they are singularly focused on building for scalability (the ability to grow) and efficiency (the ability to get the most information across with the least amount of resources)";

- An April 14, 2021 post on gemini.com in which Yakovenko touted the Solana network's ability to "support a theoretical peak capacity of 65,000 transactions per second, currently" ("around 10,000 times faster than Bitcoin, 4,000 times faster than Ethereum, and 35 times faster than Ripple—even around 2.5 times faster than Visa") and projecting that such speed would "doubl[e] in capacity every two years with improvements in hardware and bandwidth"; and

- A December 23, 2022 post on Solana's website marketing various "upgrades" that Solana and its engineers would undertake, including "turbine optimizations" introduced by the "core engineering team," which Yakovenko described as the "coolest piece of technology that we built that nobody knows about."

**RESPONSE:** Paragraph 139 purports to characterize and quote from public blog posts and Solana Labs' website, to which Coinbase respectfully refers the Court for their complete and accurate statements. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 139, and therefore denies them on that basis.

140.    Further, Solana Labs markets that it "burns" (or destroys) SOL tokens as part of a "deflationary model."  As Yakovenko explained in an April 14, 2021 article entitled "Solana (SOL):  Scaling Crypto to the Masses" posted on gemini.com, "Solana transaction fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price."  As explained on the Solana website, since the Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event."  This marketed burning of SOL as part of the Solana network's "deflationary mechanism" has led investors reasonably to view their purchase of SOL as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of SOL.

**RESPONSE:** Paragraph 140 purports to quote from and characterize an April 14, 2021 article posted on gemini.com and the "terminology" section of Solana Lab's website, to which Coinbase respectfully refers the Court for their complete and accurate statements. Coinbase denies the allegations in the fourth sentence of Paragraph 140.

### ii.    ADA

141.    "ADA" is the native token of the Cardano blockchain. The Cardano blockchain was created in 2015 by an Ethereum co-founder, Charles Hoskinson, and an Ethereum operations manager, Jeremy Wood. As described on Cardano's website, the Cardano blockchain protocol is built on its own proof-of-stake consensus protocol called Ouroboros, which is purportedly energy efficient. Hoskinson and Wood created ADA and purported to limit the supply of ADA to 45 billion. From 2015 to 2017, Input Output Hong Kong ("IOHK"), a company founded by Hoskinson and Wood, conducted a token sale during which they sold approximately 25.9 billion ADA in exchange for bitcoin, at what equates to an average price of $0.0024 per token, raising approximately $62 million for Cardano.

**RESPONSE:** Coinbase admits that Cardano represents that ADA is the native token of the Cardano blockchain, which blockchain was created in 2015 by Messrs. Hoskinson and Wood. Coinbase further admits that Cardano blockchain uses its own proof-of-stake consensus protocol called Ouroboros. In addition, Coinbase admits that Cardano has represented that ADA is limited to a maximum supply of 45 billion tokens, that IOHK was founded by Messrs. Hoskinson and Wood, and that, between six and eight years ago, it was publicly reported that IOHK sold approximately 25.9 billion ADA for approximately $62 million, representing an average price of

$.0024 per token. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 141, and therefore denies them on that basis.

142.    Today, three entities are responsible for Cardano:  (1) the Cardano Foundation, a Swiss entity that is the legal custodian of the Cardano protocol and owner of its brand; (2) IOHK, an engineering company controlled by Hoskinson and Wood responsible for designing, building, and maintaining the Cardano blockchain; and (3) Emurgo, an entity with offices in New York and California that, according to its website, is "essentially the for-profit arm of Cardano," endeavoring "to advance the platform and drive adoption through commercial ventures."  As explained on the Cardano website, "IOHK develops the technology, the Cardano Foundation is responsible for supervising development and promoting Cardano, while Emurgo drives commercial adoptions." These three entities collectively received 5.2 billion ADA following the initial mining of ADA, or approximately 16.7% of the initial token supply of 31.1 billion ADA.

**RESPONSE:** Coinbase admits that Cardano represents that three entities with separate ownership and leadership contribute to Cardano: Cardano Foundation, IOHK, and Emurgo. Coinbase further admits that Cardano represents that the Cardano Foundation is an independent Swiss entity that aids in the development of Cardano and its ecosystem, IOHK is a blockchain engineering company founded by Messrs. Hoskinson and Wood, and Emurgo serves as the commercial and venture arm of Cardano. In addition, Coinbase admits that it has been publicly reported that Cardano Foundation, IOHK, and Emurgo received approximately 5.2 billion ADA at its genesis block distribution in 2017. The remaining allegations of Paragraph 142 purport to quote from the website https://roadmap.cardano.org/en/, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142, and therefore denies them on that basis.

143.    These three entities have used the proceeds from ADA sales to fund the development, marketing, business operations, and growth of the Cardano protocol. For example, investor funds were used to enact the Cardano Roadmap created by IOHK—specifically, to develop each of the Cardano development "eras" as shown in the following screenshot from the Cardano website:



**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 143, and therefore denies them on that basis. The second sentence of Paragraph 143 purports to quote, and reproduce an image, from Cardano's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 143, and therefore denies them on that basis.

144.    ADA has been available for buying, selling, and trading on the Coinbase Platform since approximately March 2021.

**RESPONSE:** Admitted.

145.    The information publicly disseminated by Cardano, IOHK, and Emurgo—including since the initial sales of ADA—have led ADA holders, including those who purchased ADA since March 2021, reasonably to view ADA as an investment in and expect to profit from the Cardano Foundation's, IOHK's, and Emurgo's efforts to grow the Cardano platform, which, in turn, would increase the demand for and the value of ADA.

**RESPONSE:** Denied.

146.    In public statements on Twitter and other social media, as well as on their respective websites, including statements made and available during the period when ADA was available to trade on the Coinbase Platform, the Cardano Foundation, IOHK, and Emurgo have specified their expertise in developing blockchain networks and described the efforts they have made and will continue to make to develop the Cardano protocol and blockchain and attract users to the technology, including but not limited to:  (a) an announcement by IOHK in or around September 2021 about the creation of smart contracts on the protocol, which supposedly would "pav[e] the way" for additional demand for the blockchain protocol; (b) a blog post by IOHK in or around November 2022 describing its efforts to introduce "innovations, new functionality, and new features" to the blockchain; and (c) a blog post by IOHK on or around November 17, 2022 touting

ADA being "hosted on more than 30 cryptocurrency exchanges," and outlining IOHK's plans to "improv[e] the underlying performance of the Cardano network to better support growth and adoption of thousands of applications with high transaction volumes" while giving specific examples of how this would be achieved.

**RESPONSE:** Paragraph 146 purports to characterize public statements on Twitter and other social media by the Cardano Foundation, IOHK, and Emurgo, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 146.

### iii.  MATIC

147.    "MATIC" is the native token of the Polygon blockchain. Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun. Since its creation, Polygon's founders have remained actively involved with Polygon through "Polygon Labs" ("Polygon"), an entity they also founded for "the development and growth of Polygon."

**RESPONSE:**  Coinbase admits that MATIC is the native token of the Polygon blockchain, which was launched in 2017. Coinbase further admits that Messrs. Kanani, Nailwal, and Arjun are reportedly the founders of the Polygon blockchain. In addition, Coinbase admits that in 2023, approximately six years after the launch of the Polygon blockchain, the blockchain's founders were reported to have created Polygon Labs. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 147, and therefore denies them on that basis.

148.    According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

**RESPONSE:** Paragraph 148 purports to quote from and characterize Polygon's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

149.    Polygon issued a fixed supply of 10 billion MATIC tokens. MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a

validator, from delegating their MATIC to other validators in return for a portion of the fees collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

**RESPONSE:** Coinbase admits Polygon represents that MATIC has a maximum supply of 10 billion tokens. Coinbase further admits Polygon represents that MATIC holders can earn MATIC for staking their MATIC as validators, from delegating their MATIC to other validators, and for staking their MATIC through digital asset platforms that offer staking services. Coinbase avers that MATIC is not currently eligible for Coinbase's staking program. Coinbase denies any remaining allegations in Paragraph 149.

150.    According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives ... of the Matic Network [now Polygon] ... [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

**RESPONSE:** Paragraph 150 purports to quote from MATIC's whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

151.    In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC. In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO— essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com crypto asset trading platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

**RESPONSE:** Coinbase admits that it was publicly reported that Polygon sold approximately $615,000 of MATIC tokens in early-round private sales. Coinbase further admits that it was reported that Polygon sold approximately $5 million of MATIC, 19% of MATIC's total supply, at a price of $0.00263 per token in an offering through Binance Launchpad in 2019. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 151, and therefore denies them on that basis.

152.    The information Polygon publicly disseminated has led MATIC holders, including those who purchased MATIC since March 2021, reasonably to expect to profit from Polygon's

efforts to grow the Polygon protocol, which, in turn, would increase the demand for and the value of MATIC.

**RESPONSE:** Denied.

153.    For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

**RESPONSE:** Denied. Coinbase avers that the MATIC whitepaper neither refers to investment "proceeds" nor states that it will "pool" any such proceeds. Coinbase further avers that the MATIC whitepaper states that MATIC "does not represent or confer on the token holder any right of any form with respect to the [Matic Network Pte. Ltd.], the Issuer (or any of its affiliates), or its revenues or assets, including without limitation any right to receive future dividends, revenue, shares, ownership right or stake, share or security, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property or licence rights), or other financial or legal rights or equivalent rights, or intellectual property rights or any other form of participation in or relating to the Matic Network, the [Matic Network Pte. Ltd.], the Issuer and/or their service providers."

154.    Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network. On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture capital firms. Polygon reported, "[w]ith this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

**RESPONSE:** Paragraph 154 purports to quote from and characterize a February 7, 2022 blogpost, to which Coinbase respectfully directs the Court for its complete and accurate contents. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 154, and therefore denies them on that basis.

155.    Polygon has also reported fundraising from other marquee and celebrity investors.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 155, and therefore denies it on that basis.

156.    Polygon also stated that it would reserve roughly 67% of MATIC to support the Polygon ecosystem, the Foundation, and network operations. Another 20% of MATIC was further reserved to compensate the Polygon team members and advisors, aligning their fortunes with investors' with respect to MATIC.

**RESPONSE:** Coinbase admits that it was publicly reported that MATIC tokens were reserved for the Polygon ecosystem, the Foundation, and network operations. Coinbase further admits that Polygon reported that it originally reserved 4% and 16% of the total supply of MATIC for its advisors and team members, respectively. Coinbase otherwise denies the allegations in Paragraph 156.

157.    In addition, the Polygon blog provides frequent updates on network growth and developments at Polygon, including weekly statistics on active wallets and transactions per day, as well as financial metrics such as revenue per day and total network revenue.

**RESPONSE:** Paragraph 157 purports to characterize Polygon's blog, to which Coinbase respectfully directs the Court for its complete and accurate contents.

158.    Polygon has also routinely announced when crypto asset trading platforms have made MATIC available for trading, such as the Coinbase Platform in or around March 2021.

**RESPONSE:** Coinbase admits that Polygon has made public statements announcing that MATIC has been made available for secondary trading on various digital asset platforms, including on Coinbase's platform — which has listed MATIC since March 9, 2021, before Coinbase's DPO. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 158, and therefore denies them on that basis.

159.    Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways. For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



**RESPONSE:** To the extent Paragraph 159 purports to quote from or characterize public statements on Twitter, Coinbase respectfully directs the Court to such statements for their complete and accurate contents. Coinbase denies the remaining allegations in Paragraph 159.

160.  Also, on November 3, 2022, Nailwal stated on Twitter:  "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH. No other project comes even close."  In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described part of "what's different about Polygon" as:  "[w]e are as a team very, very committed, we have a very hands on approach with all the projects out there, we are working around the clock on adoption and that is why we are currently the most adopted scaling infrastructure platform."  Currently, the founders of Polygon continue to promote the platform through various social media. For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown exponentially. To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum. Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."

**RESPONSE:** Paragraph 160 purports to quote from and characterize public statements, including Twitter posts by Polygon's founders in May 2022, November 2022, and February 2023, to which Coinbase respectfully directs the Court for their complete and accurate contents.

161.  Since January 2022, Polygon has also marketed that it "burns" MATIC tokens accumulated as fees, indicating that the total supply of MATIC would decrease. For example, in January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog post titled, "Burn, MATIC, Burn!"  As Polygon explained in another blog post on its website around the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect."  As of March 28, 2023, Polygon had burned approximately 9.6 million MATIC tokens. This marketed burning of MATIC as part of the Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of MATIC.

**RESPONSE:** Coinbase admits that Polygon represents that its protocol allows for the "burning" of MATIC tokens, and that "burning" reduces the total supply of MATIC tokens. The

first, second, and third sentences of Paragraph 161 purport to characterize or quote from Polygon's public statements and blog posts, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences of Paragraph 161, and therefore denies them on that basis.

### iv.   FIL

162.   "FIL" is the native crypto asset of the Filecoin network. The Filecoin network is an open-source data storage network that runs on a blockchain, created by Protocol Labs, Inc. ("Protocol Labs"), which describes itself as a research, development, and deployment lab for network protocols.

**RESPONSE:** Coinbase admits that the Filecoin network is an open-source cryptocurrency and digital payment system created by Protocol Labs, Inc. and is intended to be a blockchain-based cooperative digital storage and data retrieval method. Coinbase further admits that FIL is the native digital asset of the Filecoin network. To the extent that Paragraph 162 purports to characterize how Protocol Labs describes itself, Coinbase respectfully refers the Court to such descriptions for their complete and accurate contents. Coinbase further avers that it met with the SEC Staff on August 17, 2020 — before it listed FIL on its exchange, and months before the SEC declared effective its registration statement for its direct public listing — during which meeting it presented its views as to why FIL likely was not a security under the SEC's definition; the SEC Staff did not assert or allege at that time that FIL constituted an investment contract or any other security. Coinbase denies any remaining allegations in Paragraph 162.

163.   In or around July 2014, Protocol Labs and its founder and CEO, Juan Batiz-Benet ("Benet"), published a whitepaper entitled "Filecoin:  A Cryptocurrency Operated File Storage Network," which Protocol Labs updated approximately three years later, setting forth a "path toward the construction of the Filecoin network."

**RESPONSE:** Coinbase admits that the whitepaper "Filecoin: A Cryptocurrency Operated File Storage Network" was published in July 2014. Coinbase further admits that Protocol Labs

published a whitepaper in July 2017 titled "Filecoin: A Decentralized Storage Network." Paragraph 163 purports to characterize and quote from those whitepapers, to which Coinbase refers the Court for their complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 163, and therefore denies them on that basis.

164.     In 2017, Protocol Labs conducted a two-part token sale:  first, an "Advisor Sale" for advisors of Protocol Labs and Filecoin, and, second, a "Public Sale" for the broader community, but supposedly limited to "accredited investors" (collectively, "2017 FIL Sales"). Investors could use U.S. Dollars and certain crypto assets to buy Filecoin.

**RESPONSE:** Coinbase admits that Protocol Labs has represented that it sold FIL tokens to advisors and accredited investors approximately six years ago, in 2017. Paragraph 164 appears to quote from the "Filecoin Token Sale Economics" document posted to the CoinList website in 2017, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase denies any remaining allegations in Paragraph 164.

165.     Protocol Labs ran the Advisor Sale from July 21 to July 24, 2017, and sold FIL to approximately 150 investors, which included individuals, institutional investors, trusts, and established syndicate investors. These investors paid $.075 per FIL and were offered "vesting/discount choices of 1-3 years and 0-30% discount."

**RESPONSE:** Paragraph 165 appears to quote from and characterize the "Filecoin Token Sale Economics" document posted to the CoinList website in 2017, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 165, and therefore denies them on that basis.

166.     In the August 2017 Public Sale, the FIL price was set based on a "public sale price function," described as "price = max ($1, amountRaised / $40,000,000) USD/FIL" and increased thereafter based on the amount sold. For the Public Sale, like the Advisor Sale, investors received discounted pricing for agreeing to longer vesting periods.

**RESPONSE:** Paragraph 166 appears to quote from and characterize the "Filecoin Token Sale Economics" document posted to the CoinList website in 2017, to which Coinbase respectfully refers the Court for its complete and accurate contents.

167.    In connection with the 2017 FIL Sales, which were effected pursuant to SAFTs, Protocol Labs filed forms with the SEC claiming an exemption from registration for the offerings of FIL pursuant to SAFTs.

**RESPONSE:** Coinbase admits that, approximately six years ago, Protocol Labs, Inc. filed Forms D with the SEC in connection with its sale of FIL tokens. Paragraph 167 purports to characterize Protocol Labs filings with the SEC, to which Coinbase respectfully refers the Court for their complete and accurate contents.

168.    Protocol Labs reported that they raised more than $205 million for the development of Filecoin in the 2017 FIL Sales, which value increased in the days following the close of the sale based on the fluctuation in value of certain invested crypto assets.

**RESPONSE:** Coinbase admits that Protocol Labs reported that it raised more than $205 million through the sale of FIL tokens in 2017. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 168, and therefore denies them on that basis.

169.    Protocol Labs pooled investment proceeds from the token sales to fund the development and growth of the Filecoin network.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169, and therefore denies them on that basis.

170.    On October 15, 2020, Protocol Labs launched the mainnet (a publicly accessible version of the network) of the Filecoin network, and FIL began being minted and distributed. There was a stated maximum circulating supply of 2,000,000,000 FIL, meaning that no more than 2 billion FIL will ever be created, with issuance aligning with network growth.

**RESPONSE:** Coinbase admits that Filecoin network's mainnet was reported to have launched on October 15, 2020, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 170, and therefore denies

them on that basis. Coinbase further admits that the maximum supply of FIL is 2,000,000,000 tokens. Coinbase denies the remaining allegations of Paragraph 170.

171.    FIL has been available for buying, selling, and trading on the Coinbase Platform since approximately December 2020.

**RESPONSE:** Coinbase admits that FIL has been available for buying, selling, and trading on Coinbase's platform since December 2020, months before Coinbase's DPO.

172.    Since the October 2020 launch, Protocol Labs has continued to use funds from the sale of FIL to develop, expand, and promote the Filecoin network.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172, and therefore denies them on that basis.

173.    The information Protocol Labs publicly disseminated, including after the initial FIL sales, has led FIL holders, including those who have purchased FIL since December 2020, reasonably to view FIL as an investment in and to expect to profit from Protocol Lab's efforts to grow its protocol, which, in turn, would increase the demand for and the value of FIL.

**RESPONSE:** Denied.

174.    The Protocol Labs Filecoin team posted about the sale:  "The Filecoin Sale was a critical milestone in the lifetime of the project. It raised the funding necessary to grow our team, to create the network, and build all the software tools needed to operate and use the network." They further stated, "Filecoin success will reward the investment of supporters like you by simultaneously driving down the cost of storage and increasing the value of the Filecoin tokens that incentivize miners to provide storage. We're thrilled by your widespread, enthusiastic interest and look forward to staying engaged and including you in our success."

