

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

DIVISION OF
ENFORCEMENT

July 7, 2023

<u>Via ECF</u>

The Honorable Katherine Polk Failla, U.S.D.J.
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *SEC v. Coinbase, Inc. and Coinbase Global, Inc.*, 23 Civ. 4738 (KPF)

Dear Judge Failla:

      Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this response to Defendants' request for leave to file a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), ECF No. 23 ("Def. Letter"). The SEC takes no position on Defendants' request but, in the event the Court grants Defendants leave to file a Rule 12(c) motion, the SEC intends to oppose that motion for the reasons summarized below, and to cross-move pursuant to Fed. R. Civ. P. 12(f) to strike Defendants' defenses 3 and 8-11 (major questions doctrine, abuse of discretion, equitable estoppel, unclean hands, and laches). The SEC respectfully requests that such cross-motion be incorporated into any briefing schedule entered with respect to Defendants' Rule 12(c) motion.[1]

      Coinbase, a multi-billion-dollar entity advised by sophisticated legal counsel, argues it was unaware that its conduct risked violating the federal securities laws, and suggests that by approving Coinbase's registration statement in 2021 the SEC confirmed the legality of Coinbase's underlying business activities—at that time and for all time. But Coinbase's own actions belie these grievances. Before becoming a publicly traded company, Coinbase itself relied on the very factors federal courts follow, as set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to assess whether the sale of crypto assets on its platform would qualify as a transaction in securities. In other words, Coinbase adopted the very legal framework as a basis for making listing decisions that it now claims has no applicability to its activities. Coinbase also explicitly discouraged crypto asset issuers from using "problematic statements" in their marketing materials that are "traditionally associated with securities." Compl. ¶ 109. And since becoming a public company, Coinbase has repeatedly informed its shareholders of the risk that the crypto assets traded on its platform could be deemed securities and therefore that its conduct could violate the federal securities laws—including in the very registration statement it now points to as proof that the SEC supposedly blessed its conduct. These actions clearly show that Coinbase understood that the securities laws could apply to its

---

[1]     SEC counsel are scheduled to meet and confer with Defendants' counsel about a briefing schedule on July 10, 2023. Individual Rule of Practice 4(A) does not require a pre-motion submission for a motion to strike, but the SEC is prepared to provide such a submission at the Court's request.

conduct and knew which rules to consider in evaluating the legality of its conduct, but nevertheless made the calculated decision to take on this risk in the name of growing its business.

Putting aside the subterfuge of Coinbase's repeated invocation of equity to justify its illegal conduct, the core legal question before this Court is: has Coinbase acted as (1) an unregistered (2) intermediary (*i.e.*, national securities exchange, broker, and/or clearing agency) (3) with respect to securities transactions?  Coinbase admits that it is not registered, and that its platform possesses key characteristics that render Coinbase an "exchange" as well as a broker and clearing agency under applicable law.  Ans. ¶¶ 1, 74-101.  Coinbase only really disputes the third question—insisting that it engages in "asset sale[s]," not in securities transactions.  Prelim. Statement to Ans. ¶ 8.  However, the Complaint pleads facts to establish that *at least* 13 of the crypto assets Coinbase makes available for trading are investment contracts, and thus securities, under *Howey*—which is more than sufficient to defeat a Rule 12(c) motion.  *See SEC v. Collector's Coffee Inc.*, 2021 WL 1956369, at *3 (S.D.N.Y. May 17, 2021) ("The standard for analyzing a motion for judgment on the pleadings … is identical to the standard for a motion to dismiss ….").  This is true irrespective of Coinbase's novel and strained reading of *Howey*, its meritless equitable defenses, and its improper, 32-page "Preliminary Statement" with 105 footnotes of evidence, which is not integral to the Complaint and thus should be precluded.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002).

**Summary of Opposition to the Proposed Motion**.  Ignoring more than 75 years of controlling law under *Howey*, Coinbase attempts to construct its own test for what constitutes an investment contract from pre-1933 Blue Sky laws based on common law contracts principles.  Coinbase makes two related and equally flawed arguments: (1) an investment contract must be or include a formal, common law contract; and (2) even if a crypto asset is considered an investment contract when it is first offered and sold by an issuer, that same asset *cannot* be an investment contract when traded between non-issuers on a platform like Coinbase's because secondary market transactions not involving its issuer are merely "asset sales."  Both arguments are wrong.

As to the first argument, *Howey* held that an "investment contract" exists when a "transaction, scheme, or contract" involves certain economic characteristics.  *Howey* did not require a common law contract, and no court has held otherwise.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004) ("The test for whether a particular *scheme* is an investment contract was established in [*Howey*].") (emphasis added); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (noting *Howey* established a test to determine when an "unconventional *scheme or* contract" constitutes an investment contract (emphasis added), and finding an investment contract existed despite lack of contractual privity between original issuer and ultimate public investor); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352-57 (S.D.N.Y. 2019) (finding an investment contract in the absence of a common law contract); *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (the definition of "offer" under the Securities Act "goes well beyond the common law concept"); *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (finding an investment contract where there was "no evidence" of any binding contractual obligations).  In applying the "flexible" and "adapt[ive]" *Howey* test, *Howey*, 328 U.S. at 298-99, the focus is on economic reality.  *SEC v. Aqua-Sonic Prods.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981), *aff'd* 687 F.2d 577 (2d Cir. 1982).  Coinbase's own reliance on *Howey* in determining whether to list crypto assets for trading on its platform underscores its central relevance to the securities law questions raised in this case.

