```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                    Plaintiff,
 5
               v.                           23 CV 4738 (KPF)
 6
     COINBASE, INC. and COINBASE
 7   GLOBAL, INC.,

 8                  Defendants.             Conference
     ------------------------------x
 9                                          New York, N.Y.
                                            July 13, 2023
10                                          10:15 a.m.

11   Before:

12                   HON. KATHERINE POLK FAILLA,

13                                          District Judge

14                          APPEARANCES

15   NICHOLAS MARGIDA
     PETER MANCUSO
16   LADAN STEWART
     BEN KURUVILLA
17        Attorneys for Plaintiff

18   WACHTELL LIPTON ROSEN & KATZ
          Attorneys for Defendants
19   BY:  WILLIAM SAVITT
          -and-
20   SULLIVAN & CROMWELL, LLP
     BY:  STEVEN R. PEIKIN
21

22

23

24

25
```

 1                  (Case called)

 2                  MR. MARGIDA:  Good morning, your Honor, Nick Margida

 3      on behalf of the Securities and Exchange Commission.

 4                  MR. MANCUSO:  Peter Mancuso with the Securities and

 5      Exchange Commission.  Good morning, your Honor.

 6                  THE COURT:  Good morning.

 7                  MS. STEWART:  Good morning.  Ladan Stewart with the

 8      SEC.

 9                  MR. KURUVILLA:  Good morning, your Honor.  Ben

10      Kuruvilla for the SEC.

11                  THE COURT:  Good morning to each of you.

12                  At the back table.  Thank you.  Mr. Savitt.

13                  MR. SAVITT:  William Savitt for Coinbase and Coinbase

14      Global.  Good morning.

15                  THE COURT:  Good morning.

16                  Mr. Peikin.

17                  MR. PEIKIN:  Good morning.  Steven Peikin for Coinbase

18      and Coinbase Global.

19                  THE COURT:  Thank you so much.  Please be seated.

20                  Welcome to those of you in the gallery, some of whom I

21      suspect are working on this case in one capacity or another.

22      This is our initial pretrial conference in this case and it is

23      as well a premotion conference.

24                  Just a couple of housekeeping things at the beginning.

25      Typically, my practice for having premotion conferences is to

1    do two things.

2          One is to try and persuade the moving party not to

3    file a motion, but I'm confident that will fail here, so I am

4    not going to try it.

5          The second is to see whether there is a desire on the

6    part of the nonmoving party to amend the pleadings at issue, so

7    I'll talk to the commission about whether there is an appetite

8    for that.

9          I understand as well that there is some discussion

10   about a motion to strike.  Without prejudging the matter, I

11   don't know enough about it to know how I feel about it.  To me,

12   it just seemed like it would be a bit of a waste of time at

13   this stage.  I am not sure what it would accomplish.  If the

14   commission is of the view that it would dramatically affect the

15   progress of discovery or something else, I will hear from you.

16          What I'd like to do in the first instance is to hear

17   from the commission about their complaint and about any desire

18   to amend or supplement the complaint, but not to hear from the

19   commission in response to the motion.

20          I would then like to hear from someone at the back

21   table about the contemplated motions, and I have some questions

22   for them in that regard.

23          Then I'll hear from the commission regarding their

24   opposition to the motion.

25          There is one other thing I would just like to put out

1    there.  I have thought very hard about how to say this, and I

2    am not sure I will say it as precisely as I'd like to.  There

3    is a sense of time sensitivity and urgency to the parties'

4    submissions, and I have no doubt that people have been working

5    extremely hard on this case for weeks, if not months, if not

6    years.  And I have no doubt that both sides could put together

7    quite professional, quite wonderful submissions on short

8    timeframes, but I need to communicate to you, just so that no

9    one is unaware of this, that I have a very busy July and

10   August, and then I go into a four to five-week RICO trial that

11   will consume my September into October.

12           So as you are thinking about what is an appropriate

13   briefing schedule, and I invite the parties to speak offline

14   about what is an appropriate briefing schedule, please

15   understand that I can't, unless there is a reason that has not

16   yet been provided to me, allow this case to leapfrog the

17   criminal and other urgent matters.  I have also, for those of

18   you who understand the concept, a Hague Convention, a parental

19   kidnapping hearing that's coming up as well.  All of those have

20   to take place first.

21           I don't want you to think that I don't care about your

22   case.  Of course I do.  But I do want us all to be realistic.

23   I don't want you, for example, to wreck all of your summer

24   vacations to get me something in the month of August that I'm

25   not going to get to in the next couple of months.  Please,

1    please, keep that in mind.  And, of course, if there is a

2    reason for immediacy that hasn't been expressed to me, you will

3    certainly let me know, but that is the concern that I have.

4          Let me then please begin with the SEC.  I don't know

5    who wants to talk about the complaint.

6          Mr. Margida, you're getting up.  Thank you so much.

7          MR. MARGIDA:  Thank you, your Honor.

8          First of all, with respect to your Honor's --

9          THE COURT:  Let me say that this courtroom is known

10   for its acoustic challenges.  I appreciate the respect, but if

11   it ends up that we all can't hear you just because of the sheer

12   number of people in here, I will take no offense if it's easier

13   for folks to sit down.

14         MR. MARGIDA:  Please let me know if you can't hear me.

15         First, your Honor, with respect to your question about

16   whether the SEC would intend to amend its complaint, we don't

17   think that's necessary at this time.

18         I don't know how much your Honor would like to hear

19   about the complaint, but I'm happy to start.  If you have any

20   questions, let me know.

21         THE COURT:  I am not sure we have had the pleasure of

22   working with each other previously, sir.  So please know, I

23   have read the complaint, I have read all the materials that

24   have been given to me, and I have in fact prepared for this

25   conference.  I do not need you to summarize.  If there are

1   things you want to call my attention to, that's great.  But if

2   the issue is one of making sure I have read the document, I

3   promise you that I have.

4          MR. MARGIDA:  Thank you, your Honor.  That's helpful.

5          As we lay out in the complaint, I just want to kind of

6   frame the case about what the complaint says and put aside kind

7   of the lamentations and grievances of Coinbase that they

8   identify in the preliminary statement of their answer.  We

9   think, respectfully, that this is a pretty straightforward

10  case.  I know --

11         THE COURT:  You see me smiling.  If I had a nickel for

12  every time someone told me it was a straightforward case, I

13  could retire.  OK.  Fine.

14         MR. MARGIDA:  We teed this up in the premotion

15  submission response, that it really has to do with the

16  application of a strict liability statute to one overarching

17  question, putting aside the staking Section 5 arguments.

18         With respect to the Exchange Act registration

19  violations that we allege, there are three elements.  One is,

20  Coinbase admits it's not registered with the SEC in any

21  capacity.  Two are the cryptoassets, do they engage in activity

22  that could be -- that's consistent with what the Exchange Act

23  rules say about National Securities Exchange activity,

24  brokerage activity, clearing agency activity.

25         THE COURT:  Just to that point, sir, at what level are

1    you asking me to focus?  You're asking me to focus on the

2    assets themself or on what's being done with them on the

3    Coinbase platform?

4            MR. MARGIDA:  That's a good question, your Honor.

5            We are asking you to focus on the securities that

6    Coinbase allows to be transacted on their platform and that

7    they offer by and through the Coinbase Wallet application and

8    through the Prime service, which gives access to the platform

9    to their institutional and other customers.

10           The only thing that's in dispute, your Honor, and I

11   think both sides agree on this, is whether the cryptoassets

12   that Coinbase makes available on its platform are fairly

13   characterized as investment contracts or not.  And obviously

14   the parties have laid out their legal arguments.  Respectfully,

15   Coinbase accuses the SEC of seeking to create new regulations

16   and new law.

17           THE COURT:  Sir, I am advised by my deputy that your

18   microphone is cutting out.  Perhaps you can be seated, sir,

19   because I do want to make sure we all can hear you.  In fact,

20   my deputy, who knows all things, suggests that it's better if

21   you remain seated.  I really do appreciate it.  Apologies for

22   our not great technology.  Thank you.

23           MR. MARGIDA:  Coinbase accuses the SEC of creating new

24   law in this area, a regulatory power grab, but Coinbase's legal

25   arguments, and I know we will get into this later, are

1    effectively asking the Court to create new law with respect to

2    a common law contract requirement that the *Howey* test and the

3    *Howey* case does not include, and no case in 75 plus years of

4    *Howey* jurisprudence has held this.

5          Additionally, I think the bigger argument is just that

6    *Howey* can never apply to secondary market transactions.  I

7    think as we laid out in our complaint, that's just illogical

8    and it's contrary to economic reality, which is what *Howey*

9    requires the Court to look at.  Coinbase has marketed these

10   cryptoassets as speculative investment opportunities.  They

11   have asset pages that include historical price and volume

12   information.

13         THE COURT:  Thank you, sir.  I think we are starting

14   to trend into their motion, and I promise you I will give you

15   that opportunity to speak.  I am, again, focusing on your

16   complaint.  If there is something that you think I'm not

17   focused on or something that you just think is very, very

18   important and might get overlooked in the many pages of your

19   complaint, please, sir, tell me what that is.

20         MR. MARGIDA:  That's helpful.

21         What I'd like to frame for the Court is why this

22   matters, and I think we go into that in some of the background

23   of the securities laws and background of cryptoassets

24   themselves.

25         The Exchange Act requirements cannot be viewed as just

1  some statutory requirement.  They matter for purposes of

2  investor protection.  With an entity such as Coinbase, if it

3  were registered as an exchange, clearing agent, or broker,

4  there are requirements -- opening up books and records to the

5  SEC, providing onsite inspection -- to allow the SEC to provide

6  oversight.

7          And so what we have alleged in the complaint is,

8  essentially, Coinbase wants a just-trust-us system and the

9  Exchange Act requires a trust-but-verify system, so that's

10  something that I think is important to frame for the Court.

