# EXHIBIT A

Office - Supreme Court. U. S.

APR 17 1946

CHARLES ELMORE TRIMPLEY
CLERK

No. 843

# In the Supreme Court of the United States

## OCTOBER TERM, 1945

SECURITIES AND EXCHANGE COMMISSION,
PETITIONER

*v.*

W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS
SERVICE, INC.

*ON WRIT OF CERTIORARI TO THE UNITED STATES CIRCUIT
COURT OF APPEALS FOR THE FIFTH CIRCUIT*

**BRIEF FOR THE SECURITIES AND EXCHANGE
COMMISSION**

# INDEX

|  | Page |
|---|---|
| Opinions below | 1 |
| Jurisdiction | 1 |
| Question presented | 2 |
| Statute involved | 2 |
| Statement | 4 |
| Specification of errors to be urged | 9 |
| Summary of argument | 10 |
| Argument | 12 |
| I. Respondents' simultaneous offers to sell units of land and service contracts constitute offers to sell "investment contracts" | 17 |
| II. The ruling of the court below, introducing new tests which are unwarranted by the statute and administratively impractical, misconceives the regulatory pattern of the Act and promises to impair effective enforcement | 30 |
| Conclusion | 41 |

## CITATIONS

Cases:

*Ascher, et al.* v. *United States*, 143 F. 2d 592 _____ 20, 29, 31

*Atherton* v. *United States*, 128 F. 2d 463 _____ 18

*Boutell* v. *Walling*, No. 73, this Term _____ 37

*Hollywood State Bank* v. *Wilde*, 160 P. 2d 846 _____ 31

*Moore* v. *Stella*, 52 Cal. App. 2d 766 _____ 19, 25

*atural* *National Resources Corporation, In re*, 8 S. E. C. 635 _____ 20

*Penfield Co. of Cal.* v. *S. E. C.*, 143 F. 2d 746, certiorari denied, 323 U. S. 768 _____ 18, 20

*People* v. *Sidwell*, 151 P. 2d 145, affirmed, 162 P. 2d 913 _____ 19

*Roland Electrical Company* v. *Walling*, No. 45, this Term _____ 37

*S. E. C.* v. *Associated Gas and Electric Company*, 99 F. 2d 795 _____ 37

*S. E. C.* v. *Bailey*, 41 F. Supp. 647 _____ 19, 26, 29, 31, 32, 33

*S. E. C.* v. *Bourbon Sales Corp.*, 47 F. Supp. 70 _____ 19, 20, 31, 32

*S. E. C.* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344 _____ 9, 10, 19, 21, 28, 29, 30, 31

*S. E. C.* v. *Crude Oil Corp.*, 93 F. 2d 844 _____ 17

*S. E. C.* v. *Cultivated Oyster Farms Corp.*, unreported, 1 S. E. C. Jud. Dec. 672 (S. D. Fla. 1939) _____ 20

*S. E. C.* v. *Payne*, 35 F. Supp. 873 _____ 19, 29, 31, 32

*S. E. C.* v. *Pyne*, 33 F. Supp. 988 _____ 20

*S. E. C.* v. *Pyne*, 39 F. Supp. 434 _____ 20

II

Cases—Continued.                                                   Page

   *S. E. C.* v. *Universal Service Association*, 106 F. 2d 232,
     certiorari denied, 308 U. S. 622_____    18
   *Skidmore* v. *Swift & Co.*, 323 U. S. 134_____    37
   *State* v. *Gopher Tire & Rubber Co.*, 146 Minn. 52_____    19
   *State* v. *Robbins*, 185 Minn. 202_____    20
   *State* v. *Whitcaker*, 118 Ore. 656_____    37
   *United States* v. *Backmeier* (S. D. Ohio, Oct. Term 1941),
     affirmed *sub. nom. Ascher, et al.* v. *United States*, 143 F.
     2d 592_____ 20, 29, 31
   *United States* v. *Brough, et al.*, unreported (W. D. Okla.,
     No. 13707, 1941)_____ 20, 29, 31
   *United States* v. *Carter & Co.*, 56 F. Supp. 311_____ 20, 31
   *United States* v. *Earnhardt*, decided Feb. 19, 1946, C. C.
     A. 7_____    29

Statutes:
  Securities Act of 1933, 15 U. S. C. 77a, *et seq.*:         9,
     Sec. 2 (1)_____ 2, 10, 12, 17
     Sec. 2 (3)_____    27
        3 (a) (9)_____    14
        3 (a) (10)_____    14
        3 (b) _____ 3, 14, 15
        4_____     4
        4 (1)_____ 4, 14, 24, 36
        5 (a)_____ 3, 4, 13, 14, 27
        17 (a)_____    13
        17 (c)_____    15
        20_____    14
        20 (b)_____     4
        23_____    13
  Ala. Code (1940) tit. 53, § 1_____    17
  1 Ark. Dig. Stat. (Pope, 1937) § 861_____    17
  2 Cal. Gen. Laws (Deering, 1944) Act 3814, § 2_____    17
  4 Colo. Stat. Ann. (Michie, 1935) c. 148, §§ 2 and 10_____    17
  Conn. Gen. Stat. (Supp. 1935) c. 212, §§ 1532c and 1548c_    17
  16 Fla. Stat. Ann. (Supp. 1945) § 517.02_____    17
  2 Ill. Stat. Ann. (Jones, Supp. 1945) § 13.02_____    17
  6 Ind. Stat. Ann. (Burns, Supp. 1945) § 25–831_____    17
  Iowa Code (1939) § 8581.03_____    17
  Kan. Gen. Stat. Ann. (Corrick, Supp. 1943) § 17–1223____    17
  Ky. Rev. Stat. (Baldwin, 1943) § 292.010_____    17
  1 La. Gen. Stat. (Dart, Supp. 1944) § 1179.1_____    17
  3 Mass. Ann. Laws (Lawyers Co-op., Supp. 1944) c. 110A,
    § 2_____    17
  14 Mich. Stat. Ann. (Reis, Supp. 1945) § 19.742_____    17
  4 Minn. Stat. (Mason, 1944) c. 21B § 3396-1_____    17
  4 Miss. Code Ann. (1942) § 5361_____    17
  18 Mo. Rev. Stat. Ann. (1939) § 8258_____    17

Statutes—Continued.                                             Page
    2 Mont. Rev. Codes Ann. (Anderson & McFarland, 1935)         17
      § 4027_____
    2 Rev. Laws, (N. H.) (1942), c. 336, § 2_____   17
    2 Gen. Stat. of N. C. (1943) § 78-2_____   17
    6 Ohio Gen. Code Ann. (Page, Supp. 1945) § 8624-2_____     17
    Okla. Stat. Ann. (1941) tit. 71 § 1_____   17
    5 Ore. Comp. Laws Ann. (Bancroft-Whitney, Supp. 1943),
      § 80-102_____       17
    Pa. Stat. Ann. (Purdon, Supp. 1944) tit. 70 § 32_____     17
    4 S. C. Civ. Code (1942) § 8114_____     17
    3 S. D. Code (1939) § 55.1902_____     17
    2 Tex. Rev. Civ. Stat. Ann. (Vernon, 1925) art. 600a, § 2(a)_   18
    5 Utah Code Ann. (1943) § 82-1-4_____     18
    W. Va. Code Ann. (1943) § 3273 (2)_____     18
    Wis. Stat. (1941) § 189.02_____   18
Miscellaneous:
    H. Rep. No. 85, 73d Cong., 1st Sess., p. 11_____   17
    Rules and Regulations under the Securities Act of 1933:
      Regulation A (Rules 220 to 224), 1 C. C. H. Fed. Sec.
        Law Service, pars. 4220 to 4224_____     8, 16
      Regulation A-M (Rule 240), 1 C. C. H. Fed. Sec. Law
        Service, par. 4240_____       16
      Regulation B (Rules 300-356), 17 C. F. R. 230:300 to
        230:356_____        16

# In the Supreme Court of the United States

OCTOBER TERM, 1945

---

No. 843

SECURITIES AND EXCHANGE COMMISSION,
PETITIONER

*v.*

W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS
SERVICE, INC.

