# EXHIBIT B

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 2 of 115

Nos. 77-753 and 77-754

# In the Supreme Court of the United States

## October Term, 1978

International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, petitioner

*v.*

John Daniel

Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Louis F. Peick, petitioners

*v.*

John Daniel

*ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT*

## BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION AS AMICUS CURIAE

Harvey L. Pitt,
  *General Counsel,*

Paul Gonson,
  *Associate General Counsel,*

Jacob H. Stillman,
  *Principal Assistant General Counsel,*

Linda W. Jarett,
  *Attorney,*

*Securities and Exchange Commission,
Washington, D.C. 20549.*

# INDEX

Page

INTEREST OF THE SECURITIES AND EX-
CHANGE COMMISSION ............................................. 1

STATEMENT ............................................................ 6

   A. Proceedings Below .......................................... 6

   B. Background .................................................... 12

      1. The Nature of Pension Funds Generally and
         of the Local 705 Pension Fund ................. 12

      2. The Rise of the Private Pension System as an
         Alternate Form of Investment Medium ....... 16

SUMMARY OF ARGUMENT ..................................... 18

ARGUMENT .......................................................... 24

   Introduction: The Nature of The Antifraud Provi-
   sions Has Been Misunderstood by The Petitioners
   and This Misunderstanding Has Caused Exagger-
   ated Fears of Retroactive Liability ....................... 24

   I. AN INTEREST IN A PENSION FUND IS A
     "SECURITY" WITHIN THE MEANING OF
     THE FEDERAL SECURITIES LAWS ............ 30

     A. An Interest in a Pension Fund is an "Invest-
       ment Contract" as That Term Has Been In-
       terpreted in Numerous Decisions of this
       Court ...................................................... 30

     B. The Commission has Consistently Taken the
       Position that Interests in Pension Funds Are
       Securities ................................................ 53

     C. Congress Has Taken Action Consistent With
       the View that Interests in Pension Funds Are
       Securities ................................................ 58

   II. A SALE OF A SECURITY OCCURS WHEN-
     EVER AN EMPLOYEE TAKES ACTION
     WHICH RESULTS IN HIS GIVING VALUE
     IN EXCHANGE FOR AN INTEREST IN A

II

ARGUMENT—Continued                                    Page

    PENSION FUND; AND WHERE HIS ACTION
    WAS MATERIALLY INFLUENCED BY
    FRAUDULENT REPRESENTATIONS CON-
    CERNING THE PENSION, THE ANTI-
    FRAUD PROVISIONS OF THE FEDERAL
    SECURITIES LAWS PROVIDE REDRESS ....    63

    A. The "No-Sale" Rationale Has Been Applied
       Only to the Registration Provisions ..............    64

    B. The "No-Sale" Rationale Rests on a Very
       Narrow View of the Meaning of "Sale", Par-
       ticularly in Light of the Evolution in the Eco-
       nomic Significance and Legal Understanding
       of Pensions, and It May Not Be Extended to
       the Antifraud Provisions .........................    70

       1. The "no value" reasoning .....................    77

       2. The "no choice" reasoning ....................    83

    C. Recovery Under the Antifraud Provisions Is
       Available Where an Employee's Choice Was
       Materially Influenced by Fraudulent Repre-
       sentations Concerning the Pension ..............    89

III. RECOVERY UNDER THE ANTIFRAUD PRO-
    VISIONS OF THE FEDERAL SECURITIES
    LAWS FOR FRAUD OCCURRING IN THE
    SALE OF INTERESTS IN A PENSION FUND
    IS NEITHER DUPLICATIVE OF NOR IN-
    CONSISTENT WITH NATIONAL LABOR
    LAW OR POLICY ...............................    91

CONCLUSION ..........................................    102

## CITATIONS

Cases:

    *Ahrens* v. *American-Canadian Beaver Co.*, 428 F.2d
      926 (C.A. 10) ...................................    48
    *Alabama Power Co.* v. *Davis*, 431 U.S. 581 ...........  21, 41
    *Ball* v. *Victor Adding Machine Co.*, 236 F.2d 170
      (C.A. 5) .......................................    78

III

Cases—Continued                                         Page

*Berko* v. *Securities and Exchange Commission,* 316
    F.2d 137 (C.A. 2) _____ 50
*Blackwell* v. *Bentsen,* 203 F.2d 690 (C.A. 5) _____ 48
*Blue Chip Stamps* v. *Manor Drug Stores,* 421 U.S.
    723 _____72, 87, 88, *et passim*
*Califano* v. *Sanders,* 430 U.S. 99 _____ 94
*Coffee* v. *Permian Corp.,* 434 F.2d 383 (C.A. 5) ___ 74, 85
*Collins* v. *Rukin,* 342 F. Supp. 1282 (D. Mass.) _____ 77, 86
*Continental Marketing Corp.* v. *Securities and Ex-*
    *change Commission,* 387 F.2d 466 (C.A. 10),
    *certiorari denied,* 391 U.S. 905 _____ 48
*Dasho* v. *Susquehanna Corp.,* 380 F.2d 262 (C.A.
    7) _____ 74
*Dudley* v. *Southeastern Factor and Finance Corp.,*
    446 F.2d 303 (C.A. 5) _____ 85
*Employing Plasterers' Ass'n of Chicago* v. *Journey-*
    *men Plasterers' Protective and Ben. Soc. of*
    *Chicago,* 279 F.2d 92 (C.A. 7) _____ 78
*Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185 _____ 28
*Exchange National Bank of Chicago* v. *Touche Ross*
    *& Co.,* 544 F.2d 1126 (C.A. 2) _____ 71
*Gardner* v. *Toilet Goods Ass'n, Inc.,* 387 U.S. 167___ 24
*Georgia* v. *Pennsylvania R. Co.,* 324 U.S. 439 _____ 95
*Glen-Arden Commodities, Inc.* v. *Costantino,* 493
    F.2d 1027 (C.A. 2) _____ 48
*Gordon* v. *New York Stock Exchange,* 422 U.S.
    659 _____ 95
*Heit* v. *Weitzen,* 402 F.2d 909 (C.A. 2) *certiorari*
    *denied,* 395 U.S. 903 _____ 82
*Inland Steel Co.* v. *National Labor Relations Board,*
    170 F.2d 247 (C.A. 7), *certiorari denied,* 336
    U.S. 960 _____ 18, 78
*International Controls Corp.* v. *Vesco,* 490 F.2d
    1334 (C.A. 2), *certiorari denied,* 417 U.S. 932___ 85
*Iroquois Industries, Inc.* v. *Syracuse China Corp.,*
    417 F.2d 963 (C.A. 2) _____ 82
*Kerst* v. *Nelson,* 171 Minn. 191, 213 N.W. 904 _____ 47
*Knauff* v. *Utah Construction & Mining Co.,* 408
    F.2d 958 (C.A. 10) _____ 74

IV

Cases—Continued | Page

*Lawrence* v. *Securities and Exchange Commission,* 398 F.2d 276 (C.A. 1) ............................................. 74

*Lennerth* v. *Mendenhall,* 234 F. Supp. 59 (N.D. Ohio) ............................................................................ 48

*Lewis* v. *Benedict Coal Corp.,* 361 U.S. 459 ............. 78

*List* v. *Fashion Park, Inc.,* 340 F.2d 457 (C.A. 2), *certiorari denied,* 382 U.S. 811 ............................... 90

*Los Angeles Department of Water & Power* v. *Manhart,* 98 S. Ct. 1371 ............................................ 28

*Lucas* v. *Seagrave Corp.,* 277 F. Supp. 338 (D. Minn.) ............................................................................ 78

*Marbury* v. *Madison,* 5 U.S. 137 ................................ 101

*Miller* v. *Central Chinchilla Group, Inc.,* 494 F.2d 414 (C.A. 8) ............................................................... 48

*Morton* v. *Mancovi,* 417 U.S. 535 ............................. 95

*National Supply Co.* v. *Leland Stanford Junior University,* 46 F. Supp. 389 (N.D. Cal.) *affirmed* 134 F.2d 689 (C.A. 9), *certiorari denied,* 320 U.S. 773 ................................................................... 71

*Pasadas* v. *National City Bank,* 296 U.S. 497 ......... 95

*Prohasta* v. *Hemmer-Miller Development Co.,* 256 Ill. App. 331 ........................................................... 47

*Roe* v. *United States,* 287 F.2d 435 (C.A. 5), *certiorari denied,* 368 U.S. 824 ................................. 48

*Securities and Exchange Commission* v. *Addison,* 194 F. Supp. 709 (N.D. Tex.) ......................... 43, 77

*Securities and Exchange Commission* v. *C. M. Joiner Leasing Corp.,* 320 U.S. 344 ...... 19, 31, 35 *et passim*

*Securities and Exchange Commission* v. *Capital Gains Research Bureau, Inc.,* 375 U.S. 180 ......... 74

*Securities and Exchange Commission* v. *Gilbert,* 29 F. Supp. 654 (S.D. Ohio) ..................................... 48

*Securities and Exchange Commission* v. *MacElvain,* 417 F.2d 1134 (C.A. 5), *certiorari denied,* 397 U.S. 972 .................................................................... 48

*Securities and Exchange Commission* v. *National Securities, Inc.,* 393 U.S. 453 ............ 21, 70, 72 *et passim*

*Securities and Exchange Commission* v. *Payne,* 35 F. Supp. 873 (S.D. N.Y.) ................................... 48

v

Cases—Continued                                           Page

*Securities and Exchange Commission* v. *United Benefit Life Insurance Co.*, 387 U.S. 202 ............ 20, 34, 53 *et passim*

*Securities and Exchange Commission* v. *Variable Annuity Life Insurance Co.*, 359 U.S. 65 ............. 11, 33, 40 *et passim*

*Securities and Exchange Commission* v. *W. J. Howey Co.*, 328 U.S. 293 ..............10, 19, 30 *et passim*

*Securities Investor Protection Corp.* v. *Morgan, Kennedy & Co.*, 533 F.2d 1314 (C.A. 2) ............ 82

*Spector* v. *L Q Motors Inns, Inc.*, 517 F.2d 278 (C.A. 5) ................................................................ 90

*State* v. *Robbins*, 185 Minn. 202, 240 N.W. 456.... 47

*Stevens* v. *Liberty Parking Corp.*, 111 N.J. Eq. 61, 161 Atl. 193 .......................................................... 47

*Tcherepnin* v. *Knight*, 389 U.S. 322 ...23, 31, 34 *et passim*

*Tennessee Valley Authority* v. *Hill*, 46 U.S.L.W. 4673 ..............................................22, 23 *et passim*

*United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837 ......................................18, 19, 36 *et passim*

*United States* v. *Borden Co.*, 308 U.S. 188 ................. 95

*United States* v. *National Association of Securities Dealers*, 422 U.S. 694 ............................................. 63

*United States* v. *Robertson*, 181 F. Supp. 158 (S.D. N.Y.) .................................................................... 74

*Vine* v. *Beneficial Finance Co.*, 374 F.2d 627 (C.A. 2) ............................................................... 74, 85

*Wood* v. *United States*, 41 U.S. 343 ............................ 95

*Zeller* v. *Bogue Manufacturing Corp.*, 476 F.2d 795 (C.A. 2) ............................................................ 85

Statutes and Rules:

Administrative Procedure Act:
   Section 10, 5 U.S.C. 701 ..................................... 94
D.C. Code:
   Section 2-2401 (e) (5) ........................................ 92
Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001, *et seq.*: ..............................4, 5, 11

   Section 3 (34), 29 U.S.C. 1002 (34) ................... 13
   Section 102 (a), 29 U.S.C. 1022 (a) .................... 96

Statutes and Rules—Continued                          Page

    Section 403(a), 29 U.S.C. 1103(a) _____   14
    Section 403(b), 29 U.S.C. 1103(b) _____   14
    Section 502(a), 29 U.S.C. 1132(a) _____   96
    Section 514(b)(2)(A), 29 U.S.C. 1144(b)(2)
      (A) _____   92
    Section 514(d), 29 U.S.C. 1144(d) _____   91

Ill. Rev. Stat. Ch. 121½:
    Section 137.3 _____   92

Internal Revenue Code of 1954:
    Section 401, 26 U.S.C. 401 _____ 13, 62

Investment Company Act of 1940, 15 U.S.C. 80a,
    *et seq.*:
    Section 3(c)(1), 15 U.S.C. 80a-3(c)(1) _____   62
    Section 3(c)(2), 15 U.S.C. 80a-3(c)(2) _____   62
    Section 3(c)(3), 15 U.S.C. 80a-3(c)(3) _____   62
    Section 3(c)(11), 15 U.S.C. 80a-3(c)(11) _____ 62, 69

*McCarran-Ferguson Act,* 15 U.S.C. 1001 *et seq.*:
    Section 1012(b), 15 U.S.C. 1012(b) _____ 33, 96

National Labor Relations Act, 29 U.S.C. 141, *et
seq.*:
    Section 9(a), 29 U.S.C. 159(a) _____    9
    Section 302(c)(5), 29 U.S.C. 186(c)(5) _____    9

N.Y. Gen. Bus. Law:
    Section 359f(2)(e) (McKinney 1962) _____   92

Securities Act of 1933, 15 U.S.C. 77a, *et seq.*:
    Section 2(1), 15 U.S.C. 77b(1) __30, 46, 55 *et passim*
    Section 2(3), 15 U.S.C. 77b(3) _____ 63, 66
    Section 3(a)(2), 15 U.S.C. 77c(a)(2) _____ 26, 59,
                            60 *et passim*
    Section 17(a), 15 U.S.C. 77q(a) _____ 8, 28
    Section 17(c), 15 U.S.C. 77q(c) _____   60
    Section 23, 15 U.S.C. 77w _____   99

Rules Under the Securities Act, 17 CFR 230.01
    *et seq.*:

Statutes and Rules—Continued                                    Page

    Rule 133, 17 CFR 230.133 .................................... 70
    Rule 145, 17 CFR 230.145 .................................... 70

Securities Exchange Act of 1934, 15 U.S.C. 78a,
  *et seq.*:

    Section 3(a)(10), 15 U.S.C. 78c(a)(10) .........30, 101
    Section 3(a)(14), 15 U.S.C. 78c(14) .............. 63
    Section 10(b), 15 U.S.C. 78j(b) ....8, 28, 70 *et passim*

Rules Under the Securities Exchange Act, 17 CFR
  240.01 *et seq.*:

    Rule 10b-5, 17 CFR 240.10b-5 .........8, 28, 70 *et passim*

Securities Investor Protection Act, 15 U.S.C. 78aaa,
  *et seq.* ....................................................................... 83

7 Uniform Laws Ann., Uniform Sec. Act:
    Section 402(a)(11) (1970) .............................. 92

28 U.S.C. 1292(b) ............................................................ 10
28 U.S.C. 1331 ................................................................ 94

Miscellaneous:

  B. Aaron, *Legal Status of Employee Benefit Rights
    Under Private Pension Plans* (1960) ..................... 17
  M. Bernstein, *The Future of Private Pensions*
    (1964 ed.) ......................................................... 14
  78 Cong. Rec. 8708 (1934) ...................................... 58
  124 Cong. Rec. 61 (May 1, 1978) ............................ 6
  1 CCH Fed. Sec. L. Rep. ¶ 2231.21 (1941) .............. 66
  *Grubbs,* Report to the Secretary of Labor, Potential
    Effects of *Daniel,* March 20, 1978 ................ 27, 28
  Hannan & Thomas, "The Importance of Economic
    Reality and Risk in Defining Federal Securities,"
    25 Hastings L. Rev. 219 (1974) .............................. 77
  Hearings on Amendment No. 438 to S. 1659 before
    the Senate Committee on Banking & Currency,
    90th Cong., 1st Sess., pt. 3 (1967) ........................ 67
  Hearings before the House Committee on Inter-
    state and Foreign Commerce, 77th Cong., 1st
    Sess. (1941) ......................................................... 55, 76

VIII

Miscellaneous—Continued                                            Page

Hearings before a Subcommittee of the Committee
  on Banking and Currency, U.S. Senate, 89th
  Cong., 2d Sess. on S. 2704 (1966) ............................    63
Hearings before a Subcommittee of the House Com-
  mittee on Interstate and Foreign Commerce,
  91st Cong., 1st Sess. pt. 2 (1969) ............................    61
Hearings before the Senate Subcommittee on Pri-
  vate Pension Plans of the Committee on Finance,
  93rd Cong., 1st Sess. (1973) ..................................    80
Hearings before the Special Subcommittee on
  Labor of the House Committee on Education and
  Labor, 87th Cong., 1st Sess. (1961) ..............79, 82, 84
Hearings before the Committee on Fiscal Policy,
  U.S. Cong. Joint Economic Committee, 91st
  Cong., 2d Sess. (1970) ........................................    16
Hearings before the Subcommittee on Commerce
  and Finance of the Committee on Interstate and
  Foreign Commerce, 90th Cong., 2d Sess. (1967)..    76
Hearings before the Subcommittee on Labor, Sen-
  ate Committee on Labor and Public Welfare,
  90th Cong., 2d Sess. (1968) ..................................    85
Hearings on S. 3598 before the Subcommittee on
  Labor of the Senate Committee on Labor and
  Public Welfare, 92d Cong., 2d Sess. (1972) .........  58, 84
Hearings before the Subcommittee on Labor, Sen-
  ate Committee on Labor and Public Welfare, 93d
  Cong., 1st Sess. (1973) ........................................    74
Senate Committee on Labor & Public Welfare, Re-
  tirement Income Security for Employees Act of
  1972, Comm. Print, 92d Cong., 2d Sess. (1972)..    80
Senate Comm. on Banking & Currency, Analysis of
  S. 34, 91st Cong., 1st Sess. (1969) ....................    60
H.R. Rep. No. 760, 67th Cong., 2d Sess. (1922)....    54
H.R. Rep. No. 1383, 73d Cong., 2d Sess. (1934)....    54
H.R. Rep. No. 1838, 73d Cong., 2d Sess. (1934)....    42
H.R. Rep. No. 85, 73d Cong., 1st Sess. (1934) ......    48
H.R. Rep. No. 91-1382, 91st Cong., 2d Sess. (1970)..    60
H.R. Rep. No. 93-807, 93d Cong., 2d Sess. (1974)..    17

IX

Miscellaneous—Continued                                    Page

Institutional Investor Study, Report of the Securities and Exchange Commission (1971) ............ 57, 67

Address by Senator Jacob K. Javits, Briefing Conference on Pensions and Employee Benefits, Sept. 19, 1974 ............................................................. 81

1 Loss, *Securities Regulation* (2d ed. 1961) ............ 43

IV Loss, Securities Regulation (Supp. 1969) .......... 72

Long, "An Attempt to Return Investment Contracts to the Mainstream of Securities Regulations," 24 Okla. L. Rev. (1971) ............................... 77

Melone, *Collectively Bargained Multi-Employer Pension Plans* (1963 ed.) ............................................. 14

R. Murray, *Economic Aspects of Pensions: A Summary Report* (1968 ed.) ............................................. 12

Mundheim & Henderson, "Applicability of the Federal Securities Laws to Pension & Profit-sharing Plans," 29 Law and Contemp. Prob. 795 (1964).. 73

Securities Act Rel. No. 3420 (1951) ....................... 72

R. Pozen, *Financial Institutions: Cases, Materials and Problems on Investment Management* (1978) ....................................................................... 13

Restatement, Contracts Section 250(a) ................... 37

S. Rep. No. 1440, 85th Cong., 2d Sess. (1958) ........ 78

S. Rep. No. 1734, Welfare and Pension Plan Investigation, 84th Cong., 2d Sess. (1956) ....................... 84

# In the Supreme Court of the United States

## OCTOBER TERM, 1978

------------

### No. 77-753

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, PETITIONER

*v.*

JOHN DANIEL

------------

### No. 77-754

LOCAL 705, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, AND LOUIS F. PEICK,
PETITIONERS

*v.*

JOHN DANIEL

------------

*ON WRITS OF CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SEVENTH CIRCUIT*

------------

**BRIEF FOR THE SECURITIES AND EXCHANGE
COMMISSION AS AMICUS CURIAE**

------------

(1)

2

## INTEREST OF THE SECURITIES AND EXCHANGE COMMISSION

This case presents the question whether the anti-fraud provisions of the federal securities laws are applicable to the acquisition by employees of interests in certain types of pension funds—a question which turns on whether such an acquisition involves the "sale" to the employee of a "security." The Commission believes that, under the proper interpretation of those terms in the securities laws—and on the basis of principles long established and consistently applied in numerous decisions of this Court construing the term "investment contract" (one of the terms included in the statutory definition of security)—the respondent's allegations, if proved, would establish that his acquisition of an interest in a pension fund was a sale of a security and, hence, was subject to the antifraud provisions.

