# EXHIBIT C

No. 02-1196

# In the Supreme Court of the United States

---

SECURITIES AND EXCHANGE COMMISSION, PETITIONER

*v.*

CHARLES E. EDWARDS

---

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT*

---

**BRIEF FOR THE
SECURITIES AND EXCHANGE COMMISSION**

---

THEODORE B. OLSON
  *Solicitor General*
    *Counsel of Record*

EDWIN S. KNEEDLER
  *Deputy Solicitor General*

MATTHEW D. ROBERTS
  *Assistant to the Solicitor
  General
  Department of Justice
  Washington, D.C. 20530-0001
  (202) 514–2217*

GIOVANNI P. PREZIOSO
  *General Counsel*

MEYER EISENBERG
  *Deputy General Counsel*

JACOB H. STILLMAN
  *Solicitor*

SUSAN S. MCDONALD
  *Senior Litigation Counsel*

CATHERINE A. BRODERICK
  *Counsel to the Assistant
  General Counsel
  Securities and Exchange
  Commission
  Washington, D.C. 20549*

## QUESTION PRESENTED

Whether the court of appeals erred in dismissing the complaint on the ground that an investment scheme is excluded from the term "investment contract" in the definition of "security" under Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(10), if the promoter promises a fixed rather than variable return or if the investor is contractually entitled to a particular amount or rate of return.

TABLE OF CONTENTS

Page

Opinions below ........................................................... 1
Jurisdiction ................................................................ 1
Statutes involved ....................................................... 1
Statement ................................................................... 2
Summary of argument ................................................ 9
Argument:
    Respondent's agreements with investors were
    "investment contracts" and thus "securities," even
    though investors were contractually entitled to a
    fixed return ........................................................... 13
    A.  The statutory text and purposes demonstrate that
        an "investment contract" includes an arrangement
        with a fixed or contractually guaranteed return ...... 15
    B.  Precedent confirms that an "investment con-
        tract" may offer a fixed or contractually gua-
        ranteed return ................................................... 21
    C.  The SEC's longstanding interpretation of "invest-
        ment contract" as including a fixed- or guaranteed-
        return investment is entitled to deference ............... 31
    D.  The court of appeals' holding is unsupported
        and would frustrate the purposes of the securi-
        ties laws ............................................................. 34
        1.  The exclusion of fixed-return investments is
            not required by *Forman* or *Reves* ......................... 34
        2.  There is no support for the court of appeals'
            conclusion that profits that are contractually
            guaranteed are not expected to come from the
            efforts of others ........................................... 37
        3.  The limitations imposed by the court of
            appeals would open a loophole in the
            securities laws ............................................. 40
Conclusion .................................................................. 43

(III)

IV

## TABLE OF AUTHORITIES

Cases:                                                              Page

*Abbett, Sommer & Co., In re,* 44 S.E.C. 104 (1969),
    order aff'd, [1970-1971 Transfer Binder] Fed. Sec.
    L. Rep. (CCH) ¶ 92,813 (D.C. Cir. Sept. 25,
    1970) ...................................................................... 12, 14, 33

*Albanese* v. *Florida Nat'l Bank,* 823 F.2d 408
    (11th Cir. 1987) ........................................................ 23

*Bailey* v. *J.W.K. Prop., Inc.,* 904 F.2d 918 (4th
    Cir. 1990) ................................................................. 23

*Blackwell* v. *Bentsen,* 203 F.2d 690 (5th Cir. 1953),
    cert. dismissed, 347 U.S. 925 (1954) ..................... 23

*Chevron U.S.A. Inc.* v. *Natural Res. Def. Council,
    Inc.,* 467 U.S. 837 (1984) ........................................ 33

*Continental Mktg. Corp.* v. *SEC,* 387 F.2d 466
    (10th Cir. 1967), cert. denied, 391 U.S. 905 (1968) .......... 23

*Evans* v. *United States,* 504 U.S. 255 (1992) ..................... 19

*Gary Plastic Packaging Corp.* v. *Merrill Lynch,
    Pierce, Fenner & Smith, Inc.,* 756 F.2d 230 (2d
    Cir. 1985) ................................................................. 29-30

*Glen-Arden Commodities, Inc.* v. *Costantino,* 493
    F.2d 1027 (2d Cir. 1974) ........................................ 23

*Golden* v. *Garafalo,* 678 F.2d 1139 (2d Cir. 1982) ............. 19

*Gustafson* v. *Alloyd Co.,* 513 U.S. 561 (1995) ................... 19

*Kansas State Bank* v. *Citizens Bank,* 737 F.2d 1490
    (8th Cir. 1984) ......................................................... 30

*Kemmerer* v. *Weaver,* 445 F.2d 76 (7th Cir. 1971) .......... 23

*Landreth Timber Co.* v. *Landreth,* 471 U.S. 681
    (1985) ...................................................................... 16, 27, 37

*Long* v. *Shultz Cattle Co.,* 881 F.2d 129 (5th Cir.
    1989) ........................................................................ 23

V

Cases—Continued:                                                    Page

*Los Angeles Trust Deed & Mortgage Exch.* v.
  *SEC*, 285 F.2d 162 (9th Cir. 1960), cert. denied,
  366 U.S. 919 (1961) ............................................................... 31
*Marine Bank* v. *Weaver*, 455 U.S. 551 (1982) ............... 15, 27
*Meason* v. *Bank of Miami*, 652 F.2d 542 (5th Cir.
  1981), cert. denied, 455 U.S. 939 (1982) ........................... 43
*Miller* v. *Central Chinchilla Group, Inc.*, 494 F.2d
  414 (8th Cir. 1974) ............................................................... 23
*Natural Res. Corp., In re*, 8 S.E.C. 635 (1941) .................... 22
*People* v. *White*, 12 P.2d 1078 (Cal. Dist. Ct. App.
  1932) ...................................................................................... 18
*Resolution Trust Corp.* v. *Stone*, 998 F.2d 1534
  (10th Cir. 1993) .................................................................... 30
*Reves* v. *Ernst & Young*, 494 U.S. 56 (1990) ............... *passim*
*Saudi Arabia* v. *Nelson*, 507 U.S. 349 (1993) .................... 3
*SEC* v. *American Trailer Rentals Co.*, 379 U.S. 594
  (1965) ..................................................................................... 32
*SEC* v. *Amtel Communications, Inc.*:
  60 S.E.C. Dkt. 2080 (Nov. 7, 1995) ................................. 31-32
  70 S.E.C. Dkt. 1605 (Aug. 30, 1999) ................................... 32
*SEC* v. *Better Life Club of Am., Inc.*, 995 F. Supp.
  167 (D.D.C. 1998), aff'd, 203 F.3d 54 (D.C. Cir.),
  cert. denied, 528 U.S. 867 (1999) ....................................... 30
*SEC* v. *C.M. Joiner Leasing Corp.*, 320 U.S. 344
  (1943) .................................... 2, 11, 12, 14, 16, 23, 25
*SEC* v. *Eurobond Exch., Ltd.*, 13 F.3d 1334 (9th Cir.
  1994) ...................................................................................... 29
*SEC* v. *Infinity Group Co.*, 212 F.3d 180 (3d Cir.
  2000), cert. denied, 532 U.S. 905 (2001) ............................ 28
*SEC* v. *Koscot Interplanetary, Inc.*, 497 F.2d 473
  (5th Cir. 1974) ...................................................................... 36
*SEC* v. *Professional Assocs.*, 731 F.2d 349 (6th Cir.
  1984) ...................................................................................... 30
*SEC* v. *SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ...................... 29
*SEC* v. *United Benefit Life Ins. Co.*, 387 U.S. 202
  (1967) ................................................................. 11-12, 25, 26, 27

VI

Cases—Continued:                                                   Page

   *SEC* v. *Universal Serv. Ass'n*, 106 F.2d 232 (7th
     Cir. 1939), cert. denied, 308 U.S. 622 (1940) ...................... 12, 14,
                                                                    24, 30, 31
   *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946) ............   *passim*
   *SEC* v. *Zandford*, 535 U.S. 813 (2002) ....................... 3, 12, 33
   *Smith* v. *Gross*, 604 F.2d 639 (9th Cir. 1979) ...................   23
   *State* v. *Gopher Tire & Rubber Co.*, 177 N.W. 937
     (Minn. 1920) ................................................................   18, 24
   *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83
     (1998) ...........................................................................   3
   *Stevens* v. *Liberty Packing Corp.*, 161 A. 193
     (N.J. Ch. 1932) ...........................................................   18
   *Tcherepnin* v. *Knight*, 389 U.S. 332 (1967) .....................   15, 27
   *Teamsters* v. *Daniel*, 439 U.S. 551 (1979) ..........................   37
   *Union Home Loans, In re*, 26 S.E.C. Docket 1517
     (Dec. 16, 1982) ...........................................................   12, 14, 33
   *Union Planters Nat'l Bank* v. *Commercial Credit*
     *Bus. Loans, Inc.*, 651 F.2d 1174 (6th Cir.), cert.
     denied, 454 U.S. 1124 (1981) ......................................   30
   *United Hous. Found., Inc.* v. *Forman*, 421 U.S.
     837 (1975) ...................................................................   *passim*
   *United States* v. *Carman*, 577 F.2d 556 (9th Cir.
     1978) ...........................................................................   28, 29
   *United States* v. *Jones*, 712 F.2d 1316 (9th Cir.),
     cert. denied, 464 U.S. 986 (1983) ................................   23
   *United States* v. *Mead Corp.*, 533 U.S. 218 (2001) ...........   33
   *Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th
     Cir. 1994) ...................................................................   20

Statutes and regulation:

   Bankruptcy Act, Ch. XI U.S.C. 701 *et seq.* (1958) ..............   32
   Securities Act of 1933, 15 U.S.C. 77a *et seq.* .......................   13
     § 2(a)(1), 15 U.S.C. 77b(a)(1) ...............   1, 2, 13, 14, 16, 19, 42
     § 3(a)(8), 15 U.S.C. 77c(a)(8) ..............................................   27
     § 5(a), 15 U.S.C. 77e(a) .......................................................   6
     § 5(c), 15 U.S.C. 77e(c) .......................................................   6

