# EXHIBIT F

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                Defendants.

Case No. 20-CV-10832 (AT) (SN)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 4

RIPPLE'S USE OF OPEN-SOURCE BLOCKCHAIN TECHNOLOGY TO MODERNIZE CROSS-BORDER PAYMENTS ................................................................................... 4

    A.    The Creation of the XRP Ledger and XRP ..................................................... 4

    B.    The Founding of Ripple ................................................................................... 6

    C.    The XRP Ledger and XRP ............................................................................... 7

    D.    Ripple's Sales, Giveaways, and Payments of XRP ...................................... 10

    E.    Larsen's and Garlinghouse's Transactions in XRP ..................................... 11

ARGUMENT ............................................................................................................... 13

I.    DEFENDANTS' OFFERS AND SALES OF XRP LACKED THE ESSENTIAL INGREDIENTS OF INVESTMENT CONTRACTS .................................................... 13

    A.    Investment Contracts Under the 1933 Securities Act Must Have Certain Essential Ingredients ................................................................................... 13

        1.    The Term "Investment Contract" in the Securities Act Draws Its Meaning from Pre-1933 Act Blue Sky Cases .......................................... 13

        2.    The "Investment Contracts" Recognized in Pre-1933 Blue Sky Cases All Shared Three Basic Characteristics ......................................... 18

            a.    Every Pre-1933 Blue Sky "Investment Contract" Case Involved a Contract ................................................................... 18

            b.    Every Pre-1933 Blue Sky "Investment Contract" Imposed Post-Sale Obligations on the Promoter of the Security .............. 19

            c.    Every Pre-1933 Blue Sky "Investment Contract" Gave the Investor a Right To Receive Profits ............................................. 21

        3.    *Howey* and Its Progeny Likewise Involved Contracts with These Same Essential Ingredients .................................................................... 21

4.     The SEC Cannot Show That an "Investment Contract" Can Exist Without These Essential Ingredients ...................................................... 23

B.     XRP Does Not Have the Essential Ingredients of an Investment Contract ......... 28

    1.     Many XRP Transactions Did Not Involve Any Contract Between Ripple and the XRP Recipient ................................................................ 29

    2.     Ripple's Contracts for the Sale of XRP Imposed No Post-Sale Obligations on Ripple To Act for the Benefit of XRP Recipients ........... 30

    3.     Ripple's Contracts for the Sale of XRP Gave XRP Recipients No Right to Any Share of Ripple's Profits .................................................... 33

C.     The SEC's Reliance on Initial Coin Offering Cases Is Misplaced ...................... 34

II.     DEFENDANTS' XRP TRANSACTIONS WERE NOT OFFERS AND SALES OF INVESTMENT CONTRACTS UNDER THE *HOWEY* TEST ...................................... 36

A.     In Many Instances, There Has Been No "Investment of Money" ....................... 36

B.     The SEC Cannot Prove Any Common Enterprise ................................................ 38

    1.     A Common Enterprise Is a Profit-Seeking Business Managed, Controlled, and Operated by Promoters for the Benefit of Investors ...... 38

    2.     The SEC Cannot Identify a Common Enterprise Under Existing Second Circuit Law .................................................................................. 40

        a.     The SEC's Common-Enterprise Theory Depends on Ripple's Efforts, Contrary to *Revak*'s Express Holding ............................ 40

        b.     The SEC Cannot Establish Horizontal Commonality ................... 44

        c.     The SEC Cannot Establish Strict Vertical Commonality ............. 47

C.     The SEC Cannot Establish That XRP Holders Reasonably Expect Profits from Defendants' Efforts ....................................................................................... 49

    1.     No Buyer Can Reasonably Expect Profits Absent Any Contractual Obligation Requiring Defendants To Make Efforts ................................... 49

    2.     Profits Attributable to Market Forces Do Not Satisfy *Howey*'s "Efforts of Others" Prong ......................................................................... 50

    3.     Defendants' Public Statements Are Insufficient as a Matter of Law To Create Any Expectation of Profits .......................................................... 54

III.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON OFFERS TO SELL AND SALES ON FOREIGN EXCHANGES .......................... 58

    A.    Factual Background Regarding the Individual Defendants' Offers To Sell and Sales on Foreign Cryptocurrency Exchanges ................................. 61

        1.    Operation of Cryptocurrency Exchanges.................................... 61

        2.    Location of Relevant Cryptocurrency Exchanges and of Individual Defendants' Offers and Sales.................................. 62

    B.    The Individual Defendants' Sales and Offers To Sell on the Foreign Exchanges Are Outside the Territorial Scope of the U.S. Securities Laws.......... 65

        1.    Defendants' Sales on the Foreign Exchanges Occurred Outside the United States ................................................................ 65

        2.    Defendants' Offers To Sell XRP on the Foreign Exchanges Occurred Outside the United States ..................................... 68

            a.    Offers To Sell on the Foreign Exchanges Occur Outside the United States ....................................... 69

            b.    GSR Did Not Turn Extraterritorial Offers Into Domestic Ones... 72

            c.    Any Contrary Result Would Reimpose the "Conduct and Effects" Test from *Morrison*....................................... 73

IV.    LARSEN IS ENTITLED TO SUMMARY JUDGMENT FOR ANY OFFERS OR SALES OF XRP BEFORE SEPTEMBER 1, 2015 ...................................... 74

CONCLUSION.................................................................................... 75

# TABLE OF AUTHORITIES

Page

## CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) .................................................................. 59, 65-67

*Agnew v. Daugherty*,
209 P. 34 (Cal. 1922) ..................................................................................21

*Allison v. Ticor Title Ins. Co.*,
907 F.2d 645 (7th Cir. 1990) ......................................................................69

*Alunni v. Dev. Res. Grp., LLC*,
445 F. App'x 288 (11th Cir. 2011) .............................................................55

*Anderson v. Binance*,
2022 WL 976824 (S.D.N.Y. Mar. 31, 2022), *appeal pending*,
No. 22-972 (2d Cir.) ...............................................................................66, 67

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ....................................................................................13

*Ass'n of Am. R.Rs. v. United States*,
603 F.2d 953 (D.C. Cir. 1979) ....................................................................38

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019) .................................................... 34-36

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*,
849 F. App'x 289 (2d Cir. 2021) ...........................................................66, 68

*Bender v. Cont'l Towers Ltd. P'ship*,
632 F. Supp. 497 (S.D.N.Y. 1986) ..............................................................51

*Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*,
240 N.W. 827 (Wis. 1932) ....................................................................18, 19

*Cahill v. Contemp. Persps., Inc.*,
1986 WL 4696 (S.D.N.Y. Apr. 15, 1986) ..................................................48

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013) ........................................................................13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ..........................................................66, 67, 72, 73

*Cohens v. Virginia*,
   19 U.S. (6 Wheat.) 264 (1821) .................................................................................25

*Coppola v. Bear Stearns & Co.*,
   499 F.3d 144 (2d Cir. 2007) ....................................................................................13

*Cornwell v. Credit Suisse Grp.*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010) ..........................................................65, 69, 70

*Creasy Corp. v. Enz Bros. Co.*,
   187 N.W. 666 (Wis. 1922) ...........................................................................19, 21, 33

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   622 F.2d 216 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982)........................................48

*Davis v. Rio Rancho Estates, Inc.*,
   401 F. Supp. 1045 (S.D.N.Y. 1975) .........................................................................56

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
   608 F.2d 1297 (9th Cir. 1979) ...........................................................................49, 56

*Deckebach v. La Vida Charters, Inc. of Fla.*,
   867 F.2d 278 (6th Cir. 1989) .............................................................................46, 47

*Demarco v. LaPay*,
   2009 WL 3855704 (D. Utah Nov. 17, 2009) ...........................................................55

*Dep't of Com. v. DeBeers Diamond Inv., Ltd.*,
   280 N.W.2d 547 (Mich. Ct. App. 1979) ..................................................................27

*Dobal v. Guardian Fin. Corp.*,
   251 Ill. App. 220 (1929) ...................................................................................18, 19

*Eberhardt v. Waters*,
   901 F.2d 1578 (11th Cir. 1990) ...............................................................................48

*Fidelity Inv. Ass'n v. Emmerson*,
   235 Ill. App. 518 (1924), *rev'd*, 149 N.E. 530 (Ill. 1925) ......................................20

*Foreign Exch. Benchmark Rates Antitrust Litig.*, *In re*,
   2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..........................................................66

*Freeze v. Smith*,
   236 N.W. 810 (Mich. 1931)......................................................................................21

*Garcia v. Santa Maria Resort, Inc.*,
   528 F. Supp. 2d 1283 (S.D. Fla. 2007) ...................................................................51

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985)................................................................................23, 52, 56

*Glen-Arden Commodities, Inc. v. Costantino*,
493 F.2d 1027 (2d Cir. 1974)........................................... 3, 22-25, 52, 56, 58

*Goldberg v. 401 N. Wabash Venture LLC*,
755 F.3d 456 (7th Cir. 2014) ..........................................................................50

*Grenader v. Spitz*,
537 F.2d 612 (2d Cir. 1976)...............................................................................51, 56

*Gugick v. Melville Cap., LLC*,
2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ...............................................48

*Hall v. Hall*,
138 S. Ct. 1118 (2018)........................................................................................15

*Hanneman v. Gratz*,
211 N.W. 961 (Minn. 1927)...........................................................................20, 57

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
396 F. Supp. 175 (N.D. Cal. 1975) ...............................................................50, 56

*Harman v. Harper*,
1990 WL 121073 (9th Cir. Aug. 21, 1990)...................................................50

*Hart v. Pulte Homes of Michigan Corp.*,
735 F.2d 1001 (6th Cir. 1984) .......................................................................44

*Hocking v. Dubois*,
885 F.2d 1449 (9th Cir. 1989) .......................................................................44, 48

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008)...........................................................................13

*Holsworth v. BProtocol Found.*,
2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ...............................................66

*IIT, an Int'l Inv. Tr. v. Cornfeld*,
619 F.2d 909 (2d Cir. 1980)...........................................................................74

*Iman v. Hall*,
2009 WL 960474 (W.D. Va. Apr. 7, 2009) .................................................51

*Int'l Bhd. of Teamsters v. Daniel*,
439 U.S. 551 (1979)......................................................................................14, 37

*Johnson v. Nationwide Indus., Inc.*,
    450 F. Supp. 948 (N.D. Ill. 1978), *aff'd*, 715 F.2d 1233 (7th Cir. 1983) ........................ 56

*Kaplan v. Shapiro*,
    655 F. Supp. 336 (S.D.N.Y. 1987) ................................................................ 47, 48

*Kerst v. Nelson*,
    213 N.W. 904 (Minn. 1927) .......................................................................... 21

*Kidd v. Thomson Reuters Corp.*,
    925 F.3d 99 (2d Cir. 2019) .......................................................................... 27

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) .................................................................................. 16

*Lavery v. Kearns*,
    792 F. Supp. 847 (D. Me. 1992) ..................................................................... 57

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............................................................... 51

*Lewis v. Creasey Corp.*,
    248 S.W. 1046 (Ky. Ct. App. 1923) ................................................................. 19

*Living Benefits Asset Mgmt., L.L.C., In re*,
    916 F.3d 528 (5th Cir. 2019) ....................................................................... 48

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) ........................................................................ 68

*Mace v. Buchanan*,
    52 S.W. 505 (Tenn. Ch. App. 1899) ................................................................ 15

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ........................................................................ 14, 30, 57

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ............................................................... 47

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................. 13

*McCormick v. Shively*,
    267 Ill. App. 99 (1932) ........................................................................ 18-19, 55

*Mechigian v. Art Cap. Corp.*,
    612 F. Supp. 1421 (S.D.N.Y. 1985) ................................................................. 48

*Milnarik v. M-S Commodities, Inc.*,
   457 F.2d 274 (7th Cir. 1972) ....................................................46

*Morissette v. United States*,
   342 U.S. 246 (1952)...............................................................15

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010).........................................58-60, 65-67, 71, 73, 74

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
   890 F.3d 60 (2d Cir. 2018)................................................66, 68, 69

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) ..........................................43, 51-52

*Olin Corp. v. Lamorak Ins. Co.*,
   2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018)..................................71

*Pennicard v. Coe*,
   263 P. 920 (Or. 1928) ...........................................................21

*People v. Claggett*,
   19 P.2d 805 (Cal. Ct. App. 1933) ..............................................20

*People v. Elliot*,
   354 P.2d 498 (Cal. 1960) .......................................................20

*People v. Fleishman*,
   557 N.Y.S.2d 369 (App. Div. 1990)............................................52

*People v. McCalla*,
   220 P. 436 (Cal. Ct. App. 1923) ..............................................20

*People v. White*,
   12 P.2d 1078 (Cal. Ct. App. 1932) .........................................20, 21

*Petrobras Sec., In re*,
   862 F.3d 250 (2d Cir. 2017)..................................................59, 67

*Procter & Gamble Co. v. Bankers Tr. Co.*,
   925 F. Supp. 1270 (S.D. Ohio 1996) ...........................................52

*Prohaska v. Hemmer-Miller Dev. Co.*,
   256 Ill. App. 331 (1930) .......................................................20

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) ................................38, 40-44, 46, 48

*Rice v. Bogart,*
    272 Ill. App. 292 (1933) ............................................................................20

*RJR Nabisco, Inc. v. Eur. Cmty.,*
    579 U.S. 325 (2016)................................................................................74

*Rodriguez v. Banco Cent. Corp.,*
    990 F.2d 7 (1st Cir. 1993).........................................27, 38, 44, 50, 56

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ..................................................................70

*S&S N.Y. Holdings, Inc. v. Able Energy, Inc.,*
    2012 WL 3084112 (S.D.N.Y. July 27, 2012) ............................25, 31

*Salahuddin v. Goord,*
    467 F.3d 263 (2d Cir. 2006).................................................................13

*Salameh v. Tarsadia Hotel,*
    726 F.3d 1124 (9th Cir. 2013) ........................................................57, 58

*SEC v. Addison,*
    194 F. Supp. 709 (N.D. Tex. 1961) .......................................................23

*SEC v. Ahmed,*
    308 F. Supp. 3d 628 (D. Conn. 2018).................................................59

*SEC v. Aqua-Sonic Prods. Corp.,*
    687 F.2d 577 (2d Cir. 1982)..........................................................23, 56

*SEC v. Belmont Reid & Co.,*
    794 F.2d 1388 (9th Cir. 1986) ...........................................27, 43, 51

*SEC v. C.M. Joiner Leasing Corp.,*
    320 U.S. 344 (1943)...............................3, 22, 25, 46, 47, 57, 58

*SEC v. Caledonian Bank Ltd.,*
    2016 WL 6441556 (S.D.N.Y. Oct. 28, 2016) .................................30

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir. 1998)..........................................................26, 30

*SEC v. Edwards,*
    540 U.S. 389 (2004).....................................................17, 18, 22, 27

*SEC v. Goldman Sachs & Co.,*
    790 F. Supp. 2d 147 (S.D.N.Y. 2011)................................................70

*SEC v. Infinity Grp. Co.*,
    212 F.3d 180 (3d Cir. 2000)...........................................................................48

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020).................................................. 34-36, 47

*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) .........................................................................48

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) .......................................................................50

*SEC v. Pac. W. Cap. Grp., Inc.*,
    2015 WL 9694808 (C.D. Cal. June 16, 2015) .................................................55

*SEC v. Revelation Cap. Mgmt., Ltd.*,
    246 F. Supp. 3d 947 (S.D.N.Y. 2017)............................................................59

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) ......................................................................47-48

*SEC v. Telegram Group Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020).................................................. 34-36, 47

*SEC v. Tourre*,
    2013 WL 2407172 (S.D.N.Y. June 4, 2013) ..................................................70

*SEC v. United Benefit Life Ins. Co.*,
    387 U.S. 202 (1967).......................................................................................22

*SEC v. Variable Annuity Life Ins. Co.*,
    359 U.S. 65 (1959)...................................................................................22, 46

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)......................2, 3, 15-19, 21-22, 24-28, 31, 36-39, 41-46, 48-53, 56

*Sikhs for Just. Inc. v. Indian Nat'l Cong. Party*,
    17 F. Supp. 3d 334 (S.D.N.Y.), *aff'd*, 596 F. App'x 7 (2d Cir. 2014) ............72

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    253 F. Supp. 359 (S.D.N.Y. 1966)..........................................................43, 52

*Stackhouse v. Toyota Motor Co.*,
    2010 WL 3377409 (C.D. Cal. July 16, 2010) ........................................65-66, 71

*State v. Agey*,
    88 S.E. 726 (N.C. 1916)............................................................................19, 20

*State v. Bushard*,
    205 N.W. 370 (Minn. 1925) ........................................................................................19, 21

*State v. Evans*,
    191 N.W. 425 (Minn. 1922) ...............................................................................................19

*State v. Gopher Tire & Rubber Co.*,
    177 N.W. 937 (Minn. 1920) .........................................................................................21, 26

*State v. Heath*,
    153 S.E. 855 (N.C. 1930) ...................................................................................................18

*State v. Ogden*,
    191 N.W. 916 (Minn. 1923) ...............................................................................................20

*State v. Robbins*,
    240 N.W. 456 (Minn. 1932) ...............................................................................................20

*State v. Summerland*,
    185 N.W. 255 (Minn. 1921) ...............................................................................................21

*Stevens v. Liberty Packing Corp.*,
    161 A. 193 (N.J. 1932) .......................................................................................................19

*Svets v. Osborne Precious Metals Co.*,
    1992 WL 281413 (N.D. Cal. June 8, 1992) .......................................................................52

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) ......................................................................................................22, 46

*Teague v. Bakker*,
    35 F.3d 978 (4th Cir. 1994) ...............................................................................................48

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ...........................................................................................23, 56

*United States v. Naftalin*,
    441 U.S. 768, 773 (1979) .......................................................................................70, 72, 73

*W. Va. v. EPA*,
    142 S. Ct. 2587 (2022) .......................................................................................................17

*Wals v. Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) ...............................................................................44, 47, 48

*Wildes v. BitConnect In'l PLC*,
    25 F.4th 1341 (11th Cir. 2022) ..........................................................................................73

*Williams v. Block.One*,
No. 20-cv-2809, ECF No. 146 (S.D.N.Y. Aug. 15, 2022)..........................................58, 67

*Williams v. Taylor*,
529 U.S. 362 (2000)..................................................................................................26

*Wis. Cent. Ltd. v. United States*,
138 S. Ct. 2067 (2018)..............................................................................................15

*Woodward v. Terracor*,
574 F.2d 1023 (10th Cir. 1978) .........................................................................55, 56


**ADMINISTRATIVE DECISIONS**

*American Diamond Co.*,
1977 WL 10907 (SEC Aug. 15, 1977) .....................................................................27

*Art Appraisers of Am., Ltd.*,
1976 WL 12424 (SEC Oct. 4, 1976).................................................................33, 53

*Future Sys. Inc.*,
1973 WL 9653 (SEC June 8, 1973).........................................................................28

*Texas Arizona Mining Co.*,
1972 WL 9415 (SEC Feb. 18, 1972) ................................................................45, 53

*The London Diamond Exch.*,
1972 WL 8488 (SEC Oct. 3, 1972)...........................................................................27


**STATUTES, REGULATIONS, AND RULES**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* .........................................................66

Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* ...............................................7

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ..............................13-17, 23-26, 30, 48, 55, 72-74

§ 2(a)(1), 15 U.S.C. § 77b(a)(1)....................................................................14

§ 2(a)(3), 15 U.S.C. § 77b(a)(3)...............................................................26, 73

§ 4, 15 U.S.C. § 77d..........................................................................................14

§ 5, 15 U.S.C. § 77e ........................................... 13, 30, 55, 69, 71, 73-74

§ 17, 15 U.S.C. § 77q.......................................................................................73

§ 17(a), 15 U.S.C. § 77q(a) ...................................................................................72

31 C.F.R. § 1010.100(ff)(8)(ii) .........................................................................8, 28

Fed. R. Civ. P. 56(a) ............................................................................................12

## LEGISLATIVE MATERIALS

H.R. Conf. Rep. No. 73-1838 (1934) ......................................................................23

## ADMINISTRATIVE MATERIALS

Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act,
  85 Fed. Reg. 34,870 (June 5, 2020) ..................................................................7

U.S. Dep't of Just., Settlement Agreement (May 5, 2015), https://www.justice.gov/
  sites/default/files/opa/press-releases/attachments/2015/05/05/
  settlement_agreement.pdf ...............................................................................8

## OTHER MATERIALS

Bain & Co., *The Global Diamond Industry 2021-22*,
  https://www.bain.com///2022/bain_report_diamond_report-2021-22.pdf.........................9

*Black's Law Dictionary* (3d ed. 1933) ...............................................................15

Brief for the SEC, *SEC v. Edwards*, 540 U.S. 389 (2004) (No. 02-1196)
  (U.S. June 26, 2003), 2003 WL 21498455 .....................................................18

Brief for the SEC, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (No. 843)
  (U.S. Apr. 17, 1946), 1946 WL 50582 ...............................................16, 24, 38

Compl., *SEC v. Wahi*,
  No. 2:22-cv-01009-TLF, ECF No. 1 (W.D. Wash. July 21, 2022) ..................61

Compl. for Injunctive & Other Equitable Reief, *CFTC v. Gelfman Blueprint, Inc.*,
  No. 1:17-cv-07181-PKC, ECF No. 1 (S.D.N.Y. Sept. 21, 2017) ...................28

Compl. for Injunctive & Other Equitable Relief, *CFTC v. Gemini Tr. Co.*,
  No. 1:22-cv-04563, ECF No. 1 (S.D.N.Y. June 2, 2022) ...............................28

Counterpoint Research, *US Smartphone Market Share: By Quarter* (Aug. 25, 2022),
  https://www.counterpointresearch./market-smartphone-share/ .........................9

*Funk & Wagnall's New Standard Dictionary of the English Language* (1933)............................28

SEC Opp. to Mot. To Dismiss Am. Compl., *Tourre*, No. 1:10-cv-3229-KBF,
   ECF No. 54 (S.D.N.Y. Dec. 21, 2010)................................................................................28

*Webster's New International Dictionary of the English Language* (2d ed. 1934) ........................9

*Webster's Practical Dictionary* (rev. ed. 1931)...........................................................................15

## INTRODUCTION

Defendant Ripple Labs Inc. ("Ripple") is a privately held financial technology company employing more than 700 people in 15 offices worldwide.  Defendant Christian Larsen is its current Executive Chairman; Defendant Bradley Garlinghouse is its current Chief Executive Officer.  For the past decade, Ripple has worked with its customers – financial institutions, payment providers, and corporations – to make cross-border payments (such as remittances) faster, cheaper, and more transparent.  Ripple's customers have transferred more than $10 billion in payments to date via Ripple products that use the XRP Ledger and XRP.

