# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**    :
                                                  :

                              **Plaintiff,**    :       20 Civ. 10832 (AT) (SN)

                                                  :

                          - against -    :       ECF Case

                                                    :

**RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,**    :
**and CHRISTIAN A. LARSEN,**    :

                                                :

                                **Defendants.**    :

                                                      :

------------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Benjamin Hanauer
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................v

PRELIMINARY STATEMENT .........................................................................................1

COUNTER-STATEMENT OF FACTS .............................................................................3

I. RIPPLE OFFERED AND SOLD XRP WHILE PROMISING TO DEVELOP "USES" THAT COULD INCREASE XRP'S VALUE. ...................................................3

    A. Touting Their Strong Financial Motivations to Do So, Defendants Stated they Would Undertake Significant, Expensive Efforts to Find Value for XRP. ..........................4

    B. Defendants Offered and Sold XRP as an Investment, Not as a "Currency."....................4

    C. Defendants Engaged in the Extensive Efforts they Promised to Undertake. ....................5

II. RIPPLE'S SOFTWARE SALES PALED IN COMPARISON TO ITS XRP SALES............6

III. RIPPLE SOLD XRP FOR CASH AND OTHER CONSIDERATION................................8

    A. Ripple's Institutional and Programmatic Sales Were All in Exchange for Cash, and Made Pursuant to Written and Implied Contracts..................................8

    B. Ripple's Other XRP Distributions Were Indirect Distributions into Public Markets Pursuant to Written Contracts and in Exchange for Consideration. ....................9

IV. THE INDIVIDUAL DEFENDANTS' DOMESTIC XRP OFFERS AND SALES. ...........10

ARGUMENT ....................................................................................................................11

I. THE INVENTED "ESSENTIAL INGREDIENTS" TEST FAILS. .................................12

    A. *Howey* and Federal Securities Law, Not Pre-1933 State Law, Control......................13

    B. Defendants' "Essential Ingredients" Argument Wildly Misstates *Howey.* .....................15

    C. Courts Applying *Howey* Do Not Require the Existence of a Written Contract or Defendants' Other Purported "Essential Ingredients." ..........................................19

    D. Crypto Asset Offerings Routinely Satisfy *Howey* Despite the Absence of a Written Contract or Defendants' Other Purported "Essential Ingredients." ....................21

II. DEFENDANTS OFFERED AND SOLD INVESTMENT CONTRACTS TO PUBLIC INVESTORS. .....................................................................................24

    A. Public Investors "Invested Money" When They Bought XRP...........................................25

    B. XRP Investors Entered Into a Common Enterprise Among Each Other and With Ripple. .....................................................................................27

        1. Defendants' Attempts to Add Requirements to the "Horizontal Commonality" Test Should be Rejected.........................................................29

            (a) Neither Formalized Mechanisms for Profit Nor "Participatory Interests" in Pooled Assets Are Required.........................................................29

(b)    Ongoing Contractual Obligations Are Not Required. ....................................31

(c)    Defendants Misstate the "Pooling" Element. ..................................31

2.    "Strict Vertical" Commonality Exists. ...................................................32

    (a)    Courts in this Circuit Accept Strict Vertical Commonality. ...........................32

    (b)    Defendants' and Investors' Fortunes Rose and Fell Together. .....................34

3.    Defendants' Other "Common Enterprise" Contentions Are Wrong.......................35

    (a)    There Is No "Economic Equivalent" of Stock Requirement.......................35

    (b)    Control of the Market for the Instruments by the Issuer Is Not Required to Find a "Common Enterprise." ......................................37

4.    Courts Have Long Rejected the Argument that Offers and Sales of "Ordinary Assets" Must Fall Outside the Federal Securities Laws. ...........................39

    (a)    "Ordinary Assets" May Be Offered and Sold As Investments.....................39

    (b)    Defendants Did Not Sell XRP For Use Or Consumption. ...........................41

C.    XRP Investors Reasonably Expected Profits Based Upon Ripple's Efforts.....................46

1.    Ongoing Contractual Obligations Are Not Required...................................47

    (a)    *Howey* Does Not Require Investors' Expectations Be Derived from Representations in Written Agreements...............................................47

    (b)    Defendants' Real Estate Cases Also Look Outside Written Contracts. ................................................................49

2.    The Existence of Market Forces Independent of Ripple Is Irrelevant. .....................50

3.    Defendants' Attempts to Undercut Their Extensive Promotional Representations Are Unavailing. ....................................................53

III.  THE INDIVIDUAL DEFENDANTS' OFFERS AND SALES OF XRP WERE ALL DOMESTIC, UNREGISTERED OFFERS AND SALES. ..................................56

A.    The Individual Defendants Made Domestic Offers of XRP.................................57

B.    The Individual Defendants Committed Themselves to Their Sales of XRP, and to Deliver XRP After a Sale, in the United States. ..................................61

1.    The Individual Defendants Entered into Sale Agreements with GSR from the United States......................................................62

2.    The Individual Defendants Committed Themselves to XRP Sales Orders While They Were in the United States. ............................................63

3.    Title Passed at the Time the Individual Defendants, from the United States, Transferred Their XRP from their U.S. Accounts to GSR's........................64

4.    Money Was Exchanged in the United States. ........................................66

C.    The Individual Defendants' XRP Distributions Were In Furtherance of Their Creation and Fostering of a Domestic Market for XRP. ....................................68

        1.    Offers and Sales under Section 5 Are Domestic When a Defendant Takes Steps to Create a U.S. Market for Securities.................................................69

        2.    The *Banque Paribas* Standard Should Be Applied to Determine Domesticity Under Section 5.................................................................................................70

        3.    Ripple and the Individual Defendants Engaged in Extensive Efforts to Create a Market for XRP in the United States..............................................72

   D.   The Evidence Underlying the Individual Defendants' Motion Is Disputed. ....................74

**CONCLUSION** ................................................................................................................**75**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ................................. passim

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) .......................................... 48

*Alunni v. Dev. Res. Group, LLC*, 445 F. App'x 288 (11th Cir. 2011)
    (per curiam) .................................................................................................................... 54

*Anderson v. Binance*, 2022 WL 976824 (S.D.N.Y. Mar. 31, 2022)
    *appeal pending* No. 22-972 (2d Cir.) ...................................................................... 67

*Ass'n of Am. R.R. v. United States*, 603 F.2d 953 (D.C. Cir. 1979) ............................................... 36

*Audet v. Fraser*, 2022 WL 1912866 (D. Conn. June 3, 2022) ................................ 23, 28, 33, 36

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................... passim

*Bamert v. Pulte Home Corp.*, 445 F. App'x 256 (11th Cir. 2011) ................................................ 48

*Banco Safra S.A. v. Samarco Mineracao S.A.*, 849 F. App'x 289 (2d Cir. 2021) ...................... 67

*Baroi v. Platinum Condo Dev., LLC*, 914 F. Supp. 2d 1179 (D. Nev. 2012) ........................ 17, 54

*Bender v. Cont'l Towers Ltd. P'Ship*, 632 F. Supp. 497 (S.D.N.Y. 1986) ............................ 41, 52

*Beranger v. Harris*, 2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) ............................................ 24

*Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187 (5th Cir. 1979) ............................... 42, 43

*Canadian Imperial Bank of Comm. Tr. Co. v. Fingland*, 615 F.2d 465
    (7th Cir. 1980) ................................................................................................................. 20

*Chris-Craft Indus. Inc. v. Bangor Punta Corp.*, 426 F.2d 569 (2d Cir. 1970) ............................ 58

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173
    (2d Cir. 2014) ................................................................................................................. 67

*Connors v. Lexington Ins. Co.*, 666 F. Supp. 434 (E.D.N.Y. 1987) ........................................... 40

*Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) ....................................... 37

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216 (6th Cir. 1980) ............ 32, 33, 35

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297
    (9th Cir. 1979) ................................................................................................................. 49

*Deckebach v. La Vida Charters Inc. of Florida*, 867 F.2d 278 (6th Cir. 1989) ..................... 33, 35

*Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118
    (2d Cir. 1998) *abrogated in part on other grounds by Morrison*, 561 U.S. 247 ................... passim

*Fedance v. Harris*, 1 F.4th 1278 (11th Cir. 2021) ................................................................... 40

*Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir 1985) ......................................................................................... passim

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ......................................................................... 21

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) .......................................................... 26

*Giunta v. Dingman*, 893 F.3d 73 (2d Cir. 2018) ......................................................................... 66

*Golden v. Garafalo*, 678 F.2d 1139 (2d Cir. 1982) ..................................................................... 36

*Grenader v. Spitz*, 537 F.2d 612 (2d Cir. 1976) ............................................................ 42, 43, 52

*Gugick v. Melville Cap., LLC*, 2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) .................................. 33

*Halsworth v. BProtocol Found.*, 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ............................. 68

*Happy Inv. Grp. v. Lakewood Props. Inc.*, 396 F. Supp. 175 (N.D. Cal. 1975) ............................ 50

*Harman v. Harper*, 914 F.2d 262 (9th Cir. 1990) ...................................................................... 50

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) ..................................................................... 17

*In re Bitconnect Secs. Litig.*, 2019 WL 9104318 (S.D. Fla. Aug. 23, 2019) ................................. 23

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) .............................. 33, 34

*In re Petrobas Secs.*, 862 F.3d 250 (2d Cir. 2017) ...................................................................... 67

*In re Picard*, 917 F.3d 85 (2d Cir. 2019) .................................................................................... 70

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979) ......................................................... 25, 27

*Jobanputra v. Kim*, 2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ................................... 25, 36, 45

*Kaplan v. Shapiro*, 655 F. Supp. 336 (S.D.N.Y. 1987) ............................................................... 34

*Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) ..................................................................... 42

*Lehman Bros. v. Minmetals Int'l*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001) ................................... 52

*Liu Meng-Lin v. Siemens AG*, 763 F.3d 175 (2d Cir. 2014) ......................................................... 72

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ............................................................................... 12, 55

*Marini v. Adamo*, 644 F. App'x 33 (2d Cir. 2016) ...................................................................... 20

*Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................... 20, 33

*Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014)
   *aff'd* 644 F. App'x 33 (2d Cir. 2016) ....................................................................................... 20

*McKinney v. Panico*, 2022 WL 4551695 (N.D. Ill. Sept. 29, 2022) ............................................ 20

*Miller v. Central Chinchilla Gp., Inc.*, 494 F.2d 414 (8th Cir. 1974) .......................................... 44

*Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010) ..................................................... passim

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60 (2d Cir. 2018) .................................... 67, 70

*Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980) ........................................................... 40, 52

*Penfield Co. of Cal. v. SEC*, 143 F.2d 746 (9th Cir. 1944) .......................................................... 40

*Pinter v. Dahl*, 486 U.S. 622 (1988) .......................................................................................... 71

*R. A. Holman & Co. v. SEC*, 366 F.2d 446 (2d Cir. 1966) .......................................................... 26

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ........................................................ passim

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ............................................................. 12, 14

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC*,
230 F. Supp. 3d 159 (S.D.N.Y. 2017) ......................................................................33

*Rodriguez v. Banco Ctr. Corp.*, 990 F.2d 7 (1st Cir. 1992) ..........................................50

*Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013) ..........................................56

*SEC v. Ahmed*, 308 F. Supp. 3d 628 (D. Conn. 2018) ........................... 62, 63, 64, 66

*SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir. 1982) ........................passim

*SEC v. Arvida Corp.*, 169 F. Supp. 211 (S.D.N.Y. 1958) ..........................................58

*SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016) ..................................................54

*SEC v. Belmont Reid & Co, Inc.*, 794 F.2d 1388 (9th Cir. 1986) ..............................52

*SEC v. Blockvest, LLC*, 2019 WL 625163 (S.D. Cal. 2019) ........................................58

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ..................................passim

*SEC v. C.M. Joiner Leasing Corp.*, 133 F.2d 241, 242-45 (5th Cir. 1943)
*aff'd* 320 U.S. 344 (1943) ........................................................................................47

*SEC v. Cap. Gains Res. Bureau*, 375 U.S. 180 (1963) ..............................................14

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) *aff'd* 155 F.3d 129
(2d Cir. 1998) ..........................................................................................................17

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir.1998) ................................................... 15, 58

*SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941) ........... 6, 21

*SEC v. Edwards*, 540 U.S. 389 (2003) ..................................................................passim

*SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019) ..............................................................45

*SEC v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973) ....................47

*SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027 (2d Cir. 1974) ..................passim

*SEC v. Goldman Sachs*, 790 F. Supp. 2d 147 (S.D.N.Y. 2011) ............................ 58, 60

*SEC v. Gruss*, 859 F. Supp. 2d 653 (S.D.N.Y. 2012) ................................................57

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ............................................27

*SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ......................passim

*SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974) ......................... 47, 48

*SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996) ..........................................40

*SEC v. Merchant Cap., LLC*, 483 F.3d 747 (11th Cir. 2007) ....................................48

*SEC v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) ..................................51

*SEC v. Pac. W. Cap. Grp. Inc.*, 2015 WL 9694808 (C.D. Cal. June 16, 2015) ..........54

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ......................................................12

*SEC v. Revelation Cap. Mgmt., Ltd.*, 246 F. Supp. 3d 947 (S.D.N.Y. 2017)................65

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) *cert. denied* 140 S. Ct. 483 (2019) ............... 21, 45, 50, 72

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ...................................................................... 20, 33, 49

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) ...................................................................... 48

*SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009)
    *aff'd* 712 F.3d 321 (6th Cir. 2013) .................................................................................. 26

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................... passim

*SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275 (D. Utah 2017) *aff'd sub
    nom SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019),
    *cert. denied* 140 S. Ct. 483 (2019) .............................................................................. 25

*SEC v. Tyler*, 2002 WL 32538418 (N.D. Tex. Feb. 21, 2002) ................................................ 40

*SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202 (1967) .................................................... 48

*SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65 (1959) ...................................... 29

*SEC v. W.J. Howey Co.*, 151 F.2d 714 (5th Cir. 1945) *rev'd* 328 U.S. 298 ...................... 30

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) .................................................................... passim

*Solis v. Latium Network, Inc.*, 2018 WL 6445543 (D.N.J. Dec. 10, 2018) ...................... 24, 28, 45

*Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409 (C.D. Cal. 2010) ............................ 70

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ...................................................................... passim

*Timmreck v. Munn*, 433 F. Supp. 396 (N.D. Ill. 1977) ...................................................... 54

*United Housing Found v. Forman*, 421 U.S. 837 (1975) .................................................. passim

*United States v. Greenberg*, 30 F.R.D. 164 (S.D.N.Y. 1962) ............................................ 69

*United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) ........................................ 65

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ...................................................... passim

*United States v. Mashni*, 547 F. Supp. 3d 496 (D.S.C. 2021) ............................................ 75

*United States v. Naftalin*, 441 U.S. 768 (1979) ................................................................ 58

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ........................................................ 62, 66

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) .................................................... 69

*United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ...................... 23, 41

*Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994) ............................................ 33, 35

*Walther v. Maricopa Int'l Inv. Corp.*, 1998 WL 186736 (S.D.N.Y. 1998) ...................... 32

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) .......................................................... 44, 55

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ............................ 70

*Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022) .................................. 23, 56, 58, 61

*Williams v. Block.One*, No. 20 Civ. 2809, D.E. 146 (S.D.N.Y. Aug. 15, 2022) ................ 68

**Page(s)**

**Statutes**

15 U.S.C. § 77b...................................................................................... 18, 36, 57, 63

15 U.S.C. § 77d................................................................................................. 45, 61

15 U.S.C. § 77e................................................................................................passim

15 U.S.C. § 78f..........................................................................................................60

15 U.S.C. § 78j(b)................................................................................................ 71, 72

**Regulations**

17 C.F.R. § 230.901...................................................................................................70

31 C.F.R. § 1010.100(m)............................................................................................5

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ...........................................................64

Edward Greene, U.S. REGULATION OF THE INT'L SECURITIES AND
DERIVATIVES MARKETS § 8 (12th ed. 2017)................................................69, 70, 73

FINANCIAL STABILITY OVERSIGHT COUNCIL, "Report on Digital Asset
Financial Stability Risks and Regulation," (Oct. 3, 2022) *available at*
https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-
Report-2022.pdf;......................................................................................................60

Indictment in *United States v. Zaslavskiy*, No. 17 Cr. 647 (D.E. 7) (E.D.N.Y.
Nov. 21, 2017) .........................................................................................................23

Registration of Foreign Offerings by Domestic Issuers, SEC Release No. 33–
4708, 1964 WL 3661 (July 9, 1964)........................................................................73

U.C.C. § 8-113, 1994 official text with comments (West 1994)...............................19

U.S. Dep't of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and*
*Businesses* (Sept. 6, 2022) *available at*
https://home.treasury.gov/system/files/136/CryptoAsset_EO....................................60

U.S. Dep't of the Treasury, *Guidance* (Mar. 18, 2013) *available at*
https://www.fincen.gov/sites/default/files/guidance/FIN-2013-
G001.pdf.......................................................................................................................5

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this brief in opposition to the motion for summary judgment (D.E. 621, "Motion") filed by Defendants Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse ("Garlinghouse"), and Christian A. Larsen ("Larsen").

## PRELIMINARY STATEMENT

The Court should deny Defendants' Motion and grant the SEC's Motion because the undisputed evidence shows that Defendants engaged in unregistered offers and sales of securities to public investors.

Defendants implicitly concede they will not prevail under controlling law—the *Howey* test. Instead, they attempt to construct their own test from pre-1933 state law by taking out of context two words ("essential ingredients") from the *Howey* opinion, and then purportedly showing that they pass their own test. Defendants' argument may be creative, but it is entirely unavailing, as their fabricated test decidedly finds no support in the law. Under the *Howey* test, and the decades of federal court cases applying it, the SEC prevails as a matter of law. Two words from *Howey*, refashioned into an invented test, cannot bear the entire weight of Defendants' Motion.

This "essential ingredients" test attempts to read three new prongs into *Howey*. The first prong purportedly requires a common law contract to exist—though Defendants vacillate between whether it must be written or not. Either way, this prong is inconsistent with *Howey*'s expressly flexible and adaptable approach. And it likewise conflicts with the securities laws' broad reach— recognized by courts for decades—over even unconventional or novel investment products. The other two prongs of Defendants' test—that the contracts have written clauses imposing post-sale obligations on the seller and written rights to receive profits—have been explicitly rejected by courts applying *Howey*. Defendants' attempt to rework *Howey* to suit their needs should be rejected.

A proper application of *Howey*, which controls this case, shows that Defendants offered and sold investment contracts. *First*, as Defendants do not dispute, the overwhelming majority of their

XRP sales were in exchange for money. Any contention that *some* XRP distributions were made for no consideration misses the mark because such distributions were indirect sales of XRP into public markets, and because consideration does not have to be in cash to satisfy *Howey*.

*Second*, the undisputed facts establish that XRP purchasers invested in a common enterprise with each other and with Ripple because they all share proportionally in any appreciation of XRP's value. Defendants' argument that XRP is not the "equivalent of stock" ignores the plain language of the Securities Act of 1933, which provides that both stock *and* investment contracts are securities. And the contention that there is no common enterprise because Ripple does not "control" XRP's market or price also seeks to add extraneous factors to the analysis that courts do not impose.

*Third*, Defendants led investors to expect to profit from their XRP purchases based upon Ripple's managerial or entrepreneurial efforts. Courts have routinely rejected Defendants' arguments that "disclaimers" preclude finding an investment contract. And Defendants' and their *amici*'s suggestion that XRP is an "ordinary asset," like an orange, is belied by the facts. It is also legally irrelevant because even "ordinary assets" may be offered and sold as investment contracts.

Finally, the Individual Defendants' arguments that certain of their XRP offers and sales were not "domestic" also fails. This argument hinges upon offers and sales where the ultimate sale was matched in the order books of crypto platforms that Defendants' expert claims are "foreign." But the Court has already rejected this argument as to the Individual Defendants' *offers*, which were all made in the U.S. The evidence also shows that the Individual Defendants irrevocably committed themselves to their *sales* in the U.S. Their attempt to reduce the analysis to a single fact—the "location" of an unregistered online platform—is contrary to the Second Circuit's application of *Morrison* and ignores the undisputed evidence showing how these sales in fact occurred.

In this case, the SEC asks that Defendants be required to register their offers and sales of XRP and make the accompanying disclosures to investors that thousands of businesses who offer

and sell securities in the U.S. markets routinely make. By contrast, the consequences of Defendants' arguments are sweeping. If accepted, a company seeking to raise funds for its ventures could avoid providing to investors important disclosures required by the securities laws by relying on modern technology, by cleverly not reducing transactions to writing, by having lawyers add boilerplate disclaimers, and by selling on certain trading platforms even though the sales originate in the U.S. and are made to U.S. investors. This would undermine the disclosure regime that has been the bedrock of U.S. capital markets for 90 years. And it would ignore consistent Supreme Court guidance that the securities laws should be flexibly and broadly applied to investment products offered and sold to the public, even those that are novel.

**COUNTER-STATEMENT OF FACTS[1]**

Defendants' statement of facts wholly ignores their avalanche of public promises to engage in significant efforts to find use and generate value and liquidity for XRP, and the multi-billion dollar efforts they undertook consistent with those representations. Instead, Defendants proffer not contemporaneous documents or testimony from fact witnesses, but rely almost entirely on the testimony of their experts, all of which is subject to exclusion under *Daubert*, and self-serving declarations submitted by two Ripple executives. Defendants' curated and incomplete "facts" are almost all irrelevant and are wholly insufficient to support their request for summary judgment.

