**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-04738 (KPF) |
| COINBASE, INC., AND COINBASE GLOBAL, INC., | |
| Defendants. | |

**BRIEF OF *AMICI CURIAE* ANDREESSEN HOROWITZ AND PARADIGM IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Michael R. Dreeben (*pro hac vice*)
Melissa C. Cassel (*pro hac vice*)
Andrew R. Hellman (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye St., N.W.
Washington, D.C.  20006
(202) 383-5300
mdreeben@omm.com

William K. Pao (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071
(213) 430-6000
wpao@omm.com

*Counsel for Amici Curiae Andreessen Horowitz & Paradigm*

## TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ............................................................................. 1

ARGUMENT ............................................................................................................ 2

I     COINBASE-TRADED TOKENS DO NOT SATISFY THE *HOWEY* TEST ........................................................................................................... 3

     A.    *Howey* Sets Forth An Established Framework For Finding An Investment Contract ............................................................. 3

     B.    The Coinbase-Traded Tokens Fail The *Howey* test ................................... 5

II    THE SEC'S THEORY, IF ADOPTED, WOULD HAVE BOUNDLESS APPLICATION AND WOULD SWEEP UP INNUMERABLE ASSET TRANSACTIONS AS INVESTMENT CONTRACTS ........................................ 8

III   PURSUANT TO THE MAJOR QUESTIONS DOCTRINE, CONGRESS SHOULD CREATE THE REGULATORY FRAMEWORK ........................... 13

     A.    Amici Favor A Comprehensive Legislative Regime To Regulate Digital Assets As Opposed To The SEC's Ad Hoc Extension Of Its Inapt Authorities ................................................................ 13

     B.    Congress Must Provide The Regulatory Framework For Digital Assets ............................................................................. 14

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998).................................................................................... 18

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023).................................................................... 15, 16, 17

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)................................................................................ 15, 16

*Int'l Bhd. of Teamsters v. Daniel*,
  439 U.S. 551 (1979)..................................................................................... 4

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
  142 S. Ct. 661 (2022).................................................................................. 18

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994) .......................................................................... 6, 7

*SEC v. C.M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)...................................................................................... 7

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).................................................................................... 18

*SEC v. CMKM Diamonds, Inc.*,
  729 F.3d 1248 (9th Cir. 2013) ...................................................................... 9

*SEC v. Edwards*,
  540 U.S. 389 (2004)................................................................................... 3, 4

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............................................. 12

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ......................................... 12, 16

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)......................................................................... 2, 3, 5, 7

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967)...................................................................................... 4

*United Housing Found., Inc. v. Forman*,
  421 U.S. 837 (1975)................................................................................... 4, 6

*Utility Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014).................................................................................... 15

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022).......................................................................... 15, 16

**Statutes**

15 U.S.C. § 77................................................................................................. 9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

15 U.S.C. § 77b ................................................................................................................. 3

15 U.S.C. § 78c ................................................................................................................. 3

**Other Authorities**

Andrew Michael & Kevin Pratt, *Cryptocurrency Statistics 2023*, Forbes Advisor (Aug. 1, 2023) .................................................................................................................... 15

Anshu Siripurapu & Noah Berman, *Cryptocurrencies, Digital Dollars, and the Future of Money*, Council on Foreign Rels. (Feb. 28, 2023) ..................................................... 16

Emma Fox, *$11,000 to See Taylor Swift? How Concert Tickets Got So Expensive*, L.A. Times (July 27, 2023) ............................................................................................... 10

Ethan Millman, *Beyoncé Tickets Aren't on Sale Yet. Scalpers Are Trying to Sell Them for Thousands*, Rolling Stone (Feb. 2, 2023) ................................................................... 10

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm. 117th Cong. 12 (May 6, 2021) .......................................................................................................... 17

Hester M. Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference*, SEC (Jan. 20, 2023) ............................................................................................................ 17

Lewis Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) ................................................................. 7

Miles Jennings & Brian Quintenz, *It's Time to Move Crypto from Chaos to Order*, a16zcrypto (July 15, 2023) ........................................................................................ 14

Press Release, SEC, *SEC Charges Crypto Asset Trading Platform Bittrex and Its Former CEO for Operating an Unregistered Exchange, Broker, and Clearing Agency* (Apr. 17, 2023) .......................................................................................................................... 13

Rodrigo Seira et al., *Lessons from Crypto Projects' Failed Attempts to Register with the SEC*, Paradigm Pol'y (Mar. 23, 2023) ...................................................................... 13

