## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff,*

v.

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants.*

23 Civ. 4738 (KPF)

### BRIEF *AMICUS CURIAE* OF THE CHAMBER OF DIGITAL COMMERCE

Joseph B. Evans
Alexandra C. Scheibe*
Patrick V. Kennedy*
Brianna Perez*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, New York 10017-3852
(212) 547-5400
jbevans@mwe.com

Paul W. Hughes
Andrew A. Lyons-Berg*
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, D.C. 20001
(202) 756-8000
phughes@mwe.com

*pro hac vice* to be filed

*Attorneys for Amicus Curiae
The Chamber of Digital Commerce*

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ ii

Interest of the *Amicus Curiae* ..................................................................................... 1

Introduction and Summary of Argument .................................................................... 1

Argument ........................................................................................................................ 4

I.      The SEC's shoot-first-and-provide-guidance-never approach threatens the U.S. digital asset industry. ................................................................................................ 4

II.     The SEC's regulation-by-enforcement regime raises separation of powers and due process concerns. ................................................................................................ 8

        A.      Most digital assets should not be considered securities. .......................... 8

        B.      The SEC's dubious assertion of enforcement authority makes this an "extraordinary case" under the major questions doctrine. ................................... 11

        C.      The SEC's approach to enforcement raises serious due process concerns. .......... 16

Conclusion ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Alabama Association of Realtors v. HHS*,
   141 S. Ct. 2485 (2021)......................................................................................12

*Balt. Gas & Elec. Co. v. FERC*,
   954 F.3d 279 (D.C. Cir. 2020)........................................................................19

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023)............................................................................ *passim*

*Cmty. Television of S. Cal. v. Gottfried*,
   459 U.S. 498 (1983)........................................................................................19

*Cunney v. Bd. of Trustees of Vill. of Grand View*,
   660 F.3d 612 (2d Cir. 2011)...........................................................................17

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)..................................................................................17, 19

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)...................................................................12, 13, 14, 15

*Nat'l Council of La Raza v. Dep't of Just.*,
   411 F.3d 350 (2d Cir. 2005)...........................................................................17

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022)...............................................................................12, 13

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)...........................................................................9, 10

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947)........................................................................................19

*SEC v. Ripple Labs, Inc.*,
   2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................................... *passim*

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020).............................................................9

*SEC v. Terraform Labs Pte. Ltd.*,
   2023 WL 4858299 (S.D.N.Y. July 31, 2023) .................................. *passim*

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).......................................................................2, 9, 11, 15

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C.Cir.1997).........................................................................17

*Upton v. SEC*,
   75 F.3d 92 (2d Cir. 1996)...............................................................................17

**Cases—continued**

*Util. Air Reg. Group v. EPA*,
   573 U.S. 302 (2014).................................................................................................12

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022).......................................................................8, 11, 12, 14

**Statutes and Regulations**

15 U.S.C.
   § 77b(a)(1) ...........................................................................................................9
   § 78c(a)(10)..........................................................................................................9
   § 78f .....................................................................................................................8

17 C.F.R.
   § 240.15c2-11 ......................................................................................................8
   § 242.301..............................................................................................................8

**Court filings**

*In re Coinbase, Inc.*,
   No. 23-1779, Dkt 1 (3d Cir. Apr. 26, 2023) ......................................................20

**Other Authorities**

Avery Minor, Note, *Cryptocurrency Regulations Wanted: Iterative, Flexible, and
   Pro-Competitive Preferred*, 61 Boston College L. Rev. 1149 (2020) ...................5

Board of Governors of the Federal Reserve System, *Economic Well-Being of U.S.
   Households in 2022* (2023) ...................................................................................6

Coinbase, Petition for Rulemaking (July 21, 2022)....................................................20

Connor Sephton, *Congressmen Call for Crypto Clarity in Letters to the SEC and
   Treasury*, Modern Consensus (Dec. 9, 2020) ......................................................18

*Crypto Needs Regulatory Clarity, Says Chamber of Digital Commerce CEO*,
   CNBC (Apr. 18, 2023)..........................................................................................18

*Cryptoasset Trading Platforms Cannot Register as Securities Exchanges,*
   Committee on Capital Markets Regulation (June 6, 2023)....................................7

CryptoCompare, *DACOM 2021: Regulatory Reckoning: The Maturing State of
   Crypto Regulation and Investor* Protection, YouTube (Dec. 10, 2021) .................7

Cryptocurrencies - United States, Statista (last visited July 29, 2023)....................13

*Framework For "Investment Contract" Analysis of Digital Assets*, SEC (April 3,
   2019) ....................................................................................................................18

*The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem*,
   Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. (June 13, 2023)..............18

**Other Authorities—continued**

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) ...............................................................................14

Gary Gensler, *Op-Ed: The SEC Treats Crypto Like the Rest of the Capital Markets*, SEC (Aug. 19, 2022) ...................................................................................2

Other Authorities

Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (July 26, 2023)..........................................................................15

Helen Braun, *ADA, SOL Underperform as Robinhood Gets Set to Delist Them Amid SEC Crackdown*, CoinDesk (Jun. 27, 2023) ......................................................5

Helen Braun, *Crypto Exchange Bittrex to Wind Down U.S. Operations Next Month*, CoinDesk (Mar. 31, 2023)...............................................................................6

Jane Edwards, *Crypto Executives Urge Congress to Provide Regulatory Clarity for Industry*, GovConWire (December 9, 2021) ..........................................................18

Jason Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, Forbes (May 19, 2022) ......................................14

Jesse Hamilton, *Robinhood Joins Coinbase in Saying It Tried to 'Come In and Register' Like SEC Wanted*, Yahoo! Finance (June 7, 2023) ....................................7

