UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Hon. Katherine Polk Failla |
| v. | |
| COINBASE, INC. and COINBASE GLOBAL, INC., | Case No. 1:23-cv-04738 |
| Defendants. | |

**BRIEF FOR *AMICI CURIAE* BLOCKCHAIN ASSOCIATION, CRYPTO COUNCIL FOR INNOVATION, CHAMBER OF PROGRESS, AND CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF DEFENDANTS**

Paul D. Clement
Erin E. Murphy
C. Harker Rhodes IV*
James Y. Xi*
Darina Merriam*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
harker.rhodes@clementmurphy.com
james.xi@clementrmurphy.com
darina.merriam@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Amici Curiae*

August 11, 2023

## CORPORATE DISCLOSURE STATEMENT

Counsel for *amici* Blockchain Association, Crypto Council for Innovation, Chamber of Progress, and Consumer Technology Association certify that *amici* have no parent corporation and no publicly held corporation owns 10% or more of any stock in *amici*.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTEREST OF *AMICI CURIAE* ........................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT ........................................................................................................................ 5

I.  Congress Must Clearly Confer Authority To Resolve Major Questions ........................... 6

II. The Major Questions Doctrine Forecloses The SEC's Attempt To Rewrite The
    Phrase "Investment Contract"........................................................................................ 8

    A.  Regulation of the Digital Asset Industry Implicates Questions of Vast
        Economic and Political Significance ....................................................... 9

    B.  The SEC's Attempt to Rewrite "Investment Contract" Would
        Unlawfully Expand Its Regulatory Authority ....................................... 12

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S.Ct. 2485 (2021) ........................................................................... 19

*Am. Diamond Co.*,
1977 WL 10907 (SEC Aug. 15, 1977) ................................................... 13

*Biden v. Nebraska*,
143 S.Ct. 2355 (2023) ....................................................... 6, 8, 18, 19

*Cont'l Mktg. Corp. v. SEC*,
387 F.2d 466 (10th Cir. 1967) .......................................................... 3, 12

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ...................................................................... *passim*

*FTC v. Bunte Brothers, Inc.*,
312 U.S. 349 (1941) ............................................................................. 7

*Future Sys. Inc.*,
1973 WL 9653 (SEC June 8, 1973) ...................................................... 13

*Gundy v. United States*,
139 S.Ct. 2116 (2019) ........................................................................... 7

*Int'l Bhd. of Teamsters v. Daniel*,
439 U.S. 551 (1979) ............................................................................ 12

*Kerst v. Nelson*,
171 Minn. 191 (1927) ......................................................................... 12

*King v. Burwell*,
576 U.S. 473 (2015) .............................................................................. 9

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) .............................................................................. 7

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
456 U.S. 353 (1982) ............................................................................ 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
142 S.Ct. 661 (2022) ............................................................................. 7

*Paul v. United States*,
140 S.Ct. 342 (2019) ............................................................................. 7

*Prohaska v. Hemmer-Miller Dev. Co.*,
  256 Ill. App. 331 (1930) ................................................................................... 12

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) ........................................................................... 17

*SEC v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................. 13

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) .................................................. 19

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) .................................................................................... 3, 12

*State v. Robbins*,
  185 Minn. 202 (1932) ....................................................................................... 12

*U.S. Telecom Ass'n v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) ........................................................................... 6

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ............................................................................... 4, 6, 7, 8

*Wayman v. Southard*,
  10 Wheat. 1 (1825) ............................................................................................. 6

*West Virginia v. EPA*,
  142 S.Ct. 2587 (2022) ............................................................................. *passim*

*Whitman v. Am. Trucking Assocs.*,
  531 U.S. 457 (2001) ........................................................................................... 6

**Constitutional Provision**

U.S. Const. art. I, §1 ........................................................................................... 6

**Statutes**

7 U.S.C. § 2 ....................................................................................................... 17

15 U.S.C. §77b .................................................................................................. 12

15 U.S.C. §78c .................................................................................................. 12

**Other Authorities**

*2023 Q1 Crypto Industry Report*, CoinGecko (July 17, 2023),
    https://tinyurl.com/3ptehpzm ............................................................... 10

*A Review of the Fiscal Year 2024 Budget for the U.S. Securities and Exchange*
    *Commission: Hearing before the S. Subcomm. on Fin. Servs. & Gen. Gov't*, 118th
    Cong. (2023), https://tinyurl.com/3z6h3kxh................................................ 15

Bd. of Governors of the Fed. Rsrv. Sys., *Economic Well-Being of U.S. Households in*
    *2021* (May 2022), https://tinyurl.com/4nmfd93m .................................. 11

Brief for the SEC, 1946 WL 50582, *SEC v. W.J. Howey Co.*,
    No. 843 (U.S. Apr. 17, 1946) ...................................................................... 13

CDC, *Burden of Cigarette Use in the U.S.*
    https://tinyurl.com/u2yapahu (last visited Aug. 11, 2023)....................... 19

Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stanford Soc.
    Innovation Rev. (Nov. 24, 2021), https://tinyurl.com/48cn8jmy ............ 11

Christos A. Markadis & Gordon Y. Liao, *Democratizing Effects of Digital Ledger*
    *Technologies: Implications for Economic Mobility*, 6 Frontiers (2023),
    https://tinyurl.com/mr3uwd9d ................................................................ 11

*Crypto Could Help Save People in the US Billions of Dollars a Year in Remittance*
    *Fees*, Coinbase (Apr. 3, 2023), https://tinyurl.com/2frmwt6d................. 11

Digital Commodities Consumer Protection Act of 2022, S. 4760,
    117th Cong. (2022), https://tinyurl.com/bdd7r5p3 ................................. 9

Digital Commodity Exchange Act of 2022, H.R. 7614,
    117th Cong. (2022), https://tinyurl.com/45cnjwyd................................. 9

