**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                           Plaintiff,

         -against-

COINBASE, INC. AND COINBASE GLOBAL,
INC.,

                       Defendants.

23 Civ. 04738 (KPF)

Oral Argument Requested


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Patrick R. Costello
Peter A. Mancuso
Nicholas C. Margida
Ben N. Kuruvilla
Elizabeth Goody
Ladan F. Stewart
Jorge G. Tenreiro

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................................1

**BACKGROUND** ....................................................................................................................2

    A.    The Purpose of Registration ..............................................................................2

    B.    The SEC's Regulatory Activity in Crypto Asset Securities...............................3

    C.    Coinbase's Platform .........................................................................................4

**ARGUMENT** ........................................................................................................................6

    I.    THE COMPLAINT SUFFICIENTLY ALLEGES TRANSACTIONS IN
        SECURITIES ON COINBASE'S PLATFORM ............................................6

        A.    Statutory Foundation and the *Howey* Test........................................6

        B.    Investment Contracts Are Something Other than Stocks and Bonds.........7

        C.    A Predicate Formal Agreement Between the Seller and Purchaser of the Token Is
            Not a Required Element of an Investment Contract.........................................9

            1.    No Court Has Adopted a Formal Agreement Requirement...........................11

            2.    Crypto Asset Securities Cases Follow the Same Analysis ...............................12

            3.    Coinbase's Comparisons to Real Estate or Certain Tangible Items Is
                Misplaced........................................................................................14

        D.    An Investment Contract Does Not Require that an Investor Get a Share in the
            Income, Profits, or Assets of a Business........................................................16

        E    *Howey* Applies as Much to Secondary Market Trading as It Does to Primary
            Market Offerings ...........................................................................................17

    II.    THE MAJOR QUESTIONS DOCTRINE IS INAPPOSITE...........................................21

        A.    The Major Questions Doctrine Is Not Concerned with Agency Enforcement of
            Congressional Enactments...............................................................................21

        B.    Even If the Major Questions Doctrine Were Applicable in the Enforcement
            Context, the Circumstances Warranting Its Application Are Absent Here.................23

III.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT COINBASE
        CONDUCTS BROKERAGE ACTIVITY THROUGH ITS WALLET
        APPLICATION ....................................................................................................................26

IV.     THE COMPLAINT SUFFICIENTLY ALLEGES THAT COINBASE,
        THROUGH ITS STAKING PROGRAM, ENGAGES IN THE
        UNREGISTERED OFFER AND SALE OF SECURITIES ...........................................27

        A.    The Complaint Adequately Alleges an Investment of Money. .....................................28

        B.    The Complaint Adequately Alleges that Staking Investors Expect Reasonably To
              Profit Based on Coinbase's Managerial Efforts ...............................................................29

CONCLUSION ............................................................................................................................................30

# TABLE OF AUTHORITIES

*Alabama Assn. of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) .................................................................................................. 23

*Audet v. Fraser,*
    2022 WL 1912866 (D. Conn. June 3, 2022) ................................................................ 14

*Balestra v. ATBCOIN LLC,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) .................................................................. 12, 13, 17

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ......................................................................................... 21, 24, 25

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ......................................................................................................... 22

*De Luz Ranchos Inv. v. Coldwell Banker & Co.,*
    608 F.2d 1297 (9th Cir. 1979) ..................................................................................... 14

*Diskin v. Lomasney & Co.,*
    452 F.2d 871 (2d Cir. 1971) ......................................................................................... 11

*FTC v. Kochava Inc.,*
    2023 WL 3249809 (D. Idaho May 4, 2023) ................................................................ 22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985) ........................................................................... 7, 11, 18, 29

*Golden v. Garafalo,*
    678 F.2d 1139 (2d Cir. 1982) ......................................................................................... 8

*Harman v. Harper,*
    914 F.2d 262, 1990 WL 121073 (9th Cir. 1990)(table) ............................................... 14

*Int'l Bhd. of Teamsters v. Daniel,*
    439 U.S. 551 (1979) ................................................................................................. 11, 29

*Landreth Timber Co. v. Landreth,*
    471 U.S. 681 (1985) .................................................................................................. 8, 18

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ..................................................................................18

*Mass. Fin. Serv., Inc. v. Sec. Investor Prot. Corp.*,
    411 F. Supp. 411 (D. Mass. 1976) .......................................................................26

*McCown v. Heidler*,
    527 F.2d 204 (10th Cir. 1975).............................................................................12

*Revak v. SEC Realty, Corp.*,
    18 F.3d 81 (2d Cir. 1994) ............................................................................ 14, 28

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990).......................................................................................8, 25

*Rodriguez v. Banco Ctr. Corp.*,
    990 F.2d 7 (1st Cir. 1992).................................................................................14

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ..............................................................................30

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986)............................................................................16

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963).........................................................................................23

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)...................................................... 7, 8, 10, 11, 13, 23

*SEC v. Edwards*,
    540 U.S. 389 (2003)................................................................................. *Passim*

*SEC v. GEL Direct Tr.*,
    2023 WL 3166421 (S.D.N.Y. Apr. 28, 2023) .....................................................26

*SEC v. Glen-Arden Commod., Inc.*,
    493 F.2d 1027 (2d Cir. 1974) .......................................................................7, 11

*SEC v. Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020).............................................13, 14, 17, 28

*SEC v. Lauer*,
   52 F.3d 667 (7th Cir. 1995) ..........................................................................8, 9

*SEC v. LBRY, Inc.*,
   2022 WL 16744741 (D.N.H. Nov. 7, 2022) ...................................................... 15, 21

*SEC v. Life Partners*,
   87 F.3d 536 (D.C. Cir. 1996) ..........................................................................30

*SEC v. Martino*,
   255 F. Supp. 2d 268 (S.D.N.Y. 2003)..............................................................26

*SEC v. Mut. Ben. Corp.*,
   408 F.3d 737 (11th Cir. 2005)..........................................................................30

*SEC v. R.G. Reynolds Enters.*,
   952 F.2d 1125 (9th Cir. 1991)..........................................................................16

*SEC v. Ripple Labs Inc.*,
   2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................................11, 19, 20

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir 2003)..........................................................................29

*SEC v. Scoville*,
   913 F.3d 1204 (10th Cir. 2019)..........................................................................12

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001).................................................................12, 17, 25

*SEC v. Telegram Grp., Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)......................................................7, 13, 17

*SEC v. Terraform Labs Pte. Ltd.*,
   2023 WL 4858299 (S.D.N.Y. July 31, 2023) ...................12, 17, 18, 20, 22, 23, 24, 25

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)................................................................................... *Passim*

v

*Solis v. Latium Network, Inc.*,
  2018 WL 6445543 (D.N.J. Dec. 10, 2018) ...........................................................14

*State v. Gopher Tire & Rubber Co.*,
  177 N.W. 937 (Minn. 1920) .................................................................................11

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967).........................................................................................8, 13

*United States v. Freeman*,
  2023 WL 5391417 (D.N.H. Aug. 22, 2023) ........................................................22

*United Housing Found v. Forman*,
  421 U.S. 837 (1975)........................................................................................6, 15

*United States v. Leonard*,
  529 F.3d 83 (2nd Cir. 2008)...........................................................................7, 30

*United States v. Zaslavskiy*,
  2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)....................................................13

*Wals v. Fox Hills Dev. Corp.*,
  24 F.3d 1016 (7th Cir. 1994)...........................................................................8, 9

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022)..........................................................................21, 23, 24, 25

## CONSTITUTION

U.S. Const. art. II, § 3...........................................................................................22

## STATUTES

5 U.S.C. § 552b........................................................................................................4

15 U.S.C. § 77b(a)(1)...............................................................................................6

15 U.S.C. § 77e(a).................................................................................................18

15 U.S.C. § 77e(c).................................................................................................18

15 U.S.C. § 77w ............................................................................................................................5

15 U.S.C. § 78b ............................................................................................................................3

15 U.S.C. § 78b(3) ........................................................................................................................3

15 U.S.C. § 78c(a)(4)(A) ............................................................................................................26

15 U.S.C. § 78c(a)(10) ..................................................................................................................6

15 U.S.C. § 78e ...........................................................................................................................18

15 U.S.C. § 78o ............................................................................................................................3

15 U.S.C. § 78q-1 .........................................................................................................................3

15 U.S.C. § 78z ............................................................................................................................5

## RULES

17 C.F.R. § 200.10 .......................................................................................................................4

17 C.F.R. § 200.735-4(d)(2)(ii)(A) ..............................................................................................4

## OTHER AUTHORITY

*BitFunder,* Lit. Rel. No. 24078 (March 23, 2018) ........................................................................4

