# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | 23 Civ. 04738 (KPF) |
| COINBASE, INC., AND COINBASE GLOBAL, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**BRIEF OF *AMICUS CURIAE***
**NEW FINANCE INSTITUTE**
**IN SUPPORT OF PLAINTIFF'S OPPOSITION TO**
**<u>DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Scott D. Brenner, Esq.
Fed Bar No. SB4264
Parlatore Law Group, LLP
260 Madison Avenue, 17th Floor
New York, NY10016
Telephone: (646) 330-4725
scott.brenner@parlatorelawgroup.com
*Attorney for Amicus Curiae*

October 10, 2023

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF AMICUS CURIAE …………………………………………………...1

. PRELIMINARY STATEMENT ……………………………………...………………1

ARGUMENT …………………………………………………………………………..4

    I.    Investing is Not a Prerequisite to Finding an "Investment Contract" ………4

        A.    Cash Flows Are a Prerequisite for Investing …………………..4

        B.    President Roosevelt Guided Congress Toward Full Transparency …………………………………………………...5

        C.    The Disclosures Needed in the 20st Century Pertained to Cash Flows …………………………………………………..6

        D.    The Disclosures Needed in the 21st Century Increasingly Pertain to the Characterization of the Assets ………………………………...8

    II.    A Contract is Not a Prerequisite to Finding an "Investment Contract".....12

        A.    Congress Did Not Limit "Investor Protection" to Contractual Arrangements ………………………………………12

        B.    A Contract Almost Always Accompanies a Cash-Flow-Generating Asset ……………………………………13

        C.    Case Law Is Not Dispositive Because of the Base Rate Fallacy ..13

i

III.    The SEC Has The Authority To Regulate Cryptocurrencies ……………15

     A.    The "Security vs. Commodity" Narrative is a Misconception That

         This Court Should Ignore ………………………………………..15

     B.    Denying the SEC Its Regulatory Authority Creates an

         Incongruence.……………………………………………………16

     C.    Other Regulators Have Similar Broad Regulatory Powers ……...17

     D.    Historically, State Regulators Had Similar Powers ……………..18

CONCLUSION ..........................................................................................................19

**TABLE OF AUTHORITIES**

**Cases**

*Basic, Inc. v. Levinson*,

      485 U.S. 224 (1988) …………………………………………………....…8

*Hocking v. Dubois*,

      839 F.2d 560 (9th Cir. 1988) ..…………………………..…………..….…12

*Reves v. Ernst & Young*,

      494 U.S. 56 (1990) ……………………………...……………………10

*SEC v. Capital Gains Research Bureau, Inc.,*

      375 U.S. 180 (1963) …………….........................................................10

*SEC v. W.J. Howey Co.*,

      328 U.S. 293 (1946) ……………………………………………....…9


**Other Authorities**

Aswath Damodaran, *Thoughts on Intrinsic Value, Musings on Markets,* June 8, 2011,
    available at https://aswathdamodaran.blogspot.com/2011/06/thoughts-on-
    intrinsic-value.html…………………………………………………..4

Aswath Damodaran, *Finance professor Aswath Damodaran warns investors not to get
    cocky, dismisses bitcoin as a currency or store of value, and blasts the Fed in a
    new interview. Here are the 11 best quotes*, available at:
    https://markets.businessinsider.com/currencies/news/aswath-damodaran-cocky-
    investors-bitcoin-currency-store-value-federal-reserve-2021-6-1030511159 ..…..5

Brief of *Amicus Curiae,* Coinbase Inc., In Support of Defendants Ishan Wahi and
    Nikhil Wahi's Motion To Dismiss, available at
    https://www.crypto-law.us/wp-content/uploads/2023/03/
    CoinBase-Amicus.pdf …………………………………………………2,11

Brief of *Securities Law Scholars As Amici Curiae,* In Support Of Coinbase's Motion

For Judgment on the Pleadings……………………….…………………….....3

Chairman McHenry, *Chairman McHenry Questions Chair Gensler on Ether at Hearing to Conduct Oversight of the SEC*, available at https://www.youtube.com/watch?v=VhA1dZXeao0 …………………………15

Coinbase, *When is the best time to invest in crypto?*, available at https://www.coinbase.com/learn/tips-and-tutorials/dollar-cost-averaging ……...10

Commercial and Financial Chronicle, April 1, 1933, Vol. 136, No. 3536, p. 53, available at https://fraser.stlouisfed.org/files/docs/publications/cfc/cfc_19330401.pdf ….…..6

