**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | 23 Civ. 04738 (KPF) |
| COINBASE, INC. and COINBASE GLOBAL, INC. | |
| Defendants. | |

**BRIEF OF *AMICUS CURIAE* NORTH AMERICAN SECURITIES ADMINISTRATORS ASSOCIATION, INC. IN SUPPORT OF THE <u>SECURITIES AND EXCHANGE COMMISSION</u>**

Vincente L. Martinez
General Counsel
NORTH AMERICAN SECURITIES
ADMINISTRATORS ASSOCIATION, INC.
750 First Street NE, Suite 990
Washington, D.C. 20002
(202) 737-0900
vmartinez@nasaa.org

*Counsel for Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...................................................................................................ii

IDENTITY AND INTEREST OF *AMICUS CURIAE*................................................................ 1

INTRODUCTION ................................................................................................................. 2

ARGUMENT ....................................................................................................................... 3

    I.   The SEC's position that certain digital assets available for trading through Coinbase are investment contracts, and therefore securities, is not novel or extraordinary. ...................... 3

        a.   Congress defined "security" broadly in order to effectively regulate investments, in whatever form they may take........................................................................................ 3

        b.   The SEC and state securities regulators have taken a consistent position that certain digital assets are investment contracts. ........................................................................... 5

        c.   It cannot be the law that an agency must have explicit Congressional authorization to apply existing law to new fact patterns in complex and evolving financial markets. ..... 9

    II.  There is no reason for the Court to import Coinbase's additional requirements into the *Howey* test. ................................................................................................................... 10

        a.   The *Howey* test does not require the existence of formal contractual undertakings...... 10

        b.   The *Howey* test does not require investors to have direct interests in the income, profits, or assets of the business. ...............................................................................................11

        c.   The Court should decline to rewrite the *Howey* test to allow digital asset enterprises to evade regulatory oversight............................................................................................ 12

    III. The SEC has more than adequately alleged that the Coinbase staking program is an investment contract. ......................................................................................................... 13

        a.   Coinbase customers "invest" in the Coinbase staking program. ................................... 13

        b.   Staking investors expect profits to be derived from the essential managerial efforts of Coinbase.......................................................................................................................... 15

    IV. Coinbase overstates the size and economic significance of the "digital asset industry." .... 18

CONCLUSION................................................................................................................... 20

## **TABLE OF AUTHORITIES**

### **Cases**

*Ala. Assn. of Realtors v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485 (2021) ................ 20

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................. 20

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................... 18, 20

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985) .......................................................................... 13, 14

*Hector v. Wiens*, 533 F.2d 429 (9th Cir. 1976) ................................................................. 13

*In the Matter of Nat'l Resources Corp.*, 8 SEC 635, Sec. Act Rel. No. 2470,
   1941 WL 36308 (SEC, Feb. 14, 1941) ................................................................... 11

*Marine Bank v. Weaver*, 455 U.S. 551 (1982) ................................................................. 14

*Movielabs, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662, 663-64 (2d Cir. 1971) ............................... 12

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) ......................................................... 3, 4, 12

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ...................................................... 4

*SEC v. Edwards*, 540 U.S. 389 (2004) ............................................................... 11, 12, 16

*SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir. 1973) ...................................... 12

*SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007) ...................................... 11, 12

*SEC v. Ripple Labs Inc.*, --- F. Supp. 3d ---, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............ 5

*SEC v. Terraform Labs Pte. Ltd.*, --- F. Supp. 3d ---,
   2923 WL 4858299 (S.D.N.Y. July 31, 2023) .............................................................. 5

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ................................................................. passim

*State v. Hawaii Market Center, Inc.*, 485 P.2d 105 (Haw. 1971) ............................................. 4

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) ................................................................. 4, 15

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) ............................................. 4, 16

*Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991) ................ 13

*Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302 (2014) ...................................................... 18, 20

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ........................................................ 18, 20

**Statutes**

15 U.S.C. § 77a(1) ........................................................................................................ 9

15 U.S.C. § 78c(a)(10) .................................................................................................. 9

**Other Authorities**

Administrative Complaint, *Dept. of Fin. Inst. v. Coinbase Global, Inc. and Coinbase, Inc.*, Admin. Action No. 2023-AH-0011 (Ky. Div. of Sec., June 6, 2023) ........................ 1, 8, 15, 17

Answer (June 28, 2023) .............................................................................................. 19

Blocknative, *How Validators Can Maximize Ethereum Block Rewards* (Feb. 8, 2023) .............. 16

Coinbase.com, *What is cryptocurrency?* ..................................................................... 16

Complaint (June 6, 2023) ..................................................................................... passim

Danny Nelson, *State Regulators Crack Down on Voyager Digital's Crypto Interest Offering*, Coindesk (updated May 11, 2023) ............................................................................ 8

Decl. of Joseph Jason Rotunda in support of Texas State Securities Board's and Texas Department of Banking's Limited Objection to the Debtors Motion for Entry of an Order, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 536 (Bankr. S.D.N.Y. Oct. 24, 2022) ... 8

Desist and Refrain Order and Notice of Intent to Issue Order Levying Administrative Penalties, *Commissioner v. Coinbase Global, Inc. and Coinbase, Inc.* (Cal. Dept. of Fin. Prot. and Innovation, June 6, 2023) ........................................................................................ 1

Financial Stability Oversight Council, *2022 Annual Report* (Dec. 16, 2022) ............................ 19

Financial Stability Oversight Council, *Report on Digital Asset Financial Stability Risks and Regulation* (Oct. 3, 2022) ........................................................................................ 19

First Amended Decl. of Joseph Jason Rotunda in support of Objection of the Texas State Securities Board and the Texas Dept. of Banking to Final Approval of the Adequacy of the Debtors' Disclosure Statement and Confirmation of the Chapter 11 Plan, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 1086-1 (Bankr. S.D.N.Y. Feb. 24, 2023) ........................ 8

Gary Gensler, *Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee* (May 26, 2021) ................................. 6, 7

H.R. Rep. No. 73-85, 1933 WL 983 (1933) ................................................................... 3

Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017) ............ 6

Jennifer M. Schonberger, *SEC's Gensler:  The 'runway is getting shorter' for non-compliant crypto firms*, Yahoo! Fin. (Dec. 7, 2022) ...................................................................................... 18

