# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

*Plaintiff,*

v.

COINBASE, INC., ET AL

*Defendants.*

Case No. 1:23-cv-04738 (KPF)

Hon. Katherine Polk Failla

## BRIEF OF AMICI CURIAE ADMINISTRATIVE LAW SCHOLARS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION ON THE PLEADINGS

Jeffrey B. Dubner (JD4545)
Orlando Economos (N.Y. Bar No. 5996681)*
Sarah Goetz (N.Y. Bar No. 5539366)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-788-6052
jdubner@democracyforward.org
oeconomos@democracyforward.org
sgoetz@democracyforward.org

*Counsel for Amici Curiae*

* Motion for admission pro hac vice pending

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ i

TABLE OF AUTHORITIES .......................................................Error! Bookmark not defined.

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I.   **The Legal Foundations of the Major Questions Doctrine Limit its Application.** .......................................................................................................... **4**

   A.  The major questions doctrine is triggered only in "exceptional" cases involving "major" claims of authority. ..................................................................... 4

   B.  The major questions doctrine is intended to vindicate Congressional intent and preserve the separation of powers. ........................................................... 6

II.  **The Major Questions Doctrine is Inapplicable to This Lawsuit.** ..................... **7**

   A.  The SEC's enforcement action is neither "extraordinary" nor "economically significant." ..................................................................................... 8

   B.  The major questions doctrine does not apply to displace or limit binding judicial standards like the *Howey* test because judicial review reinforces the separation of powers. ............................................................................... 15

   C.  The major questions doctrine leads to absurd results here as the SEC and private litigants share litigation authority. ..................................................... 18

     **CONCLUSION** ............................................................................................ **19**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021)................................................................................................4, 9

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)............................................................2, 4, 5, 7, 9, 12, 14, 16, 17

*Cont'l Mktg. Corp. v. SEC*,
  387 F.2d 466 (10th Cir. 1967) ................................................................................8, 10

*FTC v. Kochava Inc.*,
  No. 2:22-CV-00377-BLW, 2023 WL 3249809 (D. Idaho May 4, 2023)..........................8

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)..................................................................5, 6, 8, 11, 12, 18

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)..................................................................................................5, 8

*King v. Burwell*,
  576 U.S. 473 (2015)................................................................................................5, 12

*Marbury v. Madison*,
  5 U.S. 137 (1803)........................................................................................................17

*MCI Telecomms. Corp. v. AT & T Co.*,
  512 U.S. 218 (1994)...........................................................................5, 9, 11, 18–19

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA (NFIB v. OSHA)*,
  595 U.S. 109 (2022)................................................................................................9, 19

*SEC v. Brigadoon Scotch Distribs., Ltd.*,
  388 F. Supp. 1288 (S.D.N.Y. 1975) ....................................................................1, 8, 10

*SEC v. Edwards*,
  540 U.S. 389 (2004)......................................................................................................15

*SEC v. Galaxy Foods, Inc.*,
  417 F. Supp. 1225 (E.D.N.Y. 1976) ............................................................................10

*SEC v. Glenn W. Turner Enters., Inc.*,
  474 F.2d 476 (9th Cir. 1973) ................................................................................10–11

*SEC v. Merch. Cap., LLC.*,
    483 F.3d 747 (11th Cir. 2007) .......................................................................10

*SEC v. R.G. Reynolds Enter., Inc.*,
    952 F.2d 1125 (9th Cir. 1991) .......................................................................10

*SEC v. Ripple Labs, Inc.*,
    No. 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ..........13

*SEC v. Terraform Labs Pte. Ltd.*,
    23-cv-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023)...............11, 13

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)...................................................1, 3, 10, 15, 17, 18

*SEC v. Wickham*,
    12 F. Supp. 245 (D. Minn. 1935).....................................................................10

*Slack Technologies LLC v. Pirani*,
    143 S. Ct. 1433 (2023).....................................................................................16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).....................................................................................14

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975).........................................................................................18

*United States v. Texas*,
    143 S. Ct. 1964 (2023).....................................................................................14

*Utah v. Walsh*,
    No. 2:23-CV-016-Z, 2023 WL 6205926 (N.D. Tex. Sept. 21, 2023).............10

*Util. Air Regul. Grp. v. EPA (UARG)*,
    573 U.S. 302 (2014)...................................................................4, 5, 6, 16, 18

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)..........................1, 2, 4, 5, 6, 7, 9, 10, 11, 13, 15, 16, 18

**Constitutional Provisions**

U.S. Const., art. II, § 1, cl. 1; § 3 ......................................................................14

**Statutes**

15 U.S.C. § 77k .................................................................................................................18

15 U.S.C. § 77l.............................................................................................................3, 18

15 U.S.C. § 77t..................................................................................................................3

15 U.S.C. § 78c(a)(1) ........................................................................................................1

15 U.S.C. § 78r ...............................................................................................................18

15 U.S.C. § 78t-1 ............................................................................................................18

**Other Authorities**

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law*
    (Amy Gutmann ed., 1997) ........................................................................................17

