# EXHIBIT A

2023 WL 6862856

Only the Westlaw citation is currently available.

United States Court of Appeals, Fifth Circuit.

ALLIANCE FOR FAIR BOARD
RECRUITMENT; National Center for
Public Policy Research, Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

No. 21-60626
|
FILED October 18, 2023

Petition for Review of an Order of the United States Securities
and Exchange Commission Agency No. 34-92590

### Attorneys and Law Firms

Jonathan Berry, R. Trent McCotter, Boyden Gray, P.L.L.C.,
Washington, DC, for Petitioner Alliance for Fair Board
Recruitment.

Margaret A. Little, New Civil Liberties Alliance, Washington,
DC, Sheng Tao Li, Washington, DC, for Petitioner National
Center for Public Policy Research.

Daniel Matro, Tracey A. Hardin, John Robert Rady,
Senior Counsel, U.S. Securities & Exchange Commission,
Washington, DC, for Respondent.

Allyson Newton Ho, Seth D. Berlin, Paulette Miniter, Gibson,
Dunn & Crutcher, L.L.P., Dallas, TX, Seth D. Berlin, Ballard
Spahr, L.L.P., Washington, DC, Stephen J. Kastenberg, Paul
Lantieri, III, Ballard Spahr, L.L.P., Philadelphia, PA, Joanne
Pedone, John Yetter, John Zecca, Nasdaq, Incorporated,
Rockville, MD, Amalia Elizabeth Reiss, Amir Cameron
Tayrani, Gibson, Dunn & Crutcher, L.L.P., Washington, DC,
for Intervenor Nasdaq Stock Market, L.L.C.

Drew C. Ensign, Deputy Solicitor General, Drew C. Ensign,
P.L.L.C., Phoenix, AZ, for Amici Curiae State of Arizona,
State of Alabama, State of Alaska, State of Arkansas, State of
Florida, State of Indiana, State of Kansas, State of Kentucky,
State of Louisiana, State of Mississippi, State of Missouri,
State of Montana, State of Nebraska, State of Oklahoma, State
of South Carolina, State of Texas, State of Utah.

Marc Wolinsky, Getzel Berger, Elaine Patricia Golin, Carrie
M. Reilly, Kevin S. Schwartz, Wachtell, Lipton, Rosen
& Katz, New York, NY, for Amici Curiae Nonpartisan
Group of Academics, Practitioners in the Field of Corporate
Goverance.

Steven Shepard, Susman Godfrey, L.L.P., New York,
NY, for Amici Curiae Council of Institutional Investors,
Investment Adviser Association, Northern Trust Investments,
Incorporated, Ariel Investments, L.L.C., Boston Trust
Walden Company, Lord, Abbett & Company, L.L.C.,
Gaingels, Incorporated, Robert F. Kennedy Center for Justice
& Human Rights.

Pratik A. Shah, Akin Gump Strauss Hauer & Feld, L.L.P.,
Washington, DC, for Amicus Curiae Ad Hoc Coalition of
Nasdaq-Listed Companies.

Brian Matthew Hauss, American Civil Liberties Union
Foundation, New York, NY, for Amicus Curiae American
Civil Liberties Union, Incorporated.

Aaron Michael Streett, Elisabeth Catherine Butler, Baker
Botts, L.L.P., Houston, TX, for Amicus Curiae Financial
Industry Regulatory Authority, Incorporated.

Jeffrey B. Dubner, Democracy Forward Foundation,
Washington, DC, Karen Lee Loewy, Lambda Legal Defense
& Education Fund, Washington, DC, Peter C. Renn, Lambda
Legal Defense & Educational Fund, Incorporated, Los
Angeles, CA, for Amicus Curiae Academic Experts in the
Fields of Business, Management, and Economics.

Before Stewart, Dennis, and Higginson, Circuit Judges.

### Opinion

Stephen A. Higginson, Circuit Judge:

**\*1** The "fundamental purpose" of the Securities Exchange
Act of 1934 (Exchange Act), codified as amended at 15
U.S.C. § 78a *et seq.*, is to enforce "a philosophy of full
disclosure ... in the securities industry." *Affiliated Ute Citizens
of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456,
31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Rsch.
Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237
(1963)); *e.g., Lorenzo v. SEC*, —— U.S. ——, 139 S. Ct.
1094, 1103, 203 L.Ed.2d 484 (2019); *Kokesh v. SEC*, 581 U.S.
455, 458 n.1, 137 S.Ct. 1635, 198 L.Ed.2d 86 (2017); *SEC
v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d
1 (2002); *Cent. Bank of Denver, N.A. v. First Interstate*

*Bank of Denver, N.A.*, 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Basic Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Consistent with this goal, Nasdaq Stock Market, LLC (Nasdaq) proposed a rule that would require companies listed on its stock exchange to disclose information about their board members, as well as a rule that would give certain companies access to a board recruiting service. After the Securities and Exchange Commission (SEC or Commission) approved these rules, Alliance for Fair Board Recruitment (AFBR) and the National Center for Public Policy Research (NCPPR) petitioned for review. Because the SEC's Approval Order complies with the Exchange Act and the Administrative Procedure Act (APA), the petitions are DENIED.

## I.

### A.

Nasdaq is a private company that operates a securities exchange. Under the Exchange Act, a securities exchange must register with the SEC as a "national securities exchange" or seek an exemption. 15 U.S.C. § 78e. To be registered as a "national securities exchange," the exchange must have rules that "are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, ... to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." *Id.* § 78f(b)(5). But the rules must not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Exchange Act] or the administration of the exchange." *Id.* And the rules must not "impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Exchange Act]." *Id.* § 78f(b)(8).

The Exchange Act classifies "national securities exchange[s]" like Nasdaq as "self-regulatory organization[s]" (SROs). 15 U.S.C. § 78c(26). The rules of an SRO may be changed in two ways. The method at issue in this case, set out in 15 U.S.C. § 78s(b), permits SROs to propose their own rules and obtain Commission approval.[1] Under 15 U.S.C. § 78s(b)(1), an SRO must file its proposed rule with the SEC, and the

SEC must publish notice of the proposed rule and provide an opportunity for comment. After notice and comment, the SEC must either approve or disapprove the rule. The SEC "*shall* approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations issued under this chapter that are applicable to such organization." 15 U.S.C. § 78s(b)(2)(C)(i) (emphasis added). If the SEC does not make such a finding, it must disapprove the proposed rule. 15 U.S.C. § 78s(b)(2)(C)(ii).

### B.

**\*2** On December 4, 2020, Nasdaq filed proposed rule changes to address board diversity. *See* Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity, Release No. 34-90574, 85 Fed. Reg. 80,472 (Dec. 11, 2020); Notice of Proposed Rule Change to Adopt Listing Rule IM-5900-9 to Offer Certain Listed Companies Access to a Complimentary Board Recruit Solution to Help Advance Diversity on Company Boards, Release No. 34-90571 (Dec. 4, 2020). The SEC solicited comments on the proposed rules and received many, including from NCPPR.[2]

On February 26, 2021, Nasdaq submitted a letter in response to comments received and filed a superseding amendment with modifications and clarifications to the proposed rules based on those comments.[3] AFBR filed a seventy-eight-page opposition to the proposed rules.[4]

The proposed rules included two parts: (1) a "Board Diversity Proposal" (Disclosure Rule) and (2) a "Board Recruiting Service Proposal" (Recruiting Rule) (collectively, the Rules). Release No. 34-92590, 86 Fed. Reg. 44,424-25 (Aug. 12, 2021) (Approval Order) (footnote omitted). As the SEC explained:

> Under the Board Diversity Proposal, the Exchange proposes to require each Nasdaq-listed company, subject to certain exceptions, to publicly disclose in an aggregated form, to the extent permitted by applicable law, information on the voluntary self-identified gender and racial characteristics and LGBTQ+ status (all terms defined below) of the company's board of directors. The Exchange also proposes to require each Nasdaq-listed company, subject to certain exceptions, to have, or explain why it does not have, at least two members of its board of directors who are Diverse, including at least one director

who self-identifies as female and at least one director who self-identifies as an Underrepresented Minority or LGBTQ+. Under the Board Recruiting Service Proposal, the Exchange proposes to provide certain Nasdaq-listed companies with one year of complimentary access for two users to a board recruiting service, which would provide access to a network of board-ready diverse candidates for companies to identify and evaluate.

*Id.*

Under the proposed rules,

"Diverse" would be defined to mean an individual who self-identifies in one or more of the following categories: (i) Female, (ii) Underrepresented Minority, or (iii) LGBTQ +.... "Female" would be defined to mean an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth; "Underrepresented Minority" would be defined to mean an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities; and "LGBTQ+" would be defined to mean an individual who self-identifies as any of the following: Lesbian, gay, bisexual, transgender, or as a member of the queer community.

**\*3** *Id.* at 44,425 n.18.

On August 6, 2021, the SEC issued an Approval Order, approving the proposed rule changes. *See id.* at 44,424-25. The SEC found that the Board Diversity Proposal "would establish a disclosure-based framework for Nasdaq-listed companies that would contribute to investors' investment and voting decisions." *Id.* at 44,428. The SEC recognized that "the proposal may have the effect of encouraging some Nasdaq-listed companies to increase diversity on their boards" but concluded that "the proposed rules do not mandate any particular board composition." *Id.* Companies that failed to meet the objectives set forth in the proposed rule could nonetheless comply with the rule by explaining why the company does not meet the objectives, "and the Exchange would not assess the substance of the company's explanation." *Id.* Moreover, as explained in the Approval Order:

[W]hile there would be costs to listing elsewhere, companies that object to providing any explanation can choose instead to list on a different exchange. No company is required to list on Nasdaq. Rather, exchanges compete for listings, with four exchanges that currently list securities of operating companies and nine exchanges that have rules for the listing of issuers on the exchange. Listing exchanges compete with each other for listings in many ways, including listing fees, listing standards, and listing services. In approving proposed rule changes relating to complimentary services that exchanges offer to issuers, including issuers that switch listing markets, the Commission has also explained that exchanges are responding to competitive market pressures.... [T]he current proposals may provide another way in which the exchanges compete for listings.

*Id.* The SEC ultimately concluded the proposed rules were consistent with the Exchange Act and approved the Rules. *Id.* at 44,432-33.

On August 10, 2021, AFBR petitioned this court for review of the Approval Order. On September 8, 2021, this court granted Nasdaq leave to intervene on behalf of the SEC. On October 27, 2021, NCPPR's petition was transferred from the Third Circuit to this court.

Petitioners contend that the Rules violate the First and Fourteenth Amendments to the U.S. Constitution and violate the SEC's statutory obligations under the Exchange Act and the APA.

## II.

We turn first to petitioners' constitutional claims.[5] We review constitutional objections to agency actions *de novo. See Emp. Sols. Staffing Grp. II, L.L.C. v. Off. of Chief Admin. Hearing Officer,* 833 F.3d 480, 484 (5th Cir. 2016); *Trinity Marine Prods., Inc. v. Chao,* 512 F.3d 198, 201 (5th Cir. 2007).

**\*4** In general, the Constitution only applies to state action. This doctrine "distinguishes the government from individuals and private entities," and "[b]y enforcing that constitutional boundary[,] ... protects a robust sphere of individual liberty." *Manhattan Cmty. Access Corp. v. Halleck,* ––– U.S. ––––, 139 S. Ct. 1921, 1928, 204 L.Ed.2d 405 (2019).

Petitioners have two state-action theories: first, that Nasdaq is itself a government entity bound by the Constitution; and second, that Nasdaq's Rules in this case are attributable to the government such that constitutional restraints apply. Neither prevails.

