**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Plaintiff*, | |
| v. | 23 Civ. 4738 (KPF) |
| COINBASE, INC. AND COINBASE GLOBAL, INC., | |
| *Defendants*. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF COINBASE'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*

Dated: October 24, 2023

## **<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT .........................................................................................................................2

I.      THE SEC'S CONCEPTION OF INVESTMENT CONTRACT IS
        INSUPPORTABLE. ................................................................................................2

        A.     A contractual undertaking past the point of sale is required ...................................3

        B.     The offer must involve a financial interest in an enterprise ...................................9

        C.     The SEC mischaracterizes Coinbase's position on secondary trades ....................11

II.     THE MAJOR QUESTIONS DOCTRINE APPLIES. ........................................................12

III.    THE WALLET CLAIM CANNOT STAND. ..................................................................13

IV.    THE STAKING CLAIM CANNOT STAND. ..................................................................14

CONCLUSION ....................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                          **Page(s)**

*Audet* v. *Fraser*,
    605 F. Supp. 3d 372 (D. Conn. 2022) ................................................................. 7-8

*Balestra* v. *ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019)....................................................................7

*Dist. of Columbia* v. *Dep't of Labor*,
    819 F.3d 444 (D.C. Cir. 2016)..............................................................................13

*Evans* v. *United States*,
    504 U.S. 255 (1992)................................................................................................4

*FDA* v. *Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..............................................................................................13

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985)...................................................................................6

*Glen-Arden Commodities, Inc.* v. *Costantino*,
    493 F.2d 1027 (2d Cir. 1974)............................................................................. 6-7

*Hocking* v. *Dubois*,
    885 F.2d 1449 (9th Cir. 1989) (en banc) ........................................5, 6, 11, 12, 15

*In re Celsius Network LLC*,
    647 B.R. 631 (S.D.N.Y. Bankr. 2023)...............................................................7 n.3

*Marine Bank* v. *Weaver*,
    455 U.S. 551 (1982)..............................................................................................12

*McCown* v. *Heidler*,
    527 F.2d 204 (10th Cir. 1975) ...............................................................................7

*Milnarik* v. *M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir. 1972) ............................................................................. 4-5

*Rhee* v. *SHVMS, LLC*,
    2023 WL 3319532 (S.D.N.Y. May 8, 2023) ........................................................14

*Rodriguez* v. *Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993)................................................................................... 5-6

*SEC* v. *C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)......................................................................................5, 6, 7

*SEC* v. *Edwards*,
    540 U.S. 389 (2004)...........................................................................*passim*

*SEC* v. *ETS Payphones, Inc.*,
    300 F.3d 1281 (11th Cir. 2002) ....................................................................10

*SEC* v. *GEL Direct Tr.*,
    2023 WL 3166421 (S.D.N.Y. Apr. 28, 2023)...............................................14

*SEC* v. *Kik Interactive, Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)..........................................................7, 8

*SEC* v. *Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996)..........................................................................15

*SEC* v. *Ripple Labs, Inc.*,
    2023 WL 4507900 (S.D.N.Y. July 13, 2023)............................................11, 12

*SEC* v. *Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ...................................................................14, 15

*SEC* v. *Scoville*,
    913 F.3d 1204 (10th Cir. 2019) .......................................................................7

*SEC* v. *SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001).....................................................................7, 7 n.3

*SEC* v. *Telegram Grp., Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)........................................................7, 8, 9

*SEC* v. *Terraform Labs Pte. Ltd.*,
    2023 WL 4858299 (S.D.N.Y. July 31, 2023) ...........................................7, 8, 12

*SEC* v. *W.J. Howey Co.*
    328 U.S. 293 (1946)...........................................................................*passim*

*Solis* v. *Latium Network, Inc.*,
    2018 WL 6445543 (D.N.J. Dec. 10, 2018).....................................................8

*United Hous. Found., Inc.* v. *Forman*,
    421 U.S. 837 (1975)...................................................................................3, 6, 9

*United States* v. *Zaslavskiy*,
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................................................8

*Wals* v. *Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) ...........................................................................9

**Rules and Statutes**

15 U.S.C. § 78c(a)(10)................................................................................................9

**Other Materials**

Brief for the SEC, *SEC* v. *Edwards*,
    No. 02-1196 (U.S. June 26, 2003) ...................................................... *passim*

Brief for the SEC, *SEC* v. *Telegram Grp. Inc.*,
    1:19-cv-09439-PKC, ECF No. 98 (S.D.N.Y. Jan. 21, 2020)...................................10

Brief for the SEC as Amicus Curiae on Reh'g En Banc, *Hocking* v. *Dubois*,
    No. 85-1932 (9th Cir. Oct. 24, 1988)................................................................. 11-12

