O1HRSEC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          v.                        23 Civ. 4738 (KPF)

COINBASE, INC. AND COINBASE
GLOBAL, INC.,

                                    Oral Argument

                    Defendants.

------------------------------x
                                    New York, N.Y.
                                    January 17, 2024
                                    10:00 a.m.

Before:

                 HON. KATHERINE POLK FAILLA,

                                    District Judge

                         APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
BY:  PETER MANCUSO
     NICHOLAS MARGIDA
     JORGE G. TENREIRO
     PATRICK R. COSTELLO

WACHTELL, LIPTON, ROSEN & KATZ
        Attorneys for Defendants
BY:  WILLIAM D. SAVITT
     SARAH K. EDDY
     KEVIN S. SCHWARTZ
     -and-
SULLIVAN & CROMWELL, LLP
BY:  STEVEN R. PEIKIN

O1HRSEC1

1              (Case called)

2              MR. TENREIRO:  Jorge Tenreiro for the Securities and

3    Exchange Commission, your Honor.

4              MR. COSTELLO:  Good morning, your Honor, Patrick

5    Costello, also on behalf of the Securities and Exchange

6    Commission.

7              MR. MARGIDA:  Good morning, your Honor, Nick Margida

8    on behalf of the SEC.

9              MR. MANCUSO:  Peter Mancuso on behalf of the SEC. Good

10   morning, your Honor.

11             THE COURT:  All right.  Good morning.  It's

12   interesting.  You already anticipated and issue I have, which

13   is I prefer that people stand.  But if I can't hear you, I'm

14   going to have to let you sit.  I'll let it be determined by

15   whether our court reporter can hear you or not.

16             My friends at the back table, if you would like to

17   introduce yourselves?

18             MR. SAVITT:  Good morning, your Honor William Savitt,

19   Coinbase and Coinbase Global.

20             MS. EDDY:  Good morning, your Honor.  Sarah Eddy for

21   Coinbase and Coinbase Global.

22             MR. SCHWARTZ:  Good morning, your Honor.  Kevin

23   Schwartz for Coinbase and Coinbase Global.

24             MR. PEIKEN:  Steven Peiken for the same.

25             THE COURT:  Good morning.  We have a lot to cover this

O1HRSEC1

morning.  I understand as well that there are number of people
listening in on the phone.  I'm going to remind you for the
sake of my deputy to not unmute yourselves during this
conference because we will hear you, and it will disrupt us.  I
usually tell people preliminary to oral argument to please
answer the questions that I've asked and to not read too much
into the questions that I've asked.  And I think I'm going to
say that here as well.

Another thought that I had was that typically I'll let
folks give me something in the vein of an opening statement,
and then I'll start asking questions.  But I think I'd rather
do something a little bit different this time, and that is, I
have read all the briefs.  I have read all the amicus briefs.
I've read the majority of the cases that are cited in the
briefs, and so if we're going to be summarizing arguments, I
don't think I need that.  I do have questions for both sides.
So I think what I'd prefer to do is simply to ask my questions
of each side, one side and then the other, not going back and
forth as between the *Howey* test and major questions doctrine
and things of that nature.  And then at the end, if there's
something I haven't asked you and you believe it's necessary to
my decision, you can please let me know.  We'll see how that
works.

For my friends at the front table, is there a division
of labor among the issues?

O1HRSEC1

1          MR. COSTELLO:  Yes, your Honor.  I'll be planning to

2     address any questions the Court has concerning *Howey*, and then

3     my colleague Mr. Tenreiro will address the major questions

4     doctrine, and my colleague Mr. Margida will address the wallet

5     claim and the staking.

6          THE COURT:  I want to hear that again.  So you are

7     *Howey*.  Mr. Tenreiro is major questions.  Who else is speaking,

8     sir?

9          MR. COSTELLO:  My colleague Mr. Margida will address

10    that.

11         THE COURT:  Yes, is speaking about staking and the

12    wallet?

13         MR. MARGIDA:  Yes, that's right.

14         THE COURT:  My friends at the back table, is there a

15    division of labor?

16         MR. SAVITT:  Yes, your Honor.  I'll be doing my best

17    to handle questions regarding the investment contract matter

18    and the cases involving *Howey* and others.  Ms. Eddy is going to

19    take the lead on major questions doctrine.  Mr. Schwartz is

20    going to address wallet and staking.  Mr. Peiken is going to

21    correct all of our errors.

22         THE COURT:  Okay.  Let's hope there are few.

23    Although, I, of course, enjoy hearing from him.

24         All right.  Mr. Costello, let me then please begin

25    with you, sir.  At the last conference we had in this case, one

O1HRSEC1

1   of the early questions I had addressed the degree to which I

2   could take judicial notice of what ends up being the first 33

3   pages of Coinbase's answer.  It is, of course, footnoted.

4   There are sources to it.  What is the commission's view as to

5   the degree to which I may take judicial notice of the facts

6   that are contained in that section?

7          MR. COSTELLO:  Your Honor, I believe that the bulk of

8   the information that you see in those first 33 pages, in I

9   think 105, 106, something like that, footnotes.  The

10  information in there is not integral to the pleadings, which is

11  the standard, I believe, that the Court would be following in

12  this instance.  On a 12(C), the Court would be required to

13  accept the allegations in the SEC's complaint as true and would

14  be required to draw all reasonable inferences from those

15  allegations in the SEC's favor, as well as other documents and

16  materials that are contained in the complaint from which we

17  reference.  All of that the Court can consider, but I don't

18  believe that the same is true for the bulk of the material that

19  you see in those first 30 pages.  They are just not integral to

20  the SEC's complaint.

21         THE COURT:  There is a substantial portion of

22  Coinbase's briefing and Coinbase's answer, I guess I'll speak

23  to more specifically that from my perspective is interesting

24  and as a matter of optics but might not actually be

25  determinative.  Just to further probe your answer, if I

O1HRSEC1

1    exclude -- and Coinbase will tell me why I shouldn't -- the

2    references to, for example, their efforts to either provide

3    information to the commission or to obtain clarity from the

4    commission, are you still suggesting that, for example, their

5    discussion of what staking is or what Coinbase's wallet

6    functions as, are you suggesting I can't consider those to the

7    extent that they differ from the way in which the commission

8    has described these things in their complaint?  I would have

9    thought that those things, for example, are in fact integral to

10   the complaint, but I'll hear from you.

11           MR. COSTELLO:  I think the easiest way to look at

12   this, your Honor, is that I think what Coinbase has done in its

13   answer -- optics aside of course -- is to just demonstration

14   why this motion in the context of a 12(C) is just

15   inappropriate.  When it comes to all of the issues here, be it

16   the investment contract related or be they major questions, or

17   as your Honor mentioned, the staking program, Coinbase has a

18   very different view of the facts, and that's fine.  They can

19   have a different view of the facts.  And the SEC views the

20   securities transaction component of this one way and Coinbase

21   views it a different way.

22           That is just, I think, more -- I think the -- it's --

23   I'm trying to say, your Honor, that I'm not just sure that a

24   12(C) is really the right venue to be resolving that factual

25   dispute.  And I think your Honor may actually have hinted at

O1HRSEC1

1    this during the premotion conference where just wondering about

2    whether the 12(C) is the right place to be addressing this.

3         THE COURT:  Well, I did and that's why I'm asking the

4    question again, sir, because I now have a more complete record.

5    I guess the issue is let's imagine the commission has described

6    staking in a manner that runs contrary to everyone else's

7    description of it.  The DeFi people example have a fine Amicus

8    brief explaining to me what the wallet really is and what

9    staking really is, and that actually in some respects makes

10   more sense to me than the commission's description of it in the

11   complaint.  You are suggesting to me that that is a factual

12   with dispute I simply can't resolve.  Even if, for example, the

13   commission's description of staking is demonstrably wrong, yes?

14        MR. COSTELLO:  If there is a factual dispute, your

15   Honor, I would say that the Court would not be able to resolve

16   that.  But if you look at the two different versions -- and

17   there are a number of different points that the Amicus parties

18   raised, but if the Court is drawing reasonable inferences from

19   the allegations even though the two different versions of that

20   from two different perspectives may differ, the Court would be

21   required to draw those inferences in the SEC's favor at this

22   point given the nature of the 12(C).

23        THE COURT:  Well, related to this question, sir, is

24   the question of the degree to which I can take judicial notice

25   of the factual statements that are contained in the amicus

O1HRSEC1

1    briefs.  I'm thinking off the top of my head of the historical

2    presentation given by what I'll call the Securities Law

3    Scholars -- I think that's how they refer to themselves -- and

4    the background materials, sort of the crypto for dummies that

5    is presented in the DeFi Education Fund brief.  Are you

6    suggesting that I can consider those facts except to the extent

7    that they are disputed or somehow controverted by what the

8    commission alleges?

9            MR. COSTELLO:  I think the Court could read it as

10   background in considering the legal arguments that are raised,

11   but if it comes to presenting a different version of the facts,

12   that's where I would suggest that the Court not consider it, at

13   least not at this stage of the process.  If we were to be back

14   here later on on summary judgment where there to be a fuller

15   factual record, then things might be different.

16           THE COURT:  I don't recall the commission's briefing

17   anywhere, or their pleadings, containing a historical analysis

18   of the antecedents of *Howey*.  Are you suggesting -- to what

19   degree can I consider this information in the absence of

20   contrary information from the commission?

21           MR. COSTELLO:  If the Court is asking can the Court

22   look to the different cases that were cited in those briefs,

23   then certainly the Court could do that.

24           THE COURT:  Okay.  But it's more than that.  They are

25   suggesting to me that if I look at those cases I'm going to

O1HRSEC1

1    discern a common fact or a common legal position in those cases

2    and that that would inform how I should view what *Howey* was

3    thinking when *Howey* was decided.  You don't -- it doesn't sound

4    or at least you haven't presented in your briefing an opposing

5    narrative to the legal foundations of *Howey* or how they

6    progressed from state blue sky laws.

7         So I just want to know does that mean that you don't

8    dispute what they are saying or do you think that it doesn't

9    fully answer the question?

10        MR. COSTELLO:  No, your Honor.  That is -- we are

11   disputing that and I think that the easiest way to look at this

12   is that if you look at how *Howey* itself analyzed these cases,

13   the foundational principal that comes out of *Howey* in this

14   concept of looking at substance of a transaction, and

15   disregarding form to focus on the economic reality, that

16   principal of *Howey* comes from Justice Murphy's review of the

17   blue sky cases.  And we've looked at what the Securities La

18   scholars have said about these cases and I'm just not sure that

19   you see a principle coming out of these cases like they say

20   there is that in the context of these things an actual contract

21   is required.

22        Factually, and as the posture of those cases showed,

23   they may have involved a contract, but that is different than

24   saying it is a mandate coming from these cases.  And I think

25   that's the point that Justice Murphy was trying to get at

O1HRSEC1

1    there, that in discerning what the concept of an investment

2    contract is, the focus is on the economic reality where you are

3    to take the substance to be -- to disregard the form.  That is

4    the way they extrapolated the principle from those cases.  And

5    I'm just not sure that the Court needs to really get into the

6    detail of those cases to see how the Supreme Court itself

7    interpreted them.

8            THE COURT:  I'm changing topics, sir.  As I understand

9    the commission's complaint, there seems to be four Coinbase

10   services that are being challenged.  The digital assets fi

11   exchange, the prime service for institutional customers, the

12   Coinbase wallet and the facilitation of staking.  Are those the

13   services, the products, that are being challenged in the

14   complaint?  Am I missing something is what I'm saying, sir?

15           MR. COSTELLO:  No, your Honor.  Your Honor is not

16   missing anything.

17           THE COURT:  Okay.  Mr. Tenreiro agrees with you.  I'm

18   sorry.  He's providing silent commentary to everything, so

19   thank you.

20           And I'm assuming, sir, not to give anything away

21   because I've decided nothing, but I'm assuming that it isn't a

22   binary decision with respect to all four.  I could find, for

23   example, that there's something of concern at least for going

24   to discovery with respect to the exchange but not with respect

25   to the wallet, correct?  I consider each of those individually

O1HRSEC1

1    although there's some arguments that are common to all?

2            MR. COSTELLO:  That's correct, your Honor.

3            THE COURT:  There are references in the commission's

4    briefing and there's I think a footnote somewhere that speaks

5    about the asset hub and at that moment seems that the

6    commission is talking about primary offerings in the

7    securities.  But I did not understand that to be the meat of

8    the complaint.  To what extent are you asking me to look at

9    primary transactions as distinguished from transactions in the

10   secondary market, which is what I understand the exchange and

11   the prime services really pertain to?

12           MR. COSTELLO:  As we understand the asset hub feature,

13   your Honor, we understand that to mean that issuers are able to

14   sell their crypto tokens directly as your Honor observed.

15   Coinbase, just judging by the answer that they've interposed

16   seems to take a different issue as to what features this asset

17   hub actually entailed.  So there seems to be a little dispute

18   between the parties at least as of this point as to what the

19   asset hub feature is and what it isn't.

20           THE COURT:  Do I need to resolve that dispute for

21   purposes of this motion?

22           MR. COSTELLO:  Well, I'm not sure that the Court can

23   resolve the dispute for purposes of this motion.

24           THE COURT:  Okay.  Fair enough.  Let me ask the

25   question differently.  If I issue a decision that nowhere

O1HRSEC1

1    mentioned the term "asset hub," have I missed something?

2                MR. COSTELLO:  No, your Honor.  If your Honor denies

3    the motion such that this case continues, then the asset hub

4    obviously will be a point of contention between the two parties

5    going forward.

6                THE COURT:  Sir, as we talk about the principal

7    charges, the *Howey*-related charges.  I want to be sure I

8    understand what is the conduct about which the commission

9    complains.  So can you outline for me for each of the four

10   services provided by Coinbase precisely what it is that you

11   believe Coinbase is doing as to each that runs afoul of the

12   securities laws?

13               MR. COSTELLO:  So, your Honor, I'll be happy to

14   address the primary claim.  I think your Honor's questions

15   about the staking and the wallet service I'll defer to my

16   colleague on that one to explain to the Court in a little bit

17   more detail.  But essentially, the primarily claim on the

18   securities front here is Coinbase's exchange, it's clearing

19   agency, and it's broker service, which my colleague will

20   address in a moment.  But just looking at the exchange and the

21   clearing agency service, what we contend is that there are

22   securities transactions that are taking place on Coinbase's

23   platform.  And Coinbase disputes that, and you know, that is

24   what it is.  But in our view, the securities transactions are

25   taking place, which would mean that Coinbase is currently

O1HRSEC1

1   operating as an unregistered exchange and an unregistered

2   clearing agency.  An exchange in the sense that a marketplace

3   for bringing together orders of buyers and sellers as the

4   exchange act defines what an exchange is.  And a clearing

5   agency in the sense of settling transactions, ensuring that the

6   transaction goes from buyer to seller.  And that also is

7   defined by statute.  And our complaint takes through each of

8   the elements of that.  But it's essentially Coinbase's

9   intermediation services in that sense that are at issue.

10          THE COURT:  And the answer you've just given me is

11   principally focused on the exchange and the prime services,

12   correct?

13          MR. COSTELLO:  Correct.

14          THE COURT:  In your complaint, you make a point of

15   saying or you make a point of suggesting that there is some

16   novelty to combining exchange and broker and clearing services.

17   I'd like to understand that a little bit more.  I believe that

18   Coinbase disagrees with you and says it's not that big a deal,

19   but you've made mention of the uniqueness of it, and I'd like

20   to understand why I should care.

21          MR. COSTELLO:  So typically, your Honor, you do not

22   see those three functions, exchange, clearing agency and broker

23   combined under one roof, so to speak.  And the reason that you

24   don't see that is because of a number of potential problems

25   that that poses.  For example, if you look at a properly

O1HRSEC1

1    regulated and licensed exchange, the members on that exchange

2    are the broker-dealers.  If you have an exchange itself that is

3    also performing a broker function, that presents the potential

4    for a conflict of interest in terms of when broker-dealer

5    orders are placed, the exchange might be tempted to place its

6    own broker-dealer function ahead of the orders of the other

7    brokers.

8                In another sense, it presents another conflict in the

9    sense that the exchange might be prone to using the

10   confidential customer information from these other

11   broker-dealers to its competitive advantage over the brokers.

12               THE COURT:  Right.  Neither of these is alleged in the

13   complaint though, correct?

14               MR. COSTELLO:  No, that is not alleged in the

15   complaint but that is so that the Court understands why these

16   functions are normally not combined under one roof.

17               THE COURT:  Fair enough.  I appreciate you.  Let me

18   try and sharpen my question then.

19               You've just indicated to me that there are reasons why

20   you would want to not combine those functions, and I appreciate

21   some of the reasons that you've given and I'm sure there are

22   others.  How does the combination of those functions as alleged

23   here impact your claims of violation of the securities laws?

24               MR. COSTELLO:  The separation of the functions, or I

25   should say the failure --

O1HRSEC1

1          THE COURT:  Can we pause for the moment off the

2     record.  Back on the record.  Please continue, sir.

3          MR. COSTELLO:  Your Honor, the issue here is not that

4     those functions are combined because there's nothing per se

5     illegal about combining the functions.  But the fact is that

6     the commission has never registered an entity that has those

7     combined functions.  The issue here is --

8          THE COURT:  Could you say that again the commission

9     has or has not registered an entity that combines those

10    functions.

11         MR. COSTELLO:  So the commission has never registered

12    an entity that has a combined exchange and clearing entity

13    function.  It also never registered an agency that has an

14    exchange broker-dealer combination function.  But there is not

15    anything per se illegal about it.  That is not really the gist

16    of what our claim is here.  Our claim is not that they combined

17    the functions.  Our claim is that there are these securities

18    transactions taking place on Coinbase's platform, and because

19    there are Coinbase in acting as an unregistered exchange has

20    violated the securities law.  And Coinbase acting as a clearing

21    agency has violated the securities laws as well.

22         THE COURT:  Is the logical extension of your argument

23    the argument that the 12 or 13 issuers, depending on whether

24    you count Nexo, N-E-X-O, that they are all violating the

25    securities laws as well, because they are issuing securities

O1HRSEC1

that are not registered?  Do I understand that?  I mean, I

understand they are not in the complaint before me, but I'm

assuming if what you're arguing is that Coinbase is somehow by

providing these intermediation services violating the

securities laws that the actual token issuers are themselves

violating the securities laws; is that correct?

MR. COSTELLO:  Well, not exactly, your Honor.

THE COURT:  Okay.

MR. COSTELLO:  Because if we look at the platform

itself you were talking about -- and your Honor observed

earlier that the bulk of our complaint is directed towards

secondary market trading.  And so if you look at the secondary

market resale of a token, the seller of that digital token is

not the issuer at that point.  It is a private party who was

actually the offerer or seller.

THE COURT:  Yes.

MR. COSTELLO:  Every sale of a security has to be

either registered or exempt.  But what you are going to see

here is that the bulk -- nine out of ten sales in this context

are not going to trigger the registration requirement between,

you know, a private seller and a private buyer because section

4 of the Securities Act provides exemptions for registration.

And one of the most common exemptions is what we call the

4(a)(1) exemption, which exempts all offers or sales other than

by an issuer, an underwriter or a dealer.  So these

O1HRSEC1

private-party resales that you see taking place, that is not going to trigger a violation of the securities laws in the sense of registration.

THE COURT:  But what about the initial offerings of the tokens?  When the issuers decided to issue the tokens, the SOL, or S-O-L, for example; do you believe they were issuing securities?

MR. COSTELLO:  If -- yes, your Honor.  Yes, we were. And if those transactions were not registered, then yes.  Or exempt, I should say.

THE COURT:  I'll ask the question just to make sure I understand this better.

I appreciate that earlier I asked you to -- whether you were focusing on primary or secondary transactions, and I appreciate your answer on that.  You're saying that as to these 12 or 13 tokens, when they were initially issued, these tokens were themselves securities?

MR. COSTELLO:  Yes, your Honor.

THE COURT:  Okay.  Okay.  I understand the argument. I appreciate that.  We're not claiming that Coinbase is the issuer.  You said they've provided intermediation services. I've heard them in their capacity as a broker, in their capacity as a settler of trades.  Are you arguing that they are a promoter in any respect?

MR. COSTELLO:  A promoter of the offer or sale not in

O1HRSEC1

1     the traditional sense of what you would call promotion.

2               THE COURT:  Okay.

3               MR. COSTELLO:  So no.  For example, your Honor may

4     have seen in some of the *Howey* cases the concept of a promoter.

5               THE COURT:  That's what I'm thinking of, sir, yes.

6               MR. COSTELLO:  Correct.  No, not in that context, no.

7               THE COURT:  And so from your perspective the liability

8     adheres in the fact that they are a third party whose conduct

9     can impact the value of the token, or is it that they are -- I

10    mean, what's the third party that I care about here?  The *Howey*

11    test speaks to it.  So what is the third -- is it the actions

12    of the issuers themselves, the actions of individuals in the

13    orbit of the issuers, or the actions of Coinbase?  What am I

14    focusing on?

15              MR. COSTELLO:  The focus is going to be on the actions

16    of the issuer and the developer of the project team together,

17    so what you would call the issuer just for -- you know, if I

18    want to lump them altogether as one category.  And that is the

19    focus because the issuer is in charge of maintaining and

20    expanding the network that surrounds this digital token.  And I

21    think it's important for the Court to understand that the

22    practical application of this.  Because at the end of the day,

23    these 12 or 13 tokens, they are just computer code.  Okay?

24    Those tokens are linked.

25              THE COURT:  I'm smiling, sir, because that's kind of

O1HRSEC1

1    what your friends at the back table are saying and they are

2    wondering where we're here.  So okay, yes.

3              MR. COSTELLO:  I promise, your Honor, I will get you

4    there.  So it is just computer code.  And the computer code is

5    linked on a blockchain because a bunch of letters and numbers

6    that live on that blockchain.  But the key here is that these

7    letters and numbers from this code go with that blockchain and

8    its surrounding network or ecosystem, you'll see sometimes the

9    cases use.  It's that network or ecosystem, that is what drives

10   the value of the token because the token as code is linked to

11   that ecosystem.  It is tied to it.  It cannot be separated from

12   it.

13             As the value of that network or platform or ecosystem

14   increases, so does the value of the token.  And the issuers and

15   the project team, they drive the value of the ecosystem.  So

16   your token being part of this ecosystem is going up or down in

17   value based entirely on what these issuers and project team

18   members are doing and continuing to do.  So it is their conduct

19   that would be relevant for the *Howey* analysis.

20             The way Coinbase fits into this is aside from

21   facilitating or I should say intermediating the transaction as

22   by serving as the exchange for this, Coinbase is also

23   rebroadcasting all of this by linking to all of the material of

24   the issuer and the project team right there on the platform.

25   When a customer opens an account on Coinbase and wants to look

O1HRSEC1

at different tokens to purchase and sees one of these 13 in

particular as examples, they can click on it and they can be

linked right there to all of this information including the

value proposition for these tokens based on what these issuers

and project team members are doing.  So the focus --

THE COURT:  Okay.  But -- please pause.  What if

Coinbase didn't include that information?  You refer to it as

broadcasting; they refer to it as simply the provision of

historical information.  Had they not done that, would you

still believe these intermediation services to bring them

within the securities laws and if so, on what basis?

MR. COSTELLO:  Yes, the answer is yes.  And the basis

is because regardless of whether or not Coinbase is

rebroadcasting it, that doesn't change the calculus of what

these issuers and these ecosystems are.  All we're saying is

that Coinbase rebroadcasts and amplifies it right there on the

platform.  But even if they didn't, that wouldn't change the

analysis.

THE COURT:  Okay.  And so therefore the fact that --

it's simply their placement of these assets on their platform,

but didn't of the fact that in your view the assets themselves

are securities.  The placement of these securities on their

platform, either at the spot or the prime, that's enough.  I

mean, it's gravy as far as you're concerned that they've

also -- that they also provide information.  And I suppose you

O1HRSEC1

1    would say it's even more interesting that there are efforts

2    made to improve or to enhance or to develop their own customer

3    base by having them purchase these assets.  But if we're

4    looking at that irreducible minimum of conduct that brings

5    them, you believe, within the ambit of the securities laws.

6    It's the placement on their platform of tokens that you believe

7    to be securities?

8              MR. COSTELLO:  Yes, your Honor, but let me just

9    clarify, though.

10             THE COURT:  Please.

11             MR. COSTELLO:  The token itself is not the security.

12             THE COURT:  I understand that.  Right.  And that's

13   good.  Was it Mr. Hinman or someone else who said that?

14   Someone from your shop who is no longer there has said that, so

15   yes.  Token alone, not a security.  So tell me what makes these

16   the securities?

17             MR. COSTELLO:  This goes to what I said before

18   about --

19             THE COURT:  The ecosystem?

20             MR. COSTELLO:  About what it is that someone is buying

21   when they purchase the particular tokens like this, like these

22   13 examples.  When they buy this token, they are investing into

23   the network behind it.  One cannot be separated from the other.

24   One is the other effectively.  And they -- when they are

25   investing in this, when the value of the network or the

O1HRSEC1

1    ecosystem increases, so does the value of the token.  That is

2    the way that Judge Rakoff looked at it recently in the

3    Terraform decision, noting that it is the token essentially

4    plus the totality of the inducements about what makes the

5    ecosystem, the ecosystem.

6         So that is what translates this to here.  And when it

7    comes to Coinbase's conduct, the fact is that because they meet

8    the definition of an exchange -- and I don't think that they

9    are debating in this case that they otherwise meet the

10   definition of an exchange, and they meet the definition of a

11   clearing agency based on the types of services and functions

12   that they do.  I think the dispute here is that they are a

13   securities exchange and a securities clearing agency, because

14   those statutory provisions would only be triggered if there are

15   securities transactions taking place.  That, I think, is the

16   dispute between the parties here.

17        But Coinbase's conduct would be if purchases and sales

18   of these tokens, these transactions, these investments into

19   these networks, if that is -- if the Court finds those to be

20   securities transactions, then, by definition, Coinbase is

21   operating as an unregistered exchange.

