**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

v.

COINBASE, INC. AND COINBASE GLOBAL, INC.,

*Defendants*.

23 Civ. 4738 (KPF)

---

## MEMORANDUM OF LAW IN SUPPORT OF COINBASE'S
## <u>MOTION TO CERTIFY INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)</u>

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*

Dated: April 12, 2024

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL BACKGROUND ............................................................................2

      A.     The SEC sued Coinbase for facilitating trades in alleged "investment contracts" that the Commission concedes involve no post-sale obligations...........2

      B.     Coinbase sought dismissal because the SEC asserted that Coinbase transactions were "investment contracts" despite an absence of any alleged contractual undertakings. .......................................................................3

      C.     Adopting the SEC's "ecosystem" framing, the Court denied Coinbase's motion to dismiss the Exchange Act claims. ...........................................5

ARGUMENT ...........................................................................................................6

      A.     Whether an "investment contract" can exist absent any post-sale obligation is a pure, controlling question of law........................................7

           (i)     The question of law is "pure" because the SEC concedes it has pleaded no post-sale obligations and resolution turns on legal authorities, not facts. .......................................................................8

           (ii)    Resolution of the question presented would require dismissal of the SEC's Exchange Act claims and thus the bulk of the SEC's case..............9

           (iii)   Review would allow the Second Circuit to address an issue no Court of Appeals has addressed to date and which lower courts are struggling to address in this District and across the country. ....................10

      B.     There are "substantial grounds for difference of opinion" concerning the application of *Howey* to digital assets....................................................13

           (i)     Courts in this District disagree about how *Howey* applies to crypto transactions. ................................................................................14

           (ii)    No appellate court having ever found an investment contract absent a post-sale obligation, the question presented is at a minimum "difficult."................................................................15

      C.     Certifying the appeal could save substantial time and resources..........................20

CONCLUSION.......................................................................................................21

## **TABLE OF AUTHORITIES**

**Cases**                                                                            **Page(s)**

*1050 Tenants Corp.* v. *Jakobson*,
    365 F. Supp. 1171 (S.D.N.Y. 1973)..................................................................5, 16

*1050 Tenants Corp.* v. *Jakobson*,
    503 F.2d 1375 (2d Cir. 1974)........................................................................9, 16

*Am. Geophysical Union* v. *Texaco Inc.*,
    802 F .Supp. 1 (S.D.N.Y. 1992).......................................................................13

*Balintulo* v. *Daimler AG*,
    727 F.3d 174 (2d Cir. 2013)..........................................................................2, 6

*Capitol Records, LLC* v. *Vimeo, LLC*,
    972 F. Supp. 2d 537 (S.D.N.Y. 2013)........................................................9, 19, 20

*Chem. Bank* v. *Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984)............................................................................9

*Chem. Bank* v. *Arthur Andersen & Co.*,
    552 F. Supp. 439 (S.D.N.Y. 1982)...................................................................10

*Dill* v. *JPMorgan Chase Bank, N.A.*,
    No. 19 Civ. 10947 (KPF), 2021 WL 3406192 (S.D.N.Y. Aug. 4, 2021) ....................... *passim*

*Dupree* v. *Younger*,
    598 U.S. 729 (2023).....................................................................................8

*Fed. Housing Fin. Agency* v. *UBS Ams., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012).............................................................20, 21

*Flo & Eddie, Inc.* v. *Sirius XM Radio Inc.*,
    No. 13 Civ. 5784 (CM), 2015 WL 585641 (S.D.N.Y. Feb. 10, 2015) ....................7, 8, 10, 11

*Grenader* v. *Spitz*,
    537 F.2d 612 (2d Cir. 1976)............................................................................9

*In re A2P SMS Antitrust Litig.*,
    No. 12 Civ. 2656 (AJN), 2015 WL 876456 (S.D.N.Y. Mar. 2, 2015) .....................................7

*Int'l Bhd. of Teamsters* v. *Daniel*,
    439 U.S. 551 (1979).....................................................................................9

*Islam* v. *Lyft, Inc.*,
    No. 20 Civ. 3004 (RA), 2021 WL 2651653 (S.D.N.Y. June 28, 2021)........................8, 20, 21

*Klinghoffer* v. *S.N.C. Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990)..............................................................6, 7, 10, 11, 15

*Mohawk Indus., Inc.* v. *Carpenter*,
   558 U.S. 100 (2009).............................................................................................2

*Pollack* v. *Laidlaw Holdings, Inc.*,
   27 F.3d 808 (2d Cir. 1994)...................................................................................9

*Pollack* v. *Laidlaw Holdings, Inc.*,
   No. 90 Civ. 5799 (PKL), 1993 WL 254932 (S.D.N.Y. June 25, 1993).......................10, 16, 18

*SEC* v. *Binance Holdings Ltd.*,
   No. 23 Civ. 1599 (ABJ) (D.D.C. June 5, 2023).............................................11, 20

*SEC* v. *C. M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943)...........................................................................................18

*SEC* v. *Lauer*,
   52 F.3d 667 (7th Cir. 1995) ...............................................................................8

*SEC* v. *Rio Tinto PLC*,
   No. 17 Civ. 7994 (AT), 2021 WL 1893165 (S.D.N.Y. May 11, 2021).........................*passim*

*SEC* v. *Ripple Labs, Inc.*,
   No. 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) .........................*passim*

*SEC* v. *Ripple Labs, Inc.*,
   No. 20 Civ. 10832 (AT), 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ...............................8 n.6

*SEC* v. *Terraform Labs Pte. Ltd.*,
   No. 23 Civ. 1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) .........................*passim*

*SEC* v. *Terraform Labs Pte. Ltd.*,
   No. 23 Civ. 1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023).........................*passim*

*SEC* v. *W.J. Howey Co.*,
   328 U.S. 293 (1946)...........................................................................................*passim*

*Tcherepnin* v. *Knight*,
   389 U.S. 332 (1967)...........................................................................................9

*In re Voyager Dig. Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023) ...............................................................13

*Wals* v. *Fox Hills Dev. Corp.*,
   24 F.3d 1016 (7th Cir. 1994) .............................................................................4, 18

