**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | Case No. 1:23-cv-04738 (KPF) |
| | : | |
| COINBASE, INC. and COINBASE GLOBAL, INC., | : | |
| | : | |
| | : | |
| *Defendants,* | : | |

**AMICUS BRIEF OF JOHN DEATON, ON BEHALF OF 4,701 COINBASE
CUSTOMERS IN SUPPORT OF COINBASE'S
<u>MOTION TO CERTIFY INTERLOCUTORY APPEAL</u>**

John E. Deaton
8 Mohill Ave
Swansea, MA 02777
All-deaton@deatonlawfirm.com
SDNY Bar # (CT) 31415
*Amicus Counsel*

April 26, 2024

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………………………………….……………..iii

INTEREST OF THE AMICUS CURIAE…………………………...………………………….....1

PRELIMINARY STATEMENT………..…………………………………….……………..3

ARGUMENT………………………………………………………………………………...9

    **A.**  Judicial Clarity Is Desperately Needed Justifying Certification…………………..……...9

    **B.**  The SEC Extends Its Regulatory Reach Into Secondary Market Transactions………….12

        1.  The token itself is never the security……………………………………………...12

        2.  The SEC's inaccurate and far-fetched theory………………………………………..13

    **C.**  The SEC is Acting in Bad Faith………………………………………………………20

    **D.**  There Exists Substantial Grounds for Difference of Opinion……………………………22

CONCLUSION………………………………………………………….……………..……24

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Grayscale Investments, LLC v. SEC,*
    No 22-1142 (D.C. Cir. 2023)…………………………………………………………21

*SEC v. Digital Licensing Inc. (dba DEBT BOX)*
    2:23-cv-00482-RJS-DBP……………………………………………………………...22

*SEC v. Ripple Labs, Inc.,*
    2023 WL 4507900 (S.D.N.Y. July 13, 2023)……………………………………*in passim*

*SEC v. Terraform Labs Pte. Ltd.*
    2023 WL 4858299 (S.D.N.Y. July 31, 2023)………………………………………23

*SEC v. W.J. Howey Co.*
    328 U.S. 293 (1946)…………………………………………………………...*in passim*

**Transcripts**

Transcript of Hearing on January 17, 2024 ECF No. 101,
*SEC v. Coinbase, Inc. and Coinbase Global,*
No. 1:23-cv-04738-KPF (S.D.N.Y. Jan. 17, 2024)……………………………… 8, 9,14,15,16,17,19

Transcript of Hearing on January 30, 2023,
*SEC v. LBRY Inc.,* 1:21-cv-00260-PB (D.N.H. March 29, 2021)………………… 2, 6, 11, 12, 24

Transcript of Hearing on November 21, 2022,
*SEC v. LBRY Inc.,* 1:21-cv-00260-PB (D.N.H. March 29, 2021)…………….. 6, 11, 19, 20, 23,24

**Other Authorities**

Alberts, J., New York Law Journal, Aug. 4, 2023
    *The SEC's Materially False Statements on Crypto* ………………………………..20

Argo, *Explaining the Bitcoin Block Reward* ……………………………………………17

Armstrong, B., Post on X, Sep. 21, 2021 ……………………………………………5

Bambysheva, N., Forbes, Mar. 9, 2023, *How the Bitcoin Ecosystem Works*……………………16

Defi Prime, *Bitcoin DeFi ecosystem*……………………………………………………..16

Root Data, ***Bitcoin Ecosystem Map***..……………………………………………16

Bitgit, Dec. 15, 2023, ***Bitcoin Ecosytem - The Engine for the Next Bull Market,*** .................16

Bitgit, *Top Bitcoin Ecosystem Tokens By Market Cap* .................................................16

Blockchain Today, Medium, Apr. 23, 2023, ***Expanding the Bitcoin Ecosystem*** ...................16

Boring, P., Post on X, Jan. 27, 2023, *The political theater in DC around crypto is next level* .............................................................................................................5

Brambrough, B., Forbes, June 11, 2023, *A Secret 'Alliance to Destroy Crypto' by 'Usurping Congress'.* .............................................................................................5

Butts, D., Blockworks*, Mar. 9, 2023, *CFTC chair calls Ethereum a commodity, in contrast to SEC chair Gensler's position;* ...................................................................15

Chaparro, F., The Block, July 5, 2023, *Regulatory ambiguity hurts Americans, says SEC Commissioner Hester Peirce* ...............................................................................4

Cohen, L. et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, Nov. 10, 2022. .......................................................................18

Coindesk Staff, Yahoo News, Dec. 5, 2023, ***Bitcoin Ecosystem*** *Developments in 2023 as BTC Hits Fresh Hits 2023 High*, ...........................................................................16

Gary Gensler, Aug. 3, 2021, *Remarks Before the Aspen Security Forum* ...........................22

Gasparino, C., Fox Business, Nov. 14, 2022, *SEC Chairman Gary Gensler met with Head of FTX Months Before Collapse;* ..............................................................................5

Gasparino, C., *Post on X,* Mar. 30, 2024. .........................................................23

*Gensler Blockchain Interview*, April 23, 2018. ...................................................21

Hansen, E., Law360, Mar. 15, 2021,
    *XRP Holders Say SEC's Ripple Suit Has Cost Them $*15B...................................7

Hester Peirce Interview, *Thinking Crypto* Mar 9 2021 .............................................13

Hinman, W., Director, Division of Corporation Finance, SEC, Jun. 14, 2018, *Digital Asset Transactions: When Howey Met Gary (Plastic),* ...............................................13

RealXRPBoy, Twitter, https://twitter.com/boy_xrp/status/1457523395717959682. ...............24

Katten, Aug. 3, 2023, *A Disagreement Among Judges in the Same Courthouse;* ...............23
Kubal, J., International Review of Financial Analysis, V.84, Nov. 2022, *Exploring the relationship between Bitcoin price and network's hashrate within endogenous system* .........17

Layton*, R.*, D.C. Journal, Apr. 3, 2024,
    *The SEC Came to Destroy Crypto Not to Regulate it*. …………………………………1, 4, 7

Layton, R., Finance, Jun. 13, 2023, *The Hinman Documents Reveal a Deceitful SEC*..……….20

Layton, R., Real Clear Policy*,* Dec. 14, 2023, *Stop Ignoring the SEC's Malfeasance on Crypto*,.3

Lemmens, C., Altcoin Buzz, Dec. 12, 2023, *The Top 10 Projects in the Bitcoin Ecosystem,* ….17

*Letter from Representative Ritchie Torres to SEC Chair Gary Gensler,* July 18, 2023. ………..10

*Letter from Republican Senator Pat Toomey to SEC Chair Gary Gensler,*
    September 24, 2021……………………………………………………………………...10

Livingston, J., The CLS Blue Sky Blog, Aug. 14, 2023, *The Ripple and Terraform Cases Tee Up a Dramatic Showdown over Cryptocurrency Regulation,* …………………………………...23

MetaNews, Aug. 2, 2023,
    *SEC Appeal Looms as Judge Rakoff Rejects Ripple Case Distinction*…………………..23

