1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * * *
                                     *
4    U.S. SECURITIES AND EXCHANGE       *
     COMMISSION,
                                     *
5                                    * No. 1:21-cv-260-PB
                    Plaintiff.       * January 30, 2023
6                                    * 3:00 p.m.
             v.                      *
7                                    *
     LBRY, INC.,                     *
8                                    *
                    Defendant.       *
9                                    *
     * * * * * * * * * * * * * * * * *
10
                   TRANSCRIPT OF MOTIONS HEARING
11          BEFORE THE HONORABLE PAUL J. BARBADORO

12   APPEARANCES:

13
     For the SEC:              Peter Moores, Esq.
14                             Marc Jonathan Jones, Esq.
                               Amy Burkart, Esq.
15                             Securities and Exchange Commission

16
     For the Defendant:        Keith Miller, Esq.
17                             Emily Drinkwater, Esq.
                               Rachel Mechanic, Esq.
18                             Perkins Coie LLP

19                             Timothy John McLaughlin, Esq.
                               Shaheen & Gordon
20
     For the _Amicus_:         John Deaton, Esq.
21   Naomi Brockwell           Deaton Law Firm

22

23   Court Reporter:           Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
24                             United States District Court
                               55 Pleasant Street
25                             Concord, NH 03301
                               (603) 225-1454

1                 P R O C E E D I N G S

2          THE CLERK:  The Court is in session and has for

3    consideration a motion hearing in civil matter 21-cv-260-PB,

4    U.S. Securities and Exchange Commission versus LBRY, Inc.

5          THE COURT:  All right.  So, the SEC is seeking three

6    different remedies.  I thought we would structure the

7    discussion on the three remedies.  Let's start with the request

8    for an injunction.  I want to hear the SEC first, because I

9    want to be sure I understand what relief it is they're seeking,

10   and then I'll hear from LBRY as to its response.

11          The *amici* has raised some arguments that are not being

12   litigated by the other parties in the case, and at the end of

13   it I'll give them a chance to say anything they want to say and

14   hear the SEC's response on that.

15          All right.  So, that's how we're going to proceed.

16          So, first let me hear from the SEC about your request

17   for an injunction.

18          MR. MOORES:  Thank you very much, your Honor.  Peter

19   Moores on of behalf of the Securities and Exchange Commission.

20   I'm here along with my colleagues, Marc Jones and Amy Burkart

21   as well.

22          So, to address the first request, your Honor, we

23   actually attached to our papers a proposed injunctive relief

24   and the language thereof, and essentially there are two parts

25   of that.  One is the follow the law, you know, the LBRY is --

1          THE COURT:  Who are you proposing that I enjoin?

2          MR. MOORES:  Correct.  So, in the language of the

3    proposed injunction language we have LBRY's agents, servants,

4    employees, attorneys and all persons in active concert or

5    participation, and that is tracking the Rule 65 language, your

6    Honor, and so that is what we're asking for.  It is

7    specifically that.

8          THE COURT:  Does LBRY continue to have agents after it

9    ceases to exist?

10          MR. MOORES:  So, your Honor, as of now it has agents,

11    and we believe that it would -- those agents are bound by the

12    injunction, or at least the proposed injunction that we're

13    seeking here.  And with respect to injunctive and how it

14    applies in a future contempt proceeding, your Honor, successors

15    and assigns would also be subject to the injunction.

16          THE COURT:  But LBRY's going to go out of existence;

17    it's going to dissolve, right?

18                    (Mr. Moores nodded)

19          THE COURT:  And are you saying that LBRY's agents will

20    continue to be bound by this injunction after LBRY ceases to

21    exist?

22          MR. MOORES:  As at least a successor, yes, your Honor.

23          THE COURT:  Don't separate entities like Odysee have a

24    right to be heard before they're made the subject of an

25    injunction?

1          MR. MOORES:  They do, your Honor, but the Courts in

2     the First Circuit, if we look at the Webster case from 1980,

3     sort of outline that, as well as the Supreme Court in Regal

4     Knitwear company versus NLRB, which is back in 1945, which

5     essentially says that successors and assigns can be --

6          THE COURT:  Well, successors and assigns are different

7     from agents.  I agree a successor is easy to deal with, but

8     you're not alleging that LBRY has a likely successor, are you?

9          MR. MOORES:  Well, your Honor, if we just go back and

10    look at the facts of Odysee, they are currently an agent or

11    would be participating along with LBRY in concert with them.

12    However, if LBRY was to dissolve and disappear, then I do

13    believe that they would satisfy the definition of a successor

14    here, because there has been a transfer of a significant amount

15    of the business operations of LBRY to Odysee as well as its

16    assets.

17         THE COURT:  Is there evidence that LBRY was offering

18    LBC as a security?

19         MR. MOORES:  That LBRY or Odysee?

20         THE COURT:  Odysee, I'm sorry, that Odysee was

21    offering LBC as a security?

22         MR. MOORES:  So, your Honor, we believe that in the

23    summary judgment record we did submit a number of exhibits in

24    which Odysee is making the same statements that LBRY was

25    contemporaneously.  So, just taking a step back, your Honor --

1          THE COURT:  Odysee didn't have pre-mined LBC.  That

2    was LBRY.

3          MR. MOORES:  No, but it appears that Odysee was using

4    at some point some of LBRY's pre-mined LBC.  I know in the

5    declaration that Julian Chandra had provided in the reply

6    brief, I believe that Odysee is on the record as saying that it

7    has only bought LBC on the market and then has offered and sold

8    that.

9          But I think that some of the facts, if you look at --

10          THE COURT:  It's only a secondary purchaser of LBC,

11    right, in the same way that somebody that bought on an exchange

12    from LBC that had been previously sold by LBRY?

13          MR. MOORES:  I don't believe the actual facts would

14    bore that out, your Honor.  I believe that LBRY was developing

15    a number of programs and that Odysee was taking advantage of

16    some of those reward programs, to include, if you were to

17    review the Block Explorer -- and I have actually a printout of

18    some of the Block Explorer, your Honor, here, but it

19    essentially demonstrates that even to the present day that

20    there are a number of transfers of LBC that are being conducted

21    by -- and we believe that some of those are being done by

22    Odysee and not necessarily by LBRY as part of its rewards

23    programs.

24          THE COURT:  Is this LBC that's from the pre-mined, or

25    is this LBC that had been earned by miners and purchased on an

1    exchange?

2         MR. MOORES:  And I know that there appears to be a bit

3    of discrepancy about this, your Honor, and obviously further

4    discovery would get to the bottom of it, but the evidence that

5    we show, that we've seen indicates that you can trace that LBC

6    back to the LBRY pre-mined, the initial $400 million LBC that

7    had been mined by LBRY in October of 2015.

8         THE COURT:  There is LBC that comes into existence

9    from mining, not the pre-mine, right?

10        MR. MOORES:  That is correct.  There's approximately

11   767 million LBC circulating in existence as of today, we've put

12   that in our papers, and 400 million was part of the pre-mine,

13   your Honor.

14        THE COURT:  But my order was dealing with offerings by

15   LBRY of LBC which was part of their pre-mine, right, not

16   secondary sales, not things like that?

17        MR. MOORES:  Well, I think the full scope would have

18   been what we had, which was LBRY's offer and sales of LBC as an

19   investment contract, your Honor, and that would have included

20   the sales that LBRY did through Altonomy, which is the market

21   maker, and they transacted about 4.4 -- sorry -- 7.4 billion

22   LBC, which we don't have the full records of, but

23   mathematically and probabilistically that would include LBC

24   that was bought and sold on the secondary market that was not

25   part of LBRY's original pre-mine, your Honor.  So, yes, your

1    order would at least have encompassed part of the market-making

2    activity by LBRY.

3              THE COURT:  Well, to the extent it came from LBRY's

4    pre-mine offerings, not from LBC that it acquired through

5    different means, like purchasing -- if it had purchased LBC

6    from miners, say.  So, I guess you and I may be talking past

7    each other.

8              MR. MOORES:  Your Honor, perhaps your opinion doesn't

9    get into this level of detail with respect to --

10             THE COURT:  Right.  I don't think it -- it

11   intentionally didn't.

12             MR. MOORES:  Right.  But LBRY itself from the time

13   period from 2020 through 2021 was buying and selling on the

14   open market through Altonomy.

15             THE COURT:  I understand that, but there are many

16   people that acquired LBC.  Some acquired it directly from LBRY,

17   some acquired it from mining activities, some acquired it on

18   exchanges, some of what they acquired may have been from

19   miners, some of it may have been from people who acquired LBC

20   as an investment, and some of it may have been repurchased by

21   LBRY.  Those are secondary owners -- secondary offerers who try

22   to deal with those, not the initial offering of the LBC by

23   LBRY.

24             So I'm not sure -- you say those things are

25   indistinguishable.  Like, you're saying LBRY just as much

1    offered LBCs in security if they acquired some of it on an

2    exchange and sold it to somebody else as if it was selling its

3    own pre-mine?

4         MR. MOORES:  Your Honor, in terms of the Howey test

5    analysis, I believe that buying LBC on the secondary market and

6    then offering it, as LBRY had, with all the attendant promises

7    would be selling it as an investment contract.

8         THE COURT:  Then you would say that that would also be

9    true of anyone else who bought LBC?

10        MR. MOORES:  No, not necessarily, your Honor.  That's

11   not our position.  Our position here today is about LBRY's

12   offers and sales, not necessarily where the LBC originally came

13   from, but LBRY's offers and sales of LBC as an investment

14   contract.

15        THE COURT:  I have to tell you I have a significant

16   problem with the idea of using the judicial power to enjoin an

17   entity that is going to dissolve and burn its pre-mine.  I just

18   have a lot of trouble with that concept.  To the extent you

19   want me to enjoin people that aren't parties to the case and

20   haven't had an opportunity to meaningfully contest your

21   request, I have a lot of trouble with that as well.

22        So, those are things you have to overcome in my mind.

23   Is there anything else you want to say on that issue?

24        MR. MOORES:  Yes, your Honor, just with the notion of

25   the factors that we sort of laid out in our papers.  So, first,

1    isolated recurring nature of the violation, I think we've

2    already talked about that in our papers.  I'll skip over that.

