UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                *Plaintiff*,

    v.

COINBASE, INC. AND COINBASE
GLOBAL, INC.,

                *Defendants*.

23 Civ. 4738 (KPF)

---

**BRIEF OF BLOCKCHAIN ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF
DEFENDANTS COINBASE, INC. AND COINBASE GLOBAL, INC.'S
<u>MOTION TO CERTIFY INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)</u>**


MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001-5369
(202) 220-1100

Counsel for *Amicus Curiae* Blockchain
Association

Dated:  April 26, 2024

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ........................................................1
ARGUMENT...................................................................................................................................2
I.   Whether A Digital Token And Its "Ecosystem" Can Constitute An "Investment Contract" Is A New Legal Question Meriting Immediate Appellate Review ......................3
II.  The Commission's Unprecedented "Ecosystem" Theory Risks Dangerously Overbroad Application.........................................................................................................8
CONCLUSION.............................................................................................................................12

## TABLE OF AUTHORITIES
**Page(s)**

**FEDERAL CASES**

*Balintulo v. Daimler AG*,
    727 F.3d 174 (2d Cir. 2013) ................................................................................... 2, 3, 8

*Chechele v. Standard Gen. L.P.*,
    No. 20-cv-3177, 2022 WL 766244 (S.D.N.Y. Mar. 14, 2022) ........................................ 2

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*,
    921 F.2d 21 (2d Cir. 1990) ............................................................................................ 3

*Lamont v. Schultz*,
    748 F. Supp. 1043 (S.D.N.Y. 1990), *aff'd sub nom.*
    *Lamont v. Woods*, 948 F.2d 825 (2d Cir. 1991) ........................................................... 3

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ...................................................................................................... 3

*Padilla ex rel. Newman v. Rumsfeld*,
    256 F. Supp. 2d 218 (S.D.N.Y. 2003) ........................................................................ 3, 8

*Risley v. Universal Navigation Inc.*,
    No. 22-cv-2780, 2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023),
    *appeal pending*, No. 23-1340 (2d Cir.) ....................................................................... 7

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................................ 9

*SEC v. Ripple Labs, Inc.*,
    No. 20-cv-10832, 2021 WL 4555352 (S.D.N.Y. Oct. 4, 2021) ...................................... 1

*In re Trace Int'l Holdings, Inc.*,
    No. 04-cv-1295, 2009 WL 3398515 (S.D.N.Y. Oct. 21, 2009) ..................................... 3

*United States ex rel. Quartararo v. Cath. Health Sys. of Long Island Inc.*,
    84 F.4th 126 (2d Cir. 2023) ........................................................................................... 3

**REGULATORY CASES**

*In the Matter of Tether Holdings Ltd.*,
    No. 22-04 (CFTC Oct. 15, 2021) ................................................................................... 7

**FEDERAL STATUTES**

15 U.S.C. § 77b(a)(1) ............................................................................................................ 3

28 U.S.C. § 1292(b) ..........................................................................................................2, 3

**OTHER AUTHORITIES**

*Cryptocurrencies: Oversight of New Assets in the Digital Age*, Hr'g Before the
U.S. H. Comm. on Agric., 115th Cong. (2018) ..........................................................9

https://filecoin.io//#intro (last visited Apr. 26, 2024) .................................................6, 11

Gary Gensler, *Kennedy and Crypto*, Securities & Exchange Comm'n (Sept. 8,
2022), https://www.sec.gov//speech/gensler-sec-speaks-090822.............................10

Paul Grewal, *Petition for Rulemaking-Digital Asset Securities Regulation* (July
21, 2022), https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf...............11

Paul Grewal, *We Asked The SEC For Reasonable Crypto Rules For Americans.
We Got Legal Threats Instead*, Coinbase (Mar. 22, 2023),
https://www.coinbase.com/blog/we-asked-the-sec-for-reasonable-crypto-
rules-for-americans-we-got-legal...............................................................................11

William Hinman, Securities & Exchange Comm'n, *Digital Asset Transactions:
When* Howey *Met* Gary (Plastic) (June 14, 2018),
https://www.sec.gov///hinman-061418 ...............................................................7, 8, 9

