**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

                    **Plaintiff,**

          **-against-**

**COINBASE, INC. AND COINBASE GLOBAL, INC.,**

                    **Defendants.**

---

**23 Civ. 4738 (KPF)**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO CERTIFY INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)**

Peter A. Mancuso
Patrick R. Costello
Nicholas C. Margida
Jorge G. Tenreiro
David S. Mendel
Rebecca R. Dunnan

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

RELEVANT BACKGROUND ...............................................................................................3

    A.    The SEC's Complaint. ........................................................................................3

    B.    Coinbase's Motion for Judgment on the Pleadings..........................................3

    C.    The Court's Order...............................................................................................4

LEGAL STANDARD ............................................................................................................6

ARGUMENT..........................................................................................................................7

    I.    COINBASE FAILS TO DEMONSTRATE THAT THE ORDER POSES A CONTROLLING QUESTION OF LAW. ......................................................7

    II.    THERE IS NO SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION AS TO ANY ISSUES RESOLVED IN THE ORDER.......................10

        A.    No Court has Required "Contractual Undertakings" as an Additional Element of Howey...............................................................................11

        B.    Coinbase Cannot Otherwise Point to a Substantial Difference of Opinion........14

    III.    INTERLOCUTORY REVIEW WOULD NOT MATERIALLY ADVANCE THE TERMINATION OF THIS LITIGATION........................................18

    IV.    ADDITIONAL FACTORS WARRANT DENYING THE MOTION. ................20

CONCLUSION.....................................................................................................................22

# TABLE OF AUTHORITIES

*1050 Tenants Corp. v Jakobson,*
    503 F.2d 1375 (2d Cir. 1974) .................................................................................... 13

*Balestra v. ATBCOIN LLC,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................................... 5, 6

*Bellino v. JP Morgan Chase Bank, NA,*
    2017 WL 129021 (S.D.N.Y. Jan. 13, 2017) .............................................................. 10

*In re Blech Sec. Litig.,*
    2003 WL 134988 (S.D.N.Y. Jan. 17, 2003) .............................................................. 18

*Casey v. Long Island R.R. Co.,*
    406 F.3d 143 (2d Cir. 2005) ..................................................................................... 7

*Chechele v. Standard General LP,*
    2022 WL 766244 (S.D.N.Y. Mar. 14, 2022) ............................................... *passim*

*In re Currency Conversion Fee Antitrust Litig.,*
    2005 WL 1871012 (S.D.N.Y. Aug. 9, 2005) ...................................................... 20, 21

*Dill v. JP Morgan Chase Bank, N.A.,*
    2021 WL 3406192 (S.D.N.Y. Aug. 4, 2021) ................................................ *passim*

*In re Facebook, Inc, IPO Sec. and Dev. Lit.,*
    986 F. Supp 2d 524 (S.D.N.Y. 2014) ......................................... 7, 11, 12, 18

*In re Flor,*
    79 F.3d 281 (2d Cir. 1996) ....................................................................................... 10

*Glen-Arden Commod., Inc. v. Constantino,*
    493 F.2d 1027 (2d Cir. 1974) .................................................................................. 12

*Isra Fruit Ltd. v. Agrexco Agr. Exp. Co.,*
    804 F.2d 24 (2d Cir. 1986) ................................................................................... 8, 18

*Klinghoffer v. S.N. C. Achille Lauro,*
    921 F.2d 21 (2d Cir.1990) ......................................................................................... 7

*Koehler v. Bank of Bermuda Ltd.,*
    101 F.3d 863 (2d Cir. 1996) ............................................................................... 17, 19

*Lidle v. Cirrus Design Corp.,*
    2010 WL 4345733 (S.D.N.Y. Oct. 29, 2010) ..................................................... 11, 13

*Murray v UBS Securities LLC,*
 2014 WL 1316472 (S.D.N.Y. Apr. 1, 2014) ...................................................*passim*

*Patterson v. Jump Trading, LLC,*
 2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ...............................................................15

*Pereira v. Cogan,*
 265 B.R. 32 (S.D.N.Y. 2001) ...............................................................................18

*SEC v. Arbitrade,*
 2024 WL 962372 (S.D. Fla. Mar. 6, 2024) ..................................................... 16, 18

*SEC v. C.M. Joiner Leasing Corp.,*
 320 U.S. 344 (1943) ...............................................................................................12

*SEC v. Edwards,*
 540 U.S. 389 (2004) .................................................................................................5

*SEC v. Kik Interactive, Inc.,*
 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ...............................................5, 6, 11, 13

*SEC v. LBRY, Inc.,*
 639 F. Supp. 3d 211 (D.N.H. 2022) ................................................................ 13, 21

*SEC v. Ripple Labs Inc.,*
 682 F. Supp. 3d 308 (S.D.N.Y. 2023)...............................................11, 15, 16

*SEC v. Ripple Labs Inc.,*
 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ........................................................17

*SEC v. Telegram Group Inc.,*
 448 F. Supp. 3d 352 (S.D.N.Y. 2020).....................................................................13

*SEC v. Terraform Labs Pte. Ltd.,*
 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ..............................5, 6, 11, 16

*SEC v. Terraform Labs Pte. Ltd.,*
 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ................................................ 6, 16, 17

*SEC v. Wahi,*
 2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ............................................ 15, 16

*SEC v. W.J. Howey Co.,*
 328 U.S. 293 (1946) .................................................................................................1

*United States v. Zaslavskiy,*
 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)................................................6, 21

*Wals v. Fox Hills Dev. Corp.*,
 24 F.3d 1016 (7th Cir. 1994) ........................................................................................ 14

**STATUTES**

28 U.S.C. § 1292(b) .............................................................................................................. 7, 14

**OTHER AUTHORITY**

*In re Coinbase, Inc.*,
 No. 23-1779 (3rd Cir.) *filed* Apr. 26, 2023 ................................................................. 21

*Coinbase v. SEC*,
 No. 23-3202 (3d Cir.) *filed* Dec. 15, 2023 ................................................................. 21

*Amicus Curiae* Br. filed by Coinbase, Inc. in *SEC v. Ripple Labs, Inc.*,
 No. 20 Civ. 10832 (D.E. 705) (S.D.N.Y. Nov. 15, 2022) ............................................ 21

Br. in *SEC v. Ripple Labs, Inc.*,
 No. 20 Civ. 10832 (D.E. 893) (S.D.N.Y. Aug. 18, 2023) ............................................ 10

*SEC v. Ripple*,
 No. 20 Civ. 10832 (D.E. 962) (S.D.N.Y. May 7, 2024) .............................................. 21

*SEC v. Terraform*,
 No. 23 Civ. 1346 (D.E. 246) (S.D.N.Y. May 7, 2024) ................................................ 21

Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") respectfully submits this memorandum of law in opposition to Defendants Coinbase, Inc. and Coinbase Global, Inc.'s ("Coinbase") motion to certify interlocutory appeal (D.E. 109-110, "Motion" or "Mot.").

