# EXHIBIT G

I'm a former regulator. I ran the Commodity Futures Trading Commission. But this course is not about regulation, though we have to always come back to regulation. We always have to infuse what we're doing with the regulation.

But let me just give you a little framework. And then you'll have to be bored in a handful of weeks and read I gave some congressional testimony on it. Yes, it will be required reading, sorry. But it's guarding against illicit activity.

A lot of Bitcoin and cryptocurrencies started out in the cyber punk sort of movement and libertarian movement, so forth. And it is true. You can use this for illicit activity, absolutely. But would say, crime is not new, just the mechanisms and means are new. And so the criminals, yes, will use this and have used it for illicit activity.

Financial stability central bankers around the globe, sort of will this shake finance? Well, it's only $200 billion. The financial markets are $300 trillion plus not yet, is generally what they're saying. But for some countries, it's a way to get around capital controls. And so for those countries worried about capital controls, it's a very real and live set of issues.

And then protecting the investing public and when we do this in a few weeks, I'll go through each of these, the investor protection issues, and yes, the SEC, how we test, and the like. For those who wish to do their own initial coin offering, I'll give some broad sense of what the SEC is trying to accomplish. But it's a moving target.

So this is a very interesting thing. As opposed to many of your Sloan classes, or your C cell classes, or Media Lab classes, this is a very unsettled area of public policy. So it makes it interesting. And if you all go off and form companies, you will actually be helping sort of set the edge of that public policy debate.

I would always say, just remember poet Riley, the duck test. This is a poet, Indiana poet so those that aren't from the US might not know the duck test. But basically, if it quacks like a duck and it walks like a duck, it's a duck. So whenever you're thinking about public policy, folks like myself who once was a regulator, we think in the duck test.

And then we secondarily think about the actual words in the congressional act. Where is the common sense? And if it quacks and walks like a duck, it's probably a security. Or it's probably this or that.

Coindesk article. How many of you actually skimmed it, looked at it? Did it mean anything to you, or just meant that there's some alternative? What's that, Prya?

**AUDIENCE:** Just that there's some alternative.

**GARY GENSLER:** There's some alternative. That's what it meant to me the first time I looked into this about six months ago. But I want to just mention what the alternatives come down to.

They generally randomized or delegate the selection. So rather than saying any one of 10,000 nodes can prove that this works, they use various mathematical means — randomized or delegated. And sometimes they do a little bit of delegation and randomization to pick who's going to validate the next block.

It all comes down to who is picking the next block. Is it by Adam Back's sort of, as Satoshi Nakamoto put out there, we'll call it Nakamoto consensus, proof of work? And you'll have a paper for Thursday that talks about Nakamoto Consensus, the Clark paper. But — or is there some other randomized, delegated way to do it?

In some of them, they have a second check. If there's a delegated person to validate something, they put a second check in there that there's another group that officiates and says whether it's correct. And so there's proof of stake, which is based on the stake you have in the underlying currency. There's proof of activity, which is kind of a hybrid of proof of work and proof of stake.

Proof of burn — are you willing to give up coins? Proof of capacity — do you have storage capacity? And you might have a tiered system.

The major permissionless blockchains all use proof of work. And the reason is nobody's really solved — all of these other alternatives, no one's really solved for a couple of problems in them. But they usually find a way to be more efficient through delegation and randomization, and might have a backup set of checks on it.

DASH and NEO will say that they use proof of stake. But they're actually kind of using some form of masternodes or set up professional nodes. But DASH and NEO are kind of, I think, the 13th and 15th largest market value cryptos, which means everything else kind of

And Ripple doesn't — Ripple's really almost like a permission system rather than permissionless. I mean, they would say they're permissionless. But it's a confirmed set of

112

nodes in the node system.

So that's it for today. We're going to do transactions on Thursday. I moved that study question And then I'm going to ask you to read through the Clark paper, which is really the academic pedigree. Where is this built on? What's the background? But I think it's a good way to bring it all together.

And remember on Thursday, you all come in to answer this question  your own view as to who Satoshi Nakamoto is. There is no right answer. But if MIT's Blockchain and Money class can answer that, I'm sure that we'll get a write up somewhere about it.

The transactions are stored in Merkle keys. But guess what? If you were really interested and wanted to learn everything about Ethereum, there's at least four key Merkle trees that get summarized up into the block headers.

