# EXHIBIT I

1                        UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW HAMPSHIRE
2

3       * * * * * * * * * * * * * * * * *
                                        *
4       SECURITIES AND EXCHANGE         *
        COMMISSION,                     *
5                                       *  No. 1:21-cv-00260-PB
                             Plaintiff. *  February 23, 2022
6                                       *  2:00 p.m.
        v.                              *
7                                       *
                                        *
8       LBRY, INC.,                     *

9                            Defendant.

10      * * * * * * * * * * * * * * * * *

11

12          TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE
                       HELD VIA VIDEOCONFERENCE
13            BEFORE THE HONORABLE PAUL J. BARBADORO

14

15      APPEARANCES:

16      For the Plaintiff:        Peter Moores, Esq.
                                  Securities and Exchange Commission
17

18      For the Defendant:        Keith Miller, Esq.
                                  Perkins Coie LLP
19
                                  Timothy John McLaughlin, Esq.
20                                Shaheen & Gordon

21

22      Court Reporter:           Brenda K. Hancock, RMR, CRR
                                  Official Court Reporter
23                                United States District Court
                                  55 Pleasant Street
24                                Concord, NH 03301
                                  (603) 225-1454
25

1                    P R O C E E D I N G S

2          THE CLERK:  This Court is in session and has for

3    consideration a motion hearing and status conference in civil

4    matter 21-cv-260-PB, <u>U.S. Securities and Exchange Commission</u>

5    <u>versus LBRY, Inc</u>.

6          THE COURT:  I've been informed that some members of

7    the public have requested access to this hearing.  We've

8    granted those requests.  People who are not admitted as parties

9    or counsel need to keep their cameras off and their microphones

10   muted throughout the hearing; and of, of course, it is

11   forbidden to make any recording of this proceeding.

12         Okay.  So, I have a Motion to Quash, I have a Motion

13   to Modify Scheduling Order, and I have a Motion for Protective

14   Order that's not ripe yet that I won't consider, unless the

15   parties jointly ask me to.

16         Let's start with the Motion to Quash.  I'll hear the

17   SEC on that motion.

18         MR. MOORES:  Thank you, your Honor.  Peter Moores from

19   the Securities and Exchange Commission.  We filed the Motion to

20   Quash the subpoena for the testimony of Director Bill Hinman.

21   We believe that the Morgan Doctrine is what controls here and

22   that Director Hinman is a high-ranking governmental official

23   afforded the protections of the Morgan Doctrine.  As such, the

24   sort of burden to take Mr. or Director Hinman's deposition

25   switches over to the defendant here who is seeking the

1   deposition to establish that extraordinary circumstances are

2   present to warrant the circumstance of taking his deposition.

3   The test under the Morgan Doctrine for whether or not there are

4   exceptional circumstances has been phrased in a couple of

5   different ways, but essentially that the information sought is

6   not obtainable elsewhere and it is personally and uniquely

7   possessed by Director Hinman in this case; and, two, the second

8   prong, is that the information sought is essential, not merely

9   relevant to in this case the LBRY's case.

10          Many courts actually have a third prong, and, in fact,

11  the Ninth Circuit In Re:  U.S. Department of Education, which

12  was cited on February 4th, 2022, has a third prong that there

13  has to be a showing of agency bad faith, and I don't believe

14  that that has been sort of argued here per se, but LBRY in its

15  papers has never suggested or offered that there is agency bad

16  faith and would fail under that third prong of the test.  But

17  at least on the papers both parties, I believe, have argued

18  sort of the first and second prong that I identified, and we'll

19  go through that today, your Honor.

20          As I said, it is LBRY's burden to show these

21  extraordinary circumstances.  LBRY has not shown that in its

22  papers.  And, first, what LBRY has conceded is that Director

23  Hinman does not possess any knowledge of the case here.  He

24  doesn't possess any knowledge about LBRY, doesn't possess any

25  knowledge about LBRY's offer and sales, nor LBC, which is LBRY

1    credits, token in question.

2          THE COURT:  Let's back up, though, because I do think

3    they challenge your contention that he's a high-ranking

4    government official with a position -- formerly held a position

5    that would qualify for the privilege that you're invoking.

6    I've collected the cases that I can find, and certainly there

7    are cases where a court says this person is a high-ranking

8    official, this person is not a high-ranking official, but what

9    is the principal basis on which I should make the distinction

10   between someone who is sufficiently high ranking to be covered

11   by the privilege?

12         MR. MOORES:  Your Honor, a lot of those cases that I

13   think we've all collected don't articulate a specific test.  I

14   think that the case that -- one of the cases that LBRY has

15   cited says it has to be the sort of apex of the agency, but the

16   proof of the cases throughout have shown that it doesn't have

17   to be sort of the highest member of an executive agency, and so

18   I think it ultimately falls back as to the sort of first

19   principles of why the executive privilege or why that

20   protection is afforded, which is essentially that a member of

21   the sort of Executive Branch is not to be hauled into court to

22   testify or to be deposed based upon their decision-making

23   processes.  Here we have Director Hinman who is, reports sort

24   of the second highest in terms of he's the head of the

25   division, is in charge of a lot of sort of internal decision

1    making at the Commission here and advising not only he's also

2    an attorney -- so advising as to policy as well as

3    attorney-client privilege up to the members of the Commission

4    itself.  So, I believe that he qualifies in other cases,

5    including the Navellier case that we cited, where it upheld

6    that a division director was a high-ranking governmental

7    official.

8          THE COURT:  Was that issue challenged by the plaintiff

9    in Navellier?  I know that the judge applied the privilege and

10   concluded that the official was a high-ranking official, but I

11   didn't see in their evidence that that was a litigated point, a

12   disputed point.  Can you help me out on that?

13         MR. MOORES:  So, with respect to whether or not the

14   Morgan Doctrine applied, it was challenged, the Morgan Doctrine

15   specifically applied.

16         THE COURT:  Did they make an argument to the judge

17   that the deponent was not a high-ranking government official

18   under Morgan?

19         MR. MOORES:  My recollection, your Honor, is it at

20   least wasn't sort of foremost in the judge's ruling.

21         THE COURT:  She didn't really explain.  I agree she

22   applied it to someone at the same rank as we have here.  I just

23   didn't see in her decision that she was evaluating competing

24   claims by the parties and coming down in a particular way on

25   it.  So, I think it clearly applies to people like

1      cabinet-level secretaries, it clearly applies to people like

2      mayors of a city, and it has been widely applied to people who

3      are not at the very top of the agency that they're heading, and

4      I've got examples, and I can draw analogies, but I don't find

5      in any of the case law a detailed discussion of the way in

6      which a judge would go about determining whether someone is or

7      is not a high-ranking official.

