# EXHIBIT C

# WACHTELL, LIPTON, ROSEN & KATZ

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150

TELEPHONE: (212) 403-1000
FACSIMILE: (212) 403-2000

GEORGE A. KATZ (1965–1989)
JAMES H. FOGELSON (1967–1991)
LEONARD M. ROSEN (1965–2014)

June 25, 2024

<u>BY EMAIL</u>

Nicholas Margida
Senior Trial Counsel
U.S. Securities & Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549-5977

    Re:    *Securities and Exchange Commission* v. *Coinbase, Inc. and Coinbase Global, Inc.*, 23 Civ. 4738 (KPF)

Dear Nick:

    We write to summarize our understanding of the SEC's positions concerning certain of Coinbase's document requests, as conveyed during calls between the parties on June 13, 17, and 20. Please let us know if any of the following is incorrect.

## **GENERAL ISSUES**

    We have identified two broad areas of disagreement between the parties, which apply to multiple requests:

WACHTELL, LIPTON, ROSEN & KATZ

Nicholas Margida
June 25, 2024
Page 2

### Documents Held By Non-Investigatory Personnel

In its responses and objections, the SEC limited the definition of the "SEC" to the Division of Enforcement employees who conducted the Coinbase investigation. On our calls, the SEC confirmed that, other than with respect to select investigative files, it will not conduct any search outside of the files held by the Coinbase investigation staff, including any files outside of the Division of Enforcement, for information responsive to Coinbase's requests.

Coinbase disagreed with the SEC's position, noting that even divisions outside of Enforcement — for example, Trading and Markets or Corporation Finance — would likely have documents responsive to Coinbase's requests. Those sources should therefore be searched. The SEC acknowledged that Coinbase's requests called for information that might be in the possession, custody, or control of non-investigatory staff, but took the position that such documents were not relevant to the claims and defenses in the action. The SEC said that it was open to reconsidering its position in connection with specific requests but, after meeting and conferring on each of the Coinbase requests for production, the SEC has not changed its position.

The parties are at an impasse on this matter.

### Documents Relevant to Coinbase's Defenses

During our calls, the SEC asserted that Coinbase's defenses, including as to fair notice and abuse of discretion, were "effectively dead" in light of Judge Failla's decision on Coinbase's motion for judgment on the pleadings. The SEC said that it is therefore unwilling to search for and produce any documents relevant to Coinbase's defenses unless and until Judge Failla confirms that the defenses are still in the case.

Coinbase disagreed, noting that the SEC opted not to move to strike the defenses and that Coinbase did not move for judgment on the pleadings on the basis of them — a point that the SEC had acknowledged in prior meet and confers. Following our June 13 discussion, the SEC specified that in order to confirm the SEC's position that it will not search for or produce documents requested in furtherance of Coinbase's defenses, the SEC required a discussion of each Coinbase request and the related defenses pursuant to which Coinbase seeks relevant document disclosure. Coinbase provided this information in two follow-up discussions, addressing each Coinbase request, but the SEC disagreed in each instance. The SEC's position continues to be that it will not search for documents relevant to Coinbase defenses, including any such documents in the select non-Coinbase investigative files that it has agreed to search.

The parties are at an impasse on this issue.

WACHTELL, LIPTON, ROSEN & KATZ

Nicholas Margida
June 25, 2024
Page 3

## SPECIFIC RFPs

### Investigative Files

**The Coinbase Investigative File (RFP 1)**

In response to RFP 1, the SEC has agreed to produce the investigative file for the investigation captioned *In the Matter of Coinbase, Inc.* conducted under File Nos. HO-14315 and SF-04523. We explained that any file for any investigation that formed the basis for the complaint should be produced, not just the *Coinbase* investigative file. In response, you represented that any information that the SEC relied on in preparing the complaint would be included in the *Coinbase* investigative file, ███████████████████████████████, which you stated have also been produced. You also confirmed that the investigative file being produced includes all documents concerning the investigation and not just those that the SEC plans to rely on affirmatively to support its claims. Finally, you confirmed that all documents contained in the *Coinbase* investigative file would be produced or logged in accordance with the Court's Rule 502(d) order. Please let us know if any of the foregoing is incorrect.