**RESPONSE:** Paragraph 174 appears to quote from a September 13, 2017 Protocol Labs blog post, to which Coinbase respectfully refers the Court for its complete and accurate contents.

175.    In addition, Benet and the Filecoin team released a document titled, "Filecoin Token Sale Economics," that provided information about the 2017 FIL Sales and the Filecoin network, stating:

> Protocol Labs requires significant funding to develop, launch, and grow the Filecoin network. We must develop all the software required:  the mining software, the client software, user interfaces and apps, network infrastructure and monitoring, software that third-party wallets and exchanges need to support Filecoin, integrations with other data storage software, tooling for web application and

dapps to use Filecoin, and much more. We must deploy the network, facilitate its growth to large scale, market to and onboard miners and clients, bring key partners into the eco system, and much more.

**RESPONSE:** Coinbase admits that the Filecoin team released a document titled "Filecoin Token Sale Economics" in 2017. Paragraph 175 purports to quote from and characterize that document, to which Coinbase respectfully refers the Court for its complete and accurate contents.

176.     That document also stated that FIL was to be distributed to groups "critical to the network's creation, development, growth, and maintenance" with an allocation, described as follows, that tied Protocol Labs' profits to those of FIL holders:

- 70% to Filecoin miners – "For providing data storage service, maintaining the blockchain, distributing data, running contracts, and more."

- 15% to Protocol Labs – "For research, engineering, deployment, business development, marketing, distribution, and more."

- 10% to Investors – "For funding network development, business development, partnerships, support, and more."

- 5% to a "Filecoin Foundation" – "For long-term network governance, partner support, academic grants, public works, community building, etc."

**RESPONSE:** Paragraph 176 purports to quote from and characterize a document titled "Filecoin Token Sale Economics," to which Coinbase respectfully refers the Court for its complete and accurate contents.

177.     The "Filecoin Token Sale Economics" document further explained:  "We have structured the token sale to reward a large group of people that can help us build the [Filecoin] network, by selling Filecoin at what we think is a much lower price than it will be worth some day (caveat:  as with any risky investment of course we cannot make guarantees or predictions)."  As described in a July 2017 blog post, the Advisor Sale in particular was intended, in part, to secure "long-term commitment to and alignment with the Filecoin network" and "to reward their contributions so far and/or future potential with the capability to invest early."

**RESPONSE:** The first sentence of Paragraph 177 purports to quote from and characterize a document titled "Filecoin Token Sale Economics," to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 177 purports to

quote from and characterize a July 31, 2017 Protocol Labs blog post, to which Coinbase respectfully refers the Court for its complete and accurate contents.

178.    The "Filecoin Token Sale Economics" and another document made available to investors ahead of the 2017 FIL Sales, the Filecoin Primer, stated that Filecoin purchasers would be able to sell the token on crypto asset trading platforms in the future.

**RESPONSE:** Paragraph 178 purports to characterize two documents titled "Filecoin Token Sale Economics" and the "Filecoin Primer," to which documents Coinbase respectfully refers the Court for their complete and accurate contents.

179.    The Filecoin Primer also touted "Large Scale Value Creation," explaining: Filecoin Network "will create value in a number of ways, and the total impact of the network can be tremendous. Growth of the network will drive demand for the token. The more value created by the Filecoin Network, the more things people and organizations spend Filecoin on, and the greater the value and worth of the token."

**RESPONSE:** Paragraph 179 purports to characterize a document titled the "Filecoin Primer," to which Coinbase respectfully refers the Court for its complete and accurate contents.

180.    Similarly, a Confidential Private Placement Offering Memorandum in connection with the 2017 FIL Sales stated:  "[a] significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to build-out a decentralized storage network, powered by a blockchain and the Filecoin protocol token."

**RESPONSE:** Paragraph 180 purports to characterize an alleged offering memorandum, to which Coinbase respectfully refers the Court for its complete and accurate contents.

181.    Moreover, both before and after the 2017 FIL Sales, Protocols Labs consistently touted its expertise and ability, and led the work to develop the Filecoin network for launch. In an August 2, 2017 Q&A, Benet stated:  "Over the last few years, Protocol Labs has proved to the world that we know how to deploy capital to create valuable projects, valuable technology, and valuable software ... We know how to deploy capital effectively. We have great plans for the Filecoin network and its surrounding ecosystem, at many levels of funding. We plan to deploy 100s of millions of dollars over the next few years to make Filecoin the world's best storage network, not just the best decentralized storage network."

**RESPONSE:** Coinbase admits that Protocol Labs was involved in developing the Filecoin network, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 181, and therefore denies them on that

basis. The second sentence of Paragraph 181 purports to quote from and characterize an August 2, 2017 question-and-answer session with Mr. Benet, to which Coinbase respectfully refers the Court for its complete and accurate contents. To the extent a further response is required, Coinbase denies any remaining allegations in Paragraph 181.

182.    Benet also addressed the funding needs, pricing, and economics of FIL in that August 2017 Q&A, stating:  "[s]ince we think and are working for Filecoin to be worth a lot more in the future, then we naturally want to sell it at the highest price the market will bear. Subject to reason, if we can sell it higher, then we should."

**RESPONSE:** Paragraph 182 purports to quote from and characterize an August 2, 2017 question-and-answer session with Mr. Benet, to which Coinbase respectfully refers the Court for its complete and accurate contents.

183.    Benet also explained publicly that Filecoin needed funding in order to be able to compete:  "Our (collective) competition is the massive, centralized cloud storage companies. We are talking about the tech titans – AWS, Google Cloud, and Microsoft Azure – the three biggest companies in the world have cloud businesses with BILLIONS of dollars in *revenues*, not just funding. In order to put up this fight, we will need *significant* resources. Yes, resources in the hundreds of millions will empower us to develop Filecoin as fast as we can, as well as the dozens of other tools and services required to make Filecoin a service and ecosystem remotely close to competitive with the centralized counterparts."

**RESPONSE:** Paragraph 183 purports to quote from and characterize an August 2, 2017 question-and-answer session with Mr. Benet, to which Coinbase respectfully refers the Court for its complete and accurate contents.

184.    The economic structure of FIL distribution and public statements about that structure further invited investors to view FIL as an investment in Protocol Labs' and the Filecoin Foundation's efforts and to conclude that FIL investors' interests were aligned with those of FIL's developers. Specifically, the tokens allocated to Protocol Labs and Filecoin Foundation were to vest over a six-year period beginning after the network launch. As stated in the "Filecoin Token Sale Economics" document, Protocol Labs and the Filecoin Foundation "aim[ed] to make Filecoin massively valuable in the long-term, and we want to attract investors similarly interested in long-term value creation and growth" and "[v]esting creates long-term alignment" because "Protocol Labs and the Filecoin Foundation are deeply committed for the long-term, and 6-year vesting boldly proves that to all other network participants."

**RESPONSE:** Coinbase denies the allegations in the first sentence of Paragraph 184. The third sentence of Paragraph 184 purports to quote from a document titled "Filecoin Token Sale Economics," to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase admits that the "Filecoin Token Sale Economics" document states that tokens allocated to Protocol Labs and the Filecoin Foundation vested linearly, over six years. Coinbase otherwise denies the allegations in Paragraph 184.

185.    Filecoin has also implemented a process to burn FIL tokens, thereby reducing the FIL supply. As with the "burn" mechanisms of other crypto asset securities set forth herein, this marketed burning of FIL as part of Filecoin's economic features has led investors reasonably to view their purchase of FIL as having the potential for profit.

**RESPONSE:** Coinbase admits that in connection with transactions on the Filecoin blockchain, transaction fees are paid in FIL, and a portion of each such fee is "burned." Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 185, and therefore denies them on that basis.

186.    Following the release of the protocol in October 2020, Protocol Labs continued to be heavily involved in the development and promotion of the Filecoin network and its pursuit of success.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 186, and therefore denies them on that basis.

187.    In late 2021, Raul Kripalani, a Protocol Labs Researcher, introduced the "Filecoin Virtual Machine" ("FVM"), described as a "core pillar in the next evolution of the decentralized storage ecosystem."  On November 6, 2022, Kripalani tweeted, "These were amazing weeks for the #FVM + team. Momentum and expectation are through the roof. 100s of teams building on the Wallaby testnet. Many promising @Filecoin apps to launch on mainnet the minute FEVM kicks in. Pumped to be building the future of $FIL with these rockstars!"  The Protocol Labs Twitter account has posted updates regarding FVM, including through April 2023.

**RESPONSE:** Coinbase admits that the Filecoin Virtual Machine allows developers to create decentralized applications on the Filecoin network. The first sentence of Paragraph 187 appears to quote from and characterize a November 11, 2021 post on Filecoin's website titled

"Introducing the Filecoin Virtual Machine," to which Coinbase respectfully refers the Court for its complete and accurate contents. The remaining allegations in Paragraph 187 purport to quote from or characterize public Twitter posts, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 187, and therefore denies them on that basis.

188.    The Protocol Labs team has continued to release "roadmaps" or "master plans," available online and through recorded video presentations, that showcase future development plans for the Filecoin network. For example, in September 2022, Benet delivered the keynote address at FIL-Singapore, which "gathered builders from around the world to build, share experiences, and hear from other community members on what's next for the network." In his address, Benet presented "The Filecoin Masterplan" which included building the world's largest decentralized storage network.

**RESPONSE:** Coinbase admits that, on November 17, 2022, Protocol Labs posted to its website a "masterplan" and a link to Mr. Benet's September 26, 2022 keynote address at FIL Singapore, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 188, and therefore denies them on that basis.

189.    In a February 3, 2023 Protocol Labs Blog post addressing the impact of the "crypto winter" economic downturn, Benet touted the Filecoin team's supposed successes to date in growing the Filecoin ecosystem, stating: "[w]e've achieved a tremendous amount in the past several years - from Filecoin launch; to scaling IPFS to millions of users; building one of the fastest growing developer ecosystems; supporting 300+ companies across the network; growing movements like SBS and FTC; launching testnets for FVM, Saturn, SpaceNet, and Bacalhau just last quarter; and much more."

**RESPONSE:** Paragraph 189 purports to quote from and characterize a February 3, 2023 Protocol Labs blog post, to which Coinbase respectfully refers the Court for its complete and accurate contents.

### v.   SAND

190.   "SAND" was created on the Ethereum blockchain as the native token of the Sandbox platform, a virtual gaming platform first released in 2012 by Pixowl, Inc. ("Pixowl") as a game for download on mobile phones. Pixowl, which is headquartered in San Francisco, was founded in 2011 by Arthur Madrid ("Madrid") and Sebastien Borget ("Borget"). In 2018, Animoca Brands, Inc. ("Animoca"), headquartered in Hong Kong, acquired Pixowl and announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology. After Pixowl's acquisition, the Sandbox's intellectual property, along with the rest of Pixowl's assets, were transferred to TSB Gaming Ltd ("TSB"), a wholly owned subsidiary of Animoca. Madrid is CEO of TSB, and Borget is the COO.

**RESPONSE:** Coinbase admits that SAND is an ERC-20 token created on the Ethereum blockchain that is used in conjunction with the Sandbox platform, which platform today offers players a virtual world where player can build, own, and monetize their gaming experiences. Coinbase further admits that it has been publicly reported that Animoca Brands, Inc. acquired Pixowl, Inc. in 2018 and subsequently transitioned Pixowl's intellectual property to TSB Gaming Ltd. In addition, Coinbase admits that Arthur Madrid and Sebastein Borget are identified as the CEO and COO of TSB Gaming Ltd., respectively. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 190, and therefore denies them on that basis.

191.   According to Sandbox's website, SAND is required to access the Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform.

**RESPONSE:** Coinbase admits that SAND token holders may use SAND for access to the Sandbox platform, participation in the platform's governance, and staking. Coinbase avers that SAND is not currently eligible for Coinbase's staking program. Paragraph 191 purports to characterize the Sandbox's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

192.   On or about May 23, 2019, before the minting of SAND in July 2019, Animoca raised approximately $2.5 million in cash and crypto assets through TSB via the issuance of Simple Agreements for Future Equity ("SAFEs") and SAND tokens, to "fund the development of the

upcoming blockchain version of The Sandbox."  According to Animoca's May 23, 2019 press release, the majority of investors allocated their investment to the purchase of both SAND tokens and future equity in TSB via the SAFE agreements (in the amount of $2 million), while some investors allocated their investment exclusively to the purchase of SAND tokens ($500,000). Per the release, the funding round was led by Hashed, for approximately $1 million, and also included a number of other crypto venture capital investors.

**RESPONSE:** Coinbase admits that TSB has represented that, in 2019, it raised $2.5 million through the issuance of a combination of Simple Agreements for Future Equity and SAND tokens, and that the sale included a number of crypto venture capital investors, including Hashed. Paragraph 192 otherwise purports to quote from and characterize a May 23, 2019 Animoca Brands, Inc. press release, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase avers that the May 23, 2019 press release stated that Animoca expected that "the sale of SAND tokens will be treated as revenues, while proceeds from the SAFEs will be treated as liabilities." Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 192, and therefore denies them on that basis.

193.    TSB then minted a total supply of 3 billion SAND on the Ethereum blockchain in or around July 2019 and offered and sold SAND through purportedly private sales and in an IEO that raised $3 million on the Binance.com crypto asset trading platform starting August 13, 2020.

**RESPONSE:** Coinbase admits that TSB has represented that it sold approximately $3 million of SAND in an offering through Binance Launchpad in August 2020. Coinbase further admits that it has been publicly reported that there is a maximum supply of 3 billion SAND. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 193, and therefore denies them on that basis.

194.    SAND has been available for buying, selling, and trading on the Coinbase Platform since approximately May 2022.

**RESPONSE:** Admitted.

195.    The information TSB publicly disseminated has led SAND holders, including those who have purchased SAND since May 2022, reasonably to view SAND as an investment in and

to expect to profit from TSB's efforts to grow the Sandbox protocol, which, in turn, would increase the demand for and the value of SAND.

**RESPONSE:** Denied.

196.    On its blog posts announcing "exchange listings," Sandbox touted its efforts to obtain "listings" and the SAND token's liquidity in the secondary market. For example, in a September 21, 2021 Medium blog post, Sandbox stated that "$SAND is listed on over 60 global cryptocurrency exchanges, including a dozen of the top exchanges by market capitalization."

**RESPONSE:** Paragraph 196 purports to quote from and characterize Sandbox blog posts,

to which Coinbase respectfully refers the Court for their complete and accurate contents.

197.    In addition, the Sandbox stated that it would pool the proceeds from the private token sales and the IEO to develop and promote use of the platform. For example, the May 23, 2019 press release stated:  "[t]he funds raised through this transaction will be used to grow the development team and infrastructure for the [Sandbox] Game Platform, support marketing efforts through the acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs."  The Sandbox Whitepaper similarly described identical uses for the $3 million in funds intended to be raised during the IEO.

**RESPONSE:** Paragraph 197 purports to quote from or characterize a May 23, 2019 press

release and Sandbox's whitepaper, respectively, to which Coinbase respectfully refers the Court

for their complete and accurate contents.

198.    Moreover, according to the Sandbox Whitepaper, of the 3 billion SAND tokens that were initially minted, 19% were to be allocated to the Sandbox founders and team, and another 25.8% were to be allocated to the Company Reserve.

**RESPONSE:** Paragraph 198 purports to characterize the Sandbox's whitepaper, to which

Coinbase respectfully refers the Court for its complete and accurate contents.

199.    In addition, the Sandbox's Medium blog post on July 25, 2019 stated that "an interesting feature of [the $SAND] token is that it can accrue in value over time, due to the fact that it is scarce. There will be a limited supply of 3 billion units of $SAND available."

**RESPONSE:** Paragraph 199 purports to characterize a July 25, 2019 blog post, to which

Coinbase respectfully refers the Court for its complete and accurate contents.

200.    Moreover, TSB stated publicly that it would take steps to manage the market for SAND, including the SAND Whitepaper stating that the Sandbox team controls the supply of SAND tokens and has implemented a "controllable supply mechanism, such as purchasing SAND

from multiple exchanges," and that "while the total supply of SAND is fixed, the initial amount of SAND offered will provide a scarcity effect reducing the SAND available per capita and therefore fostering demand."

**RESPONSE:** Paragraph 200 purports to characterize and quote from public statements,

including the SAND whitepaper, to which statements Coinbase respectfully refers the Court for

their complete and accurate contents.

201.    Additionally, in many instances, Animoca has touted the backgrounds of Pixowl, TSB, and the Sandbox core members, including Madrid and Borget, in describing the success and future development of the Sandbox:

- After the acquisition of Pixowl, Yat Siu, the co-founder and director of Animoca, stated in a press release, dated August 27, 2018 (the "2018 Press Release") that "Pixowl's experienced developers will significantly increase our development capabilities. Its founders are highly respected game industry veterans who have developed multimillion dollar franchises. We believe the blockchain version of *The Sandbox* has incredible potential ... We look forward to utilising the many opportunities for growth conferred by this acquisition."

- In the 2018 Press Release, Madrid also commented:  "Animoca Brands is a perfect fit for Pixowl and we are happy to add our brand relationships to its portfolio while accelerating growth for our key IP, *The Sandbox* ..."

- The 2018 Press Release also touted that "Ed Fries, the creator of Microsoft Game Studios and co-founder of the Xbox project, is a special advisor to *The Sandbox's* original game developer Pixowl" and will therefore continue to serve on the advisory team.

- The Sandbox Whitepaper further provided:  "We have a strong product roadmap ahead and a top team to execute a strong vision to build a unique virtual world gaming platform where players can build, own, and monetize their gaming experiences and spread the power of blockchain as the lead technology in the gaming industry."

**RESPONSE:** Paragraph 201 purports to characterize and quote from public press releases

and the Sandbox's whitepaper, to which Coinbase respectfully refers the Court for their complete

and accurate contents.

202.    Moreover, the Sandbox Whitepaper describes that the role of the "Sandbox Foundation" is to support the ecosystem of the Sandbox by, among other things, offering grants to

incentivize high quality content and game production on the platform and further notes that the "overall valuation of the metaverse grows through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games." The Sandbox's Gitbook also notes that the Sandbox Foundation has, among other things, (a) supported play-to-earn tournaments and cross-gaming to encourage the broader adoption of SAND and (b) supported marketing activities contributing to the growth of awareness about NFTs, Metaverse and SAND adoption, including co-marketing with exchanges and influencers.

**RESPONSE:** The first sentence of Paragraph 202 purports to characterize and quote from the Sandbox's whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 202 purports to characterize Sandbox's Github webpage, to which Coinbase respectfully refers the Court for its complete and accurate contents.

### vi.   AXS

203.   Axie Infinity Shards ("AXS") are Ethereum tokens that are native to the Axie Infinity ("Axie") game, a blockchain game that allows players to interact in a virtual world through digital pets called "Axies."

**RESPONSE:** Coinbase admits that AXS is an Ethereum-based token used in the Axie Infinity game, a blockchain game that allows players to interact in a virtual world through digital pets called "Axies." Coinbase denies any remaining allegations in Paragraph 203.