Coinbase's second argument is likewise incorrect as a matter of law.  Coinbase cites no case in support of its assertion that secondary market crypto asset transactions are exempt from the federal securities laws.  And for good reason.  Courts, starting with *Howey* itself, routinely look past

conclusory assertions that a sale constituted nothing more than the sale of an "asset," and consider the totality of the facts and circumstances to determine whether the transaction involved a security. *See SEC v. Glen-Arden Commodities*, 493 F.2d 1027, 1034-35 (2d Cir. 1974) ("It ill behooves appellants, after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity."). Applying these principles, courts recognize that the economic reality of a transaction involving a crypto asset security is not irrevocably altered simply because it happens to become available on a trading platform like Coinbase's. *See, e.g., SEC v. LBRY*, 2022 WL 16744741, at *2 (D.N.H. Nov. 7, 2022) (drawing no distinction between investors who purchased crypto asset securities directly from the issuer and those who purchased them on secondary trading platforms); *Audet v. Fraser*, 605 F. Supp. 3d 372, 397 (D. Conn. 2022) (holding that the relevant crypto asset was an investment contract even though it was "traded on public exchanges"); *In re Bitconnect Secs. Litig.*, 2019 WL 9104318, at *6-9 (S.D. Fla. Aug. 23, 2019) (finding that sales of relevant crypto assets on a crypto asset trading platform involved sales of investment contracts). Nor is there any reason to alter this analysis simply because an initial investor in an investment contract resells the asset to a subsequent investor. Indeed, in the context of the transactions at issue here, the economic reality for those who invest in the secondary market is the same as for those investors who buy crypto assets directly from issuers. The representations made by crypto asset issuers and promoters and investors' reasonable profit expectations do not disappear merely because an asset can be resold or purchased on a trading platform. Moreover, even accepting Coinbase's argument that secondary market transactions do not, as a matter of law, implicate the securities laws, Coinbase's intermediation of *primary* offers and sales, which the SEC has adequately pled in the Complaint (Compl. ¶ 65), would suffice to establish Coinbase's liability. The SEC's allegations that Coinbase permits issuers to offer and sell their crypto assets directly on Coinbase's platform are thus sufficient to defeat a Rule 12(c) motion.

Further, Coinbase misapprehends the purpose and reach of the major questions doctrine in claiming (Def. Letter at 3) that it requires dismissal. The doctrine is rooted in "separation of powers concerns" and constrains agencies' "regulatory assertion[s]" of authority. *Biden v. Nebraska*, 2023 WL 4277210, at *3, *21 (U.S. June 30, 2023); *West Virginia v. EPA*, 142 S. Ct. 2587, 2609, 2614 (2022) ("major questions doctrine" concerns "congressional authorization to regulate") (cleaned up). This case, by contrast, involves the SEC's exercise of its longstanding authority to enforce statutory requirements. In 1934, Congress authorized the SEC to enforce the federal securities laws through civil law enforcement actions. *See* 15 U.S.C. §§ 77t(b), 78u(d)(1). Since its inception, the SEC has exercised that authority to pursue violations of the securities laws—and it exercises the same statutory enforcement authority here. Coinbase cites no case, and we are aware of none, applying the major questions doctrine to an agency's exercise of its authority to pursue statutory violations.

Lastly, Coinbase miscasts the SEC's claim with respect to Coinbase Wallet. The Complaint does not allege that Wallet "functions as a broker" (Def. Letter at 3); rather, the Complaint alleges that *Coinbase* is a broker and has engaged in unregistered brokerage activity, for which it has received transaction-based compensation (Compl. ¶¶ 64, 67, 69, 75, 82, 101, 376). Likewise, the SEC has sufficiently pleaded that, through its staking program, Coinbase has engaged in the unregistered offer and sale of securities (*id.* ¶¶ 309-371), and Coinbase's claim that "the facts pleaded establish" that there is no "invest[ment of] money" or "risk of loss" is belied by the very "facts pleaded"— which Coinbase simply ignores. *Id.* ¶¶ 340-345 (detailing the investment of money in the form of crypto assets transferred to Coinbase's custody and put at risk).

Respectfully submitted,

*/s/ Nicholas Margida*
Nicholas Margida

*Counsel for Plaintiff
Securities and Exchange Commission*

Cc: Peter Mancuso, Esq.
Securities and Exchange Commission

William Savitt, Esq.
Wachtell, Lipton, Rosen & Katz LLP

Steven R. Peikin, Esq.
Sullivan & Cromwell LLP