11          THE COURT:  Let me just say this, sir.  Again, we will

12  probably have a greater discussion about this in a little bit.

13  I understand the reliance on *Howey*, and I understand there is

14  this sort of contract aspect to *Howey*.

15          But there is a question about the efforts involved in

16  the underlying cryptoassets.  I think that's where perhaps

17  there is some traction to the defendants' arguments.  I know

18  you don't agree with it, and the question I'll have for both of

19  you, spoiler alert, is that I'd like to know what I really can

20  decide on the record before me and on the stuff I may properly

21  consider in this context.

22          But you can keep talking about *Howey*, and that's

23  great, but there are several parts to *Howey* that I want to

24  understand better than I do.

25          Please continue, sir.

1              MR. MARGIDA:  Sure, your Honor.

2              With respect to the efforts of others, and I can

3      elaborate later on this in response to Mr. Savitt's or Mr.

4      Peikin's arguments, the efforts as alleged in the complaint are

5      the efforts of the issuers, promoters, and developers of the

6      tokens and their associated technologies.  We are not alleging

7      that Coinbase engages in efforts with respect to *Howey* for the

8      Exchange Act registration violations.

9              We are, with respect to the staking allegations in

10     Section 5, under the '33 Act, alleging that Coinbase engages in

11     significant entrepreneurial and managerial efforts.  But for

12     purposes of the Exchange Act violations, it's an investor -- I

13     think our argument would be, an investor does not distinguish

14     between buying directly in an initial offering versus buying on

15     Coinbase's platform.  In both instances, it's relying upon and

16     reasonably expecting to profit based on the efforts of the

17     issuers themselves and the developers of the associated

18     networks, platforms, technologies, gains, etc., that we have

19     alleged with respect to the 13 cryptoassets securities in our

20     complaint.

21             THE COURT:  Thank you very much.

22             Is there someone at the back table who wants to take

23     the lead on this?  That might be Mr. Savitt.

24             Mr. Savitt, you're also welcome to sit down in

25     deference to our court reporter, if you're comfortable doing

1    that.

2          MR. SAVITT:  Thank you, your Honor.  I am not sure I'm

3    comfortable doing it.  It just seems sort of wrong.

4          THE COURT:  It does to me too, I understand that, but

5    we all want to hear you, sir.

6          Let me please ask this, sir.  I have not seen an

7    answer like the answer that was submitted in this case.

8          One of the things that I've had to learn as a judge

9    and moving from the sort of criminal side of the house to the

10   civil side is the stuff that I can properly consider in the

11   context of a dispositive motion.  I know what answers usually

12   look like, and they don't usually have preliminary statements

13   that are so heavily footnoted and argumentative.  That's fine.

14         I guess my questions in the first instance are, why is

15   it that in this context I can consider your preliminary

16   statement?  To me, it seems as though it's a lot of very

17   helpful information to you, but I am not sure that it's the

18   totality or the sum of information on the issue that's out

19   there.

20         How can I consider it?  How is it that I can decide,

21   based on basically your preliminary statement, as a matter of

22   law, that the cryptoassets are not securities and that the

23   stuff in which your clients are engaged does not bring them

24   within the securities laws?  And I appreciate you allowing me

25   the indulgence of that long question.

```
 1              MR. SAVITT:  Thank you, your Honor, and it's a fair
 2    one.
 3              Without wanting to concede that answers like this are
 4    entirely unconventional in all contexts, the question the Court
 5    has put I think is a really sound one, which is, for purposes
 6    of this pleading motion, which it is, what is the factual
 7    weight that the Court can give to the untested pleadings in our
 8    answer, confident, though we are, of their accuracy.
 9              And I think the right answer, your Honor, is that for
10    purposes of the motion for judgment on the pleadings that we
11    have sought leave to file and hope to file, the Court need look
12    no further than the complaint that the commission has filed and
13    the documents incorporated by reference into it and relied upon
14    by the SEC and other documents that are properly cognizable
15    upon judicial notice.  That's a long-winded way of saying, we
16    don't expect to ask the Court to rely on the allegations in the
17    answer, confident, though we are, of their accuracy for
18    purposes of the Rule 12(c) motion.
19              And there are other reasons why we thought it
20    appropriate and salutary to include the allegations that are
21    there; among other reasons, to ensure that there wouldn't be a
22    claim, that the affirmative defenses, for example, that we have
23    raised are inadequately supported factually.
24              But in terms of what's before the Court on 12(c), we
25    will not be relying on the unverified assertions in the answer,
```

1    notwithstanding that we are confident they are going to pull

2    through as a matter of proof.

3          THE COURT:  I didn't think you'd cite anything to me

4    that was incorrect.  I just wondered if there might be

5    competing information or competing evidence that your

6    adversaries would ask me to consider in the context of a motion

7    for judgment on the pleadings, such that I wouldn't be able to

8    decide the issue as a matter of law.

9          It seemed to me, at first blush, that there are points

10   that you make that are interesting and that I really would like

11   to explore, but they seemed to sound more in summary judgment

12   than in judgment on the pleadings.  So I am interested as to

13   how I can be as confident as you currently are, that based

14   solely on the materials that I may properly consider in a 12(c)

15   context, that I will be able to make the findings that you wish

16   me to make.

17         MR. SAVITT:  Our position, your Honor, and we will

18   have, we hope, the opportunity to elaborate this to the Court

19   in full briefing --

20         THE COURT:  Of course.

21         MR. SAVITT:  -- is that boiled all the way down on the

22   essential issue that I think is going to be before the Court on

23   the Rule 12(c) motion is the following.

24         The commission has claimed that certain of the tokens

25   trading on the Coinbase platform are trading there in violation

1    of the securities laws.  The entire rationale for that

2    contention is that these assets constitute investment contracts

3    and, therefore, fall within the purview of the SEC's regulatory

4    jurisdiction, which is broad within the universe of securities,

5    but stops at the water's edge.  If it's not a security, the SEC

6    shouldn't regulate it.

7            THE COURT:  Just to that point, sir, I don't think

8    you're suggesting in your answer that the activities that are

9    going on on the Coinbase platform and in Wallet and in Prime

10   are, in the colloquial sense, trading.  Your argument is that

11   the things that are being traded are not assets subject to the

12   securities laws.

13           Do I understand that correctly?

14           MR. SAVITT:  I think that's fair.  They do not

15   constitute investment contracts, as that idea is properly

16   understood, and, therefore, the claims of our good adversaries

17   must fail.  That is, in a sense, the boiled-down version of the

18   essential point.

19           The reason we think that it is susceptible of a motion

20   in this posture is that we think we will be able to show,

21   through an appropriate exposition of the case law, that to

22   qualify as an investment contract, a contract or scheme of

23   related contracts must represent participation in a business

24   enterprise.  That is what we intend to show your Honor upon the

25   motion for judgment on the pleadings.  An investment contract

1   will show that an investor pays money in exchange for an

2   entitlement to a future payout of some sort.  That's what turns

3   an investment contract into a security.  It's why an investment

4   contract is a security.  We will show that that is the

5   essential defining characteristic.

6          THE COURT:  If I could pause you for a moment, sir.  I

7   did appreciate and it was obvious that each side had put a lot

8   of effort into the premotion letters, so I applaud you for

9   getting them within page limits, and I thank you for that.

10         I guess I'm wondering, is what has been given to me in

11  the premotion letters the bulk or the totality of the cases on

12  the issue?  I am not sure there is a lot of case law in this

13  area.  I do feel like I'm breaking new ground.  I'm wondering,

14  sir, if you want to comment at this stage, on the three cases.

15  I believe there was a New Hampshire, a Connecticut, and a

16  Southern District of Florida case cited by the commission in

17  its opposition to your premotion letter.

18         MR. SAVITT:  I think those cases, your Honor, if I'm

19  recalling correctly, related to the question of secondary

20  trading on the platform, and the SEC in its brief colloquy with

21  the Court this morning has drawn attention to that.

22         A few things that we want to make sure in this early

23  posture, your Honor.

24         First, our position is not that something that trades

25  on a secondary market can never be an investment contract.

1    That is not our position.  It's not what we said.  It's a

2    caricature of our position.

3          The following is true, that we think that for

4    something to qualify as an investment contract, it must create

5    some promise of contractual relationship of obligation between

6    the buyer of the asset and the issuer or promoter, and that to

7    qualify as an investment contract, one must have an investment

8    of money that constitutes a claim upon the proceeds of the

9    business, as opposed to the things it creates.

10          I'm warming to your question, your Honor.

11          THE COURT:  I know you're getting there eventually.

12          MR. SAVITT:  I will get to it.

13          That is our essential claim.  We think that's clear

14   with respect to the totality of trading in the cryptoassets

15   generally.  We aren't here to litigate every cryptoasset

16   trading anyplace anywhere.  We have been confronted with the

17   claim that the 12 assets trading on our platform are unlawful

18   and that's what we are going to focus on.

19          It is true, however, and we said this in our letter,

20   and perhaps this is what the commission was picking up on, that

21   to the extent any of these tokens can be said to be investment

22   contracts in the context of an initial offering, they certainly

23   cannot be said to be that in the context of the secondary

24   trades that are occurring on the Coinbase platform, because in

25   those trades nothing is traveling with the sale, except the

1    token itself, in exchange for a payment of fiat or digital

2    currency.  That is not an exchange of value that carries any

3    ongoing obligation to anyone and it is not an exchange of value

4    that constitutes an investment or a claim on the return of the

5    issuer or the promoter now.

6            The cases that have been cited in the SEC's letter on

7    this we think do not stand for the proposition that secondary

8    trades are incapable of -- that there is no distinction, I

9    should say, between secondary trades on the one hand and

10   primary trades on the other.

11           In fact, I'm grateful for the Court's question because

12   this *LBRY* case that is the first case cited, and I think it's

13   pronounced library, even though there are some vowels missing

14   in it, in its case name, the SEC -- and I think this is

15   emblematic of what's happened here -- the SEC cites that case

16   to claim -- and I'm quoting now from the letter -- that there

17   is no distinction between investors who purchased cryptoassets

18   directly from the issuer and those who purchased them on a

19   secondary platform.