---

*ON WRIT OF CERTIORARI TO THE UNITED STATES CIRCUIT
COURT OF APPEALS FOR THE FIFTH CIRCUIT*

---

### BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION

---

#### OPINIONS BELOW

The opinion of the circuit court of appeals (R. 123–127) is reported in 151 F. 2d 714. The opinion of the district court (R. 103–107) is reported in 60 F. Supp. 440.

#### JURISDICTION

The judgment of the circuit court of appeals was entered on November 13, 1945 (R. 128). The petition for a writ of certiorari was filed on February 12, 1946, and was granted on March 25,

(1)

2

1946 (R. 129). The jurisdiction of this Court
rests on Section 240 (a) of the Judicial Code, as
amended by the Act of February 13, 1925, which
is made applicable by Section 22 (a) of the Se-
curities Act of 1933, 15 U. S. C. 77v (a).

### QUESTION PRESENTED

Whether, under the undisputed facts, respond-
ents are offering an "investment contract," as the
term is included in the definition of a "security"
in Section 2 (1) of the Securities Act of 1933,
when the offering consists of units of a citrus
grove development coupled with a contract for
cultivating, marketing and remitting the net pro-
ceeds to the investor.

### STATUTE INVOLVED

Section 2 (1) of the Securities Act of 1933, as
amended, 15 U. S. C. 77b (1), provides as follows:

> The term "security" means any note,
> stock, treasury stock, bond, debenture, evi-
> dence of indebtedness, certificate of interest
> or participation in any profit-sharing agree-
> ment, collateral-trust certificate, preorgani-
> zation certificate or subscription, transfer-
> able share, *investment contract,* voting-trust
> certificate, certificate of deposit for a secu-
> rity, fractional undivided interest in oil, gas,
> or other mineral rights, or, in general, any
> interest or instrument commonly known as
> a "security," or any certificate of interest
> or participation in, temporary or interim
> certificate for, receipt for, guarantee of, or

warrant or right to subscribe to or purchase, any of the foregoing. [Italics supplied.]

The other pertinent provisions of the Act are as follows:

SEC. 5 (a) (15 U. S. C. 77e (a)). Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

SEC. 3 (b) (15 U. S. C. 77c (b), as amended by the Act of May 15, 1945, P. L. 55, 79th Cong., 1st sess., 59 Stat. 167). The Commission may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this title with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this sub-

4

section where the aggregate amount at which such issue is offered to the public exceeds $300,000.

Sec. 4 (15 U. S. C. 77d). The provisions of section 5 shall not apply to any of the following transactions:

(1) * * * transactions by an issuer not involving any public offering; * * *.

### STATEMENT

This action was instituted by the Commission to enjoin W. J. Howey Company and Howey-in-the-Hills Service, Inc., from using the mails or instruments of transportation and communication in interstate commerce in the offer and sale of unregistered and nonexempted securities in violation of Section 5 (a) of the Securities Act of 1933 (15 U. S. C. 77e (a)) (R. 1-3).[1] The facts are not in dispute and may be summarized as follows:

Respondents, W. J. Howey Company (hereinafter called the "Howey Company") and Howey-in-the-Hills Service, Inc. (hereinafter called the "Service Company"), are Florida corporations under direct common control. They share the same offices, utilize the same facilities and personnel, and have the same officers and directors, and substantially the same stockholders (R. 5-6, 94-95). The Howey Company is the owner of large tracts of citrus acreage in Lake County,

---

[1] The Commission brought action for an injunction pursuant to Section 20 (b) of the Act, 15 U. S. C. 77t (b).

5

Florida (R. 7, 95). During the period in question, it planted approximately 500 acres per year, offering half for sale to public investors to help "finance additional development" (R. 21). It also owned and operated a tourist hotel at Howey-in-the-Hills, viz, the Floridan Country Club, the original purpose of which was "to house prospects for the purchase of land" (R. 8–9, 64, 96).[2] The hotel's advertising circulars drew attention to the fine citrus groves in its vicinity, and, during the course of their stay, patrons who came from all sections of the United States and Canada were given direct sales talks on investing in citrus groves which the Howey Company was offering for sale (R. 8–9, 20–30, 96–97). The Service Company is engaged in cultivating and developing citrus groves (R. 7, 95).

Respondents explained to prospective customers that purchasers need not care for the groves; that the Service Company will undertake their development, and will harvest and market the crop; that it is not feasible to invest in a grove unless such service arrangements are made; and that while other service companies are available in the locality, the superiority of Howey's Service

---

[2] Mr. Taylor, vice president of respondents, testified (R. 64): "Mr. Howey's original idea of it was to use it to house prospects for the purchase of land. Since 1940 we have operated it only as a tourist hotel. We have done general tourist advertising and attracted the general public, which was a departure from the plan under which Mr. Howey operated."

689762—46——2

6

Company renders desirable the full contractual arrangement which respondents offer (R. 9–10, 28, 97). They represented that profits for the 1943–44 season averaged 20% and might be higher for the 1944–45 season, and that purchasers could expect 10% per year on bearing groves for the next ten years (R. 27, 96). Investors were predominantly non-residents who possessed neither the knowledge, skill, nor equipment necessary for the care and cultivation of citrus trees. They were professional and business people, and the like, residents of twenty-three States and of Canada (R. 97).

The standard land sales contract, in effect since 1935, provides for a uniform purchase price per acre or fraction thereof (payable in installments), varying in amount only with respect to the number of years the particular plot has been planted with citrus trees (R. 7, 11–15, 99). Land sales of the Howey Company during the three-year period ending May 31, 1943, amounted to $165,788.00 (R. 34). During the period February 1, 1941, to May 31, 1943, forty-two persons purchased tracts and thirty-one took units of less than five acres. The average purchase by this latter group was only 1.33 acres, and sales of as little as 0.65, 0.7, and 0.73 of an acre were made (R. 31–34, 97). Purchases are in narrow strips which may comprise only a single row of trees (R. 46, 99). The various tracts are not separately fenced and, except for small land marks intelligible only

through a plat book record, there is no appearance of multitudinous ownership (R. 46–47, 99).

While the Howey Company, in selling citrus acreage, did not insist upon the acceptance of a service contract with the Service Company, its sales promotion methods were such that 85% of the acreage sold during the three-year period ending May 31, 1943, was covered by an accompanying agreement with the Service Company (R. 10, 71, 97).