Although the Commission believes that persons who acquire interests in pension funds should not be deprived of antifraud protection by an erroneous interpretation of the laws which the Commission administers, the Commission's primary concern is that the terms "security" and "sale"—terms which are basic to the coverage of the antifraud provisions—not be construed in a way which would jeopardize the applicability of the antifraud provisions to the countless schemes through which fraud is perpetrated on investors generally.

**3**

The Commission has particular concern that the definition of the term "investment contract" not be constricted, because its experience in administering the federal securities laws has shown that unscrupulous persons who seek to defraud others through promises of profits are constantly devising new schemes involving novel investment vehicles to effectuate their goals. The Congress, in enacting the securities laws, could not anticipate every potential investment vehicle which could be utilized to commit fraud, the number of which is limited only by the minds of dishonest promoters. The traditionally broad construction given by this Court and other federal courts to the term "investment contract," however, has precluded promoters from circumventing the important protections of the securities laws, even when using investment vehicles that do not bear the characteristics usually associated with more conventional securities.

In an effort to avoid liability for misrepresentations with respect to interests in pension funds, however, the petitioners urge an interpretation of the term "investment contract" which would undermine the principles that have been developed by this Court and the lower federal courts over a period of more than 40 years to protect investors. Essentially, the petitioners, and the *amici* who support them, believe that, *as a matter of policy*, it is unwise and undesirable that defrauded participants

4

in pension funds be afforded the type of protection granted investors by the antifraud provisions of the securities laws. To bolster their views, they rely on the fact that Congress, many years after the conduct complained of in this case, enacted labor legislation protecting pension fund participants from certain abuses (although not from fraud). But, even if that labor legislation had existed at the time of the mis-representations complained of, Congress refrained, in that legislation, from preempting the securities laws, and according the petitioners and supporting *amici* are forced to urge this Court to effectuate their policy concerns through a distorted construction of the securities laws which conflicts with well-established principles that are vital to investor protection.

Pension plans, of course, are now subject to extensive regulation administered by the Department of Labor under the Employee Retirement Income Security Act of 1974 ("ERISA"), and the Commission neither seeks nor desires to intrude upon or disrupt that regulatory system. But, the limited applicability of the securities laws' antifraud provisions to interests in pension funds would not result in any such intrusion or disruption. The petitioners and their supporting *amici* disagree with us. While their views might be supportable if, as the court of appeals suggested, the antifraud provisions imposed an across-the-board requirement of detailed specific affirmative disclosures, such as actuarial probabilities, we believe that the court of appeals erred in sug-

5

gesting that the antifraud provisions impose such a requirement. Unlike ERISA, which imposes substantive regulatory controls over the operations of pension plans and requires the filing and distribution of detailed disclosure documents, the antifraud provisions of the securities laws are essentially a prohibition upon fraudulent activity, including the making of false or misleading representations. Their applicability to interests in pension funds does *not* constitute the imposition of an additional set of regulatory controls on pension plans, and refraining from violation of the antifraud provisions is not a burdensome task.

If the petitioners or *amici* believe that public policy with respect to pension funds would better be served without a generalized prohibition against fraud, the Congress is the appropriate forum in which all views relating to this matter may fully be aired. A determination of the appropriate interplay between the different federal statutes imposing rights and obligations upon persons with respect to pension plans involves a consideration of many broad issues that cannot be adequately explored and resolved in this litigation, which only involves a motion to dismiss the securities laws counts based on a specific set of facts alleged in a complaint in a private action. Congress, on the other hand, can deal with such issues. Indeed, the Congress is currently considering, and holding hearings on, a bill which would

6

amend ERISA to provide that the federal securities laws would not apply to interests in pension funds (S. 3017; *see* 124 Cong. Rec. 61 (May 1, 1978)).

We submit that, if policy goals related solely to pensions justify denial of antifraud protections to investors in pension funds, that determination should be made directly by the Congress instead of by a dilution of long-established principles of statutory construction of terms in the securities laws, which could deprive many investors, in future schemes totally unrelated to pensions or the labor milieu, of protection from fraud. For these reasons, the Commission respectfully submits this brief, *amicus curiae.*

### STATEMENT

### A. Proceedings Below

The respondent (plaintiff below), John Daniel, was a member of Local 705, International Brotherhood of Teamsters ("Local 705") from 1950 until his retirement in 1973. During that period, he worked as a truck driver for employers who were covered under collective bargaining agreements executed with Local 705 (App. 31a).[1] Pursuant to these agreements, each employer paid to a pension fund, on

---

[1] "App. ——" refers to pages of the appendix. "IBT Br. ——" refers to the brief of petitioner International Brotherhood of Teamsters; "Local Br. ——" refers to the brief of petitioners Local 705 and Louis F. Peick; "ERIC Br. ——" refers

7

behalf of Mr. Daniel, a sum specified in the collective
bargaining agreement for each week in which he per-
formed any services (App. 72a-21). The pension fund,
a trust, was jointly administered by the union and
the employers (App. 62a-2). Under the terms of the
pension fund trust agreement, an employee was eligi-
ble for a pension if he was employed "for at least 20
consecutive, continuous and uninterrupted years im-
mediately preceding retirement" (App. 72a-8).

The basis of counts I and II of the complaint—
the counts which are in issue on *certiorari*—is the
respondent's claim that the petitioners (defendants
below) were responsible for misrepresentations and
omissions relating, among other things, to the above-
mentioned length and continuity requirements of the
pension plan. Mr. Daniel brought this suit in the
District Court for the Northern District of Illinois
against the trustees of the Local 705 pension plan,
Local 705, certain Local 705 officers and the Inter-
national Brotherhood of Teamsters ("IBT") (App.
27a-28a). He alleged that the defendants had vio-
lated the antifraud provisions of the federal securities

---

to the *amicus curiae* brief of the ERISA Regulations Industry
Committee; "NCCMP Br. ——" refers to the *amicus curiae*
brief of the National Coordinating Committee for Multiem-
ployer Plans; "Bankers Br. ——" refers to the *amicus curiae*
brief of the American Bankers Association; "AFL-CIO Br.
——" refers to the *amicus curiae* brief of the American Fed-
eration of Labor and Congress of Industrial Organizations;
and "SG Br. ——" refers to the *amicus curiae* brief submitted
by the Solicitor General.

8

laws—Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 CFR 240.10b-5—in the offer and sale of interests in the Local 705 pension fund. Among other things, the defendants were alleged to have misrepresented the length and continuity requirements for pension eligibility (App. 32a-33a). Mr. Daniel further alleged that, as a result of those misrepresentations, he "purchased and acquired an interest in [the] local Teamster affiliate * * * pension fund by agreeing to provide * * * labor services to employers who [had] labor contracts" with Local 705 (App. 34a). As the court of appeals noted (App. 214a), Mr. Daniel stated in an affidavit filed in this case that, if he had known the true eligibility requirements for the Local 705 plan, he would have sought other employment that would have provided him with retirement benefits of the type that he had been led to understand he would receive from the Local 705 plan.

Although Mr. Daniel had worked for Local 705 employers for 22½ years—2½ years in excess of the twenty years required for pension eligibility—he was thereafter denied his pension on the basis of the pension fund's continuity requirements because of an involuntary three-month lay-off in 1960 and 1961 (App. 31a). Thus, contrary to his expectations, Mr. Daniel ultimately received no value at all for the money that was paid into the pension fund on his

Case 1:23-cv-04738-KPF  Document 37-2  Filed 08/04/23  Page 22 of 115

behalf and in compensation for his labor over a 22½ year period.[2]

The petitioners moved to dismiss the counts of the complaint based on the securities laws on the ground that the court lacked subject matter jurisdiction of those counts. They argued that interests in pension funds are not "securities" within the definition of that term in the securities laws; that these interests are not "sold" to employees as that term is defined in the securities laws; and that the enactment of specialized legislation dealing with pensions discloses Congress' intention that the securities laws not apply to interests in pension funds.

The district court denied the petitioners' motion to dismiss the securities counts.[3] That court reasoned that an interest in a pension fund possesses all of the characteristics that have been identified by the courts as constituting a "security"; that there had been a "sale" of this security within the meaning of the securities laws when the union membership voted on a collective bargaining agreement that in-

---

[2] Mr. Daniel also seeks relief for the defendants' alleged breach of their duty of fair representation under Section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. 159(a), and for the failure to the pension fund to be established for the "sole and exclusive benefit of the employees," as required by Section 302(c)(5) of the NLRA, 29 U.S.C. 186 (c)(5). Finally, the plaintiff seeks to recover under common law theories of breach of fiduciary duty, fraud and deceit. These claims are not in issue on *certiorari*, and the Commission intimates no view with respect to any of them.

[3] The opinion of the district court is reported at 410 F. Supp. 541 and is reproduced at App. 105a-134a.

10

cluded a provision that the employers contribute to the pension fund on behalf of the employees in exchange for their labor or, alternatively, from the continuation of the employee in the employment relationship which required periodic payments by the employer to the pension fund; and that the antifraud provisions of the securities laws were complementary to the specialized pension legislation and therefore there was no indication from the enactment of that specialized legislation that Congress did not intend the antifraud provisions of the securities laws to apply to interests in pension funds.

On interlocutory appeals certified pursuant to 28 U.S.C. 1292(b) (App. 162a-163a, 199a-200a), the Court of Appeals for the Seventh Circuit affirmed.[4]

The court of appeals held that an interest in the Local 705 pension fund is an "investment contract," the type of security defined by this Court as "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party * * *."[5] First, the court held (App. 222a-225a) that an employee on whose behalf contributions are made to a pension fund is an investor; that is, that he invests money in the form of his services for which he receives, along with other compensation, the interest in the pension fund. Second,

---

[4] The opinion of the court of appeals is reported at 561 F.2d 1223 and is reproduced at App. 209a-262a.

[5] App. 221a, *quoting from Securities and Exchange Commission* v. *W. J. Howey Co.,* 328 U.S. 293, 298-299.

the court held that the pension fund constituted a common enterprise (App. 225a). Finally, the court concluded that the "profits from the efforts of others" test was met, rejecting as irrelevant the petitioners' argument that, although the pension payment exceeds the employer's contribution on behalf of the employee and the employee has no control over the generation of the profit, part of the gain was not attributable to the investment expertise of the pension fund trustees but rather was attributable to the forefeitures of employees whose pension rights do not vest. The court held (App. 226a), relying in part upon this Court's decision in *Securities and Exchange Commission* v. *Variable Annuity Life Insurance Co.* ("*VALIC*"), 359 U.S. 65, that "gain relative to a security can derive from sources other than the direct efforts of the managers of the common enterprise."

The court then determined that the acquisition of an interest in a pension fund constitutes a "sale" because an employee gives "value" in the form of his services for which the employer makes a money contribution to the fund (App. 244a). In so holding, it noted that "the definitions of 'sale' in the 1933 and 1934 Acts do not require volition" (App. 244a), but in any event found volition in the employee's vote on the ratification of the union contract and in his decision to take or retain the job (App. 244a, 245a).

The court analyzed (App. 250a-258a) the relationship between the antifraud provisions of the securities laws and national labor law and policy, including the Employee Retirement Income Security Act

12

of 1974 ("ERISA"). The court rejected the proposition that ERISA had preempted the securities laws (App. 250a) and reasoned that the availability of disclosure documents pursuant to ERISA does not obviate the need for the protection of the antifraud provisions.

Finally, the court identified the factors which govern recovery by private plaintiffs, in order to rebut the argument that the application of the antifraud provisions would result in extensive burdens and liabilities for pension plans, stating (App. 259a) that "[p]articular employees must show, in light of all the ambient circumstances, justifiable reliance on a material misrepresentation or omission causing him injury."

## B. Background

Some background information concerning the nature of pension funds and their growth as an alternate form of investment medium is useful to an understanding of the issues involved in this case.

### 1. *The Nature of Pension Funds Generally and of the Local 705 Pension Fund*

A pension, broadly defined, is a regular payment, normally for life, to provide retirement income to the recipient upon completion of his working years.[6] Pension plans are generally referred to as "defined contribution" plans or "defined benefit" plans. In a defined contribution plan, an individual account is

---

[6] R. Murray, *Economic Aspects of Pensions: A Summary Report* 13 (1968 ed.).

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 26 of 115

established for each participant and he receives re-
tirement benefits based upon the amount contributed
to his account and any income, expenses, gains and
losses thereon as well as any forfeitures of accounts
of other participants which may be allocated to his
account.[7] For defined benefit plans, the employer
promises to pay the employee, upon retirement, a
fixed monthly amount.[8]

Multiemployer plans, such as the Local 705 plan,
are not, strictly speaking, either defined benefit or
defined contribution plans. Although each employer
commits to pay a particular amount of money to the
pension fund each year, the employer does not com-
mit to pay an employee a fixed monthly amount upon
retirement. Instead, the plan ultimately pays to re-
tired employees a fixed monthly amount, but the size
of the monthly payment is changed from time to time
depending, among other things, upon the amount of
money in the fund. *See* pages 39-40, *infra.*

A pension fund generally is operated in the form
of a trust. The reason is that Section 401 of the
Internal Revenue Code, 26 U.S.C. 401, requires that
an employer must divorce himself completely from
the administration of the pension fund in order to

---

[7] R. Pozen, *Financial Institutions: Cases, Materials and
Problems on Investment Management* 598 (1978). ERISA
refers to this type of plan as both a defined contribution and
an "individual account" plan. Section 3(34), 29 U.S.C.
1002(34).

[8] R. Pozen, *Financial Institutions: Cases, Materials and
Problems on Investment Management* 598 (1978).

14

receive favorable tax treatment for payments made to the fund.[9] The Local 705 pension fund has a board of trustees composed equally of employer and union representatives (App. 62a-2). These trustees have general supervision of the operation of the trust, including the investment of the contributions made on behalf of employees (App. 62a-3).

The trustees of a pension fund are also responsible for assuring that the fund is actuarially sound so that it will be able to make pension payments to those eligible for them. Although there are many factors which go into the actuarial calculations,[10] one of the most important is the investment performance of the fund. Thus, it has been estimated that for each 1 per cent of investment earnings, benefits can be raised 20 per cent.[11] Indeed, the Local 705 plan has raised the amount of its fixed benefit several times since the inception of the plan (App. 72a-1).

---

[9] The Local 705 plan is set up to assure that this separation of the employer and the trust is strictly maintained. Article 14 of the Trust Agreement provides that "[n]o employee shall have any individual right, title, interest, or claim against any employer * * *" (App. 62a-7).

Under Section 403(a) of ERISA, 29 U.S.C. 1103(a), the assets of pension plans must be held in trust by one or more trustees. Section 403(b), 29 U.S.C. 1103(b), however, provides that assets in certain enumerated plans need not be held in trust.

[10] *See generally*, J. Melone, *Collectively Bargained Multi-Employer Pension Plans* 77-85 (1963 ed.).

[11] M. Bernstein, *The Future of Private Pensions* 41 (1964 ed.). *See also, Employee Benefit Plan Review* (No. 4) 50 (1954).

15

As Local 705 explained to its members in 1969 in one of its informational booklets (App. 70a-14):

> "Another advantage [of the Local 705 plan] is that the contributions earn income by being invested. Consequently, the money originally contributed grows. Without this income growth the fund could not accumulate enough money to pay the $250.00 monthly pensions provided by the Plan."

There are two basic methods of collecting money for a pension fund. In "contributory" plans, the employee himself contributes his money directly to the pension fund. In so-called "noncontributory" plans, the employee contributes indirectly through his labor in return for which his employer makes the monetary contribution to the fund.

Pension funds also may be denominated either "compulsory" or "voluntary." In a so-called "compulsory" plan the employee chooses to invest in the fund by becoming and remaining an employee, since contributions to the fund in such a plan are made automatically as part of the compensation an employee receives in return for his labor. In a "voluntary" plan, on the other hand, the employee makes a separate decision (independent of his decision to be an employee) whether to participate in the pension plan.