VII

Statutes and regulation—Continued:                                    Page

    § 6, 15 U.S.C. 77f ..............................................    6
    § 7(a), 15 U.S.C. 77g(a) ......................................    6, 21
    § 10, 15 U.S.C. 77j ...........................................    6
    § 17(a), 15 U.S.C. 77q(a) .....................................    6
    Sched. A, 15 U.S.C. 77aa ......................................    6, 21
Securities Exchange Act of 1934, 15 U.S.C. 78a
    *et seq.* .....................................................    13
        § 3(a)(10), 15 U.S.C. 78c(a)(10) .........    1, 2, 13, 15, 16, 19, 42
        § 10(b), 15 U.S.C. 78j(b) .................................    6
18  U.S.C. 981(a)(1)(C) ...........................................    6
18  U.S.C. 1343 ...................................................    6
17  C.F.R. 240.10b-5 ..............................................    6
Miscellaneous:

    *Applicability of the Securities Laws to Multi-Level
        Distributorships and Pyramid Sales Plans*, SEC
        Release Nos. 33-5211 & 34-9387 (Nov. 30, 1971) .............    32
    *Black's Law Dictionary*:
        (3d ed. 1933) .............................................    18
        (5th ed. 1979) ............................................    14
    Felix Frankfurter, *Some Reflections on the Reading
        of Statutes*, 47 Colum. L. Rev. 527 (1947) ................    19
    H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) .................    16
    *Public Offerings of Investment Contracts Providing
        for the Acquisition, Sale or Servicing of Mortgages
        or Deeds of Trust*, SEC Release No. 33-3892 (Jan.
        31, 1958) .................................................    32
    *The Oxford English Dictionary* (1933):
        Vol. 5 ....................................................    17, 18
        Vol. 8 ....................................................    18
        Vol. 20 ...................................................    18
    *The Random House Dictionary of the English
        Language* (1987) ..........................................    18
    *Webster's New International Dictionary* (2d ed.
        1934) .....................................................    17, 20, 36
    *Webster's Third New International Dictionary*
        (1993) ....................................................    17, 20, 36

# In the Supreme Court of the United States

————————

No. 02-1196

SECURITIES AND EXCHANGE COMMISSION, PETITIONER

*v.*

CHARLES E. EDWARDS

————————

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE ELEVENTH CIRCUIT*

————————

**BRIEF FOR THE**
**SECURITIES AND EXCHANGE COMMISSION**

————————

## OPINIONS BELOW

The opinion of the court of appeals (Pet. App. 1a-15a) is reported at 300 F.3d 1281. The order of the district court (Pet. App. 16a-27a) granting the Securities and Exchange Commission's motion for a preliminary injunction is reported at 123 F. Supp. 2d 1349.

## JURISDICTION

The judgment of the court of appeals was entered on August 6, 2002. A petition for rehearing was denied on November 15, 2002 (Pet. App. 28a-29a). The petition for a writ of certiorari was filed on February 13, 2003, and was granted on April 21, 2003. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

## STATUTES INVOLVED

The texts of 15 U.S.C. 77b(a)(1) and 78c(a)(10) are reproduced in the appendix to the petition for a writ of certiorari (Pet. App. 30a-31a).

(1)

### STATEMENT

1. The definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (Securities Act), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract." As this Court explained in *Reves* v. *Ernst & Young*, 494 U.S. 56, 61 (1990), "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." Congress therefore crafted "a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Ibid.*

In keeping with that broad definition, the Court has held that an "investment contract" means "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 298-299 (1946). The Court has stressed that the term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. The broad and flexible meaning of "investment contract" ensures that "the reach of the [securities laws] does not stop with the obvious and commonplace" but extends to "[n]ovel, uncommon, or irregular devices." *SEC* v. *C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

2. Respondent Charles E. Edwards was the founder, chairman, chief executive officer and sole owner of ETS

Payphones, Inc. (ETS).  Pet. App. 1a-2a; J.A. 36, 47-48, 151, 154, 242.  To raise capital to operate its payphone business, ETS and a subsidiary, under respondent's direction, sold investment packages each of which consisted of a payphone, site lease, leaseback/management agreement, and buyback agreement.  Pet. App. 2a-3a, 17a; J.A. 6, 9, 128-131, 158, 208.  Specifically, investors purchased payphones "complete with location" (J.A. 105) for up to $7,000 each; they then leased the phones back to ETS for five years for fixed payments of $82 per month per phone (approximately a 14% annual return) regardless of the profitability of the phone.  Pet. App. 17a-18a; J.A. 11, 128-129.  As part of the lease agreement, ETS promised to refund the full purchase price of each phone package at the end of the lease term or within 180 days of the investor's request.  Pet. App. 17a; J.A. 11, 104, 129.  There was up to a three-month lag between the time an investor paid the purchase price for a payphone package and the time he was assigned a specific payphone and location by ETS.  J.A. 10, 190-191, 194.[1]

---

[1]  The facts set forth in this brief are taken from the complaint that the Securities and Exchange Commission filed against Edwards and ETS, the factual findings made by the district court in granting a preliminary injunction, and the record submitted in support of the motion for a preliminary injunction.  As described below, the court of appeals not only reversed the preliminary injunction but also ordered the dismissal of the complaint for lack of subject matter jurisdiction.  This Court therefore must accept the allegations in the complaint as true.  See *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 351, 354 (1993).  If the dismissal is instead regarded as based upon failure to state a claim, then the allegations must likewise be accepted as true.  See *SEC* v. *Zandford*, 535 U.S. 813, 818 (2002); *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction").

4

Investors did not receive physical delivery of their phones, did not see the locations where the phones were installed (which were often far from where investors lived), and did not participate in operating the business. ETS found and chose the locations for the phones, installed them, connected them to telephone lines, arranged for long distance service, collected coin revenues, and maintained and repaired the phones. Pet. App. 17a, 22a; J.A. 11, 78-79, 91, 116, 119, 224, 225-226, 239-240, 253. Many of the investors were elderly; virtually all had no experience in managing payphones and were dependent upon the experience and resources of ETS to obtain the promised return on their investment. J.A. 10, 78-79, 83, 239-240.

ETS marketed its investment packages over the internet and through a network of independent distributors. Pet. App. 17a; J.A. 9-10, 165-173. Promotional brochures and materials on the web sites portrayed ETS and its management as experienced and successful in the telecommunications industry and "noted the 'profitable' opportunities for investors." Pet. App. 17a-18a; see J.A. 94, 100-102, 105, 113-120, 223, 227-228, 231, 234. The marketing materials touted "the 'profitability' of payphones and encouraged investors to 'watch the profits add up.'" Pet. App. 17a-18a; see J.A. 12, 13, 100-102, 114, 117, 118, 120, 124, 228. The ETS program was described as "virtually recession-proof," providing a "steady, immediate cash flow," easily liquidated, and suitable for retirement accounts. J.A. 10, 98, 101, 105, 115, 227, 235. As a result of that marketing, ETS took in approximately $300 million from more than 10,000 investors across the country. See Pet. App. 3a, 23a; J.A. 6.

Although the sales literature and web sites presented ETS as a profitable company, ETS was never profitable. Pet. App. 18a, 24a; J.A. 38-40, 73-77, 219-220.

5

Because revenue from payphone operations fell short of the amount needed to meet rental payments to investors, ETS used funds from new investors to pay existing investors.  Pet. App. 18a, 24a; J.A. 14, 40, 49, 76.  ETS had an operating loss of more than $42 million in 1999 and more than $33 million for the first six months of 2000.  J.A. 38, 73.  In September 2000, ETS and several of its subsidiaries filed for bankruptcy protection.  Pet. App. 19a.

Respondent was aware of ETS's poor financial condition, including the fact that the company was dependent on funds from new investors to sustain its operations.  Pet. App. 19a, 25a; J.A. 49, 189, 220-221.  Respondent nonetheless failed to disclose to investors ETS's true financial situation or that ETS would be unable to honor its commitment to repurchase investors' phones if a significant number of investors exercised their option to have ETS buy back their phones.  Pet. App. 18a, 24a; J.A. 14, 79, 192-193, 240.  Indeed, "[d]espite [his] knowledge, [respondent] marketed the program as a profitable enterprise 'ringing with opportunity.'"  Pet. App. 25a.  In a communication as late as July 2000, only two months before ETS's bankruptcy filing, respondent reassured investors of ETS's financial stability and represented that the company had made a profit of nearly $9 million in 1999.  J.A. 230.

Notwithstanding ETS's consistent losses, respondent personally profited.  Pet. App. 18a.  Respondent drained approximately $18 million from the company in direct compensation, management fees, and interest-free loans to other companies he controlled.  *Ibid.*; *id.* at 27a; J.A. 41, 51-53, 54-56, 209-216.

3.  In September 2000, the Securities and Exchange Commission (SEC or Commission) brought this civil law enforcement action against respondent and ETS in

the United States District Court for the Northern District of Georgia. The SEC alleged that respondent and ETS, in carrying out their payphone investment scheme, violated the registration requirements of Section 5(a) and (c) of the Securities Act, 15 U.S.C. 77e(a) and (c), and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5. Compl. 9-12.[2] The Commission sought a permanent injunction against future violations of the registration and antifraud provisions, disgorgement of ill-gotten gains with prejudgment interest, and civil penalties. *Id.* at 12-16.[3]

The Commission moved at the outset of the case for preliminary relief. Following an evidentiary hearing, the district court found that the SEC had made a prima facie showing that respondent had committed the al-

---

[2] The registration provisions of the Securities Act require the filing of a registration statement with the SEC and the delivery to investors of a prospectus containing various items of information, including the company's financial statements. See 15 U.S.C. 77f, 77g(a), 77j; 15 U.S.C. 77aa, Sched. A, Items 25, 26. Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities. 15 U.S.C. 77q(a). Section 10(b) of the Exchange Act and Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security. 15 U.S.C. 78j(b); 17 C.F.R. 240.10b-5.