The XRP Ledger, launched in 2012, is a distributed ledger enabled by open-source software technology that can securely record transactions at lightning-fast speeds.  The XRP Ledger's inherent properties and ability to use XRP as a bridge currency make it an ideal vehicle for nearly instantaneous cross-border payments.

XRP is a virtual currency – the native currency of the XRP Ledger.  A fixed supply of 100 billion XRP was generated by the XRP Ledger's code in 2012.  Ripple's founders gave 80% of that XRP to Ripple.  Over the years, Ripple has sold some of the XRP it received.  It has also donated and given away XRP, and exchanged XRP for services and product development.

The Securities and Exchange Commission ("SEC") claims that anytime XRP left Ripple's possession or the possession of the Individual Defendants from 2013 through 2020 – as a sale, as a giveaway, as a charitable donation, or as consideration for vendors' services – it did so as part of an unlawful "offering" of unregistered "securities."  Indeed, the SEC alleges that *all* XRP (even the 20 billion XRP that Ripple never owned) is a security issued by Ripple – specifically, that all "XRP was an investment contract" with Ripple "and therefore a security [under] the federal securities laws."  ECF No. 46 ("Am. Compl.") ¶ 231.  As a matter of law, the SEC cannot prevail on that claim.  Nor can it lawfully extend its regulatory reach to offers to sell

or sales of XRP that occurred on foreign cryptocurrency exchanges, which are governed by the laws of foreign countries and outside the territorial scope of U.S. securities laws.

The Supreme Court explained more than 75 years ago, in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), that the meaning of the statutory term "investment contract" was "crystallized" by a series of state cases interpreting state "blue sky" laws. *Id.* at 298. Every single "blue sky" case finding an investment contract had – and every Supreme Court and Second Circuit case post-1933, including *Howey* itself, has also had – three "essential ingredients." *Id.* at 301. *First*, the investment contract in every case involved a contract between a promoter and an investor that established the investor's rights as to an investment. *Second*, that contract imposed post-sale obligations on the promoter to take specific actions for the investor's benefit. *Third*, that contract granted the investor a right to share in profits from the promoter's efforts to generate a return on the use of investor funds. In the words of the well-known *Howey* test, these three essential ingredients articulate what it means to make "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.*

The undisputed facts show that these "essential ingredients of an investment contract," *id.*, are missing here. Many of Defendants' sales, donations, giveaways, and purchases using XRP during the relevant period created no contractual relationship at all between Defendants and the XRP recipients. Where contracts with Ripple existed, those contracts defined no investment-related rights, imposed no post-transaction obligations on Ripple to take actions for XRP recipients' benefit, and gave no rights to those XRP recipients to demand and receive any future profits from Ripple or anyone else. Unlike holding Ripple's equity (such as the stock Ripple sold in multiple funding rounds), holding XRP gives the recipient no stake in any business enterprise and certainly no stake in Ripple.

The SEC does not contend that those ingredients are present. Instead, its theory boils down to an impermissibly open-ended assertion of jurisdiction over any transfer of an asset (for consideration or not) that the SEC thinks may benefit from the registration and disclosure requirements of the securities laws. According to the SEC, there can be an "investment contract" without any contract, without any rights granted to the purchaser, and without any obligations on the issuer. That is not and should not be the law, because without these essential features there is nothing to which the *Howey* test can sensibly be applied. The SEC's untethered position would convert the sale of all types of ordinary assets – diamonds, gold, soybeans, cars, and even works of art – into sales of securities. Congress has given the agency no such authority. No pre-*Howey* blue sky case ever found an investment contract in such circumstances; *Howey* did not; no later Supreme Court case has; and no Second Circuit case has. This Court should not either.

Because XRP lacks the essential ingredients of an investment contract, the SEC also cannot show that purchases of XRP satisfy the traditional *Howey* elements. There was no exchange of money for a significant portion of the XRP distributed by Ripple; and where money was exchanged, it was not an "investment of money" under *Howey*. There is no "common enterprise" in which those who purchase XRP invest; the SEC admits that Ripple itself is not such an enterprise but then argues – contrary to binding Second Circuit precedent – that Ripple's "efforts" have created an amorphous enterprise comprised of countless third parties that the SEC calls "the XRP ecosystem." Finally, there is no evidence from which a reasonable finder of fact could conclude that purchasers of XRP reasonably expected profits from Defendants' efforts, as opposed to market forces affecting cryptocurrencies generally.

XRP does not have the "'character in commerce'" of a security. *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943)). Unsurprisingly, therefore, it is regulated as a

virtual currency by the U.S. Department of the Treasury's Financial Crimes Enforcement

Network ("FinCEN"); as a commodity by the Commodity Futures Trading Commission

("CFTC"); as "property" under federal tax law; as an "intangible asset" under Generally

Accepted Accounting Principles; but as a "security" by none of those authorities. In straining to

argue otherwise, the SEC is engaged in a regulatory land grab that far exceeds the boundaries

Congress set on its authority. The SEC is not following the law – it is seeking to remake it.

## FACTUAL BACKGROUND[1]

## RIPPLE'S USE OF OPEN-SOURCE BLOCKCHAIN TECHNOLOGY TO MODERNIZE CROSS-BORDER PAYMENTS

### A.     The Creation of the XRP Ledger and XRP

The first blockchain ledger, Bitcoin, launched in 2009.[2]  In 2011 and early 2012, three

individuals developed the source code for an alternative blockchain, now known as the XRP

Ledger.  56.1 ¶ 11 (Ex. 1, D. Schwartz Tr. 23:16-24:7, 118:15-20).[3]  These individuals intended

to create a better blockchain than Bitcoin by increasing the speed of transactions, reducing their

cost, and minimizing energy consumption.  56.1 ¶ 12 (D. Schwartz Decl. ¶ 3; Ex. 8, Larsen Tr.

233:5-21).  To achieve these results, the XRP Ledger uses a "consensus protocol"[4] to verify

---

[1] Citations to "56.1" are to Defendants' Statement of Undisputed Material Facts.  Citations to "Ex. __" refer to exhibits attached to the accompanying Declaration of Michael K. Kellogg.

[2] A blockchain is a system for securely recording information.  56.1 ¶ 1 (Ex. 1, D. Schwartz Tr. 28:14-20).  Each transaction is recorded as a "block" of data on the digital ledger. *Id.*  Each block is connected to the blocks before and after it, creating an immutable timeline of transactions.  *Id.*  Blockchains are typically recorded across a distributed network of computers, which helps make it difficult, if not impossible, for would-be bad actors to alter past transactions.  56.1 ¶¶ 2-3 (Ex. 1, D. Schwartz Tr. 29:9-11; Ex. 2, Osler Rep. ¶ 48).

[3] By 2012, other small cryptocurrencies had copied the Bitcoin ledger's open-source code with slight variations, but until the XRP Ledger, none deviated in any significant way from the structure of the Bitcoin ledger.  56.1 ¶ 9 (Decl. of David Schwartz ("D. Schwartz Decl.") ¶ 3).

[4] The Bitcoin blockchain records transactions through a "proof of work" process, which uses large amounts of computing power to solve complex mathematical problems that verify which transactions will be added to the blockchain.  56.1 ¶ 5 (Ex. 4, Samarasinghe Tr. 141:4-

transactions.  56.1 ¶ 24 (Ex. 2, Osler Rep. ¶ 53).  The consensus mechanism of the XRP Ledger is much faster, more reliable, and less costly than Bitcoin's proof-of-work mechanism.  56.1 ¶ 26 (Ex. 2, Osler Rep. ¶ 50).  Transactions on the Bitcoin blockchain ordinarily take about 10 minutes to settle, with settlement times varying unpredictably; transactions on the XRP Ledger ordinarily settle in 3 to 5 seconds.  56.1 ¶¶ 26-28 (Ex. 2, Osler Rep. ¶¶ 50, 54).  Bitcoin transactions also have, in the past, cost up to $60 per transaction; transactions on the XRP Ledger typically cost a fraction of a penny.  56.1 ¶¶ 8, 29 (Ex. 2, Osler Rep. ¶ 50; D. Schwartz Decl. ¶ 5).  Transactions on the XRP Ledger also require less than 0.002% of the computing power required by Bitcoin's proof-of-work mechanism.  56.1 ¶ 30 (D. Schwartz Decl. ¶ 5).

XRP is the "native currency" of the XRP Ledger.  56.1 ¶ 13 (Ex. 9, Birla Tr. 248:23-25).  Upon its launch in 2012, the XRP Ledger's code automatically generated a fixed supply of 100 billion XRP.  56.1 ¶ 18 (D. Schwartz Decl. ¶ 6).  Christian Larsen, Jed McCaleb, and Arthur Britto ("Ripple's Founders") gave 80 billion XRP to a newly formed corporate entity, now called Ripple, retaining 20 billion among themselves.  56.1 ¶ 21 (D. Schwarz Decl. ¶ 6).  No XRP was sold before the launch of the XRP Ledger.  56.1 ¶ 20 (D. Schwarz Decl. ¶ 6).  And Ripple never owned the 20 billion XRP retained by the three Ripple Founders.  56.1 ¶ 22 (D. Schwarz Decl. ¶ 7).  When those individuals have sold any of their 20 billion XRP since 2012, the sales proceeds have never been held by Ripple or commingled in Ripple's corporate accounts.  56.1 ¶ 23 (D. Schwartz Decl. ¶ 7; Ex. 8, Larsen Tr. 67:18-69:2).  Today, Ripple owns roughly 50.2 billion XRP, compared to the 49.8 billion held by persons and institutions other than (and mostly unknown to) Ripple.  56.1 ¶ 89 (Decl. of Monica Long ("Long Decl.") ¶ 11).

---

142:16).  When the XRP Ledger launched, all known existing blockchains relied on proof of work; today, most major blockchains (including the two largest, Bitcoin and Ethereum) still do, though developers of the Ethereum blockchain are moving to a different approach called "proof of stake."  56.1 ¶ 10 (D. Schwartz Decl. ¶ 4).

## B.     The Founding of Ripple

Ripple was founded in 2012,[5] after the core code for the XRP Ledger was completed. 56.1 ¶ 32 (D. Schwartz Decl. ¶ 8).  It has raised investment capital through multiple funding rounds in which it sold stock (not XRP) to investors.  56.1 ¶ 34 (Ex. 11, Ferrell Rep. ¶¶ 20-21).  Since its early days, Ripple's mission has been to realize an "Internet of Value" – using technology to enable value to move as seamlessly as information does today over the Internet. 56.1 ¶ 35 (Ex. 8, Larsen Tr. 232:19-234:4).  Some, but not all, of Ripple's products and services rely on the XRP Ledger and XRP.  56.1 ¶ 44 (Ex. 9, Birla Tr. 44:14-50:8).  One area Ripple targets is cross-border payments, a roughly $20 trillion market that still depends on mid-20th-century payment technologies.  56.1 ¶¶ 36-37 (Ex. 2, Osler Rep. ¶ 43).  Traditional payment rails are slow, costly, and opaque:  fees for cross-border remittances can sometimes approach 10% of the payment amount, and payments can take multiple days to reach recipients – particularly in parts of the world that do not have well-developed technological infrastructures.  56.1 ¶ 38 (Ex. 2, Osler Rep. ¶ 25).  Ripple seeks to modernize international payments by developing a global network for international currency transfers.  56.1 ¶ 35 (Ex. 8, Larsen Tr. 232:19-234:4).

RippleNet is a software product developed by Ripple that allows customers to clear and settle cross-border financial transactions on mutually agreed terms.  56.1 ¶ 41 (Long Decl. ¶ 2). RippleNet has been used by hundreds of financial institutions and payment providers across more than 55 countries and six continents.  56.1 ¶ 42 (Long Decl. ¶ 2).  RippleNet customers can settle cross-border transactions using fiat currency or can opt to use a feature called On Demand Liquidity ("ODL"), which uses XRP.  56.1 ¶ 45 (Long Decl. ¶ 3).  ODL leverages the inherent

---

[5] The company was initially named NewCoin, Inc. and incorporated under California law in September 2012.  It was promptly renamed OpenCoin, Inc. in October 2012.  The company was renamed Ripple Labs Inc. in 2013 and incorporated under Delaware law in 2014.  56.1 ¶ 33 (citing state articles of incorporation).

properties of XRP – fast settlement and low transaction costs – to allow cross-border transactions to settle in nearly real time rather than in days, as traditional means require. 56.1 ¶ 46 (Ex. 9, Birla Tr. 43:10-17). ODL also enables transactions during times when traditional banks are closed. 56.1 ¶ 47 (Ex. 4, Samarasinghe Tr. 231:1-5). Since its launch, ODL has experienced tremendous growth. 56.1 ¶ 48 (Long Decl. ¶ 3). To date, more than $10 billion in ODL payments have been made – meaning more than $10 billion in XRP has been used as a bridge currency to facilitate cross-border transactions using Ripple's products. *Id.*

Ripple's product successes have earned it accolades from publications such as Forbes FinTech 50, CBInsights FinTech 250, the World Economic Forum, and American Banker. 56.1 ¶ 49 (citing articles). In addition, in revising Electronic Fund Transfer Act regulations as they relate to remittance transfer providers, the U.S. Consumer Financial Protection Bureau stated it "believe[d] that expanded adoption of . . . Ripple's suite of products could . . . allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent," contrary to the current state of play. Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020).

## C. The XRP Ledger and XRP

Ripple does not own the XRP Ledger. 56.1 ¶ 51 (D. Schwartz Decl. ¶ 9). The ledger's underlying code is "open source"; anyone can use the XRP Ledger, submit transactions to the XRP Ledger, propose changes to its source code, or develop applications that run on the XRP Ledger. 56.1 ¶¶ 52, 54 (D. Schwartz Decl. ¶ 9; Ex. 26, SEC Answer to RFA No. 197). Indeed, other users of the XRP Ledger can implement changes to the XRP Ledger's code without Ripple's input and even over Ripple's express objections. 56.1 ¶ 57 (Ex. 29, Schwartz Dep. Ex. DS-70). That has happened recently: in June 2020, over Ripple's objection, the XRP Ledger's

code was modified to introduce a "check-writing" feature, which allows one account to claim funds from another. *Id.* (Ex. 1, D. Schwartz Tr. 151:15-22).

Ripple's ODL product is just one application that uses the XRP Ledger. Many other developers with no connection to Ripple have built software products that use the XRP Ledger, such as a range of payment-processing applications including micropayments. 56.1 ¶ 59 (D. Schwartz Decl. ¶ 9). In addition, at least before the SEC filed this lawsuit, various individuals and businesses independent of Ripple accepted XRP as a form of payment for goods and services ranging from coffee to furniture to travel. 56.1 ¶ 60 (Ex. 2, Osler Rep. ¶ 13). Several major charities accepted XRP for donations, including the American Red Cross, the American Cancer Society, St. Jude Children's Research Hospital, and Fidelity Charitable. 56.1 ¶ 61 (Long Decl. ¶ 7). The exact number of individuals and businesses that use or have used the XRP Ledger or XRP is unknown and unknowable to Ripple, but is likely in the millions given the number of wallet addresses on the XRP Ledger. 56.1 ¶¶ 62-63 (D. Schwartz Decl. ¶ 11).

XRP is also part of a robust, fully functioning currency market that allows trades between XRP and various other currencies (both traditional fiat currencies and cryptocurrencies). 56.1 ¶ 64 (Long Decl. ¶ 4). In 2015, FinCEN and the Department of Justice ("DOJ") determined that XRP is a "convertible virtual currency" and "the second-largest cryptocurrency by market capitalization, after Bitcoin."[6] Before the SEC filed this lawsuit, XRP was listed on more than

---

[6] DOJ, Settlement Agreement (May 5, 2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/05/05/settlement_agreement.pdf. On September 4, 2013, a Ripple subsidiary engaged in the sale of XRP registered with FinCEN. In 2015, Ripple settled with the DOJ and FinCEN, both of which determined that XRP was a "virtual currency" and that settlement required continued registration with FinCEN as a "money services business." 56.1 ¶ 68 (citing Settlement Agreement). The definition of a "money services business" excludes "[a] person registered with, and functionally regulated or examined by, the SEC." 31 C.F.R. § 1010.100(ff)(8)(ii). In June 2016, a Ripple subsidiary was one of the first entities ever to receive a "BitLicense" – a business license to conduct virtual currency activities – from the New York State Department of Financial Services. 56.1 ¶ 71 (Ex. 22, Zagone Tr. 297:12-298:23).

200 exchanges globally. 56.1 ¶ 73 (Long Decl. ¶ 4). Only six of those exchanges had contracts

with Ripple relating to their listing of XRP. 56.1 ¶ 66 (Ex. 11, Ferrell Rep. ¶ 137). At the time

the SEC brought this lawsuit, XRP was the third-largest cryptocurrency (behind Bitcoin and

Ether), with a total asset value of around $50-60 billion. 56.1 ¶ 72 (citing public data).

From the XRP Ledger's launch in 2012 to the filing of this litigation, more than 1.28

trillion XRP traded hands globally. 56.1 ¶ 76 (D. Schwartz Decl. ¶ 13).[7] Ripple's XRP

transactions were a tiny fraction of XRP's trading volume. 56.1 ¶ 77 (Ex. 11, Ferrell Rep. ¶ 143).[8]

Throughout 2018, for example, Ripple's XRP sales never exceeded 0.5% of the global XRP

trading volume. 56.1 ¶ 82 (*Ripple XRP Markets Report Q1 2018* (Apr. 25, 2018)).[9] In the first

quarter of 2019, Ripple's sales were only 0.32% of the overall trading volume. 56.1 ¶ 83 (*Ripple*

*XRP Markets Report Q1 2019* (Apr. 24, 2019)). Since May 2020, essentially all of Ripple's

sales of XRP – with full disclosure to the SEC – have been to ODL customers who have sourced

XRP directly from Ripple for cross-border transactions. 56.1 ¶ 84 (Long Decl. ¶ 10).

The SEC's filing of this lawsuit and its allegation that XRP itself is a "security"

significantly impeded XRP markets: the price of XRP declined by approximately 70% in the

---

[7] In the secondary market, a single unit of XRP can be traded multiple times by
individuals and entities with no affiliation to Ripple.

[8] A cryptographic escrow established in 2017 prevents Ripple from accessing and
distributing more than 1 billion of XRP from the escrow in any given month; in fact, Ripple has
distributed much less than that. 56.1 ¶ 78 (Ex. 8, Larsen Tr. 374:12-16).

[9] Ripple's share of XRP sales is smaller than relatively minor actors in other
markets. For example, OnePlus, the fifth-largest seller in the U.S. smartphone market, accounted
for roughly 2% of shipments in a recent quarter. *See* Counterpoint Research, *US Smartphone
Market Share: By Quarter* (Aug. 25, 2022), https://www.counterpointresearch.com/us-market-
smartphone-share/. Sellers considered dominant have much larger market shares. For example,
De Beers is responsible for about 30% of world diamond sales – orders of magnitude more than
Ripple's fraction of XRP sales. *See* Bain & Co., *The Global Diamond Industry 2021-22*, at 8,
https://www.bain.com/globalassets/noindex/2022/bain_report_diamond_report-2021-22.pdf.
And diamonds are not "investment contracts" with De Beers, even though people might buy them
with the expectation that they will see a profit thanks to De Beers' marketing efforts.

days following the filing of the initial complaint, wiping out approximately $15 billion in market value, and nearly every exchange accessible to U.S. parties de-listed XRP or blocked access to it. 56.1 ¶¶ 85-86 (Long Decl. ¶ 5). Nonetheless, the global XRP trading markets remain active, with 24-hour trading volumes approaching $1,000,000,000. 56.1 ¶ 91 (Long Decl. ¶ 6).