**I.      RIPPLE OFFERED AND SOLD XRP WHILE PROMISING TO DEVELOP "USES" AND LIQUIDITY THAT COULD INCREASE XRP'S VALUE.**

Defendants took significant steps, over many years and costing billions, to create and protect a trading market for XRP, and they used proceeds from XRP sales to pursue and promote purported "use" cases that could potentially increase XRP's value. But now Defendants entirely

---

[1]      "SEC Br." and "Def. Br." mean the opening summary judgment briefs (D.E. 628, 622). "Counter 56.1" means the SEC's Local Rule 56.1 Counter-Statement. "PX" means exhibits in support of the SEC's Motion or attached to today's Declarations of Ladan Stewart & Mark Sylvester. "SEC 56.1" and "Def. 56.1" mean the statements of undisputed facts (D.E. 629, 623).

ignore their tsunami of public written and oral statements repeatedly representing to investors that they would pursue such XRP-related efforts. Defendants' statements and the actual entrepreneurial and managerial efforts they undertook are unequivocal and undisputed. They point to only one conclusion as a matter of law: Defendants offered and sold XRP as an investment contract.

### A. Touting Their Strong Financial Motivations to Do So, Defendants Stated they Would Undertake Significant, Expensive Efforts to Find Value for XRP.

As explained in the SEC's opening brief, in 2013 Defendants began extensive, years-long marketing efforts representing they would search for purported "use" and "value" for XRP—and casting XRP as an opportunity to invest in those efforts. SEC 56.1 ¶¶ 136-43, 344-455. Defendants do not address the contents of these or any other written and oral marketing efforts, which noted Ripple's plans to sell XRP to "fund itself" and to deploy these funds to try to find supposed "uses" for XRP and Ripple's blockchain, *id.* ¶¶ 73, 76, 172-73, 180, 205, 362, 377, 386, 389, 439, 441, 461, such that "demand for XRP may increase, leading to an increase in price." *Id.* ¶¶ 187, 375. Ripple also touted its unique financial incentives to create and protect a "robust and liquid" marketplace into which it could sell XRP. *E.g.*, *id.* ¶¶ 73, 180. Later, when XRP's price began to increase, Defendants publicly touted XRP price increases and explicitly tied them to their own efforts. *E.g.*, *id.* ¶¶ 400-55; *see also* Counter 56.1 ¶¶ 273-77; PX 624 at 165-67, 198-200. Frequently, Defendants referred to their efforts as supporting an "XRP ecosystem." *E.g.*, SEC 56.1 ¶¶ 260, 270, 372.

These representations appeared in written materials such as pitch decks to investors, XRP Market Reports, social media campaigns, articles in major financial and crypto-related publications, and orally during frequent appearances on national financial news networks. *See* SEC Br. at 11-23.

### B. Defendants Offered and Sold XRP as an Investment, Not as a "Currency."

Defendants never marketed or otherwise offered or sold XRP as a "currency" used to buy goods and services. *See* SEC Br. at 29, 43, 57. Defendants' brief does not contend otherwise, but they and two *amici* nevertheless now try to label XRP as a "currency" pointing to general evidence of

third-party activities with respect to XRP. Def. Br at 1, 4, 8; D.E. 660 at 5; D.E. 661 at 8. But the

indisputable evidence shows that XRP was *not* like "fiat" currency (legal tender) and that Defendants

never treated it as such—they treated it as an investment.

Ripple's XRP sales contracts explicitly stated that XRP was "not legal tender [and was] …

not backed by the government." Counter 56.1 ¶ 463; PX 329, 769-71. This is consistent with what

Ripple represented to regulators—that institutional buyers were "purchasing XRP for speculative

purposes" and not as a "currency." SEC 56.1 ¶¶ 717-23. And it is consistent with Defendants' public

marketing explicitly noting that XRP was *not* currency. Counter 56.1 ¶¶ 289-297; PX 7 at 22-28; PX

81 at 219-222; PX 36 at 189-192; PX 503.13; PX 503.18-503.19; PX 2 at 92-94; PX 24 at 110-112,

118-123; PX 743-745; SEC 56.1 ¶¶ 85-86, 90-91, 1167. Indeed, after the 2015 FinCEN settlement,

*see* Def. Br. at 3-4, 8 & n.6, pursuing any "currency" use for XRP was "impossible." Counter 56.1

¶ 291; PX 6 at 78-79, 86-87; PX 744.[2] Moreover, Defendants can hardly claim that the

Programmatic Sales of XRP were targeted at those who wished to buy "currency," because they did

not even know to whom they were selling that XRP. *See* SEC 56.1 ¶¶ 652-55; Def. Br. at 28 n.19, 61-

62, 69.[3]

### C. Defendants Engaged in the Extensive Efforts they Promised to Undertake.

Defendants also gloss over the years of efforts they undertook, funded by XRP sales, to

establish the "building blocks" for the XRP trading markets, and the many other efforts Defendants

---

[2]     *See* 31 C.F.R. § 1010.100(m) ("currency" is issued by the United States or other country, designated as "legal tender," and used as a medium of exchange in the issuing country); U.S. Dep't of the Treasury, *Guidance* (2013) ("[I]n contrast to real currency, 'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction."), *available at* https://www.fincen.gov/sites/default/files/guidance/FIN-2013-G001.pdf.

[3]     Defendants suggest that XRP distributions into public markets via conduits (such as "xPring") show XRP was a "substitute" for currency. Def. Br. at 11, 37. But they prove the opposite. The companies that received XRP simply sold it into public trading markets for the cash they needed and could actually use. SEC 56.1 ¶¶ 836-43; PX 24 at 176-80; PX 25 at 61-63, 72, 89-93.

undertook and touted with respect to XRP. Examples included seeding the trading market through giveaways and paying market makers to buy and sell XRP, distributing XRP (including with the Individual Defendants' own sales), combatting "FUD," and ensuring orderly liquidations of XRP. SEC Br. at 13-14, 23-26; SEC 56.1 ¶¶ 592-600, 603-05, 1108. Defendants also took steps to encourage crypto asset trading platforms to make XRP available. *See* Counter 56.1 ¶¶ 46-57, 401-16; PX 715, Ex. 13; PX 376, 530, 541, 548, 561, 609, 716-22; PX 645 at 30-31; SEC 56.1 ¶¶ 479-99. Ripple understood that U.S. investors were interested in buying XRP and made specific efforts to make it easier for them to buy XRP. Counter 56.1 ¶¶ 378-400; PX 113, 578-81, 586, 589, 595, 604.[4]

As Ripple's leaders discussed in 2019—"to be brutally honest" Ripple was "commit[ted]" to its efforts because "there's no other place where predictability and stability about supply and long term health can come from" because Ripple at all times "ha[d] this giant pile of XRP." Counter 56.1 ¶ 34; PX 457; *see also* Counter 56.1 ¶¶ 27-28, 77-84; PX 6 at 201, 297; PX 455, 648, 650, 654-55, 706.

## II.    RIPPLE'S SOFTWARE SALES PALED IN COMPARISON TO ITS XRP SALES.

Defendants speak in generalities about the "hundreds of financial institutions and payment providers" that have used Ripple's "software product," which today they call RippleNet. Def. Br. at 6. Defendants then obliquely state: "RippleNet customers can settle cross-border transactions using fiat currency *or can opt to use* a feature called On Demand Liquidity ('ODL') which uses XRP." *Id.*

---

[4]    Seeking to downplay Ripple's XRP-funded efforts, Defendants claim that the "core code for the XRP Ledger was completed" when Ripple was founded. Def. Br. at 6. Whatever Defendants mean by "core code," Ripple promised and continued to engage in significant efforts to program, improve, fix issues with, and attract participants to the XRP Ledger. *See* Counter 56.1 ¶¶ 13-21, 24, 29-35; PX 7 at 133, 179-83, 227-28; PX 6 at 36-37, 112, 125-34, 170, 186-87; PX 81 at 395-97, 399-401; SEC 56.1 ¶¶ 163, 359-60; PX 47 at RPLI_SEC 532018. And whether the XRP Ledger was "completed" when Ripple was founded is irrelevant. *See infra* Argument § II.B.2(a).

Similarly, the record contradicts the suggestion that Ripple's founders merely "gave" XRP to it. *E.g.*, SEC 56.1 ¶¶ 10-12, 14, 20; *see also* Counter 56.1 ¶¶ 1-12, 464-65; PX 409, PX 6 at 23-25, 43, 53, 55-56. In any case, this does not impact whether Ripple engaged in unregistered *offers and sales* of XRP. *Cf. SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 740-41 (2d Cir. 1941) (person with no relationship to issuer violated Section 5 for unregistered sales of issuer's securities).

(emphasis added). What Defendants omit is that most of the "hundreds of customers" that have used Ripple products used two platforms—xVia and xCurrent—that are essentially *messaging* services that *do not* "use XRP," and that in any event yielded only $21.9 million in revenue. SEC 56.1 ¶¶ 146, 153-54; *see also* Counter 56.1 ¶¶ 142-56; PX 6 at 235-37; PX 7 at 189-91; PX 8 ¶¶ 85, 238; PX 45, Ex. 2; SEC 56.1 ¶¶ 150-51, 155, 159, 162, 169; PX 23 at 42-43; PX 206.

Ripple's recitation of facts is also woefully incomplete with respect to the "ODL" product, which came into existence in late 2018 and permits users to exchange fiat currencies by buying and selling XRP. The banks and financial institutions that Ripple refers to as its customers did not use ODL. Counter 56.1 ¶¶ 154, 179-85; PX 7 at 190, 193-94; PX 16 at 182-83. For most of that time, *a single entity*, MoneyGram International ("MGI") made more than 90% of the ODL transactions. *Id.* ¶¶ 210, 220; PX 499, 621; PX 624 at 76-77. Ripple *paid MGI* significant amounts to use ODL—or, as Schwartz described it, to "suffer" the product. *Id.* ¶¶ 178, 186-88, 210-33, 262, 271, 281; PX 624; PX 634 ¶ 19. MGI did not pay Ripple a single dollar with respect to ODL, nor did it ever purchase a single dollar of XRP from Ripple. *Id.* ¶¶ 171, 229, 288; PX 634 ¶ 19; PX 7 at 218-20. Any suggestion that MGI "opt[ed] to use" ODL is misleading (and irrelevant, *see infra* Argument § II.B.4).

Moreover, Ripple *did not* sell XRP to ODL users, until it began some sales in mid-2020. *Id.* ¶¶ 186-88; PX 8 ¶ 94-95; SEC 56.1 ¶¶ 743-44, 749-51. But, concerned that these sales depressed the market for XRP, Ripple used proceeds from the sales to *buy back* the XRP it had just sold (while Garlinghouse was selling his own XRP). SEC 56.1 ¶¶ 760-78; Counter 56.1 ¶¶ 189-207, 457, 462; PX 25 at 340-51; PX 81 at 482-84; PX 22 at 268-73; PX 85 ¶ 566, PX 185, 296, 630, 754, 759, 763, 765.[5]

---

[5]     Contrary to the suggestions by Ripple and two *amici*, neither ODL, nor XRP more generally, eliminate the need to use traditional financial rails to obtain foreign currency. ODL simply changes the party obtaining foreign currency through foreign currency exchanges from the money services business (that Ripple is paying to use the product) to the market maker (that Ripple is also paying). Counter 56.1 ¶¶ 160, 172-75; PX 25 at 402; PX 559. The record suggests that Ripple's practices of paying these entities to use ODL, and of paying market makers to make the XRP markets needed

The statement that $10 billion in payments "have been made" on ODL, Def. Br. at 7, is a non-sequitur because all it shows is that parties bought and resold XRP in the secondary market. *See* SEC 56.1 ¶¶ 743-44, 760-64. This activity is not "payment activity." The figure is further misleading because it is an infinitesimal part (0.12%) of the *trillions* of dollars in total XRP trading volume through the filing of this lawsuit. Counter 56.1 ¶ 209; PX 398, Ex. 3. Finally, this figure improperly relies on data bloated by adding trading that post-dates the filing of this case. *See also* D.E. 216 at 5.

Finally, at its inception, XRP had no market, no price, and no use. SEC 56.1 ¶¶ 89, 104-08, 714; PX 47; Counter 56.1 ¶ 6; PX 7 at 60. Defendants cannot dispute that, in contrast to Ripple's $22 million in software sales in that same period, from 2013 to 2020 Ripple offered and directly and indirectly sold into public markets more than 24 billion units of XRP for more than $1.5 billion in cash and $609 million in "other revenue." SEC 56.1 ¶¶ 647, 716, 830; Def. Br. at 11. It was this capital raise through selling XRP—not the limited software sales—that allowed Ripple to grow. Simply put: "Ripple's main business model/source of income is XRP sales." SEC 56.1 ¶ 168.[6]

## III. RIPPLE SOLD XRP FOR CASH AND OTHER CONSIDERATION.

### A. Ripple's Institutional and Programmatic Sales Were All in Exchange for Cash, and Made Pursuant to Written and Implied Contracts.

Ripple made approximately $1.5 billion from Programmatic and Institutional Sales of XRP. *See* SEC 56.1 ¶¶ 647, 716; Counter 56.1 ¶¶ 76, 456-57; PX 296, 398, 746-751, 753-763. Larsen and Garlinghouse, respectively, sold approximately $450 million and $160 million of their own XRP.

---

for ODL to function, were part of a strategy to show "people like the SEC" that there were uses for XRP. Counter 56.1 ¶¶ 157-70, 176-77, 286; PX 625. But even that is irrelevant. *See* Arg. § II.B.4.

[6] Defendants also misleadingly point to statements in financial publications and by the U.S. Consumer Financial Protection Bureau ("CFPB") that purportedly praised "products," Def. Br. at 7, but these have nothing to do with this litigation. The CFPB comment refers to Ripple's software *for communication* between financial institutions (*i.e.*, software that is essentially a messaging application), which has nothing to do with XRP. Counter 56.1 ¶¶ 145-48, 439-40; PX 17 at 142. Similarly, none of the articles Defendants cite pertain to ODL or its relationship to XRP, as most pre-date the ODL product. Counter 56.1 ¶¶ 458-60. The last article references Ripple's undefined "products" by a "bank," but banks did not use ODL. *Id.* ¶¶ 179-85, 461; PX 7 at 192-94.

SEC 56.1 ¶¶ 868, 870. Ripple's Programmatic Sales occurred on crypto trading platforms readily accessible to U.S. investors. Counter 56.1 ¶¶ 417-23, 439-37; PX 565-67, 577, 585. Ripple's principal market maker, GSR, pooled the proceeds from the Individual Defendants' XRP sales with those from Ripple's Programmatic Sales until the first quarter of 2018, at which point the proceeds from Ripple's sales continued to be pooled. Counter 56.1 ¶¶ 351-52; PX 26 at 141-45, 249-50. Ripple also pooled proceeds from Programmatic Sales with proceeds from Institutional Sales. Counter 56.1 ¶ 457; PX 296, 753-63. Ripple's Institutional Sales were made pursuant to "agreements" and "contracts." Def. Br. at 11. Defendants contend that Ripple's Programmatic Sales on crypto asset trading platforms were not conducted pursuant to any contracts. Def. Br. at 10.[7]

### B. Ripple's Other XRP Distributions Were Indirect Distributions into Public Markets Pursuant to Written Contracts and in Exchange for Consideration.

Defendants distributed billions of XRP to third parties pursuant to various "contracts." Def. Br. at 11; *see also* Counter 56.1 ¶¶ 65-68, 72-73, 85-88, 91-103, 110-132; PX 646-647, 651, 656, 704-705, 738. Ripple's counter-parties resold the XRP into public markets. SEC 56.1 ¶¶ 836-43; Counter 56.1 ¶¶ 227, 234; PX 634 ¶¶ 22, 24. These distributions were part of Ripple's strategy to get XRP off its balance sheet and into the hands of market participants in order to create XRP liquidity and to advance Ripple's interests in attracting people to its technology. Counter 56.1 ¶¶ 133-41; PX 10 at 58, 64, 124-26, 148-49; PX 14 at 117; PX 44. As Schwartz testified, Ripple gave XRP to companies to "extract value" from them. Counter 56.1 ¶ 138; PX 7 at 79-80, 163-64. This value included subsidizing companies that were "developing use cases" for Ripple's technology, Def. Br. at 37, as Ripple told investors it would do with XRP proceeds. Counter 56.1 ¶¶ 43-45; SEC 56.1 ¶¶ 362-74.

---

[7]     This irrelevant contention ignores that Ripple contractually employed four market makers to act as conduits for these XRP sales. Counter 56.1 ¶¶ 441, 445, 449, 452; PX 660-663. And it ignores black letter law that contracts may be written or implied, and that the sale of any asset necessarily involves a contract, as long as the requirements of offer, acceptance, and consideration are met.

Accordingly, Ripple recorded in its financial statements "consideration other than cash" worth $609 million from these distributions. SEC 56.1 ¶ 147; Counter 56.1 ¶¶ 70-71, 455; PX 750, 751.

## IV. THE INDIVIDUAL DEFENDANTS' DOMESTIC XRP OFFERS AND SALES.

The Individual Defendants were in the U.S. for the vast majority of the time they offered and sold XRP—94% of the time for Larsen (SEC 56.1 ¶ 1111; PX 393 at 7-8; PX 2 at 157) and 86% for Garlinghouse (*id.* ¶ 1159; PX 454 at 6-9). The Individual Defendants sold the "overwhelming majority" of their XRP through GSR on crypto asset trading platforms. Def. Br. at 63.

The Individual Defendants "engage[d] GSR to liquidate XRP and extract maximum value in either bitcoins or US Dollars." Counter 56.1 ¶ 304; PX 612, PX 614, PX 615, at Preamble. Larsen's first contract provided that title to his XRP passed to GSR at the time Larsen gave the XRP to GSR. Counter 56.1 ¶ 299; PX 610 § 2.7(b). The subsequent liquidation contracts, which the Individual Defendants signed in the U.S., gave GSR "custody and control" of their XRP. Counter 56.1 ¶¶ 302-03, 306; PX 612, PX 614, PX 615 § 2.3; PX 393; PX 454. "GSR's right to payment vest[ed]" as soon as GSR took custody of the XRP. Counter 56.1 ¶ 307; PX 612, PX 614, PX 615 § 2.6. The agreements "automatically terminate[d]" once "all applicable [XRP] ha[d] been liquidated…and GSR ha[d] deposited the proceeds" in the Individual Defendants' accounts. Counter 56.1 ¶ 306; PX 612, PX 614, PX 615 § 2.3. The contracts did not require the Individual Defendants to submit sell orders to GSR. Instead, GSR employed a trading algorithm that ran 24 hours a day and continuously generated orders to sell. Counter 56.1 ¶ 355; PX 26 at 311-12.

Pursuant to these contracts, Larsen transferred 1.5 billion ($495 million) and Garlinghouse transferred 167 million ($105 million) XRP, from accounts at Bitstamp, U.S.A., a California platform registered with the U.S. Department of the Treasury, to GSR. Counter 56.1 ¶¶ 314, 377; PX 202 at 27-31; PX 574; SEC 56.1 ¶¶ 1112, 1162; PX 81 at 180; PX 394, 732. These transactions were reflected on the XRP Ledger. Counter 56.1 ¶ 315; PX 202 at App'x E. To transfer their XRP to

10

GSR, the Individual Defendants used their private cryptographic keys to digitally sign a transaction transferring the XRP from the XRP Ledger "address" they controlled to the "address" supplied by GSR. Counter 56.1 ¶¶ 317-18; PX 12. Once GSR resold the XRP, it deposited the proceeds into the Individual Defendants' U.S. Bitstamp accounts. SEC 56.1 ¶¶ 1113, 1162; PX 394; PX 81 at 180-82. The Individual Defendants transferred those funds in U.S. dollars into their U.S. bank accounts. *Id.*

## ARGUMENT

Defendants violated Section 5 by conducting an unregistered, public offer and sale of securities with their Programmatic Sales, Institutional Sales, and other distributions of XRP. SEC Br. 27-33, 49-66. These were direct and indirect offers and sales of investment contracts because the public investors that bought XRP ("XRP investors") made an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S 293, 301 (1946).

Betraying the weakness of their case, Defendants refuse to grapple with *Howey* and lead by asking the Court to reject it in favor of their own manufactured test cobbled together from state law and a misreading of *Howey*. Defendants then demand summary judgment on the basis that they pass their own test. Defendants' tactic is doomed from its inception, as *Howey* and its progeny are the controlling law, and mandate judgment in favor of the SEC. Defendants' argument, that the Court should restrict the term "investment contract" only to the investment products that existed prior to 1933, runs directly counter to decades of Supreme Court jurisprudence rejecting attempts to limit the federal securities laws in this fashion. It is ironic that Defendants have unleashed a technologically advanced investment product but rely on stale jurisprudence that was supplanted by federal laws meant to regulate any number of novel means to offer and sell securities.

Even before the federal regulation of securities, state securities (*i.e.*, "blue sky") laws were "broadly construed by state courts so as to afford the investing public a full measure of protection."

*Howey*, 328 U.S. at 298; *see also SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) ("The weight of authority is committed to a liberal construction of the blue sky laws."); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 123 (1953) (state laws call for an expansive definition of "public" offering). Thus, even before *Howey*, the Supreme Court recognized that the reach of the federal securities laws did "not stop with the obvious and commonplace." *Joiner*, 320 U.S. at 351. Three years later, in *Howey*, the Court likewise held firm to the "statutory purpose of compelling full and fair disclosure relative to the issuance" of securities and noted that the concept "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

The Supreme Court has since repeatedly re-affirmed that the term "securities" should be expansively construed and is broad in scope and meaning, and that form should be disregarded for substance with an emphasis on economic reality. *E.g.*, *Ralston Purina Co.*, 346 U.S. at 124; *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847-48 (1975); *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990) (Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment"); *SEC v. Edwards*, 540 U.S. 389, 393-94 (2003); *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102-03 (2019).