*Scheme*, Black's Law Dictionary (3d ed. 1933) .......................................................... 5

*Scheme*, Chambers's Twentieth Century Dictionary (1908) ........................................ 5

*Scheme*, Dictionary.com .............................................................................................. 5

SEC FinHub, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019) .......................................................................................................................... 11

### INTERESTS OF AMICI CURIAE[1]

Andreessen Horowitz ("a16z") is a venture capital firm that backs entrepreneurs building the future through technology.  It invests in seed-, venture-, and late-stage technology companies across a range of sectors, including the blockchain sector, and it has more than $7.6 billion under management across its crypto funds.  a16z has significant expertise relating to the unique attributes of blockchain systems and digital assets and employs a dedicated team of engineers and scholars in these fields.  In 2013, a16z invested in defendant Coinbase, and a16z co-founder and general partner Marc Andreessen serves on the Coinbase Board of Directors.

Paradigm Operations LP ("Paradigm") is an investment firm that backs entrepreneurs building innovative crypto/web3 companies and protocols.  To help these entrepreneurs achieve their full potential, Paradigm offers them a range of services, from the technical to the operational.  Paradigm has more than $8.7 billion in assets under management and has also invested in Coinbase, and one of Paradigm's co-founders and managing partners, Fred Ehrsam, previously co-founded Coinbase, held the role of President from 2012-2017, and now serves on the Coinbase Board of Directors.

Amici are deeply concerned that a decision endorsing the unsupported and broad expansion of regulatory authority asserted by the Securities and Exchange Commission ("SEC") would have sweeping adverse effects on amici and the burgeoning blockchain industry.  That industry encompasses much more than just cryptocurrencies like bitcoin.  Blockchain technology promises to create a new computational paradigm that will democratize the internet and revamp many sectors of the economy, including the global financial system.  By distributing operations across a

---

[1] Defendants have consented to the filing of this brief; the SEC declined to take a position without seeing the brief.  No counsel for a party authored any part of this brief.  No party, party's counsel, or any person other than amici curiae, their members, or their counsel contributed money intended to finance the preparation or submission of this brief.

network of computers and using digital assets (tokens) as a coordination mechanism, blockchain systems can be community owned and controlled.  This is a novel feature of distributed computing systems that stands in distinct contrast to existing technologies.  This decentralization of ownership and control stands to benefit millions in the United States and around the world and positions the blockchain sector to develop into one of the most important industries in the world.

Amici submit that the SEC's position represents an untenable and unjustified expansion of the laws it administers—threatening to disrupt markets not only in digital assets, but also in a wide range of asset transactions that have never been the province of the SEC.  The SEC's regulatory overreach, coupled with the unpredictability and arbitrariness of its actions, threatens the development of blockchain technology in the United States.  Amici believe that a new regulatory framework for this emerging and novel technology is indispensable—but such a framework should come from Congress, which can create statutory frameworks to address the appropriate risks, rather than from an agency stretching its enabling statutes and regulations beyond their established limitations to reach the novel digital assets identified in the complaint.

**ARGUMENT**

Amici agree with Coinbase's fundamental submission:  Supreme Court jurisprudence supports the requirement of a contractual obligation in order to find an investment contract, and the Court should grant Coinbase's motion for judgment on the pleadings for that reason.  Amici submit this brief to make three additional points that further support granting the motion:  (1) the test for an investment contract established in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), even if interpreted to extend beyond contractual arrangements or understandings, does not justify the SEC's unprecedented broadening to cover the exchange-traded tokens it has challenged in this case; (2) taken to its logical conclusion, the SEC's position would sweep into the agency's jurisdiction ordinary transactions in a range of commodities, collectibles, and other assets that the

2

securities laws have never reached; and (3) the law, correctly interpreted, precludes this result—but if any doubt remains, the major questions doctrine prevents the SEC from unilaterally expanding its authority and jeopardizing the development of a critical technology in the United States.  Instead, Congress must craft the appropriate rules.  Regulation is essential to address the novel questions raised by blockchain technology and digital assets, which were unforeseeable when Congress enacted the securities laws nearly a century ago.  But allowing the SEC to generate new rules through ad hoc expansion of the securities laws creates an unpredictable legal environment that harms entrepreneurs and consumers alike.