K33 Research, *The Emerging Crypto Industry* 4 (2023) ...............................................13

Kate Rooney, *Congress Members Ask SEC Chairman for Clarity on Cryptocurrency Regulation*, CNBC (Sep. 28, 2018) ................................................18

Letter from Chamber of Progress to House and Senate Committee Chairs (July 20, 2022) .................................................................................................18

Letter from Representative Ritchie Torres to SEC Chair Gary Gensler (July 18, 2023) .................................................................................................15

Letter from Representatives French Hill & Dusty Johnson to SEC Chair Gary Gensler (July 19, 2023)..........................................................................................15

Lucas Schweiger, *81 of the Top 100 Public Companies Are Using Blockchain Technology*, Blockdata (Oct. 6, 2022) .....................................................................13

Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022) ..............................................................................5

Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020).......................5

*More Than One in Ten Americans Surveyed Invest in Cryptocurrencies*, National Opinion Research Center (July 22, 2021).......................................................................6

Parikshit Mishra & Jamie Crawley, *Nasdaq Halts Plan for Crypto Custody Service Due to U.S. Regulatory Conditions,* CoinDesk (July 19, 2023) ...................................5

**Other Authorities—continued**

Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got legal Threats Instead.*, Coinbase (Mar. 22, 2023) ...........................................18

Scott Chipolina, *US Crypto Clampdown Pushes Exchanges to go Offshore*, Financial Times (May 16, 2023).............................................................................6

Senator Cynthia Lummis, *Lummis Releases Statement in Response to Ripple Decision* (July 14, 2023) ......................................................................................15

Thomas Franck, *One in Five Adults Has Invested In, Traded or Used Cryptocurrency, NBC News poll shows*, CNBC (March 31, 2022).........................13

*Total Cryptocurrency Market Cap*, CoinMarketCap (last visited Aug. 8, 2023) ......................4, 5

*U.S. Share of Blockchain Developers is Shrinking*, Crypto Council for Innovation (April 24, 2023) ..............................................................................................6

USDA, *Crop Production Historical Track Records* 264 (2023) .................................13

*What are the Use Cases and Applications of Blockchain Technology?* Consensys (last visited Aug. 9, 2023).......................................................................................5

William Hinman*, Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018) .......................................................................................10

## INTEREST OF THE *AMICUS CURIAE*[1]

Founded in 2014, the Chamber of Digital Commerce ("The Chamber") is the world's largest digital asset and blockchain trade association. The Chamber represents more than 200 diverse members of the blockchain industry globally, including digital asset exchanges, leading banks and investment firms, startups, and other digital asset economy participants. Guided by the principle of industry compliance with applicable law, The Chamber seeks to foster a legal and regulatory environment in which digital asset users can enjoy regulatory certainty as they apply blockchain technologies to an array of commercial, technological, and social purposes. An important aspect of that mission is representing the interests of its members, including regularly filing briefs as *amicus curiae* in novel cases that implicate digital assets and the blockchain communities.

Pursuant to its mission, The Chamber also sponsors several compliance-focused initiatives, in addition to advocating for regulatory clarity. These include the Blockchain Alliance, which since 2015 has combatted criminal uses of blockchain technology, providing technical assistance and information-sharing resources. This initiative serves over 100 governmental and commercial entities, including the Securities and Exchange Commission (the "SEC" or the "Commission"). The Chamber also encourages industry compliance with federal securities law through initiatives like the Token Alliance, a network of 400+ thought leaders and technologists that has developed numerous tools and resources for industry and policymakers as they engage with the token economy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*SEC v. Coinbase* is the latest installment in the SEC's escalating campaign against digital assets, often referred to as "cryptocurrencies," "crypto," or "tokens." As this case demonstrates,

---

[1] Defendants consented to this brief's filing; the SEC declined to take a position without viewing an advance copy. Neither party's counsel authored any part of the brief. No party, counsel, or person other than *amicus*, its members, or its counsel financed the brief's filing or preparation.

the SEC is choosing to use the blunt and unpredictable tool of enforcement proceedings, to the exclusion of all other methods, to regulate the trillion-dollar digital asset industry. For years, digital asset industry members have asked the SEC to provide clarity about the precise question now at issue: which digital assets are securities, and when is registration required for companies like Coinbase that facilitate trading in a range of digital assets. Rather than transparently working with an innovative, nascent industry in which millions of Americans hold valuable assets, the SEC has resorted to increasingly arbitrary and aggressive enforcement tactics that leave industry players confused about how to avoid becoming the subject of the next enforcement proceeding. In public statements and media campaigns, this SEC appears to be boasting about its efforts. *See* Gary Gensler, *Op-Ed: The SEC Treats Crypto Like the Rest of the Capital Markets*, SEC (Aug. 19, 2022), perma.cc/YQ5K-VLG9 (Chair Gensler touting that "the SEC will serve as the cop on the beat" with respect to digital assets). But the SEC cannot arbitrarily decide whether to drive such a major industry out of the United States.

Coinbase—the latest digital asset exchange to come up on the SEC's roulette wheel—has rightly taken decisive action by moving for judgment on the pleadings. The SEC's claim that certain digital assets subject to secondary sales on Coinbase's platform are "investment contracts" under the securities laws is baseless. The longstanding *Howey* test for determining whether something is an "investment contract," and thus a security, makes clear that any individual digital asset is no more a security than an orange in an orange grove. In some circumstances—not at issue here—digital assets can be the *subject* of an investment contract, but that is all.