Federal Reserve Bank of NY, *The Financial Stability Implications of Digital Assets*,
    No. 1034 (Sep. 2022), https://tinyurl.com/5b2rkafh............................... 10

Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th
    Cong. (2023) ............................................................................................. 18

Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th
    Cong. (2023), https://tinyurl.com/yc38dmjn ......................................... 9

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail*
    *Investors Collide, Part III: Hearing Before the H. Comm. on Fin. Servs.*, 117th
    Cong. 12 (2021) ................................................................................. 5, 13, 14

GAO, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets*, GAO-23-105346 (Washington, D.C.: June 2022) ..................................................................................... 11

GAO, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets*, GAO-23-105346 (Washington, D.C.: June 2022) ..................................................................................... 15

GAO, *Blockchain: Emerging Technology Offers Benefits for Some Applications but Faces Challenges*, GAO-22-104625 (Washington, D.C.: Mar. 23, 2022) ............................................................................ 15

Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (July 26, 2023), https://tinyurl.com/5hap4pzm ........................................... 18

Hester M. Peirce, Comm'r, Secs. & Exch. Comm'n, Outdated: Remarks Before the Digital Assets at Duke Conference (Jan. 20, 2023), https://tinyurl.com/eh8cmtbk ............... 14

Jack Denton, *Venture Capital Is Pouring Billions Into Crypto. Bitcoin's Crash Is a Distant Memory*, Barron's (July 21, 2022), https://tinyurl.com/yh3ef4cz ............................. 10

Jason Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, FORBES (May 19, 2022), https://tinyurl.com/4wzwwzre ................................................................................. 18

Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (updated March 20, 2023), https://tinyurl.com/yxedxdyc ..................................... 15

Jenna Hall, *Can You Buy A House With Bitcoin?*, Bitcoin Magazine (May 26, 2022), https://tinyurl.com/3w6vz2wp ................................................... 11

Letter from Jake Chervinsky, Head of Policy, Blockchain Association, and Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (June 13, 2022), https://tinyurl.com/5d96p4bx ............................................. 15

Letter from Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (Apr. 18, 2022), https://tinyurl.com/3439e6p5 ........................ 15

Letter from Rep. French Hill et al. to SEC Chair Gary Gensler (July 19, 2023), https://tinyurl.com/mt957rm5 ..................................................................... 9

Letter from Rep. Tom Emmer et al. to SEC Chair Gary Gensler (Mar. 16, 2022), https://tinyurl.com/ypf2hvbs ..................................................................... 9

Lewis R. Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 81 (2019) .................................................. 14

Linda Jeng, *Crypto Migration: European and Asian Regulators Welcome Crypto Innovation While U.S. Cracks Down* (April 7, 2023), https://tinyurl.com/47hr5eee.............. 16

Matt Donovan, Ripple *Effect: The SEC's Major Questions Doctrine Problem*, 91 Fordham L. Rev. 2309 (2023) ......................................................................... 15, 17

Navdeep Singh, *Crypto Price Today: Bitcoin Below $22,800; Crypto Market Cap Crosses $1 Trillion*, The Economic Times (Jan. 23, 2023), https://tinyurl.com/yc3uksvm ................................................................. 10

*New Survey of 2,000+ American Adults Suggests 20% Own Crypto and the Vast Majority See an Urgent Need to Update the Financial System*, Coinbase (Feb. 27, 2023), https://tinyurl.com/39h8w744........................................................ 10

Olga Kharif, *Ukraine Readies NFT Sales as Crypto Donations Top $60 Million*, Bloomberg.com (April 5, 2022), https://tinyurl.com/3b87dxvw ........................... 11

Peter Van Valkenburgh, *Framework for Securities Regulation of Cryptocurrencies 2.0*, Coin Center (Aug. 2018), https://tinyurl.com/yk4nsxhv ................................. 10

Pltf. SEC's Opp. to Defts.' Mot. for Summ. J., *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y. filed Oct. 21, 2022) .................................................... 14

Rodrigo Seira et al., *SEC's Path to Registration*, Policy (Mar. 23, 2023), https://tinyurl.com/yyycdru7.............................................................. 15

Sandali Handagama, *Global Crypto Industry Pledges Aid to Turkey Following Deadly Earthquakes*, CoinDesk (Feb. 6, 2023), https://tinyurl.com/ymc58psm ............... 11

*SEC Chair Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News (Dec. 7, 2022), https://tinyurl.com/5n9ytfys........................ 14

Steven Lofchie, et al., *The Securities Law Treatment of Utility Tokens (or Why It Is Past Time for the SEC to Engage with the Hard Questions)*, FFRI Commentary, Jan. 11, 2022, *available at* https://tinyurl.com/yc8fvt5p ...................................... 15

Testimony of Sheila Warren, Chief Executive Officer, Crypto Council for Innovation, *Joint Hearing of the California Assembly Banking & Finance Committee and the Senate Banking & Financial Institutions Committee*, at 11 (Feb. 22, 2023), https://tinyurl.com/fysf9duc.............................................................. 11

*The Potential of Cryptocurrency for Kenya's Youth*, Mercy Corps (Feb. 21, 2022), https://tinyurl.com/3ufas438 .......................................................... 11

The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021), https://tinyurl.com/bezac866.............................................................. 18

*The Use of Cryptocurrency in Business*, Deloitte  (June 2023),
    https://tinyurl.com/yzw6xy5d ................................................................................... 11

Thomas Franck, *One in 5 Adults Has Invested In, Traded or Used Cryptocurrency,*
    *NBC News Poll Shows*, NBC News (March 31, 2022),
    https://tinyurl.com/78m588jr ................................................................................... 10

William Hinman, Dir., SEC Div. of Corp. Fin., Digital Asset Transactions: When
    Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit:
    Crypto (June 14, 2018), https://tinyurl.com/ymbbncnd .................................................... 5, 13

## INTEREST OF *AMICI CURIAE*[1]

The Blockchain Association ("BA") is a nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital asset economy.  BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace.  BA represents over 100 member companies reflecting the wide range of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

The Crypto Council for Innovation ("CCI") is an alliance of industry leaders with a mission to communicate the opportunities presented by digital assets and demonstrate the technology's transformational promise.  CCI's members, which include some of the leading global companies and investors in the industry, share the goal of encouraging the responsible global regulation of digital assets to unlock economic potential, improve lives, foster financial inclusion, protect national security, and disrupt illicit activity.  CCI believes that achieving these goals requires informed, evidence-based policy decisions realized through collaborative engagement.