*Bitqyck*, Lit. Rel. No. 24582 (Aug. 29, 2019) ..............................................................................4

*EtherDelta*, Exchange Act Rel. No. 84553 (Nov. 8, 2018) ..........................................................4

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III,*
Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) ............................4

*Poloniex, LLC*, Exchange Act Rel.No. 92607 (Aug. 9, 2021) .....................................................4

*SEC v. Abramoff,* No. 20-cv-4190 (N.D. Cal. June 25, 2020) .....................................................4

*SEC v. Beaxy Digital, Ltd.,*
No. 23-cv-1962 (N.D. Ill. March 29, 2023) .............................................................................4

*SEC v. Bittrex, Inc.,*
    23-cv-580 (W.D. Wash. Apr. 17, 2023) ........................................................................4

*SEC v. Brown,*
    No. 21-cv-4791 (S.D.N.Y. May 28, 2021) ................................................................4

*SEC v. Chicago Crypto Capital, LLC,*
    No. 22-cv-4975 (N.D. Ill. Sept. 14, 2022) ................................................................4

*SEC v. ICOBox,*
    No. 19-cv-8066 (C.D. Cal. Sept. 19, 2019) ..............................................................4

*SEC v. The Hydrogen Technology Corp.,*
    No. 22-cv-8284 (S.D.N.Y. Sept. 29, 2022) ..............................................................4

Thomas Lee Hazen, *The Law of Securities Regulation* § 1.5 (1985) ..............................................15

Tr. in *SEC v. W.J. Howey*, No. 45-843 (U.S. 1945) ....................................................................16

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this brief in opposition to the motion for judgment on the pleadings (D.E. 36, "Motion") filed by Defendants Coinbase, Inc. and Coinbase Global, Inc. (collectively, "Coinbase").

## PRELIMINARY STATEMENT

This case turns on whether Coinbase intermediated transactions in "investment contracts" and whether customers on Coinbase's trading platform therefore were entitled to the protections afforded by the federal securities laws that require intermediaries of securities transactions to register with the SEC. As the Supreme Court held in the seminal decision *SEC v. W.J. Howey Co.*, an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99 (1946).

The transactions at issue in this case satisfy *Howey*'s "flexible" and "adapt[able]" test. *Id.* at 299. Each crypto asset issuer invited investors—including purchasers on Coinbase's platform—reasonably to expect the value of their investment to increase based on the issuer's broadly-disseminated plan to develop and maintain the asset's value (including through a secondary market for resale). That is the essence of an investment contract under *Howey*.

Ignoring all of this, Coinbase instead asks the Court to conclude that crypto asset transactions on its platform can *never* involve "investment contracts." According to Coinbase, investment contracts must include common law "contractual undertakings to deliver future value" or a "contractual right to the profits, income, or assets of a business," and—Coinbase says—transactions on its platform never involve such contracts. (Motion at 2, 6-7.) But *Howey* did not impose any such requirement. And Coinbase cannot cite any case that does. Courts sometimes consider the existence or absence of contractual undertakings as one of many factors in determining whether an investment contract exists. But no court ever has held a formal contract is a prerequisite.

By contrast, courts applying *Howey* have found that investors had a reasonable expectation of profits based on representations made outside of any formal contract, including where investors had no right to share in the profits of a business enterprise. And courts have recognized that Congress drafted the federal securities laws to reach investments "in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2003). Coinbase instead would have the federal securities laws turn on whether parties achieved contractual privity under state law. But Coinbase cannot offer any legal support—derived from the text of the federal securities laws or relevant case law—to apply anything other than *Howey*'s test to the transactions at issue here.

To distract from the fatal flaws in its legal arguments, Coinbase cries foul and seeks to blame the SEC for its current legal predicament. It contends the SEC blessed Coinbase's violative conduct when Coinbase went public, that SEC Chair Gary Gensler's answer to a question at a Congressional hearing (which Coinbase distorts) controls this Court's application of the federal securities laws, and that the SEC in any case lacks authority to regulate securities transactions that involve crypto assets. But this lawsuit cannot really come as a surprise to Coinbase. It has known all along that a crypto asset bought and sold on its trading platform is a security if it meets the *Howey* test—as it recognized on its website as far back as 2016 and in its filings with the SEC, as well as in its continued internal efforts to analyze assets it was considering listing on its platform using the *Howey* test.

Nor does the "major questions" doctrine require a different result. The SEC has not assumed for itself any new power to do what the federal securities laws do not already expressly authorize it to do. And Coinbase's arguments as to its "Wallet" and "staking" services similarly fail.

The Motion therefore should be denied in its entirety and this case should proceed.

## BACKGROUND

### A.    The Purpose of Registration

Congress emphasized in the Securities Exchange Act of 1934 ("Exchange Act") the "national

public interest" in the registration and regulation of certain participants in the securities markets—including exchanges, brokers, dealers, and clearing agencies—in order to "perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto … in order to … insure the maintenance of fair and honest markets." 15 U.S.C. § 78b.

With respect to exchanges, Congress found that "[f]requently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation." *Id.* at § 78b(3). Accordingly, persons that meet the definition of "exchange" must register with the SEC, so that the SEC can carry out its Congressionally-mandated oversight role over the national securities markets.

The regulatory regime applicable to brokers, dealers, and clearing agencies serves the same purposes. Registered brokers, dealers, and clearing agencies are subject to comprehensive regulation that includes recordkeeping and reporting obligations, SEC examination, and requirements aimed at addressing certain conflicts of interest. *Id.* §§ 78o, 78q-1. Moreover, as with exchanges, properly registered clearing agencies must enact a set of rules, subject to inspection and review by the SEC, to govern their and their members' conduct. (*See* Complaint, D.E. 1 ("Compl.") ¶¶ 17-43.)

## B.    The SEC's Regulatory Activity in Crypto Asset Securities

In July 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws." (Compl. ¶ 60.) It also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption," even "with respect to products and platforms involving emerging technologies and new investor interfaces." (*Id.* ¶ 61.) The DAO Report further found the trading platforms at issue

"provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act. (*Id.*)[1]

On May 6, 2021, SEC Chair Gensler testified before the House Financial Services Committee during a hearing about trading in GameStop securities.[2] With respect to the crypto asset market, he noted in response to a question: "I think that this market, which is close to $2 trillion … is one that could benefit from greater investor protection *within the SEC's current authorities, our authorities around securities*." (Hearing Transcript, at 11) (emphasis added). Chair Gensler also referred to the lack of a regulatory framework at the SEC and the CFTC, making clear that this related to bitcoin: "As I said earlier, I think crypto changes. *Particularly if one trades bitcoin in America today*, there is not an investor protection regime that really protects as I think would be appropriate around these exchanges." *Id.* at 42 (emphasis added). He added: "I think that *there is a lot of authority that the SEC currently has in the securities space*, and there are a number of cryptocurrencies that fall within that jurisdiction. But there are some areas, *particularly bitcoin trades* in large exchanges, where the public is not currently really protected on these crypto exchanges, *trading just bitcoin*." *Id.* at 44-45 (emphasis added).

C.    **Coinbase's Platform**

It was against this regulatory backdrop—which has supported the United States capital

---

[1] The SEC has brought a number of enforcement actions against unregistered crypto intermediaries. As to exchanges, *BitFunder*, Lit. Rel. No. 24078 (Mar. 23, 2018); *EtherDelta*, Exchange Act Rel. No. 84553 (Nov. 8, 2018); *Bitqyck*, Lit. Rel. No. 24582 (Aug. 29, 2019); *Poloniex, LLC*, Exchange Act Rel. No. 92607 (Aug. 9, 2021). As to brokers and dealers, *SEC v. ICOBox*, No. 19-cv-8066 (C.D. Cal. Sept. 19, 2019); *SEC v. Abramoff*, No. 20-cv-4190 (N.D. Cal. June 25, 2020); *SEC v. Brown*, No. 21-cv-4791 (S.D.N.Y. May 28, 2021); *SEC v. Chicago Crypto Capital, LLC*, No. 22-cv-4975 (N.D. Ill. Sept. 14, 2022); *SEC v. The Hydrogen Technology Corp.*, No. 22-cv-8284 (S.D.N.Y. Sept. 29, 2022). As to clearing agencies, *SEC v. Beaxy Digital*, No. 23-cv-1962 (N.D. Ill. Mar. 29, 2023); *SEC v. Bittrex, Inc.*, 23-cv-580 (W.D. Wash. Apr. 17, 2023).