Commissioner Dawn D. Stump, *Digital Assets: Clarifying CFTC Regulatory Authority & the Fallacy of the Question, "Is it a Commodity or a Security?". Statement of Commissioner Dawn D. Stump on the CFTC's Regulatory Authority Applicable to Digital Assets*, August 23, 2021  available at https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement082321 ……...16

Commissioner Goldsmith Romero, *Security? Commodity? What happens if crypto is both?*, available at https://fortune.com/crypto/2023/04/12/security-commodity-crypto-both-cftc/ …………………………………………….…....15

Dan Berkowitz, Statement on Securities vs. Commodities via Unchained podcast, video excerpt post on X by Laura Shin, available at *https://x.com/laurashin/status/1661114787751948288?s=20* …...…………...15

Dan Glickman, Release of Final National Organic Standards, U.S. DEP'T OF AGRIC., (Dec. 20, 2000), available at https://www.ecomall.com/greenshopping/usdafinal.htm …………………….....17

Elisabeth Keller, *"Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934."* Ohio State Law Journal 49 (1988): 329-352 …...…………………………………………………….....6

Fortune.com, *Your father's stock market is never coming back, available at https://fortune.com/2021/06/02/changing-stock-market-meme-stocks-day-trading-reddit-crypto-investing-robinhood-btc-tsla-gme-eth-amc-nfts/* ………...11

John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, available at https://www.jstor.org/stable/1281038 ………...…...18

Professor Stephen Bainbridge, *Maybe Goldman Sachs Sold Some Rotten Eggs? So What?,* available at https://www.professorbainbridge.com/professorbainbridgecom/2010/04/maybe-goldman-sachs-sold-some-rotten-Eggs-so-what.html ……………………………………………………………..7

SEC Chairman Jay Clayton, *SEC Chairman Jay Clayton on market euphoria: When stocks run away, we get concerned*, available at
https://www.youtube.com/watch?v=b6l0vbU4a3c ………………………………….8

United States Congress, *S.2108* - Organic Foods Production Act of 1990, available at
https://www.congress.gov/bill/101st-congress/senate-bill/2108/text …………...17

United States Congress, Public Health Cigarette Smoking Act, available at
https://en.wikipedia.org/wiki/Public_Health_Cigarette_Smoking_Act ………...17

Wikipedia, *Base Rate Fallacy*, available at
ttps://en.wikipedia.org/wiki/Base_rate_fallacy …………………………………13

**INTEREST OF AMICUS CURIAE**

New Finance Institute ("NFI") is a public benefit corporation with a dedicated mission to discover financial truths and bring financial empowerment to the masses. NFI's corporate website can be found at: www.newfinanceinstitute.com. NFI publishes two blogs: Finance 2027 ("F27") and Full Court Press ("FCP"). F27 can be found at https://www.finance2027.com/ and, through its publication, NFI aims to build consensus on financial definitions. FCP is available at https://www.fullcourtpress.io/ and is dedicated to exploring the legal implications of financial definitions.

This case necessitates the application of legal principles to a unique set of facts which must be situated within the appropriate historical and financial context. NFI has a strong interest in building consensus on all financial definitions, most notably the word investing, which it sees as a gating item toward prosperity and informed decision-making. This amicus brief, drawing on financial expertise, hones in on the definition of investing, which NFI believes to be central to this case. As such, NFI advocates for an evaluation of the boundaries of investor protection through that lens. This holistic, multi-disciplinary approach is intended to offer the Court a novel and distinct viewpoint.

**PRELIMINARY STATEMENT**

The central question at the heart of this case revolves around the level of investor protection that Congress intended when enacting the securities laws. Did Congress intend to restrict investor protection solely to capital-raising transactions, as portrayed by the Defendants? Or, did Congress intend for investor protection to encompass a broader range of safeguards, as argued by the SEC?

NFI firmly aligns with the latter perspective, and posits that this case can be conceptually represented through a straightforward two-by-two table, guided by two key yes-or-no questions. First, the finance question: Is it an investment? Second, the legal question: Is it an investment contract? Answering each of these questions with a 'yes' or 'no' results in four potential outcomes (yes/yes, yes/no, no/yes and no/no). NFI contends that a comprehensive resolution of this case necessitates the simultaneous examination of both the finance and legal questions. A common-sense approach underscores the importance of viewing the issues represented by this case as an application of the law through the lens of finance: determining the boundaries of investor protection, after all, would be a difficult task unless a consensus can simultaneously be established on the definition of the term investing.