Motion for Judgment on the Pleadings (Aug. 4, 2023)....................................................... passim

NASAA 2022 Enforcement Report (Sept. 2022)........................................................................ 8

NASAA.org, *Operation Cryptosweep 2018* ............................................................................ 7

Notice of Hrg., *In the Matter of Coinbase, Inc. and Coinbase Global, Inc.*, File No. 2300225 (Ill. Sec. Dept., June 6, 2023) ..................................................................... 1, 8, 15, 17

Order to Cease and Desist, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, Matter No. 20225292 (S.C. Sec. Comm., June 6, 2023) ............................................................. 2, 8, 15, 17

Order to Show Cause, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, Admin. Order No. SC-2023-0009 (Ala. Sec. Comm., June 6, 2023)................................................. 1, 8, 15, 17

Order, *In the Matter of TokenLot, LLC, et al.*, File No. 3-18739, Exch. Act Rel. No. 84075 (Sept. 11, 2018) ............................................................................................................................... 7

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings (Oct. 3, 2023)...............................................................................................4, 5, 9, 11

Press Release, "NASAA and SEC Announce $100 Million Settlement with BlockFi Lending, LLC" (Feb. 14, 2022).................................................................................................................. 8

Press Release, "NASAA and SEC Announce $45 Million Settlement with Nexo Capital Over Interest-Bearing Accounts" (Jan. 19, 2023) ................................................................................ 8

Press Release, "NASAA Highlights Top Investor Threats for 2023" (Apr. 20, 2023) ................... 1

Press Release, "NASAA Updates Coordinated Crypto Crackdown" (Aug. 28, 2018).................. 7

Press Release, "NASAA Updates Coordinated Crypto Crackdown" (Aug. 7, 2019).................... 7

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Exch. Act Rel. No. 81207 (July 25, 2017)................................................................. 5, 6

Response of the New Jersey Bureau of Securities to Debtors' Motions, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 808 (Bankr. S.D.N.Y. Jan. 4, 2023)................. 8

SEC EDGAR, Company Search Results, "CERES Coin LLC" ...................................................... 9

SEC EDGAR, Company Search Results, "Hiro Systems PBC" ...................................................... 9

SEC EDGAR, Company Search Results, "INX Ltd."...................................................................... 9

SEC EDGAR, Company Search Results, "Open Props Inc.".......................................................... 9

SEC.gov, "Crypto Assets and Cyber Enforcement Actions" ........................................................ 7

Show Cause Order, *In Re Coinbase Global, Inc. and Coinbase, Inc.*, Docket No. 23-003-S (Vt. Dept. of Fin. Reg., June 6, 2023) ............................................................................. 2, 8, 15, 17

Statement of Charges and Notice of Intent to Enter Order, *In the Matter of Determining Whether there has been a violation of the Securities Act of Washington by Coinbase Global, Inc. and Coinbase, Inc.*, Order No. S-23-3540-23-SC01 (Wash. Sec. Div., June 6, 2023) ...... 2, 8, 15, 17

Summary Order to Cease and Desist and Order to Show Cause, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, No. 2023-0130 (Md. Sec. Div., June 6, 2023) .................... 1, 8, 15-17

Summary Order to Cease and Desist, Revoking Exemptions, and Imposing Civil Penalties, *In the Matter of Coinbase, Inc. and Coinbase Global, Inc.*, DFI Case No. S-246912 (EX) (Wis. Div. of Sec., June 6, 2023) ........................................................................................... 2, 8, 15, 17

Summary Penalty and Cease and Desist Order, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.* (N.J. Bureau of Sec., June 6, 2023) ................................................... 2, 8, 15, 17

The New Jersey Bureau of Securities' Limited Objection to Final Approval, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 1087 (Bankr. S.D.N.Y. Feb. 24, 2023) ............. 8

Treasury.gov, *Financial Stability Oversight Council* ................................................................... 19

Troutman Pepper Hamilton Sanders LLP, Regulatory Oversight Blog, *State Regulators Block Celsius From Offering Interest-Bearing Cryptocurrency Accounts* (Oct. 8, 2021) ................... 8

Uniform Securities Act (1956), § 401(m) ...................................................................................... 4

Uniform Securities Act (2002), § 102(28) ..................................................................................... 4

**Regulations**

950 Mass. Code Regs. 14.401 ......................................................................................................... 4

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The North American Securities Administrators Association, Inc. ("NASAA") is the non-profit association of state, provincial, and territorial securities regulators in the United States, Canada, and Mexico.  NASAA has 68 members, including the securities regulators in all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Guam.  Formed in 1919, NASAA is the oldest international organization devoted to protecting investors from fraud and abuse in the offer and sale of securities.  NASAA's U.S. members are responsible for regulating transactions under state securities laws, commonly known as "Blue Sky Laws."  The overriding mission of NASAA and its members is to protect investors, particularly retail investors, from fraud and abuse.

NASAA and its members have a substantial interest in this case.  While there is nothing inherently fraudulent about digital assets *per se*,[1] they have proven attractive to fraudsters to prey on investors' fear of missing out and fears of economic insecurity.  *See* Press Release, "NASAA Highlights Top Investor Threats for 2023" (Apr. 20, 2023), https://bit.ly/3Q7aL3T.  Digital assets are consistently cited as one of the most dangerous threats to investors in today's markets.  *Id.*  NASAA members have a strong interest in the outcome of this case in particular.  On June 6, 2023, state securities regulators in ten states initiated enforcement actions alleging that Coinbase violated state securities laws by offering and selling its staking program as an unregistered security.[2]  It is

---

[1]     As used in this brief, "digital asset" refers generally to assets that are issued or transferred using distributed ledger or blockchain technology.  As such, this brief draws no meaningful distinction between "digital asset" and terms such as "virtual currency," "cryptocurrency," "token," "coin," and "crypto asset."