*Apple Inc. Common Stock,* NASDAQ (accessed Oct 9, 2023),
    https://www.nasdaq.com/market-activity/stocks/aapl .......................................13

Gary Gensler, Chair, SEC, Kennedy and Crypto, Speech at SEC Speaks
    (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ..............13

Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws to Cater
    to Cryptocurrencies*, CNBC (June 6, 2018), https://www.cnbc.com/amp/2018/
    06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html .....13

Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* (6th ed. 2019) ............8

SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act
    of 1934: The DAO*, Exchange Act Release No. 81207 (July 25, 2017)............................17–18

Todd Phillips & Beau J. Baumann, *The Major Questions Doctrine's Domain*
    89 Brooklyn L. Rev. (forthcoming 2024) (available at https://papers.ssrn.com/sol3/
    papers.cfm?abstract_id=4504304) ................................................................................3, 7, 13

## INTRODUCTION

For nearly a century, the Securities and Exchange Commission (SEC) has regulated the national securities markets. Since its inception, it has carried out its mission to protect investors, preserve fair and orderly markets, and facilitate capital formation with respect to both run-of-the-mill securities instruments and novel ones. From its early days of enforcing the Securities Act's requirements to units of a citrus grove development, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to portfolios of rare coins, *SEC v. Brigadoon Scotch Distribs., Ltd.*, 388 F. Supp. 1288 (S.D.N.Y. 1975), to the modern specter of crypto assets, the "flexible" and "adapt[able]" nature of the securities laws enables the SEC to respond to industry innovations and trends, *Howey*, 328 U.S. at 299.

This enforcement action against defendants Coinbase, Inc. and Coinbase Global, Inc. ("Coinbase") is the latest such application of the SEC's authority to regulate "investment contracts" to new factual circumstances. 15 U.S.C. §78c(a)(1). The relative novelty of the investment asset does not make the SEC's invocation of its longstanding authority to regulate investment contracts "unheralded" or "transformative," *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022), to trigger the major questions doctrine; on the contrary, the SEC has been exercising this authority against the latest investment crazes for decades. Nor does shifting the focus of its enforcement efforts to a new type of investment asset implicate the kind of economic or political significance of concern to the Supreme Court in recent major questions doctrine cases. This is simply a continuation of the SEC's gradual process of finding the limits of the securities laws through incremental enforcement actions—a process it has applied to address potential new securities since the agency's creation in 1934.

The major questions doctrine has never invalidated a civil enforcement action brought by an agency, as Coinbase would have here, but only "legislative" agency actions. This is for good reason. Individual enforcement actions are fact-specific, do not bind other parties, and provide the regulated entity a chance to contest the government's theory of liability; they are necessarily more limited in their reach than industry-wide regulation. While agency-issued regulations are legislative—thereby sometimes implicating separation of powers concerns vis-à-vis Congress— civil enforcement actions are within the core of Article II authority. Indeed, through an action to enforce the Securities Act in novel circumstances, the SEC is asking this Court to say what the law is, not "arrogating [that power] to itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023). The major questions doctrine simply is irrelevant to this action.

This brief provides three reasons the major questions doctrine does not apply. *First*, the major questions doctrine is inapplicable because the SEC is proceeding through case-by-case adjudications rather than a broadly applicable rule. Far from asserting new power to regulate the "national economy," the SEC brought a specific complaint in federal court. The SEC does not purport to reinterpret the Exchange Act or the *Howey* standard. Instead, the SEC is merely attempting to vindicate its best reading of its regulatory authority as it has done in case-by-case enforcement actions for nearly a century. This does not pose the same separation-of-powers problems associated with the major questions doctrine case law, where agencies have asserted "claim[s] of 'unheralded' regulatory power over 'a significant portion of the American economy'" through legislative rules. *West Virginia*, 142 S. Ct. at 2608.

*Second*, the Court should not apply the major questions doctrine because doing so would displace or alter the longstanding *Howey* standard. The Supreme Court has never applied the major questions doctrine to displace an existing standard. In 1946, the Supreme Court gave effect to the

drafting convention in state securities laws and reasoned that in using this term, Congress intended to adopt the meaning that "had been crystallized by . . . prior judicial interpretation." *Howey*, 328 U.S. at 298. Nothing in the Court's opinion evinces any understanding that the term "investment contract" was underdetermined. As a result, if this Court applied the major questions doctrine to displace or limit the *Howey* standard, the Court would be displacing or limiting the plain language of the statute—the opposite of the doctrine's core motivations. *See infra* Part I.B.

*Third*, the Court should not apply the major questions doctrine here because doing so would lead to an absurd result. Many provisions of the securities laws may be enforced by both the SEC and private litigants, *compare* 15 U.S.C. § 77*l with id*. § 77t, to whom the major questions doctrine does not apply. Because of its origin in separation of powers concerns, the major questions doctrine could only ever apply to executive assertions of authority. Applying it to the enforcement action here could therefore lead to two bodies of law. The term "investment contract" would mean something broader in a case brought by a private litigant and something much narrower when the case is initiated by the SEC.