A.

First, NCPPR contends that Nasdaq itself "is a state actor constrained to act within constitutional bounds because it is a creature of federal law, serves federal interests, and is controlled by a federal agency." This theory turns not on the SEC Approval Order, but rather on Nasdaq's characteristics and its relationship to the SEC. In accord with the many courts that have considered this question, we hold that Nasdaq is not a state actor.

Nasdaq is a private entity. It is a private limited liability company wholly owned by Nasdaq, Inc., a publicly traded corporation. Nasdaq's board of directors is selected by its broker-dealer members and by Nasdaq, Inc., and companies wishing to list on Nasdaq do so by entering into contracts with Nasdaq. While Nasdaq must register with and is heavily regulated by the SEC, the Supreme Court has made clear that a private entity does not become a state actor merely by virtue of being regulated. "[T]he 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise." *Halleck*, 139 S. Ct. at 1932.

Based on similar facts, our fellow circuits have found that SROs registered with the SEC are private entities, not state actors. For instance, the Second Circuit has determined, and subsequently affirmed in several decisions, that SROs are not state actors. In *Desiderio v. NASD, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999), a plaintiff claimed that her constitutional rights were violated by the mandatory arbitration clause in a form used by the National Association of Securities Dealers, Inc. (NASD), a "self-regulatory private corporation registered with the [SEC] as a national securities association." *Id.* at 201. The court held that the plaintiff's "constitutional arguments all fail because the requisite state action is absent." *Id.* at 206. In reaching this conclusion, the Second Circuit held that the NASD is a private entity:

> The NASD is a private actor, not a state actor. It is a private corporation that receives no federal or state funding. Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee. Moreover, the fact that a business entity is subject to 'extensive and detailed' state regulation does not convert that organization's actions into that of the state.... Indeed, we have already ruled that the New York

Stock Exchange—a self-regulatory private organization like the NASD—is not a state actor.

*Id.* (citations omitted); *see also D.L. Cromwell Invs., Inc. v. NASD Regulation, Inc.*, 279 F.3d 155, 162 (2d Cir. 2002) ("It has been found, repeatedly, that the NASD itself is not a government functionary." (collecting cases)); *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002) ("It is clear that NASD is not a state actor and its requirement of mandatory arbitration is not state action."). Other circuits have reached similar conclusions. *See Epstein v. SEC*, 416 F. App'x 142, 148 (3d Cir. 2010) (unpublished) ("Epstein cannot bring a constitutional due process claim against the NASD, because the NASD is a private actor, not a state actor." (cleaned up)); *First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 698 (3d Cir. 1979) (noting that "Congress preferred self-regulation by a private body over direct involvement of a governmental agency"); *Jones v. SEC*, 115 F.3d 1173, 1183 (4th Cir. 1997) ("While the NASD is a closely regulated corporation, it is not a governmental agency, but rather a private corporation organized under the laws of Delaware. As such, it is highly questionable whether its disciplinary action of members, even if it is considered to be a quasi-public corporation, can implicate the Double Jeopardy Clause."); *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 186 (7th Cir. 1984) (explaining that a securities or commodity exchange is not "an arm of the federal government" because "the purpose of the federal law is to strengthen the power and responsibility of the exchange in performing a policing function that preexisted federal regulation," and ultimately holding that "the action of the Mercantile Exchange was not the action of the federal government for purposes of the due process clause of the Fifth Amendment"); *Rosee v. Bd. of Trade of City of Chi.*, 311 F.2d 524, 526 (7th Cir. 1963) ("The activities of the [Chicago] Board of Trade... do not fall within the category of governmental action."); *Galuska v. N.Y. Stock Exch.*, 210 F.3d 374, 2000 WL 347851, at *2 (7th Cir. 2000) (stating in dicta that the "NYSE is not a governmental actor subject to the Constitution's mandates"); *Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182, 1200-02 (9th Cir. 1998), *overruled on other grounds by EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742 (9th Cir. 2003) (considering NASD and NYSE's arbitration rules and concluding that there was no state action); *Roberts v. AT&T Mobility LLC*, 877 F.3d 833, 843 (9th Cir. 2017) (approvingly citing *Duffield*'s reasoning on state action).[6]

**\*5** Petitioners are incorrect that our court departed from this line of authority in *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971).

In that case, petitioner Intercontinental Industries, Inc. (INI) asked the court "to review an order of the [SEC] granting the American Stock Exchange the right to strike the common stock of INI from listing and registration on the Exchange." *Id.* at 937. INI argued that the procedure followed by the SEC and the Exchange was one that "denied [INI] the full and fair hearing demanded by the due process of the Constitution." *Id.* at 940. Before reaching the merits of INI's due-process claim, the court said:

> [T]he Exchange's position that constitutional due process is not required since the Exchange is not a governmental agency is clearly contrary to numerous court decisions. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Colon v. Tompkins Square Neighbors, Inc.*, 294 F. Supp. 134 (S.D.N.Y. 1968); *McQueen v. Druker*, 438 F.2d 781 (1st Cir. 1971). The intimate involvement of the Exchange with the [SEC] brings it within the purview of the Fifth Amendment controls over governmental due process.

*Id.* at 941. The court also listed examples illustrating the SEC's statutory relationship with the American Stock Exchange. *Id.* at 941 n.9. But in the fifty years since *Intercontinental* was written, the law upon which this passage relied has changed. *Intercontinental* invokes *Burton v. Wilmington Parking Authority*, where the Supreme Court attributed state action to a private entity because the state had "so far insinuated itself into a position of interdependence" with a private entity that "it must be recognized as a joint participant in the challenged activity."[7] 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This no longer reflects the governing standard. As the Supreme Court explained in *American Manufacturers Insurance Co. v. Sullivan*, "*Burton* was one of our early cases dealing with 'state action' under the Fourteenth Amendment, and later cases have refined the vague 'joint participation' test embodied in that case." 526 U.S. 40, 57, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Specifically, after the Supreme Court's decisions in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), state action requires "affirmative" state "encouragement"—thus, joint participation exists where private acts "not only contribute[ ] to, but also [a]re indispensable elements in, the financial success of a governmental agency." *Frazier v. Bd. of Trs. of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1286-88 (5th Cir.) (citations omitted), *amended in part*, 777 F.2d 329 (5th Cir. 1985). And as we explain, *supra* Section II.B, under

the modern doctrine, the government did not act jointly with the SEC in this case.

Moreover, this passage in *Intercontinental* is dicta. 452 F.2d at 941. The court clarified that "rather than decide" whether the exchange was a state actor, the court took no position on the issue. *See id.* Indeed, the court went on to reject INI's due-process arguments on the merits.[8] *Id.* at 942–43. Because the state-action observation was not a necessary component of the court's holding, the language on which petitioners rely is dicta. *See In re Hearn*, 376 F.3d 447, 453 (5th Cir. 2004) (noting that "obiter dictum" is a "judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential" (quoting Black's Law Dictionary 1100 (7th ed. 1999)). Judge Friendly recognized as much a few years after *Intercontinental* was decided, characterizing the statement as dictum and casting doubt on the proposition in light of intervening Supreme Court precedent. *See United States v. Solomon*, 509 F.2d 863, 871 (2d Cir. 1975) ("We need not here decide whether stock exchanges may be subject to some due process requirements for certain types of action as stated in dictum in *Intercontinental Industries* ..., although the recent decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), would suggest the need for some caution on this score.").

**\*6** AFBR asserts that this court has cited *Intercontinental* "for its constitutional holding" in two subsequent cases, and that these cases are therefore "independent precedents" that bind us on the state-action question presented here. But even assuming that *Intercontinental* is good law, these cases do not turn *Intercontinental's* dicta into precedent. AFBR first cites *Harding v. American Stock Exchange, Inc.*, 527 F.2d 1366 (5th Cir. 1976). In *Harding*, the plaintiffs brought various claims against the American Stock Exchange for suspending the trading of its stock and for applying to delist its stock from the exchange. *Id.* at 1366–67. In affirming the district court's dismissal of the action, the court held that plaintiffs lacked a federal cause of action for their constitutional due-process challenge. *Id.* at 1370. The court then wrote, in a footnote: "We note that [the plaintiff] could have raised alleged due process violations in an appeal from the SEC delisting order under [15 U.S.C. § 78y]" and cited *Intercontinental*. *Id.* at 1370 n.5. This passing remark about a hypothetical challenge not before the court has no precedential effect. *See In re Hearn*, 376 F.3d at 453.

Second, AFBR cites *North Alabama Express, Inc. v. United States*, 585 F.2d 783 (5th Cir. 1978). There, the court cited *Intercontinental*, among other cases, for the proposition that "[i]n the administrative context, due process requires that interested parties be given a reasonable opportunity to know the claims of adverse parties and an opportunity to meet them." *Id.* at 786. The court then explained that these requirements are embodied in certain sections of the Interstate Commerce Act. *Id.* There is no mention of *Intercontinental*'s state-action language, much less a statement or even insinuation that stock exchanges are state actors by virtue of their relationship to the SEC. This case too fails to give binding effect to the passage in question from *Intercontinental.*

The Supreme Court's Amtrak cases do not help the petitioners either. In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), and *Department of Transportation v. Association of American Railroads*, 575 U.S. 43, 135 S.Ct. 1225, 191 L.Ed.2d 153 (2015), the Supreme Court examined whether Amtrak qualifies as a state actor for constitutional purposes. Holding that it does, the Court in *Lebron* wrote that where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." 513 U.S. at 400, 115 S.Ct. 961. The Court elaborated in *American Railroads*:

> Given the combination of these unique features and its significant ties to the Government, Amtrak is not an autonomous private enterprise. Among other important considerations, its priorities, operations, and decisions are extensively supervised and substantially funded by the political branches. A majority of its Board is appointed by the President and confirmed by the Senate and is understood by the Executive to be removable by the President at will. Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit. Thus, in its joint issuance of the metrics and standards with the FRA, Amtrak acted as a governmental entity for purposes of the Constitution's separation of powers provisions.

575 U.S. at 53–54, 135 S.Ct. 1225.

Nasdaq is different. Although Nasdaq and other SROs must register with the SEC, they were not created by the government. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484-85, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (explaining that, although SROs are "subject to Commission oversight," they are not "Government-created, Government-appointed" entities). Nor does Nasdaq operate under the direction or control of the SEC in the manner described in *Lebron* and *American Railroads.* Its board members are not appointed or confirmed by government officials, nor are they removable by the government. And although SROs must register with and have their rules approved by the SEC, it is well established that "being regulated by the State does not make one a state actor." *Halleck*, 139 S. Ct. at 1932; *see also Jackson*, 419 U.S. at 350, 95 S.Ct. 449 (explaining that even where "many particulars" of a private company's business are "subject to extensive state regulation," the company does not become a government entity). So Nasdaq bears no resemblance to Amtrak. *See Perpetual Sec.*, 290 F.3d at 138 ("It is clear that NASD is not a state actor and its requirement of mandatory arbitration is not state action.... *Lebron* is clearly distinguishable; Amtrak, the corporation at issue in *Lebron*, was created by the government 'by special law for the furtherance of government objectives,' and the government 'retain[ed] for itself permanent authority to appoint a majority of the directors of' Amtrak. There is no commonality between NASD and Amtrak." (alteration in original) (citation omitted)). Indeed, Nasdaq has *fewer* government ties than other entities the Supreme Court has held *not* to be state actors. *See, e.g., San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542-44, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (holding that a federally chartered, regulated, and subsidized corporation was not a state actor).