Complaint of the SEC, *SEC* v. *Bitqyck, Inc.*,
    3:19-cv-2059 (N.D. Tex. Aug. 29, 2019) ......................................................11 n.5

Complaint of the SEC, *SEC* v. *Montroll*,
    1:18-cv-01582 (S.D.N.Y. Feb. 21, 2018) ......................................................11 n.5

SEC, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017) ............................................................11 n.5

SEC Chair Gary Gensler, *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*,
    Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) .................12 n.6

SEC No-Action Letter, Evare, LLC,
    1998 WL 958015 (July 29, 1998)......................................................................14 n.8

SEC No-Action Letter, GlobalTec Solutions, LLP,
    2005 WL 3695276 (Dec. 28, 2005) ..................................................................14 n.8

## PRELIMINARY STATEMENT

The SEC's authority is limited to securities transactions. Not every parting of capital with a hope of gain qualifies, and trades over Coinbase are only securities transactions if they involve "investment contracts." The transactions at issue here do not. Investment contracts grant the purchaser a contractual claim related to the future income, profits, or assets of a business enterprise. That is what makes them securities rather than just investments. Because the SEC's Complaint does not and cannot plead that the simple asset trades it identifies involve ongoing contractual obligations related to a business enterprise, Coinbase is entitled to judgment on the pleadings.

The SEC advances its contrary position in paragraphs bare or nearly bare of authority. Opp. 8, 15.[1] That is because the Commission is asking the Court to accept a definition of investment contract that is irreconcilable with statutory text, eight decades of case law, and the SEC's own prior arguments. Challenged to produce authority showing that an investment contract can exist absent a contractual undertaking, the SEC manages in response only that "[c]ourts sometimes consider the existence or absence of contractual undertakings as one of many factors in determining whether an investment contract exists." *Id.* at 1. But this "factor" is not incidental; it is the *sine qua non*. "We are considering investment *contracts*." *SEC* v. *Edwards*, 540 U.S. 389, 397 (2004) (emphasis original). And contrary to controlling precedent, the SEC asserts that any arrangement where an investor "part[s] with capital on the expectation of profit" is an "investment contract"— with no "financial interest" in a business needed. *Compare* Opp. 8-9, *with* Br. 18-21. Yet the SEC itself has long recognized that an investment contract must have the character of "debt [or] equity participation." SEC *Edwards* Br. (Ex. C) at 20 (cleaned up).

---

[1] "Opp." refers to the SEC's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings, ECF No. 69. "Br." refers to the Memorandum of Law in Support of Coinbase's Motion for Judgment on the Pleadings, ECF No. 36. "Ex." refers to the exhibits to the Declaration of David P.T. Webb in Support of Coinbase's Motion for Judgment on the Pleadings, ECF No. 37.

The SEC proposes this departure from precedent in the service of a radical expansion of its own authority. It offers no limiting principle to distinguish investments within and without its purview. It claims authority over essentially all investment activity—and thus the right to define its own regulatory ambit, constrained only by its own ambition. That claim would offend the separation-of-powers concerns animating the major questions doctrine were the Court to reach that issue. But it need not, because text and precedent alone foreclose the SEC's conception.

The SEC's claims that Coinbase "brokers" securities through Wallet and "offers" securities with its staking services are also untethered from law. Not only does the SEC identify no security that could be brokered—it pleads nothing (and identifies no even analogous authority) to show that the self-custodial Wallet software involves customary broker functions. As to staking, no Securities Act claim can arise from Coinbase's program because the IT outsourcing services offered involve neither an investment of money by customers nor managerial efforts by Coinbase. Were the SEC's position accepted, countless software-driven services would be securities. That would be another radical expansion of SEC authority with no grounding in precedent.

## <u>ARGUMENT</u>

## I.     THE SEC'S CONCEPTION OF INVESTMENT CONTRACT IS INSUPPORTABLE.

As the SEC now would have it, an investment contract exists if someone (1) parts with capital (2) expecting that her purchase will increase in value. *E.g.*, Opp. 1, 8. This conception would give the SEC roving authority over investments generally, with the terms "security" and "contract" in the authority-granting statutes performing no limiting function. Consider an artist who sells paintings over Etsy with a note that she is planning to exhibit her work in a gallery next month. Those who read the note might buy the paintings hoping the artist's plans to increase her exposure will drive up the value of her work. In the SEC's conception, each sale and resale of the paintings on Etsy would be a securities transaction. Etsy would have to register with the SEC as a

national securities exchange, and the artist would have to file expansive public disclosures about her art-selling activities. *See also* Br. of Andreessen Horowitz & Paradigm as *Amicus Curiae*, ECF No. 50, at 8-12 (demonstrating "endless breadth" of the SEC's assertion of authority).