22        THE COURT:  I suspect that I might have broader

23   questions on this issue in a little while for you.  But I am

24   interested in the first instance about your argument to me just

25   now that the token alone is not a security but that the person

O1HRSEC1

1    buying the token is buying into a system.  You've referred to

2    it earlier as an ecosystem.  How do I know or how have you made

3    the determination that a particular token brings —— the

4    purchase of a particular token brings with it entree into a

5    system as distinguished from just having an asset that is not a

6    security?

7            I'm trying to figure out what about these particular

8    tokens allow you to make the argument that their purchase is

9    not just the purchase of an asset but the purchase into a

10   system that implicates the securities laws?

11           MR. COSTELLO:  Sure, your Honor.  I think the easiest

12   answer to that question is that transactions in these

13   particular 13 tokens satisfy the *Howey* test.  That's what makes

14   them securities.

15           THE COURT:  That's a little bit circular to me, sir,

16   so we'll try that again.

17           You're saying to me that if I were to go onto Coinbase

18   right now and if I were to set up an account, that I can get

19   any number of assets that in the commission's estimation are

20   not securities, correct?

21           MR. COSTELLO:  I just want to clarify something, your

22   Honor.

23           THE COURT:  Please.

24           MR. COSTELLO:  What we've done in this case is we have

25   pointed out 13 examples of digital tokens where we believe

O1HRSEC1

1   investment contract securities are taking place.  We have not

2   looked at all of the tokens that are trading on Coinbase's

3   platform, but as I think we had mentioned at the premotion

4   conference, it would be sufficient for the Court to find that

5   just one token is a securities transaction.  We've pointed out

6   13 where we have -- the commission has made the determination

7   that it believes that these transactions in these 13 tokens are

8   securities transactions.

9           THE COURT:  I did understand that and I did not think

10  that by citing these 12 or 13 you were excluding all of the

11  others.  What I'm trying to figure out is:  What is it about

12  the issuance of these tokens?  What is it about these tokens

13  that brings them within *Howey*, and for you to say well, they

14  satisfy *Howey* is not a helpful answer to me.

15          For example, there's a fair amount of description in

16  your complaint about what the issuers were intending to do,

17  what statements they've made, what it is about -- for example,

18  whether these tokens are promoted and geared towards either

19  advancing the blockchain or the goals of blockchain or

20  developing apps for the blockchain.  That's what I'm trying to

21  figure out.

22          You're acknowledging, I think, the theoretical

23  possibility that there's stuff on Coinbase, there are assets

24  that are not securities.  I understand that you've identified

25  these 12 or 13 that are.  What is it about them, and please

O1HRSEC1

1    don't say *Howey*.  What is it about them that you believe makes

2    them securities?  Thank you.

3            MR. COSTELLO:  Understood, your Honor.  I apologize

4    earlier.  I misunderstood the question.

5            THE COURT:  I wasn't asking a precise enough question.

6    I think maybe I did now.

7            MR. COSTELLO:  I think maybe it would be helpful if we

8    looked at one or two tokens in particular so we could

9    illustrate the point about what we think is making these

10   investments.  Because at the end of the day, that's what this

11   is, it's an investment.  Essentially, the investment depends

12   entirely on the efforts of other people to bring value to that

13   investment.

14           So if we look at the CHILI token, for example, that

15   the CHZ token.  That's a sports and entertainment platform.  If

16   you look at how we track through the development of this, you

17   see in a lot of these instances, these token issuances come

18   about when the blockchain and the network first launches.  And

19   to do that these issuers and project teams need start-up

20   capital, so they will sell a certain amount of tokens to

21   institutional type investors to get the development capital

22   that they need had to launch the blockchain.  And that can be

23   done -- this is not just for the CHILI but this is for all of

24   them.  That can be done in a combination of direct placements,

25   initial exchange offering and SAP agreements, simple agreements

O1HRSEC1

1     for future tokens where the institutional investor will get the

2     right to a certain amount tokens after launch.

3                I'm sorry.  Am I speaking to fast?  I apologize.

4                So they set this up, and then what they do with that

5     capital is they then launch the blockchain, they launch the

6     network and then they continue to expand and add value to it?

7     How does that play out in real practice?  Well, if you look at

8     CHILI, the CHILI, the original white paper and its website

9     feature biographies of the founders and their project team

10    highlighting their past managerial and entrepreneurial

11    background.

12               They then explain how they allocated certain

13    percentages in those initial formation that I was talking about

14    earlier, the CHILI issuer had allocated certain percentages of

15    those -- of the CHILI token to the founders and the project

16    team to show, essentially, that these individuals, these

17    founders, these developers have ongoing invested interests in

18    this enterprise at the end of the day because they own tokens

19    as well.  And it's to their advantage to do whatever they can

20    to improve upon and expand this value because when they do

21    that, they benefit, too.

22               Now, in 2018, three years before CHILI was listed on

23    Coinbase's platform for trading, CHILI released another white

24    paper stating that they are no longer looking to fundraise at

25    this point.  They are now looking to focus on leveraging

O1HRSEC1

1    resources to realize what they called their vision for the

2    ecosystem.  Then the team has also stated publicly that as they

3    are able to grow the platform and partner with more of these

4    digital sports teams, because it's a sports and entertainment

5    platform.  As they're able to partner with more of these teams,

6    the value -- and this is where this comes into play, the value

7    of the token will increase.

8            In fact, in one tweet that they sent out, it's "demand

9    for CHZ exploded.  Going to bring a lot of value."  And then

10   they also made efforts to drive secondary market trading by

11   burning, and that's a term for, you know, creating scarcity in

12   the tokens to make them more valuable.  So if you look at that

13   as an example -- and the various tokens they all follow the

14   same initial track of that developmental capital that starts it

15   out and then it expands beyond that.  But this is just an

16   example to show that this is the way that these issuers and

17   these developers are looking at the tokens and the networks,

18   the ecosystem themselves.  They are looking at it as value

19   propositions, and then they are broadcasting this information

20   publicly so that demand is going to increase.

21           And that is the way that we have characterized the

22   allegations in this complaint.  Because at the end of the day,

23   when it comes to applying *Howey*, it is an objective test, it's

24   principles based.  It looks at all the facts and circumstances.

25           We view the transactions in these particular tokens as

O1HRSEC1

1    presenting as value propositions.  As Judge Rakoff noted, when

2    you purchase this token, you invest in that platform.

3           THE COURT:  Do you mean that at both the developmental

4    stage and the expansion stage, or to you, is one set of tokens

5    at one particular stage not a security and later since, is a

6    security.  By the way you are describing CHZ, it would seem

7    they were always thinking about how to enhance the value of the

8    CHZ token and, therefore, the initial developmental offering

9    and the advance and expand offering are both -- the tokens that

10   resulted there are both securities in your conception of

11   things, which I understand the folks at the back table disagree

12   with.  Is that what you're saying.

13          MR. COSTELLO:  Yes, your Honor.  It doesn't make a

14   difference whether you have it initially or whether you get it

15   secondarily.  This actually highlights one of the major

16   disputes between the parties, because the question becomes, if

17   you have an investment contract that can be created when you

18   buy something -- when you buy one of these tokens from the

19   issuer, that Coinbase seems to think that you can't then trade

20   that in the secondary market.  And this is where both sides

21   part company a little bit.

22          We think if the Court looks at this for what the items

23   are, this is a digital token.  It is computer code that links

24   to a blockchain.  Whether your Honor is the first person to buy

25   this particular token from this particular computer code, or

O1HRSEC1

1    whether your Honor then sells it to me and then I sell it to

2    Mr. Tenreiro, it is the same computer code no matter which one

3    of us has it.  It's still the same value proposition.

4                THE COURT:  And so this is where you are disagreeing

5    with Judge Torres in the *Ripple* case?

6                MR. COSTELLO:  Correct, your Honor.  And the reason we

7    respectfully disagree with Judge Torres --

8                THE COURT:  Of course.

9                MR. COSTELLO:  -- is because when you have those

10   problematic, those would be the retail purchasers.  When they

11   are buying XRP, they are buying the same XRP token that the

12   institutional buyers are buying.  It doesn't matter whether

13   they buy that from Ripple or from a secondary seller.  It

14   doesn't matter.  It's the same token in the same ecosystem.

15   There's no need to create two different categories of

16   purchasers in that sense.  And there's no need to do that here

17   either.

18               We just think if the Court looks at the reality of

19   what the transactions are in, being these digital tokens being

20   computer code, it doesn't matter who possesses it, it's still

21   the same investment in the same thing.

22               THE COURT:  In the commission's review of the tokens

23   that are offered on Coinbase -- and I appreciate that I'm

24   asking you now on something you didn't allege, did you find

25   tokens that are there that someone could buy for sport?  I

O1HRSEC1

1    mean, for no appreciation?  I'm just trying to figure -- I

2    would have thought that everybody buying a token on Coinbase

3    hopes one day that that token will appreciate in value, but

4    perhaps you've seen tokens where there was no ecosystem.  And

5    if so, if it's possible, could you give me an example of one of

6    those, where you looked at it and said this does not qualify.

7            MR. COSTELLO:  I believe that the commission has taken

8    the position that the Bitcoin token is not a security.  I think

9    that is -- and I believe that you can purchase Bitcoin on

10   Coinbase's platform.

11           THE COURT:  Is that because it's effectively currency,

12   it's a replacement for fiat currency or something else?

13           MR. COSTELLO:  I think the way to look at that is,

14   again, to come back to your Honor's question about the

15   ecosystem, there's no ecosystem behind it.  And I think that's

16   the easiest way to look at it.  Because the way we view these

17   13 particular tokens is that you are buying the token and the

18   totality of the inducements.  If nobody is inducing anything,

19   then you can't be buying that in a sense.  And I think you see

20   in instances like Bitcoin, it lacks that centralized function.

21           Now with respect to the others, as I have said, I

22   don't know that we've analyzed all of the tokens on there.  I

23   think we've just looked at these particular 13.  Now, it's

24   possible, even with these 13, I don't know if I'm sensing your

25   Honor's next question or not.

O1HRSEC1

1          THE COURT:  I doubt it.

2          MR. COSTELLO:  But when people purchase these 13

3    tokens, is it possible that some people are buying these

4    particular 13 to -- for utility, to use instead of to invest?

5    That is possible but that's not the way to look at it.

6          THE COURT:  Well, I guess it's possible.  I thought

7    your argument would be -- which is why it wasn't my next

8    question, was that you've alleged that at least someone out

9    there is buying for an appreciation of value, and I have to

10   accept that at this stage.  So the fact that there might be

11   someone who just likes the name or thinks that there's

12   something about the issuer that's cool for them, I get that.  I

13   get that there are people who are not -- I'm imagining that

14   somewhere out there there's someone with more money than brains

15   who is buying just to buy.  But that's not what you are

16   alleging in the complaint and I'm accepting your allegations,

17   which is why I didn't ask that question.  Let me please do

18   this.  I'm going to give you a break.

19          I have many more questions to ask, but I'm going to

20   turn to Mr. Margida for a moment because I want to have sort of

21   an intermission to talk about the staking and the wallet

22   programs.

23          Sir, again, I found very interesting the DeFi

24   education organizations, amicus in this regard.  Are they wrong

25   in their description of what the wallet is?  Are they wrong in

O1HRSEC1

1    their description of what staking is?  Or if you would like me

2    to ask the question differently:  Can I accept their factual

3    statements about how these things operate?

4            MR. MARGIDA:  Your Honor, I can answer it two ways.

5    One, I think they are wrong, but I think the more relevant

6    point is what my colleague, Mr. Costello, referred to earlier,

7    which is I think Coinbase and DeFi education fund get it wrong.

8    But you don't need to consider it at this stage of the

9    litigation, because what you are talking about is Congress

10   defined broker broadly in the Exchange Act.  But we have this

11   judicial test, and both parties have agreed to that, so I'm not

12   going to go over it.  But you are talking about the application

13   of a nine-factor test where the parties have factual disputes

14   about the extent to which Coinbase acts as a broker through its

15   wallet application.

16           So I think what the DeFi Education Fund and Coinbase

17   are doing is minimizing the function and the substance of what

18   wallet is and does by emphasizing that it provides -- that it's

19   run through software, that it provides a technical interface.

20   But at its core, what wallet does, Coinbase, acting as a

21   broker, actively solicits investors for its wallet program.

22   The investors download the app, and the app, even though it

23   only takes a couple seconds, what wallet does is significant.

24           So Coinbase, in its briefing, talks about going to a

25   store and you pull cash out of your wallet.  It's just like

O1HRSEC1

1   that.  That's wrong.  You or I or any retail investor cannot

2   like going into a 7 Eleven to buy a Big Gulp.  You can do that.

3   You don't need a wallet to do that, you can take $20 or $3 and

4   buy a Big Gulp.

5          To access and engage in the securities transactions on

6   wallet, Coinbase is essential.  I don't have a relationship

7   with DEXs out in the crypto universe.  I can't pick up a phone

8   and make my own connection with them.  Coinbase provides that

9   for its investors.

10          The swap feature that Coinbase markets as part of its

11   wallet feature is instructive.  What the swap feature does is

12   I'm a wallet user, I log on to the app, I want to trade one

13   crypto asset for another.  Coinbase through its wallet

14   application will access liquidity in the DEX market.  It has

15   relationships and establishes connections with dozens of DEXs.

16   It will go out and find a DEX that will satisfy the asset I

17   want at the quantity I want to find that liquidity.

18          (Continued on next page)

19

20

21

22

23

24

25

O1HJSEC2

1        MR. MARGIDA:  It will compare prices across the DEXs

2   that satisfy the liquidity request.  It will do all of this in

3   seconds.  And this isn't pleaded, but we define swap in the

4   complaint, your Honor, and at page 27 of our opposition we cite

5   Coinbase's website which defines the swap or the trade as using

6   the protocol within the DEX aggregator and the OX protocol to

7   go out and find to compare prices for that liquid and present,

8   find the best price and present it as a proposal to the user to

9   either accept or not.

10        That is not just a technical interface.  That is

11   providing brokerage functions, soliciting investors, routing

12   orders, providing advice in the form of a proposed swap.  That

13   is essentially it actually goes farther than what Vanguard or

14   E*TRADE would do.  Nobody claims that Vanguard or E*TRADE isn't

15   an online brokerage because they provide automated tools for

16   users to effect and participate in securities transactions.  So

17   I think Coinbase and the DeFi Education Fund, they are wrong in

18   the sense that they're minimizing the function and effect and

19   substance while waving around the fact that it's technology.  I

20   think that's a red herring, your Honor.

21        THE COURT:  And you said, similarly, a red herring in

22   your estimation that Coinbase hasn't taken a fee for the wallet

23   service since April of 2023.  If we were just to think about

24   the wallet function today, does the fact that Coinbase is not

25   today charging anything for it make it any less or implicate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HJSEC2

1    any less the securities laws?

2              MR. MARGIDA:  No, your Honor.  The commission's

3    entitled to bring enforcement actions for historical and

4    ongoing violations.  We've essentially brought them --

5              THE COURT:  I'm sorry.  I'll ask a better question.

6              When they were charging a fee for Wallet, it was

7    easier for you to say that there's somehow some violation

8    because not only are they performing these services that you

9    believe transcend a technical interface, but they're charging

10   something for it.  Right now, today, they're not charging

11   something for it.  Is it still violative or does it still

12   implicate the securities laws?  And if so, what specific part

13   of Wallet implicates the securities laws?

14             MR. MARGIDA:  Okay, your Honor.  Putting aside the

15   transaction-based conversation, it is still a violation.  *GEL*

16   *Direct* and *Hansen* and other cases tell us there are multiple

17   factors, of which transaction-based compensation is one, but

18   not a mandatory or required one.  We have alleged several other

19   factors in our complaint including active solicitation of

20   investors, the routing of orders, and the giving of advice for

21   the reasons that identified in my prior answer, your Honor.

22             THE COURT:  All right.  Thank you.  One moment,

23   please.

24             Let's then turn to staking.  You or one of your

25   colleagues at our last oral argument expressed surprise that

O1HJSEC2

1    Coinbase was moving to dismiss the stakes claim.  Whoever the
2    oralist was, their view was that actually staking was the a
3    strong claim by the commission.  I found staking to be the
4    least traditional-investment-like of the functions that you
5    were complaining about here.  So I'd like to understand what it
6    is about that, what is it that Coinbase does in the staking
7    context that brings them within the ambit of the securities
8    laws?

9            For instance, the validation protocol that is inherent
10   in staking, that's not like normal investing.  I don't think of
11   it as such, and I thought your argument was that it was the
12   aggregation or the pooling of tokens in order to perhaps make a
13   particular group of stakers more interesting to the folks who
14   are using them to validate these transactions, that that's what
15   Coinbase did, but perhaps I'm wrong.  What is it in the staking
16   context that Coinbase is doing that brings them within the
17   ambit of the securities laws?

18           MR. MARGIDA:  Okay.  Your Honor.  I understand what
19   you're saying about validation services.  I think what Coinbase
20   is doing is taking an established technology and building an
21   enterprise on top of it.  I think *Edwards* and *Rubera* are good
22   examples of that where payphones exist and ETS, the promoter in
23   *Edwards*, says, We're going to create an investment program
24   based on that and we're going to use our technical expertise,
25   we're going to install the payphones, maintain them, repair

O1HJSEC2

1    them, collect the coins, and distribute investment returns.

2    That's essentially what's happening here.

3              Investors are giving up their crypto assets to

4    Coinbase's control.  They are pooled, and then Coinbase is

5    using its managerial efforts to manage the enterprise, which is

6    the Coinbase staking program.  They provide all the

7    infrastructure, they retain third parties, they operate the

8    validators to ensure greater odds of success so the investors

9    will actually earn the rewards that Coinbase is marketing.

10             THE COURT:  You just said "they operate the

11   validators."  May I understand what you mean by that?

12             MR. MARGIDA:  They operate the validators at the nodes

13   of the respective blockchain protocols.  Here, again, not

14   unlike with Wallet, your Honor, Coinbase is saying essentially

15   that because its efforts are technical, they cannot therefore

16   be managerial or entrepreneurial, and the case law does not

17   support that.

18             THE COURT:  Well, I mean, you're both fighting over

19   what is ministerial and what managerial.  And one of the

20   reasons I'm asking you what it is Coinbase is doing is to

21   figure out what it is you're upset about.  The second thing is

22   the things that you're describing them as doing, I want to

23   know, do you define all of those as managerial as distinguished

24   from ministerial?  I suspect, as well, this is another case

25   where you're going to tell me that irrespective of all the

O1HJSEC2

1   briefing on the issue and the differing conceptions, that

2   differing conceptions simply means that at this stage of the

3   game I can't dismiss the claim.

4          MR. MARGIDA:  I do want to say that, your Honor, but I

5   won't because I think you just made the point.

6          THE COURT:  This section of our argument is for me to

7   understand what precisely Coinbase is doing that you're upset

8   about.  And particularly as to staking and Wallet, where

9   there's such a divergence between the parties as to what acts

10  Coinbase is doing, what it is you think they're doing.

11         MR. MARGIDA:  Your Honor, that's a fair question.

12         I just want to bring it back to *Howey* compels us to

13  look at the economic reality of whether investors are giving up

14  their capital and pooling that capital with the promoter's

15  efforts.  That's exactly what's being done here.  And

16  Coinbase's arguments — and I understand they disagree with the

17  commission's allegations — they are elevating, impermissibly in

18  our view, form over substance.

19         What Coinbase is offering and what they have marketed

20  is that you can put your assets to work, not to validate

21  transactions or provide some other consumptive use, but to earn

22  returns on your investment.  They give up their funds, Coinbase

23  pools them and uses them through their, yes, managerial

24  efforts, and the case law does not support Coinbase's view.

25         I understand Coinbase now is pulling back on

O1HJSEC2

1     everything it marketed that its staking program would do.

2     Staking on your own is complicated and costly, they said.

3     Coinbase will do all of that for you.  That is --

4              THE COURT:  They're right, right?

5              MR. MARGIDA:  Absolutely.  There are economic barriers

6     that prevent certain people from doing exactly what Coinbase is

7     providing.  Same thing in *Gary Plastic*.  There's an underlying

8     bank issuing a CD and Merrill Lynch creates an investment

9     program where it undertakes efforts to promote the program and

10    create a secondary mark.  And then *Edwards* and *Rubera*, which I

11    mentioned, also provide potentially seemingly ministerial

12    things, but they are managerial efforts in furtherance of the

13    enterprise requiring no efforts from the investor to generate

14    the returns that they marketed.  That is, under *Howey*, an

15    investment contract.  That is the economic reality as we've

16    alleged of what's happening here.

17             THE COURT:  Well, I guess I have two followups to

18    that.  And the first is whether the parties are in agreement as

19    to the specific services that Coinbase is providing.  And then

20    secondly, is whether one can fairly denote those services as

21    ministerial or managerial.

22             I guess, among these issues, there are claims by

23    Coinbase that the investors never actually lose their assets,

24    that they're always retaining custody.  And I think in this

25    regard, to me, it sounded, for example — and I realize this is

O1HJSEC2

1   very low tech, but I have money in a savings account, right?

2   You can use my money in the savings account.  You can do

3   something with it.  I presume the bank is doing something with

4   it, but I get interest on that.  Is staking akin to interest

5   payments on a bank account?

6        And are you telling me it's not because — for example,

7   I'm never going to lose my bank account, and here one could in

8   certain highly unlikely but nonetheless identifiable

9   circumstances lose the asset?  Because, again, there are two

10   things they're saying.  They're saying the asset holder does

11   not give up its ownership of the asset, and they say there's no

12   real risk of loss.  Are you disagreeing with them?  Are you

13   suggesting that there's a disagreement that however it works

14   out I can't decide it at this stage or something else?

15        MR. MARGIDA:  Well, I'm disagreeing with them, your

16   Honor, in that giving up legal ownership is not required.  SEC

17   *v. Edwards* tells us that.  The investors who purchased the

18   payphones that were essential to the enterprise were promised a

19   refund of their capital.

20        Coinbase's citation to its user agreement about

21   investors do not give up legal ownership, it's just irrelevant.

22   And there are risks, and we put this in the brief, your Honor,

23   so I won't go into it too much, but Coinbase is reading into

24   the investment of money prong of *Howey*, requirements that

25   simply do not exist.  If there is a risk that is inherent to

O1HJSEC2

1    the only price like a cyber security incident or theft or loss

2    of private keys or Coinbase fails, that risk matters.  Same

3    thing with slashing, which is a Coinbase specific risk --

4            THE COURT:  Sure, but hang on.  The likelihood of

5    slashing happening is really small, but the fact that it could

6    happen is enough?  Is that your argument?

7            MR. MARGIDA:  Coinbase admits in its answer that it

8    could happen.  It says that it hasn't happened and we provide a

9    limited indemnity.  But the risk exists, and that's enough.

10           THE COURT:  What if they had a full indemnity?  Is

11   that no longer an issue then?  Have you lost that argument?

12           MR. MARGIDA:  No, it's still an issue under *Edwards*

13   because they're guaranteed their money back.  *Gary Plastic* is a

14   good case, your Honor, because it shows the risk.  As the

15   Second Circuit noted, you could have the underlying bank, the

16   issuing bank of the CD go under, but you could also have

17   Merrill Lynch go under and not do what it promised to do as

18   part of the enterprise.  All those risks matter, and so

19   Coinbase's attempt to identify and distinguish between Coinbase

20   risk versus non-Coinbase risk or staking risk versus

21   non-staking risk is irrelevant.

22           THE COURT:  Well, you've answered my next question,

23   which is I believe Coinbase suggests that the risk needs to be

24   a staking-specific risk because they suggest, for example, that

25   certain things could have happen whether you solo stake or

O1HJSEC2

1    stake through their program.  Certain things could happen if

2    you're just a customer of Coinbase and not a member of the

3    staking program.  And there's a suggestion that there ought to

4    be something more, something staking specific.

5            You're telling me that under *Edwards* and cases like

6    *Edwards* there is no act-specific risk of loss that has to take

7    place, in this case, a staking-specific risk of loss that has

8    to be identified; is that correct?

9            MR. MARGIDA:  That's right, your Honor.  And I think

10   *Gary Plastic* respectfully washes away that argument because of

11   the risk I identified.  The underlying bank could go under,

12   Merrill Lynch could go under, and all of that affects whether

13   investor assets are put at risk as part of the enterprise.

14           THE COURT:  Just moving back a moment, sir, to my

15   first question, which I may have the answers to, but I want to

16   make sure I do.  What is the staking conduct that Coinbase

17   does?  I want it in gory detail.  What is it that they're doing

18   that you believe brings them within the ambit of the securities

19   laws in the specific context of staking.

20           MR. MARGIDA:  Okay.  With respect to the efforts that

21   they market and that they undertake to further the enterprise?

22           THE COURT:  Yes.

23           MR. MARGIDA:  Is that what you're asking?  Okay.  So

24   Coinbase sets up the infrastructure with each of the five

25   blockchain staking protocols.  They retain third parties, to

O1HJSEC2

1   actually carry out some of the staking.  Although, as I

2   mentioned earlier, Coinbase operates its own validators as

3   well.  It provides for increased server uptime, which is

4   important, because Coinbase, as we allege, pools investor

5   assets along withing Coinbase's own assets and stakes them as

6   validator nodes, and that increases the odds that Coinbase will

7   be selected to validate transactions and that protocol and

8   thereby increases odds of success of the enterprise.

9           Once Coinbase is selected or a third party is

10  retained, the validation needs to occur in a timely matter.

11  And that's where the slashing risk comes into play.  Coinbase

12  provides maximum server uptime to allow for greater odds of

13  success.  Then, when the returns are paid out and all the while

14  investor assets are staked at the protocol during what's called

15  a bonding period, investor assets are not able to be pulled

16  out — once upon a time, they were as a result of Coinbase's

17  liquidity pools, but apparently they no longer use those — and

18  then returns, Coinbase pays itself, and then it distributes

19  investor returns on a pro rata basis to investors.

20          THE COURT:  How long does the bonding period last?

21          MR. MARGIDA:  I believe it depends on which protocol

22  you're talking about.