*Wang* v. *Hearst Corp.*,
   No. 12 Civ. 793 (HB), 2013 WL 3326650 (S.D.N.Y. June 27, 2013)............................8, 11, 5

**Statutes and Rules**

15 U.S.C. § 77a *et seq.*............................................................................................. *passim*

15 U.S.C. § 78a *et seq.*............................................................................................. *passim*

28 U.S.C. § 1292(b) ................................................................................................. *passim*

## PRELIMINARY STATEMENT

Coinbase seeks certification for interlocutory appeal under 28 U.S.C. § 1292(b) of the Court's March 27, 2024 Order (the "Order") to allow the Second Circuit's immediate consideration of whether the Securities and Exchange Commission may regulate as "investment contracts" digital asset transactions that involve no obligation running to the purchaser beyond the point of sale. In the 90 years since the federal securities laws were enacted, neither the Supreme Court nor the Second Circuit has ever found an investment contract without a post-sale obligation. But in a blitz of recent enforcement actions against the digital asset industry, the SEC has advanced the theory that no such obligation is required. While the Order accepted this theory, the SEC's campaign has yielded starkly divergent applications of *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946), to digital asset transactions.[1]

That is exactly why the SEC itself sought interlocutory appeal in another matter just months ago: to resolve how *Howey* applies to such transactions—an issue on which there are "substantial grounds for difference of opinion."[2] And divergence of opinion on the issue is not confined to the judiciary: Dozens of Members of Congress, sitting U.S. Senators, and a fellow regulatory agency stand at odds with the SEC's position. *See infra* pp. 13, 16. SEC Commissioners themselves cannot agree on the scope of their regulatory authority, with two recognizing just last month that "[t]he environment we have created for the crypto asset markets, especially as it relates to secondary trading, is untenable."[3] The digital asset industry labors under an intolerable cloud of uncertainty. As the SEC put it, the matter has "industry-wide significance," and calls out for prompt appellate review.[4]

---

[1] *Compare SEC* v. *Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 4507900, at *11-13 (S.D.N.Y. July 13, 2023), *with SEC* v. *Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346 (JSR), 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023).

[2] SEC Mem. of Law in Supp. of Mot., *Ripple*, ECF No. 893 (S.D.N.Y. Aug. 18, 2023) ("SEC *Ripple* Mot."), at 1.

[3] SEC Comm'rs Peirce & Uyeda, Statement on ShapeShift AG (Mar. 5, 2024), https://tinyurl.com/3pj3jkda.

[4] SEC Reply Mem. of Law, *Ripple*, ECF No. 915 (S.D.N.Y. Sept. 8, 2023) ("SEC *Ripple* Reply"), at 1. Informed of Coinbase's intention to make this motion, the SEC nevertheless said it would oppose.

This case presents just the right vehicle for the Second Circuit to provide urgently needed guidance on the foundational question of law presented. The Second Circuit has instructed that where, as here, the Section 1292(b) factors are met, and the case is one that "'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'" *Balintulo* v. *Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (citing *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 111 (2009)). This is such a case, and certification should be granted.

## PROCEDURAL BACKGROUND

**A.     The SEC sued Coinbase for facilitating trades in alleged "investment contracts" that the Commission concedes involve no post-sale obligations.**

Coinbase, the largest U.S. crypto exchange, serves millions of customers and has a market capitalization of over $60 billion. Order at 5.[5] Coinbase has been traded publicly since April 2021, when, after months of review, the SEC declared its registration statement effective. Order at 6, 10-12.

On June 6, 2023, over a decade after Coinbase's founding and over two years after Coinbase went public, the SEC brought this enforcement action. The Commission asserted that by facilitating trades in 12 specified tokens over its digital asset spot exchange and as part of its "Prime" service for institutional customers, Coinbase acts as an unregistered national securities exchange, broker-dealer, and clearing agency in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act"). *See* ECF No. 1 ("Compl.") ¶¶ 372-80. The SEC also alleged that Coinbase's free, non-custodial "Wallet" software was an unregistered broker-dealer, and that Coinbase's "Staking" service, which allows customers to receive rewards paid out by proof-of-stake protocols for providing services that contribute to the validation of transactions on

---

[5] *Coinbase Global, Inc. (COIN)*, Yahoo! Fin. (Apr. 12, 2024), https://tinyurl.com/bdftzcdv.

those blockchains, was an unregistered securities offering under the Securities Act of 1933, 15 U.S.C. § 77a *et seq*. (the "Securities Act"). Compl. ¶¶ 376, 386-88. All four services targeted by the SEC's complaint—the spot exchange, Prime, Wallet, and Staking—were available through Coinbase in April 2021, when the SEC allowed Coinbase stock to be sold to millions of retail and institutional investors. Order at 6, 10-12.

The SEC concededly does not allege that any transactions over Coinbase's platform or Prime involve any post-sale obligations on the part of any issuer, Coinbase, or any other party. *Id.* at 30; *see generally* Compl. ¶¶ 127-305.

**B.     Coinbase sought dismissal because the SEC asserted that Coinbase transactions were "investment contracts" despite an absence of any alleged contractual undertakings.**

Coinbase answered the complaint and moved for judgment on the pleadings.[6] It moved to dismiss the SEC's Exchange Act claims on the ground that transactions in the tokens the SEC identified were not "investment contracts" and therefore not securities—as a matter of law—under *Howey*. ECF No. 36 ("MJOP Br.") at 6-21. Specifically, Coinbase explained that, for over eight decades, transactions held to be "investment contracts" have been founded on a contractual undertaking beyond the point of sale (hence "contract") involving a financial stake in a business (hence the "security" character of the "investment"). *See id.*; ECF No. 83 ("MJOP Reply") at 3-11. Or, as the SEC put it 20 years ago, an investment contract has the "essential properties of either a debt or equity security." Br. for SEC, *SEC* v. *Edwards*, No. 02-1196 (U.S. June 26, 2003), 2003 WL 21498455 ("SEC *Edwards* Br."), at *20 (quoted at MJOP Br. at 9; emphasis omitted).