Murray, S., The Block, Apr. 23, 2023, *FTX reboot: 'I don't see how it's possible,' says a skeptical Scaramucci*. …………………………………………………………………...…20

Peirce, H. & Uyeda, M., March 5, 2024, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG* …………………………………………………………...9

Peirce, H., Feb. 14, 2022, *Statement on Settlement with BlockFi Lending LLC* ………………..21

Popli, N., Time, Dec. 14, 2022, *Here's What We Know About Sam Bankman-Fried's Political Donations* …………………………………………………………………………………5

Primal Capital*,* Medium, Mar. 4, 2024, **Growing the Bitcoin Ecosystem***,* ……………………16

Quarmby, B., Cointelegraph, Apr. 8, 2023, *Congressman Tom Emmer says SEC chair Gary Genlser is a 'bad faith regulator'* ………………………………………………………20

Roberts*,* J*.* Fortune*,* June 9, 2023, *Gensler can destroy the U.S. crypto industry, but he can't kill crypto*. …………………………………………………………………………………4

Saini, M., Reuters, June 6, 2023, *Crypto stocks drop after US SEC sues Coinbase for failing to register* …………………………………………………………………………………...7

Schwartz, L., Fortune, Apr. 17, 2024, *Former SEC crypto leader spars with blockchain lawyers over her agency's controversial approach: 'It's not going to back off.'*. ………………...14

Seward & Kissell LLP, Sep. 12, 2022, *Gensler: The SEC Has Given You All The Crypto "Guidance" You Need* ………………………………………………………………………..6, 10

Terett, E., Fox Business, Feb. 28, 2024, *Crypto industry fights back against government crackdown*, …………………………………………………………………………….5

Vasudevan, M. Linkedin, May 11, 2023, *Is the SEC Trying to Kill Crypto*, ……………………..4

Wagner, C., Blockworks, Feb. 17, 2023, *SEC Land Grab: Crypto Enforcement Actions Accelerate Under Gensler,* ……………………………………………………………………..4

Winston & Straw, Mar. 8, 2023, *The SEC's Approach to Digital Asset Regulation is Hurting Investors*. ……………………………………………………………………………………4

**INTEREST OF AMICUS CURIAE**

Attorney John Deaton (Deaton) has been a vocal and public advocate on behalf of users, retail investors, token holders and consumers who invest or operate within the digital asset space. Deaton served as amici counsel in two high profile enforcement actions, both involving digital assets. In *SEC v. Ripple Labs, Inc.,* Deaton served as amici counsel for six individually named XRP holders but represented the interests of a putative class totaling 74,502 holders. *See SEC v. Ripple Labs, Inc.,* No. 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) at 10, n.3 (indicating the putative class included users and investors from the United States, as well as 143 countries from around the world, who acquired and utilized XRP and the XRP Ledger and most of whom were unaware of Ripple or its executives when acquiring XRP). Without Deaton serving as amici counsel in *Ripple*, U.S. and international XRP holders would not have had their voices heard in a case where the outcome had a very significant role in the holders' financial lives. *See Id*. at ECF No 831-23 (*Deaton Decl. Ex. A*, one affidavit from ECF Nos. 831-1–831-26,). The affidavits indicate holders acquired XRP in the secondary market, their XRP was being held in a licensed brokerage retirement account, which represented a significant portion of the person's retirement funds, and that their XRP had been *frozen* by said brokerage until the resolution of the *Ripple* case. Deaton also served as amici counsel in *SEC v. LBRY, Inc.*, No. 21 Civ. 260, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) (LBRY) on behalf of citizen journalist Naomi Brockwell, as well as other users of the LBRY platform. Considering his participation in both cases were referenced in Judge Torres's summary judgment decision, Deaton's efforts clearly played a role. In her decision, Judge Torres cited to the thousands of XRP Holder Affidavits, collected and submitted to the parties, by Deaton. *Ripple Labs,* ECF No. 874, at 24 (citing XRP Purchaser Affidavits*,* ECF 831-1–831-26). Also, noted in her decision, Judge Torres

declined to specifically address the issue of whether secondary market sales of XRP constituted offers and sales of investment contracts. *Id.* at 23, n.16. In doing so, however, she referenced a conversation between Deaton and Judge Barbadoro, specifically related to secondary market transactions, wherein Judge Barbadoro, in responding to Deaton's plea to make it clear that his ruling did not implicate secondary transactions, Judge Barbadoro, on the record, affirmed that his holding should not be read to include secondary sales. *Id; see also*, *Deaton Decl. Ex. B*, LBRY, Hr.g Tr., at p.32-37 (Jan. 30, 2023).

Deaton is an attorney dedicated to ensuring that individual users and investors in the digital asset industry are adequately represented in matters greatly affecting them. Deaton is the founder of Crypto-Law.us and has been a vocal advocate for digital asset regulation. Crypto-Law's goal is to provide a source of information and probing analysis on legal, regulatory and policy issues related to cryptocurrencies and blockchain technology. Crypto-Law created a Connect to Congress app allowing U.S. residents to directly contact their federally elected senators and representatives, hoping to motivate Congress to pass digital asset legislation, as well as calling for greater transparency and congressional oversight over the Securities and Exchange Commission (SEC). Under Deaton's leadership, Crypto-Law helped deliver over one-hundred thousand messages, reaching every single member of Congress. All of Deaton's work in the cryptocurrency space, including his role as counsel for amici, has been pro bono.

It has become abundantly clear the SEC does not speak on behalf of digital asset users and investors and intends to offer no regulatory guidance beyond citing the *Howey* case. Defendant, Coinbase, must protect the interests of its employees and shareholders above all others, including its customers. Deaton, on the other hand, represents 4,701 Coinbase customers and their interests in the present case. Many of these 4,701 Coinbase customers actively trade or

presently own one or more of the 12 tokens, alleged by the SEC to be securities traded on

Coinbase's digital asset spot exchange. Deaton is not being paid by anyone to represent Coinbase

customers and continues his work and advocacy for free.

## PRELIMINARY STATEMENT

It would be a gross understatement to say there's confusion surrounding the application

of the *Howey* test to modern day blockchain technology. It is difficult enough for market

participants to analyze a 1946 test, involving orange groves, and then apply that test to

decentralized software code. It becomes impossible, however, when you add into the analysis, a

regulatory agency intent on decimating the entire industry by engaging in unrelenting regulation

by enforcement. The tragic truth is that the SEC has no intent on regulating decentralized digital

code, but seeks instead, to ban it in the United States. *See e.g.,* Layton, R., D.C. Journal, Apr. 3,

2024, *The SEC Came to Destroy Crypto Not to Regulate it.* The cryptocurrency industry,

including Coinbase customers, are in **desperate need for legal clarity in the United States**.