3          The egregiousness of the conduct.  I think what's

4    important here is the notion of what is the conduct and

5    egregiousness of the conduct vis-a-vis and compared to the

6    actual scope of the injunctive --

7          THE COURT:  I think for the injunction the issue is

8    what is the real potential that they may continue to violate,

9    and an entity that doesn't exist anymore and doesn't have any

10   pre-mined, it's hard for me to see how there's a likelihood

11   that it will continue to violate.  That's why we need to

12   separate, in my mind, at least, each form of relief:

13   injunction, disgorgement and penalty.  And for the injunction,

14   I mean, I've already drawn the conclusion that they violated,

15   LBRY violated the Securities Act.

16         MR. MOORES:  Mm-hmm.

17         THE COURT:  That's a conclusion I've already reached

18   and I continue to believe is a correct conclusion.  But the

19   issue of -- I've long been concerned about addressing a remedy

20   here that would be appropriate for the violation, and one form

21   of response to this violation is injunctive relief; but I am

22   inclined to accept that, if LBRY does what it promises, that

23   there seems to be very low likelihood that LBRY will reoffend,

24   and, to the extent you want to contend an entity that hasn't

25   been named in this action is an agent and should be subject to

1    injunction, that is problematic for me.

2        So, those are the concerns I have about the

3    injunction.  Anything else you want to say about the

4    injunction?

5        MR. MOORES:  Yes, your Honor.  I just want to go into

6    a couple of the prongs that you're talking about, whether the

7    defendant will be in a position to violate again and the last

8    prong, which is the sincerity of the defendant's assurances

9    against future violations, because I think that's what you're

10   most concerned about.

11       THE COURT:  Absolutely, yeah.  And I also think that

12   it's a trust-but-verify situation, that I think I'd have to see

13   LBRY go out of existence before I can be able to establish that

14   there isn't any need for an injunction against LBRY.  But

15   assuming that LBRY is prepared to do what it says -- I have no

16   reason to doubt that it is prepared to do what it says -- once

17   it does it, there doesn't seem to me to be a basis to enjoin

18   LBRY, at least, maybe these other entities you're talking

19   about, like Odysee.  But, again, I have a problem with that

20   idea.  I had never done that, that I can recall, issued an

21   injunction to enjoin somebody who isn't a party to the

22   litigation and who hasn't been given a fair opportunity to

23   argue otherwise.  It's, like, Tough luck, you don't get to be

24   heard, you're enjoined.

25       MR. MOORES:  I understand, your Honor.

1          THE COURT:  There's nothing preventing you from

2     seeking to file an action against Odysee, and you can do that,

3     if you want, but you haven't done that here.

4          MR. MOORES:  Well, your Honor, Odysee didn't exist at

5     the time that we filed this action, obviously.

6          THE COURT:  But it has been in existence.  It was in

7     existence as of the date I issued my order, because I referred

8     to it.

9          MR. MOORES:  It was.  It was formed in 2021, I

10    believe, after this case was filed.  And so, to the point of

11    what's going to continue on in the future, again, we're not

12    asking the Court to specifically identify any other non-party,

13    but within the framework of Rule 65 it says, you know, that an

14    injunction would be applied to an agent, servant, employee or

15    attorney, etcetera, and so, to the extent that Odysee, for

16    example, is an agent, then it would be bound today just by the

17    plain language --

18         THE COURT:  It's an interesting question that I don't

19    have an answer to except to say, ordinarily principal agency

20    relationship requires a principal with the ability to control

21    the agent.  To the extent the principal no longer exists, I

22    wonder how that is an ability to control the agent.  I don't

23    think Odysee is a successor in any traditional role in the

24    sense that they acquired all or substantially all of the assets

25    or they acquired the stock of LBRY.  That would make them a

1    successor.  Neither of those things has happened or is likely

2    to happen.

3            MR. MOORES:  Well, your Honor, just on the facts of

4    that I would disagree with a little bit about the notion that

5    Odysee doesn't --

6            THE COURT:  What assets of LBRY did Odysee acquire

7    when it came into existence?  I thought it was a subsidiary of

8    LBRY.

9            MR. MOORES:  So, it was a wholly owned subsidiary, and

10   at the point --

11           THE COURT:  Have there been asset transfers?

12           MR. MOORES:  Yes, there have been.

13           THE COURT:  What assets have been transferred?

14           MR. MOORES:  So, my understand there is $1.6 million,

15   which is at this point substantially all of LBRY's liquid

16   assets, because LBRY --

17           THE COURT:  When was that transfer made?

18           MR. MOORES:  So, the transfer would have occurred over

19   2021 and 2022.  Again, your Honor, we don't have all the -- we

20   don't have discovery on this, so we don't have the detail of

21   exactly when that happened, but it would have been after this

22   case was filed, and LBRY then -- and it describes it as

23   commercial loan terms, so I'm not sure what that means.

24           THE COURT:  So, it was a loan of monies from LBRY to

25   Odysee?  Is that --

1          MR. MOORES:  Correct, of $1.6 million, which was more

2     than its liquid assets -- it was a substantial majority of its

3     liquid assets at the time --

4          THE COURT:  Of Odysee's liquid assets or LBRY's?

5          MR. MOORES:  Of LBRY's.  Odysee itself hasn't

6     generated much assets.  What we see from Julian Chandra's

7     declaration that it was tens of thousands of dollars, perhaps,

8     have been generated by Odysee itself.  So, pretty much all its

9     operational funding has come in a transfer from LBRY.  All of

10    its IP, all of its software application development, all of

11    that was created by LBRY in 2020.

12         THE COURT:  All of LBRY's IP has been transferred?

13         MR. MOORES:  Not all of LBRY's IP, but the odyssee.com

14    and attendant software application, which is the largest in

15    terms of users --

16         THE COURT:  Refresh my memory.  I haven't gone back

17    over my prior order or the record.

18         MR. MOORES:  Yes, your Honor.

19         THE COURT:  But we obviously have the LBRY blockchain.

20         MR. MOORES:  Correct.

21         THE COURT:  But Odysee, as I'm remembering it, and I

22    may be wrong, you'll correct me, is only one application that

23    runs on -- can run on the LBRY blockchain, and Odysee can

24    actually run on something other than the LBRY blockchain, if

25    I'm remembering correctly.  So, there's a significant part of

1    what LBRY is and what LBRY does or has done that's quite

2    distinct from what Odysee is and what Odysee has done; isn't

3    that right?

4          MR. MOORES:  So, I'll just go through the historical

5    development, your Honor, and perhaps this will be helpful, and

6    I'm sure Mr. Miller has some additional facts to add.

7          So, LBRY had developed sort of the protocol and LBRY

8    network, which included the sort of user-application layer as

9    well as the software that interacts between the blockchain and

10   the protocol and the user application.  That was developed by

11   LBRY initially.  And then they had created a web-based user

12   application called lbry.tv, and in 2020 LBRY developed

13   odysee.com, which was another web-based user application, and

14   they ultimately decided to shut down lbry.tv.

15         Now, LBRY has another desktop application which you

16   can download.  It's sort of not its web-based application, and

17   that, I believe, still exists and continues today that LBRY

18   supports.  But in terms of odysee.com, and that is by far the

19   largest.  So, whenever LBRY is saying the number of users, and

20   it's touting large numbers of users, our understanding is that

21   that is actually based on the users for odysee.com.

22         THE COURT:  Odysee doesn't operate the LBRY

23   blockchain, does it?

24         MR. MOORES:  I'm sorry.  Say again?

25         THE COURT:  Odysee doesn't operate the LBRY

1    blockchain?

2         MR. MOORES:  So, my understanding is that when LBRY

3    created Odysee it retained sort of the operation of the LBRY

4    protocol and blockchain and had its engineers working on that

5    part of it, your Honor, but two-thirds of the employees of LBRY

6    were transferred over to Odysee to continue to work on

7    odysee.com, and that's a web-based user application.  And that,

8    arguably, your Honor, is a majority of LBRY's assets at the

9    time, was its IP; it was the ability to work on those

10   user-based applications.

11        THE COURT:  So, there were, in your mind, substantial

12   transfers of assets from LBRY to Odysee, over a million dollars

13   in cash, IP, other assets; much of the staff went from LBRY to

14   Odysee.  Although, Odysee does -- again, I may be

15   oversimplifying this and may be misremembering it, but I'm

16   remembering it as having, at least the way LBRY portrayed it,

17   as a set of functions that are more like lbry.tv than LBRY writ

18   large.

19        MR. MOORES:  So, the LBRY protocol and LBRY -- to work

20   on that, the engineers working on that, my understanding that

21   used to -- converted it into sort of a Go software language

22   would have been done by LBRY employees, whereas the web-based

23   application, odysee.com, and all the attendant services around

24   that would have been transferred over to Odysee.

25             We actually attach an exhibit that's Exhibit 8 to our

1    opposition papers, and it's LBRY in 2022 and sort of describes

2    what the future of LBRY was going to be and what the future of

3    Odysee was going to be, and LBRY said to the public, basically,

4    that all of the marketing campaign, all of the community

5    building, all of those types of functions that LBRY used to do

6    in order to build supply and demand in the LBRY network were

7    being transferred over to Odysee, and that LBRY was no longer

8    going to be doing that type of service as well, which, again,

9    is a large part of the business that LBRY was engaged in

10   previously or a component part.

11            THE COURT:  Okay.  I hear you.  I'll take a harder

12   look at the materials you submitted on that point.

13            What else do you have on the injunction issue that you

14   want to say before I turn to LBRY?

15            MR. MOORES:  Sure, your Honor.  Just dealing with the

16   sort of sincerity of the reassurances by the defendant that it

17   won't continue to violate the securities laws, we have a number

18   of times that LBRY has said, We have stopped, you know, selling

19   at this point, and I think our papers tried to address that

20   those are not factual; they're inconsistent with the actual

21   records here in terms of LBRY first said it had stopped selling

22   any LBC in February of 2021, and we showed that that wasn't

23   true.

24            In terms of its understanding of what was wrong and

25   what was in the Court's Order, it thought that MoonPay on

1   selling to users as pre-mined in that way was not a violation,

2   when, in fact, this Court had found that it was a violation.