Chavie Lieber, *Why Fashion Brands Destroy Billions' Worth of Their Own
Merchandise Every Year*, Vox (Sept. 17, 2018),
https://www.vox.com/goods/2018/9/17/17852294/brands-burning-
merchandise-burberry-nike-h-and-m ..........................................................................4

Kellie Mejdrich, *Crypto 'Wild West' Requires New Laws, SEC Chair Says*,
Politico (Aug. 3, 2012), https://www.politico.com/news/2021/08/03/bitcoin-
cryptocurrency-regulation-sec-502281 .....................................................................11

SEC Mem. in Opp. to Motion To Intervene, *SEC v. Ripple Labs, Inc.*,
No. 20-cv-10832, 2021 WL 2819401 (S.D.N.Y. May 3, 2021) ..................................1

SEC Mem. in Support of Motion To Certify Interlocutory Appeal, *SEC v. Ripple
Labs, Inc.*, No. 20-cv-10832 (S.D.N.Y. Aug. 18, 2023)..............................................2

Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago After
Getting Laid Off*, Business Insider (Feb. 12, 2021),
https://markets.businessinsider.com/currencies//dogecoin-creator-sold-coins-
years-ago-off-cryptocurrency-mania-2021-2-1030077260 ........................................9

Hester M. Peirce & Mark T. Uyeda, *On Today's Episode of As the Crypto World
Turns: Statement on ShapeShift AG*, Securities & Exchange Comm'n (March
5, 2024), https://www.sec.gov/news/statement/peirce-uyeda-statement-a-
crypto-world-turns-03-06-24 ...............................................................................11, 12

Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures, Inc., et al., Securities & Exchange Comm'n (Feb. 9, 2023), https://www.sec.gov//statement/peirce-statement-kraken-020923 ...........................................10

Pete Rizzo, *10 Years Ago Today, Bitcoin Creator Satoshi Nakamoto Sent His Final Message*, Forbes (Apr. 26, 2021), https://www.forbes.com/sites/peterizzo/2021/04/26/10-years-ago-today-bitcoin-creator-satoshi-nakamoto-sent-his-final-message/?sh=4edb084b10dd ........................9

Leo Schwartz, *Former SEC Crypto Leader Spars With Blockchain Lawyers Over Her Agency's Controversial Approach: 'It's Not Going To Back Off'*, Fortune (Apr. 17, 2024), https://fortune.com/crypto//04/17/sec-crypto-litigation-ladan-stewart-columbia-regulation/ ...............................................................................................10

Leo Schwartz, *So Why Isn't a Pokemon Card a Security?*, Yahoo Finance (Dec. 6, 2023), https://finance.yahoo.com//why-isn-t-pokemon-card-143742057.html .........................6

Statement of Sam Waldon, Chief Counsel, Div. of Enforcement, Securities & Exchange Comm'n, *The SEC Speaks in 2024* (Apr. 3, 2024), https://www.youtube.com/watch?v=5v3frsPnUts&t=4388s ......................................................1

*Welcome to Ethereum*, Ethereum Foundation, ethereum.org (last visited Apr. 26, 2024) .......................................................................................................................................8

## INTRODUCTION AND INTEREST OF *AMICUS CURIAE*[1]

The Blockchain Association ("BA") is a nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital asset economy. BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace. BA represents nearly 100 member companies reflecting the wide range of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

BA has a significant interest in this case. This Court's opinion suggesting that a digital token plus its "ecosystem" may be considered an "investment contract" will have hugely consequential repercussions for the broader digital asset economy. In particular, this case may have serious consequences for open-source software developers building and using blockchain technology, including the creators of the 12 digital assets allegedly "offered and sold as investment contracts" on Coinbase, Op. 14, for which the Commission has provided no viable path for purportedly required registration.

The vast majority of participants in the digital asset industry have no voice in cases, like this one, where the Commission brings an enforcement action against a secondary cryptocurrency marketplace.[2] But the Commission is already citing this Court's opinion as the

---

[1] Counsel for *amicus* Blockchain Association certifies that *amicus* has no parent corporation and no publicly held corporation owns 10% or more of any stock in *amicus*. No party's counsel or other person except *amicus* and its counsel authored this brief or contributed money to fund its preparation or submission.