## PRELIMINARY STATEMENT

Coinbase seeks the exceptional relief of interlocutory review of the March 27, 2024 Order (D.E. 105, the "Order"), arguing that this Court incorrectly applied *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). At first glance, Coinbase purports to seek to certify whether *Howey* requires "obligation[s] running to the purchaser beyond the point of sale." Mot. at 1. Yet further inspection reveals that the Motion continuously vacillates between that and other questions for certification, such as "how *Howey* applies to [digital asset] transactions" generally. *Id.* Regardless of which version of the question for certification Coinbase proposes, the Motion should be denied.

Coinbase's attempts to manipulate the question for appeal to shoehorn it into a certifiable question under 28 U.S.C. § 1292(b) are self-defeating. Parties cannot manufacture a certifiable issue by jettisoning and then rescuing the questions at issue in the original order. The Order dealt not only with the "obligations running" argument, but also with Coinbase's affirmative defenses; with the arguments that sales of crypto assets in secondary market transactions cannot satisfy *Howey* and that investment contracts must provide a share in business income, profits, or assets; and with the SEC's highly factual staking-related *Howey* claim. The Order also applied settled law to allegations about transactions in certain crypto assets. Nor did the Order find any doubt as to how to apply to crypto assets "the framework that courts have used to identify securities for nearly eighty years." Order at 2. To the contrary, at every turn, the Order noted the lack of any legal authority for Coinbase's various arguments. The Motion scarcely contends otherwise and fails to offer a case with which the Order conflicts. Thus, there can be no doubt—let alone a substantial one—that the Order was correct and does not meet the standards for interlocutory review.

The initial version of Coinbase's proposed question ("whether an investment contract can exist absent any post-sale obligation") in particular, fails each of the Section 1292(b) factors. Coinbase remains unable to advance a single, coherent version of this theory, which it now claims presents a controlling question. This is unsurprising—in eighty years "no court" has ever required post-sale "contractual undertakings" or anything beyond the three factors expressly enumerated by the Supreme Court in *Howey*. Order at 58. The correctness of this ruling is thus confirmed by the fact that every court to address Coinbase's invented "obligations running" requirement has rejected it. Interlocutory review is not warranted simply because Coinbase proposes a new legal test and disagrees with the Court's rejection of that test, nor can it be supported by Coinbase's desire for quicker appellate review of its invented test. Judicial economy requires that Coinbase, like any other litigant advancing novel theories, await final judgment to be heard by the Second Circuit.

Coinbase and *amici*'s invocation of other, prudential reasons to certify an appeal fare no better. Despite the Order's unassailable conclusions that Coinbase's proposed reading of *Howey* has not been adopted by any court and, critically, that there is no lack of fair notice as to the framework that applies to its conduct, Coinbase continues to insist, as grounds for interlocutory review, that "[t]he digital asset industry labors under an intolerable cloud of uncertainty" or under a "cloud of legal uncertainty." Mot. at 1, 21. But the Court's crystal-clear Order, others like it, and the decades of legal authority they are based upon, provide that certainty. Coinbase just does not like the answer. Having made the weather, Coinbase cannot now complain that it is raining.

More broadly, it is clear that Coinbase does not like *Howey* and the current framework for securities regulation, having decided to arrange its business affairs in ways that may make it costly to comply with existing law. But Coinbase's decision to do so, and its desire to rewrite settled, decades-old legal precedent to fit its own policy goals and business needs provides no compelling reason to prematurely certify an appeal in this case.

## RELEVANT BACKGROUND

### A.    The SEC's Complaint

As set forth in the SEC's Complaint, this case involves Coinbase's unregistered intermediation of crypto asset securities on its trading platform and through its "Prime" and "Wallet" brokerage services.  *See* Complaint, D.E. 1 at ¶¶ 1, 4.  It also involves Coinbase's unregistered offers and sales of its Staking Program, whereby it manages crypto assets on behalf of investors seeking returns (the "Staking Program").  By failing to register its exchange, brokerage, and clearing services with the SEC in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), and by failing to register its offers and sales of the Staking Program in violation of Section 5 of the Securities Act of 1933, Coinbase has deprived investors of the disclosures and investor protections that registration and SEC oversight entail.  *Id.* at ¶ 1.

### B.    Coinbase's Motion for Judgment on the Pleadings

On August 4, 2023, Coinbase filed its motion for judgment on the pleadings, advancing a series of arguments.  D.E. 36 ("MJOP").  Coinbase made various versions of the claim it now seeks to certify for appeal—that *Howey* requires a "contractual undertaking beyond the point of sale."  *Id.* at 7-18.  It also argued, however, that there can be no investment contract if the buyer purchases the token in a secondary market transaction as opposed to from the issuer (*id.* at 13-17), and that there can be no "common enterprise" without rights to "business income, profits, or assets."  *Id.* at 18-19; *see also* MJOP Reply Br. (D.E. 83) ("MJOP Reply") at 9-11.  It sought judgment as to the Staking Program claim by highlighting factual features of the program and claiming they did not amount to an investment of money or managerial efforts sufficient to satisfy *Howey*.  MJOP at 27-30; MJOP Reply at 11-12.  It similarly sought to dispose of the SEC's Exchange Act Section 15(a) claim by applying a fact-intensive test to determine whether Coinbase, through Wallet, conducted brokerage activity. MJOP at 25-27.  And it advanced a series of constitutional claims based upon a factual recitation

(spread out across 84 paragraphs of Coinbase's Answer) of years of actions by the SEC and its staff, which Coinbase claimed proved its defenses. *Id.* at 21-25; MJOP Reply at 12-13; *see also* Answer (D.E. 22) at ¶¶ 1-84.