There's the transactions, which, in essence, aren't transactions. They call them state transitions. There's the state itself, something called storage, which is really related to each one of the individual Ethereum accounts, and then, believe it or not, actually, receipts. There's written records of receipts from every state transition.

So there's a lot more complexity inside the Ethereum blockchain. They run about 14 seconds a block instead of 10 minutes. And that change is a bunch of the economics.

Proof of work, for some reason, which others can study. Vatalik decided to use a different hash function. It's still based on elliptic curves, I think, but a different hash function.

What about the economics? Well, it's called ETH or E T H. It's programmed in such a way that you can't use ASICs, purposely makes it that mining is more decentralized, and you don't have the big factories.

The entire hash community, the entire mining community, is much smaller. In fact, I think it's about   what would that be? 200,000 times smaller. There's 260 terahashes per second as of yesterday. And the bitcoin mining community has 54 exahashes. That means lots more computers, a lot more electricity, a lot more gnashing of teeth about resources.

Bitcoin started in January of 2009. And nobody owned any bitcoin, whereas Ethereum started with a presale and an ICO, which we'll be talking about, about 72 million Ethereum.

Vatalik wanted to raise money he was maybe 19 years old. He looped in with a venture capitalist from Canada, Joe Lubin, who now runs ConsenSys. Lubin took about 10% or 9 and 1/2% of the offering. They put 9 and 1/2% in a foundation called the Ethereum Foundation. And the other 80% was sold to the public for $18 million.

We'll talk later in the semester as to whether that was really a securities offering. I've publicly said I think so, but that was in 2014. And in 2018, the Securities and Exchange Commission has said regardless of why it might have been in '14, it's now sufficiently decentralized that we'll consider it not a security.

But in essence, they raised $18 million and were off to the races. Oh, and the 10% that Joe

150

And what Nakamoto consensus is, is he said, well, no. We're not going to have Haber and a central authority. It's going to be decentralized.

So these other consensus protocols generally have some randomized approach to delegate the selection of the next block. It's not always that way. But they may also have a mechanism to do a second thing — a second touch.

Silvio Micali's algorand — he's a professor over in the Computer Science and AI Lab and a Turing Award winner. He's got a company that has an interesting thing. It's like a jury selection. It's like picking somebody for the jury that's picking this short group of 12 nodes that might do something. And every block has that selection process. But then there's another broader group that then can check the work of the jury.

So often, there's kind of a second automated way, because trust isn't there, ensuring that there's a quick second check. Did they decide guilty or innocent correctly, so to speak. Again, I apologize if I'm a little oversimplifying Silvio's brilliant work.

So it could be proof of stake, proof of activity, proof of burn, as we talked about, proof of capacity. And as I mentioned last week, there's not large scale uses, but DASH and NEO both have some form of this going on right now.

And Ethereum has a big project. I'm confusing their two projects. There's Plasma and there's Casper. Casper is their project to get to prove of stake, but they're not there.

Privacy and security. So I'm trying to remember who raised the contradictory tensions. The contradictory tensions is law enforcement and regulators want more transparency. Even though the FBI did, you know, sort of figure out some Russians were using Bitcoin to mess in our elections, they want some more transparency in financial institutions. Users and even some regulators want less transparency. So it's not — it kind of goes both ways.

But these, I think, are also truly solvable. Well, for consumers, there's DASH and Monero and Zcash. And there's even mechanisms called mixing and tumbling, which I truthfully can't tell you the difference. But I can tell you regulators talk about mixers and tumblers and privacy coins.

When I go to some regulatory conferences — because they sometimes invite me as a former — that middle slide — the privacy coins and the mixers and tumblers — the finance ministries and the law enforcement stuff, that's where they kind of get worried.