8              The weakness of these kind of categorical approaches

9      to problems are that you don't get to weigh competing

10     considerations and a totality of relevant circumstances

11     sometimes that you would like to be able to do.  For example,

12     here it appears that what LBRY wants to do is question the

13     former Director not about any facts about this particular case

14     that that person has knowledge of, because you've proffered

15     that he has no knowledge about this case, was not involved in

16     it, and has nothing to contribute based on personal knowledge

17     about it.  Instead, it appears that LBRY is trying to depose

18     this person to gain access to his thought process about how the

19     general issue of how the Howey test applies to digital

20     currencies works, and that seems to be matters of which you

21     would ordinarily not get a deposition for reasons completely

22     unrelated to the Morgan Doctrine.  It's the kind of thing that

23     either is simply not calculated to lead to any kind of relevant

24     information at all, or it's protected by the deliberative

25     process privilege.  So, I think that's part of the struggle

1  here.

2      It is just not apparent to me what this person has to

3  say that could be at all helpful to me in resolving the case,

4  but I did want your thoughts on how I would go about

5  distinguishing between whether someone is a high-ranking

6  official or not.  If you've got any other thoughts about it,

7  let me know.

8      MR. MOORES:  Yeah, your Honor.  I think that -- first

9  of all, I agree with a lot of what you just said about in terms

10  of the import of what Director Hinman's thoughts are and what

11  LBRY is seeking here, and I do think that there is a

12  relationship between the Morgan Doctrine and sort of

13  deliberative process privilege, which I think you were touching

14  a little bit upon, in terms of seeking the mental

15  decision-making processes of the deponent, and I think that

16  when you have someone who is cloaked with that decision-making

17  authority, which is, I believe, the sort of true import of why

18  LBRY is seeking Director Hinman, himself, they haven't noticed

19  somebody who is sort of lower on the staff or even a sort of,

20  you know, a low member of the staff.  They wanted the Director

21  himself, who is cloaked with that authority of decision making

22  on behalf of the Division of Corporation Finance, and so I

23  think sort of the reasons that LBRY is seeking Director

24  Hinman's point of fact that he would be protected under the

25  Morgan Doctrine itself.

1    THE COURT:  Although, the Morgan Doctrine appears to

2    be, rather than the deliberative process privilege, appears to

3    be focused primarily on the need to ensure that high-ranking

4    government officials aren't deluged with deposition requests,

5    because they supervise so many cases and deal with so many

6    issues that they should not be subjected to deposition as a

7    routine matter primarily because of the burden that it inflicts

8    on the person holding the position either as a current officer

9    or former official.  So, that seems to be the primary

10   motivation for the doctrine.  So, ine one sense, if you were to

11   try to construct a test you would say, well, let's interpret

12   what a high-ranking official is in light of why we have the

13   rule, and we seem to have the rule because someone who is

14   sufficiently high up in a governmental structure can find their

15   lives completely consumed with testifying in depositions of

16   routine cases.  I think your argument would be this person

17   oversees hundreds of matters that are potentially the subject

18   of litigation at any one time, and if you do not apply the

19   Morgan Doctrine to someone like this you will overburden the

20   holders of that office both while they currently hold the

21   office and after they complete their government service and

22   move on to other jobs.  So, that would seem to be one way of

23   trying to distinguish when someone who is sufficiently high

24   ranking to qualify.

25           MR. MOORES:  Your Honor, I agree.  In terms of the

1    Division of Corporation Finance, it oversees the registration

2    of security offerings that, you know, equate to trillions of

3    dollars and hundreds, if not thousands, of various issuers.

4    So, to the extent that there was ever a decision on the

5    registration that would involve Director Hinman, just with

6    respect to digital assets this is the third case in which

7    Director Hinman has been at least noticed, if not more, and I'm

8    just basing this upon when there have been motions to quash in

9    the Kik case, which we cited in our briefs, and the Ripple

10   matter, which I'm sure you're going to hear at least about from

11   LBRY.  So, this is the third time in which he's been hauled in

12   to testify as to his internal decision-making process with

13   respect to digital assets and --

14       THE COURT:  One of the concerns, potential concerns,

15   about extending the doctrine too far down into an organization

16   is that you're unnecessarily insulating people from having to

17   provide information about things that might be very important

18   to a particular litigant.  Say, for example, a person holding

19   the Director's position is a witness to allegations of sexual

20   harassment in the workplace.  That would be a case in which the

21   availability of that person for deposition would be highly

22   important notwithstanding his or her high position in

23   government, but the way the privilege works, the Morgan

24   Doctrine works under those circumstances it would be relatively

25   easy for someone in LBRY's position to demonstrate that the

1   Director, although holding a high-ranking position, should not

2   be immune from having to cooperate because they have direct

3   personal knowledge and they are uniquely positioned to

4   contribute in an important way to the case, not simply because

5   they're high up in a chain, where the actual work is being done

6   by people many levels below.  That's something that suggests to

7   me that we don't need to be, in determining what is high enough

8   for the Morgan Doctrine to apply, we don't need to be overly

9   concerned that will insulate people from being accountable for

10  their actions to the extent there's some reason to believe that

11  the person has engaged in conduct that might implicate them in

12  some kind of civil liability, or that they're a witness to

13  conduct.  Then, even if the Morgan Doctrine applied, it would

14  fit within the exception.

15          MR. MOORES:  Yes, your Honor.  I believe the

16  hypothetical you provided does not really touch upon a lot of

17  the main primary concerns of the Morgan Doctrine.  You know, if

18  it's an issue of sexual assault, that seems potentially a more

19  of a one-off situation that wouldn't overburden the

20  governmental official as well as something that's, you know,

21  within their knowledge as a potentially percipient witness and

22  does not go to their sort of decision-making in their official

23  duties.

24          THE COURT:  And if there is an allegation, say, that

25  someone at the director level harbored a particular bias and

1   participated in decisions in a way that potentially provided

2   the target of the decision with a defense, say there was a

3   selective enforcement claim that survived, I've said the

4   selective enforcement defense doesn't survive here, one could

5   say that there's a general Morgan Doctrine applicability; but

6   where the subjective mental state of the Director bears

7   directly on a viable defense, that would be a case where you

8   would find an exception to the Morgan Doctrine.

9           MR. MOORES:  Right, which I think is why you find, if

10  you read the Ninth Circuit's recent opinion and some of the

11  other court opinions that impose the bad-faith prong to the

12  sort of exceptional -- to whether or not the Morgan Doctrine

13  would apply or not, if there is a colorable argument of bad

14  faith, as you're suggesting, with the selective enforcement

15  claim, then that would fall outside of the Morgan Doctrine

16  potentially or at least it would be an exceptional --

17  extraordinary circumstance which would fall out of the

18  protection of the Morgan Doctrine.

19          THE COURT:  All right.  What else did you want to say

20  in support of your argument?