**SEC's Other Investigative Files (RFP 26)**

The SEC's initial position was that it would not search any non-*Coinbase* investigative file for responsive information, including the files related to the matters listed in RFP 26. ███████████████████████████████████████████████████████████ The SEC did not dispute that the files might contain responsive information but contended that it would be too burdensome to search and review what it claimed would be potentially dozens of other investigative files. When we asked whether the SEC had undertaken any analysis to determine or quantify that burden, you stated that the SEC had not attempted to search any non-*Coinbase* files but that the number of other files that Coinbase had requested to be searched would be "inherently burdensome." In response, we noted that RFP 26 only sought information from ten investigative files and that it did not seem overly burdensome to determine which if any of those files contained responsive information. You agreed to look into the issue.

We understand from our most recent meet and confers that the SEC has now agreed to search for responsive documents in ██████████████████████████████████████████ ██████████████████████████ and (ii) investigations related to the Bittrex, Kraken, and Binance exchanges. █████████████████████████████████████ The SEC also stated that, as to the non-*Coinbase* investigative files it is willing to search for responsive documents, the SEC will not log any responsive documents that it withholds on the basis of privilege. As we explained on the call, given that the SEC will be searching the investigative files to identify responsive information and to determine what if any of that information is privileged, preparing

WACHTELL, LIPTON, ROSEN & KATZ

Nicholas Margida
June 25, 2024
Page 4

the log required by the Court's Rule 502(d) order (on a categorical basis, supplemented by document metadata) does not present a substantial, additional burden — and again, it is required by the Court's order. Please let us know if the SEC will reconsider its position. Otherwise, we understand the parties to have reached an impasse on this issue.

We will reserve on the other investigations identified in RFP 26, except for the investigative files for *Wahi* and *Kraken* staking, as to which we reiterate our position that these files should be searched for responsive documents to be produced (or if withheld on a claim of privilege, then logged as required by the Court's order). Please let us know whether the SEC will reconsider its position at least as to those additional investigative files. Otherwise, we understand the parties to have reached an impasse on that issue.

**Documents Concerning Coinbase and the Named Tokens and Services (RFPs 2, 3, 4, 5, 6, 15, 16, 17, 20, and 21)**

The SEC does not dispute that RFPs 2, 3, 4, 5, 6, 15, 16, 17, 20, and 21 seek relevant information, but the SEC does not agree to search for and produce responsive information beyond that contained within the select investigative files discussed above. The SEC's position is that its internal views are not relevant to the claims and defenses in the action, and are in any event likely privileged, and that any relevant third-party communications, or internal communications reflecting such communications, would be too burdensome to identify. The SEC, however, has offered no information, such as "hit reports," to substantiate its claims of burden with respect to the search for the requested information.

Coinbase disagrees with the SEC's position and believes that the SEC should undertake a reasonable search of files likely to contain responsive information, including files outside the Enforcement Division.[1] Coinbase has communicated its willingness to work with the SEC on a reasonable search, including as to relevant custodians and search terms, and, as set forth below, proposes that the SEC undertake a preliminary search to furnish a "hit report" to enable the parties to better address the asserted burden of searching the files for responsive information. If the SEC does not agree to undertake the requested search, we will be at an impasse.

**Communications with Issuers/Developers of the Named Tokens (RFP 8)**

The SEC has taken the position that it will not search its files for communications with issuers or developers of the named tokens outside of the select investigative files that it has agreed to search. Coinbase's position is that such communications are plainly responsive and non-privileged. The SEC does not dispute that such communications may exist, and indeed productions in other litigation confirm that SEC personnel outside of the Division of

---

[1] While reserving our position as set forth in our Requests for Production and as stated in our meet and confers, for now Coinbase is willing to limit RFPs 15 and 16 to documents concerning the Coinbase Platform, the Named Tokens and Services, and whether market participants had fair notice of whether and how the securities laws would be applied to digital assets.