204.   Axie was created by Sky Mavis PTE LTD ("Sky Mavis") and launched in 2018. The Sky Mavis team has 40 full-time employees, which include CEO Trung Nguyen and COO Aleksander Leonard Larsen, who are part of the founding team responsible for key decisions regarding Axie, such as product development, marketing, digital design, and software engineering.

**RESPONSE:** Coinbase admits that Axie was launched in 2018, and that Trung Nguyen and Aleksander Leonard Larsen are reported to be the CEO and COO, respectively of Sky Mavis. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 204, and therefore denies them on that basis.

205.   Players of the Axie game can earn AXS for successfully playing the Axie game and can use AXS to make in-game purchases. AXS can also be staked through Axie. The total AXS token supply is 270 million with over 100 million in circulation.

**RESPONSE:** Coinbase admits that Axie represents that AXS can be staked through Axie, and that players of the Axie game can earn AXS for successfully playing the Axie game and use AXS to make in-game purchases. Coinbase admits the allegations in the third sentence of Paragraph 205. Coinbase denies any remaining allegations in Paragraph 205.

206.    In 2020, Sky Mavis raised about $864,000 in a purportedly private sale of AXS tokens to "strategic investors."  That same year, Sky Mavis conducted a public sale of AXS, resulting in the distribution of 29.7 million AXS tokens, raising $2.9 million for Axie. The AXS tokens sold to "strategic investors" were offered at a 20 percent discount to those sold in the public offering and were subject to a quarterly unlocking schedule over a two-year period.

**RESPONSE:** Coinbase admits that Sky Mavis has stated that it sold $864,000 of AXS in 2020 through a private sale, which represented a price of $.08 per AXS, each of which was subject to a two-year vesting schedule. Coinbase further admits that Sky Mavis reported that it sold $2,970,000 of AXS in an offering through Binance Launchpad in October and November 2020, which represented a price of $.10 per AXS. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 206, and therefore denies them on that basis.

207.    AXS has been available for buying, selling, and trading on the Coinbase Platform since approximately August 2021.

**RESPONSE:** Admitted.

208.    The information Sky Mavis publicly disseminated has led AXS holders, including those who have purchased AXS since August 2021, reasonably to view AXS as an investment in and to expect to profit from Sky Mavis's efforts to grow the Axie protocol, which, in turn, would increase the demand for and the value of AXS.

**RESPONSE:** Denied.

209.    For example, Sky Mavis explained publicly that funds raised in the AXS 2020 offerings were pooled and used to develop and improve the Axie platform. An October 26, 2020 article explains that the "team has used funds raised according to the allocations below:  85% [d]evelopmental expenses; 10% [a]dministrative costs; 5% [b]usiness development and marketing."

**RESPONSE:** Paragraph 209 appears to characterize and quote from an October 26, 2020 Binance Research article, to which Coinbase respectfully refers the Court for its complete and accurate contents.

210. Also, on November 19, 2020, the Axie Twitter account stated: "Today, we're proud to share more info on the $AXS strategic sale!  The participants will help open amazing new doors. The capital will help us scale the team so we can better deliver on the gameplay and feature updates you're all patiently waiting for!"  To keep the Sky Mavis team "incentivized to keep building after a successful token sale," 21 percent of the total AXS tokens—56.7 million AXS—were issued to these individuals, which will be gradually unlocked over a 4.5 year period to ensure that "the team, community and investors have aligned incentives."

**RESPONSE:** The first sentence of Paragraph 210 purports to quote from a November 19, 2020 Axie Twitter post, to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 210 appears to quote from the Axie whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

211. An Axie whitepaper further explained that the Sky Mavis team will use its experience and efforts to develop and grow the Axie game. For example, it lists the Axie founding team, their roles, and background experience and touts that "we've established a core team to lead product development and oversee most decisions related to the progress of the game. This allows us to build and iterate quickly towards product-market fit."

**RESPONSE:** Paragraph 211 purports to characterize the Axie whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

212. At the time of the initial sale of AXS, the Axie platform was not complete, and several features of the platform have been implemented since 2020 and others are still in the development phase today. Further, the whitepaper explicitly set growth goals in terms of daily average users of Axie Infinity and average weekly growth rates, that if "not met by the end of 2023, Sky Mavis will lead the formation of a steering committee or similar vehicle to discuss a path forward."

**RESPONSE:** Coinbase admits that Axie has represented that aspects of the Axie platform were under development in 2020, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 212, and therefore denies them on that basis. The second sentence of Paragraph 212 purports to quote from and

characterize the Axie whitepaper, to which Coinbase respectfully refers the Court for its complete

and accurate contents.

### vii.    CHZ

213.    CHZ is a token on the Ethereum blockchain, advertised as the "native digital token for the Chiliz sports & entertainment ecosystem currently powering Socios.com," a sports fan engagement platform built on the Chiliz blockchain. The Chiliz blockchain was introduced in early 2018 by protocol founder and current CEO Alexandre Dreyfus, under a Maltese entity named HX Entertainment Ltd. The Chiliz whitepaper describes the Chiliz protocol as "a platform where fans get a direct Vote in their favorite sports organizations, connect and help fund new sports and esports entities."

**RESPONSE:** Coinbase admits that CHZ is an ERC-20 token on the Ethereum blockchain

reportedly developed by HX Entertainment Ltd, a company reportedly registered under the Laws

of Malta. The first and third sentences of Paragraph 213 appear to quote from the Chiliz

whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

Coinbase denies the remaining allegations in Paragraph 213.

214.    The CHZ token purportedly allows "fans to acquire branded Fan Tokens from any team or organization partnered with the Socios.com platform and enact their voting rights as their fan influencers:"  Examples of voting polls that allow holders of "Fan Tokens" (purchased with CHZ tokens) to influence team decisions with their vote include selecting player warm-up apparel and choosing team pennant designs.

**RESPONSE:** The first sentence of Paragraph 214 appears to quote from the Chiliz

whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 214, and therefore denies them on that basis.

215.    According to the Chiliz whitepaper dated November 2018, during the second quarter of 2018 the Chiliz team completed fund raising of approximately $66 million in exchange for approximately 3 billion CHZ in "Chiliz's Token Generation Event" purportedly "executed via private placement."  CHZ were originally minted in 2018, and there is a maximum supply of 8,888,888,888 CHZ tokens. However, it was not until the second quarter of 2019 that Chiliz made "Fan Tokens" on Socios.com available for purchase with CHZ.

**RESPONSE:** The first sentence of Paragraph 215 purports to quote from and characterize the Chiliz whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase admits that CHZ was minted in 2018 with a reported maximum supply of 8,888,888,888 tokens. Coinbase further admits that Chiliz reported selling $66 million worth of CHZ in a private token sale. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 215, and therefore denies them on that basis.

216.    CHZ has been available for buying, selling, and trading on the Coinbase Platform since approximately June 2021.

**RESPONSE:** Admitted.

217.    From the initial "private" offering of CHZ tokens in 2018, through public statements made in 2023, the Chiliz team has disseminated information and made statements, including statements made and available during the period when CHZ was available to trade on the Coinbase Platform, that have led CHZ holders reasonably to view CHZ as an investment in and to expect profits from the team's efforts to develop, expand, and grow the platform, which, in turn, would increase the demand for and the value of CHZ.

**RESPONSE:** Denied.

218.    For example, the Chiliz website, www.chiliz.com, introduces the Chiliz team, which is "comprised of nearly 350+ cross-industry professionals across 27 different nationalities and is constantly growing:" The Chiliz team operates both the Chiliz protocol and Socios.com.

**RESPONSE:** The first sentence of Paragraph 218 purports to quote from and characterize the Chiliz website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 218, and therefore denies them on that basis.

219.    In fact, the whitepaper and other public statements by Chiliz also identify several members of the Chiliz leadership team, the bios of these "Leadership" or "Advisory" teams, and their past entrepreneurial and technology experiences and successes. The Chiliz website touts that the Chiliz team is "building the web3 infrastructure for sports and entertainment."

**RESPONSE:** Paragraph 219 purports to quote from and characterize Chiliz's whitepaper and website, to which Coinbase respectfully refers the Court for their complete and accurate contents.

220.    The Chiliz team also stated publicly that it would use the proceeds from CHZ sales to fund the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol. For example, the whitepaper explains that funding raised through token sales would be allocated as follows:  58% to Operational Expenses ("A majority of funds will be passed on from the Issuer to an affiliate to develop the Socios.com platform, secure partnerships & realize the platform's digital infrastructure."); 20% to User Acquisition ("Funds will be used to acquire new users for the Socios.com platform and grow engagement in its voting utilities."); 10% to Corporate Structuring; 5% to Security and Legal; and 7% to Ecosystem Support.

**RESPONSE:** Paragraph 220 purports to quote from and characterize Chiliz's public statements and whitepaper, to which Coinbase respectfully refers the Court for their complete and accurate contents.

221.    Moreover, 5% and 3% of the total CHZ tokens distributed were allocated to the Chiliz team and an advisory board, respectively—the two groups responsible for the creation and development of the platform—aligning the fortunes of management with those of CHZ investors.

**RESPONSE:** Coinbase admits that the Chiliz whitepaper states that 5% and 3% of the total supply of CHZ tokens were allocated to the Chiliz team and advisory board, respectively. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 221, and therefore denies them on that basis.

222.    The CHZ whitepaper further makes evident the mutuality of interest (and the alignment of fortunes) between promoter and investor when it cautions that "if the value of BTC, ETH and/or Chiliz fluctuates, the Company may not be able to fund development to the extent necessary, or may not be able to develop or maintain the Socios.com Platform in the manner that it intended."

**RESPONSE:** Paragraph 222 purports to quote from and characterize the Chiliz whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 222.

223.    The Chiliz team also frequently touts the growth potential in the sports and esports industry that it seeks to monetize through the Chiliz team's efforts to expand its platform. For example, the CHZ whitepaper highlighted the size of the gaming industry and potential for esports revenue as well as the use of CHZ to drive and monetize fan engagement for traditional sports. In reference to the June 2018 "Token Generation Event," the whitepaper stated:  "[w]e are no longer pursuing fundraising measures, instead focusing our efforts on leveraging accrued resources to realize the Chiliz/Socios.com vision."  The whitepaper continued:  "[w]ith foundations set, Chiliz and the Socios.com platform it powers will look to use Football as a benchmark to expand our Tokenized Fan Voting model to other sports in order to cater to a global marketplace where different competitive verticals are dominant – prime examples of diversification are Cricket in the Indian market, Baseball for Japan, and the like."

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 223, and therefore denies them on that basis. The second, third, and fourth sentences purport to quote from and characterize the Chiliz whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

224.    Public statements that the Chiliz team and its executives made indicate that CHZ tokens are primarily deployed for purchasing "Fan Tokens" on Socios.com and that the demand for and price of CHZ tokens is directly reliant on demand for Socios fan tokens and their benefits.

**RESPONSE:** Paragraph 224 purports to characterize undated and unidentified public statements by the Chiliz team and its executives. As such, Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224, and therefore denies them on that basis.

225.    The Chiliz team also made other public statements that emphasize the economic reality inherent in the design of the Chiliz blockchain's reliance on CHZ to function—that as Chiliz is able to grow its platform by partnering with more teams, and those teams grant attractive opportunities to token holders, the value of the respective "Fan Tokens" will increase, and in turn, the value of CHZ will also increase.

**RESPONSE:** Paragraph 225 purports to characterize undated and unidentified public statements by the Chiliz team and its executives. As such, Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 225, and therefore denies them on that basis.

226.    For instance, the FAQ section located on the Chiliz website, which was publicly available from at least December 2021 to December 2022, provided:  "Demand for the Chiliz token will increase as more esports teams, leagues and game titles are added to the platform, and as more fans want voting rights."

**RESPONSE:**  Paragraph 226 purports to quote from and characterize Chiliz's website, to which Coinbase respectfully refers the Court for its full and complete contents.

227.    Chiliz' CEO has echoed this same sentiment in other public statements. In February 2020, he stated:  "Tens of thousands of regular football fans have already started to use crypto, purchasing $CHZ in order to buy Fan Tokens, and in time we expect millions more to do so as we continue to add more partners to the platform and increase our reach and grow the brand:"  In March 2021, he tweeted:  "Monthly Active Users (MAU) of the @socios app, powered by $CHZ. You can see how the demand for $CHZ (exchanges, Etherscan wallets, ...) exploded. Everything is correlated. We are building a mainstream consumer-facing product, powered by @chiliz blockchain."  And in February 2023, he tweeted:  "I'm biased but I'm very confident that the Chiliz ecosystem is gonna bring a lot of value to fans, sports properties, and innovation in general. Long journey ahead of us. $CHZ."

**RESPONSE:**  The first and second sentences of Paragraph 227 appear to quote from and characterize an interview with Chiliz's CEO that was posted to Coin Telegraph's website on February 6, 2020, to which Coinbase respectfully refers the Court for its complete and accurate contents. The third and fourth sentence of Paragraph 227 purport to quote from March 31, 2021 and February 2, 2023 Twitter posts by Chiliz's CEO, to which Coinbase respectfully refers the Court for their complete and accurate contents.

228.    The Chiliz team has also made efforts to drive secondary trading of CHZ by offering the token on crypto asset trading platforms. For example, an earlier version of the whitepaper highlighted "ongoing discussions" to offer CHZ on trading platforms across Asia, and the Chiliz website features a "Listing Content and Q&A" document reflecting a proposal to offer CHZ on the Binance DEX platform.

**RESPONSE:**  Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 228, and therefore denies them on that basis. The second sentence of Paragraph 228 purports to quote from and characterize a version of the Chiliz whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

229.    The Chiliz team also tells investors that it plans to engage in "burning" (or destroying) CHZ tokens as a mechanism to support the price of CHZ by reducing their total supply. For instance, in 2020, the Chiliz team announced through its Fan Token exchange that it would burn 20% received in net trading fees, 10% of proceeds from "Fan Token" offering sales, and 20% of net proceeds of NFT & Collectibles. As with other crypto asset securities set forth herein, this marketed burning of CHZ has led investors reasonably to view their purchase of CHZ as having the potential for profit.

**RESPONSE:** Coinbase admits that the Chiliz team has publicly referenced plans to burn tokens. The second sentence of Paragraph 229 purports to characterize an announcement on Chiliz's Fan Token Exchange, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase denies the allegations in the third sentence of Paragraph 229. Coinbase denies any remaining allegations in Paragraph 229.

### viii.    FLOW

230.    FLOW is the native token for the Flow blockchain, a purportedly developer-friendly blockchain called Flow that Dapper Labs, an entity incorporated in Canada, developed and eventually launched in 2020. Flow was purportedly designed as "the foundation for a new generation of games, applications, and the digital assets that power them."

**RESPONSE:** Coinbase admits that FLOW is the native token for the Flow blockchain that launched in 2020. Coinbase further admits that Dapper Labs, Inc., a company reportedly incorporated in British Columbia, Canada, is recognized as the creator of the Flow blockchain, a developer-friendly blockchain. Coinbase admits the allegations in the second sentence of Paragraph 230. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 230, and therefore denies them on that basis.

231.    The Flow website boasts that the Flow proof-of-stake blockchain is designed in a manner that makes it different, faster, and more efficient than other blockchain networks due to, among other things, its "multi-node architecture," which separates the functions traditionally performed by one validator (collection, consensus, execution, and verification) across multiple validator nodes.

**RESPONSE:** Paragraph 231 purports to quote from and characterize the Flow website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

232.    Between 2019 and 2020, Dapper Labs raised approximately $24.6 million in "pre-launch" funding in two purportedly private fundraising rounds, including from Coinbase Ventures (the investment/venture capital arm of CGI) and other venture capital firms, in return for convertible notes that were expected to convert to FLOW tokens, subject to 24-month lock-up periods during which they could not be transferred, sold, or used in transactions.

**RESPONSE:** Coinbase admits Dapper Labs has represented that, between 2019 and 2020, it issued approximately $24 million in notes that could convert into either equity in Dapper Labs or FLOW tokens. Coinbase further admits that, as disclosed on Coinbase's website, Coinbase Ventures (through the legal entity Coinbase Global, Inc.) was issued such notes. Coinbase avers that it did not elect to receive FLOW tokens. Coinbase otherwise denies the remaining allegations in Paragraph 232.

233.    Subsequently, Dapper Labs held another token sale consisting of two phases which raised approximately $19 million. Additionally, Dapper Labs conducted other sales of FLOW for which it filed forms with the SEC claiming that the sales were exempt from registration under Rule 506(b) of Regulation D, including one on September 12, 2019 covering sales to 31 investors in the total amount of approximately $11.2 million, and two others on December 9 and 15, 2021, each for sales to a single investor in the amount of approximately $6.47 million and $23 million, respectively.

**RESPONSE:** Coinbase denies the allegations in the first sentence of Paragraph 233. Coinbase admits that Dapper Labs has filed Forms D with the SEC in connection with its sale of FLOW tokens in September 2019 and December 2021, to which Coinbase respectfully refers the Court for their complete and accurate contents.

234.    Since approximately May 2022, FLOW has been available for buying, selling, and trading on the Coinbase Platform.

**RESPONSE:** Admitted.

235.    According to the FAQ page on the Flow website:  "[FLOW] is the exclusive token for staking, delegating, paying transaction fees, and paying storage fees. It is also the primary token used for buying, selling, and trading assets and experiences on Flow."  Approximately 1.25 billion FLOW tokens were initially created, and, as of May 2023, approximately 72% of all FLOW is in circulation.

**RESPONSE:** The first and second sentences of Paragraph 235 purport to quote from the Flow website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase admits that, according to Flow, 1.25 billion FLOW tokens were initially created, but lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 235, and therefore denies them on that basis. Coinbase avers that FLOW is not currently eligible for Coinbase's staking program.

236.     Given that FLOW are required to interact with the Flow blockchain, the demand for and the value of the FLOW token would increase as a result of Dapper Labs' and the Flow development team's efforts to develop the Flow blockchain network and increase demand for its features and, thus, for the FLOW token itself. The increase in value of FLOW would inure to all FLOW holders—investors and the Dapper Labs/Flow development team alike. Dapper Labs and the Flow development team have promoted this dynamic through the publicly available information they disseminated.

**RESPONSE:** Coinbase denies the speculative and hypothetical allegations in the first and second sentences of Paragraph 236. The third sentence of Paragraph 236 purports to characterize undated and unidentified public information purportedly disseminated by Flow, to which Coinbase respectfully refers the Court for its complete and accurate contents.

237.     The information Dapper Labs and the Flow development team publicly disseminated has led FLOW holders, including those who purchased FLOW since May 2022, reasonably to view FLOW as an investment in and to expect to profit from Dapper Labs' and the Flow development team's efforts to grow the Flow protocol, which, in turn, would increase the demand for and the value of FLOW.

**RESPONSE:** Denied.

238.     For example, Flow's website stated that of the total FLOW supply, Dapper Labs and the Flow development team collectively received 38%; pre-launch backers and participants in the 2020 token sale received 30%; and 32% was set aside for "ecosystem development" and remains under the control of Flow's management. This last group of tokens, according to the website, are used to "bootstrap adoption and reward early participants in the network."