20           Respectfully, your Honor, that's just not what that

21   case says.  It's just not what it says.  In that case, in the

22   *LBRY* case, the SEC repeatedly refused, notwithstanding the

23   district court's preference, to put at issue to evaluate the

24   question at all whether secondary cryptotrades could be trades

25   of securities.

1          Here is what Judge Barbadoro said in the District of

2    New Hampshire.  I am quoting now.  "I would like the issue of

3    secondary trading to be resolved.  The SEC has rejected every

4    suggestion I have made that they should resolve that issue with

5    me.  That's from a transcript.

6          And reflecting that position, the *LBRY* court just this

7    week, I think it was two days ago, issued an order that

8    specifically declined to say whether secondary trades are

9    security trades and specifically made clear in issuing its

10   remedial order in that case that the case could have no effect

11   on the secondary token market.

12         So the commission's assurance to the Court that *LBRY*

13   drew no distinction between secondary trading and primary

14   trading or initial trading is just wrong.  It's just not what

15   that case says.  We don't think that's correct.

16         I will return, however, to my long introduction, your

17   Honor, to your good question to say that our first argument is

18   that the proper inquiry as to whether these investment

19   contracts looks to issues that go over the question of whether

20   they are secondary or initial trades.  The argument is even

21   more powerful here on the secondary market, but we do not say

22   that there are not circumstances one could imagine in which

23   assets or securities are traded on a secondary market and they

24   are within the scope of the securities laws, just not on the

25   pleadings in the commission's case and documents incorporated

1   therein.

2        THE COURT:  The commission seems to think that your

3   clients were provided with adequate notice, at the very least,

4   in the form of the Dao report.  Do you want to comment on the

5   degree to which one can intuit anything from that report that

6   could lead you to have expected that you'd be where you are

7   today?

8        MR. SAVITT:  Thank you, your Honor.

9        We, first of all, would observe that that report said

10  absolutely nothing about trades on a secondary market, such as

11  Coinbase.  We don't agree that it provided fair notice.

12       Moreover, the whole matter of how we got to where we

13  are we think is importantly colored by the SEC's careful review

14  of Coinbase's S-1, its declaration of effectiveness of that

15  S-1, the commencement of trading, the remarks that we put in

16  our letter, and I'm sure the Court doesn't need me to rehearse

17  about what Chair Gensler has said about the lack of regulatory

18  authority.

19       There is, moreover, the overhang here of Coinbase

20  having, over the course not just of weeks, months, but of

21  years, seeking engagement with the SEC and a reasonable

22  regulatory regime to understand what the SEC viewed as its

23  regulatory lane and what could appropriately be within it.

24  That has been entirely withheld, and we appreciate it very

25  much.

1          I did not want to fail to come back to your

2     introductory remarks that you have a very busy docket and lots

3     and lots of stuff to get to.  We, of course, understand that.

4     But one of the reasons that Coinbase is keen to move with

5     dispatch here, of course with your Honor's schedule, is that

6     the SEC has filed a serious set of allegations.  It attacks

7     Coinbase's business in some ways.  It puts a cloud over the

8     business.

9          We think that cloud is going to be, with certainty,

10    dispelled as a matter of law, whether it's in a preliminary

11    motion, which we think is the case, certainly thereafter if

12    not, and it's important from our perspective to try to get

13    clarity on these matters so that there can be a more coherent

14    and cognizable regulatory regime.  That's, in a sense, why we

15    are asking for dispatch in not just the briefing on the 12(c)

16    motion, but the case in its entirety.  I say that fully

17    appreciating that there will be things well ahead of us in the

18    queue, and of course we will work with your Honor and your

19    schedule and all of that.

20          THE COURT:  Again, sir, I've asked you questions that

21    interest me.  I am going to be returning to the front table in

22    a moment to ask them some questions sort of suggested by the

23    answers that you have given.

24          Is there anything else that you want me to know about

25    your contemplated motion?  I am quite confident I can't

1    dissuade you from filing it.

2          MR. SAVITT:  Your Honor, we think it's a meritorious

3    motion, and we'd like to file it if the Court will permit us.

4    I think that's a no on that question.

5          On the merits of the motion itself, we have tried to

6    pack a lot into our letter, and the exercise of writing it all

7    in three pages is a useful one from our perspective, so I will

8    say thanks to the Court for imposing that restriction on us.

9    It's a great exercise in distillation.

10         There is a rich body of case law about what investment

11   contracts are and how they have been perceived by the courts

12   and the commission.  There will be a lot more for the Court to

13   consider when that motion is fully briefed.  But we do think

14   that we provided the bones of the argument for the Court's

15   evaluation.

16         So if the Court has no questions on that or the major

17   questions piece of it that follows in turn, we are happy to

18   recede and turn the floor back over to our adversary.

19         THE COURT:  Then there are two follow-up questions.

20         The first is, perhaps I don't think I understand well

21   enough to opine on the portion of the SEC's complaint that

22   deals with your client's staking program.  If you want to talk

23   about the staking program and why I shouldn't be worried about

24   it, even as the SEC is worried about it, I would appreciate

25   that.  Thank you.

1            MR. SAVITT:  Staking is a means of verifying the

2    transactions that occur on the blockchain of the respective

3    tokens and platforms and trade at Coinbase.

4            As we previewed in our letter, the staking program

5    fails as a matter of law to establish the requisites for

6    regulation under the securities laws because there is

7    ultimately no risk to the staking party because of important

8    guarantees that the principal will be returned.

9            Moreover, the staking program involves, essentially,

10   the provision of administrative and IT support, rather than the

11   risk of loss, and, therefore, it is in the nature of a supply

12   contract, a services contract, not in the nature of an

13   investment contract or a security.  And we think we will be

14   able to show that here again based on the inadequacy of the

15   pleadings rather than anything that we have stated

16   affirmatively in the preliminary statement of the answer.

17           THE COURT:  Your view, sir, is that it's just the

18   equivalent of a broker holding a trade?

19           MR. SAVITT:  It's the equivalent of a payment for a

20   service with a shared return between the -- Coinbase provides a

21   service and, in response, it generates some profits that are

22   divided between Coinbase and the staking party, and there is no

23   risk of loss to the staking party, and it's ultimately an

24   administrative and IT function rather than an investment

25   function.

1          THE COURT:  I appreciate the clarity with which you

2     have described that.  I am not sure your colleagues at the

3     front table hold the same view of the staking program and

4     perhaps that's causing me a bit of confusion.

5          You also were kind enough to remind me about the major

6     questions doctrine, and I actually thought I understood the

7     major questions doctrine, and then the Supreme Court issued a

8     decision a few weeks ago, and I'm now beginning to wonder what

9     I understood.

10          I understood it as an issue of separation of powers, I

11     understood it as an issue of what has and what should be

12     arrogated to particular branches of government.

13          But it seemed to me that the *Biden v. Nebraska*, I

14     believe, decision of a couple of weeks ago also seemed to focus

15     a lot on the size, monetarily, of the issue.  Perhaps you are

16     going to argue that that portion of the decision is analogous

17     or somehow useful in your case because we are talking about

18     billions, trillions of dollars, but perhaps I could hear from

19     you on the major questions doctrine.  Thank you.

20          MR. SAVITT:  Thank you, your Honor.

21          It's an interesting area of the law.  I think

22     ultimately it does still reduce, in its doctrinal essence, to a

23     matter of separation of powers and the question of the

24     appropriate scope of the exercise of agency authority.

25          From its beginnings, and particularly as it has been

developed in the *West Virginia* case and in the *Nebraska* case of

a week or two ago, it's correct that it inheres most powerfully

in circumstances where there is clearly an important impact on

economic activity.  We are confident, your Honor, that that

branch of the major questions inquiry will be satisfied here.

Crypto is a one-trillion-dollar-plus industry.  It's an

important emergent industry.  One in five U.S. adults have held

cryptocurrency.  It has, and I think this is common ground, the

capacity to significantly create innovation in financial

services internationally and nationally.  We don't think there

is any question it will satisfy that branch of the major

questions inquiry.

          The other pieces of it that are important to ask are

the following sorts of questions:  Is the agency exercising

authority in the same way that it has previously exercised

authority?  Here we think the answer is plainly no.

          Chair Gensler's remarks that there was not adequate

regulatory authority over cryptoexchanges just two years ago we

think is very powerful evidence that what we have now is an

expansion of authority, precisely the kind of expansion of

authority that was called out in many of the cases involving

the major questions doctrine, including the *Nebraska* case, page

6 of the slip op.

          And there are important analogies here to what's come

up in these cases.  The *Brown v. Williamson* case is a good

1    example.  There, after for a long time saying that nicotine

2    wasn't a drug, the FDA said it is a drug, and the Supreme Court

3    said you can't do that.  You can't take within your regulatory

4    authority something that you had hitherto failed to, just like

5    cryptoassets here.

6         There is also the fact relevant here that there is

7    ongoing and intense congressional debate right now about who,

8    if anyone, regulates crypto and how that regulatory authority

9    should be allocated.  Senator Gillibrand just yesterday, or the

10   day before, introduced bipartisan legislation on exactly this

11   subject, which, if I'm understanding correctly, does not assign

12   to the SEC the regulatory authority that, through cases like

13   this, it seeks for itself.  That's a bipartisan bill.

14        Putting aside what the law ultimately becomes in

15   Congress, the fact that there have been over a dozen

16   legislative initiatives to try and establish a regulatory

17   regime really suggests that they have not been debating a

18   question that's already been settled.  There is even a dispute

19   within the commission amongst the commissioners and between the

20   CFTC and the SEC on this question.

21        For these reasons, we think this is a case that cries

22   out for the application of the major questions doctrine.