The standard service contract, also in effect since 1935, accords the Service Company "full and complete possession" of the land (R. 16). The equipment maintained by the Service Company to care for this large development is substantial, and includes seventy-five tractors, sprayer wagons, fertilizer trucks, and other machinery. For a specified fee plus cost of labor and materials, the Service Company cultivates and maintains each grove, gathers and markets the crop, and remits the net proceeds to the investor. Moreover, its control over cultivation, harvesting, and marketing is absolute and complete since the contract vests it with full discretionary powers, limited only by the exercise of its "best judgment." (R. 7, 15–20, 45, 101.) The investor has no right of entry to market the produce of his acreage unless consented to by the Service Company (R. 18). In most cases, this agreement was for a period of ten years without option of cancellation (R. 31–34). Under the

8

contract, the investor's only right is to receive the net proceeds from respondents' operations. Determination of the investor's interest is based upon a check made at the time of picking of the produce from each individual tract. After picking, the produce from the various tracts is pooled.[3] While the Howey Company holds itself out to prospective investors as merely the seller of the land, and while the service contract vests the Service Company alone with authority to market the crop, the record indicates that at least some of the produce is actually marketed by the Howey Company (R. 47–48, 117–119).

The mails and instruments of transportation and communication in interstate commerce were used in the sale, in combination, of the land and service contracts; but, at no time, has a registration statement under the Securities Act of 1933 been in effect with the Securities and Exchange Commission with respect to these offerings (R. 11, 102). Nor does it appear that respondents have filed the letter of notification required by the Commission's regulation regarding exemption of limited offerings pursuant to Section 3 (b) of the Act.[4]

---

[3] Under the absolute discretion conferred by the contract, produce may be sold on the tree to an independent picker or harvested and marketed directly. Respondents have their own packing plant and cannery for the latter purposes (R. 45).

[4] Regulation A of the General Rules and Regulations under the Securities Act of 1933, adopted pursuant to Section 3 (b) of the Act, 1 Fed. Sec. Law Serv., pars. 4220 to 4224. See *infra*, pp. 15–16.

The district court denied the injunction on the ground that the transactions involved did not constitute sales of a "security" within the meaning of Section 2 (1) of the Act (R. 102). In affirming, the circuit court of appeals refused to apply the Commission's proffered definition of an "investment contract," which had theretofore been the established judicial definition, as including any contractual arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters. Instead, the court below emphasized the fact that the activity or pursuit here had passed out of what it regarded as the "promotional" or experimental stage, and that the land sold had "specific value" independent of the success of the enterprise as a whole, and concluded that these circumstances, assumed not to have been present in *S. E. C. v. C. M. Joiner Leasing Corp.*, 320 U. S. 344, and other authorities relied on by the Commission, resulted in an insufficient *"nexus between the sale and the enterprise"* to make the purchase "not of a specific thing but of an interest in the enterprise." (R. 126–127.)

### SPECIFICATION OF ERRORS TO BE URGED

The court below erred:

1. In holding that the offers to sell the land and service contracts here involved did not constitute offers to sell a "security" in the nature of an

"investment contract" within the meaning of Section 2 (1) of the Securities Act of 1933.

2. In affirming the judgment of the district court.

### SUMMARY OF ARGUMENT

#### I

The inclusion of the term "investment contract," in the definition of a "security" in Section 2 (1) of the Securities Act, was not an innovation. Congress merely followed the pattern of many state "blue sky" laws which had been construed broadly by the state courts to prevent evasion of the statutory purposes. Properly assuming that Congress intended the term "investment contract" in the federal act to be similarly construed, the lower federal courts, expressly, and this Court, implicitly, in *S. E. C.* v. *C. M. Joiner Leasing Corp.,* 320 U. S. 344, have defined an investment contract to include any transaction in which the investor looks solely to the efforts of the promoter of the enterprise for the success of his investment, and many of the cases are scarcely distinguishable from that at bar.

Applying the statutory language, so construed, to the facts of this case, it is clear that respondents, concurrently offering to sell land and service contracts, have been offering to sell "investment contracts." The offer made by respondents to prospective purchasers was an offer of an interest, which, though taking the form of

legal title to small units of substantially identical acreage, in fact constituted an investment in a large business enterprise in which the promoters provided all the necessary labor, equipment, and management, and the purchaser only the capital.

## II

The court below substituted for the test heretofore consistently accepted, an approach based upon many factors which have no relevance under the statute and which are vague and indefinite in character. Under the decision of the court below, whether an offer constitutes an offer to sell an "investment contract" may turn largely on whether the particular enterprise involved is speculative or non-speculative. But it is quite clear that Congress intended to afford safeguards to investors in business enterprises, whether established or promotional, and that the character of a security in that respect was not meant to be a criterion of coverage. The Act is designed to insure an adequate disclosure of information as to all securities so that the investor may determine for himself whether and to what extent a security is speculative.

The court below misconceived the regulatory pattern of the Act. In particular, it gave no consideration to the fact that the registration provisions of the statute, with their detailed requirements for full disclosure of the pertinent investment facts, do not apply to every security

transaction which involves the use of the mails or instrumentalities of interstate commerce; and that exemptions, both unconditional and subject to administrative discretion, delimit the reach of the Act in accordance with the underlying legislative policy. This failure to comprehend the regulatory scheme of the Securities Act and the consequent erroneous conclusion as to the practical effect of granting the relief sought by the Commission apparently led the court to reject the generally accepted test as to what is an investment contract.

The ruling of the court below has also the unfortunate effect of introducing administratively unworkable criteria for which no warrant is found in the statute. While there is no evidence of fraud in this case, the decision below is objectionable for the further reason that it may well serve to abrogate the fraud sanctions of the Act in otherwise identical transactions.

### ARGUMENT

The term "security" is broadly defined by Section 2 (1) of the Act and goes far beyond such orthodox forms as stocks, bonds, debentures, or notes. In including "investment contracts" and like terms Congress intended to reach any arrangement involving, in substance, a security transaction, no matter what the form of the transaction. And in resolving the basic issue as to the proper interpretation of the phrase "in-

13

vestment contract," it is important to keep in mind the entire regulatory pattern of the Act. The Act is designed to protect the investing public. It is primarily a disclosure statute in that it requires the seller to disclose the material facts bearing on the value of securities offered through the mails or in interstate commerce.

In respondents' brief in opposition to the petition for certiorari it was urged (p. 3) that the issue in this case is whether the agreed facts "bring the business of the companies within the control of the Securities and Exchange Commission." This statement reflects a gross misconception of the statute involved. Indeed, the fact that the Commission does not regulate the business of the issuer of securities or pass on the merits of security offerings is emphasized by Section 23 of the Act, 15 U. S. C. 77w, which makes it unlawful to represent, in respect of a security registered under the Act, that the Commission has "passed upon the merits of, or given approval to, such security." Dissemination of pertinent investment information is ordinarily achieved through a "registration statement" filed with the Commission, and a "prospectus" summarizing the information contained in the registration statement. Section 5 (a) of the Act prohibits the sale of unregistered securities; and Section 17 (a), 15 U. S. C. 77q (a), makes unlawful any fraud in the sale of securities. Under

Section 20, 15 U. S. C. 77t, the Commission is authorized to bring proceedings to enjoin violations and to refer wilful violations to the Department of Justice for prosecution.

Not every transaction involving a "security" is subject to the registration provisions of the Act, however. Exemptions, both unconditional and subject to administrative discretion, provided by sections other than 2 (1), are designed to limit the application of the registration provisions in accordance with the underlying legislative policy. Thus, apart from the limitation of the entire statute to transactions related to the use of the mails or instrumentalities of interstate commerce, there is an unconditional exemption from registration in the case of transactions which do not involve a "public offering" of substantially identical units. Section 4 (1), 15 U. S. C. 77d (1). Exemptions are also available for transactions which Congress deemed by their nature to give adequate protection to investors. See, e. g., Section 3 (a) (9)[5] and 3 (a) (10,[6] 15 U. S. C. 77c (a) (9) and 77c (a) (10). In addition, Section 3 (b), 15 U. S. C. 77c (b), as amended by the Act of May 15, 1945, P. L. 55, 79th Cong., 1st sess., 59 Stat. 167, authorizes the Commis-

---

[5] Securities "exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange."