The Local 705 plan is the type which is characterized as "noncontributory" and "compulsory." Thus, the rules governing the pension plan provide that the employer shall make a contribution "for

each employee* * * for any week in which such employee performs any service for the employer" (App. 77a-21).

### 2. *The Rise of the Private Pension System as an Alternate Form of Investment Medium*

Within the last thirty years, there has been a dramatic rise in the importance of pension funds as a medium of investment. Investments can be characterized as either direct investment (*e.g.*, purchase of stock in industrial corporations or purchase of real estate) or indirect investment (*e.g.*, placing money in a financial institution such as a bank, mutual fund or pension fund, which in turn makes the direct investment). In the early part of this century, approximately 62 per cent of the money used for investment was invested directly, while 38 per cent was invested indirectly, thus reflecting nearly a 2-1 margin in favor of direct investment. Furthermore, within the category of indirect investment, most of the money went into commercial bank deposits, life insurance and mutual funds, while a negligible amount (1/10 of one per cent) was invested in pension funds.[12]

By the end of the 1950's, however, a significant change had occurred in individuals' investment preferences. Thus, in the period from 1953 to 1962, direct investment had fallen to 17 per cent while

---

[12] These statistics are discussed in *Hearings before the Subcommtitee on Fiscal Policy, U.S. Cong. Joint Economic Committee*, 91st Cong., 2d Sess. 17-18, 22 (1970).

17

indirect had jumped to about 83 per cent. Within indirect investment, another major change had occurred. Commercial bank deposits lost ground, life insurance reserves grew slightly, mutual funds grew somewhat more substantially, and pension funds increased from the earlier 1/10 of one per cent to 27 per cent.[13]

[This phenomenon is also apparent in statistics discussed by Congress in its consideration of ERISA. As reflected in the House Report, estimates of the number of employees covered by pension plans in 1972 ranged from 23 million to 30 million, compared with coverage of only 4 million in 1940 and 9.8 million in 1950. Between 1950 and 1970, total annual contributions made to pension plans by employees, and by employers on behalf of employees, rose from about $2.1 billion to about $14 billion. In 1950, 450,000 retired employees received $370 million from retirement plans; in 1970, 4,700,000 retired employees received $7.4 billion in pension payments.[14]

Not surprisingly, there has been a corresponding evolution in the legal concepts applicable to pensions. At one time, pensions were legally considered to be mere gratuities given by the employer to the employee and subject to the former's decision to withdraw the benefit at any time.[15] In 1948, the landmark decision in *Inland Steel Co.* v. *National Labor Re-*

---

[13] *Id.*

[14] See H.R. Rep. No. 93-807, 93d Cong., 2d Sess. 9-11 (1974).

[15] *See* B. Aaron, *Legal Status of Employee Benefit Rights under Private Pension Plans* 7 (1960).

18

*lations Board*, 170 F.2d 247 (C.A. 7), *certiorari denied*, 336 U.S. 960, signaled the end of this theory by holding that pension funds are a mandatory subject of collective bargaining on the ground that the employee's daily work or longevity constituted legal consideration for the pension interest. Since that time, the employee's interest in the pension fund has been recognized as being more than a mere gift.

## SUMMARY OF ARGUMENT

1. An employee's interest in a pension fund is an "investment contract," a term expressly included by the Congress when it set forth a definition of "security" in the Securities Act and in the Securities Exchange Act. This Court has held that the touchstone of the existence of an investment contract is whether an interest, in light of "economic reality," constitutes "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Foundation, Inc.* v. *Forman*, 411 U.S. 837, 852.

In the case of a pension fund, the "economic reality" is that the employee, through his labor, acquires an interest, together with other employees, in a common fund over which he and his fellow employees exercise no direct managerial control. The amount of money that the employee has a "reasonable expectation" will be returned to him, in the form of a pension, exceeds the contributions made to the fund because of the managerial efforts of the fund's

19

trustees—efforts which consist, *inter alia*, of collecting pension contributions, making calculations concerning life expectancies, and investing the fund's monies. Thus, an interest in a pension fund falls squarely within the definition of "investment contract" that this Court has applied in a long line of cases, beginning in 1943 with *Securities and Exchange Commission* v. *C. M. Joiner Leasing Corp.*, 320 U.S. 344, and continuing through the decision in *Forman*, *supra*.

In *Securities and Exchange Commission* v. *W. J. Howey Co.*, 328 U.S. 293, 301, this Court cautioned against obscuring the fundamental economic reality of transactions through the use of "unrealistic and irrelevant formulae." Nonetheless, the petitioners base their argument that an interest in a pension fund is not an investment contract upon such unrealistic formulae. In doing so, they place their heaviest reliance upon *Forman*, in which this Court held that interests in a cooperative housing association were not securities. In *Forman*, however, this Court did not disavow, and indeed expressly followed, the earlier cases in which it had found the presence of investment contracts. The basis for the holding in *Forman* that there was no investment contract was the fact that there was no expectation of profits by the purchasers in that case, who were acquiring *solely* a place to live. By contrast, employees who acquire interests in pension funds receive as compensation for their labor *both* wages and the promise of a pension upon retirement. In an analogous situa-

**20**

tion, this Court has previously found an investment contract in a case where "[t]wo entirely distinct promises"—one involving an insurance annuity and the other an interest in an investment fund—were "included in the contract and their operation [was] separated at a fixed point in time." *Securities and Exchange Commission* v. *United Benefit Life Insurance Co.*, 387 U.S. 202, 207. As to the expectation of profits from the pension fund interest in the present case, the petitioner Local 705 itself has stated, in describing its pension plan to employees, that "[y]our employer is contributing to the Fund now so that the money needed to pay your pension will be there when you retire" (App. 70a). Also, Local 705 informed employees (App. 72a-1):

> "Another advantage [of the Local 705 plan] is that the contributions earn income by being invested. Consequently the money originally contributed to the plan grows."

Such representations could lead only to the "reasonable expectation of profits."

2. An employee's acquisition of an interest in an involuntary, noncontributory, pension plan—the type of plan involved in this case—constitutes a "sale" for the purposes of the antifraud provisions of the federal securities laws, in that the employee voluntarily provides value for his interest in the pension fund in the form of his labor. Although the Commission has consistently taken the position that the acquisition of an interest in this type of pension fund does not involve a sale for the purposes of the *registration*

21

provisions of the Securities Act, it has not applied this "no sale" rationale for the purposes of the *anti-fraud* provisions. And, the appropriateness of treating a transaction as a sale for the purposes of the antifraud provisions but not for the purposes of registration was recognized by this Court in *Securities and Exchange Commission* v. *National Securities, Inc.*, 393 U.S. 453.

The historical justification for the "no sale" doctrine as applied to registration was based on the theories that (1) pensions were gifts and (2) the employee in a so-called involuntary pension plan has no choice whether or not to invest in the pension plan since, it was thought, an employee's decision to take or retain a job could never be affected by representations concerning the pension plan.

It has now been recognized by this Court and by other courts, however, and has been emphasized in the legislative history of ERISA, that pensions are not gratuities, but instead are compensation for the employee's labor that "may be traded off against current compensation" *Alabama Power Co.* v. *Davis*, 431 U.S. 581, 592-593. Similarly, the notion that the element of choice is absent in the acquisition of an interest in the type of pension fund involved in this case has no currency in modern times, in light of the recognition that an employee's decision to take or retain a job may well be affected by the pension plan. Today, pensions represent a major element in the compensation package provided by employers to employees. As the Secretary of Labor stated to the

22

Senate committee considering the bill which became ERISA, "the variety of [pension] plan types is a significant element in the competition among employers for the workforce" (*see* page 84 *infra*). Indeed, in the present case the respondent's allegations, which must be accepted as true for the purposes of the motion to dismiss, included the statement that he would have sought other employment had he known he would not be eligible for a pension under the Local 705 plan.

In sum, the reasoning behind the "no-sale" rationale has been undermined by the evolution of the economic significance and legal understanding of pensions. Accordingly, that rationale, developed only in the context of registration, should not now be held applicable to the antifraud provisions.

3. Although the enactment of ERISA now provides some important protections to participants in pension plans, it does not provide the same type of protections as the antifraud provisions of the securities laws, and nothing in ERISA conflicts with the antifraud provisions. ERISA did not preempt the federal securities laws but, instead, expressly preserved all federal laws; and the standards for implied preemption—that "the earlier and later statutes are irreconcilable"—also are not met. *Tennessee Valley Authority* v. *Hill*, 46 U.S.L.W. 4673, 4683. In any event, the conduct complained of in this case occurred long before the enactment of ERISA.

23

Although the petitioners believe that the application of the antifraud provisions to the acquisition of interests in pension funds is undesirable as a matter of national labor policy, this Court has refused to consider policy issues not related to the securities laws in determining the question of whether an interest is a security. *See Tcherepnin* v. *Knight,* 389 U.S. 332, 346. And, the policy concerns embodied in the antifraud provisions of the securities laws—including the policy of prohibiting fraud by those who manage other people's money—require that those provisions be held applicable to interests in pension funds. Even if the petitioners were correct that labor law policies would be better served if defrauded employee-investors in pension funds were left with no remedy against those who have made misrepresentations upon which the employee has relied to his detriment, it is, in the words of this Court, "the exclusive province of the Congress not only to formulate legislative policies, mandate programs and projects, but also to establish their relative priority for the Nation." *Tennessee Valley Authority* v. *Hill, supra,* 46 U.S.L.W. at 4684.

24

## ARGUMENT

**Introduction: The Nature of the Antifraud Provisions Has Been Misunderstood by the Petitioners and This Misunderstanding Has Caused Exaggerated Fears of Retroactive Liability.**

The sole issue presented by this case, on an interlocutory appeal from an order refusing to dismiss the securities laws counts of the complaint, is the issue of whether the complaint in this private action, as construed most favorably on behalf of Mr. Daniel,[16] sets forth the threshold requirements for imposition of liability pursuant to the antifraud provisions of the securities laws—the existence of a "security" and the occurrence of a "sale."

The petitioners, and the *amici* who support them, have attempted to obscure that issue, however, with an argument which is not only irrelevant to the threshold questions presented, but also is based upon a misunderstanding of the nature of the antifraud provisions of the securities laws. They argue that the applicability of the antifraud provisions to pension plans would subject pension plans to massive retroactive liability.[17] This fear, however, is founded on two basic errors.

First, the petitioners' fears of liability are not based on any assertion that there has been significant fraudulent behavior in the past, but instead on their

---

[16] *See Gardner* v. *Toilet Goods Ass'n, Inc.*, 387 U.S. 167, 172.

[17] *See, e.g.,* IBT Br. 135-136; Local Br. 35-37; NCCMP Br. 27-32; ERIC Br. 23-24.

belief that the antifraud provisions impose an across-the-board requirement of extensive, specific affirmative disclosures of various pension terms including actuarial probabilities. The petitioners and *amici* have fashioned their overbroad view of the scope of the antifraud provisions by seizing upon *dictum* in the court of appeals' decision which suggests (App. 255a), incorrectly in our view, that the antifraud provisions impose such a requirement.[18]

In this regard, the *antifraud* provisions, which are involved in this case, should be contrasted with the Securities Act's *registration* provisions (which are not). The registration provisions, which are commonly referred to as the Securities Act's "disclosure" provisions, are designed to assure that investors will be furnished all material information needed to make an informed investment decision. The mechanism for meeting that objective is the filing with the Commission of a registration statement, and the delivery to investors of a prospectus, containing detailed financial and other information about the security and its issuer. The Commission, however, has never asserted that the registration provisions apply to the type of pension fund involved in this case. Indeed, Congress, in a 1970 amendment to the Securities Act, has specifically exempted interests in most pension plans

---

[18] This language in the opinion is *dictum,* because the only issue before that court was the threshold issue of whether there was a security and a sale. The issue of whether the antifraud provisions require specific disclosures was neither before the court nor fully briefed by the parties.

26

from the requirement of registration;[19] and, even apart from that exemption, the Commission has long and consistently interpreted the Securities Act as not requiring registration of interests in so-called involuntary or noncontributory pension funds like the Local 705 plan involved here.[20]

The *antifraud* provisions, by contrast, do not establish a system of detailed specific affirmative disclosures to investors, but rather are a prohibition of fraudulent conduct, including the making of false or misleading representations.

Thus, any estimate of potential retroactive liability for pension funds that is based upon an assumption that all pension funds must make specific actuarial disclosures is inaccurate and exaggerated. Indeed, the *amicus* AFL-CIO has conceded that if the antifraud provisions, instead of requiring disclosure of actuarial probabilities, were held to be violated only because of the failure to disclose the Local 705 break-in-service rule, little liability would result. The AFL-CIO stated in its brief in support of the petitions for *certiorari*, at 3:

> "A holding so limited would have precluded claims by the vast majority of individuals who receive no benefit because the basic plan of eligibility rules have almost universally been made known to participants, and, indeed, under ERISA *must* be disclosed."

[19] Section 3(a)(2) of the Securities Act, 15 U.S.C. 77c (a)(2). *See* pages 59-61, *infra*.

[20] See pages 64-67, *infra*.

Case 1:23-cv-04738-KPF Document 37-2 Filed 08/04/23 Page 40 of 115

Similarly, an actuarial study commissioned by the Department of Labor concerning the possible effect upon pension plans of the decision below conceded (II-3):

> "Most terminated non-vested participants in pension plans have not been led to expect that they were entitled to a pension. If liability exists only with respect to terminating participants who received information leading them to expect a pension, it does not apply to most terminated participants." [21]

Second, any retroactive liability to employees for violations of the antifraud provisions in connection with a noncontributory, involuntary pension plan is limited by the requirements that the private plaintiff demonstrate:

(1) that he made an investment decision, in that his decision to take or retain a job was materially influenced by the pension;

(2) that a fraud occurred;

(3) that he was injured; and

---

[21] Grubbs, Report to the Secretary of Labor, Potential Effects of *Daniel,* Mar. 20, 1978. The Grubbs study, cited in NCCMP Br. 19, 28, 29; ERIC Br. 23-24, and Local Br. 36-37, is of no practical use in determining what, if any, liabilities would result from affirmance of the holding below, because the estimate of liability in that study is based upon a presumption that actuarial probabilities always must be disclosed. No effort was made, in the study, to estimate what liabilities would ensue if the antifraud provisions, as we submit, do not impose an across-the-board requirement to make the disclosures suggested in the court of appeals' opinion.

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 41 of 115

(4) that his injury was causally related to the fraud.[22]

The problems inherent in establishing these requisites for relief would limit the number of persons who would be able to establish a violation of the anti-fraud provisions.[23]

On the basis of the petitioners' exaggerated predictions of the amount of liability which would result from affirming the court below, they mistakenly rely upon this Court's decision in *Los Angeles Department of Water & Power* v. *Manhart*, 98 S. Ct. 1371, to support their contention (IBT Br. 135-141) that the application of the antifraud provisions of the securities laws to pension plans should be prospective only.

This Court in *Manhart*, a case not involving the federal securities laws, was concerned that retro-

---

[22] To establish a violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, a private plaintiff must also establish that the defendant acted with *scienter*. *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185. It has not yet been decided by this Court whether *scienter* is also required under Section 17(a) of the Securities Act, although the court of appeals held that such a requirement exists under the circumstances of this case. It is not necessary for this Court to reach that question, or the question raised by Local 705 of whether Section 17(a) gives rise to an implied private right of action, since violations of Section 10(b), as alleged by the respondent, provide a jurisdictional predicate for the determination of the threshold issue of whether the complaint establishes the existence of a security and a sale.

[23] The Grubbs study (*see* n. 21, *supra*) is of no utility not only for the reasons set forth in n. 21, *supra*, but also because it completely ignores the elements of securities fraud which a private plaintiff must establish.

29

active liability with respect to a plan that it had held discriminated on the basis of sex could be "devastating" for a pension fund, and that "[t]he harm would fall in large part on innocent third parties." *Id.* at 1382-1383. The Commission recognizes the importance of maintaining the solvency of pension funds. *Manhart,* however, differs critically from the present case in that this Court there refused to apply its holding retroactively in part because "conscientious and intelligent administrators of pension funds * * * may well have assumed that a program like the Department's was entirely lawful." *Id.* at 1381. While it may very well be that the petitioners in this case did not anticipate that the securities laws were applicable to pension plans, "conscientious and intelligent administrators of pension funds" would not commit the type of fraud alleged here, which included misrepresentations. A different situation, however, might be presented if, as the court of appeals erroneously suggested, the antifraud provisions imposed a specific affirmative disclosure requirement, applicable to all pension funds, relating to actuarial probabilities. In such a case, unlike the present case, perhaps the rationale articulated in *Manhart* would preclude an imposition of retroactive liability upon persons who have, in good faith, failed to make such disclosures.

30

## I. AN INTEREST IN A PENSION FUND IS A "SE-CURITY" WITHIN THE MEANING OF THE FEDERAL SECURITIES LAWS.

### A. An Interest in a Pension Fund Is an "Investment Contract" as That Term Has Been Interpreted in Numerous Decisions of this Court.

The term "security" as defined in Section 2(1) of the Securities Act, 15 U.S.C. 77b(1), and Section 3 (a)(10) of the Securities Exchange Act, 15 U.S.C. 78c(a)(10), includes any "investment contract." Although the term "investment contract" was not expressly defined in the securities laws or their legislative history, the meaning of the term had been "crystallized by * * * prior judicial interpretation"[24] to represent "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."[25] Unlike a tangible commodity, which a prospective purchaser can observe and evaluate, a security derives value from, and subjects the purchaser to the risks of, the unseen future ability of those who manage his investment. For this reason, securities investors have been accorded special status and protections.

In determining whether an investment vehicle constitutes a security, this Court has repeatedly emphasized the guiding principle

---

[24] *Securities and Exchange Commission* v. *W. J. Howey Co.*, 328 U.S. 293, 298.

[25] *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837, 852.

> "that, in searching for the meaning and scope
> of the word 'security' in the [Securities Ex-
> change] Act [of 1934], form should be disre-
> garded for substance and the emphasis should be
> on economic reality."

*Tcherepnin* v. *Knight*, 389 U.S. 332, 336; *United
Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837,
848 (1975).