[3] On December 20, 2002, the United States Attorney for the Northern District of Georgia filed a complaint for forfeiture, pursuant to 18 U.S.C. 981(a)(1)(C), against the funds in certain bank accounts and certain real property alleged to represent the proceeds of wire fraud, in violation of 18 U.S.C. 1343, committed by respondent in the operation of his payphone business. See *United States* v. *Any and All Funds Maintained in the Name of Twinleaf, Inc.*, No. 1:02-CV-3434 (N.D. Ga.). The assets identified in the forfeiture complaint were seized on or about January 3, 2003, and are currently under government control.

leged violations, and the court granted the Commission's request for preliminary relief against him.  Pet. App. 16a-27a.[4]

The district court found that the payphone sale/leaseback/buyback arrangement was an "investment contract" under the federal securities laws.  Pet. App. 17a-23a.  The court applied the test for an investment contract set forth in *Howey*.  *Id.* at 19a (noting that, under *Howey*, 328 U.S. at 298-299, "[a]n investment contract is 'a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party'").  The court found that those who purchased the payphone interests had made "an investment of money."  *Ibid.*  The court also found a "common enterprise," because recovery of the investments "depend[ed] upon the financial viability of [ETS] and [its] ability to generate a profit."  *Id.* at 21a.  Finally, the court found that the investors expected profits from ETS's efforts rather than their own, because they had relinquished "all responsibility for the payphones" to respondent and ETS, who "monitored, managed, and maintained" the phones.  *Id.* at 22a.

After determining that the payphone arrangement was an investment contract, the district court concluded that the SEC had established a prima facie case that respondent had violated the registration requirements of the Securities Act by selling "unregistered securities to thousands of people in thirty-eight states."  Pet. App. 23a.  The court also found that the SEC had established a prima facie case that respondent had com-

---

[4]  ETS itself, without admitting or denying the allegations in the complaint, consented to a preliminary injunction.  Pet. App. 16a. ETS later consented to a permanent injunction.  J.A. 5.

mitted fraud in connection with the sale of securities because "investors were led to believe that both ETS and its payphone program generated a profit" while, in fact, "ETS had failed to make a profit," "was losing money on its payphone program," and "depended on funds from new investors in order to sustain operations." *Id.* at 24a. Concluding that the SEC was likely to succeed on the merits, the court entered a preliminary injunction that prohibited respondent from engaging in future violations of the registration and antifraud provisions of the securities laws and that froze respondent's assets to the extent they were not subject to the bankruptcy proceedings involving ETS and its subsidiaries. *Id.* at 26a-27a.

4. Respondent appealed. In a per curiam opinion, the United States Court of Appeals for the Eleventh Circuit not only reversed the district court's grant of the preliminary injunction, but also ordered dismissal of the SEC's complaint for lack of subject matter jurisdiction under the federal securities laws. Pet. App. 1a-15a. The court of appeals held that the payphone sale/leaseback/buyback scheme did not involve an "investment contract." *Id.* at 4a-8a.

The court of appeals acknowledged that the scheme involved "an investment of money" (Pet. App. 5a) and that investors purchased the payphone packages "for the purpose of earning a return on the purchase price" (*id.* at 6a). The court concluded, however, that the SEC could not show "that investors who contracted with ETS expected profits to be derived solely through the efforts of others." *Ibid.*

The court of appeals understood the decision in *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837, 852 (1975), to have limited the scope of "profits" under the description of investment contract in *Howey*

to "capital appreciation" or "a participation in earnings" of the enterprise.  Pet. App. 6a.  The court of appeals held that the monthly payments that ETS investors received were not a participation in ETS's earnings because they were "fixed" amounts, rather than amounts that varied according to ETS's earnings.  *Id.* at 7a.

The court of appeals also held that, even if the monthly payments could be considered profits, they were not "derived solely from the efforts of others." Pet. App. 7a.  The court reasoned that "the determining factor is the fact that the investors were entitled to their lease payments under their contracts with ETS." *Id.* at 8a.  Because their returns were thus "contractually guaranteed," the court held, "those returns were not derived from the efforts of [respondent] or anyone else at ETS; rather, they were derived as the benefit of the investors' bargain under the contract." *Ibid.*

Because the court of appeals concluded that investors in the ETS payphone scheme did not expect profits derived from the efforts of others, the court deemed it unnecessary to determine whether there was a "common enterprise" as described in *Howey*.  Pet. App. 5a-6a.  Judge Lay, however, filed a concurring opinion addressing that issue.  *Id.* at 9a-15a.

The court of appeals subsequently denied the SEC's petition for rehearing and rehearing en banc.  Pet. App. 28a-29a.

### SUMMARY OF ARGUMENT

The payphone packages sold by respondent were "investment contracts" and therefore "securities" for purposes of the Securities Act and the Exchange Act. Those investments are not excluded from that status because they offered a fixed return or because that return was "contractually guaranteed," *i.e.*, specified as

an entitlement in the investment agreements.  That conclusion follows from the definition of "security" in the federal securities laws and the purposes underlying those laws, and it is consistent with the longstanding interpretation of the SEC.  The court of appeals erred in departing from the SEC's interpretation; and the court's holding, if endorsed by this Court, would create a serious loophole in the securities laws.

A. The securities laws define "security" in the broadest possible terms to achieve Congress's purpose of regulating all investments, regardless of the form in which they are made or the name by which they are called.  To ensure the comprehensiveness of the definition of security, Congress included in the definition not only standardized instruments, such as stocks and bonds, but also a general descriptive term that is a catch-all for unconventional investment arrangements. That term, "investment contract," is broadly phrased and easily accommodates an investment offering a fixed or contractually guaranteed return.  Moreover, Congress adopted the term "investment contract" from the state Blue Sky Laws, and the broad meaning of "investment contract" under those laws encompassed instruments with fixed and contractually guaranteed returns.

In addition, the role of "investment contract" as a catch-all in the definition of "security" requires that the term include fixed- and guaranteed-return investments. Many of the conventional instruments specifically identified in the definition as securities traditionally yield a fixed return, *e.g.*, bond and debenture, and that fixed return is typically promised in the instrument itself.  The scope of the catch-all should be interpreted in light of both the specifically listed securities (such as bonds and debentures) and the catch-all's function—to

ensure coverage of instruments that embody the essential attributes of a security, whether equity or debt.

Inclusion of investments with fixed or contractually promised returns is necessary to achieve the goals of the securities laws. Those who purchase fixed-return investments need the protections of those laws just as much as those who purchase variable-return investments. For that reason, Congress imposed disclosure and antifraud requirements on transactions in *all* securities, whether equity or debt. Indeed, in the SEC's experience, the perpetrators of fraudulent schemes frequently promise fixed or guaranteed returns, and those returns may be particularly attractive to the elderly and unsophisticated investors who are most vulnerable to fraud.

B. The conclusion that the term "investment contract" includes arrangements involving fixed or contractually guaranteed returns is also supported by this Court's cases. In *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 299 (1946), the Court articulated a "flexible" definition of "investment contract" that the Court stressed was "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." The Court equated that definition—a "scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party"—with the definition under the Blue Sky Laws, which encompassed investments offering fixed and contractually promised returns. *Id.* at 298-299.

The Court has taken a similarly broad approach to the scope of "investment contract" in its other cases, such as *SEC* v. *C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943), and *SEC* v. *United Benefit Life Insurance Co.*,

12

387 U.S. 202 (1967). In those cases, the Court empha-
sized that whether a financial arrangement is an
investment contract depends heavily on how it was
promoted. See *Joiner*, 320 U.S. at 352-353; *United
Benefit*, 387 U.S. at 211. The pitch of the promotional
materials here—that investors could expect "profits"
from a profitable company in a profitable industry
without expending any effort themselves—fits easily
within the definition of investment contract. And
*United Benefit* more specifically reinforces the conclu-
sion that an investment contract may offer a fixed
return promised in the contract, because the annuity in
that case, which the Court held to be an investment
contract, offered a guaranteed fixed-dollar amount as
one alternative return. See 387 U.S. at 205.

C. The SEC has long interpreted "investment con-
tract" to include investment agreements offering fixed
and guaranteed returns. That interpretation, which
dates back to shortly after the federal securities laws
were enacted, is embodied in formal adjudications by
the SEC. See *SEC* v. *Universal Serv. Ass'n*, 106 F.2d
232 (7th Cir. 1939), cert. denied, 308 U.S. 622 (1940); *In
re Abbett, Sommer & Co.*, 44 S.E.C. 104 (1969), *avail-
able in* 1969 WL 95359, order aff'd, [1970-1971 Transfer
Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,813, at 90,056
(D.C. Cir. Sept. 25, 1970); *In re Union Home Loans*, 26
S.E.C. Dkt. 1517 (Dec. 16, 1982), *available in* 1982 WL
522493. The SEC's reasonable interpretation of the
securities laws is entitled to deference. See *SEC* v.
*Zandford*, 535 U.S. 813, 819-820 (2002).

D. The court of appeals' erroneous holding in this
case, if affirmed by this Court, would open a serious
loophole in the securities laws. Unscrupulous promot-
ers who seek to finance their business enterprises with
the money of others could circumvent the securities

laws by selling investments offering fixed or contractu-
ally guaranteed returns even though those investments
function economically like other investments sold to
raise capital. That result would frustrate Congress's
goals of regulating all instruments sold as investments
and thereby providing comprehensive protection for
investors.