## D. Ripple's Sales, Giveaways, and Payments of XRP

The Amended Complaint alleges that, from 2013 through the end of 2020, Defendants engaged in one continuous offering of unregistered securities. Through that sweeping allegation, the SEC contends that every single sale, offer, or distribution of XRP by Ripple and the Individual Defendants was part of a single securities offering, regardless of the stark differences between Ripple's and the Individual Defendants' various XRP transactions. We summarize some of the many types of Ripple's XRP transactions below.

**Giveaways.** Ripple has given XRP away for free, receiving no consideration at all. It has given away more than 2 billion XRP to charities and grant recipients. 56.1 ¶ 93 (Long Decl. ¶ 9). In its early days, Ripple also gave away more than 500 million XRP for free to early adopters, developers, and programmers. 56.1 ¶ 92 (Long Decl. ¶ 8).

**Exchange-Based Sales.** Ripple has sold XRP on digital asset exchanges via market makers "programmatic[ally]," meaning through the use of trading algorithms. 56.1 ¶ 95 (Ex. 4, Samarasinghe Tr. 45:11-20). Sales on digital asset exchanges are blind bid/ask transactions. 56.1 ¶ 96 (Ex. 41, Yadav Rep. ¶ 77). Accordingly, Ripple did not and could not know who was purchasing the XRP, and the purchasers did not and could not know who was selling. *Id.* There is no contract between the buyer and seller on an exchange. *Id.* Ripple undertook no contractual obligations to exchange-based purchasers, and exchange-based purchasers received no rights in Ripple's business or right to demand anything from Ripple. 56.1 ¶ 99 (Ex. 40, A. Schwartz Rep.

¶¶ 33, 35). The SEC alleges that Ripple sold at least 3.9 billion XRP programmatically. Am. Compl. ¶ 91 & Tbl. 1.

**Wholesale Sales.** Ripple has sold XRP directly to certain counterparties – typically institutional buyers and ODL customers – through arm's-length agreements. 56.1 ¶ 105 (Ex. 40, A. Schwartz Rep. ¶¶ 18-31 & Ex. C). The SEC alleges that Ripple sold at least 4.9 billion XRP in such transactions. Am. Compl. ¶ 91 & Tbl. 1. The contracts governing these transactions did not give the purchaser of XRP any interest in Ripple's business; imposed no obligations on Ripple to take any actions to benefit the purchasers; and did not provide the purchaser a right to demand or receive anything from Ripple beyond delivery of the purchased XRP. 56.1 ¶¶ 105-107 (Ex. 40, A. Schwartz Rep. ¶¶ 18-31 & Ex. C).

**Form of Payment.** Ripple has used XRP as a currency to pay for services from certain vendors and employees who choose to accept XRP instead of or in addition to other currencies (such as U.S. dollars). 56.1 ¶ 110 (Ex. 40, A. Schwartz Rep. ¶¶ 36-40 & Ex. E). Ripple's contracts to buy services included no provisions obligating Ripple to take any efforts to increase the price of XRP. 56.1 ¶ 112 (Ex. 40, A. Schwartz Rep. ¶¶ 42, 105-115, 116-134, 135-143). And, like Ripple's other contracts, none of its contracts to buy services granted the counterparties any rights to share in profits earned by Ripple or to receive profits from any other source. *Id.*

As of December 20, 2020, Ripple had transferred roughly 25 billion XRP to various counterparties, including through XRP sales, giveaways, and purchases of services. 56.1 ¶ 87 (Ex. 11, Ferrell Rep. ¶ 109).

### E. Larsen's and Garlinghouse's Transactions in XRP

Christian Larsen is the former CEO and current Executive Chairman of Ripple. 56.1 ¶ 128 (Ex. 8, Larsen Tr. 49:9-18, 57:16-24). He was one of the original recipients of XRP when the XRP Ledger launched. After Ripple's Founders gave much of their XRP to Ripple, Larsen

and McCaleb each retained roughly 9 billion XRP, while Britto retained roughly 2 billion XRP. 56.1 ¶¶ 132-134 (Ex. 14, Decl. of Christian Larsen ("Larsen Decl.") ¶¶ 2-3). Larsen has donated more than 2 billion XRP to charity. 56.1 ¶ 93 (Larsen Decl. ¶ 5). Larsen has also sold some of his XRP; his XRP and the proceeds from his sales have never been intermingled with Ripple's corporate accounts. 56.1 ¶ 291 (Larsen Decl. ¶ 4). None of Larsen's XRP sales on exchanges involved contractual relationships with purchasers. 56.1 ¶ 96 (Ex. 41, Yadav Rep. ¶ 77). Of Larsen's sales on exchanges, more than 87% of the proceeds were from trades on exchanges outside of the United States. 56.1 ¶ 301 (Ex. 81, Larsen trading summary).

Bradley Garlinghouse was hired as Ripple's Chief Operating Officer in April 2015 and promoted to CEO in January 2017. 56.1 ¶¶ 140, 143 (Am. Compl. ¶ 17). He had no affiliation with Ripple or the XRP Ledger before April 2015. 56.1 ¶ 138 (Ex. 17, Decl. of Bradley Garlinghouse ("Garlinghouse Decl.") ¶ 2). Garlinghouse never sold XRP until April 2017. 56.1 ¶ 303 (Garlinghouse Decl. ¶ 3). He received XRP as part of his overall compensation from Ripple. 56.1 ¶ 145 (Ex. 80, RPLI_01708774). As with Larsen, Garlinghouse has never intermingled the proceeds from his XRP sales with Ripple's corporate accounts. 56.1 ¶¶ 23, 305 (Garlinghouse Decl. ¶ 3). None of Garlinghouse's XRP sales involved a contractual relationship with purchasers. 56.1 ¶ 96 (Ex. 41, Yadav Rep. ¶ 77). All of Garlinghouse's sales of XRP were on exchanges, and approximately 95% of the proceeds from those sales were from trades on exchanges outside of the United States. 56.1 ¶ 310 (Ex. 82, Garlinghouse trading summary).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable [factfinder]

could return a verdict for the nonmoving party.'" *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party makes this showing, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). The non-moving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact . . . to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).

## ARGUMENT

## I. DEFENDANTS' OFFERS AND SALES OF XRP LACKED THE ESSENTIAL INGREDIENTS OF INVESTMENT CONTRACTS

### A. Investment Contracts Under the 1933 Securities Act Must Have Certain Essential Ingredients

#### 1. The Term "Investment Contract" in the Securities Act Draws Its Meaning from Pre-1933 Act Blue Sky Cases

The SEC contends that, at all relevant times, "XRP was an investment contract" and therefore a security. Am. Compl. ¶ 231. From that, it claims that every offer and sale of XRP by Defendants over an eight-year period was an offer or sale of a "security" that required registration with the SEC under 15 U.S.C. § 77e. As a practical matter, the SEC's claim is even

broader.  It claims that every offer and sale of XRP is the offer and sale of an "investment contract" even if the seller has no connection with Ripple and even if the units of XRP in question never came – directly or indirectly – from Ripple, Larsen, or Garlinghouse.[10]  The SEC is wrong and over-reaching.  XRP is not a "security" within the meaning of the statute, and therefore no registration was required.

"The starting point" for resolving this dispute – as "in every case involving construction of a statute" – is "the language" of the Securities Act of 1933 ("Securities Act").  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979).  The definition of "security" under the Securities Act is based on a defined list of specific instruments, including "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement," or "investment contract," among others.  15 U.S.C. § 77b(a)(1).

The definition of "security" reflects "Congress['s] inten[t]" that "the securities laws . . . cover those instruments ordinarily and commonly considered to be securities in the commercial world."  *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982); *see also Int'l Bhd. of Teamsters*, 439 U.S. at 559 ("In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.").  Accordingly, the definition is consistent with the common understanding of the term "security"

---

[10] As the SEC acknowledged in its first hearing before Judge Netburn, its theory extends to every single buyer and seller of XRP in the secondary market, even if those buyers and sellers are wholly unaffiliated with Defendants.  *See* Mar. 19, 2021 Tr. 43:9-44:16.  That would mean that countless individuals and businesses violated the securities laws; indeed, the number would be exponentially larger if the SEC's theory were extended to other cryptocurrencies.  The SEC's suggestions that some of those individuals might be able to claim a statutory exemption from registration under Section 4 (15 U.S.C. § 77d) for their transactions, *see id.*, is small comfort and does not save the SEC's theory from its impossible breadth.

at the time of the Act's passage.  *See*, *e.g.*, *Webster's Practical Dictionary* 619 (rev. ed. 1931) ("evidence of debt or property").[11]

Of the instruments in the Securities Act's definition, the only one the SEC seeks to apply to XRP is "investment contract."[12]  The Securities Act does not define "investment contract."  But it is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.' "  *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (citation omitted; ellipsis in original).  For "terms of art," courts further presume that Congress "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."  *Morissette v. United States*, 342 U.S. 246, 263 (1952); *see also Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) ("if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it").

In *SEC v. W.J. Howey Co.*, the Supreme Court applied these principles of statutory construction to the term "investment contract" in the Securities Act.  It found "the term was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute."

---

[11] *See also Funk & Wagnalls New Standard Dictionary of the English Language* 2214 (1933) ("Written promises or assurances for payment of money; evidence of debt; as, government *securities*."); *Webster's New International Dictionary of the English Language* 2263 (2d ed. 1934) ("An evidence of debt or of property, as a bond, stock certificate, or other instrument, etc.; a document giving the holder the right to demand and receive property not in his possession."); *Mace v. Buchanan*, 52 S.W. 505, 507 (Tenn. Ch. App. 1899) (the term " 'securities' . . . generally [is] understood to refer to live and negotiable commercial obligations, or such negotiable obligations as state, county, government, and municipal bonds, and other obligations considered generally as safe or secure").  *Black's Law Dictionary* did not include a relevant definition of "securities" generally before passage of the Securities Act, but the analogous definition of "public securities" described:  "Bonds, notes, certificates of indebtedness, and other negotiable or transferable instruments evidencing the public debt."  *Black's Law Dictionary* 1596 (3d ed. 1933).

[12] *See*, *e.g.*, Am. Compl. ¶ 231 ("At all relevant times . . . , XRP was an investment contract and therefore a security subject to the registration requirements of the federal securities laws."); *see also* 56.1 ¶ 124 (SEC disclaiming other types of securities).

328 U.S. at 298. As the SEC itself argued in *Howey*, "[t]he term 'investment contract' is not defined by state or federal statutes; but, in adopting the definition of a security from the 'blue sky' laws, Congress must be deemed to have intended also to adopt that construction of the term which was uniformly followed by the state courts." Brief for the SEC at 18, *SEC v. W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), 1946 WL 50582 ("SEC *Howey* Br."). Accordingly, the Supreme Court gave the term "investment contract" the "meaning" that was "crystallized by . . . prior judicial interpretation[s]" of state blue sky laws. 328 U.S. at 298.

In concluding that the promoters in *Howey* had "offer[ed] the essential ingredients of an investment contract," *id.* at 301, the Supreme Court relied on a set of facts that held true not only in *Howey* itself, but also in the cases that preceded it and have since followed it. *First*, one or more contracts establishes the rights and obligations of the parties. *See id.* at 295-97 (describing the "land sales contract" and "service contract" that performed that function in *Howey*). *Second*, investors "provide the capital and share in the earnings and profits" of the enterprise. *Id.* at 299-300. *Third*, the promoter "manage[s], control[s] and operate[s] the enterprise" for the benefit of investors and provides "a return on their investments" based on "[t]heir respective shares." *Id.* at 300. The Court further summarized the meaning of the statutory phrase "investment contract":

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298-99. This passage of *Howey*, as it has developed over time, has come to be called the "*Howey* test." *E.g.*, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985).

The Supreme Court has further instructed that, in the blue sky cases, "[f]orm was disregarded for substance and emphasis was placed upon economic reality." *Howey*, 328 U.S. at 298. In *Howey* itself, there were two contracts – one for the sale of tracts of land in an orange

grove and one a service contract to grow and sell oranges and distribute the net profits from having done so. Although neither contract standing alone was an "investment contract," and the oranges themselves were certainly not securities, viewed as a whole the rights and obligations created by the contracts were in the nature of an investment of money in a common enterprise from which the investor expected profits solely from the efforts of the promoter. Accordingly, *Howey* instructs that courts must look to the entire relationship between the parties and evaluate its "economic reality"; a party cannot avoid application of the securities laws through the artifice of converting a sale of securities from a single transaction into multiple separate contracts.

The Court's instruction to look to substance and to economic reality is thus fully consistent with its teaching that, in applying *Howey*, courts "are considering investment *contracts*." *SEC v. Edwards*, 540 U.S. 389, 397 (2004). There is no connection between the statutory language "investment contract," which "crystallized" judicial interpretations of states' blue sky laws, *Howey*, 328 U.S. at 298, and the expansive rule of law the SEC asks this Court to apply in this case. Without an appropriate focus on the contract that supposedly constitutes an "investment contract," and in particular on the parties' post-sale rights and obligations, the *Howey* test cannot be coherently applied.

In construing a statute that – like the Securities Act – "confers authority upon an administrative agency," this Court should consider "whether Congress in fact meant to confer the power the agency has asserted." *W. Va. v. EPA*, 142 S. Ct. 2587, 2607-08 (2022). Here, the SEC contends that every transfer of (or offer to transfer) the intangible asset XRP from 2013 through 2020 (whether by Ripple, the Individual Defendants, or anyone else) was the offer and sale of a regulated "investment contract" with Ripple – even if Ripple never owned the XRP in question; even if the XRP distributions took place without any contract between Ripple and the XRP recipient; and even if, where a contract was present, the XRP recipient had no post-sale

17

rights against Ripple, and Ripple had no post-sale obligations to the XRP recipient. That breathtaking and major expansion of agency authority goes beyond anything that Congress might have contemplated or that *Howey* or its progeny authorize.

### 2. The "Investment Contracts" Recognized in Pre-1933 Blue Sky Cases All Shared Three Basic Characteristics

To determine what Congress meant by the term "investment contract," this Court should look to the pre-1933 blue sky cases on which the *Howey* Court (and the SEC itself in arguing *Howey*) relied. That is the approach the Supreme Court took not only in *Howey* itself, but also in *Edwards*, where it addressed the question whether a contract "promising a fixed return" rather than a variable one could be an investment contract by looking to whether any such "distinction . . . was drawn in the blue sky law cases that the *Howey* Court used, in formulating the test, as its evidence of Congress' understanding of the term." 540 U.S. at 395. Indeed, the SEC itself urged the *Edwards* Court to apply that approach, citing the blue sky cases and arguing that "Congress presumably intended that the term 'investment contract' in the federal securities laws would . . . be interpreted" in a manner "consistent with the cases construing the same language." Brief for the SEC at 18, *SEC v. Edwards*, No. 02-1196 (U.S. June 26, 2003), 2003 WL 21498455.

#### a. Every Pre-1933 Blue Sky "Investment Contract" Case Involved a Contract

There can be no "investment contract" if there is no "contract" with the characteristics of an investment. Accordingly, the blue sky cases treated the existence of a contract as a threshold question before even considering whether that contract was an "investment contract." *See Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*, 240 N.W. 827, 828 (Wis. 1932); *Dobal v. Guardian Fin. Corp.*, 251 Ill. App. 220, 224 (1929) (same); *see also, e.g., State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) ("The term [investment contract] is not defined in the act, but it implies the apprehension of an investment as well as of a contract."); *McCormick v. Shively*, 267

Ill. App. 99, 102 (1932) (statutory phrase "investment contract" "clearly contemplates" only "contracts" with certain characteristics). Every pre-1933 blue sky case finding an "investment contract" involved a written contract between the promoter and the investor. *See*, *e.g.*, *State v. Evans*, 191 N.W. 425, 425-26 (Minn. 1922) (written real-estate contract); *State v. Bushard*, 205 N.W. 370, 370-71 (Minn. 1925) (written "operator's agreement" between issuer bus company and investor bus driver); *State v. Agey*, 88 S.E. 726, 729 (N.C. 1916) (written contracts, labeled "application[s]"); *Stevens v. Liberty Packing Corp.*, 161 A. 193, 193-95 (N.J. 1932) (written contracts relating to rabbit-raising scheme); *Brownie Oil*, 240 N.W. at 828 (written "good-will contract"); *Dobal*, 251 Ill. App. at 224-25 (written contract for the sale of real-estate bonds).

In its briefing to the Supreme Court in *Howey*, the SEC's own proffered definition of an "investment contact" likewise required a "contractual arrangement." SEC *Howey* Br. at 9 (describing the SEC's "definition of an 'investment contract' . . . as including any contractual arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters"). The SEC's definition in *Howey* was right. Our research has found no case finding an investment contract without such a contractual relationship.

### b. Every Pre-1933 Blue Sky "Investment Contract" Imposed Post-Sale Obligations on the Promoter of the Security

There also can be no "investment contract" unless the contract includes an undertaking of post-sale obligations by the promoter to the investor. Otherwise, the contract is simply an asset sale. The blue sky cases rejected attempts to fit contracts without such obligations into that statutory language. *See*, *e.g.*, *Lewis v. Creasey Corp.*, 248 S.W. 1046, 1049 (Ky. Ct. App. 1923) (contract granting buyer the right to purchase groceries at a discount with no post-sale obligations on the seller was not an investment contract); *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (same); *McCormick*, 267 Ill. App. at 101 (contract for sale of real

estate was not an "investment contract" where the seller reserved rights to all "crops, timber, oil, gas, mines and minerals" on the land, as well as the right to drill and mine the land, but undertook no obligation to exercise those rights); *Hanneman v. Gratz*, 211 N.W. 961, 962 (Minn. 1927) (contract for purchase of shares of title in leases of oil-bearing land was not an "investment contract" because, while the purchasers were "enthused at the prospect of great wealth . . . from a sale of some of these leases and a development of the others," the contract imposed no obligations for resale or development of the land).

Again, our research has found no exceptions. Every pre-1933 blue sky case finding an "investment contract" found in the contract some post-sale obligations on the promoter to take some specific action to benefit the investor. *See, e.g., Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 333-34 (1930) (after selling land to investor, seller had contractual obligation to harvest crops on that land); *People v. White*, 12 P.2d 1078, 1079, 1081 (Cal. Ct. App. 1932) (after receiving investor's funds, seller had contractual obligation to use those funds to make loans, buy and resell foreclosed property, and return a specific level of profit to the investor by a future date certain); *Agey*, 88 S.E. at 729 (after selling fig orchards, seller had contractual obligation to cultivate and sell fig trees and share profits with investor).[13]

_____

[13] *See also, e.g., State v. Ogden*, 191 N.W. 916, 916-17 (Minn. 1923) (contractual promise to develop an oil pipeline, set up corporation to manage interests in oil-land leaseholds, and distribute pro-rata profits to shareholders); *State v. Robbins*, 240 N.W. 456, 456-57 (Minn. 1932) ("breeding contract" obligating promoter to raise, sell, and distribute profits from muskrats that the investors purchased); *People v. Claggett*, 19 P.2d 805, 805 (Cal. Ct. App. 1933) (contractual promise that gold-mine operator would create a corporation and share with investors profits from gold he recovered); *People v. McCalla*, 220 P. 436, 437 (Cal. Ct. App. 1923) (contractual obligation to manage land and distribute percentage of net income from the land), *disapproved on other grounds by People v. Elliot*, 354 P.2d 498, 503 (Cal. 1960); *Fidelity Inv. Ass'n v. Emmerson*, 235 Ill. App. 518, 521-22 (1924) (contractual obligation to invest funds in interest-bearing securities and pay annual "annuity" sum over the next 10 years), *rev'd on other grounds*, 149 N.E. 530 (Ill. 1925); *Rice v. Bogart*, 272 Ill. App. 292, 297-98 (1933) (contractual obligation to use oil equipment purchased by investors to sell oil and return six cents profit on

### c. Every Pre-1933 Blue Sky "Investment Contract" Gave the Investor a Right To Receive Profits

Finally, there can be no "investment contract" unless the investor acquires a contractual right to demand and receive part of the profits generated by the promoter's activities. *See*, *e.g.*, *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 937-38 (Minn. 1920) (relied on in *Howey*) (promise to provide pro-rata profits to all certificate holders from 20% of net profits of tire sales); *White*, 12 P.2d at 1079 (promise that $5,000 investment would result in $7,500 payment by precise future date); *Bushard*, 205 N.W. at 370 (contractual obligation for bus company to provide one-fourth of net profits to bus-driver investor); *Freeze v. Smith*, 236 N.W. 810, 810-11 (Mich. 1931) (written "unit" agreements providing profit-sharing rights in real-estate syndicate). A contract with "no obligation to pay money on the part of [defendant]" and "no rights either in the capital or profits of the company" is not a security. *Enz Bros.*, 187 N.W. at 667.

### 3. *Howey* and Its Progeny Likewise Involved Contracts with These Same Essential Ingredients

Confirming the necessity of these factors, *Howey* itself, and every Supreme Court and Second Circuit case applying *Howey* to find an investment contract, likewise involved (a) at least one contract between the promoter and the investor, that (b) imposed post-sale obligations on the promoter, and that (c) gave the investor a share of profits from the promoter's activities. These are "the essential ingredients of an investment contract." *Howey*, 328 U.S. at 301.