These decisions in the long line of the Supreme Court's securities laws jurisprudence show that Defendants' argument—the term "investment contract" should be read in a significantly more restrictive manner than it was in *Howey*—cannot be countenanced. They also affirm that novel or technically innovative investment products fall squarely within the reach of our securities laws when, under *Howey*, economic reality shows they were offered and sold as investment contracts.

## I.     THE INVENTED "ESSENTIAL INGREDIENTS" TEST FAILS.

Defendants have argued, on the record, that the *Howey* test "shouldn't even apply to XRP and other digital assets." PX 2 at 45. That remains the thrust of Defendants' Motion. Although now,

instead of explicitly asking the Court to overrule *Howey*, they advance the equally radical proposition that *Howey*'s flexible test should be supplanted by the strictures of the *state* law that predated the federal regulation of securities and ignoring 75 years of *federal* court precedent. Defendants also argue that *Howey* controls but that two words, "essential ingredients," refer not to the test the Supreme Court expressly established and the courts have applied in the decades since, but instead to another, implied test which Defendants have for the first time discovered. Defendants thus claim *Howey* requires a contract (maybe written, but it is not clear), written contractual obligations on the promoter to engage in "efforts," and written contractual rights for investors to receive distributions.

Even setting aside the extremist argument that the Court should ignore binding precedent, Defendants' "essential ingredients" test should be dismissed out of hand. The "written contract" part of their manufactured test does not exist and does not help Defendants, because they sold every unit of XRP at issue here pursuant to written or implicit contracts. The other two fabricated requirements (the existence of particular provisions within the contracts) are foreclosed not just by *Howey* but by subsequent, controlling cases. Thus, many courts have found investment contracts without these purported "essential ingredients," especially in the modern age where the investment products at issue—including crypto assets like XRP—were offered and sold online.

The Court should reject Defendants' far-fetched theories, apply *Howey* to this case, and find that Defendants engaged in unregistered offers and sales of securities.

### A.    *Howey* and Federal Securities Law, Not Pre-1933 State Law, Control.

Defendants' reactionary argument, that the Court's "investment contract" analysis should look only at pre-1933 state law decisions, should be summarily rejected. Defendants do not and cannot cite a single case saying that state law should govern this federal securities laws dispute. On the other hand, the SEC's opening brief demonstrated that federal courts have for 75 years consistently applied and fleshed out *Howey*'s test for determining the existence of investment

13

contracts. *See, e.g.,* SEC Br. at 4-6, 46-48, 54-57 (citing more than 20 cases applying *Howey*). Notable examples include recent decisions from the Supreme Court and the Second Circuit that unequivocally affirm that *Howey* remains the bedrock of any "investment contract" analysis. *See, e.g.,* *Edwards*, 540 U.S. at 393 ("The test for whether a particular scheme is an investment contract was established in our decision in [*Howey*]"); *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008) ("We write today to underscore that, in applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship").

Just as courts routinely affirm *Howey*'s enduring and central role in Section 5 cases, the Supreme Court has long held that federal law, not state law, governs disputes arising under the federal securities laws. To be sure, *Howey* recognized that the term "investment contracts" had become "crystallized" in state blue sky laws. The whole point of *Howey* and the *federal* securities laws, however, is that the federal securities laws go beyond certain restrictive state law contract principles and look to the totality of the offering. *E.g., Joiner*, 320 U.S. at 349 ("Whether, as the dissenting Judge below suggests, the assignee acquired a legal right to compel the drilling of the test well is a question of state law which we find it unnecessary to determine"); *Tcherepnin*, 389 U.S. at 337-38 ("While Illinois law gives legal form to the withdrawable capital shares held by the petitioners, federal law must govern whether shares having such legal form constitute securities under the Securities Exchange Act"); *Reves*, 494 U.S. at 71 ("The 'maturity' of the notes, however, is a question of federal law…We are unpersuaded that Congress intended the Securities Acts to apply differently to the same transactions depending on the accident of which State's law happens to apply.").

Directly refuting Defendants' state law argument, the Supreme Court has held that federal law controls even where doing so means disregarding "essential elements" of common law actions that were precursors to the federal securities statutes. *SEC v. Cap. Gains Res. Bureau*, 375 U.S. 180, 192, 194 (1963) ("It is true that at common law intent and injury have been deemed essential

elements in a damage suit between parties to an arm's-length transaction. But this is not such an action … the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and … the doctrines must be adapted to the merchandise in issue.") (citations omitted). The Second Circuit has followed suit. *See SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998) (the definition of "offer" in the Securities Act "extends beyond the common law contract concept").[8]

So extreme is Defendants' position that pre-1933 state law, and not *Howey's* flexible test and the subsequent federal cases interpreting it, should govern this case, that even Ripple's own industry trade group rejects it in an *amicus* brief arguing that the *Howey* test should be applied without modification to determine if the initial sale of a digital asset is a security. D.E. 649 at 8.

Defendants' attempts to erase 75 years of federal securities law jurisprudence, and return to state laws that predate federal securities regulation, while at the same time accusing the SEC of "not following" and "seeking to remake" the law, Def. Br. at 4, should be rejected.

### B. Defendants' "Essential Ingredients" Argument Wildly Misstates *Howey.*

Defendants' "essential ingredients" argument further seeks to distort *Howey* by reading into its holding requirements that simply do not exist.

Using plain words, *Howey's* test for determining the existence of an "investment contract" is unmistakable: "an investment contract for purposes of the Securities Act *means a contract, transaction or scheme* whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-299 (emphasis added); *see also id.*

---

[8]     Defendants seek to minimize *Cavanagh*, another Section 5 case, because it addressed the term "offer" and not "investment contract," noting that the former is defined in the Securities Act and the latter is not. Def. Br. at 26. This distinction is meaningless, because the Supreme Court defined "investment contract" for purposes of federal law. Nor can Defendants distinguish *Cavanagh's* holding, consistent with Supreme Court precedent, that federal securities laws definitions are not bound by common law definitions of the same terms.

at 301. The Second Circuit has long recognized that this identifies the "specific requirements that continue to be the analytical foundation for determining what constitutes an investment contract." *Gary Plastic Packing Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir 1985).

Defendants claim that *Howey also* held that a written contract, contractual obligations by the issuer, and contractual rights for the investor are "essential ingredients" to an investment contract. This argument takes the words "essential ingredients" in *Howey* entirely out of context.

*Howey*'s single mention of "essential ingredients" is not found in any part of the opinion setting forth the test, or elements of a test, for determining the existence of an investment contract. Rather, having concluded the land sale plus the orange-grove servicing arrangement constituted a scheme whereby investors "provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise," and that this constituted "all the elements of a profit-seeking business," the Court emphasized that not all investors had accepted the servicing contracts. 328 U.S. at 300. It held this did not change the analysis because Section 5 "prohibits the offer as well as the sale of unregistered, non-exempt securities" such that "it is enough that the [promoters] merely offer the essential ingredients of an investment contract." *Id.* at 300-01.

The foregoing demonstrates that the reference to "essential ingredients" was to the test the Court had already articulated. Lest any doubt remain, immediately following the point about the unaccepted offers the Court repeated the test without including any element Defendants now claim is essential, stating: "*The test* is whether the *scheme* involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301 (emphases added).

Moreover, nowhere does the Court say, in referring to "essential ingredients" or anywhere else, that *any* contract is required, let alone a written one. To the contrary, *Howey* flat-out rejected the notion that a contract or other formal document is required, holding it is "*immaterial* whether the shares in the enterprise *are evidenced by formal certificates* or by nominal interests in the physical assets

employed in the enterprise." *Id.* at 299 (emphasis added). Nor does *Howey* say that a contract must have clauses obligating the issuer to expend efforts or granting rights to profits. Simply put, if the Court had wanted any of Defendants' proposed "essential ingredients," it would have said so.

Defendants' argument that a contract is required also ignores that, as recognized in *Howey*, Section 5 prohibits unregistered "offers," just as it does sales. As one court in this District has held, "[i]f Section 5 were concerned only with the creation of legally enforceable contracts for the sale of unregistered securities, [its] prohibition on offers…would not have been included in the statute. Thus, even if the 'offer' in this case, once accepted, did not give rise to an enforceable contract, that fact is immaterial for purposes of determining whether the harm with which Section 5 is concerned occurred." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 368 (S.D.N.Y. 1998) *aff'd* 155 F.3d at 129.

Defendants also cannot square their argument with *Howey*'s express holding that "an investment contract for purposes of the Securities Act means a contract, *transaction **or** scheme*." 328 U.S. at 298-99 (emphasis added). *Howey* similarly used the word "scheme" when describing state courts' interpretation of blue sky laws that Defendants argue should control. *Id.* at 298 ("An investment contract thus came to mean a contract or scheme…"). Sixty years later, the Court affirmed that "the test for whether a particular *scheme* is an investment contract was established in [*Howey*]." *Edwards*, 540 U.S. at 393 ("We look to 'whether the scheme involves an investment of money in a common enterprise….'") (quoting 328 U.S. at 301). The use of these words contemplates that "the security not be formed of one neat, tidy certificate, but [by] a general 'scheme' of profit seeking activities." *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989). Thus, courts have held that in applying *Howey* a "written contract does not control." *Baroi v. Platinum Condo Dev., LLC*, 914 F. Supp. 2d 1179, 1192 (D. Nev. 2012) (citing *Hocking*, 885 F.2d at 1457).

Defendants nevertheless claim that the Court chose the words "transaction or scheme" merely to convey that a court should look to "the broader context in which the instrument is

grounded." Def. Br. at 25. But Defendants cannot cite a single case applying such a limitation. Ironically, while asking the Court to ignore the key words from *Howey*'s paramount sentence or give them their plain meaning, Defendants' elsewhere implore that dictionary definitions should govern and that "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning…'" Def. Br. at 14-15 & n.11 (citations omitted).[9]

Defendants also argue that the words "transaction or scheme" only "capture the undisputed point that a court will look at a contract in its full context" to determine what the investor was led to expect. Def. Br. at 26. This argument is inconsistent with the Supreme Court's use of the disjunctive "or" and does too much surgery to the text of the decision. The Court *did* state that expectation of profits (an actual ingredient of the *Howey* test) came not from either of the two contracts at issue, but instead from the "sales talk," what the "advertising mentions," and what was "represented." *Howey*, 328 U.S. at 295-97; *see also* Tr. in *SEC v. W.J. Howey*, No. 45-843, App'x A hereto ("Howey Record") at 20-28. According to Defendants, "contract, transaction *or* scheme" actually means "a written contract *and* a sales talk," a reading that the plain words of *Howey* do not bear.

That said, Defendants concede it is "undisputed," Def. Br. at 26, that the relevant statements do not need to be in any written contract (a point that even Defendants' expert concedes). *See* D.E. 548-8 at 61-64. This is fatal to Defendants' argument that written contractual obligations or rights are required. At a minimum, they cannot delineate from *Howey* how many of these supposedly required "contractual provisions" may actually come from oral representations.

Left with nothing else, Defendants' argument boils down to the absurd contention that a written contract is required simply because *Howey* (and some cases applying it) happened to involve

---

[9]     Likewise, the argument that Congress intended an investment contract to be limited to "evidence of debt or property," Def. Br. at 14-15, would render the term "investment contract" surplusage in the definition of "securities," which *separately* includes products such "any note, stock…[or] evidence of indebtedness." 15 U.S.C. § 77b(a)(1); *see also infra* § II.B.3(a).

written contracts. If legal tests were derived from the facts of a case, the *Howey* test could be validly

read to mean that orange groves and land in Florida are required to prove an "investment contract."

While Defendants focus on cases involving contracts in their underlying fact patterns, most of these

occurred before technological advances made possible offering and distributing securities and other

assets widely via electronic means beyond the formalities of written offers or contracts. Defendants

do not and cannot cite a single case *holding* that a written contract *is required* to establish an

investment contract under the federal securities laws.[10]

Defendants also argue that each pre-*Howey* state law case involved a contract. Def. Br. at 18-

19. This is both unsurprising and uninformative. The sale of an asset generally involves a contract, as

long as offer, acceptance, and consideration exist. *See, e.g. Joiner*, 320 U.S. at 349 ("the acceptance of

the offer quoted made a contract"). Whether an asset is offered or sold as an investment contract is

assessed under the *Howey* analysis handed down by the Supreme Court. Since that analysis does not

require that a common-law contract be present, either in a written or strictly oral form, its absence is

of no consequence. Of course in today's world, securities transactions do not occur as in 1933.[11]

### C. Courts Applying *Howey* Do Not Require the Existence of a Written Contract or Defendants' Other Purported "Essential Ingredients."

Defendants do not cite a single case using their non-existent "essential ingredients" test. And

while they claim that their "research has found no case finding an investment contract" without a

written agreement of sorts, Def. Br. at 19, many such cases exist, stretching back decades. Just last

---

[10]    Even if the presence of a written contract were required (it is not), every single sale here would satisfy that element. According to Defendants, Ripple entered into "more than 1,700 relevant contracts" in connection with its XRP distributions, Def. 56.1 ¶ 105 n.3, and sold all of its Programmatic Sales pursuant to contracts of sales. Counter 56.1 ¶¶ 441-54; PX 660-63.

[11]    Thus, Article 8 of the Uniform Commercial Code was amended in 1994 to eliminate the requirement that a contract to buy a security be reflected in a writing, because such requirement is "unsuited to the realities of the securities business" such that, under state law, oral contracts for sales of securities are permitted. *See* U.C.C. § 8-113, 1994 official text with comments (West 1994).

month, a district court held the term "investment contracts" is "broad enough to include unwritten instruments." *McKinney v. Panico*, 2022 WL 4551695, at *9 (N.D. Ill. Sept. 29, 2022) (citing *Canadian Imperial Bank of Comm. Tr. Co. v. Fingland*, 615 F.2d 465, 467 & n.5 (7th Cir. 1980) ("oral agreements have been held to be securities" and "a writing is not mandatory")).

Similarly, in *Marini v. Adamo*, defendants were found liable for fraud in the sale of "investment contracts," even though no formal or written contract existed. 995 F. Supp. 2d 155, 203 (E.D.N.Y. 2014). *Marini* determined that investment contracts existed while also finding defendants liable for unjust enrichment, a claim that was only available "in the absence of any agreement." *Id.*[12]

The First Circuit has also found investment contracts based solely on representations on defendant's website, and in the absence of a written contract, in *SEC v. SG Ltd.*, 265 F.3d 42, 49-55 & n.2 (1st Cir. 2001). *SG Ltd.* reached this holding despite the district court's finding that the investors' payments to defendant were part of a "[video] game lacking a business context" that "was not part of the commercial world." *Id.* at 46, 47. And the court reached this result after noting that "[t]he Supreme Court has long espoused a broad construction of what constitutes an investment contract" and that *Howey* "has proven to be versatile in practice. Over time, courts have classified as investment contracts a kaleidoscopic assortment of pecuniary arrangements that defy categorization in conventional financial terms, yet" satisfy *Howey* in light of economic reality. *Id.* at 47.

The Tenth Circuit took the same approach in *SEC v. Scoville*, another case involving investment products offered and sold solely over the internet, which the court had little trouble holding were securities. 913 F.3d 1204, 1221-22 (10th Cir. 2019). The court reached this finding

---

[12]     *Marini* earlier denied defendant summary judgment on the "investment contract" issue, despite the absence of any formal or written contract. *Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011). The Second Circuit later affirmed defendant's securities fraud liability. 644 F. App'x 33 (2d Cir. 2016). While the court reversed the unjust enrichment ruling, it did so because it was duplicative of plaintiffs' common law fraud claims and noted that an unjust enrichment claim would not have been available had a contract existed. *Id.* at 35-36.

without discussing any written contract, while noting that there was no contract governing how investors would be repaid. *Id.* at 1210 ("neither the website nor any other publicly available source of information informed the members how [the issuer] split the revenue between itself and [investors]"). Investment contracts thus existed even though the investors' only expectation of profits came from "the representations made to them" on the websites. *Id.* at 1222.[13]

### D. Crypto Asset Offerings Routinely Satisfy *Howey* Despite the Absence of a Written Contract or Defendants' Other Purported "Essential Ingredients."

Various courts, including in this district, have repeatedly found that crypto asset offerings violate Section 5 in cases where formal contracts or Defendants' other "essential ingredients" were absent. *Balestra v. ATBCOIN LLC* did not discuss any formal contract between the purchasers and sellers of digital tokens but still found the existence of an investment contract despite the absence of this and another of Defendants' "essential ingredients," the entitlement of investors to share in the issuer's profits. 380 F. Supp. 3d 340, 352-57 (S.D.N.Y. 2019) ("ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction. However, such a formalized profit-sharing mechanism is not required…") (citations omitted). Instead of being governed by a contract, the investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website. *Id.* at 355. While Defendants state in conclusory fashion that *Balestra* "involved contractual rights and obligations," Def. Br. at 35, they fail to identify the existence of any formal contract governing the investments in that case.

---

[13]     Two other appellate Section 5 decisions are consistent with this approach and inconsistent with the notion that a written contract is required to constitute an actionable "offer or sale" of a "security." In *Geiger v. SEC*, the D.C. Circuit found a defendant who had sold securities to the public through an intermediary and therefore had no contact with members of the public nevertheless liable under Section 5. 363 F.3d 481, 487 (D.C. Cir. 2004). And *Chinese Consol. Benevolent* held a *distributor* of securities liable even though the distributor had "no contractual arrangement or even understanding" with the original issuer of the securities. 120 F.2d at 740-41.

Another crypto asset offering case, *SEC v. Telegram Grp., Inc.*, involved a two-stage offering. The first stage involved a contractual agreement to sell Grams to 175 sophisticated investors, who the court determined to be "statutory underwriters." 448 F. Supp. 3d 352, 358-59, 380-81 (S.D.N.Y. 2020). In the second stage, these investors would "res[ell] [the] Grams into the secondary public market [as] an integral part of the sale of securities without a required registration statement." *Id.* at 358-59. This "unload[ing of] … Grams into the secondary market" was not pursuant to any written contract. Despite this, the court concluded: "the intended and expected resale of Grams into a public market [amounts] to the distribution of securities." *Id.* at 381.

*SEC v. Kik Interactive* likewise involved an offering consisting of a private sale to "50 sophisticated participants" and a general distribution to 10,000 public investors. 492 F. Supp. 3d 169, 174-76 (S.D.N.Y. 2020). While the private sales were governed by written agreements that acknowledged the investments were "securities," the only documentation for the public sales were a "Terms of Use Agreement" which "constitut[ed] the entire agreement between the purchaser and Kik." *Id.* The agreement expressly disclaimed any obligations on the part of Kik. *Id.* at 175. Despite this express absence of Defendants' "essential ingredients"—namely post-sale obligations on the part of the issuer or the right of the investors to make demands on the issuer—the court determined the public sales violated Section 5. *Id.* at 177-180 ("Rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of Kin.") (citing *Balestra*, 380 F. Supp. 3d at 354).[14]

---

[14]     In holding that the public offering violated Section 5, *Kik* observed: "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract." 492 F. Supp. 3d at 178 (citing *Joiner*, 320 U.S. at 352-55, and *Tcherepnin*, 389 U.S. at 336). Defendants' attempt to distinguish *Kik* because Kik issued "Simple Agreements for Future Tokens," Def. Br. at 34-36, 47, is misleading. That was only half of Kik's offering. The other half was a direct public offering to thousands, just as Ripple conducted a two-prong offering: a broad distribution of XRP (through contracts with GSR) *in addition* to conducting an offering of XRP via contracts with institutional investors. 492 F. Supp. 3d at 174-76.

*Balestra*, *Telegram,* and *Kik* are consistent with other in-circuit decisions where investment contracts were found to exist despite the absence of Defendants' "essential ingredients." *United States v. Zaslavskiy* found the indictment sufficiently alleged the existence of investments contracts, even though it did not allege that investors entered into formal contracts, but rather simply purchased crypto assets on a website. 2018 WL 4346339, at *7 (E.D.N.Y. Sept. 11, 2018); *see also* Indictment in No. 17 Cr. 647 (D.E. 7) (E.D.N.Y. Nov. 21, 2017). The court held these allegations satisfied *Howey* based on marketing in online advertising and websites. *Zaslavskiy*, 2018 WL 4346339 at *2, *4-*7.

Recently, *Audet v. Fraser* reached the same result when the court reversed a jury's defense verdict and held that a crypto asset called "Paycoin" was an investment contract. 2022 WL 1912866, at *15-*18 (D. Conn. June 3, 2022). *Audet* did so even though Paycoin "traded on public exchanges," which did not require any common law contract between investors and the issuer. *Id.* at *9, *16. Because Paycoin traded in public markets, "its price is determined by market forces," *id.*, as opposed to contractual obligations owed by the issuer to investors. As for investors' expectation of profits, as in the above cases, they were premised not on contractual obligations, but instead on the issuer's "promotional materials," "press release[s]," and "graphic[s] on its website." *Id.* at *16.

Finally, out-of-circuit courts have reached the same result. *In re Bitconnect Secs. Litig.*, found that sales of a crypto asset called "BitConnect Coins" on a crypto asset trading platform involved sales of investment contracts. 2019 WL 9104318, at *1, *6-*9 (S.D. Fla. Aug. 23, 2019). The court reached this finding even though there was no discussion of any contract between investors and sellers and the complaint contained "no allegations regarding a relationship between any of the Plaintiffs [investors] and [defendant promoters]." *Id.* at *10. On appeal, the Eleventh Circuit determined that the crypto asset sales were subject to the federal securities laws. *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1344-46 (11th Cir. 2022). In doing so, the court looked solely at representations made on websites and YouTube videos, and did not identify any contract. *Id.*

Likewise, in *Beranger v. Harris*, the court found the complaint sufficiently alleged that offers and sales of crypto asset tokens were securities transactions without reference to any contract and with expectation of profits premised on defendants' promotional statements in a "whitepaper" and on social media posts. 2019 WL 5485128 at *1, *3-4 (N.D. Ga. Apr. 24, 2019). *Solis v. Latium Network, Inc.* reached the same conclusion, even for a "general sale" of crypto asset tokens. 2018 WL 6445543, at *1 (D.N.J. Dec. 10, 2018). As in the above decisions, the *Solis* defendants' representations in "promotional materials, advertising methods, and public statements"—not the terms of any contract—caused investors to expect profits. *Id.* at *3.