**I      COINBASE-TRADED TOKENS DO NOT SATISFY THE *HOWEY* TEST**

**A.    *Howey* Sets Forth An Established Framework For Finding An Investment Contract**

The term "investment contract" is not defined in either the Securities Act of 1933 or the Securities Exchange Act of 1934, *see* 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10), but the Supreme Court established the test for applying that term nearly eight decades ago in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); *see SEC v. Edwards*, 540 U.S. 389, 393 (2004).  "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99; *see also id.* at 301.

*Howey* involved a company's sales of parcels of land in a citrus grove coupled with optional, but strongly encouraged, service contracts for the company to cultivate the groves and harvest and market the crops, with purchasers receiving shares of profits commensurate with the acreage they bought.  *See id.* at 295, 300.  In finding that this arrangement qualified as an "investment contract," the Supreme Court explained that "[t]he investors provide the capital and

3

share in the earnings and profits; the promoters manage, control and operate the enterprise." *Id.* at 300.

Subsequent cases have confirmed that *Howey*'s "touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). The test is satisfied when the arrangement confers rights to a share of profits in a common enterprise operated by others. *See, e.g.*, *Tcherepnin v. Knight*, 389 U.S. 332, 338-39 (1967) (state law tied the payment of dividends on withdrawable capital shares to an apportionment of profits). The test is also satisfied when a "scheme" exists that entails "promises" or "representations" of profits to be derived from the efforts of others. *Edwards*, 540 U.S. at 395 ("promising a fixed return").

But the Supreme Court has never expanded the term to reach circumstances outside that paradigm. For instance, the Supreme Court has held that shares of stock in a housing cooperative did not qualify as investment contracts or other securities where the cooperative did not "seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties," and the holders of the shares were instead "motivated by a desire to use or consume the item purchased." *Forman*, 421 U.S. at 852-54. Neither did "an employee's participation in a noncontributory, compulsory pension plan" constitute an investment contract, because "even if it were proper to describe the [pension] benefits as a 'profit' returned on some hypothetical investment by the employee, this profit would depend primarily on the employee's efforts to meet the vesting requirements, rather than the fund's investment success." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559, 562 (1979). These cases confirm that an investment contract necessitates a contract or scheme between the promoter and investors to induce investment in a

common enterprise based on the reasonable expectation of returns realized through the efforts of someone other than themselves.

### B.      The Coinbase-Traded Tokens Fail The *Howey* test

The classic investment contracts that the Supreme Court has found to come within the SEC's jurisdiction differ fundamentally from token transactions on Coinbase's platform.  Prior cases all involved payments to a promoter based on contractual promises of returns from the efforts of others; the activities here do not.  The SEC does not appear to allege a "contract" or "transaction" between the original token developers or promoters and the purchasers on Coinbase's spot market. It instead emphasizes *Howey*'s use of the word "scheme" in the trilogy of words describing an investment contract.  SEC Pre-Mot. H'rg Ltr., ECF No. 26, at 2 (July 7, 2023); *see Howey*, 328 U.S. at 298-99.  Whatever breadth the word "scheme" might have, the SEC has failed to allege the existence of *any* relationship between the original developers or promoters of digital assets and the independent and unrelated market participants who engaged in exchange-based transactions that could warrant subjecting such transactions to the securities laws.  Nor did the SEC allege that any developer or promoter of the digital assets received proceeds or derived any direct benefit from such secondary transactions.  And nothing else knits those entities together in a "plan, design, or program of action," *Scheme*, Dictionary.com;[2] *see also Scheme*, *Chambers's Twentieth Century Dictionary* (1908);[3] let alone a series of contracts, *see* Coinbase Br., ECF No. 36, at 14 (quoting *Scheme*, *Black's Law Dictionary* (3d ed. 1933)).  The SEC thus falls short of alleging the essence of an investment contract—a contract or scheme between the promoter and investors involving an investment of funds into a common enterprise with the anticipation of profits produced by the efforts of others.

---

[2] https://tinyurl.com/3aj7nk6s.
[3] https://tinyurl.com/2fp675cm.

Significantly, all of the tokens the SEC alleges are subject to securities laws are distinguishable from traditional equity or debt securities. The tokens themselves offer holders no claim on the relevant developer; they provide only a level of functionality that gives purchasers reasons to want to possess and use these tokens for purposes other than their potential to appreciate in value. *See Forman*, 421 U.S. at 852-53 (purchaser motivations to "consume" or "use" the item purchased were inconsistent with treatment of the arrangement as a security). The only assertions the SEC's pleadings offer as evidence of a "scheme" are innocuous statements by token developers for which the SEC fails to plead the appropriate context. *See* Compl. ¶¶ 126-305. The statements generally describe the current and expected functionality of the networks on which the tokens operate. As such, these statements encourage adoption of the network and cannot be viewed as promises of future returns on investment. Nor do the statements evidence a "scheme," particularly in the context of secondary purchases on Coinbase, where the token developers or promoters receive no proceeds from the transactions. They convey no enforceable rights and bear no resemblance to the promises or representations of investment returns that *Howey* and its progeny describe.