A recent ruling in this district confirms that while it is possible for a digital asset to be a part of an "investment contract," the digital assets themselves are not securities. *See SEC v. Ripple*

*Labs, Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023). The subsequent decision in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299 (S.D.N.Y. July 31, 2023), is consistent with this premise; *Terraform* recognized that a digital asset *itself* is not an "investment contract," concluding only that the digital assets at issue were the subject of an "investment contract." *Id.* at *12.

It is important to keep view of what is at stake. Digital assets represent a significant segment of the global economy and an integral part of the American financial system. This is not just about speculative or institutional trading—millions of Americans use digital assets for everyday financial transactions. The SEC's regulation-by-enforcement approach is not only detrimental to the industry, it also directly impacts individual Americans who use digital assets. The regulatory ambiguity the SEC has created drives entrepreneurs away from the U.S. markets and punishes those who remain. As a result, the U.S. economy is deprived of a dynamic source of revenue, employment opportunities, and innovation. The SEC's standard response —that digital asset issuers and exchanges should "come in and register"—has proven unworkable. The reality is that it is nearly impossible to register a particular digital asset, a digital asset exchange, or a digital asset broker-dealer because of the SEC's clear unwillingness to provide a transparent path to registration. And even if registration were feasible, it would vitiate important parts of the digital asset economy by undermining its driving ethos of decentralization.

The SEC's insistence that it has the authority to broadly classify digital assets as securities anyway raises separation of powers concerns under the major questions doctrine. This case presents an issue of vast economic and political significance. Digital asset participants are no fringe element—the blockchain industry is now a pillar of the U.S. economy, involving billions of dollars of domestic economic activity and employing tens of thousands of professionals. Long ongoing, and recently progressing, discussions in Congress on how to regulate digital assets, particularly

following the judgment in *Ripple,* further prove the point. The SEC lacks the unilateral mandate to decide the fate of the U.S. digital asset industry.

The SEC's enforcement campaign also raises due process concerns. The SEC has failed to provide any notice to the industry describing when it views digital assets as securities and intends to bring enforcement procedures. The SEC's arbitrary and erratic enforcement strategy, coupled with its refusal to adopt rules or provide formal guidance, also leaves digital asset firms guessing whether the SEC is satisfied with their compliance efforts. This troubling state of affairs offends the core constitutional principle that the government must provide regulated parties with notice of what is expected of them. The SEC's abandonment of any regulatory technique other than enforce-ment—including the tools specifically designed to provide notice—further underscores the SEC's failure to satisfy due process.

## ARGUMENT

## I. The SEC's shoot-first-and-provide-guidance-never approach threatens the U.S. digital asset industry.

The SEC's decision to regulate digital assets through one-off enforcement actions rather than the ordinary tools of economic regulation is destructive to the digital asset industry and the livelihoods of the millions of people and businesses who rely on digital assets and exchanges. The SEC's sole suggestion—that digital assets and exchanges simply "come in and register" under the securities laws—is a hollow promise that has failed in practice and elides reality.

**1.** Though it has already left an indelible mark on the global economy, the digital asset industry is still in its infancy. The first digital asset emerged just 14 years ago. Those 14 years have been marked by unending innovations in technology and constant, rapid evolution. Today, there are tens of thousands of unique digital assets on the market, available on hundreds of exchanges worldwide, representing a total market capitalization of approximately $1.2 trillion. *See Total*

*Cryptocurrency Market Cap*, CoinMarketCap, perma.cc/Y8LR-CZNL (last visited Aug. 8, 2023).
Presently, about $30 billion worth of digital assets changes hands every single day. *Id*. The digital
asset economy is also crucial to a wide variety of fields outside the financial system, from identify
verification to file storage and cloud computing to fraud detection and beyond.[2]

The SEC's ongoing practice of arbitrary enforcement actions is hampering the develop-
ment of digital assets in the United States. One recent study showed that regulatory uncertainty
was the predominant explanation among traditional asset managers who are hesitant to engage
with digital assets. *See* Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset
Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020),
perma.cc/WP9T-4MJ5. *See also* Parikshit Mishra & Jamie Crawley, *Nasdaq Halts Plan for Crypto
Custody Service Due to U.S. Regulatory Conditions,* CoinDesk (July 19, 2023), perma.cc/H4QR-
4RH6; Helen Braun, *ADA, SOL Underperform as Robinhood Gets Set to Delist Them Amid SEC
Crackdown*, CoinDesk (Jun. 27, 2023), perma.cc/ZGK7-WP2G. Another report found that mer-
chants often cite a regulatory environment that undermines trust in digital assets as the basis for
refusing them as payment. *See* Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin
Adoption*, Wall Street J. (Apr. 6, 2022), perma.cc/9TJ7-7WQJ. And commentators warn that "the
United States is losing innovative startups to other countries with more established regulatory
cryptocurrency schemes." Avery Minor, Note, *Cryptocurrency Regulations Wanted: Iterative,
Flexible, and Pro-Competitive Preferred*, 61 Boston College L. Rev. 1149, 1151 (2020) (citing
examples). Unchecked, the SEC's strategy of regulating digital assets through one-off enforcement
actions, depriving industry members of any reliable and transparent guidance, threatens to cut off

---

[2] *See, generally, e.g., What are the Use Cases and Applications of Blockchain Technology?* Con-
sensys, perma.cc/MVN3-UAYZ (last visited Aug. 9, 2023).

the U.S. digital asset industry at its knees.