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate.  It backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps, and seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users.  Chamber of Progress's work is supported by its 30 corporate partners, but none of its partners sit on its board

---

[1] Counsel for *amici* certify that no counsel for a party authored this brief in whole or in part, and no person other than *amici* made any monetary contribution to its preparation or submission.

or have a vote on, or veto over, its positions.  Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

The Consumer Technology Association ("CTA") is North America's largest technology trade association. CTA's members are the world's leading innovators—from startups to global brands—helping support more than 18 million American jobs. CTA also owns and produces CES®, the most influential tech event in the world.

As coalitions with substantial expertise in the digital asset space, *amici* have a strong interest in this case and a vital perspective to provide on issues of importance for digital asset users, developers, investors, and operators.  The Securities and Exchange Commission (the "SEC") has taken the position that nearly all digital assets are "investment contracts" within the meaning of the federal securities laws.  That interpretation would substantially burden *amici*, their members, and the broader digital asset industry.  The Court should reject the SEC's approach.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At its core, a blockchain is a distributed ledger: a database maintained by many computers that can record and verify data across the entire network.  Innovators across the United States and around the world have adopted blockchain technology for a wide range of uses, including identity verification, community governance, supply chain management, and commercial transactions. Digital assets are one important application of blockchain technology, allowing anyone with an internet connection (including those without easy access to the banking system) to engage in instantaneous and verifiable transactions and access important financial services like lending or cross-border payments.  Other digital assets allow individuals to gain access to certain software programs, communities, or events, or to participate in platform governance.  Digital assets are most frequently purchased and exchanged on secondary markets, such as Coinbase, where purchasers can buy digital assets from third-party sellers without interacting with the creator of the asset.

The SEC has taken the novel position that nearly all digital assets sold on the secondary market are "investment contracts" within the meaning of the federal securities laws, even though those transactions involve no ongoing contractual obligations. That position fails as a matter of text, history, precedent, and common sense. The term "investment contracts" refers generally to contractual promises to manage a venture for the investor's benefit. The sale of land, for example, is an investment contract if coupled with a promise to develop orange groves on it for the buyer's profit. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). So too is the sale of beavers coupled with the seller's promise to raise them for profit. *See Continental Marketing Corp. v. SEC*, 387 F.2d 466, 268-71 (10th Cir. 1967). But sales of land or beavers by themselves are not investment contracts, and they are not subject to SEC oversight. That is for good reason, as a typical asset sale does not involve the kind of information asymmetry between management and investor that the securities laws exist to address.

In its attempt to assert jurisdiction over digital assets, the SEC seeks to cast aside the nearly century-old understanding of "investment contract" and usurp Congress's authority to decide how to regulate a burgeoning industry, even though the SEC has repeatedly disclaimed such authority in the past. According to the SEC today, an "investment contract" need not involve a contract at all, let alone any post-sale obligation to develop the asset in a profitable way. Instead, in the SEC's view, any asset that a buyer purchases with the expectation that its value will go up based on "the entrepreneurial or managerial efforts of others" is an "investment contract." Compl. ¶18. That flawed interpretation threatens to sweep in many run-of-the-mill assets that are clearly not securities—extending the SEC's reach far beyond the digital asset industry. A person who purchases a Birkin bag, for example, may well expect to turn a profit based on "the entrepreneurial or managerial efforts" of Hermès, which produces and markets those coveted handbags. Under

the SEC's newly minted view of its regulatory reach, that would apparently be enough to turn that purchase into a securities transaction regulated by the SEC, and any auction house or consignment store that facilitates such purchases into an unregistered securities exchange.  Accepting that sweeping view would work an unprecedented expansion of the SEC's authority and extend its reach into every corner of the American economy.

The SEC's approach makes this a classic major questions case.  When the government "claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" courts typically "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).  After all, courts generally "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id*.  That rule reflects "both separation of powers principles and a practical understanding of legislative intent." *West Virginia v. EPA*, 142 S.Ct. 2587, 2607-09 (2022).  And it squarely forecloses the SEC's power grab here.  In seeking to regulate the sale of nearly all digital assets on secondary markets, the SEC is attempting to effect a "transformative expansion" of its authority that would extend its oversight not only to the trillion-dollar digital asset industry but potentially to countless other assets as well.  *Util. Air*, 573 U.S. at 324.

The SEC bases its newfound claim of sweeping power on a "long-extant statute" that has never before been interpreted in the way the SEC now claims.  *Id.* The term "investment contract" has been in the Securities Act of 1933 and the Exchange Act of 1934 from day one, and it has never covered run-of-the-mill asset sales that involve no contract or continuing obligations beyond the sale itself.  That is why, until recently, the SEC had repeatedly disclaimed authority to regulate the

sale of digital assets on secondary markets.[2]  By contrast, the SEC's recent change in tune would allow it to exercise authority that Congress has declined to grant it—and indeed, that many of the legislative proposals today propose to grant (at least in part) to a *different* agency, the Commodity Futures Trading Commission (the "CFTC").  There is thus every reason to "hesitate before concluding that Congress" conferred on the SEC the authority to seize control of the trillion-dollar digital asset industry through language drafted almost a century ago—let alone the authority to regulate the sale of a vast number of *other* commodities and assets.  This Court should reject the SEC's attempt to extend its regulatory reach far beyond the bounds that Congress has authorized.