[2] *See Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III,* Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gary Gensler, *available at* https://www.congress.gov/event/117th-congress/house-event/112590/text) ("Hearing Transcript"). Importantly, a single Commissioner's statements—even the Chair's—do *not* constitute the SEC's regulatory activity. *See* 17 C.F.R. § 200.10; 5 U.S.C. § 552b; *see also* 17 C.F.R. § 200.735-4(d)(2)(ii)(A).

markets for decades—that Coinbase developed and operated its trading platform. This platform operates in every critical way like exchanges for other types of securities. It establishes a market for crypto assets—which facilitates crypto asset issuers' capital raising efforts for their projects (to the extent Coinbase permits them to sell their assets on the platform, Compl. ¶ 65) and investors' passive investment in these projects. Coinbase accordingly acknowledged and publicly disclosed the risk that its unregistered intermediary services could involve crypto asset securities and that it might therefore be deemed an exchange, broker, and/or clearing agency (Compl. ¶ 112):

> Persons that effect transactions in crypto assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer." Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally subject to registration as national securities exchanges … [and] [p]ersons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency.[3]

This risk in fact materialized. As set forth with respect to 13 exemplar crypto assets in the detailed allegations of the Complaint (which must be taken as true and construed in the SEC's favor), crypto assets traded on the Coinbase platform continued to be promoted (by the issuers *and by Coinbase*) as investments—long after their first offers and sales and after they were made available on the platform. (Compl. ¶¶ 114-305.) Moreover, the issuers represented publicly that proceeds from token sales would be pooled and then used to develop the token's ecosystem and its secondary resale markets—thereby increasing the demand for and value of the assets. (*See*, *e.g.*, *id.* ¶¶ 134-35, 153, 156, 176, 221.) They also publicized their own extensive holdings (*id.*), leading reasonable investors to understand that the issuers had strong financial incentives to follow through on their promises and that all parties' financial fortunes were tied together. These representations—many of which were re-broadcast by Coinbase—led investors, including those on Coinbase's platform, to reasonably expect

---

[3] Coinbase lambasts the SEC for "allow[ing] Coinbase to go public in 2021." (*See* Motion, at 1). But "[n]either the fact that the registration statement for a security has been filed or is in effect nor the fact that a stop order is not in effect with respect thereto shall … be held to mean that the Commission has in any way passed upon the merits of, or given approval to, such security." 15 U.S.C. § 77w; *see also* 15 U.S.C. § 78z.

profits from the issuers' efforts. Why else would the issuers and Coinbase continue to tout these efforts long after the first offers and sales of the tokens?

**ARGUMENT**

## I. THE COMPLAINT SUFFICIENTLY ALLEGES TRANSACTIONS IN SECURITIES ON COINBASE'S PLATFORM

The question before the Court is whether Coinbase unlawfully acted as an unregistered exchange, broker, and clearing agency with respect to transactions in securities on its trading platform and through its "Prime" and "Wallet" applications. Coinbase admits it is not registered with the SEC in these capacities. (Answer ¶ 74.) And with the exception of the Wallet application, Coinbase does not here dispute it carried out the functions of exchange, broker, and clearing agency. Thus, the Motion hinges on whether Coinbase intermediated transactions involving investment contracts, and thus securities. It did.

### A. Statutory Foundation and the *Howey* Test

The Securities Act of 1933 ("Securities Act") governs primary offers and sales of securities, while the Exchange Act governs intermediaries and secondary markets (among other things). Both statutes include "investment contract" in their definition of "securities," along with traditional instruments like "stock" or "bond," and others which may be less familiar such as "collateral-trust certificate." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). As such, the same term, "investment contract," was included by the same Congress in two statutes, which together regulate *all* transactions in securities— both primary issuer distributions *and* secondary market transactions. *See Edwards*, 540 U.S. at 393. But nowhere do these definitions draw distinctions based on *where* or *how* the instruments trade. Instead, Congress "sought to define the term 'security' in sufficiently broad and general terms so as to include … the many types of instruments that in our commercial world fall within the ordinary concept of a security." *United Housing Found v. Forman*, 421 U.S. 837, 847-48 (1975).

As noted, *Howey* defines an investment contract as "a contract, transaction or scheme whereby

6

a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99.[4] In applying the *Howey* test, "form should be disregarded for substance and the emphasis should be on economic reality." *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (citation omitted).

In assessing economic realities, courts look at the totality of the circumstances surrounding the offer of an investment contract and what the offeror invites investors to reasonably understand and expect. *See id.* at 379. That necessarily involves examination of how the promoter marketed the investment. *See, e.g.*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (looking to "sales campaign" and "sales literature"); *Edwards*, 540 U.S. at 391 (beginning opinion with quote from marketing brochure); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 233, 240 (2d Cir. 1985) (relying on "implicit" promises); *SEC v. Glen-Arden Commod., Inc.*, 493 F.2d 1027, 1031, 1034 (2d Cir. 1974) (relying on "sales literature" and "canned sales pitch").

Accordingly, the existence of an investment contract has never turned on whether formal common law contractual undertakings exist, even if they may have been present in a particular case. *See infra* at Section I.C; *see also, e.g.*, *Leonard*, 529 F.3d at 85 ("[I]n applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions.").

## B. Investment Contracts Are Something Other than Stocks and Bonds

Coinbase tries to turn the unremarkable proposition that "investment contracts" share the "essential attributes" of other securities (Motion at 18-19 (collecting authorities)) into an argument that investment contracts must provide *identical* rights to stocks, notes, or bonds (which rights are typically conferred by operation of state law).

This argument is foreclosed by the statutory text and structure, and myriad cases construing

---

[4] The Second Circuit has held that the term "solely" in the "expectation of profits" element of the *Howey* test is not to be construed as a literal limitation. *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008).

them. True, terms like "stock" have "well settled meaning[s]," but both the Securities Act and the Exchange Act separately list both "stock" and "investment contracts" as types of securities. *Joiner*, 320 U.S. at 351. The Supreme Court thus held it would not, in construing the term "investment contract," "read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents." *Id.*; *Golden v. Garafalo*, 678 F.2d 1139, 1143-44 (2d Cir. 1982) ("investment contract" is a "catch-all phrase" that was "included [by Congress] to cover unique instruments not easily classified").

Following *Joiner*, the Supreme Court held in *Tcherepnin v. Knight* that "withdrawable capital shares"—which, unlike stocks, did not provide the right to inspect the books and records or rights of preemption—nevertheless were "investment contracts," holding those characteristics "do not, standing alone, govern whether a particular instrument is a security." 389 U.S. 332, 343-44 (1967). And in *Reves v. Ernst & Young*, the Court set forth three distinct tests to determine whether an instrument is a "stock," "note," or "investment contract." 494 U.S. 56, 61 (1990). The Court also has held that "applying the *Howey* test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985).

These cases make clear that "investment contracts" are something other than stocks, notes, or bonds. The term means what the Supreme Court has said it means—nothing more and nothing less. While stocks, notes, or bonds may impart some form of ownership interest, that another instrument might not is not dispositive of whether it is a security. "Investment contract" captures something other than notions of equity ownership and encompasses the variable transactions that, like any security, result in an investor parting with capital on the expectation of profit.

Ignoring these principles, Coinbase cites *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994), and *SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995), for the notion that an investment contract must

have the "essential properties of a debt or equity security." (Motion at 18.) But neither Coinbase nor *amici* attempt to define what those "essential" properties might be. Coinbase mischaracterizes *Edwards* as having found a note or a so-called "debt contract" (*id.* at 18) because investors received a fixed return, but *Edwards* did not even involve notes; rather, it involved an investment contract, and it explicitly distinguished the test for whether something is a "note." 540 U.S. at 396. *Edwards* did not announce or adopt an "essential properties" test—it applied *Howey*.

Nor do *Wals* or *Lauer* support the notion that an investment contract must involve a "contractual undertaking" or "profit sharing." Instead, *Wals* held that if a plaintiff "bought and then rented a home," it did not buy an investment contract. 24 F.3d at 1019. It also recognized that in a different situation, where large amounts of indistinguishable assets marketed for investment and as fungible were sold "on a large scale to unsophisticated investors"—as is the case here—an investment contract could be present, without requiring any ongoing obligations or rights to proceeds from a business. *See id.* And *Lauer* supports the SEC's position that it is the "representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract." 52 F.3d at 670. *Lauer* found that an investment contract "is *not* a conventional security like a bond or a share," but *may* be treated as such if it involves "an undivided, passive (that is, not managed by the investor) financial interest in a pool of assets," because that gives the investment contract the "essential properties" of a conventional security. *Id.* (emphasis added). But *Lauer* nowhere *required* that an investment contract involve such a financial interest.[5]

### C.   A Predicate Formal Agreement Between the Seller and Purchaser of the Token Is Not a Required Element of an Investment Contract

Coinbase argues that resales of crypto assets can never involve investment contracts because

---

[5] Stocks do confer certain rights on their holders, such as the right to vote and inspect books and records, by operation of state law. But for crypto assets, whatever rights they confer—typically the right to interact with a blockchain, suite of products, software protocol, or ecosystem—are inherent in the code itself rather than the product of state law.

an investment contract *requires* a "contractual undertaking." Coinbase reasons that because the transfer of a crypto asset from one investor to another on its platform does not involve the transfer of any such undertaking, no sale of an investment contract can take place. But this argument ignores what *Howey* and its progeny actually *hold* and instead tries to focus myopically on the specific *facts* at issue in *Howey* and cases before it.