Furthermore, it is illuminating to map the positions of the involved parties onto this hypothetical two-by-two table. The Plaintiff and Defendants have already populated three of the four available quadrants. Plaintiff's position appears firm: purchasing cryptocurrency constitutes both an investment and an investment contract. In contrast, Defendants' position is less clear: While they insist that the transactions in question do not qualify as investment contracts, they vacillate between them being investments and not being investments, thereby occupying two of the available quadrants on the table. Their *commercial* position suggests they promote investment opportunities, yet their *legal* stance put forth in a recent amicus brief displayed an unwillingness to characterize cryptocurrency purchases as investments. Brief of *Amicus Curiae*, Coinbase Inc., In Support of Defendants Ishan Wahi and Nikhil Wahi's Motion To Dismiss, available at https://www.crypto-law.us/wp-content/uploads/2023/03/CoinBase-Amicus.pdf. This inherent inconsistency in Defendants' positions strongly underscores the need for the continuation of this case.

In this amicus brief, NFI occupies the remaining and distinctive position within the hypothetical two-by-two table, offering a unique perspective that we believe will provide valuable assistance to this Court. We assert that the purchasing of crypto tokens should not be characterized as investments due to the lack of cash flow generation (a long-established prerequisite for any true investment). Such purchases are still investment contracts, however, because the buying public is denied the full and fair disclosure that they are *not* investing. Ultimately, NFI aligns with Plaintiff's position, reaching the same legal conclusion, but taking a different path of reasoning.

 In addition, hidden within the question of whether a transaction constitutes an investment contract, lies the query of whether it necessitates a contract in the first place. NFI firmly asserts that it does not. As *amici*, law scholars have emphasized the absence of any Supreme Court or Second Circuit findings of an investment contract without a contract. Brief of Securities Law Scholars As *Amici Curiae* In Support Of Coinbase's Motion for Judgment on the Pleadings ("Law Scholars Amicus Brief"), p.17. However, in doing so, they appear to have succumbed to the base rate fallacy, conflating absence of evidence with evidence of absence. The mere fact that the Supreme Court and the Second Circuit have not encountered such cases is not dispositive.

At first glance, it may seem implausible to reach the conclusion of an investment contract in the absence of both an investment, as the term is conventionally defined, and a contract. However, the label "investment contract" should not be the sole determining factor; Congress's policy objectives should hold sway. A potential dismissal of this case, based on a limited reading of the phrase "investment contract" would lead to a world where even more individuals are transacting in crypto tokens *thinking they are investing*. The result would be the denial of

providing fair and full disclosure to the buying public, precisely what Congress intended to avoid.

## ARGUMENT

### I.   Investing is Not a Prerequisite to Finding an "Investment Contract."

#### A.   Cash Flows Are a Prerequisite for Investing.

A fundamental finance principle dictates that intrinsic value is inextricably linked to the presence of cash flows, which is the bedrock of true investing. As Aswath Damodaran, Professor of Finance at the Stern School of Business at New York University aptly explains: "Only assets that are expected to generate cash flows can have intrinsic values." *See*, Aswath Damodaran, *Thoughts on Intrinsic Value*, *Musings on Markets*, June 8, 2011, available at https://aswathdamodaran.blogspot.com/2011/06/thoughts-on-intrinsic-value.html. In turn, the ability to determine intrinsic value is a necessary (but not sufficient) condition for an asset transaction to be characterized as investing. "To invest in something, you need to assess its value, compare to the price, and then act on that comparison, buying if the price is less than value and selling if it is greater." *Ibid*.

The notion that investments can exist devoid of cash flows represents not only a profound divergence from established financial wisdom, but it suggests that we are at a crossroads moment; the misconception of transactions in non-cash-flow-generating assets being investments potentially infiltrating the judiciary and undermining the protective intent of Congress cannot be overlooked. It is also worth noting that "investment" is not a label that is meant to be applied to assets or individuals universally. A stock is not an investment when purchased at any given price, it becomes one when purchased *at the right price*. Aswath Damodaran recently reiterated

this same philosophy: "We have all these people telling you to buy a quality company. That's really bad advice. If you buy a quality company that everybody else recognizes as a quality company, you're going to pay through the roof. Good companies can be bad investments, and bad companies can be good investments. The sooner we recognize that, the healthier investing is going to be." *See, Finance professor Aswath Damodaran warns investors not to get cocky, dismisses bitcoin as a currency or store of value, and blasts the Fed in a new interview. Here are the 11 best quotes*, available at:

https://markets.businessinsider.com/currencies/news/aswath-damodaran-cocky-investors-bitcoin-currency-store-value-federal-reserve-2021-6-1030511159.   Not everyone participating in the stock market qualifies as an investor, either; individuals may adopt the role of an investor in some instances but not in others. Instead, the investment label pertains to transactions and requires *two* critical elements: a cash-flow-generating asset (an absolute prerequisite to an investment characterization), and sufficient margin between the price and value, often referred to as "margin of safety."