[2]     Order to Show Cause, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, Admin. Order No. SC-2023-0009 (Ala. Sec. Comm., June 6, 2023), https://bit.ly/3ZMsYa6; Desist and Refrain Order and Notice of Intent to Issue Order Levying Administrative Penalties, *Commissioner v. Coinbase Global, Inc. and Coinbase, Inc.* (Cal. Dept. of Fin. Prot. and Innovation, June 6, 2023), https://bit.ly/3RS1TjU; Notice of Hrg., *In the Matter of Coinbase, Inc. and Coinbase Global, Inc.*, File No. 2300225 (Ill. Sec. Dept., June 6, 2023), https://bit.ly/3tv9EC2; Administrative Complaint, *Dept. of Fin. Inst. v. Coinbase Global, Inc. and Coinbase, Inc.*, Admin. Action No. 2023-AH-0011 (Ky. Div. of Sec., June 6, 2023), https://bit.ly/3tyt6he; Summary Order to Cease and Desist and Order to Show Cause, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, No. 2023-0130 (Md. Sec. Div., June 6,

virtually certain that Coinbase and others would attempt to use an adverse outcome in this case to impede the states' ability to protect investors by enforcing state securities laws.

## INTRODUCTION

The Securities and Exchange Commission ("SEC") has alleged that Coinbase[3] violated the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") by acting as an unregistered securities exchange, broker, and clearing agency, and by offering and selling unregistered securities. As a core component of these allegations, the SEC takes the unremarkable position that Coinbase's staking program, as well as at least thirteen of the digital assets available for trading through Coinbase, are "investment contracts," and therefore subject to the federal securities laws.

The SEC's theory in this case is consistent with the agency's longstanding public position, the positions advanced by state securities regulators, and even the understanding of digital asset issuers. It is also well within the bounds of established law. The Court should reject Coinbase's attempt to narrow and misapply the established legal framework in order to avoid being subject to the same regulatory obligations as all other participants in the Nation's securities markets. And the Court should decline to treat digital assets as somehow special. While they receive outsized attention from the media and regulators because they are aggressively marketed and fertile grounds

---

2023) https://bit.ly/3tqWciV; Summary Penalty and Cease and Desist Order, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.* (N.J. Bureau of Sec., June 6, 2023), https://bit.ly/46C04M2; Order to Cease and Desist, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, Matter No. 20225292 (S.C. Sec. Comm., June 6, 2023), https://bit.ly/46Fm88t; Show Cause Order, *In Re Coinbase Global, Inc. and Coinbase, Inc.*, Docket No. 23-003-S (Vt. Dept. of Fin. Reg., June 6, 2023), https://bit.ly/3ZKZwRT; Statement of Charges and Notice of Intent to Enter Order, *In the Matter of Determining Whether there has been a violation of the Securities Act of Washington by Coinbase Global, Inc. and Coinbase, Inc.*, Order No. S-23-3540-23-SC01 (Wash. Sec. Div., June 6, 2023), https://bit.ly/3tnhC0a; Summary Order to Cease and Desist, Revoking Exemptions, and Imposing Civil Penalties, *In the Matter of Coinbase, Inc. and Coinbase Global, Inc.*, DFI Case No. S-246912 (EX) (Wis. Div. of Sec., June 6, 2023), https://bit.ly/3LSxfTR.

[3]      This brief uses "Coinbase" generically to refer to Coinbase, Inc., Coinbase Global, Inc., and both collectively.

for fraud, that attention belies the very limited size and significance of this "industry" in the context of the broader U.S. economy.

The Court should deny Coinbase's motion in its entirety.

## ARGUMENT

I. **The SEC's position that certain digital assets available for trading through Coinbase are investment contracts, and therefore securities, is not novel or extraordinary.**

Although Coinbase attempts to cast the SEC's enforcement action as "novel" and "extraordinary," it is neither.  The SEC's position that certain digital assets are investment contracts under the established legal framework under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (the "*Howey* test"), is well within the bounds of established law.  It is also consistent with the SEC's longstanding public position, the position advanced by state securities regulators, and the understanding of digital asset market participants.  As such, it is unnecessary for the SEC to wait for explicit Congressional authorization before applying established law to every new set of facts.

### a. Congress defined "security" broadly in order to effectively regulate investments, in whatever form they may take.

In enacting the federal securities laws, Congress recognized that securities are "intricate merchandise" and that the business of offering and selling them presents copious opportunities for fraud and other abusive practices.  H.R. Rep. No. 73-85, 1933 WL 983, at **2-3, 8 (1933).  In order to ensure that the laws would be fit for the purpose of eliminating these dangers, Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990).  Among the wide array of instruments and transactions included in the definition are some investments "of more variable character" that "were necessarily *designated by more descriptive terms*, such as . . . 'investment contract' . . . ." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) (emphasis

added).[4]  The "touchstone" of an investment contract is "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).  *See also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings ("Opp.") at 6-7 (Oct. 3, 2023).[5]

In analyzing an investment under the *Howey* test, "form should be disregarded for substance and the emphasis should be on economic reality."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (citing *Howey*, 328 U.S. at 298).  The test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.  In other words, the *Howey* test is meant to be sufficiently flexible to encompass all manner of technological and other innovations in the securities markets, including securities sold and traded on blockchains.  Such an approach "permit[s] the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition."  *Reves*, 494 U.S. at 63 n.2.  Accordingly, the Court should reject Coinbase's attempt to cabin the term "investment contract" into a restrictive reading based on the history that preceded the development of the federal securities laws because doing so would ignore both the Supreme Court's intentional

---

[4]     While most state securities laws define "security" by reference to a substantially similar, broad list of instruments and transactions, including investment contracts, *see* Uniform Securities Act (1956), § 401(m), *available at* https://bit.ly/3P4WSme; Uniform Securities Act (2002), § 102(28), *available at* https://bit.ly/3Q9qnnA, this brief does not attempt to account for or describe all state law variations in the definition of "security."

[5]     Most states have adopted the *Howey* test to define "investment contract," although many states' laws include alternative tests.  *See, e.g.*, *State v. Hawaii Market Center, Inc.*, 485 P.2d 105, 109-11 (Haw. 1971) (applying the alternative "risk capital" test); 950 Mass. Code Regs. 14.401, "Investment Contract" at (2) (defining "investment contract" to include same).

articulation of an expansive formula applicable to investments generally, as well as the consistently flexible and investor protection-oriented jurisprudence that has followed.