Amici take no position on the proper application of *Howey*. But application of the major questions doctrine in a case like this one would conflict with governing Supreme Court precedent on the doctrine's scope. In resolving Defendants' motion to dismiss, the Court should not apply the major questions doctrine. *See generally* Todd Phillips &  Beau J. Baumann, *The Major Questions Doctrine's Domain* 89 Brooklyn L. Rev. (forthcoming 2024) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4504304) (arguing that courts should not apply the major questions doctrine beyond the heartland of its "domain," legislative rules that carry the force of law).

## ARGUMENT

I. **THE LEGAL FOUNDATIONS OF THE MAJOR QUESTIONS DOCTRINE LIMIT ITS APPLICATION.**

### A. The major questions doctrine is triggered only in "exceptional" cases involving "major" claims of authority.

The major questions doctrine has evolved over the years, but in its current form, it holds that Congress does not delegate extraordinary powers that transform an agency's authority without speaking clearly. *West Virginia*, 142 S. Ct. at 2609. It applies when an agency undertakes action that is "novel and fundamentally different" than the authority it has exercised before. *Nebraska*, 143 S. Ct. at 2369. In *West Virginia*, the Court recast the major questions doctrine as a substantive canon rooted in "both separation of powers principles and a practical understanding of legislative intent."[1] 142 S. Ct. at 2609.

The major questions doctrine has two "triggers," neither of which is sufficient on their own. If both are implicated, the doctrine requires an agency to point to "clear" statutory authorization to take the action at issue. First, the major questions doctrine applies only when the agency action at issue is "extraordinary," meaning it is "unheralded" and "transformative." *West Virginia*, 142 S. Ct. at 2610 (quoting *Util. Air Regul. Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014)). An agency action is unheralded when it lacks meaningful regulatory precedent. *See, e.g.*, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (concluding that the COVID-19 eviction moratorium was "unprecedented" because the relevant statutory authority had never yielded any regulation "approach[ing] the size or scope of the eviction moratorium" since the statute's enactment). Agency action is "transformative" if the promulgated rule would

---

[1] *But see Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring) (rejecting the substantive canon articulation for the major questions doctrine and seeking to ground the doctrine in "commonsense principles of communication").

radically alter a broader regulatory scheme. *See generally MCI Telecomms. Corp. v. AT & T Co.*, 512 U.S. 218, 229–30 (1994) (concluding that the agency action at issue implicated a major question because it would have waived an essential and mandatory tariff-filing requirement that was essential to Congress's design); *Nebraska*, 143 S. Ct. at 2369 (finding Department of Education's loan forgiveness program to have "abolished [prior forgiveness programs] and supplanted them with a new regime entirely"). Other cases have emphasized the degree to which an agency action expands the agency's jurisdiction. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)  (holding that statute did not grant the FDA jurisdiction over the Tobacco industry).

Second, an agency action must be *major*, meaning that the action implicates a "question of deep economic and political significance." *West Virginia*, 142 S. Ct. at 2626 (Gorsuch, J., concurring) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). The Supreme Court has found economic significance when agencies seek to regulate "a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 123, and when they require "billions of dollars in spending" by private persons or entities," *King v. Burwell*, 576 U.S. 473, 485 (2015); *see also West Virginia*, 142 S. Ct. at 2610 (finding the Clean Power Plan major because it would empower the EPA to "substantially restructure the American energy market"); *UARG*, 573 U.S. at 324 (rejecting a rule in part as it would have expanded the agency's regulatory authority over many never regulated sources of greenhouse gas emissions); *Nebraska*, 143 S. Ct. at 2373 (finding major student loan forgiveness worth about $500 billion). The Court has found political significance when an agency action touches on a politically contentious issue. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (finding political significance when an action touched on physician-assisted suicide, a hotly contested political issue). The Court also applied the major questions doctrine to

the FDA's attempt to regulate tobacco products after Congress had, for several decades, considered and rejected legislation that would have explicitly granted to FDA the exact authority the agency claimed already to possess. *See Brown & Williamson*, 512 U.S. at 148–49 (exploring Congress's repeated failures over a 35-year period to grant the FDA the authority at issue). The Court has never suggested that the mere existence of political disagreement with an agency's decisionmaking satisfies triggers the major questions doctrine on its own.

Once the major questions doctrine's dual triggers are both pulled, an agency's legal interpretation fails unless the agency can point to "clear" statutory authorization that Congress permitted the agency action. *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J. & Alito, J., concurring).

### B.  The major questions doctrine is intended to vindicate Congressional intent and preserve the separation of powers.