*7 Finally, petitioners argue that Nasdaq must qualify as a state actor because otherwise its authority to self-regulate would violate the private nondelegation doctrine. According to petitioners, either Nasdaq is a state actor subject to constitutional scrutiny, or it is a private actor unconstitutionally exercising government power; the SEC and Nasdaq may not—the argument goes— "have it both ways."[9]

But petitioners cite no authority for the proposition that a self-regulating entity subject to government oversight must *either* exercise delegated governmental authority *or* be a state actor. And it's unsurprising that the petitioners cannot find a case to back up this catch-22 because the private-nondelegation and state-action inquiries are distinct. Under the private nondelegation doctrine, "[a] federal agency may not 'abdicate its statutory duties' by delegating them to a private entity." *Texas v. Rettig*, 987 F.3d 518, 531 (5th

Cir. 2021) (quoting *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974)). The state-action doctrine, by contrast, asks whether the challenged conduct is fairly attributable to the government. *See Am. Mfrs. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Petitioners fail to explain why Nasdaq cannot be a private entity whose conduct, while subject to government regulation, is neither an exercise of the SEC's government authority nor fairly attributable to the SEC.[10] The Second and Third Circuits have each impliedly found as much by holding that SROs are not state actors and that SROs do not exercise unconstitutional delegations of legislative power. *See R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir.), *cert. denied*, 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952) ("In the light of the statutory provisions concerning (a) the Commission's power, according to reasonably fixed statutory standards, to approve or disapprove of the association's Rules, and (b) the Commission's review of any disciplinary action, we see no merit in the contention that the Act unconstitutionally delegates power to [NASD]."); *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 697 (3d Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Petitioners give us no reason to reach a different result here.

**\*8** Accordingly, we hold that Nasdaq is not a state actor subject to constitutional constraints.

**B.**

Petitioners argue in the alternative that the SEC's involvement with and approval of Nasdaq's Rules render the Rules subject to constitutional scrutiny. This is only so if the Rules are "fairly attributable to the State." *Sullivan*, 526 U.S. at 50, 119 S.Ct. 977. For this standard to be satisfied, there must be "a sufficiently close nexus between the State and the challenged action of the regulated entity." *Id.* at 52, 119 S.Ct. 977 (citation omitted). Such a close nexus exists "in a few limited circumstances—including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Halleck*, 139 S. Ct. at 1928 (internal citations omitted).

None of these conditions is met here. First, exchange listing standards are not "a traditional, exclusive public function." *Id.* The New York Stock Exchange was founded in 1792, adopted a constitution in 1817, and promulgated rules for listed companies. *See* Am. Bar Ass'n, *Special Study on Market Structure, Listing Standards and Corporate Governance*, 57 Bus. Law. 1487, 1497 (2002); 69 Fed. Reg. 71,256, 71,257 (Dec. 8, 2004). Stock exchanges then existed for over one hundred years as private associations regulating their own members before the SEC was created in 1934. *See* 4 Thomas Lee Hazen, Law Sec. Reg. § 14:8 (2022). Rules like the ones at issue in this case are therefore not "traditionally the exclusive prerogative of the State." *Frazier*, 765 F.2d at 1285 (emphasis omitted) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982)).

Next, this is not a case where "the government compel[led] the private entity to take a particular action." *Halleck*, 139 S. Ct. at 1928 (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Far from it—Nasdaq came up with and proposed the Rules on its own.

Petitioners attempt to show that the SEC in fact compelled Nasdaq to draft these Rules by pointing to the comments of two individual commissioners, Allison Herren Lee and Caroline Crenshaw, who had previously spoken in favor of diversity disclosure policies in the context of an SEC rule. The notice of Nasdaq's proposed Rules appears to reference those comments in a list of reasons for the proposal. *See* 85 Fed. Reg. at 80,472 & n.7. Nasdaq's reasons included its view that increased diversity results in "an increased variety of fresh perspectives, improved decision making and oversight, and strengthened internal controls," as well as its "observ[ation] [of] recent calls from SEC commissioners and investors for companies to provide more transparency regarding board diversity." *Id.* at 80,472-73.

Because these comments were first mentioned in NCPPR's reply brief, petitioners forfeited this argument. *See Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 754 (5th Cir. 2023).

But even if we were to consider this argument, the commissioners' remarks do not show that SEC compelled Nasdaq's Rules. In making the cited statements, the individual commissioners were not speaking on behalf of the SEC as a body; rather, they were writing in a dissenting posture from the promulgation of a final rule. *See, e.g.*, Comm'r Allison Herren Lee, U.S. Secs. & Exch. Comm'n, Statement, Regulation S-K and ESG Disclosures: An Unsustainable Silence (Aug. 26, 2020), https://www.sec.gov/news/public-statement/lee-regulation-s-k-2020-08-26#_ftnref15. There is no evidence that the SEC as an entity weighed in on the merits of diversity disclosure rules, much less that Nasdaq was

"compelled" or even "significant[ly] encourage[d]" by the SEC to take this particular action. *See Halleck*, 139 S. Ct. at 1928; *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777 (explaining that state action occurs if the government "exercise[s] coercive power" or "provide[s] such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State"). Thus, the commissioners' comments do not transform Nasdaq's Rules into state action. *See Jackson*, 419 U.S. at 357, 95 S.Ct. 449 ("Approval by a state utility commission ..., where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.' "); *cf. Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 615–16, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (finding sufficient "encouragement, endorsement, and participation" that implicated the Fourth Amendment where the government "removed all legal barriers" to testing on trains; "made plain not only its strong preference for testing, but also its desire to share the fruits of such intrusions"; and "mandated that the railroads not bargain away" their ability to test).

**\*9** Nor is this a case where the government has acted jointly or is otherwise pervasively entwined with the private entity such that the challenged conduct is attributable to the government. *See Halleck*, 139 S. Ct. at 1928 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Petitioners cite *Brentwood Academy v. Tennessee Secondary School Athletic Association*, in which the Supreme Court explained that it has "treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when the government is entwined in its management or control." 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (cleaned up). But these circumstances are absent here. Nasdaq drafted the Rules itself, and then submitted them to the SEC for approval, as required by statute. The SEC engaged in its statutory review and issued the Approval Order. This yes-or-no approval process does not reflect the degree of entwinement required to turn the Rules into state action. *See Sullivan*, 526 U.S. at 52, 54, 119 S.Ct. 977 (explaining that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action," and that state "permission of a private choice cannot support a finding of state action"); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 165, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (holding that a state is not responsible for a private decision that state law "permits but

does not compel"); *Jackson*, 419 U.S. at 357, 95 S.Ct. 449 (holding that a determination that a utility was "authorized to employ" a business practice did not make the practice state action); *Blum*, 457 U.S. at 1004–05, 102 S.Ct. 2777 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives."); *see also Desiderio*, 191 F.3d at 206–07 (concluding that NASD's challenged rule was not fairly attributable to the state because "no SEC rule or action that has been called to our attention encourages the NASD to compel arbitration," and because "the arbitration clause in Form U-4 was drafted by the NASD in cooperation with other self-regulatory organizations, with no encouragement from the SEC," and noting that though the rule "was subject to approval by the SEC, from which fact plaintiff infers that state action is present[,] [s]imply because the SEC approved the arbitration clause in Form U-4 is not enough.... The SEC's '[m]ere approval' of Form U-4 is 'not sufficient' to justify holding the state liable for effects of the arbitration clause." (citations omitted)); *Perpetual Sec.*, 290 F.3d at 139 ("Because NASD is a private actor and because there is no nexus between its challenged action (compulsory arbitration) and the state, Perpetual's claim of a due process violation is patently without merit."); *Bernstein*, 738 F.2d at 186 (finding that the Fifth Amendment due process clause did not apply to the Mercantile Exchange because "the fact that it is heavily regulated by a federal commission will not do, as that would bring under the Fifth Amendment much of the private sector, ranging from hospitals to railroads"). And it does not matter, as NCPPR contends, that the SEC's review is "active." As the D.C. Circuit has explained, "[t]he Supreme Court has never held that the government becomes responsible for the actions of a third party due to the length or intensity of its attention to the actions of the party before approval." *Vill. of Bensenville v. FAA*, 457 F.3d 52, 65 (D.C. Cir. 2006).

Finally, AFBR argues that because Nasdaq must enforce the Rules against its listed companies, subject to SEC sanctions if it fails to do so, the Rules are state action. AFBR relies on the Supreme Court's decisions in *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), for this proposition. But this argument misses the mark. In *Shelley*, the Supreme Court found state action where state courts had enforced racially restrictive covenants. 334 U.S. at 19, 68 S.Ct. 836. Similarly, in *Moose Lodge*, the Supreme Court held that the Constitution prohibited "invok[ing] the sanctions of the State to enforce a concededly discriminatory private rule," 407 U.S. at 179, 92 S.Ct. 1965, and enjoined

government enforcement of the discriminatory rule. *Id.* The SEC has the statutory authority under 15 U.S.C. § 78s(g) and (h) to sanction *an SRO* for failure to enforce its own rules. However, petitioners do not challenge these provisions or any enforcement action brought under these provisions as to Nasdaq's Rules. Instead, petitioners seek constitutional review of the Rules themselves. Whether later enforcement of the Rules against Nasdaq would be state action is not a question presented by this petition, and so we will not touch it today.[11]

* * *

 **\*10**  The Supreme Court recently cautioned that "[e]xpanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise." *Halleck,* 139 S. Ct. at 1934. We heed this warning in holding that the Rules drafted and proposed by Nasdaq, a private self-regulatory organization, are not attributable to the government and are therefore not subject to constitutional scrutiny.

III.

Petitioners also argue that the SEC's Approval Order exceeds the agency's authority under the Exchange Act and is arbitrary and capricious. We deny the petitions on these grounds.

A.

Under the APA, the SEC's Approval Order may be set aside if it is "in excess of statutory ... authority." 5 U.S.C. § 706(2)(C). To determine the extent of the SEC's statutory authority, we "rely on the conventional standards of statutory interpretation," *Chamber of Com. v. U.S. Dep't of Lab.,* 885 F.3d 360, 369 (5th Cir. 2018), and "must give effect to the unambiguously expressed intent of Congress."[12] *Huawei Techs. USA, Inc. v. FCC,* 2 F.4th 421, 433 (5th Cir. 2021) (internal quotation marks and citation omitted); *accord Mex. Gulf Fishing Co. v. U.S. Dep't of Com.,* 60 F.4th 956, 963 (5th Cir. 2023).

Petitioners raise four challenges to the SEC's statutory authority. They argue (i) that the word "designed" in § 78f(b) (5) prohibits the SEC from considering investors' subjective

beliefs that disclosure would be valuable, (ii) that § 78f(b) (5) prohibits the SEC from approving an exchange rule that requires disclosure of information that would not be "material" for purposes of a securities fraud claim, (iii) that Congress did not explicitly authorize the SEC to approve a rule that infringes state sovereignty, and (iv) that Congress did not explicitly authorize the SEC to approve a rule that concerns "major policy questions of vast economic and political significance."

We reject these arguments and conclude that the SEC acted within its statutory authority in approving Nasdaq's Rules.[13]

1.

 **\*11**  To start, NCPPR argues that the SEC improperly considered "[t]he subjective belief and desire of a subset of investors." The Exchange Act requires that the SEC find that an exchange rule is "designed" to meet certain statutory objectives, *see* 15 U.S.C. § 78f(b)(5), and NCPPR contends that the SEC may only rely on "objective evidence" in doing so. NCPPR does not explain what counts as "objective evidence," except to say "empirical evidence" is in bounds and "subjective belief" is not.