Congress did not grant the SEC open-ended authority to regulate commerce; it granted the authority to regulate *securities*. And Congress did not give the Commission discretion to define for itself the bounds of that authority; it supplied a definition that has long been settled by careful judicial interpretation and decades-long application—one that, though "broad" in concept, is not infinitely capacious. *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 849-57 (1975) (even "stock" was not a security where "economic realit[y]" compelled different conclusion). Until very recently, the SEC recognized as much. Br. 8-9, 12-13.

An investment contract has always required at least a contractual undertaking beyond the point of sale (hence "contract") involving a financial stake in a business (hence the "security" character of the "investment"). Br. 7-21. Because the SEC pleads not even this, Coinbase is entitled to judgment on the pleadings as to the Exchange Act claims.

### A.     A contractual undertaking past the point of sale is required.

Cases finding investment contracts have always involved *contract*ual undertakings. Br. 6-10.[2] That feature, enshrined in the term itself, derives from a vast body of Blue Sky law cases and from *Howey*. *See id.*; Br. for Securities Law Scholars as *Amicus Curiae*, ECF No. 59, at 3-12.

The SEC dismisses the Blue Sky precedents in a footnote by asserting that "[a]ttempts [] to resurrect the common law are fundamentally inconsistent with the federal securities laws." Opp. 11 n.6. But that is a dismissal of *Howey* itself, which held that Congress intended to incorporate

---

[2] Contrary to the SEC's suggestion (Opp. 1, 10, 12-13), Coinbase has never argued that a "formal," "written," or even enforceable contract is required. What matters is whether the promoter has created the impression of a contractual undertaking. Br. 8-10.

the "prior judicial interpretation" under the Blue Sky laws. *SEC* v. *W.J. Howey Co.*, 328 U.S. 293, 298 (1946); *see also Edwards*, 540 U.S. at 393-94 ("when Congress included 'investment contract' in the definition of security, it 'was using a term the meaning of which had been crystallized' by the state courts' interpretation of their 'blue sky' laws"). And it is an about-face by the SEC, which has previously and repeatedly invoked the "well-established meaning [of investment contract] under cases construing the state Blue Sky Laws that predated the federal securities laws." SEC *Edwards* Br. at 10, 18-19; *see also id.* at 19 (quoting *Evans* v. *United States*, 504 U.S. 255, 260 n.3 (1992) ("if a word is obviously transplanted from another legal source . . . it brings the old soil with it")); Br. 7 (citing and quoting SEC *Howey* Br.).

The SEC also tries to pluck passages from *Howey*, *Joiner*, and their progeny to support its position. Opp. 9-16. Those efforts fail.

*Howey.* Before Coinbase filed its motion, the SEC said *Howey*'s use of the word "scheme" in describing an investment contract gave the Commission license to pursue its claims in the absence of a contractual undertaking. *See* Br. 10. Coinbase demonstrated how untenable that position was (*id*. at 10-14), so the SEC pivoted: Now it claims *Howey* dispensed with the need for a contractual undertaking by characterizing as "purely incidental" any "legal transfer of rights." Opp. 10. This second reimagining of *Howey* is even less well-grounded than the first.

What was "purely incidental" in *Howey* were the *land rights*; the associated contracts determining "allocable shares of the profits" were the *essence of the investment*. In the Supreme Court's words: "Th[e investors'] respective shares in this enterprise are evidenced by land sales contracts and warranty deeds, which serve as a convenient method of determining the investors' allocable shares of the profits. The resulting transfer of rights in land is purely incidental." *Howey*, 328 U.S. at 300; *Milnarik* v. *M-S Commodities, Inc.*, 457 F.2d 274, 278 (7th Cir. 1972) (Stevens,

J.) (noting that in *Howey*, "the resulting transfer of rights in land was considered to be purely technical"). The management contract—the ongoing contractual obligation beyond the point of sale—was what made the arrangement an investment contract, and was anything but "incidental."

The SEC's misconstruction of *Howey* leads it to err in two further respects. *First*, to explain away the body of cases finding no investment contract where land or tangible commodities are transferred without accompanying contractual undertakings (*see* Br. 9-10), the SEC says land and tangible commodities have "inherent value" that crypto assets lack. Opp. 14-16. That is false, but it also doesn't matter here. The *Howey* Court rejected this distinction when it explained that whether interests offered are "promotional in character" or "ha[ve] intrinsic value independent of the success of the enterprise" is not determinative. *Howey*, 328 U.S. at 301; *see also SEC* v. *C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352 (1943) ("[T]he courts have not been guided by the nature of the assets back of a particular document or offering."). In fact, this was the SEC's express position—eight decades before suddenly changing course. *See* SEC *Howey* Br. (Ex. A) at 30-31 (whether interest is "tangible" or "ha[s] specific value independent of the expectation of profits to flow from the promoter's management" are "considerations which the Commission regards as administratively impractical and not warranted by the statute").