23          THE COURT:  Is it a matter of minutes?  Seconds?

24  Days?

25          MR. MARGIDA:  I believe days and ask weeks, your

O1HJSEC2

 1    Honor.

 2              THE COURT:  Days and weeks, thank you.  Okay.

 3              Coinbase has argued that rewards that are set for

 4    stakers are set by the individual blockchain protocols and not

 5    by Coinbase.  Do you disagree with that?  Does it matter to our

 6    analysis?  I sense you're agoing to tell me that even if that's

 7    true, it doesn't detract from all these other things you've

 8    just listed for me, but let me actually have you answer that

 9    question.

10              MR. MARGIDA:  That's right.  And to go back to *Gary*

11    *Plastic*.  The issuing banks, the CDs set the rates.  It's

12    immaterial.  What Coinbase is doing is created on a larger

13    scale an opportunity to profit off of the staking

14    infrastructure.  And for some of the reasons I identified

15    earlier, Coinbase's efforts make it more likely that investors

16    will receive returns because of the maximum server uptime and

17    because more assets are able to be pooled and staked at the

18    validator nodes.  That's what's more relevant in my opinion,

19    your Honor.

20              THE COURT:  Just one moment, please, sir.  I think I'm

21    back to Mr. Costello.  I thank you very much.

22              Mr. Costello, I know you're rested and ready to go

23    forward.  We are back to *Howey*, sir.  And as you know from

24    reading Coinbase's arguments, the argument that they're making

25    is that an economic arrangement can qualify as an investment

O1HJSEC2

1   contract only if it involves an ongoing business enterprise

2   where management owes some sort of obligation, I think an

3   enforceable obligation to investors.  I think, as well, in a

4   later stage of their briefing they suggest that the investment

5   must implicate a claim on the proceeds of the business, rather

6   than on the thing that the business creates.  In the

7   alternative, I believe they say you're going after just asset

8   sales.

9       Now, I appreciate that you're taking a different view

10   ask that's why we have this case.  But just, again, looking at

11   what the limits of your arguments are, are you taking the

12   position that the purchasers through Prime or through the spot

13   exchange of these 12 or 13 tokens would have, if they wanted

14   to, one of the traditional private rights of actions under the

15   securities laws?  For example, if I bought SOL and decided that

16   the — I don't want to cast dispersions on — let's say I bought

17   something that was not one of your 13, but was just rife with

18   fraud, like there's something to that in *Terraform*, I suppose.

19   But if I did that, what's my recourse as a purchaser?  Are you

20   suggesting that by bringing this action you are by extension

21   enshrining the idea that crypto asset purchases, at least of

22   these 12 or 13, can bring 10b-5 actions?  Or I suppose actions

23   under the '33 Act for selling unregistered securities?

24       MR. COSTELLO:  I think what we're contending, your

25   Honor, is that when we're talking about contractual obligations

O1HJSEC2

1    beyond the point of sale, I thought that was Coinbase's

2    original position that they took in their briefing, at least in

3    their initial brief.  And then in their reply brief, they

4    appear to have refined that somewhat.  They appear to be saying

5    it's now the impression of a contractual undertaking, and I'll

6    address that in a moment.

7         But just on this concept of this contractual

8    obligation, what they're essentially looking at, as your Honor

9    observed, is the question of enforcement in a way.  In other

10   words, being able to compel the issuer, for example, of the SOL

11   token to compel the issuer to actually do something.  You know,

12   if the issuer has said, I'm going to expand this network and

13   add a whole bunch of new dApps and features, and if that's not

14   done, then what would the purchaser be able to do about it?

15   And the question is whatever the purchaser can do about it has

16   nothing to do with whether a security is present.

17        And this issue surfaced in *Joiner*, which was a long

18   time ago.  And the Supreme Court in *Joiner* looked at this and

19   said that whether or not a purchaser of the leasehold interest

20   could actually compel the defendant to drill the test well,

21   which was the central feature of what made that an investment

22   contract, that was the inducement.  And the fact that whether

23   or not the purchaser could compel the defendant to drill the

24   test well was what the Supreme Court said a question of state

25   law that we "find unnecessary to determine."

O1HJSEC2

1          Reason being, whether or not it's enforceable has

2     nothing to do with whether a security is present is the point.

3     And I think that's what Coinbase overlooks with this argument,

4     which I'm not sure if that's why they changed the argument in

5     their reply to talk about an impression of a contractual

6     undertaking.  I'm not sure I know exactly what an impression of

7     a contractual undertaking is.

8          THE COURT:  Let me explain, then, my concern.  Let's

9     say I agree with you that certain of these tokens, at least one

10    of these tokens is, in fact, a security such that having these

11    things placed on the exchange or transacted through the Prime

12    service would amount to operating an unregistered exchange.  My

13    concern is does that mean that every crypto asset purchaser of

14    those 12 or 13 securities can, if they decide they don't like

15    what happened, bring some sort of fraud action?  I am being

16    selfish about my thoughts here.  I don't know that I really

17    want to have that NDL.

18          You telling me whether enforceable doesn't mean it's a

19    security.  Okay, fine.  But I actually care about how you're

20    defining security because I want to understand not only how it

21    applies in this case, but what it's going to mean to individual

22    purchasers of these crypto assets going forward.  And so you'll

23    understand that one of my concerns in this section of our

24    questioning concerns what are the limits?  Are there limits?

25    Are there some guardrails in the commission's arguments?

O1HJSEC2

1    Because I am concerned, and several of the amici have suggested

2    I should be concerned that what you're asking for is too broad

3    a definition of what constitutes a security.

4            So I'm back to my original question, which is what

5    does my finding in your favor mean for the purchasers of these

6    12 or 13 tokens?

7            MR. COSTELLO:  Your finding in that sense, your Honor,

8    would mean that the purchaser of the particular 12 or 13 tokens

9    has purchased a security, as in the form of an investment

10   contract.  That would be the conclusion.  And in terms of what

11   that means significantly, well, if it is a security, then it is

12   a security.  Now, there have to be a whole host of other things

13   extraneous to this case that kind of come into play there as to

14   what to do about it.

15           THE COURT:  Of course.  And I'm not suggesting that

16   any or all of the token issuers are engaged any way in

17   fraudulent activity.  But if you find, for example, that these

18   are unregistered securities, I would think that in the first

19   instance, the asset purchasers would have a right of

20   rescission.  Am I mistaken about that?

21           MR. COSTELLO:  They would.  Under Section 12, they can

22   seek rescission, correct, your Honor, yes.

23           THE COURT:  Okay.  All right.  So that's what I'm

24   trying to figure out.  I care about how the law develops in the

25   case before me.  I care, as well, about what it means going

O1HJSEC2

1   forward, which is why I'm asking about limiting principals or

2   exceptions or areas where even you agree your argument goes too

3   far.

4           So you've conceded that finding in your favor

5   potentially opens up the gates to private actions.  It's not

6   merely the commission who can bring actions.  There can be

7   private actions by the holders of the individual tokens if

8   certain circumstances were to happen, or at least if they were

9   to be alleged, yes, sir.?

10          MR. COSTELLO:  Correct.

11          THE COURT:  Okay.  Now, one of the amici, the

12  Blockchain Association, faults you for arguing that any asset

13  purchased with an expectation that its value will go up based

14  on the entrepreneurial or managerial efforts of others is an

15  investment contract.  Is that what you're arguing?

16          MR. COSTELLO:  No, your Honor.

17          THE COURT:  A few moments ago you were saying to me

18  you believed that Coinbase had itself pivoted and changed from

19  contract to something contract adjacent.  Here, that is how

20  your test is being presented to me by someone in this space.

21  What is it that you're actually arguing for?  You're saying

22  there doesn't need to be a contract, but there's got to be

23  something.  So what is the something that there must be?

24          MR. COSTELLO:  And that's a fair question, your Honor.

25  I didn't know if the Court wanted us to address that position.

O1HJSEC2

1    The problem with that characterization from the amicus party is

2    that's lacking a common enterprise.  If you buy an item and you

3    hope that it goes up, that's a lot different than buying into a

4    common enterprise, and that, I think, is what this case is

5    about.

6            In terms of what we would look at here, what

7    qualifies, if you look at the way Judge Castel and Judge Rakoff

8    framed this issue in terms of what is happening in, say, a

9    retail setting, which would be what this is, if there is an

10   instrument present — and you're going to see in some instances

11   that there are because here we had the initial set, and that's

12   why I mentioned earlier about kind of the history of each of

13   these assets, they all tend to follow the same model.  Where

14   you have those original direct placements, you have those

15   original sets of agreements, as you did in *Telegram* and as you

16   did in *Terraform*.

17           And then what happens is when the blockchain launches

18   and the network develops and then it expands, you then have

19   people in the retail sense buying into — and that's why I said

20   before buying into this enterprise.  And so the way Judge

21   Rakoff and Judge Castel looked at it is they said if you take

22   the instrument and you take the full set of expectations and

23   understandings that go with it, that is what constitutes the

24   scheme or the transaction here.  And Judge Castel was keen to

25   note that "scheme" is not anything nefarious or pejorative;

O1HJSEC2

1    it's descriptive because it looks at the totality of the

2    inducements.

3           Now, are we saying that a contract can never exist?

4    No, we're not.  In fact, there are a number of digital token

5    transactions that take place, not just in this case as it did

6    initially, but just as a general matter.  What we're saying is

7    that a contract is not dispositive, that you can have the full

8    set of expectations and understandings that embody the

9    inducements.  Now, in terms of that, I did want to point out,

10   though, on Coinbase's changing standard here, with the

11   impression of a contractual undertaking.  Because I think that

12   Judge Castel got to this in *Telegram* because Judge Castel had

13   said that when the defendants launched this blockchain and then

14   continued to publicly disseminate their plans to continue

15   expanding and supporting it, they had an implied obligation to

16   continue to do that.

17          I think that's what Coinbase might be getting at here.

18   They might be invoking Judge Castel's standard.  And if that's

19   what they're doing, then our complaint satisfies that standard,

20   your Honor, because you have in these instances an impression

21   of that undertaking.  I mean, if you look at an impression,

22   it's something that I will think of when I see, hear, or read

23   something.

24          And you look at purchasers on Coinbase's platform when

25   they see, hear, and read all about these issuers — and they can

O1HJSEC2

1    do that easily because, as we allege in the complaint, Coinbase

2    links to that information correctly, or the purchaser can read

3    about it on their own.  But when they look at all of this

4    information, what do they see, read, and hear at the end of the

5    day?  They see, read, and hear that this is an investment

6    opportunity, an opportunity to acquire a token as an investment

7    into this network.  And so if you add that up, the totality of

8    the inducements in that sense, that is what makes this an

9    investment contract transaction.

10            THE COURT:  Once again, I presume you're going to say

11   based on earlier discussions that in isolating or selecting the

12   12 or 13 tokens that you have, you specifically looked at

13   tokens for which there is this back story, this suggestion of

14   both origination and then development such that any purchaser

15   of such an asset either looking at or having the ability to

16   look at this narrative of growth, development, and hopefully

17   increase in the value of the tokens.  Is that your argument to

18   me on that point?

19            MR. COSTELLO:  Yes, your Honor.

20            THE COURT:  In Coinbase's briefing, they make the

21   point that the assets that they list — and you'll excuse me,

22   this may be in the answer, it may not be in their briefing —

23   but they talk about the approval process that they have, the

24   digital asset support group and how that winnows away certain

25   assets that were then not included on the platform.  But what

O1HJSEC2

they say is that the assets that are listed — and I imagine by

extension, therefore, the 12 or 13 you've identified — involve

no continuing promises from the issuer or developer to the

token holder, impose no post-sale obligations on the issuer or

developer, and involve no profit sharing between the issuer or

developer and the holders.

          First of all, as a factual statement, do you dispute

what they've said?  I guess my question is do you agree and say

it doesn't matter because of what you and I were just talking

about?  Or do you disagree and say it's a factual issue that I

won't be able to consider until the summary judgment motion?

          MR. COSTELLO:  No, your Honor, we've not saying that.

          We agree that sure, our complaint doesn't allege that

there are contracts between the purchasers on this platform and

the developers or the project team, sure.  And we contend that

the purchasers in these tokens are not getting a share of the

ecosystem in the form of a distribution or a dividend, sure.

          But the point is those aren't requirements under

*Howey*.  Those are just added ingredient that Coinbase has

decided to amend the *Howey* test with.  So the reason we don't

plead that is because that's not part of the test.  And as we

talked about with the contract side of it, this question about

contractual obligations and how you want to characterize it and

everything else, that's a question of state law.  That has

nothing to do with whether a security is formed.

O1HJSEC2

1          And on this other thing about acquiring a share of the

2     business, you know, getting a dividend or a distribution of

3     some kind, Justice O'Connor, I thought disposed of this in

4     *Edwards* a couple of years ago where she had said that when

5     *Howey* uses the term "profits," it's not limited to the profits

6     of the scheme in which someone invests.  It can also include an

7     appreciation or a gain.  In other words, it's the return that

8     someone expects in order to participate in something like this.

9          When you have an investment contract, somebody is

10    giving over their money, they're parting with their capital,

11    their cash, to participate in this venture, and they expect a

12    return on that.  They expect at the end of the day that they're

13    going to get more money back.  And they can do that either by a

14    distribution or a dividend or, as Justice O'Connor was getting

15    at, a gain.

16         It's similar to stock in that sense, your Honor, in

17    the sense that a stock can generate a return in the form of

18    dividends, assuming that the corporation decides to pay

19    dividends — the board might vote not to, but most of the time

20    they do.  Or a more popular way to get a return on stock is to

21    sell it at a gain, and that's exactly what's happening with

22    these tokens.  People buy these tokens hoping, as we saw before

23    with the Chiliz issuers talking about demand is going to

24    explode.  So people want to buy these because they look at what

25    the issuers and the project teams are planning, and they think

O1HJSEC2

1   this is a value proposition.

2           So they can buy this token, this computer code, and

3   then they can wait until the value of the ecosystem increases

4   based on this.  They're relying on these inducements.  And then

5   when it does, they can sell it on Coinbase's platform to

6   someone else and realize a gain on it.  That's what *Howey*

7   requires.

8           THE COURT:  But again, looking at either the limits of

9   or the logical extension of your arguments, I am presented with

10  the specter of collectibles being regulated by the securities

11  industry.  And I'm not minimizing.  I've not thought about

12  Beanie Babies in decades, and yet it's been presented to me in

13  multiple briefs, and that's fine.  But lest I be confronted

14  with a class action about Beanie Babies, you were, I think,

15  suggesting to me a moment ago what the limits are.  So I want

16  to understand how your standard that you've just articulated to

17  me does not sweep in collectible markets or commodities, which

18  is my bigger issue.  So I think you were suggesting that it was

19  sort of the collective undertaking, but let me understand that.

20  Because it is a real fear that I have that your argument is

21  just sweeping too broadly.

22          MR. COSTELLO:  Sure, your Honor.

23          And first of all, we are not contending that

24  collectibles are securities.  So I'll just get that out of the

25  way.

O1HJSEC2

1        THE COURT:  To be clear, no one is actually suggesting

2    that you are.  We're all just afraid that you have so little

3    limitation on your standard that some really thoughtful

4    attorney is going to bring the Beanie Baby class action, so

5    that's what I'm saying, recognizing that even now you could

6    foreswear it right here, that doesn't matter.  I care about how

7    I know that your test isn't going to implicate either

8    collectibles or commodities.

9        MR. COSTELLO:  So easiest way to look at this is when

10   you are buying a collectible, let's say a baseball card or a

11   figurine of some kind, you're just buying the item.  You are

12   buying a thing.  You are not buying into something.  And that,

13   I think, is the difference.  There is no enterprise that is

14   involved in this.  You know, if you buy a baseball card, for

15   example, you're not buying into the baseball card player

16   enterprise, right?  And other people are not also buying into

17   an enterprise because that's what the common enterprise

18   requires.  You're just buying an item, and you're hoping that

19   it appreciates.  That is not a securities transaction.  There

20   is a difference.

21       And also, when you're talking about collectibles in

22   particular, collectibles have their own value.  There is no way

23   for somebody to make a basic card more valuable.  It can't be

24   done.  You know, the value of that baseball card is going to

25   depend on customer tastes and passage of time and what have

O1HJSEC2

1    you, but there's no way to make that more valuable in that

2    sense.

3              THE COURT:  I would have thought, for example, in

4    certain collectibles I would've thought that akin to the

5    burning that one has in crypto assets, you can have a limited

6    edition figurine or you could do something to limit the

7    distribution of something and that would increase its value.

8    So --

9              MR. COSTELLO:  Sure, your Honor.

10             There is that possibility, but again, I come back to

11   this concept of this buying into something.  You're not buying

12   into an enterprise.  In order for something to pass the *Howey*

13   test, in order for it to be a security transaction, you have to

14   have all three elements; it's not just one and three.  So it's

15   not just buying something and expecting it to go up.  There has

16   to be this notion of the enterprise.

17             Now, what is the enterprise here?  What is

18   distinguishing these 13 tokens from a collectible?  The fact is

19   the enterprise, and what is the enterprise?  It's the network.

20   It's the ecosystem.  You are buying into that ecosystem with

21   your token.  The token is the key that gets you into this

22   ecosystem.  Without the token, you can't get in.  The token

23   would be worthless without the ecosystem; it depends on it.

24             And so when you have this collectible, you're not

25   buying into the collectible.  You're not buying into the

O1HJSEC2

1    enterprise because there's nothing around it.  Not to mention

2    that there's no commonality there, your Honor, in the sense

3    that under *Howey*, you have to have multiple people doing this

4    together who are all going to rise and fall together.

5           THE COURT:  I'm just wondering if there are

6    collectibles for which there is a group of people who are

7    working together to ensure that there is a value.  You don't

8    want to dilute the brand, as it were.  But I suppose that's

9    beyond our discussions today.

10          Just one moment, please.  Sir.  I think I've talked to

11   you or your colleague about the Securities Law Scholars, so I

12   don't think I'll discuss that with you further.

13          Did I understand your standard of the common

14   enterprise to be one of parting with capital with the

15   expectation of profit?  Or is that just part of the analysis?

16          MR. COSTELLO:  Well, that would be the first prong of

17   *Howey* and the third prong.  The second prong is the common

18   enterprise.

19          THE COURT:  Okay.  And I have to have all of them

20   together?

21          MR. COSTELLO:  Correct.

22          THE COURT:  When you're discussing the *Wals* case and

23   the *Lauer* case, you suggest that because of the marketing of

24   assets to unsophisticated investors, a Court might find on

25   those facts that an investment contract exists without

O1HJSEC2

1    requiring ongoing obligations.  I guess I have a slightly

2    broader question than that, which is to what extent today are

3    you asking me to make a determination about the sophistication

4    or not about crypto asset purchasers, and does it enter the

5    calculus at all for me?

6            Let's step back a moment.  To the extent you want to

7    tell me SEC charged with protecting investors, really

8    important, I get that.  But what I'm really saying is is my

9    analysis of whether these assets are securities or not impacted

10   by the sophistication or not of the investors, and could I even

11   make a determination if it were?

12           MR. COSTELLO:  I don't know that sophistication really

13   is the issue, your Honor.  The issue is, sure, I mean, that's

14   what our mission is is to protect investors through disclosure.

15   But in terms of whether or not a securities transaction is

16   present, it doesn't matter the level of sophistication of these

17   people who are buying these tokens, because the *Howey* test is

18   going to be the same no matter what.  In other words, I think

19   what I mentioned before where we part issue, respectfully, with

20   Judge Torres' view in *Ripple*, there's no need to create two

21   different categories of people at the end of the day.  Because

22   whether you're sophisticated or no not, you're still buying the

23   same token.

24           THE COURT:  Sir, turning to the issue of the

25   reasonable expectation of profits, this is going to be a little

O1HJSEC2

1    bit repetitive, but it's more to confirm for myself the

2    questions I had earlier have been asked.  When you're speaking

3    about the reasonable expectation of profits from a third

4    party's efforts, the third party here are the issuers and

5    developers of the crypto asset and not Coinbase?

6              MR. COSTELLO:  Correct, your Honor.

7              THE COURT:  Okay.  I'm now going back.  When we had

8    our first conference, someone at the front table emphasized in

9    a happy way the fact that this was just a consequence of the

10   strict liability of the '33 Act in certain respects, which may

11   be correct, but also may be a little troubling for me.  And I

12   was trying to figure out what it was that brought Coinbase into

13   your crosshairs.  And I suppose the real issue is that what it

14   did was it placed on its platform tokens where the issuers of

15   the token were developing an ecosystem and had big plans for

16   advancing the value of the token.

17             So you're not suggesting that Coinbase acted with any

18   bad intent or did themselves anything to enhance the values of

19   the tokens, unless you are.  I thought your point is by making

20   them available for trading on a spot exchange through Prime,

21   somebody at your table would argue through Wallet, that that's

22   all they had to do.  It's nice that they sought investors, it's

23   nice that they touted or at least provided information about

24   these securities, but simply having them on their platform is

25   enough from your perspective, yes?

O1HJSEC2

1        MR. COSTELLO:  Yes, it is.

2        THE COURT:  Okay.  Because see, the thing about

3  *Terraform* and the thing about *Ripple*.  I mean *Terraform*, Judge

4  Rakoff is, of course, brilliant, but the decision is *Terraform*

5  was not a shock to me when you look at the way he describes

6  what was going on in that case.  The difference here is we're

7  not talking about the issuer of the crypto asset.  We're

8  talking about an entity that put it on their platform.  That to

9  me is a level removed from *Terraform*.  It's a level removed

10 from Judge Castel's case.  It's a level removed from Judge

11 Barbadoro's case.

12       And that's the concern I have about how these entities

13 should have known — and you or your colleague saying "strict

14 liability" doesn't make me feel better about it — how folks

15 should know that they weren't implicating the securities laws.

16 So I'm just confirming at a minimum, the conduct was placing on

17 the platform stuff that you now tell me amounts to a security.

18       MR. COSTELLO:  Yes.  The short answer is yes, your

19 Honor.  We're not alleging fraud or anything like that.  This

20 is just a strict liability in that sense.

21       But I do want to back up because there's another part

22 to your Honor's question that concerns about, well, you know,

23 all of a sudden here's the SEC and applying *Howey* and now

24 contends there were securities transactions.  That's not quite

25 the whole story.

O1HJSEC2

1          The SEC has been clear for a very long time that *Howey*

2     is what determines whether something is trading as an

3     investment contract.  And we had been clear about that, that it

4     doesn't matter in what context it trades, whether it trades in

5     an issuer transaction or secondarily.  If you go back to 2017

6     when we first released the DAO Report, we were very clear in

7     that report we were cautioning secondary trading platforms that

8     if they are intermediating securities transactions, then they

9     have to register.

10          And that carries through into 2019 where the SEC staff

11     released additional guidance.  This is the information that we

12     allege in our complaint and that Coinbase admits being familiar

13     with in its answer.  So we've been clear about that.  And not

14     only that, your Honor, but Coinbase itself, at least according

15     to our complaint at least purported to do a *Howey* type analysis

16     on its own when it came to the listing process for these crypto

17     tokens.  And they had a rather — what at least purported to

18     be — somewhat comprehensive application.

19          So when an issuer wants to list on there, the

20     application requires the issuer to provide information about

21     its founders, its project team, its allocation of tokens to the

22     founders and the project team, its plans, its promotions, its

23     accounts, its plans to encourage scarcity to burn the tokens.

24     In other words, their listing application that they, I guess,

25     reviewed, after they were done looking at it, is exactly the

O1HJSEC2

1    type of information that appears in our complaint.

2              And we have looked at the very same information that

3    they claim, I guess, to have looked at.  We reached one

4    conclusion, and they appear to have reached another conclusion,

5    which I suppose is a long way of saying that, given that you

6    can have two parties applying the very same standards looking

7    at the very same facts and coming to the same very different

8    conclusions, I think is all the more reason why this motion

9    should be denied just for that reason alone.  But for there to

10   be an argument that neither Coinbase nor the market was on

11   notice of any of this, that's just not true.

12             THE COURT:  I do want to turn to the major questions

13   doctrine in a moment, and then we'll have a break.  And then

14   we'll have probably just as much questioning for the folks at

15   the back table.  They can rest up for it.  But I would like you

16   to comment on one thing, and I know you have in different ways,

17   but, again, it's just going to give me the clarity that I need

18   for this decision.  In one of the amicus briefs, the one that

19   O'Melveny did — I think that's Andreessen Horowitz — there's an

20   argument that your standard converts the requirement of

21   reasonable profit expectations from the efforts of others into

22   a free-floating expectation of profits, even if the expectation

23   is not enforceable, not reasonably believed to be enforceable,

24   or not tied to the actions of the developer, promoter itself.

25             Do you agree with each of those?

O1HJSEC2

1              MR. COSTELLO:  No, your Honor.

2              I think that what that party is doing is just

3      restating Coinbase's arguments, but in a different way.  I

4      think, as we talked about before --

5              THE COURT:  The impression argument?

6              MR. COSTELLO:  It's the impression argument, but it's

7      the larger point on contracts.  I think what you see in some of

8      these briefs is that this requirement of a contract is not how

9      an investment contract is formed under the law.  *Howey* is how

10     it's formed.  And whether or not it's enforceable is not a

11     securities law question; that is a stake question of some kind.

12             And on this question of turning this free-floating

13     thing into issuers and everything else, well, that's where the

14     inducements come from in this case.  They come from the issuers

15     of these tokens.  They come from their project teams.  And as

16     we saw looking at one of the examples earlier, I think it's

17     pretty clear what impression these issuers are trying to give.

18     And if you look at how the allocation of tokens played out

19     initially, these issuers and project teams allocated the tokens

20     to themselves.  I mean, it really doesn't take a leap to figure

21     out why that could be.

22             So when you look at the impression, to use Coinbase's

23     term, that these issuers are giving, the impression is this is

24     a value proposition.  This is an investment opportunity.  So we

25     take issue, I think, with some of the characterizations in the

O1HJSEC2

briefs.

THE COURT:  Mr. Tenreiro, thank you very much for your patience, sir.  Before I became a judge, I was quizzed by Senator Schumer, and one of the things he was getting at, although I'm not sure I'm supposed to disclose this here, is that he wanted to be sure that I was not going to be an activist judge, however he defined that.  And I'm not going to name the names of the judges in this and other districts that he's identifying as activist judges.  I'll leave that for you all to ruminate on.