---

[6] In its answer, Coinbase asserted defenses of failure to state a claim, lack of regulatory authority, major questions doctrine, lack of due process and fair notice, abuse of discretion, equitable estoppel, unclean hands, and laches. ECF No. 22 at 173-75. In response to Coinbase's request for leave to move for judgment on the pleadings, the SEC initially countered that it intended to seek dismissal of many of Coinbase's defenses (though not its due process and fair notice defense). ECF No. 26 at 1. But ultimately the Commission chose not to file any motion to strike, and Coinbase filed its own motion.

That was no historical accident: as the Supreme Court stated in *Howey*, investment contracts, like other securities, *see* 15 U.S.C. § 78c(a)(10), grant "shares in the enterprise." 328 U.S. at 299; *Wals* v. *Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (Posner, C.J.) (investment contracts are "unconventional instruments that have the essential properties of a debt or equity security"). An instrument that carries no ongoing relationship with and claim upon a business may be a commodity but is not a security. *See* MJOP Br. at 7-17, 18-21; MJOP Reply at 3-9, 9-11; *see also* MJOP Br. at 16 (citing *Ripple*, 2023 WL 4507900, at *11-12). The transactions the SEC pleaded bore neither of these properties.

Coinbase's motion also explained that even if the SEC's construction of "investment contract" had textual plausibility, the major questions doctrine compelled resisting the Commission's resort to self-help in expanding its regulatory reach into a two-trillion-dollar-plus industry—the proper regulation of which Congress is actively considering—based on a novel interpretation of a long-extant statutory provision. MJOP Br. at 21-25; MJOP Reply at 12-13.

The SEC, challenged to identify a limiting principle that would distinguish the investment contracts of its conception from assets that traded as commodities (like Bitcoin), offered merely that digital assets were different from "tangible items," because they lacked "inherent value." SEC MJOP Opp. at 14-15. Only later, at oral argument, did the SEC proffer that an asset's association with an "ecosystem" could supply the delineator—without offering a definition of the term. ECF No. 101 ("Hr'g Tr.") at 22:22-23:16, 55:2-57:23; *see also id.* at 100:14-101:25.

During argument, the Court acknowledged the difficulty of the questions presented. Hr'g Tr. at 104:16-19, 105:3-4, 155:7-8.

C.    **Adopting the SEC's "ecosystem" framing, the Court denied Coinbase's motion to dismiss the Exchange Act claims.**

On March 27, 2024, the Court issued its Order denying Coinbase's motion for judgment on the pleadings as to the Exchange Act claims targeted at the spot exchange and Prime services, Order at 40-60; granting the motion as to the Exchange Act claim targeted at Wallet, *id.* at 78-84; and denying the motion as to the Securities Act claim directed at Staking, *id.* at 61-78.

In denying Coinbase's motion related to the Exchange Act claims directed at the spot exchange and Prime services—the SEC's banner claims, accounting for about three quarters of the allegations in its complaint—the Court rejected Coinbase's argument that the token transactions pleaded did not involve "investment contracts." *Id.* at 40-60. The Court noted that the SEC did not contest that the at-issue "tokens, in and of themselves, are not securities." *Id.* at 29. And the Court acknowledged that the SEC has conceded the "blind bid/ask transactions" at issue involve "no continuing promises from the issuer or developer to the token holder," "no post-sale obligations on the issuer or developer," and "no profit-sharing between the issuer or developer and the holders." *Id.* at 30. Nevertheless, the Court held that the SEC plausibly pleaded "investment contract" transactions on Coinbase's platform and through Prime.

The Court reasoned that even though the SEC failed to allege any post-sale obligations, it still pleaded a possible investment contract by alleging that purchasers on Coinbase's secondary-market platform were "buying into [each] token's digital ecosystem." *Id.* at 59. The Court conceptualized the "ecosystem" as "the token's broader enterprise." Order at 6-7 n.4 & 59.

With the Court's Order, the case is set to proceed to discovery for determination of whether the 12 tokens alleged involve the kind of "ecosystem" that might support the finding of a security (as opposed to the kinds that surround many commodities)—an intensely fact-bound, asset-by-asset exercise that will be conducted without the token issuers' involvement as parties to the case.

*     *     *

In light of the industry-wide significance and urgency of the issues presented by the Court's Order, Coinbase now seeks certification of an interlocutory appeal.

## ARGUMENT

The Court's March 27 Order is the rare order that satisfies all the criteria for certification of an interlocutory appeal under Section 1292(b)—by the SEC's own lights. The SEC in *Ripple*, making an unsuccessful bid for interlocutory review of a decision adverse to its position on the issue, pressed the urgency of prompt appellate review of what an "investment contract" means in the context of digital asset transactions. *See* SEC *Ripple* Mot. at 1. The doctrinal uncertainty among federal district courts has only deepened since, and the SEC's proffered definition of "investment contract" has continued to shift even as it continues to bring new enforcement actions against the burgeoning but already substantial digital asset industry. The need for appellate review is unusually and increasingly acute.

The Second Circuit has instructed that when a controlling issue of law satisfies the requirements of Section 1292(b) and "involves a new legal question or is of special consequence, then the district court should not hesitate to certify an interlocutory appeal." *Balintulo*, 727 F.3d at 186 (internal quotations and citation omitted). There should be no hesitation here, as the Court, other tribunals, the entire digital asset industry and its millions of customers, and the SEC itself will benefit greatly from certification.

The Court's Order easily satisfies the three legal elements for interlocutory appeal: it "[i] involves a controlling question of law [ii] as to which there is substantial ground for difference of opinion and [iii] . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]" 28 U.S.C. § 1292(b); *see Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 23-25 (2d Cir. 1990).

*First*, whether an investment contract can arise from a transaction that imposes no post-sale obligations is a pure question of law the resolution of which would have a substantial impact not just on the conduct of this case but across a large number of other pending cases.

*Second*, as the SEC has itself explained, there are substantial grounds for disagreement about the application of *Howey* to digital asset transactions. *See* SEC *Ripple* Br. at 1, 11-13; SEC *Ripple* Reply at 1, 7-9. Neither the Second Circuit nor any other Court of Appeals has yet to address *Howey*'s application in this context, and its guidance is sorely needed.

*Finally*, because interlocutory appeal could remove the SEC's principal and most fact-intensive claims from among the matters to be developed and tried, and obviate the need for substantial additional work from the Court and the parties in defining the character of the "ecosystem" that the Court has held could support a finding that a digital asset transaction constituted a securities transaction, certification may materially hasten termination of the litigation.