Almost everyone, including the SEC in the *Ripple* case, agrees. According to the SEC,

"substantial grounds for difference of opinion" justify an interlocutory appeal. *Ripple*, SEC

Mem. of Law in Supp. of Mot.*,* ECF No. 893 at 1. From the digital asset holder and retail

investors' perspective, the SEC has abandoned its mission of investor protection when it comes

to crypto. According to users and investors, the SEC has caused much greater harm than any

company charged, not with fraud, but with violating Section 5 of the 1933 Securities Act,

especially considering how investors today, have access to real-time information at their

fingertips thus, reducing significant information asymmetries, that existed before the internet.

Instead of investigating and focusing on fraud cases, the SEC is much more intent on capturing

jurisdiction over this burgeoning asset class. *See e.g.,* Layton, R., Real Clear Policy*,* Dec. 14,

2023, *Stop Ignoring the SEC's Malfeasance on Crypto,* ("[SEC] pursued a ruinous "regulation by enforcement" policy to punish innovators like Ripple, LBRY, Grayscale and Coinbase, while they coddled criminals like Sam Bankman-Fried."); Wagner, C., Blockworks, Feb. 17, 2023, *SEC Land Grab: Crypto Enforcement Actions Accelerate Under Gensler,* ("After a record year for regulatory action in 2022, the 'regulation by enforcement' era has continued"). Individual users and investors are not alone in their belief that the SEC's current approach to crypto is causing investor harm. "[The SEC's] position is misguided as a legal matter and threatens a cavalcade of collateral consequences that will directly harm the people the Commission is trying to protect—individual investors—as well as other market participants and innovation more broadly." *See* Winston & Straw, Mar. 8, 2023, *The SEC's Approach to Digital Asset Regulation is Hurting Investors.* In fact, many commentators have argued that the SEC implemented an agenda to destroy the cryptocurrency industry. *See* Vasudevan, M. Linkedin, May 11, 2023, *Is the SEC Trying to Kill Crypto,* ("providing clips of congressional testimony establishing the SEC's blatant anti-crypto stance without making best efforts to provide the much-needed regulatory clarity the industry has begged for"); *See also,* Layton, R., D.C. Journal, Jun. 23, 2023, *The SEC Came to Destroy Crypto Not to Regulate it.* Roberts, J. Fortune, June 9, 2023, *Gensler can destroy the U.S. crypto industry, but he can't kill crypto.* SEC Commissioner Hester Peirce also thinks the SEC's intentional regulatory ambiguity is harming American investors. *See* Chaparro, F., The Block, July 5, 2023, *Regulatory ambiguity hurts Americans, says SEC Commissioner Hester Peirce.*

Unfortunately, politics seems to be playing an ugly role in crypto's regulatory quagmire. Bad actors, like Sam Bankman Fried (SBF), while perpetuating massive fraud, secured private meetings with Chairman Gary Gensler (Gensler), while the CEO of the largest U.S. exchange, as

well as America's only publicly traded exchange, Coinbase, couldn't get a meeting. *Compare* Gasparino, C., Fox Business, Nov. 14, 2022, *SEC Chairman Gary Gensler met with Head of FTX Months Before Collapse*; *with,* Armstrong, B., Post on X, Sep. 21, 2021 ("Some really sketchy behavior coming out of the SEC recently. Story time…"). Why would the CEO of an offshore exchange receive greater access to regulators than the CEO of the largest American exchange? *See* Popli, N., Time, Dec. 14, 2022, *Here's What We Know About Sam Bankman-Fried's Political Donations* (detailing how SBF "personally gave at least $40 million to politicians and political action committees ahead of the 2022 midterm elections, mostly to Democrats and liberal-leaning groups, making him the second overall top donor to Democrats, only behind George Soros, according to the Center for Responsive Politics."); *See also,* Boring, P., Post on X, Jan. 27, 2023, *The political theater in DC around crypto is next level* (posting a video from Fox News explaining how FOIA requests prove Senator Elizabeth Warren's office provided Gensler with not only the exact questions Senator Warren intended to ask, but gave him the suggested answers that Gensler should testify to, regarding crypto in 2021); Brambrough, B., Forbes, June 11, 2023, *A Secret 'Alliance to Destroy Crypto' by 'Usurping Congress'* ("The scuttlebutt is that Gensler has an alliance with Elizabeth Warren, and the rumor is that she will make him Treasury Secretary if he basically destroys crypto in the U.S."); Terett, E., Fox Business, Feb. 28, 2024, *Crypto industry fights back against government crackdown*, ("The crypto industry has mounted a legal counteroffensive against U.S. regulators to fight what it sees as **a government-wide attempt** by the Biden administration to quash the $2 trillion digital asset industry") (emphasis added).

Simply put, the SEC does not have retail investors' interests at heart, nor does it speak on behalf of digital asset users and investors. It is also clear; the SEC intends to offer no guidance

beyond claiming *Howey* provides all the necessary guidance needed for legal clarity. *See* Seward
& Kissell LLP, Sep. 12, 2022, *Gensler: The SEC Has Given You All The Crypto "Guidance"
You Need* (indicating "Gensler provided no guidance on how to tell a crypto security from a
crypto non-security. Instead, he criticized those who have called for more clarity."). Despite
Genlser's criticism of those calling for clarity, countless industry professionals, government
officials, judges, and even SEC members have expressed the need for clarity regarding digital
assets. In sum, Coinbase customers, retail investors, and users deserve clarity in the United States
related to this important technology. Until Congress provides regulatory clarity, **judicial clarity
is paramount.** In *LBRY*, Judge Barbadoro recognized the issue:

> [C]ertainly blockchain is a legitimate, important technology, and there are consumptive
> uses for tokens and there's a need for tokens, and there are consumptive uses for tokens,
> and the evidence in my case was there are consumptive uses for LBC that don't have
> anything to do necessarily with investment.

*Deaton Decl. Ex. B* at 31:10-14 (Jan. 30, 2023). Judge Barbadoro then expressed his own
frustration by expressing the SEC "should be able to be in a position…to provide some
clarity…but I can't make you and I won't try." *Deaton Decl., Ex. C*, *Hr'g Tr*. at 25:18-23 (Nov.
21, 2022). Judge Barbadoro recognized holders oftentimes purchase tokens in the secondary
market (e.g., on Coinbase) and do so for noninvestment purposes. Considering securities laws do
not apply to noninvestment acquisitions, individual token holders deserve clarity. *See United
Hous. Found, Inc. v. Forman*, 421 U.S. 837, 852 (1975) (holding that "[w]hen a purchaser is
motivated by a desire to use or consume the item purchased…the securities laws do not apply.").
The SEC concedes *Howey* is the controlling test, but when that standard is being warped and
argued differently than it ever has been, the clarity being touted goes out the window. *Howey*
was meant to encompass the changing ways investment schemes may come up, but *Howey* was

not meant to be the changing scheme to fit the narrative the SEC desires at any given time. The

SEC's malevolent approach was compared to an evil video game:

> Following the Securities and Exchange Commission's effort to stretch, bend and twist the law to grant itself authority to regulate cryptocurrencies has been like watching an exhausting video game. By the last level, the monster has grown so grotesque and ridiculous that you're just waiting for the relief of seeing it explode so the comforting words "game over" can finally appear.