3   The Court -- LBRY has represented that the reason why it had

4   stopped selling in February of 2021 was because it was on

5   notice from the SEC that it was filing its case.  The record

6   and testimony during the course of the discovery showed that

7   LBRY stopped using Altonomy, for example.  It wasn't until

8   March of 2021, and that's because Altonomy stopped working with

9   them, and it wasn't because they were on notice that they were

10  violating securities --

11          THE COURT:  This is kind of bleeding over to other

12  arguments that you want to make I think into the

13  appropriateness of, say, a penalty.

14          Let's be fair here.  You are not alleging that LBRY

15  engaged in any fraudulent activity, first.  Second, although I

16  held that LBRY had fair notice sufficient to allow for the

17  enforcement of the Securities Act against it for those

18  offerings, the fact of the matter is that this was one of the

19  first non-fraud cases that did not involve an initial coin

20  offering, right, where the SEC sought enforcement against an

21  issuer where there was no allegation of fraud and no initial

22  coin offering?

23          MR. MOORES:  Your Honor, I'm not sure exactly what

24  "initial coin offering" really means.  When somebody is

25  offering --

1           THE COURT:  I would say before they begin operations

2      they offer their token; whereas LBRY began operations.  And I

3      agree you can argue whether that's just a matter of degree, I

4      think I said that at the last hearing, a question of degree

5      rather than kind.  The fact of the matter is there is a

6      difference, and they turned out to be wrong.  But they weren't

7      being deceptive about what they were doing, were they?  They

8      were right out front.  I mean, you did a great job of

9      demonstrating how many times they quite clearly said to people

10     over and over again.  We look at interest here, and we have

11     incentives in interest that are aligned with yours, and we will

12     make this blockchain more valuable, which will make your token

13     more valuable.  They were very up front about what they were

14     doing.  They weren't doing it in secret, they weren't making

15     false statements about what they were doing; at least it didn't

16     come to me in the pleadings that I've seen so far.

17          MR. MOORES:  Your Honor, and we do acknowledge that we

18     did not bring a fraud case here.  That was not the case.  It

19     was a pure Section 5 violation.  In terms of the sincerity of

20     the defendant's assurances against future violations, I don't

21     think that that hinges upon whether or not it was a fraud case

22     or a fraud charge that was brought.

23          I would like to bring at least one recent statement by

24     the company to the Court's attention, and then I'll stand down

25     and maybe reserve some of my other arguments on penalty.

1          THE COURT:  Sure, yeah.

2          MR. MOORES:  And I've given this to Mr. Miller as

3    well, LBRY's counsel.  I can hand it up, or I could just read

4    it, whichever --

5          THE COURT:  If it's short you can read it.  If it's

6    longer, hand it up, because I can read faster than you can

7    speak, or at least in a way that the reporter can --

8          MR. MOORES:  All right.  Well, I will read it, and you

9    can tell me if it's sufficient.

10          MR. MILLER:  Your Honor, we would object to this, what

11    he's about to enter.

12          THE COURT:  Why don't you just hand it up, and I'll

13    look at that and decide whether to allow it.

14          (Document provided to the Court by the Clerk)

15          MR. MOORES:  Can I at least describe --

16          THE COURT:  Let me read it first and I will give you a

17    chance to briefly describe it.

18          MR. MOORES:  Sure.

19                         (Pause)

20          THE COURT:  Okay.  Go ahead.  You can describe what it

21    is.

22          MR. MOORES:  Okay.  So, this is a tweet from LBRY

23    dated January --

24          THE COURT:  Do you know who at LBRY tweeted it?

25                    (Mr. Kauffman raised his hand)

1          THE COURT:  I'm not surprised.  I suspected it was

2     you.  That's why I'm smiling, because the last time I had a

3     hearing I was on the receiving end of some very forceful

4     remarks from the person who offered this comment.

5          But go ahead.

6          MR. MOORES:  Sure, your Honor.  So, for those who

7     don't have it in front of them, this is a tweet from LBRY last

8     week, last Monday, I believe, January 23rd, in which LBRY says,

9     This is the biggest call we made wrong.  We thought by being

10    honest and open the SEC would go after us last, but they

11    actually went after us first because we made it easy.  We can

12    not emphasize enough how important it is to obscure your

13    activity from U.S. regulatory agencies.

14         And so, why this is relevant here is in terms of the

15    sincerity of defendant's assurances against future violations,

16    LBRY has taken the position that it is important to obscure

17    your activity from U.S. regulatory agencies, and we think that

18    that demonstrates their --

19         THE COURT:  I'll be interested in hearing LBRY's

20    counsel's response on this.  A lot of this -- like, I don't

21    take personally Mr. Kauffman's statements about me.  He's very

22    angry.  This was blood, sweat and tears that people put into

23    this thing over multiple years.  I don't expect them to be

24    happy, you know?  And he is very frank about just telling you

25    what he thinks, whether his lawyer likes it or not.  Sometimes

1   his lawyer doesn't like it when he says the things.  I can tell

2   by the way the lawyer is cringing when he says certain things

3   to me.  We can smile about it, but this was somebody's blood,

4   sweat and tears over multiple years, a real serious thing that

5   they thought was going to work, and I don't expect them to be

6   happy, and, just because they aren't happy about it, doesn't

7   mean that I think they are fraudulent or deceptive or anything

8   like that.  I just haven't seen that from LBRY here, and their

9   current counsel has been nothing but cooperative and

10  forthcoming in responding to my requests for information.  I

11  mean, I don't want counsel to behave like Mr. Kauffman, but I

12  don't hold it against LBRY that he's angry.

13          MR. MOORES:  Understood, your Honor.  And with respect

14  to -- I think your comment earlier is that you would need to

15  see that LBRY had burned its tokens and didn't exist anymore

16  before you sort of issued your ruling here.  And, obviously, it

17  has been a couple of months, and they haven't burned their

18  tokens.

19          THE COURT:  Well, I think they need to get an answer

20  from me, and I'm assuming, and I'll hear what their counsel

21  says, but I'm assuming if I issue an order that says, If you do

22  X, we won't see a need for an injunction, once we verify that X

23  has been done.  If they agree with that, they'll do X, and then

24  there won't be an injunction, and if they don't do X then you

25  can come back and say, Hey, Judge, you said no injunction, but

1      they aren't doing what you told them, so please now issue an

2      injunction, in which case I would probably do it.

3             I think they need a little bit of -- they need to know

4      what I'm going to do before they burn it, and I don't think

5      that's an unreasonable thing to expect from them.

6             MR. MOORES:  Right.  And I guess what I would be

7      proposing is maybe a practical solution or a more efficient way

8      of handling it, your Honor, which is, if they dissolve and if

9      you enjoin them until the point that they dissolved, then that

10     would be another way to handle it as well, your Honor.

11            THE COURT:  Okay.

12            MR. MOORES:  Thank you.

13            THE COURT:  Let me hear what LBRY has to say.  So, I

14     think the biggest concern I have, and I need to study the

15     record better on this, but they seem to be saying that under

16     the language of Rule 65 Odysee is an enjoinable entity, even

17     though it wasn't named in the action and even though it's not a

18     successor in the typical way that I would think of as a

19     successor to LBRY.

20            What's your response to that?

21            MR. MILLER:  Thank you, your Honor.  We submitted an

22     affidavit to try to short circuit this argument, Mr. Julian

23     Chandra, who is CEO.  We tried to identify the factors that we

24     think completely distinguish LBRY from Odysee.  The employees,

25     number of employees.  I think Mr. Chandra said there's 18

1   current employees.  LBRY has eight.  Yes, a lot of them came

2   from LBRY.  Why?  Because they understood the business, the

3   application business.  So, one thing that's important, and I

4   asked Mr. Chandra this question:  Tell me what the 18 people

5   do.  It's different.  So, tell me what.  Did they do any coding

6   on the LBRY blockchain?  None.  What do they do?  Sales.  They

7   do their own coding because there's, you know, software

8   between --

9        THE COURT:  I thought Odysee needs software distinct

10  from the LBRY blockchain to function.

11       MR. MILLER:  Yes.

12       THE COURT:  I may be misunderstanding it completely,

13  but that's what I thought Odysee was, something that could run

14  on the LBRY blockchain but wasn't the LBRY blockchain.

15       MR. MILLER:  Exactly.  It's an application that runs

16  on the LBRY blockchain, but it can run on any blockchain.

17       THE COURT:  That's what, yeah, I was thinking.  At

18  least according to your representations it isn't necessary to

19  run on the LBRY blockchain; it could run on other kinds of

20  blockchains.

21       MR. MILLER:  And Mr. Chandra also puts in his

22  affidavit another fact, which is they borrowed money.  They

23  borrowed money from LBRY.  They didn't have any money.  They

24  borrowed money from LBRY to get it going, to pay its employees.

25       What does Odysee do today?  Okay.  Look at how it

1   operates.  It doesn't -- it has LBRY tokens, it has LBC, and

2   where do they get them?  They buy them on the open market.  How

3   do they make money?

4         Judge, during our last hearing on summary judgment you

5   asked me how is LBRY going to make money if I'm a VC?  Pitch

6   that to me.  Let me pitch you what Odysee does.  It has

7   customer premium fees in cash, it obtains advertising revenue,

8   and it has revenue from subscribers.  So, they don't have

9   pre-mined tokens that they can use to sell to fund the

10  business.  It's a completely separate and distinct entity and

11  business.