[2] The Commission has taken the position that intervention by any entity as a third-party defendant would be a constitutionally and statutorily prohibited encroachment on the Commission's prosecutorial discretion, *see* SEC Mem. in Opp. to Motion To Intervene 10-12, *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2021 WL 2819401 (S.D.N.Y. May 3, 2021), and at least one court in this district has accepted that argument, *see SEC v. Ripple Labs, Inc.*, No. 20-cv-10832, 2021 WL 4555352, at *2-5 (S.D.N.Y. Oct. 4, 2021).

definitive "state of the law . . . as to crypto." Statement of Sam Waldon, Chief Counsel, Div. of Enforcement, Securities & Exchange Comm'n, *The SEC Speaks in 2024* (Apr. 3, 2024), https://www.youtube.com/watch?v=5v3frsPnUts&t=4388s. *Amicus* respectfully seeks to provide an additional industry perspective on why this case warrants interlocutory review.

**ARGUMENT**

"[A] district court may certify an appeal pursuant to 28 U.S.C. § 1292(b) when it is 'of the opinion that [the relevant] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (alteration in original; quoting 28 U.S.C. § 1292(b)). As this Court has recognized, "the Court of Appeals has advised district courts that '[w]hen a ruling satisfies [all three] criteria and involves a new legal question or is of special consequence, then the district court should not hesitate to certify an interlocutory appeal.'" *Chechele v. Standard Gen. L.P.*, No. 20-cv-3177, 2022 WL 766244, at *3 (S.D.N.Y. Mar. 14, 2022) (quoting *Balintulo*, 727 F.3d at 186).

*Amicus* submits that the standard for interlocutory review is satisfied here, as evidenced by the arguments the Commission itself made in another case. *See* SEC Mem. in Support of Motion To Certify Interlocutory Appeal 12-16, *SEC v. Ripple Labs, Inc.*, No. 20-cv-10832 (S.D.N.Y. Aug. 18, 2023). *Amicus* focuses here on explaining why adopting the Commission's position that an investment contract is formed when a customer "buy[s] into [a] token's digital ecosystem" by "purchas[ing] a token" in the secondary market, Op. 59, both poses "a new legal question" and "is of special consequence" to users and developers of various open source decentralized finance protocols, the blockchain networks on which they are deployed, and the

2

digital assets needed for such networks to operate.[3]  *Balintulo*, 727 F.3d at 186 (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)); *accord Lamont v. Schultz*, 748 F. Supp. 1043, 1057 (S.D.N.Y. 1990), *aff'd sub nom. Lamont v. Woods*, 948 F.2d 825 (2d Cir. 1991) (certifying decision "involv[ing] new and important areas of the law").

I.  **WHETHER A DIGITAL TOKEN AND ITS "ECOSYSTEM" CAN CONSTITUTE AN "INVESTMENT CONTRACT" IS A NEW LEGAL QUESTION MERITING IMMEDIATE APPELLATE REVIEW**

This Court's opinion explaining that digital asset transactions on Coinbase could involve "investment contracts" within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(1), hinges on the Commission's late-breaking, novel "ecosystem" theory:  that someone who purchases a digital token in a secondary market is "buying into [an] ecosystem" created and maintained by the token's "issuers and . . . project team."  Tr. 19, 57.  The "ecosystem" theory was essential to this Court's analysis of both disputed prongs of the *Howey* test for determining the existence of an investment contract, *i.e.*, "the existence of a common enterprise" and "whether investors were led to believe they could earn a return on their investment solely by the efforts of others."  Op. 47-48, 51.[4]

*Amicus* respectfully submits that whether the "ecosystem" theory faithfully implements the *Howey* test is a "difficult and novel" issue warranting certification.  *Padilla ex rel. Newman v. Rumsfeld*, 256 F. Supp. 2d 218, 221 (S.D.N.Y. 2003); *see also United States ex rel.*

---

[3] A difficult and novel question also supports a finding that there is "substantial ground for difference of opinion." 28 U.S.C. § 1292(b); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 25 (2d Cir. 1990) ("substantial grounds for difference of opinion" standard satisfied where "the issues are difficult and of first impression"); *In re Trace Int'l Holdings, Inc.*, No. 04-cv-1295, 2009 WL 3398515, at *3 (S.D.N.Y. Oct. 21, 2009) ("The requirement of § 1292(b) that there be a 'substantial ground for difference of opinion' is satisfied where (1) there is conflicting authority on the issue, or (2) the issue is particularly difficult, and one of first impression in the Second Circuit.").