With respect to the first argument, the one putatively at issue here about "contractual undertakings," Coinbase never took a clear position. It variously characterized the test as requiring that "the buyer … have a contractually-grounded expectation of delivery of future value" (MJOP at 6-7), that the investment contract "confer—or at least appear to confer—contractual rights to delivery of future value" (*id.* at 8), or that it involve "a contractual undertaking to deliver future value" (*id.* at 9, 10, 14) or a "relevant contractual arrangement." *Id.* at 15. It later stated that an actual contractual undertaking was not required, but simply that "the promoter has *created the impression* of a contractual undertaking." MJOP Reply at 3 n.2 (emphasis added). And finally, at oral argument it stated that *Howey* requires "the holding out of an offer that includes a statement meant to convey to the offeree some sort of enforceable right," or "the appearance of [a]n offering or instrument that carries with it the contractual obligation." D.E. 101 ("Hr'g Tr.") at 85:25-86:8; 167:9-24.

## C.    The Court's Order

On March 27, 2024, the Court denied most of Coinbase's motion. The Court found that "the challenged transactions fall comfortably within the framework that courts have used to identify securities for nearly eighty years" (Order at 2)—*i.e.*, the *Howey* test—and correctly applied it to determine whether the transactions intermediated by Coinbase constituted "investment contracts," based upon the detailed, factual allegations in the SEC's Complaint. *Id.* at 14-19, 47-54.

Applying *Howey*, the Court first concluded that the SEC plausibly alleged that the "crypto asset purchasers were in a common enterprise with the developers of those assets" because the Complaint asserted that "token issuers, developers, and promoters frequently represented that proceeds from crypto-asset sales would be pooled to further develop the tokens' ecosystems and promised that these

improvements would benefit all token holders by increasing the value of the tokens themselves." *Id.* at 48.   In doing so, the Court rejected Coinbase's assertion that a common enterprise requires the profits to come from "shares in income, profits, or assets of a business" (*id.* at 50 (citing MJOP at 18-21)), noting that this argument was contrary to *Howey* and *SEC v. Edwards*, 540 U.S. 389, 394 (2004), and had been rejected by the other courts in this District to confront it.   *Id.* at 50-51 (citing *Balestra* v. *ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019); *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020); *SEC v. Terraform Labs Pte. LTD.*, 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023) ("*Terraform I*")).

Next, relying on *Howey* and other cases applying it (including as to transactions in crypto assets), the Court concluded the SEC "adequately pleaded" reasonable expectation of profits from the efforts of others because the SEC "plausibly alleged that issuers and promoters of the Crypto-Assets—through websites, social media posts, investor materials, town halls, and other fora—repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset, and continued to do so long after the tokens were made available for trading on the secondary market." *Id.* at 51.

The Court then rejected Coinbase's other arguments as to whether it intermediated transactions in securities under *Howey*.   Rejecting first Coinbase's argument that there can be no securities transactions on its secondary market platforms as a general matter, the Court correctly held, relying on *Howey* and the text of the federal securities laws, that the application of *Howey* is unaffected by whether "an investor bought tokens directly from an issuer or, instead, in a secondary market transaction" as a matter of law.   *Id.* at 54-55.   It also reasoned that, as a matter of fact, investors purchasing crypto assets on Coinbase are "attracted by the promises and offers made by issuers to the investing public" that are "rebroadcast[]" by Coinbase.   *Id.*

In four pages of its 84-page Order, the Court also firmly rejected Coinbase's argument that a

contractual undertaking with post-sale obligations is required to form an investment contract.  The Order correctly reasoned that this requirement cannot be found in *Howey* or any other precedent, and that, to the contrary, the "Supreme Court has repeatedly emphasized that it is the totality of the circumstances—the economic reality—surrounding the offer and sale of an asset that matters, and that reality includes the promises and undertakings underlying the investment contract." *Id.* at 56-57. The Order also correctly pointed out that no court had adopted this requirement, and it "decline[d] to be the first." *Id.* at 58 (citing *Terraform I*, *Kik*, and *SEC v. Terraform Labs Pte. LTD.*, 2023 WL 8944860, at *13 (S.D.N.Y. Dec. 28, 2023) ("*Terraform II*")).  Here, the Order also rejected the notion that the SEC's argument would sweep in "all investment activity." *Id.*  It noted that the comparison between crypto assets and consumer goods "ignore[d] … the need for a common enterprise," and cited other authority refusing similar comparisons. *Id.* at 59-60 (citing *Balestra* and *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 439 (S.D.N.Y. 2023)).

The Court also denied Coinbase's motion as to the Staking Program, conducting a similar fact-based analysis under *Howey*. *Id.* at 61-78.  Likewise, the Court analyzed the detailed factual underpinnings of Coinbase's affirmative defenses—including the Major Questions Doctrine and those invoked under the Due Process Clause and the Administrative Procedures Act—and rejected them, reasoning that none "prevent the SEC from [alleging that] the Crypto-Assets transacted on Coinbase are 'investment contracts.'" *Id.* at 31-39.  In that regard, the Court again noted that it was in good company, as all the courts to have confronted these defenses also rejected them. *Id.* at 38-39 (citing *Kik* and *United States v. Zaslavskiy*, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018)).

Finally, the Order granted Coinbase's motion with respect to Wallet, applying the multi-pronged test as to brokerage activity to the factual allegations in the complaint. *Id.* at 78-84.

## LEGAL STANDARD

"It is a basic tenet of federal law to delay appellate review until a final judgment has been

entered." *Murray v. UBS Securities LLC*, 2014 WL 1316472, at *3 (S.D.N.Y. Apr. 1, 2014) (cleaned up). "[F]ederal practice strongly disfavors discretionary interlocutory appeals [as they] prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *Dill v. JP Morgan Chase Bank, N.A.*, 2021 WL 3406192, at *4 (S.D.N.Y. Aug. 4, 2021) (citation omitted) (denying certification); *see also Murray*, 2014 WL 1316472, at *3 (same); *Chechele v. Standard General LP*, 2022 WL 766244, at *3 (S.D.N.Y. Mar. 14, 2022) (same).

A district court may certify an order for interlocutory appeal when the "order (i) involves a controlling question of law (ii) as to which there is a substantial ground for difference of opinion and (iii) … an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The requirements "are conjunctive, not disjunctive, and courts may only certify an interlocutory appeal where all three are satisfied." *Dill*, 2021 WL 3406192, at *7 (cleaned up). "These three prerequisites create a significant hurdle to certification," *In re Facebook, Inc, IPO Sec. and Dev. Lit.*, 986 F. Supp 2d 524, 529-30 (S.D.N.Y. 2014) (cleaned up), and are to be "strictly construed." *Id.*; *see also Chechele*, 2022 WL 766244, at *3.