197

|  |  |
|---|---|
|  | Madars, you want to come up here and tell us anything about Zcash? Or you want to do it from there, as to what inspired you to do a privacy coin that a bunch of law enforcement folks don't like? |
|  | [LAUGHTER] |
|  | Oh, I don't mean   I mean, but, you know. |
| AUDIENCE: | Obviously. |
| GARY GENSLER: | And it's legal. I mean, it's a coin. It's real. |
| AUDIENCE: | So just like cash can be used for illicit purposes, also systems that provide strong privacy like Torque can be used for illicit purposes. So it's said privacy is a human right, and we shouldn't be giving up our financial independence just because I want to buy a coffee. I don't want to reveal all my other transactions. Well, I think that there are mechanisms how law enforcement can against our regulatory objectives, but privacy I think is fundamental right, so we should fight for it. |
| GARY GENSLER: | And so when did you start working on the project? |
| AUDIENCE: | I think it was 2014 when we started writing the paper. |
| GARY GENSLER: | So you started with a paper. |
| AUDIENCE: | [INAUDIBLE] like prototype, codebase, we put it open source. And then there were the companies that got formed to launch the project. |
| GARY GENSLER: | And I think Zcash now is somewhere around a billion dollar market cap. |
| AUDIENCE: | It fluctuates wildly. |
| GARY GENSLER: | Fluctuates. So that's why you're here. It went down? No, no. You don't need to answer that. Sorry. Privacy. But in essence, what Madars is saying that he came to this   what were you doing in 2014? |
| AUDIENCE: | I was a grad student here at MIT. I was mostly working in zero knowledge groups. |
| GARY GENSLER: | On zero knowledge groups. |

198

**GARY GENSLER:** You think it's just retained earnings?

**AUDIENCE:** They're selling nothing.

**GARY GENSLER:** All right. So the question is, is it earnings? Is it a revenue item when you sell it? Or some people book it as deferred revenue. So there's two ways you can book it. You could also book it as a liability, but it's either deferred revenue or current revenue. All right, what could motivate you to book it as a deferred revenue instead of current revenue? What's that?

**AUDIENCE:** Taxes, probably.

**GARY GENSLER:** Taxes. So some book it as deferred revenues, because they don't want to book taxes. And God knows whether that's really the right way to book it. And others book it right as a revenue item right now. But I don't know of anybody, whether they're booking it as deferred revenues or current revenues, that wants to book it to trigger that it's a security. So most law firms that I understand, they're not they're not accountants, but they don't want their clients to book it in a way that will make it look more like equity. So it's either deferred revenue or current revenue. Some, I've heard, have called it a liability, but I think that's the minority.

**AUDIENCE:** I don't know if it takes too much time to go through a use case to make these examples tangible. If I'm promising to deliver a good, then the company is getting back the tokens, right? How do you put it back out again in the market?

**GARY GENSLER:** So the question is what is the use case. So some use cases, the token is issued and it's really for the community. And some tokens come back to the company. So a file storage, Filecoin, for instance, they raised $250 some million, the equivalent of. And in that case, I think the token would be used within the community rather than back to the company. So even like Ethereum, when you use Ethereum as a form of buying computing power, it doesn't go back to the Ethereum Foundation.

So the most dominant — and that's why it really should be booked as current revenue, because it's not even that the software provider is providing a service later. The most dominant use case is, like in Ethereum, that you're using the Eth for other people in the network. It's a monetary unit that's not coming back. There are some where it comes back, and then it's basically returned to the corporate treasury. So it's two different models. Have I lost you or are you with me?

532

than more ICOs, because it just keeps cutting down the investor enthusiasm. I don't think it's FOMO anymore. What's the opposite of FOMO?

**AUDIENCE:** Here.

**GARY GENSLER:** What's that? So all right, so study questions for next Tuesday is just we're going to go back to ICOs, talk a little bit about the scams and frauds. We're going to talk about the Securities and Exchange Commission. We've already talked a lot about their design feature. So it's going to be like going back to some of the regulatory things. I'll try to look up on the Filecoin questions as well.

We will drop one more reading in, which is just this quick two pager from the SEC from last Friday that may be worthwhile looking at. And this is the best thing I could do to say Happy Thanksgiving. I know it's a Bitcoin turkey, blockchain turkey, and the like. But I do think it's an interesting thing. ICOs are a new means of crowdfunding. And there's been so many different ways to raise money over centuries. This is not equity, it's not debt, it's something else. I don't know how much of it will last three and five years from now, but the idea that you could pre fund an idea, a deferred revenue or some sort, but it's not your revenue, is an interesting evolution in the markets of finance.

But I think if you can't assess the viability of the use case and figure out what really is the benefit of the token economics    that comes back to, is there really a benefit to having a native token on a network for a good or a service, for file storage, for ride sharing, and so forth? And then I think this will just be looked back    decades from now, people look back and say, well, that was a small, little, odd thing that happened back there in the 2010s. But it might be. I'm not all the way to zero. I think there might be a reason why folks want to have a native currency, a native token to jumpstart a network and to motivate a network over time, whether it's like swords and skins and shields in a gaming site.