21          MR. MOORES:  Thank you, your Honor.  So, with respect

22  to the prong of whether or not the information is otherwise

23  available, this is not something that LBRY, who, again, has the

24  burden to establish is under the Morgan Doctrine, has really

25  put forth in their papers.  If we look at some of the topics

1    that they believe that Dr. Hinman, sorry, Director Hinman would

2    be testifying about, the perception in the marketplace, so if

3    this is what the marketplace was thinking, then that clearly

4    would be available from another source other than Director

5    Hinman.  And then the other sort of topics that they've

6    identified, which is the Commission's application of the <u>Howey</u>

7    test, or the Commission's approach in response to market

8    participants, or the status of the Commission's adoption, these

9    are not necessarily topics that are limited to Director Hinman,

10   and, again, if subject to discovery, then they could be

11   achieved in other ways than taking Director Hinman's testimony.

12   So, that would just, that prong alone LBRY fails in its effort

13   to take Director Hinman's testimony.

14        But more importantly I think, perhaps, is just whether

15   or not it is indeed relevant to this case, and as the standard

16   is, it's not just mere relevance.  It actually has to be

17   essential to the defense's argument here, LBRY's argument, and

18   primarily they're offering or they're proffering it that

19   Director Hinman's testimony would be somehow relevant to their

20   fair notice defense for --

21        THE COURT:  I think I've got your argument on that,

22   and my initial reaction is that argument is persuasive, that

23   fair notice defenses really turn on objective evaluations of

24   the available information and not the subjective understandings

25   of the people who are enforcing or promulgating the doctrine

1    that's being challenged.  So, I understand you make that

2    argument.  At least my preliminary assessment is that argument

3    is persuasive with me, so I don't need to hear you say more,

4    unless you feel you need to.

5           MR. MOORES:  No, your Honor.  The one thing I would

6    note sort of interestingly is LBRY is putting a lot of focus on

7    Director Hinman's speech and believes that it somehow supports

8    their position that the Howey test is too vague as applied to

9    at least LBRY's offer and sales.  But Director Hinman

10    throughout his speech in 2018 upholds the Howey test.  He's

11    simply applying the Howey test, and the references that he

12    makes to the Howey test are essentially just quoting the prongs

13    of it, where he might say if a promoter does not satisfy prong

14    two, then it's not an investment contract, or if it doesn't

15    satisfy prong three, then it's not an investment contract.  So,

16    in any sort of way it doesn't sort of make logical sense that

17    the speech in and of itself would be evidence that the Howey

18    test is too vague, because Director Hinman himself is saying

19    that the Howey test is what controls and, you know, the

20    application of it is the facts and circumstances of the

21    situation.

22           So, the last point I would make, your Honor, is really

23    just the notion that, even if it was relevant, what they're

24    ultimately seeking, what LBRY is ultimately seeking is stuff

25    that is protected by the deliberative process privilege or the

1      attorney-client privilege.  As I mentioned beforehand, Director

2      Hinman is an attorney, and in his role he would be providing

3      advice to the Commission or the Commissioners, and in terms of

4      developing policy, internal discussions about how that Howey

5      test would apply, the deliberative process privilege would also

6      apply.  So, in terms of how --

7              THE COURT:  I think you may be right on that, but if

8      that were all we were dealing with my inclination would be to

9      say you should have the deposition and you object and instruct

10     not to answer, and then the Court can evaluate on a

11     question-by-question basis claims of a deliberative process.

12             The basic problem for me is I haven't seen anything in

13     LBRY's requests that gives me any encouragement that he has

14     anything to say that would be relevant.  I understand your

15     point is that the test here, to the extent the doctrine

16     applies, is much more than mere relevance, but I'm just not

17     seeing what he has to say that's useful at all in this

18     litigation, and so that would be a basis on which to

19     potentially quash a deposition subpoena.  If it was just, well,

20     he's got things to say that are protected by the

21     attorney-client or deliberative process privilege, my view is,

22     well, let's see what he says in a deposition and you instruct

23     him not to answer on those questions where there's a potential

24     privilege, and then I evaluate those on a motion to compel.

25     Something like that's the way I would ordinarily do it.

1          MR. MOORES:  I would agree, your Honor.  I was just

2     suggesting that under this Morgan Doctrine specifically, and I

3     think you were talking a little bit perhaps outside the Morgan

4     Doctrine just on relevance, but within the construct of the

5     Morgan Doctrine, where LBRY has to establish extraordinary

6     circumstances, ultimately what they're seeking is not available

7     from Director Hinman due to the privileges, and that sort of

8     guts their argument that it is actually relevant or satisfies

9     the extraordinary circumstance.

10          THE COURT:  Your point is to the extent they want to

11     get from him, Tell us what you guys were talking about inside

12     the agency when you were formulating your policies about what

13     would qualify as an investment contract under Howey, your view

14     is that's deliberative process and/or attorney-client, and he

15     would never get it anyway, so he can't satisfy the

16     extraordinary circumstances exception based on that.  Okay.  I

17     understand your argument.

18          MR. MOORES:  Right.  And then, lastly, I know that

19     LBRY has suggested that Director Hinman's testimony would be

20     relevant to its sort of defense in chief, which is just that

21     the offer and sales do not satisfy the Howey test itself, but

22     it doesn't seem that Director Hinman --

23          THE COURT:  No offense to him, but that's my job here,

24     not his.  What he says when he speaks as a private citizen,

25     what he says when he gives speeches, my reaction is I could

1    care less.  I mean, that's not something that's entitled to

2    deference under any doctrine that I'm aware of, and in the end

3    of the day I'll make the decision whether the SEC has a viable

4    claim here or not.  So, I don't think what he has to say about

5    how he thinks the doctrine works matters at all.  Does it?  I

6    mean, how does it -- I don't defer to government employees

7    giving speeches on their own dime talking about the way they

8    think the law works.  I'm not giving any deference to that.  Am

9    I right about that?  Do you understand my concern?

10         MR. MOORES:  I do, and I think you are right, your

11   Honor, that the deference is to the precedent and the

12   controlling case law, not to director --

13         THE COURT:  And any regulations or actions that are

14   taken under doctrines like Chevron or similar doctrines in

15   which, when the agency speaks in ways that entitle it to

16   deference, then, of course, the Court would grant deference,

17   but the Court doesn't give deference to agency employees, even

18   high-ranking ones, when they try to say to people what they

19   think the law is.  That doesn't get any deference, and so it

20   wouldn't affect my decision making one way or the other.

21         MR. MOORES:  So, your Honor, subject to your questions

22   or rebuttal to what LBRY has to argue, I'll cede the floor.

23         THE COURT:  Okay.  Let me see what LBRY has to say.

24         Go ahead, Counsel.

25         MR. MILLER:  Good afternoon, your Honor.  My name is

1    Keith Miller.  I represent LBRY, Inc.  I'm a partner at Perkins

2    Coie.

3         Your Honor, I thought you made a good observation

4    regarding the rationale for the doctrine, and I'd like to

5    elaborate a little bit further on it.  First, as I understand,

6    the rationale for the rule is twofold.  One is to prevent a

7    chilling effect, if you will, on senior official government

8    officials so that they do not -- their discussions amongst

9    members of the agency are not chilled because of a threat of

10   being deposed.  The second rationale, as you stated, is the

11   need to ensure that an official, because of his title, he's not

12   engaged in litigation depositions because of his title.