WACHTELL, LIPTON, ROSEN & KATZ

Nicholas Margida
June 25, 2024
Page 5

Enforcement had communications with token issuers that would be responsive. Ex. A (letter from counsel for Dash Core Group). We believe that the burden of identifying such communications should be modest and that such communications should be collected and produced. As set forth below, Coinbase proposes that the SEC undertake a preliminary search to furnish a "hit report" to enable the parties to better understand the asserted burden of searching the files for responsive information. If the SEC does not agree to undertake the requested search, we will be at an impasse.

**Documents Concerning Public Statements by the SEC (RFPs 13, 14, and 28)**

The SEC refuses to produce documents in response to RFPs 13, 14, and 28 — which seek information concerning public positions and statements by the SEC, Chair Gensler, and other SEC representatives relating to the application of the securities laws to digital assets — on the ground that the requests seek what the SEC characterizes as irrelevant information. As noted during our calls, we disagree and believe that the requests are particularly relevant to Coinbase's fair notice defense. The parties are at an impasse as to these requests.

**Documents Concerning Coinbase's Form S-1 and Direct Public Offering (RFP 27)**

The SEC will not produce documents in response to RFP 27, concerning Coinbase's direct public offering or registration statement on Form S-1, on the ground that the requests seek what the SEC characterizes as irrelevant information. As set forth in Coinbase's Answer and as detailed in our meet and confers, the SEC's detailed review of Coinbase's business and declaring effective Coinbase's registration statements under 15 U.S.C. § 77h(a) and 17 C.F.R. § 230.461(b) bears directly on Coinbase's fair notice defense. The parties are at an impasse as to this request.

**Additional Requests Subject to Relevance Objection**

The SEC objected to producing any documents in response to RFPs 7, 9, 10, 11, 12, 19, 23, 24, 29, and 30, on the ground that they seek what the SEC characterizes as irrelevant information. For the reasons discussed on our meet and confers, we disagree with the SEC's position and believe the requests are relevant to Coinbase's defenses, including its fair notice defense. It appears we are at an impasse as to these requests. For now, however, Coinbase is willing to reserve its position on these requests.

*   *   *   *   *

During our meet and confers, the SEC justified a number of its objections to Coinbase's requests on the grounds that searching for documents and information outside of certain investigative files maintained by the Division of Enforcement would be overly burdensome. The SEC, however, has not assessed with any data the scale of that purported burden. We therefore request that the SEC prepare hit reports based on an illustrative search of its files to better understand the volume of documents that might be subject to review in response to Coinbase's

WACHTELL, LIPTON, ROSEN & KATZ

Nicholas Margida
June 25, 2024
Page 6

requests. The proposed preliminary search is set forth at the Appendix hereto.[2] Please let us know by June 27 whether the SEC is willing to undertake this search or, at minimum, to meet and confer regarding appropriate preliminary search parameters to furnish such a hit report.

Respectfully,

*Kevin Schwartz*

Kevin S. Schwartz

---

[2] Coinbase reserves all rights with respect to any final search protocol to be negotiated between the parties.

**Appendix – Proposed Search for Hit Report**

**Date Range**:  January 1, 2017 through June 6, 2023

**Custodians**:  Jay Clayton, Rob Cohen, Caroline Crenshaw, Michael Gaw, Gary Gensler, Erik Gerding, William Hinman, David Hirsch, Jon Ingram, Renee Jones, Allison Herren Lee, Kristina Littman, Jaime Lizárraga, Hester Peirce, Brett Redfearn, Elad Roisman, Michael Seaman, Amy Starr, Valerie Szczepanik, Mark Uyeda, Mark Vilardo, and Haoxiang Zhu.

**Search Terms (limited to emails with fewer than 50 addressees to avoid mass emails)**

- Coinbase
- Solana
- SOL
- @solana.org
- @solana.com
- @solana.foundation
- Cardano
- ADA
- @cardanofoundation.org
- @iohk.io
- @emurgo.io
- Polygon
- MATIC
- @polygon.technology
- @protocol.ai
- Filecoin
- FIL
- @fil.org
- Sandbox
- SAND
- @sandbox.game
- Axie
- AXS
- @animocabrands.com
- @pixowl.com
- @axieinfinity.com