**RESPONSE:** Paragraph 238 purports to quote from and characterize Flow's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

239.    Below is a graph depicting the initial or "Genesis Block" token distribution of FLOW:



**RESPONSE:** Coinbase admits that Flow's website contains the graphic set forth in Paragraph 239. Paragraph 239 purports to characterize Flow's website, including the referenced graphic, and Coinbase respectfully refers the Court to Flow's website for its complete and accurate contents.

240.    This stated distribution of FLOW tied the fortunes of FLOW holders to each other and to the fortunes of the Flow development team.

**RESPONSE:** Denied.

241.    Flow's website further highlights its development team and its ability to grow and develop the Flow blockchain and the value of the FLOW token. For example, it states that Flow was "[d]eveloped by the team behind some of the most successful crypto applications on the Ethereum network" and "Flow has been developed and brought to market by one of the most innovative and interdisciplinary teams in the world."

**RESPONSE:** Paragraph 241 purports to quote from and characterize Flow's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

242.    Indeed, according to the Flow website, since the launch of the Flow blockchain in or around December 2020, due to Dapper Labs' and others' efforts, "Flow's ecosystem has grown from a small group of enthusiasts to a global community of over 10,000 developers, over 17 million user accounts, and over 2 million monthly active wallets."

**RESPONSE:** Paragraph 242 purports to quote from and characterize Flow's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

243.    In addition, in its announcement of the Flow blockchain in or around September 2019, Dapper Labs highlighted its involvement with other successful crypto projects and funding support it had received from various investors. And, at a 2022 town hall, Dapper Labs and the Flow development team explained planned development activities for 2023, including continued development to support the consumer-scale adoption of blockchain technology.

**RESPONSE:** The first sentence of Paragraph 243 purports to characterize a 2019 announcement by Dapper Labs, to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 243 purports to characterize a 2022 town hall by Dapper Labs, to which Coinbase respectfully refers the Court for its complete and accurate contents.

244.    Further, the Flow website describes the FLOW token as a "low-inflation" asset—meaning that the only new tokens that would purportedly be issued would be distributed to stakers of the token so that FLOW investors' holdings would not be diluted.

**RESPONSE:** Paragraph 244 purports to quote from and characterize Flow's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

### ix.    ICP

245.    "ICP," previously called "DNF" and rebranded as ICP in 2021, is the native token of the "Internet Computer Protocol," a blockchain-based protocol, conceived in 2016 by Swiss not-for-profit DFINITY Foundation ("DFINITY"), which has offices in Palo Alto and San Francisco.

**RESPONSE:** Coinbase admits that ICP is the native token of the Internet Computer Protocol, which reportedly was built by the DFINITY Foundation and started by Dominic Williams in 2016. Coinbase further admits that DFINITY foundation represents that it operates research centers in Palo Alto and San Francisco. Coinbase lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 245, and

therefore denies them on that basis.

246.     DFINITY describes the Internet Computer as a set of protocols that allow independent data centers around the world to band together and offer a decentralized alternative to the current centralized internet cloud providers and ICP as the token designed to interact with these systems, including to provide for processing power, data storage, and network bandwidth.

**RESPONSE:** Admitted.

247.     In an April 8, 2017 Medium post, DFINITY's founder, Dominic Williams, referred to the Internet Computer as an "intelligent decentralized cloud." At a 2020 Blockchain conference, he further touted the protocol as a more efficient replacement for big tech cloud services, servers, databases, firewalls, VPNs and other services.

**RESPONSE:** The first sentence of Paragraph 247 purports to quote from an April 8, 2017

Medium post, to which Coinbase respectfully refers the Court for its complete and accurate

contents. The second sentence of Paragraph 247 purports to characterize Mr. Williams' statements

at a 2020 blockchain conference, to which Coinbase respectfully refers the Court for their complete

and accurate contents. To the extent any further response is required, Coinbase denies the

allegations in Paragraph 247.

248.     Between 2017 and 2018, DFINITY engaged in three funding rounds:  (1) a "Seed" round in 2017; (2) a "Strategic" round in early 2018; and (3) a "Presale" round in late 2018. In these rounds, DFINITY raised the equivalent of approximately $170 million by selling rights to receive future ICP tokens, which did not yet exist, for fiat currencies, ether (ETH) and bitcoin (BTC). According to a post released by DFINITY on its website on or about May 10, 2021, when the network launched, the rights to "access" the ICP received in the seed round funds were staggered from 0 to 90-plus days. On or about November 19, 2022, Williams tweeted that purchasers in the initial Seed fundraiser "made out like bandits" when they purchased ICP for $0.03.

**RESPONSE:** Coinbase admits that DFINITY has represented that, between 2017 and

2018, rights to ICP tokens reportedly were sold in three rounds for fiat currencies and

cryptocurrencies cumulatively totaling over $100 million dollars. The second sentence of

Paragraph 248 purports to quote from and characterize a purported DFINITY public web-posting

from May 2021, to which Coinbase respectfully refers the Court for its complete and accurate

contents. The third sentence of Paragraph 248 purports to quote from and characterize a November

19, 2022 Twitter post by Mr. Williams, to which Coinbase respectfully refers the Court for its

complete and accurate contents. Coinbase denies the remaining allegations in Paragraph 248.

249.    ICP tokens first became available on multiple crypto asset trading platforms on or about May 10, 2021, when the network launched. At launch, DFINITY minted a total of 469 million ICP tokens.

**RESPONSE:** Coinbase admits that ICP tokens became available for secondary trading on

Coinbase's platform on May 10, 2021, and that 469 million tokens reportedly were created at the

time of the network's launch. Coinbase denies any remaining allegations in Paragraph 249.

250.    Since approximately May 2021, ICP has been available for buying, selling, and trading on the Coinbase Platform.

**RESPONSE:** Admitted.

251.    The publicly available information and statements disseminated by DFINITY and its founder, including statements made and available during the period when ICP was available to trade on the Coinbase Platform, have led ICP holders reasonably to view ICP as an investment in and to expect to profit from DFINITY's efforts to grow the protocol, which, in turn, would increase the demand for and the value of ICP.

**RESPONSE:** Denied.

252.    For example, DFINITY stated publicly that it would use the proceeds from ICP sales to fund development, marketing, business operations, and growth and promotion of the Internet Computer protocol, and thus demand for its ICP token. In fact, DFINITY distributed approximately 24% of the ICP issued in the public launch to support the Internet Computer platform and to pay staking rewards through the Internet Computer ecosystem. Another 18% of ICP was distributed to compensate the DFINITY team members, aligning their financial fortunes with those of ICP investors.

**RESPONSE:** The first sentence of Paragraph 252 purports to characterize undated and

unidentified public statements by DFINITY; as such Coinbase lacks knowledge or information

sufficient to form a belief as to the truth of the sentence's allegations, and therefore denies them

on that basis. Coinbase admits that DFINITY has represented that, at the time of the initial

allocation of ICP tokens, 25.87% of ICP was allocated to the DFINITY Foundation and 33.36%

was allocated to employees, advisors, founders, and other early contributors, respectively. Coinbase avers that ICP is not currently eligible for Coinbase's staking program. Coinbase otherwise denies the allegations in Paragraph 252.

253.    Moreover, in an April 4, 2018 Medium post leading up to the 2018 funding rounds, Williams touted:  "DFINITY has received inbound interest from hundreds of private accredited entities such as hedge funds."  Indeed, a number of venture capital firms invested in ICP.

**RESPONSE:** The first sentence of Paragraph 253 purports to quote from and characterize an April 4, 2018 post on the Medium website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase admits that DFINITY has represented that, in the strategic round referenced in Paragraph 248, some venture capital firms purchased the right to receive ICP. Coinbase otherwise denies the allegations in the second sentence of Paragraph 253.

254.    Furthermore, from ICP's inception through today, DFINITY has publicly stated that its key developers, including Williams, have been and continue to be heavily involved in Internet Computer and have promoted their dedication to grow the network and increase the value of ICP.

**RESPONSE:** Paragraph 254 purports to characterize DFINITY's public statements, including those referenced in paragraph 255, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 254, and therefore denies them on that basis.

255.    For example:

- On June 27, 2020 Williams tweeted:  "[t]he Internet Computer proj is propelled by extraordinary investments in R&D. DFINITY has assembled one of the strongest science & engineering teams in tech, across several research centers worldwide. This team has been relentlessly pushing blockchain ambition to new levels."

- On December 19, 2021, Williams tweeted:  "[t]here's nothing we can do to control the price, but we feel the pain same as everyone else. There has been a lot of market manipulation by bad people but we remain focused on taking #ICP to the #1 spot."

- On January 25, 2023, Williams tweeted: "[w]hen I look at [crypto asset pricing services], I don't look at the $ price, I look position. $ICP needs to be in the top 3, and I will work tirelessly to help get it there."

**RESPONSE:** Paragraph 255 purports to quote from Twitter posts by Mr. Williams in 2020, 2021, and 2023, to which Coinbase respectfully refers the Court for their complete and accurate contents.

256.    A month after it was launched for public trading, ICP's price reached an intraday high of $700. One month later, the price of ICP had plummeted to $72 and Williams began making public statements indicating the price of ICP would increase again. For example, on June 10, 2021, Williams tweeted, "Major [venture capital] firms ... hv [sic] long-term strategies & generally don't panic dump. Their focus is on moonshots because that's what generates their primary returns. We all need to keep our focus on horizon. Watch what happens in +6/9 months." And, on September 3, 2021, Williams tweeted, "ICP seed investors' 2000X gains; crypto's largest research org; most advanced blockchain; ferocious growth."

**RESPONSE:** Coinbase admits that the price of ICP on Coinbase exceeded $600 per token in May 2021, and subsequently declined to less than $80 per token. The second, third, fourth, fifth, and six sentences of Paragraph 256 purport to quote from and characterize June and September 2021 Twitter posts by Mr. Williams, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies the remaining allegations in Paragraph 256.

257.    In an ICP whitepaper released in January 2022, DFINITY promotes that it burns ICP tokens as a mechanism to support the price of ICP by reducing their total supply. On January 20, 2023, Williams tweeted, "$ICP will eventually become deflationary"—meaning its supply will be reduced over time. On its website, DFINITY posts a Dashboard that calculates the ongoing cycle burn rate, reflecting the number of ICP tokens burned. As with other crypto asset securities set forth herein, this marketed burning of ICP as part of the system's "deflationary" mechanism has led investors reasonably to view their purchase of ICP as having the potential for profit.

**RESPONSE:** The first sentence of Paragraph 257 purports to quote from and characterize an ICP whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 257 purports to quote from and characterize a January 2023 Twitter post by Mr. Williams, to which Coinbase respectfully refers the Court for its complete and accurate contents. The third sentence of Paragraph 257 purports to characterize the

DFINITY website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase denies the allegations in the fourth sentence of Paragraph 257, and denies the remaining allegations in Paragraph 257.

### x.   NEAR

258.   "NEAR" is the native token of the NEAR blockchain protocol, a proof-of-stake blockchain conceived in 2018 by Delaware corporation Near, Inc. ("Near") and its founders Alexander Skidanov and Illia Polosukhin. According to the NEAR whitepaper, the NEAR protocol uses a technology dubbed "Nightshade" that allows the volume of transactions on the network to grow indefinitely without hurting its performance, measured in speed and transaction fees.

**RESPONSE:** Coinbase admits that NEAR is the native token of the NEAR protocol and that Messrs. Skidanov and Polosukhin are reportedly the NEAR protocol's founders. Coinbase further admits that Near, Inc. is reportedly a Delaware corporation. The second sentence of Paragraph 258 purports to quote from and characterize the NEAR whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 258, and therefore denies them on that basis.

259.   In 2019, Skidanov and Polosukhin founded the NEAR Foundation, a non-profit organization under Swiss law that claims to be "responsible for contracting protocol maintainers, funding ecosystem development, and shepherding core governance of the NEAR protocol."

**RESPONSE:** Coinbase admits that Messrs. Skidanov and Polosukhin are reported to have founded the NEAR Foundation, which is reportedly a Swiss non-profit organization. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 259, and therefore denies them on that basis.

260.   From Q3 2017 to Q1 2020, Near raised approximately $34.1 million through the offer and sale of notes that were convertible into then-nonexistent NEAR tokens. In July 2019, Near filed forms with the SEC claiming its offer and sales of convertible notes was exempt from registration and stating Near "intended to use the proceeds [of the sales] for the development of the Near protocol."  In August 2020, Near held an additional sale of approximately 120 million NEAR tokens. In January 2022, the NEAR Foundation raised an additional $150 million through a purportedly "private" sale of NEAR tokens to venture capital investors.

**RESPONSE:** Coinbase admits that it was publicly reported that the NEAR protocol sold more than $33 million in NEAR tokens between Q3 2017 and the end of Q1 2020, for which tokens the genesis event was April 22, 2020. Coinbase further admits that it was publicly reported that 120 million NEAR tokens were sold by Near in August 2020. Coinbase further admits that it was publicly reported that the NEAR Foundation sold $150 million in NEAR tokens in January 2022. The second sentence of Paragraph 260 purports to quote from and characterize Near's filings with the SEC, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 260, and therefore denies them on that basis.

261.    Although U.S. investors purportedly were prohibited from participating in the early seed funding rounds or NEAR's initial minting, NEAR has been available for purchase and sale in the United States since at least October 2020, including since September 2022 on the Coinbase Platform.

**RESPONSE:** Coinbase admits that the NEAR token has been available for purchase and sale on its platform since September 2022, and was available on other platforms prior thereto. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 261, and therefore denies them on that basis.

262.    Since the launch of the NEAR protocol in 2020, including during the period when NEAR was made available on the Coinbase Platform, publicly available information and statements disseminated by Near, the NEAR Foundation, and their common founders have led NEAR holders reasonably to view NEAR as an investment in and to expect profits from Near's and the NEAR Foundation's efforts to grow the protocol, which, in turn, would increase the demand for and the value of NEAR.

**RESPONSE:** Denied.

263.    Approximately 35.7% of the one billion NEAR tokens initially minted were transferred to early investors that held convertible notes. Of the remaining initial supply of NEAR tokens, 14% were allocated to the "Core Contributors," 11.7% to "Early Ecosystem" developers, 10.0% to the NEAR "Foundation Endowment," 17.2% to "Community Grants and Programs," and 11.4% to "Operations Grants." Accordingly, the financial incentives and fortunes of Near's core team members and those of early developers (who collectively owned approximately 25.7% of the

initial supply of NEAR) were aligned with those of other NEAR investors (who owned approximately 35.7% of the initial NEAR supply).

**RESPONSE:** Coinbase denies the allegations in the first sentence of Paragraph 263. Coinbase admits that Near has represented that NEAR tokens were allocated as follows: 14% to Core Contributors; 11.7% to Early Ecosystem; 10% to Foundation Endowment; 17.2% to Community Grants, Programs; and 11.4% to Operations Grants. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 263, and therefore denies them on that basis.

264. For example, Near stated in its SEC filings that it would pool investment proceeds from the sale of notes convertible into NEAR tokens to develop the NEAR protocol and grow Near's business and, as recently as January of 2022, that it further pooled proceeds from the sale of $150,000 in NEAR tokens that month for the same purposes.

**RESPONSE:** Paragraph 264 purports to characterize Near's SEC filings, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase admits that Near announced in a January 13, 2022 Medium blog post that it had sold $150 million in NEAR tokens, but denies that the blog post stated that Near would "pool investment proceeds" and respectfully refers the Court to the blog post for its complete and accurate contents. Coinbase further denies that Near's Form D filings state that Near would "pool investment proceeds." Coinbase denies any remaining allegations in paragraph 264.

265. And, as the NEAR Foundation publicly touted, it did in fact use its allocation of NEAR tokens to support the development of the NEAR protocol and ecosystem. For example, in October 2021, the NEAR Foundation announced "$800 million in funding initiatives targeted at accelerating growth" of the NEAR ecosystem. Subsequently, in a "transparency report" blog post on the Near website, the NEAR Foundation stated that it had "deployed $540M in fiat and tokens during [the last quarter of 2021 and the first two quarters of 2022]" to support "NEAR ecosystem projects" and launch "regional hubs" around the world, among other efforts to help grow the ecosystem.

**RESPONSE:** Paragraph 265 purports to quote from and characterize October 25, 2021 and September 12, 2022 NEAR Foundation blog posts, to which Coinbase respectfully refers the

Court for their complete and accurate contents. To the extent any further response is required, Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 265, and therefore denies them on that basis.

266.     NEAR's founders remain actively involved with the NEAR protocol today through the NEAR Foundation. In fact, Polosukhin sat on the NEAR Foundation Council (its governing group) until March 2023 and has served as its Chair for the past two years.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266, and therefore denies them on that basis.

267.     In a post on one of the NEAR Foundation's blogs discussing the role of the NEAR ecosystem in funding projects to continue growing the NEAR protocol, Polosukhin likened the NEAR ecosystem to a venture capitalist picking an investment strategy and likened the NEAR community to investors in the NEAR ecosystem:



**RESPONSE:**  Paragraph 267 purports to quote from and characterize a NEAR Foundation blog post, to which Coinbase respectfully refers the Court for its complete and accurate contents.

268.     Similarly, as an indicator of investor demand, Near has touted its high-profile venture capital partners. For example, until March 2023, Near's website stated that NEAR is "[b]acked by the best," followed by the logos of 10 venture capital firms and the following quotation from one of those firms' partners:  "NEAR is poised to be a leading smart contract blockchain platform, combining first-rate technology with a fast-growing developer ecosystem. We are excited to support NEAR as we ramp up our investments in the digital asset space."

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 268, and therefore denies them on that basis. The second sentence of Paragraph 268 purports to quote from and characterize Near's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

269.     Near has also marketed the feature of the NEAR protocol that automatically burns 70% of all NEAR tokens accumulated as fees. Accordingly, the greater the number of transactions

that occur on the NEAR protocol, the greater the number of NEAR tokens that are burned, reducing their total supply. As with other crypto asset securities set forth herein, this marketing burning of NEAR has led investors reasonably to view their purchase of NEAR as having the potential for profit.

**RESPONSE:** Coinbase admits that Near discusses on its website the Near protocol's economics, including the burning of NEAR tokens, and respectfully refers the Court to that website for its complete and accurate contents. To the extent a further response is required, Coinbase denies any remaining allegations in the first and second sentence of Paragraph 269. Coinbase denies the allegations in the third sentence of Paragraph 269.

### xi.   VGX

270.   "VGX" is the native token of the crypto asset platform known as Voyager, which is owned and operated by Voyager Digital, LLC, a New Jersey-based Delaware corporation founded in 2018. The Voyager platform allowed customers to buy and sell crypto assets as well as earn interest by participating in the Voyager Earn Program, which allowed investors to tender crypto assets to Voyager through the Voyager platform in exchange for Voyager's promise to provide a variable interest payment.