23        The last point on this before shutting up, your Honor,

24   is, you don't need to get to this issue, in our view, even on

25   our motion because we think when you look at the history of the

1    investment contract law and the other law applicable to the

2    trades on the platform and the other aspects of the

3    commission's case, staking and the rest of it, you will see

4    that they do not qualify as securities under the prevailing

5    precedent.  But if it's a colorable claim, then the major

6    question doctrine comes into play, and we think it powerfully

7    influences the analysis.

8              THE COURT:  Thank you, sir.

9              Mr. Margida, am I hearing from you or from someone

10   else at your table?

11             MR. MARGIDA:  It depends on the issue.  There is a lot

12   to unpack there, your Honor, so my colleague, Mr. Mancuso, is

13   going to address some of the issues, including the major

14   questions doctrine.

15             THE COURT:  I would like to begin where I began my

16   questioning with Mr. Savitt, which is, there was for me some

17   confusion about the degree to which defendants were asking me

18   to focus on the statements made in their preliminary statement.

19             I believe Mr. Savitt has attempted to clarify how he

20   thinks I can look at that and the fact that the defendants

21   believe that other information in the answer and in the

22   pleadings and in the materials that I may properly consider in

23   a 12(c) context is going to be enough for me.

24             So my first question is really one of just scope of

25   materials I may consider, if there is someone who wants to

1    speak to that issue.

2            MR. MARGIDA:  There is.  Mr. Mancuso can handle that,

3    your Honor.

4            THE COURT:  Mr. Mancuso, I am sure you appreciate

5    being volunteered, sir.  Thank you.

6            MR. MANCUSO:  Thank you, your Honor.

7            With regard to 12(c), your Honor hit the nail on the

8    head.  I think you were indicating that the materials that were

9    included in the 105 footnotes to the preliminary answer should

10   not be considered on a 12(c) motion.  I am sure your Honor is

11   very, very familiar with the standard.

12           12(c) is basically a 12(b)(6) motion, but that the

13   Court can consider pleadings on both sides, those that are

14   alleged in the answer, as well as information that judicial

15   notice could take account of, as well as any documents or

16   evidence that's integral to the pleadings.

17           If you run these cases, both in this district court,

18   as well as the Second Circuit, to ground, that seems to be what

19   the Second Circuit is saying, that the external documents that

20   are not attached to the pleadings, if the Court is going to

21   consider them on a 12(c) motion, they have to be integral to

22   the framing of the complaint, and, therefore, the 105 footnotes

23   in the preliminary statement are not integral to the framing of

24   our complaint.  There are certainly some documents that we do

25   reference in our complaint that are integral to the framing of

1   the complaint, but not those that are in the preliminary

2   statement.  However, it seems like we have agreement between

3   the parties as to what is and is not proper for the Court to

4   consider on a 12(c) motion.

5         THE COURT:  I will speak about this a little bit later

6   on, sir, but I'm sort of hinting to the folks at the front

7   table that I really don't want a motion to strike.  I am really

8   not convinced that we need to do a motion to strike, and I am

9   not sure it's going to save anybody any time, but you will be

10   able to persuade me of the contrary or not later on in this

11   proceeding.

12         Sir, what I am told by the defense is, fine, I am not

13   going to consider the stuff I can't consider.  But if I can

14   consider the stuff within the universe of appropriate 12(c)

15   materials, I am going to find that your complaint should be

16   dismissed because you have not properly alleged that these

17   cryptoassets are in fact securities or that they are investment

18   contracts or that somehow the conduct taking place on the

19   Coinbase exchange is within the federal securities laws.

20         I would like to understand, because I think it is

21   presented to me as a matter of optics, yet it is of interest to

22   me.  How do you -- and by you, I mean your clients --

23   contextualize Mr. Gensler's testimony?  How do you

24   contextualize what he was saying about the absence of market

25   regulation of cryptoassets?

         1          Is it your view that actually -- I understand, I

         2   think, that you are suggesting that this wasn't estoppel and

         3   that perhaps minds could be changed or maybe better arguments

         4   could be made.  But he did seem to suggest, and I thought he

         5   was speaking for the commission when he did so, that the SEC

         6   could not or did not regulate transactions of this type.  What

         7   has changed?

         8          MR. MANCUSO:  Your Honor, I think what we have to go

         9   back to is to the actual context of that quote, and I am sure

        10   your Honor has read it beyond just the snippet that is taken

        11   out and put in the answer.

        12          THE COURT:  I have.

        13          MR. MANCUSO:  However, I think if we go back to the

        14   actual transcript and you see that the question was asked, I

        15   believe it involved Bitcoin, which is not at issue here, and

        16   the SEC has made clear that that's not the focus of any of

        17   these enforcement actions.

        18          Also, I believe it was a congressman from the House of

        19   Representatives who said, what can we do to make this safer?  I

        20   don't have it in front of me, the whole quote.  But from what I

        21   remember, it was what can we do to make this market more robust

        22   so that people -- the way I interpreted it is so people trust

        23   it.

        24          Mr. Gensler said a couple of things about the

        25   unregulated nature.  There is no regulator in this space,

1    meaning no one is currently regulating it.  I think taking,

2    there is no regulator in this space out of context and just

3    throwing it in the answer is a nice soundbite, but it doesn't

4    necessarily mean that the chair committed the SEC to not, at

5    some point, based on some conduct that violates the securities

6    law, bring an enforcement action.

7            That's another thing that I think dovetails with the

8    major questions doctrine, is that the SEC is not attempting to

9    regulate all of the crypto industry in this country or around

10   the world.  We regulate conduct, and we are regulating

11   Coinbase's conduct, which we believe violates the law.

12           And if you look and you kind of synthesize all of

13   Coinbase's arguments, they are basically saying, in terms of

14   the equitable arguments, what Mr. Gensler had said, the major

15   questions doctrine, they are saying that if the SEC or some

16   other criminal authority is looking at conduct of a crypto

17   actor and it violates the securities law or some other law,

18   that they don't have authority to do that because Congress

19   hasn't given it yet.  That's just incorrect and that, we

20   believe, to be a nonsensical argument.  So I think that these

21   all have to be looked at together, and that would be my

22   response to how the Court should view it.

23           THE COURT:  Are defendants correct, and I think the

24   answer is yes to this, that the commission is not considering

25   Bitcoin or Ether to be securities, cryptoassets from Bitcoin or

1    Ether.  Do you consider those to be securities?

2            MR. MANCUSO:  I believe the commission has spoken on

3    Bitcoin.  I do not believe that the commission has spoken

4    definitively on Ether.  Certainly with Bitcoin, which I think

5    the Court can take judicial notice of, it amounts to, and don't

6    quote me on this exact number, but it's something like over 50

7    percent of the crypto industry is Bitcoin.

8            THE COURT:  Let me ask the question a little bit

9    differently, sir.

10           There are certain cryptoassets as to which I believe

11   the commission has taken the position they are not securities.

12   There are 12 or 13 assets traded by -- or something appearing

13   on Coinbase platforms or Prime or Wallet that the commission

14   has taken the position, they are securities.

15           What is the difference between those that are not and

16   those that are?  And how has that been communicated by the

17   commission to the investing public and to those involved in the

18   space so that they know that this type of asset may implicate

19   the securities laws and some other cryptoasset may not?

20           MR. MANCUSO:  The simple answer to your Honor's

21   question is the *Howey* analysis.  And those that are not, which

22   there is one that the commission has spoken to definitively is

23   not, which is Bitcoin, do not meet the *Howey* elements.  I can't

24   speak to all 250 assets that are currently traded.

25           THE COURT:  Sir, you're not committing that the number

1    is 12 or 13.  It could be hundreds.  But based on the

2    commission's implementation of the *Howey* analysis, you have

3    found 12 or 13 assets that meet what you understand to be the

4    definition of securities.

5         MR. MANCUSO:  We gave them as examples to the Court,

6    that those are what we believe to be securities based on the

7    *Howey* analysis that are being currently traded and have been

8    traded for a number of years on the Coinbase platform.

9         However, we are not committing that it is limited to

10   12, but I also can't take a position on all 250 because, as

11   your Honor is aware, this is a very fact-intensive analysis,

12   and each token has to be looked at.  As you can see from our

13   complaint, we just gave a preview of 12 tokens and each token

14   takes two pages, three pages.  That is just the tip of the

15   iceberg.  There is certainly more evidence that we will get

16   into when we are beyond the pleadings stage.  I can't sit here

17   and just determine whether we assess a specific asset to be a

18   security unless we do a full *Howey* analysis.  We have

19   communicated that -- I'm sorry, your Honor.

20        THE COURT:  I think you're about to say what I was

21   about to say, which is, in terms of whether that's been

22   communicated to the investing public and those involved in this

23   space, you're suggesting *Howey* has been around forever, they

24   should just know, and *Howey*, by its terms, even covers novel

25   assets that may or may not be securities, such as cryptoassets.

1              MR. MANCUSO:  Yes, your Honor.

2              I would also add to that that the SEC has been

3    explicit in that it said, you have to look at *Howey*.

4              Starting with the Dao report in 2017, that analysis

5    used factors from *Howey* and explicitly applied them to

6    cryptoassets, so it's beyond just that the investing or the

7    public should know about *Howey*.  SEC has said that cryptoassets

8    can be viewed under this standard.  And Coinbase has

9    acknowledged that in their filings with the commission and

10   documents that they have distributed to their shareholders that

11   the cryptoassets that are being traded -- we noted it in the

12   complaint for these purposes that these cryptoassets that are

13   being traded on our platform can be subject to regulation.

14             THE COURT:  I think personally, and perhaps at this

15   stage of the game my opinion matters, it seems to me you're

16   ascribing a little too much importance to that.  I have seen

17   registration statements.  I have seen filings in cases of this

18   type.  And there are a lot of eventualities and contingencies

19   that are covered that do not themselves amount to admissions.

20   Saying that some day someone may determine that something is a

21   security is a different thing than acknowledging that something

22   is a security.  So, again, I don't want you to rely too much on

23   that.