[6] Relating generally to securities issued in reorganizations approved by courts or governmental authorities.

15

sion to exempt any public offering of securities under $300,000 "if it finds that the enforcement of this title with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering."[7] Such exemptions are only from the registration provisions of the Act, and do not exclude the civil and criminal sanctions applicable to fraudulent transactions in securities. See Section 17 (c), 15 U.S.C. 77q (c).

Pursuant to its discretionary powers, under Section 3 (b), the Commission has adopted rules exempting from the registration provisions of the Act any public offering of securities, the aggregate amount of which does not exceed $300,000, in any twelve months' period, conditioned only upon the filing with the appropriate local office of the Commission of a simple letter of notification and copies of any sales literature. That letter need contain only the briefest description of the offering. Exemptions are denied to persons who have been convicted of or enjoined for securities frauds. In general, the regulations, without being burdensome to the issuer, serve to put the Commission on notice of possibly fraudulent transactions. See Regulation A (Rules 220 to 224) of the Rules

---

[7] At the time of the transactions in question, Section 3 (b) was limited to offerings not in excess of $100,000 (15 U. S. C. 77c (b)) ; in 1945, this figure was increased to $300,000. Act of May 15, 1945, P. L. 55, 79th Cong., 1st sess., 59 Stat. 167.

16

and Regulations under the Securities Act of 1933, 1 C. C. H. Fed. Sec. Law Service, pars. 4220 to 4224.

The exemptions so afforded are more circumscribed as applied to types of offerings which present unusual opportunities for fraud or chicanery, such as oil promotions or assessable stocks. Here, exemptions are denied completely or are granted upon conditions of such fuller disclosure as may be deemed adequate in the particular case: see Regulation A-M (Rule 240), and Regulation B (Rules 300–356) of the General Rules and Regulations under the Securities Act of 1933, 1 C. C. H. Fed. Sec. Law Serv., par. 4240, and 17 C. F. R. 230: 300 to 230: 356. Thus Regulation B, applicable to oil and gas securities, not only requires disclosure that cash distributions are in part a return of capital, but also provides machinery for suspension of the effectiveness of the exemption when there appear to be false or misleading statements in the sales literature.

As indicated below, we believe it apparent from the scheme of the Act as a whole that Congress relied primarily upon the exemption provisions, and the exercise of administrative discretion thereunder, to avoid impractical application of the full regulatory provisions to situations in which the burdens upon the promoter might be thought to be disproportionate to the need for protection of investors. On the other hand, the basic purpose of curbing fraud can be achieved only by giving full scope to the definition of

"security" including the term "investment con-
tract."

## I

### RESPONDENTS' SIMULTANEOUS OFFERS TO SELL UNITS OF LAND AND SERVICE CONTRACTS CONSTITUTE OFFERS TO SELL "INVESTMENT CONTRACTS"

The broad definition of "security" as including
an "investment contract" is not an innovation
introduced by the federal statute. In Section
2 (1) of the Act, Congress merely followed the
pattern of many state "blue sky" laws which
give the term wide scope to prevent evasion of
the statutory purposes.[8] The term "investment
contract" appears in at least thirty state statutes,[9]

---

[8] See H. Rep. No. 85, 73d Cong., 1st Sess., p. 11; *S. E. C. v. Crude Oil Corp. of America*, 93 F. 2d 844, 847 (C. C. A. 7).

[9] Ala. Code (1940) tit. 53, § 1; 1 Ark. Dig. Stat. (Pope, 1937) § 861; 2 Cal. Gen. Laws (Deering, 1944) Act 3814, § 2; 4 Colo. Stat. Ann. (Michie, 1935) c. 148, §§ 2 and 19; Conn. Gen. Stat. (Supp. 1935) c. 212, §§ 1532c and 1548c; 16 Fla. Stat. Ann. (Supp. 1945) § 517.02; 2 Ill. Stat. Ann. (Jones, Supp. 1945) § 13.02; 6 Ind. Stat. Ann. (Burns, Supp. 1945) § 25–831; Iowa Code (1939) § 8581.03; Kan. Gen. Stat. Ann. (Corrick, Supp. 1943) § 17–1223; Ky. Rev. Stat. (Baldwin, 1943) § 292.010; 1 La. Gen. Stat. (Dart, Supp. 1944) § 1179.1; 3 Mass. Ann. Laws (Lawyers Coop., Supp. 1944) c. 110A, § 2; 14 Mich. Stat. Ann. (Reis, Supp. 1945) § 19.742; 4 Minn. Stat. (Mason, Supp. 1944) c. 21B, § 3996–1; 4 Miss. Code Ann. (1942) § 5361; 18 Mo. Rev. Stat. Ann. (1939) § 8258; 2 Mont. Rev. Codes Ann. (Anderson & McFarland, 1935) § 4027; 2 N. H. Rev. Laws (1942), c. 336, §2; 2 Gen. Stat. of N. C. (1943) § 78–2; 6 Ohio Gen. Code Ann. (Page, Supp. 1945) § 8624–2; Okla. Stat. Ann. (1941) tit. 71, § 1; 5 Ore. Comp. Laws Ann. (Bancroft-Whitney, Supp. 1943) § 80–102; Pa. Stat. Ann. (Purdon, Supp. 1944) tit. 70, § 32; 4 S. C. Civ. Code (1942) § 8114; 3 S. D. Code (1939) § 55.1902; 2 Tex. Rev. Civ. Stat.

in addition to the federal Act, and has been recognized by the courts as affording the investing public a full measure of protection, whether the transaction takes one of the more orthodox forms of a security or whether the promoter clothes the transaction with the appearance of a sale of some species of real or personal property.

The term "investment contract" is not defined by state or federal statutes; but, in adopting the definition of a security from the "blue sky" laws, Congress must be deemed to have intended also to adopt that construction of the term which was uniformly followed by the state courts. Following such construction, the federal courts have defined the phrase "investment contract", in Section 2 (1) of the Act, to include any transaction in which the investor looks solely to the efforts of the promoter of the enterprise for the success of his investment. See, *e. g., Atherton* v. *United States,* 128 F. 2d 463, 465 (C. C. A. 9); *Penfield Company of California* v. *S. E. C.,* 143 F. 2d 746, 750–751 (C. C. A. 9), certiorari denied, 323 U. S. 768; *S. E. C.* v. *Universal Service Association,* 106 F. 2d 232, 237 (C. C. A. 7), certiorari denied, 308 U. S. 622.   The federal district and state court decisions in which this definition has been the

Ann. (Vernon, 1925) art. 600a, § 2 (a); 5 Utah Code Ann. (1943) § 82–1–4; W. Va. Code Ann. (1943) § 3273 (2); Wis. Stat. (1941) § 189.02.   These statutes are collected in 132 CCH Stocks and Bonds Law Service.

guiding standard are numerous.[16]  In distinguishing between the ordinary sale of real or personal property, and an arrangement falling within the judicial definition of an investment contract, the courts customarily have looked through form to the substance of the transaction.  Instances are referred to in this Court's opinion in *S. E. C.* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 352, note 10, as follows:

> One's cemetery lot is not ordinarily thought of as an investment and is most certainly real estate.  But when such interests become the subjects of speculation in connection with the cemetery enterprise, courts have held conveyances of these lots to be securities.  *Matter of Waldstein*, 160 Misc. 763, 291 N. Y. S. 697; *Holloway* v. *Thompson*, 42 N. E. 2d 421 (Ind. App.).  For other instances where purported sales of property have been held "investment contracts" see *S. E. C.* v. *Crude Oil Corp.*, 93 F. 2d 844 (interest in oil royalties sold as bill of sale for specified number of barrels of oil); *S. E. C.* v. *Tung Corporation*, 32 F. Supp. 371; *S. E. C.* v. *Bailey*, 41 F. Supp. 647 (land bearing tung trees, to be developed by seller); *S. E. C.* v. *Payne*, 35

---

[10] See, *e. g., S. E. C.* v. *Bailey*, 41 F. Supp. 647, 650 (S. D. Fla.); *S. E. C.* v. *Bourbon Sales Corp.*, 47 F. Supp. 70, 72–73 (W. D. Ky.); *S. E. C.* v. *Payne*, 35 F. Supp. 873, 878 (S. D. N. Y.); *State* v. *Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N. W. 937, 938; *Moore* v. *Stella*, 52 Cal. App. 2d 766, 778, 127 P. 2d 300, 306; *People* v. *Sidwell*, 151 P. 2d 145, 148–149 (Cal. App.), affirmed, 162 P. 2d 913 (Cal.).

F. Supp. 873 (silver foxes); *Prohaska* v. *Hemmer-Miller Development Co.*, 256 Ill. App. 331 (farm land, to be paid for with proceeds of crops raised by vendor); *Kerst* v. *Nelson*, 171 Minn. 191, 213 N. W. 904 (land to be cultivated as a vineyard by a third party); *Stevens* v. *Liberty Packing Corp.*, 111 N. J. Eq. 61, 161 A. 193 (rabbits).

Other instances have included securities disguised as sales of pecan orchards,[11] popcorn vending machines,[12] muskrats,[13] oyster bottom acreage,[14] shares in fishing boats,[15] and whiskey bottling and sales contracts.[16] The Commission's administrative interpretation of the term has been equally broad. It is set forth in one published opinion, *In re Natural Resources Corporation*, 8 S. E. C. 635, 637,[17] and has developed principally in in-

---

[11] *United States* v. *Brough, et al.*, unreported (W. D. Okla., No. 13707, 1941).

[12] *United States* v. *Backmeier* (S. D. Ohio, Oct. Term 1941), affirmed *sub nom. Ascher, et al.* v. *United States*, 143 F. 2d 592 (C. C. A. 6).

[13] *State* v. *Robbins*, 185 Minn. 202, 240 N. W. 456.

[14] *S. E. C.* v. *Cultivated Oyster Farms Corp.*, unreported, 1 S. E. C. Jud. Dec. 672 (S. D. Fla. 1939).

[15] *S. E. C.* v. *Pyne*, 33 F. Supp. 988 (D. Mass.); *S. E. C.* v. *Pyne*, 39 F. Supp. 434 (D. Mass.).

[16] *S. E. C.* v. *Bourbon Sales Corp.*, 47 F. Supp. 70 (W. D. Ky.); *Penfield Co. of Cal.* v. *S. E. C.*, 143 F. 2d 746 (C. C. A. 9), certiorari denied, 323 U. S. 768; and *United States* v. *Carter & Co.*, 56 F. Supp. 311 (W. D. Ky.).

[17] In this opinion, the Commission thus expressed its understanding of the common thread underlying the various cases

formal conferences and in the position which the
Commission has taken in litigation.

A similar construction of the term "investment
contract" is implicit in the holding of this Court
in the *Joiner* case, *supra,* which we believe should
be dispositive of the instant controversy. That
case involved purported sales to widely scattered
purchasers in eighteen States of leaseholds in
specific portions of a tract of potential oil and gas
producing land under representations in the sell-
ing literature that these investors would profit
through an exploration well to be drilled by the
promoter which would prove the productivity of
the land. In holding that the defendants were
engaged in the sale of "investment contracts,"
this Court stated (320 U. S. at 348–349, 352–353):

> Undisputed facts seem to us, however, to
> establish the conclusion that defendants
> were not, as a practical matter, offering
> naked leasehold rights. Had the offer
> mailed by defendants omitted the economic
> inducements of the proposed and promised
> exploration well, it would have been a quite
> different proposition. Purchasers then

---

which have turned on the definition of an "investment
contract":

"Thus, transactions which, in form, appear to involve
nothing more than the sale of real estate, chattels, or services,
have been held to be investment contracts where, in sub-
stance, they involve the laying out of money by the investor
on the assumption and expectation that the investment will
return a profit without any active effort on his part, but
rather as the result of the efforts of someone else."

22

would have been left to their own devices
for realizing upon their rights. They
would have anticipated waiting an indefi-
nite time, paying delayed drilling rental
meanwhile until some chance exploration
proved or disproved the productivity of
their acres. Their alternative would have
have been to test their own leases at a cost
of $5,000 or more per well.

But defendants offered no such dismal
prospect.   *   *   *

\*        \*        \*        \*        \*

It is clear that an economic interest in
this well-drilling undertaking was what
brought into being the instruments that de-
fendants were selling and gave to the in-
struments most of their value and all of
their lure. The trading in these documents
had all the evils inherent in the securities
transactions which it was the aim of the
Securities Act to end.

\*        \*        \*        \*        \*

Nor can we agree   *   *   *   that defend-
ants' offerings were beyond the scope of the
Act because they offered leases and assign-
ments which under Texas law conveyed inter-
ests in real estate. In applying acts of this
general purpose, the courts have not been
guided by the nature of the assets back of a
particular document or offering. The test
rather is what character the instrument is
given in commerce by the terms of the offer,
the plan of distribution, and the eco-
nomic inducements held out to the pros-
pect.   *   *   *

In the present case, also, the undisputed facts make it clear that investors were offered land in combination with service contracts, making the arrangement one wherein the investor laid out his money on the expectation of profits to be derived solely through the efforts of the promoters. In the light of all the relevant circumstances, it can hardly be said that these were ordinary land transactions—*i. e.,* that purchasers were buying citrus groves, *per se.* Rather, the arrangement contemplated was one whereby customers invested their money, converted into the form of an interest in land, in a large citrus enterprise managed and partly owned by respondents. The "economic inducements held out to the prospect" included the expectation of substantial profits from respondents' highly skilled managerial efforts; it was represented that profits of 20% in a particular year, and 10% over a ten-year period could be expected. Respondents' prospective customers—some 6,000 tourists and vacationists from all parts of the United States and Canada (R. 96, 97)—were not in any sense agriculturists interested in establishing their own citrus businesses. Rather, they were predominantly lawyers, doctors, manufacturers and the like—residents of distant localities—who could be persuaded to invest their money with respondents only under an arrangement such as that offered here.

This is not a case of a sale of an individual farm or orchard under an arrangement whereby the ven-

24

dor becomes the manager for the purchaser of the land [18] (Cf. R. 127). As a practical matter, the applicability of the Securities Act to such a transaction is a purely academic question in view of the statutory exemption for transactions in which there is no public offering. See Section 4 (1), 15 U. S. C. 77d (1). Moreover, what is offered and sold in the present case is really an interest in a large citrus-growing enterprise, an interest which takes the form of legal title to small units of substantially identical acreage employed therein with no right or practical possibility of individual management. During the period under investigation,

---

[18] The fact that some investors visited their particular plots annually, making suggestions as to their care and cultivation is certainly of little or no significance. The service contract gave respondents complete control of the acreage and it could hardly be expected that they would alter the operation of their business to satisfy particular investors. While such visits and suggestions were tolerated, investors certainly had no legal rights in the matter as long as the ten-year service contracts were in effect.