In the case of a pension fund, the "economic
reality" is that the employee, through his labor, ac-
quires an interest, together with other employees,
in a common fund over which he and his fellow em-
ployees exercise no direct managerial control, with
the hope and expectation that payments made on his
behalf into that fund with profits thereon will be
returned to him at a later date in the form of a
pension.

This emphasis on economic reality must govern, re-
gardless of "the name appended" to the interest
(*Forman, supra,* 421 U.S. at 849) or the particular
legal form the interest takes. Thus, in *Securities
and Exchange Commission* v. *C. M. Joiner Leasing
Corp.,* 320 U.S. 344, the first case in which this
Court defined the scope of the term "security," an oil
promoter had formed a corporation which acquired
oil and gas leaseholds. These leaseholds were then
sold to investors by the use of literature emphasizing
the future return of a profit. The lower courts had
refused to enjoin this activity under the federal
securities laws on the ground that, in the words of
the court of appeals, it could only "find * * * sales

32

and assignments of legal and legitimate oil and gas leases, *i.e.*, sales of interests in land." *Id.* at 348. Mr. Justice Jackson, writing for the majority, rejected this conclusion that only property rights were involved and held that the interests were investment contracts. He stated (*id.* at 352, citations omitted):

> "Nor can we agree with the court below that defendants' offerings were beyond the scope of the Act because they offered leases and assignments which under Texas law conveyed interests in real estate. In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering."

Similarly, in *Securities and Exchange Commission v. W. J. Howey Co., supra,* where purchasers were offered small amounts of citrus acreage accompanied by a management contract with a subsidiary of the seller, the lower courts had placed undue reliance on the formal context and had thus failed to appreciate the underlying character of the offer, treating the transaction as no more than an ordinary real estate sale with an agreement by the seller to manage the property for the buyer. This Court, however, recognized that the purchasers in *Howey* were basically "laying out [their] money in a way intended to secure income or profit from its employment," 328 U.S. at 298, and that it was "immaterial" that the transaction took the form of a sale of "property." *Id.* at 301.

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 46 of 115

In subsequent cases, this Court has found securities
to exist in situations where the interests not only
bore labels foreign to those traditionally associated
with securities, but also were subject to regulation
under other statutory schemes.  Thus, in *Securities
and Exchange Commission* v. *Variable Annuity Life
Insurance Co. ("VALIC")*, 359 U.S. 65, the Court
was confronted with the question whether variable
annuity contracts sold by insurance companies were
securities.  Under a variable annuity contract, the
benefit payments made to the purchaser vary with
the success of the company's investments.  The de-
fendants claimed that the contracts were solely "in-
surance" contracts, and that it would be inconsistent
with applicable state insurance regulations and thus
with the McCarran-Ferguson Act,[26] to hold that sell-
ers of these contracts must also comply with the re-
quirements of the securities laws.  Notwithstanding
the fact that the contracts had elements of insurance
since the benefit payments were made periodically
from both principal and income on the basis of
actuarial assumptions about the risk of mortality,
the Court concluded that the protections of the securi-
ties laws were needed because the variable annuity
"place[d] all the investment risks on the annuitant"
(*id.* at 71); that is, his return was dependent upon

---

[26] That Act provides that "[n]o Act of Congress shall be
construed to invalidate, impair or supersede any law enacted
by any State for the purpose of regulating the business of
insurance * * *." 15 U.S.C. 1012(b).

34

the investment experience of the variable annuity fund.

In *Securities and Exchange Commission* v. *United Benefit Life Insurance Co.*, 387 U.S. 202, this Court again considered the question of whether a certain type of annuity contract offered by an insurance company was a security. In that case, the purchaser agreed to make a fixed monthly payment for a number of years before a specified maturity date. The seller of the contract undertook to invest the payments. At maturity, the purchaser could elect to take the cash value of his contract, or he could convert his interest into a fixed annuity. The Court held that the pre-maturity portion of the contract was an investment contract even though the purchaser also received an insurance annuity.

In *Tcherepnin* v. *Knight, supra,* the Court considered an interest which was subject to regulation under statutes other than the securities laws, and specifically declined to hold that the absence of features traditionally associated with securities precluded the interests there involved from being securities. The case involved withdrawable capital shares in a state-regulated savings and loan association. In holding that the shares were "investment contracts" under the *Howey* formulation, the Court declined to hold, as urged by *amicus* ERIC in this case (ERIC Br. 33), that an interest must be "commonly known as a security"—another term in the definition of security—before it can be considered to be a security, stating (389 U.S. at 343):

> "This, of course, is contrary to our decision in
> *Joiner* where we rejected the respondents' invi-
> tation to 'constrict the more general terms sub-
> stantially to the specific terms which they fol-
> low.' "

The defendants in that case also stressed that the
capital shares differed from other securities in that
their holders had no preemptive rights, they were
nonnegotiable, and they carried no rights to inspect
the association's books and records. This Court re-
sponded (*id.* at 343-44):

> "The same can be said for the types of interests
> which we found to be securities in *Howey* and
> *Joiner* * * * . In short, the various factors * * *
> serve only to distinguish among different types
> of securities. They do not, standing alone, gov-
> ern whether a particular instrument is a secu-
> rity under the federal securities laws."

In short, this Court consistently has refused to
allow the form or label of an interest to obscure its
underlying economic reality; and, even though the
interest is subject to regulation under other laws, it
is a security if the purchaser is investing in a com-
mon enterprise with the expectation of profits to be
derived from the managerial efforts of others. Under
that test, the pension fund interests in the present
case, like the various interests held to be securities in
the past, unquestionably are securities.

In urging that interests in pension funds are not
securities, the petitioners and *amici* set forth a num-
ber of factors which, in their view, distinguish an

interest in a pension fund from other types of investments that are securities. We submit, however, that none of those factors are included in the test for determining the existence of an investment contract which has been set forth by this Court. Moreover, relying upon such factors as a basis for finding that an interest in a pension fund is not a security not only ignores the "economic realities" underlying participation in a pension plan but also would result in a diminution of the protections afforded by the securities laws to investors generally.

IBT argues that the participant in the Local 705 pension plan has no "interest" in the plan or fund, but merely a "contingent expectancy of future pension payments," in that "[a]lthough contributions are made for each week of work by each employee in the covered group, no employee receives anything of present economic value by reason of any such contributions" (IBT Br. 40). But, nothing in the definition of investment contract that has been consistently applied by this Court requires that an investor be immediately entitled to the profits he hopes will result from his investment. This Court has never held that the existence of an investment contract requires a certainty of profits, but only a "reasonable expectation." *Forman, supra,* 421 U.S. at 852. And, in this case, the court of appeals, in summarizing Mr. Daniel's affidavit, noted (App. 215a):

> "One of Local 705's booklets advised him that the purpose of the pension fund was to take care of him and his family in the case of retirement

Case 1:23-cv-04738-KPF  Document 37-2  Filed 08/04/23  Page 50 of 115

> and that the funds afforded protection to him, his wife, and unmarried children under 18 years of age."

Similarly, Local 705's 1969 booklet stated, "[y]our employer is contributing to the Fund now so that the money needed to pay your pension will be there when you retire" (App. 70a-14). Such representations could only lead to a "reasonable expectation" that profits from the investment made on his behalf would be forthcoming.

The fact that an employee may never realize the profits of his investment, through either voluntary or involuntary cessation of employment, is germane to the relative merits, as an investment, of participation in a pension fund in comparison to other forms of investment, but completely irrelevant to the fact that a portion of the employee's total compensation package is being invested in a common enterprise with the "reasonable expectation"—not promise—of profits.[27] It is true, of course, as IBT states (IBT Br. 42), that the employer who makes contributions to a multi-employer plan on an employee's behalf may go out of business. But the same could be said with respect to any investment—the issuer of a security may always go out of business and any security may become worthless. Moreover, in the case

---

[27] The fact that an interest is contingent does not mean it is not legally cognizable. For example, contingent remainders are a recognized interest in real property, and contracts may be subject to a condition precedent. *See* Restatement, Contracts § 250(a).

38

of a multiemployer plan such as the Local 705 plan, even if one employer decides to cease operations an employee may retain his pension rights by obtaining employment with another employer who participates in the plan. And although, as IBT points out (IBT Br. 42), the union, as the employee's agent, may agree with the employer to terminate a pension plan, under agency principles this is no different than if the employee himself had agreed to forego his pension rights in order to receive other benefits. Finally, the petitioners do not dispute that other types of investment vehicles not involving present rights but instead involving contingent expectancies are securities. For example, in employee stock option plans, the right to exercise the option may be dependent upon, for example, the employee's remaining in the job for a certain length of time.

Similarly, IBT seems to assume that a requisite element of an investment contract is that there be a direct correlation between the increase in the value of the fund through investments in securities and the benefits received by the participant, stating that "[p]erhaps the most fundamental objection to the [Court of Appeals'] 'profit' theory is that the investment gain of the fund does not necessarily redound to the advantage of the ultimate pension beneficiary" (IBT Br. 44). As the court below noted, however (App. 227a n. 23):

> "That th[e] profit element is fixed because pension payments are set at specific levels from time to time is wholly immaterial to gain being profit

> in the *Forman* sense. A number of instruments which all would concede to be securities (bonds, debentures, etc.) are fixed return."

Moreover, the managerial efforts which are an essential element of an investment contract need not, as the petitioners' arguments assume, consist solely of managing other investments, nor must those profits result from investments in the capital markets at all. The profits returned to the investor can result from management of any type of enterprise, including, as this Court has recognized, citrus acreage and oil and gas properties. See *Howey* and *Joiner, supra.* In the case of a pension fund, the managerial efforts include making actuarial assumptions and collecting the pension contributions from the employer. In any event, it is clear that the amount available for the payment of Local 705 pension benefits is affected by the efforts of the fund's trustees in managing the fund's investments and by the resulting investment performance of the fund. Indeed, IBT concedes that about 9 percent of the actuarial value of the pension benefits is attributable to "investment gain" (IBT Br. 74),[28] and Local 705 has itself expressly acknowl-

---

[28] The affidavit for the Local 705 pension fund, appended to Local 705's brief, states that "[i]t has been the policy of the fund, since its inception, to invest either in government or short-term securities on a self-administered basis" (Local Br. A6). In this regard, it is not disputed that the total amount of monies in a fund affect the amount of benefits received by the participants. The Grubbs Study, see n. 21, *supra,* relied on by the petitioners (Local Br. 36-37) and *amici* (ERIC Br. 23-24; NCCMP Br. 19, 28-29), is implicitly based

40

edged (*see* page 15, *supra*) that the payment of
pension benefits is affected by the efforts of the fund's
trustees in managing the fund's investments and by
the resulting investment performance of the fund.
Finally, the petitioners' attempt to attribute sig-
nificance to the fact that payments are made, in part,
on the basis of actuarial assumptions and not solely
on the basis of investment performance is answered
by this Court's decision in *VALIC*, since variable
annuity benefits are likewise based on actuarial as-
sumptions. *VALIC*, 359 U.S. at 70 (*see* page 33,
*supra*).

In *Howey*, this Court cautioned against obscuring
the fundamental economic reality of transactions
through the use of "unrealistic and irrelevant for-
mula." 328 U.S. at 301. The petitioners, however,
attempt to utilize such unrealistic formulae to negate
the fact that the employee acquires an interest in
the pension fund as compensation for his labor. Thus,
IBT states that "[a]n employee does not part with
money, he performs labor" (IBT Br. 37). But, unless
the petitioners wish to suggest that the part of the
employee's compensation which takes the form of
contributions to the pension fund results from volun-
teer work, the economic reality is unchanged whether
the employee first receives money which he must
invest in a pension fund or whether the contribution
to the pension fund is made directly by the employer.

---

upon that assumption, in that it states (I-6): "In defined con-
tribution plans and in multiemployer plans, any additional
costs paid by the plan and its trust reduce the amount of bene-
fits that can be paid to participants."

The idea that pensions are "gifts" from the employer to the employee has no currency in modern times.[29] Indeed, this Court has recognized that "future [pension] benefits may be traded off against current compensation." *Alabama Power Co.* v. *Davis*, 431 U.S. 581, 592-593.

Curiously, the petitioners rely (IBT Br. 39; Local Br. 38-39) on *Alabama Power Co.* v. *Davis* in an attempt to demonstrate that the funding of a pension plan does not constitute compensation to the employee. The *Davis* case, however, involved a different type of pension plan than the plan involved in the present case—a single-employer plan. Thus, in *Davis*, this Court concluded that "pension plans are predominantly rewards for continuous employment with the *same employer*." *Id.* at 594 (emphasis supplied). The Local 705 plan, however, is a *multi-employer* plan. As long as a participant worked for any of the employers who would make contributions to the plan as an incident of his employment, he could receive a pension. Accordingly, the portion of *Davis* upon which the petitioners rely has no relevance to this case. In any event, whether the employee's interest in the plan is compensation for *daily* labor or compensation for *continuous* service is not relevant to the fact that the contributions to the pension fund constitute consideration for the employee's services and not a gift.

IBT notes that pension plans are negotiated by the union, not by the individual employee (IBT Br. 37).

---

[29] *See* pp. 77-82, *infra.*

42

But, the way in which the terms of an investment are determined is not dispositive of whether or not an investment contract exists. In *Tcherepnin, United Benefit,* and *VALIC,* the individual investors could not negotiate the terms of their investment contract; they could merely choose to invest or not to invest.

Similarly, IBT makes the point (IBT Br. 41), without explaining its relevance to the question of whether there is a security, that the participant in a pension plan cannot convey that interest. But neither the securities laws nor the cases interpreting those laws require that an interest be transferable in order to constitute a security.

A similar misconception underlies IBT's claim (IBT Br. 42) that no security is involved because the employee's investment is subject not only to the risk of lack of investment success, but also to the risk that there will be a sharp reduction of employment or that contributing employers will become insolvent. But, every business enterprise, large or small, may suffer adverse economic circumstances or even become bankrupt from causes wholly outside the control of management. Thus, the investor in *Howey* was subject to the risk that poor weather would diminish the value of his investment.

Also without merit is Local 705's assertion that it is significant that an employee receives no document evidencing his investment (Local Br. 54). It is clear that the existence of a security is not dependent upon the issuance of a document. *See* H.R. Rep. No. 1838, 73d Cong., 2d Sess. 39 (1934); *Securities and Ex-*

43

*change Commission* v. *Addison,* 194 F. Supp. 709, 722 (N.D. Tex.); 1 Loss, *Securities Regulation* 458 (2d ed. 1961).

IBT also argues that the profits received by the investor in a pension fund do not result solely from the efforts of others because "the pension beneficiary himself must play a major role" (IBT Br. 50), presumably by performing the labor necessary to meet the eligibility requirements. But it is true of any investment that the investor's own efforts are involved in acquiring the money to invest. Moreover, the employee's services are not the "managerial" services on which his investment depends. *See* page 30, *supra.*

The petitioners place their greatest reliance on the *Forman* case, stating that "[t]he reasoning of Forman requires reversal of the decision in this case" (IBT Br. 30; *see also,* Local Br. 23). In so arguing, however, they have misread and misinterpreted *Forman,* and in addition, they fail to consider that case in the context of the five prior decisions of this Court discussed previously. The *Forman* decision is in no way inconsistent with the principles enunciated in the previous decisions which support the conclusion that interests in pension funds are securities. Indeed, the Court in *Forman* noted, "we do not write on a clean slate," and proceeded to apply what it characterized as "well-settled principles [previously] enunciated by this Court * * *." 421 U.S. at 848.

In *Forman,* this Court, reversing a court of appeals decision, held that interests in a cooperative housing association were not securities. The lower court had

\

44

relied on two alternate theories—that the interests were denominated "stock" and that the interests met the definition of "investment contract." This Court first rejected the literal approach of the former alternative. Viewing the securities laws as being primarily oriented toward transactions that are economic in character, the Court reaffirmed its earlier decisions to the effect that "Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." *Id.* at 849. The Court then concluded that the interests in the cooperative were not "stock" because "they lack what the Court in *Tcherepnin* deemed the most common feature of stock: the right to receive 'dividends contingent upon an apportionment of profits.' 289 U.S. at 339." 421 U.S. at 851.

Turning to the second alternative used by the court of appeals, the "investment contract" theory, this Court in *Forman* relied on the *Howey* formulation, stating (*id.* at 852):

> "[T]he basic test for distinguishing the [securities] transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' *Howey*, 328 U.S. at 301."

The Court continued (*id.* at 852):

> "This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touch-

45

> stone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entreprenurial or managerial efforts of others."

The Court then rejected the conclusion of the court of appeals that "profits" were expected by purchasers of the cooperative interests. First, it rejected "summarily," as types of securities profits, benefits to cooperative purchasers consisting of favorable tax consequences and low rental charges. The Court did discuss the possibility that "profit" could be found in the fact that net income derived from the leasing of space for commercial facilities was to be used to reduce rental costs. However, it found (421 U.S. at 856-857):

> "The short of the matter is that the stores and services in question were established not as a means of returning profits to tenants, but for the purpose of making essential services available for the residents of this enormous complex."

Consequently, having been unable to find that any "profit" could be expected by the purchaser of the cooperative stock, the Court was forced to conclude that no security was involved. As the Court concluded (id. at 858):

> "What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use."