### ARGUMENT

### RESPONDENT'S AGREEMENTS WITH INVESTORS WERE "INVESTMENT CONTRACTS" AND THUS "SECURITIES," EVEN THOUGH INVESTORS WERE CONTRACTUALLY ENTITLED TO A FIXED RETURN

To raise capital to operate a payphone business,
respondent sold members of the general public across
the country packages consisting of a payphone, a
location for the phone, and an agreement to lease the
phone, to manage it, and to repurchase it at the end of
the lease or at the investor's option. Respondent
promoted the packages as passive investments through
which investors could obtain "profits," and investors
entrusted their money to respondent for that purpose.
See pp. 3-4, *supra*.

The agreements between respondent and the public
investors who financed his business are precisely the
kind of arrangements that Congress sought to regulate
as securities under the Securities Act of 1933, 15 U.S.C.
77a *et seq*., and the Securities Exchange Act of 1934, 15
U.S.C. 78a *et seq*. Those arrangements fall squarely
within the term "investment contract," a category in-
cluded in the definition of "security" in both Acts. 15
U.S.C. 77b(a)(1), 78c(a)(10). The general term "invest-
ment contract" was included in the definition to ensure
that the Acts' reach would extend to even the most un-
usual arrangements, and thereby to advance Congress's

"intent to regulate the entire body of instruments sold as investments." *Reves* v. *Ernst & Young*, 494 U.S. 56, 64 (1990). See *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 299 (1946); *SEC* v. *C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

Given the broad statutory language and congressional purpose, the SEC has always interpreted the term "investment contract" to include an investment offering a fixed return or a return that is specified or promised as an entitlement in a contract (in the terminology of the court of appeals, "contractually guaranteed").[5]  See, *e.g.*, *SEC* v. *Universal Serv. Ass'n*, 106 F.2d 232 (7th Cir. 1939), cert. denied, 308 U.S. 622 (1940).  That longstanding interpretation is embodied not just in the SEC's enforcement actions and interpretive guidance, but also in formal SEC adjudications, and is therefore entitled to deference.  See *In re Abbott, Sommer & Co.*, 44 S.E.C. 104 (1969), *available in* 1969 WL 95359, order aff'd, [1970-1971 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,813, at 90,056 (D.C. Cir. Sept. 25, 1970); *In re Union Home Loans*, 26 S.E.C. Dkt. 1517 (Dec. 16, 1982), *available in* 1982 WL 522493. Indeed, the SEC's interpretation follows from the text

---

[5]  A true guaranty is a promise by a third party to pay the debt or otherwise perform the obligation of the principal promisor in the event of nonpayment or other nonperformance by the principal promisor.  See *Black's Law Dictionary* 634 (5th ed. 1979).  No such guaranty was present here. Rather, the court of appeals used the term "contractually guaranteed" more loosely, as a shorthand description of the fact that "investors were entitled to their lease payments under their contracts with ETS."  Pet. App. 8a.  Thus, the court apparently used the term merely to indicate that the amount or rate of return was specified or expressly promised in the contracts.  Except where otherwise indicated, this brief uses the term in that sense.

of the securities laws, promotes their underlying pur-
poses, and has substantial support in precedent.

### A. The Statutory Text And Purposes Demonstrate That An "Investment Contract" Includes An Arrangement With A Fixed Or Contractually Guaranteed Return

1. As this Court has repeatedly stressed, the federal securities laws define "security" in the broadest terms. See *Reves*, 494 U.S. at 60-61; *Marine Bank* v. *Weaver*, 455 U.S. 551, 555 (1982); *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 847-848 (1975); *Tcherepnin* v. *Knight*, 389 U.S. 332, 338 (1967). The definitions in the Securities Act and the Exchange Act each contain a long and sweeping list of instruments and arrange-ments that are included in the expansive concept of a "security." Those items include, among other things, "any note, stock, treasury stock, security future, bond, debenture" and any "collateral-trust certificate, pre-organization certificate, or subscription, transferable share, investment contract," or any "instrument com-monly known as a 'security.'" 15 U.S.C. 77b(a)(1), 78c(a)(10).[6]

Those expansive definitions reflect that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Reves*, 494 U.S. at 61. Congress determined that the best way to achieve the goal of protecting investors was "to define 'the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within

---

[6] The full text of each definition is reproduced in the appendix to the petition. Pet. App. 30a-31a. Although the two definitions contain some differences in language, the Court has treated them as essentially identical in meaning. See *Reves*, 494 U.S. at 61 n.1.

the ordinary concept of a security.'" *Forman*, 421 U.S. at 847-848 (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess. 11 (1933)).

In order to craft "a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment," *Reves*, 494 U.S. at 61, Congress included in the definition not just "standardized" instruments, such as stocks and bonds, but also arrangements "of more variable character" that it "designated by more descriptive terms," such as "investment contracts." *Joiner*, 320 U.S. at 351. Congress included those "general descriptive designations" to ensure the comprehensiveness of the Acts' coverage, which "does not stop with the obvious and commonplace" but includes "[n]ovel, uncommon, or irregular devices" that are offered as investments. *Ibid*. See also *Landreth Timber Co.* v. *Landreth*, 471 U.S. 681, 690 n.4 (1985) (investment contract cases have "involved unusual instruments that did not fit squarely within one of the enumerated specific kinds of securities"); *Howey*, 328 U.S. at 299 (emphasizing flexibility and adaptability of "investment contract" concept).[7]

---

[7] The definitions of "security" include another broad descriptive category, which is referred to in the Securities Act definition as "any interest or instrument commonly known as a 'security,'" 15 U.S.C. 77b(a)(1), and in the Exchange Act definition as "any instrument commonly known as a 'security,'" 15 U.S.C. 78c(a)(10). The Court has generally treated that catch-all category as interchangeable with the "investment contract" category, see *Forman*, 421 U.S. at 852; *Joiner*, 320 U.S. at 351, and has indicated that the test for identifying whether an interest or instrument falls within either category is substantially the same, see *Landreth*, 471 U.S. at 691-692 n.5; *Forman*, 421 U.S. at 852. To the extent that there is a difference between the two categories, "any interest or instrument commonly known as a 'security'" may be narrower because of its reference to an arrangement "commonly known" as a "security,"

The term "investment contract" is broadly phrased and easily accommodates an investment offering a fixed return or a return that is promised by the terms of the parties' agreement.  The first word in the quoted term, "investment," means the "investing of money or capital in some species of property for income or profit," and "invest" means "to lay out (money or capital) in business with the view of obtaining an income or profit." *Webster's New International Dictionary* 1306 (2d ed. 1934) (*Webster's New Int'l*); accord *Webster's Third New International Dictionary* 1190 (1993) (*Webster's Third*).  The terms "income" and "profit" in turn connote any financial return, whether fixed or variable, guaranteed or not guaranteed.  Thus, "income" includes any "gain or recurrent benefit," and "profit" encompasses "any benefit or advantage accruing from the management, use, or sale of property, or from the carrying on of any process of production, or from the conduct of business."  See *Webster's New Int'l* at 1258, 1976; *Webster's Third* at 1143, 1811.

The second word in the quoted term, "contract," means "[a]n agreement between two or more persons to do or forbear something."  *Webster's New Int'l* at 578; accord *Webster's Third* at 494.  Thus, the very term "investment *contract*" makes clear that instruments of that name include those in which a return—whether labeled income or profit—is promised in a contract.[8]

---

while "investment contract" encompasses an arrangement that, although it may not be "commonly known" at all, "embodies the essential attributes" of "a security." *Forman*, 421 U.S. at 852.

[8]  Other leading dictionaries, both when the securities laws were enacted and today, confirm that the term "investment contract" includes an agreement that promises a specified or fixed return.  See, *e.g.*, 5 *The Oxford English Dictionary* 458 (1933)

Further, as this Court noted in *Howey*, the term "investment contract" had a well-established meaning under cases construing the state Blue Sky Laws that predated the federal securities laws. 328 U.S. at 298. The Blue Sky Law cases had construed investment contract "broadly" so as "to afford the investing public a full measure of protection." *Ibid.* As a result, the term had come to mean "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" *Ibid.* (quoting *State* v. *Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920)). That definition, which includes both "income" and "profit," is clearly expansive enough to include an investment having a fixed or contractually guaranteed return.

Indeed, two of the state cases cited by this Court in *Howey* to illustrate the meaning of "investment contract" involved fixed or contractually guaranteed returns. See *People* v. *White*, 12 P.2d 1078 (Cal. Dist. Ct. App. 1932) (return of $7500 on investment of $5000); *Stevens* v. *Liberty Packing Corp.*, 161 A. 193, 195 (N.J. Ch. 1932) ("guaranteed" return amounting to $56 per year on investment of $175). Congress presumably intended that the term "investment contract" in the federal securities laws would, consistent with state cases construing the same language, likewise be interpreted to include arrangements involving fixed and contractually specified returns. See *Howey*, 328 U.S. at

---

(*Oxford Dictionary*) ("investment"); *id.* at 162 ("income"); 8 *Oxford Dictionary* 1432 ("profit"); 2 *Oxford Dictionary* 912 ("contract"); *Black's Law Dictionary* 1006 (3d ed. 1933) ("invest"); *id.* at 944 ("income"); *id.* at 1440 ("profit"); *id.* at 421 ("contract"); *The Random House Dictionary of the English Language* 1004 (1987) ("invest" and "investment"); *id.* at 967 ("income"); *id.* at 1545 ("profit"); *id.* at 441 ("contract").

298 (concluding that Congress adopted the definition of "investment contract" reflected in the state cases); *Evans* v. *United States*, 504 U.S. 255, 260 n. 3 (1992) ("if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it") (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)).