*Howey* famously involved offers and sales of tracts of land in orange groves combined with a service contract under which the Howey companies promised to grow and market the

---

each gallon sold); *State v. Summerland*, 185 N.W. 255, 255-56 (Minn. 1921) (obligation to pay syndicate unit-holders profits from operation of syndicate); *Kerst v. Nelson*, 213 N.W. 904, 904-05 (Minn. 1927) (obligation to cultivate vineyard, market crops, and share profits with investors who purchased the land); *Pennicard v. Coe*, 263 P. 920, 921 (Or. 1928) (obligation to manage syndicate's assets and distribute profits to "unit" holders); *Agnew v. Daugherty*, 209 P. 34, 34-35 (Cal. 1922) (obligation to develop mines on property and distribute profits to certificate holders).

oranges and distribute the profits.  *See id.* at 295.  Purchasers had "no right of entry" on the land and "ordinarily no right to specific fruit" – only to "an allocation of the net profits . . . at the time of picking."  *Id*. at 296.  On those facts, the Supreme Court reasoned that the purchasers were offered "something more than fee simple interests in land, something different from a farm or orchard coupled with management services" – they were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise."  *Id.* at 299.  As a matter of economic substance, the bundle of contractual rights at issue in *Howey* was indistinguishable from an equity investment in an orange-growing enterprise.

Each of the Court's later cases finding investment contracts fits the same pattern.  *SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65 (1959) ("*VALIC*"), and *SEC v. United Benefit Life Insurance Co.*, 387 U.S. 202 (1967), involved variable annuity contracts giving a right to a "*pro rata* share" of returns from a "portfolio of equity interests."  *VALIC*, 359 U.S. at 71; *see United Benefit*, 387 U.S. at 205.  *Tcherepnin v. Knight*, 389 U.S. 332 (1967), involved "withdrawable capital shares" giving a right to "dividends . . . based on [an] association's profits."  *Id.* at 337.  And *Edwards* involved payphones sold through a sale-and-leaseback agreement by a promoter that then operated the phones and promised to pay a fixed return each month to the investors who nominally owned them.  *See* 540 U.S. at 391.  Similarly, *Joiner* (cited in *Howey*), in which purchasers were offered the opportunity to "shar[e] in [the] discovery values" of an oil-drilling exploration, involved "a contract in which payments were timed and contingent upon completion of [an oil] well," so that "the purchaser was paying both for a lease and for a development contract."  320 U.S. at 348-49.

Each of the Second Circuit's cases finding an investment contract likewise identifies a contract conveying certain rights and then looks to surrounding context to determine whether those rights constitute an investment contract.  *Glen-Arden* involved "Scotch whisky warehouse

receipts" combined with agreements to "provid[e] . . . cooperage and insurance and promised assistance in the liquidation of [the whisky] investments," with at least the insurance agreements embodied in written "policies." 493 F.2d at 1032.[14] *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir. 1982), involved a "license and security agreement and notes payable," a written "Offer to Act as Sales Agent," and other written agreements. *Id.* at 578. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985), involved Merrill Lynch's sale of certificates of deposit ("CDs") through "an order ticket and a confirmation slip," accompanied by written, contractual representations that Merrill Lynch had "reviewed and approved" according to which the issuers would "maintain a secondary market for its customers," would continue to "monitor[], on a regular basis, th[e] issuers," and would be the buyer of last resort of the CDs. *Id.* at 233-35. Finally, *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008), involved written subscription agreements. *Id.* at 86.

### 4.     The SEC Cannot Show That an "Investment Contract" Can Exist Without These Essential Ingredients

In its discovery responses, the SEC has advanced four legal arguments in support of its contention that an "investment contract" can exist without a contract, without any post-sale

---

[14] In its *Daubert* reply, the SEC erroneously cites *Glen-Arden* to support its contention that an investment contract need not involve a contract. *See* ECF No. 615 at 5. That is not what the Second Circuit said. In a footnote, *Glen-Arden* cited the House Conference Report to the 1934 amendments to the Securities Act as evidence that a security need not be "represented by any document," 493 F.2d at 1033 n.4, meaning that "the statute will apply to inscribed shares, and its provisions cannot be evaded by simply refraining from issuing to the subscriber any documentary evidence of his interest," H.R. Conf. Rep. No. 73-1838, at 39 (1934); *see also SEC v. Addison*, 194 F. Supp. 709, 722 (N.D. Tex. 1961) (cited by the SEC for the same incorrect proposition, noting that the Securities Act "cannot be circumvented by simply refraining from issuing a written instrument evidencing the security transaction"). Whether an inscribed share – that is, a share for which the issuer keeps the documentary evidence of ownership – can be a security has nothing to do with whether there can be an investment contract without a contract. And, in any event, the question here is not whether investment contracts were issued without actually being delivered; it is whether there were investment contracts in the first place.

obligations on the alleged promoter, and without any right of the alleged investor to demand and receive profits from the alleged promoter's activities.  Each argument fails as a matter of law and none creates any genuine dispute of material fact.

*First*, the SEC contends that the "*Howey* test" does not require contracts, post-sale rights, or post-sale obligations, but is instead satisfied whenever "'a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party.'"  Ex. 103, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 5 (quoting *Howey*, 328 U.S. at 298-99).  As explained *infra*, pp. 36-58, the SEC cannot establish these elements, however understood.  But the SEC ignores the rest of the Court's opinion, which explains and unpacks that language, as well as how the SEC itself framed the question presented in *Howey*.[15]  *Howey* found an "investment contract" – as the SEC urged – precisely because there were contracts between the promoter and the investor that, when analyzed together as a matter of economic substance, imposed post-sale obligations on the promoter and gave the investor a share of profits from the promoter's enterprise.  As the Supreme Court recognized, that is what it means to "invest[] . . . money in a common enterprise with profits to come solely from the efforts of others."  328 U.S. at 301.

The Second Circuit's cases reflect the same principle.  In *Glen-Arden*, the Second Circuit explained that "the test whether a *contract* constitutes an investment contract within the Securities Act is 'what character the *instrument* is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'"  493 F.2d at 1029, 1034

---

[15] "Whether, under the undisputed facts, respondents are offering an 'investment contract,' as the term is included in the definition of a 'security' in Section 2(1) of the Securities Act of 1933, when the offering consists of units of a citrus grove development *coupled with a contract* for cultivating, marketing and remitting the net proceeds to the investor."  SEC *Howey* Br. at 2 (emphasis added).

(quoting *Joiner*, 320 U.S. at 352-53) (emphases added; footnote omitted).  The reference to "character . . . in commerce" (embodied in the three "essential ingredients" articulated by the Supreme Court) instructs courts on how to evaluate the "contract" (the "instrument" at issue) in order to determine whether it is an "investment" contract or some other kind.  Without a proposed "contract" that establishes investor rights and promoter obligations, an alleged offer has no terms, no plan of distribution, and no inducements held out to the prospect.  *See also*, *e.g.*, *S&S N.Y. Holdings, Inc. v. Able Energy, Inc*., 2012 WL 3084112, at *5 (S.D.N.Y. July 27, 2012) (interpreting contracts before determining whether *Howey* test applies).

Those "essential ingredients" recognized in *Howey* – ingredients also present in every blue sky and post-*Howey* case, in the Supreme Court and the Second Circuit alike – give meaning and structure to the *Howey* test.  The SEC errs in focusing solely on a stand-alone expression while asking the Court to ignore "the case in which th[at] expression[ ] [was] used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.).

*Second*, the SEC misconstrues *Howey*'s statement that " '[a]n investment contract for purposes of the Securities Act means a *contract*, *transaction or scheme*' " to argue that no "contract" is required in order to form an "investment contract."  Ex. 103, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 5 (quoting *Howey*, 328 U.S. at 298-99) (emphasis added by SEC).  *Howey* cannot support that proposition.  What *Howey* teaches is that, when deciding if an investment contract is present, a court should look not only to the four corners of each individual contract, but also to the broader context in which the instrument is grounded.  That is how the *Howey* Court reached its central holding that a land sales contract coupled with a service contract formed an investment contract, even if neither document standing alone would have sufficed. *See* 328 U.S. at 297-98.  The terms "scheme" and "transaction" refer to the full relationship between the parties, grounded in one or more contractual instruments.  Nothing in *Howey*, or the

blue sky cases on which it relied, or the Second Circuit cases following *Howey* ever held (or even suggested) that a "scheme" or "transaction" could be a security without any underlying contract at all. *See, e.g., id.* at 298-99 (relying on *Gopher Tire & Rubber*, 177 N.W. at 938). The "scheme or transaction" language captures the undisputed point that a court will look at a contract in its full context to determine whether it has the requisite features of an "investment contract."

*Third*, the SEC cites *SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998), to argue that the "Securities Act's terms are defined broader than and independently from their common law or contract law meaning," and on that basis to suggest that an "investment contract" does not require the existence of a "contract" setting forth the parties' rights and obligations. Ex. 103, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 5. But *Cavanagh* cannot support the SEC's attempt to read the word "contract" out of the statutory term "investment contract." In that case – which was not an "investment contract" case and involved the offering of traditional securities (stock in a company) – the Second Circuit interpreted the Securities Act's definition of the term "offer," which has an express statutory definition that "extends beyond the common law contract concept of an offer." 155 F.3d at 135 (citing 15 U.S.C. § 77b(a)(3)). By contrast, precisely because the term "investment contract" is not defined in the Act, the Supreme Court held in *Howey* that the term has the "crystallized" meaning given it by the pre-1933 blue sky cases, 328 U.S. at 298, which uniformly required a contract that establishes the rights and obligations of the parties. The SEC's interpretation also runs counter to the "cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted).

*Finally*, the SEC suggests that the "economic reality" language in *Howey* gives it a roving commission to regulate any outlay of funds in exchange for an asset that it claims may benefit from the registration and disclosure requirements of the securities laws. *See, e.g.*, Ex.

26

103, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 10. Neither the statute nor *Howey* goes so far, nor has the Second Circuit ever adopted such a rule. The SEC's position is inconsistent with the longstanding principle that courts "may not 'add words to the law to produce what is thought to be a desirable result'" but must "conform to the language of the statute." *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.9 (2d Cir. 2019) (citation omitted). The statute requires "investment *contracts*." *Edwards*, 540 U.S. at 397.

Without a contract that grants rights to the investor and imposes obligations on the seller, the SEC's position is unmoored from statutory language and from the precedent construing that language. Even if some (or even, as the SEC will no doubt argue, many) XRP purchasers bought XRP for speculative purposes, that does not make it an investment contract – many assets are bought with the hope of selling at a higher price without becoming securities. "A simple sale of land, whether for investment or use, is not a 'security,'" *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993); "commodities like wheat, soy beans, cocoa, sugar, [and] tobacco" are not securities, even if sold as "futures contracts," *Glen-Arden*, 493 F.3d at 1033; uncut diamonds are not securities, even if sold as an investment and by a seller who markets them as an appreciating investment, *see Dep't of Com. v. DeBeers Diamond Inv., Ltd.*, 280 N.W.2d 547, 551-52 (Mich. Ct. App. 1979); nor is "gold" a security, even if bought with the purpose of "speculating in the world gold market," *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986). The SEC itself has previously recognized that sales of commodities do not constitute the sale of securities – even when made for investment purposes – where the seller undertakes no post-sale obligations to the buyer.[16]

_____

[16] *See, e.g., American Diamond Co.*, 1977 WL 10907, at *4-5 (SEC Aug. 15, 1977) (taking no action where seller intended to advertise "the value of diamonds as an investment," but was "not contractually bound to provide any further services to the Buyer" after the transaction); *The London Diamond Exch.*, 1972 WL 8488, at *2-3 (SEC Oct. 3, 1972) (taking no

Speculative offers and sales of non-security assets are outside the SEC's purview. That does not make them unregulated. They may fall within the jurisdiction of other agencies such as the DOJ (in cases of fraud), the CFTC (in cases of commodities),[17] FinCEN,[18] or, in some cases, state regulators. But the particular registration and disclosure regime that Congress mandated for securities does not apply to them. Neither does it apply to XRP.

## B.     XRP Does Not Have the Essential Ingredients of an Investment Contract

The SEC has the burden to show that each specific offer and sale of XRP by Defendants is an investment contract. It is undisputed that Ripple had and has no contract at all with many XRP recipients and was not even involved with most XRP trading in the secondary market.[19] Even when Ripple sold XRP directly through contracts, those contracts included none of the ingredients present in *Howey*: they imposed no post-sale obligations on Ripple to work for the benefit of XRP purchasers and conveyed to XRP purchasers no entitlement to any share of Ripple's profits. Each of those deficiencies is independently fatal to the SEC's claims.

---

action where seller would offer diamonds for "investment purposes only" to "accrue in value in the future," but made "no[] guarantee or . . . represent[ation] that a profit will be made," and would not "enter into any contractual or other arrangements with prospective purchasers" following sales); *Future Sys. Inc.*, 1973 WL 9653, at *3 (SEC June 8, 1973) (taking no action in connection with sales of silver where seller, aside from storing the silver, "would have no other relationship with the purchaser after the initial sale").

[17] The CFTC recently characterized "[d]igital assets such as bitcoin and other virtual currencies" as "encompassed by the definition of 'commodity.'" Compl. ¶ 14, *CFTC v. Gemini Tr. Co.*, No. 1:22-cv-04563, ECF No. 1 (S.D.N.Y. June 2, 2022). It has taken similar positions on several occasions dating back years. *See* Compl., *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181-PKC, ECF No. 1 (S.D.N.Y. Sept. 21, 2017) (CFTC Actual Delivery Proposed Rule).

[18] As noted above, a Ripple subsidiary has been registered with FinCEN since September 2013, and a 2015 settlement with DOJ and FinCEN required a Ripple entity that sells XRP to register as a "money services business," which is inconsistent with it being a securities dealer. *See* 31 C.F.R. § 1010.100(ff)(8)(ii).

[19] Likewise, it is undisputed that the Individual Defendants had and have no contracts with the purchasers who bought XRP from them on anonymous exchanges. 56.1 ¶ 96 (Ex. 41, Yadav Rep. ¶ 77).

1. **Many XRP Transactions Did Not Involve Any Contract Between Ripple and the XRP Recipient**

The purchase and sale of XRP does not inherently involve any contractual relationship, and indeed Ripple has no contract at all with many if not most recipients of XRP and most XRP trading does not involve Ripple at all. *See supra* pp. 9-11. Moreover, even where there are purchase and sale agreements, the SEC has disclaimed that its case is premised on any relationship created by those contracts.

The SEC cannot show any contract involving Ripple for any of the following categories of transactions (among others):

**Founders' Sales.** 20 billion XRP were retained by McCaleb, Larsen, and Britto and never belonged to Ripple. 56.1 ¶ 22 (D. Schwartz Decl. ¶ 7). None has been sold as part of any contract involving Ripple.

**Exchange-Based Sales.** The Amended Complaint alleges (¶ 91) that at least 3.9 billion XRP from Ripple were purchased on digital asset exchanges. Purchasers of XRP on digital asset exchanges formed no contract with Ripple and did not know whether they were purchasing XRP from one of the third-party market makers engaged by Ripple or from another of the countless XRP holders. 56.1 ¶ 96 (Ex. 11, Ferrell Rep. ¶ 143). When XRP is sold on exchanges, there is no contract or privity between the buyer and the seller. Rather, a buyer communicates to the exchange that it wants to buy XRP, and the exchange matches a blind sell offer with a blind buy offer. *Id.* (Ex. 41, Yadav Rep. ¶ 77). Of the 2.057 billion XRP the SEC alleges were sold by the Individual Defendants (*see* Am. Compl. ¶ 91), all of Garlinghouse's and the vast majority of Larsen's sales of XRP were conducted through digital asset exchanges. Accordingly, not only was there no contract between Ripple and the ultimate purchasers in those sales, but there also was no contract between the Individual Defendants and the purchasers.

**Giveaways.** Ripple in its early years (2013-2015) gave away at least 500 million XRP to early adopters, programmers, and developers. 56.1 ¶ 92 (Long Decl. ¶ 8). No contracts accompanied those giveaways, nor did Ripple receive any consideration. *Id.*

Accordingly, for at least 24.4 billion of the XRP not owned by Ripple today, the SEC has no evidence of any contract between Ripple and the party receiving the XRP. Without such a contract, there cannot be an investment contract within the meaning of the Securities Act. No obligations are undertaken by Ripple and no rights are granted to the recipient. Yet the SEC makes no attempt to distinguish between distributions made with and those made without contracts. The federal securities laws require a transaction-by-transaction analysis. *See Marine Bank*, 455 U.S. at 560 n.11 ("*Each transaction* must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.") (emphasis added); *see also* ECF No. 441 ("MTD Order") at 30 ("Section 5's registration requirement is 'transaction-specific.'") (quoting *Cavanagh*, 155 F.3d at 133); *SEC v. Caledonian Bank Ltd.*, 2016 WL 6441556, at *3 (S.D.N.Y. Oct. 28, 2016) ("The Act's registration requirement is 'transaction-specific,' and accordingly, each separate transaction requires its own registration."). The SEC has never undertaken such an analysis.

When asked in discovery, the SEC refused to identify a contractual basis for a single offer and sale of XRP. Thus, because the Securities Act's definition of an "investment contract" requires an underlying contract, the SEC has no case to take to trial. It has no evidence to distinguish transactions with an underlying contract from those without.

## 2. Ripple's Contracts for the Sale of XRP Imposed No Post-Sale Obligations on Ripple To Act for the Benefit of XRP Recipients

Even if the SEC were to engage in a belated, post-discovery transaction-by-transaction analysis to identify XRP offers and sales with contracts, its claim would still fail as a matter of

law. Not one of those contracts granted post-sale rights to recipients as against Ripple or imposed post-sale obligations on Ripple to act for the benefit of those recipients. *See*, *e.g.*, Ex. 23, SEC Answers to RFA Nos. 57-65 (admitting that XRP holders have no right to demand from Ripple, and Ripple has no obligation to give to XRP holders, any form of money, property or dividends, or any participation rights in Ripple's business); *S&S N.Y. Holdings*, 2012 WL 3084112, at *5 (interpreting contracts before determining whether *Howey* test applied).

There is no factual dispute on this issue. Although Ripple does not have the burden of proof, it has submitted an unrebutted expert analysis of more than 1,700 contracts under which Ripple sold, made purchases with, or otherwise transferred XRP from 2013 to 2020. *See generally* Ex. 40, A. Schwartz Rep. The 1,700 arm's-length contracts addressed a wide variety of different commercial contexts, varying substantially over the eight-year period at issue.[20] But it is undisputed that not one of the contracts "included an express provision that obligated Ripple to perform post-sale duties that could affect the value of XRP or return profits to any person." Ex. 40, A. Schwartz Rep. ¶ 11. Ripple's only obligation was to deliver the XRP. It promised no efforts to increase the price of XRP; promised no increase in XRP's price or value; and promised no share of any future profits. 56.1 ¶¶ 99, 101-105, 107-109, 112-114, 117-118 (Ex. 40, A. Schwartz Rep. ¶¶ 11, 29-30, 33, 35, 42). To the contrary, Ripple's contracts generally included express disclaimers establishing that no post-sale obligations existed. For example, Ripple's

---

[20] Ripple's contracts can be roughly divided into four types: (1) sales contracts, including wholesale sales contracts and direct sales contracts; (2) programmatic contracts, pursuant to which Ripple hired third-party market makers to sell XRP on its behalf over digital asset exchanges; (3) service contracts, pursuant to which Ripple paid companies or individuals in XRP to provide various services to Ripple; and (4) other, miscellaneous contracts, none involving post-sale obligations. 56.1 ¶¶ 98, 105, 110, 115 (Ex. 40, A. Schwartz Rep. ¶ 18). Examples of "other" contracts include Master Hosted Services Agreements, Loans and Promissory Notes, Custody Agreements, RippleWorks Contracts, Settlement Agreements, Xpring Contracts, and Joint Venture Contracts. 56.1 ¶ 115 (Ex. 40, A. Schwartz Rep. ¶¶ 18, 144-218).

contracts frequently provided that "[Ripple] has no obligation to redeem or exchange the Purchased XRP for monetary value, goods, services or any other item" and that "[Ripple] is not responsible for any use by [the purchaser] or any third party of the Purchased XRP." 56.1 ¶ 107 (Ex. 40, A. Schwartz Rep. ¶ 60). In addition, "all title to and risk of loss related to . . . XRP passe[d] to the customer," and buyers had no post-sale remedies against Ripple. 56.1 ¶ 107 (Ex. 40, A. Schwartz Rep. ¶ 14).[21]

The SEC seeks to strike Ripple's expert who collects and summarizes these contracts, but in discovery, Ripple asked the SEC – the party with the burden of proof – to identify any contractual provisions on which it would rely to show that Ripple's contracts were investment contracts. The SEC's response confirms that it cannot point to any provision requiring Ripple – directly or indirectly – to take post-sale actions to create profits for, share profits with, or return value to any XRP purchaser.