* * *

In short, Defendants' "essential ingredients" test is not in *Howey* or any of the dozens of cases, including Supreme Court and Second Circuit cases, applying the *Howey* test. To the contrary, the test is fundamentally inconsistent with *Howey*. Defendants' attempt to squeeze out of two words in *Howey* an entire, new test to determine the existence of investment contracts should be rejected.

## II. DEFENDANTS OFFERED AND SOLD INVESTMENT CONTRACTS TO PUBLIC INVESTORS.

Applying the actual law that governs this case, the *Howey* test, demonstrates that Defendants offered and sold investment contracts and that their contrary arguments all fail. *Howey* asks "'whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" *Leonard*, 529 F.3d at 88 (quoting *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)). In applying *Howey* "courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions." *Id.* at 85.

As noted, courts, including many in this district, have held that unregistered offers and sales of crypto assets violated Section 5 (on motions for summary judgment as a matter of law or on a motion to dismiss assuming allegations to be true). *See also* SEC Br. at 49 (collecting cases); *Johanputra*

24

*v. Kim*, 2022 WL 4538201, at *8 n.8 (S.D.N.Y. Sept. 28, 2022) ("courts in this district have applied the *Howey* test to determine that cryptocurrency tokens intended to be sold on a blockchain or in the general market were securities … [defendant] points to no case to the contrary") (citations omitted).

Here, the economic reality of Ripple's business is straightforward. Ripple did not grow exponentially in size or raise over $2 billion from selling software. "The evidence clearly points to the fact that" Ripple's "explosive growth was driven by members purchasing and repurchasing" XRP "in order to obtain the incredible returns on their investment, not by intense demand for" any software services. *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1302 (D. Utah 2017) *aff'd sub nom SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), *cert. denied* 140 S. Ct. 483 (2019).

## A. Public Investors "Invested Money" When They Bought XRP.

Defendants do not dispute that Ripple's Institutional and Programmatic Sales of XRP and all of the Individual Defendants' sales were made in exchange for cash or other consideration. This satisfies *Howey*. *E.g.*, *Telegram*, 448 F. Supp. 3d at 368-69.

Defendants nevertheless purport to "expressly reject" that there was an "investment of money" with respect to their $1.5 billion in XRP sales, suggesting that *Howey's* first prong distinguishes between a "payment" and an "investment." Def. Br. at 37 n.23. No such distinction exists. The inquiry is whether investors "provide[d] the capital," *Howey*, 328 U.S. at 300, "put up their money," *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027, 1034 (2d Cir. 1974), or "provid[ed]" cash. *Telegram*, 448 F. Supp. 3d at 368-69; *see also Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559-60 (1979) (investment contracts are formed based on "money paid" for property). To the extent Defendants' "payment" versus "investment" distinction alludes to their statements that XRP is an "ordinary asset" such as gold, it is a non sequitur. Defendants never *argue* they sold XRP as an "ordinary asset," likely because such argument would run into a thicket of cases holding that

25

ordinary items with intrinsic value (which XRP did not have) may be sold as investment contracts, including *Howey* itself. *See infra* § II.B.4.

Defendants do argue that in *some* "cases, the recipients of XRP from Defendants did not exchange money, or any other financial consideration," but that, instead, Ripple "invested" in these companies by transferring XRP to them. Def. Br. at 36-37. This misconstrues the "sale" at issue. Section 5 prohibits "directly or *indirectly*" offering or selling securities without filing a registration statement. 15 U.S.C. § 77e(a), (c) (emphasis added). Accordingly, a "public offering" or "distribution" must be registered. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959). That "'[d]istribution' comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and *ultimately comes to rest in the hands of the investing public*.'" *R. A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (emphasis added) (citation omitted). When Ripple transferred XRP to certain recipients, it was but the first step in a public distirbution.[15]

Defendants concede that the parties that received XRP from Ripple, such as an "xPring recipient," could "transfer their XRP (in exchange for units of another currency, goods, or services) to another holder." Def. Br. at 38; *see also* Counter 56.1 ¶ 102(a); PX 6 at 392-93. The undisputed facts show this is exactly what occurred and that Ripple took steps to manage these sales. *See* SEC Br. at 31-32, 64-65; SEC 56.1 ¶¶ 835, 843; PX 193, 194, 199; Counter 56.1 ¶¶ 214-15; PX 36 at 144-45. In other words, Ripple distributed XRP to the public, whether directly or through intermediaries.

---

[15]    Ripple also argues that its distributions of XRP to "early adopters and developers," Def. Br. at 36, and/or in connection with "bounty" programs, *id.* at 37, do not satisfy *Howey*. The SEC did not charge these transactions, *see* Am. Compl. (D.E. 46) ¶ 91 Tbl. 1, ¶ 170 Tbl. 3, 432, even though the law supports doing so. *E.g.*, *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 940-41 (S.D. Ohio 2009) ("[W]here a 'gift' disperses corporate ownership and thereby helps to create a public trading market it is treated as a sale. In other words, where a gift is followed by widespread downstream sales of those securities, these would-be gifts may be characterized as a subterfuge to evade registration.") (citations and quotations omitted) *aff'd* 712 F.3d 321 (6th Cir. 2013).

And, even if the relevant analysis ends at Ripple's distribution of XRP to these intermediary recipients (it does not), Ripple recognized over $609 million in revenue with respect to such XRP distributions while stating that it had received "other consideration" for them. SEC 56.1 ¶ 830; PX 45 at Ex. 2; Counter 56.1 ¶ 455; PX 750 at RPLI_SEC 0301117; PX 751 at RPLI_SEC 0920433; *see supra* Counter-Statement of Facts § III.B.[16]

### B.    XRP Investors Entered Into a Common Enterprise Among Each Other and With Ripple.

A common enterprise can be established through a showing of "horizontal commonality," which "ties the fortunes of each investor in a pool of investors to the success of the overall venture." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (citations omitted). Additionally, courts routinely hold that a common enterprise can also be shown through "strict vertical commonality" which "requires that the fortunes of investors be tied to the fortunes of the promoter." *Id.* at 88 (citation omitted); *Telegram*, 448 F. Supp. 3d at 369 (collecting cases).

XRP investors invested in a common enterprise that satisfies both commonality standards. Horizontal commonality exists because Ripple treated investor cash indistinguishably in its accounts and spent it to find use and value for XRP, which benefited all XRP holders equally. *See* SEC Br. at 50-51; SEC 56.1 ¶¶ 150-52, 162-70, 647-51. This is "not a scenario where the funds of each investor were segregated and separately managed." *Kik*, 492 F. Supp. 3d at 179. Moreover, as Defendants acknowledge (*e.g.*, Def. Br. at 37-38) all XRP are fungible and their price rises or falls together and equally. SEC 56.1 ¶¶ 206-07. Thus, an increase in XRP's price equally benefits all XRP holders, including Ripple, and vice-versa. SEC 56.1 ¶¶ 208-234. Accordingly the "return on investment" for

---

[16]    Ripple's selective quoting from *Teamsters v. Daniel* (Def. Br. at 37) is unavailing. In that case, where an employee was involuntarily enrolled into a pension plan funded entirely by employer contributions, but was really working for a cash salary, the employee had not bought an investment contract. *Daniel*, 439 U.S. at 559-60. Here, the *entire reason* Ripple gave XRP to these entities was to enroll them in undertaking projects that benefited Ripple—finding "use" for XRP and distributing it—such that Ripple received "tangible and definable consideration" for this XRP. *See id.* at 560.

any one XRP holder is "directly proportional to the amount of that investment." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000); *see also Gary Plastic*, 756 F.2d at 241 (offering "to the public at large" involved instruments that "have the equivalent value to most persons").

Strict vertical commonality is met for largely the same reasons—the fortunes of XRP investors rise and fall with those of Ripple, as a result of Ripple's initial retention of nearly all XRP created and continued holding of billions of units of XRP. Def. Br. at 5. Indeed, Defendants touted this fact as an inducement to invest in XRP. *See* SEC Br. at 15-16, SEC 56.1 ¶¶ 251-74.

Numerous cases find that purchasers of crypto assets entered a common enterprise based on these facts. *Telegram* found horizontal commonality because Telegram received the investors' funds and used them to develop a blockchain, and where if the venture failed all investors "would suffer a diminution in the value of their Grams." 448 F. Supp. 3d at 369-70. The court also found vertical commonality because the 28-percent stake in Grams that Telegram had given itself "link[ed]" the company's financial fortunes to the price of Grams and the success of the [Telegram] Blockchain." *Id.* at 370. *Kik* likewise found horizontal commonality because Kik used the funds from the sale of Kin for the "construction of the digital ecosystem it promoted" and investors "reaped their profits in the form of the increased value of Kin." 492 F. Supp. 3d at 178. And in *Audet*, horizontal commonality existed where the promoter used the funds raised via Paycoin sales to facilitate "adoption" of Paycoin, "the price of which rose and fell across the board, so that its purchasers gained or lost in proportion to the amount of Paycoin they owned." 2022 WL 1912866, at *15.[17]

---

[17]     *See also Balestra*, 380 F. Supp. 3d at 353 (finding horizontal commonality where "the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins"); *Solis*, 2018 WL 6445543, at *2 (horizontal commonality pled through allegations "that the funds raised through Latium's ICO were pooled to develop and maintain Latium's tasking platform" and "'an investor's return…is directly proportional to the amount of an investor's financial stake and number of LATX tokens owned.'") (citation omitted). Defendants' attempt to distinguish these cases as involving "ICOs" (Initial Coin Offerings) fails because whatever one calls an instrument does not control the analysis. *See Forman*, 421 U.S. at 848-49 (economic reality, not the name of a transaction, controls).

Defendants do not directly confront these tests. Instead, Defendants misstate the law with respect to horizontal commonality by incorrectly arguing it requires pooling of the *Individual Defendants'* XRP proceeds, ongoing contractual obligations, absolute control of the common enterprise by Ripple, and that investors have a legal right to Ripple's assets. These are more Defendant-invented requirements. And Defendants misstate the viability of strict vertical commonality and then misapply that test through a confused comparison of XRP to Ripple stock.

1.  **Defendants' Attempts to Add Requirements to the "Horizontal Commonality" Test Should be Rejected.**

    (a)  **Neither Formalized Mechanisms for Profit Nor "Participatory Interests" in Pooled Assets Are Required.**

Defendants try to add two non-existent requirements to horizontal commonality: that investors have "participatory financial interests" in the pool of assets and rights to "receive profits or dividends … from Ripple or [the] common pool." Def. Br. at 44-46. This fails for two reasons.

*First*, no court has ever held that profits, dividends, or "participatory financial interests" are required to establish commonality or any part of *Howey*. "Horizontal commonality is established when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 87). As for the type of profits, a "formalized profit-sharing mechanism," such as rights to pro rata distributions, "is not required." *Balestra*, 380 F. Supp. 3d at 354. Likewise, "receiving a pro-rata distribution of profits … is not required." *Kik*, 492 F. Supp. 3d at 178. "[P]rofits in the sense of income or return," includes "for example, dividends, other periodic payments, *or the increased value of the investment*." *Edwards*, 540 U.S. at 394 (emphasis added).[18]

---

This principle is crystallized here given that, at some point during the height of ICOs, Ripple considered a media strategy to cast XRP as the first ICO. *See* Counter 56.1 ¶ 438; PX 526; PX 741.

[18]    To the extent Defendants suggest *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 71 (1959), requires a pro-rata distribution of profits to establish commonality, Def. Br. at 22, the case

Nor does horizontal commonality require that investors retain some legal interest over the funds raised (such as to Ripple's "bank accounts," Def. Br. 46), or "participatory interest" in a group of assets. *See e.g., id.* at 38, 41, 45-47. Rather, "profits" refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Edwards*, 540 U.S. at 394.

Defendants' convoluted argument that *Kik* and *Telegram* involved a "business venture [that] pooled the investments [to] launch new blockchains[] in order to create profits in which participants shared a participatory interest," is wrong. Def. Br. at 47. Neither *Telegram* nor *Kik* refer to any "participatory interest" in a business venture, a blockchain, a pool of assets, or anything else, any more than *Howey* does. The pooling in those cases was the same type of pooling here: using the proceeds from the token sale to engage in efforts to increase use and demand for the tokens. And the fortunes in those cases were the same type of fortunes here: capital appreciation through an increase in the price of the token. *See Telegram*, 448 F. Supp. 3d at 369 ("Telegram pooled the money received from" buyers, used it for a common enterprise, and all buyers "would be equally affected" by token's price changes); *Kik*, 492 F. Supp. 3d at 178 (Kik pooled proceeds from the sales to fund operations, and "investors reaped their profits in the form of the increase valued of Kin").

That the "XRP Ledger was operational before a single unit of XRP" existed, Def. Br. at 47, even if true, *but see supra* n.4, is similarly irrelevant. *Telegram* involved a company that had a well-developed, "signature product," which it promised to leverage to increase the value of a new blockchain "ecosystem." 448 F. Supp. 3d at 359. *Howey* itself rejected the distinction between "established" and "new businesses" whose product was not yet developed. *See SEC v. W.J. Howey Co.*, 151 F.2d 714, 717 (5th Cir. 1945) *rev'd, Howey*, 328 U.S. at 299. In reversing the Fifth Circuit's holding, *Howey* noted the promoter was "well established in the citrus business," and "reject[ed]"

---

law demonstrates otherwise, as "profits" under *Howey* can be established by showing "*either* capital appreciation resulting from the development of the initial investment …or a participation in earnings resulting from the use of investors' funds." *Forman*, 421 U.S. at 852, 855 (emphasis added).

that an investment contract is missing where the enterprise is established and therefore "not speculative." 328 U.S. at 296, 301. The *Howey* promoter had been operating orange groves for more than twenty years, and servicing others' groves for three. *See* App'x A at 5-7 (Stip. ¶¶ 2, 3, 8); *see also infra* § II.B.4 (addressing irrelevance of an asset having "use"). Of course, here, the XRP Ledger was but the first step of a broader set of suites, products, and uses that Ripple promised to develop.

*Second*, Defendants' related suggestion that the "profits" at issue must come from the pool of assets the promoter amasses by selling investment contracts is also incorrect. *E.g.*, Def. Br. at 45. In *Howey*, the promoter pooled the proceeds from selling land and from collecting servicing fees, and used those funds to develop the enterprise. The investors' profits did not come from that pool, to which they had no "participatory interests" or other rights. Instead, they came when the promoter *sold the oranges* and then, rather than pooling the cash from those sales, allocated those proceeds *pro rata*. As the Court explained: the "company [was] accountable *only* for an allocation of the net profits based upon a check made at the time of picking." 328 U.S. at 296 (emphasis added).

### (b) Ongoing Contractual Obligations Are Not Required.

Defendants argue both that there is no common enterprise because there is *no enterprise under their control*, Def. Br. at 41-42, and also that there is no common enterprise because they *are in sole control* of whether and how to expend the proceeds from Ripple's sales of XRP. Def. Br. at 46-47. This appears to be another argument that legal *obligations* to make efforts are required, which is wrong. *See also infra* § II.C.1 (addressing lack of ongoing contractual obligations requirement).

### (c) Defendants Misstate the "Pooling" Element.

When they address *Revak*'s actual horizontal commonality test, Defendants contend that "pooling" is absent because proceeds from Ripple's sales were not pooled with the *Individual Defendants'* sales. Def. Br. at 45 n.26. This contention is factually incorrect and legally irrelevant. GSR pooled all proceeds from all XRP sales by all Defendants at least until mid-2018. *See* Counter 56.1

31

¶¶ 331; 351-56; PX 26 at 141-44. Regardless, *Revak* does not require that the issuer's *affiliates* pool *their* sales proceeds with the issuer's. The suggestion that XRP sales proceeds from "third-party sellers on exchanges" must be pooled with Ripple's, Def. Br. at 45, likewise misses the mark. What is required is that the *promoter or issuer* pool the proceeds of *its* sales, as opposed to segregating investor proceeds. *Kik*, 492 F. Supp. 3d at 178-79. Ripple indisputably did this. SEC 56.1 ¶¶ 647, 649-51.[19]

### 2. "Strict Vertical" Commonality Exists.

#### (a) Courts in this Circuit Accept Strict Vertical Commonality.

Defendants urge the Court to reject "strict vertical" commonality as a viable theory by misleadingly suggesting that the Sixth Circuit has held this approach is "inconsistent with *Howey*," Def. Br. at 48 (citing *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 224 (6th Cir. 1980)). But the Sixth Circuit said no such thing, and neither has any court in the Second Circuit.

In *Revak*, the Second Circuit first defined horizontal commonality as described above. 18 F.3d at 87. *Revak* then analyzed two forms of "vertical" commonality—"broad vertical" or "strict vertical"—and whether either could also independently establish a "common enterprise." *Revak* reasoned that "broad vertical" commonality, which links the fortunes of an investor to the *efforts* of a promoter, asks essentially the same question as whether profits are to be derived from the efforts of others, such that "two separate questions posed by *Howey* … are effectively merged into a single inquiry." *Id.* at 88. *Revak* held that, for that reason, "broad vertical" commonality was insufficient to establish a common enterprise. With respect to "strict vertical" commonalty, however, *Revak* said nothing other than, based on the record, it "need not address the question." *Id.*

---

[19]     Defendants acknowledge "XRP is fungible." Def. Br. at 37. To argue this does not establish horizontal commonality, Defendants erroneously claim that what is required is that "XRP holders depend upon one another to earn profits." *Id.* at 43. But that is not the test. The requirement is that the fortunes of XRP investors rise and fall together—as XRP's fungible character indisputably shows that they do—not that the fortunes of XRP holders are dependent upon "one another."

After *Revak*, Judge Baer observed: "courts in the Southern District have consistently held that strict vertical commonality is sufficient to establish a common enterprise." *Walther v. Maricopa Int'l Inv. Corp.*, 1998 WL 186736, at *6 (S.D.N.Y. 1998) (collecting cases). Judge McMahon agreed that "courts in this district have held that strict vertical commonality…is sufficient to establish a common enterprise," listing five pre- and post-*Revak* decisions reaching this conclusion, and held that strict vertical commonality sufficed. *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (collecting cases). Multiple courts in this circuit have since followed suit. *See Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC*, 230 F. Supp. 3d 159, 165 (S.D.N.Y. 2017); *Telegram*, 448 F. Supp. 3d at 370-71; *Gusick v. Melville Cap., LLC*, 2014 WL 349526, at *4-5 (S.D.N.Y. Jan. 31, 2014) (strict vertical commonality suffices but not satisfied); *Balestra*, 380 F. Supp. 3d at 353 n.10 (strict commonality suffices but not reaching it) (citing *Gusick*); *Audet*, 2022 WL 1912866, at *15 n.5 (strict vertical commonality suffices, was not met as to one investment, and not deciding whether it was met as to another); *Marini*, 812 F. Supp. 2d at 256 (strict vertical commonality suffices).

Against this backdrop, Defendants' contention that "most" courts that have "considered strict vertical commonality have rejected it or expressed doubts," Def. Br. at 48, is simply untrue. The principal case they cite, *Curran*, did not do so. While *Curran* did not distinguish between the two types of vertical commonality, the Sixth Circuit clearly referred to broad vertical commonality when it reasoned that finding commonality "based solely upon the fact of entrustment by a single principle of money to an agent effectively excises the common enterprise requirement of *Howey*" and would make commonality "redundant of other elements of the definition of a security." 622 F.2d at 224. This is the exact reasoning *Revak* applied to reject *broad* vertical commonality.[20] Accordingly, there is

---

[20]     The other cases Defendants cite, Def. Br. at 48 n.28, similarly do not criticize or reject strict vertical commonality. Another Sixth Circuit case, *Deckebach v. La Vida Charters Inc. of Florida*, did not mention the strict version of the test. 867 F.2d 278, 282 (6th Cir. 1989); *see also Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994) (not distinguishing between the two types of vertical

no "persuasive reasoning" from *Curran* upon which to reject strict vertical commonality, Def. Br. at 48, especially given the unified chorus of courts in this Circuit that hold otherwise.

(b)     **Defendants' and Investors' Fortunes Rose and Fell Together.**

Defendants do not dispute that the "fortunes of [XRP] investors [are] tied to the fortunes of" Ripple due to Ripple's massive XRP holdings. *See Revak*, 18 F.3d at 88. Defendants instead note that XRP investors may experience losses on their XRP holdings while Ripple the company has positive income or sees its equity increase in value. *See* Def. Br. at 48-49. These apples to oranges comparisons are unavailing. A company may run businesses as to which it has not offered investment contracts while still offering investment contracts to public investors for other aspects of its business. In *Howey* itself, for example, the promoter ran at least two businesses with income streams separate from the orange grove investments—a hotel for tourists, and orange grove caretaking services to parties that had *not* entered into the land purchase agreement. *See* App'x (Howey Record) at 7-10 (Stip. ¶¶ 8, 12, 14, 16). The *Howey* investors could suffer a loss with respect to the orange grove investments and the *Howey* promoter could still turn a profit on these separate businesses. Here, that XRP is not equity in Ripple Labs, Inc. is irrelevant to whether strict vertical commonality exists between Ripple and XRP investors. *See also* Def. Br. at 6 (referring to funds raised from sale of Ripple stock (insufficient to cover Ripple's $2 billion expenses, SEC 56.1 ¶ 145)).