Nor do the allegations about the exchange-traded tokens satisfy the "common enterprise" element of an investment contract. As the Second Circuit has explained, "[a] common enterprise within the meaning of *Howey* can be established by . . . 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits. . . . Some circuits hold that a common enterprise can also exist by virtue of 'vertical commonality,' which focuses on the relationship between the promoter and the body of investors." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Horizontal commonality does not exist here, as holders of the tokens at issue do not

"share[] or pool[]" their assets, as that sort of common enterprise requires; the purchasers here do not even make payments to a common seller, and even that would not be enough. *Id.* at 88. Nor does vertical commonality exist. The Second Circuit has held that evidence that "the fortunes of the investors [are] linked . . . to the *efforts* of the promoter" does not alone establish vertical commonality. *Id.* And here, the SEC has not alleged any more than that: it has not alleged any identifiable legal or business relationship between developers or promoters of digital assets and purchasers in secondary transactions.[4] Rather, it makes only conclusory allegations that secondary market purchasers have a common interest with promoters. *E.g.*, Compl. ¶¶ 184, 222. That is not enough. No common enterprise is properly alleged, then, either horizontally or vertically, in the transactions that the SEC claims are investment contracts. *See* Coinbase Br., ECF No. 36, at 20.

That is not to say that tokens traded on a secondary exchange can never be investment contracts. The test from *Howey* is one of "economic reality," and every arrangement must be examined as a matter of substance, not form. *Howey*, 328 U.S. at 298. A "scheme" may exist, for instance, in a set of interconnected token transactions that facilitate distribution to the public, such as transactions between an issuer, an underwriter, and token purchasers. But the investment-contract concept cannot be stretched to cover transactions so attenuated from the digital asset developer or promoter that the essential *Howey* factors drop out; the SEC must allege *some* relationship beyond the purchase of the token itself that would qualify it as part of an investment contract. *Cf. SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943) (finding an investment

---

[4] *See* Lewis Cohen et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* 48-49 (Nov. 10, 2022) (discussion draft), https://tinyurl.com/3mektzre (surveying all 266 relevant federal appellate and Supreme Court decisions addressing the "common enterprise" element of the *Howey* test, and finding that among the 37 decisions either finding an investment contract or remanding for factfinding, "the one constant, even in the decisions taking the most plaintiff-friendly position . . . was that the common enterprise was based on a direct business relationship between the sponsor and the participant").

contract when an "exploration enterprise was woven into [the sale of] these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung").  Here, the SEC alleges nothing that would establish a scheme or common enterprise embracing token developers or promoters and secondary-market purchasers—in short, nothing to justify treating token transactions on Coinbase's exchange as investment contracts.

## II    THE SEC'S THEORY, IF ADOPTED, WOULD HAVE BOUNDLESS APPLICATION AND WOULD SWEEP UP INNUMERABLE ASSET TRANSACTIONS AS INVESTMENT CONTRACTS

The complaint's theory of an investment contract has endless breadth.  While purporting to apply *Howey*, the SEC untethers that decision from its bedrock requirements.  In particular, the SEC converts the requirement of reasonable profit expectations from the efforts of others into a free-floating expectation of profits even if the expectation is not enforceable, reasonably believed to be enforceable, or tied to the actions of the developer or promoter itself.  *See* SEC Pre-Mot. H'rg Ltr., ECF No. 26, at 3 (July 7, 2023).  The SEC's submission in another case in this district leaves no doubt about its position: the SEC has denied the existence of any requirement under *Howey* that the token purchaser's "*expectations* [of profits] . . . derive from the issuer's efforts," arguing, to the contrary, that such a factor is "plainly not part of the *Howey* analysis."  SEC Resp. to Suppl. Auth., ECF No. 49, at 4, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-1346 (JSR) (S.D.N.Y. filed July 21, 2023).  Extended to its logical limits, the SEC's position would allow the efforts-of-others requirement to be satisfied by profit expectations generated by individuals entirely outside the context of the token transaction itself.  For example, if a digital asset developer distributes tokens to a person who in turn sells them on the spot market through an exchange, under the SEC's theory, an entirely independent person promoting the asset could reasonably lead spot-market buyers to believe that they would profit from the token's appreciation—thus transforming the spot-market