The SEC's efforts against digital assets would also harm those who use digital assets to pay expenses. Federal Reserve data shows that, conservatively, at least ten percent of Americans—more than 33 million people—used digital assets at some point in 2022. *See* Board of Governors of the Federal Reserve System, *Economic Well-Being of U.S. Households in 2022* at 41 (2023), perma.cc/YDM7-3SMF. These people have chosen to use digital assets for many purposes, including buying goods and services, starting businesses, supporting relatives, and more. *Id*. at 41-42. The Federal Reserve report also showed that digital assets are especially important for the unbanked as well as for low income and minority communities, all of whom disproportionately use digital assets to conduct everyday "financial transactions." *Id*. at 42-43.[3] The community that uses digital assets for these purposes will needlessly suffer under the SEC's arbitrary actions.

In addition, the SEC's unchecked enforcement efforts, if endorsed by courts, will drive industry members to friendlier jurisdictions. Already, regulatory uncertainty and fear of business-annihilating enforcement have seen "US crypto exchanges" lose ground to "offshore rivals [that] have been able to launch products and take market share with less fear of reprisal." Scott Chipolina, *US Crypto Clampdown Pushes Exchanges to go Offshore*, Financial Times (May 16, 2023), perma.cc/4TNU-377U (apostrophe omitted). *See also U.S. Share of Blockchain Developers is Shrinking*, Crypto Council for Innovation (April 24, 2023), perma.cc/3JNX-N7R2 (documenting the decline in the U.S. share of blockchain developer roles since 2017). Many U.S. exchanges have had no choice but to consider relocating outside the United States as well, despite an earnest desire to continue to make contributions to America's culture and economy. *See* Helen Braun, *Crypto*

---

[3] *See also More Than One in Ten Americans Surveyed Invest in Cryptocurrencies*, National Opinion Research Center (July 22, 2021), perma.cc/MN5M-RTSM (finding 44% of digital asset owners are people of color, 55% lack college degrees, and 35% have household incomes under $60,000).

*Exchange Bittrex to Wind Down U.S. Operations Next Month*, CoinDesk (Mar. 31, 2023), perma.cc/SJ79-XU6U (quoting Bittrex as stating "[i]t's just not economically viable for us to continue to operate in the current U.S. regulatory and economic environment"). This unfortunate result would deprive the United States of the ongoing benefits of hosting a valuable homegrown industry with plenty of room still to grow and plenty more innovation to unlock.

**2.** The SEC's only answer to these concerns—insofar as it has expressed one at all—is for digital asset creators and exchanges to "come in, [and] get registered." *See, e.g.,* CryptoCompare, *DACOM 2021: Regulatory Reckoning: The Maturing State of Crypto Regulation and Investor Protection*, YouTube (Dec. 10, 2021), perma.cc/GZJ2-DZVP (remarks of SEC Chair Gary Gensler at DACOM Summit 2021 on Dec 1. 2021). In practice, the SEC has made it all but impossible to do so—its suggestion is belied by its record of refusing such registrations. *See generally Cryptoasset Trading Platforms Cannot Register as Securities Exchanges,* Committee on Capital Markets Regulation (June 6, 2023), perma.cc/87X8-NQEM (explaining "why the SEC's own policies in fact make it impossible for cryptoasset trading platforms" to "register[] and operat[e] in compliance with the regulatory framework for securities exchanges"). Companies attempting to register either as digital asset issuers, exchanges, or broker dealers have explained that they "couldn't get the agency to guide [them] into crypto compliance" and that the agency pulled the plug on their efforts. *See* Jesse Hamilton, *Robinhood Joins Coinbase in Saying It Tried to 'Come In and Register' Like SEC Wanted*, Yahoo! Finance (June 7, 2023), perma.cc/JZ4N-N3SW.

Indeed, the SEC has only ever granted registration to nine digital assets as securities (only five of which are still available), *see Cryptoasset Trading Platforms, supra*. This handful of digital assets registered as securities accounts for "virtually 0%" of global daily digital asset trading volume. *Cryptoasset Trading Platforms*, *supra*, at 2.

Further, SEC registration is incompatible with many uses of digital assets. Requiring digital assets and exchanges to register under the same regulatory framework used for traditional asset market participants would undermine the utility of digital assets for purchasing goods and services and conducting routine financial transactions. Because securities must be purchased and sold through broker-dealers, alternative trading systems, or national securities exchanges, *see* 17 C.F.R. §§ 240.15c2-11 & 242.301; 15 U.S.C. § 78f, a user seeking to buy household goods directly with digital assets registered as securities would need to do so through an SEC-registered entity—a service no such entity offers. Just as buying goods and services with traditional equity securities would be cumbersome and unworkable, so too would be transacting with registered digital asset securities. The SEC's "answer" of coming in to "register" is no answer at all. Ultimately, the securities laws—built around introducing intermediaries into securities transactions—are a poor fit for an industry structured around the core values of decentralization and disintermediation.

## II.   The SEC's regulation-by-enforcement regime raises separation of powers and due process concerns.

The SEC is wrong to paint virtually all digital assets as securities. Longstanding precedent makes clear that digital assets, on their own, are not "investment contracts." The SEC treating most all digital assets as securities anyway thus raises grave separation of powers concerns under the major questions doctrine. The SEC's crusade against digital assets offends due process, as it has repeatedly failed to provide the industry with clear guidance. Instead, the SEC decides arbitrarily which industry members to punish to promote its apparent policy agenda against digital assets.

### A.   Most digital assets should not be considered securities.

At the outset, the SEC's interpretation of the statute relied on to reach the Coinbase's activities—and, indeed, many other digital assets and exchanges—does more than just "raise[] an eyebrow." *West Virginia v. EPA*, 142 S. Ct. 2587, 2613 (2022). It is flatly wrong.