## ARGUMENT

Rather than ask Congress to grant it regulatory authority over the digital asset industry (and risk the possibility of legislative compromises or congressional choice of a different regulator), the SEC is trying to win that authority for itself in court, by pressing a novel and flawed interpretation of the age-old statutory term "investment contract" in a slew of enforcement actions.  As Coinbase explains in its motion for judgment on the pleadings, the statutory text, history, precedent, and common sense all foreclose the SEC's attempt to rewrite the definition of "investment contract" to reach digital asset sales unaccompanied by any ongoing contractual obligations.  *Amici* fully agree with those arguments, and submit this brief to emphasize that the rapidly expanding market in digital assets is a major development and the major questions doctrine forecloses the SEC's

---

[2] *See, e.g.*, William Hinman, Dir., SEC Div. of Corp. Fin., Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), https://tinyurl.com/ymbbncnd (acknowledging that a digital asset "all by itself is not a security"); *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*: *Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 12 (2021) (statement of Gary Gensler, SEC Chair) (acknowledging that "right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the [CFTC]").

effort to arrogate to itself massive powers that Congress has never clearly granted it.  This Court should grant Coinbase judgment on the pleadings.

## I.     Congress Must Clearly Confer Authority To Resolve Major Questions.

The major questions doctrine instructs that courts must "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 133).  Consistent with those principles, the inquiry is "whether Congress in fact meant to confer the power the agency has asserted" in the statute at issue.  *West Virginia*, 142 S.Ct. at 2607-08 (quoting *Brown & Williamson*, 529 U.S. at 159).  As a general matter, in "a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'"  *Biden v. Nebraska*, 143 S.Ct. 2355, 2380-81 (2023) (Barrett, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 43 (1825)).  Courts thus "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'"  *West Virginia*, 142 S.Ct. at 2609 (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc)).  And they are reluctant to interpret "'modest words,' 'vague terms,' or 'subtle devices'" as effecting "[e]xtraordinary grants of regulatory authority.'"  *Id.* (quoting *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001)).

That rule not only reflects "common sense as to the manner in which Congress is likely to delegate a policy decision of … economic and political magnitude," *Brown & Williamson*, 529 U.S. at 133, but also acts as a guardrail for the separation of powers.  The Constitution vests "[a]ll legislative Powers … in a Congress of the United States," not administrative agencies.  U.S. Const. art. I, §1.  And the Framers understood that it would "frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals."  *Gundy v. United States*, 139 S.Ct.

2116, 2133 (2019) (Gorsuch, J., dissenting) (quoting *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892)).  By preventing agencies from invoking vague and ambiguous language to claim authority that properly rests with the legislative branch, the major questions doctrine acts "in service of the constitutional rule that Congress may not divest itself of its legislative power." *Gundy*, 139 S. Ct. at 2142 (Gorsuch, J., dissenting); *see also Paul v. United States*, 140 S.Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari).

The major questions doctrine demands particular "skepticism" when an agency claims to have discovered in "a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'"  *Util. Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U. S., at 159).  A longstanding "want of assertion of power by those who presumably would be alert to exercise it" is a telling sign that no "such power was actually conferred."  *West Virginia*, 142 S.Ct. at 2610 (quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)).  For example, in *National Federation of Independent Business v. Department of Labor*, 142 S.Ct. 661, 665 (2022) (per curiam), the Supreme Court rejected OSHA's attempt to impose a sweeping vaccine mandate where "OSHA, in its half century of existence, ha[d] never before adopted a broad public health regulation of this kind."  *Id.* at 666.  In *West Virginia*, the Court rejected the EPA's attempt to impose "unprecedented" environmental regulations that would have "effect[ed] a fundamental revision of the statute."  142 S.Ct. at 2610-12.  In *Brown & Williamson*, the Court refused to sanction a late-breaking effort by the FDA to regulate tobacco that was "[c]ontrary to [the agency's] representations to Congress since 1914."  529 U.S. at 159.  And in *Utility Air*, the Court was deeply skeptical of the EPA's claim to have discovered "newfound authority" in the Clean Air Act that empowered it to regulate greenhouse-gas permits for "millions of small-sources—

including retail stores, offices, apartment buildings, shopping centers, schools, and churches." 573 U.S. at 328.

Courts are all the more skeptical when an agency claims to have discovered in a long-extant statute regulatory powers that Congress has affirmatively declined to grant.  In *Biden v. Nebraska*, for example, the Court rejected the Secretary of Education's attempt to enact a massive loan forgiveness program where "[t]he Secretary's assertion of administrative authority … conveniently enabled him to enact a program that Congress has chosen not to enact itself."  143 S.Ct. at 2373.  In *West Virginia*, the Court similarly emphasized that "the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions had become well known, Congress considered and rejected multiple times."  142 S.Ct. at 2614.  And in *Brown & Williamson*, the Court emphasized that Congress "considered and rejected bills that would have granted the FDA" authority to regulate tobacco and instead adopted a "distinct regulatory scheme."  529 U.S. at 144.  Simply put, when Congress has declined (or is still considering) a request to expand an agency's powers, the agency cannot colorably claim that it has actually possessed those expanded powers all along.