In *Howey*, all investors purchased tracts of orange groves pursuant to land sale agreements, and all were offered, but only a certain percentage entered into, a separate service contract whereby the defendants committed under state law to undertake efforts to cultivate the land for the investors' benefit. 328 U.S. at 296-99. But the Supreme Court noted the lower courts' error in "treat[ing] the contracts and deeds as separate transactions involving no more than an ordinary real estate sale and an agreement by the seller to manage the property for the buyer." 328 U.S. at 297-98. The Court went on to explain that the written contracts only "evidenced" the relationships, and the legal transfer of rights was "purely incidental." *Id.* at 300; *see also id.* ("The investment contracts *in this instance take the form of* land sales contracts, warranty deeds and service contracts.") (emphasis added). In other words, these formalities were present but were not dispositive to the existence of an investment contract. Although the defendant in *Howey chose* to legally bind itself to purchasers in the form of certain service undertakings, those contracts did not determine the substance of the transactions. Indeed, the Court underscored that it was "*immaterial* whether the shares in the enterprise *are evidenced by formal certificates* or by nominal interests in the physical assets employed in the enterprise." *Id.* at 299 (emphasis added).

This formulation is consistent with the Supreme Court's decision in *Joiner* on this very point. The Court held there that the sale of oil leasehold interests gave rise to investment contracts based on the promoter's stated intent to drill an exploratory oil well, which appeared only in sales literature and not in the actual leasehold assignments. 320 U.S. at 346-48. *Joiner* thus looked to these representations to determine whether, given the factual setting as a whole, an investment contract existed,

10

emphasizing: "the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348. Critically, as Coinbase acknowledges, the Court also found it "unnecessary to determine" whether the purchaser had also acquired "a legal right to compel" the promoter to undertake efforts under state law. *Id.* at 349. Coinbase's and *amici*'s insistence that no investment contract can exist here—because investors on the Coinbase platform simply buy an asset without any state law remedies to compel managerial efforts—is directly foreclosed by *Joiner.*[6]

Under *Howey*, what matters is not any predicate formal agreement between an offeror and offeree, but rather the totality of circumstances—the economic reality—surrounding the offer and sale of an asset, including promises and undertakings in whatever form or manner those may take. *That* is the investment contract.[7]

### 1. No Court Has Adopted a Formal Agreement Requirement

Courts, including the Second Circuit, have consistently applied the correct formulation of *Howey* without analyzing—let alone requiring—any "contractually-grounded undertakings." For example, *Gary Plastic* found an investment contract based in part on Merrill Lynch's statement in an "Information Bulletin" that it "fully intends to maintain a secondary market for its customers which would enable them to sell" the instruments they were buying from Merrill Lynch, and on its "*implicit* promise to maintain its marketing efforts" with respect to the instruments. 756 F.2d at 233, 240 (emphasis added); *see also Glen-Arden*, 493 F.2d at 1034 (focusing on "[t]he economic inducements

---

[6] Attempts (*e.g.*, Motion at 6-8; D.E. 59 at 3-12) to resurrect the common law are fundamentally inconsistent with the federal securities laws. *See, e.g., Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (the definition of "offer" under the Securities Act "goes well beyond the common law"). Even the case Coinbase cites rejects this argument. *SEC v. Ripple Labs Inc.*, 2023 WL 4507900, at *6 (S.D.N.Y. July 13, 2023). In any event, the facts of those cases vary significantly, and at most, they demonstrate that state courts applied "investment contracts" to the "variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the effort of [others]." *Howey*, 328 U.S. at 299; *see also State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920).

[7] Coinbase cites to the SEC's brief in *Howey* in which the SEC proposed a definition of "investment contract" as "*including* any *contractual* arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters." (Motion at 8-9, second emphasis in Motion). Yes, the SEC argued in *Howey*, in *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979), and in *Edwards*, that an "investment contract" *can* include a "contractual arrangement." But that does not mean one is *required*.

[which] were in the nature of inducements to invest"); *McCown v. Heidler*, 527 F.2d 204, 207-09 (10th Cir. 1975) (promoter's promise to engage in profit-increasing efforts is a "contractual promise").

Similarly, the First Circuit in *SEC v. SG Ltd.* found an investment contract based solely on representations on the promoter's website, without a common law written agreement binding the promoter to undertake efforts. 265 F.3d 42, 49-55 (1st Cir. 2001). The court made that determination despite the district judge's finding that the investors' payments to defendant were part of a "[video] game lacking a business context" that "was not part of the commercial world." *Id.* at 46, 47. The Tenth Circuit took the same approach in *SEC v. Scoville*, where the court had little trouble finding the offerees' only expectation of profits came from "the representations made to them" on the websites. 913 F.3d 1204, 1221-22 (10th Cir. 2019). The court made this determination without discussing any written agreement, while noting there was no contract governing how investors would be repaid. *Id.* at 1210.

### 2. Crypto Asset Securities Cases Follow the Same Analysis

The *Howey* test was artfully crafted to be fit for purpose and evergreen—*i.e.*, to encompass any number of developments, including technological ones such as crypto assets. *See Edwards*, 540 U.S. at 393 (test can adapt to all "schemes devised by those who seek the use of the money of others on the promise of profits" (quoting *Howey*, 328 U.S. at 299)). For this reason, courts have declined invitations by defendants in the crypto asset space to apply a test other than *Howey*'s, and not one has taken up the repeated attempts to insert the "contractually-grounded" requirement into the analysis.

Most recently, Judge Rakoff held in *SEC v. Terraform Labs Pte. Ltd.* that "[b]y stating that 'transaction[s]' and 'scheme[s]'—and not just 'contract[s]'—qualify as investment contracts, the Supreme Court made clear in *Howey* that Congress did not intend the term to apply only where transacting parties had drawn up a technically valid written or oral contract under state law." 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023) (internal citations omitted).

In *Balestra v. ATBCOIN LLC*, Judge Broderick similarly found an investment contract despite

the absence of a common law contract obligating the issuer to undertake efforts or any entitlement of investors to share in the issuer's profits. 380 F. Supp. 3d 340, 354, 357 (S.D.N.Y. 2019) ("ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction. However, such a formalized profit-sharing mechanism is not required.") (citations omitted). Instead of a contract, the court held investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website. *Id.* at 355.

Judge Castel reached the same result in *Telegram*, which involved a single, two-stage offering. The first phase was pursuant to contracts to sell the tokens to sophisticated investors who were "statutory underwriters." 448 F. Supp. 3d at 358-59, 380-81. In the second phase, these investors would sell the tokens into the secondary market. *Id.* at 358-59. This "unload[ing]" of tokens was not pursuant to any written contract. Despite this, the court concluded: "the intended and expected resale of [the tokens] into a public market [amounts] to the distribution of securities." *Id.* at 381.

*SEC v. Kik Interactive, Inc.* likewise involved an offering consisting of an initial private sale to "sophisticated participants" and a general distribution to 10,000 public investors. 492 F. Supp. 3d 169, 174-76 (S.D.N.Y. 2020). While the private sales were governed by written agreements that acknowledged the investments were "securities," the only documentation for the public sales was a "Terms of Use Agreement" which "constitut[ed] the entire agreement between the purchaser and Kik" and through which Kik "expressly disclaimed any ongoing obligation" to the public investors after they purchased the tokens. *Id.* at 175, 178. In holding the entire offering violated Section 5 of the Securities Act, Judge Hellerstein rejected an "ongoing contractual obligation" requirement, observing: "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract." *Id.* at 178 (citing *Joiner*, 320 U.S. at 352-55, and *Tcherepnin*, 389 U.S. at 336).

Outside this District, the court in *United States v. Zaslavskiy* found the indictment sufficiently

alleged the existence of investment contracts based on marketing in online advertising and websites, even though it did not allege investors entered into formal contracts. 2018 WL 4346339, at *2, 4-7 (E.D.N.Y. Sept. 11, 2018). Similarly, the court in *Audet v. Fraser* reversed a jury's defense verdict and held a token that "traded on public exchanges" was an investment contract, without requiring any common law contract between investors and the issuer. 2022 WL 1912866, at *9, 15-18 (D. Conn. June 3, 2022). As for investors' expectation of profits, they were premised not on contractual obligations, but instead on the issuer's "promotional materials," "press release[s]," and "graphic[s] on its website." *Id.* at *16; *see also Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (finding securities in "general sale" of crypto asset tokens and focusing on representations in "promotional materials, advertising methods, and public statements").