In simple terms, investing is akin to purchasing an apple tree at a cheap price. The cash flows generated by an asset are comparable to the fruits produced by the tree and the asset can be likened to the tree itself. However, the price paid for the apple tree, *relative to the value*, plays a pivotal role. The same apple tree can be an investment at a low price, but not so at a higher price.

## B.   President Roosevelt Guided Congress Toward Full Transparency.

Just like how a purchaser of an apple tree would want to know about an infection to the tree that might materially impact how many apples the tree will produce, an investor would want to know about disclosures that might materially impact the cash flows that the company will generate. The marketplace was not necessarily producing that outcome; "[a]ccording to

congressional reports, in the decade after World War I, approximately fifty billion dollars of new securities were floated in the United States, and half of them were worthless." *See,* Elisabeth Keller, "Introductory Comment: *A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*." Ohio State Law Journal 49, (1988): 329-352, 334. Therefore, an act of Congress was needed to mandate proper disclosures.

On March 29, 1933, President Roosevelt conveyed a crucial message to Congress, emphasizing the need for transparency and investor protection. His statement resounded with the following words: "Of course, the Federal Government cannot and should not take any action which might be construed as approving or guaranteeing that newly issued securities are sound in the sense that their value will be maintained or that the properties which they represent will earn profit. There is, however, an obligation upon us to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that *no essentially important element attending the issue shall be concealed from the buying public*." *See*, Commercial and Financial Chronicle, April 1, 1933, Vol. 136, No. 3536, p. 53, available at: https://fraser.stlouisfed.org/files/docs/publications/cfc/cfc_19330401.pdf (emphasis added)

This message remains pivotal for a compelling reason: True investors must have access to complete and unobstructed information *of any kind* to make informed decisions.

C.      **The Disclosures Needed in the 20st Century Pertained to Cash Flows**

Guided by President Roosevelt's vision, the "Truth in Securities Act" was born, ushering in an era of full and fair disclosure.  Stephen Bainbridge, one of the *amici* who co-authored the Law Scholars Amicus Brief aptly stated: "As a result, the New Deal Congress explicitly rejected the blue sky regulatory model in favor of a disclosure-based system. The SEC thus has no authority to pass on the merits of an offering of securities. The system that resulted fairly has

been called a rotten egg statute. You could sell all the rotten eggs you wanted as long as you fully told people just how rotten they were." *Maybe Goldman Sachs Sold Some Rotten Eggs? So What?,* available at

https://www.professorbainbridge.com/professorbainbridgecom/2010/04/maybe-goldman-sachs-sold-some-rotten-eggs-so-what.html.

It is essential to recognize the audience the disclosure regime intended to serve. The disclosure regime is not designed to protect *all* market participants, rather, it focuses on safeguarding those who *seek* to become true investors. Investing inherently demands the estimation of value, which is contingent on an assessment of cash flows. A robust valuation is only possible with full and fair disclosure, and a true investor would still need to have a buffer, the margin of safety, because some uncertainty remains even with full and fair disclosure. To illustrate this point, consider a potential investor who values a stock at $10, while the asking price is $8. In this scenario, the investor might conclude that the margin of safety is sufficient and decide to make a purchase. However, if material information was concealed from the investor and if, once revealed, it resulted in a revised valuation of, say, $7, the stock may then cease to be an attractive purchase.[1]

On the other hand, for the speculators who believe the price could reach $12, notwithstanding the fact that the true value is $7, the decision to buy when the asking price is $8 remains unchanged. Congress's goal was not that everybody in the market would turn into a true investor, but rather, that they could, if they wanted to. "No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his

---

[1] The need for disclosure does not disappear whether the sale is on the primary or secondary market. The potential investor needs that disclosure to make an informed decision regardless of who the seller is.

judgment as to the value of the securities he buys or sells.'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (internal citations omitted).