Further, the *Howey* test does not differentiate between primary and secondary market transactions. Such a differentiation would run counter to the economic reality of such transactions. In any secondary market transaction, whether blind or face-to-face, a seller can only sell the interest that she has. If she has a security, and sells that security, then the buyer purchased her security. Just like the blind bid-ask transactions conducted on the Coinbase platform, an investor who buys shares of public company stock on an exchange has no reason to believe that the proceeds from his purchase will go directly to the company issuer. Indeed, the more likely scenario is that the issuer receives no new capital directly as a result of that transaction. And yet, the shares remain securities because the nature of the interest embodied in them does not change when they are resold. At minimum, recent decisions from other judges in this District demonstrate that it is far from settled law that such a distinction exists. *See SEC v. Terraform Labs Pte. Ltd.*, --- F. Supp. 3d ---, 2923 WL 4858299, at *15 (S.D.N.Y. July 31, 2023) (rejecting the approach adopted in *SEC v. Ripple Labs Inc.*, --- F. Supp. 3d ---, 2023 WL 4507900 (S.D.N.Y. July 13, 2023)). For these reasons, as well as those provided by the SEC, Opp. at 17-21, the Court should decline to draw any distinction under the *Howey* test between digital assets based on their manner of sale.

### b. The SEC and state securities regulators have taken a consistent position that certain digital assets are investment contracts.

In July 2017, the SEC issued its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"). Exch. Act Rel. No. 81207 (July 25, 2017), https://bit.ly/3ZUGNU8.[6] In the DAO Report, the agency found that tokens offered

---

[6]     Section 21(a) of the Exchange Act authorizes the SEC "to publish information" related to any Exchange Act violation it discovers. 15 U.S.C. § 78u(a)(1). In lieu of bringing an enforcement action, which may have limited impact, the SEC can use a Section 21(a) report to explain its views on "substantial issues of public concern,

and sold by a virtual organization known as "The DAO" were securities and therefore required to be registered or exempt from registration under the federal securities laws. *Id*. at 11-16. The SEC also found that certain online platforms that matched and executed orders for the tokens "appear[ed] to have satisfied the criteria" to be exchanges by virtue of matching and executing orders for the DAO tokens. *Id.* at 17. The DAO Report thus established the SEC's position publicly that certain digital assets are investment contracts under the *Howey* test and it made clear that entities that effect or facilitate transactions in digital asset securities for others are subject to the securities laws as well.

Following the issuance of the DAO Report, both former SEC Chair Jay Clayton and current Chair Gary Gensler have been steadfast in the view that some digital assets are indeed securities under recognized frameworks. *See, e.g.*, Gary Gensler, *Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee* ("Gensler Testimony") (May 26, 2021), https://bit.ly/3tsrHsL ("Many of these tokens are investment contracts under the securities law.");[7] Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017), https://bit.ly/3Q71jNZ ("It has been asserted that cryptocurrencies are not securities and that the offer and sale of cryptocurrencies are beyond the SEC's jurisdiction.

---

widespread investor impact, or other matters of significance relating to the federal securities laws . . . ." *The Commission's Practice Relating to Reports of Investigations and Statements Submitted to the Commission Pursuant to Section 21(a) of the Securities Exchange Act of 1934*, Exch. Act. Rel. No 15664 (Mar. 21, 1979).

[7]     Coinbase's argument that Chair Gensler's testimony that "there is not a market regulator around these crypto exchanges" and that "trading in . . . crypto assets do[es] not have a regulatory framework," demonstrates that the SEC lacks any authority over digital asset securities is without merit. *See* Memorandum of Law in Support of Coinbase's Motion for Judgment on the Pleadings ("Mot."), 4, 22 (Aug. 4, 2023). Chair Gensler's statements are better understood merely to reflect the simple fact that Congress has not specified a single market regulator for digital asset trading entities from among the multiple existing agencies that could lawfully assert regulatory authority over portions of the digital asset markets. There is a significant difference between the lack of a single designated, top-down regulator for a particular type of business or activity and the lack of (or inadequacy of existing) authority to address digital asset-related issues overall. The SEC has the authority to regulate both companies that issue digital asset securities and the businesses that are involved in trading those assets.

Whether that assertion proves correct with respect to any digital asset that is labeled as a cryptocurrency will depend on the characteristics and use of that particular asset.").

By May 2021, the SEC had brought 75 cases in this area, Gensler Testimony, *supra*, and today that number is over 100, *see* SEC.gov, *Crypto Assets and Cyber Enforcement Actions*, https://bit.ly/46kx3Vn (last visited Oct. 2, 2023).  These include actions against firms like Coinbase, specifically alleging that they acted as unregistered broker-dealers by soliciting and facilitating the purchase and sale of digital assets in connection with initial coin offerings ("ICOs") and secondary market trading. *See*, *e.g.*, Order, *In the Matter of TokenLot, LLC, et al.*, File No. 3-18739, Exch. Act Rel. No. 84075 (Sept. 11, 2018), https://bit.ly/3PKdBul (finding that entity calling itself an "ICO Superstore" acted as an unregistered broker-dealer in connection with more than 200 digital asset securities).

State securities regulators have likewise taken action to protect investors from fraud and abuse involving the offer and sale of digital asset securities, including through actions premised on the theory that certain digital assets are investment contracts.  In April 2018, a task force of NASAA member state and provincial securities regulators began a coordinated series of investigations into ICOs and digital asset-related investment offerings.  NASAA.org, *Operation Cryptosweep 2018*, https://bit.ly/45o2WLp (last visited Oct. 3, 2023).  Between May 2018 and August 2019, NASAA members conducted hundreds of investigations and brought many enforcement actions involving ICOs and digital asset-related investments.  Press Release, "NASAA Updates Coordinated Crypto Crackdown" (Aug. 7, 2019), https://bit.ly/46DOgcg; Press Release, "NASAA Updates Coordinated Crypto Crackdown" (Aug. 28, 2018), https://bit.ly/3QaWL96.