The major questions doctrine assumes that Congress does not delegate extraordinary powers without speaking clearly. *See West Virginia*, 142 S. Ct. at 2609 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms or subtle devices. Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme.") (cleaned up); *Brown & Williamson*, 529 U.S. at 160 ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). So in the rare case in which an agency claims such extraordinary authority, the doctrine requires Congress to have clearly authorized the power at issue. *See West Virginia*, 142 S. Ct. at 2609 (quoting *UARG*, 573 U.S. at 324) ("[I]n certain extraordinary cases . . . [t]he agency . . . must point to 'clear congressional authorization' for the power it claims."). This rationale for the major questions doctrine elevates congressional intent as a critical component of the doctrine's applicability. It also suggests that, where evidence flips this across-the-board presumption about how Congress

6

"speaks" in statutes, the major questions doctrine may not apply. *See, e.g.*, *Nebraska*, 143 S. Ct. at 2381 (Barrett, J., concurring) (suggesting that in at least "some cases" where contextual evidence runs against the major questions doctrine's insight into how language is used in statutes, the major questions doctrine will not apply).

A second rationale focuses on "separation of powers principles." *West Virginia*, 142 S. Ct. at 2609. The major questions doctrine is preoccupied with stopping executive aggrandizement at the expense of the legislature. *See Nebraska*, 143 S. Ct. 2373 ("[T]his is a case about one branch of government arrogating to itself power belonging to another. . . . [I]t is the Executive seizing the power of the Legislature."). As a result, the major questions doctrine is often implicated when an agency "conveniently" seizes on an untested and ancillary provision to "enact a program that Congress has chosen not to enact itself." *Id.* (citing *West Virginia*, 142 S. Ct. at 2614).

## II.    THE MAJOR QUESTIONS DOCTRINE IS INAPPLICABLE TO THIS LAWSUIT.

The major questions doctrine is inapplicable to the SEC's enforcement action against Coinbase because there is simply nothing "extraordinary" or "major" about this case—it is one incremental step in a gradual process of case-by-case enforcement. Contrary to Coinbase's assertions, *see* Mem. Law Supp. Coinbase's Mot. J. on the Pleadings (hereinafter "MOL"), ECF No. 36, at 22, the SEC is proceeding down a mundane path by bringing an enforcement action against a single firm under precedent that is almost a century old. And there is nothing "extraordinary" about this case because the SEC is proceeding just as it has since the 1930s. *See* Phillips & Baumann, *supra* page 3, (manuscript at 64) (identifying various enforcement actions brought by the SEC, including one filed the year after the agency's creation).

The SEC's authority to enforce the Exchange Act has long required it to bring actions in response to new financial arrangements. Using enforcement actions to address crypto assets is simply the latest iteration of an incremental process of giving meaning to the securities laws

through application to new situations—from rare coins, *see SEC v. Brigadoon Scotch Distrib., Ltd.*, 388 F. Supp. 1288 (S.D.N.Y. 1975), to live beavers, *see Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967). The SEC here is merely asking courts to apply the statutory framework to another novel fact pattern, an Article II law-enforcement function. *See FTC v. Kochava Inc.*, No. 2:22-CV-00377-BLW, 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) (concluding that the major questions doctrine was inapplicable against an FTC enforcement action because "it is merely asking a court to interpret and apply a statute enacted by Congress"). This case-by-case approach to regulation eliminates many of the concerns associated with the major questions doctrine.

### A. The SEC's enforcement action is neither "extraordinary" nor "economically significant."

The major questions doctrine is inapplicable to the SEC's enforcement action because the SEC is merely applying existing law to a single firm in an enforcement proceeding. Given the foundations of the doctrine discussed in Part I.B, *supra*, it can only reasonably be applied to agency actions that are "legislative in character"—i.e., they alter rights and bind the regulated entities[2]—and operate on a national or industry-wide scale.[3] *See, e.g.*, *Brown & Williamson*, 529 U.S. at 159 (applying the major questions doctrine to a legislative rule that would have allowed the Food and Drug Administration to "regulate an industry constituting a significant portion of the American

---

[2] *See* Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* 410–11 (6th ed. 2019) (discussing "legislative rules" that "have the same force and effect as statutes").

[3] The only case applying the major questions doctrine to anything but a straightforwardly "legislative" rule, order, or standard is *Gonzales v. Oregon*, 546 U.S. 243 (2006). In an action styled as an interpretive rule, Attorney General Gonzales declared that assisting suicide was not a "legitimate medical practice." *Id.* at 243. However, a nuanced view of the case reveals that it involved an agency action that was essentially "legislative" in character because it purported to carry the force of law. That the agency action at issue was a legislative rule in disguise was crucial to the Court's analysis, specifically the fact that it could levy criminal consequences on physicians. *Id.* at 245 ("It would be anomalous for Congress to have painstakingly described the Attorney General's power . . . but to have given him, just by implication, authority to declare an entire class of activity outside the course of professional practice and therefore *a criminal violation*[.]").

economy"); *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 (applying the major questions doctrine against a nationwide eviction moratorium that curtailed the rights of some landlords); *Nebraska*, 143 S. Ct. at 2369, 2372–76 (invoking the major questions doctrine where an agency asserted the power to "discharge" borrowers' legal obligations on a nationwide scale). This feature of the doctrine derives from the major questions doctrine's two rationales. The theory about how Congress "speaks" in statutes is most relevant to instances in which agencies act with nationwide and legislative power that mirrors Congress's own policy prerogatives. *See MCI*, 512 U.S. at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or event substantially, rate-regulated to agency discretion[.]"). Similarly, legislative rules and their ilk[4] are the type of agency action most likely to raise the separation-of-powers issues that animate the major questions doctrine. *See, e.g.*, *West Virginia*, 142 S. Ct. at 2610 (determining that a legislative rule triggered the major questions doctrine because it would allow an agency to "substantially restructure the American energy market"); *Nebraska*, 143 S. Ct. 2375 (holding that a legislative agency action triggered the major questions doctrine because, among other things, it would have threatened Congress's "control of the purse"). In this case, the SEC has not issued a rule altering Defendants' rights or obligations. To the contrary, the SEC is engaged in straightforward law enforcement under existing precedent.