But the Exchange Act does not limit the SEC to considering "objective evidence" in deciding whether to approve a proposed rule. Instead, "the findings of the [SEC] as to the facts, if supported by *substantial evidence,* are conclusive." 15 U.S.C. § 78y(a)(4) (emphasis added). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Meadows v. SEC,* 119 F.3d 1219, 1224 (5th Cir. 1997) (quoting *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir. 1995)). Under this standard, so long as evidence is relevant to the issue at hand, the SEC can rely on it.

*Domestic Securities, Inc. v. SEC* illustrates the point. 333 F.3d 239 (D.C. Cir. 2003). There, the petitioner challenged the SEC's determination that a platform for displaying securities orders was technologically sound. *See id.* at 248. The petitioner argued that because the platform used an "obscure communications protocol" instead of the "standard industry protocol," the platform would impose high costs on market participants. *Id.* at 249 (cleaned up). Relying on the fact that "several" networks for securities transactions "expressed an interest in fulfilling their quote display obligations through

[the platform],” the SEC found that the platform was viable. *Id.* The D.C. Circuit thought that this was enough, holding that “[t]hese expressions of interest support the SEC's conclusion” that the platform was viable, even though the platform did not use the “standard industry protocol.” *Id.* As Judge Sentelle explained, writing for the panel, “[t]he making of policy decisions and the resolution of conflicting evidence is the SEC's job, not the court's. *Id.*

There is no textual basis in § 78f(b) for a separate “objective evidence” standard. NCPPR points to the requirement that an exchange rule be “designed to” meet certain goals,[14] 15 U.S.C. § 78f(b)(5), and argues that a rule is “designed to” meet a goal if there is a “close causal nexus” between the rule and the goal. Even if this were true, however, NCPPR gives no reason why such a “close causal nexus” would have to be supported by “objective evidence” as opposed to “substantial evidence,” which is all the plain text of the statute requires.[15] *See id.* § 78y(a)(4).

**\*12** Finally, NCPPR argues that the SEC cannot conduct an “independent review” of an exchange rule if the SEC relies on investors' “subjective belief” as evidence. We agree that “the SEC cannot simply accept what a *self-regulatory organization* has done, but rather is obligated to make an independent review.” *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446 (D.C. Cir. 2017) (emphasis added) (cleaned up). But the SEC's obligation to look beyond an exchange's self-serving statements does not otherwise restrict what evidence the SEC can consider as “relevant.” *Meadows*, 119 F.3d at 1224 (citation omitted). The SEC must independently analyze investor comments submitted during the administrative process. Still, the subjective opinions of those investors may be relevant evidence and sufficient to meet the substantial evidence standard, as they are here.

2.

Petitioners' materiality challenge is also unconvincing. Their argument goes like this. Under the Exchange Act, the SEC cannot approve an exchange rule that is designed to “regulate by virtue of any authority conferred by [the Exchange Act] matters not related to the purposes of [the Exchange Act] or the administration of the exchange.” 15 U.S.C. § 78f(b)(5). According to the petitioners, “[a] disclosure requirement must be limited to ‘material’ information to fall within the scope of the Exchange Act,” meaning that there is “a substantial likelihood that a reasonable investor would consider the

information important in making a decision to invest.” Petitioners argue that “information regarding directors' race, gender, and sexuality is not material.” From these premises, petitioners conclude that the SEC acted outside its statutory authority in approving Nasdaq's Rules.

A “material misrepresentation (or omission)” is an element of securities fraud claims under certain parts of the Exchange Act and the SEC's rules. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (emphasis omitted) (discussing § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5); *see Heinze v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020) (explaining that § 14(a), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9(a), allow a claim based on “material omissions from proxy statements” under certain circumstances). And it's true, as petitioners note, that this element is satisfied “if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.” *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (internal quotation marks and citation omitted); *see Levinson*, 485 U.S. at 240, 108 S.Ct. 978 (“[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information.”); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (similar).

But a disclosure rule can be “related to the purposes of [the Exchange Act],” 15 U.S.C. § 78f(b)(5), even if the SEC does not find that the disclosure rule is limited to information that would be “material” in the securities fraud context. The “fundamental purpose” of the Exchange Act is “implementing a philosophy of full disclosure,” *Levinson*, 485 U.S. at 230, 108 S.Ct. 978 (internal quotation marks and citation omitted)—not just the disclosure of information sufficient to state a securities fraud claim. Indeed, the Exchange Act gives the SEC “very broad discretion to promulgate rules governing corporate disclosure.” *Nat. Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979). To give one example, for a security to be registered on an exchange, the SEC can require the issuer to disclose *any* information about “the organization, financial structure, and nature of the business” as is “necessary or appropriate in the public interest or for the protection of investors.” 15 U.S.C. § 78l(b)(1)(A). Nothing in this provision or the provision governing exchange rules cabins disclosure rules to information that would meet the materiality element of a securities fraud claim. And, as the SEC Approval Order explains, “[e]xchanges have historically adopted listing rules

that require disclosures in addition to those required by [SEC] rules." 86 Fed. Reg. at 44,438 & n.202 (giving examples).

**\*13** A materiality standard for exchange disclosure rules is also unworkable. Determining the materiality of a given statement is a "fact-specific inquiry," *World Tree*, 43 F.4th at 465 (quoting *Levinson*, 485 U.S. at 240, 108 S.Ct. 978), that "is peculiarly within the competence of the trier of fact," *id.* (citation omitted). Because materiality is context dependent, it is unclear how the SEC could say, in a factual vacuum, that a particular *category* of information is or is not material to investors in all circumstances.[16] To make such a finding, the SEC would be forced to speculate about, and rule out, any factual scenarios in which there might be "a substantial likelihood that a reasonable investor would consider" any information falling within the relevant category "important in making a decision to invest." *Id.* at 459 (citation omitted). The prohibition in § 78f(b)(5) on exchange rules that are designed to regulate matters unrelated to the purposes of the Exchange Act does not contemplate such an impossible task. No court, to our knowledge, has ever said it does.

Of course, the Exchange Act still limits the kinds of disclosure rules the SEC can approve. An exchange rule, including a disclosure rule, must be "designed to" accomplish certain statutory objectives. *See* 15 U.S.C. § 78f(b)(5). And disclosure rules that violate other requirements of § 78f cannot be approved. To the extent that petitioners have briefed arguments on these fronts, we address them below. Here, to resolve petitioners' statutory argument, we only need to hold that § 78f(b)(5) does not require an exchange disclosure rule to be limited to information that would be material for purposes of a securities fraud claim.

Before moving on, we note that even if the petitioners' theory were right, substantial evidence supports the SEC's finding that Nasdaq's rule would provide "information that would contribute to investors' investment and voting decisions." 86 Fed. Reg. at 44,430. The SEC based this conclusion on "the broad demand for this information" from "institutional investors, investment managers, listed companies, and individual investors, as well as statements made by institutional investors, asset managers, and business organizations." *Id.* In support, the SEC cited "statements from Vanguard, State Street Global Advisors, and BlackRock that call for companies to disclose board diversity information," "petitions for [SEC] rulemaking from groups of institutional investors," and comments from Goldman Sachs, Microsoft, and Facebook, among other market participants. *Id.* at

44,430 nn. 91 & 92; *see id.* at 44,429 (pointing out that "many commenters believe[d] that the proposed board diversity disclosures would be material to investors"). For example, one "large, global asset manager" asserted that "[t]he composition of a company's board and management is an important element of [its] fundamental analysis,"[17] and a letter on behalf of investment institutions with over $325 billion under management said that a similar regime in Canada had "improv[ed] both the quality and quantity of diversity data" for use in "investment decision-making."[18] This evidence is sufficient to support the SEC's determination that regardless of whether investors think that board diversity is good or bad for companies, disclosure of information about board diversity would inform how investors behave in the market:

> [F]or investors who support board diversity, the proposed disclosures could inform their decision on issues related to corporate governance, including director elections, and company explanations as to why they do not meet the diversity objectives could better inform those investors as to the risks and costs of increased board diversity. And for investors who do not believe that having additional "Diverse" directors would be beneficial for a company, the proposed disclosures could inform their decision to vote to preserve the existing board composition in a company.

**\*14** *Id.* at 44,431.

Petitioners argue that board diversity information is immaterial because "there is no evidentiary basis to believe race, gender, and sexual preference of directors bear any relationship to corporate governance or performance." But the SEC could find that disclosure of board diversity information would be "viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available," *Levinson*, 485 U.S. at 231–32, 108 S.Ct. 978 (citation omitted), even without conclusive empirical evidence that board diversity helps or hurts corporate performance. Here, as we explained, the SEC decided that board diversity information "contribute[s] to investors' investment and voting decisions" based on substantial evidence of industry demand for this information to use in managing funds. 86 Fed. Reg. at 44,430. The SEC did not need to find that there is an empirical or scientific basis about the effects of board diversity or that these effects are beyond debate to conclude that a "reasonable investor" could find board diversity information "important." *World Tree*, 43 F.4th at 459. Rather, the SEC's candid findings that "studies of the effects of board diversity are generally inconclusive"

and "that the effects of even mandated changes remain the subject of reasonable debate," 86 Fed. Reg. at 44,432, set alongside substantial evidence that many investors already use board diversity information to make investments, are consistent with a finding of materiality—assuming that it is even possible to make such a finding outside the context of securities fraud litigation.[19]

3.

 **\*15** Next, NCPPR argues that the SEC's Approval Order approving Nasdaq's Rules regulates corporate governance, an issue reserved for the states. Although NCPPR does not specify how the Rules regulate "the internal affairs" of corporations, we think that NCPPR means that Nasdaq's Rules "impose ... demographic quota and disclosure requirements on corporate boards." But the SEC conclusively determined, based on substantial evidence, that Nasdaq's proposal is a disclosure rule, not a mandatory quota; that Nasdaq's disclosure-based framework does not alter the state-federal balance; and that the Exchange Act unambiguously authorizes the SEC to approve disclosure rules.

a.

First, the SEC's finding that Nasdaq's proposal is a "disclosure-based framework" and not a quota is supported by substantial evidence and therefore conclusive.[20] 86 Fed. Reg. at 44,428; 15 U.S.C. § 78y(a)(4). The SEC observed that:

> the proposed rules do not mandate any particular board composition[,] .... would not require a company to select a director solely because that person falls within the proposed definition of 'Diverse,' would not prevent companies and their shareholders from selecting directors based on experience, competence, and skills, and would not substitute a regulator's judgment for companies' or their shareholders judgment in selecting directors.

86 Fed. Reg. at 44,428. If a company does not meet diversity objectives, the company has the option to "explain[ ] why it does not meet the objectives." *Id.* And Nasdaq "would not assess the substance of the company's explanation." *Id.* Instead, companies that "prefer not to explain their approach to board diversity" can take advantage of "substantial flexibility in crafting the required explanation." *Id.* According to Nasdaq, permissible explanations include: "The Company does not meet the diversity objectives ... because it does

not believe Nasdaq's listing rule is appropriate," "because it does not believe achieving Nasdaq's diversity objectives are feasible given the company's current circumstances," "because the Nominations Committee considers a variety of professional, industry, and personal backgrounds and skill sets to provide the Board with the appropriate talent, skills, and expertise to oversee the Company's business," and because the Nominations Committee "is committed to ensuring that the Board's composition appropriately reflects the current and anticipated needs of the Board and the company."[21] Therefore, all a company has to do is give *an* explanation, however short. In light of these parameters, the SEC was entitled to credit industry comments "stat[ing] that the proposal would not impose a quota for a minimum number of Diverse directors." *Id.* at 44,427.