*Second*, again discussing *Howey* and other real estate cases, the SEC says these show courts looking to "extra-contractual representations" to find the existence of an investment contract. Opp. 14 n.8. Not so; what undertakings courts have suggested in these cases might form an investment contract are still *contractual* ones. *See, e.g.*, *Hocking* v. *Dubois*, 885 F.2d 1449, 1457-58, 1462 (9th Cir. 1989) (en banc) (an important case cited in SEC's pre-motion letter, now vanished from its response); *see also Rodriguez* v. *Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (no investment contract because "[t]he evidence did not show that the promoter or any other obligated

person or entity was promising the buyers to build or provide anything" after the sale of the land). As set forth in Coinbase's opening brief (Br. 10-13), *Howey* establishes that two related contracts can be read together, as a "scheme." *See Howey*, 328 U.S. at 297; *Hocking*, 885 F.2d at 1458 n.7 (question was "whether the sale and the offering of management services form parts of what is 'essentially one transaction'"). The SEC doesn't just stretch *Howey* beyond recognition, but inverts *Howey*'s key points—all of which support dismissal.

**Joiner.** The SEC also bends *Joiner* to breaking. It claims the undertaking there to drill an exploratory oil well, which grounded investors' expectation of profits, was not a contractual one. Opp. 10-11. That is incorrect. The express terms on which the leases were offered, which the Court emphasized, required payment only at intervals marked by completion of the wells. *Joiner*, 320 U.S. at 346. It was precisely because "the acceptance of the offer quoted made a contract in which payments were timed and *contingent upon completion of the well*" that the Court agreed there was "therefore [an] investment contract in which the purchaser was paying both for a lease and for a development project." *Id.* at 349 (emphasis added); *Forman*, 421 U.S. at 852 (explaining that *Joiner* involved "sale of oil leases conditioned on promoters' agreement to drill exploratory well"). The *Joiner* Court's emphasis on the post-sale contractual undertaking underscores its centrality.

**Court of Appeals Cases.** Next, the SEC turns to court of appeals cases it claims found investment contracts absent "contractually-grounded undertakings." Opp. 11. Here again, the SEC is wrong—every case it cites involved a contractual undertaking between the promoter and the purchaser. *See Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 234-41 (2d Cir. 1985) (bespoke CDs granting purchasers right to "receive[] all principal and interest due it under the terms of the confirmation slips" upon maturation, with seller receiving "a commission for its services, which include providing a secondary market"); *Glen-Arden*

*Commodities, Inc.* v. *Costantino*, 493 F.2d 1027, 1032-35 (2d Cir. 1974) (contracts for whisky and accompanying "guaranteed services" of sourcing, warehousing, insuring, and ultimately selling or repurchasing the whisky); *McCown* v. *Heidler*, 527 F.2d 204, 206, 209 (10th Cir. 1975) ("sale of a contractual promise . . . to improve" a real estate project in which "developers were obligated to include a large lake, 18-hole golf course, swimming pools, clubhouse, roads, etc."); *SEC* v. *Scoville*, 913 F.3d 1204, 1210 (10th Cir. 2019) ("Adpacks" entitling purchaser to website visits and "opportunity to share in [the promoter's] revenue"); *SEC* v. *SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) (shares in virtual company with promises of a "flat 10% guaranteed return," that "principal would be repaid in full upon demand," and payment of "referral fees to existing participants").[3] Like *Howey* and *Joiner*, these cases not only undercut the SEC's new take on investment contract but also well illustrate the decades of contrary understanding.

**Crypto Cases.** The district court crypto decisions the SEC cites—even were they controlling—all likewise involve contractual undertakings. All addressed a relationship of contractual privity between token issuers and purchasers—a key point of distinction with this case. *See SEC* v. *Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *2-3 (S.D.N.Y. July 31, 2023) (issuer sales in initial offering and on trading platforms); *SEC* v. *Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 174-76 (S.D.N.Y. 2020) (initial coin offering ("ICO") sales); *SEC* v. *Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 358-59 (S.D.N.Y. 2020) ("series of contracts and understandings" between issuer and initial purchasers); *Balestra* v. *ATBCOIN LLC*, 380 F. Supp. 3d 340, 347 (S.D.N.Y. 2019) (ICO pre-orders allegedly based on false representations about platform build-out); *Audet*

---

[3] The SEC says the *SG Ltd.* arrangement was not a "common law written agreement," Opp. 12, and elsewhere suggests that widely publicized offerings are not "common law contract[s]," *id.* at 14. Even were that required—Coinbase argues only that there must be a contractual undertaking—it is unclear what the SEC means. *SG*, for example, involved a written offer, acceptance, and consideration paid. That's a contract. *See In re Celsius Network LLC*, 647 B.R. 631, 648 (S.D.N.Y. Bankr. 2023) ("[C]ourts have adapted traditional principles of contract formation to fit the digital era.").