But the larger point for me is that I recognize that I have a lane that I should be staying in.  And there's a lane that you all are in, and there's a lane that Congress is in. And I actually have received a brief from a sitting United States senator involved in this space who says to me, "Don't do this, Failla."  I have to give that some deference, don't I?  I mean, why is she wrong?

MS. TENREIRO:  Thank you, your Honor.

I think that the reason we have to be careful there, because I think that the *Howey* test was specifically enacted with the Congressional intent in mind — that's what the Supreme Court said when they said, well, contract and define investment contract, what were they thinking?  And so I think she's wrong, respectfully, to Senator Lummis, because one senator's view cannot override that Congress' will from 1934.  So when I

O1HJSEC2

| 1 | became a law student, I read Justice Scalia's book, and he

| 2 | didn't like legislative history because he said it's become a

| 3 | game.  And the senator put something in the legislative history

| 4 | and says, "Oh, this is what this means," because he knows that,

| 5 | respectfully, Judge Failla is going to look at it.

| 6 |             THE COURT:  He wasn't wrong.

| 7 |             MS. TENREIRO:  That's right.

| 8 |             The major questions doctrine is there to make sure

| 9 | everyone stays in their lane.  And by perming one senator to

| 10 | say something, say, "I disagree with the SEC," I think that

| 11 | would create really more than just separation of powers

| 12 | concerns but really structural concerns.

| 13 |             THE COURT:  But she's not just random senator.  She's

| 14 | someone who is deeply involved in the space and is herself a

| 15 | cosponsor of legislation to implement the regulations or to

| 16 | implement a structure that she says is not found in the *Howey*

| 17 | test, and it doesn't cover this specific group or type of

| 18 | assets.  Why is she wrong?

| 19 |             MS. TENREIRO:  And respectfully, your Honor, I

| 20 | certainly --

| 21 |             THE COURT:  By the way, you guys can stop saying

| 22 | "respectfully."  I always wonder what that means.  I actually

| 23 | interpret that as an insult.  I'll accept that you'll all be

| 24 | respectful of whoever you're maligning in your answer.

| 25 |             MS. TENREIRO:  The press might not, your Honor.

O1HJSEC2

1          So take a step back.  Certainly one of the factors
2     that the Supreme Court has looked at in major questions
3     doctrine is Congressional action or what Congress has
4     considered.  There's one case in which Chief Justice Roberts
5     quotes Speaker Pelosi.  I'm certainly not saying that the Court
6     completely ignores what Senator Lummis or others are saying.
7     I'm simply saying that it cannot be that a senator or even a
8     group of them have the authority to sort of overrule or repeal
9     what a Congress duly enacted, presented to the president for
10    signature in 1934.  That could create all sorts of issues with
11    all sorts of laws where --

12          THE COURT:  Sure.  But they're not saying they're
13    overruling or repealing it.  They're saying we've had a great
14    run.  We've had 90 years for which these securities laws have
15    been able to cover all manner of instruments, and now we've got
16    something different.  And these are instruments that I'm not
17    saying they were designed to evade the securities laws, but
18    they're just differently qualitatively than other instruments.
19    And so the argument is we're not sure whether they're
20    securities, we're not sure whether they're commodities, we're
21    not sure who should have custody of them.  But I don't know
22    that this is necessarily a repeal as much as it is a filling of
23    the void as to a particular category of instruments.

24          MS. TENREIRO:  Well, we simply don't agree.  And that
25    sort of does, I think, expose a little bit of a circularity of

O1HJSEC2

1    Coinbase invoking the major questions doctrine here.  In any

2    event, if it's not a filling of the void because the *Howey* test

3    gives you the answer in either direction — and we think it's

4    the direction that Mr. Costello explained — then you're not

5    filling the void.  You're simply applying the *Howey* test, which

6    again was constructed specifically with the Congressional

7    intent in mind.

8            That's what's so interesting about trying to apply

9    major questions to the *Howey* test.  The Court said congress

10   wanted it to be flexible, and there's a line in, I think,

11   *Joiner* where the Court said Congress specifically crafted these

12   statutes to capture the countless ways in which people might

13   think to raise funds for their projects.  I'm now giving a more

14   abbreviated version of the *Howey* test than Mr. Costello did,

15   but the point is that's what Congress wanted to do.

16           And so applying the *Howey* test to new types of

17   investment schemes, investment products, is in fact nothing

18   new, to be a little circular.  The Courts have been applying

19   the -- the case where there were cattle embryos.  I don't know

20   if payphones existed in 1933, but let's assume they did.  There

21   are Court of Appeals cases about what were called AdPacks on

22   the internet in the Tenth Circuit, and there's the SG Limited

23   case in the first circuit.

24           So courts have been applying the *Howey* test, the

25   flexible *Howey* test to these investment schemes for decades.

O1HJSEC2

1    And that has, by the way, not resulted in people bringing the

2    Beanie Babies lawsuit.  But more importantly, courts have been

3    doing that because they thought that in doing so they were

4    effecting the congressional purpose.  And so that's it.

5            THE COURT:  That was abrupt.

6            There's a dispute, I would say, between Coinbase and

7    some of the amici about the significance of the crypto asset

8    industry when compared with something like the energy industry

9    or student loan debt forgiveness.  I don't know that the

10   commission really spoke to that, and if you want to speak to

11   that, please do so now.

12           MS. TENREIRO:  Yes, your Honor.

13           So it's important to contextualize the size.  So

14   there's a number of major questions cases, right?  Some of them

15   have used --

16           THE COURT:  I didn't think there were that many, but

17   go ahead.

18           MS. TENREIRO:  Somewhere between five and eight,

19   depending on how you count them.

20           THE COURT:  Hardly "a number," but yes, go ahead.

21           MS. TENREIRO:  And so in the cases where the Court

22   looks at the size or the economic significance, there's a

23   number of ways in which the Court does it.  One is the cost of

24   compliance, and I think that's the landlords' case, the *Alabama*

25   *Realtors* case.  They look at the cost of compliance.  In other

O1HJSEC2

1    cases they look at the expansion of the agency's scope.  In the

2    *Utility Air* case, they say in one category you had 800 permits

3    and now you're going to have 2,000, and you're going to

4    increase the cost of compliance from 62 million to 21 billion.

5         In other cases, the Supreme Court looks at sort of the

6    totality of the American economy, and they'll say — in the

7    evictions case, they'll say 80 percent of the country might be

8    affected.  And in the student loan case they say 98 percent of

9    borrowers might be affected, and we're talking about

10   500 billion in student loan debt versus 1.3 trillion in

11   spending.

12        So I'm giving that as context to my answer, which is

13   no matter which of these sort of versions of the economic

14   significance factor one applies, with all due respect to the

15   crypto industry, it does not meet that version.  So there's a

16   number of ways to look at it.

17        So first of all, they're playing a little fast and

18   loose with the number because they say, well, it's 1 trillion,

19   but that's really a global number.  And I haven't seen that in

20   these five or eight cases, right, we're looking at the American

21   economy.  They're saying that 1 trillion includes Bitcoin,

22   which is not at issue here and is a significant portion of

23   these markets.  So already there they're giving the wrong

24   number, in our estimation.

25        And then they're not comparing it to the right number.

O1HJSEC2

1    The commission regulates the 100-plus-trillion capital markets

2    in the United States.  The size of the global capital markets

3    is north of $400 trillion.  And so when one looks at that,

4    again, I'm going to say it with due respect to the crypto

5    industry, they're a rounding error in that sense, right?

6    1 trillion is a rounding error when it comes to the global size

7    of the global capital markets.

8              And so for this quote/unquote "new asset class" to be

9    somehow swept in — and of course that's not what we're doing

10   here, right?  But even accepting that premise would not

11   constitute a significant expansion of the commission's

12   jurisdiction over the capital markets.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O1HJSEC2

1   So that's the context in which I think we these to look at the

2   one trillion number that they offer.

3           THE COURT:  Thank you very much.  Just one moment

4   while I see if I have additional questions for you.  Sir, bound

5   up in the major questions doctrine or sort of adjacent to the

6   major questions doctrine is this idea of SEC is violating

7   Coinbase's due process rights.  Are you the person to speak to

8   that issue, other than to just say, no, we're not?  Or is there

9   someone else at your table who wants to just briefly address

10  that issue?

11          MR. TENREIRO:  Your Honor, I think Mr. Costello

12  addressed it already in some ways, but I'll try to repeat.  We

13  are not -- so if it's a fair notice argument, that's the due

14  process argument, I think, and we are not violating Coinbase's

15  due process rights or violating fair notice principles.  The

16  courts have been clear that if we apply *Howey*, that's the

17  notice you need.  Judge Dearie in Brooklyn said it in 2018 that

18  if anything were needed to issue the DAO report, that sort of

19  made clear the commission's position.  And what fair notice and

20  due process require is that the party know, the regulated

21  party, particularly in the context of civil regulation, that

22  the party know the test that is going to be applied, not the

23  outcome.

24          THE COURT:  Okay.  Thank you very much.  Let me do

25  this because I tend not to look at time until my deputy tells

O1HJSEC2

1    me to look at the time.  We've been two hours at this, and it's

2    been very productive.  I imagine we'll have the same with the

3    back table, at least, the 90 minutes to the two-hour mark.

4    I'll take a break of 15 minutes.  If folks had plans to break

5    for lunch, and I mean really the folks at the front two tables.

6    I'm sorry.  I don't care about the rest of you in the gallery,

7    but if folks have plans, I didn't think you did, tell me and

8    I'll see what I can do.  But my plan was to go and finish

9    questions for the folks at the back table, and then allow each

10   side very brief summation in the sense of anything they wanted

11   to tell me but I didn't ask a question about.  That's my plan.

12   If you guys had different thoughts, talk to each other and talk

13   to me in about 15 minutes.

14          I'll see you then.  Thank you very much.

15          (Recess)

16          THE COURT:  Thank you very much.  Please be seated.

17   And thanks to those of you who remained who are foregoing your

18   lunch for this event.  Much appreciated.

19          All right.  Mr. Savitt, I believe I'm talking to you,

20   sir.  Can I begin, please, with some of the preliminary

21   questions that I had for the commission?  I believe you have a

22   different view, sir, as to the degree to which I can take

23   judicial notice of your factual statements and of the factual

24   statements in the amicus briefs.  But may I hear from you on

25   that, please?

O1HJSEC2

1           MR. SAVITT:  Yes, your Honor.  Thank you.  We agree

2     with the commission that the materials both before the Court

3     and the posture of this motion are substantially similar to

4     what they would be in the context of the Rule 12(b)(6) motion.

5     Of course, the well-pleaded allegations in the complaint are

6     before the Court as are all matters properly before the Court

7     of judicial notice and all documents incorporated by reference

8     in the complaint.  To the extinct there are public statements

9     of the SEC, officers of the SEC, those we believe are properly

10    before the Court as a matter of judicial notice.

11          To the extent the litigation involves legislative

12    proposals that are a matter of public record, they, too, we

13    believe are before the Court as a matter of judicial notice.

14    We think public filings are before the Court as a matter of

15    judicial notice.  We think the S1 filing of Coinbase is before

16    the Court.

17          THE COURT:  Two things, sir, please excuse me.  First

18    of all, for reasons known only in my courtroom, your microphone

19    is not as strong as others.  Can you bring it a little bit

20    closer to you because I want to make sure we hear you.  Trust

21    me, it's not you.  It's the microphone.  So I can take better

22    notes, if I could ask you to speak a little bit slower.  Go

23    ahead.

24          MR. SAVITT:  Of course, your Honor.  Apologies.

25          We think SEC filings are a matter of public record and

O1HJSEC2

1    properly before the Court accordingly as a matter of judicial

2    notice that includes Coinbase's S1 filing.  The Court has seen

3    the discussion of Chair Gensler's remarks.  We think they are

4    properly before the Court.  There are a number of documents

5    incorporated by reference into the complaint including

6    Coinbase's user agreement.  Those are properly before the

7    Court.  To the extent the complaint makes reference to what

8    appears on Coinbase's website in connection with its

9    allegations, those are properly before the Court.

10          So we agree that this is a pleadings motion, and it's

11   governed by all of the rules that govern what's before the

12   Court in the pleadings motion.  But there is a quantum of

13   matters that the Court, we think, can take properly take notice

14   of cognizance of as a matter of judicial notice or the

15   incorporation principle.

16          THE COURT:  And so from your perspective, sir,

17   everything in the first 33 pages fits into one of the

18   categories that you've just articulated for me, and I can

19   therefore articulate all the factual statements that are

20   contained in the first 33 pages -- I believe it's 33 pages --

21   of your answer?

22          MR. SAVITT:  I do not agree with that, your Honor.

23          THE COURT:  Oh, okay.

24          MR. SAVITT:  What I can't do is catalog for you what's

25   in and what's out off the top of my head.

O1HJSEC2

1      THE COURT:  Okay.  You are saying you are admitting

2   the possibility that there are some things in the answer that

3   are interesting but I can't consider.

4      MR. SAVITT:  We agree with that.  Properly before the

5   Court are the plaintiff's pleadings, the well-pleaded

6   allegations of the complaint, matters of judicial notice,

7   matters that are incorporated by reference.  You had a colloquy

8   with my friends at the front table about whether certain

9   matters that were in briefs by law scholars and the like were

10  properly before the Court.  That's an interesting question, and

11  I think the answer to that would be yes because they do not

12  seem to be to us matters of factual dispute.  Even in the

13  motion to dismiss, the Court is permitted and I think expected

14  to take account of what is happening in the world, and the

15  contents of scholarship and facts that are not truly matters

16  that are disputed in the litigation.  The background of an

17  industry, for example, I think that's common, appropriate and a

18  matter of judicial notice.  So we wouldn't exclude those

19  matters, but we wouldn't say that every factual allegation in

20  our answer is before the Court.

21      THE COURT:  Much appreciated.  With respect, for

22  example, to the scholars, we have two sets of scholars.

23  There's sort of the state law, blue sky law scholars and then

24  the admin law scholars.  I suppose the answer is that I could

25  look at those same cases myself and come to the same

O1HJSEC2

1   conclusions.  So rather than think of it as giving me facts

2   that I must accept or reject, they are pointing me in the way

3   of cases that say or don't say what they are represented to

4   say.  But I appreciate your thoughts on that.

5          Again, sir, some of these questions were specific to

6   the commission because they are the ones bringing the

7   complaint.  But I would like to understand from your

8   perspective whether to focus -- I should be focused solely on

9   the secondary market here.  There was some discussion with the

10  SEC about AssetHub and what it does or does not do.  But I'm

11  assuming that, particularly given the nature of the arguments

12  you are making me to me under the *Howey* test, that my focus is

13  on the secondary market; is that your understanding as well?

14          MR. SAVITT:  It is, your Honor.  We think we

15  understand the allegations of the complaint insofar as the

16  investment contract issue, the *Howey* test issue is concerned,

17  to relate to the trading of twelve tokens on Coinbase's

18  secondary market, either the prime platform or the spot market,

19  which are all blind bid ask transactions.  And we believe that

20  those are the only transactions that are properly before the

21  Court.

22          There is, as the Court noted, a passing reference in

23  paragraph 65 of the complaint to AssetHub.  That's the only

24  fact in this lengthy complaint that even references primary

25  sales.  That allegation references Coinbase's website.  We

O1HJSEC2

1  think that is properly before the Court, and if you click

2  through to the website, you will see there that that is not a

3  source through which issuers can sell tokens.  It supplies no

4  basis for the Court to consider or for the plaintiff to put

5  before the Court the issue of primary trading.  There isn't

6  anything here that relates to primary trading at all.  This

7  case is about secondary trades on the spot market and the prime

8  market between strangers.

9          THE COURT:  Let me ask you this.  I thought I

10  understood Coinbase's submissions to say to me that the assets,

11  these tokens, are not securities in the first instance.  And

12  therefore, by extension, secondary transactions in things that

13  are not securities are not themselves transactions involving

14  securities.  Was that, in fact, the argument that Coinbase was

15  making, or is Coinbase arguing that these assets may in some

16  circumstances be securities but that the particular

17  transactions that one can have on the spot market, on prime,

18  through wallet, through staking, that those are simply outside

19  of the purview of the securities laws?

20          MR. SAVITT:  Your Honor, let me try to answer the

21  question this way.  We are skeptical that crypto tokens, that's

22  these digital assets can themselves be securities in any

23  scenario.  And while I listened with care to your conversation

24  with the commission earlier today, I believe that's where they

25  ended up, too, that the tokens themselves are not securities.

O1HJSEC2

1    And I think that is common ground, and I think that would be

2    our position.

3            That's a different matter, though, your Honor, and I

4    wouldn't want to be heard to overstate our position as to

5    whether transactions in these tokens can be on the primary or

6    secondary market in some set of circumstances investment

7    contracts and therefore securities.  We do contend with force

8    that the tokens that trade on Coinbase's secondary market that

9    are before the Court in the complaint are not as a matter of

10   law investment contracts and therefore not securities.

11           THE COURT:  I really appreciate the clarification that

12   you were just giving me, because I thought it would have been

13   easier to say they are not securities, they can never be

14   securities, and therefore, any transaction involving them could

15   not be a security.  I understand you now to be saying that

16   there is a possibility.  Well, that the assets themselves are

17   not -- are not -- in and of themselves securities, that there

18   are perhaps theoretical possibilities where transactions

19   involving those assets securities could be investment

20   contracts, but that the particular transactions at issue in

21   this case as described by the commission do not implicate the

22   securities laws.  That's your argument?

23           MR. SAVITT:  That's our position, your Honor.

24           THE COURT:  I appreciate understanding that better

25   that I did when this began, so thank you for that.

O1HJSEC2

1          If the assets, these crypto assets, are not themselves

2    securities; they're tokens.  Why does one buy them?  And

3    according to the commission one of the reasons that one buys

4    them is that they might appreciate in value.  There are other

5    reasons to be sure, but one of the allegations in the complaint

6    is that they are being bought with the theory that there's some

7    value to them or perhaps some value in transactions involving

8    them such that they would appreciate in value.  But why does

9    one buy a token?

10          MR. SAVITT:  I am not sure that I want to give the

11   devil its due, but I want to give the commission its due.

12          THE COURT:  Okay.

13          MR. SAVITT:  We do not contend that there are

14   inadequate allegations in this complaint to establish that some

15   tokens are traded on the Coinbase platform in the hope that

16   they'll appreciate.  We're not saying that that's true, but for

17   a matter of pleadings, we understand that to be part of what

18   the front table is alleging.  And no part of our defense on

19   this motion goes to that point.  I appreciate that that was a

20   slightly indirect answer to your Honor's question.

21          THE COURT:  Yes, I did notice that, too, but --

22          MR. SAVITT:  I say it because I did want to make that

23   point clear.  We want to join issue with the SEC on the actual

24   controversy here, and that's not what it is.

25          As to why people buy tokens, I should say at the risk

O1HJSEC2

1   of being crosswise with my client, I don't know.  I've never

2   bought one.  I think there are multiple reasons people buy

3   tokens.  I think they can be purchased for investment.  They

4   can be purchased for utility.  They can be purchased to swap

5   and trade.  I think there are any number of reasons.  But

6   insofar as matters here, we will accept for purposes of the

7   pleadings that some trades will happen in Coinbase in these

8   twelve tokens on the secondary market in which one of the

9   objectives is investment gain.

10          THE COURT:  All right.  So you just said a moment ago,

11  you actually want to join with the commission on actual

12  arguments and not some of these more esoteric and theoretical

13  matters.  So what are the arguments in which you join?  Your

14  arguments are that these transactions alleged in the complaint

15  are not themselves investment contracts; not that there

16  couldn't be but that these aren't.

17          MR. SAVITT:  That is our argument, your Honor.  And as

18  I said a moment ago, we don't take the view that token

19  transactions on primary or even potentially on secondary

20  markets can never be an investment contract.  I think we could

21  have a conversation in which we could imagine transactions that

22  could would look like investment contracts, but it requires

23  allegations of fact that are missing in this complaint.  And to

24  be clear, what I -- we want to give the full perimeter to the

25  commission's position on its pleadings.

O1HJSEC2

1          We know that the Court will give every inference that

2     is reasonably drawn in their favor, so we want to give those

3     inferences.  Because we think even with that perimeter, we have

4     arguments that should prevail, which is the point that I was

5     trying to make about not wanting to draw caricature of the

6     position on the other side but to give it its full berth.

7          THE COURT:  Appreciated, thank you.  According to the

8     commission then, as I look at these transactions in the

9     secondary market through services offered by Coinbase, I don't

10    just look at the purchase of the asset.  I look at what the

11    purchaser is getting.  And according to the commission, the

12    purchaser either is aware of could be aware that one of the

13    reasons that buying this token buys into the ecosystem, the

14    goals of the issuer, whether they be to build a better

15    blockchain or to develop apps for that blockchain or otherwise

16    promote whatever the blockchain is.

17         And so what they're suggesting is that by dint of

18    their being statements from promoters and developers and

19    issuers, and by dint of those statements being included on

20    Coinbase's platforms, that I can understand, at least 12(b)(6)

21    purposes, that a reason that customers are buying these tokens

22    is in order to advance the goals of the issuers to join that

23    common enterprise.  Could you tell me, please, why they're

24    wrong?

25         MR. SAVITT:  Well, I should say, I don't think all of

O1HJSEC2

1    that is wrong.

2              THE COURT:  Okay.

3              MR. SAVITT:  And here again, this is in the spirit of

4    trying to flush out the position of the other side.

5              THE COURT:  Yes.  I like to hear what you agree with

6    and what you disagree with.  Thank you.

7              MR. SAVITT:  We think so much is true, for purposes of

8    the pleadings only, it's alleged that there are circumstances

9    on the secondary platform in which buyers buy tokens with

10   knowledge of the statements of intent of promoters with respect

11   to the things they may hope to do on their blockchain or

12   otherwise with the token that they've issued.  And that those

13   statements may well be in the understanding or consciousness of

14   a buyer when he, she or it purchases the tokens.

15             Whether that constitutes buying into an ecosystem is

16   something that I don't know that we believe is adequately

17   pleaded.  I'm not quite sure what the phrase "buying into"

18   means, and we're at a point where distinctions like that might

19   matter.  But we would acknowledge this.  You have the purchase

20   of an asset, and what it's accompanied by are statements of

21   promotion, statements of intent by a promoter, which a buyer

22   might believe if they were followed through on, which they may

23   or may not be, could create a rise in the value of the

24   investment.

25             To that extent, we do agree with the SEC.  We depart,

O1HJSEC2

1    of course, your Honor, on the question whether that is enough

2    in any reasonable conception of an investment contract, whether

3    looking at it as a matter of statutory construction given the

4    words of the statute itself and the sections of the statute in

5    which it appears or within the contemplation of the contract,

6    that could constitute an investment contract.  We think the

7    answer there is no, there isn't enough.

8          THE COURT:  All right.  So I believe the commission is

9    suggesting, and I'm going to very much minimize and dumb down

10   their position, but they are suggesting, as you were just

11   saying to me, that the purchase of an asset with knowledge of

12   the statements of intent could lead one to believe that the

13   person is purchasing the asset as some sort of espousal of or

14   hope to continue whatever the statements of intent are.  If

15   your token is going to change the world in some great way, I,

16   by buying your token, may say, I agree and I think you should

17   change the word in that way and I hope that you do and that of

18   that leads to an appreciation in the value.

19          For you, sir, for your team, that is not enough.  I'm

20   saying what's missing, and you are going to say some

21   contractual, some ability to enforce.  But I want to understand

22   what does that mean?  I'm asking you to describe it at its most

23   basic level so that I understand it.

24          MR. SAVITT:  Completely fair, your Honor, and

25   understood.  There were incidents -- before getting to that,

O1HJSEC2

1    with apologies, your Honor said that the SEC's position

2    involved buying a product to advance the interests or the ideas

3    of the promoter and I hear that.

4            THE COURT:  Let me be more specific because I don't

5    think I was complete.  Because I think in so doing they are

6    doing a couple of things.  They are, number one, joining the

7    common enterprise of that issuer, of that developer; and number

8    two, they are doing so with the hope that there will be some

9    gain in the form of token appreciation as a result of that

10   purchase.  So for some reason I'm thinking about those folks

11   who pick the NCAA teams based on the color of the uniform or

12   something like that with no -- and I'm not saying I was those

13   people, but I'm not not saying that I was those people.  But

14   I'm saying so you could pick a token because you think it

15   sounds really cool or because your friend has that token and

16   you want to be just like your friend.  But I think what the

17   commission is arguing is there are purchasers through Coinbase

18   who are looking at a token, looking at the developers, looking

19   at what the issuer hopes to do, and aligning themselves with

20   that and thereby, they say, joining that enterprise.

21           I think or I thought that your position was that

22   there's an absence on the part of the purchaser some way of

23   enforcing that or getting something from that.  And then that

24   is the problem, but I'll let you speak.

25           MR. SAVITT:  Your Honor, that's exactly what it is.

O1HJSEC2

1    We say that -- our friends at the front table picked on us a

2    little bit on this, but we deserve it.  It's the right question

3    to push on by the commission and the Court.  What we say, and

4    we think this is truly faithful to the statute, truly faithful

5    to the securities laws and their purpose and truly faithful to

6    the cases is that what's required, at least at the minimum, is

7    the holding out of an offer that includes a statement meant to

8    convey to the offeree some sort of enforceable right.  At a

9    minimum, that much is required as a securities law matter.

10          THE COURT:  And so just to play dumb here, what does

11    that mean?  I mean, I guess you heard me ask Mr. Costello

12    whether the logical extension of his argument was that

13    purchasers of those tokens suddenly got rights under the

14    securities laws.  I'm asking you the converse.  If I bought SOL

15    or one of these tokens, and it went belly up not just because

16    that's just the way the world is but because something bad that

17    happened by company managing, which, of course, I'm not saying

18    is actually happening, am I just out of luck?  Am I limited to

19    common law contracted tort rights but just not rights under the

20    securities laws?

21          MR. SAVITT:  Very much the latter, your Honor.  That

22    is to say the purchaser of SOL in the Court's hypothetical

23    would have claims sounding in fraud were there a fraud, and

24    that may or may not be, conceal that claims having a contract.