### A.   Whether an "investment contract" can exist absent any post-sale obligation is a pure, controlling question of law.

Whether an asset sale can give rise to an "investment contract" absent any post-sale obligation is just the sort of "pure question of law that a reviewing court could"—and should—"decide quickly and cleanly." *See Dill* v. *JPMorgan Chase Bank, N.A.*, No. 19 Civ. 10947 (KPF), 2021 WL 3406192, at *4 (S.D.N.Y. Aug. 4, 2021) (citations and quotations omitted); *see also, e.g.*, *In re A2P SMS Antitrust Litig.*, No. 12 Civ. 2656 (AJN), 2015 WL 876456, at *4 (S.D.N.Y. Mar. 2, 2015). Undeniably, the question's resolution could "significantly affect the conduct of the action," *Dill*, 2021 WL 3406192, at *4; *see also, e.g.*, *SEC* v. *Rio Tinto PLC*, No. 17 Civ. 7994 (AT), 2021 WL 1893165, at *2 (S.D.N.Y. May 11, 2021); *Flo & Eddie, Inc.* v. *Sirius XM Radio Inc.*, No. 13 Civ. 5784 (CM), 2015 WL 585641, at *1 (S.D.N.Y. Feb. 10, 2015). And the question is "controlling" in both the case-specific and broader senses, *see Klinghoffer*, 921 F.2d at 24: Second Circuit

precedent addressing *Howey*'s application to digital asset transactions would have "value for a large number of cases" in circumstances crying out for controlling authority. *Dill*, 2021 WL 3406192, at *4; *see also Rio Tinto*, 2021 WL 1893165, at *2; *Islam* v. *Lyft, Inc.*, No. 20 Civ. 3004 (RA), 2021 WL 2651653, at *4 (S.D.N.Y. June 28, 2021); *Flo & Eddie*, 2015 WL 585641, at *2; *Wang* v. *Hearst Corp.*, No. 12 Civ. 793 (HB), 2013 WL 3326650, at *2 (S.D.N.Y. June 27, 2013).

> **(i)     The question of law is "pure" because the SEC concedes it has pleaded no post-sale obligations and resolution turns on legal authorities, not facts.**

The question presented here is unencumbered by factual disputes and therefore ripe for immediate review. *See Dupree* v. *Younger*, 598 U.S. 729, 735 (2023) ("pure[] legal issues" are those that "can be resolved without reference to any disputed facts"). The SEC concedes that it has pleaded no post-sale obligations connected to any digital asset transactions over Coinbase's exchange or Prime. *See* Order at 30; Hr'g Tr. 52:20-53:17. The parties' instant clash is over a fundamental and purely legal question: whether some obligation past the point of sale is required for a transaction to involve an investment contract under *Howey*. Order at 30. The SEC itself has urged that whether transactions over crypto exchanges involve "investment contracts" is a "pure legal question[]" properly certified for interlocutory appeal. SEC *Ripple* Mot. at 8, 9, 10.[7]

Resolution of this pure question of law therefore can be accomplished "quickly and cleanly." *Dill,* 2021 WL 3406192, at *4. As reflected in the parties' briefing and the Court's reasoning, the question turns on an analysis of a limited universe of familiar legal texts—statutory language, Blue Sky law cases, *Howey*, and *Howey*'s progeny. Precedent confirms the propriety of

---

[7] The court to which the SEC presented that argument rejected it, but on the ground that resolution of the question in that case was anchored in disputed facts. *See Ripple*, 2023 WL 6445969, at *3 (S.D.N.Y. Oct. 3, 2023) (denying interlocutory appeal on ground that question presented was resolved based on "an extensive, heavily disputed factual record"). The same cannot be said here, where the parties and the Court alike agree that the relevant facts are undisputed and the legal issue thus joined without hindrance to its prompt appellate review.

interlocutory certification in these circumstances: At least two significant Supreme Court cases applying *Howey* originated as interlocutory appeals from denials of pleadings motions. *See Tcherepnin* v. *Knight*, 389 U.S. 332, 334-35 (1967); *Int'l Bhd. of Teamsters* v. *Daniel*, 439 U.S. 551, 557 (1979). And the Second Circuit has on several occasions accepted certification under Section 1292(b) of appeals presenting the question whether an investment involved a security. *See Pollack* v. *Laidlaw Holdings, Inc.*, 27 F.3d 808, 809-11, 815 (2d Cir. 1994) (resolving on appeal under § 1292(b) whether mortgage participations were securities); *Chem. Bank* v. *Arthur Andersen & Co.*, 726 F.2d 930, 932-36, 939 (2d Cir. 1984) (resolving on appeal under § 1292(b) whether replacement notes issued to commercial banks as part of an integrated refinancing were securities); *Grenader* v. *Spitz*, 537 F.2d 612, 613-14 (2d Cir. 1976) (resolving on appeal under § 1292(b) whether sales of stock in apartment house cooperative were securities transactions); *1050 Tenants Corp.* v. *Jakobson*, 503 F.2d 1375, 1376-77 (2d Cir. 1974) (resolving on appeal under § 1292(b) whether share of stock in cooperative housing corporation was a security). As in these cases, the question presented here turns "almost exclusively on a question of statutory interpretation," and thus is the archetype of a question that the Second Circuit can resolve promptly, just as this Court did. *See Capitol Records, LLC* v. *Vimeo, LLC*, 972 F. Supp. 2d 537, 552, 553 (S.D.N.Y. 2013).

### (ii)    Resolution of the question presented would require dismissal of the SEC's Exchange Act claims and thus the bulk of the SEC's case.