*See e.g.,* Layton*,* R., D.C. Journal, Apr. 3, 2024, *The SEC Came to Destroy Crypto Not to*

*Regulate it.* Describing the SEC's approach on crypto as a policy of regulation by enforcement

does not fully capture the current regulatory environment. Professor J.W. Verret of George

Mason University perfectly described the SEC's policy as "'**enforcement by destruction**,'

trying to turn courts into execution chambers for an industry it never intended to regulate but to

destroy." *Id*. (emphasis added).

   *Howey* and its progeny never addressed investment contracts changing hands in the

secondary market. The SEC seeks a new application of *Howey*, and it needs to be resolved

sooner rather than later, or market participants, including end users and retail investors, will

remain in regulation purgatory for years to come. Without certification, individual investors and

blockchain users will continue to be the one's harmed each time the SEC announces its next

crypto enforcement action. *See* Hansen, E., Law360, Mar. 15, 2021, *XRP Holders Say SEC's*

*Ripple Suit Has Cost Them $15B;* Saini, M., Reuters, June 6, 2023, *Crypto stocks drop after US*

*SEC sues Coinbase for failing to register.*

   Another area of concern that must be addressed by the appellate courts is the SEC's policy of

taking specific transactions, made during the early stages of a blockchain ecosystem, claimed by

the SEC to be investment contracts, and then issuing a blanket declaration that, because of those

initial transactions, the asset itself, is, and always will be, a security in perpetuity, despite a lack

of involvement by those earlier participants thereafter. Related to the token, the SEC continues to speak out of both sides of its mouth. On one side, it agrees that the tokens themselves are not securities, and "[s]tripped down, [crypto] is just computer code." *Ripple,* ECF No. 640 at 10. But on the other side of its mouth, it argues that the token effectively embodies the second and third prongs of the *Howey* test and is thus, a security. *See Ripple,* ECF No. 153, at 24 ("The XRP traded, **even in the secondary market, is the embodiment** of those facts, circumstances, promises, and expectations and **today represents** that investment contract.") (emphasis added). The SEC's embodiment theory is the functional equivalent of arguing the token itself is a security. However, the SEC fails to offer a single citation of legal authority to support its newly made-up theory. In fact, the SEC started laying a foundation for advancing its novel embodiment theory in the present case. *See SEC v. Coinbase,* ECF No. 101, *Hr'g Tr.* at 51: 7-9 (Jan. 17, 2024) ("What [the SEC is] saying is that a contract is not dispositive, that you can have the full set of expectations and understandings **that embody the inducements**.") (emphasis added). Again, arguing the token itself isn't the security, but claiming it represents or embodies all the promises and inducements of others, and therefore, is a security - is the functional equivalent of arguing the token itself is a security!

The *Howey* test is a transaction-by-transaction analysis. There are thousands of digital assets and thousands, sometimes millions, of transactions occurring on various blockchains. Because of this inconvenient reality, the SEC adopted an unconstitutional shortcut by effectively saying all transactions of the tokens violate securities laws. If the *Howey* test is going to be interpreted and used to include all transactions in perpetuity, an appellate court, possibly the U.S. Supreme Court, needs to be the one who validates it, not a politically driven, compromised agency that has abandoned its mission.

## ARGUMENT

### A.  Judicial Clarity Is Desperately Needed Justifying Certification

Industry experts, professionals, market participants, government officials, judges, and even members of the SEC all agree: a lack of legal clarity exists related to the digital asset industry. On March 5, 2024, SEC Commissioners, Hester Peirce (Peirce) and Mark Uyeda (Uyeda), provided a scathing rebuke of the crypto regulatory environment under Gensler's leadership:

> This…action underscores the adverse consequences of the Commission's approach to regulation in the crypto space and adds to the ambiguity that hangs over the crypto world.  It is entirely unclear how [participants]…discern that the Commission would consider crypto assets generally—and any crypto asset in particular - a security in the form of an investment contract. Even now, ten years on, it is hardly more discernable.

Peirce, H. & Uyeda, M., March 5, 2024, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG*. Peirce and Uyeda do not hold back in their blistering criticism of the SEC's intentional lack of clarity: "The standards are so opaque and arbitrary that the Commission itself is unwilling to stand by its own analysis." *Id.* Most troubling and significant for amici is that "[t]he environment we have created for the crypto asset markets, **especially as it relates to secondary trading**, is untenable. Cases like this **do not protect investors**; they intimidate innovators and entrepreneurs." *Id*. (emphasis added).

Even this Court, in the present case, expressed concern about "how these entities should have known…that they weren't implicating the securities laws" *Coinbase,* ECF No. 101, *H'g. Tr*., at 6:6-17. It is a legitimate concern because this case is different from many of the other cases the SEC relies on. Specifically, this case does not involve the issuer of the crypto assets in question. The SEC's response, of course, is that *Howey* controls, therefore, everyone in the world has been placed on proper notice, and clarity must exist. *See Id.* at 62.

Furthermore, there have been numerous government officials calling for more clarity and scrutinizing the SEC's actions to date. *See e.g., Letter from Republican Senator Pat Toomey to SEC Chair Gary Gensler,* September 24, 2021 ("My concerns about the SEC's lack of regulatory clarity are shared by others, including SEC commissioners."). The criticism of the SEC's approach has been bipartisan. Democratic Representative Ritchie Torres stated that the *Howey* test has "been applied sloppily by the SEC" and faults the SEC because:

> [U]nder Chair Gensler, the SEC has not issued a single rule on crypto assets, nor has it given any clear guidance. All it has done is sent mixed messages, one after another, not only contradicting the CFTC but often contradicting itself.

*Letter from Representative Ritchie Torres to SEC Chair Gary Gensler,* July 18, 2023. Congressman Torres clearly agrees with Commissioner Peirce because he stated "The endless stream of contradiction and *confusion*… I hope the SEC will…concentrate the Commission's enforcement energies where it belongs, on the bonafide bad actors who perpetrate serious transgressions like fraud, market manipulation, and the misappropriation of customer funds." *Id.* If members from both political parties are authoring these types of letters, the application of *Howey* to blockchain technology is not so clear. Proof the SEC has been hijacked by politics can be found by simply evaluating Gensler's comments before and after he became Chairman. While teaching at MIT, Gensler was a huge proponent of cryptocurrencies, blockchain technology, *and establishing regulatory clarity for the industry*. **Five years ago**, Gensler was adamant that "there needs to be clarity in the market and if the clarity in the market is that they're not securities, they might still be commodities and need to comply with those laws." Gensler, G., MIT, April 23, 2018. But today, Gensler criticizes anyone who argues the same thing he argued FIVE years ago. *See* Seward & Kissell LLP, Sep. 12, 2022, *Gensler: The SEC Has Given You All The Crypto "Guidance" You Need.* ("Gensler criticized those who have called for more clarity."). In open

court, an American entrepreneur told a judge: "I mean, I just don't know if you appreciate the amount of chaos that has been created by this decision and **the complete lack of understanding that the industry still has about what they can and cannot do**." *Deaton Decl. Ex. C* at 12:18-21. The LBRY CEO pleaded for clarity within the secondary markets: "we would destroy everything if, for example, it would -- the SEC would be -- make it clear that secondary market -- that secondary sales aren't securities sales.' *Id.* at 12:22-25. To truly appreciate what American innovators and token holders are faced with today, Amici respectfully encourages this Honorable Court to review the hearing transcripts from *LBRY*. *See Deaton Decl. Ex. B and C*. After years of litigation, the CEO said:

> What I would like to come out of this is at least some knowledge of what the rules are. There are so many smart people who want to be building and working in this -- in this field. Everyone in my company, whether we work at LBRY or not, wants to keep doing this work. And I -- I thought for sure that by the end of this we would at least know what they are. **And - and still no one does**.