12        There's more in the affidavit, your Honor.  I don't

13  want to bore you with going through each and every point, but

14  the point here is Odysee is separate and distinct.  The problem

15  -- and I go back to your comment during the November 21st

16  conference that we had.  You made this point, and I think it's

17  loud and clear to the crypto industry:  Let's make the best out

18  of a bad situation.  And you asked the SEC, Provide some

19  clarity, particularly for the secondary holders, right?  Odysee

20  is no different than anyone else.  Naomi Brockwell, secondary

21  holder, Odysee secondary holder.  They use LBC.  If someone

22  comes and you'll ask me how does Odysee use LBC --

23        THE COURT:  Yeah, I do want to -- I know there may be

24  some artificiality to this, but I think it makes sense to hold

25  this issue of secondary acquirers of LBC to the end, because

1       this is an issue that has been of concern to me from the

2       beginning, but it's not an issue that the parties have

3       litigated with me.  The SEC has elected not to litigate it, and

4       this argument, which has been an interesting argument that some

5       of the *amici* present, and I have been thinking about before I

6       received the *amici* filings about it, does not necessarily

7       follow that the token is the security that is restricted.  What

8       I was focused on is what the parties were litigating, was

9       whether these particular offerings of the token were securities

10      offerings, and I said that they were.  That does not

11      necessarily mean that every offering of the -- every resale of

12      the token violates the Securities Act because it's a restricted

13      security.  That does not necessarily mean that, and it might

14      mean that, but that's an issue that the parties have not

15      litigated in my case.

16              I think you're going to litigate it in Ripple, aren't

17      you?  At some point the SEC is going to have to do that,

18      because there are a lot of tokens that have consumptive use

19      that maybe ultimately should be regulated as a commodity rather

20      than as a security.  But that's not me.  That's not my job.

21      That's the SEC's job, and I can't make the SEC litigate

22      something in front of me that it doesn't want to.

23              There is a principle in jurisprudence, I think it's

24      called the party presentation principle, that the litigants get

25      to control what issues they want the court to resolve, not the

1    judge, and, while I would like that issue to be resolved, the

2    SEC has rejected every suggestion I have made that they should

3    resolve that issue with me.

4           And I can tell you this, though:  I don't have the

5    power to take up issues that the SEC doesn't choose to litigate

6    with me, but I can be absolutely clear I'm not going to do

7    anything to restrict resales of LBC in this case, because the

8    SEC had its chance to argue that in front of me, and they are

9    not arguing it.  So, to the extent that somebody has some kind

10   of concern that this Court is going to restrict resales of LBC,

11   I'm not, because I think that raises interesting issues.

12          But if I'm wrong, Counsel, you'll tell me, but I

13   recall you telling me many times, Oh, that's an issue of

14   policy.  The Commission has to make the policy.  I said, Okay,

15   that's true, but don't come to me asking me to order some kind

16   of relief that goes to things that you aren't litigating with

17   me.  And that's -- am I frustrated by that?  I am frustrated by

18   that.  But that's the SEC that controls what it chooses to

19   litigate, and judges can't just go reach out and decide issues

20   that would be interesting for the judge to decide.  That's just

21   --

22          MR. MILLER:  So, your Honor, what I would say is the

23   SEC has put that issue squarely before you.  Why?  They want an

24   injunction from Odysee.  Odysee is no -- it's just like any

25   other secondary holder of LBC.  That's what I would argue.

1    They put that squarely before you by saying, We want a

2    permanent injunction against Odysee.  They're not entitled to a

3    permanent injunction, like you said.  They weren't a party to

4    this litigation, right?  They weren't a party.  The SEC could

5    have amended their complaint.  The SEC, if they thought that

6    Odysee and LBRY was continually violating, they could have

7    sought a preliminary injunction.  They didn't do this.  So, now

8    that they're asking for an injunction against Odysee, I think

9    it is before the Court, more importantly, regulation through

10   enforcement.  And that's what the SEC is doing.  There's no

11   qualms.  They recognize it.  They're regulating through

12   enforcement.

13          It has to come to a point in time where the Court

14   needs to step in, and that's the frustration I think that the

15   crypto industry and my client has, is someone needs to say, and

16   in this case I think it can be said, and that is LBRY offered a

17   security.  People who have -- but LBC is not a security.  It

18   could be, but it's no more than a rock.  A rock is a thing.  If

19   you bundle it with a bunch of other rocks and sell it as an

20   interest saying, It's going to go up because I'm going to

21   create a lot of rocks, then it could be a security, but in and

22   of itself it's nothing; it's software code.

23          THE COURT:  Yeah, I mean, I get the point.  Is it

24   oranges or is it the contract to sell -- contract to buy an

25   orange tree or something in a market coupled with a promise to

1    fertilize the trees and harvest the oranges.  It's a

2    legitimate, interesting issue and an important issue that at

3    some point needs to be resolved.

4          But, again, I hear your point, I'll think about the

5    Odysee issue, but up until now neither you nor they have

6    litigated this argument.  Not once did one of you say to me,

7    Oh, yeah, our offerings were securities but our tokens are not,

8    okay?  Certainly they never claimed, Issue an order that the

9    tokens are the security, and you never claimed, We should win

10   because the tokens are not a security.  That is a new argument

11   that has emerged only late in this process, but I've got to

12   tell you it's one I've been thinking about for many, many

13   months, because courts kind of look to analogies when they try

14   to determine how to apply concepts like very broad definitions,

15   like securities, and if you play it out you have to ask

16   yourself to what extent does that fit or not fit?

17         And that's primarily a concern about secondary sales,

18   and this case isn't primarily, at least up until this point,

19   has not been about primarily secondary sales, and I can

20   understand why LBRY didn't make that argument, because it was

21   facing a huge problem regardless of how that issue was, because

22   it's my conclusion, right or wrong, that these offerings of LBC

23   were investment contracts, and therefore meet the definition of

24   a security, whether or not the token stripped from the rest of

25   the offering is itself an investment contract.  That's why I

1    can understand why you didn't raise it, but people may be

2    trying to read something into my order that isn't there.  It

3    isn't there because it wasn't litigated by the parties because

4    it wasn't necessary to the particular form of relief that the

5    SEC was seeking.  I thought we would get there at the remedy

6    stage, potentially, but the SEC's argument every time I raise

7    it is, Oh, it's a matter of policy.  We're not litigating that

8    here, and the Commission has to decide that, and blah, blah,

9    blah.

10          But I understand your point.  In order to extend an

11   injunction to Odysee, you would have to necessarily conclude

12   that its LBC transactions somehow violate the registration

13   requirement because they are restricted and because, doing

14   that, in order to grant them the injunction you would have to

15   buy the argument that the tokens themselves are the security,

16   right?  That's your --

17          MR. MILLER:  Yeah.  And I think they've put this

18   squarely in issue for your Honor to rule on.

19          THE COURT:  I don't think they've put it squarely in

20   issue.  I don't think they would say that, because they are

21   trying as hard as they possibly can not to put it as an issue

22   for whatever reason in front of me.

23          Okay.  Thank you.  I appreciate that.

24          Let's turn to the -- well, inevitably we've bled into

25   this question that the *amici* are raising.  Did you want to say

1    anything about that, just briefly?  And then we'll go on.

2    There is somebody -- are you representing one of the *amici*?

3              MR. DEATON:  Yes, your Honor, Naomi Brockwell.

4              THE COURT:  Okay.  Mr. Brockwell (sic), why don't you

5    just -- I don't think you have a right to do this, but I'm

6    happy to give you a brief opportunity to say what you want to

7    say, and then the government can respond to that.

8              MR. DEATON:  Absolutely, your Honor.  John Deaton on

9    behalf of Naomi Brockwell.  I acknowledge you exercise your

10   discretion, but, your Honor, I have to respectfully disagree

11   that it's not before the Court.  This permanent injunction says

12   "all personals in active concert."  That can be implied that

13   all LBC holders who may have received LBC.  It violates

14   Morrison, because there are international LBC holders.

15             And here's the thing that I implore of the Court,

16   because I know my comments have to be brief as a non-party.  I

17   would ask the Court to look at the 11/21 transcript hearing.

18   It's extraordinary, Judge.  It's extraordinary the fact that

19   Mr. Kauffman spoke and how your Honor handled that situation.

20   "Secondary sales" was brought up 14 times in that brief

21   transcript.  The word "clarity" was raised 16 times.

22             THE COURT:  A lot of them by me.

23             MR. DEATON:  Half by your Honor, and your Honor was

24   saying something needs to be done, there needs to be clarity.

25   These users -- the SEC concedes that people, many, if not more,

1    received LBC and acquired it for non-investment reasons, for

2    consumptive use, just like Naomi Brockwell, but they won't

3    provide clarity because of their policy issues and whatnot.

4          I'm not asking your Honor to do the SEC's job, but I

5    am asking your Honor to clarify what you meant.  I put in as

6    Exhibit B that huge article by Lewis Cohen.

7          THE COURT:  I read that article before you put it in.

8    Again, I didn't raise that stuff for the fun of it.  It's

9    something that I've been concerned about, because it appears to

10   me that certainly blockchain is a legitimate, important

11   technology, and there's a need for tokens, and there are

12   consumptive uses for tokens, and the evidence in my case was

13   there are consumptive uses for LBC that don't have anything to

14   do necessarily with investment.  So, trying to be clear about

15   how you address tokens of that type while still protecting the

16   public from unregistered securities offerings is an important

17   challenge, and I don't think -- I don't fully understand the

18   SEC's ultimate position on that at this point.

19         MR. DEATON:  Your Honor, but here's the problem, and I

20   understand your Honor intentionally avoided it for those

21   reasons, but in that article they do quote, they interpret --

22   and I'm not necessarily agreeing with them.  It's a bit

23   awkward, because they are critical of the Court's decision in

24   the article.

25         THE COURT:  I thought it was a very -- I mean, I don't

1    mind that people are critical of me.  I thought their analysis

2    was very interesting.  I think it misunderstood my ruling and

3    doesn't understand the party presentation principle, which is

4    an important restraint on judicial power.  It's to prevent

5    judges from going out and using cases as vehicles to decide

6    whatever issue interests them.  Within the last five-or-so

7    years there is a Supreme Court case that discusses this very

8    issue.  So, I think the authors, they raise the very issue I

9    have been concerned about.

10            MR. DEATON:  Yes.

11            THE COURT:  They misunderstand my order as being

12    something different from what it is --

13            MR. DEATON:  Right.

14            THE COURT:  -- and I understand why.  I used the

15    language of the case law, which is, they offered LBC as a

16    security.  From that one statement they construe my order to be

17    saying I think tokens are securities --

18            MR. DEATON:  Exactly.

19            THE COURT:  -- when I'm saying, no, I haven't made

20    that determination.  That issue hasn't been raised in front of

21    me.  No one should understand my order as taking a position on

22    an issue that wasn't briefed that I was thinking about but

23    consciously hadn't decided simply because I used the language

24    of the case law that defines what an investment contract is.