[4] As to the former prong, this Court held that "the SEC ha[d] plausibly alleged horizontal commonality" between investors and "the overall enterprise" because "[t]he ability of a Crypto-Asset purchaser to profit" from his purchase "is dependent on . . . expansion of the token's ecosystem."  Op. 48-49 (citation omitted).  And as to the latter prong, this Court concluded that the "SEC ha[d] plausibly alleged that issuers and promoters" had led purchasers to believe that "further development of the token's ecosystem" would "increase the value of the token."  Op. 51-53.

*Quartararo v. Cath. Health Sys. of Long Island Inc.*, 84 F.4th 126, 129 (2d Cir. 2023) (certification of "a novel question of law in the Second Circuit").  That theory has never been passed upon, much less adopted by, the Second Circuit or any other federal court of appeals.

To begin with, this Court's partial denial of the motion for judgment on the pleadings based on the Commission's theory that an investment contract can be formed by an asset plus an "ecosystem," *see* Op. 46, risks recategorizing a huge swath of economic activity as activity involving "securities" that would become subject to the Commission's regulation.  Under such a standard, the purchase of any asset in a secondary market could be an "investment contract," and therefore a security, whenever (1) the asset's "market value" is "dependent" on the health of the asset's "ecosystem," Op. 49-50, and (2) the asset's "issuers and promoters" have made public statements indicating that they would make efforts to "improve the value of the asset" (perhaps with proceeds from sales of the asset), including by "reduc[ing] the total supply" of the asset, Op. 7 n.4, 51-53.  The Commission's application of that test could transform into "securities" luxury consumer goods, because their price is driven by sophisticated marketing (including the production of "limited editions") and tight control over the secondary market.  *See, e.g.*, Chavie Lieber, *Why Fashion Brands Destroy Billions' Worth of Their Own Merchandise Every Year*, Vox (Sept. 17, 2018), https://www.vox.com/the-goods/2018/9/17/17852294/fashion-brands-burning-merchandise-burberry-nike-h-and-m.  It could apply to all manner of collectibles—such as vintage wines, fine art, postage stamps, comic books, and baseball cards—that have little to no inherent value outside of an "ecosystem" of producers, collectors, authenticators, and appraisers who believe in and promote their worth.  And it could capture the sale and purchase of all sorts of commodities, such as gemstones and precious metals, that derive their value from society's

collective decision to treat them as valuable—driven in no small part by their scarcity and the promotional efforts of businesses in those markets.

The Court's opinion suggests that "the offer and sale of cryptocurrencies" may be distinguished from "commodities or collectibles" on the ground that the latter "may be independently consumed or used" while the former "is necessarily intermingled with its digital network." Op. 59. But this distinction does not hold up in the current Internet age, where nearly all popular digital and physical goods may be marketed, exchanged, and even "consumed or used" online. Op. 59.

First, the value of physical goods—just like cryptocurrencies—cannot be divorced from those goods' "ecosystems." For example, although rare baseball cards, which have enormous value as collectibles, could *theoretically* be "used" as a convenient source of statistics on baseball players, Op. 59, "the economic reality," Op. 41 (citation omitted), is that investors purchase such assets for their speculative value rather than their intrinsic utility. That value, in turn, is created and maintained by the "'full set of contracts, expectations, and understandings' surrounding [those assets'] sale and distribution"—*i.e.*, their "ecosystem[s]." Op. 46 (citation omitted). And many of those "ecosystems" are primarily digital—that is, they are enabled by software that allows fans, producers, promoters, verifiers, and secondary-market sellers and buyers to interact (and transact) online, including in ways that cause popular physical goods to go up in value. No less than digital assets, collectibles and luxury goods ranging from sneakers to handbags to trading cards are "intermingled" with the "digital network[s]," Op. 59, of the modern age. But no one would argue that transactions in Beanie Babies on eBay or designer sneakers on StockX are "investment contracts" under the *Howey* test, notwithstanding that the value of those assets is tied to their associated "ecosystems."