"The movant bears the burden of demonstrating that all three of the substantive criteria are met." *Dill*, 2021 WL 3406192, at *4 (citing *Casey v. Long Island R.R. Co.*, 406 F.3d 143, 146 (2d Cir. 2005)). Here, Coinbase fails to satisfy any of the three requirements of Section 1292(b).

## ARGUMENT

### I. COINBASE FAILS TO DEMONSTRATE THAT THE ORDER POSES A CONTROLLING QUESTION OF LAW.

An order may involve a "controlling" question of law when, for example, "'reversal of the district court's order would terminate the action,'" such as issues of personal or subject matter jurisdiction. *Murray*, 2014 WL 1316472, at *3 (quoting *Klinghoffer v. S.N. C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir.1990)). Coinbase admits that reversal of its putative certified question will not terminate

this action, as reversal would only lead to dismissal of part of the case.  Mot. at 9-10.

Another way in which an order may involve a "controlling" question is when reversal, "even though not resulting in dismissal, could significantly affect the conduct of the action" or would have "precedential value for a large number of cases."  *Dill*, 2021 WL 3406192, at *4.  Such an order must also "refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record."  *Id.* (cleaned up).  Coinbase points to these arguments to satisfy the first Section 1292(b) prong (Mot. at 9-11), but its arguments in this regard fail.

Coinbase purports to seek certification merely of "whether some obligation past the point of sale is required … under *Howey*."  Mot. at 8.  Coinbase contends this question forms the basis of the "parties' instant clash" and is "ripe for immediate review" since the SEC did not plead "post-sale obligations."  *Id.*  Coinbase's construction of this question makes it appear simple; but this framing is misleading because the certified question was not the sole basis of the Court's Order.

"[S]ection 1292(b) authorizes certification of *orders* for interlocutory appeal, not certification of *questions*."  *Chechele*, 2022 WL 766244, at *9 (emphasis added) (quoting *Isra Fruit Ltd. v. Agrexco Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986) (collecting cases)).  This Order addresses certain questions that Coinbase now asks this Court to forget, some which Coinbase advanced based upon the lengthy recitation of facts Coinbase saw fit to include as a preface to its Answer.  This includes arguments enveloping Coinbase's constitutional defenses, the Staking Program, and the application of *Howey* to the allegations in the Complaint.  Order at 14-19, 31-39, 47-54, 61-78.  The Order also disposed of Coinbase's invented requirements not just about the "contractual obligations," but also about supposed distinctions between buying a token directly from an issuer or in a secondary market transaction, and the requirement that an investment contract confer rights to profits in a business.  *Id.* at 50-51, 54-58.

This equivocation is evident in the Motion itself.  In arguing that the question it seeks to certify

would not require an analysis of the record, Coinbase focuses on the supposed "purely legal question" as to "contractual obligations." Mot. at 8-9.  A few moments later, however, Coinbase argues that what is urgently needed is "a Second Circuit opinion addressing" a much different question—"*Howey*'s application to digital asset transactions" as a whole (*id.* at 10)—a question that goes far beyond the supposedly "pure" question about "contractual obligations."  Similarly, attempting to meet the "precedential value for a number of cases" factor, Coinbase again pivots away from the "contractual obligations" question, this time into "[h]ow *Howey* applies to secondary-market crypto transactions." Mot. at 11.[1]  Coinbase goes further astray when it relaunches into grievances akin to its affirmative defenses, based on supposed "shifting conceptions" by the SEC.  *Id.* at 12-13; *see also id.* at 19 (noting supposed difference of opinion as to application of the Major Questions Doctrine to this case).  This argument is on its face intertwined with and dependent upon a series of speeches, filings, hearings, and statements that are far beyond the scope of the motion for judgment on the pleadings and the Order—this is why Coinbase added pages of them to its Answer and a whole host of new ones to its Motion for good measure.

Varying formulations of the proposed question preclude finding a controlling issue.  Coinbase cannot decide which of its many arguments that the Order rejected it truly seeks to appeal, nor can it even make up its mind about what the "contractual obligation" test itself supposedly requires.  It is simply impossible to discern whether the issue(s) Coinbase seeks to certify meet(s) the first Section 1292(b) factor.  *Cf. Dill*, 2021 WL 3406192, at *6 (first factor not met where the movant shifted

---

[1]      The SEC pleaded that "Coinbase typically does not limit or restrict the ability of crypto asset issuers or promoters (or their agents) to trade on the Coinbase Platform" (Complaint at ¶ 65) and Coinbase admitted that "digital asset issuers and their affiliates may be permitted, subject to certain restrictions, to … engage in secondary market transactions on the Coinbase platform" (Answer at ¶ 65).  Those claims are thus not affected by Coinbase's argument that sales between two investors on a crypto asset trading platform categorically do not meet *Howey*.  Thus, Coinbase does not further press the notion that the blanket "secondary market transactions" argument is a "controlling" question.

between questions proposed for certification).[2]

Even if the issue presented could properly be framed as whatever question Coinbase now conveniently seeks to certify, and even assuming that, on reply, Coinbase could discipline itself into articulating a single, cohesive theory about the supposedly required "contractual undertakings," the first factor would not be met. While the invented "contractual undertakings" theory may have "more traction" as a pure legal question, the "controlling question argument rises or falls—and, in this case, falls—on the second prong of the analysis." *Chechele*, 2022 WL 766244, at *9.

## II.   THERE IS NO SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION AS TO ANY ISSUES RESOLVED IN THE ORDER.

"A substantial ground for difference of opinion exists when [i] there is conflicting authority on the issue, or [ii] the issue is particularly difficult and of first impression for the Second Circuit." *Murray*, 2014 WL 1316472, at *5 (cleaned up). However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996). "Rather, the district court must 'analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute.'" *Murray*, 2014 WL 1316472, at *6 (quoting *In Re Flor*, 79 F.3d at 284) (emphasis in original).