The majority of ICOs have failed already. And because they keep failing so fast    I don't know    by the end of this year or certainly by the middle of next year, over 90% or 95% of them will have failed, like if you take the whole total. So it's pretty clear it's going to come down. There's going to be less and less probably in this ICO thing. It doesn't mean that blockchain technology is over. It just means that this wave, I think, will diminish. So Happy Thanksgiving. Is there a question before we all go to Thanksgiving and airports and trains?

**AUDIENCE:** Just a quick question. Does any ICO take ownership of the company besides [INAUDIBLE]

538

**GARY GENSLER:** So we'll talk about this Tuesday. The question is, can you ever have an ownership right in a token? The answer is yes, you could structure it to have voting rights, governance rights, dividend rights. There are a handful that have done that. But after the DAO or DAO issuance, which did give some governance rights and cash flow rights, the SEC spoke to that in a paper one year ago or 15 months ago. There's very few of them. Most of them are what you would call either utility tokens or service tokens, where you have a right to get a service or a good usually from the rest of that network, rather than back. I'll check on Filecoin, but the answer is yes you can do it, but it's a rare case that does it. So thank you. Happy Thanksgiving. Thank you for all being in this class.

[APPLAUSE]

And then you get to some issuers who have to deal with multiple jurisdictions. And almost every large corporation that has investors in multiple jurisdictions has to deal with the investor laws in multiple jurisdictions. So initial coin offerings, if they want to tap into US 328 million people to buy some of these, it's more than a de minimis.

It's not a majority. US law doesn't need a majority. It just has to be more than a handful. US Securities and Exchange Commission might exert its jurisdiction. It doesn't always. So please.

**AUDIENCE:** So some of these ICOs, Filecoin, I think, included, only sold to accredited investors. In my mind, that doesn't really change the definition of security or highly taxed or jurisdiction. So what is the benefit of only selling to accredited investors?

**GARY GENSLER:** Can I hold that, because I'm going to slide on that? But it's a very good question. So the Ernst & Young study   and I promise we'll get to it. So one year later, they looked at the top 141 ICOs of 2017.

I haven't looked at the whole list. But I think they pretty much got the top end. 86% are trading below listed price as of September 30. This does not take into consideration the last week. But the number would go up   86% nine months later.

30% have lost substantially all their value, and not necessarily scams and frauds. But it's interesting to compare that to Christian Catalini's 25% scam or fraud number. But these are the top 141 in size. These aren't the small riff raff size.

Collectively, the portfolio is down 66%. I didn't go back to compare what that would be versus Bitcoin because some of these were issued in October, some December. But collectively, if you invested in the port   it's not January 1 to September 30. It's from investment day. And only 13% have working products and 16% have prototypes.

Another interesting thing is the 13% that have working products, which is about 25 of these. Is that right? Roughly, yeah, about 25 or so, 20 to 25. Seven of them have decided subsequent to launch to accept fiat currency to get the good or service. So literally, if you dig into the Ernst & Young report, they've chosen to take something else.

And Hugo, back to your question about XRP, as I understand it and as I studied it, I might be mistaken, but xRapid, you can actually use something other than XRP as the bridge currency. It has to be another crypto.

But 7 of 25 live projects that Ernst & Young followed have decided subsequently maybe to take a fiat currency for the good or service, as well. So that kind of gives you the sense this was a note about the Catalini report and that status report, as well.

What's going on on Ethereum? This is the most recent report. I summarized something from a site. These are exchanges. There's 179 DApps. This is just looking at Ethereum.

But there's only 25,000 uses a day for 179 sites. 17,000 in gambling. But it's exchanges, gambling, games, finance fourth. And then you can go down. The other category, which only has 275 daily uses, covers governance, identity, security, energy, insurance, and health.

Of six of those use cases   218 DApps, which means they're all being used zero or once a day. I believe I pulled this for the month of October. I think all these stats are   yeah, this was for the month of October. So it might be September, but it's all current information.

So what has the SEC done in this space? Well, they brought the DAO report in July of 2017. If you remember, this was the big $150, $160 million big ICO in 2016. A third of it was hacked. It led to the break in the Ethereum network between Ethereum Classic, the hard fork, and Ethereum.

DAO actually shut down. It didn't take off. And a year later, the SEC did not bring an enforcement action. They chose not to penalize anybody. But they laid out in pretty good detail as to why these things were securities.