13        So, with that rationale I would argue, your Honor, we

14   need to look at what we're trying to get from Mr. Hinman.

15   First of all, we're trying to obtain as a private citizen -- as

16   he said, These are my personal statements -- what he believed

17   was relevant in making determination under Howey whether a

18   digital asset is a security.  It's his speech that we're asking

19   to depose him about, not what did the other staff members talk

20   to you about about digital assets.  That's not what we're here

21   to ask Mr. Hinman about.  We're here -- he made a speech where

22   he drew conclusions as a personal individual.  We believe it is

23   very dispositive on the issue of fair notice.

24        If the Director of -- I'm sorry.  If the Director of

25   Corporate Finance has a theory about what the industry does

1    know and what the industry doesn't know, that's important

2    because it provides a standard.  If the entire industry, and we

3    will be presenting evidence at trial on this, if the entire

4    industry doesn't know if a digital asset under these types of

5    circumstances is an investment contract under Howey, okay, that

6    is relevant to evidence at trial to prove that they didn't have

7    fair notice.

8            THE COURT:  So, if he thought -- if a person in his

9    position gave a deposition in this case and took the position

10   that he subjectively thought that LBRY's offerings were

11   registrable securities offerings, that's a fact that I could

12   take into account in deciding whether your client is liable or

13   not?  That seems really weird to me.  We want to make decisions

14   about whether your client is liable based on the law, not based

15   on what random private citizens think about it.

16           MR. MILLER:  It goes to fair notice, your Honor, what

17   in our papers we've shown.  We have Mr. Hinman talking about

18   two digital assets, Bitcoin and Ether, and he concludes that

19   they are not securities, and he also concludes that at some

20   point in time, and his speech is clear on this, and it's also

21   cited by Chairman Clayton in his letter to Congress, that

22   securities that are initially securities can morph if the

23   efforts of others are no longer there.  So, we think, and

24   there's never been any communication by the SEC about what are

25   those factors, like when is something a security in the

1    beginning and then morphs into a non-security?  And so, we've

2    raised that as a defense here.  In our answer we said, even if

3    it was at some point in time and it is no longer a security

4    because the efforts of others are ministerial, and so, if

5    Hinman were to testify, I went through this process in writing

6    my article and in connection with that I met with industry

7    leaders, I met with lots of different attorneys, and that was

8    the impetus of writing this speech, I think that goes to show

9    or support our argument of fair notice, that there really

10   wasn't fair notice here.

11        THE COURT:  Let's assume that you're right, at least

12   insofar as it bears on your fair notice defense, what Hinman

13   actually publicly says, but that's not what you're seeking to

14   obtain in this deposition, because you already have what he

15   publicly says.

16        MR. MILLER:  Right.

17        THE COURT:  You're trying to get at things he hasn't

18   publicly said but that you think are useful in understanding

19   his thought process.  I don't see how that has any bearing on

20   your fair notice defense.

21        MR. MILLER:  Well, we would ask him, What was the

22   rationale for your speech?  Why did you put it out?  What were

23   your communications with third parties in connection with your

24   speech?  What was your application at the time -- how did you

25   apply Howey to Bitcoin and Ether?  You know, I think those are

1   the things that we would explore to try to figure out whether

2   our fair notice defense has further evidence that can be

3   demonstrated at the trial.

4        THE COURT:  Okay.  Well, look, I think that's helpful

5   to me, because it does -- you're being frank with me about the

6   kinds of things you want, which I appreciate.  It helps me

7   evaluate your request.  But I do understand you to be saying

8   that we really want to know what led into his speech, what his

9   thinking was, who he was talking to, what input he was getting

10  for it, because we think that bears on our fair notice defense.

11  That's primarily what you want to talk to him about.  Is that

12  fair to say?

13       MR. MILLER:  That's fair to say, and that's, frankly,

14  consistent in how the Court in the Ripple case has approached

15  this, and that is allow Hinman's deposition to occur and to

16  allow limited discovery regarding --

17       THE COURT:  In that Ripple case I'm remembering, if

18  I've got it wrong, you'll tell me, wasn't there an aiding and

19  abetting allegation in that case, and didn't the Court

20  specifically have to be concerned with the subjective mental

21  state of the deponent to evaluate a claim?  Much in the nature

22  of before I precluded it you asserted a selective enforcement

23  defense and a kind of bad-faith argument on the part of

24  decision makers, if I allowed that defense this case would look

25  more like Ripple, but it isn't really a Ripple case as it

1     currently is postured.  So, isn't that a way to distinguish

2     Ripple?  I think the government makes that point.

3          MR. MILLER:  They do, and in our response, your Honor,

4     we demonstrate why the Court's opinion wasn't solely focused on

5     the aiding and abetting.  Ripple and the individuals brought

6     the motion.  And so, yes, the Court did mention that the

7     individuals have to substantiate a knowledge prong for aiding

8     and abetting, but it was also for the benefit of Ripple.  It

9     wasn't just, Okay, individuals, you can take the deposition,

10    and I think we mention that in our brief at pages 12 and 13.

11         THE COURT:  So, you argue that, but what about Judge

12    Bowler's decision in Navellier?  She reached the conclusion

13    that the Morgan Doctrine did apply and protect someone at the

14    very same level.  You just say she got it wrong on this one and

15    I should --

16         MR. MILLER:  I think that case, if I remember it

17    correctly, your Honor, I believe that the depositions did take

18    place, but, again, the deliberative process privilege was

19    invoked at the deposition.  It wasn't a blanket, absolute

20    prohibition, unless I'm mixing that case --

21         THE COURT:  I may have misunderstood that.  Let me ask

22    the government.  Just tell me.  You're the one that cited

23    Navellier.  Is that right, the depositions already took place

24    and it's just a selective -- because that wouldn't make sense

25    to me.  That would be a deliberative process privilege, not a

1    Morgan Doctrine problem.

2         MR. MOORES:  Your Honor, I'll double check on this,

3    but it's my understanding that those depositions did not go

4    forward.  It was a former Commissioner and it was the Director

5    of Enforcement.  My understanding is that neither of those went

6    forward.

7         THE COURT:  Yeah, the Morgan Doctrine is designed to

8    prevent the deposition entirely, not to prevent selective -- to

9    protect certain answers once the deposition is underway.

10   That's really more deliberative-process privilege kind of

11   issues.  If you allow the deposition, the ordinary rules govern

12   how the deposition takes place.  That's the way I thought the

13   Morgan Doctrine worked.  Okay.  So, you'll both check on that

14   and let me know if you come up with anything, and I'll go back

15   over it, but I didn't recollect that the depositions, in fact,

16   occurred.  There were other depositions, but those depositions

17   I don't think did occur.

18        Okay.  So, Counsel, can you help me out on this?  What

19   do you think is the way to distinguish a high-ranking official

20   from a non-high-ranking official for purposes of the doctrine?