- @skymavis.com
- Chiliz
- CHZ
- @chiliz.com
- @mediarex.com
- "Dapper Labs"
- FLOW
- @dapperlabs.com
- @dfinity.org
- "Internet Computer"
- ICP
- Internetcomputer.org
- NEAR /s (protocol or token)
- @near.foundation
- @near.org
- Voyager
- VGX
- @investvoyager.com
- DASH
- @dash.org
- (crypto* or token or "digital asset") and ("fair notice" or *certainty or confusion)
- (crypto* or token or "digital asset") and (Howey or securit* or ecosystem)

# EXHIBIT A

# Exhibit 217



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-001

October 31, 2018

Office of Chief Counsel
Division of Corporation Finance
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Office of Chief Counsel
Division of Markets and Trading
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Re:     Dash Virtual Currency

Dear Sir or Madam:

On October 4, 2018, representatives of our client Dash Core Group, Inc. ("DCG") and we met with members of the Staff of the Division of Corporation Finance and the Division of Markets and Trading to discuss our draft letter dated August 30, 2018 requesting no action relief (the "Draft Request") in respect of Dash, a virtual currency, on the basis outlined therein. At such meeting, the Staff requested that we provide a supplemental memorandum analyzing Dash within the rubric of the factors outlined by William Hinman, Director of the Division of Corporation Finance, in his speech titled "Digital Asset Transactions: When Howey Met Gary (Plastic)," dated June 14, 2018. This letter sets forth our analysis.

For ease of reference, each of the factors identified in Director Hinman's speech is reproduced below in bold text with our responses immediately following.

1. **Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?**

    The Dash network (the "Network") is decentralized and has been since inception. Dash and the Network initially were developed by a small group of individuals led by Evan Duffield, but these individuals' efforts were relatively quickly replaced by efforts of a much larger decentralized community of persons interested in promoting Dash as a superior virtual currency. DCG is not aware of any of the initial developers continuing to play a significant role in further development or maintenance of the Network.

    As explained in greater detail in the Draft Request, the Network consists of thousands of nodes that validate transactions which are processed by "miners." Certain nodes known as "masternodes" perform specialized functions on the Network, including processing InstantSend transactions (which allow users to receive confirmation of their transaction within seconds) and PrivateSend transactions (which provide enhanced privacy). In exchange for their contributions to the Network, miners and masternodes share "block rewards," which are sums of newly created Dash, and transaction fees. All Dash in existence has been created via the issuance of block rewards and Dash Treasury Funds (discussed below) after the Network was operational. The Network has never sold Dash.

Paul Hastings LLP | 515 South Flower Street | Twenty-Fifth Floor | Los Angeles, CA 90071
t: +1.213.683.6000 | www.paulhastings.com

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004765
SEC-LIT-EPROD-001463104
RPLI_02172973



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-002

October 31, 2018
Page 2

In addition to performing specialized functions for the Network, masternodes also serve a governance function in the Network by voting on Network proposals. Each month, 10% of the amount of aggregate block rewards is allocated to "Dash Treasury Funds," which are used to fund projects and activities that serve the needs of the Network, including supporting further development of the Network and promoting the use of Dash. Anyone can submit a proposal for such a project for a fee of five Dash (Dash paid as proposal submission fees are destroyed). The decision to approve a specific proposal is determined by a vote of the masternode operators. Assuming there are sufficient Dash Treasury Funds to fund a particular proposal, if the number of votes in favor of such proposal exceeds the number of votes against a proposal by a margin of at least 10% of the total number of masternodes, the Network automatically creates and allocates the requested amount of Dash Treasury Funds contemplated by the proposal.[1]

Numerous organizations, groups and individuals, including DCG, regularly submit proposals for Dash Treasury Funds to fund their activities in support of the Network. DCG provides software development, marketing, advocacy and business development services to advance the interests of the Network. However, there are other organizations, groups and individuals who regularly submit proposals for and receive Dash Treasury Funds to provide these types of services to the Network. Masternode operators determine which proposals to fund.

2. **Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?**

As architected, there never was a "developers' fund" or other reserve of Dash that was allocated to the developers of the Network. Any Dash possessed by early developers of the Network was acquired through mining (in which case, their mining activities competed with those of other miners) or as Dash Treasury Funds or purchased on the secondary market.