**RESPONSE:** Coinbase admits the allegations in the first sentence of Paragraph 270. Coinbase further admits that Voyager customers could buy and sell digital assets on the Voyager platform, and that Voyager represented that its customers could earn rewards on the digital assets they held at Voyager through Voyager's so-called Earn Program. Coinbase respectfully refers the Court to Voyager's website for a complete and accurate description of the Earn Program. Coinbase otherwise denies the allegations in Paragraph 270.

271.   Voyager's website, www.investvoyager.com, has advertised that its "commission-free" "broker model" utilized "Smart Order Routing" to connect more than a dozen crypto asset trading platforms and market makers "to offer investors unparalleled speed, liquidity, and pricing – all in one app:"  According to its website, as of March 2022, the Voyager platform supported more than 100 crypto assets.

**RESPONSE:** Paragraph 271 purports to quote from and characterize Voyager's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

272.    In October 2020, Voyager acquired LGO Markets, a French crypto asset trading platform and its native token LGO. As part of the acquisition, VGX and LGO tokens both were swapped into newly minted tokens that Voyager referred to in its whitepaper as VGX 2.0 tokens, although the new integrated tokens continued to trade on both Voyager and third-party crypto trading platforms simply as "VGX."

**RESPONSE:** Coinbase admits that it was publicly reported that Voyager acquired LGO Markets in 2020. The second sentence of Paragraph 272 purports to characterize the VGX whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 272, and therefore denies them on that basis.

273.    VGX is an "exchange token" (the crypto asset associated with a crypto trading platform) for the Voyager platform. Specifically, Voyager describes VGX as "designed to reward Voyager customers for their loyalty, for holding VGX in their Voyager accounts and to motivate community members for their participation in the multifaceted rewards functions of VGX."

**RESPONSE:** Paragraph 273 appears to quote from and characterize the VGX whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents. To the extent a further response is required, Coinbase admits that VGX had utility through, among other sources, use on the Voyager platform. Coinbase otherwise denies the allegations in Paragraph 273.

274.    Since approximately November 2021, VGX has been available for buying, selling, and trading on the Coinbase Platform.

**RESPONSE:** Admitted.

275.    From approximately October 2019 until October 2022, Voyager was the majority owner of VGX tokens, holding approximately 60.38% as of October 2022. As of June 2023, Voyager owns approximately 17% of all VGX tokens. Accordingly, Voyager's fortunes were, and remain, aligned with VGX investors' fortunes.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 275, and therefore denies them on that basis.

276.    The information publicly disseminated, and statements made, by Voyager, as well as the economic incentives that Voyager has offered with respect to VGX, have led VGX holders, including those who purchased VGX since November 2021, reasonably to view VGX as an investment in and to expect to profit from Voyager's efforts to develop its trading platform, loyalty

program, and other touted features of its business, which, in turn, would increase the demand for and the value of VGX.

**RESPONSE:** Denied.

277.    For example, Voyager has touted the experience of its founders in both the original VGX and subsequent VGX 2.0 whitepapers, and has also highlighted the continued role that Voyager would have in ensuring the success of VGX, including the following examples:

- The original whitepaper stated:  "Voyager's team consists of finance and technology industry veterans dedicated to empowering and servicing investors in the most exciting asset class to date—crypto. Our founders have combined their decades worth of experience from leading organizations."

- The VGX 2.0 whitepaper set forth that in the first three years following the integration of VGX and LGO, Voyager would mint an additional 70 million VGX for the "growth pool . . . to power Voyager Loyalty rewards, as well as fund promotional campaigns."

**RESPONSE:** Paragraph 277 purports to characterize and quote from "The Voyager Token" and "VGX 2.0: The Voyager Token" whitepapers, to which Coinbase respectfully refers the Court for their complete and accurate contents.

278.    Moreover, Voyager has incentivized all of its platform customers to buy, hold and encourage others to purchase VGX. For example, by holding VGX on the Voyager platform, customers could earn interest in-kind as well as interest rate "boosts" on certain other crypto assets loaned to Voyager. Customers could also earn VGX by referring friends to the Voyager platform.

**RESPONSE:** Coinbase admits that Voyager represented that through its Loyalty Program, holders of VGX could earn staking rewards and rewards boosts on other digital assets loaned to Voyager, including BTC, ETH, and USDC. Coinbase further admits that Voyager represented that its customers could earn cash rewards for referrals to the platform. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in Paragraph 278, and therefore denies them on that basis.

279.    Voyager further incentivized its customers to buy and hold VGX with its "Loyalty Program," launched in or around September 2021, under which customers achieved higher reward "tiers" based on the amount of VGX they held on the platform. Each tier offered progressively higher rewards with respect to staking as well as higher discounts on crypto withdrawal fees and

rewards on Voyager debit card charges. (In June 2022, Voyager announced it was expanding its Loyalty Program to six tiers.)

**RESPONSE:** Coinbase admits that Voyager represented it had a tiered reward structure that corresponded to the amount of VGX held in a customer's wallet, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 279, and therefore denies them on that basis. Coinbase further admits that Voyager represented that earnings rewards boosts, crypto back rewards, crypto withdrawal discounts, and crypto back on debit card percentages increased as a customer moved up in reward tier. Coinbase admits the allegations in the third sentence of Paragraph 279. Coinbase avers that VGX is not currently eligible for Coinbase's staking program. To the extent a further response is required, Coinbase denies any remaining allegations in Paragraph 279.

280.    The July 2021 VGX 2.0 whitepaper introduced and touted even more features that Voyager was developing for the VGX loyalty program, including VGX cashback rewards on a Voyager debit card, auto-staking of various crypto assets, and continued international expansion of the Voyager platform.

**RESPONSE:**  Paragraph 280 purports to characterize the "VGX 2.0: The Voyager Token" whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

281.    Further, on or about May 1, 2021, Voyager introduced a 25% burn of all VGX used to pay withdrawal fees on the Voyager app "in an effort to help reduce the circulating supply of tokens:"  As with the "burn" mechanisms of other crypto asset securities set forth herein, this marketed burning of VGX led investors reasonably to view their purchase of VGX as having the potential for profit.

**RESPONSE:** The first sentence of Paragraph 281 appears to quote from and characterize Voyager's May 1, 2021 announcement on its website titled "Voyager Loyalty Program & Token Utility Model," to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase denies the allegations in the second sentence of Paragraph 281.

282.    On or about July 1, 2022, following a number of crypto market disruptions and a large customer default on a multi-hundred million-dollar loan, Voyager suspended all trading and interest programs on the Voyager platform. On or about July 5, 2022, Voyager and its parent

companies filed for Chapter 11 bankruptcy. Consequently, as of May 23, 2023, VGX trades at $0.15. From its October 2019 rebrand through the present, VGX has been traded on U.S.-based crypto asset trading platforms, including on the Coinbase Platform, fluctuating significantly between its August 2021 high of $7.50 and its December 2019 low of $0.02.

**RESPONSE:** Coinbase admits that in July 2022, the Voyager platform suspended trading, rewards programs, deposits, and withdrawals, and Voyager Digital, LLC subsequently declared bankruptcy. Coinbase further admits that VGX has traded at varying prices across several digital asset platforms, including since November 2021 on the Coinbase platform. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 282, and therefore denies them on that basis.

### xii.    DASH

283.    "DASH" is the native token of the Dash blockchain and the token used for financial transactions on the Dash platform, including payment of transaction fees required to propose transactions on the blockchain. The Dash blockchain is a protocol launched in or about January 2014 by founder Evan Duffield. According to its website, www.dash.org, Dash is a crypto payment platform "forked" (or split off) from the Bitcoin source code.

**RESPONSE:** Coinbase admits that the Dash blockchain and DASH tokens have existed for over ten years, and otherwise admits the remaining allegations in the first and second sentences of Paragraph 283. The third sentence of Paragraph 283 purports to quote from and characterize the Dash website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

284.    DASH has been available for trading on the Coinbase Platform since approximately September 2019.

**RESPONSE:** Coinbase admits that DASH has been available for buying, selling, and trading on Coinbase's platform since September 2019, over one and one-half years before Coinbase's DPO.

285.    The initial distribution of DASH was as rewards to miners that provided value to the Dash network by mining blocks for the blockchain. Today, the Dash network is purportedly run by a subset of its users, which are called "Masternodes," servers that provide a second layer of

services and governance on the Dash blockchain on top of the services provided by standard nodes. Ninety percent of the block rewards—in the form of DASH tokens—generated through blockchain mining are split between the Masternodes and the regular nodes. At the end of every month, the remaining 10% of the block rewards are sent to the Dash Treasury to fund operation of, and improvements to, the Dash platform and DASH token. Below is a breakdown of how rewards are purportedly distributed on the Dash platform:



**RESPONSE:** Coinbase admits that it has been publicly reported that the initial distribution of DASH was as rewards to miners that mined blocks for the Dash blockchain. The remaining allegations in Paragraph 285 appear to characterize, and reproduce an image from, the Dash website, to which Coinbase respectfully directs the Court for its complete and accurate contents.

286.    The DCG (Dash Core Group), an entity controlled by the Masternodes and funded by the Dash Treasury, is responsible for making budget proposals meant to improve and advance the Dash network. The Masternodes vote on all funding proposals submitted to the Dash Treasury, including DCG proposals. The Masternodes also indirectly control the DCG through the Masternodes' voting control over the Dash Trust, which is the sole shareholder of DCG. The DCG's improvements to the Dash platform and the DASH token increase the DASH token's value, thereby benefitting all token holders. Accordingly, the fortunes of the investors (*i.e.*, the non-Masternodes token holders) are tied to the fortunes of the Masternodes and the DCG.

**RESPONSE:** Coinbase admits that it has been publicly reported that the Dash Core Group is funded by the Dash Treasury, but avers it lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in the first sentence in Paragraph 286, and

therefore denies them on that basis. Coinbase lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in the second, third, and fourth sentences of Paragraph 286,

and therefore denies them on that basis. Coinbase denies the allegations in the fifth sentence of

Paragraph 286.

287.    From the founding of the Dash platform, the Masternodes and the DCG have
disseminated information that has led DASH holders, including those who purchased DASH since
September 2019, reasonably to view DASH as an investment in and to expect to profit from the
DCG's and the Masternodes' efforts to develop, expand, and grow the protocol, which, in turn,
would increase the demand for and the value of DASH.

**RESPONSE:** Denied.

288.    For instance, Duffield purportedly launched DASH to improve on Bitcoin's
relatively slow transaction times and privacy issues. To address this, he invented an algorithm used
for calculations on the DASH blockchain, which the DCG touts as "one of the safest and more
sophisticated cryptographic hashes in use by modern cryptocurrencies."  Subsequently, Duffield
also invented "InstantSend" and "PrivateSend," which the Dash website describes, respectively,
as enhancing DASH's speed and privacy by allowing users to transfer DASH without waiting for
the transactions to be confirmed on the blockchain and by making transactions more difficult to
trace.

**RESPONSE:** Coinbase admits that is has been publicly reported that Mr. Duffield

launched DASH to improve on Bitcoin's slow transaction times. The second sentence of Paragraph

288 appears to quote from the "Features" section of Dash's website, to which Coinbase

respectfully refers the Court for its complete and accurate contents. The third sentence of

Paragraph 288 purports to characterize the Dash website, to which Coinbase respectfully refers the

Court for its complete and accurate contents. To the extent a further response is required, Coinbase

avers that its lacks knowledge or information sufficient to form a belief as to the truth of any

remaining allegations in Paragraph 288, and therefore denies them on that basis.

289.    Further, the DCG uses the DASH it receives from the Dash treasury to fund
performance enhancements and to add features to the Dash platform. For instance, the DCG works
to advance DASH as a medium of payment. Dash's website states that DASH can be spent at
thousands of retailers through the "DashDirect" consumer app and, in or around May 2022,

@DashInformation tweeted, "DCG is a [Dash Funded Organization] with a dedicated team working for the Dash network that is responsible for the main development of Dash. Its mission is to provide greater financial freedom by delivering and improving financial solutions which are secure, reliable, decentralized, and usable for all."

**RESPONSE:** Coinbase admits that it has been publicly reported that the Dash Core Group supports the continued development, integrations, and other activities of the Dash Network. The third sentence purports to quote from and characterize the Dash website and a May 2022 Twitter post by @DashInformation, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies any remaining allegations in Paragraph 289.

290.   The DCG also promotes DASH's supposed superiority over other tokens due to the attributes Duffield has developed for it, namely greater scalability of the protocol (which increases usability), short processing times, and low transaction costs.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 290, and therefore denies them on that basis.

291.   Finally, the value of DASH is further enhanced by the fact that the token has a limited supply and is deflationary in nature. For example, the Dash website explains that the block reward is reduced by approximately 7% every 210,240 blocks (approximately every 380 days).

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of Paragraph 291, and therefore denies them on that basis. The second sentence of Paragraph 291 purports to characterize the Dash website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

### xiii.   NEXO

292.   "NEXO" is the native or "exchange" token for the Nexo platform, a crypto asset trading and lending platform created by Nexo Capital, Inc. ("Nexo"), a Cayman Islands corporation formed in 2018 with its principal place of business in Grand Cayman, Cayman Islands.

**RESPONSE:** Coinbase admits that NEXO is the native token for the Nexo platform, which purports to be a digital lending and exchange platform. Coinbase further admits that Nexo Capital, Inc., a Cayman corporation, has been identified as the creator of the Nexo platform.

Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 292, and therefore denies them on that basis.

293.    The Nexo platform provides crypto asset-related financial products and services, including purchasing, lending, borrowing, trading, and storing. According to Nexo's website, www.nexo.com, and as also described on Coinbase's website, the Nexo platform leverages blockchain technology to provide crypto asset holders access to currency and high-yield idle assets and to allow its users to participate in sophisticated and over-the-counter trading.

**RESPONSE:** Coinbase admits the allegations in the first sentence of Paragraph 293. The second sentence of Paragraph 293 purports to characterize Nexo's and Coinbase's websites, to which Coinbase respectfully refers the Court for their complete and accurate contents.

294.    From February through May 2018, Nexo conducted a public offering of NEXO and sold NEXO to 129 investors globally in exchange for bitcoin and ETH, raising approximately $52.5 million. Nexo's self-described "Token Sale" consisted of an initial airdrop distribution in February 2018, an ICO "pre-sale" in March 2018, and ICO from April to May 2018. In 2018, Nexo filed forms with the SEC claiming that its offers and sales of NEXO were offers and sales of securities exempt from the federal securities' laws registration requirements.

**RESPONSE:** Coinbase admits that it was publicly reported that, in May 2018, Nexo sold $52.5 million of NEXO tokens to 129 individuals or entities. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 294, and therefore denies them on that basis. The third sentence purports to characterize Nexo's filings with the SEC, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies any remaining allegations in Paragraph 294.

295.    Since at least March 2019, NEXO has been available for buying, selling, and trading on crypto asset trading platforms in exchange for fiat currency (including, U.S. dollars) or other crypto assets (including bitcoin), including on Coinbase Wallet since at least August 2021.

**RESPONSE:** Coinbase denies that NEXO can be bought, sold, or traded "on" Coinbase Wallet. Coinbase lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 295, and therefore denies them on that basis.

296.    The publicly available information disseminated by Nexo, as well as the economic incentives that Nexo has offered with respect to NEXO, have led investors—including those who

purchased NEXO via Coinbase Wallet since August 2021—reasonably to view NEXO as an investment in and to expect profits from Nexo's efforts to develop its lending business and grow the Nexo platform, which in turn would increase the demand for and the value of NEXO.

**RESPONSE:** Denied.

297.    For example, Nexo took and touted steps to make NEXO available for trading on crypto asset trading platforms. In a July 7, 2021 blog post on its website, Nexo—in announcing NEXO's listing on the Bitfinex crypto asset trading platform—stated:  "[o]ne of the Nexo community's repeated requests has been that we list our native asset [NEXO] on more and more bigger exchanges. Our team wasted no time addressing these requests."  In a May 29, 2022 blog post Nexo made similar statements with respect to NEXO's listing on the crypto asset trading platform Bitstamp. Both of these blog posts emphasized that the relevant listings had the potential to augment NEXO token usage and boost its price.

**RESPONSE:** Coinbase lacks knowledge or information sufficient to form a belief as to

the truth of the allegations in the first sentence of Paragraph 297, and therefore denies them on that

basis. The second, third, and fourth sentences of Paragraph 297 purport to quote from and

characterize July 2021 and May 2022 Nexo blog posts, to which Coinbase respectfully refers the

Court for their complete and accurate contents.

298.    In addition, Nexo's website has stated that Nexo pools and uses the proceeds from NEXO sales to fund and develop Nexo's lending and investment activities to generate Nexo profits, which in turn are used to make "interest rate payments" (which Nexo described at the time of its Token Sale as "dividends") to NEXO investors on a *pro rata* basis. Similarly, in a post on its Medium blog on or around November 23, 2018, Nexo touted that it had "raised funds in a token offering and [had] been able to develop a user-friendly crypto lending wallet and a profitable business model in less than 6 months."

**RESPONSE:** The first sentence of Paragraph 298 purports to quote from and characterize

Nexo's website, to which Coinbase respectfully refers the Court for its complete and accurate

contents. The second sentence of Paragraph 298 purports to quote from and characterize a

November 2018 blog post on the website Medium, to which Coinbase respectfully refers the Court

for its complete and accurate contents.

299.    In the NEXO whitepaper, Nexo stated that "52.50% of NEXO tokens will be distributed to investors from the Nexo Token Sale" and "25% of NEXO tokens will be allocated towards the growth of the loan portfolio."  In addition, as disclosed in the whitepaper, 11.25% of NEXO tokens were distributed to Nexo's founders and the team with a vesting structure to "ensure

that the team's interests are aligned with those of the investors and that the team's efforts will be channeled to towards the creation of a profitable and sustainable business"—with an additional 5.25% for Nexo's advisors. An additional 6% of NEXO was retained by Nexo to use for "community building and Airdrops" to "promote the Nexo loan services by engaging the crypto community, thus ensuring the long-term success of the Nexo enterprise."

**RESPONSE:** Paragraph 299 purports to quote from Nexo's whitepaper, to which Coinbase respectfully refers the Court for its complete and accurate contents.

300.    In its 2018 Interim Report, Nexo further highlighted the alignment between NEXO purchasers and Nexo's management team, stating: "[n]one of Nexo's managers has sold a single NEXO token; rather, everyone is motivated to deliver the strongest possible performance and pursue long-term higher returns in accordance with successful company growth."

**RESPONSE:** Paragraph 300 purports to quote from and characterize Nexo's 2018 Interim Report, to which Coinbase respectfully refers the Court for its complete and accurate contents.

301.    In public statements on its website and social media pages, including statements made and available during the period when NEXO was available to trade via Coinbase Wallet, Nexo specified its expertise and described the efforts it has made and will continue to make to develop its lending business and the Nexo platform and to attract customers and users, for example:

- the NEXO whitepaper statement touting Nexo's "experienced", "award-winning", and "[s]uccessful FinTech Team serving millions of people for over 10 years under strict European Banking and Financial Services Supervision" and that "the team's efforts will be channeled towards the creation of a profitable and sustainable business";

- Nexo website's "About Us" page, which highlighted the expertise of its team and described Nexo as "[l]everaging the best of the team's years of experience in FinTech along with the power of blockchain"; and

- Nexo's statement in its 2018 Interim Report that "[g]iven the executive management's institutional background, Nexo is always assessing new and constructive partnerships" and that Nexo is "keen to pursue further productive collaborations, which would facilitate Nexo's continuous loan portfolio growth and platform functionalities."