24             I am just trying to figure out how folks involved in

25   the industry can know that a particular cryptoasset with which

1  they are involved is or is not going to be found at some later

2  date by the commission to be a security.

3       MR. MANCUSO:  They need to do an analysis of the

4  cryptoassets that they allowed to trade on their platform or

5  that they have issued.  We see that the industry has done this.

6  They have created, I believe they call it a CRC -- I forget

7  what it stands for; crypto rating council -- where there is a

8  number of market participants that have gotten together, and

9  they have created I think what they call a scorecard, and they

10 use the *Howey* analysis as part of that to determine how risky

11 their cryptoassets are in terms of, I think it's like a zero to

12 a five scale, and how risky they think it is for being

13 considered a security.

14      The industry has been aware of this standard and that

15 these factors could be applied.  There have been several

16 district court cases that have applied them over the past

17 couple of years and have found that some cryptoassets are

18 securities.  I understand your Honor --

19      THE COURT:  One moment, please, sir.  How many

20 district court -- you gave me three.  Are there more out there?

21 I didn't understand there to be a wealth of case law on this

22 issue.

23      MR. MANCUSO:  It's under ten, I would say.  Please

24 don't hold me to that.  It's not hundreds.  I know that.

25      THE COURT:  Fair enough.  I appreciate the wiggle room

you are giving yourself.  Is Mr. Savitt correct that the three

that you have identified really involve secondary market

trading?

          MR. MANCUSO:  I believe Mr. Savitt's point was they

don't involve --

          THE COURT:  I beg your pardon.  You're exactly right.

I have misspoken.

          MR. MANCUSO:  Those cases were brought against

issuers, so Mr. Savitt is not wrong that in a direct context of

those cases that the SEC brought enforcement actions against

companies that were issuing cryptoassets and not -- they

weren't traded.

          However, the district courts in those cases, in

response to arguments that, well, these assets are now being

traded on a secondary platform, and therefore I believe the

argument went that they are no longer securities, there is

language that there is no distinction or it doesn't matter that

they are now being traded on secondary platforms.  My decision

still stands.

          I don't agree a hundred percent with Mr. Savitt's

characterization of the *LBRY* decision because the Court does

discuss secondary trading.  I know he quoted from, I believe, a

transcript from oral argument.  But we all have access to the

decision, and the Court does discuss secondary trading.

          However, back to your Honor's question, Mr. Savitt is

1   correct that LBRY was not running an exchange or brokerage or

2   clearing agency.  They were issuing a cryptoasset that was

3   found to be a security.

4           THE COURT:  Thank you, sir.

5           Sir, you have mentioned that there are some small

6   modest number of cases on the issue.  At least one of them

7   predates the issuance of CGI's registration statement, is that

8   correct?

9           MR. MANCUSO:  I don't have them all off the top of my

10  head, your Honor.  I can look up what is cited in our letter.

11          THE COURT:  The Southern District of Florida

12  *Bitconnect Securities Litigation* was 2019, per your letter.

13  Will you agree with me on that?

14          MR. MANCUSO:  Yes.

15          THE COURT:  Am I correct that the CGI registration

16  statement was sometime in 2021?

17          MR. MANCUSO:  That's correct, your Honor.

18          THE COURT:  The defendants tell me that at the time

19  that the commission was evaluating the registration statement

20  there were six cryptoassets being traded on the Coinbase

21  platform that you now say qualify as securities.  Is that

22  correct?

23          MR. MANCUSO:  Factually, yes, there were cryptoassets

24  that were trading that are now part of enforcement action, yes.

25          THE COURT:  Is there some significance that I should

1    give, or maybe there is none, to the fact that the commission

2    issued the S-1 and didn't say, hey, watch out, guys, you're

3    engaging in securities laws violations?

4         What I believe the defense wants me to do is to intuit

5    from the fact that you issued the registration statement, or at

6    least another side of the commission issued the registration

7    statement, to intuit that they felt that whatever was going on

8    there was OK, no one was in violation of the securities laws,

9    and that we should all be surprised that two years later we are

10   here.  Please comment on that.

11        MR. MANCUSO:  Sure.  The short answer is no.  Your

12   Honor should take nothing from that.

13        THE COURT:  Let me have a slightly longer answer.

14        MR. MANCUSO:  Your Honor, I'll say that simply because

15   the SEC allows a company to go public does not mean that the

16   SEC is blessing the underlying business or the underlying

17   business structure or saying that the underlying business

18   structure is not in violation of the law.

19        The S-1 is about disclosures, and I don't have

20   everything in front of me.  We can fully brief all of the legal

21   and factual implications that goes on with regard to an S-1

22   filing.  But there is no way that an approval of a S-1 is a

23   blessing of a company's entire business.  In fact, there is no

24   evidence being put forth that the SEC looked at specific assets

25   and made specific determinations and then gave Coinbase comfort

 1    that this would not later be found to be a security.

 2              THE COURT:  Let's just pause so I can just sort of get

 3    rid of the skepticism I currently have as I hear that answer.

 4              I am not saying that the commission should be

 5    omniscient at the time it's evaluating a registration statement

 6    and that it should know all things.  But I would have thought

 7    the commission was doing diligence into what Coinbase was

 8    doing, and somehow I thought that it would say, you know, you

 9    really shouldn't do this.  This is violative of the securities

10    laws, or we are kind of in some interesting unchartered

11    territory here with respect to whether the assets on your

12    platform are securities, so be forewarned that maybe some day

13    there could be a problem.

14              I hear what you are saying, which is, I shouldn't give

15    it any consideration and it doesn't absolve the defendants of

16    any of the securities laws.  Yet I'm just wondering why it is

17    that the commission saw fit to bless what they were doing,

18    because that is kind of what they did by issuing the S-1, and

19    that there not be any discussion about the possibility of

20    violative conduct.  Again, you may be right, but I am just

21    viewing your answer with a measure of skepticism.

22              MR. MANCUSO:  Understood, your Honor.

23              Respectfully, I would take issue again with the word

24    blessing their conduct or their business.  This is about

25    disclosures.  In fact, and I think we lay it out in our

1    complaint, that Coinbase disclosed in their S-1 that the risk

2    that the assets that are being traded on their platform could

3    be found to be securities, and that came from the process back

4    and forth between --

5            THE COURT:  You never could have said to them, hey,

6    you guys need to register as a securities exchange.  That was

7    within the power of the SEC to do, was it not?

8            MR. MANCUSO:  I can't really speak to that.

9            THE COURT:  I think it was.  I don't think anything

10   stopped the commission from doing it.  I am not suggesting,

11   sir, that this is dispositive or that there is an estoppel

12   issue.  But it's not crazy in the Failla parlance for Coinbase

13   to think that what they were doing was OK because it was

14   exactly what you let them do when they issued the S-1.  That's

15   the point I'm making.  You may say that they and I are reading

16   too much into the issuance of the S-1.

17           MR. MANCUSO:  I'd agree with that.

18           THE COURT:  I might disagree with that, but I do

19   understand.

20           Eventually, sir, we are going to get to the major

21   questions doctrine, but let me ask you.  You have heard me

22   engage with Mr. Savitt in discussions about the arguments that

23   they contemplate making.  I have certainly seen your responses,

24   at least as they are in writing.  Is there something else that

25   you want me to know or do you wish to engage at a more granular

1   level with any of the responses that Mr. Savitt gave me this

2   morning?

3          MR. MANCUSO:  Your Honor, if we are not going to talk

4   about the major questions doctrine -- and you would like to

5   talk about secondary trading or their reasons for moving to

6   dismiss -- if that was it, I will defer to my colleague to

7   handle those.

8          THE COURT:  Are you coming back for major questions

9   doctrine?

10         MR. MANCUSO:  I will be coming back, unless you want

11  to hear about that now.

12         THE COURT:  I will wait.  Thank you so much.

13         MR. MANCUSO:  Thank you, your Honor.

14         MR. MARGIDA:  Thank you, your Honor.

15         I don't want to belabor this because I think the

16  positions of the parties are fairly set out in the letters.

17         I do want to point out that what Coinbase is doing

18  with respect to reading into *Howey* a contract requirement is

19  very interesting.  They acknowledge that *Howey* says an

20  investment contract can be a contract transaction or a scheme,

21  and in their letter they say the transaction or scheme, yeah,

22  but associated contractual undertakings.  Today I think Mr.

23  Savitt's phrase was schemes of related contracts.

24         The SEC's position is that's just wrong as a matter of

25  law.  No court in 75 plus years has held that *Howey* requires a

1    common law contract. *Howey* itself said the paper or the

2    financial instrument is incidental.  Courts in this circuit,

3    including *Gary Plastic* and *Glen-Arden*, have looked at what

4    *Howey* compels, which is the economic reality of the

5    transaction.  They have looked at the series and collection of

6    inducements, representations, what they are selling, the

7    enterprise.

8           And Judge Castel in *Telegram* says, scheme is used in a

9    descriptive, not a pejorative sense.  And Coinbase seems to

10   ignore the fact that courts are actually finding cryptoassets

11   to be securities where there is no contract. *Balestra v.*

12   *ATBCOIN* in this court is an example of that where there is no

13   contract.

14          In *Telegram*, Judge Castel is very clear -- and I know

15   it was in the context of, the Court found there was one

16   continuous offering, but the Court also found that there is no

17   ongoing -- there is no ongoing privity between what happens in

18   like public market sales.  So there is an initial offer to 175

19   initial purchasers and *Telegram* finds -- and this relates to

20   the secondary market transaction argument -- *Telegram*

21   envisioned that there would eventually be secondary sales, and

22   there is no distinction -- I'll get to that point in a minute.

23          On *LBRY*, we think it speaks for itself.  Putting aside

24   any examination of the transcript, I think the Court itself

25   draws no distinction between primary and secondary

1  transactions.  The '33 and the '34 Acts draw no such

2  distinction.  There are no such distinctions drawn in other

3  securities market contexts, and Coinbase offers no compelling

4  reason why we should draw one here.