Likewise, the fact heretofore emphasized by respondents and by the District Judge (R. 106, 60 F. Supp. at 442), that investors actually inspected their particular plots before purchasing them, does not alter the essential character of the contracts entered into nor clothe the promoters with immunity from the application of the statute to the security transaction actually involved. Such inspections, of course, constituted good sales policy on respondents' part. The investor had very little to gain therefrom since the various units offered for sale were substantially identical. Moreover, the fact that he actually saw his acreage before sale is hardly an adequate substitute for the protection against false and misleading representations as to the profits which might be expected to flow from the proffered investments.

thirty-one of the forty-two purchasers acquired tracts of less than five acres and the average holding of these purchasers was only 1.33 acres; indeed sales of as little as 0.65, 0.7, and 0.73 of an acre were made. While it might theoretically be possible to cultivate so small a holding in some fashion, admittedly that is not economically feasible (R. 69).[19] Respondents, on the other hand, are well established in the citrus business and maintain a large force of skilled personnel and a great amount of equipment, including seventy-five tractors, sprayer wagons, fertilizer trucks, and other machinery. For the duration of the standard service contract—generally a ten-year period without option of cancellation—the acre or so to which a particular investor holds legal title is actually part of a much larger enterprise which is run entirely by the respondents. The various tracts are not separately fenced and the only indication of several ownership by the investors is found in small land marks intelligible only through a plat book record. Under the service contract, respondents acquire a leasehold interest giving them full and complete possession of the investor's acreage (R. 16–17). Moreover, the investor has no right to a specific crop, and may not market the produce

---

[19] *Cf. Moore* v. *Stella*, 52 Cal. App. 2d 766, 775, 127 P. 2d 300, 304, where the court stated: "Of course each owner of a drill site would have the right to drill a well on it or to lease it separately for the drilling of a well (assuming that he also held the necessary surface rights), *but the scheme of the promotion cannot be given a pattern drawn upon this fantastic possibility.*" [Italics supplied.]

from his own land unless the respondents consent.
Respondents are accountable only for an allocation
of the net profits which is based on a check made
at the time of picking. All produce is pooled by
respondents who do business in their own names.[20]
In brief, investors merely execute the requisite
documents and make the necessary money contri-
butions. The promoters provide all the labor,
equipment and management necessary for the suc-
cess of the over-all enterprise.[21]

---

[20] See, *c. g.*, the standard agreement for sale of fruit on
the tree executed by the Howey Company (R. 117–119).

[21] In *S. E. C.* v. *Bailey*, 41 F. Supp. 647, 650 (S. D. Fla.),
identical on its facts except that tung trees were there in-
volved, Judge Strum, of the same district court as that which
heard this case, aptly summarized the essence of the type of
security transaction involved when he stated:

"* * * The overwhelming percentage of purchasers are
persons wholly inexperienced in tung tree cultivation, who
live at a great distance from these lands, and who have no
intention of occupying the same or cultivating them by their
own efforts, but who are attracted thereto solely by the in-
come to be derived through cultivation of the lands by the
defendants.

"In essence, what the defendants are really offering, and
certainly what the average purchaser is really buying is, not
land for its intrinsic value, but a producing tung grove as a
source of income, without which he would not be interested
in purchasing the land. Purchase of the land is merely the
conduit by which the investment is accomplished. Instead
of a stock certificate evidencing a share in a common owner-
ship of capital assets, these purchasers receive a deed evi-
dencing an ownership in severalty. But the paramount
emphasis is always upon the income to accrue, which is the
chief, if not the sole, attraction to the purchaser. Separa-
bility of ownership does not deprive the transaction of its
character as an investment contract. In its ultimate anal-

The question is not at all affected by the fact that the purchaser of a unit of citrus acreage is not required to enter into a service contract with respondents, but may have his unit serviced by another company. All investors are offered land and service contracts in combination, and 85% of the acreage sold during the period involved was sold under this arrangement. Indeed, the emphasis in the sales literature upon expected profits of 20% in a particular year and 10% per year average profits, was based on the hypothesis of service by respondents (R. 96). The statute prohibits the *offer* as well as the sale of unregistered, non-exempt securities,[22] and the fact that some purchasers chose not to accept the full offer

ysis, the formal purchase is a profit-making venture with others, in which there is a complete separation of ownership and management, and in which the owner takes no part, other than investing in the land. Based upon the defendants' representations, the purchaser's expectation is that for a sum of money invested in a small tract of land which the purchaser places in the hands of the defendants for cultivation, along with many similar and contiguous tracts owned by others, he will ultimately receive an income from the yield produced by defendants' development activities. This is not an ordinary purchase of land, as such. It is an investment for the purpose of producing an income.

"Although the investors own a tangible property interest in severalty, the method of cultivation followed by the developers is such that each purchaser is in effect a unit holder in an extensive enterprise carried on by the defendants, in which the expected income, not the land itself, is the attraction * * *."

[22] The term "sell", found in Section 5 (a), is defined in the Act to include an "offer to dispose of * * * a security, for value." Section 2 (3), 15 U. S. C. 77b (3).

of an "investment contract" is hardly relevant to
the question whether unlawful offers are made.
Likewise, the possibility that the service contract
may not be renewed at the expiration of the ten-
year term, or may be cancelled by the parties, is
no more significant than the fact that any invest-
ment contract may be modified or terminated.

In one important respect, the circumstances
here presented are even more compelling in favor
of the conclusion urged by the Commission than
those in the *Joiner* case. In that case, this Court
did not deem it necessary to decide whether the
representations there involved, by themselves or
in combination with other circumstances, gave a
purchaser of a leasehold interest an implied con-
tractual right to insist upon the drilling of a
test well. (320 U. S. at 349.) Whether or not such
a legal right existed, the Court noted, "the accept-
ance of the offer quoted made a contract in
which payments were timed and contingent upon
the completion of the well and therefore a form
of investment contract in which the purchaser was
paying both for a lease and for a development
project" (320 U. S. at 349). Thus, this Court
held that even though a purchaser may have ac-
quired only an interest in the land without the
contract right to the drilling of a well, the char-
acter of the transaction was that of an invest-
ment contract. In the present case, there is no
doubt as to the contractual rights of investors who
acquire not merely interests in the land, but en-

Case 1:23-cv-04738-KPF   Document 37-1   Filed 08/04/23   Page 34 of 46

forcible written contracts for development, cultivation and marketing of produce by the promoters.

Moreover, this case is scarcely distinguishable on its facts from several of the unappealed district court cases cited with approval by this Court in the *Joiner* case. See, *e. g., S. E. C.* v. *Bailey,* 41 F. Supp. 647 (S. D. Fla.); *S. E. C.* v. *Payne,* 35 F. Supp. 873 (S. D. N. Y.). The *Bailey* case, identical on its facts except that tung instead of citrus trees were involved, is noted, *supra,* p. 26, note 21. In the *Payne* case, sales of silver foxes coupled with collateral agreements for servicing by the vendor were also held to involve the sale of investment contracts.[23]

---

[23] See also the recent decision of the Seventh Circuit Court of Appeals in *U. S.* v. *Earnhardt,* decided February 19, 1946, upholding a conviction under Section 17 of the Act for fraud in the sale of securities. The securities involved took the form of sales of specific parcels of purported oil land accompanied by collateral representations that the promoter would drill oil wells on nearby land to prove the productivity of the parcels sold, and that, thereafter, the promoter would aid investors in selling leases to their newly acquired lands at substantial profits.