46

In relying on *Forman*, IBT refers (IBT Br. 30) to the statement in that case that the "primary purpose" of the federal securities laws is to eliminate abuses in a largely unregulated securities market, thereby implying that, since pension interests are not traded in the securities markets, they should not be considered securities. But this language from *Forman* did not appear in that part of the opinion discussing whether there was an "investment contract," the term involved here. The language was used only in connection with the question of whether the shares of the cooperative, which were denominated "stock," were securities because the definition of "security" includes the term "stock." In determining whether the "stock" of the cooperative was the type of "stock" which Congress contemplated, the Court appears to have considered it significant that the cooperative stock was not traded in the securities markets. Such a limitation, however, has never been considered applicable to the investment contract portion of the definition of security.[50] Thus, in at least four of the

---

[50] As this Court noted in *Howey, supra,* 328 U.S. at 298:

"The term 'investment contract' is undefined by the Securities Act or by relevant legislative reports. But the term was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute and, although the term was also undefined by the state laws, it has been broadly construed by state courts so as to afford the investing public a full measure of protection. * * *

"By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a

47

five preceding Supreme Court cases, the interests held to be investment contracts, and therefore securities, were not traded on a market. Furthermore, in *Tcherepnin, supra*, 389 U.S. at 345, this Court took exception to the reasoning of the court of appeals in that case, which, in holding that the withdrawable shares were not securities, had noted that the securities laws "were passed in the aftermath of the great economic disaster of 1929." The court of appeals had therefore concluded that the securities laws were intended to deal only with "speculation in securities which had a fluctuating value and which were traded in securities exchanges or in over-the-counter markets." This Court responded (*id.*):

> "This statement suggests, and the respondents have argued in this Court, that the petitioners' withdrawable capital shares are not within the purview of the 1934 Act because their value normally does not fluctuate and because they are normally not traded in securities exchanges or over-the-counter. The accuracy of this assertion is open to question. But, more important, it is irrelevant to the question before us. As was ob-

term the meaning of which had been crystallized by this prior judicial interpretation."

Under state "blue sky" laws, the term "investment contract" was never limited to apply only to securities traded in a securities market. *See, e.g., State* v. *Robbins,* 185 Minn. 202, 240 N.W. 456 (1932) (muskrats); *Stevens* v. *Liberty Packing Corp.,* 111 N.J. Eq. 61, 161 Atl. 193 (1932) (rabbits); *Kerst* v. *Nelson,* 171 Minn. 191, 213 N.W. 904 (1927) (vineyards); *Prohasta* v. *Hemmer-Miller Development Co.,* 256 Ill. App. 331 (1930) (farm lands).

served in *Howey*, 'it is immaterial whether the enterprise is speculative or nonspeculative.' 328 U.S. at 301." (footnote omitted).

IBT similarly refers (IBT Br. 30) to other language used by the Court in *Forman* only in its discussion of the term "stock"—the Court's statement (421 U.S. at 851) that the housing cooperative shares involved there had "none of the characteristics 'that in our commercial world fall within the ordinary concept of a security.' H.R. Rep. No. 85, [73d Cong., 1st Sess.] 11 ;[(1934)]." But neither did the citrus acreage,[31] chinchillas,[32] Scotch whisky [33] or numerous other property interests [34] which have been held to involve investment contracts.

---

[31] *Howey, supra.*

[32] *Miller* v. *Central Chinchilla Group, Inc.,* 494 F.2d 414 (C.A. 8).

[33] *Glen-Arden Commodities, Inc.* v. *Costantino,* 493 F.2d 1027 (C.A. 2).

[34] *See Ahrens* v. *American-Canadian Beaver Co.,* 428 F.2d 926 (C.A. 10); *Securities and Exchange Commission* v. *MacElvain,* 417 F.2d 1134 (C.A. 5), *certiorari denied,* 397 U.S. 972 (interest in a lawsuit); *Continental Marketing Corp.* v. *Securities and Exchange Commission,* 387 F.2d 466 (C.A. 10), *certiorari denied,* 391 U.S. 905 (beavers); *Roe* v. *United States,* 287 F.2d 435 (C.A. 5), *certiorari denied,* 368 U.S. 824 (oil leases); *Blackwell* v. *Bentsen,* 203 F.2d 690 (C.A. 5) (citrus groves); *Lennerth* v. *Mendenhall,* 234 F. Supp. 59 (N.D. Ohio) (archery range); *Securities and Exchange Commission* v. *Payne,* 35 F. Supp. 873 (S.D. N.Y.) (foxes); *Securities and Exchange Commission* v. *Gilbert,* 29 F. Supp. 654 (S.D. Ohio) (motor boats).

49

IBT further interprets *Forman* as precluding "taking a complex transaction [and] breaking it into small parts," stating that the decision of the court below requires isolating the employee's "contingent expectancy" of receiving a pension from the "predominant considerations" in taking a job—"the nature of the job and the rate of pay" (IBT Br. 32, 33). IBT fails to recognize, however, that the purchaser in *Forman* was acquiring *only* housing—an interest which, as this Court emphasized, was not an investment for profits to be derived from the efforts of others (*see* page 45, *supra*). It was this lack of profit which was the critical factor in the Court's decision. By contrast, the employee who acquires an interest in a pension fund is obtaining, in addition to employment, an investment in a common fund with the expectation of profit—a security.[35] And, although IBT may well believe that "common sense" (IBT Br. 33)[36] indicates that the conditional promise of future pension rights is not a predominant consideration in taking a job, whether or not an interest is a security depends upon the objective characteristics

_____

[35] *Amicus* NCCMP argues that in the previous cases in which this Court found the existence of an investment contract, "the interest sold as an investment contract was advertised and sold as an investment" (NCCMP Br. 9-10). But Local 705 itself, in its booklet describing its pension plan (App. 70a, 14), has stated, "the contributions [to the fund] earn income by being invested. * * *. Without this income growth the Fund could not accumulate enough money to pay the $250.00 monthly benefits."

[36] *See also* NCCMP Br. 9.

50

of the interest itself, not on the motivation of the individual acquiring the interest.

Of course, the question of an individual's motivation in acquiring an investment vehicle may be relevant to whether he can prevail in a private damage action alleging violations of the antifraud provisions, insofar as a plaintiff in such a case must establish that his injury was *caused* by the alleged fraud. By contrast, when the Commission brings an injunctive action or administrative proceeding against a person for violations of the antifraud provisions, the Commission is not required even to show that any investor was injured by the alleged fraudulent conduct. As stated in *Berko* v. *Securities and Exchange Commission*, 316 F.2d 137, 143 (C.A. 2), a case involving judicial review of a Commission administrative proceeding, in which a salesman contended that the Commission must show that his customers were injured,

> "the fact that the salesman's clients were not misled and indeed may even have profited from his actions is legally irrelevant. *Hughes* v. *Securities and Exchange Commission*, 85 U.S. App. D.C. 56, 174 F.2d 969, 974 (1949). The Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury."

To encumber the definition of "security" with factors relating to the motivation of particular individuals— which motivation may vary from individual to indi-

vidual—would seriously hamper the goals of the Commission's enforcement program which include quickly identifying fraudulent activity and "nipping it in the bud" by immediately seeking injunctive relief in the federal courts.

Like IBT, the Solicitor General also argues (SG Br. 16) that the question of whether there is an investment contract turns on a subjective factor—whether the individual investor has made an investment choice. His brief supports this argument with a quotation from *Forman, supra*, 421 U.S. at 858, that "[w]hat distinguishes a security transaction * * * is an investment where one parts with his money * * *" (SG Br. 16). The quoted language from *Forman*, however, does not address whether there is a security, but whether there is a securities "transaction"—a sale—and thus does not support the contention that "choice" is an element of the definition of investment contract.[37]

Just as IBT, as noted *supra* at page 49, has argued that the employee's investment in the pension fund cannot be separated from the other factors which may enter into his decision to take or retain a job, the Solicitor General, in a similar vein, argues (SG Br. 17-18) that in order for an interest in a pension fund to constitute a security the employees must be attracted to their jobs solely or primarily by the pros-

---

[37] Accordingly, the Commission has addressed the argument that the acquisition of an interest in a pension fund does not involve a choice in the section of this brief discussing whether there is a sale. *See* pp. 83-86, *infra*.

pects of a pension. In making this argument, his brief quotes from *Forman*, at 421 U.S. 852, language that this Court in turn was quoting from *Howey*, 328 U.S. at 300, that investors are "attracted solely by the prospects of a return." But, when this Court used that language in finding an investment contract in *Howey*, it was merely describing the factual situation presented by that case. Neither in *Howey* nor in *Forman* was this Court presented with a situation in which an investment decision is coupled with another type of decision. In *Forman*, this Court's holding that there was no investment contract was based not upon the circumstance that the persons acquiring cooperative housing were attracted more by housing than by profits, but rather upon the fact that such persons were acquiring solely housing and that no profit element was present at all.

By contrast, in the present case the respondent, in return for the value he gave in the form of his labor, was receiving two things—wages as well as an investment in the pension fund; and the underlying investment character of a security is not destroyed simply because a purchaser of that interest may be acquiring something else with his investment. Thus, in *Forman*, in a footnote directly appended to the paragraph in which the language cited in the brief of the Solicitor General appears, this Court recognized that a different case would have been presented if there had been an offer of "both a commodity or real estate for use *and* an expectation of profits," 421 U.S. at 853 n. 17 (emphasis supplied)—a situa-

tion where the purchaser would have acquired both
housing and a securities investment. This Court has
also recognized that an investor may be attracted by
several factors in *VALIC*, where the purchaser of the
variable annuity was interested in both in the in-
surance element of benefit payments for life and the
securities element of payments dependent upon the
investment performance of the variable annuity fund
(*see* pages 33-34, *supra*). Finally, in *United Benefit*,
the Court was confronted with an argument that the
insurance context of the annuity contract precluded
the applicability of the securities laws to the security
part of the contract (*see* page 34, *supra*). In rejecting
this argument, the Court stated (387 U.S. at 207):

> "[W]e do not agree with the Court of Appeals
> that the 'Flexible Fund' contract must be char-
> acterized in its entirety. Two entirely distinct
> promises are included in the contract and their
> operation is separated at a fixed point in time."

The same is true here: the employee furnishes his
labor in exchange for promises to pay wages during
his working years and, by reason of the employer's
payments into an investment fund on his behalf,
pension payments after his retirement.

### B. The Commission Has Consistently Taken the Position that Interests in Pension Funds Are Securities.

As we have demonstrated, the definition of security
in the securities laws encompasses interests in pen-
sion funds. The Commission, although it formerly
took the position that certain pension interests—those

54

involved in involuntary, noncontributory plans—did not involve a "sale" for the purposes of the registration process, has always recognized that such interests did constitute "investment contracts," and hence are securities. From the beginning, the securities laws were intended to protect from fraudulent conduct those persons who rely on the managerial efforts of others to return profits to them at a later date. In 1922, the House Report on one of the precursors of the securities laws described the kind of people the laws were intended to protect:

> "[The] victims [of securities fraud] are usually men and women of small means and little business experience and who have no means of judging the value of a security." [38]

Twelve years later, a House committee discussed the necessity of protecting investors who are unsophisticated in the ways of the financial world:

> "As a complex society so diffuses and differentiates the financial interests of the ordinary citizen that he has to trust others and cannot personally watch the managers of all his interests as one horse trader watches another, it becomes a condition of the very stability of that society that its rules of law and business practice recognize and protect that ordinary citizen's dependent position." [39]

The response of that Congress was to enact broad-ranging securities legislation designed, among other

---

[38] H.R. Rep. No. 760, 67th Cong., 2d Sess. 2 (1922).

[39] H.R. Rep. No. 1383, 73d Cong., 2d Sess. 5 (1934).

55

things, to protect investors against fraudulent conduct.

Several years later, in 1941, the Congress considered, but did not adopt, an amendment to Section 2(1) of the Securities Act which would have excluded from the definition of security, "any interest (or any instrument representing such interest) of employees arising out of or resulting from the creation or operation of any employees' stock bonus, pension, or profit-sharing trust * * *." [40] Commissioner Purcell, testifying before the Congress concerning this amendment,[41] articulated the Commission's view that interests in pension funds are securities, since a pension fund is simply another investment vehicle through which the funds of individuals are managed. He stated (1941 Hearings at 895):

> "Now, any plan under which employees are given the opportunity to place part of their earnings in a fund which is to be invested for their benefit and returned to them at a later date involves the offering of an 'investment contract.' In fact, many employee plans are in the nature of investment trusts and are indistinguishable in legal effect from investment companies offering securities to the public at large."

The petitioners and supporting *amici* attempt to turn Commissioner Purcell's testimony on its head,

---

[40] Hearings before the House Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. 919 (1941) ("1941 Hearings").

[41] *Id.* at 887-920.

stating that "Commissioner Purcell was speaking only of voluntary, contributory plans" (IBT Br. 106; *see also* Bankers Br. 6; Local Br. 43). The proposal upon which Commissioner Purcell was testifying, however, related to *all* pension funds. Significantly, Commissioner Purcell stated two reasons why some employee plans do not require registration. First, he pointed out that some employee plans do not involve securities. The type of plans he viewed as not involving securities were not *pension* plans at all. Indeed, Commissioner Purcell delineated specifically the type of employee plans which do not involve a security (1941 Hearings at 896) (emphasis supplied)):

> "Now, in anything that I have said, I do not mean to imply that every employees' plan requires registration. It is only those plans which involve the sale of an investment contract or some other type of security. *Obviously I am not talking about plans which provide simply for sick benefits or hospitalization or social and cultural activities.* The Securities Act does not apply unless the employees' payments are made with a view of their being invested and earning a return for them."

Second, he pointed out that, "even where the plan involves securities," registration is not required where there is no sale. *Ibid.*[42] He stated (1941 Hearings at 896):

---

[42] Commissioner Purcell also indicated that, notwithstanding the fact that the Commission viewed compulsory, noncon-

57

> "[C]ompulsory plans do not require registration. If a plan is so set up that participation in it is a condition of employment, the Commission has taken the position that, as in the case of a non-contributory or bonus plan, there is no sale involved."

If, as the petitioners urge, the Commission had regarded interests in noncontributory, compulsory pension plans as not being securities, there would have been no need to address the issue of whether a sale was involved. Thus it is clear that the pension interests which Commissioner Purcell, speaking for the Commission, viewed as being securities encompassed not only interests in voluntary, contributory plans but also interests in involuntary, noncontributory plans, like the Local 705 plan.

The Commission has articulated on other occasions its position that interests in pension funds are securities. Thus, in its *Institutional Investor Study* in 1971, the Commission noted that "interests of participants in [pension] plans meet the definition of 'security' under the Securities Act of 1933." [43] This statement was introduced into the record by Manuel Cohen, after serving as Chairman of the Commission, when he testified before the Senate Labor Committee which

---

tributory plans as involving securities that are not subject to registration, all securities are subject to the antifraud provisions. *See* page 75, *infra.*

[43] Institutional Investor Study, Report of the Securities and Exchange Commission, Summary Volume at 69 (1971) ("Institutional Investor Study").

58

was considering the bill that eventually became ERISA.[44] He also stated:

> "Pension plans represent an investment medium. Interests in a private pension plan fall within the definition of a security under the Securities Act of 1933, and most private pension plans would be subject to regulation under the Investment Company Act of 1940 but for a specific exemption from that statute."[45]

### C. Congress Has Taken Action Consistent With the View that Interests in Pension Funds Are Securities.

As the court below correctly noted (App. 233a), "[t]he legislative history of the 1933 and 1934 Acts themselves is silent on the question of pension plans." The court found, however, "a measure of guidance" in certain legislative action relating to the securities laws (App. 233a).

First, the court noted (App. 233a) that, in 1934, the Senate adopted an amendment to the Securities Act to exempt from registration "an offering made solely to employees of an issuer or of its affiliates in connection with a bona fide plan for the payment of extra compensation * * *." 78 Cong. Rec. 8708 (1934). This amendment was eliminated in conference because employee participants in such plans "may be in as great a need for protection afforded by availability of information concerning the issuer for

---

[44] Hearings on S. 3598 Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess. 238 (1972).

[45] Id. at 231. For a discussion of the Investment Company Act provision to which Mr. Cohen referred, see p. 62, infra.

**59**

which they work as are most other members of the public." H.R. Rep. No. 1838 (Conference Report), 73d Cong. 2d Sess. 41 (1934). While the rejected amendment, as IBT notes (IBT Br. 92), did not expressly refer to the type of pension plan involved in this case, the Conference Report demonstrates that the Congress was aware that compensation for employment may take the form of an investment and that, notwithstanding the special characteristics of the employer-employee relationship, employees as investors are in need of securities law protection.

Second, the court of appeals also found a measure of guidance (App. 236a) in the fact that, in 1970, the Congress amended Section 3(a)(2) of the Securities Act to exempt from registration, but not from the antifraud provisions,

> "any interest or participation in a single or collective trust fund maintained by a bank or in a separate account maintained by an insurance company * * * in connection with (A) a stock bonus, pension, or profit-sharing plan * * *." [46]

---

[46] Section 3(a)(2), as amended in 1970, provides, in pertinent part, an exemption for

> "any interest or participation in a single or collective trust fund maintained by a bank or in a separate account maintained by an insurance company which interest or participation is issued in connection with (A) a stock bonus, pension, or profit sharing plan which meets the requirements for qualification under section 401 of the Internal Revenue Code of 1954, or (B) an annuity plan which meets the requirements for the deduction of the employer's contribution under section 404(a)(2) of such Code, other than any plan described in clause (A) or (B)

60

The court of appeals viewed this exemption, for the reasons set out in its opinion (App. 236a-241a), as encompassing interests acquired by employees in pension funds, and thus as reflecting a Congressional belief that such interests, for which registration is not required, are securities subject to the antifraud provisions as are all other securities.[47] IBT argues (IBT Br. 126) that the 1970 amendment to Section 3(a)(2) does not encompass interests of employee participants in pension funds, but rather is limited to

---

of this paragraph (i) the contributions under which are held in a single trust fund maintained by a bank or in a separate account maintained by an insurance company for a single employer and under which an amount in excess of the employer's contribution is allocated to the purchase of securities (other than interests or participations in the trust or separate account itself) issued by the employer or by any company directly or indirectly controlling, controlled by or under common control with the employer or (ii) which covers employees some or all of whom are employees within the meaning of section 401 (c)(1) of such Code."

[47] Section 17(c) of the Securities Act, 15 U.S.C. 77q, a part of the antifraud section, provides: "The exemptions provided in Section 3 shall not apply to the provisions of this section"; and the House and Senate committees, in considering the 1970 legislation, specifically stated:

"As with other securities exempted under section 3 of the act, the amendment would not exempt the securities from the antifraud provisions of section 17."

H.R. Rep. No. 91-1382, 91st Cong., 2d Sess. 43 (1970); S. Comm. on Banking and Currency, Analysis of S. 34, 91st Cong., 1st Sess. 15 (1969) ("Analysis of S. 34").

interests sold by banks and insurance companies to pension plans.[48]

The legislative history of Section 3(a)(2) is not a model of clarity. But, even if the petitioners were correct in their reading of Section 3(a)(2), and we submit they are not for the reasons articulated by the court below and those set forth in note 48, *supra,* that does not negate the fact that Congress defined "security" to include "investment contract," a term which, as we have shown, includes employee interests in pension funds in light of well-established principles. Thus, the enactment of the 1970 Amendment to Section 3(a)(2) merely serves to bolster a conclusion which, we submit, is firmly grounded in the statutory definitions and the cases interpreting them.