2.  The role of the term "investment contract" in the statutory definitions of "security" confirms that the term includes an agreement providing for a fixed or guaranteed return.  As the Court's discussion in *Joiner*, *Howey*, and other cases illustrates, Congress included the term "investment contract" as a catch-all for unusual investments that cannot be categorized as one of the standardized instruments that are also identified in the definitions.  See pp. 15-16, *supra*; *Golden* v. *Garafalo*, 678 F.2d 1139, 1144 (2d Cir. 1982).  Several of the conventional securities enumerated in the definitions of security are debt securities that traditionally yield a fixed return, *e.g.*, "bond" and "debenture," 15 U.S.C. 77b(a)(1), 78c(a)(10), and that return is typically promised ("guaranteed") in the instrument itself.  Moreover, the definition of security in the Securities Act expressly includes a "guarantee of" any of the other listed items.  15 U.S.C. 77b(a)(1).  Because the specific securities listed in the definitions of security include investments having returns that are fixed and contractually guaranteed, it makes sense that the catch-all term "investment contract" should also include such investments.  See *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995) (relying on the principle that "a word is known by the company it keeps" and noting that the Court has applied that principle in interpreting the definition of "security" in the Exchange Act).

20

Consistent with the term's role as a catch-all, the Court has noted that the definition of "investment contract" "embodies the essential attributes that run through all of the Court's decisions defining a security." *Forman*, 421 U.S. at 852 (citing *Joiner*, *Tcherepnin*, and *Howey*). Those essential attributes include debt as well as equity participation, and returns that are contractually specified as well as those that are not. See *Webster's New Int'l* at 2263 (defining "security" as "[a]n evidence of *debt* or of property, as a *bond*, stock certificate, or other instrument") (emphasis added); *Webster's Third* at 2053-2054 (defining "security" as "a written obligation, evidence, or document of ownership or *creditorship* (as a stock, *bond*, *note*, *debenture*, or certificate) giving the holder the right to demand and receive property not in his possession) (emphasis added). The "fundamental essence of a 'security'" is "its character as an 'investment.'" *Reves*, 494 U.S. at 68-69. For that reason, an instrument may be an investment contract if it has the essential properties of *either* "a debt or equity security," *Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994), and investment contracts may offer either fixed or contractually guaranteed returns.

Inclusion of investments with fixed or contractually promised returns in the catch-all category of "investment contract" is necessary to achieve the securities laws' goals of ensuring honest securities markets and protecting investors from fraud. Purchasers of fixed-return investments need the protections provided by the securities laws just as much as the purchasers of variable return investments, because both categories of investors are dependent on the efforts of others to manage successfully the enterprise in which they invest. Congress recognized as much by requiring that

issuers making public offerings of *any* securities, debt or equity, disclose information about the company's financial condition, including its assets and liabilities, and its earnings, income, and expenses.  See 15 U.S.C. 77g(a); 15 U.S.C. 77aa, Sched. A, Items 25, 26. Likewise, the fraud prohibitions in the Acts extend to all securities, not only equities.  Indeed, in the Commission's experience, those who perpetrate fraudulent investment schemes frequently promise fixed or guaranteed returns (see pp. 28-34, 41-42 & note 14, *infra*), and such promises may be particularly attractive to the elderly or unsophisticated investors who are most likely to fall victim to fraud.  Thus, coverage of investments offering fixed or contractually guaranteed returns is critical to Congress's goal of providing comprehensive protection to investors by "regulat[ing] *investments*, in whatever form they are made and by whatever name they are called."  *Reves*, 494 U.S. at 61.

### B. Precedent Confirms That An "Investment Contract" May Offer A Fixed Or Contractually Guaranteed Return

1.  The conclusion that an "investment contract" may offer a fixed or contractually guaranteed return is also supported by this Court's cases.  The Court has consistently applied a broad and flexible definition of "investment contract."  As noted above, in *Howey*, the Court concluded that Congress adopted the expansive definition of "investment contract" that had been used by state courts interpreting Blue Sky Laws.  The Court paraphrased that definition as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party" (*Howey*, 328 U.S. at 298-299) and, later in the opinion,

22

as a "scheme [that] involves an investment of money in a common enterprise with profits to come solely from the efforts of others" (*id.* at 301). The Court noted that the definition is "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. The Court stressed that, in applying the definition, the emphasis is on "economic reality" and the substance of the transaction rather than its form. *Id.* at 298. The Court further cautioned that "[t]he statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae." *Id.* at 301.

Applying that "flexible" approach, the Court in *Howey* concluded that the investments at issue there— fee-simple interests in citrus groves packaged with service contracts to cultivate the land, sell the fruit, and remit any profit to the investors—were investment contracts. 328 U.S. at 299-300. The Court cited a variety of cases (*id.* at 299 n.5), including a formal adjudication by the Commission, in which "transactions which, in form, appear to involve nothing more than the sale of real estate, chattels, or services, have been held to be investment contracts where, in substance, they involve the laying out of money by the investor on the assumption and expectation that the investment will return a profit without any active effort on his part." *In re Natural Res. Corp.*, 8 S.E.C. 635, 637 (1941). The Court explained that it is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise," *Howey*, 328 U.S. at 299, even if the "tangible interest which is sold has intrinsic value independent of the success of the enterprise as a

whole" (*id.* at 301).  See also *Joiner*, 320 U.S. at 352-353 n.10.[9]

In concluding that the citrus grove scheme involved an investment contract, the Court in *Howey* relied on the fact that investors did not expect to use the land themselves, but instead were "attracted solely by the prospects of a return on their investment."  328 U.S. at 300.  The Court was not concerned with whether the anticipated return was fixed or variable, contractually promised or unspecified.  On the contrary, the Court stated that, in determining whether an investment contract is involved, "it is immaterial whether the enterprise is speculative or non-speculative."  *Id.* at 301.

Although the interpretation that the Court articulated used the term "profit," the Court did not, by using that term, signal that investment contracts must offer variable or unspecified returns.  As described above, the ordinary meaning of "profit" encompasses any kind of financial return, including one that is fixed or contractually guaranteed.  See p. 17, *supra.*  Moreover, the interpretation of investment contract that the Court

---

[9]  In the half century since *Howey*, the courts of appeals have continued to find such schemes to be investment contracts.  See *Blackwell* v. *Bentsen*, 203 F.2d 690 (5th Cir. 1953) (citrus groves), cert. dismissed, 347 U.S. 925 (1954); *Continental Mktg. Corp.* v. *SEC*, 387 F.2d 466 (10th Cir. 1967) (beavers), cert. denied, 391 U.S. 905 (1968); *Kemmerer* v. *Weaver*, 445 F.2d 76 (7th Cir. 1971) (beavers); *Glen-Arden Commodities, Inc.* v. *Costantino*, 493 F.2d 1027 (2d Cir. 1974) (whiskey); *Miller* v. *Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974) (chinchillas); *Smith* v. *Gross*, 604 F.2d 639 (9th Cir. 1979) (earthworms); *United States* v. *Jones*, 712 F.2d 1316, 1321-1322 (9th Cir.) (truck trailers), cert. denied, 464 U.S. 986 (1983); *Albanese* v. *Florida Nat'l Bank*, 823 F.2d 408 (11th Cir. 1987) (ice machines); *Long* v. *Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989) (cattle); *Bailey* v. *J.W.K. Prop., Inc.*, 904 F.2d 918 (4th Cir. 1990) (cow embryos).

24

quoted from a leading Blue Sky Law case used the even broader phrase "income or profit." See *Howey*, 328 U.S. at 298 (quoting *Gopher Tire & Rubber Co.*, 177 N.W. at 938). And the Court cited with approval not only the two state cases involving fixed or guaranteed returns described above, but also an SEC injunctive action in which the investment contract promised a fixed return. See *Howey*, 328 U.S. at 299 n.5 (citing *SEC* v. *Universal Serv. Ass'n*, 106 F.2d 232, 237-238 (7th Cir. 1939), cert. denied, 308 U.S. 622 (1940)).[10]

Respondent's payphone packages fit squarely within *Howey*'s understanding of an investment contract. Like the citrus grove investments in *Howey*, the payphone investments were nominally structured as a sale of property coupled with a leaseback and management agreement. But, also like the *Howey* investments, in substance, they involved the laying out of money by investors in the expectation of a financial return without any active effort on their part. Just as the investors in *Howey* generally knew nothing about running a citrus grove, lived far from the groves they purchased, and had no intention of cultivating the groves themselves, the investors in respondent's payphone packages generally knew nothing about operating payphones, lived far from the phones that respondent assigned them, and had no intention of operating the phones themselves. Compare *Howey*, 328 U.S. at 299, with p. 4, *supra.* They were passive investors, "attracted solely by the prospects of a return on their

---

[10] The fact that the ordinary meaning of "profit" encompasses a fixed return is reinforced by this Court's statement in *Reves* that, in the context of notes, the Court uses the term "profit" to mean "a valuable return on an investment," including a return "in the form of interest." 494 U.S. at 68 & n.4. See pp. 36-37, *infra.*

25

investment," and their agreements with respondent were therefore investment contracts. *Howey*, 328 U.S. at 299-300.

2. The conclusion that respondent's agreements with investors were investment contracts is also supported by this Court's other cases. In *Joiner*, the Court held that assignments of oil leases, sold in a nationwide campaign that promoted them as investments and "assured [potential investors] that the Joiner Company was engaged in and would complete the drilling of a test well * * * to test the oil-producing possibilities of the offered leaseholds," were securities in the form of investment contracts. 320 U.S. at 346. The Court reasoned that whether an investment contract is involved turns on "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* at 352-353. "In the enforcement of an act such as this," the Court stressed, "it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *Id.* at 353.

The Court took the same approach in *SEC* v. *United Benefit Life Insurance Co.*, 387 U.S. 202 (1967). In that case, the Court reiterated that, in determining whether financial arrangements are investment contracts, promoters should be held accountable for their representations to prospective investors. *Id.* at 211. Based on that principle, the Court held that investments in certain annuity products were investment contracts because the promotional materials stressed "the possibility of investment return" and "the prospect of 'growth' through sound investment management." *Id.* at 211 & n.15.

Viewed in light of the promoter's representations, as in *Joiner* and *United Benefit*, the payphone packages

here are plainly investment contracts. Respondent consistently marketed the arrangement as an investment opportunity that would provide "profits." See Pet. App. 17a-18a; J.A. 100-102, 114-115, 117-119, 124, 223, 227. The lure that respondent's promotional materials held out to prospective investors—the expectation of a return on their money from a profitable company in a profitable industry, with no effort expended by the investors themselves—readily fits within *Howey*'s description of investment contract.