The only contractual provisions the SEC identified (which appear in only some of Ripple's contracts) were (i) "lock ups and other sales restrictions" that bind the buyer in certain of Ripple's contracts with wholesale purchasers, and (ii) discounts in some of Ripple's wholesale contracts and contracts with digital asset platforms. Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 11, 13, 19-20, 22. Neither category saves the SEC's case. "Lock ups and other sales restrictions" are obligations undertaken by XRP purchasers, not by Ripple, and Ripple made no commitment to any third party to obtain lock-ups for their benefit. Discounts are insufficient as a matter of law to create an investment contract: pre-1933 blue sky cases made clear that the right to purchase an asset at a discount does not create an investment contract

___

[21] Some of Ripple's contracts provide that a buyer may obtain a refund from Ripple as a remedy, but only if the sale does not occur. 56.1 ¶ 116 (Ex. 40, A. Schwartz Rep. ¶ 14). This refund provision is not a post-sale obligation because it takes effect only when there is no sale.

in the absence of any post-sale obligations.  *See Lewis*, 248 S.W. at 1049 (contractual right to

buy groceries at discounted price was not an investment contract without post-sales obligations);

*Enz Bros.*, 187 N.W. at 667 (same); *Art Appraisers of Am., Ltd.*, 1976 WL 12424, at *4 (SEC

Oct. 4, 1976) (discounted sales of lithographs were not sales of investment contracts where

gallery did not contractually obligate itself to provide a resale market).

### 3.  Ripple's Contracts for the Sale of XRP Gave XRP Recipients No Right to Any Share of Ripple's Profits

Also absent from Ripple's contracts is any right of XRP holders to demand or receive a

share of Ripple's profits or to make any demand on Ripple.  That absence is independently fatal

to the SEC's claims.  It is undisputed that nothing in Ripple's contracts requires Ripple to pay (or

allows a holder to demand) any share of Ripple's revenue, profits, dividends, or "any other

payments or consideration from Ripple."  Ex. 23, SEC Answer to RFA No. 60; *see also id.* Nos.

57-59, 62; Ex. 26, SEC Answer to RFA No. 133 (admitting that "no holder of XRP, based solely

on their status as a holder of XRP, has the right to receive any dividends from Ripple"); *see Enz

Bros.*, 187 N.W. at 667 (finding the lack of an investment contract "clear" because "[i]n the

contract in question there is no obligation to pay money" to the investor and the investor

"acquired no rights either in the capital or profits of the company").  Rather than impose any

obligation upon Ripple to distribute profits from its business, Ripple's contracts regularly include

acknowledgements that "the Purchased XRP do *not* represent a right to make any demand on

[Ripple]."  56.1 ¶ 107 (Ex. 40, A. Schwartz Rep. ¶¶ 60, 129) (emphasis added).

The SEC suggests that merely holding XRP is a right to participate in the profits of

Ripple's enterprise because those profits are supposedly reflected in the price of XRP itself.  But

the SEC admits that the price of XRP can go up when Ripple is unprofitable and can go down

when Ripple turns a profit.  Ex. 23, SEC Answers to RFA Nos. 32, 34.  Those admissions defeat

any argument that XRP is a channel for the distribution of Ripple's profits. At bottom, the SEC's position is that the price of XRP held by Ripple is the same as the price of XRP held by others. That is true for any fungible asset or commodity, whether currencies or gold or oil or soybeans. The holders of those assets all benefit if the value increases. But they have no right to share in one another's profits, including the profits of the seller from whom those assets were acquired. Such a right to share – not merely holding an identically priced asset – is a necessary element of an investment contract. The SEC itself has repeatedly recognized that requirement in giving industry guidance through no-action letters. *See supra* p. 27 & n.16.

### C.    The SEC's Reliance on Initial Coin Offering Cases Is Misplaced

The SEC may try to rely on three decisions from this District concerning digital tokens: *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019); *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020); and *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020). None of these cases helps the SEC; each involved materially different facts.

In *Balestra* (a motion to dismiss decision), the promoters sold ATB Coins through an initial coin offering in order to raise funds "to enable [them] to create and launch a new blockchain." 380 F. Supp. 3d at 347. In *Telegram* (a preliminary injunction decision), what was at issue were agreements to sell Gram tokens in the future after the blockchain was developed. The agreements at issue were admitted by their promoters to be securities. *See* 448 F. Supp. 3d at 367 ("Telegram concedes that the initial Purchasers' 'interest in Grams' are a security"). In *Kik*, the promoters sold rights, through written agreements known as SAFTs ("Simple Agreements for Future Tokens"), to receive digital tokens, the functionality for which did not yet exist. These too were admitted by their promoters to be securities. *See* 492 F. Supp. 3d at 174 ("Pursuant to the SAFT, purchasers acknowledged that their right to acquire Kin was a security"). What the *Kik* and *Telegram* courts rejected were attempts by the defendants in those

cases to argue that subsequent distributions of the tokens would no longer be integrated into the securities offerings.  Kik began its "public" sale the day after the private securities offering ended.  *Id*.  Telegram's securities offering was preliminarily enjoined before the tokens could even be distributed.  *See* 448 F. Supp. 3d at 358, 379-80.

*Balestra*, *Telegram*, and *Kik* thus each involved contractual rights and obligations that are absent here.  The money invested in each ATB Coin, Gram, or Kin went to the promoter; the promoter contractually undertook to use that money to build the blockchain and/or the functionality for the tokens; and the investor could receive value only after – and only if – the promoter built the blockchain and/or the functionality using those assets as promised.[22]

Here, the XRP Ledger and all units of XRP already existed before Ripple distributed XRP – indeed, before Ripple even received its own XRP.  56.1 ¶ 32 (D. Schwartz Decl. ¶ 8). The XRP Ledger was operational, and everyone who had or received XRP could use that XRP to operate the ledger or for other uses.  56.1 ¶ 19 (D. Schwartz Decl. ¶ 4).  Ripple might or might not receive money from a particular XRP recipient; in a number of XRP transactions, it did not. *See infra* pp. 36-38.  If it did, it might or might not use that money on a project related to XRP or the XRP Ledger.  But regardless of what Ripple chose to do, it is undisputed that XRP recipients had no contractual rights against Ripple and no claim on Ripple's profits simply by virtue of having purchased or received XRP.  Ripple could have distributed any money it obtained

---

[22] The opinions in *Telegram* and *Kik* each discuss specific written instruments under which the promoters sold Grams and Kins.  *See Telegram*, 448 F. Supp. 3d at 361-62, 372, 377 (discussing the terms of the "Gram Purchase Agreements"); *Kik*, 492 F. Supp. 3d at 174-75 (discussing the "Simple Agreements for Future Tokens" and "Private Placement Memorandum" given to one group of purchasers); *id.* at 175-76 (discussing the "Terms of Use Agreement" given to another group).  *Balestra*, which was decided on a motion to dismiss, did not discuss specific instruments but found that "the Complaint satisfactorily plead[ed] . . . [a] promise to launch and improve the ATB Blockchain."  380 F. Supp. 3d at 355-56.  The SEC fails to tie any specific offers and sales of XRP to any analogous instruments here.

through sales of XRP to its shareholders, or thrown a holiday party for its employees, or donated it to charity. No XRP purchaser would have had any recourse. *Balestra*, *Telegram*, and *Kik* are all critically different. To the extent these cases could be read to suggest that all cryptocurrencies are securities even if they are sold pursuant to contracts that impose no post-transaction obligations on the seller to take action for the benefit of the purchasers and give no right to those purchasers to demand and receive any future profits from the seller, they are inconsistent with the language of the statute and with the holdings of *Howey* and its progeny.

## II. DEFENDANTS' XRP TRANSACTIONS WERE NOT OFFERS AND SALES OF INVESTMENT CONTRACTS UNDER THE *HOWEY* TEST

The SEC contends that the absence of the "essential ingredients" is unimportant and that the *Howey* test can be satisfied without any contract, any rights granted to the purchaser, or any obligations on the seller. That is not the law, as *Howey* itself makes clear. But even accepting the SEC's (incorrect) reading that you can have an "investment contract" without any contract, the SEC still lacks evidence from which a reasonable finder of fact could conclude that an XRP purchaser (a) invests money, (b) in a "common enterprise," and (c) is "led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99.

### A. In Many Instances, There Has Been No "Investment of Money"

In many cases, the recipients of XRP from Defendants did not exchange money, or any other financial consideration, in return for XRP. For example, Ripple has given away more than 2 billion XRP to charities and grant recipients, and Larsen has given away more than 2 billion to charity as well. *See supra* pp. 10, 12; 56.1 ¶ 93 (Long Decl. ¶ 9). Ripple also gave away more than 500 million XRP to early adopters and developers, and the SEC has admitted that these recipients "did not pay money or property to Ripple" in exchange for the XRP they received. 56.1 ¶ 92 (quoting Ex. 23, SEC Answer to RFA No. 56; Long Decl. ¶ 8). Accordingly, there was

no "investment of money," *Howey*, 328 U.S. at 301, for these transactions, and thus no offer or sale of an investment contract.[23]

As to certain of Ripple's giveaways, such as its "Bounty Program" (where XRP was given to programmers who identified a bug in the code and proposed a fix) and xPring (where Ripple invested XRP in companies building new technologies), the SEC tries to avoid this conclusion by arguing that those recipients "provided services" to Ripple. *See* Ex. 23, SEC Answer to RFA No. 56 (Bounty Program); Am. Compl. ¶¶ 149-150 (xPring). Even if true, that does not make the giveaways "investment[s] of money" under *Howey*. In rejecting a similar argument in *Teamsters v. Daniel*, the Supreme Court explained that "[i]n every case [finding an investment contract] the purchaser gave up some tangible and definable consideration." 439 U.S. at 560. The SEC has made no such showing for the Bounty Program and has the relationship exactly backwards for xPring, in which *Ripple* invested money or provided grants (sometimes in U.S. dollars and sometimes in the form of XRP) in new companies that were developing use cases leveraging the XRP Ledger. Those fledgling companies were not investing money or anything else in Ripple; Ripple was investing in them.

The absence of any investment of money for this significant portion of Ripple's distributions not only is fatal to the SEC's claims for those particular transactions, but also points to a deeper problem in the SEC's case. XRP is fungible; each unit of XRP is identical to and indistinguishable from all other units. 56.1 ¶ 15 (Ex. 8, Larsen Tr. 233:7-12). The recipient of a charitable donation, giveaway, or xPring grant holds XRP that is indistinguishable from any

---

[23] Defendants do not concede and expressly reject the SEC's position that any exchange of money for an asset is enough to prove *Howey*'s first prong – an "investment of money." As explained throughout this brief, *Howey* requires much more, because there is a difference between a "payment" and an "investment." That said, this subsection discusses the undisputed facts where there has been no exchange of money at all.

other XRP:  it is worth the same, can be used for all the same purposes, and creates the exact same claim on Ripple (that is, none) as XRP exchanged for money.  Further, a charitable, giveaway, or xPring recipient can transfer their XRP (in exchange for units of another currency, goods, or services) to another holder, who will not even necessarily know the source of the XRP they received.  The SEC can proffer no theory under which XRP given away without an "investment of money" satisfies the first prong of the *Howey* test.

**B.**     **The SEC Cannot Prove Any Common Enterprise**

       **1.**     **A Common Enterprise Is a Profit-Seeking Business Managed, Controlled, and Operated by Promoters for the Benefit of Investors**

*Howey*'s "common enterprise" element requires the SEC to prove that Defendants offered recipients of XRP the economic equivalent of stock in a business enterprise.  Stated another way, the "common enterprise" element requires the SEC to prove that the holder of the alleged investment contract obtained a participatory interest in the future economic performance of a business enterprise.  *See* 328 U.S. at 300 (land sales contracts and warranty deeds were stand-ins for common stock in "determining the investors' allocable shares of the profits").  In *Howey*, "all the elements of a profit-seeking business venture [we]re present" – "[t]he investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise." *Id.*[24]  No oranges were sold to the investors, only "an interest in a large citrus-growing enterprise."  SEC *Howey* Br. at 24.

_____

[24] *See also Ass'n of Am. R.Rs. v. United States*, 603 F.2d 953, 971-72 (D.C. Cir. 1979) (once " 'an investment of money in a common enterprise with profits to come solely from the efforts of others' . . . is shown," "the 'evidence of interest in or indebtedness of the [holder]' would be substantially similar to the stocks and bonds expressly mentioned in [the Interstate Commerce Act] and would thereby harmonize with the doctrine of *ejusdem generis*") (citations omitted); *Rodriguez*, 990 F.2d at 10 ("the substance of an investment contract [must be] a security-like interest in a 'common enterprise' ").

The Second Circuit set out the governing legal framework for a "common enterprise" in *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994). There, the court held that sales of condominiums did not constitute a "common enterprise" under *Howey* – even where the condominiums were sold by a promoter to absentee owners and expressly marketed as an investment vehicle, with many using the same rental management company. *Id.* at 88. The court noted that a common enterprise can be established by a showing of "horizontal commonality," in which "the fortunes of each investor" are tied to the fortunes of other investors and "depend upon the profitability of the enterprise as a whole." *Id.* at 87. It held that, even though the condominiums were all in the same development, were offered by the same promoter, and used the same property manager, there was no common enterprise because the owners did not hold interests within an undivided pool; instead, each "owned individual units, and could make profits or sustain losses independent of the fortunes of other purchasers." *Id.* at 88.

The Second Circuit observed – without accepting – that "[s]ome circuits [have] h[e]ld that a common enterprise can also exist by virtue of 'vertical commonality,' which focuses on the relationship between the promoter and the body of investors." *Id.* at 87. These out-of-circuit courts have identified two kinds of vertical commonality: strict and broad. Strict vertical commonality requires that "the fortunes of investors be tied to the *fortunes* of the promoter." *Id.* at 88. For broad vertical commonality, the fortunes of the investors need to be linked only to "the *efforts* of the promoter." *Id.* at 87-88. The court found it unnecessary to decide whether strict vertical commonality can give rise to a common enterprise because the test was not met in that case, but it expressly rejected broad vertical commonality. *Id.* at 88. It held that the focus on "the efforts of the promoter" improperly collapses two separate questions under *Howey* – "whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others" – into a single inquiry: "whether the fortuity of the investments

39

collectively is essentially dependent upon promoter expertise." *Id.* As the Second Circuit explained: "We do not interpret the *Howey* test to be so easily satisfied." *Id.*

Accordingly, under existing Second Circuit law, the SEC must prove a common enterprise through horizontal commonality. If the SEC argues that the law should expand to recognize strict vertical commonality, this Court should reject that argument. In any event, *Revak* precludes the SEC from relying on a theory of broad vertical commonality based on Ripple's "efforts." Yet that is exactly what the SEC does in this case.

### 2. The SEC Cannot Identify a Common Enterprise Under Existing Second Circuit Law

#### a. The SEC's Common-Enterprise Theory Depends on Ripple's Efforts, Contrary to *Revak*'s Express Holding

The SEC's definition of "common enterprise" has shifted since it sued Defendants. In its Amended Complaint, the SEC first appeared to claim that Ripple itself was the common enterprise in which XRP holders had an interest. *See* Am. Compl. ¶ 290 ("Investors who purchased XRP in the Offering invested into a common enterprise with other XRP purchasers, as well as with Ripple."); *id.* ¶ 291; *id.* ¶ 293 ("Ripple pooled the funds it raised in the Offering and used them to fund its operations"). The SEC has since conceded that XRP holders have no right to share in Ripple's earnings and profits; rather, Ripple has issued shares to investors in its business who have rights to share in those earnings and profits. Ex. 23, SEC Answers to RFA Nos. 57-72, 90. That concession dooms any argument that Ripple is the common enterprise.

The SEC accordingly changed its theory mid-litigation. Answering an interrogatory asking it to "[i]dentify the enterprise(s) or venture(s), if any, in which you contend XRP holders acquired a stake in by virtue of their purchase of XRP from Defendants," the SEC stated:

> [T]he Commission responds that it contends that XRP holders were invested in Ripple's *efforts* to create a use for and demand for XRP. XRP holders hoped to profit from a potential increase in the value of XRP based on Ripple's *efforts* to

40

create a use for XRP and develop the XRP "ecosystem," potentially increasing demand for the token.

Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 41 (emphases added).[25] It has never precisely defined that "ecosystem"; but, under any formulation, the SEC's theory fails under Second Circuit precedent for at least two reasons.

*First*, the SEC identifies the alleged enterprise only by reference to "Ripple's efforts to create a use for XRP and develop the XRP 'ecosystem.'" The SEC thus uses exactly the test for common enterprise that the Second Circuit rejected in *Revak*: a "mere showing that the fortunes of investors are tied to the efforts of the promoter." 18 F.3d at 88. That error is fatal to the SEC's argument for a "common enterprise," and hence to the SEC's entire case.

*Second*, a universal characteristic of a "common enterprise" is that the "investor" invests in a "profit-seeking business venture" that the promoter can "manage, control and operate." *Howey*, 328 U.S. at 300. The "XRP ecosystem" is no such venture. It includes the open-source XRP Ledger (*i.e.*, publicly available computer code), independent developers, exchanges, and myriad holders and users of XRP. That is not a profit-seeking business in whose profits an XRP holder holds any participatory interest – and certainly not one under Defendants' control.

One of the SEC's own proffered experts defines the XRP "ecosystem" as "all the software, people, and organizations who are involved with a blockchain project, such as retail investors, institutional investors, miners, software developers, software products, companies, merchants, trading platforms and market makers." Ex. 104, Expert Report of ██████████ (Oct. 4, 2021) ¶ 8 n.3. Defendants do not and cannot "manage, control and operate" all that software, all those people, and all those organizations in this amorphous "ecosystem," which

---

[25] As this interrogatory response makes clear, the SEC does not contend that XRP holders were invested in the Individual Defendants' efforts or hoped to profit based on those efforts.

involves millions of worldwide market participants independent of (and largely unknown to) Defendants, all pursuing their own independent goals. 56.1 ¶¶ 62, 89 (D. Schwartz Decl. ¶ 11; Long Decl. ¶ 11); *cf. Howey*, 328 U.S. at 299 (promoter owned and operated single "citrus fruit enterprise" and remitted net sales proceeds to the investors; nobody else had any involvement).

To take just a few examples, members of the XRP "ecosystem" in 2020 implemented changes to the XRP Ledger protocol over Ripple's objections, 56.1 ¶ 57 (D. Schwartz Decl. ¶ 10); scores of exchanges chose to list (and de-list) XRP with no involvement from Ripple, 56.1 ¶ 65 (Long Decl. ¶ 6); software engineers and businesses unconnected with Ripple created new uses for the XRP Ledger, 56.1 ¶ 59 (D. Schwartz Decl. ¶ 9); charities such as the American Red Cross accepted donations of XRP, 56.1 ¶ 61 (Long Decl. ¶ 7); and countless individuals exchanged billions if not trillions of XRP in transactions that did not involve Defendants at all, 56.1 ¶¶ 65, 89 (Long Decl. ¶¶ 6, 11). That is not management, control, or operation of a common enterprise. What *Howey* requires is that the holder of the investment contract has a right to share in the profits and losses from a specific business enterprise managed and controlled by the entity that sold the investment contract: no such business exists in this case. The SEC has no evidence to show any genuine issue of disputed fact as to the existence of a common enterprise functioning as a business under Ripple's management and control.

Consider what the SEC might equally well label the "gold ecosystem." Many individuals and firms seek to profit from the purchase, sale, or use of gold. The "gold ecosystem" would thus consist of gold miners, refiners, metalworkers, wholesalers, jewelers, industrial manufacturers, commodity traders, investors, e-commerce platforms, jewelry collectors, and wearers. Plenty of participants in that "ecosystem" may well be for-profit businesses, from the miners who extract the gold to the jewelry stores selling rings to the gold futures traders and the speculators in the gold spot market. But the "ecosystem" as a whole is not a business venture.

Buying a gold ring (or a gold bar or a gold futures contract) does not put the purchaser into a "common enterprise" with any other jewelry owners, with anyone who invests in gold as a hedge against inflation, with any electronics company that maintains an inventory of gold to use in microchips, or with any other participant in the gold market "ecosystem" – and certainly not with all of them at once. Some may profit or lose money (in varying degrees depending on when and how they buy and sell) from price swings, some may profit from price declines (depending on their trading and hedging positions), and some may simply wear the gold they bought or use it in other products. The only thing they have in common is that they face the same market price for gold. That is precisely the same relationship that holders of XRP have in the supposed "XRP ecosystem" articulated by the SEC – and precisely the same relationship that *Revak*'s condominium purchasers had with the promoter, in facing the same real-estate market but having the ability to decide individually whether and when to sell or rent their own units. That relationship does not – and cannot – satisfy *Howey*'s "common enterprise" requirement.