Defendants' reliance on cases finding no strict vertical commonality for one-on-one arrangements between stockbrokers and their clients are all unavailing, as those cases typically involved the broker collecting a fee upfront with no additional financial exposure to the underlying investments. *See* Def. Br. at 48 & n.29. *Kaplan v. Shapiro*, for example, involved an arrangement that did not provide for "any commissions for managing" the investments. 655 F. Supp. 336, 341

_____

commonality). And, in *SG Ltd.*, the First Circuit merely took "no view as to whether vertical commonality, in either of its iterations, also may suffice." 265 F.3d at 50 n.2.

(S.D.N.Y. 1987). Conversely, *Jeanneret* involved a similar arrangement but, there, the investment manager was paid in part through a 20% performance fee for managing the investment. 769 F. Supp. 2d at 360. Thus, "financial compensation was linked to the fortunes of the investors" and strict vertical commonality existed. *Id.* Here, Ripple admittedly retained the majority of XRP in existence, and would benefit from an increase (or suffer a loss from the decrease) in XRP's value.

More generally, cases that involve one-to-one arrangements (such as *Kaplan*, *Curran*, *Deckebach*, and *Wals*, Def. Br. at 48-49 & nn. 28, 29) have nothing to do with a public distribution of securities. Indeed, Defendants emphasize the lack of individualized arrangements between Ripple and XRP investors. Def. Br. at 10-11, 37-38; *see also Gary Plastic*, 756 F.2d at 241 (distinguishing a "one-of-a-kind arrangement" with a promoter from a program "offered to the public at large").[21]

### 3. Defendants' Other "Common Enterprise" Contentions Are Wrong.

#### (a) There Is No "Economic Equivalent" of Stock Requirement.

Defendants argue a common enterprise only exists when issuers offer "the economic equivalent of stock." Def. Br. at 38. This is another requirement Defendants simply invent.

*First*, Defendants provide no support for the "economic equivalent of stock" theory other than misleadingly citing *Howey*'s passage that "all of the elements of a profit-seeking business venture [we]re present" because the "investors provide the capital and share in the earnings and profits" and the "promoters manage, control, and operate the enterprise." Def. Br. at 38, 44-47 (citing *Howey*, 328 U.S. at 300). But that passage does not purport to define "common enterprise." It simply describes the classic profit-seeking business that existed despite the presence of various separable parts, with

---

[21]    Defendants finally argue against "strict vertical" commonality because many participants exist in the so-called "XRP ecosystem" such that some may profit while others do not. Def. Br. at 49. But the existence of other players in the market is irrelevant (just as the orange markets involved many other participants than *Howey*'s promoter and investors). The question is whether the fortunes of *Ripple* and *XRP investors* are tied together. They indisputably are here.

the Court laying out "[t]he test" to be followed later in the opinion. *Id.* at 301. Nowhere does *Howey*, or any subsequent case, create an "economic equivalent of stock" requirement.

Moreover, the facts of *Howey* foreclose requiring stock-like traits. That case involved two corporations, one a land owner and the other a servicing company. *See* App'x A (Howey Record) at 5-6. Each company had five "stockholders." *Id.* at 6. The servicing company serviced and harvested the groves sold by the landowner company. *Id.* at 7 (Stip. ¶¶ 8, 10), at 15-20 (Ex. B § 2(c)); *see also Howey*, 328 U.S. at 294-95. But *Howey* investors had no right to the dividends of either corporation or to inspect their books, no voting rights, and no rights to appoint directors.

Nor do Defendants cite to any case in the Second Circuit for their "economic equivalent" test. To the contrary, *Revak* plainly sets forth the test for horizontal commonality without including an "equivalence to stock" requirement. If the "equivalent of stock" test were part of "common enterprise," then *Revak*, *Leonard*, *Telegram*, *Kik*, *Balestra*, *Audet*, and *Jobanputra* (and all the other cases applying *Howey*, including to crypto assets, *see* SEC Br. at 49) all missed it. Defendants' sole citation to law is instead to *Ass'n of Am. R.R. v. United States*, which construed the term "securities" in the *Interstate Commerce Act* ("ICA") while explicitly stating it was *not* interpreting the Securities Act. 603 F.2d 953, 958, 971-72 (D.C. Cir. 1979). The ICA narrowly defines "securities" to include only "any share of capital stock or any bond or other evidence of interest" in a carrier. *Id.* at 958 n.8. The Securities Act definition of the term, of course, is far more expansive. 15 U.S.C. § 77b(a)(1).

*Second*, Defendants' argument ignores the Securities Act's plain text, which defines "security" to include specific terms like "stock," which have "well settled meaning[s]," but also separately lists the more general term "investment contracts." *Joiner*, 320 U.S. at 351. Thus, *Joiner* held it would not, in construing "investment contracts," "read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents." *Id.*; *see also Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982) ("investment contract" is a "catch-all phrase").

Following *Joiner*, *Tcherepnin* held that "withdrawable capital shares"—which did not provide the right to inspect the books and records or rights of preemption—were nevertheless "investment contracts." 389 U.S. at 343-44. Those characteristics "distinguish among different types of securities" but "do not, standing alone, govern whether a particular instrument is a security." *Id.* at 344. *Tcherepnin* also reaffirmed that it would not "read the words an 'instrument commonly known as a "security"' … as a limitation on the [Securities Act's] other descriptive terms." *Id.* at 343.

Consistent with the foregoing, *Reves* identified the three distinct tests to determine whether an instrument is a "stock," "note," or "investment contract" under the securities laws. 494 U.S. at 61. These definitions were "the best way to achieve [Congress'] goal of protecting investors" and to reach the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profit." *Id.* (citing *Howey*, 328 U.S. at 299). Finally, *Edwards* clearly rejected Defendants' argument, Def. Br. at 40, that an investment contract requires that XRP investors have a right to Ripple's profits. 540 U.S. at 392-397 (rejecting that *Howey* requires "a participation in the earnings of the enterprise"). The "equivalent of stock" test—which would collapse the definition of "investment contract" into the term "stock"—is foreclosed by *Joiner*, *Tcherepnin*, *Reves*, and *Edwards*.

### (b) Control of the Market for the Instruments by the Issuer Is Not Required to Find a "Common Enterprise."

Defendants next fault the SEC for too broadly defining the "enterprise" at issue as the "XRP ecosystem," a term Defendants coined and touted. *See* Counter-Statement § II.A. This is yet another red herring based on two faulty premises—that the SEC must show that Ripple was the *only* party making efforts as to XRP and that Ripple had to "control" XRP. No such requirements exist.

As a threshold matter, courts routinely define the "enterprise" in broad terms. In *Continental Marketing Corp. v. SEC*, for example, the promoter sold beavers while encouraging purchasers to transfer their beavers into the care of third-parties who would manage their reproduction and the sale of their offspring. 387 F.2d 466, 470 (10th Cir. 1967). Finding the arrangements constituted

"investment contracts," the court held that the "economic inducement" was to invest "in the success of the enterprise—the domestic beaver industry," *id.* at 471, of which the promoter "represented itself as an integral part." *Id.* at 468.

Further, the law does not require that the promoter "control" the underlying asset or its price. The *Howey* promoters could not control the price of oranges, and were not the only company offering orange growing services. App'x A (Howey Record) at 9-10. And the promoter in *Cont'l Mktg.* did not "own" or "control" the "domestic beaver industry." *See also Glen-Arden*, 493 F.2d at 1032 ("the value of Scotch [was] determined by the basic laws of supply and demand"). *Glen-Arden* likewise dispels Defendants' suggestion that there can be no common enterprise because XRP investors may decide "individually whether and when to sell" their XRP, and that their only "common interest" is "in XRP's price when they decide to sell." Def. Br. at 43. *Glen-Arden*, like many other cases, found investment contracts despite purchasers being able to individually sell out of their investments separately. 493 F.2d at 1031; *see also Kik*, 492 F. Supp. 3d at 179 (rejecting argument that there could be no commonality because investors could sell at separate times).

What commonality requires is far more modest than the monopolistic, all controlling version of the *Howey* test that Defendants posit. That others may also be making efforts to find uses for XRP or otherwise profit from it, *e.g.*, Def. Br. at 42, is immaterial. Ripple succeeded in selling XRP by claiming to be managing (i.e., controlling) the funds raised by those sales to expend efforts to develop XRP's value. That is the essence of a common enterprise. *Kik*, 492. F. Supp. 3d at 179.

Here, of course, Ripple had far more control over XRP than the *Howey* promoter had over the market for oranges. Ripple controlled most of the initial supply of XRP and sought to influence demand using its considerable funds. Ripple has even managed the development of *others'* efforts by using its ample XRP resources to support them. And, since at its inception XRP had no use, no market, and no price, SEC 56.1 ¶¶ 104-08, Ripple also laid down the "building blocks" of this

market and further developed it through efforts and its "significant economic power" in that market. SEC Br. at 13-14, 23-26; SEC 56.1 ¶¶ 592-605. The contributions of others, whether real or theoretical, into an "ecosystem" are irrelevant when Ripple continues to tout, and actually expend, significant efforts to manage the development of the ecosystem.[22]

> **4. Courts Have Long Rejected the Argument that Offers and Sales of "Ordinary Assets" Must Fall Outside the Federal Securities Laws.**

Defendants also suggest that even if there is a common enterprise with respect to XRP, Defendants did not sell investment contracts because commonality also exists with respect to certain "ordinary assets." Def. Br. at 42-44 (cases involving "gold coins," "silver bars," and "sugar futures"); *id.* at 3 (arguing the SEC seeks to "convert the sale of all types of ordinary assets…into sales of securities"). This fallacious argument implies that the analysis should end at "commonality"—but Ripple's XRP offers and sales meet *all* the elements of *Howey*; that assets like gold may not is irrelevant. Moreover, the key inquiry is whether an asset was *offered and sold* as an investment or as an ordinary asset. Defendants never argue that XRP was sold as an ordinary asset, but two *amici* suggest that XRP was not sold as an investment. They, too, are wrong.

> **(a) "Ordinary Assets" May Be Offered and Sold As Investments.**

That a separate asset sold as part of an investment contract may have intrinsic value is immaterial. *Howey* itself found the sale of orange tracts, which can be sold as real estate or as commodities, was nevertheless the sale of investment contracts. *See* 328 U.S. at 301 ("reject[ing] the suggestion…that an investment contract is necessarily missing … where the tangible interest which

---

[22] Further refusing to grapple with the horizontal or strict vertical commonality tests, Defendants misstate the SEC's position. They italicize a subpart of an SEC interrogatory answer to misleadingly argue the SEC's "common enterprise" theory is focused on Ripple's efforts and therefore relying on broad vertical commonality. Def. Br. at 40-41. Not so. As the SEC's opening brief makes clear, SEC Br. at 50-53, the SEC's "common enterprise" theory—unlike Defendants'— is squarely based on horizontal and strict vertical commonality. The SEC's citation to Ripple's efforts relates to the "reasonable expectation of profits based on the efforts of others" part of the analysis, *e.g.*, SEC Br. at 59-63, which *Revak* itself explains is relevant to the analysis. 18 F.3d at 88.

is sold has intrinsic value independent of the success of the enterprise as a whole," and holding that it was "immaterial … whether there is a sale of property with or without intrinsic value").

Similarly, in *Joiner*, which involved oil and gas interests that also could have been sold as commodities, the Court cited examples of sales of assets that became investment contracts. 320 U.S. 352-53 and n.10 ("One's cemetery lot is not ordinarily thought of as an investment and is most certainly real estate. But when such interests become the subjects of speculation in connection with the cemetery enterprise, courts have held conveyances of these lots to be securities.") (omitting citations to various cases holding that "purported sales of property have been held 'investment contracts'"); *see also Penfield Co. of Cal. v. SEC*, 143 F.2d 746, 750 (9th Cir. 1944) ("The term 'investment contract' particularly, which appears in thirty of the state [blue sky] acts, has been construed in a long line of cases, both federal and state" to apply even if "the promoter clothes [the transaction] with the appearance of a transaction in some species of real or personal property.").[23]

*Glen-Arden* affirmed a preliminary injunction to stop a promoter from offering and selling Scotch whisky warehouse receipts. 493 F.2d at 1036. The promoter, like Defendants here, argued that the underlying "thing" being sold was a "commodity" with intrinsic value. *Id.* at 1033. The Second Circuit rejected this argument, noting the "long line of cases where purported sales of tangible property…were held to be investment contracts." *Id.* at 1035 (collecting cases); *see also Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) ("Plenty of items that can be consumed or

---

[23]    Accordingly, examples abound where courts properly reached different conclusions with respect to the sale of a similar tangible asset based upon the economic reality of the transaction, like the presence or absence of representations by the promoter that it would engage in certain efforts. *Compare SEC v. Life Partners, Inc.*, 87 F.3d 536, 545-56 (D.C. Cir. 1996) (investment into life insurance proceeds failed *Howey* because the activities of promoters were ministerial) *with SEC v. Tyler*, 2002 WL 32538418, at *5-6 (N.D. Tex. Feb. 21, 2002) (same instruments were investment contracts because managerial activities by promoter were part of investment inducement); *compare Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (sale and custodial arrangement for silver bars failed *Howey* because no assets were pooled) *with Connors v. Lexington Ins. Co.*, 666 F. Supp. 434 (E.D.N.Y. 1987) (similar sale was investment contract because pooling occurred). N*ot one of these cases* reaches the outcome by simply asking whether an "ordinary asset" is involved. *All of them* apply *Howey*'s test.

used…have been the subject of transactions determined to be securities because they had the attributes of an investment") (citations omitted). This applies even when the "thing" underlying the "sale" may be used as another financial instrument. *See Gary Plastic*, 756 F.2d at 240 (bank CDs).

Of course, what distinguishes XRP from the examples Defendants cite is that Ripple's founders created XRP, XRP had no intrinsic value when it was created, Ripple owned the majority of XRP, and Ripple took extensive efforts to create a trading market, protect its liquidity, increase its utility, and defend its price. The same cannot be said for any of the "ordinary assets" Defendants cite. Def. Br. at 42-44 & n.16; *see also Bender v. Cont'l Towers Ltd. P'Ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986) ("A piece of real estate … has inherent worth, a worth not solely dependent on the efforts of a promoter."); *infra* § II.C.2(b) (addressing cases involving real estate).

### (b)      Defendants Did Not Sell XRP For Use Or Consumption.

For these reasons, it is not enough to just say that XRP is a commodity (or a currency)—*Howey* does not turn on labels. *See Zaslavskiy*, 2018 WL 4346339, at *7 (labeling a digital token as "cryptocurrency" does not control the outcome). What matters under the law is the economic substance or the manner in which the instruments are offered and sold. Two *amici* make passing references to *Forman* and claim to be "users" of XRP, such that they had no "expectation of profits" from their interaction with XRP. *See* D.E. 660 at 5 (brief of I-Remit, Inc.); D.E. 661 at 8, 661-1 (brief of TapJets, Inc. and supporting affidavit). The *amici's* untested, post-discovery insertion of facts into the record does not change the outcome.

The "use" or "consumption" (as opposed to "profit") concept derives from *Forman's* holding that shares in a housing co-op, entitling the holder to lease an apartment, were not "investment contracts." 421 U.S. at 857-59. The Court reasoned that this result followed for at least two reasons. First, "[t]he *sole* purpose of acquiring the[] shares [was] to enable the purchaser to occupy an apartment," and the shares "c[ould] not be transferred to a nontenant" and had to be sold

41

back to the co-op at the price originally paid, which was $26. *Id.* at 842-43 (emphasis added). Second, the purchasers "were attracted *solely* by the prospect of acquiring a place to live, and not by financial returns" because purchasers would "be unable to resell their apartments at a profit since the apartment must first be offered back" to the co-op. *Id.* at 853-54 (emphasis added).

Thus, courts considering whether an instrument was purchased for use under *Forman* typically consider the following three factors:

(1) whether the amount sold was indicative of a true consumptive purpose; *compare Grenader v. Spitz*, 537 F.2d 612, 617-618 (2d Cir. 1976) (co-op shares were not investment contracts because "[t]he number of shares [available was] . . . clearly in proportion to the size and location of the apartment . . . .") *with Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir. 1979) (since investors were sold many units, they "manifestly could not use" all of them, and the shares were investment contracts);

(2) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SG Ltd.*, 265 F.3d at 53-54 (statements discussing potential returns "constitute[s] a not-very-subtle form of economic inducement" at odds with the bulletin in *Forman* that "nowhere" sought "to attract investors by the prospect of profits" (citing *Forman*, 421 U.S. at 854)); and

(3) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals …").

The undisputed facts foreclose any suggestion by Defendants' *amici* that Defendants sold XRP "solely" or even principally for "use," a contention that Defendants themselves do not make.

*First*, Ripple did not sell XRP in amounts commensurate with any use, but instead sold from based mostly on the average trading volume for XRP, which is infinitesimally divisible. SEC 56.1 ¶¶ 17, 633-40. Defendants make no claim that any XRP purchaser ever has been limited to buying only the amount of XRP needed to use, say, on ODL. Indeed, only a small subset of money services businesses, and not the individuals to whom Defendants sold XRP, even used ODL (a product that did not exist until late 2018), and Ripple mostly did not sell XRP to them. SEC 56.1 ¶¶ 109, 739-48; Counter 56.1 ¶¶ 149, 155; 179-183; 186-88; PX 15 at 195; 204-06; PX 7 at 193-95; PX 16 at 182-83;

PX 6 at 42-43; PX 21 at 298-99; PX 8 No. 90; PX 8 No. 95; PX 25 at 47; PX 8 No. 94; PX 81 at 336. Nor is the transferability of XRP limited, as were the co-op shares in *Forman* and *Grenader*. With respect to the small subset of XRP sold to ODL users, the whole point was that the ODL users would immediately resell it to public investors, as they all indisputably did. SEC 56.1 ¶¶ 755, 760, 787-88; *see also* Counter 56.1 ¶ 234; PX 634 ¶ 24. *Amicus* I-Remit, for example, touts that it buys XRP (not from Ripple, but from an XRP investor in the U.S. markets) and then "instantaneously" resells it. D.E. 660 at 3. Such economic reality is inconsistent with consumptive use. *Cameron*, 608 F.2d at 193. Thus, as the CFO of MGI explained—XRP "wasn't a currency" on ODL. Counter 56.1 ¶ 252; PX 624 at 113-14. ODL was simply a mechanism that relied almost exclusively on the existence of speculative, investment-related trading of XRP on both sides of a transaction.

*Second*, Defendants cannot dispute that, prior to ODL's launch in late 2018, they marketed XRP primarily as an investment and not for any consumptive use, and they cannot dispute that their investment-related marketing of XRP continued after 2018. *See, e.g.*, Def. Br. at 57 (noting most of the promotional statements at issue were in 2017); *see also* SEC Br. at 18-26, 53-63. The record plainly forecloses any conclusion that "[n]owhere" does Ripple's marketing speak of the possibility of profits in addition to "uses." *Forman*, 421 U.S. at 854.

Defendants' actual sales similarly foreclose any argument that Defendants sold XRP primarily or even mostly for any consumptive use. Defendants' sales targeted speculators, not individuals in, for example, countries that may need to use crypto assets as a substitute for unsuitable fiat currencies. SEC 56.1 ¶¶ 648, 670-709. Defendants' Institutional Sales in particular—to sophisticated investors, venture capital firms, and crypto asset speculators, some with discounts to prevailing market prices that encouraged profit-taking—demonstrate this economic reality. *Id.* at ¶¶ 531, 533-34, 572, 574, 717-18, 721, 723, 790-95. Here, as in *Telegram*, Ripple "did not focus on cryptocurrency enthusiasts, specialty digital asset firms, or even mass market individuals who had a

need for an alternative to fiat currency" but instead "selected sophisticated venture capital firms …

with an inherent preference (i.e. their business model) toward an investment intent rather than a

consumptive use." 448 F. Supp. 3d at 373-74 (holding that these factors, and large size and

concentration of Grams sales, and sales at discounted market prices with lockups, all supported

finding that Grams were not sold as "as a substitute currency to store and transfer value").

 *Third*, for many of the same reasons, it is not reasonable to expect the average XRP

purchasers in the market to be buying them to "use" them. Ripple specifically disclaimed that XRP

is a "currency" for regular individuals to buy goods and services. *See supra* Counter-Statement § I.B.

By contrast, Ripple *has* made efforts to ensure XRP is freely tradeable, facilitating investment profits.

Counter 56.1 ¶¶ 46-63; PX 715, Ex. 13; PX 716-722; PX 25 at 147-48, 235; PX 645 at 30-31; PX

506.107; PX 501.05; SEC 56.1 ¶¶ 479-98. *Cf. Aqua-Sonic*, 687 F.2d at 583-84 (*Howey* not defeated

based on theoretical "efforts" investors could make, where marketer did not seek out investors, or

limit sales, based on purchasers' ability to actually make such efforts).[24]

 *Finally*, even if some subset of purchasers were motivated by their desire to "use" XRP, that

would not make the offer and sale of XRP something other than an investment contract. As noted,

the *Howey* inquiry is objective and focused on what investors were offered and what was represented

to them, not on the precise motivation of each purchaser. *See Telegram*, 448 F. Supp. 3d at 371;

*Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). After all, investors in *Glen-Arden*, 493 F.2d at

1031, who technically bought only whiskey, could have drunk it; and the investors in *Miller v. Cent.*

---

[24] Ripple's *amici* provide no concrete evidence of any use of XRP. For example, while the
TapJets CEO touts that TapJets once "accept[ed] XRP as payment," he carefully never states how
much XRP was actually accepted from the individuals paying $60,000 for a private flight or even
whether a single such transaction was ever made (facts that could have been fleshed out at a
deposition, had he been disclosed as a witness in this case). *See* D.E. 661 at 2-3; D.E. 661-1 ¶ 21.
Moreover, while the CEO simply claims to then "use" XRP to pay TapJets' vendors (again without
supplying any of the backup evidence that would be asked of him in discovery), he also admits he
converts the XRP into actual currency, belying any claim that XRP is currency. *See* D.E. 661-1 ¶ 21.