transaction into an investment contract.  This would allow third-party-generated expectations to unilaterally subject the developer, seller, and buyer to the regime of the securities laws.  Applying the securities laws in this scenario would have no relation to their pro-disclosure and investor-protection purposes—yet the SEC's distortion of *Howey* would invite exactly that result.  It would also deprive market participants of the ability to objectively assess whether these third-party efforts turn something into a security.  Such uncertainty is particularly problematic given the strict liability regime applicable to unregistered public offerings of securities.  *See SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256-57 (9th Cir. 2013) (scienter is not an element of liability for selling unregistered securities in violation of Section 5 of the Securities Act, 15 U.S.C. § 77(a)).

The SEC's unbounded theory not only opens the door to such inapt uses of the securities laws, but also brings within SEC jurisdiction a host of ordinary asset transactions that have never been thought to be securities transactions.  The SEC's redefinition of an "investment contract" would reach transactions long (and correctly) understood to be straightforward sales of commodities.  Consider, for instance, a person who buys barrels of oil after listening to a financial commentator's report that OPEC plans to cut oil production, leading the person to expect that oil prices will increase.  The SEC's rationale for finding investment contracts here could equally find an investment contract there:  the buyer reasonably relied on the commentator's "promotional efforts," even absent any transaction or even interaction between the buyer and commentator, or *any* action by the commentator beyond publicly reporting financial news.  So, suddenly, the statements of the commentator make the seller of the oil a participant in a securities transaction.

And the SEC's approach would reach far beyond barrels of oil and other classic commodities to an endless array of commonly sold assets, including fine art, antique jewelry, limited edition shoes, sports memorabilia, classic cars, and vintage wines.  Take art, for example.

A collector of artwork expects to profit from the performance of the art market and reasonably counts on the artists, museums, and galleries to promote the artists, with the natural effect of enhancing the purchased art's market value.  On the SEC's theory, these are investment contracts, rather than asset sales with the desire for appreciation.  And this is so even though none of the hallmarks of an investment contract exist.  The buyer of the work has no enforceable rights against the artists, museums, or galleries.  The buyer's future sale of the asset cannot be deemed to be part of an artist-initiated "scheme." And at no point do the artist and the buyer share in a common enterprise.

Similar scenarios abound.  For instance, the purchaser of popular concert tickets may expect to sell them at significantly higher prices on the secondary market based on the promotional efforts of the performers, other resellers, and venues.[5]  But it is beyond question that such expectations have never made the ticket holders purchasers or sellers of an investment contract.  Similarly, an auto aficionado might buy a high-tech car in the hope that one day it will have full autonomous self-driving, an upgrade that requires the company's engineers to advance that technology.   If engineers succeed in developing the technology, that breakthrough will significantly increase the car's value and allow the purchaser to profit on the secondary market— but the sale of the vehicle will not become an investment contract based on the buyer's mere hope for the upgrade.

---

[5] *See, e.g.*, Emma Fox, *$11,000 to See Taylor Swift? How Concert Tickets Got So Expensive*, L.A. Times (July 27, 2023), https://tinyurl.com/5b9zxu3w ("For Swift's sold-out shows at SoFi Stadium in Inglewood next month, face-value tickets sold for $49 to $449 if you could get them. Now, first-night tickets will set you back around $800 to $11,000 each on StubHub."); Ethan Millman, *Beyoncé Tickets Aren't on Sale Yet. Scalpers Are Trying to Sell Them for Thousands*, Rolling Stone (Feb. 2, 2023), https://tinyurl.com/fvnh8cj6 (describing how resellers offered Beyoncé concert tickets marked up to "as much as $3,000 a ticket—even if they don't actually have them yet").

While the price of many commodities is primarily dependent on market forces, managerial efforts can and do affect the price of commodities and assets that are traded on secondary markets—including oil, art, concert tickets, and automobiles.  In the vast majority of cases, these dynamics do not mean that a scheme or common enterprise exists, and these secondary market transactions are easily excluded from securities laws.  But here, the SEC is proposing to turn that reality on its head by stretching the definitions of a "scheme" and a "common enterprise" so broadly that *Howey* becomes unrecognizable and could be applied to an endless array of ordinary asset sales.