The SEC insists that the activities and digital assets it challenges constitute "investment contract[s]" under 15 U.S.C. §§ 78c(a)(10); 77b(a)(1). The Supreme Court laid out the governing standard to determine whether something is an investment contract, and thus a security, in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298 (1946). Under *Howey*, an investment contract involves a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id*. at 298-99. While digital assets can be part of an "investment contract," a digital asset itself is not by nature a security.

A court in this district recently confirmed as much. *See Ripple*, 2023 WL 4507900. As the court explained, a "digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." *Id*. at *8. Rather, a digital asset— like any other commodity, from an orange to a condominium to a beaver pelt—can be the *subject* of an investment contract. But a digital asset, merely by virtue of being a digital asset, is "not itself inherently an investment contract" as it does not have any of the characteristics of one. *Id*. at *7. *See also SEC v. Telegram Grp. Inc.,* 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) (digital assets, as "little more than alphanumeric cryptographic sequence[s]" are not themselves securities).

Purchasing a digital asset on Coinbase's spot market is not investing in a "common enterprise." *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (defining investing in a "common enterprise" as the "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits."). On Coinbase, purchasers buy digital assets on a spot market based on bids and asks. These are "blind" transactions in which the purchaser and seller do not know who they are transacting with. Coinbase does not facilitate primary distributions. *See* Dkt. 36 at 17 n. 13. Instead, as in

*Ripple*, the traders on Coinbase merely execute trades with others, and not because they are choosing to invest in any particular company or project team.

Nor do the buyers of digital assets on an exchange like Coinbase form contractual privity with the issuer of any particular digital asset. Indeed, sellers and buyers often "do not know to whom or what [they are] paying [their] money," *Ripple*, 2023 WL 4507900 at *11, let alone do they bind one another's fortunes together, agree to do anything for the other, or reserve any of the others' rights. *See Revak*, 18 F.3d at 89 (condominium purchase contract was not an investment contract as it did not "place[] [any] limitation[] on plaintiffs' use of their units" or oblige them to participate in the sellers' rental business).

Digital assets can of course increase in value—as can boats, cars, oranges, and baseball cards. That does not make a digital asset a security. Of course, some who participate on digital asset exchanges may speculate that an asset's value will increase—but in the usual case that fluctuation is driven by external market forces. As the court put it in *Ripple*, "[i]t may certainly be the case that many Programmatic Buyers purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)." 2023 WL 4507900 at *12. And as the SEC's former director of corporate finance put it, many digital assets are "sufficiently decentralized—where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts." William Hinman*, Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018), perma.cc/JA9E-6F2U.

*Terraform* held no different. In that case, the court recognized that "the term 'security' [] cannot be used to describe any crypto-assets that [are] not somehow intermingled" with some other investment scheme. *Terraform*, 2023 WL 4858299 at *12. Indeed, "tokens, if taken by themselves,

might not qualify as investment contracts." *Id*.

The SEC's effort to break with *Howey's* longstanding rule, instead treating digital assets always as securities—without tying them to an "investment contract" by pointing to promises from the asset's promoter's, efforts of a project team, or privity in contract—has no basis in fact or law.

**B.    The SEC's dubious assertion of enforcement authority makes this an "extraordinary case" under the major questions doctrine.**

As demonstrated above, the SEC lacks any authority to bring capricious enforcement actions against digital assets in the manner it seeks now to do. That the Commission must reach so far beyond the *Howey* framework to bring digital assets within its enforcement grasp makes this a question for Congress to resolve, not an agency. That is the driving principle behind the major questions doctrine, which provides that in "extraordinary cases" involving broad agency claims to authority, particularly those of massive "economic and political significance," courts must "hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 142 S. Ct. at 2608 (quotation marks omitted). In such instances, the agency "must point to clear congressional authorization for the power it claims." *Id*. at 2609 (quotation marks omitted). "[R]egulatory assertions" with merely a "colorable textual basis" will not do. *Id*.

At its heart, the major questions doctrine is about respecting the separation of powers by recognizing that on "questions of deep economic and political significance" that are "central to the statutory scheme," courts must "not assume that Congress entrusted the task to an agency without a clear statement to that effect." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (cleaned up). There is no question that this case satisfies each of those elements—it (1) concerns a question of deep economic and political significance, which (2) is central to securities law and over which (3) the agency has asserted a breathtaking claim to authority made possible only by ignoring the long-governing *Howey* standard.

**1.** First, the SEC's enforcement actions treating digital assets as securities generally raise a question of vast economic significance, as the Supreme Court's recent cases show. For instance, in *Alabama Association of Realtors v. HHS*, the Court found that "$50 billion in emergency rental assistance" was "a reasonable proxy for the [challenged policy's] economic impact," and that this was enough to trigger major-questions scrutiny. 141 S. Ct. 2485, 2489 (2021). The *Biden* Court, noting that if $50 billion in rental assistance was enough to "trigger[] analysis under the major questions doctrine," held that student-loan cancellation amounting to "ten times" that impact necessarily qualified as well. 143 S. Ct. at 2373.

Nor need a case involve government spending to qualify as economically significant. What matters is the government's effort to "exercise control over 'a significant portion of the American economy.'" *Biden*, 143 S. Ct. at 2373 (quoting *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014)). In *NFIB v. OSHA*, the Court found that regulatory requirements imposing "billions of dollars in unrecoverable compliance costs" and possibly causing "hundreds of thousands of employees . . . to leave their jobs" was a major question. 142 S. Ct. 661, 664-666 (2022). *See also Util. Air Reg. Group,* 573 U.S. at 322 (measure would lead to "permitting costs of $147 billion" and "caus[e] construction projects to grind to a halt nationwide"). The economic toll need not even be described in dollars. In *West Virginia v. EPA*, rather than quantify the economic stakes, the Court simply noted that the government had arrogated to itself the power to "substantially restructure the American energy market." 142 S. Ct. at 2610. And in *FDA v. Brown & Williamson Tobacco Corp.*, the Court observed that "FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy." 529 U.S. 120, 159 (2000).