## II.    The Major Questions Doctrine Forecloses The SEC's Attempt To Rewrite The Phrase "Investment Contract."

The SEC's attempt to rewrite the longstanding interpretation of "investment contract" to empower it to regulate a massive new industry based on technological underpinnings distinct from traditional assets runs head-on into the major questions doctrine.  In seeking to regulate the sale of nearly all digital assets on secondary markets, the SEC purports to locate newly discovered power in the words "investment contract," even though that phrase has never been understood to cover asset sales that involve neither a contract nor a continuing obligation beyond the sale itself.  Worse still, the SEC's newfound position would empower it to exercise authority that Congress has

conspicuously declined to grant, and that Congress is actively considering assigning (at least in part) to a *different* agency.[3]  Indeed, Members of Congress on both sides of the aisle have made it clear that they consider further legislation necessary to fill the current regulatory gap that leaves no agency with clear authority over transactions involving digital assets.[4]  Given those circumstances, there is every reason to doubt Congress conferred on the SEC regulatory authority over the digital asset industry—let alone the myriad *other* commodities and assets that the SEC's sweeping approach would cover.  Absent the kind of "clear delegation" that is plainly lacking here, a "decision of such magnitude and consequence" on a matter of "earnest and profound debate across the country" must rest with Congress. *West Virginia*, 142 S.Ct. at 2614, 2616.

A.    **Regulation of the Digital Asset Industry Implicates Questions of Vast Economic and Political Significance.**

The SEC's attempts to rewrite the definition of "investment contract" indisputably raises important questions of "deep economic and political significance."  *King v. Burwell*, 576 U.S. 473, 485-86 (2015).  Since its inception in 2008, the digital asset industry has grown exponentially, attracting an increasing number of entrepreneurs and developers and powering a wide range of

---

[3] *See, e.g.*, Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023), https://tinyurl.com/yc38dmjn; Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022), https://tinyurl.com/45cnjwyd (defining "digital commodity" and providing CFTC regulatory jurisdiction over digital commodity markets); Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022), https://tinyurl.com/bdd7r5p3 (amending Commodity Exchange Act to provide CFTC regulatory jurisdiction over the digital commodity spot market).

[4] *See, e.g.*, Letter from Rep. French Hill et al. to SEC Chair Gary Gensler (July 19, 2023), https://tinyurl.com/mt957rm5 (recognizing that Congress must "[e]stablish[] a comprehensive regulatory framework for digital assets" and "address [the] regulatory gaps"); Letter from Rep. Tom Emmer et al. to SEC Chair Gary Gensler (Mar. 16, 2022), https://tinyurl.com/ypf2hvbs (objecting to SEC investigations of "non-SEC regulated" digital asset industry participants).

applications.  The industry is now valued at more than a trillion dollars,[5] its daily trading volume is in the tens of billions of dollars,[6] and Bitcoin, the first and largest cryptocurrency, has a market capitalization of $450 billion.[7]  Entrepreneurs have attracted billions of dollars in venture capital funding for blockchain technology,[8] and roughly one in every five Americans—more than 50 million people—has purchased a digital asset.[9]  That percentage is even higher among young Americans and Black Americans, with roughly four in ten having used digital assets.[10]

The sheer size of the industry reflects the utility of digital assets and their underlying blockchain technology.  While some people may purchase digital assets with the hope that those assets will rise in value, many use them in ways that look nothing like traditional investments.  Some digital assets have functional uses linked to their specific networks, such as allowing users to purchase virtual goods or buy data storage.[11]  Others can be used as currency or payment mechanisms in the broader economy; for instance, more and more U.S. businesses now accept Bitcoin and other digital assets as a form of payment for anything from groceries to airline

---

[5] Navdeep Singh, *Crypto Price Today: Bitcoin Below $22,800; Crypto Market Cap Crosses $1 Trillion*, The Economic Times (Jan. 23, 2023), https://tinyurl.com/yc3uksvm.

[6] *2023 Q1 Crypto Industry Report*, CoinGecko (July 17, 2023), https://tinyurl.com/3ptehpzm.

[7] Federal Reserve Bank of NY, *The Financial Stability Implications of Digital Assets*, No. 1034 (Sep. 2022), https://tinyurl.com/5b2rkafh.

[8] Jack Denton, *Venture Capital Is Pouring Billions Into Crypto. Bitcoin's Crash Is a Distant Memory*, Barron's (July 21, 2022), https://tinyurl.com/yh3ef4cz.

[9] *See, e.g.*, *New Survey of 2,000+ American Adults Suggests 20% Own Crypto and the Vast Majority See an Urgent Need to Update the Financial System*, Coinbase (Feb. 27, 2023), https://tinyurl.com/39h8w744.

[10] Thomas Franck, *One in 5 Adults Has Invested In, Traded or Used Cryptocurrency, NBC News Poll Shows*, NBC News (March 31, 2022), https://tinyurl.com/78m588jr.

[11] *See* Peter Van Valkenburgh, *Framework for Securities Regulation of Cryptocurrencies 2.0*, Coin Center (Aug. 2018), https://tinyurl.com/yk4nsxhv.

tickets,[12] and they can even be used to buy real estate.[13]   The digital asset industry has also provided access to financial services to individuals who have no or very limited access to banking, filling an important gap in the availability of financial services.[14]   And digital assets offer an alternative way for borrowers to obtain loans at lower interest rates, thereby potentially diminishing the risk of predatory and discriminatory lending practices.[15]   Digital assets are also used to complete foreign exchange transactions and send cross-border remittance payments faster and at a greatly reduced cost.[16]   And donors have compliantly sent millions of dollars in digital assets in response to crises like the war in Ukraine[17] or the recent earthquakes in Turkey and Syria.[18]

---

[12] *The Use of Cryptocurrency in Business*, Deloitte (June 2023), https://tinyurl.com/yzw6xy5d.

[13] Jenna Hall, *Can You Buy A House With Bitcoin?*, Bitcoin Magazine (May 26, 2022), https://tinyurl.com/3w6vz2wp.