       3.      <u>Coinbase's Comparisons to Real Estate or Certain Tangible Items Is Misplaced</u>

Coinbase's reliance on cases involving real estate transactions (Motion at 9-10) is equally unavailing. In the words of the Ninth Circuit, "simple transactions in real estate, without more, generally do not satisfy the *Howey* criteria." *Harman v. Harper*, 914 F.2d 262, 1990 WL 121073, at *6 (9th Cir. 1990) (table). Indeed, as the *Kik* court explained, real estate has "inherent value," whereas a crypto token "will generate no profit absent an ecosystem that drives demand," 492 F. Supp. 3d at 180—which is precisely what the issuers and promoters of the subject tokens in this case promised to design and build. *Howey*'s focus on economic reality undermines any attempt to equate (i) the sale of unique real properties with inherent value and utility to discrete groups of buyers, and (ii) capital raises of billions of dollars on Coinbase's platform by issuers and promoters offering and selling fungible assets with no inherent value to an unlimited number of public buyers.[8]

---

[8] The cases Coinbase cites undermine its argument because each looks to extra-contractual representations. *Revak v. SEC Realty, Corp.* considered representations made to investors in an "offering plan" separate from the deed of trust conveying title to the condominium. 18 F.3d 81, 88 (2d Cir. 1994). *De Luz Ranchos Inv. v. Coldwell Banker & Co.* noted it was a "close question" whether the seller had sold investment contracts based upon extra-contractual promises to develop common facilities areas, but ultimately held it had not. 608 F.2d 1297, 1301 (9th Cir. 1979). And *Rodriguez v. Banco Ctr. Corp.* held there was no investment contract because a sale of land was coupled only with "suggestions that the surrounding area

More generally, the thread connecting Coinbase's defense—that it merely facilitates "simple asset sale[s]" and transactions in "something one hopes will increase in value (like a collectible)," (Motion at 14, 18)—is nonsensical. First, Coinbase does not treat the assets it lists on its platform like oranges or baseball cards. (*See id.* at 7.) Instead, Coinbase treats them as investments and touts the expectation of profit associated with the assets. *See infra* at Section I.E.

Moreover, any suggestion that the potential utility of some of the assets somehow changes the analysis is wrong. The investment contracts in *Howey* involved the sale of an asset—orange groves. Other tangible assets sold as part of investment contracts include beavers, whiskey caskets, and chinchillas—assets with inherent value. *See* Thomas Lee Hazen, *The Law of Securities Regulation* § 1.5, at 14 (1985). Crypto assets are unlike the tangible assets sold in those cases. If crypto assets embody some underlying value (like an entry on a ledger), that value is accessed through the digital token. But the token (which is just software) has no innate or inherent value of its own—it is tied to its underlying value, which for the crypto assets at issue in this case, is the investment contract. Without the access to a service or the intellectual property those crypto assets signify, they would be worthless. After all, investors are not purchasing those assets to own a digital sequence of letters and numbers.

Finally, Coinbase does not argue—nor could it—that its sales of crypto assets satisfy the *Forman* test for distinguishing between sales of assets for consumptive use and sales of securities. 421 U.S. at 847-48. And "[n]othing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract" or that a token was not offered "as a security simply because some … purchases were made with consumptive intent." *SEC* v. *LBRY, Inc.*, 2022 WL 16744741, at *7 (D.N.H. Nov. 7, 2022). Here, the crypto assets at issue were marketed for

---

would develop" on its own, but noted the outcome would have been different had defendants in their extra-contractual representations "promised … to develop the community themselves." 990 F.2d 7, 11 (1st Cir. 1992).

investment purposes, including by Coinbase, and sold in amounts wholly unrelated to what a purchaser may reasonably be expected to "consume." (*See*, *e.g.*, Compl. ¶¶ 139, 145, 160, 212, 226, 242-43, 255.) This is what distinguishes an ordinary "sale-of-goods contract in which the buyer pays in advance" highlighted in *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986), on which Coinbase relies (Motion, at 15).[9] Coinbase's reductive statement that sales of crypto assets on its platform is akin to the sale of collectible baseball cards flies in the face of reality.

### D. An Investment Contract Does Not Require that an Investor Get a Share in the Income, Profits, or Assets of a Business

Coinbase also contends that for an investment contract to exist, the offeree must acquire a share in the income, profits, or assets of a business. (Motion at 18-21.) As with Coinbase's argument about the predicate formal agreement, this additional "requirement" also should be rejected.

Neither *Howey* nor its progeny have ever held that profits to be expected in the common enterprise are limited just to shares in the income, profits, or assets of a business. Quite the opposite. Indeed, in *Howey*, investors' profits did not come from any dividends or earnings of the corporations that sold the investment contracts (which had their own shareholders), but from the later sales of the oranges the corporations harvested and sold. *See* Declaration of Patrick R. Costello, at Ex. A (Tr. in *SEC v. W.J. Howey Co.*, No. 45-843, at 20-28 (U.S. 1945)). In other words, the profits derived from the sale of a consumable asset (oranges) to those who wanted to consume the oranges. *See also Howey*, 328 U.S. at 296 (noting the "company [was] accountable only for an allocation of the net profits based upon a check made at the time of picking").

This is precisely the distinction the Supreme Court also later made in *Edwards*: "Thus, when we held that 'profits' must 'come solely from the efforts of others,' we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used

---

[9] The Ninth Circuit later qualified *Belmont* by differentiating assets obtained for personal consumption and those acquired for investment purposes. *See SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1135 n.13 (9th Cir. 1991).

'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment*." *Edwards*, 540 U.S. at 394 (emphasis added); *see also SG Ltd.*, 265 F.3d at 46-47, 51 (common enterprise established where "each investor was entitled to receive returns directly proportionate to his or her investment stake" as an "increase in the value of the investment"); *Terraform*, 2023 WL 4858299, at *13 (allegations that issuer "used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves" sufficient for "pooling"); *Balestra*, 380 F. Supp. 3d at 354 ("formalized profit-sharing mechanism," such as rights to *pro rata* distributions, "is not required"); *Kik*, 492 F. Supp. 3d at 178 ("rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of [the asset]"); *Telegram*, 448 F. Supp. 3d at 369 (common enterprise established by pooling and because all buyers "would be equally affected" by token's price changes).[10]

### E.    *Howey* Applies as Much to Secondary Market Trading as It Does to Primary Market Offerings

At bottom, Coinbase is asking the Court to conclude that crypto asset sales on secondary market platforms *are never* investment contract sales. That extreme position, which rests on the artificial requirements that Coinbase seeks to persuade the Court to impose, is both unsupported and nonsensical. Under Coinbase's theory, an issuer could offer and sell a token as an investment contract directly to an investor. Then, on the very same day, with absolutely nothing changing in terms of whether investors reasonably would expect profits based on the efforts of the issuer, that investor

---

[10] Courts in the Second Circuit find a "common enterprise" either by (i) horizontal commonality, when "investors' assets are pooled and the fortune of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise"; or (ii) strict vertical commonality, when the fortunes of the investors are tied to the fortunes of the promoter. *Telegram*, 448 F. Supp. 3d at 369. Here, the SEC has pleaded facts showing how proceeds from the crypto asset sales would be pooled (*see, e.g.*, Compl. ¶¶ 133-34, 145, 153, 159, 169, 173, 184, 195, 197, 208, 209, 217, 237, 251, 262, 264, 276, 287, 296, 298), and has alleged the alignment of mutual fortunes between the issuers and investors in the ongoing enterprises (*see, e.g.*, *id.* ¶¶ 156, 221, 222, 240, 252, 263, 275, 286).

could turn around and resell the token on Coinbase's platform and that transaction would somehow not be the sale of an investment contract. This is not—and cannot be—the law. An investment contract does not simply vanish as soon as it is sold on Coinbase's platform, nor does the economic reality that makes it an investment contract somehow automatically disappear.[11]

As noted, Congress used the same term—"investment contract"—to define "security" regardless of whether someone "sell[s]" or "offer[s] to sell" the instrument, 15 U.S.C. § 77e(a), (c), or whether they "effect any transaction" utilizing the facility of an "exchange." *Id.* § 78e. There is nothing in the statutory language that suggests the nature of the instrument changes based on the medium of the transaction. To the contrary, "the definitions of 'security' in [the Securities Act and the Exchange Act] are virtually identical and [are] treated as such." *Landreth*, 471 U.S. at 687 n.1; *see also Gary Plastic*, 756 F.2d at 240-43 (determining whether something was a "security" and then remanding to determine whether Exchange Act antifraud provisions were violated). There is, accordingly, no reason to apply anything other than *Howey*'s test to *both* primary offerings and transactions on the secondary market.