### D.    The Disclosures Needed in the 21st Century Increasingly Pertain to the Characterization of the Assets.

21st-century finance ushers in an entirely new set of challenges. "... [T]here is a new paradigm. There are more retail investors participating in the market than ever before." S*ee, SEC Chairman Jay Clayton on market euphoria: When stocks run away, we get concerned*, available at https://www.youtube.com/watch?v=b6l0vbU4a3c. When it pertains to cash-flow-generating assets, that paradigm can be perplexing in its own right, as excessive speculation in markets can result in asset bubbles where prices significantly exceed the intrinsic value of the assets. However, it does not warrant a different disclosure regime because the valuation of a cash-flow-generating asset is inherently a subjective exercise, and no matter how expensive a stock may seem, making the determination that the transaction crossed into the territory of excessive speculation implies a merit-based assessment; this is precisely what Congress intended to avoid. "We regulate disclosure, we regulate trading… one thing that we don't regulate, directly, … is euphoria." *Ibid*.

When that speculative mindset extends to assets devoid of cash flows, however, it results in a more profound predicament, because the debate stops being a mere disagreement between price and value. Instead, the crux of the issue lies in the lack of intrinsic value to calculate in the first place.[2] Investing fundamentally hinges on the comparison of an objective element, which is the price, with a subjective benchmark, which is the value. However, this assessment loses its

---

[2] Any crypto tokens that generate cash flows, or staking contracts are the exception; they can be valued, and, at the right price, could potentially qualify as investments. The vast majority of crypto tokens, however, do not have the ability to generate cash flows.

meaning when there is no intrinsic value to reference. When the intrinsic value of the asset is zero, there is no room for subjectivity. Effectively, *all* purchasers of the asset are speculating because they are *all* paying too high a price relative to value. This complex scenario underscores the unique challenges posed by the changing landscape of 21st-century finance.

While it is true that "investments" in these types of assets have existed in unorganized pockets for some time, their proliferation has accelerated in the late 20th and into the 21st century, reaching a culmination in cryptocurrencies being traded on exchanges like Coinbase. Defendants try to portray the cryptocurrency markets as a continuation of the fragmented speculative activity that has existed, but a proper *Howey* analysis could produce a different outcome for these assets than it does for crypto tokens. *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Gold, for example, is surely viewed by some, incorrectly, as an investment vehicle, but that doesn't necessarily imply that gold *automatically* becomes a security. If the vast majority of the gold buyers buy it for consumptive purposes, a *Howey* analysis would likely conclude that gold is not an investment contract. A similar argument would disqualify American Girl Dolls, baseball cards, and, notwithstanding the fact that speculative intent may have dominated for a limited period of time, Beanie Babies. The same principle, of course, shall apply to cryptocurrencies, but it is not sufficient to assert that the predominant use of crypto tokens is consumptive, that assertion should be proven out by facts, and NFI is not aware of such an analysis being produced *for any token*. Anecdotal evidence won't suffice.[3]

---

[3] Another relevant *Howey* inquiry is whether the "efforts of others" prong is satisfied in the case of secondary market crypto transactions. The most common interpretation of *Howey* is that it is a conjunctive test, and all four prongs have to be satisfied for a finding of an "investment contract." It is this reasoning that leads to decentralized currencies such as Bitcoin often not being characterized as an investment contract (rendering the "expectation of profits" prong moot). NFI has a different view on that prong as well; NFI believes that the "efforts of others" prong is one that applies to cash-flow-generating assets only, warranting a modified *Howey* analysis for crypto tokens. The Court does not need to make a determination on this alternative

A naive view might suggest that in a free market economy, purchasers can buy any asset they desire; they certainly can, but with a crucial and needed caveat: full and fair disclosure. The pivotal question is: What does full and fair disclosure mean? In the 20th century, finance predominantly dealt with cash-flow-generating assets, and disclosure centered around the investing public having access to material information.  In the 21st century, in the case of cryptocurrencies, disclosure takes a whole new meaning, and could take the form of telling cryptocurrency purchasers that they are *not* investing. The fact that it's a different type of disclosure is simply a result of what is being transacted in the market today, and perfectly consistent with what Congress intended to accomplish. "A fundamental purpose … was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*, and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963) (emphasis original). "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

Such disclosure would not necessarily deter all cryptocurrency purchases; one can expect that purchasers with a consumptive intent or those that are speculating would *willingly* continue to buy. However, it could change some purchasing decisions at the margin, *i.e.*, a group of purchasers might stop buying crypto tokens once they realize they are not investing, and that change in behavior, in turn, could potentially inconvenience a crypto exchange, such as Coinbase, which is incentivized to maximize trading volume. Thus, it is not surprising that Defendants take a commercial position appealing to a broader set of market participants. *See*, *e.g.*, an article on their website titled, *When is the best time to invest in crypto?*, available at

_____

reading of *Howey* at this time, but the continuation of this case would undoubtedly allow the Court to consider such arguments at a later stage.