In recent years, state securities regulators have also pursued enforcement actions against a wide variety of digital asset issuers and platforms.  *See* Danny Nelson, *State Regulators Crack Down on Voyager Digital's Crypto Interest Offering*, Coindesk (updated May 11, 2023), https://bit.ly/3PQ7y7y; Press Release, "NASAA and SEC Announce $45 Million Settlement with Nexo Capital Over Interest-Bearing Accounts" (Jan. 19, 2023), https://bit.ly/3tmoLhp; NASAA 2022 Enforcement Report, 14-16 (Sept. 2022), https://bit.ly/47RbtJs (summarizing state enforcement actions); Press Release, "NASAA and SEC Announce $100 Million Settlement with BlockFi Lending, LLC" (Feb. 14, 2022), https://bit.ly/3tpMLjH; Troutman Pepper Hamilton Sanders LLP, Regulatory Oversight Blog, *State Regulators Block Celsius From Offering Interest-Bearing Cryptocurrency Accounts* (Oct. 8, 2021), https://bit.ly/3QcKIbI.[8]  And in June 2023, state securities regulators in ten states initiated enforcement actions alleging that Coinbase violated state securities laws by offering an unregistered investment contract security, specifically, the Coinbase staking program.  *See* note 2, *supra*.

The understanding that some digital assets are or could be considered securities is not unique to regulators.  Some companies have conducted digital asset offerings within the securities law framework, specifically the securities registration exemptions available under SEC Regulation

---

[8]     States have advanced a similar position in other proceedings, including by filing objections in the bankruptcy court to the proposed acquisition of Voyager Digital LTD customer account assets by FTX, and later by Binance.us. Specifically, Texas and New Jersey objected on the basis, among others, that each entity appeared to be offering digital asset staking or "yield" programs as unregistered securities, in violation of state securities laws.  *See* First Amended Decl. of Joseph Jason Rotunda in support of Objection of the Texas State Securities Board and the Texas Dept. of Banking to Final Approval of the Adequacy of the Debtors' Disclosure Statement and Confirmation of the Chapter 11 Plan, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 1086-1, at ¶¶ 39-41, 70-103 (Bankr. S.D.N.Y. Feb. 24, 2023); Decl. of Joseph Jason Rotunda in support of Texas State Securities Board's and Texas Department of Banking's Limited Objection to the Debtors Motion for Entry of an Order, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 536 (Bankr. S.D.N.Y. Oct. 24, 2022); The New Jersey Bureau of Securities' Limited Objection to Final Approval, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 1087 (Bankr. S.D.N.Y. Feb. 24, 2023); Response of the New Jersey Bureau of Securities to Debtors' Motions, *In re: Voyager Digital Holdings, Inc. et al.*, Case No. 22-10943, Dkt. 808, at ¶ 39 (Bankr. S.D.N.Y. Jan. 4, 2023) (joining objections previously filed by Texas and other states, including Dkt. 536).

D and Regulation A.   *See*, *e.g.*, SEC EDGAR, Company Search Results, "Open Props Inc.," https://bit.ly/48L12Y9 (offered pursuant to Regulation A); SEC EDGAR, Company Search Results, "Hiro Systems PBC," https://bit.ly/46mT4mr (offered pursuant to Regulation A, previously Regulation D); SEC EDGAR, Company Search Results, "CERES Coin LLC," https://bit.ly/45hwIlf (offered pursuant to Regulation A); SEC EDGAR, Company Search Results, "INX Ltd.," https://bit.ly/3ZOv09M (registered offering).   *See also* Complaint ("Compl."), ¶ 129 (June 6, 2023) (alleging Solana Labs sold approximately $23 million worth of SOL between 2018-2020 pursuant to Rule 506(c) of Regulation D) and ¶ 233 (alleging Dapper Labs sold approximately $40 million worth of FLOW between 2019-2021 pursuant to Rule 506(b) of Regulation D).   Coinbase is therefore wrong to argue that it is settled as a matter of law that digital asset issuances are not securities when courts, government agencies, and private actors have found that they are.

>         **c.  It cannot be the law that an agency must have explicit Congressional authorization to apply existing law to new fact patterns in complex and evolving financial markets.**

By pursuing this enforcement action against Coinbase, the SEC has not laid claim to any authority that it has not had for decades.   *See* Compl. at ¶¶ 372-74 (alleging violations of 15 U.S.C. § 78e), ¶¶ 375-77 (alleging violations of 15 U.S.C. §, 78o(a)), ¶¶ 378-80 (alleging violations of 15 U.S.C. § 78q-1(b)), 381-85 (alleging violations of 15 U.S.C. §§ 78e, 78o(a), 78q-1(b)), and ¶¶ 386-99 (alleging violations of 15 U.S.C. §§ 77e(a) and (c)); *Howey*, *supra*.   The SEC has alleged that certain digital asset tokens and digital asset investment products are investment contracts, and thus securities, under the established legal framework of *Howey* and its progeny.   *See*, *e.g.*, 15 U.S.C. §§ 77a(1), 78c(a)(10); *Howey*, *supra*.   The SEC is not making new policy; it is enforcing existing law.   *See* Opp. at 21-23.

Coinbase points to the "more than 20 legislative proposals [considered by Congress in recent years] concerning regulation of digital assets."   Mot. at 23.   However, none of these

proposals have been enacted to date.  Although Congress may eventually legislate a comprehensive regulatory framework for digital assets in the future, it has not done so.  It is also possible that Congress will not do so.  Thus, it cannot be said that Congress has made any policy decision rejecting the application of the federal securities laws to digital asset investments that are securities.  Unless and until Congress enacts law to the contrary, both regulators and the courts are empowered and obligated to apply the law as it exists today.

II.     **There is no reason for the Court to import Coinbase's additional requirements into the *Howey* test.**

Appearing to concede that the SEC has adequately pled that the thirteen named tokens available for trading through Coinbase meet each element of the *Howey* test, Coinbase instead asks the Court to read two new requirements into the framework and dismiss the Complaint for the SEC's purported failure to plead them.  Specifically, Coinbase contends that the *Howey* test requires:  (1) formal "contractual undertakings" between the buyer and seller, and (2) that investors share directly in the profits, income, or assets of the issuer's business.  *Id*. at 7-17, 18-21.  But these are not, and have never been, required elements to find an investment contract.  The Court should decline to read these new requirements into the *Howey* test.

a.  **The *Howey* test does not require the existence of formal contractual undertakings.**

The plain text of *Howey* does not require formal contractual undertakings to find an investment contract.  To the contrary, the Supreme Court expressly states that "investment contract" includes not only formal "contract[s]," but "transaction[s]" and "scheme[s]," as well. 328 U.S. at 298-99.  The *Howey* court also explained that, where such a contract, transaction, or scheme represents an investment in a common enterprise with an expectation of profits to be derived from the efforts of someone other than the investor, it is "immaterial" whether the investment is represented by a formal instrument or interest in the assets of the business.  *Id*.