> ***Exceptional.*** There is nothing *exceptional* about this enforcement action. The *West Virginia* Court gauged the "exceptional" or "transformational" nature of an agency action by

---

[4] The same can be said of the "emergency temporary standard" at issue in the vaccine-or-test case. *Nat'l Fed'n of Indep. Bus.  v. Dep't of Lab., OSHA (NFIB v. OSHA)*, 595 U.S. 109, 114 (2022). Although the order did not go through notice-and-comment rulemaking like most "legislative" rules, the order was "legislative" in that it prospectively bound the public with the force of law. *See id.* at 114–115 (discussing the "blunt" application of the standard to millions of employees).

assessing "the history and breadth of the authority that the agency has asserted." *West Virginia*, 142 S. Ct. at 2608 (cleaned up). Reviewing prior cases, the Court noted that some indicators that an agency might be acting in such a manner include regulating outside of its traditional sphere of expertise, seeking to draw new classes of entities into its regulatory orbit, meaningfully diverging from its regulatory antecedents, and whether the agency's legal interpretation upends the broader statutory scheme. *Id*. at 2607–09 (listing cases). Courts have applied this analysis to find that the major questions doctrine is not triggered where "the reasonableness of [the agency's] interpretation is supported" by the "history and breadth of authority" it has asserted. *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 6205926, at *4, *4 n.3 (N.D. Tex. Sept. 21, 2023) (citing *West Virginia*, 142 S. Ct. at 2608).

For nearly a century the SEC has enforced the *Howey* standard against newly popular types of assets to carry out its mission. The SEC has a storied history of proceeding through enforcement actions before Article III courts to test the ambit of its authority under the *Howey* standard. The SEC did so first in the 1935 case *SEC v. Wickham*, one year after the agency was created. 12 F. Supp. 245 (D. Minn. 1935) (providing that the contract at issue was a security). In *Howey*, the SEC did the same thing. *See Howey*, 328 U.S. at 295. More recently, the SEC asked courts to determine whether contracts for these assets qualify as securities: the refining and sale of gold, *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125 (9th Cir. 1991); interests in specific registered limited liability partnerships, *SEC v. Merch. Cap., LLC*, 483 F.3d 747 (11th Cir. 2007); the sale of portfolios of rare coins, *Brigadoon Scotch Distribs.*, Ltd., 388 F. Supp. at 1288; the sale of business franchises, *SEC v. Galaxy Foods, Inc.*, 417 F. Supp. 1225 (E.D.N.Y. 1976); investment in a scheme to raise, sell, and deliver live beavers, *Cont'l Mktg. Corp.*, 387 F.2d at 466; and even the purchase of a business motivation course and sales scheme, *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d

476 (9th Cir. 1973). Unlike prior cases in which the Court held that the agencies' interpretations of statutes would result in the statutes' fundamental revision, such as *MCI*, 512 U.S. at 231 and *Brown & Williamson*, 529 U.S. at 137–39, a legal finding by this Court that sales of certain crypto assets are investment contracts would merely result in those sales having to comply with existing rules on the sale of securities—like countless new products before them.[5]

In sum, there are countless regulatory antecedents to the SEC's actions here. The SEC does not issue legislative rules reinterpreting *Howey*, and has not done so here. Instead, the agency has proceeded through case-by-case adjudication for a century, in partnership with the federal judiciary, and does so again here. There is simply nothing extraordinary about the SEC's enforcement action.

The same results can be reached by focusing on the major questions doctrine's approach to how Congress "speaks" in statutes. The major questions doctrine has always proceeded on the theory that Congress does not empower the executive to engage in nationwide, major, and extraordinary *lawmaking* through underdetermined text. *See Brown & Williamson*, 529 U.S. at 160 ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."). Here, the "decision" or "authority" the SEC claims is simply the authority to enforce the securities laws to securities, as it has done many times before. The agency has views on whether the tokens here are securities—

---

[5] The SEC's regulation of the sales of these various goods does not amount to regulation of the goods themselves. The securities laws give the SEC authority to regulate *sales* of crypto assets that are securities, not the underlying *technology*. Although the SEC regulates how Apple Inc. stock is sold, for example, it cannot be said to regulate Apple. *See* S*EC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299 at *8 (S.D.N.Y. July 31, 2023) (quoting *West Virginia*, 142 S. Ct. at 2610) ("[T]he SEC's decision to require truthful marketing of certain crypto-assets based on its determination that certain of such assets are securities hardly amounts to a 'transformative expansion in its regulatory authority'").

why would the SEC bring a case it believed would lose?—but suing is different from asserting new authority to regulate non-securities. To be clear, the SEC is not even asserting authority to interpret the term "investment contract," but is asking this Court to apply *Howey*. It is in no way "extraordinary" for the SEC to ask this Court to apply *Howey*, a standard that has existed for almost a century.