True, there are mandatory parts of Nasdaq's proposal. Companies need to report board diversity statistics, and a company with less than two diverse board members must say more than, "the Company does not comply with Nasdaq's diversity rule." *Id.* at 44,426 n.31. If a company with less than two diverse board members refuses to disclose why—in even the most minimal terms—the company may be delisted. *See id.* at 44,426. However, as the SEC explained, "[t]his is distinct from facing a fine as an alternative to compliance or possibly facing the requirement to dissolve for non-compliance." *Id.* at 44,432. In other words, the requirement that a company give *an* explanation is not a sanction that mandates compliance with the two-diverse-board-members benchmark. The only sanction is for giving *no* explanation at all.

 **\*16** Thus, as the SEC concluded, the explanations are part of a disclosure framework, not a quota. *See, e.g., id.* at 44,428 n.54. The SEC acknowledged that this "proposal may have the effect of *encouraging* some Nasdaq-listed companies to increase diversity on their boards." *Id.* at 44,428 (emphasis added). But the proposal does not *require* companies to have any number of diverse board members. All that's required, under the proposal, is a de minimis explanation for having less than two diverse board members.[22]

In sum, the SEC made a reasonable finding—based on sufficient evidence about how Nasdaq's proposal would work and industry reactions to it—that the proposal does not impose a diversity quota on corporate boards. We cannot "reweigh the evidence" and "substitute [our] judgment for that of the [SEC]." *Meadows*, 119 F.3d at 1224. Accordingly, we will adhere to the SEC's conclusive determination that

the proposal implements a "disclosure-based framework." 86 Fed. Reg. at 44,428; *see* 15 U.S.C. § 78y(a)(4).

b.

SEC approval of Nasdaq's disclosure-based framework does not implicate the canon that Congress "must make its intention ... unmistakably clear in the language of the statute" "to alter the usual constitutional balance between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (internal quotation marks and citation omitted).

At the threshold, this canon only applies when a statute is ambiguous. *Salinas v. United States*, 522 U.S. 52, 60, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) (citing *Gregory*, 501 U.S. at 467, 111 S.Ct. 2395). But instead of identifying any triggering ambiguity in the Exchange Act, NCPPR's position appears to be that in approving Nasdaq's proposal, the SEC construed the Exchange Act to permit federal encroachment upon a traditional state power. Without an adequately briefed articulation of what specific statutory provision is at issue, and why that provision is ambiguous such that the canon applies, we decline to hold that the SEC lacked statutory authority to approve Nasdaq's proposal on this basis.

Regardless, Nasdaq's disclosure-based framework does not alter the state-federal balance. It is well-established that disclosure rules do not interfere with the role of "state corporate law" in "regulat[ing] the distribution of powers among the various players in the process of corporate governance." *Bus. Roundtable v. SEC ("Business Roundtable I")*, 905 F.2d 406, 411-12 (D.C. Cir. 1990). Although NCPPR suggests, contrary to this settled principle, that Nasdaq's proposal "govern[s] the internal affairs of the corporation," *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (citation omitted), NCPPR does not explain how a disclosure-based framework could have this effect or encroach on state corporate law in any other way.[23]

In any event, the Exchange Act unambiguously *requires* the SEC to approve Nasdaq's disclosure-based framework if it is "consistent with the requirements of [the Exchange Act]."[24] 15 U.S.C. § 78s(b)(2)(C)(i). NCPPR does not point to any requirement of the Exchange Act that could be plausibly read to prohibit an exchange from adopting a disclosure-based framework for board diversity information.

*See supra* Section III.A.2 (rejecting petitioners' argument that the purposes of the Exchange Act limit disclosure rules to material information). It would be surprising if NCPPR could find such a provision because, as we have repeated, the fundamental purpose of the Exchange Act is full disclosure in the securities industry. *See, e.g., Affiliated Ute Citizens of Utah*, 406 U.S. at 151, 92 S.Ct. 1456; *Levinson*, 485 U.S. at 230, 108 S.Ct. 978.

 **\*17** For those reasons, the federalism canon is not applicable here.

4.

Last, invoking the "major questions doctrine," NCPPR argues that the SEC cannot approve an exchange rule that "impose[s] unprecedented demographic quotas and disclosure requirements regarding race, sex, and sexual preference on companies valued at over 20 *trillion* dollars" (emphasis in original), without "clear and explicit" Congressional authorization.

This is not a "major questions case." *West Virginia v. EPA*, ––– U.S. ––––, 142 S. Ct. 2587, 2610, ––– L.Ed.2d –––– (2022). The "major questions doctrine" applies in "extraordinary cases" where the "history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 2608 (cleaned up). In those "extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text" a statutory delegation of authority to the agency. *Id.* at 2609 (internal quotation marks and citation omitted). Then, the agency "must point to a clear congressional authorization for the power it claims." *Id.* (internal quotation marks and citation omitted). Here, the SEC's asserted authority is an ordinary exercise of its power to approve exchange listing rules; a disclosure rule for board diversity information is not significant enough to trigger major questions concerns; and the Exchange Act authorizes SEC approval of exchange disclosure rules.

The "history and the breadth" of the SEC's asserted authority is unremarkable. *Id.* at 2608 (citation omitted). Since 1975, the Exchange Act has empowered and required the SEC to approve proposed changes to exchange rules. *See* Pub. L. No. 94-29, 89 Stat. 146 (1975) (codified as amended

at 15 U.S.C. § 78s(b)). Because the core objective of the Exchange Act, as we have repeated, is to establish "a philosophy of full disclosure ... in the securities industry," *Affiliated Ute Citizens of Utah*, 406 U.S. at 151, 92 S.Ct. 1456 (citation omitted), exchanges sometimes adopt disclosure rules that go beyond the requirements of federal securities laws—for example, as the SEC's Approval Order notes, Nasdaq "already requires its listed companies to publicly disclose compensation or other payments by third parties to a company's directors or nominees." 86 Fed. Reg. at 44,438. And more than a decade ago, the SEC itself adopted a disclosure rule related to board diversity. *See* 17 C.F.R. § 229.407(c)(2)(vi); Proxy Disclosure Enhancements, 74 Fed. Reg. 68,334, 68,364 (Dec. 23, 2009) (codified at 17 C.F.R. § 229.407(c)(2)(vi)). This rule requires companies to disclose how the company's nominating committee or board "considers diversity in identifying nominees for director." *Id.* If the committee or board "has a policy with regard to the consideration of diversity in identifying director nominees," it must "describe how this policy is implemented, as well as how [it] assesses the effectiveness of its policy." *Id.* Disclosure rules, including those related to diversity, are business as usual for the SEC, and there is nothing "unheralded," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014), or "unprecedented," *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, ––– U.S. ––––, 141 S. Ct. 2485, 2489, 210 L.Ed.2d 856 (2021) (per curiam), about the SEC's Approval Order here.

**\*18** Further, the SEC's approval of a rule requiring disclosures of board diversity information is not economically and politically significant enough to trigger the major questions doctrine. Compare the SEC's Approval Order to agency action that the Supreme Court *has* found sufficiently significant. The Court has held that the Food and Drug Administration lacked statutory authority "to regulate, and even ban, tobacco products," that the Centers for Disease Control and Prevention lacked statutory authority to "institute a nationwide eviction moratorium," and that the Environmental Protection Agency lacked statutory authority to regulate greenhouse gas emissions from "millions of small sources, such as hotels and office buildings, that had never before been subject to [permitting] requirements." *West Virginia*, 142 S. Ct. at 2608 (summarizing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126–27, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488-90; and *Util. Air. Regul. Grp.*, 573 U.S. at 324, 134 S.Ct. 2427). In contrast with these assertions of agency power over daily life across America, Nasdaq's

proposal requires companies that voluntarily list on Nasdaq to disclose information about board member diversity—a small step from disclosures about board diversity policies that the SEC already requires. It is more than a stretch to say that these new disclosures "affect[ ] every member of society in the profoundest of ways," *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021), as NCPPR implies.[25]

Finally, even if this were an unheralded exercise of SEC authority with sufficient economic and political significance, neither the SEC nor Nasdaq asks us to "read into ambiguous statutory text" a delegation of authority to the SEC to approve Nasdaq's proposal. *Id.* That authorization is plain on the face of the Exchange Act: the SEC "shall" approve Nasdaq's disclosure-based framework if it is "consistent with the requirements of [the Exchange Act]." 15 U.S.C. § 78s(b)(2)(C)(i).

To find a major-questions hook in the text, NCPPR argues that the Exchange Act "does not contain a single phrase explicitly or even implicitly granting [the] SEC or SROs power to impose *any* demographic quota ... on corporate boards." The premise of this argument is wrong because the SEC's finding that Nasdaq's proposal is a disclosure-based framework is conclusive. *See supra* Section III.A.3.a.

NCPPR also argues that the Exchange Act "does not contain a single phrase explicitly or even implicitly granting [the] SEC or SROs power to impose *any* ... disclosure requirements on corporate boards." This is wrong, too. *See, e.g., supra* Section III.A.3.b. The text of the statute says that if a disclosure rule is consistent with the requirements of the Exchange Act— which is a disclosure statute, *see, e.g., Affiliated Ute Citizens of Utah*, 406 U.S. at 151, 92 S.Ct. 1456; *Levinson*, 485 U.S. at 230, 108 S.Ct. 978—the SEC must approve it. *See* 15 U.S.C. § 78s(b)(2)(C)(i). In turn, § 78f(b)(5) requires that a proposed rule be designed to meet one of several objectives. *See* 15 U.S.C. § 78f(b)(5). These objectives are not, as NCPPR argues, "grants [of] authority for Nasdaq to issue and for SEC to approve rules." If the SEC "determines that" a proposed rule is designed to meet one of those objectives, *id.* § 78f(b), and if all other statutory requirements are met, the SEC must approve the rule, *id.* § 78s(b)(2)(C)(i). So the question is not, as NCPPR posits, whether "[s]pecific authority to impose ... disclosure requirements can[ ] be found in" those objectives. Properly understood, the question is whether the SEC's determination that Nasdaq's proposed rule is designed to meet one of those objectives complies with the APA. We consider this question next. *See infra* Section III.B.1.

**\*19**  In short, this is not a case where the SEC has asserted "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. We hold that the SEC's Approval Order fell within its statutory authority under the Exchange Act.

**B.**

Finally, the SEC's Approval Order is not arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Under the "arbitrary and capricious" standard, the SEC "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted). In reviewing agency action, we do not "substitute [our] judgment for that of the agency" but rather "consider[ ] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 904 (5th Cir. 2021) (cleaned up). "The petitioner has the burden of proving that the agency's determination was arbitrary and capricious." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010) (citation omitted).

Petitioners offer five reasons that the SEC acted arbitrarily and capriciously. They argue that the SEC: (1) improperly decided that the Disclosure Rule is designed to accomplish at least one objective listed in § 78f(b)(5); (2) improperly decided that the Disclosure Rule is not designed to permit unfair discrimination among issuers; (3) improperly assessed the costs of the Disclosure Rule; (4) failed to conduct an independent review of the record; and (5) failed to adequately analyze the content of the Recruiting Rule. None of these contentions has merit.

**1.**

Petitioners agree that an SRO rule need only be designed to meet one of the enumerated statutory objectives. The SEC concluded that the Disclosure Rule is "designed to ... remove impediments to and perfect the mechanism of a free and open market and a national market system," among other objectives, because the Disclosure Rule would "contribute to the maintenance of fair and orderly markets."[26] 86 Fed. Reg. at 44,425. AFBR argues that this determination is not supported by substantial evidence.