v. *Fraser*, 605 F. Supp. 3d 372, 383 (D. Conn. 2022) (ICO investors allegedly duped with false promises that token was "backed by a $100 million reserve[] that [the issuer] would [use to] maintain a $20 price floor"); *United States* v. *Zaslavskiy*, 2018 WL 4346339, at *2 (E.D.N.Y. Sept. 11, 2018) (charges that issuer duped purchasers with false representations that coins would be backed by real estate and diamond investments); *Solis* v. *Latium Network, Inc.*, 2018 WL 6445543, at *1 (D.N.J. Dec. 10, 2018) (ICO sales). The defendants in all but *Kik* and *Terraform* did not contest that the promises they made were part of a contractual undertaking, and the matter was not discussed by the court.[4]

As for *Kik* and *Terraform*, the SEC simply ignores Coinbase's points. Coinbase showed that the authorities cited in *Kik*—a pure ICO case—do not support the court's statement that no "ongoing contractual obligation" is needed to establish an investment contract. Br. 13. The SEC does not deny this. Nor, in parroting *Terraform*'s invocation of *Howey*'s "scheme" reference, does the SEC answer Coinbase's demonstration that *Howey* used the word to mean a collection of related contractual undertakings. Opp. 12; *see* Br. 10-14. The SEC's silence confirms that *Kik* and *Terraform* cannot bear the weight the Commission would place on them.

Finally, the SEC is wrong that *Telegram* shows that "contract" has no meaning in "investment contract." Contrary to the SEC's characterization, *Telegram* did not hold that the "'unload[ing]' of tokens" into the "secondary market" was an investment contract even though "not pursuant to any written contract." Opp. 13. The specific question in *Telegram* was whether

---

[4] The SEC asserts that Coinbase touted tokens as investment vehicles, perhaps to try to liken this to the ICO cases. Opp. 5; *see also id.* at 19. But the SEC has not alleged that Coinbase offers or underwrites unregistered securities in violation of the Securities Act by listing tokens on its platform (nor could the SEC so claim); instead the SEC alleges that Coinbase has violated the Exchange Act by operating an exchange. And there is no basis for the SEC's insinuation that Coinbase allows ICO-like offerings through its "Asset Hub," Compl. ¶ 65. *See* Opp. 5, 18 n.11. As Coinbase showed in its opening brief, *see* Br. 17 n.13, the very source the Complaint cites—the Asset Hub's webpage—makes clear that it merely allows applications for listing a digital asset on Coinbase's platform. *See* Answer Response ¶ 65.

delivery of tokens to the *initial purchasers* was integral to the initial token offering—an admitted securities transaction—such that it needed to be registered. *See* 448 F. Supp. 3d at 367 ("Telegram argues that a second and distinct set of transactions will be the delivery of the newly created Grams to the Initial Purchasers upon the launch of the TON Blockchain."). The court held that it was, because delivery upon launch of the platform and the ability to resell were baked into the initial undertaking and not severable. *Id.* This was thus a classic application of *Howey*: viewing two transactions together as a single "scheme." *Id.* at 379. The case does not say secondary-market token trades are investment contracts, or suggest that no contractual undertaking is required.

### B. The offer must involve a financial interest in an enterprise.

The SEC also fails to plead that transactions in the subject tokens purport to confer a financial stake in an enterprise. Coinbase's point is not "that investment contracts must provide *identical* rights to stocks, notes, or bonds." Opp. 7. That is another convenient caricature. The point, rather—as *Howey* recognizes, as reflected in the statute, and as the *Forman* Court explained—is that an investment contract, to be designated as such, must share the "essential attributes" of other securities. 421 U.S. at 852; 15 U.S.C. § 78c(a)(10) (listing "investment contract" as one of many "instrument[s] commonly known as a 'security'"). The SEC has said so itself. SEC *Edwards* Br. at 20 (investment contract must have "essential properties of *either* 'a debt or equity security'" (quoting *Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994))). An investment contract need not be tantamount to a stock, but it must purport to give the investor a right to something more than ownership of a commodity. That's the whole point. A painting, a baseball card, Bitcoin, and Ether can all be investments, but that doesn't make them securities. And because trades of assets on Coinbase's platform neither purport to nor do confer a claim upon any enterprise, they are also not investment contracts.