25          THE COURT:  Well, you just said to me there's no

O1HJSEC2

1    enforce -- we're talking about the situation where there is no

2    statement of enforceable right, which would suggest that there

3    is.  What is the context then in this attenuated transaction

4    between the purchaser and the ultimate issuer of the asset?

5          MR. SAVITT:  That's a great question, your Honor, and

6    I should be clear.  Fraud, we don't have the contract problem.

7    It's a tort, as the Court knows, and the most natural place

8    where there might be a cause of action in that scenario if

9    there was fraud.  And the Court has no doubt seen when its

10   reviewed the investment contract cases that some number of them

11   either declined to find investment contracts but say there

12   could be fraud claims or find fraud claims under common law in

13   addition to an investment contract.  One would imagine a

14   scenario where there was some sort of contractual relationship

15   between a buyer of a token and a promoter that was not

16   sufficiently linked to the investment that it would constitute

17   an investment contract.  They could have contractual

18   relationships otherwise that constitute an investment contract.

19   But the bottom line we would want to push on is that there as a

20   distinction between the securities laws and the law of contract

21   and the law of tort.

22          Mr. Costello made reference to the *Joiner* case

23   earlier, and it's an important one, I think.  And it informs

24   much of our thinking and perhaps much of the commission's in

25   that case.  There was a question whether there was a state law

O1HJSEC2

1    contract claim.  And it's very interesting when one traces it

2    through the lower court decisions, and you see that what's

3    happening is a debate amongst the circuit court about whether

4    there's an implicit contract or an explicit one, and the

5    Supreme Court, as the Court saw, found it unnecessary to

6    resolve that question because what it found was that there was

7    a sufficient holding out of a contractual relationship that

8    satisfied the securities law test.  So as to render the precise

9    state law contract question unnecessary for disposition, Judge

10   Boudin said something to the same effect of the *Rodriguez* case.

11        THE COURT:  And it is that sufficient holding out of a

12   contract is what you find be missing of the transactions at

13   issue here?

14        MR. SAVITT:  In candor, your Honor, that's a little

15   bit of an understatement.

16        THE COURT:  Okay.

17        MR. SAVITT:  We think the complaint is truly devoid of

18   anything that could plausibly amount to a promise that is

19   enforceable by an issuer to a secondary buyer on Coinbase's

20   platform.  And I'll raise, and I hope it's helpful to raise it

21   at this point in our conversation a couple of cases that really

22   came to mind when you were chatting with Mr. Costello on

23   largely this subject.  The *Rodriguez* and *De Luz* cases, those

24   are cases in which real estate developers undertook to sell

25   plots of land, made all sorts of promotional statements about

O1HJSEC2

1    what they were going to do.  They were going to put electricity

2    in.  They were going to build roads.  There was going to be a

3    country club.  There was going to be a meetinghouse.  I don't

4    know what there was going to be, all sorts of stuff.  There was

5    a thing called Rancho California in southern California -- and

6    this is the *De Luz* case -- and it was going to be great.  And

7    the Disney World developments in Florida that were at issue in

8    *Rodriguez*, these are cases that are feeling a lot like the

9    argument that we're hearing here, your Honor.

10            There's a promoter.  The promoter is making promises

11   that it's going to develop a real estate ecosystem.  Those

12   promises were on their face not enforceable by the buyers, and

13   when the sales were made, and in retrospect the buyers were

14   aggrieved by their purchase.  They sued under the securities

15   law and said it's an investment contract.  The Court said no

16   investment contract, and the reason was that promotional

17   statements aren't enough.  Even promises in the ether aren't

18   enough.  There has to be sufficient undertaking of an

19   apparently legally enforceable character so as to give the

20   buyer a claim.  That's what those cases said in what we think

21   are highly analogous circumstances.

22            And I don't think there's any surprise in that.  It

23   is, to return to for instance principles, your Honor, the words

24   are investment contract.  It ought not come as a surprise that

25   people looking for a contract, and that has always been the

O1HJSEC2

1    touchstone.

2              THE COURT:  Sure.  But then we've got the whole scheme

3    argument.

4              MR. SAVITT:  Well, we do have the scheme argument,

5    your Honor, and that's what we thought we would be confronted

6    with when we came to visit with you in July.

7              THE COURT:  And we weren't.

8              MR. SAVITT:  And we weren't, and we think there's a

9    reason, your Honor.  We demonstrated we think to a

10   fare-the-well that the only way to understand the word scheme

11   as it appears *in Howey*, and it has been echoed down now through

12   the generations, is part of the scheme of contracts, a series

13   of transactions and contractual undertakings that taken

14   together constitute a whole.

15             We were so confident we were going to be confronted

16   with that argument, we addressed it in our opening brief.  It

17   was met with stunning silence.  That argument went offstage,

18   left never to return.  And we don't think it's in the case

19   anymore.  And we certainly don't think it's a position defended

20   in the answering brief.  I mean, we think the reason is clear.

21   It can't be.  It's not what the blue sky cases taught what the

22   investment contract meant.  It's not what *Howey* meant when it

23   brought in the blue sky cases, and it's not what has ever been

24   meant in the cases since then.  Every one of which, your Honor,

25   every one of which -- putting aside at any rate the recent

O1HJSEC2

1   crypto enforceable blitz, every one of them has involved a

2   cognizable contractual undertaking.  No exceptions.

3           Your Honor, that reminds me that I was remiss in

4   failing to ask you whether, notwithstanding the character of

5   argument we made, we could hand out some slides that we made

6   that you might want to talk about.

7           THE COURT:  I'm sure someone stayed up through the

8   night putting them together, so please.  I'm sure they are

9   wonderfully done, and I appreciate that, so yes, as long as

10  you're sharing with the folks at the front table.

11          MR. SAVITT:  I was going to play the

12  someone-stayed-up-all-night card if it was necessary, your

13  Honor.  We have a great team of lawyers that have been working

14  hard on this, so thank you for that recognition.  It came to

15  mind because one of the slides in here, and the Court will look

16  at it or not.

17          THE COURT:  I have it in front of me.  Is there

18  something you wanted to point my attention to right now, sir?

19  It's fine for after you all leave and I have nothing to do.

20          MR. SAVITT:  Since you asked, your Honor.

21          THE COURT:  Yes, thank you.

22          MR. SAVITT:  Since you asked, your Honor, page 2

23  relates to an issue that should be talked about.  And the point

24  we would like to make as a first principles point is that

25  everything has always known that investment contracts have to

O1HJSEC2

1   have contracts.  This is an excerpt from the SEC's brief of the

2   *Edwards* case that your Honor heard about this morning.  They

3   talk very specifically about the meaning of these two words as

4   they appear in the 33 and 34 Act, and quite unsurprisingly,

5   they observed, the commission did, before it decided that it

6   wanted to expand its jurisdiction in respect of crypto that the

7   second word in the quoted term contract means an agreement

8   between two or more persons to do or forebear something.  It

9   has never been the commission's submission before the crypto

10  cases that the a contractual undertaking was not required.  And

11  the additional point that I'll call your attention to slide 6.

12       THE COURT:  Just a moment, please.  I'm still at slide

13  two.  Thank you.  I'm there now, sir, thank you.

14       MR. SAVITT:  I'm sorry, your Honor.  Knowing that time

15  and life is short we didn't want to belabor all of these cases.

16  But these appear to us to be the universe of controlling cases

17  in this Court, the Second Circuit and Supreme Court cases on

18  investment contracts and every one of them involved a

19  contractual undertaking to deliver future value.  Every one of

20  them until the crypto cases.  Of course, there hasn't been any

21  Circuit or Supreme Court authority on those matters.

22       THE COURT:  Before we put this to the side, sir, are

23  there other slides you want to call to my attention at this

24  stage?

25       MR. SAVITT:  Not at this stage.

O1HJSEC2

1        THE COURT:  Okay.  Thank you.  I'll keep it nearby

2    just in case.  Thank you.  I want to back up.  I know we should

3    be going forward but I'm moving backward.  I had extensive

4    discussion with the commission about what conduct of Coinbase,

5    what it is your client actually did that brings them here

6    today.  And part of the reason I was asking that question was

7    to figure out whether there were factual disputes that

8    foreclosed a motion to dismiss based on the conduct alleged or

9    whether everybody agreed on the conduct and they just disagreed

10   as to the legal import of that conduct.

11        I know from your submission, I know from the DeFi

12   folks' submission that there is some dispute about what is

13   actually involved with the wallet program or with the staking

14   program.  But perhaps including that, are you accepting the

15   commission's allegations of Coinbase's conduct and saying that

16   they are nonetheless, insufficient based on the discussion

17   we've just been having to implicate the securities laws.  Or

18   are you saying otherwise, that there is a dispute but it's

19   obvious from my read or my ability to read materials of which I

20   can take judicial notice or that are fairly implicated by the

21   pleadings, the complaint, that I can determine that your view

22   of Coinbase's conduct is correct?

23        MR. SAVITT:  I think, your Honor, for purposes of this

24   motion only, we are accepting the allegations in the complaint

25   as true.  I do hasten to add that they need to be well pleaded.

O1HJSEC2

1    And by that, I mean that they need to plead facts rather than

2    conclusions.

3              THE COURT:  Well, of course, yes.

4              MR. SAVITT:  And that if they rely on the document,

5    the Court can and should resort to that document to verify the

6    well-pleaded character of the complaint.  But we've worked very

7    hard to accept the pleadings as true, and to create for the

8    Court a pure question of law in respect of the investment

9    contract issue, and I think as Mr. Schwartz will say as respect

10   of the wallet and staking issue as well.

11             THE COURT:  Okay.  Perhaps that's where these factual

12   discussions are going to be had with greater detail.  I guess

13   I'm asking, and perhaps it's too much to ask of you right now.

14   As you're sitting here, are their factual disputes, are there

15   things that you are thinking to yourself the commission

16   completely got it wrong and if Failla would look at the

17   underlying documents, she'll realize they got it wrong?

18             To me, the disputes were most acute and pronounced in

19   the discussion of the wallet and staking programs.  But if, for

20   example, in the other areas there's something that you want to

21   call to my attention, please tell me that now.

22             MR. SAVITT:  I think the answer is no, your Honor.  We

23   talked, for example, about paragraph 65 in the complaint, and

24   AssetHub and you have our position.  And that's an example

25   where I think there needs to be at least a jot of critical

O1HJSEC2

1    scrutiny attended to the pleadings and what they actually put

2    before the Court.

3              I listened with great interest to your discussion with

4    Mr. Costello about the scarcity potential in commodities and

5    having failed to get a complete set of baseball cards many

6    times as a child, I can tell you that certain cards are always

7    withheld to create scarcity and value.  Whether that's a fact

8    issue, I don't know.  But we aren't going to accept, for

9    example, without a fight the idea that things like Beanie

10   Babies and Star Trek memorabilia aren't part of an ecosystem,

11   to use Mr. Costello's -- I think that's is fair ground to

12   debate and I don't think that's what the Court was alluding to

13   but we could join issue on stuff like that.

14             THE COURT:  Yeah.  No, I'm grateful that we're all not

15   taking the tangent of thinking about our favorite collectibles

16   and using those.  But I appreciate that.  Thank you.

17             Okay.  Before I started resuming discussions of the

18   legal issues, I wanted to make sure I understood where the

19   parties agreed or disagreed as to the conduct.

20             Just in that vein, sir, there's a lot of discussion

21   about what Coinbase supposedly does or doesn't do.  And in

22   particular, in your answer, your client and you by extension,

23   are extremely careful by parsing each allegation of the

24   complaint to let me know what you agree with, what you are

25   disagreeing with but it doesn't really matter, and what you are

O1HJSEC2

1    absolutely denying.  I appreciate knowing that.  I'm just

2    wondering about the degree to which that matters for this

3    motion.  And my sense, the more I speak with you, is that it

4    doesn't.

5            MR. SAVITT:  Your Honor, it does not matter

6    critically.

7            THE COURT:  Okay.

8            MR. SAVITT:  We agree.  And that's because I think

9    this can be boiled all the way down to the question whether the

10   sale on a secondary market in a blind bid-ask transaction of a

11   token where no rights or obligations travel as part of that

12   transaction can be an investment contract, as that term appears

13   in the statute in the case law, on the strength of the

14   statements of intent or promotional statements that issuers

15   have made.  I think the case, at least this branch of the case,

16   boils all the way down to that.

17           THE COURT:  And on that point, my understanding of my

18   conversations with Mr. Costello was that he believes that

19   Coinbase is just being a bit too literal or too stentorian

20   about what that means, and that they are not suggesting it

21   needs to be a written contract or a formal document, and you're

22   not suggesting it either.  What he's saying is though is that

23   there is an implicit relationship, an implicit agreement or at

24   least extension by the purchase of the crypto asset in a

25   situation where there's discussion or a lot of submissions on

O1HJSEC2

1    the part -- or I guess, white papers and such on the part of

2    the developers as to what is going to be done with this crypto

3    asset.

4           I think you are saying to me unless there's some

5    mechanism of enforcement in all of that very lovely promotional

6    and marketing language, it just doesn't matter.  Do I

7    understand that correctly?

8           MR. SAVITT:  I think that's fair, your Honor.  To give

9    even a little more ground because we want to make for more

10   purposes of this motion our position capacious, there has to

11   be -- in the transaction that constitutes the sale of the

12   asset, there has to be at least as part of that offering, there

13   has to be a statement that is meant to convey an enforceable

14   promise.  That's the irreducible minimum of what could be

15   conceived to be an investment contract knowing that we're

16   talking about contracts in the securities law context.

17          If you don't have that, then you don't have a contract

18   of any kind, anywhere in the vicinity and, therefore, you don't

19   have an investment contract.  Here again, I would keep coming

20   back to the real estate cases where you had all sorts of

21   blandishments and suggestions about what was going to be built

22   out.  And the courts, one after another, said not enough.

23          I talked about *De Luz* and *Rodriguez*, the *Revak* case in

24   our circuit is of a similar ilk.  It didn't go off on the

25   efforts of others element but rather on the common enterprise,

O1HJSEC2

1    insisted on collateral agreements.

2           It insisted on collateral agreements, finding none,

3    the Second Circuit rejected the investment contract claim.  So

4    we don't think it's fair, reasonable or, sensible statutory

5    interpretation to say that you're insisting on too much when

6    you're talking about an investment contract to look for a

7    contract.  And the SEC has said that itself more than once.

8    The Supreme Court has said that itself.  These cases all come

9    out the same way.

10          And what's marked here, in our judgment, your Honor,

11   is a departure.  We've been criticized a little bit, I think,

12   from our friends at the other table for saying the rules of

13   *Howey* and its logic and reasoning don't apply to crypto.  I

14   think the shoe is on the other foot.  I think what's exactly

15   being promoted here is a view of what an investment contract is

16   and has been understood to be under the cases and within the

17   statute that is completely different than has ever been the

18   case.

19          It is not we who are unwilling to faithfully apply

20   that statute and that case law.  It is the commission.  They

21   are trying to stuff these transactions into the investment

22   contract rubric when it's perfectly plain from the words of

23   statute and the decided cases and the chairs' statements, that

24   they don't belong there.  We think that's what's happening.

25          And it's a really important issue because at the end

O1HJSEC2

1   of it, agencies have authority.  And the commission has broad

2   authority within the world of securities to regulate, but it

3   does stop at the water's edge.  And if it doesn't, one is

4   casting about for a limiting principle.  And I think the Court

5   has cast about for a limiting principle.  We can talk about

6   that as well, but I don't actually think the Court has heard

7   one and I think that's a very big problem.

8           THE COURT:  Actually, you're anticipating my next

9   question.  You've obviously been paying attention.  You saw my

10  lengthy discussion with Mr. Costello and the concerns that I

11  had and my requests for a limiting principle.  He has given me

12  some.  You don't accept them because they are not contract

13  based.

14          MR. SAVITT:  You asked for a limiting principle with

15  respect to whether private plaintiffs could bring suit and I

16  don't think you did get one.  I think you were told that they

17  couldn't.

18          THE COURT:  Yes, that was what I was told.

19          MR. SAVITT:  So that request for a limiting principle

20  was met with a response, no, thank you.

21          THE COURT:  We'll no, no.  We'll both be fair, fairer

22  to Mr. Costello.  What he said was it wasn't by itself -- and

23  to the extent I'm thinking of it is sort of an opening of flood

24  gates to letting all this in.  The putative private plaintiff

25  would still have to satisfy the securities laws.  There would

O1HJSEC2

1   have to be some allegation of a purchase, or sale, or fraud or

2   something warranting rescission.

3        So I accept that I overstated the amount of private

4   plaintiff actions that could be tied to my decision in this

5   case.  Although, there are some.  He is at least admitting of

6   the possibility there are some so.

7        Yes, on that limiting -- I have a limit.  It's just --

8   it's rather expansive but I have a limit.  The bigger issue and

9   the issue with which I was discussing with Mr. Costello, is my

10  concern about this idea that simply looking at the promotion

11  materials of an issuer somehow makes the transaction an

12  investment contract.  That purchase with knowledge of or with

13  reading of these materials makes it an investment contract.

14       What I was told, I believe, and he will tell me in his

15  summation part, is that it's more than that and there has to be

16  some sense that someone is buying in to the ethos or the

17  ecosystem of the issuer by purchasing that token.  Now, that

18  may get them through 12(b)(6).  Who knows what happens at the

19  Rule 56 stage.  But I believe that to be the limiting principle

20  that I was given.  I'll ask you to tell me whether I misheard

21  and whether it's enough.

22       MR. SAVITT:  Your Honor, we heard the same thing.  I

23  do think that's the commission's position.  That's how we

24  understand it.  And we don't think it's enough.  We don't think

25  it's enough for a couple of reasons which I'll try to

O1HJSEC2

1    summarize.

2            The first is we're deeply unpersuaded that it is or

3    has been shown to be an actual limiting principle.  By which I

4    mean the idea that by purchasing what is after all just an

5    asset, one buys into the ecosystem can be said about very

6    nearly anything because nearly every commodity of value, nearly

7    every collectible one can imagine has an ecosystem around it.

8    It doesn't really tell you whether you are in or you're out.  I

9    want to circle back to the question of the conceptual and the

10   practical implications, and I'll jump on that before I shut up

11   if that's okay, your Honor.

12           THE COURT:  Go ahead.

13           MR. SAVITT:  I wanted to say before getting to that is

14   we've offered two limiting principles.  And we don't think they

15   are parsimonious.  One is if there's an investment contract

16   there needs to be at least the offering of what is meant to be

17   a contract.  That seems fair.

18           We've also said that a further limiting principle is

19   that the investment needs to be in the business.  And I think

20   the commission allies that point by saying it needs to be

21   around investment in the ecosystem.  But I don't know what that

22   means.  It means a statement of affiliation with it perhaps.

23   But let's be clear at least on the secondary market, which is

24   all we're talking about, your Honor, no one is giving anything

25   to the promoter.  Period, full stop.

O1HJSEC2

1          THE COURT:  Fair enough.  But Justice O'Connor says in

2    *Edwards*, profits means the profits the investment seeks on her

3    investment and not the profits of the scheme in which she

4    invests.  How do you square that with the argument you just

5    made to me?

6          MR. SAVITT:  I think it squares well, your Honor.  I

7    want to talk about *Edwards* a little bit because to state what

8    I'm sure that the Court is fully aware of, *Edwards* was a case

9    in which the Eleventh Circuit found that an investment contract

10   could not be had in circumstances where the investment contract

11   promised a fixed rather than variable return.  That created a

12   circuits plea.

13         THE COURT:  Right.

14         MR. SAVITT:  In retrospect anyway, it's a peculiar

15   holding given that it's pretty clear that the securities laws

16   were each fixed on investments.  So the Supreme Court reversed.

17   The question before the Supreme Court was this:  Is the profit

18   or the payout that has to be available in the investment

19   contract context one that is tied to the profitability of the

20   enterprise?

21         And the answer to that question stated that way was

22   no.  And the reason was even if the Edwards business wasn't

23   terribly profitable, or it was less profitable or more

24   profitable, a fixed return could issue.  It was okay to have a

25   fix returned in the context of an investment contract.  That's

O1HJSEC2

1    what Justice O'Connor was saying there.

2            I appreciate that plucked from that context that

3    appears to suggest something else, but it is not consistent

4    with the rest of that decision, as I'm sure the Court has seen.

5    And I would remind the Court that in the Edwards opinion, the

6    Supreme Court went out of its way to say this is just the way

7    the SEC has been interpreting this all the way along.

8            And your Honor looked at our second slide about what

9    the SEC told the Supreme Court was going on with an investment

10   contract, including a contract which is an agreement between

11   several parties.  And it's really important because Justice

12   O'Connor was saying you can get a payout in an investment

13   contract scenario that is not commensurate with the

14   profitability of the enterprise if the contract is so

15   structured.  But it was not saying that you could -- the profit

16   or payout could be untethered from the capital structure or

17   invested proceeds of the company's simpliciter.  That makes no

18   sense in the context of that case or the long, long line of

19   Supreme Court cases that preceded and followed it.

20           THE COURT:  All right.  But we're talking about two

21   things.  You are talking now about tethering to the capital

22   structure and earlier we were talking about the rights of the

23   putative purchaser to enforce.  Help me with that because they

24   are two different things, yes?

25           MR. SAVITT:  They are two different things.  One of

O1HJSEC2

truly fascinating and head hurting parts of this case is the
more you think about them you see real points of intersection.
But the answer is yes.  There are at least two very distinct
ways of holding the problem up to the light to understand how
to think about *Howey* and the contractual provision.

     And I do think the relevance -- the reason, your
Honor, with apology, the reason I addressed *Edwards* in that way
is I perceived the question about that statement to go to that
issue but perhaps wrongly.

     THE COURT:  No.  You've not misunderstood anything
that I've said.  I just thought it was interesting that we
ended with the discussion with tethering to the capital
structure, when we began sometime earlier, with a discussion
about enforceability.  I wonder if you could pause for a
second, sir, and talk with me, not to me, about the decisions
this past year from Judge Rakoff and from Judge Torres.  And
why don't we all just stipulate, lest we be accused of either
complimenting them or criticizing them unduly, that these are
hard issues.  And maybe they came out differently, maybe they
didn't come out differently.  Maybe the decisions can be
reconciled.

     But I want to -- for example, with respect to the
*Terraform* decision, and in particular the motion to dismiss, I
think there was some discussion about the need for some sort of
contractual right, and I thought that Judge Rakoff wasn't

O1HJSEC2

1    really feeling it, as it were.  But I acknowledge that

2    *Terraform* is quite different from the facts of this case.

3            Separately, I myself, I'm following Judge Torres'

4    decision and it's on very difficult subject matter.  Although,

5    I don't -- I think I tripped when I got to the

6    primary/secondary market transactions distinction.  And when

7    you began your discussions with me by talking about the blind

8    nature of the buys and sells here, I thought, ah, I have to

9    remember to ask him about that and what importance he ascribes

10   to that distinction that Judge Torres has found in her

11   decision.

12           So that's a very long question, and I'll try and do

13   better this time around.  Let's start with *Terraform*.  Is Judge

14   Rakoff right or wrong?

15           MR. SAVITT:  I don't know.

16           THE COURT:  Okay.

17           MR. SAVITT:  It's a very different case.  I think we

18   disagree with meaningful aspects of Judge Rakoff's analysis.

19   There's a big however which is --

20           THE COURT:  Right.  Because he then finds -- I thought

21   he found that the asset was not itself an investment contract

22   but could be used in an investment contract.

23           MR. SAVITT:  I do think that was part of what Judge

24   Rakoff was saying there.  And though we would probably disagree

25   with certain aspects of his holding.  Our view, when you put

O1HJSEC2

1    the decisions together, the motion to dismiss and the summary

2    judgment decision together, we think even if that mode of

3    analysis were applicable here, our motion would survive.

4           Let me say why.  The *Terraform* case, first of all, as

5    I know the Court knows, did not involve secondary market

6    transactions.  There were no secondary market transactions in

7    that case.  The SEC went out of its way to tell the Court that

8    it wasn't dealing with the secondary market transactions.

9    Those were all situations where there was a relationship of

10   privity between the investor and the promoter.  It's a very

11   important point of distinction.

12          Judge Rakoff said ultimately in *Terraform* and I think

13   I have this right, that no formal contract was necessary to

14   form an investment contract.  Fine, we agree with that.  What's

15   required in our judgment is a showing that the promotor had

16   held out the promise of something meant to convey a contractual

17   promise.

18          But Judge Rakoff does apply as follows, and I think

19   these are his words, a investment contract at a minimum

20   requires the contracting parties to agree or scheme together

21   that the contractee will invest in the contractor's profit

22   seeking endeavor.  Now, that would probably be a point of

23   disagreement between the way we're framing this matter and are

24   litigating it to your Honor, and the way it's going to be

25   rightly decided in Judge Rakoff.  But we can live with his

O1HJSEC2

1    formulation.

2         The reason is, the SEC in this case, hasn't alleged

3    anyone agreeing or scheming together to invest in the

4    contractor's profit seeking endeavor.  The allegations here

5    show no agreement of any kind as between these trades on the

6    secondary market between strangers to invest in any contractor,

7    that is to say promotor's business.  And there is still less

8    any kind of agreement that the buyer's payment be invested in

9    that business.  So that's one point I really wanted to

10   emphasize about *Terraform*.

11        Second, is moving to the summary judgment ruling.

12   It's a very -- the texture of that decision seemed to us to be

13   quite a lot different.  And while the Court did enter summary

14   judgment on the investment contract issue, it did so, first of

15   all, on the basis of recognizing some contractor, contractee

16   relationship, which I've just said.  And it also went out of

17   its way to emphasize that there were ongoing relationships and

18   obligations with respect to the token.

19        So as to the USC token, which is the dollar

20   denominated, the dollar paid token, the Court relied on the

21   fact that the token could be deposited in the anchor protocol

22   and earn pro rata interest or dividends, thereby demonstrating

23   that that investment was one that was in the ongoing

24   enterprise.