The question here is not only "pure" but "controlling," 28 U.S.C. § 1292(b)—in the first instance because reversal on the question presented would dispose of the SEC's principal claims, which account for the bulk of the complaint's factual allegations. A question of law is controlling if its resolution could "significantly affect the conduct of the action." *Dill*, 2021 WL 3406192, at *4 (citation omitted). Courts have thus repeatedly held—and the SEC has acknowledged—that a

question of law is "controlling" where its resolution on appeal would affect a large portion of a case. *See, e.g.*, *Klinghoffer*, 921 F.2d at 24 ("the resolution of an issue need not necessarily terminate an action in order to be 'controlling'"); *Rio Tinto*, 2021 WL 1893165, at *2 (certifying appeal of order dismissing "several of the SEC's claims"); *Flo & Eddie*, 2015 WL 585641, at *2 (certifying appeal of order denying dismissal of claims constituting "significant portions of th[e] lawsuit"); *Capitol Records*, 972 F. Supp. 2d at 554; *Pollack* v. *Laidlaw Holdings, Inc.*, No. 90 Civ. 5799 (PKL), 1993 WL 254932, at *2, *4 (S.D.N.Y. June 25, 1993); *Chem. Bank* v. *Arthur Andersen & Co.*, 552 F. Supp. 439, 443 n.7 (S.D.N.Y. 1982); SEC *Ripple* Reply at 6-7 (marshaling authority that ruling "dispos[ing] of a significant portion of the SEC's case," but not all claims, presented a controlling question of law). That plainly could be the effect of resolution here because reversal would dramatically reduce the scope of this case.

> **(iii)** **Review would allow the Second Circuit to address an issue no Court of Appeals has addressed to date and which lower courts are struggling to address in this District and across the country.**

The question presented is "controlling" in a deeper sense as well: as the SEC agrees, a Second Circuit opinion addressing *Howey*'s application to digital asset transactions would give industry participants and regulators sorely needed appellate guidance in circumstances where lower courts are struggling to confront the spate of actions brought by the SEC and, more recently, by industry participants seeking clear declarations of the limits of SEC authority. *See, e.g.*, SEC *Ripple* Reply at 7 (emphasizing that *Ripple* court's ruling that blind bid-ask trades of XRP token over exchanges involved no investment contracts "could affect a large number of actions similar to this one . . . given the many pending cases . . . involving crypto assets offered or sold on trading platforms"); *Lejilex* v. *SEC*, No. 4:24 Civ. 168 (RCO) (N.D. Tex. Feb. 21, 2024); *Beba LLC* v. *SEC*, No. 6:24 Civ. 153 (ADA) (W.D. Tex. Mar. 25, 2024); *see also* Hr'g Tr. at 104:16-19, 105:3-4, 155:7-8 (noting difficulty of issues presented).

"[T]he impact that an appeal will have on other cases is a factor that [courts] may take into account." *Klinghoffer*, 921 F.2d at 24. Indeed, the prospect of "precedential value for a large number of cases" independently satisfies the first prong of Section 1292(b)—and that prospect is substantial here. *See Dill*, 2021 WL 3406192, at *4; *see also, e.g.*, *Wang*, 2013 WL 3326650, at *2 (certifying appeal where a "decision on the[] questions will significantly affect the conduct of other lawsuits now pending in the district courts"). Particularly given that no Court of Appeals has weighed in on the matter, there would be enormous value in "[r]eceiving authoritative guidance from the Second Circuit [that] will help resolve [similar] actions quickly and consistently." *Rio Tinto*, 2021 WL 1893165, at *2 (first and third alterations original) (quoting *Flo & Eddie*, 2015 WL 585641, at *2).

The need for authoritative appellate guidance could not be more pressing. How *Howey* applies to secondary-market crypto transactions is being litigated in numerous cases pending in this courthouse and across the country. *See, e.g.*, *SEC* v. *Eisenberg*, No. 23 Civ. 503 (LGS) (S.D.N.Y. Jan. 20, 2023); *SEC* v. *Sun*, No. 23 Civ. 2433 (ER) (S.D.N.Y. Mar. 22, 2023); *SEC* v. *Binance Holdings Ltd.*, No. 23 Civ. 1599 (ABJ) (D.D.C. June 5, 2023); *SEC* v. *Payward Inc.*, No. 23 Civ. 6003 (WHB) (N.D. Cal. Nov. 20, 2023); *Lejilex* v. *SEC*, No. 4:24 Civ. 168 (RCO) (N.D. Tex. Feb. 21, 2024); *Beba LLC* v. *SEC*, No. 6:24 Civ. 153 (ADA) (W.D. Tex. Mar. 25, 2024). And many more may be in the offing.[8] The cases that have addressed the issue have reached different results, with the Order and *Terraform* concluding that a blind, bid-ask trade of a digital asset carrying no post-sale obligations can be an "investment contract," and *Ripple* reaching a different

---

[8]  *See, e.g.*, Alexander Osipovich, *SEC Warns DeFi Firm Uniswap Labs of Potential Lawsuit*, Wall. St. J. (Apr. 10, 2024), https://tinyurl.com/jbp3st7m ("Uniswap Labs, creator of the world's largest decentralized crypto exchange, said that it received a so-called Wells notice from the Securities and Exchange Commission on Wednesday, indicating that it faces a potential SEC lawsuit.").

result. *Compare Terraform*, 2023 WL 4858299, at *15, *and* Order at 45-46, 58, *with Ripple*, 2023 WL 4507900, at *11-13.

The uncertainty is aggravated by the SEC's shifting conceptions of its own authority and its evolving conception of the law. SEC Chair Gary Gensler asked Congress in 2021 for authority to regulate crypto exchanges, then in 2023 declared he had it already.[9] In April 2021, the SEC allowed Coinbase to go public with essentially the same business it has today, then two years later it brought an enforcement action saying that business needed to be registered under the securities laws. In this case the SEC agreed (rightly) that the digital asset itself is *not* the security, Order at 29 ("[T]he SEC does not appear to contest that tokens, in and of themselves, are not securities."), only to then insist in another case, five days after oral argument before Your Honor, that the digital asset "itself represents the investment contract." *SEC* v. *Binance Holdings Ltd.*, No. 23 Civ. 1599 (D.D.C. June 5, 2023), ECF No. 212 (Jan. 22, 2024 Hr'g Tr.) at 92:14-15. When alerted during briefing that its conception of "investment contract" would capture trades of Bitcoin, Beanie Babies, and other commodities, the SEC argued just that digital assets are different because they are "[in]tangible" and lack "inherent value." SEC MJOP Opp. at 14-15. Then at oral argument it pressed an undefined concept of "ecosystem" as a potential limiting principle to distinguish securities from commodities. *See, e.g.*, Hr'g Tr. at 55:8-58:4. No wonder the conflicting judicial decisions. As one judge put it, the crypto "regulatory environment [] at best can be described as highly uncertain . . . Regulators themselves cannot seem to agree as to whether cryptocurrencies are