*Deaton Decl. Ex. C* at 12:5-11 (emphasis added). The founder of *LBRY* summed it up like this: "I just want to know the rules. Tens of thousands of other companies just want to know the rules." *Id.* at 11:25-12:1. It isn't just the Defendants who have been sued who have expressed frustration with the SEC. Even a federal judge concluded: "I don't fully understand the SEC's ultimate position on that at this point." *Deaton Decl. Ex. B*, at 31:17-18. Judge Barbadoro expressed the difficulty of applying 1946 caselaw to modern day blockchain technology, especially when coupled with the SEC's opaque approach to crypto:

> And I'm not interested in participating in SEC policymaking, but I've got a problem here. Right? The problem here is this. You've got a company that without fraudulent intent, at a time when things were less certain than they are now, engaged in certain practices and developed a blockchain that has legitimate uses and a token that has consumptive uses.

*Deaton Decl. Ex. C*, at 34:19-25. Judge Barbadoro expressed that his hands were tied when he said "But that's not me. That's not my job. That's the SEC's job, and I can't make the SEC litigate

something in front of me that it doesn't want to." *Deaton Decl. Ex. B*, at 25:20-21. Standing

alone, the fact that almost everyone agrees there's a lack of clarity, including industry

professionals, elected officials, SEC commissioners, judges, and even Gensler (years earlier),

certification is warranted.

**B.  The SEC Extends Its Regulatory Reach Into Secondary Market Transactions**

**1.  The token itself is never the security.**

Seventy-eight years of caselaw has shown any asset or commodity can be offered as a

security, whether that asset be orange groves, whiskey, chinchillas, condos, beavers, or Bitcoin.

The SEC offers no legal precedent establishing that the underlying asset of an investment

contract is itself a security. The reason there is no precedent, is because the underlying asset, in

an investment contract, **is never the security**. *See Howey*, 328 U.S. at 301 ("If that test be

satisfied, it is immaterial… whether there is a sale of property with or without intrinsic value.");

*SEC v. Telegram Grp., Inc*., 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) ("the security…is not

simply the Gram, which is little more than alphanumeric cryptographic sequence."). Claiming

the token is the security is the same as calling the oranges in *Howey* securities. In *Telegram*, the

Court was clear that the central issue in *Howey* and *Telegram* was not the underlying product,

agreement, or the underlying asset. *Id.* The Court confirmed that the underlying asset (whether

oranges or digital tokens) are not themselves investment contracts. *Id*. Any doubt or confusion

regarding whether the Court considered the token itself a security was laid to rest when Judge

Castel issued a second ruling in *Telegram*. 2020 WL 1547383 at *1 (clarifying that the central

point of the Court's holding was that "the 'security' was neither the Gram Purchase Agreement

nor the Gram."). In *Telegram*, there existed actual written contracts between the promoter and

the investors, yet the underlying written contract, itself, was not the security. *Id*. Considering

*Telegram* involved a pure ICO, with a blockchain yet to be built, if there ever existed a case where the token itself constituted the security, it would be *Telegram*. However, the Court made it crystal clear that the underlying asset, in an investment contract, is not the security. *Id.* In addition to disregarding precedent spanning from 1946 (*Howey*) to 2020 (*Telegram*), the SEC's farfetched theory also contradicts the SEC's own guidance. Former SEC Director Hinman (Hinman) unequivocally stated: "the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not." Hinman, W., Director, Division of Corporation Finance, SEC, Jun. 14, 2018, _Digital Asset Transactions: When Howey Met Gary (Plastic)_, ("Hinman Speech"). Hinman also noted "the digital asset itself is simply code." *Id.* Hinman emphasized "that the analysis of whether something is a security is not static and does not strictly inhere to the instrument." *Id.* Just like any other commodity, "investment contracts can be made out of virtually any asset (including virtual assets)." *Id.* Former SEC Chairman Clayton agreed. *See* Mar. 7, 2019, _Ltr. from Chairman J. Clayton to Congressman Ted Budd_ ("I agree that the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument.").

**2. The SEC's inaccurate and far-fetched theory**.

Starting in the *Ripple* case, the SEC proffered a theory that, regardless of the seller or circumstances of the sale, crypto tokens are per se securities (a/k/a investment contracts).[1] Admittedly, the SEC does not phrase its theory in those precise terms, instead, the SEC gets

---

[1] The SEC's obsession with focusing on the token, and not on the circumstances surrounding the offering, allows the SEC to sidestep a legitimate *Howey* analysis. The SEC's unconstitutional shortcut was criticized by Commissioner Hester Peirce. *See* Mar. 9, 2021 Hester Peirce Interview, Thinking Crypto at 18:58 ("We tend at the SEC to talk about the token itself as a security and that's really a shorthand…what we've done now is said that orange groves are kind of like the security.").

creative but argues the functional equivalent. The present case is no different. In fact, this Court asked counsel for the SEC directly:

> THE COURT:     You're saying that as to these  12 or 13 tokens, when they were initially issued, these tokens were **themselves securities**?
> MR. COSTELLO: **Yes, your Honor**.

*Coinbase,* ECF 101, *Hrg Tr*., at 17: 15-18 (emphasis added). Of course, during the same hearing, the SEC conceded that "at the end of the day, these 12 or 13 tokens, they are just computer code." *Id.* at 18:22-23. This Court immediately noted the inconsistency: "I'm smiling, sir, because that's kind of what your friends at the back table are saying and they are wondering why we're here." *Id*. at 19:1-2. Recently, the public was provided further insight into the SEC's *internal struggle* when dealing with digital tokens. After working on both the *Ripple* and *Coinbase* cases, Attorney Ladan Stewart (Stewart) left the SEC. Recently, Stewart claimed the SEC does not view the tokens as securities, but instead only their offer and sale. *See* Schwartz, L., Fortune, Apr. 17, 2024, *Former SEC crypto leader spars with blockchain lawyers over her agency's controversial approach: 'It's not going to back off."*. Stewart then was immediately asked: "But then what do you register?' *Id.* Stewart responded: "**'The token**, plus all the stuff around the token,' **is the security**. You can't obviously register the stuff, **but you can register the token.**'" *Id.* (emphasis added). Clearly, SEC lawyers are trained in double speak. The SEC attempted the same analytical gymnastics in *Ripple.* In that case, on one hand, the SEC said: "[s]tripped down, XRP is just computer code." *Ripple*, ECF No. 640 at 10. On the other hand, the SEC argued "[t]he XRP traded, **even in the secondary market**, is the **embodiment** of those facts, circumstances, promises, and expectations and today *represents* that investment contract." *Id*. ECF No. 153 at 24 (emphasis added). Missing from the SEC's embodiment theory, however, is a single citation of legal support. The SEC is unable to cite a single source because none exist.