25    So, that's my position on that particular issue.

1          But I think the authors of that article, it's a very

2     carefully thought-out, interesting article, and I don't mind

3     that it's critical of me.  In my view, it misunderstands my

4     order, but that's fine.

5          MR. DEATON:  Your Honor, that's the issue, is that

6     they do say that it reads, and I'm not necessarily agreeing

7     with it --

8          THE COURT:  To the extent it's necessary to disabuse

9     anybody that the order had some meaning -- when I issue an

10    order on remedy I'll make clear that I am not taking the

11    position that LBC is or is not a security.  What I held, and

12    all that I held, and I think the SEC acknowledges this, is that

13    the offerings here of LBC were investment contracts, and they

14    are subject to the registration requirement.

15         MR. DEATON:  Your Honor, and that's why I'm here, and

16    I'll sit down real soon.  That's why I'm here before you and

17    traveled, because that clarity needs to be made.  It was made

18    in Telegram in the second decision that Judge Castel out of the

19    Southern District of New York, he stated, the first time he

20    said it, and the second time he says, You're not listening.

21    The underlying contract is not the security.  The Gram token,

22    its alphanumeric code, that's not the security.  It is the

23    offering and it's the scheme, and I think that needs to be

24    clear.

25         Here's the thing:  The SEC would agree, I believe they

1    would agree that Naomi Brockwell's acquisition of LBC doesn't

2    even meet the first prong of Howey.  She does all her own

3    efforts to build her platform, so it doesn't meet the third

4    prong of Howey.  Arguably, they could try to say she's in some

5    kind of common enterprise, yet this injunctive request that

6    they're asking could be argued to be applied against her.  So

7    I'm asking that, your Honor, if you do enter injunctive relief

8    or in the clarification that you state that your ruling has

9    nothing to do with secondary sales.

10        THE COURT:  I absolutely will intend to do that,

11   unless the SEC changes its position and argues that some of the

12   relief I order should affect secondary sales.  If they stick to

13   their current position, which is, I'm not asking you to do

14   anything with respect to secondary sales, I'm going to make it

15   very clear that nothing in my order has anything to do with

16   secondary sales.  And, as I said, I have doubts about whether

17   to grant any injunction at all here, and, to the extent I don't

18   grant any injunction at all, that part of your concern will go

19   away, because I won't be granting any injunction in any way

20   that could be, in my view, misconstrued to apply to secondary

21   sales, something the SEC has expressed multiple times to me it

22   has no desire to try to effect in this particular case.

23        MR. DEATON:  Your Honor, the final thing I would say

24   is, if you don't order injunctive relief at all, if you would

25   still address that, because if you review the record, when

1    counsel for the SEC was up here in the initial presentation

2    this afternoon it was a little confusing, because you said,

3    Wait, my order has nothing to do with secondary sales, and then

4    there was this discussion, well, there is a market where maybe

5    it is.  It is a bit confusing, and a clarification on that

6    issue would help not just LBC holders but the industry at

7    large.  And it's not doing SEC's job; it's just making sure

8    that your decision isn't misapplied.

9         THE COURT:  I don't want my order to be misunderstood,

10   to be misapplied, again.  And I commend both LBRY and the SEC.

11   They tried in my case to raise a very narrow set of issues.  If

12   you look at the order you can see this is not in dispute, that

13   is not in dispute.  There's only one little issue that is in

14   dispute.  My view of judging is you focus on only that which

15   you need to focus on to resolve the problem in front of you,

16   and that's the way -- someone would call that incrementalism.

17   It's an idea that judges should be restrained in what they do,

18   because we are not accountable directly to the public, only to

19   higher courts, and we should rule as narrowly as we can to

20   resolve the problem in front of us.

21        But I understand your point.  I appreciate it.  Thank

22   you.

23        MR. DEATON:  Your Honor, sincerely on behalf of Naomi

24   and Brockwell and LBC holders, I appreciate you giving me an

25   opportunity.

1              THE COURT:  Sure.

2              So, let me just ask the SEC, have I misstated anything

3    you -- I understand you to say, have said to me repeatedly, We

4    are not seeking in this action to regulate secondary sales of

5    LBC; we are not asking you to do that in anything that you are

6    doing, Judge.  That's what I've understood your position to be.

7    Have I misunderstood your position?

8              MR. MOORES:  No.  I do think just a clarification.

9    I'm not sure exactly what secondary sales -- the term has been

10   bandied about, but we're concerned about the offers and sales

11   by LBRY.  So, with all due respect to the *amici*, I think what

12   they're presenting is not what's in front of the Court, and we

13   agree with you.

14             But just with respect to secondary sales, to the

15   extent that that incorporates what LBRY has offered and sold,

16   then I think what we're asking for an injunction -- we don't

17   think LBRY should be going out into the secondary market --

18             THE COURT:  Let's talk about an exemplar case, because

19   I'm not sure I'm completely understanding you.  If LBRY made

20   certain sales to an investment club -- I can't remember the

21   name of it.  Right?  Remember that?

22             MR. MOORES:  Flipside Crypto, your Honor.

23             THE COURT:  Pardon me?

24             MR. MOORES:  Flipside Crypto, your Honor.

25             THE COURT:  Flipside Crypto, right?  Okay.  Flipside

1    Crypto bought that, right, that LBC?

2            MR. MOORES:  Correct.

3            THE COURT:  If Flipside Crypto decided tomorrow to

4    sell their LBC holdings, you would not in any way argue that

5    you are seeking any way to restrict the ability of Flipside

6    Crypto to sell its LBC.  Am I right about that?

7            MR. MOORES:  Correct.  Not in this case, your Honor.

8            THE COURT:  Not in this case.  Okay.  So, nobody

9    should have any more thought that this case involves any effort

10   to restrict someone like Flipside Crypto from reselling their

11   LBC.  I'm not saying that they can resell it; I'm not saying

12   they can't resell it.  I'm saying I can only address problems

13   that the litigants present to me, and the SEC has very

14   consciously and repeatedly refused to address those issues in

15   this litigation and said this litigation does not concern that.

16   So, I will make it very clear, Counsel, that when somebody like

17   Flipside wants to resell, this order, this Court's order does

18   not in any way restrict their ability to do that.

19           MR. DEATON:  Thank you, your Honor.

20           THE COURT:  All right.  And that's because the SEC

21   acknowledges that its litigation in this case does not reach

22   those particulars matters, okay?  I understand your point.  To

23   the extent LBRY -- your view is, and I'm now understanding it,

24   I think, for the first time -- to the extent LBRY bought LBC

25   from someone else other than its pre-mine and then tried to

1    resell it, you would say that is a resale that should be

2    subject to an injunction, but to the extent anybody else other

3    than LBRY or Odysee are doing it, you're not trying to restrict

4    their ability to do that in this litigation at all?

5          You've got to tell me one way or the other, okay?  I'm

6    entitled to know what your position is.

7          MR. MOORES:  It is, your Honor.  We're just saying the

8    Rule 65 encompasses agents, servants, employees and attorneys.

9    Just to be clear, we want the full scope of Rule 65.  That's

10   all.

11         THE COURT:  All right.  All right.  All right.

12         Okay.  Let's deal with disgorgement.  What's the SEC's

13   position on the disgorgement remedy?  So I understand your view

14   is essentially that it's their burden to prove that they have

15   legitimate business expenses that offset any profits they

16   otherwise would have earned.  You say they haven't demonstrated

17   that.  I think you say you need some discovery before you can

18   adequately respond to their contention.  They say you conceded

19   in your pleadings that all of their expenses were business

20   expenses, and they say, Look, we've provided, we've given you

21   our financial statements, and we show that we had had

22   legitimate business expenses.  You say that's not sufficient.

23   So, elaborate on your argument there as I've --

24         MR. MOORES:  I think you've got a lot of that in a

25   nutshell, your Honor, essentially that we lack the full

1       information in order to present to the Court --

2            THE COURT:  What are your concerns?  Are your concerns

3       that they have siphoned off profits and, say, paid them to

4       people like Mr. Kauffman and put that under the guise of a

5       business expense?  Is that your concern, that they, instead of

6       paying salaries, they were effectively paying dividends which

7       are not business expenses?

8            MR. MOORES:  Your Honor, I think that there's sort of

9       a twofold nature.  One is, you're trying to figure out what the

10      total amount that LBRY received as benefit for the sales, and I

11      don't think we have the full information on that.  Then, with

12      respect to the expenses, in order to do the analysis we believe

13      that you really have to understand what the expenses are and

14      figure out whether or not they're applicable.

15           If I just take one sort of giant step back, your

16      Honor, with respect to -- I know Mr. Miller has talked about

17      legitimate business expenses and this notion where you can

18      essentially spend away all of the money that was unjustly

19      enriched.  We think that that is sort of a misread of the

20      equitable principles in the first place.

21           THE COURT:  Do you doubt that their assets are as

22      limited as they say they are now?

23           MR. MOORES:  There have been representations about

24      their assets that are inconsistent with what they are now;

25      however, we believe that they do have limited assets, your

1    Honor.

2            THE COURT:  So, how do you get blood from a stone,

3    right, in terms of disgorgement?  What's the answer to that

4    problem?

5            MR. MOORES:  So, disgorgement is not blood from a

6    stone, your Honor.  Disgorgement is not to be reduced by the

7    inability of the person to pay.  The Courts have ruled that

8    way.  I know it is one of the factors for a penalty in terms of

9    the ability to pay but with respect to --

10           THE COURT:  I haven't dealt with that particular

11   issue.  So, you say, and your brief, I assume, cites these,

12   they just escape me, there are cases that say even a company

13   with no remaining assets can be subjected to a disgorgement

14   remedy, because if they siphon them off into other areas or

15   wasted them on things that weren't legitimate business expenses

16   what happens to the order?  I just order it and then nothing

17   happens, right?