5

Second, just like commodities, luxury goods, and collectibles, digital assets often have "use[]," Op. 59, beyond the simple potential to appreciate in value, *see* Op. 8 (recognizing digital assets often have a "nominal purpose"). The nature of that use varies widely. For example, Filecoin (FIL) can be used by customers to pay for data storage and retrieval on Filecoin's innovative cloud-based, decentralized storage network. *See* https://filecoin.io/store/#intro (last visited Apr. 26, 2024). Axie Infinity Shards (AXS), the native token of the blockchain game "Axie Infinity," can be earned by players for "successfully playing the Axie game" and then "use[d] . . . to make in-game purchases." Compl. ¶¶ 203, 205. And, as this Court's opinion explains, the Chiliz (CHZ) token can be used to purchase "voting rights" to "influence [sports'] team decisions," including "selecting player warm-up apparel and choosing team pennant designs." Op. 18 (citation omitted).

Accordingly, it is simply not possible to distinguish between transactions in digital assets and transactions in luxury goods, collectibles, or commodities under the Commission's "ecosystem" theory. *Amicus* respectfully suggests that there is no statutory basis, for example, to treat transactions in digital Pokémon cards on the blockchain as "investment contracts" but transactions in physical Pokémon cards as mere sales of collectibles. *See* Leo Schwartz, *So Why Isn't a Pokemon Card a Security?*, Yahoo Finance (Dec. 6, 2023), https://finance.yahoo.com/news/why-isn-t-pokemon-card-143742057.html (summarizing testimony by Chairman Gensler that "buying a Pokemon card would not be a security transaction, but it might if it were tokenized on the blockchain"). The former kind of asset is made out of zeroes and ones while the latter is made out of molecules—but that does not change the fact that both kinds of assets would be essentially "valueless," Op. 59, without their "ecosystems" of developers, players, and

6

collectors.  A rule that distinguishes between them could do so only by applying a technology-specific test that finds no grounding in the securities laws.

Moreover, to the extent this Court's opinion could be read to suggest that an "investment contract" includes any transaction involving an asset that relies on a "digital network" for its "exist[ence]," Op. 59-60, or about which initial promises or sales were made by the asset's creators, *see* Op. 48, that position would lead to an outcome that both the Commission and the Commodity Futures Trading Commission ("CFTC") have disavowed.  Such a rule risks transforming *all* transactions in cryptocurrencies into securities transactions without exception, including transactions involving Bitcoin and Ether—the value of which "is necessarily tied to" and "intermingled with" those tokens' "digital ecosystem[s]," and the "exist[ence] of which relies on "digital network[s]."  Op. 59-60.  The Commission itself, however, has previously recognized that transactions in Bitcoin and Ether—regardless of the way those assets were initially sold and whatever the managerial efforts of their creators may have been—are *not* securities transactions because those tokens now operate on "decentralized" networks.  William Hinman, Securities & Exchange Comm'n, *Digital Asset Transactions: When* Howey *Met* Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.  And the CFTC has taken the position that transactions in "[d]igital assets such as bitcoin, ether, litecoin, and tether tokens are commodities," not securities.[5]  *In the Matter of Tether Holdings Ltd.*, No. 22-04, at 8 (CFTC Oct. 15, 2021), *available at* https://www.cftc.gov/media/6646/enftetherholdingsorder101521/download.  Those agency positions strongly underscore that whether a transaction in a digital asset should be treated as an "investment contract" due to the

---

[5] This Court has also recognized elsewhere that Bitcoin and Ether are "crypto commodities."  *Risley v. Universal Navigation Inc.*, No. 22-cv-2780, 2023 WL 5609200, at *14 (S.D.N.Y. Aug. 29, 2023), *appeal pending*, No. 23-1340 (2d Cir.).

7

existence of an associated "ecosystem" is a "difficult and novel" question, *Newman*, 256 F. Supp. 2d at 221, that merits interlocutory appellate review.

## II. THE COMMISSION'S UNPRECEDENTED "ECOSYSTEM" THEORY RISKS DANGEROUSLY OVERBROAD APPLICATION

This Court's order is also of "special consequence," *Balintulo*, 727 F.3d at 186, to the digital asset industry. Adopting the Commission's "ecosystem" theory risks transforming all software developers that build digital "platforms," Op. 9, or contribute to a digital asset's "ecosystem," into issuers or promoters of securities, and thus poses a foundational threat to those developers and the innovative projects they create.