A substantial ground for dispute is something more than a disagreement between parties or courts, and alleging that the "court was incorrect … is not enough." *Bellino v. JP Morgan Chase Bank, NA*, 2017 WL 129021, at *3 (S.D.N.Y. Jan. 13, 2017). Instead, there must be "substantial doubt that

---

[2]     Coinbase mischaracterizes the SEC's argument in seeking interlocutory review of the motion for summary judgment in *Ripple*. The SEC did not, as Coinbase contends, "urge[] that whether transactions on *crypto exchanges* involve 'investment contracts' is a 'pure legal question.'" Mot. at 8 (emphasis added). It argued that whether "*issuer* offers or sales over trading platforms … satisfy *Howey*'s requirements" was such a question. Br. in *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (D.E. 893) at 10 (S.D.N.Y. Aug. 18, 2023) (emphasis added). Additionally, the SEC sought leave to appeal in *Ripple* after summary judgment motion practice and a fully developed factual record—a very different procedural posture from what is present here.

the district court's order was correct." *Chechele*, 2022 WL 766244, at *9. Similarly, "being merely a difficult ruling is not an adequate reason for interlocutory appeal" (*In re Facebook*, 986 F. Supp. 2d at 543 (cleaned up)) since "Section 1292(b) was not intended … to be a vehicle to provide early review of difficult rulings" (*Lidle v. Cirrus Design Corp.*, 2010 WL 4345733, at *2 (S.D.N.Y. Oct. 29, 2010)). Here, Coinbase fails to establish that any version of the legal question it seeks to certify is subject to substantial ground for difference of opinion, which is independently fatal to its Motion.[3]

A.   **No Court has Required "Contractual Undertakings" as an Additional Element of *Howey*.**

Coinbase purports to seeks certification of "whether some obligation past the point of sale is required for a transaction to involve an investment contract under *Howey*." Mot. at 8. Yet, as this Court explained, "no court" in the eighty years since *Howey* has required contractual undertakings to find the existence of an investment contract. Order at 58 ("Ultimately, since *Howey*, no court has adopted a contractual undertaking requirement."). Confirming the correctness of the Court's Order in this regard, courts in this District, including the *Ripple* decision on which Coinbase so extensively relies, have uniformly rejected the invitation to insert this prong into *Howey*, and have done so repeatedly and specifically with respect to transactions involving crypto assets. *Id.* ("[A]s previously noted, courts in this Circuit have repeatedly rejected efforts by defendants in the cryptocurrency industry to insert such a requirement into their *Howey* analysis." (citing *Terraform I* and *Kik*); *see also SEC v. Ripple*, 682 F. Supp. 3d 308, 323 (S.D.N.Y. 2023) ("*Ripple I*") ("the Court rejects Defendants' argument that all investment contracts must include post-sale obligations of the promoter").

The Motion does not persuasively contend otherwise. In arguing that the "grounds for disagreement" on this point are "pronounced" Coinbase simply resorts to arguments advanced in support of its original motion (including statements in an SEC brief that Coinbase misconstrues), not

---

[3]   Indeed, Coinbase devotes only two pages of its Motion even attempting to argue that any of the Order's *Howey*-related findings are incorrect or conflict with any legal authority. Mot. 13-15.

to any legal authority, let alone any inconsistent with this ruling.  Mot. at 17.  As "the issues raised by [Coinbase] are a repeat of the arguments [it] unsuccessfully raised in the [original motion]," certification is "not appropriate."  *In re Facebook*, 986 F. Supp 2d at 530-31.

Coinbase similarly relitigates its losing argument that the SEC's claims supposedly sweep in purchases of commodities.  Mot. at 17-18.  In doing so, Coinbase ignores that here, too, the Order based its rejection of the false equivalence between a crypto asset and "Taylor Swift concert tickets" on persuasive legal authority (and common sense).  Order at 59-60.  Rather than citing any case that conflicts with the Order, Coinbase again offers nothing but SEC briefs, as well as a gross mischaracterization of *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352 (1943).  While Coinbase suggests that *Joiner* somehow forecloses an economic reality-based analysis of the totality of the circumstances of a transaction, *Joiner* is fatal to Coinbase.  It shows that, even if one accepts the labels-driven characterization of crypto assets as "commodities," their offer and sale on Coinbase's platform would fall "within the facts of a long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts."  *Glen-Arden Commodities v. Constantino*, 493 F.2d 1027, 1034-35 (2d Cir. 1974) (analyzing and citing *Joiner* and *Howey*).

The Motion fares even worse when the other versions of Coinbase's invented "contractual obligations" requirement are scrutinized under Section 1292(b)'s second prong.  Coinbase can offer no case whatsoever supporting the notion that investment contracts require that a "promoter has created the impression of a contractual undertaking," (MJOP Reply at 3 n.2), or that *Howey* requires "the holding out of an offer that includes a statement meant to convey to the offeree some sort of enforceable right," or "the appearance of [a]n offering or instrument that carries with it the contractual obligation."  Hr'g Tr. at 85:25-86:8; 167:9-24.  No such case exists, and Coinbase's inability to plainly and cleanly state what it claims the law requires fatally undermines any argument that there is a "substantial" ground for a difference of opinion as to that requirement.

Accordingly, there is simply no "strength" to any of Coinbase's "arguments in opposition to the challenged ruling" sufficient to demonstrate that Coinbase's proposed issue for appeal is "truly one on which there is a *substantial* ground for dispute." *Dill*, 2021 WL 3406192, at *8.

Undaunted, Coinbase notes that because of the supposed lack of "appellate court" decisions as to "post-sale obligations," and the supposed lack of "definitive precedent," the question it seeks to certify is a "difficult one" and certification is warranted. Mot. at 15, 16. But the only difficulty here is the one Coinbase is having formulating the question for appeal, and absent a straightforward statement of that question, it is hard to know what "definitive precedent" to look for. In any case, interlocutory review was "not intended … to be a vehicle to provide early review of difficult rulings" (*Lidle*, 2010 WL 4345733, at *2), or to speed up appellate review for a litigant who claims authority "is sorely needed" (Mot. at 12, 15, 18) in the face of eighty years of that authority. In other words, Coinbase need look no further than *Howey* for the "definitive precedent" it seeks as to the various incarnations of the questions it wishes to certify.[4]