I don't think they had planned for what was going to happen next. But the ICO, boom, took off, I don't think because of the DAO report. But it's an interesting coincidence whether this kind of gave a bunch of lawyers and entrepreneurs a sense, all right, if I avoid doing what they did specifically   and the DAO, they actually paid part of the revenues to the token holders, and they gave a sense of voting rights.

So it was so security looking because there were a form of participation in governance and a form of participation in profits that everything took off. Then then the SEC did two other things. One was   the REcoin complaint was a real fraudulent player, and the Munchee order in December last year. I read that in January or February. And I thought, well, that's pretty clear.

And Jay Clayton, who runs the SEC, has said in congressional testimony in February that he hadn't met an ICO that he didn't think was a security. His words were a little different. But I

But I think that even the Securities and Exchange Commission will speak more definitively than Bill Hinman's speech he gave in, was it June? Yeah, June. That was one of the readings, right Director Hinman's. I like that he used my name in his speech, the title. He was talking about Gary, Indiana, though.

But I do think, just like what happened with Airfox and Paragon, more ICOs will be brought into compliance either by registering in the US under Reg D, or maybe Regulation A. Or they'll just come into compliance even if they didn't earlier come into compliance.

I think that the early tokens will be tested as some platforms become functional. Most will fail. Most we'll never hear from. But what happens when Filecoin actually they raised a quarter of a billion dollars.

Let's at least for now presume they will become functional sometime in 2019, or Telegraph. That will be interesting to see what the test of these large cap ICOs are. We'll learn from that.

I also think markets will better differentiate viability. They'll go through, when do you need an append only log, consensus among multiple parties, and a native token on a distributed ledger? That wasn't happening, probably, enough in late 2017 and early 2018.

I don't think they had to take this class, even though we'll put it out live, and people will be able to see it. But I think markets will start to differentiate viability by CO use cases a little better than they have the last 12 months. So any questions? Eric?

**AUDIENCE:** Yeah. There's a bunch of startups we've been checking out. They're going through a new approach. There is actually a lot of venture capital firms that are doing a financing stage pre ICO to help these startups build the actual network.

And in that case, when they go to post ICO, you could argue that that helps, building the network before the ICOs can actually make them fail the Howey Test, because there's no in a sense, you have a network, a decentralized arrangement, that you don't have the single enterprise

**GARY GENSLER:** So I think, Eric, you're raising two questions. Are there ways to stage your financing to help build a network, just as a pure money and finance? And secondly, what is the regulatory implication, because I think it's two part.

569

I think, like in any form of venture, you might stage your financing and, in this case, sort of address the network possibility before you do the regulatory. And it may be enough.

I mean, the US Securities and Exchange Commission and Hinman's speech sort of said you could be sufficiently decentralized as Ethereum. They, in essence, had some regulatory forbearance.

And there's a key sentence in that speech as to, I think the words were, regardless of what Ethereum might have been in 2014 — like, Hinman kind of pushed that to the side and said, I'm not going to address that question implicitly. But it's sufficiently decentralized.

That's the debate that's going on now between a bunch of venture firms and the SEC. When are you sufficiently decentralized? And so that form that you just mentioned might get us there — might. I don't know. Did you have one last question? And then we're going to—

**AUDIENCE:** Maybe, just on the second point about likelihood of [INAUDIBLE], [? which I ?] obviously agree is there any research on—

**GARY GENSLER:** This is just a prediction.

**AUDIENCE:** Yeah. I'll bet on it. How much of the ICO funding was crypto to fiat to crypto, people selling appreciated bitcoins—

**GARY GENSLER:** Terrific question. Almost all ICOs are priced crypto to crypto. So if you look at whether the initial ones, all the way back when the Ethereum was priced vis á vis Bitcoin or, the most recent, iOS that raised $4.2 billion, their actual pricing mechanism — I'm not familiar with any that priced versus fiat.

Their pricing mechanism in their auction or offering, it's almost always crypto to crypto. But somebody might be funding it fiat to crypto. But I think, to answer your question, you should assume 99% the actual exchange is crypto to crypto.

**AUDIENCE:** So I mean, just the decline in the price of Ethereum to Bitcoin, Bitcoin to cash almost has to—

**GARY GENSLER:** It has to put pressure on it. But I also think it is likely that the decline in the ICO market has put price pressure downward on Ethereum, for sure. And so Ethereum was the second most valued crypto. And now it's third.

And it's had more price decline than Bitcoin or XRP. And I think part of that's narrative. Part of

570