21        MR. MILLER:  I think you need to go back to the

22   rationale again, which is the need to ensure that an official

23   in his official capacity isn't being burdened.  Mr. Hinman is

24   no longer an official.  So, that argument I think is much more

25   supportive of our argument.

1      THE COURT:  I do think it's a relevant factor in

2  determining if they are a high-ranking official potentially

3  able to invoke the Morgan Doctrine whether there should be an

4  exception.  I think it's a factor but not determinative.

5  That's how I process it.  Do you agree or disagree?

6      MR. MILLER:  Yeah, I agree.  I do agree.  And we also

7  say in terms of looking at, as you said, there are cases on

8  both sides where a mayor is clearly, you know, a top-ranking

9  official and when there's other deputies, things like that,

10 depending on the agency.  So, we need to look at the SEC.  The

11 SEC is run by the Chairman and four Commissioners.  We're not

12 asking for their depositions.  Underneath are five Division

13 Directors and 25 other offices that report to the office of the

14 Chairman.  You've got Chief Accountant's office, you have Head

15 of Public Affairs, you have legislation and inter-government

16 affairs, you have the various divisions, Enforcement, things

17 like that.  Our position would be in this context Mr. Hinman is

18 not a high-ranking official because he's not at the apex of the

19 decision making.  And so, a lot of these cases talk about the

20 apex, and I've been trying to figure out what is apex, what

21 isn't, and I think it comes down to can they make the ultimate

22 decision.

23     THE COURT:  Well, if you believe in the unitary

24 executive theory, there's only one person at the apex of the

25 Federal Government, and that's the President of the United

1    States.  So, it clearly doesn't mean that, because it applies

2    to a secretary, it applies to cabinet secretaries, and it would

3    clearly apply to the SEC Commissioners and the Chair of the

4    Commission.  The question is does it ever apply below that

5    level in an organization like the SEC, and I don't think

6    there's been a well-reasoned decision that I've seen that helps

7    inform how a court should go about undertaking that analysis,

8    so what we're left with are a bunch of analogies where the

9    court applied it this way and the other court applied it that

10   way.

11          What I'm inclined to do is to say that we should

12   evaluate high ranking not in any kind of absolutist or

13   categorical way; we should really look at what the functions of

14   the office are, and if those functions are such that that

15   person is likely to be involved in highly voluminous, complex,

16   discretionary decision making, where the person exercises a

17   policy formulation role and isn't simply executing policies

18   established at lower levels, that you probably ought to think

19   of that person as high ranking because, given the exposure that

20   that person has to potential litigation, the burdens on the

21   office could be extraordinary, as opposed to, say, a line SEC

22   attorney, like the one that's currently arguing in front of me,

23   who's not a high-ranking official, but when you go sufficiently

24   up the policy chain that that person is effectively a manager

25   of a big portfolio where hundreds and thousands of decisions

1    are being made by subordinates and reviewed that that person is

2    sufficiently high ranking to potentially qualify.

3            And then, in my mind, we should police the

4    extraordinary circumstances exception reasonably to allow

5    exceptions like the one I proposed, where someone has direct

6    personal knowledge of a matter that isn't part of his

7    management portfolio where he's indirectly supervising a bunch

8    of stuff but he, in fact, or she, in fact, witnessed something

9    if it happened in the office that gives rise to potential

10   liability.  Then you would easily find the exception satisfied,

11   because that person has unique and very important information

12   as opposed to information that is largely derivative about

13   policymaking or execution of policy.

14           So, that's how I'm inclined to look at it, and

15   anything else you want to say on that subject go ahead, and

16   then make any other points you want to make on the particular

17   issue.

18           MR. MILLER:  Just a final point is, again, I think the

19   Court should view this as an individual, yes, he was at an

20   agency, but expressed an opinion, their personal opinion, and

21   for that reason I think the exceptions to Morgan, the Morgan

22   Doctrine, apply, and the rationale for the Morgan Doctrine

23   would not apply in this situation.

24           THE COURT:  All right.  Thank you.  I appreciate the

25   argument on it.

1    So, in preparation for the hearing today I carefully

2  reviewed the Supreme Court's decision in <u>Morgan</u>.  I read the

3  First Circuit's decision in Bogan against the City of Boston

4  reported at 489 F.3d 417, a 2017 First Circuit decision, which

5  is, of course, controlling precedent in my case.

6    I tried to look at how other courts dealt with the

7  issue of whether someone is a high-ranking official or not,

8  and, as I have suggested to you, I don't think there are an

9  abundance of well-reasoned decisions, certainly nothing that's

10  controlling on me.  Let me just identify a couple of examples

11  that I think are somewhat helpful, although the reasoning

12  provided is very limited.

13    I did look at the case of RI, Inc. against Gardner,

14  which is reported at 2011 Westlaw 4974834, an Eastern District

15  of New York decision from 2011 that held that the Solicitor

16  General of the United States Department of Labor was a

17  sufficiently high-ranking official to qualify under the Morgan

18  Doctrine.

19    I looked at a decision from the District of New

20  Jersey, U.S. against Sensient, S-e-n-s-i-e-n-t Colors, Inc.,

21  reported at 649 F.Supp. 2d 309, a 2009 District of New Jersey

22  decision, where the Court held that an EPA regional

23  administrator was a high-ranking government official.

24    And I looked at a decision from the District Court of

25  the District of Columbia, Low against Whitman, reported at 207

1  F.R.D. 9, where the Court concluded that the EPA's Deputy Chief

2  of Staff did qualify as a sufficiently high-ranking person.

3         Finally, I looked at, again, a District of -- Columbia

4  District Court decision, Sourgoutsis, S-o-u-r-g-o-u-t-s-i-s,

5  against United States Capitol Police, 323 F.R.D. 100, a 2017

6  District of Columbia District Court decision where the Court

7  held that the Inspector General of the United States Capitol

8  Police was a high-ranking official for the purpose of the

9  Morgan Doctrine.

10         As I said, my inclination, in the absence of more

11  specific guidance from the First Circuit or the Supreme Court,

12  is to suggest that in determining whether someone's a

13  high-ranking official you shouldn't look at a simple

14  categorical approach of are they the highest ranking official

15  in their agency.  Rather, I think you should look at it

16  functionally, and do they perform functions that involve

17  supervision of a large number of subordinate employees that are

18  responsible for carrying out the day-to-day operations of that

19  particular governmental agency, whether they are involved in

20  overseeing substantial amounts of government activity that

21  could potentially expose them to hundreds of thousands of

22  lawsuits if they were routinely subject to deposition, and

23  judged by that standard -- and I do believe, as I said, that

24  the Navellier case that I've previously cited supports this.