Similarly, organizations, groups and individuals who "support" the Network today do so by processing transactions (and are rewarded with block rewards) or performing services to benefit the Network pursuant to proposals submitted to and approved by the masternode operators. For example, DCG submits proposals to cover its operating expenses, including compensation to employees, contractors and other service providers, rent and other overhead expenses. DCG spends nearly all of the Dash it receives on a monthly basis; any balance is maintained for working capital purposes (e.g., to pay operating expenses in months during which such expenses exceed the Dash Treasury Funds received by DCG).

Dash Treasury Funds can fund proposals that promote Dash or improve the functionality of the Network, which may lead to an increase in Dash's value due to demand and other market factors. However, there is no assurance that any proposal for Dash Treasury Funds will be approved or that parties who provide services to the Network will continue to do so.

---

[1] From time to time, proposals are submitted that seek input from the masternode operators regarding significant strategic decisions relating to the Network rather than requesting allocation of Dash Treasury Funds. The subject matter of past "decision proposals" has included increasing the transaction block size, changing the Dash logo, and reducing the proposal submission fee.

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004766
SEC-LIT-EPROD-001463105
RPLI_02172974



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-003

October 31, 2018
Page 3

3.  **Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?**

    The Network did not conduct an "ICO" or any other form of token sale. No Dash were ever sold by the Network or any founder to fund development of the Network. All Dash in circulation were created after the Network became operational in January 2014 as a result of mining, in the form of block rewards and Dash Treasury Funds.

4.  **Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?**

    Dash generally is promoted as a superior form of virtual currency and not for its investment potential. When used in commercial transactions, Dash functions as a medium of exchange. Dash is accepted by over 3,900 merchants around the world.[2] It can be used to pay for food, clothing, utilities, mobile service, travel and many other goods and services.[3] Dash users completed around 979,000 transactions using Dash in the second quarter of 2018.[4]

    We note that, due to the decentralized nature of the Network, no particular person or entity controls the marketing of Dash. From time to time, the Network approves proposals submitted by third parties, including DCG, to promote the benefits of Dash. DCG has tended to focus on Dash's utility and unique features in its own marketing efforts and has discouraged other marketers of Dash from characterizing Dash as an investment opportunity or emphasizing the potential for profit.

    Dash can only be acquired through mining, operating a masternode, through an approved proposal for Dash Treasury Funds or in the secondary market. When acquired on the secondary market, the parties to the transaction determine the price at which Dash is sold.

5.  **Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?**

    Characterization of Dash as a "security" under the Securities Act makes no sense and would be a substantial impediment to Dash achieving widespread use as a virtual currency. In no way does a holder, in receiving Dash through mining or Dash Treasury Funds or in purchasing Dash in the secondary market, invest in any profit-making enterprise managed by any identified dedicated group of individuals or entities.

---

[2] *See Welcome To Discover Dash Online Business Directory,* https://discoverdash.com (last visited Oct. 29, 2018).
[3] *Id.*
[4] *See Dash Transactions hist. chart,* BitInfoCharts, https://bitinfocharts.com/comparison/dash-transactions.html (last visited Oct. 30, 2018).

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004767
SEC-LIT-EPROD-001463106
RPLI_02172975



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-004

October 31, 2018
Page 4

The Network as the creator of Dash does not generate revenues or profits that are paid as financial return to holders of Dash. Moreover, there are no managers or promoters of Dash who solicit funds from purchasers or upon whose performance the value of Dash is dependent. As described in detail in the Draft Request, the Network relies on many third parties to perform functions that might typically be carried out by promoters or managers. In exchange for Dash paid from the Network (in the form of block rewards and Dash Treasury Funds), these third parties provide services that enhance the Network, such as transaction processing (provided by miners), Network security and functionality (supported by masternodes), and software development and marketing (provided by third parties like DCG). However, these services are funded only as a result of mining and only if proposals for such services are approved by the masternodes. Ultimately, the masternodes (of which there are currently approximately 4,900[5]) collectively choose how to allocate Dash Treasury Funds.