**RESPONSE:** Coinbase denies that Nexo is or has been "available to trade via Coinbase Wallet." Coinbase avers that its users can choose to connect their Wallets to third-party decentralized protocols, exchanges, and applications — and those third-party platforms make

possible the sending, receiving, and swapping of digital assets, without using intermediaries such as centralized trading platforms. Coinbase further avers that Wallet is passive software lacking order matching or routing functionality; it does not "trade" anything. Paragraph 301 otherwise purports to characterize Nexo's public statements, whitepaper, website, and 2018 Interim Report, to which Coinbase respectfully refers the Court for their complete and accurate contents.

302.    Further, Nexo explicitly promised returns to investors in public statements on its website and social media pages. For example, in the NEXO whitepaper and on its Medium blog, Nexo told NEXO holders that it would provide them with dividends of 30% of Nexo's profits generated from loan interest paid by Nexo customers, among other business lines. Specifically, as Nexo explained in a Medium blog post on or around November 23, 2018, a "base dividend" is "paid out to all eligible token holders proportionally to their NEXO Token holdings" and, in addition, at least one-third of the total dividend amount goes towards a "loyalty dividend" that is "paid out individually for each NEXO Token based on how long it has been in the Nexo Wallet from one ex-dividend date to the next."

**RESPONSE:** Paragraph 302 purports to characterize Nexo's public statements, whitepaper, and Medium blog posts, all to which Coinbase respectfully refers the Court for their complete and accurate contents. To the extent a further response is required, Coinbase denies any remaining allegations in Paragraph 302.

303.    In addition, Nexo's website touts the special economic incentives and benefits Nexo provides to NEXO holders, including daily "interest payments" (returns) and lower interest rates on loans. Specifically, as marketed on Nexo's website, NEXO "[h]olders receive up to 12% interest per annum on the NEXO Tokens held in both the Savings and Credit Line wallets of their Nexo accounts."   Nexo's website has also told investors that "holding NEXO Tokens automatically makes you a part of Nexo's Loyalty Program which gives you:  [u]p to 50% higher yields with our Earn on Crypto suite", "[u]p to 0.5% back in crypto rewards on purchases or swaps via the Nexo Exchange", "[b]orrowing rates starting from just 0% APR", and "[u]p to 5 free crypto withdrawals."

**RESPONSE:** Paragraph 303 purports to characterize Nexo's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

304.    Moreover, the Nexo website tells investors they can use NEXO to "[s]wap any asset for NEXO with zero fees and fixed-price execution"; "[b]orrow instantly" ("from 0% APR"); "[s]pend the value of your NEXO Token without selling it"; and "[k]eep more NEXO in your portfolio to get higher yields, lower borrower rates, and more crypto rewards."

**RESPONSE:** Paragraph 304 purports to characterize Nexo's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

305.    Finally, beginning in December 2020, Nexo conducted multiple NEXO token "buyback" programs, pursuant to which Nexo repurchased from investors over $150 million worth of NEXO. As Nexo explained on its website, these buybacks were designed to "boost [NEXO] token liquidity, thus reducing price volatility" and to "give token holders additional security that the token's value will continue to rise."

**RESPONSE:** Coinbase admits that it has been publicly reported that Nexo has repurchased NEXO tokens, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence of Paragraph 305, and therefore denies them on that basis. The second sentence of Paragraph 305 purports to quote from and characterize Nexo's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

## IV.    COINBASE WAS REQUIRED TO, BUT DID NOT, REGISTER AS A NATIONAL SECURITIES EXCHANGE, BROKER, AND CLEARING AGENCY.

306.    Coinbase, through the Coinbase Platform, used the means and instrumentalities of interstate commerce to bring together the orders of multiple buyers and sellers of crypto assets that were offered and sold as securities using a trading facility programmed with non-discretionary rules for orders to interact and buyers and sellers to agree upon the terms of trades in these securities. Coinbase was therefore required to register with the SEC as a national securities exchange or operate pursuant to an exemption to such registration, but did not do so.

**RESPONSE:** Denied.

307.    Coinbase, through the Coinbase Platform, Prime, and Wallet, used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding itself out as a place to buy and sell crypto asset securities, facilitating trading in crypto asset securities by opening customer accounts and handling customer funds and crypto asset securities (which it commingled and treated as fungible) through Coinbase-controlled accounts and digital wallets, and being compensated for doing so. Coinbase was therefore required to register with the SEC as a broker or operate pursuant to an exemption, but did not do so.

**RESPONSE:** Denied.

308.    Coinbase served as an intermediary in settling transactions in crypto asset securities occurring on the Coinbase Platform. Coinbase also acted as a custodian of securities by requiring

customers to deposit their crypto asset securities in Coinbase-controlled wallets, creating a system for the central handling of securities whereby securities deposited and traded on the Coinbase Platform were treated as fungible and customer accounts debited and credited by Coinbase to settle customers' transactions. Coinbase was therefore required to register with the SEC as a clearing agency or operate pursuant to an exemption, but did not do so.

**RESPONSE:** Denied.

## V.     THROUGH ITS STAKING PROGRAM, COINBASE HAS ENGAGED IN THE UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF SECTION 5 OF THE SECURITIES ACT.

309.     Coinbase has violated, and continues to violate, Sections 5(a) and 5(c) of the Securities Act by engaging in the unregistered offer and sale of securities in connection with its Staking Program. In so doing, Coinbase has deprived investors of material information about Coinbase and its Staking Program offerings, including how Coinbase uses the offering proceeds and the risks and trends that affect the enterprise and an investment in these securities.

**RESPONSE:**   Denied. Coinbase denies that its staking services constitutes a security, that its staking services violate the U.S. securities laws in any way, or that it has deprived customers of any material information concerning those services.

310.     Coinbase began offering its Staking Program to U.S. investors in or around November 2019, as a means to participate in, and profit from, the "proof-of-stake" consensus mechanism of the Tezos blockchain. Today, the Staking Program enables investors to stake five different assets:  XTZ (Tezos), ATOM (Cosmos), ETH (Ethereum), ADA (Cardano), and SOL (Solana). Coinbase describes all aspects of the Staking Program—including the services it provides and the efforts it undertakes—as being applicable to each of the five stakeable assets. For each of these five assets, Coinbase pools the assets provided to Coinbase by investors in the Staking Program in omnibus crypto asset wallets controlled by Coinbase (and segregated by asset), and then performs all of the efforts necessary and expected by investors to obtain investment returns marketed by Coinbase, including staking those assets in order to obtain rewards, which Coinbase distributes *pro rata* to investors after paying itself a 25 or 35% commission.

**RESPONSE:** Coinbase admits that it began offering staking services to certain U.S. residents in 2019 — well over one year before Coinbase's DPO — to facilitate their staking of XTZ on the Tezos blockchain network, and further avers that it provided information, including detailed analyses, to the SEC regarding its retail staking services both before and during the SEC's review of Coinbase's registration statement for the DPO. Coinbase further admits and avers that Coinbase's staking services currently enable customers to stake six digital assets, XTZ (Tezosa),

ATOM (Cosmos), ETH (Ethereum), ADA (Cardano), SOL (Solana), and DOT (Polkadot), and that Coinbase facilitates its users' staking by acting as a node to validate transactions, including through third-party validator operators, on those blockchain networks. Coinbase further admits that it distributes the rewards earned through its staking services pro rata to users, in proportion to the amount of a digital asset an individual user stakes through Coinbase, and that Coinbase earns a commission for its staking services, based on a percentage of the rewards earned by users. Coinbase refers to its response to Paragraph 83 and the Coinbase User Agreement, and otherwise denies that it "pools" customer assets, as a result of its staking services or otherwise. Coinbase otherwise denies the allegations in Paragraph 310.

311.     To participate in the Coinbase Staking Program, investors need only have or open an account at coinbase.com and purchase staking-eligible crypto assets on the Coinbase Platform, or transfer their existing staking-eligible crypto assets to their Coinbase account. Investors then sign up for the Coinbase Staking Program and transfer their crypto assets (including the private keys thereto) to Coinbase's possession and control. Prior to April 2023, customers holding staking-eligible crypto assets at Coinbase were automatically enrolled in, but could opt out of, the Staking Program. Now, investors must opt in through the Coinbase website or mobile application to participate in the Staking Program.

**RESPONSE:** Coinbase admits that, to stake through Coinbase, users must have a Coinbase account and hold staking-eligible digital assets in their account, and avers that, as set forth in the Coinbase User Agreement, staking through Coinbase does not change ownership of users' digital assets in any way. Coinbase denies that, for a customer having met these eligibility conditions, participation in staking involves a subsequent transfer of crypto assets or private keys to Coinbase. Coinbase otherwise denies the allegations in the first two sentences of Paragraph 311. Coinbase further admits that, prior to March 2023, for certain digital assets (ADA, ATOM, SOL, and XTZ), Coinbase users were enrolled automatically to receive staking rewards if they held the required minimum balances of those assets but could opt out of staking those assets through

Coinbase at any time, and that, as of March 2023, users must opt in to Coinbase's staking services.

Coinbase otherwise denies the allegations in the third and fourth sentences of Paragraph 311.

### A.   Staking Background

312.   Coinbase's Staking Program capitalizes on the reward structure of the "proof of stake" consensus mechanism used by some blockchains to reach agreement about which transactions are valid, to update the blockchain accordingly, and to reward participants with additional crypto assets. A blockchain using the proof of stake consensus mechanism selects a "validator" from a group of blockchain participants who have agreed to certain requirements necessary to maintain the blockchain and construct new blocks.

**RESPONSE:** Coinbase admits that some blockchain networks use a "proof-of-stake"

consensus mechanism to validate transactions on and update the blockchain network, and that

those blockchain networks have protocols that provide rewards for participating in that validation

process. Coinbase otherwise denies the allegations in the first sentence of Paragraph 312. Coinbase

admits the allegations in the second sentence of Paragraph 312.

313.   To be considered for selection into the group or pool of validators, a potential validator must commit, or "stake," a set amount of the blockchain's native asset (*e.g.*, ETH for Ethereum). These staked assets are held as collateral in the protocol to incentivize validators to perform required functions. In addition, certain protocols charge crypto asset validators fees to stake and unstake crypto assets and require an upfront refundable deposit (in addition to the crypto assets staked). A "correction penalty" is deducted, or "slashed," from the staked crypto assets of validators who underperform. Conversely, validators earn rewards, in the form of additional amounts of the native asset, by timely voting on proposed blocks, proposing new blocks, and participating in other consensus activities.

**RESPONSE:** Coinbase admits that a blockchain protocol may require a minimum amount

of that network's native digital asset to be staked in order to establish an active validator eligible

to be chosen to validate transactions on the blockchain network. Coinbase otherwise denies the

allegations in the first sentence of Paragraph 313. Coinbase denies the allegations in the second

sentence of Paragraph 313. Coinbase admits that certain protocols charge transaction fees to stake

and unstake crypto assets, and that some protocols require an upfront, refundable deposit (in

addition to the crypto assets staked) to participate. Coinbase otherwise denies the allegations in

the third sentence of Paragraph 313. Coinbase admits that certain blockchain networks subject staked assets to "slashing" if a validator violates the rules of the protocol. Coinbase otherwise denies the allegations in the fourth sentence of Paragraph 313. Coinbase admits that blockchain networks provide rewards for successfully proposing new blocks, attesting to blocks proposed by other validators in a timely manner, and other protocol-specified consensus activities, and that those rewards may take the form of the blockchain network's native token, and otherwise denies the allegations in the fifth sentence of Paragraph 313.

314.    To create a new block to add to the chain of blocks, the protocol chooses a validator from among those that have staked. The more the holder stakes, and the less server downtime a potential validator exhibits, the more likely that holder is to be selected as a validator and receive the maximum staking reward. Thus, the most successful staking operations maximize the chances of being selected by staking a large number of assets and having better computer resources to minimize server downtime.

**RESPONSE:** Coinbase admits that, to create a new block to add to the chain of blocks, a proof-of-stake blockchain network will choose a validator from among those that are in the active set. Coinbase otherwise denies the allegations of the first sentence of Paragraph 314. Coinbase admits that, as a general matter and subject to the staking protocols of specific blockchain networks, the more assets staked to a validator, that validator becomes proportionally more likely to be selected to participate in a consensus activity, and thereby earn a staking reward. Coinbase otherwise denies the allegations in the second and third sentences of Paragraph 314.

315.    The amount of time set by a protocol for a crypto asset to be staked by a validator before earning rewards is referred to as the "bonding period." And the "unbonding period" is the length of time set by the protocol to release staked crypto assets back to the validator. In certain cases, a bonding period may mean that it can take weeks before a validator can begin earning rewards. The unbonding period may mean it can take weeks for a crypto asset validator to unstake crypto assets (or release them from staking) and transfer or use them for other purposes. During the time the crypto assets are bonded to a protocol, the crypto asset owners are unable to transact in them, for example, to react to market price fluctuations of the crypto assets.

**RESPONSE:** Admitted.

**B.      Coinbase Offers Investors in the Coinbase Staking Program Unique Features that May Not Be Available to Investors Staking on Their Own.**

316.     Through its Staking Program, Coinbase offers and markets an investment opportunity to receive rewards from proof-of-stake blockchains and gain benefits that may not be available to those investors if they were to stake crypto assets on their own. In particular, the Staking Program offers investors the ability, through Coinbase's efforts, to obtain returns based on Coinbase's participation in proof-of-stake activities for the five staking-eligible crypto assets. Indeed, in a YouTube video marketing its Staking Program, Coinbase stated, "[w]hile it's possible to stake crypto on your own, this can be confusing, complicated, and costly" and touted that "Coinbase is changing all that."

**RESPONSE:** Coinbase admits and avers that its staking services facilitate users' ability to earn rewards through staking, in accordance with the protocols of the digital assets' blockchain networks, that Coinbase currently allows users to stake six digital assets through Coinbase, and that users can stake these digital assets and receive rewards on their own and without Coinbase's retail staking services. Coinbase otherwise denies the allegations in the first two sentences of Paragraph 316. The third sentence of Paragraph 316 purports to quote from and characterize a YouTube video, to which Coinbase respectfully refers the Court for its complete and accurate contents.

317.     Specifically, the Coinbase Staking Program offers and markets several features that differentiate it from what staking investors would be able to do by staking and earning rewards on their own.

**RESPONSE:** Denied.

318.     For one, the Coinbase Staking Program offers no, or low, staking minimums or deposits. Staking protocols typically require a certain threshold number of crypto assets, or an additional refundable deposit, to be able to participate in staking, and investors who stake on their own—not with Coinbase—are subject to those minimum thresholds. For example, the Ethereum blockchain requires users to stake a minimum of 32 ETH (currently approximately $60,000) to run a validator node. But the Coinbase Staking Program allows investors to participate in staking without having to meet such thresholds; as Coinbase touts, investors can "[s]tart earning with as little as $1."

**RESPONSE:** Coinbase admits that proof-of-stake blockchain networks set certain requirements for acting as a validator node, including requiring a minimum amount of assets to be

staked to act as a node, and that the Ethereum blockchain requires users to stake a minimum of 32 ETH to run a validator node. Coinbase further admits that it sets requirements for the minimum amount that must be staked by users to stake through Coinbase, and that for certain digital assets there is no minimum amount that must be staked. The fourth sentence of Paragraph 318 appears to characterize and quote from Coinbase's website, to which Coinbase refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 318.

319.    Relatedly, running a validator node is often expensive, for example due to equipment and/or software needed to stake. Through the Coinbase Staking Program, investors avoid paying those expenses because Coinbase operates its own validator nodes to earn and pay investor rewards. For example, CGI's February 21, 2023 annual report on Form 10-K filed with the SEC and available on Coinbase's website stated: "Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as 'Delegated Proof of Stake,' which reduces the complexities of staking." Similarly, Coinbase acknowledged on its website that "[b]ecoming a validator is a major responsibility and requires a fairly high level of technical knowledge."

**RESPONSE:** Coinbase admits that operating a validator node requires running publicly available open-source software, and that Coinbase operates validator nodes as part of its staking services. Coinbase otherwise denies the allegations in the first two sentences of Paragraph 319. The third sentence of Paragraph 319 purports to quote from and characterize Coinbase Global, Inc.'s 2022 Annual Report on Form 10-K, to which Coinbase respectfully refers the Court for its complete and accurate contents. The fourth sentence of Paragraph 319 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase denies any remaining allegations in Paragraph 319.

320.    Further, until approximately April 2023, the Coinbase Staking Program maintained a "liquidity pool" of crypto assets—for each of the five stakeable assets—that were held in reserve, which enabled Coinbase to provide investors faster liquidity in connection with unstaking requests. Effective April 1, 2023, Coinbase purports to no longer maintain reserves of stakeable assets. In or around October 2022, in response to an FAQ on its website ("Can I trade or send funds while they're earning rewards"), Coinbase stated:    "You'll typically be able to cash out your cryptocurrency that's earning rewards on Coinbase as you would any other cryptocurrency. Cashing out may be subject to factors including, but not limited to, your account history, transaction history, and banking history. In rare circumstances, trades and cash-outs may be

delayed while we wait for staked funds to be unlocked." As a result, during the Relevant Period, Coinbase was able to offer investors enhanced liquidity and quicker reward payments compared to staking on their own. (Currently, in response to the same FAQ, Coinbase's website states: "Funds can't be traded or sent while they're staked and earning rewards. You'll need to unstake them first.")

**RESPONSE:** Coinbase admits that, prior to April 2023, for assets other than ETH, there generally existed a reserve of unstaked assets from among the staking-eligible assets of Coinbase users, and that Coinbase systems have since been updated to eliminate such reserves. Coinbase further admits that in certain circumstances these reserves allowed Coinbase to allow users who unstaked their assets to transfer those assets prior to the end of the blockchain network's unbonding period. The last six sentences of Paragraph 320 purport to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 320.

321.    Coinbase has also offered bonuses to Staking Program participants during the Relevant Period. For example, in or around June 2022, in a marketing email soliciting staking investors for ETH, Coinbase promised: "Stake at least $100 to earn [a] $10 bonus ... We'll deposit the $10 ETH bonus to your account within 45 days. That's it! You don't have to do anything else." As set forth in Coinbase's User Agreement, Coinbase also offers, on a promotional basis, "Boosted Staking Rewards" where specified investors ("Coinbase One members") are offered "higher net reward rates" (as a result of Coinbase taking "lower commissions") for certain stakeable assets.

**RESPONSE:** Paragraph 321 purports to quote from and characterize an email sent by Coinbase and Coinbase's User Agreement, to which Coinbase respectfully refers the Court for their complete and accurate contents. Coinbase denies any remaining allegations in Paragraph 321.