5       Commonality -- I think Mr. Savitt was hitting on like

6  investing in an enterprise.  Commonality, as your Honor knows,

7  is about tying -- if you're talking about horizontal

8  commonality, it's tying the fortunes of investors together, and

9  then strict vertical commonality is about tying the enterprise

10 itself, the people who are running the platform or network or

11 the issuers together with investors.  We have alleged in our

12 complaint, and they have to be taken as true at this stage,

13 that those elements are satisfied.

14      The fortunes of an investor who buys a cryptoasset

15 security, including one of the 13 that we have alleged here --

16 and, by the way, your Honor, the commission has spoken on other

17 cryptoassets that are available that the commission thinks are

18 securities.  The *Wahi* litigation, insider trading litigation,

19 named specific assets.  Coinbase didn't delist any of those,

20 except for one later when the relevant platform became defunct.

21 We also identify in paragraph 124 of the complaint other assets

22 that the commission has brought enforcement actions on.

23      The argument that the commission hasn't spoken until

24 now with this complaint about assets being securities on

25 Coinbase's platform is just not true.

1              I don't want to belabor this, but coming back to your

2      Honor's question from earlier this morning about the reasonable

3      expectation of profits based on the efforts of others, someone

4      who purchases in an initial offering on a Monday, versus on a

5      secondary platform the following week, has the same expectation

6      of profit based on the representations of the issuers, the

7      promoters and the developers, so I think that's pretty clearly

8      alleged in our complaint as well.

9              If your Honor has other questions about the *Howey*

10     related aspects, but I think our position is well set out, and

11     we look forward to briefing the issues.

12             THE COURT:  On the issue of staking, in listening to

13     Mr. Savitt, I began thinking that the parties had completely

14     different views of the staking program.  Because the way it was

15     being described to me by him suggested more.  I believe he used

16     the word administrative.  I guess the defendants are suggesting

17     that it's sort of a means of verifying trades and transactions

18     and, again, something almost back office-y, although there is

19     perhaps a profit-generating element to it as well.

20             Is it that you just hold two different views as to

21     what the staking program is?  Has your position been clarified

22     by Mr. Savitt's comments to me this morning?  And if not,

23     what's violative about the staking program?

24             MR. MARGIDA:  I am really confused about Coinbase's

25     decision to move for judgment on the pleadings with respect to

N74SEC14                                                               44

1   staking because I think -- and we include a specific *Howey*

2   analysis, and our facts as alleged are supposed to be deemed

3   true and reasonable inferences drawn in our favor.

4           With respect to your Honor's question about the

5   reasonable efforts here for purposes of the third element of

6   *Howey*, Coinbase argues that they are just IT services.  There

7   is no case that says IT services can't be entrepreneurial and

8   managerial.

9           But putting that issue aside, what Coinbase does here

10  is far more significant than what Coinbase is saying in its

11  answer.

12          By the way, I don't think the SEC and Coinbase dispute

13  much with respect to staking.  I think it's how you

14  characterize the efforts and whether investor assets are

15  actually invested and there is a risk of loss.  Our position

16  is, at least for 12(c), we have alleged that they are put at

17  risk.  I think that's pretty clear.  Whether the relevant

18  staking protocol goes under, whether private keys associated

19  with cryptoassets that are staked get lost, whether there is a

20  cybersecurity incident, for a number of reasons as we have

21  alleged.

22          But the efforts, what Coinbase does, first of all, it

23  markets this as an investment opportunity.  It says:  Earn up

24  to 6 percent for the respective assets.  This is applying *Howey*

25  to the economic reality based on the perspective of an

1    objectively reasonable investor looking at the facts and

2    circumstances.  If it walks like a duck and quacks like a duck,

3    it's a duck.  This is an investment scheme, a product that they

4    are selling, and their efforts go to establishing the necessary

5    links with the staking protocols which involves -- I think one

6    witness testified during the investigation -- involves creating

7    and implementing software to establish that, providing

8    cybersecurity protections, actually operating the validator

9    nodes, so pooling investor assets and then staking those at the

10   validator nodes.

11          And Coinbase -- the way staking works is, the greater

12   number of assets that are staked at a particular node, the

13   higher the likelihood it is that that protocol will select, in

14   this instance, Coinbase to actually validate transactions on

15   the respective blockchain.  That increases the success of the

16   enterprise, and Coinbase does that.

17          They also do the actual staking.  They receive the

18   cryptoassets that they distribute, then they take their

19   commission, so their fortunes are tied with investors.  If the

20   staking program succeeds, Coinbase succeeds.

21          And then the returns are the cryptoasset rewards that

22   the protocols provide to be the investment returns, and those

23   are done on a pro rata basis based on the amount of assets that

24   the customer stakes.

25          I'm confused why they are moving on staking.  I think

1   we have laid out why it satisfies the *Howey* test.  There are

2   issues of fact.

3           THE COURT:  Excuse me for a moment, please.  I just

4   want to check my notes.

5           Mr. Margida, just so I'm clear, I think what I'm

6   hearing you say is, as the commission understands the staking

7   program, it is subject to the securities laws.  If it turns out

8   your understanding of the program is wrong, you have still

9   alleged enough in the complaint, and I must accept your

10  well-pleaded allegations and the inferences that can be drawn

11  from them, and I still have to find, at least at this stage,

12  that your conception of the staking program is the one I can

13  consider, and your conception implicates the securities laws.

14  Yes, sir?

15          MR. MARGIDA:  That's our position with respect to

16  Coinbase's proposed motion.  Like I said, with respect to the

17  merits, I don't think Coinbase disputes a whole lot, so I think

18  we will be successful on the merits, but I know that's not your

19  question.

20          THE COURT:  That's not my question.  Thank you.

21          Perhaps I can return to Mr. Mancuso and the question

22  of the major questions doctrine.  Thank you.

23          MR. MANCUSO:  Sure, your Honor.  Can I clarify

24  something from our earlier discussion --

25          THE COURT:  Of course.

1          MR. MANCUSO:  -- that I should have picked up on

2     before.

3          Your Honor was asking about Mr. Gensler and his

4     statements to Congress, and I believe they were three weeks

5     after he became commissioner.  I just wanted to note for the

6     Court that any individual commissioner statement, as I am sure

7     your Honor has heard before, does not represent a decision.  It

8     does not speak for the five-member commission.  So only the

9     five-member commission, after taking a vote and having a

10    majority, can issue a statement on their behalf and bind the

11    commission.

12         THE COURT:  I think it's being presented to me, sir,

13    for background information and optics.

14         But my larger question to you and your colleagues was

15    the manner in which the commission has made determinations

16    about whether and when cryptoassets are securities and the

17    manner in which that has been communicated.  I think we have

18    discussed that today.

19         MR. MANCUSO:  Understood.  I just wanted to clarify

20    that, your Honor.

21         THE COURT:  It is so clarified, sir.  Thank you.

22         MR. MANCUSO:  Thank you.

23         THE COURT:  Perhaps major questions doctrine.

24         MR. MANCUSO:  Sure, your Honor.

25         Your Honor was correct earlier with regard to

1    identifying separation of powers.  That's what this line of

2    cases -- although the moniker major questions doctrine has only

3    recently been announced, when you look at Chief Justice

4    Roberts' opinion, I believe in *West Virginia*, he cites about

5    six cases dating back to the 1990s that form this doctrine.

6            This doctrine, if you look at all these cases, which I

7    am sure your Honor has at least perused them, they all involve

8    regulation beyond what the agency was allowed by Congress.  Not

9    one of them involves enforcement.

10           What's going on here is, we are not seeking to

11   regulate the entirety of the crypto industry.  We are enforcing

12   a violation of the securities law based on Coinbase's conduct.

13   I think that that's a very important distinction, and we have

14   to look at it in that context.

15           I think I said this before, but it's important and I

16   am going to say it again.  Coinbase's argument seems to be that

17   if there is a violation of securities law by a crypto company

18   or a crypto player in the sphere, there is no power to civilly

19   or criminally enforce that violation based on the major

20   questions doctrine.  We think that's an incorrect reading of

21   the case law.

22           THE COURT:  The decision from the court two weeks ago

23   in no way changes your analysis.  Is there anything you wish to

24   comment on or distinguish?

25           MR. MANCUSO:  No.  But I think it further supports our

1    argument in that in the *Biden v. Nebraska* case, you have the

2    Department of Education, through its secretary, completely

3    changing -- Chief Justice Roberts says that this was not the

4    understanding of what that statute allowed previously.  It was

5    a modification of the student loan policy.  It wasn't a

6    wholesale forgiveness.  That's just not applicable to the facts

7    we have here.

8         THE COURT:  Sir, if I could just push back slightly on

9    something you said earlier, which has been sort of percolating

10   while you've been talking, so excuse me.

11        I thought I heard you say a few sentences ago that the

12   question was not whether the commission wanted to regulate the

13   entire crypto industry but whether it wanted to regulate those

14   assets that are found to be securities.  Perhaps you can just

15   restate that position, because I want to make sure I have it

16   with greater clarity.

17        MR. MANCUSO:  Sure.  The commission regulates conduct

18   that falls under the securities law, and we believe that

19   Coinbase's conduct has violated the securities law.  That's it.

20   We are not looking to regulate through this action the entire

21   crypto industry.

22        THE COURT:  I guess I hear you.  I am just wondering

23   where we go with that because it seems to me, in trying to

24   determine what conduct within the industry falls within the

25   purview of the commission, it does sort of sound to me that you

1   have to consider all of the conduct in the industry.

2         I hear you saying, I do, that it's not a question of

3   the commission purporting to regulate the entire cryptoasset

4   industry.  But I am just saying, there is a tension between

5   making that argument and then having to determine in this

6   rather unique space what are the things you actually get to

7   regulate.  That's my only point.