Scarcely distinguishable also are the facts which formed the bases for the indictments and judgments of conviction in *United States* v. *Brough, et al.,* unreported (W. D. Okla., No. 13707, 1941), in which the securities took the form of sales of pecan orchard acreage under collateral contracts for cultivation, harvesting and marketing, and *United States* v. *Backmeier* (S. D. Ohio, Oct. Term, 1941), affirmed *sub nom. Ascher, et al.* v. *United States,* 143 F. 2d 592 (C. C. A. 6), in which convictions under the Act were sustained for fraud

30 .

From the foregoing, it would appear to be clear that respondents are engaged in the offer and sale of "investment contracts" within the meaning of the Securities Act.

## II

THE RULING OF THE COURT BELOW, INTRODUCING NEW TESTS WHICH ARE UNWARRANTED BY THE STATUTE AND ADMINISTRATIVELY IMPRACTICAL, MISCONCEIVES THE REGULATORY PATTERN OF THE ACT AND PROMISES TO IMPAIR EFFECTIVE ENFORCE-MENT

The ruling of the court below, while purporting to distinguish earlier authorities, including the *Joiner* case, in effect rejects the heretofore judicially established formulation of what constitutes an "investment contract" and introduces novel considerations which the Commission regards as administratively impractical and not warranted by the statute.

These considerations are reflected in the following propositions, advanced by the court below: first, that a case such as the *Joiner* case which takes the form of a sale of an interest in real estate is a close one, not necessarily to be followed under slightly variant circumstances; and, second, that the contemporaneous offering of tangible property and a contract to produce income therefrom, as part of a business venture, does not make

---

in the sale of popcorn vending machines under "lease back" agreements pursuant to which the vendors serviced the machines and accounted for the net profits.

the combined transaction a sale of an investment contract if the tangible interest has "specific value," independent of the success of the enterprise as a whole, and is susceptible of severable management, and if the activity is not in the "promotional" or "experimental" stage (R. 126–127).[23a] It should be noted, however, that in many of the decided cases, the tangible interest sold, e. g., barrels of whiskey,[24] silver foxes,[25] chinchillas,[26] planted acreage,[27] popcorn vending machines,[28] did have specific value independent of the expectation of profits to flow from the promoter's management. Moreover, there is nothing in the language or policy of the statute which would warrant such a formalistic criterion in determining the coverage of the Act. As this Court said in the *Joiner* case (320 U. S. at 352): "In applying acts of this general purpose, the courts

[23a] The court describes "the critical question" as "whether in fact the purchase was of a specific thing having specific value in itself, or was of a thing having no value unless the enterprise as a whole should succeed" (R. 127).

[24] *S. E. C.* v. *Bourbon Sales Corp.*, 47 F. Supp. 70 (W. D. Ky.; *United States* v. *Carter & Co.*, 56 F. Supp. 311 (W. D. Ky.).

[25] *S. E. C.* v. *Payne*, 35 F. Supp. 873 (S. D. N. Y.).

[26] *Hollywood State Bank* v. *Wilde*, 160 P. 2d 846 (Cal. App.).

[27] *S. E. C.* v. *Bailey*, 41 F. Supp. 647 (S. D. Fla.) ; *S. E. C.* v. *Tung Corp.*, 32 F. Supp. 371 (N. D. Ill) ; *United States* v. *Brough et al.*, unreported, W. D. Okla., No. 13707, 1941.

[28] *United States* v. *Backmeier et al.*, S. D. Ohio, Oct. Term, 1941, affirmed *sub. nom. Ascher et al.* v. *United States*, 143 F. 2d 592 (C. C. A. 6).

have not been guided by the nature of the assets back of a particular document or offering.''

The court below apparently conceived the present promotion as not a single enterprise but as a series of separate enterprises under common management (R. 127). While we regard this as a strained interpretation of the undisputed facts, the distinction is not a vital one since many of the above-cited cases also involve a comparable segregation of profits attributable to the individual units sold to particular investors, and thus could as readily as the present promotion be regarded as the promotion of a series of separate enterprises under common management rather than as the promotion of one single enterprise. See, *e. g.*, *S. E. C.* v. *Bailey,* 41 F. Supp. 647 (S. D. Fla) ; *S. E. C.* v. *Payne,* 35 F. Supp. 873 (S. D. N. Y.) ; *S. E. C.* v. *Bourbon Sales Corp.,* 47 F. *Supp.* 70 (W. D. Ky.). While some of the cases do stress elements in the particular situations making the enterprise a common one, there is no suggestion in the statutory language that an investment contract is limited to an investment in a single enterprise. The requirement of a public offering (Section 4 (1)) does, of course, necessitate sufficient community of interest to make the individual units offered substantially similar investments.

The court below apparently agreed, as Judge Strum had expressly held in the *Bailey* case,[29] that a

---

[29] *S. E. C.* v. *Bailey,* 41 F. Supp. 647 (S. D. Fla.), *supra,* p. 26, note 21.

substantially identical form of transaction would involve an investment contract where the acreage was planted to tung trees rather than citrus trees (R. 126). In explanation, it was stated that the tung growing enterprise involved in the *Bailey* case was more experimental and speculative. We are not clear whether the distinction turns upon the supposed established character of the industry or the established character of the particular promoter: In the Commission's experience, there is an infinite gradation in the degree of speculation involved in different promotional activities, making it utterly impractical to employ such a test in determining whether or not a security is involved. Thus, in the instant case, the conclusion of the court below as to the nonspeculative character of respondents' enterprise is certainly open to question. As indicated in the typical sales talk (R. 20-28), potential factors such as unseasonable frosts, fall droughts, insect damage, depressed markets, and the like, certainly present elements of risk even in the Florida citrus industry. Moreover, respondents emphasized such risks in their sales talk, representing that their long experience and purported superior cultivation skills would reduce them to a minimum and would render it to the financial advantage of investors to take Howey's service contract, rather than that of another company. However, the possibility of a poor season or seasons always remains, so that an investor who pays in installments with the

expectation of meeting future payments from expected profits may, in such event, find himself faced with the prospect of foreclosure under the sales contract.[30]

More fundamentally, however, the element of speculation is an irrelevant one as regards the coverage of the statute, which applies equally to security issues of well-established and highly experimental enterprises. How speculative the particular security may be is really a matter for the judgment of the investor and not within the scope of the statutory regulation, which is designed merely to insure adequate disclosure so that the investor's judgment may be an informed one.[31]

It should be noted that the rejection by the court below of the previous uniformly recognized test of what constitutes an investment contract appears to rest upon assumptions as to the practical effect of that test, assumptions which are wholly unwarranted. This is implicit in the court's entire approach and is most clearly re-

---

[30] The record indicates provision in respondents' forms for installment purchases and for foreclosure in the event of default. We make no claim that respondents' customers placed substantial reliance upon anticipated profits to help them pay installment notes. The fact remains, however, that the type of investment interest offered by respondents readily lends itself to inducing reliance upon expected future profits as a means of paying deferred installments of the purchase price.