---

[48] IBT's argument might be supportable if Section 3(a)(2) exempted only interests in collective trust funds. That Section, however, also exempts interests in *single funds* from the registration provisions. In the case of a single pension fund, there is only one security—the employee's interest in that fund. A bank or insurance company may have investment discretion over the assets of a single fund, but it is not considered to have sold the fund a security separate from the employee's interest in the fund. It is unrealistic to assert that the pension fund is itself holding a security consisting of a trust containing solely the pension fund's own assets. Accordingly, if Section 3(a)(2) did not apply to the employee's interest—as the petitioners contend—there would be nothing, in the case of single funds, to be exempted by the section and Congress' exemption of interests in single funds would serve no purpose.

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 75 of 115

62

IBT argues (Br. 95-102) that the exclusion of employee pension trusts from the definition of "investment company," in Section 3(c)(11) of the Investment Company Act of 1940, 15 U.S.C. 80a-3(c) (11), supports its "contention that Congress has never regarded employee plan participants as investors to be protected by the securities laws" (IBT Br. 96). Even a cursory glance, however, at the various types of investment devices excluded from the coverage of the Investment Company Act demonstrates that the basis of exclusion is not that persons with interests in the excluded entities are not investors. Thus, excluded from coverage under that Act, for example, are issuers of securities with a small number of investors (Section 3(c)(1)), brokerage firms (Section 3(c)(2)), and banks and insurance companies (Section 3(c)(3)). A person who owns stock in, for example, an insurance company, is an investor, even though the company is not subject to the scheme of substantive regulation embodied in the Investment Company Act. And, the exclusion for pension plans is limited to plans meeting the requirements of Section 401 of the Internal Revenue Code, or collective trusts consisting of such tax-qualified plans. If the reason for exclusion from the Act was that participants were not investors, it would not make sense to exclude some plans and include others depending on the tax status of the plan.

In any event, as IBT recognizes, "[t]he Investment Company Act of 1940 goes beyond disclosure and introduces various substantive regulatory provisions

* * *." [49] Since Congress, and the Commission, have not subjected most pension plans even to the disclosure requirements of the registration provisions of the Securities Act, it would have been anomalous to subject those plans to the Investment Company Act's panoply of substantive regulation.

## II. A SALE OF A SECURITY OCCURS WHENEVER AN EMPLOYEE TAKES ACTION WHICH RESULTS IN HIS GIVING VALUE IN EXCHANGE FOR AN INTEREST IN A PENSION FUND; AND WHERE HIS ACTION WAS MATERIALLY INFLUENCED BY FRAUDULENT REPRESENTATIONS CONCERNING THE PENSION, THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS PROVIDE REDRESS.

The applicability of the antifraud provisions depends not only on there being a security, but also on there being a sale (or an offer to sell). The term "sale" is defined in Section 2(3) of the Securities Act, 15 USC 77b(3), as including

> "every * * * disposition of a security or interest in a security, for value."

The term is defined in Section 3(a)(14) of the Securities Exchange Act, 15 USC 78c(a)(14), as including "any contract to sell or otherwise dispose of."

---

[49] IBT Br. 96, quoting from Testimony of Securities and Exchange Commission Chairman Manuel F. Cohen, Collective Investment Funds, Hearings before a Subcommittee of the Committee on Banking and Currency, U.S. Senate, 89th Cong., 2d Sess. on S.2704, at 134 (1966). *See also, United States* v. *National Association of Securities Dealers,* 422 U.S. 694, 704-705.

64

There appears to be no dispute that a sale occurs when an employee acquires an interest in a pension plan that is both contributory and voluntary, since the employee makes a separate decision to pay money directly into the pension fund. However, the Commission, in its early days, reached a different result for purposes of the Securities Act's *registration* provisions in the case of plans that are either noncontributory or compulsory. It was reasoned that there was no sale of an interest in a noncontributory plan because there was no direct investment of money by the employee; consistent with the then prevailing legal understanding, the employer's contributions were considered to be gifts. Similarly, it was reasoned that no sale was made in a compulsory plan. Although it was recognized that the individual had a choice whether to become or remain an employee, it was thought that the choice could never be affected by representations concerning the pension plan.

This Court, many years later, in this case involving a compulsory and non-contributory pension plan, is now presented with the question of whether the foregoing "no-sale" rationale may be extended to the antifraud provisions. The Commission believes, as did the court of appeals and the district court, that the "no-sale" rationale may not be so extended.

### A. The "No-Sale" Rationale Has Been Applied Only to the Registration Provisions.

In 1941, Commissioner Purcell explained to Congress the basis of the Commission's "no-sale" ra-

659

tionale and its applicability to the Securities Act registration of interests in pension funds (1941 Hearings at 896-897, emphasis supplied):

> "[E]ven where the [pension] plan involves securities, *registration is not required* in the many cases where the employees pay nothing for the securities, but receive an interest in an investment fund by way of bonus from their employer; for, of course, a gift is not a sale, and the Securities Act is concerned only with sales of securities. . . .

> "Similarly, compulsory plans *do not require registration*. If a plan is so set up that participation in it is a condition of employment, the Commission has taken the position that, as in the case of a noncontributory or bonus plan, there is no sale involved. The purpose of the *registration provisions of the Securities Act* is to disclose to prospective investors the essential facts about securities which they are asked to buy, and if the employees are given no choice as to whether to buy or refuse to buy there hardly seems any point in the *registration process*. As a practical matter, people do not decide, it seems to me, to take jobs or leave them because they like or dislike the company's investment plan."

The subsequent discussions of the "no-sale" rationale by the Commission and its staff demonstrate that the theory was developed and has been applied only in the context of registration. Thus, in a 1941 opinion letter, an Assistant General Counsel of the Commission stated:

66

"As to the question of finding a 'sale' within the meaning of Section 2(3) of the [Securities] Act, it is our position that, wherever a plan involves an investment contract or a certificate of interest or participation in a profit-sharing agreement and the employees have a choice whether or not to make contributions, there is obviously an 'attempt or offer to dispose of * * * a security * * * for value.' On the other hand, it is because of the language of Section 2(3) that we have taken the position in the past no 'offer' or 'sale' is involved in the case of a non-contributory plan, where the employees are not requested to make contributions, or in the case of a compulsory plan, where there is no element of volition on the part of employees whether or not to participate and make contributions.

"I trust that this letter will make clear both the presence of a 'security' and the presence of a 'sale' in those cases in which the Commission considers that *registration* of interests in employees' plans is required" (emphasis supplied).[50]

In 1967, when Congress was considering an amendment to exempt certain pensions from registration, Commission Chairman Cohen testified:

"The application of the Securities Act of 1933 to pension and welfare plans has presented difficulties over the years. Such plans could be regarded as involving the public offering of securi-

---

[50] 1 CCH Fed. Sec. L. Rep. ¶ 2231.21 (1941), [1941-44 Transfer Binder] CCH Fed. Sec. L. Rep. ¶ 75,386.

ties requiring *registration.* On the other hand, the special characteristics of these plans and the fact that they are often an integral part of labor relations, often determined by collective bargaining, has presented difficulties and in general *the Commission has not heretofore required registration of such plans under the Securities Act of 1933,* except where such plans are funded by investment in the employer's securities" (emphasis supplied).[51]

IBT argues (IBT Br. 60) that the Commission's "no sale" doctrine encompassed both the registration and the anti-fraud provisions of the statute. In this regard, IBT relies (IBT Br. 59) upon a statement in the Commission's Institutional Investor Study in an attempt to demonstrate that the Commission's "no sale" rationale applies to the antifraud as well as the registration provisions. But the statement to which IBT refers is only a recital of the fact that, as noted earlier (*see* page 65, *supra*), the Commission's staff had adopted the "no sale" rationale. The Institutional Investor Study specifically referred [52] to the 1941 Assistant General Counsel's opinion, which, as we have seen (*see* page 66, *supra*), dealt with registration only. The Commission has *never* taken the position that there is no sale for the purposes of the antifraud provisions.

---

[51] *Hearings on Amendment No. 438 to S.1659 Before the Senate Committee on Banking and Currency,* 90th Cong., 1st Sess., pt. 3, at 1326 (1967).

[52] *Institutional Investor Study, supra,* Vol. III at 996 n. 32.

Case 1:23-cv-04738-KPF Document 37-2 Filed 08/04/23 Page 80 of 115

**68**

IBT and two of the *amici*, relying on certain Congressional materials, claim that Congress, in its consideration of labor legislation, had the belief that not only the registration provisions but also the antifraud provisions of the securities laws were inapplicable to interests in pension funds (IBT Br. 73; ERIC Br. 10-11 n.6; Bankers Br. 15-16). We note, at the outset, that even if Congress had such a belief, there is no basis for concluding that it would have been based on the notion that a pension fund interest is not a "security." Instead, it is more likely that persons involved with the labor legislation, if they considered the issue at all, assumed, without analyzing the question, that the antifraud provisions, like the registration provisions, were subject to the "no sale" rationale.

In any event, we submit that the Congressional materials do not demonstrate that Congress regarded the antifraud provisions as being inapplicable. They do indicate that Congress was aware of the "no sale" rationale the Commission has consistently applied to pension plans for the purpose of registration. But, with respect to the antifraud provisions, it is likely, in light of the nature of those provisions, that Congress never thought about them, and was unconcerned about them, in connection with the type of labor-management and pension legislation that the Congress was considering at that time.

In contrast to the antifraud prohibitions, the legislation which Congress was considering involved, among other things, detailed and complex regulation

69

of pension funds through the prescribing of duties and responsibilities in their day-to-day operation, requirements for the filing of disclosure documents with a government agency, and the delegation to the agency of authority to adopt detailed rules and regulations with respect to pension funds. When the Congressional committees and their staffs commented on the absence at that time of adequate federal legislation, they were, of course, referring to the absence of the type of legislation that they were contemplating. The Commission does administer legislation of that type—the Investment Company Act, which imposes broad regulatory control over the operation of investment companies, and the registration provisions of the Securities Act, which require the filing with the Commission of a disclosure statement, and the delivery to the investor of a prospectus, containing detailed financial and other information. However, most pension funds were expressly exempted from the former act (*see* Section 3(c)(11), 15 U.S.C. 80a-3(c)(11)) and, by virtue of the "no sale" rationale, were not subject to the latter act's registration requirements. Presumably, it was the inapplicability of legislation similar to this to which the Congressional materials were referring when they commented upon the absence of appropriate Federal legislation; they were not referring to the far different type of requirements imposed by the securities laws' antifraud provisions, which are essentially a prohibition upon fraudulent activity.

**B. The "No-Sale" Rationale Rests on a Very Narrow View of the Meaning of "Sale", Particularly in Light of the Evolution in the Economic Significance and Legal Understanding of Pensions, and It May Not Be Extended to the Antifraud Provisions.**

In considering whether the "no-sale" rationale may be extended to the antifraud provisions, it is important to note that both the Securities Act and the Securities Exchange Act contemplate that the terms defined in those statutes, including the term "sale," need not be construed the same for all purposes. Indeed, the appropriateness of treating a transaction as involving a sale for purposes of the antifraud provisions but not for purposes of registration was recognized by this Court in *Securities and Exchange Commission* v. *National Securities, Inc.*, 393 U.S. 453. The Court there held that a corporate merger involved a sale for purposes of the antifraud provisions of Section 10(b) of the Securities Exchange Act and Rule 10b-5, notwithstanding the existence of a Commission rule providing that, for purposes of the Securities Act's registration provisions, such a transaction did not involve a sale.[58] The Court stated (*id.* at 466):

> "Although the interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the lan-

---

[58] The Commission rule, Rule 133 under the Securities Act, was subsequently rescinded and replaced by Rule 145, 17 CFR 230.145, which provides for the applicability of the registration provisions to mergers and certain other business combinations.

guage Congress has chosen, ordinary rules of statutory construction still apply. The meaning of particular phrases must be determined in context, *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350-351 (1943). Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and the 1934 Acts preface their lists of general definitions with the phrase 'unless the context otherwise requires.' 1933 Act, § 2, 48 Stat. 74, 15 U.S.C. § 77b; 1934 Act, § 3, 48 Stat. 882, 15 U.S.C. § 78c. We must therefore address ourselves to the meaning of the words 'purchase or sale' in the context of § 10(b). Whatever these or similar words may mean in the numerous other contexts in which they appear in the securities laws, only this one narrow question is presented - here." [54]

---

[54] *See also, Exchange National Bank of Chicago* v. *Touche Ross & Co.*, 544 F.2d 1126, 1139 (C.A. 2), where the court stated:

> "[T]he purposes of the registration and anti-fraud provisions differ, thus altering the 'context' to be examined to determine whether the admonition 'unless the context otherwise requires' is to be applied."

IBT notes (IBT Br. 110 n. 97) that in 1941, in the Commission's *amicus curiae* brief in *National Supply Co.* v. *Leland Stanford Junior University*, 46 F. Supp. 389 (N.D. Cal.), *affirmed*, 134 F. 2d 689 (C.A. 9), *certiorari denied*, 320 U.S. 773, the Commission stated that its "no sale" rationale for *mergers* applied to both the antifraud and the registration provisions. The Commission, however, later rejected that view, and, as Professor Loss notes, "has repeatedly urged as *amicus curiae* that a merger does involve a "sale" and "purchase" for purposes of that rule [10b-5] * * *." IV Loss,

72

This case, like *National Securities*, presents the question of whether a "no-sale theory," the applicability of which has been confined to the registration provisions, may be extended for purposes of the antifraud provisions. The "no-sale" rationale with respect to pensions rests on a very narrow view of the meaning of "sale," which is defined as including any "disposition of a security * * * for value" (*see* page 63, *supra*). An employee, even in the case of a compulsory, noncontributory plan, acquires his interest in the pension fund as a result of his voluntary decision to provide value—his labor—in exchange for the interest. Such a transaction falls within the plain meaning of the statutory definition.[55] It may well have been justifiable, however, to adopt a narrow construction of "sale" and thereby exclude this transaction from that term for purposes of registration, where a contrary interpretation would have led to

---

*Securities Regulation* 2563 (1969). Indeed, in 1951, the Commission adopted a rule to codify its practice of not considering certain mergers to involve a sale to stockholders for *registration* purposes, but in adopting this rule stated the "[a]s a matter of statutory construction the Commission does not deem the 'no sale theory' which is described in the rule as being applicable for purposes of any of the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934." Securities Act Rel. No. 3420 (Aug. 2, 1951).

[55] *See Blue Chip Stamps* v. *Manor Drug Stores,* 421 U.S. 723, 756, where Mr. Justice Powell stated in his concurring opinion:

> "The starting point in every case involving construction of a statute is the language itself. * * * Before a court properly could consider taking * * * liberty with statutory language there should be, at least, unmistakable support in the history and structure of the legislation."

the possibly inappropriate or unnecessary application of the registration requirements in the employment context, and where the "no sale" rationale was supported by the then extant understanding of the nature of pensions. No such consideration is involved in the question of the applicability of the antifraud provisions, which are essentially a prohibition upon fraudulent activity including the making of false or misleading representations.[56] These provisions afford particularly valuable protection for purchasers of interests in pension funds, who are not likely to be sophisticated and knowledgeable investors and who are offered this complex investment in an atmosphere where there may well be a temptation to over-promote the investment. As one pension industry spokesman has testified:

> "The magnitude of the investment employers make in pension benefits for employees, encourages the tendency to present the plan in the most positive terms possible so that a return in positive employee attitudes can be realized on the investment. This leads to over simplification and an advertising sales approach. When, as is so often the case, the communication material is prepared by persons not thoroughly cognizant

---

[56] *See* Mundheim and Henderson, "Applicability of Federal Securities Laws to Pension and Profit-sharing Plans", 29 Law and Contemp. Prob. 795 (1964), where it is pointed out (*id.* at 814) :

> "Since th[e] antifraud provisions do not impose an undue burden on anyone, there is no reason why they should *not remain as* remedies available to employees for use in cases where fraud of the kind covered by these sections has been committed."

74

of the technical and legal nature of plan pro-
visions, the result can easily become a document
subject to criticism as incomplete and mislead-
ing." [57]

Accordingly, the narrow construction of the term
"sale" underlying the "no-sale" rationale is not war-
ranted for purposes of the antifraud provisions.[58]
Indeed, the Commission has historically recognized,
and informed Congress, of the differences between
exempting pension funds, as well as other securities,
from registration and exempting them from the anti-
fraud provisions. In Commissioner Purcell's testi-
mony before Congress in 1941 concerning a proposal
to exclude pension fund interests from the definition

---

[57] Testimony of Ernest Griffes on behalf of the American
Society for Personnel Administration, *Hearings before the
Subcommittee on Labor, Senate Committee on Labor and Pub-
lic Welfare*, 93d Cong., 1st Sess. 765 (1973).

[58] The courts repeatedly have emphasized that the definition
of "sale" must be construed liberally for purposes of the anti-
fraud provisions. *See Coffee* v. *Permian Corp.*, 434 F.2d 383,
385 (C.A. 5) ; *Knauff* v. *Utah Construction & Mining Co.*, 408
F.2d 958, 961 (C.A. 10) ; *Lawrence* v. *Securities and Exchange
Commission*, 398 F.2d 276, 280 (C.A. 1) ; *Vine* v. *Beneficial
Finance Co.*, 374 F.2d 627, 634 (C.A. 2); *Dasho* v. *Susque-
hanna Corp.*, 380 F.2d 262, 266 (C.A. 7) ; *United States* v.
*Robertson*, 181 F. Supp. 158, 162 (S.D. N.Y.). These decisions
are consistent with this Court's admonition that the federal
securities laws, "enacted for the purpose of avoiding frauds,"
must be construed "not technically and restrictively, but flex-
ibly to effectuate [their] remedial purposes." *Securities and
Exchange Commission* v. *Capital Gains Research Bureau Inc.*,
375 U.S. 180, 195, *accord, Tcherepnin* v. *Knight, supra*, 389
U.S. at 336.