*United Benefit* also indicates that an investment contract may offer a fixed return the amount of which is promised in the investment contract. The annuity product in *United Benefit* provided two alternative returns. Under one alternative, the purchaser was entitled to "his proportionate share" of the total amount that had been generated with the initial investments. 387 U.S. at 205. Under the other alternative, the purchaser could select a "cash value measured by a percentage of his net premiums, which gradually increase[d] from 50% of that sum in the first year to 100% after 10 years." *Ibid*. The latter alternative return was thus a fixed amount (albeit one that increased with each year that the investor participated in the annuity), and the investor was guaranteed that fixed amount by the contract. Indeed, the Court later referred to the alternative return as a "guarantee." *Id*. at 211.

Although the Court in *United Benefit* did not address an argument that the guaranteed fixed return prevented the annuity from being an investment contract, the Court was fully aware of that feature of the annuity. Indeed, the Court expressly rejected the argument that the guaranteed return made the annuity an "insurance" product, which is exempt from coverage

27

under the Securities Act. 387 U.S. at 210-211; see 15 U.S.C. 77c(a)(8). It therefore is significant that the Court made no mention of any possibility that the guaranteed return would disqualify the investment from being an investment contract. Given the prominence of the guaranteed return in the Court's analysis, it seems clear that the Court did not believe that the nature of that return disqualified the annuity from being an investment contract.

3. The Court has consistently followed the approach illustrated by *Howey*, *Joiner*, and *United Benefit* in other cases involving investment contracts. For example, the Court has repeatedly emphasized the breadth and flexibility of the definition. See *Marine Bank*, 455 U.S. at 555-556; *Forman*, 421 U.S. at 847-848; *Tcherepnin*, 389 U.S. at 338. The Court has also frequently stressed the importance of economic reality and substance rather than form. See *Forman*, 421 U.S. at 848; *Tcherepnin*, 389 U.S. at 336; *Marine Bank*, 455 U.S. at 560 n.11. And the Court has repeatedly looked to the promoter's representations in characterizing the instrument. *Marine Bank*, 455 U.S. at 556; *Forman*, 421 U.S. at 850-851; see *Reves*, 494 U.S. at 69-70 (relying on fact that advertisements for notes characterized them as "investments" in holding that the notes were securities); *Landreth*, 471 U.S. at 686 (relying on purchaser's expectations in concluding that an instrument that is called stock and bears the usual characteristics of stock is a security). All of those considerations reinforce the conclusion that respondent's payphone packages were investment contracts notwithstanding that investors were entitled by contract to a fixed return.

4. In keeping with this Court's cases, several courts of appeals have specifically recognized that investments offering fixed and contractually guaranteed returns

28

come within the term "investment contract." In *SEC* v. *Infinity Group Co.*, 212 F.3d 180 (3d Cir. 2000), cert. denied, 532 U.S. 905 (2001), the Third Circuit expressly rejected the argument that the promise of a fixed return precludes an investment scheme from qualifying as an investment contract. Purchasers of Infinity's "property transfer contracts" transferred money to a trust to invest at the trustees' discretion. *Id.* at 184. As in the present case, participants were by "contract[]" "guaranteed," *id.* at 187, a high, fixed rate of return and repayment upon demand, *id.* at 184-85 & n.2. Notwithstanding the fixed and contractually guaranteed return, the Third Circuit held that the property transfer contracts "clearly constitute securities." 212 F.3d at 191. The court explained that

> the definition of security does not turn on whether the investor receives a variable or fixed rate of return. * * * The mere fact that the expected rate of return is not speculative does not, by itself, establish that the property transfer contracts here are not "investment contracts" within the meaning of [the] federal securities laws.

*Id.* at 189. The court concluded: "We will not embroider a loophole into the fabric of the securities laws by limiting the definition of 'securities' in a manner that unduly circumscribes the protection Congress intended to extend to investors." *Id.* at 191.

Similarly, in *United States* v. *Carman*, 577 F.2d 556 (1978), the Ninth Circuit held that an investment with a fixed return and a conditional third-party guaranty was an investment contract. The defendant in *Carman* sold a different asset than respondent—a federally-insured student promissory note rather than a payphone—but with a similar addition of a service contract and a

29

repurchase agreement. *Id.* at 560. The *Carman* court held that "[t]he combination created an integrated investment package which must be viewed in its entirety in determining whether it is within or without the Act." *Id.* at 564 (internal quotation marks and citation omitted).

The *Carman* court rejected the defendant's argument that the package could not be an investment contract "because the return was in the form of fixed interest, guaranteed by the federal government." 577 F.2d at 563. The court recognized that, despite the fixed return and federal guaranty, purchasers of the note packages remained subject to investment risk. The federal guaranty was conditioned on the defendant's "care and diligence" in "making and collecting on the notes." *Ibid.* Investors were therefore dependent on the defendant's sound management and continued solvency, without which it would not be able to meet its obligations (*ibid.*), just as the investors in this case were dependent on ETS's continued solvency for ETS to be able to meet its lease-payment and repurchase obligations. The *Carman* court concluded that "[t]his risk of *loss* is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed." *Ibid.* See also *SEC* v. *Eurobond Exch., Ltd.*, 13 F.3d 1334, 1340 (9th Cir. 1994) (same, quoting *Carman*).

Other courts of appeals have similarly found instruments or schemes yielding fixed or contractually-guaranteed returns to be investment contracts, albeit without directly addressing the arguments accepted by the court of appeals here. See, *e.g.*, *SEC* v. *SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) ("flat 10% guaranteed return"); *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 234 n.2 (2d

Cir. 1985) (certificates of deposit paying fixed rates between 12.55% and 14.60%); *SEC* v. *Professional Assocs.*, 731 F.2d 349, 351, 355, 357 (6th Cir. 1984) (units in escrow account earning "interest" and trust accounts paying 9% annually); *SEC* v. *Universal Serv. Ass'n*, 106 F.2d 232 (7th Cir. 1939) (contract promising 30% per annum return), cert. denied, 308 U.S. 622 (1940); *SEC* v. *Better Life Club of Am., Inc.*, 995 F. Supp. 167, 173-174 (D.D.C. 1998) (purported "loans" promising double the money invested), aff'd, 203 F.3d 54 (D.C. Cir.) (Table), cert. denied, 528 U.S. 867 (1999).[11]

---

[11] In his brief in opposition to the certiorari petition (at 20), respondent relied on a line of cases holding bank "loan participations" not to be investment contracts  Those cases are inapposite because they involved transactions of a primarily commercial, rather than investment, nature, and there were no sales to ordinary investors.  Most of the cases involved transactions in which two or more financial institutions shared in making a commercial loan to a business.  See, *e.g.*, *Kansas State Bank* v. *Citizens Bank*, 737 F.2d 1490, 1493-1495 (8th Cir. 1984); *Union Planters Nat'l Bank* v. *Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1181-1182 (6th Cir.), cert. denied, 454 U.S. 1124 (1981).  Although those cases may have correctly held that the arrangements at issue were not investment contracts because of their commercial nature, cf. *Reves*, 494 U.S. at 66, the courts mistakenly relied on the fact that the lending banks expected to receive fixed returns.  See, *e.g.*, *Kansas State Bank*, 737 F.2d at 1495; *Union Planters Nat'l Bank*, 651 F.2d at 1184-1185.  In *Resolution Trust Corp.* v. *Stone*, 998 F.2d 1534, 1538-1540 (10th Cir. 1993), the court held that a savings and loan association did not purchase investment contracts when it bought commercial paper (known as "enhanced automobile receivables" or "EARs") consisting of "car loans purchased from automobile dealers and resold on the secondary market in a package [with] certain enhancements to insure collectability" (*id.* at 1536).  In that case as well, the court incorrectly relied on the fact that the EARs paid a fixed return, but the court may have been correct that the EARs were not investment contracts when purchased in a commercial transaction by a financial institution.  Cf. *Reves*, 494

31

### C. The SEC's Longstanding Interpretation Of "Investment Contract" As Including A Fixed- Or Guaranteed-Return Investment Is Entitled To Deference

The holdings of the courts of appeals that have rejected the view of the court below comport with the longstanding view of the SEC that an investment contract encompasses an arrangement paying a fixed or contractually guaranteed return. The SEC's view dates back to shortly after enactment of the securities laws. The SEC took that position in a civil enforcement action that it brought in 1936. In *SEC* v. *Universal Service Ass'n*, 106 F.2d 232 (1939), cert. denied, 308 U.S. 622 (1940), the Seventh Circuit upheld the SEC's charges in that enforcement action and ruled that various individuals, an association, and a corporation violated the Securities Act in the sale of investment contracts promising that, after five years, investors would receive their initial principal plus a 30% per annum return. The court concluded that the arrangement was a security because it fell within the definition proposed by the SEC—"[t]he investment of money with the expectation of profit through the efforts of other persons." *Id.* at 237.

The SEC has consistently adhered to the interpretation reflected in that early enforcement action. That interpretation has formed the basis for numerous other civil enforcement actions, *e.g.*, *Los Angeles Trust Deed & Mortgage Exch.* v. *SEC*, 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919 (1961), including actions against payphone sale/leaseback schemes just like respondent's, *e.g.*, *SEC* v. *Amtel Communications*,

---

U.S. at 66, 68. If, however, the EARs had been promoted as investments and sold to ordinary investors, they likely would have been investment contracts.

*Inc.*, 60 S.E.C. Dkt. 2080 (Nov. 7, 1995) ($51 per month lease payment); see 70 S.E.C. Dkt. 1605 (Aug. 30, 1999) (noting entry of final judgment).