The SEC may argue that, "[b]ecause XRP is fungible, the fortunes of XRP purchasers were and are tied to one another, and each depend on the success of Ripple's XRP Strategy." Am. Compl. ¶ 291. Again, this is an improper attempt to equate a common enterprise with "the efforts of the promoter," which *Revak* forbids. *Revak*, 18 F.3d at 88. That XRP is fungible does not mean that XRP holders depend upon one another to earn profits; it means that those who own XRP as an investment have a common interest in XRP's price when they decide to sell (or hedge or arbitrage) their own assets. As set out above, it could just as well be said that all owners of gold share a common interest in the price of gold; or that all owners of soybeans or of pigs share a common interest in the price of soy or pork. Those owners are still not engaged in a common enterprise because they do not depend upon one another to earn profits on sales. Common interest is no substitute for common enterprise and does not satisfy the SEC's burden under

43

*Howey*. *Cf. Belmont Reid*, 794 F.2d at 1391 (sale of fungible gold coins was not an investment contract); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (per curiam) (silver bars); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) (sugar futures).

### b.     The SEC Cannot Establish Horizontal Commonality

The SEC's failure to identify a cognizable common enterprise is confirmed by its inability to show "horizontal commonality" – the only common-enterprise test the Second Circuit has adopted. "Horizontal commonality" is "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87. "'[H]orizontal commonality requires a sharing or pooling of funds.'" *Id.* (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir. 1984)). A "pooling of profits" also is "essential to horizontal commonality." *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994).

"Pooling" requires combining investors' funds into an undifferentiated mass in which the investors maintain determinable participatory financial interests and from which the promoter conducts the operations of a common enterprise (*e.g.*, digging an oil well or planting and harvesting orange trees) and distributes profits to investors. *See Howey*, 328 U.S. at 300 ("The investors provide the capital *and* share in the earnings and profits; the promoters manage, control and operate the enterprise.") (emphasis added); *cf. Revak*, 18 F.3d at 88 (holding that condominium owners using same rental agency had not pooled their funds because "rents and expenses attributable to each unit were not shared" among all owners); *Rodriguez*, 990 F.2d at 11-12 ("what was purchased in this case was not a share of a business enterprise"; "there is no preten[s]e of a 'common enterprise' managed by the promoter and hence 'no security'"); *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) (horizontal commonality

requires investors to "give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise").

As noted above, it is undisputed that XRP holders have no participatory interest in any common pool of assets. They are entitled to the proceeds of their own XRP when they sell it and no one else's. Proceeds of XRP sales are not deposited in a single pool. Sales by Larsen and Garlinghouse are not combined with the proceeds of Ripple's sales, in a pool or in any other way. Nor are the billions of other XRP sold by parties with no relationship with Ripple, including McCaleb or third-party sellers on exchanges. Nor are XRP holders (unlike Ripple's stockholders) entitled, by owning XRP, to receive profits or dividends or anything else from Ripple or any other common pool. 56.1 ¶¶ 117-118; Ex. 23, SEC Answers to RFA Nos. 57-72, 90. They own only a simple asset: XRP.

The SEC has alleged that Ripple deposited the funds it obtained from its own sales of XRP into specific bank accounts it owned and thus, according to the SEC, "pooled" those funds. 56.1 ¶ 127; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 44.[26] But that interpretation of "pooling" – a single seller putting its own proceeds in its own bank account, regardless of what other sellers may do – has no basis in *Howey* and its progeny. What matters under *Howey* is whether a single pool of money is formed and used to conduct a common enterprise, the profits of which are then distributed to investors based on their shares in that enterprise.[27] The investment contracts are a proxy for shares in the pooled funds, and those

---

[26] The SEC also inexplicably claims that the proceeds of XRP sold by the Individual Defendants are part of the common enterprise required under *Howey*, but does not allege that the proceeds from their individual sales were ever deposited into Ripple's corporate bank accounts or otherwise pooled. 56.1 ¶ 127. Nor could it do so.

[27] In *Texas Arizona Mining Co.*, 1972 WL 9415 (SEC Feb. 18, 1972), for example, the SEC stated it would take no action against sales of negotiable contracts redeemable for an amount of silver on a date certain, to be guaranteed by a financial institution and sold in

shares replace any individualized interests the investors have in the assets.  In *Howey*, the orange collective itself was managed by the Howey Corporation, and income received from the ultimate orange sales (after netting expenses) was divided and distributed by the Howey Corporation to its contractual counterparties; investors had no ownership interest in any specific oranges. Likewise, in *VALIC*, variable annuity contracts gave investors a right to a "*pro rata* share" of returns from a "portfolio of equity interests."  359 U.S. at 71; *see also Tcherepnin*, 389 U.S. at 337 ("withdrawable capital shares" gave a right to "dividends . . . based on [an] association's profits"); *Joiner*, 320 U.S. at 349 ("payments were timed and contingent upon completion of [the oil] well").

Where funds are not placed into a collective pool and where investors retain no participatory interests – such as when a single rental company services multiple owners – there is no pooling.  *See Revak*, 18 F.3d at 88 ("[t]he rents and expenses attributable to each unit were not shared or pooled in any manner"); *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 283 (6th Cir. 1989) (affirming summary judgment where "purchase/management arrangement was not demonstrated by plaintiffs to rise to the level of a contribution or pooling of venture capital by a number of investors for a common and joint enterprise"); *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 278 (7th Cir. 1972) (separate agreements to trade commodities futures involved no "pool of capital to be used in furthering a common enterprise").

It is undisputed that XRP holders have no future interest in any Ripple property – whether funds in a bank, revenues, dividends, or anything else that would remotely resemble a security.  The money allegedly "pooled" in Ripple's bank accounts was exchanged for an asset – XRP – and thereafter the money received by Ripple was Ripple's exclusive property to be

---

expectation of a rise in the price of silver, even where proceeds from the sale were credited to books of the seller as unearned income and deposited into the seller's general budget.

deployed however Ripple chose, with any profit (and all other rights) inuring to the sole benefit of Ripple and its equity shareholders. Ripple was not under any obligation to use the proceeds from its own sales to advance the fortunes of "the XRP ecosystem," whatever that might mean.

The District Court's decisions in *Kik* and *Telegram* are not to the contrary. As noted above, *supra* pp. 34-36, in *Kik*, the Private Placement Memorandum promised "that money [investors] paid would be used to create a 'Minimum Viable Product,' advance the development of a 'Kin Ecosystem,' and build an application to make the Kin Ecosystem available via Kik Messenger." 492 F. Supp. 3d at 175, 178. Similarly, in *Telegram*, all proceeds from its security sales were placed in a single pool controlled by Telegram, and "[t]he ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain." *Telegram*, 448 F. Supp. 3d at 369. Thus, *Kik* and *Telegram* are cases in which the business venture pooled the investments (whether to drill an oil well, plant orange groves, or launch new blockchains) in order to create profits in which participants shared a participatory interest. *See Joiner*, 320 U.S. at 349 ("[w]ithout the drilling of the well, no one's leases had any value"). No such pooling occurred here; the XRP Ledger was operational before a single unit of XRP was ever sold. 56.1 ¶¶ 19-20 (D. Schwartz Decl. ¶¶ 4, 6).

### c. The SEC Cannot Establish Strict Vertical Commonality

As noted above, the Second Circuit has rejected broad vertical commonality. It has not yet decided whether a common enterprise can be shown through "strict vertical commonality," which requires a "'one-to-one relationship between the investor'" and the promoter such that there is "'an interdependence of *both profits and losses* of the investment.'" *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (quoting *Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987)) (collecting cases) (emphasis in *Kaplan*). Most circuit courts that have

considered strict vertical commonality have rejected it or expressed doubts.[28]  That is because

the theory "is inconsistent with *Howey*," *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

622 F.2d 216, 224 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982), and is inconsistent with the

interpretation of the term "investment contract" in the Securities Act as requiring an investment

in a common enterprise, *see Wals*, 24 F.3d 1018 (where only vertical commonality is present,

"[t]he nature of [the purchaser's] interest . . . is different from that of a shareholder in a

corporation").  This Court should follow the persuasive reasoning of *Curran* and *Wals* and

decline to find strict vertical commonality sufficient to prove a common enterprise.

    Even if strict vertical commonality could satisfy *Howey*'s common-enterprise prong, the

SEC cannot establish it here.  Strict vertical commonality is lacking where the alleged promoter

can profit even when the investor suffers a loss – for example, a broker may profit from

commissions even as her clients incur losses on their investments.  *See*, *e.g.*, *Kaplan*, 655

F. Supp. at 341 (collecting cases).[29]  Here, it is undisputed that XRP holders can experience

---

[28] The Sixth and Seventh Circuits require horizontal commonality and expressly reject vertical commonality.  *See Deckebach*, 867 F.2d at 282; *Wals*, 24 F.3d at 1018.  The First, Second, Third, Fourth, and D.C. Circuits have adopted horizontal commonality, but left open whether vertical commonality suffices.  *See SEC v. SG Ltd.*, 265 F.3d 42, 50 & n.2 (1st Cir. 2001) (collecting cases and expressing doubt about vertical commonality); *Revak*, 18 F.3d at 88; *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 187-88 (3d Cir. 2000); *Teague v. Bakker*, 35 F.3d 978, 986 n.8 (4th Cir. 1994); *SEC v. Life Partners, Inc.*, 87 F.3d 536, 543 (D.C. Cir. 1996).  The Ninth Circuit recognizes vertical commonality only in its strict form.  *See Hocking*, 885 F.2d at 1459.  And the Fifth and Eleventh Circuits accept broad vertical commonality, *see In re Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 536 (5th Cir. 2019); *Eberhardt v. Waters*, 901 F.2d 1578, 1581 (11th Cir. 1990), which the Second Circuit rejected in *Revak*.

[29] *See also Gugick v. Melville Cap., LLC*, 2014 WL 349526, at *4-5 (S.D.N.Y. Jan. 31, 2014) (strict vertical commonality lacking "[b]ecause Melville was entitled to a commission under the November 3, 2008 letter regardless of whether Plaintiff made a profit from the sale of the Policy"); *Cahill v. Contemp. Persps., Inc*., 1986 WL 4696, at *3 (S.D.N.Y. Apr. 15, 1986) (strict vertical commonality lacking where plaintiff and promoter would "split the profits from the books . . . only until such time as [a] non-recourse mortgage on the books is paid off," after which promoter would receive no royalties); *Mechigian v. Art Cap. Corp.*, 612 F. Supp. 1421, 1427-28 (S.D.N.Y. 1985) (strict vertical commonality lacking because plaintiff did "not contend

losses on their XRP holdings even when Ripple has positive income, and Ripple's equity can increase in value even as XRP decreases in price. 56.1 ¶¶ 119, 122; Ex. 23, SEC Answers to RFA Nos. 32-33. The opposite is also true: Ripple can experience losses or decreases in equity while XRP increases in price and XRP holders experience profits. 56.1 ¶¶ 120-121; Ex. 23, SEC Answers to RFA Nos. 31, 34. It is further undisputed that Ripple's business can succeed if its products and services achieve commercial success, even if the price of XRP falls. 56.1 ¶¶ 119, 122; Ex. 23, SEC Answers to RFA Nos. 32-33.

The same point applies with even more force to the "XRP ecosystem" proposed by the SEC. The "XRP ecosystem" is not a business enterprise at all; nobody owns the "ecosystem" and there is no realistic way to value it. It is absurd to talk about the "fortunes" of the "XRP ecosystem" as a whole. The individual participants in the "ecosystem," such as exchanges, software developers, market makers, and others, can each make or lose money in that purported ecosystem whether or not XRP increases in value and whether or not Ripple experiences losses. Thus, the SEC cannot establish strict vertical commonality.

### C. The SEC Cannot Establish That XRP Holders Reasonably Expect Profits from Defendants' Efforts

Finally, the SEC cannot prove XRP holders were "led to expect profits solely from the efforts of" Defendants. *Howey*, 328 U.S. at 298-99. Two undisputed facts establish this point.

#### 1. No Buyer Can Reasonably Expect Profits Absent Any Contractual Obligation Requiring Defendants To Make Efforts

It is undisputed that Defendants have no contractual obligation to make efforts that would return a profit to XRP owners. *See supra* pp. 31-34. As a matter of common sense and as a matter of law, no purchaser can reasonably expect profits to come from the efforts of someone

---

that defendants' fortunes will fall with his; apparently, defendants could do no worse than maintain their position after the purchase").

who has no obligation to expend any efforts on their behalf.  *See*, *e.g.*, *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300-01 (9th Cir. 1979) (marketing materials promoting real estate as "a passive investment" that "would appreciate in value as a result of [the promoter's] development of common facilities" were insufficient to create an investment contract because it was "undisputed that the land sale contracts obligate [the promoter] to do no more than transfer title"); *accord Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 180-81 (N.D. Cal. 1975); *Rodriguez*, 990 F.2d at 11 ("[W]hat was purchased in this case was not a share of a business enterprise and so not a security.  Taking the evidence most favorably to the buyers, they were sold land in individual parcels with strong and repeated suggestions that the surrounding area would develop into a thriving residential community.  But apart from the promise of an existing lodge or a new country club, the evidence did not show that the promoter or any other obligated person or entity was promising the buyers to build or provide anything.").  This rule is independently fatal to the SEC's claims.  The SEC cannot point to any promise or other obligation requiring Defendants to take efforts to increase the price of XRP.  No buyer could reasonably expect to receive profits based on Defendants' efforts when they were not required to undertake any efforts in the first place.

### 2.   Profits Attributable to Market Forces Do Not Satisfy *Howey*'s "Efforts of Others" Prong

To the extent XRP owners have obtained profits, uncontested evidence shows that those profits result primarily from market forces of supply and demand, 56.1 ¶ 123 (Ex. 74, ███ Rep. ¶ 121 & Fig. 40; Ex. 11, Ferrell Rep. ¶¶ 90-106), which do not satisfy the "efforts of others" prong of *Howey* as a matter of law.  "[I]f the realization of profits depends significantly on the post-investment operation of market forces," this does "not satisfy *Howey*'s third prong."  *SEC v.*

*Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005).[30]  This remains true even if the

promoter can modestly affect returns; if returns are driven *mostly* by market forces, the plaintiff

cannot satisfy the "efforts of others" prong.  *See Grenader v. Spitz*, 537 F.2d 612, 619 (2d Cir.

1976) ("While efficient management of the cooperative will enhance its desirability as a place of

residence, it is hardly a factor which would result in the appreciation in value of the shares of a

Corporation operating a Building nearly fifty years old.  Realistically, that will depend upon the

general housing market, the status of the neighborhood and the availability of credit."); *cf.*

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d

159, 164 (S.D.N.Y. 2001) (no investment contract where "any gain likely would result in large

part from market movements, not from capital appreciation due to Lehman's efforts").

 *Belmont Reid* illustrates this principle.  There, the alleged promoter sold gold coins

---

[30] *See also*, *e.g.*, *Harman v. Harper*, 1990 WL 121073, at *5 (9th Cir. Aug. 21, 1990)
(judgment noted at 914 F.2d 262 (table)) ("The success of the investment was in no way
dependent upon [the promoter's] entrepreneurial or managerial efforts. . . . [The investor]
expected to profit only from appreciation in the value of the Arlington Lane and Santa Rosa
Drive properties."); *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 466 (7th Cir. 2014)
("It's not as if the plaintiff had been induced to buy the condos because of the potential income
from the common elements . . . .  She bought them as speculative real estate investments, hoping
also to earn some rental income from them, which is different from sharing returns common to
all the hotel condominium owners."); *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497,
501 (S.D.N.Y. 1986) ("[P]laintiffs allege that Continental influenced the value of the
condominium units through its marketing efforts and its own buying and selling strategies.  But
these efforts by Continental would have at most only a marginal effect on the value of the
condominium units. . . .  [T]he value of the units '[r]ealistically . . . will depend upon the general
housing market, the status of the neighborhood and the availability of credit.'") (citation omitted;
first two alterations added); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 1283, 1292-93
(S.D. Fla. 2007) ("[W]here the purchaser of a condominium expresses the intention of reselling
at a higher price, federal securities law is not implicated.  Rather, such a purchaser is drawn in by
an expectation of appreciation in value rather than an expectation of profits solely from the
efforts of a promoter or a third party.") (citation and internal quotation marks omitted); *Iman v.
Hall*, 2009 WL 960474, at *4 (W.D. Va. Apr. 7, 2009) (condominium purchases were not
investment contracts where plaintiffs were simply drawn in by an expectation of appreciation in
value that depended not on the efforts of the developer, "but on the vagaries of the real estate
market at the time Plaintiffs attempted to resell their condominiums").

through a prepayment system; purchasers would profit more if the market price of gold increased after their prepayments. 794 F.2d at 1391. The Ninth Circuit held that this did not satisfy the third *Howey* prong because "the purchasers were speculating in the world gold market" rather than on the success of this particular coin-minting operation. *Id.*; *see also Noa*, 638 F.2d at 79 (no investment contract where, "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of" the alleged promoter); *Sinva*, 253 F. Supp. at 367 (contracts to purchase sugar for future delivery were not "investment contracts" because the expected profits came from market fluctuations).[31]

Accordingly, when market forces dictate a purchaser's anticipated returns, the third *Howey* prong is not met. There may be an exception in cases in which the promoter backstops market forces by committing to repurchase the assets – as a buyer of last resort – if their market price falls. *See Glen-Arden*, 493 F.2d at 1032, 1035 (emphasizing promoter's offer to repurchase the Scotch should it prove impossible to find another buyer); *Gary Plastic*, 756 F.2d at 232, 233 (promoter committed to repurchase its "negotiable, insured, and liquid" CDs "at prevailing market rates"). It is undisputed that Defendants made no such guarantee. *See supra* pp. 30-34.

The role of market forces is fatal to the SEC's claims. Since at least 2018, the price of XRP correlates more closely with the prices of Bitcoin and Ether – that is, the cryptocurrency market as a whole – than with any action or statement of Ripple. The SEC's own expert admits

---

[31] *See also Procter & Gamble Co. v. Bankers Tr. Co.*, 925 F. Supp. 1270, 1278 (S.D. Ohio 1996) (finding certain interest rate swap transactions were not investment contracts in part because "the value of the swaps depended on market forces"); *Svets v. Osborne Precious Metals Co.*, 1992 WL 281413, at *2 (N.D. Cal. June 8, 1992) ("[O]nce the plaintiffs made their investment, their profits depended on the fluctuations of the market [for precious metals], not the managerial effort of defendants."); *People v. Fleishman*, 557 N.Y.S.2d 369, 370 (App. Div. 1990) ("Despite defendant's exaggeration of the potential value, and his offer to exchange for set periods of time, the intrinsic value of the prints would rise or fall of their own accord and not solely on the basis of defendant's promotion.").

this:  he concedes that since at least mid-2018, broader cryptocurrency trends explain more than 50% of XRP returns, and in the final two full calendar quarters before the SEC filed this action (Q2 and Q3 2020), returns for Bitcoin and Ether "can explain as much as almost 90% of XRP returns."  56.1 ¶ 123 (Ex. 74, █████ Rep. ¶ 121 & Fig. 40; Ex. 11, Ferrell Rep. ¶¶ 90-106 (variations in long-run XRP price return can be explained by exogenous cryptocurrency market factors)).[32]  Because there is no dispute that most (recently, nearly all) of the change in XRP's price comes from market forces, the SEC cannot carry its burden of showing that XRP purchasers reasonably expected to obtain profits "solely," *Howey*, 328 U.S. at 298-99, or even "primarily," *Aqua-Sonic*, 687 F.2d at 582, from Ripple's efforts since at least mid-2018.

The SEC cannot cure that flaw by arguing that Ripple owns a large amount of XRP and so has an incentive to increase its price.  Am. Compl. ¶¶ 282-289.  That alleged incentive does not give Ripple any ability or obligation to influence prices.  Nor does it distinguish other cases finding no investment contract where market forces control profitability.  For example, the gold company in *Belmont Reid* was also selling gold at market price, *see* 794 F.2d at 138, and would have made more money on those sales if gold prices had gone up; the developer in *Goldberg* owned other parts of the building, *see* 755 F.3d at 458-59, which would have been worth more if real-estate prices had gone up.  In neither case could a shared incentive for higher prices substitute for a reasonable expectation that the promoter would earn profits for the investor.  *See also Art Appraisers of Am.*, 1976 WL 12424, at *4 (no action against offers and sales of lithographs, including those purchased for "investment potential," where gallery did not promise "that the art will appreciate or retain its appraised value or even its original purchase price, nor

---

[32] Defendants have filed a *Daubert* motion to exclude ████'s testimony.  Whether his testimony is excluded or not, it does not change that variations in long-run XRP price return can be explained by exogenous cryptocurrency market factors; no expert offered an opinion contrary to Defendants' expert Allen Ferrell on that point.  56.1 ¶ 123 (Ex. 11, Ferrell Rep. ¶¶ 90-106).

w[ould] the Gallery contractually obligate itself to provide a resale market for the lithographs");

*supra* p. 45 n.27 (discussing *Texas Arizona Mining*).

### 3. Defendants' Public Statements Are Insufficient as a Matter of Law To Create Any Expectation of Profits

The SEC has attempted to overcome this gap in its case by pointing to "public statements

that Ripple and its executives [allegedly] made regarding Ripple's various XRP-related efforts to

increase XRP liquidity and increase XRP demand, which Ripple and its executives stated and

suggested would lead to an increase in XRP's value and price." Ex. 39, Pl.'s Suppl. Resps. &

Objs. to Ripple's Interrogs. at 9.[33]  The SEC further argues that terms in some of Ripple's

contracts "reinforced" these public statements and, therefore, Ripple's sales of XRP were

investment contracts (though it has failed to identify a single contract term that did any such

"reinforcing").  As a matter of law, the SEC's reliance on public statements cannot save its case.