*Chinchilla Grp., Inc.*, 494 F.2d 414, 417-18 (8th Cir. 1974), who bought live chinchillas, could have made coats from them. The *existence* of, or even the desire for, some consumptive use does not defeat *Howey*'s "expectation of profit" prong.

Indeed, as explained in *SEC v. Feng,* the prong is satisfied even when "the investors' primary reason to participate" in a scheme was consumptive. 935 F.3d 721, 730-31 (9th Cir. 2019) (investors sought to secure visas they would undeniably use); *see also Solis*, 2018 WL 6445543, at *3 (rejecting "use" argument with respect to digital asset that could supposedly unlock in-network uses, given that the platform had "limited functionality" at the time); *Scoville*, 913 F.3d at 1221 (where evidence showed purchasers bought "in order to obtain the incredible returns on . . . investment" and "had no interest in the" services the promoter offered, instruments were "investment contracts").

The economic reality and the undisputed facts foreclose any claim that XRP is outside the scope of the federal securities laws based on *Forman*. Ripple had found no "use" for XRP until the ODL product, which did not occur until 2018. Even at that point, Ripple did not *sell* XRP for its purported "use" to any ODL customer until mid-2020. The ODL customers simply took whatever XRP they found in the open market and immediately resold it, as one *amicus* willingly concedes. ODL users buying XRP from the market and reselling it is not at issue and does not affect the analysis. Meanwhile, Ripple sold hundreds of millions of dollars of XRP to public investors, and $0 to ODL customers by mid-2020. Instead, Ripple was *actually paying* ODL customers to "use," or as Schwartz described it, to "suffer" that product. *See* Counter 56.1 ¶¶ 178, 210-12, 224-28, 230-33, 251-57, 262, 271, 281; PX 7 at 212-16; PX 624; PX 634 ¶¶ 13-33.[25]

---

[25]     As the SEC has consistently noted in response to Defendants' persistent attempts to confuse the record, XRP transactions between two public investors not involving Ripple's affiliates, dealers, or underwriters would be exempt from Section 5's registration requirements, despite such transactions involving securities. *See* 15 U.S.C. § 77d(a)(1). This case is about whether *Defendants'* offers and sales must be registered. The SEC's theory here has no more "impossible breadth," Def. Br. at 14 n.10, than claiming that an issuer of securities like stocks and bonds must register their offers and sales, even while public investors may generally trade those securities among themselves

Most revealing is that when Ripple did sell approximately $70 million of XRP to entities operating ODL it quickly *rebought* the XRP it sold. *See supra* Counter-Statement § II. No seller of an actual "ordinary asset" (like diamonds or land) would do this. The economic reality is that Ripple was concerned with managing XRP's liquidity and value in the public trading markets because it depended on being able to sell XRP into that market to fund its business, SEC 56.1 ¶¶ 144-70, just like the issuer of traditional securities would, and quite unlike the seller of an "ordinary asset."

In sum, even viewing XRP through the "ordinary asset" lens does not change the outcome. There is nothing unusual about an investment contract involving a concurrent sale of a commodity, a currency, real property, or a crypto asset. A security exists when the asset is being *offered* and *sold* as an investment, whereby purchasers are led to reasonably expect profits from others' efforts. That is how XRP was offered and sold, and the economic reality forecloses any other conclusion.[26]

### C.      XRP Investors Reasonably Expected Profits Based Upon Ripple's Efforts.

Defendants led XRP investors to expect profits based upon Ripple's efforts. The Second Circuit notes that the question under *Howey* is "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own

---

without having to do so. *See Johanputra*, 2022 WL 4538201, at *8 n.8 (crypto assets "sold … in the general market" may be securities). Nor does the SEC allege that an investor that buys XRP from another investor is "entering into an investment contract" with that investor, as one *amicus* appears to believe. *See* D.E. 634-1 at 10. Those investors are buying and selling *Ripple's* investment contracts from each other, in securities transactions exempt from registration. *Amicus* Chamber of Digital Commerce raises a separate question, which is whether at some point in time XRP is "decentralized" such that it no longer meets the investment contracts offered and sold by Ripple. D.E. 634-1 at 12 (relying on a term, "decentralized," that Ripple disavows, claiming it "lacks any settled meaning—both under the securities law and in the computer-science field," D.E. 541 at 2). As neither the Chamber nor Defendants contend that this is the present state of XRP, or was at any time during the relevant period, that separate question is not at issue.

[26]      As noted previously, *amici* offer no support for their purported primary justification for advocating Defendants' position, their belief that a finding of Ripple's liability would harm their businesses due to their purported use of XRP. Indeed, *amici* still do not and cannot explain how *Defendants* being required to *register their* XRP distributions—the outcome the SEC is seeking to enforce—would prevent *amici* from using XRP or otherwise impact their business.

activities, their money and the promoter's contribution in a meaningful way." *Leonard*, 529 F.3d at 88

(quoting *Aqua-Sonic*, 687 F.2d at 582). The "critical inquiry is 'whether the efforts made by those

other than the investor are the undeniably significant ones.'" *SEC v. Koscot Interplanetary, Inc.*, 497

F.2d 473, 483 (5th Cir. 1974) (citing *SEC v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th

Cir. 1973)). Here, Defendants persistently marketed XRP as an investment. They publicly promised

to undertake efforts to find uses that could generate value and act as responsible "stewards" of the

XRP market, highlighted their strong financial incentives to undertake these efforts for a long time,

and touted when they executed on some of these representations. *See* SEC Br. at 18-26, 53-63.

### 1. Ongoing Contractual Obligations Are Not Required.

Defendants argue that a contractual "obligation to expend efforts" is required to establish

expectation of profits from the efforts of another. Def. Br. at 49-50. This is wrong.

#### (a) *Howey* Does Not Require Investors' Expectations Be Derived from Representations in Written Agreements.

Even before *Howey*, the Supreme Court found investment contracts where investors'

expectations derived from promotional materials and not written agreements. *Joiner* held the sale of

oil leasehold interests gave rise to investment contracts, even though the promoter's intent to drill an

exploratory oil well appeared only in sales literature and not in the leasehold assignments. 320 U.S. at

346-48. *Joiner* looked to these representations to determine whether, given the factual setting as a

whole, an investment contract existed, emphasizing: "The exploration enterprise was woven into

these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through

the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348. In fact, as

set forth in the underlying opinion of the court of appeals, the leasehold assignments did not impose

any contractual obligations to drill a well. *See SEC v. C.M. Joiner Leasing Corp.*, 133 F.2d 241, 242-45

(5th Cir. 1943) *aff'd* 320 U.S. at 348. Further, *Joiner* found it "unnecessary to determine" whether the

promoter's non-contractual statements created legal rights under state law, as "acceptance of the

offer quoted" created "a form of investment contract in which the purchaser was paying both for a lease and for a development project." *Id.* at 349.

Since *Joiner*, the Supreme Court has consistently assessed all representations used to solicit investors, including focusing on the "sales talk" in *Howey*, 328 U.S. at 297, and examining what the investment was "represented to be," not simply the legally binding contracts, in *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211 (1967) (citing *Joiner*). The Court did so again in *Edwards*, by quoting the "promotional brochure" and "representations" made on "marketing materials and on [the promoter's] Web site." 540 U.S. at 391-92.

Appellate courts have followed suit, routinely finding investment contracts based on claims to engage in efforts regardless of the existence of common law contracts. *Gary Plastic*, for example, found an investment contract based in part on Merrill Lynch's statement in an "Information Bulletin" that it "fully intends to maintain a secondary market for its customers which would enable them to sell" the instruments they were buying from Merrill Lynch, and on its "implicit promise to maintain its marketing efforts" with respect to the instruments. 756 F.2d at 233, 240; *Glen-Arden*, 493 F.2d at 1031-32 (relying on "sales literature" and a "canned sales pitch" to determine reasonable expectations of investors); *Aqua-Sonic*, 687 F.2d at 583 (examining "promotional materials"); *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) ("[W]e look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest."); *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 756 (11th Cir. 2007) (same); *Koscot*, 497 F.2d at 476 ("it is upon the promotional aspects that we focus").

Applying the same reasoning, *Leonard* looked "beyond the formal terms of a relationship to the reality of the parties' positions." 529 F.3d at 85; *see also Bamert v. Pulte Home Corp.*, 445 F. App'x 256, 259-60 (11th Cir. 2011) (despite integrations clauses in the purchase agreements at issue, the complaint plausibly alleged the existence of investment contracts based on defendants' oral

representations); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980)

(investment contract can exist if there is a "contract *or promise* to provide significant development

services for the benefit of purchasers") (emphasis added).

Courts apply these same principles to hold that crypto assets similar to XRP are investment

contracts. *Telegram*, for example, found "[a]n implicit (though formally disclaimed) intention on the

part of Telegram to remain committed to the success of the TON Blockchain," which the promoter

would do "as a matter of fact rather than legal obligation." 448 F. Supp. 3d at 358. Telegram argued

that the third element of *Howey* could not be satisfied given that Telegram had disavowed future

contractual obligations, but the court rejected this argument, stating, "[d]isclaimers, if contrary to the

apparent economic reality of a transaction, may be considered by the Court but are not dispositive."

*Id.* at 365 (citing *SG Ltd.*, 265 F.3d at 54). *Kik* similarly held that "an ongoing contractual obligation

is a not a necessary requirement for a finding of a common enterprise." 492 F. Supp. 3d at 178

(citing *Joiner*, *Howey*, and *Tcherepnin*).

> **(b)    Defendants' Real Estate Cases Also Look Outside Written
> Contracts.**

Defendants cite three cases holding that sales of real estate which the purchaser *occupied* were

not sales of investment contracts. Beyond being readily distinguishable for that reason, these cases

undermine rather than support Defendants' contention because each case looks to extra-contractual

representations to determine whether the promoter offered and sold an investment contract.

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.* noted that it was a "close question" whether

the seller of real estate had sold investment contracts based upon extra-contractual promises to

develop common facilities areas, but ultimately held that it had not, in part because the seller

"retained no interest in th[e] parcels" it sold. 608 F.2d 1297, 1301 (9th Cir. 1979). Here, Ripple held

"this giant pile of XRP." Counter 56.1 ¶ 34; PX 457. *Rodriguez v. Banco Ctr. Corp.*, *see* Def. Br. at 44,

50, 56 n.37, is equally unavailing. That case held there was no investment contract because a sale of

land was coupled only with "suggestions that the surrounding area would develop" but noted the outcome would have been different had defendants in their extra-contractual representations "promised, along with the land sales, to develop the community themselves." 990 F.2d 7, 11 (1st Cir. 1992). That is precisely what Ripple did here. Finally, *Happy Inv. Grp. v. Lakewood Props. Inc.* also examined extra-contractual representations and noted that because the promoter did not offer to develop common areas in the land, and because as a matter of economic reality the *purchaser* had to first build his own house before he could resell for profit, the entrepreneurial efforts of the promoter were not the significant ones. 396 F. Supp. 175, 180-81 (N.D. Cal. 1975).

Defendants' extensive reliance on cases involving real estate, *e.g.*, Def. Br. at 44, 49-50, 51 n.30, exposes the fundamental weakness of their case. As explained in *Harman v. Harper*, 914 F.2d 262 (9th Cir. 1990), upon which Defendants rely, *see* Def. Br. at 51 n.30, "one-on-one … transactions in real estate, without more, generally do not satisfy the *Howey* criteria." As *Kik* explained, real estate has "inherent value," whereas a crypto token conjured out of thin air "will generate no profit absent an ecosystem that drives demand," 492 F. Supp. 3d at 180, which is what Ripple promised to (and did) architect. There is simply no valid comparison between (a) the sale of unique properties with inherent value and utility to discrete groups of buyers, and (b) a tech company's capital raise of billions of dollars through the sale of fungible assets with no inherent value to an unlimited number of public buyers.

### 2. The Existence of Market Forces Independent of Ripple Is Irrelevant.

Defendants next contend that if profits come from "supply and demand," then there is no investment contract. Def. Br. at 50-51. This argument fares no better here than in the "common enterprise" analysis. *See supra* § I.B. The focus is on *reasonable expectations* created by the promoter, not on the nature of the "profits." *Cf. Scoville*, 913 F.3d at 1222 ("all that *Howey* requires is a 'reasonable expectation of profits'" (citation omitted)).

As noted previously, there is nothing remarkable about investors in securities making or losing money based upon market forces outside the issuer's control. Defendants thus attempt to limit their argument by stating that it applies only when the "returns are driven *mostly* by market forces" or when market forces "dictate" or "control profitability." Def. Br. at 51-53. They then assert that because Ripple's activities purportedly accounted for over 50% of XRP returns until mid-2018 but no more than 10% by the end of 2020, there can be no reasonable expectation of profits from Ripple's efforts. *Id.* at 52-53. But even if this were true, Defendants do not and cannot explain why Ripple's ability to generate over 50% of XRP price movements before mid-2018 is not enough.

Once again, Defendants' cited cases do not support their remarkable proposition. Def. Br. at 50-51 & n.30. Those cases distinguish between where investors are led to look to the promoter's efforts and where the investor is not led to expect any such efforts and instead must rely on her own efforts or simply on the vagaries of the market. None of the cases support the patently absurd notion that if the market "dictates" the price of an asset (a proposition applying to nearly all assets), then it cannot be offered and sold as an investment contract.

The principal case upon which Defendants rely, *SEC v. Mutual Benefits Corp.*, held that life insurance settlements *were* investment contracts. 408 F.3d 737, 741 (11th Cir. 2005). The question was whether both pre- and post-purchase efforts could satisfy the "efforts of others prong," with the court holding that pre-purchase efforts also counted so long as there were still some promised post-purchase efforts by the promoter. The court contrasted situations where an investor is led to rely on a promoter's promised continued efforts to instances where those efforts are over. *Id.* at 744, n.5. Because the *Mutual Benefits* promoter still had to decide how to deploy funds after receiving them, there was an expectation of profits from its efforts. *Mutual Benefits* does not suggest that the existence of market forces affecting the price of an asset means *Howey* cannot be satisfied.

The Second Circuit's holding in *Grenader*, Def. Br. at 51, is also inapposite. Noting that "real estate transactions are traditionally left to state supervision," the court concluded that no investment contract existed because "the purchasers … desired to personally occupy the apartments" and the promoters made no representations leading the purchaser to expect "bonanza" or that the promoter would use the proceeds from the sales to further develop an enterprise that was nearly "fifty years old." 537 F.2d at 619-20. The court's decision did not turn on whether market forces determine the price of the apartments at issue, but whether the investor reasonably could look to the seller to make efforts to increase the value of those parcels. Defendants' "driven mostly by market forces" test is nowhere to be found in *Grenader*, either.[27]

Defendants then purport to carve out an exception to their "market forces" rule for situations "in which the promoter backstops the market forces by committing to repurchase assets - as a buyer of last resort – if the market price falls." Def. Br. at 52 (citing *Glen-Arden* and *Gary Plastic*). This attempt also fails. As a threshold matter, *Glen-Arden* and *Gary Plastic* are not "exceptions" to non-existent rules. Moreover, Defendants *were* "buyers of last resort" with respect to XRP and publicly held themselves out as such. SEC 56.1 ¶¶ 586, 784, 786. Defendants' attempt to distinguish those cases by claiming they involved a contractual "guarantee" to backstop the market is simply wrong. Merrill Lynch's commitment to buy back the CD was stated in its marketing brochure, *Gary*

---

[27]     As the court explained in *Bender*, upon which Defendants rely, Def. Br. at 51 n.30, "real estate transactions are not in and of themselves governed by the federal securities laws" because of the inherent worth of a condominium. 632 F. Supp. at 501. Real estate cases are of little relevance to this case, and they do not support inserting the "driven mostly by market forces" test into "efforts of others." The same is true of the two futures contract cases—*SEC v. Belmont Reid & Co., Inc.*, 794 F.2d 1388 (9th Cir. 1986) and *Noa*, 638 F.2d at 77. Def. Br. at 51-52. Both stand for the proposition that where the only relationship between the promoter and the buyer is one whereby the promoter promises to deliver a tangible item at a future date, there is no "investment" in anyone's efforts. Neither holds that the existence of market forces affecting the price of an asset precludes finding an investment contract. They simply focus on whether the promoter promised, undertook, or needed to undertake significant efforts and found that they did not. Finally, *Lehman Bros. v. Minmetals Int'l*, 179 F. Supp. 2d 159, 163 (S.D.N.Y. 2001), which involved an application of state law to a simple FX transaction, has no bearing here.

*Plastic*, 756 F.2d at 233. More generally, *Gary Plastic* holds that when an issuer sells an asset while leading investors to rely on the "skill and financial stability" of the issuer, on the issuer's "ongoing" or "implicit" efforts (including to provide "liquidity and capital appreciation"), and on the issuer's "significant economic power" in the market, then an investment contract exists. 756 F.2d at 240-42.

The arrangement Ripple marketed with respect to XRP and the efforts it undertook to lay the "building blocks" and start the "flywheel" for the XRP market were far more extensive and all engrossing than the steps Merrill Lynch could ever hope to take in *Gary Plastic*. Because Ripple had the "giant pile of XRP," there was "no other place where predictability and stability about supply and long term health" for XRP markets could come from. Counter 56.1 ¶ 34; PX 457.

In sum, Ripple's "insistence in its brief[] that 'market forces' would drive the value of" XRP "ignores the essential role of" Ripple "in establishing the market" and that Ripple "had a unique incentive to increase demand for" XRP. *Kik*, 492 F. Supp. 3d at 180. It ignores that unlike the seller of real estate, Ripple could significantly affect and control the supply of XRP. "These efforts by" Ripple "were crucial" and XRP investors reasonably hoped to profit from them. *Id.*

### 3. Defendants' Attempts to Undercut Their Extensive Promotional Representations Are Unavailing.

Confronted with their extensive public statements touting XRP, Defendants again argue that written contracts are required to give meaning to these statements. Def. Br. at 54. That argument fails here for the same reasons explained above. *See supra* §§ I.B.2(b), I.C.1; *infra* § II.C. Defendants' remaining arguments attempting to downplay their plethora of public representations are unavailing.

*First*, Defendants contend Ripple's contracts disclaimed that Ripple had any obligations to engage in efforts. Def. Br. at 55. Defendants argue the Court should ignore the avalanche of public written and oral promises simply because they were not included among the boilerplate language in Ripple's contracts. The law plainly rejects this defense.

It is true that, in considering the totality of representations made, "[d]isclaimers, if contrary to the apparent economic reality of the transaction, may be considered by the Court but are not dispositive." *Telegram*, 448 F. Supp. 3d at 365. In this case, however, boilerplate integration clauses cannot trump the economic reality, created through Defendants' extensive marketing, that Ripple was selling its own future efforts alongside XRP itself. *See id.* at 374-75; *Kik*, 492 F. Supp. 3d at 175 (describing integration clauses in certain sales agreements); *see also Baroi*, 914 F. Supp. 2d at 1197-98; *Timmreck v. Munn*, 433 F. Supp. 396, 401 (N.D. Ill. 1977); *SEC v. Battoo*, 158 F. Supp. 3d 676, 696 (N.D. Ill. 2016). This is particularly so because, as Defendants themselves emphasize, XRP investors in the public markets never saw any of these disclaimers. Defendants' disclaimers argument is likewise inconsistent with their repeated insistence that no contracts were at issue in the first place.[28]

*Second*, Defendants suggest that their promotional statements are too vague to lead investors to reasonably expect profits. They do so both by returning to the "suggestions" in real estate cases that property would appreciate based upon undetermined efforts, and by asserting that "[a]ll the SEC has pointed to are statements showing that Ripple had its own interest in the price of XRP." Def. Br. at 55-56 & nn.35, 37. Defendants' reliance on real estate cases once more fails. *See supra* §§ II.B.4, II.C.1(b). And their other point, that the SEC has only shown statements of Ripple being interested in XRP's price, simply cannot be squared with the statements themselves. *See, e.g.,* SEC 56.1 §§ C, D(i)-(iii), D(ix), E(ii), E(vii).

Defendants cannot distinguish their own promotional statements from those in four Second Circuit cases—*Glen-Arden*, *Aqua-Sonic*, *Gary Plastic*, and *Leonard*. Instead, they again argue their own

---

[28]   Ripple's disclaimers are unlike the disclaimers in *Alunni v. Dev. Res. Group, LLC*, which in the very first sentence of the purchase contract stated "ORAL REPRESENTATIONS CANNOT BE RELIED UPON," and which involved no dependency at all upon the efforts of the promoter. 445 F. App'x 288, 292-93, 297-98 (11th Cir. 2011). Similarly, *SEC v. Pac. W. Cap. Grp. Inc.*, 2015 WL 9694808, at *6 (C.D. Cal. June 16, 2015) ruled that there was no investment contract not merely due to disclaimers, but because there were no efforts left for the promoter to do. Notably, both cases looked beyond disclaimers to determine whether a reasonable expectation of profit existed.

statements cannot be compared to those cases, which involved contracts. Def. Br. at 56 n.36. As explained above, a written agreement is not required, and in any event, Defendants again ignore that their XRP sales *were also* pursuant to contracts.