The SEC's protean and expansive approach fosters regulatory uncertainty and exposes parties like Coinbase to regulatory whipsaw.  Here, for example, the SEC had approved Coinbase's S-1 registration statement with no hint that it would come back to challenge Coinbase's basic business model.  More broadly, the SEC last provided constructive guidance to the industry in 2019—and then only to catalogue a multiplicity of *Howey* factors for initial coin offerings.[6]  Even on its own terms, that laundry list of factors would defy predictable application—and it did not even purport to speak to secondary market transactions.  Nevertheless, it at least provided some evidence of the SEC's views that market participants could take into account in structuring their affairs.  Yet, as Coinbase has detailed, the SEC Chair has since tried to walk back even that guidance and taken inconsistent positions about the legal framework that applies to the industry. In May 2021, he acknowledged that congressional action was necessary to fill a gap in existing regulations, but then asserted in December 2022 that the SEC already had "enough authority" to regulate digital asset platforms.  *See* Coinbase Answer, ECF No. 22, ¶¶ 50, 73.  Coinbase itself has

---

[6] *See* SEC FinHub, *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), https://tinyurl.com/2w8u7t6j.

petitioned the SEC for rulemaking to afford concrete guidance to resolve the uncertainties the SEC has created, but its petition remains unanswered. *See id.* at ¶ 12. The lack of fair warning and shifting agency positions reflect the Commission's radical departure from the grounded framework for an investment contract in existing law.

Unsurprisingly, even courts are struggling with the SEC's erratic and unsupported approach, which is compounding uncertainty. In *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), one judge in this district ruled that a company's sales of a digital token that—like the sales alleged here—were "blind bid/ask transactions," *id.* at *11, and "did not constitute the offer and sale of investment contracts," *id.* at *13. The *Ripple* court reached that conclusion notwithstanding that the defendant there actually sold tokens to investors, which the SEC has not alleged as to any of the tokens in its complaint here—yet the result there did not deter the SEC from continuing to pursue its aggressive strategy here, on facts less favorable to its case. Compounding the confusion, just days later, another judge in this district rejected the *Ripple* court's analysis—in an opinion that itself left doubt about what constitutes an investment contract. *See SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023). The internal inconsistencies in the SEC's approach, coupled with the courts' struggles to understand them, have created an unstable and unpredictable regulatory environment for entrepreneurs. That uncertainty harms consumers and investors, destabilizes markets, hinders capital formation, fails to provide a clear path to compliance, and undermines the growth of a trillion-dollar industry that is playing an innovative and valuable role in the global economy.

**III    PURSUANT TO THE MAJOR QUESTIONS DOCTRINE, CONGRESS SHOULD CREATE THE REGULATORY FRAMEWORK**

**A.    Amici Favor A Comprehensive Legislative Regime To Regulate Digital Assets As Opposed To The SEC's Ad Hoc Extension Of Its Inapt Authorities**

Amici's position is *not* that digital assets should be immune from regulation.  To the contrary, amici favor regulation as a necessary measure to protect consumers, provide clarity and predictability to entrepreneurs, to encourage the creation of new and beneficial products, and to foster innovation.  But the SEC's case-by-case attempt to jam digital assets into a legal framework that was designed nearly a century ago—long before the creation of blockchain technology and the decentralization it enables—predictably stifles this growing and nascent industry.

The SEC often asserts a "lack of compliance" by industry participants.[7]  But the reality is that the securities laws in their current form do not fit this technology, and industry participants take pains to avoid subjecting themselves to its inapt provisions.  The securities laws, which focus on regulating centralized actors, are antithetical to the key benefit blockchain technology enables—decentralization.  The technology's facilitation of decentralized systems also has the potential to mitigate many of the risks that the securities laws are intended to address, including information asymmetries.[8]  Further, while the SEC often suggests that crypto companies "come in and register," such registration is not only infeasible, it is not possible.[9]  As a result, most developers go to extreme lengths to ensure that when they distribute digital assets, they are not

---

[7] *See, e.g.*, Press Release, SEC, *SEC Charges Crypto Asset Trading Platform Bittrex and Its Former CEO for Operating an Unregistered Exchange, Broker, and Clearing Agency* (Apr. 17, 2023), https://tinyurl.com/efr5s6xt (enforcement actions "send a message to other non-compliant crypto market intermediaries to follow the federal securities laws or be held accountable for their violations").

[8] *See generally* Rodrigo Seira et al., *Lessons from Crypto Projects' Failed Attempts to Register with the SEC*, Paradigm Pol'y (Mar. 23, 2023), https://tinyurl.com/ycxyp7wt.