The economic stakes implicated by the SEC's recent enforcement actions dwarf those in many of the cases cited above. The United States is by far the world leader in digital asset jobs,

calling itself home to 30% of the global digital asset workforce of 190,000 people. *See* K33 Research, *The Emerging Crypto Industry* 4 (2023), perma.cc/3WDU-6LGN. *Compare with NFIB*, 142 S. Ct. at 666 (noting concern that "hundreds of thousands of employees" might "leave their jobs"). Furthermore, digital asset use is widespread. Some estimates show that as many as 21% of Americans—approximately 70 million people—have used digital assets in some way. *See* Thomas Franck, *One in Five Adults Has Invested In, Traded or Used Cryptocurrency, NBC News poll shows*, CNBC (March 31, 2022), perma.cc/V6XU-TAAW. *Compare with Biden*, 143 S. Ct. at 2372 (student loan plan forgiveness plan affecting 43 million borrowers). Many of the largest public companies use blockchain technology. *See* Lucas Schweiger, *81 of the Top 100 Public Companies Are Using Blockchain Technology*, Blockdata (Oct. 6, 2022), perma.cc/9H4F-T6GN. Overall, the U.S. digital asset industry is projected to generate approximately $18 billion in revenue in 2023, on top of a global market cap greater than $1 trillion. *See* Cryptocurrencies - United States, Statista, perma.cc/YK3U-XG24 (last visited July 29, 2023). By comparison, the production value of tobacco crops in 2000, the year the Court decided *Brown & Williamson*, was $2 billion ($3.54 billion in today's dollars). USDA, *Crop Production Historical Track Records* 264 (2023), perma.cc/9ZR2-GWB2.[4] Clearly, the SEC's assertion of authority over the digital asset industry raises an issue of vast economic importance, and the Commission is attempting to regulate a significant portion of the American economy without explicit authority.

**2.** Likewise, this case confronts issues of considerable political significance. "[D]eep . . . political significance" can be found where Congress has "considered and rejected" the legislative

---

[4]   Accordingly, *Terraform's* unexplained conclusion that "it would ignore reality to place the crypto-currency industry . . . on the same plane of importance" as the industries in major questions doctrine precedents simply does not hold up. *Terraform*, 2023 WL 4858299 at *8. In fact, the economic stakes at issue in this case, including the size of the industry involved, is much *greater* than in some of the Supreme Court's major questions doctrine cases.

adoption of similar regulatory schemes. *West Virginia*, 142 S. Ct. at 2614 (quoting *Brown & Williamson*, 529 U.S. at 144). Thus, in *West Virginia*, the Court faulted the government for adopting, "at bottom," a cap-and-trade program the likes of which Congress "ha[d] consistently rejected . . . long after the dangers posed by greenhouse gas emissions 'had become well known.'" *Id.* (quoting *Brown & Williamson*, 529 U.S. at 144). And in *Brown & Williamson*, a similar pattern suggested that Congress had "effectively ratified the FDA's long-held [prior] position that it lacks jurisdiction under the FDCA to regulate tobacco products." 529 U.S. at 144. *See also Biden*, 143 S. Ct. at 2373-74 (doctrine triggered where "[t]he Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself.").

Similarly, Congress has long expressed interest in adopting a regulatory framework around digital assets but has declined—as yet—to do so. Indeed, members of Congress have introduced dozens of bills relating to digital asset regulation. *See* Jason Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, Forbes (May 19, 2022), perma.cc/2X5N-5P4R. This level of congressional interest—including over whether digital assets belong in the SEC's wheelhouse at all—strongly counsels against allowing the SEC to appropriate the authority to step into the regulatory breach. In congressional testimony, SEC Chair Gensler stated the following: "I think it is only Congress that could really address it . . . right now the exchanges trading in these crypto assets **do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission**, that could instill greater confidence. Right now, **there is not a market regulator around these crypto exchanges**."[5]

---

[5]   *See Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021), perma.cc/D3PH-A4BE (emphasis added).

Since this testimony, no new law has expanded the SEC's power to be the "market regula-tor" of digital asset exchanges. Despite recognizing that these issues should be left to Congress, the SEC has seemingly taken matters into its own hands, using enforcement to do what Congress has declined to do through legislation. Congress's consistent decision not to bring digital assets under the auspices of the SEC is clear evidence of its intent to "effectively ratif[y]" the SEC's "previous position." *Brown & Williamson*, 529 U.S. at 156.