[14] *See* Bd. of Governors of the Fed. Rsrv. Sys., *Economic Well-Being of U.S. Households in 2021*, at 43-44 (May 2022), https://tinyurl.com/4nmfd93m; Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, Stanford Soc. Innovation Rev. (Nov. 24, 2021), https://tinyurl.com/48cn8jmy; Christos A. Markadis & Gordon Y. Liao, *Democratizing Effects of Digital Ledger Technologies: Implications for Economic Mobility*, 6 Frontiers (2023), https://tinyurl.com/mr3uwd9d.

[15] Testimony of Sheila Warren, Chief Executive Officer, Crypto Council for Innovation, *Joint Hearing of the California Assembly Banking & Finance Committee and the Senate Banking & Financial Institutions Committee*, at 11 (Feb. 22, 2023), https://tinyurl.com/fysf9duc.

[16] *See Crypto Could Help Save People in the US Billions of Dollars a Year in Remittance Fees*, Coinbase (Apr. 3, 2023), https://tinyurl.com/2frmwt6d; GAO, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets*, at 15-23, GAO-23-105346 (Washington, D.C.: June 2022); *The Potential of Cryptocurrency for Kenya's Youth*, Mercy Corps (Feb. 21, 2022), https://tinyurl.com/3ufas438.

[17] Olga Kharif, *Ukraine Readies NFT Sales as Crypto Donations Top $60 Million*, Bloomberg.com (April 5, 2022), https://tinyurl.com/3b87dxvw.

[18] Sandali Handagama, *Global Crypto Industry Pledges Aid to Turkey Following Deadly Earthquakes*, CoinDesk (Feb. 6, 2023), https://tinyurl.com/ymc58psm.

**B.      The SEC's Attempt to Rewrite "Investment Contract" Would Unlawfully Expand Its Regulatory Authority.**

The Exchange Act of 1934 and the Securities Act of 1933 each define "security" to include, among other "instrument[s] commonly known as a 'security,'" an "investment contract."   15 U.S.C. §78c(a)(10); 15 U.S.C. §77b(a)(1).   As the Supreme Court explained in *Howey*, Congress incorporated the "common" and "uniformly applied" understanding of "investment contract" at the time into the federal securities laws.   328 U.S. at 298.   The phrase "investment contract" was used then to denote transactions that differed from traditional securities like stocks and bonds, but that still had the core "characteristics of a security."   *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979).   It refers generally to business ventures that involve the sale of an asset coupled with a contractual promise by the seller to develop that asset in a profitable manner for the investor's benefit.   The sale of land, for example, is an investment contract if it is coupled with a promise by the seller to develop orange groves on that land and share the resulting profits with the buyer.   *See Howey*, 328 U.S. at 298-99.   So too for the sale of beavers coupled with a promise to raise them for profit.   *See Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 268-71 (10th Cir. 1967); *see also State v. Robbins*, 185 Minn. 202, 204-05 (1932) (sale of muskrat breeding pairs *plus* promise to rear pairs until later sold for fur); *Prohaska v. Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 334-35 (1930) (sale of land *plus* promise to harvest crops on it); *Kerst v. Nelson*, 171 Minn. 191, 193-95 (1927) (sale of land *plus* promise to cultivate vineyard, harvest crops, and market wine).   But without a contractual arrangement providing for post-sale obligations and a share in the profits, there is just an asset sale.   It is not a beaver-based investment; it is just a beaver.

The SEC has long recognized that sales of commodities and other physical assets are not sales of securities—even when sold for investment purposes—if the seller undertakes no post-sale obligations to the buyer.   *See, e.g.*, *Am. Diamond Co.*, 1977 WL 10907, at *4-5 (SEC Aug. 15,

1977) (taking no action where seller intended to advertise "the value of diamonds as an investment," but had no contractual obligations to provide further services); *Future Sys. Inc.*, 1973 WL 9653, at *3 (SEC June 8, 1973) (taking no action on sales of silver where seller stored the silver but "would have no other relationship with the purchaser after the initial sale").  Even in *Howey*, the SEC's proffered definition of an "investment contract" required an ongoing "contractual arrangement."  Brief for the SEC at 9, 1946 WL 50582, *SEC v. W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), (describing the SEC's "definition of an 'investment contract' … as including any *contractual arrangement* for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters" (emphasis added)).

For many digital assets, a purchaser simply buys the asset and does with it what the purchaser chooses; the asset does not entail any ongoing contractual obligation on the part of the seller to the purchaser.  SEC officials have openly acknowledged that a digital asset "all by itself is not a security, just as the orange groves in *Howey* were not,"[19] and that many digital assets transferred on decentralized blockchains function more like a currency or commodity.[20]  They have also expressly recognized that the SEC could obtain power to regulate such assets only through legislative action that has not yet occurred.[21]  Proving the point, SEC Commissioner Peirce has noted that if the SEC "seriously grappled with the legal analysis and [its] statutory authority," it "would have to admit that [it] likely need[s] more, or at least more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to

---

[19] Hinman, *supra* note 2.

[20] *See id.*; *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) ("The SEC, for example, does not contend that Bitcoins transferred on the Bitcoin blockchain are securities.").

[21] *See Game Stopped?*, *supra* note 2, at 12.

register with us."[22]  SEC Chair Gensler likewise acknowledged in 2021 that "right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the [CFTC]," and noted that "it is only Congress that could really address" such regulatory gap.[23]

But although Congress has yet to fill that gap, Chair Gensler has inexplicably reversed his views, proclaiming that he now "feel[s] that we have enough authority … in this space" to require digital asset companies to register as national securities exchanges.[24]  According to the SEC's newly minted position, an "investment contract" need not involve a contract at all, let alone any post-sale obligation to develop the asset in a profitable way.  Instead, in the SEC's view, any asset that a buyer purchases with the *expectation* that its value will go up based on "the entrepreneurial or managerial efforts of others" is an "investment contract."  Compl. ¶18; *see* Pltf. SEC's Opp. to Defts.' Mot. for Summ. J. 11-23, *SEC v. Ripple Labs, Inc.*, No. 1:20-cv-10832 (S.D.N.Y. filed Oct. 21, 2022).