Nor is there any logic to the distinction Coinbase attempts to draw between reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market, as Judge Rakoff recently noted. *See Terraform*, 2023 WL 4858299, at *15. An investor selecting an investment opportunity is attracted by the representations the promoter makes about the promoter's efforts. And contrary to Coinbase's contentions, reasonable investors who consider buying from an existing investor look to the efforts and commitment of the issuer in evaluating the prospect of investment profits before parting with their money. *See Gary Plastic*, 756 F.2d at 240 (*Howey*'s third prong is satisfied because "the investor relies on Merrill Lynch's implicit promise to maintain its

---

[11] Even accepting Coinbase's argument that secondary market transactions do not, as a matter of law, implicate the securities laws, the Complaint contains well-pleaded allegations that Coinbase allows issuers to offer tokens for *primary* sale on Coinbase's platform. (*See* Compl. ¶ 65.) While Coinbase denies this (Motion at 17 n.13; Answer at ¶ 65), the SEC's allegations are sufficient to defeat a Rule 12(c) motion. *See Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

marketing efforts. The success of the secondary market … hinge[s] on Merrill Lynch's success in finding new buyers").

Here, the Complaint demonstrates how the expectation of profits generated from the efforts of others continued to be communicated to investors trading in the secondary market. These representations were not only made by the token issuers and promoters but also amplified by Coinbase itself. For instance, Coinbase invites issuers to list their crypto assets on its trading platform through the "Asset Hub" feature of its website "[w]here asset issuers list, launch, and grow … [their] asset across Coinbase products." (Compl. ¶¶ 65, 80.) Every crypto asset has an "informal asset page[]" on Coinbase's website that contains links to the asset's website and whitepaper as well as information regarding the persons who "developed," "launched," or "created" the token and a compendium of public statements made by them about the token. (*Id.* ¶¶ 77, 121.) And Coinbase's website features whitepapers and other information containing many of the promises of continued efforts that lead a secondary market investor reasonably to expect to earn a profit. (*See, e.g., id.* ¶¶ 139, 212, 226, 242.)

Beyond information disseminated through Coinbase's website, issuers of these crypto assets represented publicly that they would continue their efforts to improve the value of the investments, even after the tokens were made available for trading on the secondary market. (*See, e.g., id.* ¶¶ 145, 160, 243, 255). These promises further stoked investors' expectations—whether the particular token they bought came from the issuer's stash or from another investor in the secondary market.

Coinbase relies on Judge Torres's recent holding that sales by Ripple of its XRP token to retail investors through crypto asset trading platforms were not sales of investment contracts because these transactions were "blind bid/ask transactions." *Ripple*, 2023 WL 4507900, at *11. But Judge Torres explicitly declined to rule on whether secondary market resales of tokens constituted investment contract transactions. *See id.* at *6, *11 n.16. To the extent *Ripple*'s gloss on the *Howey* test with respect to primary sales by the issuer is correct (it is not) or also applies to resales, the Complaint contains

more than sufficient factual allegations from which to reasonably infer that purchasers of tokens on Coinbase's platform *were* aware of the token issuers' existence, given that Coinbase directed investors to those issuers for more information about the tokens. (*E.g.*, Compl. ¶¶ 65, 80.)

To the extent *Ripple requires* contractual privity to find an investment contract or turns on the *manner* of sale, that part of its reasoning was rejected by Judge Rakoff in *Terraform* and this Court should likewise reject it. 2023 WL 4858299, at *15 ("declin[ing] to draw a distinction between [the crypto assets at issue] based on their manner of sale" because "*Howey* makes no such distinction between purchasers. And it makes good sense that it did not. That a purchaser bought the coins directly from the defendants or, instead, in a secondary re-sale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts").

In an attempt to distinguish the reasoning in *LBRY*, Coinbase observes the case explicitly refused to decide whether secondary market trading implicated *Howey*. (Motion, at 17.) True—both *LBRY* and *Ripple* explicitly refused to reach resales of investment contracts. But the court's reasoning in *LBRY* nevertheless is instructive insofar as it (like *Terraform*, *Kik*, and *Telegram*, but unlike *Ripple*), drew no distinction between investors based on the manner in which they acquired their tokens. There, 44.1 million tokens were sold on secondary trading platforms, while nearly 10 million were sold directly to investors by the issuer. 2022 WL 16744741, at *2. In finding an investment contract existed, the court emphasized two aspects of the transactions that were equally true for both sets of investors. First, the issuer marketed the token to the public as a profitable investment. *Id.* at *5 ("[T]he SEC is correct that potential investors would understand that LBRY was pitching a speculative value proposition for its digital token."). Second, those profits derived from the efforts of the issuer's management team. *Id.* at *6 ("LBRY also signaled that it was motivated to work tirelessly to improve

the value of its blockchain for itself and any LBC purchasers."). As such, *every* investor's expectation of profits was based on the efforts of the issuer, regardless of how that investor acquired her tokens.

Ultimately, whether the offer or sale of an asset involves an investment contract does not turn on whether an issuer is speaking to the public in the context of a primary offering or in a secondary market transaction. Instead, the focus is on what representations and inducements are made to the investing public, and what the economic realities are. If these are the same regardless of whether the sale occurs through a primary offering or in the secondary market, then it follows that their treatment under the federal securities laws ought to be the same, too.

## II.     THE MAJOR QUESTIONS DOCTRINE IS INAPPOSITE

### A.     The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments

In invoking the major questions doctrine, Coinbase fundamentally misapprehends the doctrine's purpose and reach. The doctrine is rooted in "both separation of powers principles and a practical understanding of legislative intent." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). It is premised on the notion that "one branch of government" should not "arrogat[e] to itself power belonging to another" (*Biden v. Nebraska*, 143 S. Ct. 2375, 2373 (2023)), and the "presum[ption] that Congress intends to make major policy decisions itself" (*West Virginia*, 142 S. Ct. at 2609 (cleaned up)). Focused on preventing "the Executive seizing the power of the Legislature" (*Nebraska*, 143 S. Ct. at 2373), the doctrine constrains agencies' "regulatory assertions" of "highly consequential power beyond what Congress could reasonably be understood to have granted" (*West Virginia*, 142 S. Ct. at 2609, 2621 (cleaned up)), such as the adoption of an entirely new "regulatory scheme" (*id.* at 2616), or the enactment of a new regulatory "program" (*Nebraska*, 143 S. Ct. at 2369).

Coinbase cites no support for extending the major questions doctrine to an agency's exercise of statutory enforcement authority; indeed, courts have rightly rejected that argument. *See, e.g.*, *FTC v.*

*Kochava Inc.*, 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) ("[T]he FTC is not flexing its regulatory muscles—it is merely asking a court to interpret and apply a statute enacted by Congress. Accordingly, [the major questions] doctrine … is inapplicable."); *United States v. Freeman*, 2023 WL 5391417, at *8 (D.N.H. Aug. 22, 2023) (rejecting major questions doctrine in statutory enforcement action).

Yet that is precisely what is at issue in this case. In filing this action, the SEC is exercising the power to "take Care that the Laws be faithfully executed" that the Constitution vests in the Executive Branch. U.S. Const. art. II, § 3. "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts" the "'take Care'" "responsibility." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam) (citation omitted).

Coinbase thus has it backwards when it argues (Motion at 24) that "[t]he notion that an agency deserves *greater* deference for assuming power peremptorily, while refusing to follow the regulatory process, does even further violence to the separation of powers." Tellingly, Coinbase fails to provide any support for this assertion or to explain why a doctrine intended to protect Congressional authority to make major policy decisions would be served by precluding the SEC from enforcing the Congressional policy choices embodied in the securities laws. As Judge Rakoff reasoned in rejecting application of the major questions doctrine in an SEC crypto enforcement action, "[d]efendants cannot wield a doctrine intended to be applied in exceptional circumstances as a tool to disrupt the routine work that Congress expected the SEC … to perform." *Terraform*, 2023 WL 4858299, at *9.