https://www.coinbase.com/learn/tips-and-tutorials/dollar-cost-averaging. While NFI does not believe that investing is a prerequisite to finding an "investment contract," Coinbase presumably does; it is difficult to conceive another rational explanation as to why their legal position in a recent amicus brief would contradict their commercial one: "The SEC posits that the digital assets qualify as securities because they are 'investment contract[s].' But the assets lack both essential attributes of that statutory term: They are neither contracts *nor investments*." Brief of *Amicus Curiae*, Coinbase Inc., In Support of Defendants Ishan Wahi and Nikhil Wahi's Motion To Dismiss, p. 16, available at https://www.crypto-law.us/wp-content/uploads/2023/03/CoinBase-Amicus.pdf (emphasis added, internal citations omitted)

Ultimately, it is in Defendants' best interest for cryptocurrencies to be perceived as being on par with stocks, and the "investing" label is needed for that parity. As currently designed, most cryptocurrencies do not have the ability to generate cash flows, and such parity can never be achieved on technical finance grounds, but for most investors, perception is reality. *See*, *e.g.*, *Your father's stock market is never coming back, available at* https://fortune.com/2021/06/02/changing-stock-market-meme-stocks-day-trading-reddit-crypto-investing-robinhood-btc-tsla-gme-eth-amc-nfts/ ("The generation creating the new conventions of the investing landscape views stocks and crypto coins as interchangeable."). At the same time, Defendants try to eschew the regulatory regime that is designed to protect investors. Essentially, Defendants want the perception of investment without being burdened by the accompanying regulatory regime. NFI believes that Defendants' position is backward; cryptocurrencies are not investments, and that is precisely why a new form of disclosure is needed (in addition to standard disclosures that may also apply), and Defendants' "have your cake and eat it too" approach effectively amounts to regulatory arbitrage.

**II.      A Contract is Not a Prerequisite to Finding an "Investment Contract"**

**A.      Congress Did Not Limit "Investor Protection" to Contractual Arrangements.**

Defendants read the statute in a limited fashion, but that reading does not find support in the legislative history of the Securities Act of 1933. "The remedial purposes of the 1933 Act were expressed as follows: The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion . . . ." *Hocking v. Dubois*, 839 F.2d 560, 564 (9th Cir. 1988), citing S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933) (withdrawn on other grounds).

While it's true that Congress emphasized the acquisition of capital by an enterprise, the overarching goal was not explicitly linked to contracts. A closer examination reveals that the remedial purpose is centered on placing "adequate and true information before the investor" and safeguarding "honest enterprise" from unfair competition posed by deceptive securities promoted to the public. *Ibid*.

Failing to disclose the nature of crypto purchases as speculative not only contradicts the purpose of placing "adequate and true information before the investor" but it also fails to protect honest enterprises. *Ibid*. Currently, honest enterprises are compelled to compete not only against the dishonest promoters of other enterprises but also an entirely different set of promoters that advocate crypto "investments." To the public, both avenues may appear as investments, leading to capital being diverted from traditional capital markets to the crypto sector. This trend would likely accelerate if this Court decides to dismiss this case.

Every dollar that flows into the crypto sector is a dollar that could have been directed toward more productive uses in the stock and bond markets, contributing to cancer research, clean energy initiatives, or any other cause that the investing public may deem worthwhile. To that extent individuals would like to speculate on digital assets with their money, rather than providing it as equity or debt capital to enterprises, are entitled to do so, but the *new bargain* in the 21st century should be, at a minimum, that they are truly informed that they are transacting in a speculative asset, and are made aware that they are not actually investing at all.

### B.    A Contract Almost Always Accompanies a Cash-Flow-Generating Asset.

It is not by mere chance that every single term enumerated in the legal definition of a security pertains to assets with the capacity to generate cash flows, whether directly or indirectly. Congress meticulously listed these terms based on the prevailing market transactions during that time, which involved cash-flow-generating assets like stocks and bonds.

That one would find contract(s) associated with cash-flow-generating assets is not at all surprising. Without a contract, how would the parties know what claims they have on the cash flows? The existence of a contract, then, was simply a result of the type of asset that was transacted in commerce. If there are no cash flows, then there is not necessarily a need to draft a contract that stipulates how and when the cash will move. That does not mean that the need for protection disappears.