10

Additionally, the Supreme Court specifically noted that the SEC "ha[d] followed *the same definition* in its own administrative proceedings." *Id.* at 299 n.5 (emphasis added) (citing *In the Matter of Nat'l Resources Corp.*, 8 SEC 635, Sec. Act Rel. No. 2470, 1941 WL 36308 (SEC, Feb. 14, 1941)). The *Howey* court's favorable citation of *Nat'l Resources* is significant because, in that proceeding, the SEC determined that the investment at issue was indeed an investment contract *in the absence of formal contractual undertakings*. 1941 WL 36308, at *3. Instead, similar to the allegations in this case, the SEC focused on the fact that the issuer "made it clear in its selling literature" that it had begun, and would continue, to engage in activity that would be economically beneficial to investors. *Id*. That was precisely the test for "investment contract" that the Supreme Court announced in *Howey*. And, as the SEC explains in its brief, courts have consistently applied the *Howey* test without requiring formal contractual undertakings. Opp. at 11-14 (cases cited); *see also SEC v. Merchant Capital, LLC*, 483 F.3d 747, 760 (11th Cir. 2007) ("A focus on the bare terms of the legal agreement would also be inconsistent with the substance over form principle of *Howey*, and would be an invitation to artful manipulation of business forms to avoid investment contract status."). In sum, Coinbase could not be more clearly wrong.

### b. The *Howey* test does not require investors to have direct interests in the income, profits, or assets of the business.

On its face, *Howey* requires only that the investor expect to realize a profit from her investment, not a direct interest in the income, profits, or assets of a business. 328 U.S. at 298-99 (noting that it is "immaterial" whether the investment is represented by an interest in the assets of the business). The Supreme Court subsequently put to rest any questions about the meaning of "profit" in *SEC v. Edwards*, clarifying that the required "profits" are "the profits that investors seek on their investment, *not the profits of the scheme in which they invest*." 540 U.S. 389, 394 (2004) (emphasis added). Thus, it is not necessary that the enterprise be profitable, or even that the

enterprise have income or assets from which those profits can be paid.[9]  Again, Coinbase's argument ignores the law.

### c. The Court should decline to rewrite the *Howey* test to allow digital asset enterprises to evade regulatory oversight.

The securities laws, including the definition of "security," must be construed flexibly, not technically or restrictively.  *See, e.g., Movielabs, Inc. v. Berkey Photo, Inc.*, 452 F.2d 662, 663-64 (2d Cir. 1971).  Courts have consistently rejected previous attempts to limit the reach of the *Howey* test because an unduly technical or restrictive interpretation would make it easy for wrongdoers to evade the securities laws.  *See, e.g., Edwards*, 540 U.S. at 394-95 (refusing to "read into the securities laws a limitation not compelled by the language that would so undermine the laws' purposes"); *Merchant Capital*, 483 F.3d at 760; *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (rejecting a strict interpretation of the requirement that profits come "solely" from the efforts of others); *see also Reves*, 494 U.S. at 63 n.2.

In *Howey*, the Supreme Court deliberately referred to contracts *and* transactions *and* schemes that bear certain characteristics.  328 U.S. at 298-99.  The Court should not read Coinbase's asserted limitation into the definition of "investment contract" because it would read the Supreme Court's words out of the *Howey* test and it would undermine the purposes of the securities laws.  *See Edwards*, 540 U.S. at 394-95.  Adoption of Coinbase's interpretation would not only make it harder for the SEC to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *Howey*, 328 U.S. at 299, but it would also impede private litigants and potentially state securities regulators as well, given the

---

[9]     Even if such an interest were required under the *Howey* test, Coinbase would not be entitled to judgment on the pleadings regarding its staking program because investors have a direct interest in the income that Coinbase earns through staking.  *See* Compl., ¶ 337 (alleging that "Coinbase 'considers itself the principal' in staking"), and ¶ 354 (alleging that Coinbase "earns rewards," "takes a commission," and then "credits rewards to . . . investors' accounts on a *pro rata* basis").

similarities between the state and federal definitions of "security."   Investors throughout the securities markets would thus be left more vulnerable to securities fraud and other abusive tactics. And, as explained above, Coinbase's additional requirements are not required under the *Howey* test.  The Court should therefore reject them.

### III.   The SEC has more than adequately alleged that the Coinbase staking program is an investment contract.

Coinbase argues that it is entitled to judgment on the pleadings with respect to the allegation that its staking program is offered and sold as an investment contract because (1) Coinbase customers do not invest money in the staking program because they do not relinquish property creating risk of loss, Mot. at 27-29, and (2) staking investors' expected profits are not generated by Coinbase's essential managerial efforts, *id.* at 29-30.  These arguments lack merit and the Court should reject them.

#### a.   Coinbase customers "invest" in the Coinbase staking program.

The "investment" prong of the *Howey* test requires only that the investor "commit his assets to the enterprise in such a manner as to subject himself to financial loss."  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976); *accord Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) ("[F]or an investment to be a security the investor must risk loss.").  *See also Uselton v. Commercial Lovelace Motor Freight, Inc*., 940 F.2d 564, 574 (10th Cir. 1991) (noting that the "investment" may be any "exchange of value").  As the SEC alleges in the Complaint, Coinbase staking investors commit their digital assets to the staking enterprise, Compl., ¶¶ 340-41, and subject themselves to financial loss as a result of, *inter alia*, market fluctuations, "slashing,"[10] theft, or loss of private keys during the required lockup periods

---

[10]     *See* Compl., ¶ 313.