*Significance.* Second, the SEC's enforcement action is not "a decision of such economic and political significance" as to trigger the major questions doctrine, *Brown & Williamson*, 529 U.S. at 160, because it is merely pursuing a single firm for violating extant law. The major questions doctrine case law has only found actions to be economically significant where they affect an entire industry, require citizens nationwide to pay for some service, or involve the expenditure of so much taxpayer money that the agency threatens Congress's control over the purse. *See id*., 529 U.S. at 159 ("the FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy"); *Nebraska*, 143 S. ct. at 2372–73 ("[T]he Secretary of Education claims the authority, on his own, to release 43 million borrowers from their obligations to repay $430 billion in student loans. . . . Practically every student borrower benefits, regardless of circumstances."); *King*, 576 U.S. at 474 ("The tax credits are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people. Whether those credits are available on Federal Exchanges is thus a question of deep 'economic and political significance' that is central to this statutory scheme; had Congress wished to assign that question to an agency, it surely would have done so expressly.").

The crypto asset activities subject to the SEC jurisdiction are not "a vast swath of the economy" as Coinbase claims. MOL, ECF No. 36, at 24–25. The market capitalization of *domestic*

crypto *securities* is a small fraction of the $1 trillion *global* size of crypto assets—securities, commodities, and other—that Coinbase cites. For comparison, the value of the single U.S. company Apple Inc. is roughly $2.8 trillion. *Apple Inc. Common Stock*, NASDAQ (accessed Oct. 9, 2023) https://www.nasdaq.com/market-activity/stocks/aapl.

Nor can Coinbase point to a single case applying the major questions doctrine to a comparable scenario—one involving an enforcement action against a single firm (or, for that matter, a small collection of firms). Realizing this problem, Coinbase emphasizes the size of its *entire industry*. MOL, ECF No. 36, at 22 (quoting *West Virginia*, 142 S. Ct. at 2608) ("[T]he digital asset industry, worth around $1 trillion, is a 'significant portion of the American economy'"). But there is no agency action on the part of the SEC asserting jurisdiction over the crypto-assets industry more generally.[6]  *See* Phillips & Baumann, *supra* page 3 (manuscript at 66–67). The enforcement action against Coinbase is not economically significant. Although a finding by this Court that the crypto assets at issue are securities under *Howey* could affect the industry, that is a

---

[6] Coinbase argues that "rather than let Congress decide [how crypto assets should be regulated], the SEC has mounted a campaign of regulation-by-enforcement culminating in this action." MOL, ECF No. 36, at 23. But Congress has already decided this question by granting the SEC jurisdiction to bring suits that allege that certain assets are securities. That grant gives the SEC the power to press its theories of what constitutes an investment contract in federal court. Courts will identify some crypto assets as securities, *see Terraform Labs Pte. Ltd.*, 2023 WL 4858299 at *10 ("[T]he SEC has alleged facts sufficient to claim that the defendants' crypto assets are securities[.]"), but others will remain outside the SEC's jurisdiction. Indeed, the most recent two chairmen of the SEC have disclaimed authority over Bitcoin, the largest crypto asset by market capitalization, and other crypto assets that do not fit the *Howey* test. *See* Gary Gensler, Chair, SEC, *Kennedy and Crypto*, Speech at SEC Speaks (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822; Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws to Cater to Cryptocurrencies*, CNBC (June 6, 2018), https://www.cnbc.com/amp/2018/06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html. To that end, courts have refused to extend SEC authority to particular crypto transactions when they deem them other than securities. *See, e.g.*, *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023).

consequence of the statute (as interpreted by the Courts through *Howey*), not anything "major" that the agency has accomplished.

The defendants' invocation of the major questions doctrine ignores the doctrine's core concern: separation of powers. Unlike enforcement actions, the legislative agency actions that have implicated the major questions doctrine in the past raised separation-of-powers issues because Congress had delegated "legislative" authority to the relevant agencies. *See, e.g.*, *Nebraska*, 143 S. Ct. at 2373 ("[T]his is a case about one branch of government arrogating to itself power belonging to another. . . . [I]t is the Executive seizing the power of the Legislature.").

These concerns are inapplicable to the SEC's enforcement actions. Enforcement actions are outside the major questions doctrine's domain because they are core Article II activity: law enforcement in Article III courts. *See United States v. Texas*, 143 S. Ct. 1964, 1971 (2023) (quoting U.S. Const., art. II, § 1, cl. 1; § 3; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021)) ("Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.' Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"). And the executive-enforcement paradigm differs materially from legislative rules in that it polices past conduct, rather than prospectively restraining regulated entities. Moreover, to vindicate its reading of the law, the SEC must persuade federal judges with every complaint it files.