**\*20**  The statutory objective to "remove impediments to and perfect the mechanism of a free and open market and a national market system," 15 U.S.C. § 78f(b)(5), concerns the "maintenance of fair and orderly markets." 15 U.S.C. § 78k-1(a)(1)(C); *see NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (explaining that the Exchange Act "makes plain that maintenance of fair and orderly markets is the animating goal of federal securities law" and that the "remov[ing] impediments" is a means to "this end" (internal quotation marks and citation omitted)).[27] As AFBR acknowledges, fair and orderly markets assure economically efficient securities transactions and fair competition among market participants. *See* 15 U.S.C. § 78k-1(a)(1)(C)(i)-(ii).

The SEC's finding that the Disclosure Rule would "contribute to the maintenance of fair and orderly markets" and is therefore "designed to ... remove impediments to and perfect the mechanism of a free and open market and a national market system," 86 Fed. Reg. at 44,425, is supported by substantial evidence. The SEC found that "[b]oard-level diversity statistics are currently not widely available on a consistent and comparable basis, even though [Nasdaq] and many commenters argue that this type of information is important to investors." *Id.* In making this finding, the SEC relied on numerous comments from market participants. *See, e.g., id.* at 44,429 nn.72 & 79. Indeed, the record is full of evidence that the status quo deprives market participants of fair access to information about board composition, impeding efficiency. For example, one commenter explained that current disclosures "are insufficient and noncomparable" because some companies report composition "using broad groupings" like "minority" while others "report by specific racial or ethnic groups."[28] In light of this "opacity," the commenter stated, current disclosures "provide little actionable or decision-useful information for investors."[29] Another asserted that "[m]any investors are left to consult board data that has been 'assessed' by third parties for commercial purposes rather than collected directly from company reporting, which raises concerns about accuracy, objectivity and consistency."[30] A third said that "a lack of standardization" in "the current reporting environment" "creates a lack of

consistency, comparability and transparency" and that this environment "generates information asymmetry, disorder and inefficiency."[31] Because the Disclosure Rule standardizes disclosures of board diversity information, including the format and timing of disclosures,[32] the SEC reasonably found that the Disclosure Rule "would make it more efficient and less costly for investors to collect, use, and compare information on board diversity" and would "mitigate any concerns regarding unequal access to information that may currently exist between certain (likely larger and more resourceful) investors who could obtain the information and other (likely smaller) investors who may not be able to do so." 86 Fed. Reg. at 44,430. Thus, based on substantial evidence, the SEC concluded that the Disclosure Rule would "contribute to the maintenance of fair and orderly markets," *id.* at 44,425, and satisfied § 78f(b)(5).[33]

2.

**\*21**  AFBR also argues that because the Disclosure Rule imposes different disclosure requirements on domestic and foreign issuers, the SEC erred in concluding that the rule is not designed to permit unfair discrimination among issuers. *See* 86 Fed. Reg. at 44,426 n.26 (defining "foreign issuer").

The Disclosure Rule operates differently for foreign issuers than other Nasdaq-listed companies. Nasdaq-listed companies must generally list the number of directors based on "gender identity (female, male, or non-binary)," "race and ethnicity (African American or Black, Alaskan Native or Native American, Asian, Hispanic or Latinx, Native Hawaiian or Pacific Islander, White, or Two or More Races or Ethnicities), disaggregated by gender identity," and "self-identif[ication] as LGBTQ+," as well as the number of directors who did not disclose information in these categories. *Id.* at 44,426-27. In contrast with these requirements, a foreign issuer must state "whether disclosure is prohibited under its home country law," "the number of directors based on gender identity (female, male, or non-binary)," "the number of directors who self-identify as [u]nderrepresented [i]ndividuals in its home country jurisdiction," "the number of directors who self-identify as LGBTQ+," and the number of directors who did not disclose information in these categories. *Id.* at 44,427.

The definitions of diversity for foreign issuers and non-foreign issuers correspond with these disclosure requirements. For foreign issuers, a diverse board member is defined as an individual "who self-identifies as one or more of the following: Female, LGBTQ+, or an underrepresented individual based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the company's principal executive offices." *Id.* at 44,426 n.26. For domestic issuers, a diverse board member is defined as "an individual who self-identifies in one or more of the following categories: (i) Female, (ii) Underrepresented Minority, or (iii) LGBTQ+." *Id.* at 44,425 n.18. "Underrepresented Minority" means "an individual who self-identifies as one or more of the following: Black or African American, Hispanic or Latinx, Asian, Native American or Alaska Native, Native Hawaiian or Pacific Islander, or Two or More Races or Ethnicities." *Id.*

Both foreign issuers and non-foreign issuers without at least two diverse board members must explain why. Foreign issuers must provide an explanation if the board does not have at least two diverse directors, including one who self-identifies as "Female." *Id.* at 44,426 n.26. The second diverse director "may include an individual who self-identifies as one or more of the following: Female, LGBTQ+, or an [u]nderrepresented i]ndividual." *Id.* Most other issuers must provide an explanation if the board does not have at least two diverse members, including one who self-identifies as "Female" and one who self-identifies as "an Underrepresented Minority or LGBTQ+." *Id.* at 44,426.

In designing these standards, Nasdaq relied on evidence that women are "underrepresented in boardrooms across the globe," and that there "is no internationally agreed definition as to which groups constitute minorities."[34] So, to craft a definition of underrepresented individuals applicable to foreign issuers, Nasdaq borrowed from the United Nations Declaration on the Rights of Persons Belonging to National or Ethnic, Religious and Linguistic Minorities and the United Nations Declaration on the Rights of Indigenous Peoples.[35] *See* 86 Fed. Reg. at 44,434 n.144 (explaining the origin of this standard).

**\*22**  The SEC gave a satisfactory explanation for its conclusion that the different requirements that apply to foreign issuers are not "unfairly discriminatory." *Id.* at 44,435; *see State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. The SEC explained:

[I]t is not unreasonable for [Nasdaq], in crafting board diversity disclosures, to recognize that the proposed definition of "Underrepresented Minority" for domestic

companies may not be as effective in identifying underrepresented board members in foreign countries that have differing ethnic and racial compositions, and may therefore result in disclosures that are less useful for investors who seek board diversity information for Foreign Issuers. It is therefore not unreasonable for [Nasdaq] to require Foreign Issuers to provide disclosures relating to underrepresented individuals based on national, racial, ethnic, indigenous, cultural, religious, or linguistic identity in the country of the issuer's principal executive offices. Similarly, to the extent Foreign Issuers choose to meet the proposed diversity objectives, it is not unreasonable for [Nasdaq] to take into account the differing demographic compositions of foreign countries and to provide Foreign Issuers flexibility in recognition of the different circumstances associated with Foreign Issuers hiring Diverse directors. Moreover, investors would still have access to a Foreign Issuer's Board Diversity Matrix and any disclosures explaining why it does not meet the applicable diversity objective, and this information may still be important to investors' investment and voting decisions notwithstanding the flexibility provided to Foreign Issuers.

86 Fed. Reg. at 44,435. To sum up, the SEC's point is that because the meaning of diversity varies globally, it is fair and desirable to let foreign issuers report diversity information according to nationally appropriate standards.

AFBR's attacks on the SEC's analysis are unavailing. AFBR asserts that separate standards for foreign issuers undercut uniformity in disclosures without explaining why these standards are "designed to permit unfair discrimination." 15 U.S.C. § 78f(b)(5) (emphasis added). Moreover, the SEC rationally found that the disclosure-based framework would provide investors with information that would influence investment and voting decisions and would mitigate market inefficiencies, regardless of variations in the standards for those disclosures. AFBR also speculates that foreign issuers should have been treated more stringently because "the political and economic marginalization of underrepresented minorities in many foreign countries around the world is probably worse, not better, than in the United States." But AFBR ignores that the foreign issuers must still disclose the number of board members who self-identify as underrepresented individuals and may count underrepresented individuals for purposes of determining whether an explanation is required.

3.

Next, AFBR objects that the SEC failed to adequately consider "tremendous costs for firms that dare to defy the quotas" and failed to show "that the asserted benefits of the diversity rule outweigh the costs."

AFBR misunderstands what the Exchange Act requires. The SEC must consider whether proposed rules "impose any burden on competition not necessary or appropriate *in furtherance of the purposes* of [the Exchange Act]." 15 U.S.C. § 78f(b)(8) (emphasis added). So the SEC must analyze burdens on competition, and then decide whether those burdens are "necessary or appropriate" to further the purposes of the Exchange Act. *Id.* These purposes include implementing a philosophy of full disclosure in the securities industry, *see, e.g., Affiliated Ute Citizens*, 406 U.S. at 151, 92 S.Ct. 1456, and relatedly, maintaining fair and orderly markets, *see NASDAQ OMX Grp.*, 770 F.3d at 1021.

**\*23** Moreover, in fulfilling its duty under § 78f(b)(8), the SEC need not "measure the immeasurable." *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (citation omitted). We must "be mindful of the many problems inherent in considering costs and uphold a reasonable effort made by the [SEC]." *Huawei Techs.*, 2 F.4th at 452 (cleaned up). In deciding whether "any burden on competition" imposed by a rule is "necessary or appropriate" to further the purposes of the Exchange Act, 15 U.S.C. § 78f(b)(8), the SEC's "discussion of unquantifiable benefits" is sufficient so long as the SEC articulates "a satisfactory explanation" for its analysis, "including a rational connection between the facts found and the choice made," *Lindeen*, 825 F.3d at 658 (cleaned up); *see Huawei Techs.*, 2 F.4th at 454 (holding that the agency "was not required to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits").

The SEC adequately considered potential burdens on competition. The SEC noted AFBR's concerns that the Disclosure Rule "would create a target for activist divestment campaigns or shareholder lawsuits," and "that companies will need to spend limited resources to hire communications consultants and attorneys to evaluate the marketing and legal risks of providing an explanation," along with concerns raised by other commenters regarding pressure campaigns and harassment. 86 Fed. Reg. at 44,436 n.175. But on the other side of the ledger, the SEC found that Nasdaq's proposed

rule changes "may promote competition for listings among exchanges by allowing [Nasdaq] to update its disclosure rules and related listing services in a way that better attracts and retains the listings of companies that prefer to be listed on an exchange that provides investors with the information required by the [Disclosure Rule]." *Id.* at 44,437. The SEC recognized that some companies that are concerned about cost exposure might choose not to list on Nasdaq or might leave Nasdaq. *Id.* at 44,437-38. Still, the SEC observed that the Disclosure Rule allows for "[f]lexibility in formulating an explanation for not meeting the diversity objectives," flexibility for foreign issuers, smaller companies, and companies with smaller boards, flexibility about where the disclosures are filed, and phase-in periods for newly listed companies. *Id.* at 44,437. Companies that do not have at least two diverse board members can provide a minimal explanation or list on a different exchange. *Id.* at 44,436. And given evidence of "interest shown in comparable and consistent board diversity information," the SEC explained that the Disclosure Rule may spur some companies to list on Nasdaq, benefiting investors "by increasing the number of publicly listed companies." *Id.* at 44,438.