In insisting that no financial stake in an enterprise is needed, the SEC asserts that *Howey*

did not involve "shares in the income, profits, or assets of a business," because the profits there "did not come from any dividends or earnings of the corporations that sold the investment contracts." Opp. 16. This is a serious mischaracterization by the agency charged with implementing *Howey*. Just because the *Howey* investors were not given formal shares in W.J. Howey Co. itself does not mean they did not participate in the "income" or "profits" of the business. In the SEC's own recent words, the promoter's "management contract promis[ed] to use its experience to manage the land, grow oranges, and *share*[] *the profits with investors*." SEC Resp. in Opp'n, *Telegram*, 1:19-cv-09439-PKC, ECF No. 98, at 20 (S.D.N.Y. Jan. 21, 2020) (emphasis added). Howey "offer[ed] an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise," and the Supreme Court thus specifically found that the investors "*share[d] in the earnings and profits*" of the business venture. 328 U.S. at 299-300 (emphasis added).

The SEC also distorts *Edwards*. *See* Opp. 9, 16-17. Whether an investment contract requires a financial stake in an enterprise was not even at issue in *Edwards*. The question was whether the "expectation of profits" prong of *Howey* was satisfied where the *returns* investors received from the business were fixed rather than variable. SEC *Edwards* Br. at I (noting question presented was whether an investment contract can exist where "the promoter promises a fixed rather than a variable return"). The Eleventh Circuit had said no, reasoning that debt-like interests didn't satisfy the standard. *SEC* v. *ETS Payphones, Inc.*, 300 F.3d 1281, 1284-85 (11th Cir. 2002). The SEC successfully urged reversal, arguing that the instruments shared "essential attributes" of a security because, even if they did not operate like equity, they did operate like debt, and an instrument mimicking "*either* 'a debt or equity security'" meets the test. SEC *Edwards* Br. at 20.

The SEC in *Edwards* did not suggest, nor did the Supreme Court hold, that a transaction with characteristics of *neither* equity *nor* debt—a purchase of an asset involving no "financial

interest" in an enterprise but just a hoped-for increase in the value of the asset itself, Opp. 9—could be an investment contract. The fixed returns at issue in *Edwards*, like debt interests, reflected an interest in the earnings of the payphone enterprise, because those earnings were the source of payment for the return. *Accord* SEC *Edwards* Br. at 36 ("an investor expects a 'participation' in 'earnings' when [] he is led to believe that the *source* of *his return* will be the company's earnings" (first emphasis original, second added)). No parallel may be drawn to the facts alleged here. Instead, *Edwards* only further instructs—based on the SEC's own arguments in that case—that an investment contract must at least purport to grant a stake in an enterprise. *See* Br. 18-21.

### C. The SEC mischaracterizes Coinbase's position on secondary trades.

The SEC mischaracterizes Coinbase's position as asserting that "crypto asset transactions" on secondary trading platforms "can *never* involve 'investment contracts.'" Opp. 1, 9-10. While the SEC is wrong that the "*where* or *how*" of trading have no relevance, Opp. 6; *see SEC* v. *Ripple Labs, Inc.*, 2023 WL 4507900, at *11-13 (S.D.N.Y. July 13, 2023), this motion is not about the locus of the trading. ECF No. 30 at 15:24-19:1. Nothing in Coinbase's position would require the Court to decide, for example, whether the judicial "enforcement actions against . . . exchanges" the SEC cites (Opp. 4 n.1)—that apparently involved crypto assets with contractual entitlements to share in the issuers' profits or income[5]—were correct applications of the law.

Coinbase's position instead is that if, as is alleged here, the only thing that travels is the asset and a hope of gain, there is no investment contract. *Hocking*, 885 F.2d at 1458 n.7; SEC

---

[5] *See SEC* v. *Bitqyck, Inc.*, 3:19-cv-2059, ECF No. 1 at ¶¶ 2, 4, 9, 16(e), 20 (N.D. Tex. Aug. 29, 2019) ("Defendants represented that every investor [would receive] . . . Bitqyck common stock . . . associated with the token."); *SEC* v. *Montroll [BitFunder]*, 1:18-cv-01582, ECF No. 1 at ¶¶ 2, 16, 20 (S.D.N.Y. Feb. 21, 2018) ("offerings promised and paid dividends (referred to as 'dividend paying asset share[s]' on the BitFunder website)"). Similarly, the subject tokens of the SEC's 2017 DAO Report, *see* Opp. 3-4, were likened to "buying shares in a company and getting . . . dividends," because tokenholders could vote to "distribute The DAO's anticipated earnings from the projects it funded." *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, SEC, at 4 (July 25, 2017), https://tinyurl.com/2cpax2b4; *see also id.* at 6 ("DAO Token holders would then vote to either use the rewards to fund new projects or to distribute the ETH to DAO Token holders.").