25        As to LUNA, the court relied on the representations of

O1HJSEC2

1    the company that the token would carry a claim to a

2    distribution of transactions fees.  Again, proceeds coming from

3    the enterprise to the investors in a relationship of privity.

4    And similarly, with the MIRA protocol token, the Court found

5    that it earned fees from asset trades.

6            So we might have a lot to quarrel about with Judge

7    Rakoff's decision, but the truth is we can live with its

8    analysis because it recognized -- it recognized ultimately,

9    that there has to be a contractee/contractor relationship and

10   there has to be some ongoing engagement with the assets of the

11   enterprise.  Nothing like that is alleged in this case, your

12   Honor.  So that is why we're holding the *Terraform* case up to

13   the light.

14           THE COURT:  Could you then speak to the *Ripple* case?

15           MR. SAVITT:  Well, *Ripple* starts with the correct

16   first principals.  Judge Torres says digital assets aren't

17   securities.  And then it goes on to analyze whether the various

18   transactions are investment contracts.  And there, as here, the

19   question whether a security existed was strictly a matter of an

20   investment contract.  What it found, Judge Torres -- what the

21   Court found in Judge Torres's case, is applying *Howey* to

22   secondary market trades could not give rise to an investment

23   contract.  That was what Judge Torres found.

24           We don't think all of the same arguments were raised

25   here as in that case.  But the critical takeaway there is that

O1HJSEC2

1    Judge Torres recognized that secondary market token purchases

2    of XRP were not investing in *Ripple*.  And in that sense it

3    rejected what I think is a core portion of the commission's

4    argument before the Court today, which is that it's investing

5    in an ecosystem.  At least in respect to transactions between

6    strangers where no relationship exists, where no obligation to

7    travel.  That couldn't be said there and it can't be said here.

8    *Ripple* couldn't make any promises to those people because it

9    didn't even know who they were.

10        Same here with each of the twelve tokens at issue.

11   These applied but as trades, and therefore, as a matter of law,

12   Judge Torres held, and we think correctly on this, investment

13   contract law doesn't apply.  These trades couldn't be

14   investment contracts and therefore, couldn't be securities.

15   And we think that branch of the holding, which was

16   determinative in that case, as to the trades that are at issue

17   here, secondary markets trades, is it's a very close cousin of

18   the issue right before the Court.

19        THE COURT:  Yes, I understand that and I think that's

20   probably where the commission disagrees with it so much.  The

21   issue here -- I'm not disagreeing with your recitation of it.

22   I guess I'm not familiar with -- in other aspects of securities

23   laws in other cases that I've had where the primary/secondary

24   market distinction holds so much force, and where the notion

25   or, indeed, the fact that it's blind bid, blind asset trades

O1HJSEC2

1   matters so much.

2          Am I wrong?  Or are there other areas where it really

3   does -- where it has similar importance?  Here, I just don't

4   remember having to focus on this in other securities cases I've

5   done.

6          MR. SAVITT:  Thank you for that question, your Honor.

7   It goes right to the heart of what is interesting about this.

8   Let's talk about stocks.  Stock, they trade in blind bid-ask

9   the time and no one would think it's not a security.  A stock

10  reflects an interest in the permanent capital of a corporation.

11  And when it trades, that interest in the permanent capital of

12  the corporation which is a participation in its capital

13  structure, transfers in entirety from one holder to another

14  holder.

15         Attached to a stock are a bundle of rights:

16  Inspection rights, right to sue, right to dividends, right to

17  dissolution, all that good stuff.  They transfer in their

18  entirety from one seller to the other seller.  And therefore,

19  in every case like that, the issue doesn't come up because it

20  doesn't matter who holds it.  They hold the same bundle of

21  interests, the same claims against the same entity, insofar as

22  they are just trading interest in permanent capital.

23         Much the same can be said about what trade commonly is

24  notes are on.  Investment contracts are different because

25  investment contracts are assets stapled to obligations.  And

O1HJSEC2

1    the relevant question in every case is going to be whether with

2    the asset travels the legal obligation.  You don't need to ask

3    that question in the context of a bond transaction, your Honor.

4    It does.  You don't need to ask that question in the context of

5    a stock transaction.  It all travels.  These are different, and

6    that's why.

7            And it just won't do given the requirements of an

8    investment contract, we don't think, to say that it's the same

9    transaction on the secondary market as on a primary market.

10   Because whatever may have traveled with respect to the ICO is

11   not likely to travel in a secondary offering.  But what matters

12   for our motion, your Honor, is it's not alleged to have

13   traveled.  And no one can say that in the context of a bond or

14   stock sale.

15           THE COURT:  We've had thoughtful discussions for a

16   while now on the idea about the need for a contractual

17   relationship and an ongoing engagement with the assets of the

18   enterprise.  I think in another section of your briefing, a

19   distinction that you draw or an argument that you make is that

20   an investment contract must share the essential attributes of

21   other securities.

22           I assume that is just a variation on the theme and

23   that what you're saying is, for example, that you have to have

24   something more than ownership of the asset.  Perhaps you have

25   some interest in the enterprise, perhaps you have something

O1HJSEC2

1   else.  But I do want to make sure, when you're talking about

2   essential attributes and that's your argument, is that

3   something different than what we've been talking about?  And if

4   so, what are the essential attributes that I you think I should

5   be looking for here?

6          MR. SAVITT:  I think what I'd say in response to that

7   question, your Honor, is first of all, when one looks at the

8   definitional provision of the 33 and the 34 Act, the 34 Act as

9   is relevant for the 12 that we're talking about now, there are

10  a list of securities and investment contract is one of a bunch.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O1HJSEC4

1          MR. SAVITT:  And each one of them is an instrument

2     that carries the legal entitlement to the proceeds, assets, or

3     profits of an ongoing business enterprise.  And so part of our

4     argument is that investment contract should be understood to be

5     consistent with that recitation, and that is what, in the words

6     of the statute, makes something commonly known as a security,

7     as opposed to buying the output of what a company makes.  It's

8     the difference between investing in Beanie Baby Inc. and buying

9     Beanie Babies.  It's the difference between those two things.

10         Additionally, we call attention to Judge Posner's *Wals*

11    decision, which I'm pretty confident was picked up in the SEC's

12    briefing.

13         THE COURT:  Yes, we talked about it earlier.

14         MR. SAVITT:  It talks about the essential instruments

15    of a debt or equity instrument.  And it's the same point, we

16    think, but it's something different than the output of a

17    company.  It's debt, which is a senior contribution to a

18    capital structure that's put to work by a company, or equity,

19    which is the residual claim that is junior capital structure.

20    And the things that are now being forced into the investment

21    contract, we think, are different because they play no part in

22    the capital structure, and they carry no claims against the

23    ongoing enterprise and carry no contractual rights at all.

24         THE COURT:  Just one moment, please.  Thank you.

25         In the interest of transparency, as I was taking my

O1HJSEC4

1   notes over the weekend for this conference — I can't define

2   when precisely I was typing this up — one of the issues that I

3   had was that I believed it was difficult for Coinbase to argue

4   that a crypto asset purchaser has merely a hoped-for increase

5   in the value of the asset itself.  Because to me, to the extent

6   that the purchaser had a hope for an increase in the value, it

7   was because of the efforts of the developer or the issuer.

8          And I think what I'm understanding from our

9   discussions this afternoon is that you're not disputing that as

10  far as it goes, but for you, for your client, the issue is that

11  there is missing or at least missing allegations of some sort

12  of way of enforcing that hoped-for increase in the value of the

13  stock.  And similarly, that there is no manner by which the

14  purchaser remains engaged on an ongoing basis in the assets of

15  the enterprise.  Am I understanding that argument correctly?

16         MR. SAVITT:  I think that's fair, your Honor.

17         THE COURT:  Or tell me I'm overstating your hoped-for

18  increase.

19         MR. SAVITT:  I don't think our argument, at least for

20  purposes of this motion, is really fighting about whether

21  someone's hoping for the increase.  And we appreciate that the

22  commission has alleged that there were statements made that

23  someone might have thought, if they were followed through upon,

24  were going to lead to the increase.  For purposes of today

25  we'll accept that.

O1HJSEC4

1          But it's not enough to make an investment contract.

2     And it's not enough as a word of simple English when you think

3     about investment contract, but it's not enough under the cases.

4     And here again, just to bang this drum, when you look at the

5     real estate cases, you'll see they're very similar.  And Judge

6     Bodine has an analysis that says at some point, if the promises

7     are enough and they seem enforceable enough, you have an

8     investment contract.

9          There has to be something that's held out that's

10    enforceable.  That's what case after case after case says, and

11    that's what missing here.  And it's really an important issue

12    because there is no limiting principle otherwise, and that's

13    because the vast majority of type of investments are going to

14    be accompanied by someone saying something, but they aren't all

15    securities.  And the question is what is and what isn't.

16         You could have a situation where it isn't enough for

17    the commission to say, Trust us, we're not going to use this

18    authority except when it makes sense.  Because that can lead to

19    a company thinking it was complying with the securities laws

20    and then being on the receiving end of an enforcement action.

21    That's a familiar scenario for us.  It could also lead to any

22    number of businesses believing they're operating essentially in

23    dealing what are non-securities and finding out that they're

24    not, because every commodity has promotional statements around

25    it, and they aren't all securities.

O1HJSEC4

1          And what makes it different is the contractual

2     undertaking that gives an interest in the business.  If you

3     don't have that, you don't have a security.  So I'm sorry for

4     the long-winded answer.  The short of it is you're right that

5     we accept that there is an investment, and someone might think

6     the promotional statements might, if acted upon, give rise to

7     an increase.  Our position is that's not enough, that the cases

8     say it, and they say it over and over again.

9          THE COURT:  Where is this in *Howey*?  I mean, I

10    understand from the Securities Law Scholars that the

11    precursors, the state law antecedents to *Howey* speak about this

12    or at least they arose in that context.  But the actual

13    definition doesn't itself speak of either this contractual

14    relationship or means of enforcement or the ongoing engagement.

15    So I don't know where it comes from, and I'd like to know where

16    you're slotting it in in the *Howey* test, if anywhere.  Let's

17    start with that.

18          MR. SAVITT:  Well, it's a fair question.  *Howey* only

19    applies to instruments that constitute a contract, transaction,

20    or scheme.  And one answer to your Honor's question is it's

21    none of those things.  It's not a contract, it's not a

22    transaction, it's not a scheme.  And we've talked about how

23    it's not a contract, and we've shown, I think, that it's not a

24    scheme, as that phrase was understood in *Howey*.

25          It is true that we have chosen in our presentation to

O1HJSEC4

1    the Court to not reduce *Howey* to three elements and then

2    ritualistically go through each of the three elements, and we

3    did that for several reasons.  One is that, as I mentioned

4    earlier, there's a great deal of intersection between the

5    issues, for example, the need for a contract came up in the

6    context of a collateral agreement in *Revak* in the discussion of

7    the common enterprise, but it came up in the other circuit

8    cases in the context of the reliance for profit solely on the

9    work of others.

10           So these issues cut through, but they do not appear

11   all the time in the same place, but they appear over and over

12   again in the *Howey* jurisprudence.  When the Supreme Court talks

13   about *Howey*, it doesn't reduce it to three elements.  It looks

14   at the instrument in front of it, and it tries to figure out

15   whether it fits within the traditional definition of a

16   security.  A lot of the circuit court cases do the same thing.

17   The *Wals* case does and *Rodriguez*.

18           We would broadly say this, that much of what we say

19   about the need for a contractual undertaking demonstrates the

20   lack of any adequate pleading as to the generation of profits

21   from the efforts of others, because those cases all say that

22   has to be something that you can go and get, at least has to be

23   promised to you that you can go acquire that, so it fits in

24   there.  And much of what we say about the SEC's failure to

25   allege interest in an enterprise demonstrate a failure to plead

O1HJSEC4

a common enterprise within the *Howey* factors.  And that's why

we cite not just *Howey* over and over again, which we do, but

the cases interpreting it.

THE COURT:  To that point, I have two reactions going

in two different directions.  And one was I thought you were

about to step in the trap that Mr. Costello laid for you

earlier where he discussed how Coinbase's citation to or use in

any way of the *Howey* test undercut its major questions doctrine

argument because, by acknowledging *Howey* as being the playing

field on which these issues are to be resolved, you're

necessarily suggesting that there isn't some void, some almost

*ultra vires* activity that the commission is doing, which would

implicate the major questions doctrine.

Thing two is I had a question to myself, which is how

your arguments applied or was the logical extension of your

arguments to be that there could be no common enterprise with

respect to the 12 or 13 tokens.  So we can save major questions

for your colleague, who I know is going to speak to that, so

she'll know to talk about that.  But can you help me understand

how, if at all, your arguments about the need for contractual

or ongoing relationships — and I'm very much short circuiting

them by calling them just with those few words, I'm just sort

of evoking them for you — how that impacts the common

enterprise analysis.

MR. SAVITT:  Well, I don't think it's impossible that

O1HJSEC4

1    a token could have those characteristics and satisfy the *Howey*

2    test, and we said that in the abstract.  We haven't talked

3    about Judge Castel's decision in *Telegram*, but that is a really

4    interesting case along these lines, the primary issuer case.

5    And I want to be clear on that because it's suggested in the

6    briefing that it's not, but the SEC was plain as day that it

7    was, and I think the case is clear.

8            But that was a situation where there was a contract

9    right in the middle of the case.  It wasn't anything like this,

10   the Gram purchase agreement.  And it provided for certainly a

11   contractual undertaking, and one in which there were going to

12   be payments made in tokens for the performance of the

13   enterprise or the return of the investment if the blockchain

14   wasn't launched.  And that seemed to be a very reasoned

15   application of all of this in the *Howey* prongs.  It fit in a

16   way, because you were able to look at the way the funds were

17   invested, see them pooled in a common enterprise, and you were

18   able to see the contractual undertaking that made for the

19   return.

20           Many of the cases, however, that are shoehorned into

21   the complaint and might otherwise be litigated just can't fit.

22   And one of the things that caused us to think a little

23   differently about *Howey*, your Honor, in this case is that it's

24   a unique case — and I use that word advisedly — where the SEC

25   alleges that an investment contract changes hands on a

O1HJSEC4

1    secondary market.  That's new, and it fits very, very -- with

2    real difficulty analytically with *Howey* because *Howey* was a

3    privity case, a primary issuance privity case.  Nearly every

4    single one of the cases that followed it was a primary issuer

5    privity case.  The only one that wasn't was maybe the *Hocking*

6    case, which we've talked about in our brief, and I won't bore

7    the Court with.

8         It seems in the context of a secondary transaction

9    very difficult to shoehorn a blind transaction that required a

10   contractual undertaking into the *Howey* analysis, which I do

11   think fairly said wasn't built for that.  But I want to be

12   clear, we have no fear of *Howey*.  It's a case that says an

13   investment contract requires a contract.  It actually says that

14   the investment contract anticipates a investor taking shares in

15   an enterprise.  And it says repeatedly that those shares are to

16   be evidenced by contracts and leads, and those contracts,

17   indeed, should determine the future payout due investors.  That

18   was *Howey*, and that's our case.

19        THE COURT:  Speaking for a moment, going back to

20   *Terraform* and also Judge Barbadoro's *LBRY*, I thought I

21   understood and at least it's been suggested to me that I should

22   understand those cases to stand for the propositions that what

23   matters for purposes of whether these were investment contracts

24   or whether it's securities was whether the tokens were marketed

25   as profitable investments and whether the profits were derived

O1HJSEC4

1    from the efforts of the issuer's management team.

2            Now, neither of your issues, either a means of

3    enforcement or sort of an ongoing interest or relationship, is

4    present.  Has the argument that's been made to me, does it just

5    overlook important things of *Terraform*?  You've already talked

6    about *Terraform*.  Perhaps *LBRY* is the place to talk.

7            MR. SAVITT:  I guess I do want to emphasize that *LBRY*

8    is a pure ICO primary trading case, and that's a very important

9    point of distinction.  And because it was an ICO case, the

10   matter of the contractual undertaking was much easier to

11   resolve, and there were findings about the way those proceeds

12   were invested to launch the enterprise.

13           On the subject of our slides, I'll just draw the

14   Court's attention to slides 10 and 11.  And we think this is

15   really important because we don't think these cases, which had

16   only to do with the ICO context, the initial offering context,

17   the primary privity context, can be imported into the secondary

18   arena.  In the briefing, the commission suggests that they

19   stand for the proposition, that primary and secondary

20   transactions ought to be viewed in the same way.

21           In every one of these cases, the commission stood up

22   and told the judge we're not talking about secondary trades,

23   they're different, each one of them, including on the last side

24   here, 11, you can see that the judge even seemed quite

25   frustrated about it.  Every time he raised the matter of

O1HJSEC4

1   secondary transactions, "We're not litigating that here.  The

2   commission has to decide that."  Blah, blah, blah.  And then

3   the Court said --

4              THE COURT:  That's the actual transcript, huh?

5              MR. SAVITT:  "Have I misunderstood your position?

6   No."  So those cases are just not apposite here.  They concern

7   a very different factual predicate.

8              THE COURT:  Okay.  Thank you.  I'd like to give you a

9   break, please.

10             If I can turn to your colleague, Mr. Schwartz, to talk

11  about why my discussions with Mr. Margida about Wallet and

12  staking were all wrong.  Thank you, sir.

13             MR. SCHWARTZ:  Not all wrong, your Honor.

14             THE COURT:  Okay, great.

15             MR. SCHWARTZ:  Your Honor, I'll start with Wallet, if

16  that's comfortable.

17             THE COURT:  Please.

18             MR. SCHWARTZ:  There are actually very few allegations

19  put at issue in the Wallet claim.  And as you heard from our

20  friends at the front table, the law is well settled, and the

21  parties aren't disagreeing about what it is.  We both cited the

22  same nine factors, and I think there's no real dispute that

23  nearly all of them are absent from the SEC's allegations.  They

24  don't dispute that they haven't purported to allege the variety

25  of core brokerage activities that are traditionally found by

O1HJSEC4

1    Courts, negotiating terms for the transaction, making

2    investment recommendations, arranging financing, holding

3    customer funds, conducting independent asset valuations.  None

4    of these core factors are addressed at all, even purport to be

5    alleged.

6           What they do say they allege, and that's what I want

7    to turn to, as my colleague said, you may find it helpful to

8    look at page 15 in the deck.  This just sets out on one slide

9    for you so you can see the four paragraphs in one place that

10   the SEC points to as sufficient pleadings to survive the motion

11   for judgment on the pleadings.  We think these fail as a matter

12   of law to support a claim that Wallet acts as a broker.  I'll

13   point you to 6482 to start.  Those together talk about Wallet,

14   routing, customer orders through third-party decentralized

15   exchanges, assets from blockchains available to swap via

16   Wallet, price comparisons across multiple exchanges.

17          What you don't see in these allegations, your Honor,

18   are any well-pleaded facts showing that Wallet itself is doing

19   any of these activities beyond allowing users access to the

20   third-party platforms who give that functionality, who carry

21   out those activities.  And here, your Honor asked about this

22   earlier, and we want to direct your attention to it.  In the

23   user agreement, which is incorporated in the complaint by

24   reference, lays this bare, the bottom line that it's not

25   wallet, but it's third-party platforms that are carrying out

O1HJSEC4

1    the very activities the SEC is referencing.

2              And here, if you turn to slide 16, your Honor, you'll

3    see the portion of the Coinbase user agreement excerpted for

4    you setting forth what happens in Wallet.  The app or browser

5    provides a link to the platform.  Through the link, users

6    "navigate away from the Coinbase site to the dApp or the DEX."

7    And you know, your Honor put it very well in the Uniswap case.

8    Once Wallet provides a technical connection to the third-party

9    platforms, customers then direct the smart contracts on those

10   platforms, like the Uniswap trading platform, to take the

11   digital assets out of Wallet and carry out the swaps or

12   whatever activity those exchanges permit.

13             There are no well-pleaded facts to the contrary here

14   suggesting that these activities occur within Wallet itself.

15   And I'll just add, your Honor, there was an earlier colloquy

16   about 0x, which is yet another one of these third-party

17   exchanges.  It's an information-based protocol that connects up

18   to third-party platforms.  That is not within Wallet.  It's not

19   alleged to be within Wallet, by the way.

20             My colleagues at the front acknowledged that.  It was

21   noted in our footnote on page 27 of the brief.  It was not

22   alleged in the pleadings.  But I'll hasten to correct it

23   anyway.  0x is one of those third-party platforms to which the

24   Coinbase Wallet user interface connects those users to do

25   activities on a third-party platform.  And that's a critical

O1HJSEC4

correction or clarification in light of the limits of the
pleadings and the user agreement that's fairly before the
Court.

Another activity they point to in paragraph 75 you had
a discussion about earlier was solicitation of investors as
something that was purportedly alleged.  If you look back at
paragraph 75, again, on slide 15, the allegation is that
Coinbase solicits customers by advertising features of Prime
platform and Wallet advertising to download the software.
That's nothing like the findings that courts have made for
solicitation of investors for particular investment
transactions.

That's the broker solicitation courts have addressed
in the cases the SEC points you to, *Hansen*, *Martino*.  In the
SEC's brief, those cases are ones that identified as brokers
agents of issuing companies who actively targeted prospective
investors to raise capital by telling particular investments.
None of that is alleged here.

And so here, again, I think it's fair to consider
solely the limits of the allegation and the absence of
well-pleaded facts, adding anything of the sort to solicitation
of investors to conclude that this, too, is not alleged as
wallet activity.

Lastly, you had a discussion about paragraph 101, the
last one listed on slide 15, that Coinbase used to charge

O1HJSEC4

1    customers transaction-based compensation for the activities on

2    those third-party platforms.  Coinbase no longer does charge

3    for those activities.  But even if it did, it's important to

4    say the courts have been crystal clear, and it's long been

5    true, commission-based payments standing alone do not make

6    brokerage activity, and that's not in dispute.

7            THE COURT:  But they're not suggesting that the

8    commission standing alone would've made Coinbase a broker.

9    They're suggesting what you say is providing access to

10   third-party dApps and things like that.  The concern I have --

11           MR. SCHWARTZ:  Absolutely true.

12           THE COURT:  The concern I have is you all seem to have

13   a dispute about the facts.  I think I'm hearing you to say, so

14   tell me, that I can resolve that dispute in this context

15   because the user agreement and other statements, when compared

16   with the paucity or the abstractness of the commission's

17   allegations — no offense — is enough to allow me to find as you

18   wish me to find.  But I think they're saying, Not yet, Failla,

19   you've got to let this go through to discovery.

20           MR. SCHWARTZ:  Yes, your Honor.  I think that's

21   exactly right.

22           With respect to the allegations in 6482 we talked

23   about, that paucity, saying that Wallet does something through

24   third-party platforms, that something happens via Wallet that

25   the price compare happens on, each of those is the circumstance

O1HJSEC4

1    you just described where the paucity plus the user agreement

2    gives you ample basis to decide the pleadings don't suffice.

3            But where I'll round out the picture is with respect

4    to the solicitation of investors, the only other core broker

5    activity the SEC claims to have even alleged, that on its face

6    does not allege what is understood as a matter of law to be the

7    solicitation of investors by brokers.

8            THE COURT:  I see.  I appreciate the clarification.

9    Thank you.  Let me just take note of that.

10           MR. SCHWARTZ:  Your Honor, in case useful, it occurs

11   to me from your discussion, one way that the SEC has sought to

12   suggest there's an alternative frame or some different version

13   of facts, is by saying the user interface connects and

14   therefore facilitates, puts these parties together.  Again,

15   this is not a fact dispute.  As a matter of law, that

16   facilitation or putting parties together does not make

17   brokerage activity.

18           And I'll point your Honor's attention to a case in our

19   briefing, the *Rhee* case.  This is also found in the *Foundation*

20   *Ventures* case.  But Judge Liman in the *Rhee* case made clear

21   merely providing information or bringing two parties together

22   to make their own contract does not transform an individual or

23   entity into a broker, even if they receive commission-based

24   payments.  At most, it's the activities of a finder, and that

25   is not subject to the security laws.  In that case, the person

O1HJSEC4

1    at issue didn't negotiate the transaction, didn't engage in

2    substantive conversations, give valuation advice, the variety

3    of core activities I mentioned that aren't even purported to be

4    alleged here.

5            THE COURT:  Fair enough, sir.  But I think the concern

6    of the commission, and it might be a concern that I share, is

7    to the extent that what we're talking about is how you can

8    implement technology to make things faster, easier, have access

9    to even more entities, there's a concern the commission has

10   that it can't just be that technology obviates a finding that

11   one is a broker.  Because if you do broker e-functions, but you

12   do them through some sort of automated mechanism that you have

13   at your disposal, you might still be a broker.  I think that's

14   what the commission is saying.

15           I think what you're saying, and let me just confirm

16   that, is that the allegations that are contained in the

17   pleadings, as amplified or perhaps given further detail by the

18   user agreement, are just not enough.  Am I understanding your

19   argument correctly?

20           MR. SCHWARTZ:  I think that's exactly right with

21   respect to those activities that the commission claims to have

22   alleged.  And there's no dispute about the variety of core

23   activities they don't claim to have alleged that I mentioned at

24   the outset.

25           THE COURT:  Right.  So there are a number of factors

O1HJSEC4

```
 1    that I may consider in determining whether someone is acting as

 2    a broker.  You're saying they don't allege all nine or

 3    whatever, they allege a couple.  And as to those, there are

 4    reasons to disbelieve or to view with skepticism the

 5    allegations that are made?

 6                MR. SCHWARTZ:  Yes.  We would say there's reason to

 7    find there are not well-pleaded facts to support those

 8    allegations.

 9                THE COURT:  Or that.  Shall we then speak of staking,

10    sir?

11                MR. SCHWARTZ:  Yes, absolutely.

12                THE COURT:  Are there slides about staking?

13                MR. SCHWARTZ:  You better believe it, Judge?  I will

14    turn your attention — in fact, I hope it's helpful — slide 17

15    was designed late at night, bearing in mind and reflecting on

16    the last time we all gathered, and so I'm very glad to give

17    that some attention.

18                Your Honor asked a question about what's properly

19    before you when it comes to staking back in July, and that's

20    why we thought it might be worth stepping back to frame what is

21    properly at issue in the pleadings when it comes to the staking

22    product.  And to be clear, we think there are three different

23    reasons, each sufficient on its own for this claim to be

24    dismissed.

25                But I'm going to start with the investment of money,
```

O1HJSEC4

1   and let me frame this for you.  We've set out here the various

2   provisions from the allegations in the complaint and from the

3   user agreement, which we think suffice to give you the picture

4   of the facts that are relevant for disposing of these

5   pleadings.