---

[9] *Compare Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gary Gensler), https://tinyurl.com/mtrnkbn2 (acknowledging that "right now the exchanges trading in these crypto assets do not have a regulatory framework"), *with* Jennifer M. Schonberger, *SEC's Gensler: The 'runway is getting shorter' for non-compliant crypto firms*, Yahoo! Fin. (Dec. 7, 2022), https://tinyurl.com/46wn46cj (asserting that the SEC had "enough authority" to fully regulate digital asset platforms); *see also* Dave Michaels & Paul Kiernan, *SEC's Gary Gensler Had Crypto in His Sights for Years. Now He's Suing Binance and Coinbase*, Wall St. J. (June 8, 2023), https://tinyurl.com/4743c26j (opining that "[i]f you're winning all your cases . . . you're not bringing enough cases").

commodities that may be subject to regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision." *In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023).

All of this, and the doctrinal confusion it has sowed, underscores the need for prompt appellate review. *See Am. Geophysical Union* v. *Texaco Inc.*, 802 F .Supp. 1, 30 (S.D.N.Y. 1992) (removal of "substantial uncertainty" supports certification). As SEC Commissioners Peirce and Uyeda recently noted: "It is entirely unclear how [industry participants] w[ere] to discern that the Commission would consider crypto assets generally—and any crypto asset in particular—a security in the form of an investment contract. Even now, ten years on, it is hardly more discernable."[10] And the very day before the Court's Order, 48 Members of Congress wrote to the SEC emphasizing the uncertainty in the "digital asset marketplace," which has been "compound[ed]" by "enforcement actions[] accusing certain digital asset trading platforms of . . . transacting in digital asset securities."[11]

In the SEC's own words, application of *Howey* to digital asset transactions has "industry-wide significance" and is "of special consequence," such that a case presenting the issue "is precisely the type of case as to which the Second Circuit has invited interlocutory appeal." SEC *Ripple* Reply at 1. Authoritative precedent is sorely needed, and this case is just the right vehicle for the Second Circuit.

**B.    There are "substantial grounds for difference of opinion" concerning the application of *Howey* to digital assets.**

The second prong of Section 1292(b)—requiring that the question presented generate "substantial grounds for difference of opinion"—is readily met. Indeed, few issues have generated

---

[10] SEC Comm'rs Peirce & Uyeda, Statement on ShapeShift AG (Mar. 5, 2024), https://tinyurl.com/3pj3jkda.

[11] Ltr. to the Hon. Gary Gensler, Chair of the SEC at 1-2 (Mar. 26, 2024), https://tinyurl.com/2ccfcbd3.

as much disagreement and confusion in securities law as the SEC's application of *Howey* to digital assets. Because that application has already generated "conflicting authority," and is "particularly difficult and of first impression for the Second Circuit," *Dill*, 2021 WL 3406192, at *7, this case meets not one but both independently sufficient tests under the second prong of Section 1292(b). *See id.*

> **(i)   Courts in this District disagree about how *Howey* applies to crypto transactions.**

As the SEC argued in seeking review of the *Ripple* decision, there is a stark inconsistency in the way courts even within this District are applying *Howey* to crypto transactions; the same token transaction may be an investment contract in one courtroom but not in another. SEC *Ripple* Br. at 1, 13-14; SEC *Ripple* Reply at 7-8. In *Ripple*, the court held that a blind, bid-ask trade of a token over a secondary-market trading platform was not an "investment contract." *Ripple*, 2023 WL 4507900, at *12. Though the court rejected the defendants' arguments that post-sale obligations were legally required by dint of the Blue Sky cases, *see id.* at *6, it found no investment contract where, among other things, the issuer "did not make any promises or offers because [it] did not know who was buying" the token; "the purchasers did not know who was selling" the token; and the secondary-market sales "were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose." *Id.* at *12.

Weeks later, the court in *Terraform* took a different course, "expressly rejecting" the *Ripple* court's approach. Order at 45; *see Terraform*, 2023 WL 4858299, at *15. In evaluating whether transactions in digital assets gave rise to an investment contract, the *Terraform* court "decline[d] to draw a distinction . . . based on their manner of sale," including whether they were "sold through secondary market transactions." *Id.*; *see* SEC *Ripple* Reply at 7-8 (arguing that "a direct, explicit conflict exists" between *Ripple* and *Terraform* because *Terraform* "reject[ed] [the *Ripple*] Court's

legal conclusion that the existence of 'blind' trading platform-based transactions precludes the application of *Howey*, *as a matter of law*, under virtually identical facts (sales of the crypto asset by the issuer to investors on a platform in blind bid/ask transactions)"). This Court then deepened the split by adopting an analysis more congruent with that of *Terraform*. *See* Order at 46, 49-60. What's more, in its later decision granting summary judgment to the SEC, the *Terraform* court supported its conclusion that certain digital asset transactions involve investment contracts with specific factual findings of an obligation past the point of sale, *see* 2023 WL 8944860, at *13-15, thus increasing the unpredictability within this District raised by the question presented.

The consequence of these conflicting authorities is that even similarly situated defendants face different outcomes in different courts within the District. That the issue has generated "very different results" notwithstanding the "careful analysis provided in each opinion" underscores the urgency of interlocutory review. *Wang*, 2013 WL 3326650, at *2.