Arguing the token *represents* the investment contract is a clever way of arguing the token itself is the security. When an asset is offered and sold as an investment contract, therefore a security, it does not transform the underlying asset itself into a security. Oranges remain oranges and digital assets remain code. The SEC is making it up, as they go. Except now, they've added a new angle to their working theory: *the ecosystem argument.*

Before we get to the SEC's new ecosystem twist, let's review how we got here. In previous cryptocurrency cases, the SEC made no distinction between direct sales by an issuer or secondary sales independent of the issuer. In *Rip*ple, the SEC argued XRP was, is and always will be a security. *See Ripple,* ECF No. 708, at 9-11. Therefore, every offer, sale, or transaction, involving XRP, is subject to registration or must qualify for a Section 4 exemption. *Id*. By including secondary market transactions, the SEC's theory covers all past, present and future sales of tokens, without limiting those sales to the issuer, promoter, or their affiliates. In *Ripple,* the SEC supported its sweeping theory by arguing that because "[a]ll units of XRP are fungible with each other and the price of all units of XRP rise or fall equally," XRP must be a security. *Id.* ECF No. 640 at 2. Since *Ripple*, the SEC has stretched its theory further by including an undefined concept - claiming a purchaser is buying into the token's ecosystem. *Coinbase,* ECF No. 101, *Hr'g Tr.* at 55:8-58:4. The problem with assertions of fungibility, price equality, and the token belonging to an ecosystem, is that those same assertions equally apply to Bitcoin and Ether - tokens accepted by the SEC, other U.S. regulators, and courts - as commodities - not securities. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (indicating *"*it is well-established that the SEC does not contend that Bitcoins transferred on the Bitcoin blockchain are securities."); Butts, D., Blockworks*,* Mar. 9, 2023, *CFTC chair calls Ethereum a commodity, in contrast to SEC chair Gensler's position; See* Hinman Speech (declaring Bitcoin and Ether non-securities).

In this case, the SEC argued, remarkably, that Bitcoin is not a security because with Bitcoin, "**there's no ecosystem behind it.**" *Coinbase,* ECF No. 101, *Hr.g Tr.,* at 30:5-6. That statement alone demonstrates one of two things: 1) although in existence for more than a decade, the SEC still fundamentally misunderstands the underlying technology; or 2) the SEC is intentionally misleading this Court. Simply put, **the core reason to acquire or invest in Bitcoin is because it is the most secure and immutable software monetary ecosystem known to the world.**

Bitcoin is certainly distinguishable from other cryptocurrencies but claiming it is not a security, unlike other tokens, because it doesn't have an ecosystem, is just plain dumb. *See* Bitgit, *Top Bitcoin Ecosystem Tokens By Market Cap* (stating '**[t]he Bitcoin Ecosystem** refers to the **expansive network** of technologies, services, products, and communities that have been developed around the foundational principles of Bitcoin.") (emphasis added); Bambysheva, N., Forbes, Mar. 9, 2023, *How the Bitcoin Ecosystem Works,* (emphasis added); Bitgit, Dec. 15, 2023, *Bitcoin Ecosytem - The Engine for the Next Bull Market,*(emphasis added); Primal Capital, Medium, Mar. 4, 2024, *Growing the Bitcoin Ecosystem,* (emphasis added); Coindesk Staff, Yahoo News, Dec. 5, 2023, *Bitcoin Ecosystem Developments in 2023 as BTC Hits Fresh Hits 2023 High,* ("The **Bitcoin ecosystem** is under a renewed spotlight") (emphasis added); Blockchain Today, Medium, Apr. 23, 2023, *Expanding the Bitcoin Ecosystem,* ("In recent years, **the Bitcoin ecosystem has been evolving**") (emphasis added); *see also, Bitcoin Ecosystem Map,; and, Bitcoin DeFi ecosystem.* Simply put, the same arguments made by the SEC, related to the 12 tokens traded on the Coinbase platform, equally apply to Bitcoin. The SEC's argument is as follows:

> So it is just computer code. And the computer code is linked on a blockchain because a bunch of letters and numbers that live on that blockchain. But the key here is that these letters and numbers from this code go with that blockchain and its surrounding network or ecosystem, you'll see sometimes the cases use. It's that network or ecosystem, that is

> what drives the value of the token because the token as code is linked to that ecosystem. It is tied to it. It cannot be separated from it. As the value of that network or platform or ecosystem increases, so does the value of the token. And the issuers and the project team, they drive the value of the ecosystem.

*Coinbase,* ECF No. 101, *Hr'g Tr.* at 19:4-15. The above statement is a very generic but accurate description of the Bitcoin *network or ecosystem*. With Bitcoin, *the issuers and the project team* could easily be argued to be the Bitcoin miners. *See* Kubal, J., International Review of Financial Analysis, V.84, Nov. 2022, *Exploring the relationship between Bitcoin price and network's hashrate within endogenous system,* ("The process that allows the Bitcoin network to run is called mining, as it issues new bitcoins and releases them into circulation as a reward **to miners for securing the network's operation**.") (emphasis added). In other words, "there is strong evidence of a relationship between the Bitcoin price and the network hashrate." *Id.; See also,* Argo, *Explaining the Bitcoin Block Reward* ("In the case of **Bitcoin's blockchain network**, the players in the game are Bitcoin miners.") (emphasis added). In sum, the assertion by the SEC, that Bitcoin does not have an ecosystem, is nonsense. In fact, one commentator stated: "Bitcoin is preparing for the bull run [and] **[t]he Bitcoin ecosystem** will surf along with th[e] wave." *See* Lemmens, C., Altcoin Buzz, Dec. 12, 2023, *The Top 10 Projects in the Bitcoin Ecosystem,* (emphasis added). Make no mistake, the same arguments, made by the SEC (fungibility, price equality, and belonging to an ecosystem), equally apply to holders of almost all commodities, collectibles, or fiat currency, including every holder of the U.S. Dollar. The SEC's attempt to focus on the token itself fails to accept that it must establish each *Howey* factor with respect to any particular transaction. Each transaction "must be examined as of the time that the transaction took place." *SEC v. Aqua–Sonic Prods. Corp*., 524 F. Supp. 866, 876 (S.D.N.Y. 1981). Amici's extensive research has not found a single case where an investment contract was found absent some level of privity or contact between the promoter and the buyer. In sum, the SEC cannot

offer a single citation where an investment contract was found when there existed absolutely no contact or privity between the promoter/seller and the purchaser. Furthermore, "of the many federal appellate and Supreme Court decisions in which the Howey analysis is applied, none directly dealt with secondary transactions in the objects of investment contracts by the original buyer." *See* Cohen, L. et al., *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, Nov. 10, 2022, at *58. This extensive research article found "only one case analyzing a transaction under *Howey* that did not directly involve as a party the entity that would normally be considered the "sponsor" of the alleged investment contract scheme." *Id*. at 58-59 (citing *Hocking v. Dubois,* 885 F.2d 1449 (9th Cir. 1989) (en banc) ("Hocking II"), cert. denied 494 U.S. 1078 (1990)). The point of the *Hocking* case is that it is the only appellate case that has dealt with the secondary sale of an asset originally packaged, marketed, offered and sold as an investment contract and the court ultimately held the secondary sale did not constitute the sale of an investment contract. Also of significance, the "SEC took the highly unusual step of submitting an amicus brief to the court arguing that the facts did not warrant the finding of an investment contract transaction." *Id.* Today, we have a very different SEC.