18           MR. MOORES:  Well, you know, it would be up to the

19   Commission at that point to try to collect on the order, and,

20   to the extent it could not, then your point is well taken, no

21   blood from a stone.  But with respect to -- and my

22   understanding of the law, and we can get to the cases, your

23   Honor, about this, but that it is an equitable remedy, and so

24   it is ordered by the Court even to the extent that the parties

25   don't necessarily have the cash on hand to satisfy.

1          THE COURT:  I'll read the cases in your brief on that

2     point.  It's just not something I have had to deal with before.

3     But I get your point.  So, you say, Okay, the judge should

4     issue it whether or not they have the ability, if the judge is

5     satisfied that there are net profits that had been earned.

6     Okay.  The burden is on LBRY to show that it has legitimate

7     business expenses, right?

8          MR. MOORES:  Correct.

9          THE COURT:  You say they haven't done that, and, B,

10    before I can finally take a position on that I need to do some

11    discovery?

12          MR. MOORES:  Yes, your Honor.

13          THE COURT:  Okay.  How limited -- there already have

14    been, if we try to reduce your time to, say, $500 an hour,

15    hundreds of thousands of dollars in legal time spent by the SEC

16    on this particular case, no doubt.  I don't know what LBRY's

17    been paid, LBRY's lawyers have been paid, but I would assume

18    hundreds of thousands of dollars paid to the lawyers.  At what

19    point do -- what's the minimum amount of discovery that you

20    would need to be able to respond?

21          So, for example, there are a couple of accounts you've

22    identified where, I don't know, what's that $3,000,000 kind of

23    thing, you know?  And could you make some really targeted,

24    expedited discovery and have a limited, say, maybe three

25    depositions of people with the greatest knowledge of particular

1    matters, resolve that within about 30 days, and then file a

2    supplemental taking a position on exactly how much is

3    legitimate business expense and how much isn't?

4         MR. MOORES:  Yes, your Honor.  I mean, I think what we

5    had originally envisioned was something like six weeks just in

6    order to make sure we could draft up the request, and then the

7    request would then be submitted back to us and that we could

8    then, as necessary, take depositions.

9         However, I mean, one of the overarching principles

10   here, your Honor, that might make this a little bit easier is

11   the notion of unjust enrichment, and I know the Court cites

12   this in Liu, which is the *Third Restatement* about restitution

13   on unjust enrichment, sort of walks through the concepts, and I

14   think that one of the initial positions or the fundamental

15   position that LBRY is taking is that it can spend away what it

16   was unjustly enriched.

17        THE COURT:  I don't think that's their position.  They

18   can engage in legitimate business expenses that happen to

19   deplete or overcome any net profits that it's made.

20        MR. MOORES:  And so, the fundamental principle, it's

21   in Liu and it's in a number of other cases, it would be

22   inequitable that a wrongdoer should make a profit out of his

23   own wrong; unjust enrichment is supposed to revert back to the

24   status quo and is supposed to ultimately deprive the wrongdoer

25   of a wrongful gain, and the way that at least the *Restatement*

1    portrays it is that --

2           THE COURT:  But in Liu doesn't the Court make clear

3    that, in order for it not to be a penalty, you have to make an

4    allowance for legitimate business expenses?

5           MR. MOORES:  You do.  And I think it's really

6    important also to look at Liu itself in terms of who the

7    petitioners were there.  So, the petitioners were individuals;

8    it was not a company.  So, when you say "legitimate business

9    expenses," this was a misappropriation case, and the court was

10   trying to determine what amount the individuals had put in

11   their own pocket, and so, when you are trying to measure how

12   much an individual puts in their own pocket, the amount of

13   money that was raised and ultimately spent on business expenses

14   was not put into the individual's own pocket.

15          And so, actually on remand and down to the Ninth

16   Circuit, when it came back to the Ninth Circuit, they sort of

17   said the notion of profits here is a bit of a misnomer.

18          And so, in this case and, again, we haven't had the

19   full discovery, so we don't sort of fully appreciate this, but

20   the Restatement lays out, and there's a couple of sections,

21   there's Section 49, and there's Section 51, and 49 talks about

22   how you measure unjust enrichment, and essentially it is the

23   amount of money that was paid or the amount of money that was

24   received by the defendant, and that's essentially what you'd

25   refer to as the principal.

1          And then, when you look at Section 51, then it tries

2     to measure, well, what is the amount of gain that the defendant

3     was able to gain the benefit of based upon that principal, and

4     there's a couple of important illustrations.  So, for example,

5     in Restatement Section 51, illustration 2 talks about if there

6     was an embezzler and that embezzler stole $100,000 to buy

7     Blackacre and it appreciates in value to $150,000.  Then the

8     amount of unjust enrichment is not the $100,000, it's actually

9     the $150,000, because that would represent not only the

10    principal, the amount that was taken, embezzled, stolen but

11    also the gain on that as well.

12         THE COURT:  I agree that that basic concept of

13    depriving them of gain is the way to go about analyzing this

14    particular problem.  But, to the extent that they can try to

15    make the LBRY blockchain work, engaged contractors, rented

16    facilities, paid reasonable salaries that aren't simply covers

17    for dividend transfers to the investors, that those expenses

18    need to be deducted from the total amount that they generated

19    from their offerings.

20         MR. MOORES:  Right.  And it appears on facts, and,

21    again, we don't have all of them, and so that discovery would

22    be helpful on this, that there are essentially -- I think

23    LBRY's position is there is no gain upon the principal, right?

24    So, there is the amount that they raised from the sales, which

25    is the principal, and then there was no gain on that because

1   the company ultimately was not able to turn a profit, etcetera,

2   but the unjust enrichment in that circumstance is the amount

3   that was first received.

4          So, illustration 24 in Restatement Section 51 is

5   important on this.  It talks about, if the trustee stole

6   $100,000 from a fund and then ultimately bought Blackacre and

7   it depreciated, so it went down in value, then the unjust

8   enrichment in that context is still $100,000.  Just because the

9   investment and the expenses didn't enure to a benefit, into a

10  profit, it doesn't mean that the original amount, the

11  principal, is not actually to be returned --

12         THE COURT:  But doesn't <u>Liu</u> draw a distinction between

13  entities which are wholly fraudulent in their activities, in

14  which case you look at it very differently from a business that

15  is not a fraudulent business and simply does something that

16  entitles you to disgorgement?  In that case this was a

17  legitimate business.  It was engaged in offerings that were not

18  proper because they weren't registered, but it was not an

19  illegitimate business.  So, you have to be careful -- like an

20  example about, oh, person A defrauded somebody of a million

21  dollars, invested the million dollars in property, it went down

22  by 100,000, that makes complete sense to me.  But people

23  operating a business, legitimate business, who use profits from

24  unregistered offerings to buy a facility at $1,000,000 that

25  goes down to $900,000, you don't necessarily treat the profit

1    as a million, you treat it as 900,000, because the buying of

2    that property was a legitimate business activity.  It didn't

3    turn out to be as valuable, but that is a legitimate business

4    expense.

5          So, I think those two examples illustrate how you

6    treat a purely fraudulent business differently from a business

7    that is not a fraudulent business who engages in unregistered

8    offerings of securities.  Does that make sense to you?

9          MR. MOORES:  I understand your point.  I would

10   respectfully disagree that the unjust enrichment is the amount

11   that was received by -- through the conduct of the wrongful

12   action.

13         THE COURT:  But if I operate a legitimate business, I

14   raise money through offerings to run a legitimate business that

15   I don't register, right, and I buy the property that is going

16   to be the core property on which I'm going to operate my

17   business, and it turns out that I put all my money from my

18   illegal offering in that business and it went down to 900,000,

19   you say that loss of the value of a property that you bought to

20   operate your business is not a legitimate business expense?

21         MR. MOORES:  I'm not going to characterize it as an

22   illegitimate business expense --

23         THE COURT:  Right.

24         MR. MOORES:  -- your Honor, but it would be something

25   that you would deduct from the amount that was actually paid by

1   the investors.

2          THE COURT:  I'm not sure I agree with you on that

3   point.  I'll have to think that true.  I will look at the

4   examples more carefully.

5          MR. MOORES:  Yeah.  So, I think the *Restatement* is

6   illustrative of this as well.  And it sort of just makes sense,

7   because it results in some potentially absurd results where

8   disgorgement would change, the amount of unjust enrichment

9   would change over time based upon just the amount of

10  expenditures or dissipation of assets.

11         THE COURT:  I think it could change over time.  I

12  think it could change over time.

13         MR. MOORES:  Well, I understand if there was gains

14  over time, but this is not a situation in which there are

15  actual profits and you're deducting --

16         THE COURT:  But if to try to operate the business you

17  lose money, that offsets against the profits you otherwise

18  would have made.  So, when that business winds up and it has

19  $100,000 less because it engaged in a legitimate business

20  expense, that it bought a piece of real estate that didn't end

21  up appreciating, in fact, it depreciated, that still seems to

22  be a legitimate business expense.

23         MR. MOORES:  Your Honor, I'm not disagreeing with you

24  how a company, if it spent it honestly in terms of trying to

25  run a business --

1          THE COURT:  Which is what LBRY did here.

2          MR. MOORES:  It would be a legitimate business

3    expense, but that doesn't ultimately deduct from a gain,

4    because a gain would be something in addition to the original

5    principal.  That's where the profit comes in, your Honor.

6          THE COURT:  Okay.

7          MR. MOORES:  Thank you.

8          THE COURT:  I will tell you that what does concern me

9    is that you be given some reasonable opportunity to make sure

10   that LBRY -- and, again, this isn't a fraud case.  I haven't

11   seen evidence that LBRY has engaged in any fraudulent

12   activities, but it is very common for businesses that are

13   closely held to charge things as business expenses to the

14   company that don't turn out to be business expenses.  It's one

15   way in which people pass through income to the founders of the

16   business.  That often happens.  Personal expenses often get

17   intermingled with business expenses, and all of those things

18   are entirely, in my mind, fair game for you to argue don't

19   reduce it by the full amount that they say for these reasons,

20   and you should be given some -- there's an argument you should

21   be given some reasonable opportunity to check that out before

22   you are forced to respond to their argument.  I'm not persuaded

23   by their general claim that they make in their brief that you

24   said in your brief that everything -- they used all the money

25   to plow back into the business.  That isn't enough in my mind.