The first problem with defining transactions in digital assets as "investment contracts" by virtue of their associated "ecosystems," and thus requiring registration with the Commission, is that it is far from clear who should make (and maintain, quarterly and annually) such registrations. The "digital network[s]" on which digital assets rely, Op. 59-60, often involve a number of independent actors or groups of actors who have no control over each other and who might not even communicate with each other.

All sorts of independent actors may contribute to open source networks and the ostensible "ecosystems" built around them. For instance, a blockchain "ecosystem" may include unrelated developers who contribute code for a protocol early in the project and then are no longer involved, developers who join later to fix specific bugs and then never have any other involvement, or developers who are focused on designing future improvements. And it may include any combination of other independent persons or entities, each playing a different role in the perpetuation of the ecosystem as a whole. *See, e.g.*, *Welcome to Ethereum*, Ethereum Foundation, ethereum.org (last visited Apr. 26, 2024) (describing Ethereum as a "community-run technology"); William Hinman, Securities & Exchange Comm'n, *Digital Asset Transactions:*

*When* Howey *Met* Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (arguing that, in light of Bitcoin's and Ether's "decentralized" networks, "applying the disclosure regime of the federal securities laws to" Bitcoin and Ether transactions "would seem to add little value"). Those entities may do so as wholly separate organizations without any formal or informal obligations to each other.

Moreover, a digital asset is not dependent on the continued existence of the person or entity that created it. Digital assets can continue to have value even if their creators are no longer putting any effort into developing or maintaining their "ecosystems"—indeed, even if their creators are defunct. For example, the creator of Bitcoin abandoned the project 13 years ago,[6] *see* Pete Rizzo, *10 Years Ago Today, Bitcoin Creator Satoshi Nakamoto Sent His Final Message*, Forbes (Apr. 26, 2021), https://www.forbes.com/sites/peterizzo/2021/04/26/10-years-ago-today-bitcoin-creator-satoshi-nakamoto-sent-his-final-message/?sh=4edb084b10dd, and the DOGE token continues to retain value and trade at high volumes even though its creator has publicly walked away from the token, *see* Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago After Getting Laid Off*, Business Insider (Feb. 12, 2021), https://markets.businessinsider.com/currencies/news/dogecoin-creator-sold-coins-years-ago-laid-off-cryptocurrency-mania-2021-2-1030077260.

Even if the question of *who* should register could be answered, there would remain the question of *what* should be registered. Everyone agrees that digital assets themselves are not

---

[6] As discussed above, *see* p.7, *supra*, even the Commission appears to agree that transactions in two of the most popular digital assets—Bitcoin and Ether—are not investment contracts because there is no single entity on whose managerial efforts a buyer could theoretically rely when purchasing those assets. *See, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) (recognizing that a digital asset "utilized by members of a decentralized community" and "administered by this community of users . . . is not likely to be deemed a security"); *Cryptocurrencies: Oversight of New Assets in the Digital Age*, Hr'g Before the U.S. H. Comm. on Agric., 115th Cong. 28 (2018) (statement of Gary Gensler); William Hinman, Securities & Exchange Comm'n, *Digital Asset Transactions: When* Howey *Met* Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

securities.  *See* Op. 29; Tr. 21 (Commission acknowledging that "[t]he token itself is not the security").  But the Commission has never explained what precisely constitutes an "ecosystem"—or, more practically, how one could go about registering an "ecosystem" as a security.  *See* Tr. 22 (Commission describing the relevant "investment contract" as a "token . . . plus the totality of the inducements" surrounding it); Leo Schwartz, *Former SEC Crypto Leader Spars With Blockchain Lawyers Over Her Agency's Controversial Approach: 'It's Not Going To Back Off'*, Fortune (Apr. 17, 2024), https://fortune.com/crypto/2024/04/17/sec-crypto-litigation-ladan-stewart-columbia-regulation/ (former chief of the Commission's crypto litigation unit stating that "the token, plus 'all the stuff around the token,' is the security" but admitting that "[y]ou can't obviously register all the stuff").  Although the Commission's Chairman has taken the position in speeches that "the vast majority" of "the nearly 10,000 tokens in the crypto market . . . are securities" and has admonished "entrepreneurs to get their tokens registered and regulated," he has also admitted that only "[a] handful" of purported "crypto security tokens" have been able to successfully "register[] under the existing regime."  Gary Gensler, *Kennedy and Crypto*, Securities & Exchange Comm'n (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822.  That is not because software developers of digital tokens are scofflaws.  Instead, as Commissioner Hester Peirce has observed, it is because the Commission has failed to provide any "workable registration process that [would] provide[] valuable information to investors," instead opting time and again "to shut down entirely . . . program[s] that ha[ve] served people well."  Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures, Inc., et al., Securities & Exchange Comm'n (Feb. 9, 2023), https://www.sec.gov/news/statement/peirce-statement-kraken-020923 (describing the Commission as a "regulator" that "is hostile to crypto").  "[W]ell-meaning entrepreneurs" and