---

[4]      In *1050 Tenants Corp. v Jakobson* (Mot. at 16) the Second Circuit reviewed an interlocutory order applying *Howey*, but neither it nor the district court explained why the Section 1292(b) factors were met. 503 F.2d 1375 (2d Cir. 1974). Accordingly, that case cannot stand for the proposition Coinbase appears to advance it for, that an issue "of first impression" (Mot. at 16) alone satisfies Section 1292(b)'s second prong. To the contrary, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Murray*, 2014 WL 1316472, at *6. In any event, this Court applied 80 years of case law interpreting *Howey* to the facts alleged in the Complaint—as a result it can hardly be said that the Order disposed of an issue of first impression. Similarly, Coinbase's suggestion that the concept of a crypto asset's "ecosystem" is novel (*e.g.*, Mot. at 4) should be rejected out of hand. *See, e.g.*, *Kik*, 492 F. Supp. 3d at 178 ("The success of the *ecosystem* drove demand for Kin and thus dictated investors' profits.") (emphasis added); *SEC* v. *Telegram Group Inc.*, 448 F. Supp. 3d 352, 362 (S.D.N.Y. 2020) ("Telegram's existing *ecosystem* will offer simple ways of buying the TON coins (Grams) and a range of services to spend them on, driving demand for the cryptocurrency.") (emphasis added); *SEC* v. *LBRY, Inc.*, 639 F. Supp. 3d 211, 218 (D.N.H. 2022) ("Vine's response betrayed LBRY's powerbroking role within its *ecosystem*") (emphasis added); *Terraform*, 2023 WL 4858299, at *14 ("In particular, they said that profits from the continued sale of LUNA coins would be fed back into further development of the Terraform *ecosystem*, which would, in turn, increase the value of the LUNA coins.") (emphasis added). The contention is also belied by Coinbase's own conduct. For every one of the tokens in the Complaint, save VGX, Coinbase displays on Coinbase.com a section that details and explains the respective token

**B.      Coinbase Cannot Otherwise Point to a Substantial Difference of Opinion.**

As it did during its attempt to meet Section 1292(b)'s first prong, Coinbase uses a sleight of hand to manufacture a difference of opinion to justify interlocutory review.  Although Coinbase frames the question it seeks to certify in terms of "contractual obligations" (Mot. at 8-9), its arguments regarding the second prong of Section 1292(b) address how *Howey* should be applied to secondary market crypto-asset transactions. Mot. at 14 ("Courts in this District disagree about how *Howey* applies to crypto transactions."); *id.* (alleging there is different treatment as to "whether transactions in digital assets gave rise to an investment contract").  This is a different question and one that requires the Court to "engag[e] in a fact-intensive application" to an incomplete record.  Order at 39, 47-54.  The reason for such sleight of hand is obvious—as shown, there is no dispute as to the inclusion of a "contractual undertaking" requirement in *Howey*.  That Coinbase cannot demonstrate any substantial dispute "*as to*" the question it seeks to certify (28 U.S.C. § 1292(b)), provides yet another independent ground to deny the Motion.

Notwithstanding all of this, there is also no substantial ground for difference of opinion even as to Coinbase's other questions.  For example, in analyzing the second Section 1292(b) prong, Coinbase once again abandons the supposedly pure and clean "contractual undertakings" question, returns to its argument that investment contracts require "an interest in income, profits, or assets of a business" (Mot. at 18 (citing Order at 48-50)), and appears to contend this question has led to substantial disagreement.  Specifically, Coinbase argues that the Order "parted ways" with the Seventh Circuit's decision in the time-share condominium case, *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994), in rejecting Coinbase's arguments.  Mot. at 18.  Not so.  The Court's decision was grounded in controlling Supreme Court authority—*Edwards*.  Order at 50.  Elsewhere, the Order also noted the

---

and the relationship to its "ecosystem."   *See, e.g.*,   https://www.coinbase.com/price/solana; https://www.coinbase.com/price/cardano.

Court was "not swayed" by "reliance on cases involving real estate transactions," just as the *Kik* court was not. *Id.* at 57. Nor does *Wals* require the characteristics Coinbase claims. *See* SEC Br. at 8-9. Coinbase's incorrect contention that the Order is wrong in this regard is, again, just "simple disagreement on the issue" and an attempt to relitigate it. *Chechele*, 2022 WL 766244, at *9.

Nor can Coinbase offer any cases that diverge from this Court's Order rejecting Coinbase's blanket argument that secondary market transactions in crypto assets can never constitute investment contracts. The courts that have analyzed whether secondary market transactions in crypto assets were securities, based upon the facts and circumstances of the transactions at issue, have concluded *Howey* was satisfied. *See, e.g.*, *Patterson v. Jump Trading, LLC*, 2024 WL 49055, at *11-12 (N.D. Cal. Jan. 4, 2024) (transactions by retail investors of crypto assets on trading platforms constituted investment contracts); *SEC v. Wahi*, 2024 WL 896148, at *6-7 (W.D. Wash. Mar. 1, 2024) (purchases by insider trader of crypto assets on trading platforms constituted investment contracts). While Coinbase invokes *Ripple* in this regard, the court there specifically explained that it was *not* reaching the issue of how *Howey* applies in secondary market resale transactions, because the question was not at issue there, and because, in any case, the determination would depend on the specific circumstances of the "transaction, contract, or scheme." 682 F. Supp. 3d at 329 n.16.

*Terraform* and *Ripple* do explicitly diverge on whether the "manner of sale" is a relevant factor in whether sales by an *issuer* to a retail investor constitute investment contracts. *Compare Ripple*, 682 F. Supp. 3d at 329 (considering "blind bid/ask" nature of transactions) *with Terraform*, 2023 WL 4858299, at 815 ("reject[ing]" that approach). But that is not the dispute Coinbase seeks to certify. Nor do the different outcomes in *Ripple* and *Terraform*, and those courts' disagreement over the relevance of the manner of sale, show "substantial" ground for difference of opinion *as to the question Coinbase seeks to certify*, which was not the question at issue in the SEC's bid for certification in *Ripple*, either. In any

event, and tellingly, no court has followed *Ripple*. *See also Jump Trading*, 2024 WL 49055, at *11-12 (citing *Terraform I*); *Wahi*, 2024 WL 896148, at *6-7 (same).

In analogous circumstances, this Court was "not willing to recognize a 'substantial ground for difference of opinion' with 80 years of precedent, based on a single Supreme Court case involving the SEC in a different procedural context." *Chechele*, 2022 WL 766244, at *10. Here, where the "challenged transactions" also "fall comfortably within the framework that courts have used to identify securities for nearly eighty years" (Order at 2), the Court should do the same.