25         I do believe that potentially that the former Director

1    does qualify as a high official.  The fact that he's a former

2    official is a factor to consider but isn't dispositive,

3    because, again, we don't want people who take these positions

4    when they do leave office to spend the rest of their life

5    taking depositions, responding to efforts to establish whatever

6    it is that the litigant wants to establish.  So, I do think

7    that this former Director does have a position that potentially

8    qualifies him under the Morgan Doctrine for protection against

9    deposition.

10          What's really important to me here, though, is I just

11   do not understand how the former Director has anything to

12   contribute here.  And I respect Mr. Miller's argument, and I

13   appreciate his frankness.  I don't think that questions about

14   what drove him to make the speech, who he communicated with

15   when he made the speech, what his internal thought process was,

16   or who he may have been deliberating with while formulating his

17   views on this matter come anywhere close to satisfying an

18   extraordinary circumstance test.  To the extent he wants to use

19   the testimony to convince me that it was widely understood in

20   the marketplace that there was a particular view about how the

21   Howey test applies, that could be established from people other

22   than the former Director.  One could imagine an expert witness

23   that might testify about that, one could imagine people engaged

24   in the industry that might be able to testify about that, and I

25   don't believe that that information would be uniquely available

1  from the former Director.

2      More fundamentally, I just don't see how that

3  information has any potential relevance to the proceeding.  The

4  way I'm seeing it, the primary defenses here are this just

5  doesn't qualify under Howey, it's not an investment contract,

6  the SEC can't prove its case, and, in any event, we have a

7  viable fair notice defense.  Both of those issues turn on

8  objective facts, the Director has no personal knowledge of the

9  particulars of this case, and in my view the fair notice

10  defense really turns on objective criteria, not subjective

11  thought process of the individual involved, and I do agree that

12  it's likely that, to the extent one wants to get into that,

13  it's hard for me to see how it isn't protected by the

14  deliberative process privilege, and so it wouldn't be

15  available, in any event.  So, I don't believe that the

16  exceptional circumstances test comes anywhere close to being

17  satisfied here.

18      So, for those reasons and the additional reasons set

19  forth in the SEC's supporting memorandum I'm going to grant the

20  Motion for Protective Order and bar the deposition of the

21  former Director.

22      Does anybody need me to make any additional findings

23  or rulings with respect to that particular issue?

24      Is there anything else from the SEC that you feel I

25  need to take up that I haven't taken up?

1           MR. MOORES:  Not as to that motion, your Honor.

2           THE COURT:  All right.  Mr. Miller, anything else?

3    Your objections are all preserved, of course, for purposes of

4    appeal.  Is there anything else you need me to take up that I

5    haven't taken up on that particular --

6           MR. MILLER:  No, your Honor.

7           THE COURT:  All right.  So, let's turn to the next

8    matter, which is a proposal by the SEC to delay the scheduling

9    of this case.

10          Counsel, one thing that has really resonated with me

11   in this case is that LBRY feels extremely burdened by this

12   litigation.  Now, you make arguments that everything you've

13   done is appropriate and the discovery requests to date have not

14   been overly burdensome, but this is a company that is clearly

15   not in great financial circumstances.  This has a big bearing

16   on their efforts to survive.  This has been going on for years.

17   To the extent they oppose delays, I want to try to keep this

18   matter moving.  On the other hand, your point is you think that

19   they have -- if I'm understanding your position correctly, your

20   position is that LBRY, without making it clear to you

21   initially, has arbitrarily drawn a self-imposed line on what

22   discovery they're going to produce and that they're not -- they

23   haven't produced anything post filing of the complaint.  Am I

24   overstating your position, or is that your position?

25          MR. MOORES:  Your Honor, there's a lot that's true.

1   There's, I'm sure, things that just need to be clarified on the

2   edges.  But, you know, our position is we're not seeking sort

3   of additional number of depositions, we're not seeking

4   additional interrogatory numbers.  What we're really seeking

5   here is a little bit more time for LBRY to produce the

6   documents that are responsive to the requests and that have

7   been sort of outstanding since October and that LBRY just has

8   not yet produced, either sort of inadvertent oversight or

9   potentially they just hadn't gotten to it at that point, and

10  one of the things --

11       THE COURT:  I'll let you finish in a minute, but as

12  specifically as you can and as narrowly as you can do it and

13  consistent with your responsibilities, what is it that you're

14  seeking from LBRY that you believe you've requested but have

15  not yet received?

16       MR. MOORES:  Just as sort of a chronology, your Honor,

17  is that essentially LBRY was doing a rolling production.  It

18  had made a substantial production towards the end of January.

19  We looked -- and they reported they were mostly done with their

20  production.  We started looking at it, you know, soon after it

21  got in and it was processed, and we noticed that there were a

22  lot of gaps in their production.  Some of them were gaps about

23  what custodians that they had collected documents from.  Some

24  were as to the types of documents.  So, for example, business

25  records like memoranda, Excel spreadsheets, presentations to

1    investors.  So, all of that type of documentation was not

2    produced.

3        Their filing system is like a Google Drive, and that

4    is where the company stores its documents, and those documents

5    hadn't been produced.

6        THE COURT:  Well, let me stop you.  This is not

7    Facebook; this is a company that has got a very small

8    operation.  It's hard for me to understand why you can't meet

9    and confer and specifically lay out for them.  This is what I

10   think you have that you haven't produced.  We don't need these

11   kind of mass over-productions where people just, like, dump the

12   hard drive on someone else.  At this point you've had years to

13   get your act together.  You should be able to be very specific

14   about -- you know who's involved in this company that makes

15   representations regarding the LBRY currency.  You know what

16   they've been doing and saying.  Why can't you just be a little

17   more specific with them, rather than making kind of blanket

18   requests that they then have to just kind of blindly poke

19   around in their files for?

20       MR. MOORES:  Well, your Honor, we did actually go

21   through that meet-and-confer process just like you're

22   suggesting.  We provided a long list of items that we thought

23   that they hadn't produced that were responsive and were

24   relevant and important to their claims or defenses -- our

25   claims or their defenses -- but they have endeavored after that

1    meet and confer to actually produce a large volume of those

2    documents that we noticed that were missing, and they're still

3    endeavoring to produce it, like, as I mentioned, sort of the

4    Google Drive documents, which, you know, it's a company that

5    does a lot of their work, my understanding is, virtually

6    because, you know, the employees might be scattered at

7    different places, and they save their documents to a Google

8    Drive, at which point they will link their communications, even

9    with investors, that will say, Go to our Google Drive and look

10   at documents in connection with an offer.  And those are the

11   types of documents that we were seeking and that hadn't been

12   produced and the company is still producing.

13         THE COURT:  What depositions do you have left that you

14   need to do?