Information about Dash and the Network is publicly available to anyone with internet access. The Network's code can be viewed on github.com.[6] All proposals for Dash Treasury Funds and the results of voting on such proposals are publicly viewable.[7] Many of the organizations, groups and individuals who receive Dash Treasury Funds share periodic updates on their activities and the progress of specific projects funded by Dash Treasury Funds with the Dash community in public online forums.[8]

6. **Do persons or entities other than the promoter exercise governance rights or meaningful influence?**

Because there is no central authority or single or core group of promoters of Dash, governance and influence over Dash and the Network resides with users that contribute resources to the Network. Miners influence the Network in a similar fashion to Bitcoin, in which a critical mass of users must support a new Network version or feature for such version or feature to be implemented successfully. Masternodes participate in Network governance in the same way as miners and also by voting on proposals, thereby determining who receives Dash Treasury Funds from the Network.

7. **Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?**

All Dash in circulation were created after the Network became operational in January 2014, as a result of mining in the form of block rewards and Dash Treasury Funds. No Dash have ever been sold by the Network.

8. **Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?**

---

[5] *Home*, Dash Central, https://www.dashcentral.org/ (last visited Oct. 30, 2018).
[6] See *dashpay/dash*, GitHub, https://github.com/dashpay/dash (last visited Oct. 30, 2018).
[7] See *Budget*, Dash Central, https://www.dashcentral.org/budget (last visited Oct. 30, 2018).
[8] See *Welcome to the Dash Forum*, https://www.dash.org/forum/ (last visited Oct. 30, 2018). For example, DCG holds quarterly webcasts to update the Dash community on progress of projects it has undertaken and provide transparency regarding its activities.

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004768
SEC-LIT-EPROD-001463107
RPLI_02172976



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-005

October 31, 2018
Page 5

The price of Dash is solely determined by buyers and sellers in the secondary market. DCG does not engage in trading Dash and simply sells a portion of the Dash it receives pursuant to approved proposals for Dash Treasury Funds when and as needed to support its ongoing operations.[9]

9. **Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?**

As noted above, users acquire Dash through mining, operating a masternode, through an approved proposal for Dash Treasury Funds or in the secondary market. Because users do not acquire Dash from the Network in a purchase transaction, they do not make representations to the Network regarding their intent. While it is impossible to know the subjective motivations of purchasers of Dash, it is evident from the adoption of Dash as an alternative form of payment that many users purchase Dash for personal use as a medium of exchange. Dash has become a leading cryptocurrency, accepted by over 3,900 merchants around the world and can be used to pay for a multitude of goods and services. Dash can be held and transferred in amounts as small as eight (8) decimal places, or $1/100,000,000^{th}$ of one unit. At current prices, this is less than $1/5,000^{th}$ of one U.S. cent.[10] Together with Dash's InstantSend feature, this makes Dash suitable for use in everyday transactions like buying a cup of coffee.

10. **Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?**

As noted above, Dash can be held and transferred in amounts that make it suitable for everyday use and even micro-payments.

The value of Dash fluctuates over time with market supply and demand, but there is nothing inherent in the Dash protocol that incentivizes either its prompt or later use. Similar to Bitcoin or fiat currencies, Dash can and does act as a store of value, though the value remains volatile at its current scale.

The supply of Dash increases over time as new Dash are created through mining. The amount of Dash created annually has declined as a result of lower block rewards, and is expected to continue to do so.[11] The total amount of Dash that can be created is not expected to exceed 18.9 million.[12]

---

[9] DCG endeavors to pay its vendors and contractors in Dash however, it has to exchange some of its Dash into fiat currency in order to pay those vendors and contractors who do not accept Dash.

[10] *See Dash*, https://coinmarketcap.com/currencies/dash/ (last visited Oct. 30, 2018).

[11] As explained in more detail in the Draft Request, block rewards fluctuate based on how much processing power is operating on the Network. Based on the level of processing power currently available to the Network, it is likely that the block reward will remain at its minimum going forward.