### C.    Coinbase Has Marketed the Coinbase Staking Program as an Investment Opportunity.

322.    Coinbase has marketed and continues to market the Coinbase Staking Program to the general public—through its website, social media pages, and blog, and in Google and other advertisements—as an investment opportunity to ***"[e]arn on as much as you want***." (Emphasis added.)

**RESPONSE:** Coinbase admits that it communicates information publicly concerning its staking services, including through its website and blog, social media platforms, and Google, and

respectfully refers the Court to those communications for their complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 322.

323.    Specifically, Coinbase markets the possibility of profits through an expected rate of investment return. For example, during the Relevant Period, Coinbase's website, an image of which is shown below, stated that investors can "[e]arn up to 6.00% APY on your crypto."



**RESPONSE:** Coinbase admits that it communicates to users the potential to earn rewards on certain of their digital assets through staking, and avers that it communicates to users that the rewards earned by users are based on the rewards rates set by the staking protocols of the relevant blockchain networks. Coinbase otherwise denies the allegations in the first sentence of Paragraph 323. The second sentence of Paragraph 323 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents.

324.    On its website, Coinbase also markets the "estimated reward rate" for each of the five staking-eligible crypto assets (ranging between approximately 2% and 6.12%) and provides the "Staking Market Cap" for each of those assets (ranging from approximately $568 million for XTZ to $33.4 billion for ETH). Although the Coinbase User Agreement states that staking "[r]ewards are determined by the protocols of the applicable [blockchain] network," Coinbase has acknowledged publicly its ability to change the reward payout amount at its discretion. For example, in response to questions about Coinbase's Staking Program during a quarterly analyst call on or about November 3, 2022, CGI's CFO stated, "we haven't changed the reward payout rate on our retail [staking] product within the year, that has been held consistent."

**RESPONSE:** The first sentence of Paragraph 324 purports to quote from and characterize Coinbase's website, to which Coinbase respectfully refers the Court for its complete and accurate contents. The second sentence of Paragraph 324 purports to quote from and characterize Coinbase's User Agreement, to which Coinbase respectfully refers the Court for its complete and accurate contents, and denies that Coinbase has acknowledged publicly its ability to change the reward payout amount at its discretion or that the rewards earned by users are based on anything but the rewards rates set by the protocols of the applicable blockchain networks. The third sentence of Paragraph 324 purports to quote from and characterize statements made by Coinbase Global, Inc.'s CFO on a quarterly analyst call, to which Coinbase respectfully refers the Court for its complete and accurate contents. To the extent any further response is required, Coinbase otherwise denies the allegations in Paragraph 324.

325.    Historically, Coinbase has made other statements and issued marketing materials advertising investor returns from the Coinbase Staking Program, including, for example:

- In a post on or about September 29, 2020 on its Twitter page, Coinbase stated, "[t]oday you can start earning 5% APY with Cosmos Staking Rewards on Coinbase."

- In a tweet on or about February 16, 2021, Coinbase stated, "ETH2 staking is coming soon" and told investors they could "earn up to 7.5% APR."

- In a post on or about June 29, 2022 on its Twitter page, Coinbase stated, "@Solana staking is rolling out on Coinbase!  Start earning up to 3.85% APY."  In a video embedded in that post, Coinbase stated, "Earn crypto with your crypto. Grow your crypto with stakeable assets on Coinbase."

- As of approximately March 2023, Coinbase's website encouraged investors to stake their ETH with the Coinbase Staking Program and "get" or "earn 4.07% APY on all [their] staked ETH" in addition to a 10% bonus for staking at least $100 in ETH.

**RESPONSE:** Paragraph 325 purports to quote from and characterize certain Coinbase informational materials, to which Coinbase respectfully refers the Court for their complete and

accurate contents. Coinbase denies that it advertises "investor returns" from its staking services,

and otherwise denies any remaining allegations in Paragraph 325.

326.    Coinbase has also made statements marketing its Staking Program as an opportunity to invest in Coinbase's managerial and entrepreneurial efforts, including statements touting the growth of Coinbase's Staking Program and Coinbase's success in generating investor returns.

**RESPONSE:** Denied.

327.    For example, in a post on its Twitter account on or about May 28, 2020, Coinbase promoted the returns that investors could earn by investing in the Coinbase Staking Program to stake Tezos, by stating that, "[s]ince launching in the US last fall, customers have earned over $2 million in Tezos staking rewards."

**RESPONSE:** Paragraph 327 purports to quote from and characterize a post by Coinbase's

Twitter account, to which Coinbase refers the Court for its complete and accurate contents.

328.    Coinbase also posted on its website a CGI shareholder letter dated on or about August 10, 2021 stating, "we ended Q2 with 1.7 million customers earning yield on their crypto assets with Coinbase" and touting that adoption of Coinbase's "Blockchain rewards – primarily comprised of staking [had] increase[d] more than 300% in Q2 compared to Q1."

**RESPONSE:** Paragraph 328 purports to quote from and characterize a Coinbase

shareholder letter, to which Coinbase refers the Court for its complete and accurate contents.

329.    Similarly, a CGI shareholder letter posted on Coinbase's website on or about November 3, 2022 provided:  "We have grown the number of assets supported for staking, including adding Cardano in Q1 and Solana at the end of Q2 which impacted Q3 results. These new products help attract new customers onto the platform but are also engaging older vintages of customers on the platform who find value in these products."

**RESPONSE:** Paragraph 329 purports to quote from and characterize a CGI shareholder

letter, to which Coinbase refers the Court for its complete and accurate contents.

330.    CGI has also acknowledged the Coinbase Staking Program's "earning" and "yield" potential and highlighted the program's growth and success in other SEC public filings and during quarterly earnings and analyst calls—transcripts of which are available on Coinbase's website.

**RESPONSE:** Paragraph 330 purports to quote from and characterize Coinbase Global,

Inc.'s SEC filings, statements made on Coinbase earnings calls, and statements made by Coinbase

on analyst calls, to which Coinbase refers the Court for their complete and accurate contents. To the extent any further response is required, Coinbase otherwise denies the allegations in Paragraph 330.

331.    For example, during CGI's quarterly earnings call on or about November 3, 2022, Coinbase's founder and CEO, when emphasizing investors' "love" of the company's "portfolio of different products," highlighted the ability of customers who "already have their crypto stored with [Coinbase]"—through "just one more click"—to "stake and earn yield on their crypto."

**RESPONSE:** Paragraph 331 purports to quote from and characterize statements made on a Coinbase earnings call, to which Coinbase refers the Court for its complete and accurate contents.

332.    Also, in its November 3, 2022 quarterly report on Form 10-Q, CGI stated that it "saw strong growth in our subscription and services revenue, driven by ... growth in staking." In the same filing, CGI indicated that its 2022 "[s]ubscription and services revenue increased by $205.6 million compared to the same period for 2021, due, at least in part, to "an increase in blockchain rewards of $92.4 million" in 2022 "due to the addition of new assets available for staking and increased staking activity with higher native tokens staked."

**RESPONSE:** Paragraph 332 purports to quote from and characterize statements made in Coinbase Global, Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2022, to which Coinbase refers the Court for its complete and accurate contents.

### D.    Coinbase Has Profited as a Result of the Coinbase Staking Program.

333.    Throughout the Relevant Period, Coinbase has offered the Staking Program to all U.S. residents, excluding Hawaii and New York residents. Through the Coinbase Staking Program, these U.S. investors have been able to stake (and earn staking rewards in the form of) XTZ, ATOM, ETH, ADA, and SOL, as summarized in the following table:

| Protocol | Asset | Approximate Date Available as Part of the Coinbase Staking Program |
|---|---|---|
| Tezos | XTZ | November 6, 2019 |
| Cosmos | ATOM | September 29, 2020 |
| Ethereum | ETH | April 16, 2021 |
| Cardano | ADA | March 23, 2022 |
| Solana | SOL | June 29, 2022 |

**RESPONSE:** Coinbase admits that U.S residents who wish to stake through Coinbase must meet certain eligibility requirements, and that users who reside in all states except for New York and Hawaii may be eligible to stake through Coinbase, subject to any specific state restrictions, requirements, or proceedings, including certain notices and orders issued by state securities agencies regarding Coinbase's staking services in actions brought in coordination with the SEC's Complaint here. Coinbase further admits and avers that eligible U.S. residents have been able to stake through Coinbase the digital assets XTZ (Tezosa), ATOM (Cosmos), ETH (Ethereum), ADA (Cardano), SOL (Solana), and DOT (Polkadot) since November 6, 2019, September 29, 2020, April 16, 2021, March 23, 2022, June 29, 2022, and May 23, 2023, respectively. Coinbase otherwise denies the allegations in Paragraph 333.

334.    As of July 2022, over 4 million U.S. customers were invested in the Coinbase Staking Program—an increase from 1.725 million U.S. investors at the end of 2021. And, as of the end of 2021, the total value of crypto assets committed by investors to the Staking Program was approximately $28.7 billion.

**RESPONSE:** Coinbase admits that over 4 million of its U.S. customers used Coinbase's staking services, an increase from 1.725 million U.S. users at the end of 2021. Coinbase denies the remaining allegations in Paragraph 334.

335.    Revenue earned by Coinbase by or through its Staking Program is recognized by CGI and included on CGI's consolidated financial statements.

**RESPONSE:** Coinbase admits that the revenue earned through its staking services is recognized by Coinbase Global, Inc. and included in its financial statements. Coinbase otherwise denies the allegations in Paragraph 335.

336.    In its annual report on Form 10-K for 2022, CGI reported $275.5 million in revenue recognized for Coinbase's blockchain rewards, consisting primarily of staking revenue. CGI also reported blockchain reward revenue for 2021 of approximately $223 million, and of $10.5 million for 2020. These figures include only the gross, not net, revenue generated by the Coinbase Staking Program because CGI records staking rewards paid to investors as a "transaction expense."

**RESPONSE:** Paragraph 336 purports to quote from and characterize statements made in Coinbase Global, Inc.'s Annual Reports on Form 10-K for the years 2020, 2021, and 2022, to which Coinbase refers the Court for their complete and accurate contents.

337.   In its May 10, 2022 Form 10-Q, CGI explained that Coinbase "presents [its staking and other blockchain protocol] rewards on a gross basis" because Coinbase "considers itself the principal" in staking and other "transactions with blockchain networks."

**RESPONSE:** Paragraph 337 purports to quote from and characterize statements made in Coinbase's Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, to which Coinbase refers the Court for its complete and accurate contents.

338.   CGI does not disclose Coinbase's itemized transaction expenses (including staking rewards paid to investors) in its financial statements or elsewhere.

**RESPONSE:** Coinbase admits that the staking rewards earned by users are not included as a line item in Coinbase's financial statements. Coinbase otherwise denies the allegations in Paragraph 338.

### E.   The Coinbase Staking Program as It Applies to Each of the Five Stakeable Crypto Assets Is a Security.

339.   At all relevant times, the Coinbase Staking Program, as it applied to each of the five stakeable assets, was an investment contract under *Howey*, and therefore a security, whose offers and sales were subject to registration under the Securities Act. Coinbase describes all aspects of the Staking Program as being the same for, or applicable to, each of the five stakeable assets, with the only differences being the asset that is staked, the reward that is paid, and the percentage commission Coinbase pays itself as to each asset. As discussed below in Section V.E.ii, Coinbase segregates, pools, and stakes investor assets by asset class. In other words, Staking Program investors' XTZ, ATOM, ETH, ADA, and SOL are not all pooled together, but the assets of all Staking Program investors who stake, for example, XTZ, *are* pooled together with the assets of all other Staking Program investors who stake XTZ.

**RESPONSE:** Denied.

### i.   *Participants in the Coinbase Staking Program Invest Money.*

340.   Coinbase's offer and sale of the Coinbase Staking Program for each of the five stakeable assets involves an investment of money, in the form of staking-eligible crypto assets. Here, investors tender their crypto assets to Coinbase in order to participate in the Coinbase Staking

Program, by either purchasing staking-eligible crypto assets from Coinbase or transferring their own crypto assets to their Coinbase account for staking.

**RESPONSE:** Denied.

341.    Customers give up control of their crypto assets while they participate in the Staking Program and cannot use them for any purposes, such as trading or transferring them to another account. Coinbase has control over all of the crypto assets invested in the Coinbase Staking Program, including through Coinbase's omnibus crypto asset wallets.

**RESPONSE:** Coinbase admits that digital asset networks may require staked assets to be restricted from being traded or transferred. Coinbase denies that its customers give up any control of their digital assets to Coinbase if they stake through Coinbase and otherwise denies the allegations in Paragraph 341.

342.    Investors put their crypto assets at risk as part of the Coinbase Staking Program.

**RESPONSE:** Denied.

343.    For one, once an investor's crypto assets are staked to the underlying blockchain protocol, those assets are at risk of being slashed (or destroyed). While Coinbase pledges to reimburse investors for any slashing-related losses, its User Agreement describes how customers' assets are subject to all of Coinbase's custodial and operational risk, stating, for example, that "[a]ny bond or trust account maintained by Coinbase for the benefit of its customers may not be sufficient to cover all losses incurred by customers."

**RESPONSE:** Coinbase admits that some digital asset networks subject staked assets to "slashing" if the validator staking those assets violates the rules of the protocol and avers that it has never experienced a slashing event. Coinbase otherwise denies the allegations in the first sentence of Paragraph 343. The second sentence of Paragraph 343 purports to quote from and characterize Coinbase's User Agreement, to which Coinbase refers the Court for its complete and accurate contents.

344.    Relatedly, once an investor's crypto assets are staked to the underlying blockchain protocol, those assets are at risk of being lost, for example in the event the relevant blockchain is forced or chooses to shut down or cease operations.

**RESPONSE:** Coinbase admits that, whether or not particular digital assets are staked, users may lose digital assets recorded on a particular blockchain if that blockchain shuts down or ceases operations. Coinbase otherwise denies the allegations in Paragraph 344.

345.    Further, in its SEC filings, CGI has disclosed the staking-related risk that "customers' assets may be irretrievably lost" due to cybersecurity attacks, loss of customers' private keys, or other security issues, or if Coinbase's node "validator, any third-party service providers, or smart contracts fail to behave as expected." In addition, CGI's September 30, 2022 Form 10-Q provided that customers' crypto assets "are not insured or guaranteed by any government or government agency"; that Coinbase is "dependent on [its] partners' operations, liquidity and financial condition for proper ... safekeeping of customer assets"; that Coinbase's liabilities are not limited for certain customer contracts; and that insurance coverage in certain instances is limited and "may not cover the extent of loss nor the nature of such loss, in which case [Coinbase] may be liable for the full amount of losses suffered, which could be greater than all of [its] assets."

**RESPONSE:** Paragraph 345 purports to quote from and characterize Coinbase Global, Inc.'s SEC filings, to which Coinbase refers the Court for their complete and accurate contents.

### ii.    *Coinbase Staking Investors Participate in a Common Enterprise.*

346.    Investors in the Coinbase Staking Program participate in a common enterprise with Coinbase and with other Staking Program investors in the same staked asset.

**RESPONSE:** Denied.

347.    *First*, the fortunes of investors in the Coinbase Staking Program are tied together with those of other investors staking the same asset—including Coinbase.

**RESPONSE:** Denied.

348.    Coinbase controls and pools Staking Program investors' crypto assets, together with Coinbase's own crypto assets, in wallets controlled by Coinbase and segregated by asset. And Coinbase stakes its own crypto assets alongside those of Staking Program investors, including as part of the same staking pools on each of the five protocols.

**RESPONSE:** Coinbase refers to its response to Paragraph 83 and the Coinbase User Agreement, and avers that staking with Coinbase does not affect ownership of staked assets and that customers have the same custody relationship with Coinbase whether or not they stake, and otherwise denies the allegations in the first sentence of Paragraph 348. Coinbase admits that

Coinbase may at times stake its own digital assets through Coinbase's staking services. Coinbase otherwise denies the allegations in Paragraph 348.

349.   Specifically, as set forth in its User Agreement, Coinbase pools investors' crypto assets in omnibus wallets and is under no obligation to segregate individual investors' crypto assets in exchange for the advertised staking returns. Coinbase accounts for investors' crypto assets through entries on its internal ledger system. The User Agreement provides: "Coinbase shall retain control over electronic private keys associated with blockchain addresses operated by Coinbase, including the blockchain addresses used to hold the Supported Digital Assets credited to [customers'] Digital Asset Wallet." The User Agreement continues: "Coinbase may use shared blockchain addresses, controlled by Coinbase, to hold Supported Digital Assets for Digital Asset Wallets on behalf of customers and/or held on behalf of Coinbase. Although we maintain separate ledgers for users' Coinbase Accounts and Coinbase accounts held by Coinbase for its own benefit, Coinbase shall have no obligation to create a segregated blockchain address for your Supported Digital Assets."

**RESPONSE:** Paragraph 349 purports to quote from and characterize Coinbase's User Agreement, to which Coinbase refers the Court for their complete and accurate contents. Coinbase further avers that the language quoted from the User Agreement discusses how Coinbase custodies users' digital assets generally and is not specific to staking.

350.   In addition, Coinbase treats all crypto assets—tendered to it by investors and segregated by stakeable asset—as fungible. As the User Agreement tells investors: "You agree that all forms of the same Digital Asset that are held and made available across multiple blockchain protocols may be treated as fungible and the equivalent of each other."

**RESPONSE:** Paragraph 350 purports to quote from and characterize Coinbase's User Agreement, to which Coinbase refers the Court for their complete and accurate contents.

351.   Coinbase's pooling of investors' crypto assets, and the correspondingly larger number of crypto assets to be staked at or with each of the five proof-of-stake protocols, increases the likelihood that a blockchain network will select Coinbase to validate transactions, and thus enables Coinbase to more reliably earn rewards and distribute returns to investors. In fact, as Coinbase disclosed on its website as recently as October 2022, the staking "reward rate can also be influenced by factors including, but not limited to, validator performance" and the "amount staked/stakers"—not just the "rates set by the network."

**RESPONSE:** Coinbase admits that digital asset networks set requirements for the minimum number of digital assets that must be staked by a validator for that validator to be in the active set and have the opportunity to propose new blocks, attest to blocks proposed by other

validators, and participate in other consensus activities. Coinbase further admits that the probability of a validator being chosen to participate in a consensus activity may, on some protocols, increase in proportion to the number of digital assets staked to it. Coinbase otherwise denies the allegations of the first sentence of Paragraph 351. The second sentence of Paragraph 351 purports to quote from and characterize Coinbase's website, to which Coinbase refers the Court for their complete and accurate contents.

352. As disclosed to investors, Coinbase distributes investor returns for each of the five stakeable assets on a *pro rata* basis depending on the amount of crypto assets investors have staked. Coinbase's User Agreement tells investors: "Rewards will be credited to your account by taking into account the amount of your principal and previously accrued rewards that remain staked with Coinbase." Likewise, during the Relevant Period, Coinbase stated on its website: "Rewards are calculated based on the amount of cryptocurrency you hold in that particular balance. Meaning, the more you hold of the cryptocurrency, the more Coinbase can stake on your behalf; and the more potential rewards you receive."