8         MR. MANCUSO:  Understood.

9         THE COURT:  Anything else you would like me to know,

10  sir?

11        MR. MANCUSO:  Not with regard to the major questions

12  doctrine, no.

13        THE COURT:  Fair enough.  Perhaps I should take the

14  hint from your last statement.  Is there something else you

15  wish to speak on?  And then which of you gets to speak on the

16  motion to strike that I am trying to persuade you not to file?

17        MR. MANCUSO:  That would be myself, your Honor.  We

18  will move right to that.

19        THE COURT:  If there is something else --

20        MR. MANCUSO:  No.

21        MR. MARGIDA:  Can I just say one thing on the

22  fair-notice issue, unless your Honor is prepared to move

23  forward?

24        THE COURT:  I do not want to foreclose you from saying

25  something, sir.

1                   MR. MARGIDA:  Thank you, your Honor.  I'll be brief.

2                   I just wanted to point out that with respect to the

3       Dao report, paragraph 61 of the complaint --

4                   THE COURT:  Excuse me for calling it the Dao report.

5       I appreciate that.

6                   MR. MARGIDA:  That's fine.  It took me a couple of

7       years to figure that out.

8                   Paragraph 61 of the complaint identifies the Dao

9       report and where it emphasizes the importance of complying with

10      the registration provisions of the securities laws, including

11      with respect to platforms.

12                  The other thing I want to note about their fair-notice

13      defense is that, under *Brigadoon Scotch* in the Second Circuit,

14      it's untenable to find that an 'investment contract' is

15      unconstitutionally vague.  Challenges in the cryptoassets space

16      and elsewhere, on the basis that that term, investment

17      contract, is vague, have failed, whether as applied or a facial

18      challenge.  We expect that to be true here.  The only reason we

19      are not moving to strike that defense now is because sometimes

20      courts prefer to rule on that at the summary judgment stage.

21                  Looking at whether the respective defendant had actual

22      notice, we think it's pretty clear, and we have alleged in our

23      complaint, that Coinbase had actual notice.  They integrated

24      *Howey* into their listing process.  They disclosed the very risk

25      that they would be found to be violating the securities laws.

 1              Thank you, your Honor.

 2              THE COURT:  Thank you very much.  Just give me a

 3    moment to take a note of that.  Then I'll hear from Mr.

 4    Mancuso.

 5              Let's take a 10-minute break.  I will be back as soon

 6    as I can

 7              (Recess)

 8              THE COURT:  I'm confident everyone has used the break

 9    to streamline what they want to say to me.

10              Mr. Mancuso, I believe it's you on the motion to

11    strike that, I don't know if you know, I don't want you to

12    file.

13              MR. MANCUSO:  Understood, your Honor.  If you will

14    indulge me just briefly.

15              THE COURT:  Briefly.

16              MR. MANCUSO:  The reason we put it in our letter is

17    because we believe that there is no daylight between your

18    Honor's decision to deny defendants' motion with regard to the

19    major questions doctrine and striking that affirmative defense.

20    The standard is no question of fact, no question of law, and

21    prejudice to the plaintiff.  We believe there are no facts at

22    issue here.  Obviously, Coinbase wouldn't have moved to dismiss

23    it if they thought there was a factual issue that could change

24    your Honor's decision on major questions.

25              THE COURT:  I thought I just heard Mr. Savitt say a

1    moment ago that really the reason they weren't pushing the

2    issue was because they think you are going to fall at the first

3    hurdle and I don't even have to get to the issue of major

4    questions doctrine, and that's sort of in the back pocket or in

5    reserve in case something were to come up.

6              But go ahead.  Keep going.

7              MR. MANCUSO:  Understood.  But they indicated, at

8    least in their letter, that that is going to be part of their

9    motion to dismiss, so we think it is ripe that the Court

10   decides whether this is properly in the case or not.  If the

11   Court denies their 12(c) motion, it should be stricken as an

12   affirmative defense.  As I said before, the standard for the

13   two doesn't seem to be that there is any daylight between them.

14   It can be decided as a matter of law.

15             THE COURT:  Perhaps I misunderstood Mr. Savitt.  I

16   thought what he was saying was, look, Failla, you can, just

17   looking at the pleadings and materials you can consider, you

18   can find, as a matter of law, that these things are not subject

19   to regulation and therefore that the complaint falls apart.

20             But if, heaven forfend, you find that these things are

21   possibly within the purview of the securities laws, then go to

22   the major questions doctrine and basically decide that the

23   commission can't do that because of either a change in position

24   or an arrogation of power they don't have or some other reason.

25   That's what I'm understanding.

1      I guess I am saying, why do I need to do the motion to

2  strike if there are several places in which the major questions

3  doctrine may come up.  If it turns out that in none of those

4  places does it succeed, then, again, I am still not sure there

5  is going to be, for example, additional discovery or -- I don't

6  know how it hurts you to have it in the case, but that's where

7  you can help me.

8      MR. MANCUSO:  Understood, your Honor.

9      We believe that every affirmative defense, if any

10 other cases in this space are an indication, will be used to

11 purportedly justify intrusive discovery into the SEC's internal

12 communications and emails.  And we think that an affirmative

13 defense should be dismissed as a matter of law or if it has

14 insufficient legal basis, that it should be decided up front

15 and should be out of this case as early as possible.  We think

16 if your Honor is treating this legal issue at this early stage

17 based on -- I know their position -- I wasn't totally clear

18 from their motion -- their motion letter how low on the food

19 chain they may have felt the major questions doctrine is.

20     But as your Honor characterized what Mr. Savitt said,

21 it may be their last argument, but it's still going to be their

22 argument that our case should be dismissed on that basis.

23     We believe that the other direct arguments on *Howey*

24 and secondary transactions will fail and that your Honor will

25 have to rule on the major questions doctrine, and, therefore,

1   we are proposing moving to strike because we believe it's the

2   same legal issue, and your Honor can decide at this early stage

3   whether this theory of law in their affirmative defense is

4   properly part of this case.  That's the thinking and that's the

5   reasoning.

6        Just very quickly, we are also planning to move to

7   strike the equitable affirmative defenses that we believe have

8   no basis in law, especially equitable estoppel, laches, and

9   unclean hands, which I believe Judge Liman just ruled recently

10  out of this court cannot be found against the Federal

11  Government unless there is extreme extenuating circumstances of

12  affirmative misconduct, which is not present in this case.  I

13  believe that is specifically with equitable estoppel.

14        And the cases that Mr. Savitt cites in his letter that

15  we received last night are no different.  Those are cases of

16  extreme circumstances, if they were held against the Federal

17  Government.

18        That's the basis of our motion.

19        THE COURT:  I thought for a moment there, sir, you

20  were burying the lead because I heard the words intrusive

21  discovery.

22        It's your belief, sir, that if these defenses go

23  forward, the quantum of discovery sought by defendants from the

24  commission will somehow change?

25        MR. MANCUSO:  With regard to major questions and abuse

1    of discretion, certainly.  We believe they will be used to

2    justify what they seek.  We will oppose them, even if they are

3    still in the case.  But we believe that discovery could be

4    justified as being broader based on these affirmative defenses,

5    yes.  That would be our prejudice.

6           However, we understand the Court's position and your

7    skepticism of this, and we would ask if we could take this back

8    to the office and discuss it and possibly get back to your

9    Honor about our decision whether to move forward or not.

10          THE COURT:  Let me say this, lest I forget.  I'm

11   assuming, given the sheer number of people in the room, that

12   someone is getting the transcript of this conference, so I am

13   not going to impose on someone the obligation of doing it.

14          I am also going to ask the parties when we break if

15   the parties could meet and confer, in light of all the

16   discussions we have had today, and propose a briefing schedule

17   that accommodates one or both motions with a realistic time

18   frame, and, with that, I'll sign it.  I was going to give the

19   parties a week to get back to me on that because I didn't know

20   what folks' schedules were.  That, I would hope, would give you

21   the chance to talk to whomever you need to speak with.

22          Again, I can be skeptical, but it doesn't mean I am

23   going to be closed-minded about it.  If you want to persuade

24   me, you're certainly welcome to try, and I do appreciate it,

25   but I did just -- I think what I'm reacting from, and it's

1    something I have seen recently, is, I believe, and you will

2    excuse me if I'm misquoting this, but I believe there is a

3    decision from Judge McMahon in which I think she says that

4    motions to strike affirmative defenses are the stupidest thing

5    ever.  I'm kind of quoting that, but I'm kind of just giving

6    the gist.  Maybe I am just translating my Judge McMahon

7    knowledge.  I think that's probably just in my head.  So thank

8    you, sir.  Much appreciated.

9            Anything else?

10           MR. MANCUSO:  One thing.  We did meet and confer with

11   counsel a few days ago about a briefing schedule.

12           THE COURT:  I knew you had, but you hadn't heard me by

13   then.  I did not know if folks wanted to rethink, in light of

14   what I've said.

15           MR. MANCUSO:  If Coinbase's letter is any indication,

16   I know they hadn't heard you in person, we would like to

17   discuss with them if they are rethinking it.

18           MR. PEIKIN:  Your Honor, of course we will meet and

19   confer, in light of what you said today.

20           THE COURT:  Mr. Peikin, I thank you very much.

21           MR. MANCUSO:  Thank you, your Honor.

22           THE COURT:  If I can just ask the folks at the front

23   table from whom I have not heard.

24           Anything you want to add?  You are here.  You are

25   allowed to talk.

1          MS. STEWART:  No, your Honor.  Thank you very much.

2          MR. KURUVILLA:  No, your Honor.  Thank you for the

3     opportunity.

4          THE COURT:  Much appreciated.

5          From my friends at the back table, does someone want

6     to be heard in reply?

7          Mr. Peikin, you are taking over?

8          MR. PEIKIN:  I don't think I am taking over.

9          THE COURT:  Let me not step into that thicket.

10          Would you like to add to what Mr. Savitt said?

11          MR. PEIKIN:  I just want to make two what I think will

12     be brief points.