[31] To a certain extent, of course, the speculative character of the securities involved may affect the exercise of the Commission's discretion in granting exemptions under the rule-making power described above. See pp. 14–16.

vealed by the concluding sentences of the opinion (R. 127):

> To say that because a purchaser of a farm or a building, at the time and in connection with the purchase, secured the services of another, whether the seller, someone connected with him, or someone entirely independent of him,[32] to manage it, he became a purchaser not of property but of a security, an investment contract, is to stretch beyond the breaking point the analogy of the *Joiner* case. It is, indeed, to run a good principle into the ground.

The court below assumed that the construction of the term "investment contract" urged by the Commission would render the Act applicable to such ordinary real estate transactions, and hence necessitated limitation of the scope of the statute by a narrow construction of the basic definition of a security. In proceeding under this assumption, the court below gave no consideration to the fact that the statute does not impose a rigid pattern of disclosure regulation upon every transaction involving the use of the mails, or instrumentalities of interstate commerce. Apart from the fact that the instant arrangement is hardly analogous to ordinary real estate transactions, the example

---

[32] The Commission did not, as the above quotation suggests, urge that there would be an offer or sale of a security by the respondents if the management arrangement was with "someone entirely independent" of the vendor. Here the vendor and the affiliated service company worked together as promoters of the combined enterprise.

36

cited by the circuit court of appeals is one which, in any event, would render applicable the unconditional exemption from registration of transactions which do not involve a "public offering" of substantially identical units. Section 4 (1), 15 U. S. C. 77d (1). As previously noted, *supra,* pp. 14–16, other exemptions provided by the Act, both unconditional and subject to administrative discretion, limit the regulatory pattern in conformity with the statutory purpose.

When the court below concluded that it would be unreasonable to apply the term "investment contract" to transactions where the activity in question may have passed out of what it regarded as the promotional or experimental stage, and the thing sold may have specific value independent of the anticipated efforts of the promoters (R. 126–127), it introduced criteria which, although possibly relevant to a generalized administrative determination of the conditions for exemption from registration of limited offerings, could have no relevance to whether or not the transactions should be immune from the fraud sanctions of the Act or from the minimum requirements that a notification be filed in a regional office of the Commission. See *supra,* p. 15. In thus attempting to force the definition of a "security" to perform the entire function of inclusion and exclusion from the coverage of the Act, the court below not only gave an unduly restrictive scope to the term "invest-

ment contract" but also intruded into the area of exemption confided by Congress to the discretion of the Commission.[33]

In rejecting the heretofore uniformly recognized test of what constitutes an "investment contract," the court below offers no substitute standard of definite content but, instead, introduces criteria which are not only unwarranted by the statute, but are vague and fraught with difficulties of administration. The consequence is to afford loopholes for those who may desire to evade the Act.[34] Thus, under the decision below, a conclusion as to the applicability of the Act can be made only after preliminary determinations of such matters as whether a particular business is an established one or is still in the promotional stage, the degree of risk involved, whether the tangible property involved in the transaction is or is not of any substan-

---

[33] It is especially where policy considerations are involved that this Court has emphasized the weight which will be given the administrative interpretation of statutory language. See, *e. g.*, *Skidmore* v. *Swift & Co.*, 323 U. S. 134; *Roland Electrical Company* v. *Walling*, No. 45, this Term, and *Boutell* v. *Walling*, No. 73, this Term. For a specific application of this approach in the field of defining Securities Act terms, see *S. E. C.* v. *Associated Gas and Electric Company*, 99 F. 2d 795 (C. C. A. 2).

[34] As noted by the court in *State* v. *Whitealer*, 118 Ore. 656, 661, 247 Pac. 1077, 1079, there is always "* * * a certain class of gentlemen of the 'J. Rufus Wallingford' type— 'they toil not neither do they spin'—* * * [who] lie awake nights endeavoring to conceive some devious and shadowy way of evading the law. * * *"

tial intrinsic value, and the like.   Apart from
the fact that these manifold considerations are ir-
relevant to the prime objective of securities laws—
*i. e.,* the protection of investors in all types of
securities transactions—reference to such consid-
erations can serve only to create loopholes and to
invite extended litigation in those cases where the
form of the security is novel and differs from
more orthodox types in general use.   Determina-
tions in a particular case, based on such inherently
elusive factors, may lose value as precedents in a
subsequent case differing in only insubstantial
respects.

In broadly defining "security" to include any
"investment contract," Congress intended to af-
ford safeguards to investors in business enter-
prises whether established or promotional, specu-
lative or nonspeculative, and irrespective of the
method of distributing profits or of the intrinsic
value of property incidentally acquired.   The ex-
istence of such special factors as were stressed by
the court below is not an adequate substitute for,
and hence cannot render inapplicable, the statutory
provisions for protection of the investor against
fraud and inadequate disclosures.   The function
of adequate disclosure is performed by the prospec-
tus and registration statement when the extensive
character of the offering makes applicable the regis-
tration requirements of the Act.   Even as applied

to transactions which may fall within the "limited offering" regulation (see *supra*, pp. 15–16), it is important that the Commission receive letters of notification describing the character of the enterprise and exhibiting copies of promotional literature which may serve as a basis for an appraisal as to the possible necessity for further inquiry to detect and restrain frauds upon investors.[35]   To hold, as did the court below, that the Commission must establish the speculative character of the enterprise before it is entitled to such notification would be to make such an appraisal virtually impossible, as a matter of overall administration, by denying to the Commission an opportunity even to be notified of the pendency of the transaction, let alone its nature. The Commission's test, on the other hand, requires no detailed financial study; the Commission must be able to show only, on the basis of facts which are not hard to come by, that the proposed transaction involves an investment of capital in an enterprise whose promoter's efforts are alone relied upon for the production of profit for the investor.

The Commission does not suggest that respondents' program was adopted for any improper purpose.   The fact remains, however, that the sale of property in conjunction with a contract for

---

[35] The notification also serves to better inform the Commission in the exercise of its rule-making functions of determining the conditions upon which exemptions may be obtained.

its development has been and still is a rather com-
mon device by which fraudulent promoters have
sought to escape the applicability of securities laws.
The efficient enforcement of such laws in the field of
stocks and bonds has driven many such promoters
into veiled and devious ways of accomplishing
their ends. Yet, under the holding of the court
below, the most flagrant fraud in transactions
otherwise identical with those here involved would
not form the basis for prosecution or injunctive
action under the Act. In fact, complete immunity
from the fraud provisions of the Act may be
afforded if the promoter is sufficiently astute to
limit his activity to enterprises which have passed
the "promotional or experimental stage" (R. 126)
and maintain a formal separation between the
sale of tangible property and the accompanying
contractual arrangements upon which the investor
relies for his expectation of profit. If the present
decision is permitted to stand, it will afford a
simple pattern to which the fraudulent promoter
may conform in order to escape the impact of the
Act. The processes driving the fraudulent pro-
motor from the securities field will thus be hampered
and a new safe haven created for such promoters.
Such construction should not be given to an Act
of broad remedial character designed to reach
substance rather than form.

41

## CONCLUSION

The judgment of the court below should be reversed.

Respectfully submitted.

J. HOWARD MCGRATH,
*Solicitor General.*

ROGER S. FOSTER,
*Solicitor,*
ROBERT S. RUBIN,
*Assistant Solicitor,*
ALEXANDER COHEN,
*Attorney,*
*Securities and Exchange Commission.*

APRIL 1946.

U. S. GOVERNMENT PRINTING OFFICE: 1946