75

of "security" (*see* page 55, *supra*), he stated (1941 Hearings at 920):

> "[T]he Commission believes that whatever exemption is afforded to employees' plans should be an exemption from registration on a par with the other exemptions contained in the act. H.R. 5065 would actually exclude the specified types of interests or instruments from the definition of the term "security." This would result in giving an exemption not only from the registration and prospectus requirements of section 5, but also from the civil and criminal liabilities for actual fraud which are contained in sections 12 and 17 of the act. Under the act today no securities at all—not even Government securities—are exempted from the fraud provisions of section 17(a). * * * Even if it be assumed that the protection of employee investors does not justify registration, it hardly follows that such investors should be denied a right under the act to recover from employers who have actually defrauded or deceived them. The Commission knows of no reason why employee investors should be singled out from all other investors for discrimination in this respect." [59]

---

[59] In the same vein, the Commission, in reporting to Congress at that time on the proposed elimination of pension interests from the definition of security, stated:

> "H.R. 5065 would not only exempt employees' plans generally from the registration provisions of the act, but it would also deprive employees of the protection now afforded them by the fraud provisions of the statute. Even if it be assumed that there are situations in which the protection of employees does not justify the expense of registration, it hardly follows that employees should be

Similarly, Commission Chairman Cohen, testifying in 1967 concerning proposed legislation that would have exempted certain types of collective funds, not pension plans, from the definition of a security in the Securities Act and the Securities Exchange Act, stated:

> "No provision of these acts now authorizes anyone to exempt a security from the prohibitions against fraud, which apply even to government bonds, and we do not see why this should be done. Among other things, it would be an awkward type of authority to exercise because we can hardly see how any responsible agency would wish to exempt any security from the prohibitions against fraud and deception.[60]

The inappropriateness of extending the "no-sale" rationale to the antifraud provisions is reinforced by the evolution in the economic significance and legal

---

denied a right under the act to recover from employers who have actually deceived them. Under the act no securities at all, not even Government securities, are exempted from the fraud provisions of section 17(a). Only Government securities are exempted from the civil liability provisions of section 12(2). The Commission knows of no reason why employee-investors should be singled out from all other investors for discrimination in this respect."

Report of the Securities and Exchange Commission on Proposals for Amendments to the Securities Act of 1933 and the Securities Exchange Act of 1934, House Committee Print, Printed for the use of the Committee on Interstate and Foreign Commerce, 77th Cong., 1st Sess. 15 (1941).

[60] Hearings Before the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce, 90th Cong., 2d Sess. 134 (1967).

77

understanding of pensions. The tremendous growth in the importance of pensions and the concomitant judicial recognition that a pension is not a gift (*see* pages 16-18, *supra*) have undermined the reasoning behind both components of the "no-sale" rationale— the "no value" reasoning with respect to a noncontributory plan and the "no choice" reasoning with respect to a compulsory plan. As to the former, it is no longer realistic to say that the employer's contribution is a gift rather than compensation for services, and that the employee, therefore, provides no "value" for his interest in the pension fund. Similarly, as to the latter component, it is not correct to view the employee's voluntary decision to accept or retain a job, and thereby receive an interest in a pension fund, as never being affected by misrepresentations about the pension.

### 1. *The "no value" reasoning*

The employer's contribution to a noncontributory pension plan is not a gift, but, rather, is compensation for the employee's labor. And, as has been recognized in cases arising under the antifraud provisions of the federal securities laws, the giving of labor for a security constitutes the giving of value.[61]

---

[61] *Collins* v. *Rukin*, 342 F. Supp. 1282 (D. Mass.); *Securities and Exchange Commission* v. *Addison*, 194 F. Supp. 709 (N.D. Tex.). *See also,* Hannan & Thomas, "The Importance of Economic Reality and Risk in Defining Federal Securities," 25 Hastings L. Rev. 219, 236 (1974); Long, "An Attempt to Return 'Investment Contracts' to the Mainstream of Securities Regulations," 24 Okla. L. Rev. 135, 161-162 (1971).

78

We have previously seen (*see* pages 16-18, *supra*) that at one time pensions were legally considered to be mere gratuities given by the employer to his employees, until, in the *Inland Steel* decision in 1948, it was established that pension funds were a mandatory subject of collective bargaining on the ground that the employee's labor constituted the legal consideration for the pension interest. In the next twenty years, other decisions similarly held that pensions funded through employer contributions were not gratuities, but rather were purchased by employees through their labor; in other words, the employer contributions were considered to be, in the words of this Court, "really another form of compensation to the employees." *Lewis* v. *Benedict Coal Corp.*, 361 U.S. 459, 469.[62]

Whatever doubts about this proposition remained, however, were completely dispelled by the legislative history of federal pension legislation, including ERISA. As early as 1958, the Senate Committee on Labor and Public Welfare stated:

"Regardless of the form they take, the employer's share of the costs of these plans or the benefits the employers provides is a form of compensation." [63]

---

[62] *See also, Employing Plasterers' Ass'n of Chicago* v. *Journeymen Plasterers' Protective and Ben. Soc. of Chicago,* 279 F.2d 92, 99 (C.A. 7) ; *Ball* v. *Victor Adding Machine Co.,* 236 F.2d 170, 173 (C.A. 5) ; *Lucas* v. *Seagrave Corp.,* 277 F. Supp. 338, 343-344 (D. Minn.).

[63] S. Rep. No. 1440, 85th Cong., 2d Sess. 4 (1958).

In 1961, Arthur Goldberg, then Secretary of Labor, engaged in the following colloquy during testimony before the Congress:

> "Mr. Pucinski. Do I understand the situation correctly: A company sets up a *pension plan* for its workers. This plan is part of the fringe benefits that are given to the worker and therefore may deter him from asking for additional salary in wage negotiations. Then the employer pays into this pension plan a certain amount of money and holds out to his employees that, when they retire and become eligible for benefits under this plan, they will have certain pension benefits available to them. Is this the way this works?
>
> "Secretary Goldberg. There are two ways that this is generally done. Where you have a union, more often than not it is negotiated as part of a collective bargaining arrangement. *Very often when it is negotiated in this way the settlement allocates part of what might otherwise have gone into a wage package which the employee might receive, to the welfare fund for the benefit of the employees.* You may have noticed in the papers this morning the negotiation that is taking place right here in the District between some of the building trades unions where the sole request, if I read it accurately, was that a contribution be made into the welfare fund. So that, really in those situations *this is really part of what normally would be a wage settlement.* That is one way it is done" (emphasis supplied).[64]

---

[64] *Hearings before the Special Subcommittee on Labor of the House Committee on Education and Labor,* 87th Cong., 1st Sess. 27 (1961).

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 93 of 115

A union representative echoed this belief in 1973. Leonard Woodcock, president of the United Auto Workers, testified:

> "UAW members have regularly given a high priority to pension benefits in collective bargaining. Repeatedly, with membership support from all age groups, decisions have been made to direct substantial parts of a potential 'economic package' into pensions." [65]

Congress, in its consideration of ERISA, indicated its belief that pension benefits are deferred wages. In introducing pension legislation in 1972, Senator Williams, one of the two sponsors of ERISA, stated:

> "Pensions are not gratuities, but earnings saved and deferred to retirement. They represent compensation which the employee would have received in his paycheck had he not belonged to a pension plan.[66]

And Senator Javits, the other sponsor of ERISA, has stated:

> "I believe that the law [ERISA] has settled in an indisputable fashion, the legal status of private pensions. Whatever lingering doubts may have persisted prior to its passage, the law tells us that private pensions are a form of deferred

---

[65] *Hearings before the Senate Subcommittee on Private Pension Plans of the Committee on Finance,* 93d Cong., 1st Sess. 467 (1973).

[66] Senate Committee on Labor and Public Welfare, Retirement Income Security for Employees Act of 1972, Comm. Print, 92d Cong., 2d Sess. 100 (1972).

Case 1:23-cv-04738-KPF Document 37-2 Filed 08/04/23 Page 94 of 115

wages and not a form of gratuity to be offered and withdrawn at the whim of the employer. In short, the 'gold watch' theory of pensions is dead once and for all * * *." [67]

IBT argues (IBT Br. 61) that, since the securities laws were enacted at a time when pensions were generally regarded as gifts, that outdated premise must be the predicate for interpreting the securities laws today. This argument is unsound. The legislative history of the securities laws is silent on the question of whether pensions are gifts. At most, it might be possible to speculate that individual members of Congress who thought about the issue, if they thought about it at all, might have thought pensions to be gifts, but such thoughts, if any, were not enacted as part of the securities laws. The determinative factor is that Congress defined "sale" as "every contract of sale or disposition of a security or interest in a security for value." There is no indication that Congress even considered whether providing labor in exchange for an interest in a pension plan constituted value. But Congress drafted a definition broad enough to encompass any situation in which a person provides consideration in exchange for a security, even though notions of what constitutes consideration have changed. [68]

---

[67] Address by Senator Jacob K. Javits, Briefing Conference on Pensions and Employee Benefits, September 19, 1974.

[68] Local 705 argues that if the employee's services constitute value given for the employer's contributions to the pension fund, "the employer, not the Local 705 Pension Fund, is the

82

Notwithstanding the petitioners' contentions, they are unable to dispute that the employer's contributions are part of the total compensation paid in exchange for the employee's labor. IBT itself, at one time, understood quite well this economic reality. In testimony before Congress, Sidney Zagri, legislative counsel of IBT, stated:

> "We subscribe to the concept that health and welfare and *pension funds are for the most part deferred wages* and, as such, should receive similar protection afforded other funds of a quasi-public nature" (emphasis supplied).[69]

purchaser and the employee is the seller" (Local Br. 55). The employee, however, cannot be the seller of a *security*—the only security involved in this case in the pension fund interest, which the employee purchases by providing value in the form of his services. Moreover, this argument seems to reflect a mistaken belief that a *defendant* in an action by a defrauded securities purchaser must be the seller of the security. A defrauded purchaser of a security, however, has a cause of action against "any person" who committed fraud "in connection with the purchase or sale," regardless of whether that person is the seller. Securities Exchange Act Rule 10b-5. *See, e.g., Iroquois Industries, Inc.* v. *Syracuse China Corp.,* 417 F.2d 963 (C.A. 2); *Heit* v. *Weitzen,* 402 F.2d 909 (C.A. 2), *certiorari denied,* 395 U.S. 903.

[69] *Hearings before the Special Subcommittee on Labor, House Committee on Education and Labor,* 87th Cong., 1st Sess. 225 (1961).

Local 705 also relies (Local Br. 45-46) on the decision of the Court of Appeals for the Second Circuit in *Securities Investor Protection Corp.* v. *Morgan, Kennedy & Co.,* 533 F.2d 1314, where the court held that employee beneficiaries of a profit-sharing trust are not "customers" of the broker-dealer firm with which the trust maintained a brokerage account. The court there held only that the individual beneficiaries of the

## 2. *The "no choice" reasoning*

As discussed previously, the Commission has taken the position for registration purposes that no sale to the employee occurs in a compulsory pension plan because it was believed that an employee's decision to take or retain a job was never affected by representations about the pension offered. That conclusive presumption of no sale should not now be extended to the antifraud provisions; while it may have had some basis in fact when the pension constituted an insignificant portion of the benefits received by the employee, it is no longer valid today when pensions represent a major element of the compensation package.

We have previously discussed the legal recognition of the importance of pensions to employees. We have also cited testimony before Congress, including that of union representatives, on the importance of pension funds in collective bargaining. It is not surprising, therefore, that it has been recognized that pen-

---

trust must make their claim against the broker-dealer through the trust, rather than individually. The contrary interpretation rejected by the court would mean, for example, that each of the hundreds or thousands of shareholders in a mutual fund would separately be able to take advantage of the guarantee provisions of the Securities Investor Protection Act, 15 U.S.C. 78aaa, *et seq.*, and thereby each obtain reimbursement from the Securities Investor Protection Corporation up to the maximum amount authorized by that Act to be paid to a single brokerage "customer." We do not see how this determination of the rights under that Act of the trust beneficiaries vis-a-vis the broker-dealer has any relevance to the rights of the beneficiaries vis-a-vis the trust itself.

Case 1:23-cv-04738-KPF  Document 37-2  Filed 08/04/23  Page 97 of 115

sions can be a significant factor in the decision to take or keep a job. Thus, a Senate committee stated in 1956 that pensions are important in the attraction of good workers.[70] Similarly, then Secretary of Labor Arthur Goldberg, in testifying before Congress in 1961, observed:

> "It is commonplace today when you go into a firm for employment that one of the things you discuss is what type of welfare and pension plan an employer has. That is an essential condition of employment as any employer, I am sure, would tell you testifying before you." [71]

And, James Hodgson, then Secretary of Labor, echoed this comment eleven years later, when he stated to the Senate committee considering the bill which became ERISA:

> "Indeed, the variety of [pension] plan types is a significant element in the competition among employers for the workforce." [72]

Not only may representations about a pension affect a person's initial decision to take a job, they may also affect him thereafter in his decision whether to retain the job and its accompanying pension or to seek

---

[70] *See* S. Rep. No. 1734, *Welfare and Pension Plan Investigation*, 84th Cong., 2d Sess. 11-13 (1956).

[71] *Hearings before the Special Subcommittee on Labor, House Committee on Education and Labor*, 87th Cong., 1st Sess. 32 (1961).

[72] *Hearings before the Subcommittee on Labor on S. 3598, Senate Committee on Labor and Public Welfare*, 92d Cong., 2d Sess. 99 (1972).

a different job with a different pension or no pension. And, in view of the extent of job mobility in this country, this decision whether to change jobs and pension coverage is a matter of continuing importance. The Bureau of Labor Statistics found that in a period of one year, ten percent of the labor force shifted from one job to another.[73] Moreover, a majority of the job shifts involved a change to a different industry. Thus, it is likely that an employee will be faced with a number of employment decisions in his lifetime and, as he gets older, such shifts will be more and more affected by the pension plan offered by the employer.

Accordingly, an employee may be faced with a meaningful decision, even in the case of a compulsory plan, whether to acquire an interest in the pension fund. And, this voluntary decision is sufficient to satisfy the "sale" requirement under the antifraud provisions of the securities laws. Indeed, cases have held, under the antifraud provisions, that a "sale" occurs in a variety of situations where there is *no* voluntary action by the alleged "purchaser."[74] Here there is even a stronger case for finding a sale, since

---

[73] *See Hearings before the Subcommittee on Labor, Senate Committee on Labor and Public Welfare*, 90th Cong., 2d Sess. 249 (1968).

[74] *See, e.g., Vine* v. *Beneficial Finance Co.*, 374 F.2d 627 (C.A. 2) ; *International Controls Corp.* v. *Vesco*, 490 F.2d 1334 (C.A. 2), *certiorari denied*, 417 U.S. 932; *Zeller* v. *Bogue Manufacturing Corp.*, 476 F.2d 795 (C.A. 2) ; *Coffee* v. *Permian Corp.*, 434 F.2d 383 (C.A. 5) ; *Dudley* v. *Southeastern Factor and Finance Corp.*, 446 F.2d 303 (C.A. 5), *certiorari denied*, 404 U.S. 858.

86

the employee does take voluntary action (obtaining employment and thereafter performing labor for his employer) which results in his giving value for a security. As one court has stated, in *Collins* v. *Rukin*, 342 F. Supp. 1282, 1286 (D. Mass), where the defendants argued that the antifraud provisions should not apply to a security (a stock option) which is "incident to and part and parcel of an employment contract for personal services" (*id.* at 1287-1288):

> "No compelling reason has been suggested to this Court why one who, in the interest of promoting his company and employing the most talented people in a particular field, engaged in fraudulent practices in connection with the offer or sale of securities should enjoy any greater freedom from the operation of the federal securities laws than one who perpetrates a fraud without promotional or employment motive."

In arguing in this case that the acquisition of a pension interest in a compulsory plan does not involve a sale, the petitioners dispute the court of appeals' conclusion that the vote to ratify the collective bargaining agreement constitutes voluntary action which gives rise to a sale. They contend that that conclusion is contrary to a basic characteristic of collective bargaining that the individual employee relinquishes his right to bargain to his union (IBT Br. 65-66; Local Br. 57).[75] But, entirely apart from

---

[75] While we do not base our conclusion that there was a sale here on the ratification of the contract providing for the pension plan by the union membership, there is no inconsistency

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 100 of 115

the ratification vote, and even in situations where no ratification vote is taken, we have shown, and the court of appeals held, that the employee's decision to take or retain the job, and thereafter perform labor for a package of compensation and benefits, constitutes voluntary action resulting in a sale. And, as the Secretary of Labor pointed out in his *amicus* brief to the court below (at pages 2-3, n. 1):

> "Individual decisions to take or leave employment are not governed by labor law, and are not central to the bargaining process that is of major concern to the Secretary."

The petitioners contend (IBT Br. 53; Local Br. 54) that a finding that a sale occurred in the present case would be inconsistent with this Court's holding in *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, that persons who refrain from purchasing or selling securities based upon material misrepresentations or omissions do not have standing to maintain a private damage action under Section 10(b) of the Securities Exchange Act. In making this point, they erroneously have equated an employee's decision to retain his job with a stockholder's decision to retain his stock. The latter decision, however, results in the stockholder's giving no value and acquiring

---

between collective bargaining principles and the conclusion that the ratification vote involves a sale. Although the majority's decision in the ratification vote overrides any individual employee's own choice, the majority's decision is made up of separate individual decisions. These individual decisions, and consequently the group's decision, can be affected by misrepresentations concerning the pension.

88

nothing; he merely keeps what he already owns. By contrast, the employee who decides to retain his job makes a decision which results in his continuing to give value in the future to further his acquisition of an interest in the pension fund.