The SEC has also advanced that interpretation in its briefs before this Court and in interpretive guidance. See, *e.g.*, Br. for the SEC as Amicus Curiae Supporting Petitioners at 28, *Reves*, *supra* (No. 88-1480); *Public Offerings of Investment Contracts Providing for the Acquisition, Sale or Servicing of Mortgages or Deeds of Trust*, SEC Release No. 33-3892 (Jan. 31, 1958) (noting that an "[i]mplied or actual guarantee of specified yield or return" is indicative of an investment contract); *Applicability of the Securities Laws to Multi-level Distributorships and Pyramid Sales Plans*, SEC Release Nos. 33-5211 & 34-9387 (Nov. 30, 1971) (stating that it is not "significant that the return promised for the use of an investor's money may be something other than a share of the profits of the enterprise").

This Court has noted the SEC's interpretation in one of its decisions. That case, *SEC* v. *American Trailer Rentals Co.*, 379 U.S. 594 (1965), concerned the scope of Chapter XI of the Bankruptcy Act, 11 U.S.C. 701 *et seq.* (1958). In recounting the factual history of the case, the Court explained that the company had started out by financing itself through the sale of tractor trailers to hundreds of small investors who simultaneously leased the trailers back to the company in exchange for "a set 2% of their investment per month for 10 years." 379 U.S. at 598. The Court further noted that the company halted that financing method because "the SEC advised [the company] that these sale and lease-back arrangements were investment contracts and therefore securities" subject to the registration requirements of the Securities Act. *Ibid.*

33

Most significantly, the SEC's interpretation is embodied in at least two formal adjudications. In *In re Abbett, Sommer & Co.*, 44 S.E.C. 104 (1969), *available in* 1969 WL 95359, order aff'd, [1970-1971 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,813, at 90,056 (D.C. Cir. Sept. 25, 1970), the Commission ruled that mortgage notes—which provided a fixed rate of interest as the return—were investment contracts when they were sold together with management services and a pledge to repurchase the notes in the event of default. The Commission noted that the sales literature touted the "guarantee" of the notes by the company and concluded that the purchasers were "rel[ying] upon the services and undertakings of others to secure the return of a profit." 1969 WL 95359, at *4.

Similarly, in *In re Union Home Loans*, 26 S.E.C. Dkt. 1517 (Dec. 16, 1982), *available in* 1982 WL 522493, the SEC held that promissory notes secured by deeds of trust on real property and sold with a package of management services were investment contracts. The Commission noted that the promoter solicited investors with the promise that they would receive "a specified percentage return on their investment depending upon the market at the time the loan is made" and the representation that "[t]he return currently being offered is about 16 percent." 1982 WL 522493, at *2.

The SEC's interpretation of the securities laws reflected in those adjudications is entitled to deference under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). See *SEC* v. *Zandford*, 535 U.S. 813, 819-820 (2002) (citing *United States* v. *Mead Corp.*, 533 U.S. 218, 229-231 & n.12 (2001)). The SEC's interpretation is reasonable for the reasons described earlier in this brief, and should be sustained by this Court.

### D. The Court Of Appeals' Holding Is Unsupported And Would Frustrate The Purposes Of The Securities Laws

#### 1. *The exclusion of fixed-return investments is not required by* Forman *or* Reves

a. The court of appeals did not adhere to the SEC's interpretation of "investment contract" because the court concluded that this Court, in *Forman*, had limited the meaning of "profits" under the *Howey* definition of investment contract to exclude fixed returns. See Pet. App. 6a-7a. That conclusion was mistaken.

In *Forman*, the Court, describing its holdings in prior investment contract cases, stated: "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment * * * or a participation in earnings." 421 U.S. at 852. The Court's reference to "a participation in earnings" did not create a new test that narrowed *Howey* to variable return investments. The Court was simply describing one of its prior cases (*Tcherepnin*), and it did not thereby hold that no other kind of return can constitute profits.

The basic point of the Court's reference in *Forman* to capital appreciation or a participation in earnings was to distinguish the situation in which an investor is "'attracted solely by the prospects of a return' on his investment," which involves a security, from a situation in which "a purchaser is motivated by a desire to use or consume the item purchased," which does not involve a security. 421 U.S. at 852-853 (citation omitted). Thus, in *Forman*, where low-income purchasers received stock entitling them to lease an apartment in a state-subsidized and supervised non-profit housing cooperative, the Court concluded that there was no investment contract because purchasers "were attracted solely by

the prospect of acquiring a place to live, and not by financial returns on their investments." *Id.* at 853. In this case, by contrast, investors in the ETS scheme were motivated by the prospect of a financial return on the purchase price of the payphone packages rather than a desire personally to use the payphones. See Pet. App. 6a (noting that ETS investors purchased the payphone packages "for the purpose of earning a return on the purchase price"); *id.* at 22a (stating that "[i]nvestors never saw the telephones" and "never used the telephones").[12]

Moreover, there is no indication in *Forman* that the Court understood "a participation in earnings" as limited to a variable return. On the contrary, the Court made clear that "profit may be derived from the *income* yielded by an investment," 421 U.S. at 855 (emphasis added), and that the essence of the test is whether "the investor is 'attracted solely by the prospects of a *return*' on his investment," *id.* at 852 (emphasis added) (citing *Howey*, 328 U.S. at 300). The Court also sometimes equated "profits" with "financial *returns*" and with "*income* or profits." See *id.* at 853, 855 (emphasis added). And, in the course of its analysis, the Court stated that "one might readily agree that net *income*

---

[12] The court of appeals' statement that "capital appreciation is not at issue" in this case (Pet. App. 7a) is incorrect. Respondent himself claimed that the value of the payphone packages increased over time. See J.A. 162-163, 183. Promotional materials also implied that the payphone interest being offered was a "valuable asset" that would "increase[] in value." See J.A. 96. And the record suggests that investors expected returns in the form of capital appreciation (as well as in the form of the monthly payments). See J.A. 92-93 (statement by ETS investor that he believed there was a possibility that the payphone package would increase in value over time).

from the leasing of commercial and professional facilities is the kind of *profit* traditionally associated with a security investment." *Id.* at 856 (emphasis added). The terms "income" and "return" (like the term "profit" itself) are not limited to variable yields. See p. 17, *supra*; *Webster's New Int'l* at 2130; *Webster's Third* at 1941.

Nor is the ordinary meaning of the phrase "a participation in earnings" limited to a variable return. An investor can have a "participation" in the "earnings" of an enterprise even when his return is not *measured* by those earnings. Irrespective of the measure of the return, an investor expects a "participation" in "earnings" when, as in this case, he is led to believe that the *source* of his return will be the company's earnings. Cf. *SEC* v. *Koscot Interplanetary, Inc.*, 497 F.2d 473, 485 (5th Cir. 1974) (describing fixed payments promised to investors for bringing in new investors as "a share in the proceeds" of the business). Thus, the statement in *Forman* on which the court of appeals relied in this case did not narrow the *Howey* definition of investment contract.

b. The *Howey* definition also was not narrowed by the Court's characterization in *Reves* of its statement in *Forman*. In *Reves*, the Court established the test for determining whether an interest denominated as a note is a security. In so doing, the Court concluded that the *Howey* test did not govern that question, and the Court stated that "the *Howey* test is irrelevant to the issue before us today." 494 U.S. at 64, 68 n.4. In describing the "irrelevant" *Howey* test, however, the Court, citing *Forman*, stated that "profit," as used in that test, had been defined "restrictively" in a way that would "suggest" that "a rate of interest not keyed to the earnings of the enterprise" would not constitute "profit." *Id.* at

68 n.4.  The meaning of the *Howey* test was not, how-ever, before the Court in *Reves*.  The Court therefore had no occasion to (and did not purport to) alter its meaning.  Nor is it likely that the Court would have done so in a footnote containing no elaboration on the point.

It bears note as well that the Court in *Reves* was careful to say only that the *Forman* language "sug-gest[ed]" the need for a return keyed to earnings.  The Court did not say that the *Forman* language defini-tively meant that such a return is required.  In any event, even if the Court's statement in *Reves* did reflect the view that *Howey* "profits" must be keyed to earnings, the Court was merely characterizing the way it believed *Forman* had interpreted the *Howey* test.  As the discussion above illustrates, such a characterization of *Forman* (and *Howey*) would be mistaken, and should not be adopted here.  Compare *Landreth*, 471 U.S. at 691 n.5 (declining to read broadly dicta concerning the *Howey* test in a footnote in another decision of the Court, *Teamsters* v. *Daniel*, 439 U.S. 551, 558 n.11 (1979) (quoting *Forman*, 421 U.S. at 852)).

### 2.  There is no support for the court of appeals' conclusion that profits that are contractually guaranteed are not expected to come from the efforts of others

In addition to relying on the fixed nature of the investment return, the court of appeals also held that profits that are an "entitle[ment] * * * under their contracts" and thus "contractually guaranteed" cannot meet the *Howey* test.  Pet. App. 8a.  The court reasoned that such profits cannot satisfy the require-ment that they be expected to come "from the efforts of others" (*Howey*, 328 U.S. at 301), because they are

38

instead "derived as the benefit of the investors' bargain under the contract." Pet. App. 8a.

Neither logic nor precedent supports that conclusion. As a logical matter, the fact that investors have bargained for a return in their investment agreement does not mean that the return is not also expected to come from the efforts of others. If it did, virtually no investment agreement would qualify as an "investment contract" because investors almost always obtain the promise of a return in exchange for parting with their money. If the promised return is to come from a business enterprise in which the investors are not active participants, then the return is expected to come from the efforts of others, since effort by *someone* will be necessary to produce the return. Absent the efforts of others, the investors will not receive the return— whether or not they are legally entitled to it as the benefit of their bargain.