Five reasons show why not.

*First*, the SEC still cannot identify any contractual or other binding obligation on or any

promise by Defendants.  *See supra* pp. 30-34.  No contractual terms could "reinforce" public

statements when no contract existed in the first place.  For those sales that did involve contracts,

---

[33] Specifically, the SEC claims that Ripple publicly reported "it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts," Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10; "its contracts with wholesale purchasers contained lock ups and other sales restrictions," *id.* at 11; "its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP," *id.* at 12, and "by partnering with digital asset trading platforms," *id.* at 13; and "its efforts to develop a use for XRP through its On-Demand Liquidity Product," *id.* at 14, and "its xPring initiative," *id.* at 15.  The SEC also cites Ripple's statements that, "according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP," *id.* at 10, and, in Q2 2020, that it "had begun purchasing XRP in the secondary market to ensure 'a healthy, orderly XRP market,'" *id.* at 12.  It contends that these statements, along with Ripple's "contracts with wholesale purchasers, digital asset trading platforms, and market makers[,] led XRP holders to believe that they would be able to sell XRP at a profit."  *Id.* at 14.

the SEC does not point to any contractual term that "reinforced" any of these public statements. Accordingly, there is no transaction-by-transaction analysis for the Court (or a jury) to conduct under Section 5 of the Securities Act because the SEC has failed to raise a factual dispute with respect to any transactions. *See supra* p. 30.

*Second*, Ripple's contracts often contained integration clauses and express disclaimers specifying that Ripple had no obligations beyond those in the contracts. 56.1 ¶¶ 99-104 (Ex. 40, A. Schwartz Rep. ¶ 33 & Ex. D). Those unambiguous provisions preclude the SEC from trying to fill the gaps in its case with extra-contractual representations. *See, e.g., Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir. 2011) (per curiam) (explaining that, even though the court "must consider 'the promises and inducements held out to investors . . . in determining whether or not a particular transaction is a security,' " an integration clause will exclude "oral representations" from qualifying as "promises [or] inducements") (citation omitted; ellipsis in original); *SEC v. Pac. W. Cap. Grp., Inc.*, 2015 WL 9694808, at *6 (C.D. Cal. June 16, 2015) (no investment contract because seller "expressly disclaimed that its investors' profits derived from its efforts or expertise," so investors could not expect seller to work on their behalf).[34]

*Third*, even if extra-contractual statements could be part of the contracts, none of the public statements to which the SEC points suffices to establish a reasonable expectation of profits. *See, e.g., Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (affirming summary judgment for land developer because extra-contractual representations about "shopping centers, health and cultural facilities, transportation facilities, and abundant recreational opportunity" did

---

[34] *See also Demarco v. LaPay*, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) ("[M]arketing and advertising hooks do not change the character of the transaction, nor are they generally representations upon which a purchaser can reasonably rely especially in the face of clear [contractual] language to the contrary."); *McCormick*, 267 Ill. App. at 103 (finding no investment contract notwithstanding "extraneous matters referred to in the advertisements" because no contractual terms incorporated any obligations from such materials).

not establish an investment contract where developer had "no contractual obligation to the plaintiffs other than to deliver title").[35]  In each case where the Second Circuit has found an investment contract, the alleged promoters promised profit-generating efforts either within or accompanying a contract.[36]  Neither kind of promise was made here.  *See* 56.1 ¶¶ 99, 101-105, 107-109, 112-114, 117-118 (Ex. 40, A. Schwartz Rep. ¶¶ 11, 29-30, 33, 35, 42).  All the SEC has pointed to are statements showing that Ripple had its own interest in the price of XRP, such that any efforts it made to increase the price of XRP would be for its own benefit.  But "[a]ny benefit to" XRP holders from such efforts "would be purely incidental."  *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975).[37]

---

[35] *See also*, *e.g.*, *Happy Inv. Grp.*, 396 F. Supp. at 181 (granting summary judgment where "literature and handouts" made "promises of [a] general nature" but "no actual commitments to perform specific services" after sale); *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 953 (N.D. Ill. 1978) (granting motion to dismiss where extra-contractual statements that "dr[ew] in [purchasers] by an expectation of appreciation in value" did not include any contractual "arrangement" requiring the seller to effect that increase in value), *aff'd*, 715 F.2d 1233 (7th Cir. 1983).

[36] *See Glen-Arden*, 493 F.2d at 1032-35 (defendants used their "expertise" to select "the type and quality of Scotch whisky" for purchase, promised investors that the whisky would "enhance in value day by day," and "represented that they would handle all the necessary arrangements for warehousing the Scotch and insuring it" and "would find buyers for the Scotch or buy it back themselves"); *Aqua-Sonic*, 687 F.2d at 578-79 (promoter was "responsible for all sales . . . for the benefit of th[e] licensee" and for "all significant marketing functions, such as finding customers, taking orders, collecting proceeds, and paying expenses and taxes"); *Gary Plastic*, 756 F.2d at 232, 233 (Merrill Lynch represented it would repurchase its "negotiable, insured, and liquid" CDs "at prevailing market rates" and committed to "monitoring" certificate "issuers" and providing "a written credit analysis on each"); *Leonard*, 529 F.3d at 85-86 (sales of "units" in companies to finance the production and distribution of motion pictures that would generate profits for unit holders); *see also Grenader*, 537 F.2d at 618 (no investment contract where "the proprietary lease and the by-laws [were] barren of any representation or intimation of anticipated profits").

[37] *See also Woodward*, 574 F.2d at 1025 ("Terracor was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met.  Unlike Howey, Terracor was not under any collateral management contract with the purchasers of its land."); *Rodriguez*, 990 F.2d at 11 (sales of undeveloped real estate were not investment contracts where "the evidence did not show that the promoter . . . was promising the buyers to build or provide anything"); *De Luz Ranchos*, 608 F.2d at 1301 (land sales contracts were not investment

*Fourth*, the SEC consistently fails to distinguish between public statements made *before* a sale or offer of XRP and those made *after* it. As a matter of law, the SEC cannot rely on post-sale representations to prove its case. A "transaction must be characterized at its inception, not as it develops, for registration of securities must occur before their sale." *Lavery v. Kearns*, 792 F. Supp. 847, 855 (D. Me. 1992) (citing *Joiner*, 320 U.S. at 352-53); *see Marine Bank*, 455 U.S. at 559 n.9 (rejecting argument "that the certificate of deposit [of a bank] was somehow transformed into a security when it was pledged, even though it was not a security when purchased"); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013) (plaintiff's claim that extra-contractual hotel guide and rental management agreement FAQs created an investment contract failed because, "[i]f Plaintiffs did not have these documents before they signed the Purchase Contracts, the representations in these documents are irrelevant in assessing whether a security was 'presented' to the Plaintiffs at that time").[38]

Here, the SEC relies on public statements from as late as August 3, 2020 (the Q2 2020 XRP Markets Report), and the vast majority of statements that the SEC cites were in 2017. 56.1 ¶ 126; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10-16. If statements from August 3, 2020 (or from 2017) were necessary to create a reasonable expectation of profits, then any offers and sales before August 3, 2020 (or before 2017) could not have been investment contracts. Billions of XRP were distributed prior to 2017, and substantially all of Ripple's total

---

contracts where there was "no reference in the contracts to an obligation on the part of [the promoter] to develop any land" or "promise to distribute profits"); *Happy Inv. Grp.*, 396 F. Supp. at 181 (no investment contract where, "although defendants may have created the illusion that the subdivision would develop primarily through their managerial efforts, in fact defendants offered to do and did nothing more than sell plaintiffs a parcel of land").

[38] *See also Hanneman*, 211 N.W. at 962-63 (no investment contract where contract imposed no specific obligations for resale or redevelopment of the lands, and a second agreement forming a corporation to manage the lands and issuance of shares and certificates was not reached until a year after purchase).

25 billion total outflow of XRP was distributed before August 2020.  56.1 ¶ 75 (Ex. 11, Ferrell Rep. ¶ 109 & Ex. 10).

*Fifth*, the SEC cannot (and does not attempt to) show that any purchaser actually encountered any of the public statements it cites.  The public statements on which the SEC relies were made in a variety of forums:  "among other places, in YouTube videos, Tweets, and posts on digital asset discussion fora," "by Ripple on its website," and in "in-person conversations between Ripple personnel and members of the public."  Ex. 103, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 10.  When courts look to extra-contractual statements, they look to "the economic inducements *held out to the prospect*" in the form of direct sales pitches.  *Glen-Arden*, 493 F.2d at 1034 (emphasis added); *see also Salameh*, 726 F.3d at 1131-32 (extra-contractual representations that were not made *to the purchasers* before the sale were "irrelevant"); *cf. Joiner*, 320 U.S. at 348 ("Had the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well it would have been a quite different proposition.").  Without evidence that many, some, or even any purchasers actually encountered the public statements upon which the SEC relies, the SEC cannot meet its burden of proof that such statements created an expectation of profits from the efforts of Ripple.

## III.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON OFFERS TO SELL AND SALES ON FOREIGN EXCHANGES

The U.S. securities laws do not apply extraterritorially, and the SEC must therefore prove that each offer to sell and sale of XRP for which it seeks liability is domestic.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); Mem. Op. at 17, *Williams v. Block.One*, No. 20-cv-2809, ECF No. 146 (S.D.N.Y. Aug. 15, 2022) (Kaplan, J.) ("a transaction by transaction

approach seems appropriate" in determining domesticity); *In re Petrobras Sec.*, 862 F.3d 250, 272-73 (2d Cir. 2017) (holding that *Morrison* inquiry is "individualized"); MTD Order at 20-23.[39]

The SEC cannot meet its burden. Rather than focusing on particular transactions, the SEC has relied on generalized allegations about Defendants' "years-long unregistered offering of securities," lasting from "at least 2013 through the present." Am. Compl. ¶¶ 1, 5. That abstract approach is not sufficient to defeat summary judgment. After nearly two years of fact and expert discovery, the SEC has failed to adduce evidence that the overwhelming majority of the specific offers to sell and sales of XRP by the Individual Defendants[40] were within the territorial scope of the U.S. securities laws. While it is not their burden, the Individual Defendants have shown through undisputed evidence the exact opposite: Around 95% of Garlinghouse's, and around 87% of Larsen's, proceeds from XRP transactions derived from sales on foreign cryptocurrency exchanges. *See SEC v. Revelation Cap. Mgmt., Ltd.*, 246 F. Supp. 3d 947, 954 (S.D.N.Y. 2017) (granting summary judgment when the SEC failed to meet its burden to provide evidence that defendants incurred irrevocable liability within the United States).

The Court has already held in connection with the Individual Defendants' motions to dismiss that, to determine whether a sale occurred domestically, the "transactional domesticity test" set out in *Morrison* and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66-70 (2d Cir. 2012), applies. The location of a sale is the place where irrevocable liability passes. *See* MTD Order at 23-25. As to offers to sell, the Court held that the proper test is

---

[39] *See also SEC v. Ahmed*, 308 F. Supp. 3d 628, 660 (D. Conn. 2018) (noting that "the SEC must prove" domesticity "as to each transaction at issue").

[40] This portion of the motion is made specifically as to the Individual Defendants' trades. Ripple believes that the SEC cannot prove on a transaction-by-transaction basis that most of Ripple's trades were domestic; it is not moving for summary judgment on this issue but reserves all rights.

whether a person or entity attempted to dispose of securities in the United States or solicited an offer to buy securities in the United States. *Id.* at 25-26. The Court rejected the SEC's reliance on a more expansive definition of offers that would encompass the "entire selling process." *Id.*

While the Court credited the SEC's allegations and the inferences that flowed from them at the motion-to-dismiss stage, as it was required to do, the actual evidence does not align with the SEC's allegations. The SEC strategically alleged, for instance, that the Individual Defendants' "offers and sales of XRP occurred on various digital asset trading platforms, including [at least four] incorporated in the United States," Am. Compl. ¶¶ 177, 186, omitting the fact that those four U.S.-based platforms accounted for a tiny fraction of the Individual Defendants' trades. Instead, as discovery has shown, the vast majority of the Individual Defendants' trades were executed through a foreign market maker on foreign cryptocurrency exchanges. This was known to the SEC when it pled its case, and is not surprising given that many of the most prominent cryptocurrency exchanges are based in and operate in countries like Singapore and the United Kingdom, whose securities regulators have provided their markets considerably more regulatory clarity than the SEC has provided to market participants here. The SEC has no regulatory authority over transactions that took place in other countries, and accordingly cannot exercise enforcement authority over the Individual Defendants' offers to sell and sales on foreign exchanges. *See Morrison*, 561 U.S. at 267 ("We know of no one who thought that the Act was intended to 'regulat[e]' *foreign* securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so.") (brackets in original); *id.* at 269 ("[W]e reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad[.]").

## A. Factual Background Regarding the Individual Defendants' Offers To Sell and Sales on Foreign Cryptocurrency Exchanges

### 1. Operation of Cryptocurrency Exchanges

The vast majority of the Individual Defendants' offers to sell and sales of XRP took place on cryptocurrency exchanges that are located overseas and bear "no significant indicia of being located in the United States." 56.1 ¶ 301 (Ex. 41, Yadav Rep. ¶ 106 & Tbl. A). Like traditional exchanges, such as commodities exchanges, cryptocurrency exchanges operate as centralized forums for market participants to transact pursuant to rules set by the exchange through its user agreements. 56.1 ¶ 149 (Ex. 41, Yadav Rep. ¶¶ 30, 59). They typically facilitate transactions only in assets that have been deposited in custodial accounts held by the exchange itself. 56.1 ¶ 156 (Ex. 41, Yadav Rep. ¶¶ 62, 67-68). Thus, users who wish to sell cryptocurrencies must upload their assets to accounts (or "wallets") on the exchange, and only those assets held in wallets on that cryptocurrency exchange can be bought or sold on the exchange. *Id.*[41] Sell or buy orders are processed by the exchange and matched automatically and instantaneously by the exchange's matching engines under its rules, resulting in a final trade. 56.1 ¶ 157 (Ex. 41, Yadav Rep. ¶ 69). For the most part, transactions on cryptocurrency exchanges are not recorded on a blockchain. Instead, they are recorded solely on the books and records of the relevant exchange, usually by moving assets into or out of a user's wallet. 56.1 ¶ 162 (Ex. 41, Yadav Rep. ¶ 67).

Offers to buy an asset at a particular volume and price are viewable and executable only on the exchange. 56.1 ¶ 163 (Ex. 41, Yadav Rep. ¶ 77). For an offer to sell to materialize on an exchange, the cryptocurrency generally must be pre-loaded in the seller's exchange account; to

---

[41] The SEC has made this same observation elsewhere. *See* Compl. ¶ 23, *SEC v. Wahi*, No. 2:22-cv-01009-TLF, ECF No. 1 (W.D. Wash. July 21, 2022) ("People can also own crypto assets by opening an account with . . . crypto asset trading platforms, . . . then transferring their crypto assets from their personal blockchain address to an address controlled by the trading platform.").

become "executable," it must "be published on the exchange's platform, or otherwise be entered into the exchange's systems." *Id*. Only then can orders be viewed by other users on the exchange, and sales take place. 56.1 ¶ 165 (Ex. 41, Yadav Rep. ¶ 82). Thus, offers to buy or sell cryptocurrencies on exchanges are made on the exchanges themselves, as if buyers and sellers were exchanging information and shaking hands there. 56.1 ¶ 168 (Ex. 41, Yadav Rep. ¶ 83).

### 2. Location of Relevant Cryptocurrency Exchanges and of Individual Defendants' Offers and Sales

The Individual Defendants offered to sell and sold XRP on more than two dozen foreign exchanges – Binance, Bitfinex, Bitforex, Bithumb, Bitlish, BitMart, AscendEX/Bitmax, Bitrue, Bitstamp, Coinbene, Coinone, HitBTC, Huobi, Korbit, OKEx, Upbit, ZB, and ZBG. 56.1 ¶ 171 (Exs. 81-82, Larsen and Garlinghouse trading summaries). Larsen also traded on Bitso, SnapSwap, GateHub Fifth, GateHub, Mr. Ripple, Rippex, RippleFox, RippleChina, RippleTradeJapan, and Tokyo JPY (collectively, the "Foreign Exchanges"). 56.1 ¶¶ 293, 295, 297 (Ex. 87, GSR00000443). The SEC has admitted that most of the Foreign Exchanges were not incorporated in, were not domiciled in, and did not have their principal places of business in the United States. 56.1 ¶¶ 174-266 (Ex. 83, SEC Answers to RFA Nos. 1049-1334).[42] For many, the SEC has also acknowledged that they are foreign by making requests about them to overseas regulators. 56.1 ¶¶ 176, 180, 187, 192, 195, 199, 203, 212, 232, 244, 263 (Exs. 84-86, 88-90, 92-96). The evidence demonstrates that these exchanges operate in accordance with the principles discussed above, and there is no evidence to suggest that transactions on the Foreign Exchanges became irrevocable (or, indeed, that any piece of the transactions happened at all) in the United

---

[42] The SEC asserted that (1) BitMart's principal place of business is in the United States; and (2) ZBG was incorporated or domiciled, and has its principal place of business, in the United States. Ex. 83, SEC Answers to RFA Nos. 1088, 1274, 1275, and 1277. But it has proffered no evidence to support bare assertions.

States.  There is also no evidence that trades on the Foreign Exchanges were made on any U.S. affiliate of these exchanges or otherwise bear any indicia of domesticity.  56.1 ¶ 301 (Ex. 41, Yadav Rep. ¶ 106 & Tbl. A).  Because exchange trading is an anonymized process, the Individual Defendants did not solicit specific purchasers on these exchanges, and they did not know the purchasers' identities.  56.1 ¶ 281 (Ex. 41, Yadav Rep. ¶ 77).  Purchasers likewise did not know they were purchasing the Individual Defendants' XRP.  *Id.*

The overwhelming majority of both Individual Defendants' offers to sell and sales on cryptocurrency exchanges were conducted by a foreign market maker called GSR.  56.1 ¶ 268 (Exs. 81-82, Larsen and Garlinghouse trading summaries).[43]  Larsen relied on GSR to conduct exchange-based trades beginning in 2014; Garlinghouse, in December 2017.  56.1 ¶¶ 269, 307 (Ex. 8, Larsen Tr. 84:23-85:4; Ex. 82, Garlinghouse trading summary).  In total, counting both sales through GSR and sales he made directly,[44] almost 95% of Garlinghouse's proceeds from sales of XRP derived from transactions on the Foreign Exchanges.  56.1 ¶ 310 (Ex. 82, Garlinghouse trading summary).  More than 87% of Larsen's proceeds from sales of XRP on exchanges derived from transactions on the Foreign Exchanges.  56.1 ¶ 301 (Ex. 81, Larsen trading summary).[45]

At all relevant times, GSR was incorporated in Hong Kong, Singapore, or Andorra.  56.1 ¶ 270 (Ex. 25, ▮ Tr. 274:7-276:22).  It was never incorporated in the United States.  And, while GSR has a U.S. affiliate, this affiliate was not involved in the services GSR provided to the

---

[43] GSR is the Market Maker referenced in the Amended Complaint.

[44] Garlinghouse first began selling XRP in April 2017.  56.1 ¶ 303 (Garlinghouse Decl. ¶ 3).  Between April and December 2017, virtually all of his trades were conducted on the Foreign Exchange Bitstamp.  56.1 ¶ 306 (Ex. 82, Garlinghouse Summary Exhibit, at n.1).

[45] Of course, the Individual Defendants did not receive any proceeds from offers to sell that did not lead to consummated sales.

Individual Defendants. 56.1 ¶ 271 (Ex. 25, ███ Tr. 276:25-277:19). None of GSR's U.S.-based personnel were traders, conducted trades for the Individual Defendants, or were otherwise involved in GSR's services provided to the Individual Defendants. 56.1 ¶ 272 (Ex. 25, ███ Tr. 277:20-278:5). The Individual Defendants' principal point of contact at GSR, ██████, was domiciled in Spain and conducted business from there. 56.1 ¶¶ 273-274 (Ex. 25, ███ Tr. 164:7-8, 278:8-19). The vast majority of GSR's sales occurred on foreign cryptocurrency exchanges, from accounts at those exchanges maintained by GSR in its own name. 56.1 ¶ 285 (Exs. 81-82, Larsen and Garlinghouse trading summaries; Ex. 25, ███ Tr. 289:14-21, 303:20-304:16).