*Third*, Defendants contend the SEC has identified *too many* public statements, stretching into August 2020, and that if those statements "were necessary to create a reasonable expectation of profits, then any offers and sales" before then "could not have been investment contracts." Def. Br. at 57. But from the very beginning, Defendants promoted XRP as an investment contract. Examples include the marketing brochures and tweets quoting Larsen representing that Ripple would keep 50% of XRP "to build team to contribute code, build apps, [and] promote #Ripple" and touting increases in *XRP*'s price as "Ripplemania," and with other public statements casting Ripple as the "central authority" as to XRP, who was "legally obligated" to try to maximize the value of XRP and who was committed to "develop[ing] client and server software for as long as necessary" because it "believe[d] that broad adoption of Ripple as a payment platform would drive demand." SEC 56.1 ¶¶ 192-205, 456. That Defendants engaged in a cacophony of similar statements only underscores, not undercuts, the gravity of their Section 5 violations.

*Finally*, Defendants argue the SEC cannot show their statements created a reasonable expectation of profit without showing that "any purchaser actually encountered any of the public statements." Def. Br. at 58. Defendants are wrong. *Howey*'s "inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant. … [C]ourts conduct an objective inquiry into the character of the instrument or transaction." *Telegram*, 448 F. Supp. 3d at 371 (citing *Warfield*, 569 F.3d at, 1021); *see also Aqua-Sonic*, 687 F.2d at 584 ("courts [applying *Howey*] are to examine the offering from an objective perspective …"). Defendants' attempt to add a reliance element also fails because the SEC, "unlike private parties, need not show reliance in its enforcement actions." *Lorenzo*, 139 S. Ct. at 1104.

*Salameh v. Tarsadia Hotel*, upon which Defendants rely, found no investment contract because investors signed rental management agreements containing the relevant representations 15 months *after* they had already made the purchase at issue. 726 F.3d 1124, 1128 (9th Cir. 2013). *Salameh* stands in stark contrast to this case. The evidence includes Ripple's brochures, marketing materials, XRP Market Reports, Whitepaper, and a fusillade of coordinated Tweets, blog posts, YouTube videos, appearances on national television, social media posts, and many other statements. Defendants cannot dispute (a) the statements' contents, (b) that the statements were directed to the public, or (c) that they made the statements simultaneous with offering and selling XRP. On this record, Defendants' reliance defense simply makes no sense.

By contrast, accepting Defendants' contention that only "direct sales pitches" allow for "extra-contractual representations," Def. Br. at 58, would permit "easy end-runs around" Section 5. *Wildes* 25 F.4th at 1346. As the Eleventh Circuit reasoned in another recent crypto asset Section 5 case: "Technology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as here, online videos and web links ... A seller cannot dodge liability through his choice of communications—especially when the Act covers 'any means' of 'communication.'" *Id.* (citing 15 U.S.C. § 77e(a)(1)).

## III.   THE INDIVIDUAL DEFENDANTS' OFFERS AND SALES OF XRP WERE ALL DOMESTIC, UNREGISTERED OFFERS AND SALES.

The Individual Defendants (but not Ripple) seek summary judgment as to the subset of their XRP "sales" that matched with unknown investors who interacted with online unregistered crypto platforms. The factual and legal basis for this argument is their expert's opinion (which should be excluded, D.E. 536) that certain of these unregistered platform have "indicia" of being "foreign," and that this single, disputed fact means that "sales" on such platforms are always beyond the reach of the U.S. securities laws without regard to any other fact. But they ignore that some of these supposedly "foreign" platforms were registered with the U.S. Department of the Treasury and

accepted U.S. customers, and that the Individual Defendants took no steps to ensure their XRP would not land in the hands of U.S. investors. Relying on the same flawed expert opinion and ignoring the Court's prior ruling, they also insist they did not engage in domestic *offers* of XRP, which is an actionable violation of Section 5 irrespective of whether any sales eventually occurred.

These arguments are without merit, and it is the SEC, not the Individual Defendants, who is entitled to summary judgment. The undisputed evidence shows they made their "offers" from the United States and those offers are therefore domestic. The undisputed evidence also shows their sales on crypto asset platforms were domestic under this Court's prior ruling and *Morrison v. Nat'l Australia Bank*, 561 U.S. 247 (2010) because the Individual Defendants incurred irrevocable liability to deliver their XRP when they entered into liquidation agreements within the United States, and also passed title to the XRP here. And, finally, while those grounds entitle the SEC to summary judgment, the SEC respectfully submits that, in the alternative, the Individual Defendants' offers and sales were domestic under the non-transactional test for domesticity the SEC believes governs Section 5. *Cf. SEC v. Gruss*, 859 F. Supp. 2d 653 (S.D.N.Y. 2012) (finding *Absolute Activist* transactional test inapplicable to claims under the Investment Advisers Act, and, in the alternative the transactional test was met).[29]

### A. The Individual Defendants Made Domestic Offers of XRP.

The term "offer" under the Securities Act includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3).

---

[29] The SEC previously argued that the transactional test does not apply, and in its earlier Order ruling on Defendants' motion to dismiss, the Court found this unavailing. On Defendants' motion for summary judgment and with the benefit of the more fully developed evidentiary record now available, the SEC respectfully requests that the Court consider, in the alternative, the SEC's arguments concerning the appropriate analysis of domesticity in Section 5 cases under *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998) *abrogated in part on other grounds by Morrison*, 561 U.S. 247 ("*Banque Paribas*"), and further respectfully seeks to preserve this argument for all purposes.

"[F]or an 'offer' to be domestic, 'a person or entity must (1) 'attempt or offer[,]' in the United States, 'to dispose of' securities. . . or (2) 'solicit[,]' in the United States, 'an offer to buy' securities. . .'" D.E. 441 at 26 (quoting *SEC v. Goldman Sachs*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011)). "When assessing offers…the focus 'is on the person or entity [offering] securities.'" *Id.* at 27 (quoting *Goldman Sachs*, 790 F. Supp. 2d at 165). Thus, "it is the location of the offerors"—here Larsen and Garlinghouse—"that is relevant." *Id.* "[A]n order to a broker to sell securities is certainly 'an attempt to dispose' of them." *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *see also Cavanagh*, 155 F.3d at 135 (the term 'offer' "extends beyond the common law contract concept").

At the pleading stage, *allegations* the Individual Defendants were in the United States when they made their offers sufficed. D.E. 441 at 28. The undisputed facts have now proven they were indeed in the U.S. during the relevant period: the Individual Defendants admit they were in the U.S. for the vast majority of the time they offered and sold XRP—94% of the time for Larsen (SEC 56.1 ¶ 1111; PX 393 at 7-8; PX 2 at 157) and 86% for Garlinghouse (SEC 56.1 ¶ 1159; PX 454 at 6-9).[30]

The undisputed facts also show the Individual Defendants "attempted to dispose" of XRP through GSR from within the United States. *See* Counter 56.1 § F. Larsen, while in the U.S., entered into XRP liquidation agreements with GSR in 2017 and 2020. Counter 56.1 ¶ 302; PX 612; PX 614; PX 393 at 7-8. Garlinghouse, also while in the U.S., entered into a similar agreement with GSR in

---

[30]     The Individual Defendants treat the term "offer" as limited to their attempts to dispose of XRP through GSR while in the U.S. While those attempts were domestic, and alone warrant summary judgment for the Commission, "offer" is defined broadly, and the undisputed facts here also show the Individual Defendants were in the U.S. when they offered XRP through press releases, media interviews, social media posts, and other public statements touting XRP to investors. *See Wildes*, 25 F.4th at 1344-46; *Chris-Craft Indus., Inc. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970) ("announc[ing] that securities will be sold at some date in the future and" including "an attractive description of these securities and of the issuer" constitutes an "offer."); *SEC v. Arvida Corp.*, 169 F. Supp. 211, 215 (S.D.N.Y. 1958) ("the furnishing to the press by representatives of the issuer and the underwriters of written and oral communications concerning the forthcoming public offering… constituted an 'offer to sell'); *SEC v. Blockvest, LLC*, 2019 WL 625163, *9 (S.D. Cal. 2019) ("the contents of Defendants' website, the Whitepaper and social media posts concerning the ICO of the BLV tokens to the public at large constitute an 'offer' of 'securities'").

2017. Counter 56.1 ¶ 303; PX 615; PX 454 at 6-9. Per these agreements, the Individual Defendants

instructed GSR "to liquidate XRP and extract maximum value in either bitcoins or US Dollars."

Counter 56.1 ¶ 304; PX 612, PX 614, PX 615, at Preamble. The agreements further provide: "GSR

will sell [the XRP]...in a series of liquidation transactions" and the Individual Defendants will

"direct[]" GSR where to deposit sales proceeds. Counter 56.1 ¶ 305; PX 612, PX 614, PX 615 § 2.5.

Defendants suggest these agreements still required a "specific order to sell" (Def. Br. at 73),

but they did not. Instead, the agreements clearly state GSR "will sell" the XRP after it has "custody

and control" of the XRP transmitted to GSR. Counter 56.1 ¶ 305; PX 612, PX 614, PX 615 §§ 2.3,

2.5. Thus, consistent with the agreements, GSR used a trading algorithm that ran 24 hours a day and

continuously sold XRP on unregistered crypto platforms, without requiring any additional

commands or directives. Counter 56.1 ¶ 355; PX 26 at 311-12. From time to time, the Individual

Defendants directed GSR from within the U.S. to pause or restart XRP sales.[31] Counter 56.1 ¶ 332;

PX 729; PX 731. Finally, pursuant to these contracts, the Individual Defendants transferred their

XRP to GSR from accounts at Bitstamp U.S.A., a FinCEN-registered entity, or from "cold wallets"

(*i.e.*, addresses on the ledger not connected to an institution that they directly controlled). Counter

56.1 ¶¶ 314, 377; PX 202 at 27-31; SEC 56.1 ¶¶ 1112, 1162; PX 81 at 180; PX 394; PX 732.

There can be no question that the Individual Defendants' engagement of GSR, their transfer

of XRP to GSR, and their command to GSR pursuant to "Liquidity Extraction Agreements" to sell

their XRP—all from within the United States—were attempts to dispose of XRP. D.E. 441 at 28.

All, accordingly, are domestic offers.

Unable to dispute these facts, Defendants recast their arguments by conflating offers with

sales. They cite to cases applying *Morrison* to *sales* of securities, which found the location of the seller

---

[31]     Garlinghouse used a disappearing messaging application to communicate with GSR, and
there is no way to know whether or how many of Garlinghouse's instructions to GSR from the
United States were destroyed and therefore not produced. SEC 56.1 ¶¶ 1170-74, 1179-80.

or purchaser was not necessarily dispositive to *Morrison's* transactional domesticity test (discussed further below). Def. Br. at 73. But this Court already correctly held that *Morrison*'s test does not govern *offers*. D.E. 441 at 25. Likewise, any contention that no "offer" exists until a trade order has been published on a crypto asset trading platform, Def. Br. at 69, is wrong. An offer includes attempts to dispose of their XRP both by offering and transferring it to GSR, and by instructing GSR to offer to sell their XRP, from within the U.S. The ultimate publication of an order on a platform is irrelevant to whether and when *offers* in connection with those trade orders were made.

Moreover, Defendants' "facts" that the platforms are "foreign" are just the disputed opinions of their expert, Yesha Yadav (which should be excluded, D.E. 563), who created four "indicia" of foreignness out of whole cloth and applied them inconsistently. *See infra* § III.D.[32]

Nor is there any merit to the argument that *Goldman Sachs* is applicable only to direct negotiations between the buyer and the seller. *Goldman Sachs* did not examine or rely on the nature of the transaction, but on the broad definition of "offer," 790 F. Supp. 2d at 165, which does not

---

[32]     Defendants mischaracterize how the crypto asset trading platforms operated, particularly when they argue that offers are "viewable … only on the exchange." Def. Br. at 61-62. Unlike registered national securities exchanges, which typically permit only their *members—i.e.,* broker dealers registered with the exchanges—to transact on their platforms, crypto asset trading platforms offer their services to retail customers as well. Counter 56.1 ¶¶ 370-71; 15 U.S.C. § 78f(c); *see also* FINANCIAL STABILITY OVERSIGHT COUNCIL, "Report on Digital Asset Financial Stability Risks and Regulation," (Oct. 3, 2022) at 118, *available at* https://home.treasury.gov/system/files/261/FSOC-Digital-Assets-Report-2022.pdf; *see generally id.* at 4-7 (noting risks from vertical integration of services by crypto trading platforms). U.S. customers access the platforms by interacting with offers of XRP accessed through their computers in the U.S.  These platforms are therefore not the "foreign securities exchanges" that were of concern to the Supreme Court in *Morrison*. *See* U.S. Dep't of Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* (Sept. 6, 2022) at 7-9 (platforms provide services to retail customers and "[a]ny activity with U.S. residents involving crypto-assets that are derivatives or securities falls under the jurisdiction of the CFTC or SEC") *available at* https://home.treasury.gov/system/files/136/CryptoAsset_EO; *id.* ¶¶ 373-75; PX 636 at 18 ("In many instances, these platforms are operating outside the jurisdiction's regulatory perimeter, or are not in compliance with applicable regulatory requirements," and have essentially formed "a shadow crypto financial system"); PX 637 at 47 (according to the IMF, "many countries do not have conduct or prudential regulations in place that encompass the activities of crypto asset service providers"). *see also* Counter 56.1 ¶¶ 365-69, 372 (discussing requirements and listing of "national securities exchanges" that are registered with the SEC under the Exchange Act).

distinguish face-to-face "offers" from general solicitations. As the Eleventh Circuit recently held in defining the term "offer" in a crypto case, to interpret the Securities Act to have a *shorter* reach when the general public is solicited to buy securities would permit "easy end-runs around" the Securities Act given that "[t]echnology has opened new avenues for both investment and solicitation" and that "[s]ellers can now reach a global audience through podcasts, social media posts, or, as here, online videos and web links." *Wildes*, 25 F.4th at 1346.

The hypothetical about a foreign citizen "vacationing in New York, who placed an order on the Tokyo Stock Exchange to sell stock in a company registered on that exchange," Def. Br. at 71, is a red herring. Section 5 applies to issuers and their affiliates, underwriters, and dealers engaging in public offerings of securities, and not to retail investors selling shares in the secondary market on stock exchanges. 15 U.S.C. § 77d. Here, the Individual Defendants are the U.S. citizen-affiliates of a U.S.-domiciled company, who themselves raised over $600 million and who transmitted from the U.S. their offers to sell the issuer's securities utilizing trading platforms that broadcast those offers through the internet to U.S. investors, which would land them in the hands of U.S. investors.

### B. The Individual Defendants Committed Themselves to Their Sales of XRP, and to Deliver XRP After a Sale, in the United States.

*Morrison* does not save Individual Defendants' conduct from liability under Section 5 for the additional reason that their "sales" of XRP, under the undisputed facts, were domestic. *Morrison* held that sales of securities "registered on a national securities exchange" and "domestic transactions in other securities" are within the scope of the Exchange Act. 561 U.S. at 266-67. The first part of *Morrison* is not implicated here—the Individual Defendants did not sell any XRP on any country's registered securities exchange. As for the second, part, while "*Morrison* itself did not clearly state when purchases or sales are 'made' in the United States under the transactional domesticity test, the Second Circuit has since articulated a series of standards for determining where those purchases and sales occur." D.E. 441 at 22.

"To sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange…a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). "[U]nder *Absolute Activist* the SEC need only show that either of these events occurred in the United States in order to establish domesticity." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 665 (D. Conn. 2018). Relevant to this analysis are facts "[1] concerning the formation of the contracts, [2] the placement of purchase orders, [3] the passing of title, or [4] the exchange of money." D.E. 441 at 23 (citing *Absolute Activist* at 70). Courts analyze the provisions of relevant agreements to determine where these acts took place. *E.g.*, *Ahmed*, 308 F. Supp. 3d at 669-73 (analyzing written contracts and concluding that, where "at least one party … was acting from the United States" at each of these points, "all transactions are domestic"). The Second Circuit has clarified that "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself." *United States v. Vilar*, 729 F.3d 62, 77-78 n.11 (2d Cir. 2013).

The undisputable facts show that the Individual Defendants committed themselves to sell their XRP from the United States. Counter 56.1 § F. While any one of the *Absolute Activist* factors occurring domestically can suffice to make this showing, here all four occurred in the United States.

### 1. The Individual Defendants Entered into Sale Agreements with GSR from the United States.

As to the "formation of contracts" factor, the Individual Defendants were in the United States when they signed their contracts with GSR. *See supra* at § III.A.

The liquidation contracts gave GSR "custody and control" of the Individual Defendants' XRP from the moment they transferred their XRP to GSR. Counter 56.1 ¶ 305; PX 612, PX 614, PX 615 § 2.3. And "GSR's right to payment vest[ed]" as soon as GSR took custody of the XRP. Counter 56.1 ¶ 307; PX 612, PX 614, PX 615 § 2.6. Once GSR took custody of the XRP, GSR employed a trading algorithm that typically ran nonstop and continuously generated offers to sell on

behalf of the Individual Defendants. Counter 56.1 ¶ 355; PX 26 at 311-12. There is no evidence that GSR ever returned their XRP. *See* Counter 56.1 ¶ 311; PX 612, PX 614, PX 615 § 2.1.

The contracts also made clear the Individual Defendants had no legal relationship with the crypto platforms upon which GSR distributed their XRP. All the rights at that point belonged to GSR, which had no "agency"-type powers to bind the Individual Defendants with respect to the platforms. The agreement thus provided that ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ Counter 56.1 ¶ 313; PX 612 § 11.2; PX 614, PX 615 § 12.2. Finally, the contracts provided that, ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████. Counter 56.1 ¶ 312; PX 612 § 10.1; PX, PX 615 § 11.1.

These provisions together make clear that the agreements with GSR for the "disposition" of XRP, or even just a possessory "interest in" XRP, in exchange for the promise of payment, constituted a "sale" contract under the express terms of the Securities Act. 15 U.S.C. § 77b(a)(3).

### 2. The Individual Defendants Committed Themselves to XRP Sales Orders While They Were in the United States.

The Individual Defendants were also in the United States when they carried out the individual transfers of XRP to GSR contemplated by those sale contracts, which independently establishes that they incurred irrevocable liability to sell while in the United States.[33]

---

[33] In addition, the Individual Defendants were in the U.S. the vast majority of time when their orders were matched with buyers on these platforms. While this does not "on its own" establish domesticity, that the Individual Defendants typically "functioned out of United States offices … lends some support for the SEC's claims that the transactions themselves also occurred domestically." *Ahmed*, 308 F. Supp. 3d at 665; *see also id.* at 669 (contract was formed in the U.S. where U.S.-based entity "did not have a practice of traveling outside the US to form contracts for the purchase or sale of investments").

Pursuant to these contracts, Larsen transferred 1.5 billion XRP ($495 million) and Garlinghouse transferred 167 million ($105 million) XRP, from accounts at U.S.-based crypto platform Bitstamp U.S.A. or cold wallets, to GSR. Counter 56.1 ¶¶ 314, 377; PX 202 at 27-31; SEC 56.1 ¶¶ 1112, 1162; PX 81 at 180; PX 394; PX 732. Each of these transactions was reflected on the XRP Ledger, which means each transaction had to be independently and simultaneously validated by each of the U.S. nodes of the ledger, because of how the ledger is programmed. Counter 56.1 ¶ 315; PX 202 at App'x E. The later transactions, between the GSR account at the particular platform and the ultimate investor, were not on the ledger—those were simply book entries in the platforms' records. *See* Def. Br. at 61; *see also infra* § IV.B.4 (explaining electronic mechanics of XRP Ledger).

Each of these transactions between the Individual Defendants and GSR, while the Individual Defendants were in the U.S. and through U.S. means of execution, constituted domestic dispositions of XRP for value under Section 5.

### 3. Title Passed at the Time the Individual Defendants, from the United States, Transferred Their XRP from their U.S. Accounts to GSR's.

Those U.S. transactions also coincided with transfers of title to XRP, establishing another independent basis for their domesticity under *Absolute Activist. See* 677 F.3d at 68 (irrevocable liability is not "the only way to locate a securities transaction," and "a sale of securities can be understood to take place at the location in which title is transferred").

To transfer their XRP to GSR, the Individual Defendants used their private cryptographic keys to digitally sign the transaction to transfer the XRP from the "address" they controlled to the "address" supplied by GSR. Counter 56.1 ¶¶ 317, 361; PX 12 at 12. (A private key is a password known only to the person who controls a crypto asset which is tied to the address they control. *Id.*)

At that moment, GSR had "title" to this XRP. Title simply means "legal evidence of a person's ownership rights in property." *Ahmed*, 308 F. Supp. 3d at 666 (citing BLACK'S LAW DICTIONARY (10th ed. 2014)). In blockchain, "[a]s a fundamental principle, whoever controls the

private keys corresponding to a given address, controls [the crypto asset] pertaining to that address."

PX 12 at 12. As a recent decision explained with respect to another crypto asset:

> Transferring or otherwise using bitcoin requires an address, a public encryption key, and a private encryption key. Units of bitcoin are stored by reference to that address. The address, similar to a bank account number...is a long string of letters and numbers. Every address is associated with a public key. Every public key is derived from a private key. Importantly, private keys are secret, like passwords… [T]he sender must sign the transaction using a digital signature generated using the sender's private key….After the transaction is verified, the bitcoin being sent becomes associated with the recipient address and its attendant private and public keys.

*United States v. Harmon*, 474 F. Supp. 3d 76, 81 (D.D.C. 2020) (internal quotation marks and citations omitted). Importantly, "[o]wnership of bitcoin is thus based on a user's possession or knowledge of the private key associated with a public key and address." *Id.* at 82; *see also* Counter 56.1 ¶ 323; PX 638 at 138 (same). The innovation of blockchain created a world where possession of the key is the power to transfer without recourse and without the need for trusted intermediaries.