[9] *Id.*

issuing securities.[10]  This includes forgoing all public sales, only distributing digital assets for free, or simply excluding all U.S. persons from any activity—actions that run counter to the notion that such distributions are a "scheme" or that the developer intends to form a "common enterprise" with participants.[11]

Despite these efforts, the SEC continues to change the rules in a manner that targets this growing and evolving industry, apparently without regard for what its approach would mean for other asset classes.  The SEC's "current regulation-by-enforcement posture" leaves "[r]esponsible actors . . . subject to dubious U.S. regulatory enforcement actions, while ill-intentioned firms launch products that flagrantly violate long standing rules."[12]

Clear, comprehensive rules responsive to the unique characteristics of this novel technology and the digital assets that rely on it are thus crucial.  Only Congress has the authority to create them.  The "only way forward . . . is through thoughtful, well-calibrated legislation that protects consumers from scams and conflicts of interest—while still embracing the innovations of blockchain technology."[13]  It is no solution for the SEC to overextend its jurisdiction and bend existing doctrine through ad hoc enforcement actions.

### B.    Congress Must Provide The Regulatory Framework For Digital Assets

If any ambiguity exists over the SEC's authority to apply *Howey* as it seeks to do here—and as discussed, the unambiguous answer is that *Howey* cannot be stretched that far—the major questions doctrine supplies the answer:  Congress, not the SEC, has the authority to make the fundamental policy decisions in this area.  Under the major questions doctrine, when an agency

---

[10] *Id.*

[11] *Id.*

[12] Miles Jennings & Brian Quintenz, *It's Time to Move Crypto from Chaos to Order*, a16zcrypto (July 15, 2023), https://tinyurl.com/nzc3r4dx.

[13] *Id.*

takes unprecedented action with vast "economic and political significance"—asserting a transformative expansion in its authority—courts "hesitate before concluding that Congress meant to confer such authority." *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (internal quotation marks omitted) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022)); *see Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). The SEC must "point to clear congressional authorization to justify" its departure from the settled investment-contract paradigm to cover assets outside its established legal scope. *Biden*, 143 S. Ct. at 2375 (internal quotation marks omitted). But while the SEC repeatedly cites *Howey* as if the Supreme Court's gloss on the statutory text somehow clearly anticipated blockchain technology's novel potential, an agency's "enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted).

The regulation of blockchain technology and digital assets plainly has profound "economic and political significance." *Biden*, 143 S. Ct. at 2372; *see West Virginia*, 142 S. Ct. at 2608 (issue that reaches "a significant portion of the American economy" likely to be major question). At its peak, cryptocurrency traded at volumes as high as $500 billion per day.[14] By comparison, the Supreme Court recently found "staggering" economic significance where an agency decision affected $430 billion in student loans. *Biden*, 143 S. Ct. at 2373. In the United States, at least one in five adults has held such a digital asset. Coinbase Br., ECF No. 36, at 29. More broadly, the development of blockchain technology has already altered the way people engage in financial transactions in numerous industries around the world. As the Council on Foreign Relations put it,

---

[14] Andrew Michael & Kevin Pratt, *Cryptocurrency Statistics 2023*, Forbes Advisor (Aug. 1, 2023), https://tinyurl.com/krwfb62v.

the "dizzying rise of Bitcoin and other cryptocurrencies" threatens to "disrupt the global financial system."[15]  Yet the SEC's boundless approach to *Howey* threatens to decimate the industry by thwarting blockchains' ability to operate at all.  The regulatory action here thus has deep economic significance.[16]

Likewise for political significance.  *See West Virginia*, 142 S. Ct. at 2614 (finding major question where the issue had "been the subject of an earnest and profound debate across the country").  Congress has recognized the need for regulation for this emerging industry:  more than 20 legislative proposals have been introduced and, just last month, the House Financial Services Committee approved legislation that would provide the SEC and Commodity Futures Trading Commission ("CFTC") a regulatory framework for the issuance and trading of digital assets.  *See* Coinbase Br., ECF No. 36, at 23 & n.17.  That legislation would assign responsibilities, impose obligations, and establish restrictions on the roles of the SEC and CFTC in regulating digital assets, reaffirming that Congress has not *already* delegated this regulatory power to the agency.  *Id.* at 23.