Moreover, *Ripple* has sparked even more congressional interest, further demonstrating in real time the "political significance" of the "major question" at hand. The House Financial Services and House Agriculture Committees recently advanced bipartisan legislation to clarify digital as-sets' regulatory status. *See* Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (July 26, 2023), perma.cc/8WYL-Y5L6. And Senator Cynthia Lummis, who sponsors the Responsible Financial Innovation Act, which would clarify when digital assets are commodities or securities, stated that *Ripple* "confirms the need for Congress to deliver a clear regulatory structure for the digital asset industry that provides the highest level of consumer pro-tection" and should inspire Congress to pass legislation "uphold[ing] the *Howey* test as interpreted by the Southern District of New York." Senator Cynthia Lummis, *Lummis Releases Statement in Response to Ripple Decision* (July 14, 2023), perma.cc/XHE3-V78B.[6]

---

[6]   Likewise, following *Ripple*, several members of Congress have urged the SEC to end its reg-ulation-by-enforcement regime and allow Congress to provide a path forward. *See* Letter from Representatives French Hill & Dusty Johnson to SEC Chair Gary Gensler (July 19, 2023), perma.cc/UV5N-QPTH (warning that the SEC's "regulate by enforcement . . . approach does not protect the public" and calling for a "statutory framework [that] would establish a process for firms to come into the regulatory parameter . . . rather than relying on enforcement actions"); Letter from Representative Ritchie Torres to SEC Chair Gary Gensler (July 18, 2023), perma.cc/SM95-4HEY (condemning the SEC for "cho[osing] . . . to regulate not by clear rule or guidance but by enforce-ment actions, often politically timed"). *See also Biden*, 143 S. Ct. 2374 (citing statement from member of Congress to inform the Court's separation of powers analysis).

At bottom, blockchain technology is a technological innovation that has given rise to a trillion-dollar industry in a matter of years, implicating the financial wellbeing of millions of individuals and businesses in the United States. A "major question" is plainly presented as to whether the SEC has the statutory authority to significantly impact the digital asset industry through its unexpected, ongoing enforcement actions. Because the SEC's enforcement actions against digital asset exchanges implicate many of the factors present in past cases raising similar separation of powers concerns, courts should not defer to the agency's interpretation of the statute but should insist on a clear statement from Congress conferring upon the agency the "staggering" regulatory authority it asserts. *Biden*, 143 S. Ct. at 2373.[7]

### C.   The SEC's approach to enforcement raises serious due process concerns.

The SEC's regulation-by-enforcement approach to digital assets also flouts due process. This case is the latest in a recent series of aggressive and arbitrary enforcement actions that the Commission has initiated against the digital asset industry despite refusing to provide regulatory notice of what actions would beget enforcement. In doing so, the Commission has abandoned the traditional tools of administrative policymaking, and particularly those—such as notice and comment rulemaking and formal interpretive relief—that incorporate due process principles into agency action. These actions offend the digital asset industry's core due process right to know the government's view of the law so it has the opportunity to comply with applicable rules and regulations, rather than learning the SEC's interpretive positions through court filings.

**1.** There is no more "fundamental principle in our legal system" than the rule "that laws

---

[7]   The SEC's argument that the major questions doctrine does not apply to enforcement actions, *see* Dkt. 26 at 3, is meritless. "It would be odd to think that separation of powers concerns evaporate simply because the Government is" exceeding its statutory mandate under its enforcement powers rather than its rulemaking ones. *Biden*, 143 S. Ct. at 2375. To the contrary, "experience shows that major questions cases 'have arisen from all corners of the administrative state,' and administrative action resulting in" enforcement should be "no exception to that rule." *Id*.

which regulate persons or entities must give fair notice of conduct that is forbidden or required."
*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Yet despite years of efforts by the
digital asset industry to achieve clarity on which digital assets the SEC might regard as securities,
it has refused to provide any formal guidance. In so doing, it has deprived the industry of any
"reasonable opportunity to know what is prohibited"—a textbook due process violation. *Upton v.
SEC*, 75 F.3d 92, 98 (2d Cir. 1996). In *Upton*, the Second Circuit cited "substantial uncertainty in
the Commission's interpretation" of its regulations, faulting the Commission for "t[aking] no steps
to advise the public that it believed [a] practice was questionable" before reversing course and
undertaking aggressive enforcement efforts. *Id*. The Court concluded that "[t]he Commission may
not sanction [a defendant] pursuant to a substantial change in its enforcement policy that was not
reasonably communicated to the public." *Id*. The Court should find the same here.

      When the government punishes conduct that is not clearly covered by the applicable rule—
particularly when breaking with past practice—the Constitution requires the government to make
its intentions known in a way that puts the public on notice of its legal interpretation. After all,
"the public can only be enlightened by knowing what the agency believes the law to be." *Nat'l
Council of La Raza v. Dep't of Just.,* 411 F.3d 350, 360 (2d Cir. 2005) (quoting *Tax Analysts v.
IRS*, 117 F.3d 607, 618 (D.C.Cir.1997)) (brackets omitted). In assessing fair notice, courts consider
not only "whether the language conveys sufficiently definite warning as to the proscribed conduct
when measured by common understanding and practices" but also whether an agency's "interpre-
tation of the statute" delivers such warning as well. *Cunney v. Bd. of Trustees of Vill. of Grand
View*, 660 F.3d 612, 621 (2d Cir. 2011) (internal quotation marks and citations omitted). *See also
Upton*, 75 F. 3d at 98 ("[W]e cannot defer to the Commission's interpretation of its rules if doing
so would penalize an individual who has not received fair notice of a regulatory violation.").