The SEC's view has no basis in law. Accepting the SEC's interpretation of "investment contract" would transform the digital asset industry, turning many users and networks into broker-dealers under the Exchange Act and subjecting them to net-capital requirements, SEC examinations, and more.[25]  Those demands would upend the industry, rendering thousands of transactions infeasible due to unworkable and ill-fitting disclosure requirements and transfer

---

[22] Hester M. Peirce, Comm'r, Secs. & Exch. Comm'n, Outdated: Remarks Before the Digital Assets at Duke Conference (Jan. 20, 2023), https://tinyurl.com/eh8cmtbk.

[23] *Game Stopped?*, *supra* note 2, at 12.

[24] *SEC Chair Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News (Dec. 7, 2022), https://tinyurl.com/5n9ytfys.

[25] Lewis R. Cohen, *Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens*, 65 Wayne L. Rev. 81, 96-97 & n.74 (2019).

restrictions.[26]  Not only that, but these various regulatory requirements could wipe out many new digital asset creators and prevent startups from entering the market altogether, thus suppressing competition and innovation in the United States.[27]  Practically, it would make little sense for the SEC to regulate products that serve no investment purpose.

The SEC's newfound claim to regulatory authority would threaten the United States' competitive advantage in the development of these innovative technologies.[28]  Indeed, the SEC's aggressive regulation through enforcement, in combination with the resulting regulatory uncertainty, has already driven some digital asset companies abroad, where the rules are clearer and they can more quickly develop and deploy their new products.[29]  Countries in Europe, the Middle East, and Asia are starting to lead the way in digital asset innovation and are attracting more and more of the industry,[30] with roughly 70% of digital asset developers now living outside

---

[26] *See* Matt Donovan, Ripple *Effect: The SEC's Major Questions Doctrine Problem*, 91 Fordham L. Rev. 2309, 2343 (2023); Rodrigo Seira et al., *SEC's Path to Registration*, Policy (Mar. 23, 2023), https://tinyurl.com/yyycdru7.

[27] Steven Lofchie, et al., *The Securities Law Treatment of Utility Tokens (or Why It Is Past Time for the SEC to Engage with the Hard Questions)*, FFRI Commentary, Jan. 11, 2022, at 7, *available at* https://tinyurl.com/yc8fvt5p.

[28] *See* Letter from Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (Apr. 18, 2022), https://tinyurl.com/3439e6p5; Letter from Jake Chervinsky, Head of Policy, Blockchain Association, and Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (June 13, 2022), https://tinyurl.com/5d96p4bx.

[29] *See, e.g.*, GAO, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets*, GAO-23-105346 (Washington, D.C.: June 2022); *A Review of the Fiscal Year 2024 Budget for the U.S. Securities and Exchange Commission: Hearing before the S. Subcomm. on Fin. Servs. & Gen. Gov't*, 118th Cong., at 1:38:00 (2023), https://tinyurl.com/3z6h3kxh; GAO, *Blockchain: Emerging Technology Offers Benefits for Some Applications but Faces Challenges*, GAO-22-104625 (Washington, D.C.: Mar. 23, 2022).

[30] Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (updated March 20, 2023), https://tinyurl.com/yxedxdyc.

the United States.[31]  In short, there should be no question that the SEC's attempt to regulate digital assets as securities would have a dramatic impact on a transformative industry that represents "a significant portion of the American economy."  *Brown & Williamson*, 529 U.S. at 123.

The SEC's attempt to rewrite the term "investment contract" to reach the digital asset industry is "not only unprecedented"; it also effects a "fundamental revision of the statute" that would work a "transformative expansion in [the SEC's] regulatory authority."  *West Virginia*, 142 S.Ct. at 2610, 2612.  It would turn not just the entire digital asset industry but also all manner of commodities and physical assets into securities.  A person who buys a Rolex watch may well expect to turn a profit based on Rolex's "entrepreneurial or managerial efforts," and an investor who buys a rare baseball card may likewise expect to sell that card at a profit based on "the entrepreneurial or managerial efforts" of The Topps Company to regulate the supply of a product that trades at many multiples of its release price.  The same is true for countless other assets whose value may depend in part on their creators' marketing efforts or control of supply.  Even when a buyer considers an asset purchase to be an investment, no ordinary English speaker would call such purchases "investment contracts."  But the necessary consequence of the SEC's position is that they are all unregistered securities transactions, and all of the secondary markets that facilitate them are unregistered securities exchanges.  That is plainly not the regime that Congress contemplated when it empowered the SEC to regulate "investment contracts" ninety years ago, or even the regime Congress is contemplating in its pending legislative proposals today.

The SEC's position is particularly untenable in light of Congress's "distinct regulatory scheme" for commodities.  *Brown & Williamson*, 529 U.S. at 159-60.  Congress gave the CFTC

---

[31] Linda Jeng, *Crypto Migration: European and Asian Regulators Welcome Crypto Innovation While U.S. Cracks Down* (April 7, 2023), https://tinyurl.com/47hr5eee.

"exclusive jurisdiction [over] transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2.  The purpose of this exclusive grant was to "separate the functions" of the CFTC from those of the SEC and other agencies.  *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 386 (1982).  That division reflects the vastly different regulatory regimes that govern the securities markets and the commodities markets.  The federal securities laws impose substantial disclosure requirements on issuers of securities to ensure that investors have access to sufficient information about the plans and qualifications of the managers who will operate the enterprise.  By contrast, there is no need for similar disclosure requirements in the commodities context, as a commodity purchase embodies no obligation on the seller's part to try to increase the commodity's value.  *See, e.g.*, *SEC v. Life Partners, Inc.*, 87 F.3d 536, 547 (D.C. Cir. 1996) ("[I]f neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.").  Stated otherwise, commodities are regulated differently from securities in large part because they generally are not subject to the same information asymmetry inherent in security investments, whereby a specific management team holds critical information about the enterprise that the public must be aware of to inform and facilitate price discovery.  Accordingly, the CFTC's authority over commodities is much more limited, allowing the agency to regulate only fraudulent and manipulative activities in the commodities spot markets.[32]  But under the SEC's interpretation of "investment contract," all kinds of commodities regulated by the CFTC would potentially be transformed into securities, subjecting market participants to an entirely different regulatory regime with countless inapposite disclosure obligations and other requirements.