Instead of focusing on what Congress has done, Coinbase and *amici* point to laws Congress has not enacted. (Motion at 24.) But the conclusion that the SEC cannot enforce existing statutes in light of proposed legislation finds no support in the Supreme Court's major questions doctrine cases or otherwise. Congress created the SEC to administer and enforce the securities laws, which were designed to "eliminate … abuses which were found to have contributed to the stock market crash of 1929" by adopting a "philosophy of full disclosure" to "achieve a high standard of business ethics in

the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963); *see also Terraform*, 2023 WL 4858299, at *9 ("the SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosure to investors"). Since its creation, the SEC has exercised its Congressionally bestowed enforcement authority with respect to a wide variety of securities. *See, e.g., Edwards*, 540 U.S. at 389; *Joiner*, 320 U.S. at 344. Congress does not alter the SEC's mandate to enforce existing law by considering possible new legislation.[12]

### B.     Even If the Major Questions Doctrine Were Applicable in the Enforcement Context, the Circumstances Warranting Its Application Are Absent Here

The Supreme Court has indicated the major questions doctrine applies to "agencies' assert[ions] of highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. The Court's concerns are simply not present here.

First, this civil enforcement action does not have the vast economic or political significance the Supreme Court has noted when it applies the major questions doctrine. In *Alabama Assn. of Realtors v. HHS*, for example, the Court emphasized that the challenged CDC eviction moratorium would govern 80 percent of the country. 141 S. Ct. 2485, 2489 (2021). And in *West Virginia*, the Court described the EPA rule at issue as one that would have "force[d] a nationwide transition away from the use of coal to generate electricity," allowing the EPA "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." 142 S. Ct. at 2610, 2616 (cleaned up).

Coinbase's and *amici's* argument that the current size of the "digital asset industry" gives this lawsuit comparable economic and political significance fails for several reasons. One, in this enforcement action, the SEC is not exercising authority over the entire "digital asset industry." Rather, this action covers only Coinbase's conduct as an intermediary of crypto assets, and a "determination

---

[12] Indeed, if the SEC were to refrain from enforcing the laws as written based upon proposed legislation, the same critics would say the SEC is improperly deciding what the law should be. Until the law changes, the SEC must enforce the law as it is. To suggest otherwise would allow agencies to arrogate to themselves the power held by Congress.

that certain of such assets are securities hardly amounts to a 'transformative expansion of [the Commission's] authority.'" *Terraform*, 2023 WL 4858299, at *8 (quoting *West Virginia*, 142 S. Ct. at 2610). And even accepting Coinbase's estimate of its size, the "digital asset industry" "falls far short of being a portion of the American economy bearing vast economic and political significance." *Id.* at *8 (cleaned up). "[I]t would ignore reality to place the crypto-currency industry and the American energy and tobacco industries … on the same plane of importance." *Id.*[13]

Second, it is simply not the case that this enforcement action is an exercise of authority beyond what Congress could reasonably be seen to have granted to the SEC—in sharp contrast to cases in which the Supreme Court has applied the major questions doctrine. In explaining why the EPA regulatory scheme challenged in *West Virginia* was an unanticipated exercise of authority, the Court observed that the EPA had "located that newfound power in the vague language in an ancillary provision" of the Clean Air Act which "was designed to function as a gap filler and had rarely been used in the preceding decades." 142 S. Ct. at 2610 (cleaned up).

Similarly, in *Nebraska*, the Court found it unlikely that by giving the Secretary of Education discretion to modify or waive statutory and regulatory student loan provisions, Congress authorized him to "create[] a novel and fundamentally different loan forgiveness program" that would "release 43 million borrowers from their obligations to repay $430 billion." 143 S. Ct. at 2369, 2372. Noting it was the first time the Secretary had "claimed powers of this magnitude" and that "Congress ha[d] chosen not to enact" such a program, the Court concluded that the "tradeoffs inherent in a mass debt

---

[13] Moreover, crypto asset securities are but a subset of the crypto asset industry as a whole (even Coinbase acknowledges the SEC asserts no jurisdiction over the largest crypto asset, which constitutes a significant portion of the crypto industry— bitcoin). And it makes little sense to question the SEC's enforcement authority over crypto asset securities based on the current size of the "digital asset industry" when Congress has undisputedly given it enforcement authority over the broader *securities* industry. Coinbase also ignores that the SEC has been bringing actions to enforce the registration provisions of the federal securities laws in this space since 2017, when the "digital asset industry" was but a small fraction of its current size. The notion that the SEC's enforcement authority has somehow receded as the industry has expanded cannot be reconciled with Congress's mandate to the SEC to enforce the federal securities laws.

cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375.

The circumstances presented in those cases are a far cry from what is at issue here. The SEC did not file this action pursuant to a "previously little-used backwater" provision (*West Virginia*, 142 S. Ct. at 2612) or some "humdrum reporting requirement" (*Nebraska*, 143 S. Ct. at 2371). Rather, the SEC filed this action pursuant to the same authority it has exercised since its establishment to enforce the same provisions of the federal securities laws that it seeks to enforce in this case.[14] That authority was intended to be brought to bear with respect to interests or instruments encompassed by the term "security" under the federal securities laws, and "there is no indication that Congress intended to hamstring the SEC's ability to resolve new and difficult questions posed by emerging technologies where these technologies impact markets that on their face appear to resemble securities markets." *Terraform*, 2023 WL 4858299, at *9. To the contrary, because "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called," it enacted a definition of "security" that is "sufficient to encompass virtually any instrument that might be sold as an investment." *Edwards*, 540 U.S. at 393. "Congress painted with a broad brush" precisely because "[i]t recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes." *Reves*, 494 U.S. at 60-61; *see also, e.g., SG Ltd.*, 265 F.3d at 44 (applying federal securities laws to "virtual shares in an enterprise existing only in cyberspace"). The SEC's clear authority to enforce the federal securities laws thus forecloses the doctrine's application here.

Finally, even if the major questions doctrine applied, it would not foreclose this enforcement action. That is because the Commission has "clear congressional authorization" (*Nebraska*, 143 S. Ct. at 2375 (cleaned up)) to enforce the federal securities laws. *See supra* at Section I.A.

---

[14] Nor has the SEC claimed "sole regulatory authority" over the *entire* crypto asset industry. (Motion at 23.) As explained above, this action covers only Coinbase's conduct as an intermediary of crypto assets that qualify as investment contracts.

### III.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT COINBASE CONDUCTS BROKERAGE ACTIVITY THROUGH ITS WALLET APPLICATION

Beyond arguing the underlying crypto assets are not securities, Coinbase does not otherwise contest the SEC's Exchange Act charges—with the exception of the SEC's allegations that Coinbase acts as an unregistered broker through its "Wallet" application (which routes customer orders to third-party crypto asset trading platforms to access liquidity outside the Coinbase platform). Coinbase is wrong, and the SEC's allegations as to Wallet are sufficient.

A "broker" is broadly defined as "any person engaged in the business of effecting transactions in securities for the accounts of others." 15 U.S.C. § 78c(a)(4)(A). Courts consider certain factors, including whether the person: "(1) actively solicits investors; (2) receives transaction-based compensation; (3) handles securities or funds of others in connection with securities transactions; (4) processes documents related to the sale of securities; (5) participates in the order-taking or order-routing process; (6) sells, or previously sold, securities of other issuers; (7) is an employee of the issuer; (8) is involved in negotiations between the issuer and the investor; and/or (9) makes valuations as to the merits of the investment or gives advice." *SEC v. GEL Direct Tr.*, 2023 WL 3166421, at *2 (S.D.N.Y. Apr. 28, 2023) (denying motion to dismiss where complaint alleged defendant routed securities orders in exchange for a commission).

These factors are not exclusive, and not all of them, or any particular one, need be satisfied. *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (finding brokerage activity where defendant regularly solicited clients to purchase securities and acted as middleman between buyers and sellers). Rather, the key inquiry is whether the conduct may be characterized by "a certain regularity of participation in securities transactions at key points in the chain of distribution." *Mass. Fin. Serv., Inc. v. Sec. Investor Prot. Corp.,* 411 F. Supp. 411, 415 (D. Mass. 1976), *aff'd,* 545 F.2d 754 (1st Cir. 1976).

Coinbase argues both that the Complaint alleges *no such* brokerage activities and also that the Complaint alleges *only* transaction-based compensation. (Motion at 26-27.) Neither is true. The

Complaint does allege Coinbase charged a 1% commission for Wallet's brokerage services (Compl. ¶ 101), but it alleges much more. Coinbase actively solicits investors (on its website, blog, and social media) to use Wallet's trading features, which compare prices across different third-party trading platforms, and takes and routes customers' orders in crypto asset securities to those platforms. (*Id.* ¶¶ 64, 75, 82.) Indeed, Coinbase explains to Wallet customers that "[w]hen [a customer] initiate[s] a swap, [of one crypto asset for another], the Trade feature [of Wallet] processes [the] order through the 0x decentralized exchange protocol, attempting to find [the customer] the best value for [her] trade."[15] Moreover, through Wallet, Coinbase effects transactions in crypto asset securities by making them "available to buy, sell, receive, 'swap,' or 'bridge,'" "rout[ing] customer orders through third-party … trading platforms … to access liquidity outside the Coinbase Platform," and providing the best price and processing the transaction. (*Id.* ¶¶ 64, 82.) Wallet's services are far more extensive than providing "passive software … that allows customers to store the private keys for their own digital assets" (Motion at 26) and fall squarely within the ambit of brokerage activity.