### C.    Case Law Is Not Dispositive Because of the Base Rate Fallacy.

The "base rate fallacy" is "is a type of fallacy in which people tend to ignore the base rate (e.g., general prevalence) in favor of the individuating information (i.e., information pertaining only to a specific case). *Base Rate Fallacy*, available at

https://en.wikipedia.org/wiki/Base_rate_fallacy. For example, a researcher trying to understand

how parents protect their children in a given neighborhood could decide to visit a few preschools in the area and talk to multiple parents in each school. That analysis would likely result in a finding that child protection takes the form of safety gates and swimming pool warnings, rather than conversations about drugs or social media. It would be a fallacy, however, to conclude that parents are not concerned about protecting their teenagers; the hypothetical researcher would simply be conflating evidence of absence with absence of evidence. The error the researcher made would be in limiting the survey to preschools only, thus significantly oversampling the parents of toddlers and effectively excluding the parents of teenagers. The resulting sample, then, would fail to be a true representation of parents of *all* ages of children.

*Amici's* assertion in the Law Scholars Amicus Brief that neither the Supreme Court nor the Second Circuit has found an investment contract in the absence of a contract appears to be similarly conflating absence of evidence with evidence of absence. One would not expect to find such a case, if there were not many cases that had reached those courts involving assets that did not generate cash flows in the first place. The peculiarities of 21st-century finance, *i.e.*, the emergence of assets that do not generate cash flows, is only now moving to the litigation stage in earnest; the voluminous case law involving cash-flow-generating assets is of little use in these cases. Parents eventually remove the safety gates and start focusing on other matters as their child grows; their ultimate goal is to protect their children, with the specific form of protection evolving over time. Similarly, investor protection undeniably stands as Congress's paramount goal. However, it is essential to recognize that the nature of protection can vary depending on the specific context, and 21st-century finance calls for a different form of protection.

14

**III.    The SEC Has The Authority To Regulate Cryptocurrencies.**

**A.    The "Security vs. Commodity" Narrative is a Misconception That This Court Should Ignore.**

A popular, but erroneous narrative, is that an asset can be a security or a commodity, but not both. For example, in a recent congressional hearing, Chair McHenry asked SEC Chair Gensler: "Clearly, an asset cannot be both a security and a commodity. Do you agree?" *Chairman McHenry Questions Chair Gensler on Ether at Hearing to Conduct Oversight of the SEC*, available at https://www.youtube.com/watch?v=VhA1dZXeao0. Chair McHenry then asked Chair Gensler multiple times, "Is Ether a commodity, or a security?" *Ibid*.

The question presumes a distinction that does not exist. Ether can certainly be a commodity when Ether futures are trading under the purview of the Commodity Futures Trading Commission ("CFTC"), but that does not preclude the possibility that purchases of Ether on a crypto exchange can be construed as a security transaction. Notably, NFI's view is supported by both former and current CFTC commissioners. Dan Berkowitz, former Commissioner observed: "Something can be both. It can be a commodity under the [Commodity Exchange Act] and a security." Dan Berkowitz statement on securities vs. commodities via *Unchained* podcast, video excerpt posted on X by Laura Shin, available at https://x.com/laurashin/status/1661114787751948288?s=20. Similarly, current Commissioner Goldsmith Romero stated: "It's not an either/or - almost everything is a commodity unless it's an onion or movie ticket. Something can be a commodity and a security at the same time. *Security? Commodity? What happens if crypto is both?*, available at https://fortune.com/crypto/2023/04/12/security-commodity-crypto-both-cftc/. Then-current Commissioner Stump offered perhaps the sharpest rebuke by issuing a statement, noting that

"there has often been a grossly inaccurate oversimplification offered which suggests these are either securities regulated by the Securities and Exchange Commission, or commodities regulated by the Commodity Futures Trading Commission. The prevalence of this misunderstanding about U.S. regulatory delineations has grown to a point that I believe requires correction," with an accompanying slide deck titled *Digital Assets: Clarifying CFTC Regulatory Authority & the Fallacy of the Question, "Is it a Commodity or a Security?"*. *Statement of Commissioner Dawn D. Stump on the CFTC's Regulatory Authority Applicable to Digital Assets*, August 23, 2021, available at

https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement082321.

Defendants' arguments implying a mutual exclusivity that does not exist are simply a red herring, and should be ignored by this Court.

### B.     Denying the SEC Its Regulatory Authority Creates an Incongruence.

Defendants argue that Congress limited its regulatory focus to the capital-raising needs of enterprises. However, such a narrow approach would result in incongruent outcomes. It would lead to a bifurcated regime where a plethora of information continues to be produced in the equity capital and debt capital markets, which wouldn't be mirrored in the cryptocurrency markets. It does not seem reasonable that potential investors would have access to information that would allow them to make a different decision, when, as illustrated by the hypothetical example above, full and fair disclosure results in a valuation adjustment from $10 to $7, but, no disclosure is made when the intrinsic value is $0. This cannot be the outcome Congress had intended.