*Id.* at ¶¶ 315, 342-45.  Coinbase also benefits from its investors' commitment of assets to the enterprise by obtaining more assets to stake, thereby increasing both the likelihood of earning rewards and the magnitude of Coinbase's return.  More specifically, Coinbase receives significant revenue from its staking operations, from which it takes a commission of up to 35% before crediting rewards to investors on a *pro rata* basis.  *Id.* at ¶¶ 328-38, 354.  However, in order to earn revenue, Coinbase must first be selected as a validator.  *See id.* at ¶ 314.  As with any pooled vehicle, economies of scale benefit Coinbase by giving it more assets to stake, thus increasing its chances of being selected and earning commissions.  *See id*. at ¶¶ 314, 351, 353-56.  The amount of digital assets staked can also influence the gross amount of staking rewards from which Coinbase can draw its commission.  *See id.* at ¶ 351.

Coinbase argues that customers do not "invest" in its staking program because the staking program "*creates* no risk" that is not also present outside of the staking program.  *See* Mot. at 27 (emphasis added).  But the relevant inquiry is not focused on the *source* of the risk; the inquiry is whether the investor risks loss of their invested capital.  *See Marine Bank v. Weaver*, 455 U.S. 551, 558 (1982) (focus is on whether the investor "assumes the risk"); *Gary Plastic*, 756 F.2d at 239 (focus is on whether the investor "risk[s] loss").  Many pooled investments involve risks of loss that are similar or identical in kind to the risks involved in conducting the underlying activity separately.  For example, investors in an exchange-traded fund or a mutual fund risk loss if the market value of the fund's portfolio investments declines, while individual investors would face the same market risks if they were to invest directly in the portfolio companies outside of the fund. That does not mean that investors in a fund do not "risk loss," *Gary Plastic*, 756 F.2d at 239, within the meaning of the securities laws.

Coinbase also argues, again without merit, that its customers do not "invest" in the staking program because they technically retain legal ownership of their staked digital assets. Mot. at 28-29. But such legal formalities must be "disregard[ed]" when applying the *Howey* test, in favor of substance and economic reality. *Tcherepnin*, 389 U.S. at 336. The economic reality is that staking program investors tender control of their digital assets to Coinbase and Coinbase then pools those assets in omnibus wallets for which Coinbase retains control of the private keys. Compl., ¶¶ 340, 341, 348, 349. Coinbase treats and uses all units of each digital asset as fungible. *Id.* at ¶ 350. Coinbase thus exercises complete control over the staked assets and investors risk losing their staked assets permanently if, for example, the assets are slashed or stolen. *Id.* at ¶¶ 342-45.[11] There is no vault into which an investor can reach to retrieve her staked assets, and her legal ownership does not guarantee her a replacement in the event of loss.

### b. Staking investors expect profits to be derived from the essential managerial efforts of Coinbase.

Coinbase does not dispute that investors in its staking program expect to profit from their investment. Instead, it argues (1) that those profits are derived not from its own efforts, but from investors' use of their digital assets; (2) that the reward payments are set by network protocols and are the same whether customers stake through Coinbase, on their own, or through some other service; and (3) that its efforts are purely "technical or administrative," rather than "managerial." These arguments lack merit.

---

[11] As alleged in certain state actions, *see* note 2, *supra*, there are circumstances in which Coinbase *will not* replace staked assets that are lost, including "protocol-level failures caused by bugs, maintenance, upgrades, or general failure, the investor's acts or omissions, the acts or omissions of any third-party service provider, a force majeure event as defined by the [user] agreement, acts by a hacked or other malicious actor, or any other events outside of Coinbase's reasonable control," and there is a chance that Coinbase *will not be able to* replace any slashed or lost assets if its business is not profitable enough to do so. *See* Summary Order to Cease and Desist and Order to Show Cause, ¶¶ 82-84, *In the Matter of Coinbase Global, Inc. and Coinbase, Inc.*, No. 2023-0130 (Md. Sec. Div., June 6, 2023).

Coinbase's argument that investing in its staking program is simply *using* one's digital assets is a curious one.  On its website, Coinbase describes digital assets as "decentralized digital money" that can be used "to pay for goods or services" without the need for traditional financial intermediaries, "*or* held as part of an investment strategy."   Coinbase.com, *What is cryptocurrency?*, https://bit.ly/46KkoLt (last visited Oct. 5, 2023) (emphasis added).  Moreover, Coinbase presents staking as an example of *an investment*, rather than as a use case (*i.e.*, paying for goods or services).  Accordingly, investors in the staking program are not "motivated by a desire to use or consume" the relevant digital assets in the same way that the renters of New York City apartments in *Forman* were "attracted solely by the prospect of acquiring a place to live." 421 U.S. at 853.

Even if Coinbase were correct that the expected returns do not vary as a result of investors' use of the staking program, rather than staking on their own,[12] Coinbase would still be incorrect to contend that fixed returns preclude an investment contract.  In *Edwards*, the Supreme Court definitively held it is not necessary for the issuer of an investment contract to be able to influence the *amount* of any expected returns.  540 U.S. at 394-97 (rejecting a distinction between fixed and variable returns).  As made clear in *Edwards*, it is especially important for the *Howey* test to reach "investments pitched as low-risk (such as those offering a 'guaranteed' fixed rate of return)" because they are "particularly attractive to individuals more vulnerable to investment fraud, including older and less sophisticated investors."  *Id.* at 394.

Finally, Coinbase's efforts are not merely "technical" or "ministerial."  To the contrary, Coinbase undertakes serious entrepreneurial and managerial efforts to pool investors' digital assets

---

[12]    *See* Compl., ¶ 351 (alleging otherwise).  *See also* Blocknative, *How Validators Can Maximize Ethereum Block Rewards* (Feb. 8, 2023), https://bit.ly/3rC6ITV.