It is irrelevant that these enforcement actions will collectively have some precedential effect for the broader crypto-assets industry if defendants appeal their cases and those cases produce published judicial opinions. By definition, courts are tasked with applying the law to new facts and conduct. All of the alleged separation-of-powers concerns raised by the defendants are

imagined as this case is about the most straightforward of executive tasks: case-by-case law enforcement.

    **B.**  **The major questions doctrine does not apply to displace or limit binding judicial standards like the *Howey* test because judicial review reinforces the separation of powers.**

Coinbase quietly requests that this Court do something far more extraordinary than the SEC's action—indeed, something that no court has done. In asking this Court to apply the major questions doctrine, Coinbase posits that the Court should do so only if it "were to find the SEC's construction [of the term 'investment contract'] colorable at all," as the SEC would have "arrogated to itself authority to police a vast swath of the economy." MOL, ECF No. 36, at 24–25. Yet interpretation of that term is controlled by the *Howey* standard, which is based on a plain reading of the securities laws. *See Howey*, 328 U.S. at 298 ("By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystalized by this prior judicial interpretation"), and which the Supreme Court explains is "*the test* for whether a particular scheme is an investment contract." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (emphasis added). If this Court were to accept Coinbase's request and decide that the major questions doctrine now determines whether particular assets are investment contracts, it would either displace or narrow *Howey*, a result that is the exact *opposite* of the major questions doctrine's motivations around legislative intent.

A straightforward application of the major questions doctrine's triggers—which requires an action to be both "extraordinary" and "major"—places preexisting judicial precedents, such as *Howey*, beyond its reach. Assume for argument's sake that the agency action at issue is "major." The SEC's actions under *Howey* would still fail to trigger the major questions doctrine because this enforcement action is not extraordinary. An agency action is extraordinary when an agency attempts to transform the reach or character of statutory text, *see West Virginia*, 142 S. Ct. at 2610

(quoting *UARG*, 573 U.S. at 324), or exceeds its own past interpretation or implementation, *id.* at 2608–09. Here, the agency's action is compatible with a long-standing judicial test that has been used for decades to determine whether the agency may regulate a given contract for decades, consistent with the agency's own practice of seeking elucidation of the securities laws from the judiciary through enforcement. If the SEC is stretching the meaning of securities laws beyond what they can maintain, then *Howey* will lead to a dismissal of SEC complaints on their own, without any help from the major questions doctrine. But the possibility that the SEC might lose under a well-established test (and amici do not suggest that it will or should lose) hardly makes the agency's decision to bring that lawsuit an extraordinary transformation of its authority.

There are also good reasons to think that the major questions doctrine should not displace *Howey* based on the doctrine's motivation about how Congress "speaks" in statutes. Congress has operated with *Howey* in the background for nearly eight decades, never once enacting new legislation to rebut it. *See* page 10, *supra* (listing cases); *see also Nebraska*, 143 S. Ct. at 2378–81 (Barrett, J., concurring) (arguing that the major questions doctrine accounts for longstanding "legal conventions"). This decision—to acquiesce to *Howey*'s open-endedness—provides a reason for not applying the major questions doctrine. As Justice Gorsuch recently remarked for the Court in *Slack Technologies v. Pirani, LLC*, "Congress remains free to revise the securities laws at any time . . . . [The judiciary's] only function lies in discerning and applying the law as we find it." 143 S. Ct. 1433, 1442 (2023).

The major questions doctrine's separation-of-powers motivation also counsels against applying the major questions doctrine to limit Supreme Court precedent. The major questions doctrine is mainly concerned with agencies gaming "ancillary provision[s]" in ways that are "unprecedented" and skirting congressional intent. *West Virginia*, 142 S. Ct. at 2610, 2612. But

far from gaming an ancillary provision, the SEC here is asking the Court to apply a judge-made standard that has been central to the securities field for nearly a century.

Finally, applying the major questions doctrine to eviscerate judicial precedent seems inconsistent with the judiciary's Article III duty to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The *Howey* Court gave the securities laws their best meaning. Nothing in that Court's opinion suggests that the term "investment contract" is underdetermined, and to the contrary, it casts the *Howey* standard as the term's plain meaning in light of an extant drafting convention. *See Howey*, 328 U.S. at 298 (explaining that "Congress was using a term the meaning of which had been crystalized by this prior judicial interpretation" and describing it as "reasonable to attach that meaning to the term as used by Congress, especially since such a definition is consistent with the statutory aims"). Using the major questions doctrine to overturn *Howey* would suggest that the doctrine can overwhelm clear and durable judicial precedent, a result that would reek of "dice-loading" concerns. *See Nebraska*, 143 S. Ct. at 2378 (warning against a "version of the major questions doctrine [that] 'loads the dice'" against agency action); Antonin Scalia, *A Matter of Interpretation* 27 (Amy Guttman ed., 1997) (arguing against "the use of certain presumptions and rules of construction that load the dice for or against a particular result").