In addition, the SEC reasonably weighed burdens on competition against the "difficult-to-quantify, intangible benefits" of the Disclosure Rule in furthering the purposes of the Exchange Act. *Huawei Techs.*, 2 F.4th at 454. To recap, the SEC found that the Disclosure Rule "would provide widely available, consistent, and comparable information that would contribute to investors' investment and voting decisions," making "it more efficient and less costly for investors to collect, use, and compare information on board diversity." 86 Fed. Reg. at 44,430. And the SEC found that the Disclosure Rule would mitigate information asymmetries in the market. *Id.* Based on this analysis, the SEC decided that the Disclosure Rule contributes to the maintenance of fair and orderly markets. And given these benefits, the SEC reasonably concluded that the Disclosure Rule "would not impose a burden on competition between issuers that is not necessary or appropriate in furtherance of the purposes of the Act." *Id.* at 44,435.

**\*24**  AFBR does not explain how the SEC acted arbitrarily and capriciously in weighing burdens on competition against the purposes of the Exchange Act. Instead, AFBR argues that the SEC ignored "tremendous costs for firms that dare to defy the quotas." The crux of AFBR's argument is that the SEC underestimated the costs of non-compliance to Nasdaq-listed companies.[36] However, as we explained, in conducting

the § 78f(b)(8) analysis, the SEC *did* account for the costs that AFBR asserted in its comment letter. *See, e.g.*, 86 Fed. Reg. at 44,436-38 & 44,436 n.175 (summarizing portions of AFBR's comment letter cited by AFBR in its brief on appeal). And the SEC made a rational decision that those burdens on competition were "necessary or appropriate" to further the purposes of the Exchange Act. Therefore, AFBR has failed to meet its burden to show that the SEC's Approval Order is arbitrary and capricious on this basis. *Medina Cnty. Env't Action Ass'n*, 602 F.3d at 699.


4.

In approving a proposed rule, "the SEC cannot simply accept what [an SRO] has done but rather is obligated to make an independent review." *Susquehanna*, 866 F.3d at 446 (cleaned up). Petitioners argue that the SEC failed in this regard. Specifically, they claim that the SEC did not independently analyze "whether disclosures and quotas would be outside the purposes of the Exchange Act," "whether significant numbers of investors in fact base their voting and investment decisions on the race, gender, and sexual preferences of company directors," and whether "preference for directors with certain racial, gender, and sexuality characteristics originate[s] from investors' rational ... desire for improved corporate governance."

The SEC independently reviewed the record. Throughout the Approval Order, the SEC documented Nasdaq's position regarding the proposal's effects and compliance with the Exchange Act. *See, e.g.*, 86 Fed. Reg. at 44,427, 44,429, 44,431. And the SEC considered supporting and contrary evidence in the record. *See, e.g., id.* at 44,431, 44,436. For example, in finding that the Disclosure Rule is designed to accomplish the purposes of the Exchange Act, the SEC reviewed, summarized, and synthesized numerous comments regarding investor demand for board diversity information. *See, e.g., id.* at 44,429-30 & nn.72-80. The SEC juxtaposed that evidence against comments arguing that demand is overstated. *See id.* at 44,430 & n.82. Faced with this body of evidence, the agency thought for itself and reached a reasonable conclusion. *See Citadel Secs. LLC v. SEC*, 45 F.4th 27, 34 (D.C. Cir. 2022) (holding that the SEC did not make a *Susquehanna* error where the SEC took "data, analyzed it for itself," and reached a reasonable conclusion). The agency did the same with respect to the question whether the proposal is a disclosure-based framework or a quota. *See id.* at 44,427-28 & 44,427 nn.43-48.

**\*25**  The extent to which the SEC did not "simply accept what [Nasdaq] has done," *Susquehanna*, 866 F.3d at 446 (citation omitted), is apparent from the SEC's rejection of one of Nasdaq's reasons for adopting the proposal. Nasdaq concluded that "an extensive body of empirical research demonstrates that diverse boards are positively associated with improved corporate governance and company performance." 86 Fed. Reg. at 44,431. But the SEC reviewed the studies cited by Nasdaq, as well as studies that the comments referenced, and found that the results were "mixed." *Id.* at 44,432. "Taken together, studies of the effects of board diversity are generally inconclusive," the SEC determined, "and suggest that the effects of even mandated changes remain the subject of reasonable debate." *Id.* Further, the SEC found that studies of board diversity mandates were not "a reliable basis for evaluating the likely overall effects of the [Disclosure Rule], which does not mandate any particular board composition." *Id.* This is not the work of an agency taking an SRO's "word for it." *Susquehanna*, 866 F.3d at 447 (faulting the SEC for taking a clearing agency's "word for it" in determining whether a dividend level was reasonable).

For those reasons, we cannot agree that the SEC abdicated its statutory obligation to independently review the proposed rule.

5.

Finally, NCPPR poses a list of questions that the SEC purportedly failed to consider in approving the Recruiting Rule. These questions include, who will compile a list of board-ready diverse candidates and how will the list be compiled, where will recommended candidates be posted, will the service be available to companies at a fee, and if so, what will the fees be used for?

Many of these questions were answered in the SEC's Approval Order. The SEC noted that, according to Nasdaq, the proposed provider of the board recruiting service is Equilar. 86 Fed. Reg. at 44,444. And Nasdaq's partnership with Equilar would not generate any revenue for Nasdaq. *Id.* NCPPR argues that because these questions concern "operations, hiring, duties, or mechanics" of the recruiting service, they concern "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856. However, NCPPR identifies no requirement of the Exchange Act to which these questions are "important" or even relevant. And it is not apparent why the SEC needed to know how Equilar sources candidates, or any other granular information about Equilar's systems, to conclude that Nasdaq's provision of an optional, free network of diverse candidates to eligible listed companies would help Nasdaq "compete to attract and retain listings." 86 Fed. Reg. at 44,444. NCPPR has not shown that any open question renders the Approval Order arbitrary and capricious.

IV.

AFBR and NCPPR have given us no reason to conclude that the SEC's Approval Order violates the Exchange Act or the APA. The petitions for review are DENIED.

**All Citations**

--- F.4th ----, 2023 WL 6862856

---

Footnotes

1    The SEC may also "abrogate, add to, and delete from" the rules of an SRO by following the process set out in 15 U.S.C. § 78s(c).

2    *See* U.S. Secs. & Exch. Comm'n, *Comments on NASDAQ Rulemaking* (last modified Aug. 6, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081.htm; Justin Danhof & Scott Shepard, Nat'l Ctr. for Pub. Pol'y Res., *Re: File Number SR-NASDAQ-2020-081* (Dec. 30, 2020), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8259890-227947.pdf.

3    See Jeffrey S. Davis, Senior Vice President, Senior Deputy Counsel, Nasdaq, Response to Comments and Notice of Filing of Amendment No. 1 of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity (Feb. 26, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8425992-229601.pdf

4    *See* All. for Fair Bd. Recruitment, *Comments Submitted on Behalf of Alliance for Fair Board Recruitment* (Apr. 6, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8639478-230941.pdf.

5    As a threshold matter, the parties dispute whether NCPPR has standing. In its opening brief, NCPPR addressed standing only by stating that "NCPPR is a non-profit organization incorporated in Delaware and located in Washington, D.C. It both holds stock and exercises its voting rights in Nasdaq-listed companies." The SEC argues that this statement fails to demonstrate standing because statements by counsel in briefs are not evidence, *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir. 1980), and, even if such statements were evidence, "NCPPR does not state what Nasdaq-listed companies it owns stock in, whether those companies already meet Nasdaq's diversity objectives, or how they plan to respond to the rules." The SEC thus argues that NCPPR has forfeited the issue of its standing, and "only the arguments raised by AFBR are properly before the Court." In its reply brief, NCPPR argues that it has not forfeited standing, and attaches a declaration by Scott Shepard, the director of NCPPR's Free Enterprise Project, stating in part that NCPPR "held shares in about 30 Nasdaq-listed companies." We opt to consider NCPPR's declaration submitted in reply, because it appears that NCPPR's cursory treatment of standing in its opening brief is explained by "a good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 n.4 (5th Cir. 2019). And Shepard's declaration suffices to establish NCPPR's standing to sue.

6    Petitioners filed a 28(j)-letter directing this court to a three-sentence order from a split D.C. Circuit panel, which granted an emergency injunction prohibiting the Financial Industry Regulatory Authority ("FINRA") from expelling one of its members pending appeal. *See Alpine Securities Corp. v. Financial Industry Regulatory Authority*, No. 23-5129, 2023 WL 4703307 (D.C. Cir. July 5, 2023). In addition to the different procedural posture of that case (an injunction pending appeal) and the fact that it involves a different organization, the D.C. Circuit appeal relates to an enforcement proceeding, which is not at issue here. To the extent that Petitioner relies on the reasoning identified in one judge's concurrence—that FINRA may be a state actor—that view represents the opinion of one judge at a preliminary stage of a case, prior to merits briefing, involves a wholly separate issue—an expedited enforcement action adjudicated by FINRA—and contradicts decades of case law across circuits. *See* discussion *supra* II.A.

7    The other two cases cited by *Intercontinental, Colon v. Tompkins Square Neighbors, Inc.*, 294 F. Supp. 134, 137-38 (S.D.N.Y. 1968), and *McQueen v. Druker*, 438 F.2d 781, 782-84 (1st Cir. 1971), also rely on *Burton.*

8    In *Rooms v. SEC*, the Tenth Circuit made a similar move, pretermitting the state-action question in the context of a due-process challenge to SEC action. There, the petitioner argued to the Tenth Circuit that the SEC had violated his due-process rights by upholding a permanent bar that the NASD National Adjudicatory Council imposed on him as a sanction for misconduct. 444 F.3d 1208, 1212, 1213–14 (10th Cir. 2006). The court stated that "[d]ue process requires that an NASD rule give fair warning of prohibited conduct before a person may be disciplined for that conduct" and concluded that, "[b]ecause Mr. Rooms had fair notice that his conduct was contrary to [one of NASD's rules], we reject his due process argument." *Id.* at 1214. But the court did not discuss state action, much less explain if NASD's rules constituted state action.

9    To be clear, because petitioners rely on this "either-or" proposition to establish state action and do not ask us to strike down Nasdaq's Rules, the SEC's Approval Order, or the Exchange Act on private nondelegation grounds, there is no private nondelegation challenge properly before us in this case.

10    Nor does the Sixth Circuit's recent decision in *Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) support petitioners' private nondelegation argument. AFBR filed a Rule 28(j) letter alerting us to the *Oklahoma* decision, contending that it supports petitioners' position that constitutional restraints apply to Nasdaq's Rules and the SEC's approval of the Rules. But *Oklahoma* is inapposite. There, the Sixth Circuit considered a private nondelegation challenge to the rulemaking authority of the Horseracing Authority, a private entity regulated by the Federal Trade Commission. *Id.* at 225. In rejecting the nondelegation challenge, the court discussed the relationship between SROs and the SEC, noting that "[i]n case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors." *Id.* at 229 (citations omitted). The case weighs *against* petitioners' assertions regarding private nondelegation and says nothing at all about state action.

11    NCPPR argues in a similar vein that Nasdaq's Rules are not private compacts but instead "operate[ ] ... as federal law" because "companies must comply to participate in the securities market," and Nasdaq faces penalties if it does not

enforce its Rules. NCPPR cites *Blount v. SEC*, 61 F.3d 938 (D.C. Cir. 1995) in support of this contention and reiterated its reliance on this case at oral argument. Setting aside that this authority was cited for the first time in NCPPR's reply brief, the case is unpersuasive. In *Blount*, the D.C. Circuit entertained a constitutional challenge to a rule of the Municipal Securities Rulemaking Board ("MSRB"), finding that the rule amounted to state action. *Id.* at 941. The court explained that the rule "operates not as a private compact among brokers and dealers but as federal law," emphasizing that brokers and dealers are subject to financial, regulatory, and criminal penalties for failure to comply with MSRB rules. *Id.* The court concluded that the rule was "a government-enforced condition to *any* participation in a municipal securities career." *Id.* (emphasis added). The same cannot be said about Nasdaq's listing rules. The Rules govern the private relationships between Nasdaq and its listed companies. And should a company opt not to comply with the Rules, it can simply list on a different exchange. The Rules therefore do not operate as a government-enforced condition to participation in the market.