*Hocking* Br. (Ex. I) at 3. That is true whether the asset is sold by a promoter or a third party—what matters is "the content of the instruments in question." *Marine Bank* v. *Weaver*, 455 U.S. 551, 560 n.11 (1982); *accord Ripple*, 2023 WL 4507900, at *11-12. Absent what courts and the SEC have long understood to be an investment contract—a contractual undertaking related to a financial interest in the enterprise—a token sale on Coinbase is no different from a trade of a baseball card or Pokemon card or a Beanie Baby or a painting or Bitcoin or Ether.

## II.    THE MAJOR QUESTIONS DOCTRINE APPLIES.

In asking the Court to dispense with definitional limits, and to allow the SEC to police any "exchange" facilitating trades in commodities people may buy for investment purposes, the Commission appeals to policy concerns. It insists that crypto investors need its protection. Opp. 1-3. But that is an appeal to be made to Congress, as Chair Gensler recognized in May 2021.[6] Were the Court to perceive ambiguity in "investment contract" as applied here, notwithstanding the unbroken chain of precedent, the major questions doctrine would require resolving that ambiguity against the SEC. Br. 21-25; *see also generally* Br. of Sen. Lummis as *Amicus Curiae*, ECF No. 53.

In arguing otherwise, the SEC mainly parrots the recent *Terraform* ruling, without addressing the infirmities Coinbase and *amici* identified in that decision. *See* Br. 23-24; Br. of Blockchain Ass'n et al. as *Amici Curiae*, ECF No. 48, at 19-20; Br. of Chamber of Dig. Commerce as *Amicus Curiae*, ECF No. 55, at 12-14 & n.4. The Commission also invents an exception to the major questions doctrine, claiming it does not apply where an agency resorts to enforcement—

---

[6] Contrary to the SEC's revisionist history, Chair Gensler's testimony before Congress plainly was not just about Bitcoin. Opp. 4. He referred to exchanges in "crypto assets," plural. *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gary Gensler), https://tinyurl.com/mtrnkbn2. As far as Coinbase is aware, there were then and are now no Bitcoin-only exchanges. And if Chair Gensler really thought only Bitcoin fell outside the SEC's authority in 2021, why the need to lobby Congress for more authority? According to the SEC, it has authority to regulate any exchange trading in even one token that is a security. Compl. ¶ 125.

even when that action is based on an untested view of the agency's own authority. Opp. 21-23; Br. for Admin. L. Scholars as *Amici Curiae*, ECF No. 78-1, at 8-9, 14-15. This artificial line-drawing ignores that the question in reviewing any agency action is whether "*the agency has stayed within the bounds of its statutory authority.*" *Dist. of Columbia* v. *Dep't of Labor*, 819 F.3d 444, 449-51 (D.C. Cir. 2016) (Kavanaugh, J.) (in adjudication context, rejecting Labor Department's "novel reading" and "significant expansion of the Davis-Bacon Act"); *see FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126-27, 161 (2000) (FDA exceeded "the authority that it s[ought] to exercise" by determining cigarettes were "drug delivery devices")*.* Indeed, the separation-of-powers concerns animating that question are at their most acute when an agency wields enforcement power without regulatory process, under the guise of enforcing a Congressional mandate. At least with rulemaking, the agency's interpretation of a statute is announced in advance and presumptively applied equally to all. Neither is true for enforcement actions, which are *post hoc* and discretionary. Had the FDA in *Brown & Williamson* dispensed with regulatory process and just pursued selective enforcement actions against a subset of cigarette companies, can there be any doubt the Supreme Court would have weighed in to check that arrogation of authority?

## III.   THE WALLET CLAIM CANNOT STAND.

The failure to plead an investment contract likewise dooms the SEC's claim as to Coinbase Wallet. An independent ground compelling dismissal is the failure to plead facts showing that Coinbase's Wallet software acts as a "broker." The SEC does not dispute that nearly all the factors for identifying a "broker" are absent from its scant Wallet pleadings. Br. 25-27. What the SEC does point to—that Wallet charged transaction fees, offers a price-compare function, and "routes" customers' orders, Opp. 26-27—do not alone or in combination establish "brokerage activities." As the SEC does not deny, commissions alone do not a broker make, even if Coinbase still charged fees for Wallet today. Br. 26-27. And the SEC pleads nothing to suggest that Wallet actually

undertakes any of the routing activities courts have recognized as traditionally carried out by brokers—like issuing trading instructions to third parties or directing how trades should be executed. *See SEC* v. *GEL Direct Tr.*, 2023 WL 3166421, at *2-3 (S.D.N.Y. Apr. 28, 2023); *cf. Rhee* v. *SHVMS, LLC*, 2023 WL 3319532, at *8 (S.D.N.Y. May 8, 2023) ("merely providing information or bringing two sophisticated parties together" not broker activity).[7] Unsurprisingly, the SEC identifies *not a single case* finding self-custodial wallet software to be a broker.[8]

## IV.   THE STAKING CLAIM CANNOT STAND.

As to staking: The SEC does not claim that staking itself is an investment contract, but contends that Coinbase offers a security by handling IT functions for customers who validate blockchain transactions and receive compensation for the service. That position is insupportable.