6          At the foundation of blockchain is the need to

7   validate each new block or transaction that's added before it's

8   added to ensure the security and accuracy on a consensus basis.

9   Can you see that in paragraph 312.  Where staking comes in,

10  your Honor, is from two propositions, again, set out in the

11  sources before you.  Number one, blockchains that use proof of

12  stake to achieve the consensus I mentioned, set a fee, they

13  call it "rewards" that they pay to token holders to perform

14  this critical validation service.  That's set out in paragraphs

15  312 and 313 of the complaint.

16         Number two, the users who take on this validation

17  service to put up or stake some of their tokens while they're

18  performing the validation service they get paid for,

19  paragraph 313 calls these staked assets is collateral,

20  collateral against improper validation, and collateral that's

21  held in the protocol while the services are being carried out.

22         For token holders who stake on their own, your Honor,

23  that's it.  It's a fee for validation service for the

24  blockchain.  And you can identify that again in the allegations

25  before you confirm by the provisions of the user agreement.

O1HJSEC4

1    Some users then choose to subcontract that service to Coinbase.

2    They hire Coinbase to operate the IT, to validate on their

3    behalf, and they direct Coinbase to take their tokens on the

4    blockchain while that happens.  Those are the facts from the

5    complaint and the user agreement.

6          And with these in hand, we think, you can turn to each

7    of the two reasons — we'll start with the investment of money —

8    of why the complaint fails to plead an investment of money

9    under *Howey*.  And I'll begin, your Honor, just with a case that

10   the SEC emphasized to you, the *Rubera* case from the Ninth

11   Circuit.  The Court of Appeals there said one has to "commit

12   assets to the enterprise in such a manner as to face the risk

13   of loss."  And I want to focus on the first part of that.

14   Commit assets to the enterprise to have an investment of money,

15   sound straightforward.  Without a contribution of assets to the

16   capital structure, there's just no investment.

17         Here, the SEC has made no allegation, there's no

18   plausible claim that they could, that staking customers commit

19   anything to Coinbase in this case in this way.  They just

20   direct Coinbase in the normal custodial relationship to make

21   their tokens available to the blockchain as collateral, as

22   paragraph 313 puts it, for a potential slashing for validation

23   and to provide IT services in connection with it.

24         Now, the sole way that the SEC tries to satisfy this

25   commitment of assets requirement — I'll point you to slide 18

O1HJSEC4

1   for this, just to put their allegation in front of you,

2   paragraphs 340 and 341 and repeated elsewhere — is to tell you

3   staking customers tend to just give up control over their

4   tokens to Coinbase.  And here, going to your question earlier

5   about where something is wrong but properly before you to

6   resolve, center stage, your Honor, this bare allegation

7   warrants no credit, and it's contradicted by the user

8   agreement.

9           You can see on the next slide, slide 19, Section 2.7.3

10  of the user agreement, and the appendix which established,

11  "You, the customer, control the digital assets held in your

12  digital wallet."  And Appendix 4 extends this to staking

13  services whether or not the digital asset is staked.  And this

14  is important in granting a motion to dismiss the *Underwood*

15  complaint against Coinbase.  Judge Engelmayer addressed the

16  same user agreement, and much as your Honor described earlier

17  said, "Where a document is incorporated by reference, the Court

18  need not accept contrary allegations in the complaint that seek

19  to allude the facts contained in the incorporated document."

20  His words were the user agreement checkmated those plaintiffs

21  from adequately pleading their claims.

22          And your Honor, you won't be surprised to hear we

23  think you should likewise find the SEC's bare allegations that

24  customers give up control over staked tokens in order to claim

25  there's a commitment of assets, it's checkmated by the user

O1HJSEC4

1    agreement.  And taking that aside, there are no well-pleaded

2    facts suggesting that anything about this relationship, this

3    fee-for-service relationship that users have with the

4    blockchain and they subcontract to Coinbase, there is no

5    commitment of assets, there is no contribution of capital by

6    the users to Coinbase's capital structure that could possibly

7    satisfy the investment of money requirement that *Rubera* and

8    Courts have long required.

9           Another aspect of staking you asked about, your Honor,

10   unless there's a further question about that, is risk.  We

11   spent some time in colloquy about risk.  And that goes to the

12   second half of *Rubera*, of the sentence from *Rubera*, again, that

13   the SEC is trying to rely on.

14          THE COURT:  Are you suggesting that it's wrong for

15   them to rely on it?

16          MR. SCHWARTZ:  No.  I think it's the right case to

17   rely on, it just doesn't help them.  Unfortunately, their

18   allegations fall short of that standard of law.

19          And here, again, I'll just quote you the back half of

20   what we said, "An investor must commit his assets to the

21   enterprise in such a manner as to subject himself to financial

22   loss."  And it's not just the Ninth Circuit; the Second Circuit

23   has affirmed that the Supreme Court added this limiting

24   requirement, as well.

25          Now, on slide 20, your Honor, you'll see the handful

O1HJSEC4

1    of paragraphs that the SEC tells you suffice to allege risk of

2    loss from staking.  And I'm happy to take you through them.

3    I'll tell you broadly speaking, apart from the conclusory

4    allegation at the top, the first two, 341 and 343, concern

5    blockchain requirements for staking and validation.  The bottom

6    two don't concern staking; they're just risks that are general

7    to token holders.  Both buckets of these allegations fail as a

8    matter of law to rise to assert risk of financial loss in the

9    commitment of assets to the Coinbase enterprise.

10            THE COURT:  Let me ask you to pause for a minute, sir.

11   I've spoiled myself a little by looking at the next slide,

12   slide 21, which speaks about the risk of loss and how it's

13   discussed in the user agreement.  My reaction to reading the

14   briefing was that I thought that Coinbase argued in a number of

15   ways that the risk of loss was infinitesimal or that the risk

16   of loss was something that could be addressed and made up for

17   by Coinbase if anybody lost money or that the risk of loss was

18   the same if you were self-staking or that the risk of loss was

19   something that you would have just as a customer of Coinbase,

20   irrespective of whether you staked or not.  But all of those

21   arguments, they sounded to me a little bit defensive because

22   they all seemed to presuppose that there was a possibility of

23   loss.

24            If the Ninth Circuit test that we're saying is the

25   right test to use is that the risk of loss is itself enough,

O1HJSEC4

1    then the fact that the risk of loss is really small, could be

2    made up, or could happen in other circumstances, I'm not sure

3    it gives me a complete answer.  Can you help with that?

4          MR. SCHWARTZ:  Thank you for the question.  It covers

5    the waterfront really well, and so let me try to take it in a

6    few pieces, if I can.

7          Let's distinguish the two buckets, if you will, those

8    relate to staking in some way and those that don't.  Because I

9    don't think we would say that the risk is just so small, you

10   don't have to worry about it.  The risk of loss does not exist

11   on the pleadings and the user agreement before you.  The first

12   risk they point to is slashing, your Honor, this idea that

13   there could be improper validation and the staked assets are

14   slashed.  But that same paragraph, 343, acknowledges that is

15   not a risk that Coinbase stakers face.  It doesn't say it's

16   small.  It's not a risk that Coinbase stakers face because

17   Coinbase indemnifies for it.

18         Now, they go on to stay there's still general risk.

19   I'll just flag for your Honor that quote on the rest of 344 is

20   from a money transmission disclosure that Coinbase has for New

21   York State where paragraph 333 of the complaint acknowledges

22   Coinbase does no staking business.  So that quote has nothing

23   to do with staking.  So there's a discussion about slashing

24   risk, Coinbase indemnifies for it, the allegation acknowledges.

25   That risk does not exist.

O1HJSEC4

1          The second risk that's talked about in 341 is a risk

2     of loss while staked because tokens can't be used for other

3     purposes like trading or transferring.  Here, again, this is

4     just restating a condition imposed by the blockchain that the

5     validators who choose to sign up for this service and perform

6     this service for the blockchain, in return for a fee, put up

7     collateral while they're doing the service.  Think of it

8     something like a security deposit.  They're not going to do a

9     bad job.  They're not going to make mistakes while they're

10    there.  They get it back in the end.  There's the allegation of

11    risk that they can't do other things with their collateral,

12    with their security deposit.  Doesn't state a risk of financial

13    loss that *Rubera* was talking about in such a manner from your

14    investment.

15          The last two, again, I think your Honor summarized it

16    very well, 344 and 345 are just not staking risks, they're

17    risks alleged for anyone who holds tokens.  Now, the way the

18    SEC frames that as a defensible and sufficient allegation is to

19    say that there's a risk of ownership loss for all token holders

20    and they don't have to allege more.  And I want to tell you why

21    that's wrong, your Honor.  But first, as you saw in the

22    briefing, we do take issue with and dispute that standard of

23    law.

24          What courts have to show is that investors put capital

25    into a business with the risk that its performance may lead to

O1HJSEC4

1   their inability to recover the capital.  That's what investing

2   in such a manner to face the risk of loss is, according to

3   *Rubera*.

4           Stepping back, here the SEC is charging Coinbase with

5   offering an investment contract through its staking service.

6   To have an investment of money that's required for that, there

7   has to be a risk of loss alleged that arises from staking

8   through Coinbase.  But even if that's not necessary and your

9   Honor says, Well, what about their risk of ownership loss?  You

10  can see on the slide, as you jumped ahead to slide 21, there

11  are no well-pleaded facts here stating a risk of ownership loss

12  over staked tokens.

13          My friends at the front table say, That's our say-so.

14  It's the Court's say-so over and over again for a custodial

15  validator like Coinbase, ownership over staked assets is

16  dictated by the contractual agreement between the user and the

17  custodian.  You can see in these provisions we've set out for

18  you, your Honor, this user agreement is crystal clear.  Title

19  to staked assets at all times remain with the users.  They do

20  not transfer to Coinbase, they don't become property of

21  Coinbase, and they don't become subject to general creditor's

22  claims under any circumstances.  And these guarantees are

23  obviously very important that the tokens will be returned.

24          I want to point you to one more source, your Honor.

25  Your colleague, Judge Engelmayer, who recently confirmed this

O1HJSEC4

1    very point that I'm pressing to you as a basis for the

2    inadequacy of this claim.  He examined whether title had passed

3    to Coinbase in any respect in the *Underwood* case.  And he

4    granted the motion to dismiss based on the user agreement

5    finding, "The user agreement's terms flatly contradict the

6    allegations that Coinbase holds title to the digital assets."

7    Appendix 4 says the same thing for staking services; they do

8    not affect ownership.

9         Taking that on its face, your Honor, this is an

10   independent reason what why, as a matter of law, the complaint

11   fails to plead the required investment of money bearing a risk

12   of financial loss, and the claim should be dismissed.  We think

13   that does resolve the staking claim.

14        THE COURT:  You're saying it's an independent reason,

15   and that's because the first reason is because they aren't

16   securities?

17        MR. SCHWARTZ:  Well, the first reason is there's no

18   investment of money in capital structure.  And second, in any

19   case, there's no risk of financial loss well pleaded in the

20   allegations.

21        The last aspect of staking, I'm happy, your Honor, if

22   you'd like to discuss it.  Although mindful of time, I'll

23   respect if you've heard enough about staking for the day.  It

24   is the efforts of others that you've had some colloquy with our

25   friends from the front table as well.

O1HJSEC4

1          THE COURT:  It seems that there's not necessarily a

2     disagreement between what activities or what services Coinbase

3     is or is not affording to folks involved in the staking

4     process, but whether those amount to ministerial or managerial.

5          MR. SCHWARTZ:  For the most part, I think that's

6     right.  I'll offer one clarification.  You can see on slide 22

7     we tried to group the various activities from Coinbase that the

8     SEC alleges as efforts of others.  The reason I offer an

9     asterisk to that otherwise apt description, your Honor, is the

10     first few categories do not concern Coinbase's activities or

11     those that are alleged to be managerial.

12          The first category, the group of paragraphs concern

13     general proof of stake activities; it's not about Coinbase, and

14     so that's not about Coinbase's efforts.  The second is about

15     retaining third parties to stake assets.  Again, not about

16     Coinbase, not Coinbase's efforts.  The third category is about

17     liquidity pools for quicker withdrawal, something that's

18     acknowledged in the complaint is no longer the case in Coinbase

19     staking.  But in any event, again, on its face, addresses the

20     administrative convenience of unstaking, of exiting the staking

21     program.  It doesn't posit any managerial qualities or

22     otherwise in the conduct of the actual staking program at

23     issue.

24          So those first three I'll just say are actually

25     separate.  The bottom two are the remaining efforts the SEC

O1HJSEC4

1    alleges.  And quite as Honor put it, those just aren't the type

2    of managerial and entrepreneurial efforts required by *Howey*.

3    They are just the type of clerical and routine functions that

4    courts have found do not suffice to plead the requisite

5    standard of the material significant impact on returns.  That

6    goes for the IT services with software and equipment.  That

7    goes for the pooling, where there's an aggregation of tokens to

8    stake.

9         And we direct your Honor's attention to the *Life*

10   *Partners* case where what was found to ministerial, your Honor,

11   was an almost identical constellation of efforts that was found

12   to have "no material impact on the profits of the investors,"

13   including because these were services that "anyone, including

14   the supposed investor himself could supply these services,"

15   and there were a number of others who could have as well.

16        So again, happy to delve into it further, but we would

17   commend those excerpts that we've put in front of your Honor

18   from *Life Partners* to lay bare quite how clear it is as a

19   matter of law that we think the back office mechanical

20   outsourced IT services and administration that's alleged in

21   those bottom two categories of paragraphs do not rise to the

22   level of an adequate pleading of efforts of others.

23        THE COURT:  Thank you so much.

24        I think that leaves me with Ms. Eddy and the major

25   questions doctrine.  One of the discussions I was having with

O1HJSEC4

```
1    your colleague, Mr. Savitt, was the reconciliation, if there

2    needs to be one, between Coinbase's arguments about the

3    applicability or how it interpreters the *Howey* test and how

4    that works with the arguments it's making about the major

5    questions doctrine.

6           So perhaps we could begin there.  Could you help me

7    reconcile those two ideas.  And what I need in particular is,

8    to the extent that you are arguing that the *Howey* test applies

9    by its terms that that's the test I should be using and we

10   should be working in that framework, rather than suggesting

11   that these particular tokens are outside of that framework,

12   does that in any way exist in tension with your argument that

13   the SEC's bringing of this case amounts to some sort of

14   aggregation of powers it doesn't have?

15          And I'll ask you, just because I know this courtroom,

16   to grab the microphone and bring it near you.  I'm sure we will

17   hear you, but I just know there's something about those

18   microphones.  Thank you so much.

19          MS. EDDY:  Thank you, your Honor.

20          And I will say I'll preface this by saying our

21   position is that our interpretation of *Howey* and our argument

22   about the investment contract and what it requires fortifies

23   the major questions position that we have, in fact, it

24   undergirds the whole thing.

25          We don't think you even get to major questions here
```

O1HJSEC4

1    because the text and the context and the precedent established

2    that the position the SEC is advancing here is not grounded in

3    law.  But if the Court were to disagree and to find

4    plausibility in the SEC's position, that's when the major

5    questions doctrine would kick in and it would compel rejection

6    of that position.  And that's because, as Mr. Savitt, I think,

7    already explained at length, the transactions on Coinbase's

8    secondary exchange are of a different character than anything

9    that the SEC has asserted regulatory authority over before, and

10   they are of a different character than the interpretation the

11   SEC itself has advanced in *Howey* in its briefing there.

12           It talked about contractual arrangements, for example.

13   It's different than any position that it's taken in briefing

14   since, in some of the briefs that Mr. Savitt highlighted from

15   *Edwards*.  It's taking a different position than Chair Gensler

16   took in 2021 when he appeared before Congress asking for

17   regulatory authority to cover transactions on crypto exchanges.

18           THE COURT:  Let me pause you right there for a moment

19   because I want to know the degree to which you're asking me to

20   look at certain allegations in the preface to your answer that,

21   again, to me seem to speak more to a question of optics or not.

22   For example, I can understand Coinbase's frustration that it

23   tried to be helpful, if that's how it perceives what it's

24   doing.  It tried to be helpful, it tried to talk to the

25   commission, it tried to get some guidance.  And then, rats,

O1HJSEC4

1    there's an enforcement action brought against it.

2            So I get that.  But for me, there's a layer of optics

3    that I'm really not considering or at least I didn't think I'd

4    need to be considering in terms of the context of the major

5    questions doctrine, the fact that you asked for guidance, your

6    client asked for guidance and didn't get it.  I'm assuming

7    instead I'm looking at a narrower universe of materials, which

8    would be the statements of SEC officials, of the higher-ups

9    there, and the positions that the commission itself has taken

10   in other cases.  Am I correct or am I also supposed to be

11   looking at everybody's efforts to be helpful?

12           MS. EDDY:  Your Honor, you're absolutely correct.

13   There is a good portion of the allegations in the preface to

14   our answer that you can properly consider and should consider,

15   not just as optics but as going to factors that the Supreme

16   Court has repeatedly identified as relevant, the bevy of

17   Congressional activity surrounding this very significant

18   question of how to regulate crypto, and the fact that Chair

19   Gensler made those statements to Congress in 2021, all those

20   facts you can consider and should consider, we submit.

21           And I don't think the SEC disputes that.  Those aren't

22   really facts --

23           THE COURT:  I don't think they dispute it.  I think

24   what they say is the Gensler statement is taken out of context,

25   and you disagree.  There's quite detailed and yet not the same

O1HJSEC4

1   results.  I really think everybody has a view of that, and I

2   understand that.

3        With respect to the "bevy of Congressional activity,"

4   I thought I understood your argument to be — and it's also

5   presented in some of the amicus briefs — is that the fact that

6   Congress seeks greater clarity doesn't necessarily mean that

7   the SEC lacks the authority in this space.  I appreciate that

8   your view is it does, but I think their argument is, We've

9   always had rights to regulate securities, and it may have took

10  us a moment.  We may have stumbled along the way, but we

11  figured out how we could do it, and here we are doing it.

12       I'm not sure it's of a piece, for example, with — just

13  to pull something out of the air — with the OSHA vaccine

14  mandate — whatever your position is on that — I'm not sure that

15  was something OSHA did on a regular basis.  Or the student debt

16  cancellation, I'm not sure that's done on a regular basis.

17       Here, the commission would argue, This is what we do.

18  And yes, the token, the asset may be different because over

19  time different assets develop, but it's really no different in

20  terms of the motive analysis that we're applying.  Why are they

21  wrong?  What is it about crypto that makes it so qualitatively

22  different than the other assets or the other putative

23  securities that the commission has considered and regulated

24  over time?

25       MS. EDDY:  Let me begin by saying that it's not what

O1HJSEC4

makes crypto special.  It's the nature of the transaction that
the SEC is now designating and calling a security that it
didn't designate or recognize as a security in any of its prior
briefing over sort of the 90-year history of the Exchange Act
in Chair Gensler's comments to Congress.  And this is a special
kind of transaction; it's one that doesn't have an ongoing
legal relationship between the issuer and the purchaser.

         So that is the class of transaction that is at issue
here.  And the SEC is offering an interpretation through a
campaign of enforcement actions that is not just arrogating
authority to itself, it is expanding its jurisdictional
perimeter.  In some sense it's similar to the *Brown &*
*Williamson* case where the question was was tobacco a drug or
device?  Here, the question is is this class of transaction a
security?  And the Congressional activity, we're not saying
that's dispositive, but it is something the Court can and
should consider under the governing precedents in assessing
whether Congress has spoken clearly about whether the term
"security," the term "investment contract" can properly be
conceived to cover what the SEC is identifying and pursuing
here.  And I think, for all the reasons that Mr. Savitt already
gave, there's no clear statement of that kind here.

         THE COURT:  I just want to make sure I understand what
you're saying because it's not the answer I was expecting,
which doesn't mean it wasn't a perfectly fine answer.  You're

O1HJSEC4

1   saying that the thing I should be concerned about is not crypto

2   assets, what are they, are they securities or are they not, but

3   that the particular transaction that's being challenged, the

4   particular types of transaction that are being challenged are

5   so different than anything as to which the commission's

6   asserted authority in its history?  Am I understanding that

7   correctly?

8          MS. EDDY:  That is the first part, your Honor, yes.

9          And I think the cases look both at what is the nature

10  of the arrogation of authority, how expansive is it?  And I

11  think that's part one of the answer.  The cases also look at

12  what is the impact here, and what is the significance on the

13  practical level of the expansion that the agency is asserting?

14  And that's where we look at the fact that this is an arrogation

15  of authority over an entire industry.

16         THE COURT:  I'm sorry.  I'm looking at the impact on

17  whom?  On both the industry and on the commission?  Because I

18  thought from listening to your colleagues at the front table

19  that one of the issues that was discussed was whether

20  enforcements went from something in the tens to something in

21  the thousands or something like that.  So am I looking at what

22  this could do in terms of how much it would expand the number

23  of enforcement actions the commission could bring?  Or am I

24  looking at it in terms of the crypto industry itself?

25         MS. EDDY:  You're looking at it, your Honor, I think

O1HJSEC4

1    both, but it's certainly the latter.  And the commission does

2    try to advance this argument that this is really just routine

3    enforcement action, and sort of incremental routine enforcement

4    action.  It is certainly true that the complaint here pleads

5    allegations regarding just 12 tokens traded on Coinbase, but it

6    is part of a concerted campaign against crypto exchanges

7    generally.

8            There were other lawsuits filed in close proximity to

9    this one against other crypto exchanges, and it is obvious that

10   if the Court were to accept the commission's definition of

11   investment contract in this case, that would have essentially

12   legislative implications.  It would affect the whole industry.

13   And the commission has kind of made no apologies for this.

14           THE COURT:  Please pause for a second.  Two followup

15   questions before you move to your next section of argument.

16   You're suggesting to me that I need to look at this as sort of

17   it's one enforcement action, it's only 12 to 13 tokens, but

18   heaven forfend, Failla, if you let this in, there will be

19   nothing but enforcement actions against either folks who

20   provide the services that Coinbase provides or crypto asset

21   issuers in the first instance.

22           So I guess when I'm thinking about the impact, am I

23   allowed to think of it, as you suggest, by looking at it not

24   merely as the case before me but as what that case might

25   portend?

O1HJSEC4

1          MS. EDDY:  I think you are, your Honor.  And I think

2     it is not just a matter of enforcement.  I want to be clear

3     about that too.  If the Court were to take the SEC's view that

4     the trades over Coinbase's secondary exchange are investment

5     contracts, then the implications of that are that the SEC's

6     regulatory apparatus applies to crypto, to crypto exchanges.

7     The Court can and should take that into account.

8          And I know there's been some suggestion that there's

9     an absence of authority for the proposition that an enforcement

10    action can give rise to the major questions doctrine, and I

11    want to just point the Court — one of the amici cites this —

12    but it's the *Gonzalez* case in which an enforcement policy was

13    at issue, and the major questions doctrine was applied there.

14    Attorney General Ashcroft had issued an interpretive rule

15    construing the Controlled Substances Act to prohibit

16    physician-assisted suicide.  And the Court held that that

17    wasn't a regulation, it wasn't entitled to any deference of any

18    kind; it was an announcement of an enforcement policy, and it

19    applied the major questions doctrine to that.

20          And I think the doctrine applies when the position

21    that the agency is advancing is essentially an encroachment

22    upon Congress' prerogative.  That is what's going on here.

23    Congress in 1934 listed out the instruments that qualify as

24    securities; investment contract is one of them.  The SEC has

25    been litigating the contours of investment contract for

O1HJSEC4

1    decades, never advancing the theory it is now advancing in this

2    case.  And that's precisely the sort of circumstance in which

3    the major questions doctrine should be invoked and should be

4    applied.

5           THE COURT:  The second argument you make is that

6    accepting their position would have effectively legislative

7    implications.  Did I understand that argument correctly?

8           MS. EDDY:  Yes, I think that's right, your Honor.

9           The commission, deliberately seeing that Congress has

10   not acted, has not granted the authority to regulate crypto,

11   has instead taken matters into its own hands.  It has gone back

12   and looked into the act from 1934 and said, Aha, we have the

13   authority we asked for two years ago.  That's impermissible,

14   and it's impermissible because there's no clear statement that

15   this kind of transaction fits within the definition of a

16   security and, thus, within the commission's own jurisdiction.

17          THE COURT:  I guess what concerns me is I'm reluctant

18   to focus or to view through too narrow a lens what the

19   commission's enforcement ability is.  I think they're telling

20   me it is routine, and you're saying it's not, so I appreciate

21   that.  I'm just saying that I guess another issue is ten years

22   on the bench, no one has ever said to me "major questions

23   doctrine" until this case.  I understand ten years is just a

24   very small drop in the bucket to many judges, but I'm sort of

25   shocked.  I've had some interesting cases, and this has never

O1HJSEC4

1    come up.

2         My research into this area does not suggest that it

3    comes up very often, and even less often does it actually get

4    found by a Court.  So I guess my question, and I mean no

5    disrespect to your clients, but I'm just not sure the crypto

6    industry is so major or so extraordinary that I need to find it

7    here.  I understand your initial point, which is you don't have

8    to if you just go our way on the other arguments, yes, I get

9    that.  But I'm saying I have a natural hesitation to involve or

10   to make a finding that something implicates the major questions

11   doctrine because it is so infrequently done.

12        And I'm not sure this is on a par with the student

13   loan forgiveness or with the energy industry.  And I know what

14   *Brown & Williamson*.  Perhaps I might have my own skepticism

15   about the *Brown & Williamson* decision.  I appreciate, of

16   course, that I'm bound by it.  But I guess I'd like a little

17   bit of comfort that what you're asking me to do -- here's the

18   tension.  You're saying to me what the commission is doing is

19   so crazy, so beyond what it should be doing that you need to

20   stop them.