> (ii)   **No appellate court having ever found an investment contract absent a post-sale obligation, the question presented is at a minimum "difficult."**

The conflict between *Ripple* on the one hand and *Terraform* and the Order on the other is symptomatic of the more fundamental difficulty of applying *Howey* to crypto transactions—particularly where there is no relationship between the parties beyond the point of sale. As the Court observed several times at oral argument, these questions are hard and implicate difficult subject matter. Hr'g Tr. at 104:19, 105:4; *see Klinghoffer*, 921 F.2d at 25 (accepting certification where district court "pointed out that the issues are difficult"). And the SEC agrees there are "substantial grounds for difference of opinion" concerning application of *Howey* to digital asset transactions—as it explained when seeking interlocutory appeal last summer: "reasonable jurists could reach [contrary] conclusions" on these issues. SEC *Ripple* Br. at 12-13; *see also* SEC *Ripple* Reply at 7-9. The Second Circuit itself has previously agreed that where an order's application of

-15-

the "traditional three-prong test for an investment contract established by the Supreme Court in [*Howey*]" to an instrument or transaction is "essentially a question of first impression," the order is worthy of interlocutory review. *1050 Tenants Corp.* v. *Jakobson*, 365 F. Supp. 1171, 1173 (S.D.N.Y. 1973), *interlocutory appeal granted* 503 F.2d 1375 (2d Cir. 1974). That the instant question also arises "on the fringe of the law in [a] developing area" makes interlocutory appeal all the more appropriate here. *Pollack*, 1993 WL 254923, at *3.

Absent definitive precedent, the question of the SEC's authority to regulate crypto has generated sharply divergent opinions across and within the branches of government. Sitting U.S. Senators have reached conclusions at odds with this Court's. *See, e.g.*, ECF No. 53 (*Amicus Curiae* Br. of Sen. Lummis) at 13 ("The SEC's assertion of power over crypto asset secondary markets . . . is an unprecedented use of the *Howey* test.").[12] Dozens of Members of Congress have likewise voiced their and "[o]ther regulators['], intermediaries['], and market participants['] disagree[ment] with [the SEC's] assertions" of regulatory authority over "digital asset trading platforms."[13] Indeed, CFTC and SEC Commissioners recognize the regulatory confusion that has been sown. CFTC Commissioner Pham has emphasized the "open questions on the legal statuses of various digital assets."[14] And Commissioner Peirce similarly has lamented the SEC's "reluctan[ce] to help provide clarity" as to how "a trading platform and its customers [can] determine whether a particular digital asset is a security"—a question she and Commissioner Uyeda confirmed just last

---

[12] *See also* Ltr. from Sen. Warren to Gary Gensler, Chair of the SEC at 1-2 (July 7, 2021), https://tinyurl.com/2cfcdd8k (describing Coinbase's exchange and recognizing Chair Gensler's "acknowledge[ment] in May [2021] that] these exchanges do not have a regulatory framework at the SEC" (internal quotations omitted)).

[13] Ltr. to the Hon. Gary Gensler, Chair of the SEC at 1 (Mar. 26, 2024), https://tinyurl.com/2ccfcbd3.

[14] Statement of Comm'r Caroline D. Pham on *SEC* v. *Wahi* (July 21, 2022), https://tinyurl.com/57ywwsyc.

month remains "entirely unclear."[15] There are serious questions whether the federal securities laws fit here.

As to the Court's ruling that an investment contract can exist under *Howey* without any obligation past the point of sale, Coinbase respectfully submits that the grounds for disagreement are pronounced—starting with the statutory text and decades of precedent. As Coinbase and its *amici* law scholars and others demonstrated, an "investment contract" has for decades meant a contractual arrangement; a "security" grants an investor a claim upon a business enterprise; and one therefore cannot have an investment contract under the federal securities laws without a contractual undertaking that amounts to a financial stake in an enterprise. MJOP Br. 6-17, 18-21; MJOP Reply 2-8, 9-11; ECF No. 48 (*Amicus Curiae* Br. of Blockchain Ass'n et al.) at 3-4, 12-17; ECF No. 50 (*Amicus Curiae* Br. of Andreessen Horowitz & Paradigm) at 3-8; ECF No. 59 (*Amicus Curiae* Br. of Securities Law Scholars) at 3-18; *see* SEC *Edwards* Br. at *19-20 ("'investment contract' embodies the essential attributes" of securities, including "debt [or] equity participation" (cleaned up)). *Howey*, the Blue Sky cases preceding it, and every Supreme Court and Second Circuit decision before *Howey* and since recognized as investment contracts only instruments with post-sale obligations. MJOP Br. 7-12; MJOP Reply at 3-11; ECF No. 59 (*Amicus Curiae* Br. of Securities Law Scholars) at 3-18.

In rejecting Coinbase's arguments, the Court adopted the SEC's contested position that transactions in assets that have no "inherent value" can be subject to different treatment under *Howey*, because such assets "may [not] be independently consumed or used" outside of the "ecosystem" from which they derive value. Order at 57-58, 59. But the SEC did not plead that the

---

[15] Comm'r Peirce, Statement on In the Matter of Poloniex, LLC (Aug. 9, 2021), https://tinyurl.com/34t2cwdt; Comm'rs Peirce & Uyeda, Statement on ShapeShift AG (Mar. 5, 2024), https://tinyurl.com/3pj3jkda.

tokens at issue lacked "inherent value," and it acknowledged some at least may have "utility." *See, e.g.*, Hr'g Tr. at 31:2-5. What is more, plenty of commodities—carbon credits, emissions allowances, even expired Taylor Swift concert tickets—have no inherent value outside of the "ecosystem" in which they are issued or consumed. That is why the Supreme Court has counseled that the inquiry is not "guided by the nature of the assets back of a particular document or offering." *SEC* v. *C. M. Joiner Leasing Corp*, 320 U.S. 344, 352 (1943); *see also* ECF No. 37.01 (SEC *Howey* Br.) at 30-31 (arguing, successfully, that whether an "interest has 'specific value' independent of the success of the enterprise as a whole" is a "test[] which [is] unwarranted by the statute").