If the Court were to agree with the SEC and fail to conduct a *Howey* analysis related to each transaction traded in the secondary market, the SEC could claim Coinbase customers, who sell or transfer their tokens, are doing so in violation of securities laws, even if they're completely unaware of the issuer and know absolutely nothing about other participants within the ecosystem. This ridiculous theory is exactly what caused Judge Netburn, in *Ripple*, to observe: "Presumably under this theory then, every individual in the world who is selling XRP would be committing a Section 5 violation based on what you just said." *Ripple,* Hr'g Tr. 44:7-9 (Mar. 19, 2021). The SEC's breathtaking theory also encompasses the non-investment

acquisition of tokens. Judge Netburn is not the only judge in the Southern District to be troubled by this. This Court questioned the scope of the SEC's theory "[b]ecause it is a real fear that I have that your argument is just sweeping too broadly." *Coinbase,* ECF No. 101, *Hr.g Tr.,* at 50:19-21. Clearly, the SEC's goal from the start, including in the *Ripple* and *LBRY* cases, was to expand its regulatory reach beyond primary sales offered by issuers so it could regulate the secondary market. *See Ripple,* ECF No. 153 at 24. This Court recognized the significant distinction between the two types of transactions when it asked: "To what extent are you asking me to look at primary transactions as distinguished from transactions in the secondary market?" *Coinbase,* ECF No. 101, *Hr.g Tr.,* at 11:8-10; *see also Id.* at 121:18-20 ("I asked you to – whether you were focusing on primary or secondary transactions."). Counsel for Coinbase, provided the answer: "In the briefing, the commission suggests that they stand for the proposition, that **primary and secondary transactions ought to be viewed in the same way."** *Id.* at 121:18-20 (emphasis added). In *LBRY*, the SEC was encouraged by the court, multiple times, to clarify the secondary market confusion. Judge Barbadoro attempted to secure clarity for innocent holders in the secondary market when he asked the SEC: "what's the SEC's position with respect to people who are holding the LBC token right now other than LBRY?" *Deaton Decl. Ex. C*, at 16:20-22. Judge Barbadoro openly questioned the SEC's motive:

> [B]ut those people who acquired the token because they believe it has use on the LBRY blockchain, that the LBRY blockchain should not be -- have to become dysfunctional simply to satisfy the SEC. That -- that seems to me to be a -- an issue worth exploring. At the end of the day, whether you decide to pursue that or not is totally up to the SEC.

at 35:7-13. The SEC responded to Judge Barbadoro in typical SEC fashion:

> Secondary sales…to set expectations here, a resolution that would involve some sort of secondary sales clarity…seems to be asking for would seem to be beyond the controversy that's before the Court…We will see what we can do, but…it could be very difficult for the SEC to fashion a policy about secondary sales in this circumstance because it really is policy and we're constrained…before the SEC makes policy.

*Id.* at 33:21-25-34:1-15. The SEC has had every opportunity to provide clarity but has chosen maximum opaqueness to allow it to go after secondary market transactions.

### C.  The SEC is Acting in Bad Faith

Gary Gensler has been described as a bad faith regulator. *See* Quarmby, B., Cointelegraph, Apr. 8, 2023, *Congressman Tom Emmer says SEC chair Gary Genlser is a 'bad faith regulator'.*; Alberts, J., New York Law Journal, Aug. 4, 2023, *The SEC's Materially False Statements on Crypto,* The CEO of SkyBridge, Anthony Scaramucci, stated: "Mr. Gensler is a bad faith regulator, and I think he'll just delay the process of adoption for the U.S. and it's sad, because other countries will take the lead and we'll be missing out." *See* Murray, S., The Block, Apr. 23, 2023**,** *FTX reboot: 'I don't see how it's possible,' says a skeptical Scaramucci.* It isn't just market participants saying it. Federal judges have repeatedly called out the bad faith behavior coming out of the SEC. Judge Netburn, clearly fed up with the SEC's behavior, said: "Shielding the Court from indisputable truths is a win at all costs strategy and **another example** of the SEC "adopting its litigation positions to further its desired goal, and **not out of a faithful allegiance to the law**." *Ripple,* ECF No. 531 at 6. Independent observers have described the SEC as deceitful. *See* Layton, R., Finance, Jun. 13, 2023, *The Hinman Documents Reveal a Deceitful SEC.* The SEC's lack of allegiance to the law, and its win at all costs' approach, is crippling American innovation. In open court, one innovator disclosed how the SEC was using the cost of litigation to bully or even bankrupt companies: **"**The SEC's objective of bankrupting us through the process, **which they threatened privately three years ago**, they succeeded." *Deaton Decl. Ex. C* at 12:15-17. The comments made by LBRY's founder cannot be summarily dismissed as comments coming from a disgruntled Defendant. His claim of the SEC using the system to bankrupt his company was corroborated from within the SEC itself. Hester Peirce

made her own observation: "Inviting people to come in and talk to us only to drag them through a difficult, lengthy, unproductive, and labyrinthine regulatory process casts the Commission in a bad light and thus makes us a less effective regulator." *See* Peirce, H., Feb. 14, 2022, *Statement on Settlement with BlockFi Lending LLC*. The SEC's conduct related to crypto rose to the extraordinary level of "arbitrary and capricious." *See Grayscale Investments, LLC v. SEC,* No 22-1142 (D.C. Cir. 2023) at 2. Even this Honorable Court, called into question the SEC's inconsistent behavior. Understandably, this Court viewed, with great skepticism, how the SEC could bless and approve Coinbase going public in 2021, and only two years later, claim the entire business model is unlawful. *Coinbase*, ECF No. 30, July 20, 2023, Hr.g Tr. at 38:4-21, 39:5-19. This Court wondered the same exact thing Coinbase customers have wondered:

> Yet I'm just wondering why it is that the commission saw fit to bless what they were doing, because that is kind of what they did by issuing the S-1, and that there not be any discussion about the possibility of violative conduct…I am just viewing your answer with a measure of skepticism…But it's not crazy in the Failla parlance for Coinbase to think that what they were doing was OK because it was exactly what you let them do when they issued the S-1.