1    So, I think that's my principal area of concern where you may

2    be entitled to some brief, very focused, very brief opportunity

3    for discovery.

4            MR. MOORES:  Thank you, your Honor.

5            THE COURT:  All right.  Let me hear from LBRY's

6    counsel.

7            MR. MILLER:  First of all, your Honor, with respect to

8    disgorgement, the Court has wide discretion to determine what's

9    appropriate under the circumstances.  I would argue in this

10   circumstance, given the fact that LBRY's insolvent, broke,

11   given the fact --

12           THE COURT:  I have no belief that this has happened,

13   but if LBRY is broke because it siphoned off all of its profits

14   to its founders and owners, that wouldn't be a basis not to

15   order disgorgement, right?  Their point is blood from a stone

16   is not the appropriate way to think about disgorgement, because

17   we want to make sure that they haven't diverted these profits

18   out of the business, and, just because the business doesn't

19   have anything left doesn't mean that profits weren't diverted

20   in ways that aren't legitimate business expenses.

21           MR. MILLER:  2018, 2019, 2020, three years of an

22   investigation, 2021, 2022, two years of discovery, and now

23   they're coming to the Court and saying, Well, there may be some

24   illegitimate business expenses here.  We would like to drive

25   LBRY further into the hole.  They don't have the money.

1          Let's be practical here, okay?  It's a waste of

2     judicial resources, it's a waste of time for the defendant, and

3     it's a waste of the plaintiff, the government, to do this.

4          THE COURT:  That point does resonate with me.  I

5     recognize company of limited means, very complex discovery,

6     very complex litigation.  I'm sensitive to the practical

7     problems that LBRY faces.

8          MR. MILLER:  Thank you, your Honor.

9          THE COURT:  Briefly on the penalty, okay?

10    Multi-factored analysis.  My preliminary assessment of this is

11    this is the kind of case that calls for a Tier 1 penalty

12    because of the absence of fraud allegations, the fact that

13    there was some measure of uncertainty, not enough to render

14    enforcement impossible, but should be taken into account when

15    considering a penalty, and that's my thinking about why we

16    should consider something a Tier 1 penalty.

17         I recognize your view that this has, in your mind,

18    continued, even after the litigation was brought, and I want to

19    hear what LBRY's response is to that argument.  What else did

20    you want to add?

21         MR. MOORES:  Thank you, your Honor.  So, going back to

22    the ultimate purposes of the penalty itself, which is

23    punishment and deterrence, we think that the deterrence part of

24    this is really, really important.  We believe that -- and,

25    look.  You know, we obviously ask for gross pecuniary gain

1    which could be under a Tier 1, Tier 2 or Tier 3 analysis.  So,

2    we understand your position, your Honor, but our position is

3    consistent with that as well, and we still get gross pecuniary

4    gain.

5         So, it kind of comes down to the question of what's

6    important here to send sort of -- making sure LBRY or somebody

7    else similarly situated, you know, knows from the outset that

8    they, their actions, raising money illegally is not going to be

9    to their betterment, it's actually going to be to their

10   detriment, and the penalty should be set at a level in which

11   the parties understand that it can't be an efficient breach of

12   the securities laws.

13        THE COURT:  I agree with that.

14        MR. MOORES:  They can't raise tens of millions of

15   dollars and then write a check at the very end for $50,000 and

16   say, well, you know, that wasn't so bad, but -- and so the

17   deterrence value --

18        THE COURT:  But the next company that tries to do what

19   LBRY has done, now that there is a ruling from a court, would

20   not be in the same position as LBRY is.

21        You have to go back to the time this action was filed.

22   This was relatively early on in the development of the SEC's

23   position with respect to crypto offerings, and I don't think a

24   company that tried to do today what LBRY did, if found to have

25   violated the registration requirement, that a court will be

1    looking at giving them a Tier 1 penalty.  Do you see what I'm

2    saying?

3          MR. MOORES:  Understood, your Honor, and, again, gross

4    pecuniary gain we believe is within the scope of Tier 1.

5          THE COURT:  I hear you.

6          MR. MOORES:  But I think that when you said looking

7    back at when this case was filed, and this case was filed in

8    March of 2021, at that point in time the Dow report had been

9    issued in 2017, Munchee, which was an enforcement action in

10   December of 2017, there have been numerous statements by

11   Chairman Clayton at the time, public speeches in 2017, 2018,

12   numerous enforcement actions, no-action letters.  Judicial

13   opinions ultimately came out with Kik and Telegram.  So, all of

14   those had occurred prior to the filing of an action in this

15   case.

16         So, I would respectfully disagree in terms of sort of

17   what's sort of clarity and whether or not LBRY was on notice,

18   because I think Mr. Miller had said that the investigation

19   began in 2018, and during that entire time period it did not

20   slow the speed in which LBRY was selling and offering and

21   selling LBC as investment contracts.

22         THE COURT:  And your argument about continuing to sell

23   even after the litigation was brought, just refresh my memory,

24   what are the sales that you're pointing to on that?

25         MR. MOORES:  Sure.  So, the sales were MoonPay, which

1    was sort of direct to the consumer through LBRY's website.

2    LBRY says that that actually went through November of 2021, but

3    the record in this case suggests that it went through at least

4    March of 2022.

5            We had subpoenaed MoonPay, and they gave us records

6    through I think November 4th of 2021, but there were sales that

7    appear to have been ongoing after that as well due to

8    testimony.  So, for example, they were running the MoonPay

9    server, which we have documented evidence and we put in the

10   papers, in 2022, as well as the testimony by the CTO, which

11   indicated that they were running the MoonPay server in 2022.

12           There were sales to employees that was ongoing, and

13   LBRY has admitted that this ran through 2022, at least.  So,

14   afterwards -- and then, in addition, so sort of a rewards

15   program that LBRY was offering in which, in exchange for

16   services it was selling, offering and selling LBC continued

17   through 2021 and 2022, we believe.

18           And with respect to some of the sales that LBRY has

19   said that it stopped, it said it stopped selling at least on

20   the open market in 2021, at least we know that continued at

21   least into March of 2021, and I think the representation by

22   LBRY is that, oh, well, once it knew there was a case coming

23   down, and it doesn't appear based upon the record that that was

24   the case.  The motivation was at least Altonomy, which was its

25   market maker, once it learned about the case that was what

1     precipitated LBRY to actually stop selling --

2          THE COURT:  I will be interested in LBRY's response.

3     I think they disagree with you on these facts.  The other area

4     where I think there's disagreement is your claim is the total

5     amount of offerings, the number I don't have off the top of my

6     head, something like 20 million or something.

7          MR. MOORES:  Approximately 22 million.

8          THE COURT:  22 million.  They say that's flat-out

9     wrong in their reply brief.  Can you just give me your response

10    to their contention in the reply brief that that number is just

11    flat-out wrong?

12         MR. MOORES:  Sure, your Honor.  So, what the number is

13    based upon is two sort of factors, one which is their

14    interrogatory answer, which was approximately 14 million,

15    670-or-so-thousand dollars, and that comes directly from their

16    interrogatory answer, the amount that they raised in dollars,

17    once they converted into dollars, and then the amount that they

18    still had in various crypto, so it was the monetary value of

19    the crypto that they had received for their sales.

20         The remaining balance of approximately $7,483,177

21    represents the amount that they had transferred or sold --

22    sorry -- offered and sold to either beta testers or debuggers

23    or other people through their rewards programs from their

24    Community Fund; and so we don't have from LBRY the sort of full

25    value of when they made those sales and the price at that

1    point, but what we did is we took sort of by quarter, which is

2    the amount of information we had, and we found the average

3    price by quarter for those LBC sales.  We calculated that

4    ultimately it added up to, again, that 7.4 million, $7.5

5    million figure, so we added that to the $22 million to

6    determine what the gross pecuniary benefit was to LBRY for the

7    sales.  So, it's coming from their interrogatory answers, which

8    is the $14 million, and then it comes from the --

9            THE COURT:  You say their reply is wrong why?  You saw

10   in their reply they said the $22 million figure is wrong,

11   right?

12           MR. MOORES:  Right.  So, I think they acknowledge

13   their interrogatory answers as being accurate with some

14   adjustments.  For example, they increase the amount based upon

15   the sales to their employees.  I think it was $1,800 that they

16   added.  They didn't adjust it for MoonPay sales, even though

17   the MoonPay sales occurred after their interrogatory answers in

18   September of 2021.

19           But I think that the sort of differential is that we

20   had valued the sale of the $142 million LBC from their

21   Community Fund, which I don't think that they incorporated

22   within -- now, they said something to the effect of that it

23   somehow was part of their interrogatory answers, and I think

24   that's where the difference of opinion is, your Honor.

25           THE COURT:  Well, I'll hear what their response is on

1   that.  I was somewhat confused about -- I mean, I'm not a

2   forensic accountant.  I have not tried to examine the materials

3   you submitted with that level of specificity.  I expect you

4   both to give me the basics that I need.  It just isn't

5   something I intend to spend the time on to try to conduct my

6   own forensic accounting of the company to determine which of

7   you is right.

8          MR. MOORES:  Understood.  I think, at minimum, we

9   agree that their interrogatory answer, the 14-something-million

10  dollars, forms sort of a core, your Honor.  We believe that

11  additional valuation needs to be done of the community sales of

12  142 million LBC, and I don't think they've incorporated that.

13         THE COURT:  All right.  Let me hear LBRY's response on

14  that, and then we'll wrap up.

15         MR. MILLER:  Your Honor, once again, for civil

16  penalties this Court has wide discretion to determine what is

17  an appropriate civil penalty.  The factors that the Court needs

18  to address is the egregiousness of the violation, the

19  defendant's scienter, repeated nature of the violation,

20  defendant's admissions of wrongdoing and cooperation with

21  authorities and defendant's financial situation.

22         With respect to the financial situation, I think we

23  all know LBRY is insolvent.  There's no qualms about that.  SEC

24  hasn't said that they dispute that, at least not that I've

25  heard.  A first-Tier penalty we believe is appropriate, not for

1    the amount that the SEC has somehow calculated, $22 million,

2    based on net proceeds.  We don't think that that's a fair

3    interpretation of the amount that they would be required to

4    disgorge.