10

"innovators," in turn, are left "expose[d] . . . to a regulatory sword of Damocles." Hester M. Peirce & Mark T. Uyeda, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG*, Securities & Exchange Comm'n (March 5, 2024), https://www.sec.gov/news/statement/peirce-uyeda-statement-a-crypto-world-turns-03-06-24.

The same problem plagues digital asset trading platforms as well. Although the Commission has publicly stated that exchanges simply need to "come in [and] register . . . with the SEC," Kellie Mejdrich, *Crypto 'Wild West' Requires New Laws, SEC Chair Says*, Politico (Aug. 3, 2012), https://www.politico.com/news/2021/08/03/bitcoin-cryptocurrency-regulation-sec-502281, in practice that has been an impossible task. The efforts of the defendants in this very action provide a cautionary tale. Coinbase both petitioned the Commission for a rulemaking concerning the "offer, sale, registration, and trading of digital asset securities," Paul Grewal, *Petition for Rulemaking—Digital Asset Securities Regulation* 3 (July 21, 2022), https://www.sec.gov/files/rules/petitions/2022/petn4-789.pdf, and—in the absence of direction from the Commission—*itself* offered two different proposals to the Commission for how Coinbase could register under the existing regulatory framework, *see* Paul Grewal, *We Asked The SEC For Reasonable Crypto Rules For Americans. We Got Legal Threats Instead*, Coinbase (Mar. 22, 2023), https://www.coinbase.com/blog/we-asked-the-sec-for-reasonable-crypto-rules-for-americans-we-got-legal. But rather than work with Coinbase to achieve registration, the Commission proceeded with this enforcement action.

The potential costs inflicted by validating the Commission's "ecosystem" theory could be high and immediate. Blockchain technology is being used to solve some of the most vexing computer-science problems, such as creating resilient, redundant, and inexpensive decentralized data storage. *See, e.g.*, https://filecoin.io/store/#intro (last visited Apr. 26, 2024). But this

Court's opinion leaves room for the Commission (wrongly, in *amicus*'s view) to label *anyone* who expends "technical . . . efforts," Op. 51, in support of a digital asset—including, for example, software developers who contribute code to open source projects on the blockchain—as "'issuers' or 'promoters'" of securities, Op. 8. Thus, as a consequence of the rule embraced by this Court, a wide range of software developers could face the chilling effect of a "regulatory sword of Damocles": the practical impossibility of creating software without a viable path to registration. Peirce & Uyeda, *On Today's Episode of As the Crypto World Turns: Statement on ShapeShift AG*, Securities & Exchange Comm'n (March 5, 2024), https://www.sec.gov/news/statement/peirce-uyeda-statement-a-crypto-world-turns-03-06-24. It is therefore critically important that the Commission's "ecosystem" theory receive a full airing before the Second Circuit as soon as possible, and certainly before final judgment in this case.

## CONCLUSION

The motion to certify for interlocutory appeal the Court's March 27, 2024 order on Coinbase's Motion for Judgment on the Pleadings should be granted.

Dated: April 26, 2024

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Sarah E. Weiner
601 Massachusetts Avenue NW,
  Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Donald.Verrilli@mto.com

Counsel for *Amicus Curiae* Blockchain Association

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

MUNGER, TOLLES & OLSON LLP

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
601 Massachusetts Avenue NW,
    Suite 500E
Washington, DC 20001-5369
(202) 220-1100
Donald.Verrilli@mto.com

Counsel for *Amicus Curiae* Blockchain Association

13