Nor can Coinbase's contention that *Terraform II* somehow "increase[ed] the unpredictability" as to the "contractual obligations" question be taken seriously. *See* Mot. at 15 (citing 2023 WL 8944860, at *13-15). That some cases involve contractual obligations as a factual matter does not mean they are *required*. *E.g.*, *Ripple*, 682 F. Supp. 3d at 322 (rejecting "contractual obligations" argument, reasoning that even if past cases "shared some common features does not convert those common features into requirements … under *Howey*"). Thus, that Judge Rakoff considered all the facts and circumstances, including contractual obligations, is unremarkable and not an indication that he was reading new requirements into *Howey* or walking away from his decision on the motion to dismiss that such features are not mandatory. *See also Terraform*, 2023 WL 8944860, at *13.

Recently, the court in *SEC v. Arbitrade* grappled with an almost identical issue when faced with a motion for leave to certify interlocutory appeal of a ruling that the SEC had sufficiently pleaded transactions in a crypto asset satisfied *Howey*. 2024 WL 962372 (S.D. Fla. Mar. 6, 2024). There, after the court denied a motion to dismiss the SEC's complaint, the defendant moved for leave to certify an interlocutory appeal on the question of "[w]hether digital asset sales on trading platforms constitute securities transactions under the *Howey* test." *Id.* at *3. Relying primarily on *Ripple I* and *Terraform I*, as well as "the Commission's attempt to certify the decision in *Ripple I* for interlocutory appeal," the defendant argued there existed a "substantial ground for difference of opinion justifying certifying his

proposed question for interlocutory appeal." *Id.* at *8-9.  The court rejected the request for interlocutory review, reasoning that a defendant "cannot meet his burden under [Section] 1292(b) by pointing to the Commission's conduct in another case." *Id.* at *8.  The court found that this "is particularly the case considering *Ripple II* denied the Commission's request to certify an interlocutory appeal." *Id.*  (discussing *SEC v. Ripple Labs, Inc.*, 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023)).

Unable to muster any support for its purported application of Section 1292(b)'s second prong to the various issues in the Order, Coinbase resorts to supposedly "divergent opinions across and within the branches of government" as to the SEC's authority to bring this case.  (Mot. at 16.) Coinbase cites no case holding that disagreement on policy matters satisfies Section 1292(b)'s second prong.  To the contrary, because "[t]he fact that there is some level of disagreement *among the courts* does not mean … that the standards of 1292(b) are necessarily satisfied" (*Dill*, 2021 WL 3406192, at *9 (emphasis added)), it is hard to see how disagreements *outside* the courts could qualify—at least not without turning any case that garners public attention instantly certifiable.

Fundamentally, Coinbase's use of its newly created and uniformly rejected legal test to justify interlocutory review would render the rule of finality illusory and turn the doctrine on its head. Coinbase's certified question argues for, at a minimum, a rewriting of *Howey.*  It now claims an immediate right to interlocutory review when this Court correctly and summarily rejected Coinbase's attempt to do so.  *See Terraform*, 2023 WL 8944860, at *13 ("*Howey's* definition of 'investment contract' was and remains a binding statement of the law.").  If a movant is permitted to invent a new legal test—one without legal support—and, when correctly rejected by the district court based upon settled law, obtain interlocutory review, the rare exception provided by Section 1292(b) would swallow the rule of finality and make hollow the "basic tenet of federal law to delay appellate review until final judgment." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996).  The Court should "reject[] these efforts by [Coinbase] to concoct a legal dispute worthy of interlocutory appeal." *Dill*, 2021 WL

3406192, at *7.

### III.   INTERLOCUTORY REVIEW WOULD NOT MATERIALLY ADVANCE THE TERMINATION OF THIS LITIGATION.

"An immediate appeal is considered to advance the ultimate termination of the litigation if that appeal *promises* to advance the time for trial or to shorten the time required for trial."  *Murray*, 2014 WL 1316472, at *7 (emphasis added).  Accordingly, the last Section 1292(b) factor is "closely connected" to whether there is a controlling issue of law.  *In re Facebook*, 986 F. Supp 2d at 536.  The possibility that the appeals court may affirm the district court's order—or decline to hear the appeal—must also be considered, as that will only serve to unnecessarily delay the action by the interlocutory appeal and inefficient multiple appeals.  *See, e.g.*, *Murray*, 2014 WL 1316472, at *7; *Arbitrade*, 2024 WL 962372, at *11 ("The more likely scenario is a considerable delay in these proceedings while the parties await a decision from the Eleventh Circuit.  If the Eleventh Circuit [affirms] the net result of an interlocutory appeal will simply be delay and additional expense.").

Moreover, courts find interlocutory appeal impractical—and therefore the third prong of Section 1292(b) unsatisfied—when even reversal would not wholly terminate the action and leave claims remaining that relate to other claims (such as the Staking Program claims, which also turn on *Howey*).  *See Isra Fruit Ltd*, 804 F.2d at 26 (concluding that where two issues are "closely related," even if one "were dismissed at this stage in the litigation, there is scant basis for believing that trial of the latter claims would be concluded with any appreciable saving of time"); *Pereira v. Cogan,* 265 B.R. 32, 34 (S.D.N.Y. 2001) (certification is "inappropriate when the remaining claims in the lawsuit [are] closely related") (cleaned up); *In re Blech Sec. Litig.*, 2003 WL 134988, at *3 (S.D.N.Y. Jan. 17, 2003) (same).

Critically, a high degree of "confidence in [the court's] prior decision" militates against certification under this factor.  *Murray*, 2014 WL 1316472, at *7.  Given the unassailable correctness of the Order (*see supra* §§ I, II), Coinbase's burden as to the third factor is particularly heavy, and

Coinbase cannot meet it for three independent reasons.

First, Coinbase's contention that absent interlocutory review it will have to devote "substantial resources and attention" towards the "facts and subsidiary legal issues concerning each of the 12 tokens pleaded" (Mot. at 20), overstates Coinbase's burden.  Coinbase avers that it has already conducted significant due diligence on all tokens listed on its platform and therefore already has considered much of the relevant information.  *See* Answer at ¶ 55 ("Coinbase established a systematic analytical process for reviewing crypto assets and screening from listing those that could be deemed 'securities'"); at ¶ 56 ("Before any token is listed, it must be approved by [Coinbase's] Digital Asset Support Group ('DASG')"); at ¶ 58 ("The DASG review process is designed to identify and screen assets posing a high risk that the SEC might deem them 'securities.'").