15         MR. MOORES:  So, we had previously noticed the

16   depositions of Mr. Kauffman and Mr. Grin.  We also have a

17   30(b)(6) deposition that has been noticed, and there's

18   potentially a couple of other depositions that we would take,

19   depending on the Court's --

20         THE COURT:  And you want to delay these depositions

21   until you've had what you think is a more complete production

22   from LBRY?  You're not planning to take more; you want to do

23   those depositions after you've had a reasonable time to process

24   a full document disclosure?

25         MR. MOORES:  Right.  So, there are potentially a

1    couple of depositions -- to be candid, your Honor, our schedule

2    ends at the end of -- a week from Friday, and if the Court did

3    not extend the schedule, then next week would be full of as

4    many depositions as possible.  So, there are other depositions

5    that we hadn't noticed that we were contemplating taking, but,

6    you know, there just isn't enough time under the current

7    schedule.  But to your point, your Honor, that is fundamentally

8    the important piece, is that we wanted to be able to receive

9    the documents, review them, process them in order to use them

10   at these depositions, and there just isn't enough time.  There

11   was a production made last night; there was a production that

12   was made earlier this morning.  We anticipate that LBRY will

13   continue to make productions over the next couple of weeks in

14   order to fulfill those items.  There is a discovery dispute.

15        And specifically as to that cutoff that you had

16   mentioned, your Honor, where LBRY has sort of arbitrarily cut

17   the date of the complaint off as what is discoverable, we

18   disagree with that.  Now, the company has produced some

19   documents that postdate the date of the complaint, but they're

20   withholding a number of others, and we have sent that to the

21   Magistrate for her attention and mediation.

22        THE COURT:  So, have they presented a log of documents

23   that are responsive but they believe should not be produced?

24        MR. MOORES:  Negative, your Honor.  They just have

25   sort of said the date of the complaint is a date that we would

1    not be receiving any electronic communications or business

2    records.

3            THE COURT:  I'm the last one to want to encourage

4    discovery motion practice.  I abhor discovery motion practice.

5    I usually ask the Magistrate Judge to oversee it for me, and,

6    frankly, it's not in either of your side's interest to involve

7    me in those matters, because it becomes unpleasant quickly.

8    So, I want to try to avoid having to become engaged with those

9    kind of specific back and forth.  I will offer some general

10   thoughts.

11           You have an argument where you are going to be

12   requesting injunctive relief, and you have allegations of what

13   you say are continuing violations.  The date of the complaint

14   is not an arbitrary cutoff date.  On the other hand, I am

15   sympathetic to LBRY's expressed concern.  I keep in mind when

16   they say the million documents -- you make a good point that,

17   as is usually the case when you make electronic production

18   nowadays, what in the paper world 30 years ago would have been

19   three file boxes is now a million documents.  So, I don't make

20   too much of the number of documents.  But you've had a long

21   time to do pre-filing investigation here; you've had a

22   substantial amount of time to engage with this litigation.

23   Ordinarily, when we get to the end of a discovery period you

24   should be, and you're trying to be, courteous and cooperative,

25   and let's meet and confer, all of which I encourage, but as the

1    discovery deadline approaches that's when you have to sort of

2    get tough and you have to say, Look, I need A, B and C, and I

3    need them by this date, or we're going to have to extend the

4    discovery deadline by X amount of time.

5         So, I'm sympathetic to the extent that LBRY has not

6    produced post-filing documents that are responsive to your

7    request.  In my view, a company that isn't producing what's

8    requested either should seek a protective order from the Court

9    on the grounds that it's overly burdensome, or they should

10   withhold the documents and produce a privilege log explaining

11   the legal reasons why, although responsive, they don't have to

12   be produced.  Absent that, I expect the moving party to file a

13   motion to compel so that we then can order a person to compel

14   and then moderately extend the deadline.  We haven't done any

15   of that here.  My inclination is to say, all right, let's --

16   what are you requesting, a 60-day extension?

17        MR. MOORES:  Yes, your Honor, which actually doesn't

18   impact the trial date as proposed.

19        THE COURT:  My proposal is that we try to cut this

20   thing down, we extend everything by 30 days, we keep the trial

21   date as we schedule it.  That will put pressure on me.  It will

22   take time away from me to resolve the summary judgments

23   motions, but I'm willing to try to assign this matter as an

24   expedited matter in my chambers so that, when the motions

25   become ripe, we hold argument and I try to resolve those on an

1    expedited basis.

2            So, that gives you a little more time, but I think

3    what you would need to do is you need to be very specific with

4    LBRY and say, These are the things out there that I really need

5    before I can do these remaining depositions, and then, if they

6    don't get them, I think what you probably need to do is take

7    the depositions with the documents you've got, file a motion to

8    compel, and at the risk of, if LBRY doesn't produce and I later

9    determine that they have failed to produce, I'll reopen

10   discovery, allow you to do a limited re-deposition about the

11   new documents at LBRY's expense.

12           I want to keep the case moving.  I recognize we're

13   close to the deadline, and so a month seems to be reasonable.

14   You'll have to work hard to get everything in.  But at this

15   point I think the two things you need to do is take a look back

16   at your demands, see what reasonable focus you can bring to

17   them, renew your demands, schedule the remaining depositions.

18   If you don't get the documents you want, file a motion to

19   compel and remind me that I told you that you should go ahead

20   and take the depositions with what you've got, and if I allow

21   additional relevant discovery I'll consider a request to reopen

22   limited depositions at LBRY's expense if they're improperly

23   withholding information.  Okay?  So, that's how I would say to

24   practically resolve it.

25           Let me hear from LBRY.  As I said, I'm sympathetic to

1        your desire to move ahead, but I also -- I don't believe, to

2        the extent you're using some kind of arbitrary filing date

3        cutoff, that that's justifiable, and I do think you should be

4        able at this point -- that the SEC should be able to be quite

5        specific with you as to what they need, and then you need to

6        assign it as a priority.  But we need to get those depositions

7        taken, complete the record here, get our motion practice

8        underway and get this matter resolved.  That's sort of where I

9        am in my thinking.

10              But, Mr. Miller, what did you want to say?

11              MR. MILLER:  I just want to make sure the record is

12       clear on certain things and it's really on what's occurring in

13       discovery.  In our objections to their initial request for

14       document productions we claim we are going to produce between

15       this time and this time.  You need to have, as I explained to

16       counsel, there's got to be a point in time when you have to

17       stop collecting.  I can't go to the company and say, Last week

18       did you -- did you -- were you responding on a slot chain (ph)?

19       That's not fair and reasonable.  We did say to them after this

20       was raised -- and when was this raised?  And I think it's

21       interesting, you Honor, to find out when it was raised.  It was

22       raised in the beginning, right after we submitted our expert

23       report, which was February 4th.  The SEC did not submit an

24       expert report, and since then we've been deluged with, Oh, we

25       don't have this, we don't have that, we don't have this, and

1    we've been trying to work with them.