[12] The total amount of Dash that ultimately will be created depends on three variables: (i) the number of Dash created as block rewards; (ii) the number of Dash created and allocated each month as Dash Treasury Funds and (iii) decreases in Dash circulation resulting from the destruction of Dash paid as proposal submission fees. Because of these factors, it is highly unlikely that the total number of Dash in circulation will ever exceed 18.9 million.

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004769
SEC-LIT-EPROD-001463108
RPLI_02172977



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-006

October 31, 2018
Page 6

### 11. Is the asset marketed and distributed to potential users or the general public?

Dash is created and distributed by the Network only in connection with mining, operation of a masternode and approved proposals for Dash Treasury Funds. Dash also may be acquired on the secondary market on digital currency exchanges or through direct transfers between users. Users who acquire Dash through mining, operating a masternode or as Dash Treasury Funds are likely potential users of the Network, as are users who acquire Dash directly from other users.

As noted above, no particular person or entity controls the marketing of the benefits of Dash. Dash is marketed by individual users as well as groups and organizations, some of whom are funded by approved Network proposals; consequently, marketing techniques, messages and the audiences for whom they are intended vary. Some parties who promote the use of Dash likely take the view that because Dash is a virtual currency useable by anyone with access to the internet, the potential user base of Dash extends to the general public at large.

### 12. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

DCG is not aware of any individuals or entities with concentrated holdings of Dash sufficient to control the outcome of masternode voting or transaction processing on the Network.

While nobody can precisely determine concentration of ownership of Dash due to the fact that ownership of wallets is not known, all anecdotal evidence, such as voting behavior and wallet analysis[13], suggests that Dash is as diversely held as other similar virtual currencies. As of October 30, 2018, the top ten and 100 addresses holding the largest quantities of Dash held 5.36% and 13.99%, respectively, of total Dash in circulation.[14] By comparison, as of that same date, the top ten and 100 addresses holding the largest quantities of Bitcoin held 5.38% and 18.94%, respectively, of total Bitcoin in circulation.[15]

Similarly, based on information made available to DCG by dashcentral.org, a website that allows masternode operators to register their masternodes and obtain access free monitoring and voting tools, DCG believes there is little concentration of masternode ownership. According to such information, as of July 27, 2018, 472 masternode owners had proven ownership of 1,990 masternodes, or approximately 42% of all masternodes as of such date. The most masternodes owned by a single account was 197, which represents approximately 4% of all masternodes as of such date. This data set represents almost half of the masternode population, and DCG believes it offers valuable insight into masternode ownership distribution.

---

[13] Analysis of masternode voting supports certain assumptions about the ownership of masternodes. For example, if a block of masternodes consistently votes the same way, it might suggest that they are owned by the same person. Timing of voting is also a potential indicator of common ownership; for example, if a block of masternodes consistently cast their votes at the same time, it might suggest that they are owned by the same person. There are various types of analyses that can help link individual addresses to a single wallet or owner. The most commonly used analysis, referred to as a "taint" analysis, makes the assumption that whenever a transaction involves two or more inputs, those addresses most likely belong to the same user.

[14] *Dash (DASH) price stats and information*, BitInfoCharts, https://bitinfocharts.com/dash/ (last visited Oct. 30, 2018).
[15] *Bitcoin (BTC) price stats and information*, BitInfoCharts, https://bitinfocharts.com/bitcoin/ (last visited Oct. 30, 2018).

HIGHLY CONFIDENTIAL

SEC-SEC-E-0004770
SEC-LIT-EPROD-001463109
RPLI_02172978



CONFIDENTIAL TREATMENT REQUESTED
BY DASH CORE GROUP, INC.
UNDER 17 C.F.R. §200.83
DASH-007

October 31, 2018
Page 7

**13. Is the application fully functioning or in early stages of development?**

The Network has been fully operational since 2014. New features and enhancements are continuously added to the Network to facilitate greater adoption of Dash through improved functionality and security.

DCG submits that application of the factors identified in Director Hinman's speech to Dash and the Network further supports the no action position requested by DCG that Dash is not a security.

If you have any comments or questions, please do not hesitate to contact the undersigned.



HIGHLY CONFIDENTIAL

SEC-SEC-E-0004771
SEC-LIT-EPROD-001463110
RPLI_02172979