**RESPONSE:** Paragraph 352 purports to quote from and characterize Coinbase's User Agreement and website, to which Coinbase refers the Court for their complete and accurate contents. To the extent any further response is required, Coinbase otherwise denies the allegations in Paragraph 352.

353. *Second*, the fortunes of investors for each of the five stakeable assets and of Coinbase are also tied together. The revenue and profits that Coinbase stands to receive—the portion of the staking rewards from each of the five protocols that Coinbase keeps as a commission—grows as more investors participate in the Coinbase Staking Program.

**RESPONSE:** Coinbase admits that it receives a commission for performing its staking services, calculated as a percentage of the rewards paid out by applicable blockchain protocols to users who stake through Coinbase (as of June 16, 2023, 35% for ADA, DOT, and SOL (26.3% for eligible Coinbase One members) and 25% for ETH, XTZ, and ATOM (for XTZ, and ATOM, 15% for eligible Coinbase One members)). Coinbase otherwise denies the allegations in the first sentence of Paragraph 353.

354.    Once Coinbase earns rewards from a particular protocol but before it credits rewards to Staking Program investors' accounts on a *pro rata* basis, it takes a commission for the services it provides to investors. Coinbase takes a 35% commission on ADA and SOL staking rewards, and 25% for ETH, XTZ, and ATOM. Coinbase determines the amount or rate of the commissions it takes, and during the Relevant Period Coinbase stated in its User Agreement that it had the ability to change its commission rate "at its discretion and without notice." On or about March 10, 2023, Coinbase revised its User Agreement to tell investors: "Coinbase may change [its] published commissions at any time, including after your assets have been staked."

**RESPONSE:** Coinbase admits that it receives a commission for performing its staking services, calculated as a percentage of the rewards paid out by applicable blockchain protocols to users who stake through Coinbase (as of June 16, 2023, 35% for ADA, DOT, and SOL (26.3% for eligible Coinbase One members) and 25% for ETH, XTZ, and ATOM (for XTZ, and ATOM, 15% for eligible Coinbase One members)). Coinbase otherwise denies the allegations in the first two sentences of Paragraph 354. The third and fourth sentences of Paragraph 354 purport to quote from and characterize Coinbase's User Agreement, to which Coinbase refers the Court for its complete and accurate contents.

355.    In addition, as explained above, the larger the pool of assets for staking on each of the five protocols, the higher the likelihood of obtaining rewards from a respective protocol, which benefits all investors *and* Coinbase.

**RESPONSE:** Coinbase incorporates its response to Paragraph 351, and otherwise denies the allegations of Paragraph 355.

356.    Further, because the commission Coinbase receives is profit-based, if Coinbase fails to produce staking rewards on the invested crypto assets, neither Coinbase nor investors receive any returns. In other words, investors pay Coinbase a commission from the staking rewards only if Coinbase generates the marketed returns using investors' funds.

**RESPONSE:** Coinbase admits that the commissions it receives for its staking services are based on a percentage of the rewards paid out by applicable blockchain protocols to users who stake through Coinbase, and that Coinbase receives commissions only when its users earn rewards through staking. Coinbase otherwise denies the allegations of Paragraph 356.

### iii. *Coinbase Staking Program Investors Reasonably Expect to Profit from Coinbase's Efforts.*

357.    Investors in the Coinbase Staking Program reasonably expect to profit from Coinbase's efforts.

**RESPONSE:** Denied.

358.    From the Staking Program's inception, Coinbase has marketed it as an investment opportunity, telling investors that its Staking Program offers an "easy" and "passive" way to put their "assets to work" and "earn rewards for crypto that would otherwise be sitting around."

**RESPONSE:** Paragraph 358 purports to quote from and characterize Coinbase's website, to which Coinbase refers the Court for their complete and accurate contents. To the extent a further response is required, Coinbase otherwise denies the allegations in Paragraph 358.

359.    As noted, Coinbase has promoted the Coinbase Staking Program—on its website, blog, and social media pages, and in advertisements—as a means for investors to earn high, fixed investment returns. And, based on those representations by Coinbase, investors have reasonably expected to profit from participating in the Coinbase Staking Program.

**RESPONSE:** To the extent the first sentence of Paragraph 359 purports to characterize Coinbase's website, blog and social media pages, Coinbase refers the Court to those documents for their complete and accurate contents, denies that Coinbase has promoted its staking services "as means for investors to earn high, fixed investment returns," and otherwise denies the allegations in the first sentence of Paragraph 359. Coinbase denies the allegations in the second sentence of Paragraph 359.

360.    Further, as described above, Coinbase has publicly touted its efforts to create the advantages of the Coinbase Staking Program over staking independently, which according to Coinbase can be "confusing, complicated, and costly." For example, on its website (as recently as early 2022), Coinbase told potential staking investors: "[S]taking your own crypto is a challenge for most *investors*. To stake on your own requires running a node on your own hardware, syncing it to the blockchain, and funding the node with enough cryptocurrency to meet minimum thresholds, including providing a sizable deposit and bond. On Coinbase, *we do all this for you*." (Emphases added.) Similarly, as Coinbase's founder and CEO acknowledged in an interview with Bloomberg on or about March 6, 2023, the "average person doesn't really know what a private key is," adding: "crypto is still being treated like a growth asset." According to Coinbase, the advantages of its Staking Program, relative to investors staking on their own, include Coinbase

taking steps to, among other things, make an otherwise complex staking process "simple and seamless" and "easy and secure."

**RESPONSE:** To the extent Paragraph 360 purports to quote from and characterize Coinbase's website and a Bloomberg interview with Coinbase's founder and CEO, Coinbase refers the Court to those sources for their complete and accurate contents. Coinbase otherwise denies the allegations in paragraph 360.

361.    Investors are led by Coinbase to reasonably expect that they may obtain investment returns generated by Coinbase's efforts with respect to the Staking Program.

**RESPONSE:** Denied.

362.    For example, during an analyst call on or about May 10, 2022, CGI's CFO, addressing questions concerning the Coinbase Staking Program, highlighted the extent to which investor returns result from Coinbase's efforts:  "The model that we offer to our retail users is effectively called delegated proof-of-stake, where *we* are staking on behalf of our users directly at the protocol, *we're* controlling those keys, *we* receive the reward and we pay out a portion of that reward to our users and retain the balance as a commission for *our services*."  (Emphases added.)

**RESPONSE:** Paragraph 362 purports to quote from and characterize a Coinbase Global, Inc. analyst call, to which Coinbase refers the Court for its complete and accurate contents. Coinbase otherwise denies the remaining allegations in Paragraph 362.

363.    Coinbase controls all Staking Program efforts. Coinbase (not investors) determines how and when investors' crypto assets will be staked with each of the five protocols—for example, by implementing software systems it developed to stake investor assets, and also by using its liquidity pools of staking-eligible assets during the Relevant Period.

**RESPONSE:** Denied.

364.    Coinbase marshals its technical expertise and experience to stake investor crypto assets and operate nodes on each of the five blockchain protocols to validate transactions and obtain the rewards from which investors returns are paid. In doing so, Coinbase engages in additional efforts to prevent malicious behavior or hacks, protect keys to staked assets, and increase server uptime (the percentage of the time a validating node or server is online). This is consistent with what Coinbase tells investors when promoting its Staking Program—that Coinbase, not investors, possesses the "fairly high level of technical knowledge" and "state-of-the-art encryption and security" required to stake successfully and safely. For example, in its Form S-1 filed with the SEC on February 25, 2021, CGI stated, "[o]ur experience allows us to ... safely support new products like staking."  Similarly, in or around January 2020, Coinbase posted a video

to its YouTube channel stating: "At Coinbase, we're focused on offering more ways for customers to earn money with crypto. Now, we're going to make it easy and safe to earn staking rewards."

**RESPONSE:** Coinbase admits that, as part of its staking services, Coinbase facilitates the staking of users' digital assets by acting as a node, including through third-party validator operators, to validate transactions on the Ethereum, Cardano, Solana, Cosmos, Tezos, and Polkadot blockchain networks, operates standard and publicly available open-source validator software, and takes steps to prevent security breaches, protect users' digital assets, and ensure that its nodes remain operational. Coinbase otherwise denies the allegations in the first two sentences of Paragraph 364. The remaining sentences in Paragraph 364 purport to quote from and characterize Coinbase's website, the Form S-1 filed by Coinbase Global, Inc. with the SEC on February 25, 2021, and a video posted on YouTube, to which Coinbase refers the Court for their complete and accurate contents. To the extent a further response is required, Coinbase denies any remaining allegations in Paragraph 364.

365.    Thus, customers who participate in the Staking Program understand that Coinbase's efforts are essential to the success or failure of the enterprise. Participants in the Staking Program, on the other hand, are quintessentially passive investors who do not exert their own efforts.

**RESPONSE:** Denied.

366.    Further, because Coinbase discloses that it retains a portion of the staking rewards as commissions, investors understand that Coinbase has a strong financial incentive to engage in the efforts required to make the enterprise successful.

**RESPONSE:** Coinbase admits that it receives commissions for its staking services, that those commissions are based on a percentage of the rewards paid out by applicable blockchain protocols to users who stake through Coinbase, and that it discloses those commissions to users. Coinbase otherwise denies the allegations of Paragraph 366.

367.    Coinbase's statements and actions, and the economic reality of the arrangements with respect to the Coinbase Staking Program, have led and will continue to lead investors reasonably to expect profits based on Coinbase undertaking significant and essential technical, managerial, and entrepreneurial efforts.

**RESPONSE:** Denied.

**F.**     **Coinbase Has Failed to Register Its Offers and Sales of the Coinbase Staking Program as It Applies to Each of the Five Stakeable Crypto Assets.**

368.     Coinbase has used interstate commerce to offer and sell the Coinbase Staking Program by, among other things, engaging in general solicitation through its website and other promotional materials, including Google advertisements and social media.

**RESPONSE:** Coinbase admits that it provides information regarding its staking services

on its website, social media, and other media. Coinbase otherwise denies the allegations of

Paragraph 368.

369.     Coinbase has never had a registration statement filed or in effect with the SEC for its offers and sales of the Coinbase Staking Program as it applies to each of the five stakeable crypto assets. No exemption from registration applied or applies.

**RESPONSE:** Coinbase admits that it has not filed a registration statement to register the

offering of its staking services. Coinbase denies that the filing of any such registration statement

is required under the securities laws because Coinbase's staking services are not a securities

offering, and otherwise denies the allegations in the first sentence of Paragraph 369. The second

sentence of Paragraph 369 states a legal conclusion to which no response is required. To the extent

a further response is required, Coinbase denies any remaining allegations in Paragraph 369.

370.     Coinbase's and CGI's public disclosures have contained selective or limited information about Coinbase's Staking Program and have lacked full and detailed information. For example, CGI does not disclose staking-related expenses in its financial statements or otherwise, including the actual amount of Staking Program rewards paid to investors. Nor does Coinbase disclose whether and to what extent: (i) it exercises discretion in determining whether and when to stake investors' crypto assets; (ii) retail customer assets are used by Coinbase to fund security deposits required by any of the staking-eligible blockchain protocols; (iii) Coinbase, during the Relevant Period, held any of its or investors' crypto assets in reserve to provide liquidity for its Staking Program, including to more quickly generate rewards payouts and/or process investors' unstaking requests; and (iv) Coinbase and investors are receiving equal staking reward rates.

**RESPONSE:** Coinbase avers that it provides substantial disclosures regarding its staking

services in its SEC filings, on its website, and through other public sources, to which Coinbase

refers the Court for their complete and accurate contents. Coinbase otherwise denies the allegations in Paragraph 370.

371.    In its March 23, 2021 amended registration statement on Form S-1/A filed with the SEC, CGI stated:  "there is regulatory uncertainty regarding the status of our staking activities under the U.S. federal securities laws. While we have implemented policies and procedures designed to help monitor for and ensure compliance with existing and new laws and regulations, there can be no assurance that we and our employees, contractors, and agents will not violate or otherwise fail to comply with such laws and regulations."

**RESPONSE:** Paragraph 371 purports to quote from and characterize Coinbase Global, Inc.'s amended registration statement filed with the SEC on Form S-1/A on March 23, 2021, to which Coinbase refers the Court for its complete and accurate contents.

### FIRST CLAIM FOR RELIEF
### Violations of Section 5 of the Exchange Act
### (Coinbase)

372.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

**RESPONSE:** Coinbase repeats and incorporates by reference its responses to the foregoing allegations in the Complaint.

373.    By engaging in the acts and conduct described in this Complaint, Coinbase met the definition of "exchange" and, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States, to effect transactions in a security, or to report any such transaction, without registering as a national securities exchange under Exchange Act Section 6 [15 U.S.C. § 78f], and without being exempted from such registration.

**RESPONSE:** Denied.

374.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined will continue to violate Exchange Act Section 5 [15 U.S.C. § 78e].

**RESPONSE:** Denied.

## SECOND CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
### (Coinbase)

375.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

**RESPONSE:** Coinbase repeats and incorporates by reference its responses to the

foregoing allegations in the Complaint.

376.    By engaging in the acts and conduct described in this Complaint, Coinbase, a person other than a natural person under the Exchange Act, is a broker and made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering as a broker, and without being exempted from such registration.

**RESPONSE:** Denied.

377.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**RESPONSE:** Denied.

## THIRD CLAIM FOR RELIEF
### Violations of Section 17A(b) of the Exchange Act
### (Coinbase)

378.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

**RESPONSE:** Coinbase repeats and incorporates by reference its responses to the

foregoing allegations in the Complaint.

379.    By engaging in the acts and conduct described in this Complaint, Coinbase, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance to Section 17A(b) of the Exchange Act and without being exempted or excluded from such registration.

**RESPONSE:** Denied.

380.    By reason of the conduct described above, Coinbase, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b) [15 U.S.C. § 78q-1(b)].

**RESPONSE:** Denied.

### FOURTH CLAIM FOR RELIEF
### Violations of Sections 5, 15(a), and 17A(b) of the Exchange Act
### (CGI as Control Person of Coinbase)

381.    The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 371.

**RESPONSE:** Coinbase repeats and incorporates by reference its responses to the foregoing allegations in the Complaint.

382.    As alleged above, Coinbase has violated Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].

**RESPONSE:** Denied.

383.    CGI is, and was during the Relevant Period, a control person of Coinbase for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

**RESPONSE:** Denied.

384.    At all relevant times, CGI exercised power and control over its wholly-owned subsidiary, Coinbase, including by managing and directing Coinbase, and by directing and participating in the acts constituting Coinbase's Exchange Act violations.

**RESPONSE:** Coinbase admits that Coinbase, Inc. is a wholly owned subsidiary of CGI. Coinbase otherwise denies the allegations in Paragraph 384.

385.    By reason of the foregoing, CGI is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Coinbase's violations of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)]. Therefore, CGI is jointly and severally liable with and to the same extent as Coinbase for those Exchange Act violations.

**RESPONSE:** Denied.

### FIFTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Coinbase)

386.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 371.

**RESPONSE:** Coinbase repeats and incorporates by reference its responses to the foregoing allegations in the Complaint.

387.    By virtue of the foregoing, Coinbase, through its offers and sales of the Coinbase Staking Program, directly and indirectly:  (a) without a registration statement in effect as to those securities, (1) made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use or medium of any prospectus or otherwise, and (2) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities for the purpose of sale or for delivery after sale; and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

**RESPONSE:**  Denied.

388.    By reason of the conduct described above, Coinbase, directly or indirectly violated, is violating, and, unless enjoined will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

**RESPONSE:**  Denied.

## PRAYER FOR RELIEF

Answering the prayer for relief, Coinbase denies that Plaintiff is entitled to any of the relief sought.

## DEFENSES

Coinbase asserts the following defenses without assuming the burden of proof or any other burden if such burden would otherwise be on Plaintiff:

## FIRST DEFENSE:  FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE:  NO AUTHORITY TO REGULATE

The SEC has no authority to regulate Coinbase under Sections 5, 15(a), or 17A(b) of the Exchange Act or Section 5 of the Securities Act because none of the tokens identified in the Complaint is a security within the meaning of the Exchange Act, and because Coinbase's staking services do not involve the offering or sale of any securities.

## THIRD DEFENSE:  MAJOR QUESTIONS DOCTRINE

Were there ambiguity regarding the SEC's authority to regulate Coinbase under Sections 5, 15(a), or 17A(b) of the Exchange Act or Section 5 of the Securities Act, application of the major questions doctrine would require that that ambiguity be resolved against a finding of authority.

## FOURTH DEFENSE:  NO SECURITIES TRADE ON COINBASE'S SPOT EXCHANGE

Coinbase did not violate Sections 5, 15(a), or 17A(b) of the Exchange Act because none of the tokens identified in the Complaint is a security with the meaning of the Exchange Act.

## FIFTH DEFENSE:  COINBASE WALLET IS NOT A BROKER

Coinbase Wallet is simply software that allows users to self-custody digital assets. Because the Wallet software does not "effect[] transactions in securities for the accounts of others," 15 U.S.C. § 78c(a)(4)(A), it is not a broker and was not required to register as one.

## SIXTH DEFENSE:  COINBASE'S STAKING SERVICES ARE NOT SECURITIES

Coinbase did not violate Section 5 of the Securities Act by offering its staking services, because Coinbase's staking services do not involve the offering or sale of any securities.

## SEVENTH DEFENSE:  LACK OF DUE PROCESS AND FAIR NOTICE

Coinbase did not have, and Plaintiff failed to provide, fair notice that its conduct was in violation of law.

## EIGHTH DEFENSE:  ABUSE OF DISCRETION

Plaintiff abused its discretion by bringing this enforcement action instead of engaging in notice-and-comment rulemaking.

## NINTH DEFENSE:  EQUITABLE ESTOPPEL

Plaintiff is equitably estopped from pursuing its claims.

## TENTH DEFENSE:  UNCLEAN HANDS

The Complaint is barred by Plaintiff's unclean hands.

## ELEVENTH DEFENSE:  LACHES

The Complaint is barred by the doctrine of laches.

## **<u>RESERVATION OF DEFENSES</u>**

Additional facts may be revealed by future discovery that support additional defenses presently available to, but unknown to, Coinbase. Defendants therefore reserve the right to assert additional defenses, cross-claims, and third-party claims, not asserted herein of which they may become aware through discovery or other investigation as may be appropriate.

WHEREFORE, Coinbase respectfully requests entry of judgment granting the following relief:

A.    dismissing the Complaint with prejudice and granting judgment in favor of Defendants on all claims; and

B.    granting such further relief as this Court may deem just and proper.

Dated:  June 28, 2023
New York, New York

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ

/s/ William Savitt
William Savitt
Kevin S. Schwartz
Sarah K. Eddy
Adam M. Gogolak
51 West 52nd Street
New York, New York  10019
(212) 403-1000
WDSavitt@wlrk.com
KSSchwartz@wlrk.com
SKEddy@wlrk.com
AMGogolak@wlrk.com


Steven R. Peikin
Kathleen S. McArthur
James M. McDonald
Julia A. Malkina
Olivia G. Chalos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*