13          You asked the people at the front table whether the

14     commission has spoken about whether Bitcoin or Ethereum are

15     securities, and what you were told was the commission has only

16     spoken about whether Bitcoin is a security.

17          On June 14, 2018, a person named Bill Hinman, who was

18     then the director of corporation finance, gave a speech called

19     *When Gary met Howey Plastics*, and it's a speech that's gotten a

20     lot of attention, and everybody sitting at the front table is

21     very familiar.

22          THE COURT:  I think I actually have it on my screen

23     right now.

24          MR. PEIKINL:  In that speech Mr. Hinman said -- I'm

25     reading from it -- putting aside the fundraising that

accompanied the creation of Ether, based on my understanding of

the present state of Ether, the Ethereum network and its

decentralized structure, current offers and sales of Ether are

not securities transactions.

Now, this case is not about Ether, but I think the

position of the people at the front table reflects on their

position about Mr. Gensler's testimony, under oath, before

Congress, in which -- and I think a fair reading of what he

said is not that he was talking about Bitcoin or he was new on

the job.  He was saying that platforms like Coinbase's need

congressional authorization for them to be regulated.  That's

the gravamen of what he said.

I know the commission wishes that he hadn't said

things like that, because it impacts their position in this

litigation, but you can't just will away things like what

Mr. Hinman said and what Chair Gensler testified, and I think

those things are going to be important.

THE COURT:  Fair enough.  Perhaps I misspoke earlier

in saying that I understood it was being presented to me for

optics and background information.  You are not making an

estoppel argument, or are you?

MR. PEIKIN:  I think we will have to see how that

plays out, your Honor, but I think it certainly is relevant.

I want to just raise one other point, which is, you

reflected some discomfort with the idea that the commission

1    could authorize Coinbase's S-1 and allow it to become public,

2    and your gut suggested to you that there seems to be something

3    wrong with the idea that that's of no legal import, as the

4    commission now says.  The fact that they declare a registration

5    statement effective says nothing about whether they are

6    blessing, or maybe some less strong word, approving of the

7    underlying business.

8           The fact is, other judges have had the exact same

9    instinct that you have had and have said, in numerous

10   instances, the fact that the commission reviews and authorizes

11   a registration statement is of some legal weight.

12          It's clear that the commission has repeatedly refused

13   to review authorized registration statements for companies

14   because of concerns about the legality about their underlying

15   business.  It has done that repeatedly with cannabis companies.

16   It did it repeatedly with betting companies.  And here

17   securities registration is the core competency of this agency.

18          So the idea that the commission could authorize the

19   offer and sale of Coinbase's securities to millions of retail

20   investors and then turn around and flip-flop and say, oh,

21   sorry, you are running a completely illegal business --

22          THE COURT:  But not merely that.  An S-1 registration

23   statement for Coinbase to provide the very platform that

24   apparently I'm being told today violates the securities laws.

25   That's what you're really saying.

1          MR. PEIKIN:  Yes.  All I'm just saying, to the extent

2     that you have some core discomfort with the idea that this

3     counts for nothing, we think your instinct is correct.

4          THE COURT:  Thank you.

5          MR. SAVITT:  Your Honor, if I might just add one or

6     two points.

7          THE COURT:  Of course.

8          And I'm not at all hurrying you up, sir.  I am just

9     letting the parties know that in about ten minutes I have an

10    arraignment.  I am sure we will be done by then.

11         Thank you, sir.

12         MR. SAVITT:  Thank you, your Honor.  We will be very

13    quick.

14         I did want to pick up on Mr. Peikin's point regarding

15    Bitcoin and Ether.  Because while it's true that in some

16    important respect the remarks of Chair Gensler go to equities

17    and optics and potentially the major question doctrine, the

18    following point does not.  It's an important analytical one.

19         Bitcoin and Ether are commodities.  We think that's

20    conceded.  When a Coinbase customer buys tokens on Coinbase,

21    the ones at issue in this lawsuit, she is buying no more and no

22    fewer rights or interests than when she buys any other token,

23    including Ether and Bitcoin.

24         There is no principal basis, no legal basis, no

25    economic basis for the SEC's distinction between the tokens

1    that we now know are commodities beyond the SEC's regulatory

2    power, beyond its remit on the one hand and those that it

3    claims in this lawsuit are securities, and that is a

4    fundamental analytical point that we hope to elaborate for the

5    Court in our briefing.

6          Your Honor, you asked in your colloquy with plaintiff

7    here how do people in the space know what is a security and

8    what's not in the SEC's contemplation.  The candid answer is,

9    they don't.  No one has any idea.  You find out when you get a

10   backwards-looking, after-the-fact enforcement action, the

11   commission having declined, over the repeated requests, among

12   others, of our client to promulgate rules that would permit at

13   least the industry to understand the SEC's position.

14         I briefly just wanted to make sure that the Court had

15   the latest information on the *LBRY* case because it was a

16   decision two days ago.  I just didn't want it to be left with

17   any suggestion that that case bears on the secondary trading

18   issue, and I'm, admittedly, with a couple of ellipses to make

19   this sensible to the Court, but what the judge said there was,

20   given --

21         THE COURT:  Slow down, please.  I know you're trying

22   to be attentive to my schedule, but I want to be sure that we

23   get what we are all saying.

24         MR. SAVITT:  Thank you, your Honor.  My apologies.

25         What the Court said is, given the SEC's litigating

1    posture, the issue of secondary trading has not been litigated

2    in this case.  I take no position whether the registration

3    requirement applies to secondary market offerings and goes on

4    to hold, therefore, that the remedial order in that case can't

5    apply here.

6           I have some copies of this decision, if it would be

7    useful for me to hand them up to the Court.

8           THE COURT:  Yes, they would be welcome.  Thank you.

9           Ms. Noriega, if you would accept them from Mr. Savitt.

10          MR. SAVITT:  I think the final point we just wanted to

11   make, and it's in the nature, your Honor, of a clarification,

12   respectful as we are of the Court's time, is that our friends

13   on the other side mentioned the *Balestra* case.  That is one

14   that we think is not applicable to the proposition for which it

15   was stated.

16          THE COURT:  You weren't going to say that it was

17   wrongly decided.

18          MR. SAVITT:  It may or may not be wrongly decided, but

19   I was going to make the point that it was an issuer case.  It

20   was an ICO case, not a secondary trading case.  And contrary to

21   what we heard in the letter submitted a few days ago and this

22   morning, the proposition that there was no contract in that

23   case, no undertaking, isn't so.  The Court found that in

24   exchange for ICO funds, the issuer promised to launch and

25   improve the ATB blockchain.  Real attention to the various

1    decisions that have come down is going to be important.

2          I am certain, with a final point, picking up on a

3    theme that our good friend on the other side made about the

4    word scheme, we are going to be litigating that point, but we

5    really are confident, your Honor, when the law and precedent is

6    put before the Court, you will see that the bedrock principle

7    remains.  This isn't going to be surprising linguistically.  To

8    have an investment contract, you've got to have a contract of

9    some sort, and that is what the law will show when we are able

10   to present it to your Honor.

11         Happy, of course, to take any further questions that

12   your Honor might have.

13         THE COURT:  At the very end of my discussions with Mr.

14   Mancuso we spoke about the motion to strike, and I have done my

15   diplomatic best to express some concerns about it.  Perhaps you

16   want to remain silent, thinking that it can only hurt the

17   matter, but if you want to speak on the motion to strike issue,

18   I will hear from you.

19         MR. SAVITT:  Thank you, your Honor.

20         Our inclination on that is to try and work with

21   plaintiff here to see if we can come to an agreement regarding

22   whether the motion ought to go forward and, if it ought to go

23   forward, how it should be presented.

24         We don't take any position whether the motion should

25   happen.  We agree with the Court that it is highly unlikely to

1    be granted and is probably not incremental to all the stuff

2    that we have to get done over the next bit of time.

3              THE COURT:  Thank you.

4              I should end, and I perhaps should have began this

5    way, by thanking those of you who have spoken to me this

6    morning for the preparation that you have undertaken.  It's not

7    always the case that I have oral argument, and it's certainly

8    not always the case that I have it at the beginning of motion

9    practice.  But you were all very well prepared, and I'm

10   grateful for that because it allows me to situate myself better

11   for any proceedings in this case going forward.

12             Also, I have a sense that somewhere in the audience

13   are associates or more junior folks who have given their lives

14   for the papers that I have received, and know that your work

15   was very much appreciated.  Thank you very much, even those who

16   of you who did not speak.

17             I am asking the parties to get together and meet and

18   confer about a schedule, about what motions we are having, what

19   time schedule we are having them on, and what reasonable,

20   reasonable page limits are necessary to adequately express

21   these motions.  I appreciate it.  Mr. Savitt's comment about my

22   three-page letters, it's just because if I don't have those

23   limits, I get ridiculous submissions.  Please try so hard not

24   to ask me for 50-page briefs.  Also please don't put everything

25   in footnotes.

```
 1              Unless there is anything else that anyone wants me to
 2    know, I'll let you go to have that meet and confer and to go
 3    forward with this case with my thanks.
 4              Sir.
 5              MR. MARGIDA:  I have to say, I disagree with most of
 6    what Mr. Savitt and Mr. Peikin said, but I know --
 7              THE COURT:  I am not shocked.
 8              MR. MARGIDA:  I just want to put that out there.  We
 9    have --
10              THE COURT:  Government disagrees.  SEC disagrees.
11    Understood.  I'm writing it down.
12              MR. MARGIDA:  Thank you, your Honor.
13              MR. MANCUSO:  Your Honor, when would you like to hear
14    from us about the briefing schedule?
15              THE COURT:  One week, please.
16              MR. MANCUSO:  Can do.
17              THE COURT:  Thank you, all.  Take care, everyone.
18              We are adjourned.
19              (Adjourned)
20
21
22
23
24
25
```