IBT also argues (IBT Br. 53-58) that in light of certain "policy considerations" relied upon by this Court in *Blue Chip*, the antifraud provisions should be held inapplicable to the present case. IBT posits that a holding that the antifraud provisions apply would lead to litigation in which the trier of fact must resolve "rather hazy issues of historical fact," and speculates that "the expense of defending a 10b-5 or 17(a) claim would invariably be greater than paying a pension to a claimant even if he is ineligible under the pension plan's rules" (IBT Br. 56-57). But, the issue before this Court in *Blue Chip* was that of the standing of a private plaintiff to maintain what this Court characterized as "a private cause of action which has been *judicially* found to exist" and which may be "*judicially* delimited" on the basis of "considerations of policy" which the Court there believed it was "free to weigh." 421 U.S. at 749 (emphasis supplied). By contrast, the issue in the present case of whether there was a "sale" is not one of policy but rather is solely a question of construing a statutory term expressly defined by the Congress. As this Court has recently stated:

> "Our individual appraisal of the wisdom or un-wisdom of a particular course consciously se-lected by the Congress is to be put aside in the

> process of interpreting a statute. Once the mean-
> ing of an enactment is discerned and its constitu-
> tionality determined, the judicial process has
> come to an end. We do not sit as a committee
> of review.

*Tennessee Valley Authority* v. *Hill,* 46 U.S.L.W. 4684.
Furthermore, unlike the issue of standing in *Blue
Chip,* which affects only private actions, the question
here—the meaning of sale—involves an element of
the violation itself and thus affects the statutorily
created right of action of the Commission to main-
tain enforcement proceedings against violators of the
antifraud provisions.

*     *     *

In sum, the reasoning behind the "no-sale" ra-
tionale has been undermined by the evolution of the
economic significance and legal understanding of pen-
sions. Accordingly, we believe that rationale, de-
veloped in the context of registration, has no appli-
cability to the antifraud provisions.

### C. Recovery Under the Antifraud Provisions Is Available Where an Employee's Choice Was Materially Influenced by Fraudulent Representations Concerning the Pension.

As we have stated (*see* page 83, *supra*), our ob-
jection to the "no choice" reasoning behind the "no-
sale" rationale is that it rests on the unrealistic as-
sumption that a decision to take or keep a job can
*never* be based upon the pension plan. Thus, this
reasoning creates a conclusive presumption that the
employee's decision is not so based, thereby denying
relief not only to the employee whose decision was in

fact not influenced by the pension, but also to the employee whose decision was so influenced. In urging that an employee's decision to give value for a security by accepting or retaining a job gives rise to a sale for purposes of the antifraud provisions, we are not arguing that he should be permitted, *ipso facto*, to recover damages under those provisions. Our position, rather, is that, consistent with general principles of causation,[76] recovery should be permitted where the employee's decision was materially influenced by fraudulent representations about the pension. An employee who acquires an interest in a compulsory pension plan may, as a practical matter, encounter some difficulty in establishing the requisite causation. But, that should not mean that such an employee should be deprived of an opportunity to prove the necessary elements of his claim.[77]

We recognize that an employee's decision to take or keep a job is not, by itself, an investment decision. But, when that decision is materially influenced by the existence of a security—in this case, an interest in a pension fund—which he will purchase with his labor, he is making not only an employment decision but also an investment decision which is protected by the antifraud provisions.

---

[76] *See e.g., List* v. *Fashion Park, Inc.,* 340 F.2d 457, 462 (C.A. 2), *certiorari denied,* 382 U.S. 811.

[77] *See Spector* v. *LQ Motor Inns, Inc.,* 517 F.2d 278 (C.A. 5).

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 104 of 115

### III. RECOVERY UNDER THE ANTIFRAUD PROVISIONS OF THE FEDERAL SECURITIES LAWS FOR FRAUD OCCURRING IN THE SALE OF INTERESTS IN A PENSION FUND IS NEITHER DUPLICATIVE OF NOR INCONSISTENT WITH NATIONAL LABOR LAW OR POLICY.

The petitioners rely heavily on the fact that the Congress has enacted legislation directed specifically at regulation of pension plans—ERISA—to bolster their arguments that the securities laws do not apply to interests in pension funds. We note, however, that ERISA was enacted in 1974, long after the conduct complained of in this case. Thus even if ERISA had preempted the securities laws, which it did not, this case would be unaffected. Moreover, to the extent the petitioners may be arguing, irrespective of actual preemption, that the regulatory scheme of ERISA renders the protection of the antifraud provisions unnecessary, which it does not, that regulatory scheme did not exist at the time Mr. Daniel alleges he was defrauded concerning his pension eligibility. Accordingly, the relationship between ERISA and the securities laws has no applicability to the present case.

The petitioners do not argue that ERISA expressly ousted the federal securities laws. Indeed, they cannot. The Congress, in Section 514(d) of ERISA, 26 U.S.C. 1144(d), expressly provided:

> "Nothing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States * * *or any rule or regulation issued under any such law."

Case 1:23-cv-04738-KPF    Document 37-2    Filed 08/04/23    Page 105 of 115

By contrast, Congress in ERISA did specifically pre-empt all *state* laws, but with the following significant exception (Section 514(b)(2)(A)):

> "[N]othing in this title shall be construed to exempt or relieve any person from any law of any state which regulates insurance, banking, or *securities*" (emphasis added).

The statutory scheme of state securities laws is generally similar to the federal scheme; they exempt pension interests from registration but not from anti-fraud provisions.[78]  Congress could hardly have believed that the antifraud provisions of the federal securities laws would conflict with ERISA and, therefore, should be ousted, while at the same time it preserved the numerous antifraud laws of the various states.

Notwithstanding the absence of an express pre-emption of the federal securities laws' antifraud provisions, the defendants and *amici*, by contending that the application of those provisions would be duplicative of and inconsistent with national labor law and policy (IBT Br. 79; NCCMP Br. 16-27; AFL-CIO Br. 20-21; ERIC Br. 31-48), are arguing, in effect, for an implied preemption. IBT carries this argument still further, stating (IBT Br. 77) that "if Congress had been given any reason to entertain a doubt on this score [that the securities laws apply to

---

[78] *See, e.g.,* Ill. Rev. Stat. Ch. 121½, Section 137.3; D.C. Code Sec. 2-2401(e)(5); N.Y. Gen. Bus. Law Sec. 359-f(2)(e) (McKinney 1962); 7 Uniform Laws Ann., Uniform Sec. Act Sec. 402(a)(11) (1970).

.

pension plans], it most probably would have taken steps to prevent the securities laws from expanding into this area * * *." But, ERISA expressly preserved all other federal law, and we are aware of no cases which stand for the proposition that preemption of a federal statute may be implied by speculation concerning what Congress *might* have done if it had had the benefit of additional argumentation such as the petitioners argue in their briefs to this Court.

An argument similar to that of the petitioners (although an argument that, unlike the petitioners', had some basis for its speculation as to what Congress would have done had it thought about a problem) was recently rejected by this Court in *Tennessee Valley Authority* v. *Hill, supra,* 46 U.S.L.W. 4673. That case presented the issue of whether a provision of the Endangered Species Act of 1973, which by its express terms would have the effect of prohibiting completion of a dam on which $78 million had already been expended, had been impliedly repealed by later Congressional action which actually appropriated money for completion of the dam. In addition, the Committee reports accompanying the appropriations bill stated that the Committees did not view the Endangered Species Act as prohibiting the completion of the dam. 46 U.S.L.W. at 4677, 4678. This Court, however, refused to give weight to the Committee reports and the later legislation, and instead based its decision solely on the plain language of the Endangered Species Act, stating that "[i]t is not for

94

us to speculate, much less act, on whether Congress would have altered its stance had the specific events of this case been anticipated." *Id.* at 4682.

Thus, even if Congress, in enacting ERISA, was unaware that the antifraud provisions applied to interests in pension funds, such unawareness would not justify implied repeal.[79]

The contentions of the petitioners and *amici* that the securities laws are duplicative of, and inconsistent with, national labor law and policy do not justify implied preemption any more than the petitioners' speculations concerning the Congress's thoughts about the antifraud provisions. The petitioners have failed to satisfy the exacting standard which this Court

---

[79] IBT argues (IBT Br. 81-83) that this Court's holding in *Califano* v. *Sanders*, 430 U.S. 99, supports the view that the applicability of the antifraud provisions to this case should be governed by the impressions of the Congress enacting ERISA. *Califano* addressed the question of whether Section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. 701-706, afforded an implied grant of subject-matter jurisdiction to federal courts. This Court decided that question in the negative because Congress subsequently, in 1976, had amended 28 U.S.C. 1331 to eliminate the amount-in-controversy requirement for general federal-question jurisdiction, thus conferring jurisdiction on the federal courts to review agency action with no need for jurisdiction under the APA because Section 1331, as amended, did the same thing. The situation in the present case differs from that in *Califano*, since ERISA, unlike the securities laws, does not give a cause of action for fraud.

Moreover, in *Califano*, another statute expressly precluded jurisdiction under the circumstances of that case. In contrast, no statute precludes applicability of the antifraud provisions to this case. Indeed, ERISA itself expressly preserved all other federal laws. *See* p. 91, *supra*.

has set for establishing an implied repeal stemming from an inconsistency between two statutes. In *Tennessee Valley Authority* v. *Hill, supra,* this Court re-enunciated the well established principle "that repeals by implication are not favored" and that "in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Tennessee Valley Authority* v. *Hill, supra,* 46 U.S.L.W. at 4683, *quoting from Morton* v. *Mancovi,* 417 U.S. 535, 549.[80]

That repeal of the antifraud provisions of the federal securities laws is not lightly to be inferred is demonstrated by this Court's decision in *Securities and Exchange Commission* v. *National Securities Inc., supra,* 393 U.S. 453. In that case, the Court held that a federal district court, in an action brought by the Commission under Section 10(b) of the Securities Exchange Act and Rule 10b-5, had authority to "unwind" a merger between two insurance companies which had been approved by the Arizona Director of Insurance under state insurance laws. The Court au-

---

[80] *See also, Georgia* v. *Pennsylvania R. Co.,* 324 U.S. 439, 456-457; *United States* v. *Borden Co.,* 308 U.S. 188, 198, 199; *Pasadas* v. *National City Bank,* 296 U.S. 497, 503; *Wood* v. *United States;* 41 U.S. 343, 363. *Cf. Gordon* v. *New York Stock Exchange,* 422 U.S. 659, 682-683, in which this Court concluded that an implied repeal of the antitrust laws resulted from an inconsistency between those laws and provisions of the federal securities laws. The Court emphasized in its opinion, however, that implied repeal "is not favored and not casually to be allowed," and that it may be found only where there is a "plain repugnancy" between the statutory schemes.

thorized this remedy for a violation of the antifraud provisions, notwithstanding a provision of the Mc-Carran-Ferguson Act, 15 U.S.C. 1012(b) (*see* note 26, *supra*), that "[n]o act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * *."

Here the defendants and *amici* have failed to satisfy the applicable criteria for implied repeal. First of all, their claim that the antifraud provisions would be duplicative of ERISA, even if true, would not justify an implied repeal of the antifraud provisions, since the mere existence of duplicative regulation does not constitute the "irreconcilable" conflict required for such repeal.

In any event, the antifraud provisions are not duplicative of ERISA. Although Section 502(a) of ERISA, 29 U.S.C. 1132(a), provides a right of action for a pension fund beneficiary "to obtain * * * appropriate equitable relief * * * to redress * * * violations" of any provisions of Title I of ERISA (Title I contains the labor law provisions of ERISA), there is no provision of Title I which generally prohibits the making of false or misleading representations to an employee concerning the pension fund. Although ERISA requires that the employee be furnished a summary description of the pension (29 U.S.C. 1022(a)) and annual summaries of financial information (29 U.S.C. 1024(b)), ERISA provides no relief where false or misleading representations are made either orally, or in written materials other

Case 1:23-cv-04738-KPF   Document 37-2   Filed 08/04/23   Page 110 of 115

than the documents required by ERISA. Thus, while Congress, in enacting ERISA, provided some very important protections to participants in pension plans, it did not provide the type of protection available under the antifraud provisions of the securities laws.

Nor are the antifraud provisions and ERISA inconsistent with each other. Although there may be exceptional situations where a failure to make a disclosure which ERISA does not require would constitute a violation of the antifraud provisions, ERISA does not contain any provision prohibiting additional disclosures. And, the antifraud provisions do not impose across-the-board disclosure requirements as does ERISA.[81] In any event, in a particular case under the antifraud provisions, arising (unlike the present

---

[81] By contrast, the Securities Act's registration provisions do require extensive and detailed disclosures. But, the position we are urging in this case would not result in the applicability of the registration provisions for two reasons. First, as we have indicated, *see* p. 70, *supra,* rejection of the "no sale" rationale for antifraud purposes does not require its rejection for purposes of registration. Second, the 1970 Amendment to Section 3(a)(2) of the Securities Act has specifically exempted interests in most pension funds from the requirement of registration. IBT disagrees (IBT Br. 133) with respect to the extent of the exemption afforded by Section 3(a)(2), contending that the exemption applies only to funds which are maintained by banks. In the Commission's view, however, the phrase "maintained by a bank," in Section 3(a)(2), modifies only "collective trust fund"; single pension funds are exempt from registration whether or not they are maintained by a bank.

98

case) after ERISA and involving (unlike the present case) allegations of omissions only but not misrepresentations, it would be appropriate for the court in such a case to construe the materiality of any alleged omission in light of the disclosure requirements of ERISA in order that the two statutes be harmonized.

One of the *amici* argues (ERIC Br. 31-38) that the applicability of the antifraud provisions would disrupt the collective bargaining process. But, insofar as the Commission is urging that a sale occurs when the employee decides to take or keep a job (as opposed to any sale which might occur when there is a ratification vote), the claimed disruption of the collective bargaining process is irrelevant. The Secretary of Labor so acknowledged in his brief to the court below (at pp. 2-3, n. 1): "Individual decisions to take or leave employment are not governed by labor law, and are not central to the bargaining process that is of major concern to the Secretary."

Local 705 argues that a holding that the antifraud provisions apply to this case would subvert the judgment made by the Congress in enacting ERISA not to apply ERISA's new vesting provisions (which would not allow the type of break-in-service rule that Local 705's plan had) retroactively (Local Br. 35). This argument misconceives the nature of the antifraud provisions. It is true that Congress made a decision that the new vesting standards embodied in ERISA should not be applied retroactively. But, in doing so, the Congress did not endorse the past right of persons to lie about unfair vesting pro-

99

visions. Nothing in the federal securities laws would prohibit a break-in-service rule such as the one involved in this case, just as nothing in those laws prohibits the sale of speculative securities of dubious worth.[82] And, nothing in those laws would permit the imposition of liability in this case merely because a court might agree with the respondent that Local 705's rule was shockingly unfair. Instead, Mr. Daniel can recover only if he can demonstrate, to the trier of fact, that he was *deceived* about this rule, and that in reliance on such deception he made an investment decision to continue working for an employer who contributed to the plan on his behalf, and that the deception caused him injury.

The petitioners and *amici* believe that it is undesirable as a matter of policy for the antifraud provisions to apply to pension plans. Of course, the *Congress* could make a policy determination, in future legislation, that antifraud protection for participants in pension plans would be more appropriate under the labor laws, and amend the labor laws accordingly. Or, Congress could even make the policy choice that persons who have been defrauded in the manner alleged in this case should not be entitled to any relief at all. But, to effectuate policy considerations (whether meritorious or not) relating solely to pension

---

[82] Even in the context of registration, the Commission does not have the authority to evaluate the merits of a security registered with it. Indeed, criminal penalties attach to any person who represents that the Commission has passed upon the merits of a particular enterprise. *See,* Section 23 of the Securities Act of 1933, 15 U.S.C. 77w.

plans, by a *judicial* decision that the antifraud pro-
visions of the securities laws are inapplicable, would
have the effect of undermining over 40 years of
judicial and administrative interpretation of those
laws, and thus jeopardize the protection provided by
the securities laws to investors in the offer and sale
of securities in other contexts not involving employ-
ment or pension plans.

While policy, of course, has a role to play, at times,
in a court's resolution of legal issues, including issues
under the securities laws, the policy concerns that
are appropriately considered are those which are
embodied in the laws which the court is interpreting
and applying. And, as we have seen with respect to
the issues in the present case, the policy concerns
embodied in the antifraud provisions of securities
laws—including the policy of prohibiting fraud by
those who manage other people's money—support
applying those provisions to interests in pension
funds. The policy considerations relied upon by the
petitioners, however, are policies embodied not in the
securities laws, but rather in the labor laws. Only
the Congress may remove the protections of the se-
curities laws on the basis of labor law policies.

This Court has refused to consider policy issues
not related to the securities laws in determining
the question of whether an interest is a security.
*See Tcherepnin* v. *Knight, supra,* 389 U.S. at 346.[33]
And, in a recent case in which policy concerns

---

[33] In *Tcherepnin,* the defendants argued that withdrawable
capital shares of a savings and loan association were not

not embodied in the statute being construed in the case would have supported a different result than the language of the statute being construed, this Court stated:

> "While [it] is emphatically the province and duty of the judicial department to say what the law is, *Marbury* v. *Madison*, 5 U.S. 137, 177 (1803), it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies, mandate programs and projects, but also to establish their relative priority for the Nation."

*Tennessee Valley Authority* v. *Hill*, *supra*, 46 U.S.L.W. at 4684.

---

securities, contending that the plaintiffs, if successful in their rescission action under Rule 10b-5, would gain an unfair advantage over other investors in the association, which was in liquidation. This Court responded (389 U.S. at 346):

> "This argument, at best, is a *non sequitur*. This case in its present posture involves no issue of priority of claims against City Savings. This case involves the threshold question of whether a federal court has jurisdiction over the complaint filed by the petitioners.—a question which turns on our construction of the term 'security' as defined by § 3(a)(10) of the Securities Exchange Act of 1934. It is totally irrelevant to the narrow question of statutory construction that these petitioners, if they are successful in their federal suit, might have rights in the limited assets of City Savings superior to those of other investors in that Association."

## 102

## CONCLUSION

For the foregoing reasons, the Securities and Exchange Commission urges that this Court hold, as did the court of appeals, that the district court properly denied the motion to dismiss the securities law counts of the complaint, thereby affording the respondent an opportunity to prove his case.

Respectfully submitted.

HARVEY L. PITT,
*General Counsel,*

PAUL GONSON,
*Associate General Counsel,*

JACOB H. STILLMAN,
*Principal Assistant General Counsel,*

LINDA W. JARETT,
*Attorney,*

*Securities and Exchange Commission.*

AUGUST 1978.

I authorize the filing of this brief.

WADE H. MCCREE, JR.,
*Solicitor General.*