The Court's cases are fully consistent with that understanding of what it means for profits to be expected from "the efforts of others." *Howey*, 328 U.S. at 301. *Howey* makes clear that the focus of that aspect of the investment contract definition is on whether someone other than the investors themselves manages the enterprise that is expected to generate the money that will fund the return. See *id.* at 300 ("manage-[ment] by [the promoters] or third parties with adequate personnel and equipment [was] therefore essential if the investors [we]re to achieve their paramount aim of a return on their investments"). Whether or not the investor's return was promised in the contracts was irrelevant to the Court's analysis. In fact, the investors in *Howey* were entitled to their returns under the contracts they had with the promoters. See *id.* at 296 (noting that, under the service contracts with investors,

the company was "accountable * * * for an allocation of the net profits" from cultivation and sale of the fruit).

In this case, the complaint—the allegations of which the Court must accept as true (see note 1, *supra*)—stated that "[i]nvestors under the lease program have no involvement in the operation of the pay telephone site" and that "ETS manages and maintains the payphones, including interior and exterior maintenance as well as coin retrieval." J.A. 11. Moreover, the district court found that respondent "manage[d], maintain[ed], and operate[d] the pay phones" and that "investors retain[ed] little, if any, control." Pet. App. 17a. The court of appeals did not conclude that the district court's finding concerning the investors' lack of control was clearly erroneous. Indeed, the court of appeals recognized that "the funds generated by the payphones [through ETS's management] helped ETS meet its [lease and buyback] obligations." *Id.* at 7a. Under *Howey*, the fact that investors expected to have no role in managing their phones and to receive their returns from the earnings generated by respondent's efforts in managing ETS established that they expected to receive their returns "from the efforts of others" (328 U.S. at 301).[13]

---

[13] The district court's factual findings are not directly at issue here, because the court of appeals ordered the case dismissed based on the allegations of the complaint. Nonetheless, contrary to the court of appeals' statement that "[t]he parties dispute the level of control over the telephones the investors retained under the leaseback agreements" (Pet. App. 7a), there was no real dispute that investors who chose the leaseback arrangement (99% of all investors, see J.A. 164) expected to be passive investors who would receive their returns from funds generated by the efforts of others. See, *e.g.*, J.A. 78 (statement by an investor that he expected to have no role in managing his phones), J.A. 239 (same).

### 3. The limitations imposed by the court of appeals would open a loophole in the securities laws

There would be a serious gap in investor protection if this Court were to accept the interpretation of "investment contract" reflected in the court of appeals' decision. That interpretation would preclude the Commission from bringing enforcement actions based on fraudulent investment contract schemes that promised fixed or "contractually guaranteed" returns. It would also bar private actions under the securities laws based on such fraud. There is no reason to open such a significant loophole in the securities laws.

As explained above, the phrase "investment contract" was included in the statutory definition of a security as a catch-all for investments that do not fit easily into the other categories listed. The "investment contract" category has served as a critical means of bringing a host of unconventional financial arrangements—offering both fixed and variable returns—within the purview of the federal securities laws. See cases cited at pp. 21-30 & note 9, *supra*. The Commission continues to bring many injunctive and administrative actions each year in which the schemes involve investment contracts with fixed or guaranteed returns. In fiscal year 2002 alone, the SEC instituted more than

---

ETS investors expected their monthly payments to come out of revenue generated by respondent's efforts in managing their phones because the program was advertised that way. See, *e.g.*, J.A. 119 (touting "profits" for owners of payphones through ETS's management); J.A. 124 (same); J.A. 223 (same); J.A. 231 (telling prospective investors that ETS's efforts "will allow you to become detached from the day-to-day demands of the payphone business").

thirty actions involving investment contracts offering fixed or contractually guaranteed returns.[14]

---

[14] See *In re Donald D. Lukens*, Admin. Pro. File No. 3-10894 (instituted Sept. 20, 2002); *SEC* v. *Eisenberg*, No. CV 02-6479 AHM (JTLx) (C.D. Cal. compl. filed Aug. 20, 2002); *SEC* v. *Lefebvre*, No. C-02-3704-MEJ (N.D. Cal. compl. filed July 31, 2002); *In re Raphael Levy*, Admin. Pro. File No. 3-10822 (instituted July 9, 2002); *In re Gerald Cohn*, Admin. Pro. File No. 3-10826 (instituted July 9, 2002); *In re Douglas C. Brandon*, Admin. Pro. File No. 3-10799 (instituted June 12, 2002); *SEC* v. *Gold-Ventures Club*, No. 1:02-CV-1434(CAP) (N.D. Ga. compl. filed May 28, 2002); *SEC* v. *Watts*, No. 5-02-CV-0109-C (N.D. Tex. compl. filed May 21, 2002); *SEC* v. *Starcash, Inc.*, No. 02-80456-CIV (S.D. Fla. compl. filed May 16, 2002); *SEC* v. *Americash-Inc.com*, No. 02-CV-80457 (S.D. Fla. compl. filed May 16, 2002); *SEC* v. *U.S. Funding Corp.*, No. 2:02cv2089 (D.N.J. compl. filed May 2, 2002); *SEC* v. *4NExchange, LLC*, No. 2:02CV-431K (D. Utah compl. filed May 2, 2002); *SEC* v. *Corriere*, No. 8:02-CV-666-T17EAJ (M.D. Fla. compl. filed Apr. 18, 2002); *SEC* v. *Herula*, C.A. No. 02 154 ML (D.R.I. compl. filed Apr. 1, 2002); *SEC* v. *Gilliland*, No. 3:02CV128-H (W.D.N.C. compl. filed Mar. 27, 2002); *SEC* v. *Dunbar*, No. 02-233 (M.D. La. compl. filed Mar. 4, 2002); *SEC* v. *CDH & Affiliates, Inc.*, No. 3:02cv00017 (N.D. Ga. compl. filed Feb. 25, 2002); *SEC* v. *Goldstein*, No. 302048517 (D.S.C. compl. filed Feb. 14, 2002); *SEC* v. *Tyler*, No. 3:02-CV-0282-P (N.D. Tex. compl. filed Feb. 11, 2002); *SEC* v. *Moody*, No. 2:02CV-0110B (D. Utah compl. filed Feb. 6, 2002); *SEC* v. *McConnell*, C.A. No. 02 0075 RCL (D.D.C. compl. filed Jan. 16, 2002); *SEC* v. *Dillie*, No. CV-01-2493-PHX-JAT (D. Ariz. compl. filed Dec. 20, 2001); *SEC* v. *Invest Better 2001*, No. 01 Civ. 11427 (S.D.N.Y. compl. filed Dec. 13, 2001); *SEC* v. *Willy*, No. EDCV01-979VAP(SGLx) (C.D. Cal. compl. filed Dec. 5, 2001); *SEC* v. *Taylor*, No. 3:01-CV-2683-X (N.D. Tex. compl. filed Dec. 20, 2001); *SEC* v. *BIJ Fin. Servs.*, C.A. No. 01-Z-2322 (D. Colo. compl. filed Dec. 3, 2001); *SEC* v. *Lukens*, No. CV 01-09410 SVW (AJWx) (C.D. Cal. compl. filed Nov. 1, 2001); *SEC* v. *Texon Energy Corp.*, No. 2:01cv09706 (C.D. Cal. compl. filed Nov. 13, 2001); *SEC* v. *Hill*, No. 3:01-CV-2189-X (N.D. Tex. compl. filed Oct. 31, 2001); *SEC* v. *Bentley*, No. 2:01-CV-053-66-JF (E.D. Pa. compl. filed Oct. 23,

Excluding such unconventional investments from the scope of the securities laws because they offer a fixed return or are "contractually guaranteed" would be a radical departure from the enforcement history under those laws and would significantly impair the SEC's ability to protect investors from securities fraud. Indeed, the court of appeals' decision provides a blueprint for unscrupulous promoters to circumvent the securities laws by structuring the returns offered by their investment schemes as fixed or contractually guaranteed amounts even though the investments function economically like other investments sold to raise capital. That result would frustrate Congress's "intent to regulate the entire body of instruments sold as investments." *Reves*, 494 U.S. at 64. And it would have a disproportionate impact on those who are most likely to fall victim to fraud—unsophisticated and elderly investors, to whom fixed- and guaranteed-return investments have particular appeal.[15]

---

2001); *SEC* v. *Chiarella*, No. 3:01-CIV-2037-G (N.D. Tex. compl. filed Oct. 10, 2001).

[15] Even if the court of appeals were correct in its narrow interpretation of the term "investment contract," it still would have erred in ordering the SEC's complaint dismissed for lack of subject matter jurisdiction. The complaint alleged not only that the payphone packages were investment contracts but also more generally that they were "securities." J.A. 12. The SEC argued in the district court that the packages qualified as securities both because they were investment contracts and because they were "note[s]" or "evidence[s] of indebtedness." 15 U.S.C. 77b(a)(1), 78c(a)(10). Although those terms are less flexible and do not describe the payphone investments as well as the term "investment contract," the Commission might well be able to establish that the payphone investments fit within those terms or that they qualify as "instrument[s] commonly known as  *  *  *  'securit[ies].'" 15 U.S.C. 77b(a)(1), 78c(a)(10). The court of appeals should have

**CONCLUSION**

The judgment of the court of appeals should be reversed.

Respectfully submitted.

THEODORE B. OLSON
  *Solicitor General*

GIOVANNI P. PREZIOSO
  *General Counsel*

EDWIN S. KNEEDLER
  *Deputy Solicitor General*

MEYER EISENBERG
  *Deputy General Counsel*

MATTHEW D. ROBERTS
  *Assistant to the Solicitor
    General*

JACOB H. STILLMAN
  *Solicitor*

SUSAN S. MCDONALD
  *Senior Litigation Counsel*

CATHERINE A. BRODERICK
  *Counsel to the Assistant
    General Counsel
    Securities and Exchange
    Commission*

JUNE 2003

---

remanded for the district court to consider whether the case could proceed on one of those alternative theories. See *Meason* v. *Bank of Miami*, 652 F.2d 542, 547-548, 550-551 (5th Cir. 1981) (reversing dismissal of complaint for lack of subject matter jurisdiction and remanding for consideration whether certificate of deposit was some kind of security other than an investment contract), cert. denied, 455 U.S. 939 (1982).