The Individual Defendants' sales through GSR were executed on a consignment model. First, the Individual Defendants transferred XRP on-ledger to wallets held by GSR pursuant to contracts under which GSR took custody of the XRP. 56.1 ¶ 275 (Ex. 100, GSR00000681 (§ 2.5); Ex. 97, GSR00008433 (§§ 2.1-2.4, 3.3)). These transfers were not sales to GSR. 56.1 ¶ 275 (*id*.). Next, GSR exercised its discretion to determine where, when, and how to sell the XRP. 56.1 ¶ 276 (Ex. 25, ███ Tr. 292:13-21). The Individual Defendants relied on GSR's expertise and only occasionally provided instruction regarding sales targets or to pause or resume selling. 56.1 ¶ 277 (Ex. 8, Larsen Tr. 126:14-17, 106:10-16). Sales were made using algorithms (or "bots") that GSR developed and programmed, which decided how much to trade, when to trade, and the exchanges on which to trade. 56.1 ¶ 278 (Ex. 25, ███ Tr. 115:15-17, 290:16-291:1). Unless and until GSR sold the Individual Defendants' XRP on exchanges, the Individual Defendants could require that GSR return their XRP or that GSR stop the trading algorithm. 56.1 ¶ 284 (Ex. 25, ███ Tr. 291:22-293:8). Finally, once the sales occurred, GSR remitted the proceeds to the Individual Defendants and was paid through commissions on executed sales. 56.1 ¶¶ 286-287 (Ex. 100, GSR00000681; Ex. 99, GSR00000689).

**B.      The Individual Defendants' Sales and Offers To Sell on the Foreign Exchanges Are Outside the Territorial Scope of the U.S. Securities Laws**

**1.      Defendants' Sales on the Foreign Exchanges Occurred Outside the United States**

To prove that sales occur domestically, the SEC must show that "irrevocable liability" was incurred, or title was transferred, in the United States.  *See Absolute Activist*, 677 F.3d at 66-70; MTD Order at 23.  The SEC cannot make that showing with respect to the Individual Defendants' sales on the Foreign Exchanges.[46]  Discovery has established that these sales are foreign, and the SEC is therefore foreclosed from pursuing claims based on them.

There is no dispute that the Foreign Exchanges are foreign.  *See supra* pp. 62-63.  And there is no dispute that the Individual Defendants' sales of XRP on the Foreign Exchanges became irrevocable on the Foreign Exchanges.  Irrevocable liability attached the moment the Foreign Exchanges – acting under their own rules – matched an order from the seller (either the Individual Defendants or GSR) with a corresponding order from an anonymous buyer.  Sales were then recorded on the books and records of the Foreign Exchanges.  *See supra* pp. 61-62.

The conclusion that sales occurred at the physical location of the Foreign Exchanges is in harmony with law applying the principles of *Morrison* to the operation of exchanges.  As courts have explained, a "United States resident purchasing stock on a foreign exchange has figuratively traveled to that foreign exchange – presumably via a foreign broker – to complete the transaction."  *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 626 (S.D.N.Y. 2010) (internal quotation marks omitted); *see Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *1

---

[46] Defendants do not seek summary judgment as to the domesticity of trades on four exchanges:  Bittrex, Coinbase, Kraken, and Poloniex.  (Coinbase and Kraken are Platforms A and B referenced in the Amended Complaint.)  Trades on these platforms were less than 6% of Garlinghouse's sales and offers, and less than 13% of Larsen's.  56.1 ¶¶ 301, 310 (Exs. 81-82, Larsen and Garlinghouse trading summaries).

(C.D. Cal. July 16, 2010) (same). And as the Court has recognized, the Second Circuit has explicitly affirmed the principle that irrevocable liability is incurred at the geographic location of the exchange. *See* MTD Order at 23 (citing *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A*., 849 F. App'x 289, 293 n.2 (2d Cir. 2021)); *see also Absolute Activist*, 677 F.3d at 68; *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (parties incurred irrevocable liability "at the moment of matching" on the exchange because, according to the exchange's rules, the parties could not "unilaterally revoke acceptance following matching"). The *Banco Safra* court, citing to *Myun-Uk Choi*, explained that a transaction is domestic "when the two sides of the transaction are 'matched' – thus forming a binding contract – on an electronic exchange system within the United States." 849 F. App'x at 293 n.2. By natural extension, a transaction is foreign "when the two sides of the transaction are 'matched' – thus forming a binding contract – on an electronic exchange system" outside the United States. *Id.*[47]

Courts in this District have applied the same rule to sales on foreign cryptocurrency exchanges, finding that claims premised on those sales do not satisfy *Morrison*. *See, e.g.*, *Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (holding that plaintiffs' transactions on a foreign cryptocurrency exchange "cannot qualify as domestic" under *Absolute Activist*, as plaintiffs needed to allege more than they "bought tokens while located in the U.S."), *appeal pending*, No. 22-972 (2d Cir.); *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *1, *3 (S.D.N.Y. Feb. 22, 2021) (dismissing claim under *Morrison* where plaintiff purchased digital

---

[47] *See also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *26-27 (S.D.N.Y. Sept. 20, 2016) (finding that transactions in which "an American investor is essentially submitting buy or sell orders on foreign exchanges" do not "occur[ ]" in the United States and excluding "transactions conducted on foreign exchanges" from liability under the Commodity Exchange Act); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (allegation that a U.S. entity "placed a buy order in the United States that was then executed on a foreign exchange" did not establish irrevocable liability was incurred in the United States).

coins on cryptocurrency exchange located in Singapore); *see Williams v. Block.One*, at 21 (criticizing plaintiff for failing to "distinguish between domestic and foreign [cryptocurrency] exchanges, which is critical in view of *Morrison*").

In short, even if the buyer and seller are sitting at computers halfway across the world, for transactions on an exchange, courts consider the buyer and seller to have virtually traveled to the exchange, as if they are meeting and transacting there.[48] Here, that rule establishes that the Individual Defendants' sales on the Foreign Exchanges occurred outside the United States.

The SEC has attempted to avoid this conclusion by suggesting, without evidentiary support, that at least some of the Foreign Exchanges may have servers in the United States. But the location of servers is irrelevant to showing where a transaction became final. *See Anderson*, 2022 WL 976824, at *4 (under *Morrison*, plaintiffs needed to "allege more than stating that [they] bought tokens while located in the U.S. and that title passed in whole or in part over servers located in California that host Binance's website") (internal quotation marks omitted). If the SEC were correct that server location is relevant under the transactional domesticity test, the SEC could regulate sales on the London Stock Exchange upon a showing that it has one U.S. server.[49]

---

[48] The physical location, citizenship, or residency of the transacting parties is thus irrelevant. *See City of Pontiac*, 752 F.3d at 181 (allegation that a U.S. entity "placed a buy order in the United States that was then executed on a foreign exchange" did not establish irrevocable liability was incurred in the United States); *Petrobras*, 862 F.3d at 262 (the "location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction"); *Absolute Activist*, 677 F.3d at 69 ("[a] purchaser's citizenship or residency does not affect where a transaction occurs") (alteration in original); *Williams v. Block.One*, at 21-22 (holding that purchasers' physical location while trading a digital asset on an exchange "tells the Court little about the situs of those transactions for purposes of *Morrison*"); *see also* MTD Order at 23.

[49] Even if the location of servers were relevant, the SEC has suggested that only two of the Foreign Exchanges have servers in the United States. Ex. 105, ███ Rebuttal Rep. ¶ 132. And the SEC has adduced no evidence that any of Defendants' specific sales on these two Foreign Exchanges ever touched – let alone became irrevocable on – a U.S.-based server.

Nor can the SEC carry its burden by establishing that "the Individual Defendants executed offers and sales on a cryptocurrency trading platform through accounts based in the United States." The Court previously held that such allegations allowed it to "*infer* that their sales on that platform occurred in the United States" because "irrevocable liability *may* attach when digital assets enter and leave" Defendants' "accounts based in the United States." MTD Order at 27 (citing *Myun-Uk Choi*, 890 F.3d at 67) (emphases added). But at summary judgment, the SEC must point to evidence confirming where irrevocable liability was incurred – not just permissible inferences based on generic allegations. Simply moving assets into or out of a U.S.-based account is "insufficient to demonstrate a domestic transaction." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (explaining that use of accounts based in the United States is not the same as execution of sales in the United States, and a "direction to wire transfer money to the United States is insufficient"); *Banco Safra*, 849 F. App'x at 294 ("Nor does the direction to transfer money using New York bank accounts to purchase the bonds suffice to demonstrate a domestic transaction."). Here, the undisputed evidence shows that irrevocable liability passed not when XRP entered or left wallets in the United States, but rather when orders were matched on foreign cryptocurrency exchanges – which occurred abroad.[50]

### 2. Defendants' Offers To Sell XRP on the Foreign Exchanges Occurred Outside the United States

The Individual Defendants' offers to sell XRP on the Foreign Exchanges were foreign as well. The Court already found that the term "offer" should "not be given its most expansive meaning," MTD Order at 26, and rejected the SEC's argument that the definition of "offer"

---

[50] In *Myun-Uk Choi*, the court held that plausible allegations that irrevocable liability was incurred upon matching on a U.S.-based exchange were sufficient to survive a motion to dismiss. 890 F.3d at 66-67. The case provides no support for the proposition that irrevocable liability attaches when cryptocurrencies enter or leave accounts.

encompasses "the entire selling process," *id.* at 25; *see also Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990) ("Section 5 . . . applies to transactions; each sale must be registered or exempt. A violation does not stick to the instruments like tar."). What matters is whether the Individual Defendants attempted to offer to dispose of securities in the United States or solicited an offer to buy securities in the United States. *See* MTD Order at 25-26. With respect to their offers on the Foreign Exchanges, the Individual Defendants did neither.

### a. Offers To Sell on the Foreign Exchanges Occur Outside the United States

When an individual transacts on an exchange, as noted above, they have effectively (if virtually) traveled there to make trades that are governed by the rules the exchanges set. *See supra* pp. 61, 67; *e.g.*, *Cornwell*, 729 F. Supp. 2d at 626; *see generally Myun-Uk Choi*, 890 F.3d at 67-68 (analyzing rules of an exchange and determining irrevocable liability is incurred upon matching of trades). Cryptocurrency exchange rules, like those of more traditional exchanges, typically establish the visibility, revocability, and acceptance of offers, in addition to the finality of trades. Thus, for "any offer to materialize and become executable," it must "be published on the exchange's platform, or otherwise be entered into the exchange's systems." 56.1 ¶ 163 (Ex. 41, Yadav Rep. ¶ 77). Unless and until the offers are published by cryptocurrency exchanges, *no information* about a seller's specific offers on the exchange is communicated to the market. And no buyer can accept that offer. *See supra* pp. 61-62. Moreover, trades in cryptocurrency are anonymous and automatic; the only entity that can allow the offer to happen, knows the identity of the counterparty, and can reverse a trade if the offeror chooses not to sell after all, is the exchange. *See id.* In short, an order to buy or sell "cannot exist unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account." 56.1 ¶ 162 (Ex. 41, Yadav Rep. ¶ 82).

Because offers to sell are made only when those offers are actually communicated, an offer should be considered made where it is visible and subject to acceptance by prospective purchasers – here, on the Foreign Exchanges themselves.  Accordingly, there is no genuine dispute of fact as to whether an offer to sell or buy – that is, an "attempt to dispose" of cryptocurrency, *United States v. Naftalin*, 441 U.S. 768, 773 (1979) – occurs at the location of the exchange, the place where the seller, regardless of residence, has "figuratively traveled." *Cornwell*, 729 F. Supp. 2d at 626.

To be sure, some cases have found other factors (such as the physical location of the seller) relevant to determining where an offer to sell occurs, but those cases have involved *bilateral* transactions involving a *direct relationship* between the seller and potential buyer, not transactions conducted on a third-party trading forum like an exchange.  This was the fact pattern of the Court's decision on a motion to dismiss in *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011), and its later decision on partial summary judgment, *SEC v. Tourre*, 2013 WL 2407172, at *10 (S.D.N.Y. June 4, 2013).  *See* MTD Order at 27 (citing *Goldman Sachs*).  The defendant there *directly* communicated with prospective investors to discuss potentially fraudulent transactions from his office in New York.  *Tourre*, 2013 WL 2407172, at *10; *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer.").  There was no such direct (or even indirect) communication here, as all of the information about the offer was visible, and executable, only on the exchange.  In short, exchange trades are fundamentally different from bilateral trades, as the SEC admitted in its briefing in *Tourre*.  *See* SEC Opp. to Mot. To Dismiss Am. Compl. at 19 n.3, *Tourre*, No. 1:10-cv-3229-KBF, ECF No. 54 (S.D.N.Y. Dec. 21, 2010) (arguing that Tourre's cited cases were "inapposite" because they "involved securities traded on foreign exchanges, not non-exchange transactions like those in this case").

The SEC has offered no competent evidence to suggest that offers made on the Foreign Exchanges were somehow domestic. Its sole source of evidence is its purported expert ████, ████, who is unqualified and uses no reliable methodology.[51] His opinion as to other factors the Court should consider is also inadmissible because (among other reasons) it applies the wrong legal standard, relying on the "entire selling process" test that the Court has rejected – a fatal flaw the SEC did not contest in its opposition to Defendants' *Daubert* motion. *See* ECF Nos. 544 & 608; *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) ("Expert testimony also should be excluded when it applies the wrong legal standard.").

The fact that the Individual Defendants were located in the United States as they traded abroad is of no moment. If that were relevant, it would contravene *Morrison*'s prohibition on imposing domestic law on foreign businesses. For example, if the offeror's physical location mattered, a Japanese citizen vacationing in New York, who placed an order on the Tokyo Stock Exchange to sell stock in a company registered on that exchange but not in the United States, would be "offering" unregistered securities "domestically" and therefore would be in violation of Section 5. That is not and should not be the law. As the Supreme Court stated, "we reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad," because the "probability of incompatibility" with the applicable laws of other countries – including laws regarding "what disclosures must be made" – is "so obvious that if Congress intended such foreign application it would have addressed the subject of conflicts with foreign laws and procedures." *Morrison*, 561 U.S. at 269 (internal quotation marks omitted); *see also Stackhouse*, 2010 WL 3377409, at *1 (rejecting view of *Morrison* that, "if the purchaser or seller

---

[51] *See* ECF No. 544. Additionally, ████ opinion on this point is solely a rebuttal of Defendants' expert, Yesha Yadav, and solely relates to "Ripple's offers and sales" (not the Individual Defendants'). Ex. 106, ████ Second Am. Rebuttal Rep. ¶ 90. ████ offered no affirmative opinions to carry the SEC's burden of proof on this issue.

resides in the United States and completes a transaction on a foreign exchange from the United

States, the purchase or sale has taken place in the United States"); *City of Pontiac*, 752 F.3d at

181 (purchaser's residence "does not affect where a transaction [on an exchange] occurs").

> **b.     GSR Did Not Turn Extraterritorial Offers Into Domestic Ones**

In its ruling on the motion to dismiss, the Court suggested that the Individual Defendants'

"offers" may have been domestic because those offers were made through the "Market Maker,"

which the SEC alleged was a "global digital asset trading firm with an office in the United

States." MTD Order at 28. This inference of domesticity has been disproven.

Discovery has shown that GSR's "office in the United States" has no bearing on this

dispute. GSR is a foreign entity, incorporated overseas. While GSR has a U.S.-based affiliate,

discovery has established that this affiliate was not involved in the services GSR provided to

Defendants; none of GSR's U.S.-based personnel conducted trades for the Individual

Defendants, and instead all services were performed out of foreign offices, principally by ███

who was domiciled in Spain. *See supra* pp. 63-64. GSR's U.S-based affiliate is legally separate

from its foreign entity, and its mere existence does not make GSR's business domestic. *See*

*Sikhs for Just. Inc. v. Indian Nat'l Cong. Party*, 17 F. Supp. 3d 334, 345 (S.D.N.Y.) (finding that

action did not "touch[] and concern[]" the United States where "the performing actors and the

actual conduct at issue occurred entirely abroad" despite existence of U.S. affiliate), *aff'd*, 596

F. App'x 7 (2d Cir. 2014). This alone is dispositive.

*United States v. Naftalin* does not compel a different result. *See* MTD Order at 27-28

(citing *Naftalin*). *Naftalin* concerned whether a defendant's false statements that he owned

securities, made *to his broker* in the course of directing the broker to sell the securities in the

market, were made "in the offer or sale of any securities" within the meaning of Section 17(a) of

the Securities Act. They clearly were, as the broker was defrauded as part of the defendant's

"attempt to dispose" of specific securities. *See Naftalin*, 441 U.S. at 770 (defendant "selected stocks" and "then placed with five brokers orders to sell shares of these stocks").

This is not a Section 17 fraud case. The *Naftalin* Court was applying a broader "entire selling process" test, and the Court rejected the application of that test to the different statutory language in Section 5. *Compare Naftalin*, 441 U.S. at 773, *with* MTD Order at 25.

In any event, the relationship between Defendants and GSR demonstrates that any offer to sell was not an "attempt to dispose" of an asset through a broker akin to the one at issue in *Naftalin*. Here, there is no evidence that Defendants sought to place any specific order to sell XRP through GSR. Rather, the Individual Defendants transferred their XRP to GSR, which then exercised its judgment to execute trades (or not). *See supra* p. 64. Transferring XRP to GSR was a preliminary step in what ultimately became an offer to sell (that occurred abroad), but it was not itself an offer to sell. *Cf.* 15 U.S.C. § 77b(a)(3) ("offer to sell" must be "for value"). A contrary rule would impose liability on any U.S. person who accesses foreign capital markets to buy or sell securities not registered with the SEC through a broker duly licensed in a foreign country. *See Stackhouse*, 2010 WL 3377409, at *1 (rejecting view of *Morrison* that, "if the purchaser or seller resides in the United States and completes a transaction on a foreign exchange from the United States, the purchase or sale has taken place in the United States"); *see also City of Pontiac*, 752 F.3d at 181 (purchaser's residence "does not affect where a transaction [on an exchange] occurs"); *Wildes v. BitConnect In'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022) (solicitation under the Securities Act includes an "approach with a request or plea, as in selling").

### c. Any Contrary Result Would Reimpose the "Conduct and Effects" Test from *Morrison*

If trades on the Foreign Exchanges were considered domestic simply because Defendants' acts in the United States ultimately led to offers that were visible and acceptable

there, *Morrison*'s "clear test" designed to avoid "interference with foreign securities regulation" would be undermined.  561 U.S. at 269.  This is not a fraud case; it is a registration case.  As the Second Circuit has recognized, U.S. registration requirements have a limited extraterritorial reach because "[t]he problem of conflict between our laws and that of a foreign government is much less when the issue is the enforcement of the anti-fraud sections of the securities laws than with such provisions as those requiring registration of persons or securities."  *IIT, an Int'l Inv. Tr. v. Cornfeld*, 619 F.2d 909, 921 (2d Cir. 1980), *abrogated on other grounds by Morrison*, 561 U.S. 247; *see also RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 348 (2016) (where "'a risk of conflict between the American statute and a foreign law' . . . is evident, the need to enforce the presumption [against extraterritoriality] is at its apex") (quoting *Morrison*, 561 U.S. at 255). Imposing liability for "offers" that were only made on the Foreign Exchanges, when no liability can attach to the actual sales on those exchanges, would have the perverse effect of giving Section 5 *broader* extraterritorial application than Section 10(b), when the opposite is true:  "it is well-settled in this Circuit that the anti-fraud provisions of American securities laws have broader extraterritorial reach than American filing requirements."  MTD Order at 26 (citing cases); *see also Morrison*, 561 U.S. at 268 ("The same focus on domestic transactions is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading.") (citation omitted).

## IV.    LARSEN IS ENTITLED TO SUMMARY JUDGMENT FOR ANY OFFERS OR SALES OF XRP BEFORE SEPTEMBER 1, 2015

The five-year statute of limitations for Section 5 claims bars the SEC from seeking monetary relief related to any offer or sale of XRP by Larsen prior to September 1, 2015.  *See* MTD Order at 29 ("The SEC and Larsen entered into a tolling agreement on September 1, 2020," thus "the SEC may seek monetary penalties for any causes of action that accrued after

September 1, 2015."). The SEC also conceded this point in its opposition to Larsen's motion to dismiss. *See* ECF No. 182 at 59 ("Under the statute of limitations applicable to claims for monetary relief based on Larsen's Section 5 violations, the SEC may recover . . . for conduct between September 1, 2015 and the filing of the Complaint."). Accordingly, the SEC cannot seek any monetary relief for any offers or sales that Larsen conducted prior to September 1, 2015.

## CONCLUSION

The Court should grant summary judgment in favor of Defendants.

Date: September 13, 2022

Respectfully submitted,

KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.

By: */s/ Michael Kellogg*
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer

PAUL, WEISS, WHARTON, RIFKIND &
GARRISON LLP

By: */s/ Martin Flumenbaum*
Martin Flumenbaum
Michael E. Gertzman
Meredith Dearborn

1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
mflumenbaum@paulweiss.com
mgertzman@paulweiss.com
mdearborn@paulweiss.com

*Counsel for Defendant Christian A. Larsen*

Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com

DEBEVOISE & PLIMPTON LLP

By: */s/ Andrew J. Ceresney*
Andrew J. Ceresney
Mary Jo White
Lisa Zornberg
Christopher Ford
919 Third Avenue
New York, NY 10022
(212) 909-6000
aceresney@debevoise.com
mjwhite@debevoise.com
lzornberg@debevoise.com
csford@debevoise.com

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: */s/ Matthew C. Solomon*
Matthew C. Solomon
Nowell D. Bamberger

2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 974-1680
msolomon@cgsh.com
nbamberger@cgsh.com

*Counsel for Defendant Bradley Garlinghouse*

*Counsel for Defendant Ripple Labs Inc.*