Thus, once the Individual Defendants transferred the XRP from their address to GSR's address—which GSR controlled—the XRP was owned by GSR and a "sale" had occurred for purposes of the Securities Act. Defendants have acknowledged as much in contracts Ripple had with GSR and other market makers. *See* Def. 56.1 ¶ 98 (referencing contracts "under which Ripple transfers *possessory interests* in units of XRP to the counterparty and the counterparty promises to sell those units of XRP to various third parties" (emphasis added)). Indeed, Larsen's first agreement with GSR explicitly stated that title passed in this way. Counter 56.1 ¶ 299; PX 610 § 2.7(b).

This is in line with the Court's finding that "irrevocable liability may attach when digital assets enter and leave" the Individual Defendants' accounts. D.E. 441 at 27; *see also SEC v. Revelation Cap. Mgmt., Ltd.*, 246 F. Supp. 3d 947, 954 (S.D.N.Y. 2017) (analyzing, under *Morrison*, the moment a party bound itself to a sale by looking at relevant definition of "sale" in the Securities Act, and noting that a "sale" occurs when the party obligates itself to perform "even if the formal performance of their agreement is to be after a lapse of time" (citation omitted)).

### 4. Money Was Exchanged in the United States.

Once the sales were finalized, GSR deposited the sales proceeds in U.S. dollars into the Individual Defendants' U.S.-based crypto trading platform accounts. The Individual Defendants then transferred those funds into their U.S.-based bank accounts. SEC 56.1 ¶¶ 1113, 1162; PX 394.

\* \* \*

For these reasons, the Individual Defendants committed themselves to "deliver a security," *Absolute Activist*, 677 F.3d at 68, when they signed the GSR contracts to sell (from the United States), and they actually transmitted the security for sale when they transferred their XRP to GSR for sale (also from the United States). The answer to "where, physically, the…seller committed him or herself," *Vilar*, 729 F.3d at 77 n.11, is clear: it was in the United States.[34]

Ignoring all of these factors and refusing to engage with the terms of their contracts or with *any* of *Absolute Activist's* factors, Defendants argue that *the only relevant factor* is the "location" of the crypto asset trading platform. But even assuming that the platforms are "foreign," this is not dispositive of the domesticity analysis. While courts have looked to the location of a platform as one relevant factor, there is no support for the position that this one factor ends the analysis.

To the contrary, the Second Circuit recognizes "the reasoning of *Morrison* does not preclude the application of [the relevant statute] to trades made on a foreign exchange when irrevocable

---

[34] Of course, GSR still had to perform certain acts to sell the XRP, but the Individual Defendants completed their obligations at the time they transferred the XRP to GSR. *See Giunta v. Dingman*, 893 F.3d 73, 81 (2d Cir. 2018) ("irrevocable liability may be incurred [in the U.S.] despite the existence of conditions necessary to closing the transaction abroad"); *Absolute Activist*, 677 F.3d at 68 (what matters is when "the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time"). Moreover, the ultimate purchasers of the Individual Defendants' XRP became bound later—when GSR subsequently traded on the platforms and those purchases took the XRP. But this does not change that the Individual Defendants had committed themselves to sell earlier—at the point when they signed the contracts and also when they transferred the XRP to GSR for sale on the crypto asset trading platforms. "In the modern era, securities transactions are not completed at one time and in one location." *Ahmed*, 308 F. Supp. 3d at 660 n.26; *see also id.* at 669.

liability is incurred in the United States." *Myun-Uk Choi v. Tower Rsch. Cap. LLC,* 890 F.3d 60, 67 (2d Cir. 2018). If Defendants were correct that any sale of a security on a foreign (or foreign-owned) trading platform is necessarily foreign under *Morrison*, it would be impossible to have the situation contemplated in *Myun-Uk* where irrevocable liability is incurred in the U.S. for a trade on a foreign exchange, and the cases holding that trades in securities listed on domestic exchanges were not necessarily domestic would also be wrong. *E.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 n.33 (2d Cir. 2014) ("[W]e have never held that the placement of a purchase order, *without more*, is sufficient to incur irrevocable liability, *particularly in the context of transactions in foreign securities on a foreign exchange*." (emphasis added)); *In re Petrobas Secs.*, 862 F.3d 250, 262 (2d Cir. 2017) (quoting *City of Pontiac* holding that listing on an exchange does not end the domesticity inquiry if the transaction "did not *occur*" on the exchange).[35] Defendants' test, which reduces the irrevocable liability analysis to a single factor, should be rejected.

Defendants cite three cases in this district that applied *Morrison* to crypto asset transactions (Def. Br. at 66-67), but do not actually dive into their facts because none supports the theory that the supposed foreign "location" of the platform is the sole relevant, let alone dispositive, factor. In *Anderson v. Binance* the only domesticity allegation was that the buyer was in the U.S. and that title passed over U.S. servers. *See* 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) *appeal pending* No. 22-972 (2d Cir.). The decision does not treat the "location" of Binance as dispositive of a transactional test. Nor did the *Anderson* plaintiffs enter into contracts of sale like the Individual Defendants did. *Holsworth v. BProtocol Found.* is even less helpful, as it involved Israeli citizens buying crypto assets

---

[35]     In the same vein, a transaction is "domestic when the two sides of the transaction are 'matched'—thus forming a binding contract—on an electronic exchange system within the United States." *Banco Safra S.A. v. Samarco Mineracao S.A.*, 849 F. App'x 289, 293 n.2 (2d Cir. 2021). Defendants are wrong, however, that the reverse is true by "natural extension." Def. Br. at 66. While evidence of a binding commitment in the United States certainly does end the *Morrison* inquiry, evidence of a binding commitment *outside* the United States does not.

from a Swiss company, and the court dismissed the case on *forum non conveniens* grounds with only a passing reference to *Morrison* and no analysis of the platform's location. 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021).

*Williams v. Block.One*, No. 20 Civ. 2809, D.E. 146 (S.D.N.Y. Aug. 15, 2022), is the most unhelpful to the Individual Defendants. There, Judge Kaplan relied not on the location of the crypto asset trading platform, but instead held that the domesticity of the transaction would be determined by *which node* in the blockchain had first confirmed the transaction at issue. If the node was in the United States, the transaction would be domestic. *Id.* at 16-17. This holding, however, relied on the manner in which the *Ethereum* blockchain validated transactions at the time—using a "first to the flag" mechanism that rewarded the first node to solve a complex computational problem and making that node the one to validate the transaction. *Id.* As Defendants take pains to point out, however, this is *not* how the XRP Ledger operates. As David Schwartz, who programmed it, explained under oath, a transaction on the XRP Ledger does not become "validated" for a node until 80% or more of the nodes in that node's particular "trusted node" list agree to the transaction. Counter 56.1 ¶ 35; SEC 56.1 ¶¶ 629-30; PX 6 at 61; PX 682; Def. Br. at 4-5 (contrasting consensus mechanism for XRP and Bitcoin blockchains). In other words, in the XRP blockchain, all the nodes must validate a transaction for their own purposes by listening to the other nodes, including the many existing in the United States throughout the relevant period. Counter 56.1 ¶¶ 319-22, 324; PX 12; PX 6 at 61. If the *Williams* approach controls, all the Individual Defendants' sales were validated in nodes that were in the U.S. and are therefore domestic transactions.

### C. The Individual Defendants' XRP Distributions Were In Furtherance of Their Creation and Fostering of a Domestic Market for XRP.

In its order denying the Individual Defendants' motions to dismiss, this Court noted "the SEC has provided no convincing reason why the transactional domesticity test for sales under Section 10(b) should not apply to sales under Section 5." D.E. 441 at 24-25. The SEC respectfully

submits, however, that the transactional domesticity test used in private actions under Section 10(b) is not the test to be applied in this government enforcement action, as set forth in its original briefing, and as explained below. D.E. 183 at 36-59. In light of the undisputed facts now before the Court at summary judgment, the SEC respectfully provides this argument as an alternative ground for rejecting the Individual Defendants' arguments that their XRP sales were not domestic.

1.  **Offers and Sales under Section 5 Are Domestic When a Defendant Takes Steps to Create a U.S. Market for Securities.**

Section 5 applies to "any offer or sale made by U.S. 'means or instruments of transportation or communication in interstate commerce or of the mails'—the so-called 'jurisdictional means'." Edward Greene, U.S. REGULATION OF THE INT'L SECURITIES AND DERIVATIVES MARKETS § 8.01 (12th ed. 2017) ("Greene") ("a public offering outside the United States by a U.S. issuer may be subject to the registration requirements of the Securities Act since jurisdictional means would almost certainly be used"); *see also, e.g.*, *United States v. Greenberg*, 30 F.R.D. 164, 168 (S.D.N.Y. 1962) (Sections 5(a)(1) and 5(a)(2) "specifically and unambiguously prohibit the use of the mails to sell or to transport a security which has not been registered.").

Section 5(a)(1) prohibits the use of interstate commerce "to sell [a] security through the use or medium of any prospectus or otherwise" without registration. 15 U.S.C. § 77e(a)(1). Section 5(a)(1) "is violated when…the mails are used to transmit an offer or other sales literature, to transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways." *United States v. Wolfson*, 405 F.2d 779, 784 (2d Cir. 1968) (internal quotation marks and citation omitted). Section 5(a)(2) makes it unlawful to "to carry or cause to be carried through" interstate commerce "any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a)(2). And Section 5(c) proscribes using "means or instruments of transportation or communication in interstate commerce" to make unregistered offers "through the use or medium of any prospectus or otherwise."

While "the U.S. courts have generally applied the concept of jurisdictional means broadly," Greene § 8.01, the SEC has, by rule, interpreted the territorial reach of Section 5. Rule 901 of Regulation S defines offers and sales under Section 5 "to include offers and sales that occur within the United States" and "not to include offers and sales that occur outside the United States." 17 C.F.R. § 230.901. Regulation S provides safe harbors that give a means to engage in foreign offerings without incurring the obligation to register those offerings, but Rule 901 establishes the default territoriality rule under Section 5. *See Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998) *abrogated in part on other grounds by Morrison*, 561 U.S. 247 ("A transaction not within either of the safe harbors may still be outside of the United States within the meaning of 17 C.F.R. § 230.901"); *see also Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *2 (C.D. Cal. 2010) (noting Regulation S "may be relevant to discerning what the Supreme Court meant by 'domestic transactions'" in *Morrison*).

In *Banque Paribas*, the Second Circuit provided the standard under which territoriality should be analyzed under this statutory and regulatory rubric: "the registration provisions should apply to those offers of unregistered securities that tend to have the effect of creating a market for unregistered securities in the United States" and excludes that which is "not such as to have the effect of creating a market for those securities in the United States." *Id.* at 126.

### 2. The *Banque Paribas* Standard Should Be Applied to Determine Domesticity Under Section 5.

To determine what constitutes "domestic" violations under *Morrison*, a court "must look to a statute's 'focus,'" and the "focus of a statute is 'the object of its solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protect' or vindicate." *In re Picard*, 917 F.3d 85, 96 (2d Cir. 2019) (*quoting WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018)); *see also Myun-Uk*, 890 F.3d at 67 (the Second Circuit "heed[s] *Morrison*'s mandate that an extraterritorial analysis assess 'the particular statutory provision' at issue") (citation omitted).

70

The domesticity test of *Morrison*, as applied in *Absolute Activist*, is rooted in the "[t]he primacy of the domestic exchange" and in the "focus of the [Exchange] Act," which is to regulate national securities exchanges and domestic securities purchases. *Morrison*, 561 U.S. at 267-68. The SEC and Defendants agree that *Morrison* is premised on the notion that the *Exchange Act* was not "intended to 'regulat[e] foreign securities exchanges.'" Def. Br. at 60 (quoting *Morrison*, 561 U.S. at 267).

In contrast to Section 10(b) of the Exchange Act, Section 5 is instead meant "to assure full and fair disclosure in connection with the public distribution of securities." *Banque Paribas,* 147 F.3d at 126 (citations omitted). As the Second Circuit elaborated in *Banque Paribas*:

> [T]he registration provisions [of the Securities Act] are designed to prevent the offer of securities in the United States securities market without accompanying standardized disclosures to aid investors, a course of conduct. This conduct, in turn, has the effect of creating interest in and demand for unregistered securities. To avoid this result, in keeping with Congress's purpose, the registration provisions should apply to those offers of unregistered securities *that tend to have the effect of creating a market for unregistered securities in the United States.*

*Id.* (emphasis added). Section 5 thus seeks to regulate not the execution of purchase and sales transactions, but rather steps that would create a market for unregistered securities domestically. And "the parties and interests it 'seeks to protect' or vindicate" are investors in the United States market entitled to the information required by registration—"the heart of the [Securities] Act." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).

Accordingly, the text of the two statutes differs substantially. Section 10(b) includes language focusing on purchases and sales on "national securities exchanges," and related Exchange Act provisions—key factors in *Morrison*—speak of transactions. *See Morrison*, 561 U.S. 267-68; 15 U.S.C. § 78j(b). Section 5 includes neither indication of a transactional focus nor a reference to exchanges, but focuses on the means by which securities are offered, sold, transported, and delivered.

Because the Securities Act and Exchange Act have different subjects of focus, the transactional test that *Morrison* found appropriate for Section 10(b) is not appropriate for Section 5.

Indeed, the transactional test does not even govern in SEC actions under Section 10(b). In 2010, Congress overrode *Morrison* and restored the conducts-and-effects test for extraterritorial application in *government enforcement actions* only, in Dodd-Frank Section 929P(b). *See Scoville*, 913 F.3d at 1218 ("Congress undoubtedly intended that the substantive antifraud provisions should apply extraterritorially" pursuant to these revisions.); *see also Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 181 (2d Cir. 2014) (recognizing that Dodd Frank changed the law to be applied in government enforcement actions under Section 10(b)).[36] Notably, the *Banque Paribas* standard is more confined, as it does not provide for extraterritorial application of Section 5 at all and is more targeted than the broad conduct and effects test. Instead, *Banque Paribas* applies the SEC's territorial interpretation of Section 5 that *Morrison* cited with approval. 561 U.S. at 268. *Banque Paribas* adheres to *Morrison*, and it is not inconsistent with *Absolute Activist*, a decision involving *private* actions under Section 10(b).[37]

### 3. Ripple and the Individual Defendants Engaged in Extensive Efforts to Create a Market for XRP in the United States.

The Individual Defendants violated Section 5 by using U.S. instrumentalities to offer, sell, and transfer their XRP to U.S. investors. Counter 56.1 ¶¶ 314-37; PX 81; PX 732. Under *Banque Paribas*, the foregoing is outside the reach of Section 5 if it did not "have the effect of creating a market for those securities in the United States." 147 F.3d at 126. By contrast, using "a U.S. broker or other U.S. financial entity," making "solicitations to individuals [they] had reason to suspect were American[s]," or directing "general sales efforts here," *id.*, all could indicate domestic violations.

---

[36]     In other words, to the extent *Morrison* overruled *Banque Paribas*, Section 929P(b) of Dodd Frank overruled *Morrison* in *government enforcement actions* only under Section 10(b).

[37]     In addition, *Morrison* interpreted Section 10(b) against a blank state, as the SEC had not interpreted its territorial reach by rule, whereas the SEC has a longstanding rule doing so for Section 5 (Regulation S), a rule that is understood and followed by domestic and foreign issuers to ensure that foreign offerings are not a backdoor means for sending unregistered securities to U.S. investors.

At the time of their sales, the Individual Defendants were engaging in numerous domestic acts that had the effect of "creating a market for unregistered securities in the United States." They engaged and paid incentives to U.S.-domiciled unregistered trading platforms that made XRP available to U.S. investors; directed U.S. investors on how to purchase XRP on domestic and foreign platforms; took no steps to prevent their XRP from being sold to U.S. investors; and allowed GSR to sell XRP into public markets via unregistered platforms readily accessible to U.S. investors (some of them registered with FinCEN but not the SEC). Counter 56.1 ¶¶ 85-132, 338-50, 378-435; PX 81 at 24, 310-16, 487; PX 2 at 88-89, 102-103; PX 26 at 130-32; PX 541, 564-67, 580, 583-87, 590, 595, 598, 604-08. The Individual Defendants cannot draw a boundary around their sales on supposedly foreign-domiciled platforms, having created a U.S. market for XRP.

Under *Banque Paribas*' domesticity test, such facts indisputably establish the Individual Defendants' distributions of XRP—no matter where any particular transaction could be contractually orchestrated with underwriters to be "irrevocable"—were effected such that the securities came to rest with U.S. investors who were deprived of all the mandated disclosures to which they were entitled under Section 5. *See Banque Paribas*, 147 F.3d at 126 (citing Registration of Foreign Offerings by Domestic Issuers, SEC Release No. 33–4708, 1964 WL 3661 (July 9, 1964) (stating that "U.S. corporations could safely distribute unregistered securities abroad to foreign nationals, if distribution were effected so that would result in the securities coming to rest abroad").

It is notable that Defendants, a *domestic* issuer and its *domestic* affiliates, would advance an argument that they are not subject to the laws of the United States. The leading treatise on U.S regulation of international securities transactions explains that even a domestic issuer offering securities is subject to the highest level of scrutiny to ensure that the offering is truly foreign and is not a disguised domestic offering, and that the issuer is not engaged in directed selling efforts in the U.S. that would stimulate a domestic secondary market. *See* Greene § 8.02. To avail itself of the

Regulation S safe harbor, a domestic issuer and its control persons must thus meet more stringent requirements.[38] To allow the Individual Defendants to exclude from Section 5 their sales executed on unregistered online platforms with certain amorphous "indicia" of being abroad but that indisputably permit U.S.-based investors (*see also infra* § III.D), simply by structuring sales transactions so that trades are matched in the internal recordkeeping of these platforms, at a time when Ripple was fostering U.S. investor demand for XRP, particularly during 2020 when Ripple was taking both sides of the XRP market while Garlinghouse was selling his XRP (Counter 56.1 ¶¶ 194-96, 457, 462; PX 763, 765), would erase Section 5's registration requirement from the SEC's enforcement toolkit in the age of crypto assets.

**D.    The Evidence Underlying the Individual Defendants' Motion Is Disputed.**

Defendants use opinions of their purported expert, Yadav, as "evidence" of two sets of "facts" they claim are undisputed. First, Yadav opines that certain unregistered crypto platforms are foreign. She also posits the Individual Defendants' sales of XRP on those unregistered platforms "became irrevocable" abroad at the time the trading platforms matched buy and sell orders because, according to Yadav, those platforms "lack any significant indicia showing that offers on those exchanges are made in the United States, or that trades being matched on these exchanges become final and binding in the United States." The SEC disputes both sets of "facts," which are based on improper, inadmissible opinion testimony. D.E. 536 at 45-51.

*First*, Yadav's opinions are based entirely on a test she invented for this litigation, which, as explained in the SEC's motion to exclude, she developed and applied improperly and inconsistently. *Id.* at 48-50. She ignores, as one of many examples, that the platforms accept U.S. investors and

---

[38]    It is undisputed that none of the Defendants took any of the steps to comply with Regulation S. Some of these requirements include requiring the purchasers to certify they are not U.S. persons and to agree to resell only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

some are registered with U.S. regulators providing U.S. addresses. *See* Counter-Statement § IV. For this reason, Defendants' assertion that certain crypto asset trading platforms are "foreign" is entirely conclusory and improper.[39] Nonetheless, even accepting these proffered "facts" as true, the SEC has shown above that the Individual Defendant's offers and sales, including those where the ultimate sale was made through such purportedly foreign trading platforms, were in fact domestic acts.

*Second*, Yadav's opinion that XRP sales on those platforms became irrevocable "on" those platforms is improper for various reasons, including that, Yadav offers an improper legal conclusion about where and when irrevocable liability occurs. Next, to arrive at her legal conclusion, Yadav looks only at her four indicia of location of the crypto *platforms* themselves, and not at the host of factors that *Morrison*, its progeny, and this Court have deemed relevant to determining whether a *transaction* is domestic, as set forth above. And, even accepting Yadav's theory that irrevocable liability occurs on the platform at the time buy and sell orders are matched, she does not offer any evidence about *where* this occurs. Presumably, a purely electronic matching of orders occurs at the physical location of the trading platform's computer servers, which Yadav makes no attempt to determine. In any event, the Individual Defendants became irrevocably bound long before any orders were matched on a platform's server.[40]

## CONCLUSION

Defendants' Motion should be denied and the SEC's Motion should be granted.

---

[39]     Yadav created four "indicia" for where a trading platform is located: (1) place of business, registered office, and domicile; (2) location "mentioned" in terms of service; (3) the beliefs of "market participants and the public"; and (4) regulators' beliefs. D.E. 536 at 45 (quoting Yadav Report ¶ 103). These indicia obviously cannot reveal where in the world a trading platform is actually located as, for example, market participants' subjective beliefs have no control over where a platform physically conducts its operations. Yadav tellingly acknowledges that her criteria at times identify multiple *different* geographic locations for a single platform. D.E. 615 at 40.

[40]     Larsen's request for summary judgment as to the pre-September 2015 offers and sales he acknowledges are not at issue, *see* Def. Br. at 74-75, should be denied as an improper attempt to obtain an advisory opinion. *E.g.*, *United States v. Mashni*, 547 F. Supp. 3d 496, 515 (D.S.C. 2021).

Dated: New York, New York
      October 18, 2022

Jorge Gerardo Tenreiro
Jon A. Daniels
Elizabeth Goody
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

Benjamin Hanauer
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

*Attorneys for Plaintiff*