What is more, the SEC's late-breaking assertion of authority is undermined by its prior "disavowal" of that exact power.  *See Brown & Williamson*, 529 U.S. at 160 (finding major question where agency had previously "expressly disavowed any such authority" to regulate, *id.* at 125); *Biden*, 143 S. Ct. at 2372 (finding major question where agency had "never previously

---

[15] Anshu Siripurapu & Noah Berman, *Cryptocurrencies, Digital Dollars, and the Future of Money*, Council on Foreign Rels. (Feb. 28, 2023), https://tinyurl.com/5586r8h5.

[16] In *Securities and Exchange Commission v. Terraform Labs Pte. Ltd.*, 2023 WL 4858729 (S.D.N.Y. July 31, 2023), Judge Rakoff recently concluded that the cryptocurrency industry lacks vast economic and political significance, reasoning that "it would ignore reality to place the cyrpto-currency industry and the American energy and tobacco industries . . . on the same plane of importance."  *Id.* at *8.  The court's analysis, however, is not only empirically unfounded, but also impossible to square with the Supreme Court's recent decision in *Biden v. Nebraska*, which looked at the financial magnitude of a regulatory action and the political debate surrounding the issue, not to its resemblance to the character of the industries involved in prior cases.

claimed powers of this magnitude").  Barely two years ago, SEC Chair Gary Gensler testified to the House Financial Services Committee that "it is only Congress that could really address" the regulation of digital assets because, in his words, "the exchanges trading in these crypto assets do not have a regulatory framework . . . at the SEC."  *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm. 117th Cong. 12 (May 6, 2021).[17]  At least one sitting Commissioner has conceded the same: "if we seriously grappled with the legal analysis and our statutory authority, as we would have to do in a rulemaking, we would have to admit that we likely need more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us."[18]  And when it acts, "Congress might decide to give that authority to someone else."[19]  Regardless of what Congress ultimately decides, the point remains: the Commission's recent about-face confirms that Congress has not clearly authorized the extraordinary power the agency now claims.

Nor does the major questions doctrine apply differently in the enforcement context than in the context of rules or regulations.  *See* SEC Pre-Mot. H'rg Ltr., ECF No. 26, at 3 (July 7, 2023) (arguing that the doctrine does not apply to "agency's exercise of its authority to pursue statutory violations").  The major questions doctrine ensures that before an agency "can unilaterally alter large sections of the American economy," Congress must "speak clearly."  *Biden*, 143 S. Ct. at 2375.  Agencies, of course, can alter our economy through both rulemaking *and* enforcement actions—and regularly announce policies through both.  "[T]he choice made between proceeding

---

[17] https://tinyurl.com/39pb5hyt.
[18] Hester M. Peirce, *Outdated: Remarks Before the Digital Assets at Duke Conference*, SEC (Jan. 20, 2023), https://tinyurl.com/4uuu436e.
[19] *Id.*

by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).  And the same requirement of "reasoned decisionmaking" applies to both rulemaking and adjudication. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  Exempting enforcement actions from the major questions doctrine would thus undermine the doctrine's entire purpose; *i.e.*, to ensure that Congress has authorized an agency to act before it can disturb "the daily lives and liberties of millions of Americans"—no matter what form their policies come in.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring).

Accordingly, while amici support a comprehensive regulatory framework that protects both innovators and consumers, they emphasize that "any new laws governing the lives of Americans"—whether announced through formal rulemaking or enforcement action—should be "subject to the robust democratic process the Constitution demands." *Id.*  That is especially so because the novel issues and challenges of blockchain technology and digital assets demand an innovative and nuanced regime that Congress is uniquely equipped to provide—and that it is currently actively debating.  Comprehensive reform should come from the legislature, not an agency seeking to resolve emerging issues based on inapt authorities that long-predate the industry.

## CONCLUSION

For the foregoing reasons, amici urge the Court to grant defendants' motion for judgment on the pleadings.

Dated:  August 11, 2023                    O'MELVENY & MYERS LLP

                                           By: /s/ *Michael R. Dreeben*
                                                Michael R. Dreeben (*pro hac vice*)
                                                Melissa C. Cassel (*pro hac vice*)
                                                Andrew R. Hellman (*pro hac vice*)
                                                O'MELVENY & MYERS LLP
                                                1625 Eye St., N.W.
                                                Washington, D.C.  20006
                                                (202) 383-5300
                                                mdreeben@omm.com

                                                William K. Pao (*pro hac vice*)
                                                O'MELVENY & MYERS LLP
                                                400 South Hope Street
                                                Los Angeles, CA  90071
                                                (213) 430-6000
                                                wpao@omm.com


                                                *Counsel for Amici Curiae Andreessen*
                                                *Horowitz and Paradigm*