The SEC's regulation-by-enforcement strategy flunks this test. For years, the Commission studiously evaded providing any formal, binding clarity about whether and when it would consider digital assets to be securities, commodities, or other types of assets. And the digital asset industry, as well as congressional leaders, have repeatedly asked the Commission to clarify its view.[8] Indeed, Coinbase itself met with the SEC no fewer than thirty times in attempting to seek guidance. *See* Paul Grewal, *We Asked the SEC for Reasonable Crypto Rules for Americans. We Got legal Threats Instead.*, Coinbase (Mar. 22, 2023), perma.cc/JL26-ANJG. Yet, the Commission has steadfastly declined to be transparent about its thinking or to define what industry behavior would elicit enforcement. Instead, agency leaders have made contradictory public pronouncements, often in the form of public statements by individual commissioners rather than the Commission as a whole, sowing confusion and lulling the industry into a false sense of security early on that the SEC would not, generally, consider digital assets themselves to be securities.[9] Gallingly, in this case, the SEC *approved* Coinbase's registration statement and allowed it to become a publicly

---

[8]   *See, e.g., The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. (June 13, 2023), perma.cc/U73D-XLFP (executives citing the need for regulatory clarity); *Crypto Needs Regulatory Clarity, Says Chamber of Digital Commerce CEO*, CNBC (Apr. 18, 2023), perma.cc/EK24-Z6QG; Letter from Chamber of Progress to House and Senate Committee Chairs (July 20, 2022), perma.cc/J6CY-KZSV ( "[The] U.S. crypto industry is struggling to operate in an unclear regulatory environment" and "the SEC attempts to regulate via lawsuit"); Jane Edwards, *Crypto Executives Urge Congress to Provide Regulatory Clarity for Industry*, GovConWire (December 9, 2021), perma.cc/G74N-JVBV; Connor Sephton, *Congressmen Call for Crypto Clarity in Letters to the SEC and Treasury*, Modern Consensus (Dec. 9, 2020), perma.cc/5NMZ-BPPQ; Kate Rooney, *Congress Members Ask SEC Chairman for Clarity on Cryptocurrency Regulation*, CNBC (Sep. 28, 2018), perma.cc/R6CH-YXYF.

[9]   After years of mostly silence by the Commission, in 2018, then-director William Hinman publicly stated that the SEC may not possess regulatory authority over digital assets. *See, supra*, 14. The framework released by SEC's Strategic Hub for Innovation and Financial Technology in 2019, *see Framework For "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), perma.cc/W8XC-WDCZ, explicitly noted that "[i]t is not a rule, regulation, or statement of the Commission, and [that] the Commission has neither approved nor disapproved of its content."

traded company in 2021, despite now insisting that much of the company's activity violates laws the Commission is charged with enforcing.

The SEC's abrupt reversal is indicative of its scorched earth regulation-by-enforcement campaign. To be sure, nobody doubts the Commission's role in preventing fraud. But the SEC's apparent effort to test the boundaries of securities law by bringing one enforcement action after another to see what sticks leaves industry actors helpless to know what they can do to avoid drawing the Commission's ire. These actions deprive industry actors of any notice of the SEC's understanding of the law until the moment they become the target of a novel enforcement action.[10]

**2.** The SEC's shortcomings of due process are further underscored by the Commission's failure to adhere to the ordinary and orderly tools of administrative policymaking. These tools vindicate and codify the due process right by "incorporat[ing]" through the Administrative Procedure Act, "basic principles of fair notice and equal treatment" into agency action. *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020). Accordingly, it is a long-established principle of administrative law that "rulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy." *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (The SEC's "function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future").

Viewed against these background principles, the SEC's considerable efforts to evade traditional regulatory avenues for prospectively clarifying the law further underscore how uneasily

---

[10]   Accordingly, the *Terraform* court's suggestion that SEC's enforcement actions, themselves, cure any due process violation does not hold any water. *See Terraform*, 2023 WL 4858299 at *9 n. 4. Beyond informing digital asset companies that the Commission is on a crusade against digital assets, these actions give the industry no basis to determine what "conduct [] is forbidden or required." *Fox Television Stations, Inc.*, 567 U.S. at 253.

this enforcement proceeding and others like it sit with the Constitution's guarantee of due process. This dynamic is most evident in the current case: Coinbase formally petitioned the SEC to promulgate rules on exactly this issue more than a year ago. *See* Coinbase*,* Petition for Rulemaking (July 21, 2022), perma.cc/Z7GK-4DCW. The petition was met with silence. But shortly after Coinbase sought a writ of mandamus to compel such rulemaking, *see* Petition for Writ of Mandamus, *In Re Coinbase, Inc.*, No. 23-1779, Dkt. 1 (3d Cir. Apr. 26, 2023), the SEC initiated this enforcement action. That captures the SEC's approach to digital assets in a nutshell: avoid laying down rules of the road by any means necessary, yet happily play traffic cop after the fact regardless.

The SEC's deviation from its customary notice and comment rulemaking processes to bring clarity to the law, despite repeated pleas from both industry and Congress, and in direct contradiction of earlier statements, raises red flags. The SEC's regulate-by-enforcement mentality towards digital assets deprives the industry and the public alike of notice of how the Commission views the law and a chance to participate in shaping it. This leaves exchanges like Coinbase to guess at what the Commission might do next, until they finally become targets themselves for the Commission's next arbitrary and unreasoned enforcement action. The Constitution demands more.

## CONCLUSION

The SEC's enforcement action here—and its attitude towards enforcement against digital assets generally—rests on the fatally flawed premise that digital assets, on their own, are securities. That is simply not correct; not as a matter of doctrine, and not as digital assets are commonly used. The Commission's insistence that it may treat all digital assets as securities notwithstanding governing law, and with no regard for the enormous economic consequences of such a conclusion, is an audacious claim to authority that the constitutional separation of powers cannot abide. And the Commission's refusal to supply industry any indication on how it will wield that doubtable authority offends due process. The Chamber respectfully asks the Court to grant Coinbase's motion.

Dated:  August 11, 2023

/s/ Paul W. Hughes

Paul W. Hughes
Andrew A. Lyons-Berg*
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

Joseph B. Evans
Alexandra C. Scheibe*
Patrick V. Kennedy*
Brianna Perez*
MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5400
jbevans@mwe.com

*pro hac vice to be filed

*Attorneys for Amicus Curiae*
*The Chamber of Digital Commerce*