---

[32] *See* Donovan, *supra* note 26, at 2323.

That the SEC has sought to claim this power in service of regulating the entire digital asset industry is particularly remarkable given that Congress has repeatedly refused to give the agency the very authority it now claims. How to regulate the digital asset industry is a matter of "earnest and profound debate." *Nebraska*, 143 S.Ct. at 2373-74. And far from being "unaware of the challenges" involved in regulating this novel industry, *id.* at 2373, Members of Congress have introduced dozens of bills related to digital asset regulation in recent years.[33] Notably, some of these bills would expressly clarify that the SEC *lacks* regulatory authority over digital assets.[34] Others would grant that authority to the CFTC.[35] None of the proposed or introduced bills— including legislation advanced last month from two House committees on a bipartisan basis[36]— contemplate vesting the SEC with sole regulatory authority, let alone sole regulatory authority over secondary market transactions. To be sure, some envision a role for both the SEC and the CFTC.[37] But all confirm the same core point: While Congress is actively wrestling with the complex how-and-who questions of the optimal regulatory approach for this significant new industry, it has thus far "conspicuously … declined" to grant the SEC the authority it claims. *West Virginia*, 142 S.Ct. at 2610. Unless and until it does so, the SEC has no power to "work around the legislative process to resolve for itself a question of great political significance." *Id.* at 2621 (Gorsuch, J., concurring).

---

[33] Jason Brett, *Congress Has Introduced 50 Digital Asset Bills Impacting Regulation, Blockchain, and CBDC Policy*, FORBES (May 19, 2022), https://tinyurl.com/4wzwwzre.

[34] *See, e.g.*, The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021), https://tinyurl.com/bezac866. (defining "digital token" under the Securities Act and excluding it from the definition of "security").

[35] *See supra* note 3 (citing proposed legislation).

[36] *See* Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023).

[37] Hannah Lang, *Crypto Bill Passes Congressional Committee in Victory for Industry*, Reuters (July 26, 2023), https://tinyurl.com/5hap4pzm.

The recent decision in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299 (S.D.N.Y. July 31, 2023), does not compel a different conclusion.  That decision declined to apply the major questions doctrine in evaluating whether the SEC could assert regulatory authority over certain digital assets, on the theory that the issues presented by regulation of the digital asset industry are not as "major" as those raised by regulation of "the American energy and tobacco industries—the subjects of *West Virginia* and *Brown & Williamson*."  *Id.* at *8.  That reasoning is both dubious and beside the point.  As already explained, the digital asset industry is valued at $1 *trillion*, and affects countless Americans across the country.  Indeed, about twice as many Americans have purchased a digital asset as currently smoke cigarettes.  *See supra* p.10 (more than 50 million Americans have purchased a digital asset); CDC, *Burden of Cigarette Use in the U.S.* https://tinyurl.com/u2yapahu (last visited Aug. 11, 2023) (about 28 million Americans currently smoke cigarettes).  In any event, the major questions doctrine does not turn on a slide-rule calculation of whether the industry at issue is bigger than the tobacco industry, and the Supreme Court has regularly applied that doctrine in cases with far less financial impact than the potential impact here.  *See, e.g.*, *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S.Ct. 2485, 2489 (2021) ($50 billion); *West Virginia*, 142 S. Ct. at 2622 ($200 billion); *Nebraska*, 143 S.Ct. at 2362 ($430 billion).  Put simply, the major questions doctrine "is not an on-off switch that flips when a critical mass of factors is present," or when an industry reaches a particular size; instead, it reflects "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude."  *Nebraska*, 143 S.Ct. at 2384 (Barrett, J., concurring).  *Terraform* simply ignored the many commonsense reasons why this is a major questions case, including the SEC's departure from the longstanding interpretation of "investment contract," Congress's repeated refusal to grant

the SEC the authority it seeks, and the tremendous and unilateral expansion of the SEC's regulatory authority that its interpretation would permit.

In sum, it is difficult to imagine a more compelling case for the application of the major questions doctrine.  The SEC is pressing a novel construction of its authority to assert breathtaking power over a trillion-dollar industry.  It has repeatedly disclaimed that authority in the past.  Congress is actively debating the issue and has thus far conspicuously declined to adopt the SEC's preferred approach.  As a result, the SEC is now trying to short-circuit the legislative process and seize the power to resolve for itself questions of massive economic and political importance.  Given "'the history and the breadth of the authority'" asserted by the SEC and the "'economic and political significance' of that assertion," this Court has every "'reason to hesitate before concluding that Congress' meant to confer such authority."  *West Virginia*, 142 S. Ct. at 2595 (quoting *Brown & Williamson*, 529 U.S. at 159-60).  The SEC's attempt to seize that expansive authority for itself without clear congressional authorization, and contrary to its own past representations about the scope of its powers, must be rejected.

## CONCLUSION

This Court should grant Coinbase's motion for judgment on the pleadings.

Respectfully submitted,

<u>s/C. Harker Rhodes IV</u>
Paul D. Clement
Erin E. Murphy
C. Harker Rhodes IV*
James Y. Xi*
Darina Merriam*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
harker.rhodes@clementmurphy.com
james.xi@clementrmurphy.com
darina.merriam@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia Bar

*Counsel for Amici*

August 11, 2023