## IV. THE COMPLAINT SUFFICIENTLY ALLEGES THAT COINBASE, THROUGH ITS STAKING PROGRAM, ENGAGES IN THE UNREGISTERED OFFER AND SALE OF SECURITIES

Coinbase offers and sells a crypto asset staking program (the "Staking Program") that allows investors to earn financial returns through Coinbase's managerial efforts. Through the Staking Program, investors' crypto assets are transferred to and pooled by Coinbase and subsequently "staked" (or committed) by Coinbase in exchange for rewards, which Coinbase distributes *pro rata* to investors after paying itself a 25-35% commission. (Compl. ¶ 7.)

The Complaint adequately alleges Coinbase has offered and sold its Staking Program as an investment contract, and thus a security, under *Howey*. (*Id.* ¶¶ 339-367.) Coinbase does not argue the

---

[15] *See* http://coinbase.com/learn/wallet/how-to-swap-tokens-with-coinbase-wallet (last visited Oct. 2, 2023).

SEC has failed to plead the presence of a common enterprise[16] or that Staking Program participants were not led reasonably to expect profits. Instead, Coinbase argues that (1) Staking Program participants' tendering of their crypto assets to Coinbase does not constitute an "investment of money" (Motion at 27-29), and that (2) Coinbase's efforts to generate the returns it marketed to investors are not "managerial" but merely "ministerial." (*Id.* at 2, 4, 29-30). Both arguments fail.

### A.      The Complaint Adequately Alleges an Investment of Money

Coinbase argues staking investors do not "invest money" under *Howey* because the Staking Program "create[s] no risk" of loss emanating specifically from using Coinbase's staking services as opposed to staking generally. (Motion, at 27-30.) This argument is yet another attempt to read into *Howey* requirements that do not exist.

Coinbase acknowledges the Complaint's well-pleaded allegations detailing the ways in which Staking Program investors' assets are put at risk of loss. (*See, e.g.*, Compl. ¶¶ 342-345; Motion at 27-28 (citing User Agreement App'x 4, § 3.1.3.)) But it argues these risks—including failures by Coinbase or of the underlying protocol, or investors being unable to react to market price fluctuations—should be ignored because they apply broadly to all Coinbase customers (not just staking investors) or because they apply to anyone who stakes crypto assets outside the Staking Program. (Motion at 28.) However, Coinbase cites no authority for the illogical contention that if a Staking Program participant is subject to a risk of loss that a non-staking customer is *also* subject to, then the risk as applied to a staking investor somehow is null. Nor does Coinbase cite a single case for the equally illogical contention that an investment program must come with *additional* risks associated exclusively with the promoter. No

---

[16] An *amicus* argues the Staking Program does not involve a common enterprise because, the *amicus* contends, a common enterprise requires not just pooling of assets but that the "effect of pooling" be to potentially increase the returns an investor would receive absent pooling. (D.E. 60 at 18.) This requirement is found nowhere in the law, but even if it existed it would be met here because Coinbase's pooling of assets "increases the likelihood that a blockchain network will select Coinbase to validate transactions, and thus enables Coinbase to more reliably earn rewards" (Compl. ¶ 351). *See Revak*, 18 F.3d at 87 (pooling establishes horizontal commonality); *Kik*, 492 F. Supp. 3d at 178-79 (finding horizontal commonality).

such requirements exist. The economic reality is that certain risks are inherent to the investments in the enterprise, and that is all that is required. *See Gary Plastic*, 756 F.2d at 241 (investors relied on the solvency of both the underlying bank and the promoter); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir 2003) (investor need only commit his assets in such manner as to "subject himself to financial loss").

Further, Coinbase dismisses the Complaint's well-pleaded allegation that Staking Program investors give up control over their assets as additional evidence of risk of loss, based entirely on its own say-so that legal ownership of investors' staked assets remains with Staking Program participants (Motion at 28). But courts have never imposed any requirement that investors give up permanent control over the capital deployed into the enterprise. *See Edwards*, 540 U.S. at 391-92 (investors purchased payphones but entered into a buyback agreement promising to refund the purchase). And Coinbase ignores that it requires staking investors to transfer the staking-eligible assets to Coinbase's omnibus wallets, where they are commingled and treated as fungible, and as to which Coinbase has sole control. (*See* Compl. ¶¶ 3, 34, 47, 55, 83-85, 310-311, 313, 315, 320, 340-341, 345, 348-350.) As such, staking investors are providing "specific consideration" (Motion at 29, quoting *Int'l Bhd. Of Teamsters*, 439 U.S. at 561) for an interest in a pool of fungible assets.

B.     **The Complaint Adequately Alleges that Staking Investors Expect Reasonably To Profit Based on Coinbase's Managerial Efforts**

Coinbase argues that "[s]taking rewards are not properly conceived as investment profit" but are instead simply "payments" for putting crypto assets to work. (Motion at 29.) But *Howey* recognizes no consequential distinction between labelling something a "payment" or a "return"—for example, the investors in *Edwards* received fixed amounts for essentially putting their purchased payphones to work. In any event, Coinbase marketed the Staking Program as an investment opportunity (Compl. ¶¶ 322-332), not a receipt of "payments" for "validation services" as Coinbase claims now in litigation.

Coinbase also attempts to downplay its pre-sale efforts and recast the entirety of its efforts as not "managerial" but only "ministerial." (Motion at 30.) However, any distinction between pre-sale

and post-sale efforts is artificial and, in any event, meaningless here where the Complaint alleges Coinbase has promised and undertaken significant post-sale managerial efforts (in addition to its significant and continuing pre-sale efforts), including: retaining third parties to stake investor assets; deploying proprietary software and equipment; maintaining "liquidity pools" (or reserves) to allow for quicker investor withdrawals; drawing "stake" from pools of investor assets; increasing the likelihood of the enterprise's success by pooling investor assets across multiple validator nodes; and marshalling its technical expertise to operate and maintain nodes and stake investor assets. (*See* Compl. ¶¶ 312-321, 351, 357-367.) *SEC v. Life Partners*, which involved only pre-sale efforts, is thus distinguishable. 87 F.3d 536, 546 (D.C. Cir. 1996); *see also SEC v. Mut. Ben. Corp.*, 408 F.3d 737, 743 (11th Cir. 2005) (disagreeing with *Life Partners* and holding that pre-sale efforts may suffice to satisfy *Howey*).

Finally, while it may be true that "customers [can] stake … on their own" (Motion at 29-30), Coinbase's attempt to downplay the significance of its efforts is belied by its own marketing to potential investors—emphasizing that staking is "confusing, complicated, and costly" and requires "a fairly high level of technical knowledge," and that, with the Staking Program, Coinbase is "changing all of that" and "do[es] all this for [investors]." (Compl. ¶¶ 316, 360, 364.) The focus is "not on whether it was somehow possible for an investor to profit without [relying on the efforts of others] … but rather on whether the typical investor who was being solicited would be expected under all the circumstances to … remain[] passive" and rely on the promoter's efforts to generate the profits. *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582-83 (2d Cir. 1982). In other words, Coinbase "promoted" the Staking Program "as an investment or as a means whereby participants could pool … their money and [Coinbase]'s contribution in a meaningful way." *Leonard*, 529 F.3d at 88 (cleaned up).

## CONCLUSION

For the reasons set forth above, the SEC respectfully requests the Court deny Coinbase's Motion for Judgment on the Pleadings in its entirety.

Dated:  October 3, 2023         Respectfully submitted,

          */s/ Patrick R. Costello*
          Patrick R. Costello
          Nicholas C. Margida
          SECURITIES AND EXCHANGE
          COMMISSION
          100 F. Street NE
          Washington, DC 20549
          Tel: (202) 551-3982 (Costello)
          CostelloP@sec.gov

          Peter A. Mancuso
          Ben N. Kuruvilla
          Elizabeth Goody
          Ladan F. Stewart
          Jorge G. Tenreiro
          SECURITIES AND EXCHANGE
          COMMISSION
          New York Regional Office
          100 Pearl Street, Suite 20-100
          New York, New York 10004

          *Attorneys for Plaintiff*