C.       **Other Regulators Have Similar Broad Regulatory Powers.**

Effective regulation is an intricate dance, where the delicate balance between innovation and protection takes center stage. At its core, effective regulation aims to grant individuals the freedom to make choices, but with a crucial caveat: they must be *fully* informed.

In 1990, Congress enacted the Organic Foods Production Act to promote the production of organically produced foods through the establishment of a national standard production for organically produced products and providing for the labeling of organically produced products and for other purposes. S.2108 - Organic Foods Production Act of 1990, available at https://www.congress.gov/bill/101st-congress/senate-bill/2108/text. A decade later, USDA released the final national organic standards. Dan Glickman, then Secretary of Agriculture stated: "This is the strongest and most comprehensive organic standard in the world. For consumers who want to buy organic foods, the standards ensure that *they can be confident in knowing what they are buying.*" Dan Glickman, Release of Final National Organic Standards, U.S. DEP'T OF AGRIC., (Dec. 20, 2000), available at https://www.ecomall.com/greenshopping/usdafinal.htm. (emphasis added).

Another pertinent example is the Surgeon General's warning that was added to packs of cigarettes in 1970 after Congress passed the Public Health Cigarette Smoking Act in 1969. "The bill required cigarette packages to be labeled the following, "Warning, The Surgeon General has determined that cigarette smoking is dangerous to your health and may cause lung cancer or other diseases." Public Health Cigarette Smoking Act, available at https://en.wikipedia.org/wiki/Public_Health_Cigarette_Smoking_Act.

These examples, drawn from two different regulatory regimes underscore the fundamental principle that individuals are free to make their own choices but should do so only with complete information.

### D.   Historically, State Regulators Had Similar Powers.

The regulatory labeling regime proposed here is not a novel concept. In fact, it's a revival of an age-old idea that actually predates the federal securities laws.  Under the blue sky laws, certain securities in certain states could not even reach potential buyers: "[T]he registration may show that the corporation has never had a record of earnings that will assure the payments of dividends or interest on the securities sold, unless the rosy hopes of promoters are realized, but such securities can be safely sold without fear of penalty, although they could never be sold in a State with a properly administered licensing act unless expressly labeled: 'This is a speculative security.'" *See*, John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, 1123, available at https://www.jstor.org/stable/1281038. This historical fact, largely forgotten, strongly points to the SEC having authority to regulate cryptocurrencies without further action by Congress. Just as state governments entrusted state regulators with these powers over a century ago, it stands to reason that the federal government should entrust its federal regulator with similar authority.

A potential counterargument might arise, suggesting that labeling a security as speculative amounts to a merit-based evaluation, which runs counter to the primary intent of the federal securities laws which was to move away from such assessments. It is true that such labeling *was* a merit-based evaluation in the context of cash-flow-generating assets. In that realm, the responsibility to assess whether a transaction qualifies as investment or speculation rightfully belongs to the investor, rather than the regulator, based on an estimated value and the

comparison of price to that estimated value. The essential goal of the federal securities laws was to equalize the playing field by democratizing information impacting cash flows and allowing individuals to make informed decisions, based on full and fair disclosure.

NFI contends that this counterargument is no longer valid. While there can be legitimate disagreement about what the cryptocurrency *prices* could be, there can be no disagreement about the *intrinsic value* of cryptocurrencies: it remains zero. Labeling a stock as "speculative," while well-intended, was a misguided approach; a stock can be speculative at high prices but a true investment at a much lower price. That policy effectively died off nearly a century ago, but finds a true home in 21st-century finance, with the intrinsic value of most crypto assets firmly being set at zero. Essentially, in the absence of cash flows, cryptocurrencies will *always* be speculative in nature. In NFI's view, a regulatory solution that is not built around such labeling for cryptocurrencies would fall short and deny investors the protection they need. In addition, developing detailed guidance that builds on that idea is a task that the SEC is fully equipped to execute on.

## CONCLUSION

For the foregoing reasons, NFI respectfully requests that this Court deny Defendants' Motion for Judgment on the Pleadings.

Dated:  October 10, 2023                                    Respectfully submitted,

                              By:  _____
                                            Scott D. Brenner, Esq.
                                            Fed Bar No. SB4264
                                            Parlatore Law Group, LLP
                                            260 Madison Avenue, 17th Floor
                                            New York, NY10016
                                            Telephone: (646) 330-4725
                                            scott.brenner@parlatorelawgroup.com

                                            *Attorney for Amicus Curiae*