and employ them to generate significant profit for both Coinbase and its investors.  Coinbase pools investors' assets in omnibus wallets; determines how and when to stake investors' digital assets; operates validator nodes; takes action to prevent malicious behavior or hacks, protect keys, and increase server uptime; and periodically credits investors' Coinbase accounts with rewards after taking its commission.  *See* Compl. , ¶¶ 312-21, 341, 348-49, 352-54, 363, 364.[13]  Even if Coinbase customers could, in theory, download, configure, and operate Coinbase's staking software effectively from their home computers, the same is true of any pooled investment vehicle; *i.e.*, an investor could construct the economic equivalent of the pooled vehicle's portfolio by buying individual securities.  In reality, and as underscored by Coinbase, staking can be "confusing, complicated, and costly," and requires a "fairly high level of technical knowledge" and "state-of-the-art encryption and security."  *See id.* at ¶¶ 360-64.  There are also economic barriers that make it difficult for individual investors to earn the same rewards by staking their digital assets alone.  For instance, staking protocols typically require a minimum amount of digital assets in order to participate, *see id. at* ¶ 318, and the chance of being selected to validate a block is typically dependent on staking a larger amount of digital assets and exhibiting less server downtime, *see id.* at ¶ 314.  Coinbase holds out its staking program as a solution to these challenges for individual investors.  *See id.* at ¶¶ 353, 360.  As a result of pooling investors' assets, along with Coinbase's substantial advantage in both resources and expertise, Coinbase's staking program is far more likely to generate returns than any investor acting alone.  In sum, Coinbase engages in significant and essential entrepreneurial and managerial efforts in the operation of its staking program.  The profits expected by both Coinbase and its investors are dependent on those efforts.

---

[13]     *Accord*, state actions in note 2, *supra*.

**IV.**    **Coinbase overstates the size and economic significance of the "digital asset industry."**

Coinbase dubiously casts the "digital asset industry" as "a significant portion of the American economy," Mot. at 21 (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022)), on par with the American energy and tobacco industries and the like, *id.* (citing *Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).   However, Coinbase overstates both the size and significance of this "industry," particularly the portion that securities regulators oversee.

As an initial matter, digital assets cannot reasonably be considered a sufficiently significant component of the American economy because there is no practical economic use case identified or widely adopted for the vast majority of digital assets, other than speculation.  With very few exceptions, digital assets are not widely accepted to pay for goods or services, nor can they be used to satisfy obligations to the government such as fees or taxes.  As a class of assets, digital assets are not economically useful.

Coinbase claims in its Answer that the "digital asset industry" is worth "around $1 trillion," but that number is unhelpful here because, as Coinbase recognizes, it is a *global* market capitalization figure.  Answer, Prelim. Stmt. at ¶ 21 and n.23 (June 28, 2023).  In a December 2022 interview, Chair Gensler noted that the number is "far smaller" in the *American* market.  Jennifer M. Schonberger, *SEC's Gensler:  The 'runway is getting shorter' for non-compliant crypto firms*, Yahoo! Fin. (Dec. 7, 2022), https://yhoo.it/3rF57wu.  Regardless of the raw numbers, it is also important to note that the market valuation is largely driven by digital asset prices, particularly

Bitcoin.[14]  Financial Stability Oversight Council ("FSOC"),[15] *Report on Digital Asset Financial Stability Risks and Regulation*, 9 (Oct. 3, 2022), https://bit.ly/46mnhCb.  But market capitalization is an unreliable measure because it can fluctuate significantly, such as when it rose from about $200 billion in April 2020 to nearly $3 trillion in November 2021, then fell back to about $900 billion by July 2022.  *Id.*

The overall impact of digital assets on the U.S. and global financial system to date has been limited.  For example, the FSOC recently found that digital assets are "still relatively small in the scope of the global financial system," *id.*, and noted that "the turmoil in the crypto-assets ecosystem [in 2022] did not have notable effects on the traditional financial system" because of "the limited overall scale of crypto-asset activities," FSOC, *2022 Annual Report*, 33 (Dec. 16, 2022), https://bit.ly/46mnm8X.

Furthermore, survey data suggest that the percentage of Americans comfortable investing in digital assets dropped significantly from 2021 to 2022, including a decrease of 20% among Americans between the ages of 26 and 51.  *Id.*  And although Coinbase offers that "[o]ne in five adults in the United States has owned a cryptocurrency," Mot. at 22, industry data suggests that digital assets are highly concentrated among the top 1% of asset holders, FSOC Annual Report at 33, further undercutting the significance of digital assets to the broader economy.  As such, the "digital assets industry" today bears no meaningful comparison in terms of economic and political

---

[14]     The SEC has never asserted that Bitcoin is a security and NASAA is unaware of any state securities regulator doing so.

[15]     The FSOC was established in 2010 under the Dodd-Frank Wall Street Reform and Consumer Protection Act.  It provides comprehensive monitoring of the stability of our Nation's financial system.  FSOC members include, *inter alia*, the Chairs of both the SEC and the Commodity Futures Trading Commission, as well as a state securities commissioner or officer performing like functions (currently Commissioner Melanie Senter Lubin of the Maryland Securities Division) as a nonvoting member.  *See* Treasury.gov, *Financial Stability Oversight Council*, https://bit.ly/3LTH57R (last visited Oct. 6, 2023).

significance to the tobacco industry,[16] the U.S. energy market,[17] eviction protections during the COVID-19 pandemic,[18] and student debt relief[19] that have been the subject of the Supreme Court's recent major questions jurisprudence.

## **CONCLUSION**

For the reasons above, in addition to the reasons provided by the SEC in its brief, Coinbase is not entitled to judgment on the pleadings and its motion should be denied.

Dated:  October 10, 2023                      Respectfully submitted

                                              By:   /s/ Vincente L. Martinez
                                              Vincente L. Martinez
                                              General Counsel
                                              NORTH AMERICAN SECURITIES
                                              ADMINISTRATORS ASSOCIATION, INC.
                                              750 First Street NE, Suite 990
                                              Washington, DC 20002
                                              Tel:  (202) 737-0900
                                              vmartinez@nasaa.org

                                              *Counsel for Amicus Curiae*

---

[16]    *See Brown & Williamson, supra.*

[17]    *See West Virginia* and *Util. Air, supra.*

[18]    *Ala. Assn. of Realtors v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485 (2021).

[19]    *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was filed on October 10, 2023, with the Clerk of the Court by using the CM/ECF system, which will effect electronic service on all parties and attorneys registered to receive notifications via the CM/ECF system.

A courtesy copy is being sent to Chambers by United States mail.


Dated:  October 10, 2023                    By:  _/s/ Vincente L. Martinez_
                                            Vincente L. Martinez