Here, Coinbase has argued that crypto assets are commodities, *see* MOL, ECF No. 36, at 7 (arguing that crypto sales on its platform "are commodity sales"), and compares sales of crypto assets to sales of baseball cards.[7] It alleges that the term "investment contract" requires "a

---

[7] Many crypto assets are similar to stock certificates in that they give holders rights vis-à-vis the issuing schemes. Whereas stock certificates may give shareholders contractual rights to vote for corporate directors or to receive pro-rata shares of dividends, crypto assets may give token-holders technological rights to vote for changes to their underlying protocols, including changes that would provide token-holders with pro-rata shares of fees collected. *See, e.g.*, SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*,

contractual undertaking to deliver future value." *Id*. at 9. If either of these assertions is true (and amici take no position on whether they are), then the securities laws themselves should result in the SEC lacking jurisdiction over these assets. But the fact that Coinbase arguably has plausible defenses provides no reason to resort to the major questions doctrine's heavy artillery.

### C. The major questions doctrine leads to absurd results here as the SEC and private litigants share litigation authority.

Investors who have faced losses by the purchase of unregistered securities or by other enumerated violations of the securities laws may bring suit to recover for those damages. *See* 15 U.S.C. §§ 77*l*, 77k, 78t-1, 78r. Using these laws, class action lawsuits may be filed on the grounds that purchased crypto assets are unregistered securities and the issuers, therefore, owe the plaintiffs money damages. In these cases, litigants must first convince courts that the assets purchased are securities through application of the *Howey* test.

It would be nonsensical to apply the major questions doctrine—which presupposes an evaluation of the "history and the breadth of the authority that [the agency] has asserted," *Brown & Williamson*, 529 U. S. at 160—to actions where the SEC has not asserted authority. There is no "claim of 'unheralded' regulatory power over 'a significant portion of the American economy,'" *West Virginia*, 142 S. Ct. at 2608 (quoting *UARG* at 310); no effort on the part of the "agency to make a 'radical or fundamental change' to a statutory scheme," *id*. at 2609 (*quoting MCI*, 512 U.S.

---

Exchange Act Release No. 81207 at 4 (July 25, 2017) (explaining that owning tokens "would permit the participant to vote and entitle the participant to 'rewards'").

Importantly, in *United Housing Foundation, Inc. v. Forman*, the Supreme Court determined that stock certificates are not securities if they lack "the presence of" the *Howey* test's four factors. 421 U.S. 837, 852 (1975). *See also Howey*, 328 U.S. at 299 (providing it "immaterial [to the *Howey* test] whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise"). Accordingly, just as stock certificates can be the *evidence* of stocks, crypto assets may be the *evidence* of investment contracts. It is this evidence that trades on exchanges.

at 229); and no agency "claim[ of] the power to resolve a matter of great 'political significance,'" *id*. at 2620 (Gorsuch, J., concurring) (*quoting NFIB v. OSHA*, 595 U.S. at 117), because there is no agency claim to legislative power *at all*. The application of *Howey* is all that should matter.

If courts were to apply *Howey* in a case brought by a class action against the issuer of one crypto asset and hold that they are securities subject to the securities laws, but apply the major questions doctrine to a case brought by the SEC against that same issuer and hold that the securities laws do not apply notwithstanding the *Howey* test, those opinions would collide. There would effectively be two bodies of law depending on who brought the case at issue. In addition to the absurdity that comes with deciding the same case differently, the principle of collateral estoppel would be impossible to apply.

## CONCLUSION

Application of the major questions doctrine in this case would betray the doctrine's motivations, displace judicial interpretation of legislative text, and create absurdity. For the foregoing reasons and those put forth by the SEC, the Court should not apply the major questions doctrine here.

Respectfully submitted,

Dated: [October 10, 2023]

*/s/ Jeffrey B. Dubner*

Jeffrey B. Dubner (N.Y. Bar No. JD4545)
Orlando Economos (N.Y. Bar No. 5996681)*
Sarah Goetz (N.Y. Bar No. 5539366)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-788-6052
jdubner@democracyforward.org
oeconomos@democracyforward.org
sgoetz@democracyforward.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 11.1 and section 4(B) of this Court's Individual Rules of Practice in Civil Cases and to the extent necessary under this Court's practice, the undersigned counsel for amici curiae certifies that this brief complies with all requirements and limitations set forth therein because the brief: (1) is plainly typed and bears the docket number, District Judge's initials, and name of each person signing it typed clearly below the signature; (2) is set in 12-point type, has one-inch margins on all sides, and is double-spaced; and (3) is no more than 25 pages in length, excluding the elements exempted by the Local and Individual Rules.

Dated: [October 10, 2023]

*/s/ Jeffrey B. Dubner*

Jeffrey B. Dubner (JD4545)
Orlando Economos (N.Y. Bar No. 5996681)*
Sarah Goetz (N.Y. Bar No. 5539366)*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
202-788-6052
jdubner@democracyforward.org
oeconomos@democracyforward.org
sgoetz@democracyforward.org

*Counsel for Amici Curiae*

*\* Admission pro hac vice pending*