12   Because the Exchange Act unambiguously authorizes the SEC's Approval Order, we do not consider whether, as NCPPR argues, deference to the SEC's interpretation of the statute would be inappropriate.

13   NCPPR also contends that the Exchange Act violates the nondelegation doctrine. This argument fails. Under the nondelegation doctrine, Congress can give executive agencies "regulatory power" so long as Congress "provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)); *see Consumers' Rsch. v. FCC*, 63 F.4th 441, 447 (5th Cir. 2023). Here, Congress gave the SEC numerous parameters for approving exchange rules. *See* 15 U.S.C. § 78f(b). To name a few, as described earlier, a rule must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." *Id.* § 78f(b)(5). A rule must not be "designed to permit unfair discrimination between customers, issuers, brokers, or dealers." *Id.* A rule must not be "designed to ... regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange." *Id.* And a rule must "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." *Id.* § 78f(b)(8). This is more than enough guidance under this court's and the Supreme Court's nondelegation precedents. *See, e.g., Gundy v. United States*, ––– U.S. ––––, 139 S. Ct. 2116, 2123–24, 204 L.Ed.2d 522 (2019) (plurality op.); *Jarkesy*, 34 F.4th at 462-63 (holding that the intelligible principle standard means "that a total absence of guidance is impermissible under the Constitution"); *Consumers' Rsch.*, 63 F.4th at 447. And the petitioners have litigated this case as though the SEC *did* have adequate guidance from Congress: the heart of the petitioners' APA challenge is that the SEC acted arbitrarily and capriciously in concluding that Nasdaq's Rules met the statute's parameters.

14   Once again, *see supra* note 12, these goals are "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. § 78f(b)(5).

15   The only case NCPPR cites in support of its theory, *Business Roundtable v. SEC* ("*Business Roundtable II*"), is unpersuasive. 647 F.3d 1144 (D.C. Cir. 2011). In *Business Roundtable II*, petitioners challenged an SEC rule that required "public companies to provide shareholders with information about, and their ability to vote for, shareholder-nominated candidates for the board of directors." *Id.* at 1146. The court held that the SEC acted arbitrarily and capriciously for having failed "adequately to assess the economic effects of a new rule," *id.* at 1148, in part because the SEC's cost-benefit analysis was flawed. *See id.* at 1149–51. Among other mistakes, the SEC "relied upon insufficient empirical data when it concluded that [the rule] will improve board performance and increase shareholder value by facilitating the election of dissident shareholder nominees." *Id.* at 1150. Specifically, the SEC relied "exclusively and heavily upon two relatively unpersuasive studies," even though commenters submitted "numerous studies ... that reached the opposite result." *Id.* at 1150–51. So, *Business Roundtable II* faulted the SEC for *misinterpreting* the evidence and proceeding without *enough* evidence—not relying on the wrong *type* of evidence.

16    In a *specific* factual setting, a *specific* statement may be "immaterial as a matter of law" if "there is no substantial likelihood that a reasonable investor would consider [the] statement[ ] ... to have significantly altered the total mix of information." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 422 (5th Cir. 2001) (internal quotation marks and citation omitted).

17    William J. Stromberg & David Oestreicher, T. Rowe Price Group, Inc., *RE: SR-2020-081* (Dec. 29, 2020), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8204319-227487.pdf.

18    Kristi Mitchem, BMO Glob. Asset Mgmt., Re: The Nasdaq Stock Market LLC: Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity (Release No. 34-90574; File No. SR-NASDAQ-2020-081) (Jan. 11, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8231371-227747.pdf.

19    AFBR also argues that "[t]he SEC itself has said the key inquiries for materiality focus on 'quantitative considerations.' " But the Second Circuit case that AFBR quotes explained that "[a]ccording to [SEC guidance about materiality], both quantitative *and qualitative factors* should be considered in assessing a statement's materiality." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (emphasis added). And the SEC guidance, which the Second Circuit treated as persuasive authority, demonstrates how incongruous it would be to import materiality into exchange-rule approval decisions: "[u]nder [the quantitative] factor, the SEC considers the financial magnitude of the misstatement." *Id.* How could the SEC assess "the financial magnitude" of a category of information without any facts about the disclosing company or the disclosure? In any event, in the securities fraud context, a plaintiff doesn't have to show that a misrepresentation is quantitative—or quantify its magnitude—to establish materiality. For example, conflicts of interest are generally material, even though a conflict of interest is not quantitative or readily quantifiable. *See World Tree*, 43 F.4th at 465 (affirming district court's conclusion "that a reasonable investor would consider important whether [d]efendants traded in the same securities as their clients," and collecting cases).

20    Petitioners do not contest that the substantial evidence standard applies to this determination, as Nasdaq urges, so they have forfeited any argument that our review is under a different standard. *See Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 754 (5th Cir. 2023).

21    *See* Davis, *supra* note 3, at 8.

22    *See generally Grutter v. Bollinger*, 539 U.S. 306, 335, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are *reserved* exclusively for certain minority groups." (emphasis added) (internal quotation marks and citation omitted)).

23    For its part, AFBR asserts that the proposal "impos[es] obligations on corporations." This is true of every exchange listing rule that requires a listed company to take any action and is not a sufficient basis to conclude that the proposal alters the state-federal balance.

24    SROs have adopted listing rules on corporate governance matters with the SEC's approval. *See Business Roundtable I*, 905 F.2d at 409–10 ("[T]he exchanges have routinely submitted changes in listing standards for approval .... Many of the past proposals dealt with matters of internal corporate governance, but in no such case did the SEC seek to exercise its veto." (citations and footnotes omitted)). However, because the SEC's finding that the proposal is a disclosure rule is conclusive, we do not need to decide anything about SRO rules that regulate corporate governance in this case.

25    This is especially true because companies that reject Nasdaq's disclosure-based framework can list on a different exchange. And NCPPR's conjecture that other exchanges or the SEC could propose identical rules is irrelevant. We review agency action, including SEC approval of proposed rules and SEC rulemaking, on a case-by-case basis, not wholesale. Although we hold that the major questions doctrine does not prevent SEC approval of Nasdaq's proposal in this case, we decline NCPPR's invitation to speculate about how other yet-to-be proposed rules or future agency action subject to other statutory standards, like SEC promulgation of rules for SROs, might fare.

26    Although the SEC found that the Recruiting Rule was consistent with § 78f(b)(5), *see* 86 Fed. Reg. at 44,425, 44,444, the SEC's Approval Order does not identify which of the statutory objectives the Recruiting Rule is designed to meet. Instead, the SEC found the Recruiting Rule would help Nasdaq "compete to attract and retain listings" and "reflects the current competitive environment for listings among national securities exchanges." *Id.* at 44,444. AFBR does not contend

that the SEC failed to support these findings as to the Recruiting Rule with substantial evidence. And AFBR does not appear to argue that the Recruiting Rule is inconsistent with § 78f(b)(5), so any challenge to the Recruiting Rule on this ground is forfeited. In any event, AFBR recognizes that promoting fair competition in the exchange market is an adequate basis for the SEC to conclude that a rule is designed to "remove impediments to and perfect the mechanism of a free and open market and a national market system."

27   The "fair and orderly market" that Nasdaq operates is the exchange itself. *See NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014).

28   Aron Szapiro & Michael Jantzi, Morningstar, Inc., *RE: Release No. 34-90574* (Jan. 13, 2021), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8262444-227960.pdf.

29   *Id.*

30   Roger W. Ferguson, Jr. & Jose Minaya, Teachers Ins. & Annuity Ass'n of Am., Re: The Nasdaq Stock Market LLC; Notice of Filing of Proposed Rule Change to Adopt Listing Rules Related to Board Diversity; File No. SR-NASDAQ-2020-081 (Dec. 31, 2020) at 2, https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8198333-227346.pdf.

31   Michael W. Frerichs, Off. of the Ill. State Treasurer, *Re: SR-NASDAQ-2020-081 – Proposed Rule Change to Adopt Listing Rules Related to Board Diversity* (Dec. 31, 2020), https://www.sec.gov/comments/sr-nasdaq-2020-081/srnasdaq2020081-8198331-227345.pdf.

32   As the SEC explained, under the Disclosure Rule, companies must "make board-level diversity disclosures in a substantially similar format"; "following the first year of disclosure, disclose the current year and immediately prior year" information; provide the information "in a searchable format"; and "provide the required disclosures in a proxy statement or information statement ... in advance of the company's annual shareholders meeting or provide the required disclosures on the company's website concurrently with the filing of the company's proxy statement or information statement." 86 Fed. Reg. at 44,430 n.90.

33   AFBR also argues that employment decisions for corporate boards have nothing to do with a fair and orderly exchange. But the Disclosure Rule does not regulate employment decisions for corporate boards; the SEC conclusively found that the rule is a disclosure-based framework, not a quota. *See supra* Section III.A.3.a. The question then is whether such a disclosure-based framework *is* designed to "remove impediments to and perfect the mechanism of a free and open market and a national market system." 15 U.S.C. § 78f(b)(5). For the reasons stated above, substantial evidence shows that it is.

Relatedly, petitioners argue that the SEC erred in determining that the Rules are not designed to "regulate ... matters not related to the purposes of [the Exchange Act]," 15 U.S.C. § 78f(b)(5), because "favoring certain people because of their race, sex, or sexual orientation ... is far removed from the purposes of the Exchange Act." This argument, too, rests on the mistaken premise that the Disclosure Rule imposes a quota on listed companies. As the SEC conclusively determined, the Disclosure Rule does not regulate the composition of corporate boards, thereby favoring certain people over others, but rather requires companies to disclose information about board members' identities.

34   Davis, *supra* note 3, Notice of Filing of Amendment No. 1, at 82, 140 (citation omitted).

35   *See* Davis, *supra* note 3, Notice of Filing of Amendment No. 1, at 140-41.

36   None of AFBR's evidence quantifies costs from non-compliance or estimates the magnitude of those costs in concrete terms. *See, e.g.,* All. for Fair Bd. Recruitment, *supra* note 4, Ex. B, Aff. of James R. Copland ¶¶ 20 ("In my expert opinion, firms that opt to publicly explain their reasons for non-compliance with Nasdaq's diversity rule will be subject to an increased risk of reputational harm."), 21 ("Negative news coverage and diversity activist campaigns ... could impair a firm's reputation ... and result in a higher cost of capital, reduced profitability, and lower share prices, even if such effects might be mitigated in the long run."). The SEC "was not required to conduct or commission its own empirical or statistical studies" to determine whether these costs would be "tremendous," as AFBR asserts on appeal. *Huawei Techs.,* 2 F.4th at 454 (cleaned up). AFBR also argues that the SEC "did not directly respond to [this] expert affidavit." But the SEC cited to the relevant part of AFBR's comment letter, 86 Fed. Reg. at 44,436 & n.175, and then considered whether the resulting burdens on competition were necessary and appropriate. AFBR cites no authority that this response was inadequate, nor

does AFBR explain why this is so. In any event, the SEC "clearly thought about the commenters' objections and offered reasoned replies—all the APA requires." *Huawei Techs.*, 2 F.4th at 450 (cleaned up).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.