The Complaint fails to allege that Coinbase's staking services involve an "investment of money." Br. 27-29. First, no part of staking is alleged to involve a customer "commit[ting] his assets" as capital to a business. *SEC* v. *Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003). Staked assets are alleged only to be "collateral" to pay potential blockchain-imposed slashing penalties for errant validation. Compl. ¶ 313. The SEC says that as the custodian of digital assets, Coinbase has "sole control" over such assets. Opp. 29. But Coinbase's User Agreement, incorporated into the Complaint, shows that *users* control the assets custodied by Coinbase and staking "does not affect the ownership of [users'] digital assets." *See* Br. 28-29. The SEC does not dispute that customers

---

[7] To the contrary, as the webpage on which the SEC now relies makes clear, Opp. 27 n.15, Wallet simply provides a graphical interface to show customers available trade and price information from DeFi exchanges and to allow customers to access the trading functionality on those third-party platforms. Http://coinbase.com/learn/wallet/how-to-swap-tokens-with-coinbase-wallet; *see also* Br. of DeFi Educ. Fund as *Amicus Curiae*, ECF No. 60, at 6-9 ("Wallet helps users discover pricing on decentralized exchanges, but this does not constitute the routing of order on decentralized exchanges."). Customers maintain control over their crypto assets at all times, and direct all trading activities with respect to them. Compl. ¶ 64. Indeed, as the cited webpage notes, Wallet "allow[s] [users] to swap thousands of crypto assets . . . *without a middleman.*" (emphasis added).

[8] Indeed, the SEC has historically afforded no-action relief to passive software that simply interfaces with and/or provides access to trading platforms. *See, e.g.*, Evare, LLC, SEC No-Action Letter, 1998 WL 958015 (July 29, 1998); GlobalTec Solutions, LLP, SEC No-Action Letter, 2005 WL 3695276 (Dec. 28, 2005).

control decision-making authority—including whether to stake or unstake—limited only by protocol-imposed bonding periods that apply to all staking. *See* DeFi Brief, *supra*, 17-18. Second, the SEC does not dispute that staking customers are exposed to no Coinbase financial risk. The only alleged risks are the same whether customers stake through or outside of Coinbase, or whether they stake at all (*e.g.*, risk of theft). Br. 27-29. Citing nothing, the SEC says it need not show "risks associated exclusively with" staking through Coinbase. Opp. 28. But to make an "investment of money," a user must commit assets "to the enterprise in such a manner as to subject himself to financial loss." *Rubera*, 350 F.3d at 1090.

Nor are staking rewards a result of Coinbase's "essential managerial efforts." *Hocking*, 885 F.2d at 1455.[9] The SEC calls Coinbase's IT services "significant post-sale managerial efforts," Opp. 30, but the services they describe are common to virtually any IT outsourcing arrangement: deploying hardware and software and keeping servers running and protected, Compl. ¶ 364. There is no dispute that customers could download and operate the same software and stake assets on their own. Opp. 30. And there is no allegation that Coinbase applies some managerial skill to increase the amount that blockchains pay for validation services. *See* Br. 30; DeFi Brief, *supra*, 14-17. The absence of such allegations alone is fatal to the SEC's claim. *See SEC* v. *Life Partners, Inc.*, 87 F.3d 536, 545-46 (D.C. Cir. 1996).

## CONCLUSION

For the foregoing reasons, Coinbase is entitled to judgment on the pleadings.

---

[9] Coinbase does not, as the SEC asserts, Opp. 27-28, concede that the Complaint pleads an expectation of profits from staking. As set forth in the opening, Br. 29, staking rewards are payments for validation services, not profits from invested capital. The SEC points to *Edwards* in an attempt to conflate "payment" for a service and "return on investment." Opp. 29. But at issue in *Edwards* was a "fixed return" on a sale-leaseback financing arrangement, nothing like the payment for blockchain validation at issue in Coinbase's IT staking services.

Dated: October 24, 2023
New York, New York

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ

/s/  *William Savitt*
William Savitt
Kevin S. Schwartz
Sarah K. Eddy
Adam M. Gogolak
David P.T. Webb
Emily R. Barreca
Sijin Choi
51 West 52nd Street
New York, New York 10019
(212) 403-1000
wdsavitt@wlrk.com

Steven R. Peikin
Kathleen S. McArthur
James M. McDonald
Julia A. Malkina
Olivia G. Chalos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*