21        My point to you is it is so infrequently, and, in

22   fact, this is the one case where I've been asked to do that,

23   that I worry that I am in my own lane doing exactly the thing

24   that you're arguing the commission is doing here, which is to

25   take power I don't have, to stop activity I shouldn't be

O1HJSEC4

1    stopping.  I'm not asking you to hold my hand here, but I'm

2    just saying there's a comfort that I need to have that this

3    isn't as much of a nuclear option as I think it is based on the

4    cases that I've read.

5        MS. EDDY:  Your Honor, you spoke about your own power

6    and the concern about stepping outside your lane, and I want to

7    just return to a comment that you made when speaking to my

8    colleagues on the front table about Senator Lummis' brief.

9        THE COURT:  Yes.

10       MS. EDDY:  The question here is, as between Congress

11   and the SEC, who has the power to legislate this question?  And

12   that's, I think, the question that is central to your inquiry.

13   I do want to note, though, and just make sure the Court has in

14   mind there are a wide variety of circumstances in which the

15   major questions doctrine has been invoked and has been applied.

16       THE COURT:  Yes, those are two different things, being

17   invoked and being applied.

18       MS. EDDY:  Well, let's talk about the ones in which

19   it's been applied.  It's been applied to the elimination of

20   rate publication requirements for 40 percent of telecom

21   providors in the long distance business.  That's the *MCI* case.

22   It's been applied for new emissions controls for existing coal

23   mines.  That's *West Virginia*.  The eviction moratorium at issue

24   in the *Alabama Association of Realtors* case was one affecting 6

25   to 17 million tenants with a potential economic impact of

O1HJSEC4

1    50 billion.

2          And let me just pause on that for a moment because

3    there's been some math thrown around.  This is not a math

4    question.  And none of the cases treat this as a math question

5    or as a question of fixed numbers.  It gives a flavor of the

6    significance of the impact of the agency's action.  Chair

7    Gensler himself the very day he made the request of congress

8    for authority to assert regulatory authority over crypto

9    exchanges prefaced his comments by saying this is a

10   2 trillion-dollar industry.

11         The SEC's complaint, I think paragraph 1 talks about

12   billions of dollars in trades happening every day.  The

13   economic impact here could be really crippling, and I want to

14   just make a point that hasn't gotten a lot of play here today

15   yet, which is the architecture that the SEC has in place it

16   does not work with crypto.  That's why my clients made a pitch

17   for rule making.  There's no pathway to registration as it

18   stands right now.  So if the SEC's position is accepted, the

19   potential impact of that is potentially crippling.

20         THE COURT:  Is it crippling or are you going to tell

21   me it's existential?  Or is it existential for those assets as

22   to which transactions in the assets, however they come about,

23   are investment contracts?

24         MS. EDDY:  I think it is certainly the impact is vast,

25   your Honor.  And I will return again to the point that the SEC

O1HJSEC4

1    is offering no limiting principle really to what it will

2    designate as an investment contract in the absence of an

3    ongoing contractual obligation or something that's conferring a

4    share in the enterprise.  So the potential impact is vast.

5            Now, it could go, I suppose, a different way.  The SEC

6    could put in place an entire new architecture that would

7    address this.  That's the kind of change, though, that the

8    major questions doctrine says should not be effectuated by the

9    agency.  That's something that Congress should decide.  Those

10   are the kinds of questions that Congress has before it now, and

11   that Congress should have been left to decide before the SEC

12   came and took matters in its own hands.

13           THE COURT:  But in fairness, they haven't done

14   anything.  So I have a concern about not recognizing someone's

15   authority to do something in this space.  The answer may be

16   that I'm just out of luck until Congress acts, as you would

17   say, Chair Gensler recognized sometime ago.  But maybe I'll

18   leave it at that.  Okay.  Thank you.

19           Did I just deprive you of some great thought you

20   wanted me to know about?

21           MS. EDDY:  I don't believe so, your Honor, but I'm

22   sure there will be an opportunity later if something comes to

23   mind that I think I missed.

24           THE COURT:  Funny you should mention that.  We've now

25   finished our fourth hour of argument and congratulate those of

O1HJSEC4

1    you who've stayed and listened through all of this.  I have

2    asked the 14 pages of questions I wanted to ask, and I thank

3    you very much.  And what I'd like to do is the following:  I

4    imagine that if I asked you, you would not forego the

5    opportunity to say something to me in the vein of a summation

6    or something I need to focus on or something I was too dumb to

7    ask you about.

8            So we're going to take another break, and I'm going to

9    ask folks to get together.  Mr. Peikin, my thought was that's

10   where you would be coming in and you would be speaking to that

11   issue, but if there's something else, tell me now because you

12   were designated cleanup.  So what is it that they --

13           MR. PEIKEN:  I was responsible for correcting errors,

14   and since none were made, there's nothing for me to contribute,

15   your Honor.

16           THE COURT:  I do appreciate the love the back table

17   has for each other.  I still think you should make a play to

18   speak, but that's just me.

19           MR. PEIKEN:  This is the longest I've been silent for

20   my entire life.

21           THE COURT:  I'm not going to disagree.  Yes.  So take

22   ten minutes, think small thoughts, just something really

23   summary that you want me to know that I'm not going to get from

24   our argument, which I promise you I will reread the transcript

25   of and from the briefing.  And just in case there's something

O1HJSEC4

1    we didn't cover and we should have, that's your opportunity.

2    Let's say five, ten minutes maximum.  This is not the two-hour

3    summation at a trial.  But take the break, thank you all very,

4    very much for your preparation.  And my thanks to those of you

5    who've spoken today, to those of you on quality control, to

6    those of you who actually prepared the oralists to speak as

7    well as they did.  You have my deepest thanks because this is a

8    hard question, but I can't say there's an argument you haven't

9    made to me.  I just have to decide which one makes more sense.

10   So we'll be back in ten.  I thank you very much.

11            (Recess)

12            THE COURT:  Mr. Costello, whom do I have the pleasure

13   of hearing from from your side?  Unless you want to forego all

14   of this.

15            MR. COSTELLO:  Your Honor will be hearing from

16   Mr. Tenreiro.

17            MS. TENREIRO:  Thank you, your Honor.

18            And I am going to use some of the five to ten minutes

19   you've given me to clarify something that I think is critical

20   to the Court's decision today.  There's been a lot of talk

21   about *Ripple*, *Terraform*, and *LBRY*, and I know the Court's going

22   to look at, again, the cases and at the briefs.

23            So in one respect, we absolutely agree with the Court

24   that this case is different.  And the reason it's different is

25   because in this case, we sued the intermediary.  So the cause

O1HJSEC4

1    of action was here, Section 5 under the '34 Act.  In those

2    cases, all of them involved at a minimum causes of action under

3    Section 5 of the '33 Act.  But what those cases did involve,

4    and I think there's been a perhaps accidental misstatement,

5    particularly of *Terraform*, is sales by those issuers on what

6    we're calling today secondary market platforms, and to read

7    from Judge Rakoff's summary judgment ruling — and that's

8    page 60, I think of the Westlaw version at least — and it's in

9    a section where he says that *Terraform* violated Section 5.

10   *Terraform* also sold both LUNA and MIR tokens to secondary

11   market purchasers on...crypto trading exchanges.

12           So our contention is, if he's correct that those were

13   securities, and those crypto trading exchanges meet the

14   statutory definition of exchanges, those exchanges are

15   violating, like Coinbase, Section 5 of the '34 Act, while

16   *Terraform* is violating Section 5 of the '33 Act.

17           Neither *Ripple* nor *Terraform* nor *LBRY* involved any

18   claim by the commission that a sale between what I'll say two

19   of us here at this table was a violation of the act.  All of

20   those cases focused entirely on the issuer's conduct, but all

21   of those cases*, Ripple* included, and *LBRY*, all of them, they

22   sold also on these platforms, right?  And Judge Barbadoro found

23   no meaningful distinction, neither did Judge Rakoff in

24   *Terraform* find a meaningful distinction between an issuer

25   selling on the platform and what Judge Torres calls blind bid

O1HJSEC4

1   asset transactions or selling them more or less directly

2   through these one-on-one meetings.

3            And the reason that matters to us, your Honor, is the

4   cases are different in the cause of action.  Our perspective is

5   they're identical in terms of the *Howey* test that applies.  And

6   we think Coinbase is trying to create a different *Howey* test

7   for when the people at this table might sell the tokens to each

8   other on its platform and when *Terraform* might sell its tokens

9   on Coinbase's platform.  And we think that's just wrong, your

10  Honor.

11           And actually, Coinbase did the Court a favor and put

12  some of our briefs there.  And if the Court does in its spare

13  time look at the briefs, our briefs and defendant's briefs,

14  they're actually remarkably quite similar.  A lot of them talk

15  about these contractual obligations, and so our perspective is

16  it's the same test.  The fact that it's an issuer selling it on

17  the platform or that two people are reselling it once it sells

18  does not materially alter the outcome.

19           And why does this even matter for this case is that

20  there's a lot of conversation about the asset hub, but the key

21  sentence in paragraph 65 of our complaint, your Honor, is

22  actually the last one, which Coinbase, I believe, admits or at

23  least qualifies.  And what we say there is that Coinbase does

24  not restrict issuers from selling its tokens on these

25  platforms, and they admit that Coinbase permits them, subject

O1HJSEC4

1   to certain restrictions, to create customer accounts and engage

2   in secondary market transactions.

3          So if Judge Rakoff is correct, then that's the end of

4   this motion to dismiss, given that admission in paragraph 65.

5   Now, to be fair, to be clear, we focused on sort of Solana and

6   these tokens because, again, we don't view a distinction

7   between the issuer selling or what Coinbase calls engaging in

8   secondary markets transactions on the Coinbase platform.

9   That's a reference to the exchange, not the asset hub, and

10  again, people at this table selling amongst themselves.  So

11  that's the clarifying point.

12         I'll now move to a brief summation, with the Court's

13  indulgence.  So the parties agree, I think, your Honor, that

14  this case is resolved by the statute, and really it's not a

15  major questions case.  There's some modicum of agreement.

16  Where we part ways with Coinbase, at least for purposes of this

17  summation, is as to what *Howey* requires.  We think they're

18  making up a new test, and we believe that our position is the

19  one that's most faithful and consistent, but, in fact,

20  compelled by the *Howey* test.  It's not just a plausible

21  reading, as they claim it is.

22         And one phrase I would like to leave the Court with

23  that was not discussed a lot today that I would like to have in

24  the Court's mind before we leave is "economic reality."

25  Economic reality is part of the analysis that Mr. Costello was

O1HJSEC4

1    offering earlier and that I believe is completely avoided by

2    Coinbase's arguments, and that provides part of the limiting

3    principle, including the Court's concern about a floodgate of

4    private actions.

5            And so I'd like to borrow from a rhetorical question

6    that the chief justice asked in the *Biden v. Nebraska* case.

7    Wouldn't the Congress be surprised that the commission is

8    bringing this action?  We know they created the commission.  We

9    know they said to securities exchanges, You got to register.

10   We know they gave the commission the power to sue if someone

11   violated this command.

12           So the answer to whether they would be surprised --

13   and Coinbase we know does not dispute for purposes of this

14   motion that they are an exchange.  The answer to the question

15   depends on what are they exchanging?  Coinbase and the amici

16   suggest that we're suing the supermarket, that we've sued Whole

17   Foods.  And I concede that if we had sued Whole Foods, we

18   should lose.  But economic reality makes it quite plain that

19   our lawsuit and these transactions and these assets are of a

20   quite different nature than if I were suing someone for

21   intermediary transactions in bananas or other items that they

22   used in their examples.

23           What is at issue here — and let's just imagine this in

24   the eyes of the Congress of 1934.  It's an exchange.  That's

25   conceded for purposes of this motion.  The exchange permits

O1HJSEC4

1    buyers and sellers, they get together and they trade in these

2    assets.  What are these assets as a matter of economic reality?

3    There are issuers also in this marketplace.  And in 1934

4    there's no crypto, so what they have maybe is just a piece of

5    paper with numbers to keep track.  That's all that is, and that

6    doesn't do anything.

7            It represents what these investors are buying, and the

8    issuers say, Give us all your capital, give us your capital.

9    We're going to take this capital, and with this capital we're

10   going to make these little pieces of papers with numbers

11   valuable, and you'll be able to resell them, and you'll make

12   some money.  And the exchange — again, they concede an

13   exchange — also permits people to buy and sell amongst

14   themselves these same little pieces of paper.  And everybody

15   knows because these issuers in 1934 have flooded all the

16   then-available methods of communication.  They've bought radio

17   ads and put in the paper and sent glossy mailers and said, This

18   is what we're going to do.

19           Because I have to explain to you what these little

20   pieces of paper do.  They're not bananas.  Let me explain to

21   you what's going to happen with them.  After I take your funds

22   and deploy those funds into this ecosystem, you're going to

23   make some money.  And the other thing the issuers remind

24   everyone of consistently is, I'm going to keep a big stash to

25   myself because when they go up in value, I'm going to make

O1HJSEC4

1    money too.

2            So the reasonable investor in 1934 understands that

3    what they're buying into is an investment contract.  Wouldn't

4    the Congress of 1934 be surprised that we've asked that this

5    exchange register?  I submit to the Court that the answer is

6    plainly no.  If the response were, Well, yes, you're right,

7    SEC, but the issuers were clever enough — and not to use a

8    magical word like impressions of an offer of contractual

9    obligation or were clever enough to not reduce into writing the

10   promises that they've made, therefore, this is Whole Foods, I

11   submit to the Court that the Congress of 1934 would not only be

12   surprised, but actually stunned that there would be such an

13   easy workaround to the carefully constructed regulatory

14   structure that they created in 1933 and 1934 around the capital

15   markets.

16           So we are asking that the Court not endorse such an

17   outcome, your Honor.  We are simply asking that the Court look

18   at the economic reality, apply the *Howey* test as it was

19   written.  And to end on a major questions point, we believe

20   that the *Howey* test is there, precisely as I said, to give

21   effect to that Congressional purpose.  And to set it aside or

22   add elements to it, as Coinbase is really asking the Court to

23   do, is really what creates violence to the statutory structure.

24   For those reasons, your Honor, we ask that Coinbase's motion be

25   denied in its entirety.  Thank you.

O1HJSEC4

1    THE COURT:  Thank you very much.  Just one moment,
2    please.  Thank you.
3    Someone at the back table?
4    MR. SAVITT:  Your Honor, good afternoon.  I think I've
5    been designated.
6    THE COURT:  Congratulations.
7    MR. SAVITT:  Thank you so much.  And let me say we're
8    thankful for Court's time and patience with our arguments.
9    THE COURT:  You've helped me more than I've helped you
10   in any way.  Thank you.
11   MR. SAVITT:  Thank you, your Honor.
12   Let me start here.  I think, after all of it, after
13   our four and a half hours, and after hearing from our friends
14   at the table in front, the SEC still has not alleged and
15   doesn't contest, doesn't argue that the issuer of any of the 12
16   tokens that it challenges in this complaint made any statement
17   that could be interpreted as a contractual obligation.  Still
18   less, any kind of promise or obligation that traveled with any
19   of the 12 tokens at issue when they were sold in blind
20   transactions on the secondary market.
21   We heard a little more about paragraph 65 of the
22   complaint, and I don't want there to be any confusion on that.
23   That platform allows that promoters, like everyone else, can
24   make trades on the platform of tokens that have already been
25   issued.  It does not involve primary transactions, it is purely

O1HJSEC4

1    secondary transactions.  That's what paragraph 65's last

2    sentence is about.

3          And for the reasons we've talked about, nothing in the

4    allegation of this complaint gives rise to any allegation

5    regarding any primary transaction or initial coin offering.

6    And the fact that there are no promises of any kind that travel

7    in any of these transactions, we think is fatal to the

8    complaint.

9          I want to talk just a bit more about *Howey* because

10   it's an important case, and I don't know if it's the alpha and

11   the omega.  I don't know if it's the beginning and the end, but

12   I don't want there to be any mistake about it.  *Howey* is where

13   we start.  And the promoter, they're talking about economic

14   reality.  The promoter there was a company.  It sold parcels of

15   land and a commitment to do stuff on that land, two contracts.

16   The question before the Court was whether those two contracts

17   can be stapled together.  If the answer was yes, there would be

18   an investment contract.  If the answer was no, there wouldn't

19   be, an asset plus an obligation.  That is what all the blue sky

20   laws said an investment contract was.  That's what *Howey* said

21   it was.

22         Now the commission has argued in its papers — we

23   didn't get a chance to talk about this when we were talking

24   earlier — that *Howey*'s obligation to develop the orange

25   business was what it called purely incidental.  It does this,

O1HJSEC4

1    the commission does, by plucking those words that are purely

2    incidental and are obviously out of context in *Howey* itself.

3    The sale of the land, the asset sale was what the Court called

4    purely incidental.  The management contract, the contractual

5    obligation to develop the business, that was the opposite of

6    incidental.  It's what made the arrangement a security.

7            There's no way to read that opinion and not understand

8    it.  You can even read Justice Frankfurter's very short and

9    completely overlooked dissent, and it will tell you the same

10   thing.  There's no doubt that what made the two contracts there

11   an investment contract was that the asset was stapled to an

12   obligation to manage.

13           The cases, one after another after another, teach the

14   same lesson.  I won't rehearse them all.  I will also refrain

15   from undue counterfactual historiography as to what the

16   Congressmen and women in 1933 and 1934 would have thought about

17   this.  But I will tell you this, I think there would have been

18   a lot of surprise to find out that an investment contract

19   didn't have anything to do with a contract at all.  And that's

20   the position that's being sponsored here, that the very words

21   of that statute are being alighted from, erased from it,

22   completely in derogation of all the case law that preceded it

23   and all that has followed.  I would also say I think it will

24   come as a surprise to Senator Lummis, that this was obviously

25   something that was to be regulated.

O1HJSEC4

1          I won't cause the Court to look at it, but slide 12

2     recounts about — I don't know — maybe a dozen and a half

3     statutory initiatives over the past two years where Congress is

4     trying to figure out who crypto should be regulated by and how.

5     I think there would be an awful lot of surprise, historical and

6     present, about the willy-nilly arrogations of regulatory

7     authority that the SEC purports to assert by virtue of this

8     action.

9          Part of the trouble with the position the commission

10     here sponsors is that we wish to insist that there has been no

11     showing of a necessary limiting principle.  We talked about

12     this a little bit, your Honor.  I want to push on it because it

13     won't do to say an asset plus promotional statements is enough,

14     and it won't solve that problem to say, Well, you're buying

15     into an ecosystem.  I am advised that there is an Apple+

16     documentary about Beanie Babies that talks at great length

17     about the --

18          THE COURT:  Please don't make me watch it.

19          MR. SAVITT:  Your Honor, I thought about it.

20          That makes perfectly clear the communities that grew

21     up around that.  And it is true of all sorts of things that

22     people buy and sell, the buying into a community.  It is an

23     absolutely vacant limiting principle.  It's no limiting

24     principle at all.

25          The point is further illustrated by the

O1HJSEC4

1    acknowledgment, the concession that Bitcoin is a commodity, not

2    a security.  Bitcoin has every bit the ecosystem of these other

3    tokens.  There are community groups, there are chat groups,

4    there are validators, there are support groups.  Bitcoin is an

5    ecosystem just like all of the others, and that won't do as a

6    limiting principle, as the commission's own actions we think

7    make clear.

8          On the other branch of our argument, whether the

9    investment needs to be in an enterprise, I just want to make

10   sure to call to the Court's attention what *Howey* said.  Because

11   *Howey* didn't use the idea that the investment contract had to

12   be what it called shares in an enterprise.  That's from the

13   Supreme Court 3218 U.S. at 299.  That's *Howey*.  And it's not

14   for nothing that Judge Bodine talked about finding and

15   discussing investment contracts, that what was purchased in

16   this case was not a share of a business enterprise, and so not

17   a security.

18         These cases haven't addressed this issue because this

19   issue is new, but they address the principle at issue here,

20   which is when does an investment in an asset become an

21   investment in an enterprise.  And the answer is clear in case

22   after case, it is at the moment where the asset is stapled to a

23   contractual undertaking that gives an interest in the

24   enterprise.

25         Let me close with just a word or two more on secondary

O1HJSEC4

1   markets, because I think the following can be fairly said.  The

2   commission's complaint draws the Court into truly unprecedented

3   territory.  To call these secondary market transactions

4   "investment contracts" when there's no contract is atextual and

5   it's ahistorical and it's unprecedented.  There has been no

6   finding of any kind in any court that a transaction on a

7   secondary market gives rise to an investment contract, and that

8   is not a coincidence.

9           Echoing the conversation, your Honor, that you and I

10  had a little bit ago, investment contracts are contracts, after

11  all, and that implies privity.  And absent the usual

12  circumstances, circumstances that one can imagine, but

13  nevertheless aren't alleged here, contractual obligations could

14  travel so as to create an investment contract, no allegation

15  here.  And what we say you can't have, what we say will make a

16  hash of the statute is an investment contract without at least

17  the appearance of an offering, and that is completely not

18  alleged in this case, and there was a reference --

19          THE COURT:  May I hear that again, please.  You cannot

20  have an investment contract without at least the appearance of

21  an offering?

22          MR. SAVITT:  You cannot have an investment contract

23  without at least the appearance of on offering or instrument

24  that carries with it the contractual obligation.

25          THE COURT:  Thank you.

O1HJSEC4

1          Just while we're talking, what do you mean by "at

2     least the appearance of"?  It's this strange simulacrum that

3     you're suggesting.  I guess you're just trying to cover all

4     bases.  It's the word "appearance" that's throwing me off.

5          MR. SAVITT:  What we're trying to convoy here, your

6     Honor, is that an attitude towards this instrument is not

7     ungenerous, but generous towards the commission.  If there is

8     an instrument that is meant to convey a contractual obligation,

9     that is, an offering of an instrument that is meant to convey,

10    that will satisfy the securities laws.  But it has to partake

11    in the appearance or offering or intent to create a contractual

12    obligation.  Otherwise, you do not have an investment contract;

13    you just have an investment.  So it's got to be stapled to

14    something that from an objective standard could constitute the

15    offering of a contract in the mind of a reasonable offer or an

16    offeree.

17         I wanted to very quickly just mention the DAO Report

18    because it came up earlier, and it bears a little bit on this

19    because it's the kind of instrument that one could imagine

20    fulfilling some of the characteristics that aren't fulfilled in

21    the pleadings.  But what I wouldn't want left is the impression

22    that the DAO Report put anyone on notice of what is going on

23    here.

24         Here's what the DAO Report said.  The DAO token was

25    like, and I'm quoting now from the SEC, "The token was like

O1HJSEC4

1    buying shares in a company and getting dividends because block

2    token holders could vote to distribute the DAO's anticipated

3    earnings from the projects it funded."  That was the

4    commission's conception in 2017.

5            Notice its language.  It has all the earmarks, not

6    just of what we're saying today — of course we're litigants,

7    we're going to be skeptical, we have a position.  It has all

8    the hallmarks of all the cases we've been seeing for a hundred

9    years.  2017, you had an instrument that was buying shares that

10   had the possibility of getting dividends that had voting rights

11   and, therefore, had an interest in the enterprise in a manner

12   that at least resembled other securities.  That's what the DAO

13   Report was about.  They're 180 degrees away from that point

14   now.  In fact, no court has ever held that something without

15   those sorts of attributes can be traded on a secondary platform

16   and be a security.

17           By the way, I want to say this and then I'll stop.

18   Coinbase appreciates the utility and the wisdom of sound and

19   predictable regulation in the crypto industry, as in elsewhere.

20   The Court should know that Coinbase is subject to many, many

21   regulatory regimes, state regulatory regimes, the CFTC.  It's

22   not as though there's no regulatory authority beyond the SEC.

23           Coinbase has made clear in this case in its public

24   statements about the SEC that it's looking for rules of the

25   road, and we know the SEC has a broad mandate to regulate

O1HJSEC4

1    things that are securities.  But the SEC's regulatory reach

2    does not go beyond securities.  And if it's permitted to

3    regulate here, it's permitted to regulate everywhere.  And it

4    could do so after the fact, enforcement actions, with or

5    without notice, with or without warning.  And that is not the

6    way administrative law is supposed to work.

7            The SEC knows, your Honor, that it's trying to squeeze

8    crypto transactions into a statutory rubric where they don't

9    belong.  That's the significance of the Chair Gensler remarks.

10   That's the significance of DAO.  There's an understanding that

11   they don't fit.  We know Congress is trying to sort it out.

12           And what should happen here is the SEC should follow

13   enforcement and rule making actions that make sense of the

14   statutory language that does not twist it upside down, that

15   does not read the word contract out of the word contract, that

16   harmonizes rather than does violence to all of the cases that

17   have come before it.  And this is several bridges too far, and

18   for that reason we really encourage the Court to grant the

19   motion.

20           THE COURT:  Earlier today my deputy said to me with

21   some horror, "Are you going to decide this from the bench?"

22   And it only prompted horror on my part.  I had questions when I

23   began this day.  I have some answers, and I have some questions

24   as I end the day.  So I suppose I should thank you both.  And

25   it is a measure of everyone's preparation that I can't decide

O1HJSEC4

```
1    this from the bench right now, so take that as the compliment
2    it is.
3              I have a favor to ask of the folks at the back table,
4    and that is if you would accept a friendly amendment of your
5    transcript order to be tomorrow rather than this evening, but
6    I'm aware that the court reporters have been moved to other
7    places this afternoon, and I kept them so much longer than they
8    thought that I just ask for your indulgence.  Again, since I'm
9    not deciding today and with appropriate respect to your client,
10   tomorrow should be fine for everybody.  So I'm going to ask
11   that your request for whatever is nightly becomes daily.  I
12   never know what the thing is, so let's hope for tomorrow.
13   You'll be fine.  Nothing will change between tonight and
14   tomorrow.  All right.
15             I think we've all had a really productive day.  I
16   appreciate it very much.  Speaking only for myself, I'd like
17   some lunch.  Hopefully you will too.  Thank you.  That's all I
18   can say.  Thank you very much, and we'll talk again when we
19   can.
20             We're adjourned.
21             (Adjourned)
22
23
24
25
```