In rejecting Coinbase's position that a security necessarily entails an interest in income, profits, or assets of a business, *see* Order at 48-50, the Court also parted ways with the Seventh Circuit, which has repeatedly characterized investment contracts as "unconventional instruments that have the essential properties of a debt or equity security." *See Wals*, 24 F.3d at 1018; *SEC* v. *Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, C.J.) (an investment contract, while "not a conventional security like a bond or a share of common stock," has "the essential properties of a conventional security"). And the Court adopted an interpretation of the Supreme Court's decision in *Edwards*—where *Howey*'s common enterprise element was not at issue, and where investors indisputably received a financial stake in a business—at odds with the SEC's own briefing in that case. *See* Order at 50 (quoting *Edwards* as saying the Court there "used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment*" (Order's emphasis)); *compare* MJOP Br. 18-21, *and* MJOP Reply 9-11, *with* SEC MJOP Opp. at 16-17. Finally, in concluding that the SEC had pleaded a common enterprise based on allegations respecting an "ecosystem," Order at 59, the Court endorsed a concept that neither the Supreme Court nor any federal appeals court has yet endorsed, and the

contours of which remain undefined. *See, e.g.*, *Pollack*, 1993 WL 254932, at *3 (certifying appeal as to application of *Howey* "in this area of the law that has, as yet, undefined boundaries").[16]

Reasonable minds may also debate the Court's ruling that the major questions doctrine has no application here. *See* Order at 33-35. The sitting U.S. Senator who submitted an *amicus* brief in this action emphasized the unprecedented "economic, political, and legal questions" raised by the SEC's interpretation of "investment contract" and its concomitant assertion of regulatory authority over a multi-trillion-dollar industry in circumstances where the very question of that authority is being debated in the legislature. ECF No. 53 (*Amicus Curiae* Br. of Sen. Lummis) at 3; *see also id.* at 4-15. Other *amici* argued forcefully that deference to Congressional prerogative compelled rejection of the SEC's construction of "investment contract." *See* ECF No. 48 (*Amicus Curiae* Br. of the Blockchain Ass'n et al.) at 2-20; ECF No. 50 (*Amicus Curiae* Br. of Andreessen Horowitz & Paradigm) at 13-18; ECF No. 55 (*Amicus Curiae* Br. of Chamber of Digital Commerce) at 8-20. In rejecting those arguments, the Court reasoned that "[t]he very concept of enforcement actions evidences the Commission's ability to develop the law by accretion." Order at 34. But that analysis assumes that, because the SEC has chosen to regulate by enforcement rather than notice-and-comment rulemaking, its actions fall outside the major question doctrine's zone of inquiry. That proposition is far from settled, and downplays the constitutional concerns that have animated recent development of the doctrine in the Supreme Court. *See* MJOP Reply at 13.

In sum, whether an investment contract can exist absent post-sale obligations presents—in the SEC's words—"precisely the kind of 'knotty legal problem[]' that led Congress to provide for interlocutory review in 28 U.S.C. § 1292(b)." SEC *Ripple* Reply at 1.

---

[16] To the extent that the Order endorses the suggestion that horizontal commonality can be satisfied merely by token purchasers paying money to belong to an "ecosystem," Coinbase respectfully submits that it misconceives the doctrine and looks forward to briefing the matter when and if the opportunity should arise.

**C.      Certifying the appeal could save substantial time and resources.**

Finally, immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. 1292(b). "[I]n practice," the analysis on this prong "is closely connected to the first factor," *Capitol Records*, 972 F. Supp. 2d at 551 (internal quotation and citation omitted), and the focus is on the "institutional efficiency of both the district court and the appellate court," *Rio Tinto*, 2021 WL 1893165, at *2; *see Islam*, 2021 WL 2651653, at *5 (review favored where the "system-wide costs and benefits of allowing the appeal, including the impact that an appeal will have on other cases," warrant prompt resolution). The test "is met when an intermediate appeal promises to advance the time for trial or to shorten the time required for trial." *Capitol Records*, 972 F. Supp. 2d at 551. Indeed, in passing Section 1292(b), "the House Committee on the Judiciary specifically identified as falling into th[e] category [of cases warranting certification] cases such as this one, in which 'a long trial is envisioned to determine liability over a defense disputing the right to maintain the action.'" *Fed. Housing Fin. Agency* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 337-38 (S.D.N.Y. 2012) (citation omitted).

Reversal by the Second Circuit would substantially reduce the issues to be tried, leaving only the unrelated Securities Act claim concerning Staking. The scope of the case would correspondingly be narrowed, as would the ultimate scope of trial. As noted, fully three quarters of the SEC's allegations in this case pertain to its Exchange Act claims, with a comparatively much smaller and factually distinct set of allegations devoted to the Staking program. Absent immediate review, the facts and subsidiary legal issues concerning each of the 12 tokens pleaded and their surrounding "ecosystems"—as well as the features that distinguish those "ecosystems" from the ones surrounding conceded non-securities like Bitcoin—promise to occupy substantial resources and attention. *See Binance*, Jan. 22, 2024 Hr'g Tr. at 104:16-17 (expressing concern "about the discovery and mini trials that each of these are going to generate, especially when the issuers aren't even parties to the lawsuit"). "[A] definitive answer" on

the question presented, by contrast, "may save the Court and parties vast amounts of expense and time." *Capitol Records*, 972 F. Supp. 2d at 554 (internal quotations and citation omitted).

Widening the lens beyond this case, litigation involving digital assets is "ubiquitous, and the particular legal questions raised [here] . . . have arisen frequently in district courts in recent months, including in this Circuit," *Islam*, 2021 WL 2651653, at *5; *see supra* pp. 14-15. "[C]lear guidance from the Circuit" would thus inure to the institutional efficiencies of the district courts. *Islam*, 2021 WL 2651653, at *5.

*     *     *

The application of *Howey* to digital asset transactions raises hard questions. That Members of Congress, Senators, and regulatory agencies have divided in answering them bespeaks the difficulty of the subject matter, and the divergent judicial outcomes illustrate the point. As a result of these divisions, a "cloud of legal uncertainty [] hangs over" the digital asset industry. *Fed. Housing Fin. Agency*, 858 F. Supp. 2d at 338. This case offers the ideal vehicle for the Second Circuit to quickly and cleanly remove it.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Coinbase's motion and certify for interlocutory appeal the March 27 Order.

Dated: April 12, 2024
New York, New York

Respectfully submitted,

WACHTELL, LIPTON, ROSEN & KATZ

/s/ *William Savitt*
William Savitt
Kevin S. Schwartz
Sarah K. Eddy
Adam M. Gogolak
David P.T. Webb
Emily R. Barreca
51 West 52nd Street
New York, New York 10019
(212) 403-1000
wdsavitt@wlrk.com

Steven R. Peikin
Kathleen S. McArthur
James M. McDonald
Julia A. Malkina
Olivia G. Chalos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
(212) 558-4000

*Attorneys for Defendants*