*Id*. Market participants have been forced to go on the offensive against the SEC, a path no company wishes to embark on. "In Gensler's first three years as SEC chair, the agency has been sued for abusing its rulemaking powers more times than the SEC was sued in the prior 10 [plus] years, spanning the tenure of three long-serving chairs combined." Alderoty, S., Post on X, Apr, 24, 2024. It is undeniable, that this case serves as an expansion of the SEC's jurisdictional reach into a burgeoning asset class, riddled in confusion and regulatory uncertainty - much of it caused by the SEC itself. It is undeniable because in 2018 (before becoming Chairman), Gary Gensler cautioned that the digital asset markets lacked regulatory clarity and that "**even for Ripple**,… **needs for there to be clarity in the market**." *See* Gensler Blockchain Interview at 1:24-1:38, April 23, 2018. But today, he claims, "**rules related to crypto assets are well-settled**" and

"[t]he test to determine whether a crypto asset is a security is clear." *See* Gary Gensler, Aug. 3, 2021, *Remarks Before the Aspen Security Forum* (emphasis added). These two separate statements by Gensler highlight his lack of sincerity and bad faith. Unfortunately, Gensler's bad faith seems to have run downhill. When an agency is run without faithful allegiance to the law, that agency becomes "permeated with bad faith." *See SEC v. Digital Licensing Inc. (dba DEBT BOX)* 2:23-cv-00482-RJS-DBP (Debt Box), ECF 275, at 65. When that happens, eventually you get a scenario like the one that played out in *Debt Box*. The SEC was more interested in hurting a crypto company than maintaining an allegiance to truth and justice. A federal judge, outraged by the SEC's misconduct and bad faith, took the extraordinary step of sanctioning the SEC. *Id.* at 79. The judge held:

> Each piece of support the Commission offered…proved to be some combination of false, mischaracterized, and misleading. Further, the Commission not only repeated and affirmed its misrepresentations in the face of contrary evidence, it presented new falsehoods to the court…The Commission's conduct demonstrated it knew its representations were false and it was deliberately perpetuating those falsehoods— continuing to abuse the judicial process…

I*d.* at 63-64. Before a judge can find bad faith, "there must be clear evidence that the challenged claim 'is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons. *Id*. at 41. Yet, the judge found multiple examples of subjective bad faith. *Id*. at 52 ("the starkest demonstration of subjective bad faith"); *Id.* at 55 ("pervasive abuses of judicial process and subjective bad faith."). Market participants, including Coinbase customers, cannot afford to wait several more years for judicial clarity.

### D.  There Exists Substantial Grounds for Difference of Opinion

Public perception by market participants, including Coinbase customers, is that substantial grounds for differences of opinion do exist and the market is anticipating that an appellate court

will ultimately need to resolve the difference of opinion.[2] In fact, some securities lawyers are predicting that an appellate court is likely to reverse Judge Torres in the *Ripple Labs* case. *See* Gasparino, C., Post on X, Mar. 30, 2024, (commenting that because both Judge Failla and Judge Rakoff rejected Judge Torres's analysis: "Securities lawyers say a Federal judge's ruling against Coinbase should be a warning to XRP holders that Judge Torres's is likely to be reversed by the federal courts."). Judges have become frustrated:

> I thought we would get there at the remedy stage, potentially, but the SEC's argument every time I raise it is, Oh, it's a matter of policy. We're not litigating that here, and the Commission has to decide that, and blah, blah, blah.

*Deaton Decl. Ex. C* at 29:7-9; *See also*, *Id.* at 31:14-18 ("So, trying to be clear about how you address tokens of that type while still protecting the public from unregistered securities offerings is an important challenge, and I don't think -- **I don't fully understand the SEC's ultimate position on that at this point**."). Judge Barbadoro described the task at hand an important challenge "because there are a lot of tokens that have consumptive use that maybe ultimately should be regulated as a commodity rather than as a security." *Id*. at 25:17-22. Judge Castel saw the same issue:

> Cryptocurrencies…are a lawful means of storing or transferring value and may fluctuate in value **as any commodity would**…a cryptocurrency utilized by members of a decentralized community connected via blockchain technology, which itself is administered by this community of users…is not likely to be deemed a security under the familiar test laid out in *S.E.C. v. W.J. Howey*.

*Telegram Grp., Inc*., 448 F. Supp. 3d 352, 358. It is clear, certification is warranted because even the current Chairman of the SEC has stated that courts will have to decide it. Gensler stated:

---

[2] See Livingston, J., The CLS Blue Sky Blog, Aug. 14, 2023, *The Ripple and Terraform Cases Tee Up a Dramatic Showdown over Cryptocurrency Regulation,* Katten, Aug. 3, 2023, *A Disagreement Among Judges in the Same Courthouse*; MetaNews, Aug. 2, 2023, *SEC Appeal Looms as Judge Rakoff Rejects Ripple Case Distinction*

There's a lot of debate. Can you put a packaging around a token and the package is a security and the token later on is not? Is that alright? The SEC has not yet spoken on that and there's controversy around that. That's yet to be determined.[3]

## **CONCLUSION**

Former SEC Attorney Ladan Stewart, who worked on this case, as well as the *Ripple* case, commented about this Court's recent ruling, denying Coinbase's motion to dismiss, and she confirmed the market's worst fear: that this Court's recent ruling would "embolden Gensler and agency lawyers." *See* Schwartz Article. Stewart predicted: "It's probably going to give the SEC that sort of comfort it needs to proceed as it has been [because] [i]ts's not going to back off of bringing regulatory cases in the crypto space." *Id.* If certification is denied, end users, token holders, and Coinbase customers will be forced to endure 3-5 more years of litigation. As the LBRY CEO succinctly stated: "All that we have ever wanted was to achieve the same legal status that [Bitcoin and Ether] have." *Deaton Decl. Ex. C.* at 11:19-21. If we don't get clarity, even experienced federal judges will continue to be confused. *See Deaton Decl. Ex. B* at 27:23-25 (Judge Barbadoro stating, "[y]eah, I mean, I get the point. Is it oranges or is it the contract to sell -- contract to buy an orange tree or something in a market coupled with a promise to fertilize the trees and harvest the oranges. It's a legitimate, interesting issue **and an important issue that at some point needs to be resolved**.) (emphasis added).

As a federal judge stated: "the Commission's bad faith conduct in misappropriating the power of the court "undermines the confidence of both litigants and the public in the fairness of judicial proceedings . . . and impugn[s] the integrity of these proceedings." *DEBT BOX* at 74. The SEC will continue to harm investors and users of blockchain technology. It is imperative for this Honorable Court to certify the interlocutory appeal because digital asset users and investors,

---

[3] Available at https://twitter.com/boy_xrp/status/1457523395717959682.

including Coinbase customers, have been endlessly begging for legal clarity and an interlocutory

appeal can achieve that - in a timely manner - rather than resolving it years from now. Prolonged

litigation, coupled with regulatory uncertainty, can have a devastating impact on innocent third

parties, such as token holders or customers.

Respectfully Submitted,

/s/ John E. Deaton
_____

John E. Deaton
SDNY Bar # (CT) 31415
8 Mohill Ave
Swansea, MA 02777
All-deaton@deatonlawfirm.com

*Amicus Counsel*