5            Mr. Kauffman submitted an affidavit to try to clarify.

6    There were some sales to employees after the amount that they

7    identified in their interrogatory.  He didn't think that that

8    was -- as he put in his affidavit, he didn't think that that

9    was -- that those sales to -- which were ongoing.  This is a

10   program that was set up.  He didn't think that that was deemed

11   to be a security, and so he didn't stop it.  He finally stopped

12   it.  No sales -- no further sales occurred after November --

13   or, I'm sorry -- February of '22.

14           THE COURT:  In terms of the totals, do you agree on

15   the 14 million, and you think they are misstating the total

16   when they get it up to 22?

17           MR. MILLER:  I don't know how they get to 22, your

18   Honor.

19           THE COURT:  How do you feel about the 14 million?

20           MR. MILLER:  Yeah, we've admitted that the $14 million

21   occurred.  I'm not sure if the net proceeds is the accurate way

22   to describe civil penalty in this situation.

23           THE COURT:  Yeah, I have to look at that.  But in

24   terms of you agree at 14 million; you say you don't understand

25   what counsel has just said about how they get up to 22?

1          MR. MILLER:  That's correct.

2          THE COURT:  It's something about the Community Fund

3     sales.  Isn't that how you say you get up to 22?

4          MR. MOORES:  Yeah.  142 million LBC.

5          THE COURT:  142 million LBC in the Community Fund.

6     They've tried to come up with an average price or something.

7          MR. MOORES:  Yes, using the LBRY's expert data.

8          THE COURT:  Yeah.  So, that's how they get to that.

9     Do you have any thought about that particular issue?

10         MR. MILLER:  Yeah.  Again, I'm not -- I contest the

11    fact that I don't believe that that's -- we don't understand

12    how they got to 22.  And I think, more importantly, again,

13    going back to the factors that the Court needs to address for

14    civil penalties --

15         THE COURT:  You've already got me on this.  I thought

16    I made clear no fraud; wrong but out front about what they were

17    doing, which, to my mind, is different from somebody that's

18    trying to scam people.  I mean, I think that's an important,

19    very important consideration in determining the scope of a

20    penalty.  I will consider these other factors as well, and I

21    understand how long it went on, how much total was gained as a

22    result of it, those are factors that need to be considered as

23    well.

24         But I do think it is important to recognize -- unless

25    it is shown through some limited discovery that this money that

1    LBRY generated was siphoned off to founders and others, or that

2    the business was intermixing personal expenses, private jets

3    for people to fly, that kind of stuff, which I see no evidence

4    of, I don't see -- the expenses that are legitimate should be

5    reduced against the profit to determine the disgorgement

6    remedy, and it's also reasonable to conclude that, if there

7    were legitimate business expenses attempting to operate a

8    business in a non-fraudulent way that consumed the proceeds of

9    these sales, that that's a relevant factor in determining not

10   only the disgorgement but the amount of the penalty.

11            MR. MILLER:  I would just argue, your Honor, it could

12   be for civil penalty, it could be, because a Section 1

13   violation is, in some scenario I think it's 50, it may go on up

14   because of interest, okay, or the amount of pecuniary -- or.

15            THE COURT:  Right.

16            MR. MILLER:  So we would argue that the first prong of

17   that.

18            THE COURT:  I have discretion to do 50,000 rather than

19   to do the gross pecuniary --

20            MR. MILLER:  Right, and we think that that's

21   appropriate under these circumstances.

22            THE COURT:  Because of the other factors that I'm

23   supposed to consider?

24            MR. MILLER:  That's right.

25            THE COURT:  All right.  I hear you on that.

1          MR. MILLER:  And I would just -- I am concerned, your

2     Honor, that this is never ending.

3          THE COURT:  I want it to end.  Believe me, I want it

4     to end for me as well as for you, okay?  And I'm very sensitive

5     to the costs involved and the delay.  The SEC marches on.  Its

6     lawyers continue to get paid.  It operates its businesses in

7     perpetuity with taxpayer dollars.  You're a private entity

8     trying to respond, paying very high-priced lawyers, very high

9     hourly rates.  I'm very sensitive to that.  I understand it.

10    But I also think that the SEC has a responsibility to try to

11    satisfy itself that it has provided the judge with the facts,

12    and I do think some very limited discovery would be

13    appropriate.

14          But, okay.  I hear you.

15          I hear you.

16          All right.  Here's what I've decided to do:  I'm going

17    to take the matter under advisement, but I am going to have a

18    Zoom scheduling conference with the parties, say, on Monday.

19          I don't start that trial till Tuesday, right?

20          THE CLERK:  Right.

21          THE COURT:  On Monday for the purpose of reaching an

22    agreement about very narrow, very focused, very expedited

23    discovery on certain limited, targeted issues.  So, the SEC has

24    got to come to that conference telling me, We need to do, at a

25    minimum, these three depositions and ask these requests to

1    investigate these accounts, okay?  I'll give you a brief period

2    of time to do that.  The depositions will be limited in the

3    amount of time it takes -- you're given to do them, how many

4    are going to be given.  The discovery requests are going to be

5    very narrow, very limited, very expedited.  And then you're

6    going to be given an opportunity to file a supplemental brief,

7    and then file a reply.  That, then, ends your costs in

8    connection with the case.  I'll decide the case after that.

9          My tentative view is, unless you have persuaded me,

10   and I'll take under advisement and consider it, your point

11   about Odysee, is that I won't be inclined to issue an

12   injunction at all in this case.  If LBRY does what it says it's

13   going to do, I'm not convinced that I should be issuing

14   injunctions against Odysee or other entities who aren't parties

15   to the case, first.

16         Second, I am, unless -- LBRY has made a proffer that

17   it has legitimate business expenses that exceed any profits

18   that it has earned so that it has no net profits to disgorge,

19   right?  That's your position.

20         You have a right to contest that.  This discovery will

21   allow you to do it.  If your supplemental brief persuades me

22   that there are net profits, then I will order disgorgement.  If

23   I'm not persuaded, then I won't order disgorgement.

24         With respect to penalty, I'm inclined to issue a

25   Tier 1 penalty in a smaller amount, like $50,000, but I want to

1    hear what this additional discovery produces, and I want to

2    investigate your argument about gross profit being a factor in

3    determining the amount of the penalty, okay?  You've caught my

4    attention on that.  I will pay attention to it.

5          Finally, with respect to the *amici*, I will be very

6    clear that no order I have issued and no order I will issue is

7    intended to affect secondary purchasers such as Flipside,

8    because the SEC has not asked me to take any action with

9    respect to those people.  All right.  So, I will make that very

10   clear.  Nothing I have done and nothing I will do is going to

11   do that, because that was not a subject of litigation in my

12   mind.

13         I recognize LBRY's argument with respect to Odysee.

14   To the extent that I do include injunctive relief that

15   encompasses Odysee, I'll have to grapple with your claim that

16   that necessarily implicates secondary sales.  But none of that

17   would suggest, because the SEC says, Well, you can do that

18   against Odysee because it's an affiliated entity, they're not

19   saying your client or Flipside Crypto are affiliated in ways

20   that would subject them to the injunction.  So, I'll make that

21   very clear.  I can't do more for you than that, in my view,

22   because the SEC has very carefully not chosen to make that a

23   subject of this litigation, but I will make it clear.

24         All right.  So, I appreciate your filings.  I'll look

25   them over again carefully.  I'll consider what you've had to

1   say.  That's my tentative view about how I'm going to approach

2   this case.  Unless the additional materials persuade me

3   otherwise, no injunction.  Any disgorgement has to be of a net

4   profit, not a gross profit.  Tier 1 penalty likely a monetary

5   in the neighborhood of $50,000, unless I'm persuaded by the

6   supplemental discovery.

7           We will meet, and I will lay out for you in response

8   to your specific request very detailed what you can do, what

9   you can't do, under what circumstances.  It will get done,

10  you'll make a supplemental filing, you'll make a reply filing,

11  I'll take the matter under advisement and issue an order, and

12  that will end the case at my level.

13          All right.  Anything else from you before we wrap up?

14          MR. MOORES:  No, thank you, your Honor.

15          THE COURT:  Anything else from you before we wrap up?

16          MR. MILLER:  Just, your Honor, I'm not sure if LBRY is

17  going to be able to provide discovery.  Its employees haven't

18  been paid since December 2nd.  They are all looking for other

19  jobs.  I'm just not sure that LBRY will be in a position to

20  respond to any of the discovery requests.

21          THE COURT:  Okay.  We'll have to take that up.  I

22  mean, at some point basically you're going to go into

23  dissolution or file bankruptcy or something, right?

24          MR. MILLER:  That's right.

25          THE COURT:  Okay.  We'll have to deal with that if and

1    when it comes up.  We'll talk about it on our conference call

2    when I set these things up.  All right.

3           And, finally, just for the *amici*, I didn't want to cut

4    you off.  You understand what I'm doing?  That's my view about

5    the maximum extent I can do something for you and people in

6    your client's position.

7           MR. DEATON:  I do, your Honor.  I would ask,

8    respectfully, if you could consider commenting about the token

9    itself, that it's not a security.  If you would consider that.

10          THE COURT:  Just look me up.  I'm a minimalist.  I

11   decide only what I need to decide and nothing else, because I'm

12   so likely to be wrong about things.  It's a question of

13   humility, essentially.  Don't do anything you don't need to do,

14   because it lessens the likelihood that you'd make a mistake, is

15   what it comes down to.

16          MR. KAUFFMAN:  I'm sure all my unemployed employees

17   will appreciate that.

18          THE COURT:  Yeah, I understand, Mr. Kauffman.  I get

19   it.

20          Okay.  Thank you.  That concludes the proceeding.

21          THE CLERK:  All rise.

22       (WHEREUPON, the proceedings adjourned at 4:37 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   knowledge, skill, ability and belief, a true and accurate

8   transcription of the within proceedings.

9

10

11

12

13   Date:  ___3/10/23___              /s/ Brenda K. Hancock
                                       Brenda K. Hancock, RMR, CRR
14                                     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25