Second, given that Coinbase does not purport to certify all grounds for denial in the Order, including as to the Staking Program, the prospect of piecemeal appeals is all but assured.  *Koehler*, 101 F.3d at 865-66 ("the final judgment rule … generally prohibits piecemeal appeals").  Litigation on this remaining claim will require fact and expert discovery regarding, among other things, Coinbase's efforts in managing and operating its Staking Program, and the application of *Howey* to the facts discovered—not to mention discovery and subsequent motion practice on remedies if the SEC were to prevail.  And Coinbase has reserved a second bite at the apple by purportedly (though not entirely unequivocally) not seeking to appeal its constitutional defenses now.  This equivocation suggests that Coinbase may still determine to raise the Major Questions Doctrine should the Second Circuit agree to hear this appeal (*see* Mot. at 19), and then to raise it again as to the Staking Program.

Third, Coinbase's efficiency argument only gains some traction if the Second Circuit reverses on the "contractual obligations" question.  "[I]f the Second Circuit affirms the Court's decision, or rather yet, declines to hear [the] appeal, the result will be that this action will have been unnecessarily delayed by the interlocutory appeal." *Murray*, 2014 WL 1316472, at *7.  The current posture of this

case indicates that it is entirely possible—if not likely—that much of it will be litigated before the Second Circuit issues a decision on any interlocutory appeal. *See* Civil Case Mgt. Plan and Scheduling Order at ¶ 7, 19 (D.E. 116) (all discovery closing by December 20, 2024, and providing for a two-to-three-week trial). The Order also narrowed the issues of law and areas of discovery to be litigated, noting that several of Coinbase's affirmative defenses are not viable as a matter of law. Order at 32-39. "[I]t is safe to assume that the appeal process will take longer than" the district court litigation. *Murray*, 2014 WL 1316472, at *7.

In sum, granting interlocutory review at this juncture will not serve to increase the "institutional efficiency of the federal judiciary;" instead, it will reduce it. *In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 1871012, at *3 (S.D.N.Y. Aug. 9, 2005). Given "these competing outcomes, the … confidence in [the Court's] prior decision, and the fact that certifying the issues for interlocutory appeal would only delay adjudication of the merits of this action," the Court should not "find that granting certification would 'promise' to advance the ultimate termination of this action so as to establish this final requirement." *Id.*

## IV.   ADDITIONAL FACTORS WARRANT DENYING THE MOTION.

"[E]ven where the three legislative criteria of Section [ ] 1292(b) appear to be met, district courts retain unfettered discretion to deny certification if other factors counsel against it." *Dill*, 2021 WL 3406192, *4. Here, as noted, Coinbase cannot meet a single Section 1292(b) factor. Even if it did, the additional factors Coinbase invokes counsel against, not for, certification.

To be sure, Coinbase is correct that the Order could have persuasive value in other cases and may even affect their outcome, just as the order the SEC sought to certify in *Ripple* could. *See generally* Mot. at 9-11 (citing SEC's *Ripple* briefs and other cases). Nor is there any doubt that the SEC's enforcement actions in the crypto space have garnered attention from various parties. But Coinbase and *amici's* prudential arguments for certification—specifically, claims about "a cloud of uncertainty"

(Mot. at 1, 21)—ultimately show that certification is not warranted.  It is Coinbase, not the SEC, that is engaging in "self-help" (*id.* at 4) to achieve the legal outcome it desires with respect to the application of the federal securities laws to its activities.  *See, e.g.*, *Amicus Curiae* Br. filed by Coinbase, Inc. in *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (D.E. 705) (S.D.N.Y.  Nov. 15, 2022); *In re Coinbase, Inc.*, No. 23-1779 (3rd Cir.) *filed* Apr. 26, 2023; *Coinbase v. SEC*, No. 23-3202 (3d Cir.) *filed* Dec. 15, 2023.

Coinbase claims to seek legal clarity—but it ignores the light that this Court's Order provided. Coinbase's claim to simply seek appellate level precedent rings hollow given the extensive body of case law applying *Howey* at every level of the judiciary.  *See LBRY, Inc.*, 639 F. Supp. 3d at 221 (describing *Howey* as "venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years"); *Zaslavskiy*, 2018 WL 4346339 at *9 (noting the "abundance of caselaw interpreting and applying *Howey*, at all levels of the judiciary").  Or maybe Coinbase wants an appellate court to apply *Howey* to crypto assets, as the myriad, uniform district court decisions that have come out against Coinbase's arguments are not sufficient "clarity."  Even in that regard, however, Coinbase ignores that courts "must consider the institutional efficiency of the federal judiciary when considering an application for Section 1292(b) certification."  *In re Currency Conversion Fee Antitrust Litig.*, 2005 WL 1871012, at *3.  The two principal cases Coinbase points to—*Terraform* and *Ripple*—are both fully briefed as to remedies and could provide the very vehicle for appellate resolution and controlling authority Coinbase claims to seek.  *See SEC v. Terraform*, No. 23 Civ. 1346 (D.E. 246) (S.D.N.Y. May 6, 2024); *SEC v. Ripple*, No. 20 Civ. 10832 (D.E. 962) (S.D.N.Y. May 7, 2024).  Considerations of judicial economy warrant permitting the Court of Appeals to consider the matters with fully developed factual records, rather than burdening its docket with unripe ones.

It is also possible that Coinbase simply does not like the answer provided for years now by the SEC and the courts, having decided to structure its business in ways that now may make it difficult or costly to comply with the securities framework put in place by Congress and the SEC over our capital

markets for nearly a century.  But Coinbase's desire to change the rules, to do so quickly, and to enlist the federal judiciary in this endeavor, supply no basis to certify an appeal.

## <u>CONCLUSION</u>

For the foregoing reasons, Coinbase's Motion should be denied.

Dated:  May 10, 2024

Respectfully submitted,

 /s/ *Peter A. Mancuso*
Peter A. Mancuso
Jorge G. Tenreiro
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004
Tel: (212) 336-5562 (Mancuso)
MancusoPe@sec.gov

Patrick R. Costello
Nicholas C. Margida
David S. Mendel
Rebecca R. Dunnan
SECURITIES AND EXCHANGE
COMMISSION
100 F. Street NE
Washington, DC 20549

*Attorneys for Plaintiff*