2          The Google Drive.  We've produced almost everything

3    except for 226 loose documents from Google Drive that are being

4    reviewed right this second, and that's how we've been making

5    production since last week.  If you say this is what we need

6    past this point, we're willing to consider it.  But you can't

7    tell us, You take the subpoena and you interpret it and you

8    produce everything that's responsive as of last week.  That's

9    not fair and reasonable.

10         THE COURT:  I'm sympathetic to that concern.  We're

11   getting towards the end of discovery, so at this point we've

12   got to have the SEC reasonably say, Give us what you've got to

13   this point, and then let's move on, and then, of course, if

14   there is some unusual development in the last few weeks, if

15   someone needs to move to reopen discovery, you can try and do

16   that, but I agree we've got to try to bring this matter to

17   closure.  I would have to imagine that the SEC will have

18   virtually everything it needs to bring its case when it takes

19   those few remaining depositions, and we've just got to get on

20   with the matter.  So, I hear you on that, and I am sympathetic

21   and just would, you know, tell you I will do what I can to

22   expedite my part of it once the motions are ripe and I can

23   consider it.

24         I did take a long time, in my book, to resolve the

25   selective enforcement claim, and I will tell you that, because

1    of the arguments that the parties were taking and my own view

2    -- so the ground on which I decided that matter was a narrow

3    ground, but I have a broader view about how selective

4    enforcement works.  I would have come out the same way without

5    dealing with the narrower ground.  I don't believe the SEC is

6    completely right on its position of a kind of categorical, We

7    can never be charged with selective enforcement approach, that

8    it was arguing.  I also don't believe that LBRY's position --

9    regarding how you deal with selective enforcement defenses, I

10   have my own view, which I spent a lot of time thinking about

11   and ultimately decided, you know, that wasn't an argument that

12   the parties presented, and so out of fairness to the parties I

13   went back and looked at the narrower argument on which I

14   believed from the beginning that the SEC was correct and

15   followed that.  So, that took me a while, because that, as I

16   think you both will acknowledge, is a pretty challenging area

17   of law where the Supreme Court has not been as clear as we

18   would all like it to be about how you deal with the issues of

19   selective enforcement post Engquist.

20           So, I apologize for that.  That took me longer than I

21   expected, but I will assign a priority to this matter when it

22   comes up on the remaining issues, and I should be able to put

23   out an order within, like, 60 days of the time the matter is

24   argued to me, if not sooner.  So, I'll work on my end.  I want

25   you to work on your end.

1           I will grant a 30-day extension of the deadlines you

2    propose, not 60.

3           I will instruct the parties to meet and confer again.

4    I'll tell the SEC that I agree with LBRY's position that we

5    can't expect it to make open-ended, every day they're doing

6    something different they need to go back and they're, Have you

7    got any more now that we need to produce?  It's reasonable to

8    impose a cutoff date, and so you'll explain what that is, agree

9    to it, be specific in your requests, they'll comply, you'll go

10   ahead and schedule all the remaining depositions you propose to

11   take within the next 30-or-so days that we have left in the

12   discovery period, and then we'll move on.  Okay?

13          So, the parties' positions on that are preserved, to

14   the extent they disagree with that.  It's a practical approach

15   to try to address I think legitimate concerns on both sides.

16          Did you want to say something else, Mr. Miller?

17          MR. MILLER:  Yeah, I just wanted, for point of

18   clarification, the extension of 30 days is simply for the

19   completion of discovery; it doesn't include expert disclosures

20   and reports.  Is that correct?

21          THE COURT:  All right.  I'm glad you raised that.  You

22   alluded to this, and we need to explore it.  I think maybe I'm

23   reading too much into your remarks, but you've left me with the

24   impression that what you think is going on here is that the SEC

25   was caught flatfooted by your expert disclosure, and what it's

1   really trying to do here is bargain for more time to find a

2   last-minute expert and make a report?  Am I reading too much

3   into your remarks?

4         MR. MILLER:  I think that's correct, your Honor.

5         THE COURT:  All right.  So, are you trying to get an

6   extension of the expert disclosure deadline, and, if so, why?

7   I'm talking to the SEC now.

8         MR. MOORES:  Your Honor, that's not a part of our

9   proposal.

10         THE COURT:  Okay.

11         MR. MOORES:  But I would reserve, you know, if we were

12   to come back and propose to the Court a rebuttal expert report

13   deadline, but at this time we are not seeking an extension of

14   the expert report deadline.

15         THE COURT:  Okay.  So, that's covered, and you reserve

16   your right to try to get an extension, if you need one, on the

17   rebuttal disclosure deadline.

18         So, that should give you some comfort, Mr. Miller.

19         Okay.  So, that takes care of that issue.  The other

20   issue really isn't ripe yet.  I can't really, out of fairness

21   to LBRY, the government filed a motion for protective order

22   with respect to the 30(b)(6) deposition.  I do need to hear

23   LBRY's response to it.  On the other hand, I do think there is

24   information that the parties can glean from this hearing that

25   should give them some ability to predict how I'm likely to rule

1    on some of these matters.  So, do what you need to do, but we

2    should probably not hold the 30(b)(6) deposition until LBRY

3    responds and I have a chance to rule on LBRY's response.  And

4    I'm completely open-minded on this with respect to specific

5    issues, but, as I said, I am inclined to think of the fair

6    notice defense, and this isn't an investment contract defense,

7    as largely issues that are resolved based on what's in the

8    public record and not on what's in the internal deliberative

9    processes of the SEC.  So, I think to the extent LBRY is

10   seeking all of the things it's listed in that enumerated list

11   with the government's filing there are going to be some

12   problems with that based on what I've said to you up to now.

13   But I'm open to hearing your views, and perhaps the parties

14   between now and then can reach some kind of reasonable

15   compromise on a narrower subset of proposals.  But if you

16   can't, file your objection.  I'll rule on it when I get the

17   objection, and I'll rule on it on the papers and try to do it

18   expeditiously so we can keep this thing moving.

19           All right.  Is there anything more from the SEC?

20           MR. MOORES:  No, thank you, your Honor.

21           THE COURT:  Anything else from LBRY, Mr. Miller?

22           MR. MILLER:  Nothing further.  Thank you, your Honor.

23           THE COURT:  All right.  Thank you.  That concludes the

24   hearing.  I appreciate the good quality of the argument.  The

25   parties in their dealings with me have been nothing but

1    cooperative and responsive, and I hope you'll continue to work

2    that way with me and with each other so that we can focus on

3    the legitimate legal issues that are being raised here.  So, I

4    appreciate your efforts in that regard.

5            All right.  Thank you.  That concludes the hearing.

6            MR. MOORES:  Thank you, your Honor.

7        (WHEREUPON, the proceedings adjourned at 3:10 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of the

8    within proceedings.

9

10

11

12

13   Date:  ___2/25/22___                /s/ *Brenda K. Hancock*
                                         Brenda K. Hancock, RMR, CRR
14                                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25