# EXHIBIT N

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

# VIRTUAL HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

MAY 6, 2021

Printed for the use of the Committee on Financial Services

## Serial No. 117–22



U.S. GOVERNMENT PUBLISHING OFFICE

44–837 PDF          WASHINGTON : 2021

HOUSE COMMITTEE ON FINANCIAL SERVICES

MAXINE WATERS, California, *Chairwoman*

| | |
|---|---|
| CAROLYN B. MALONEY, New York | PATRICK McHENRY, North Carolina, |
| NYDIA M. VELÁZQUEZ, New York | *Ranking Member* |
| BRAD SHERMAN, California | FRANK D. LUCAS, Oklahoma |
| GREGORY W. MEEKS, New York | BILL POSEY, Florida |
| DAVID SCOTT, Georgia | BLAINE LUETKEMEYER, Missouri |
| AL GREEN, Texas | BILL HUIZENGA, Michigan |
| EMANUEL CLEAVER, Missouri | ANN WAGNER, Missouri |
| ED PERLMUTTER, Colorado | ANDY BARR, Kentucky |
| JIM A. HIMES, Connecticut | ROGER WILLIAMS, Texas |
| BILL FOSTER, Illinois | FRENCH HILL, Arkansas |
| JOYCE BEATTY, Ohio | TOM EMMER, Minnesota |
| JUAN VARGAS, California | LEE M. ZELDIN, New York |
| JOSH GOTTHEIMER, New Jersey | BARRY LOUDERMILK, Georgia |
| VICENTE GONZALEZ, Texas | ALEXANDER X. MOONEY, West Virginia |
| AL LAWSON, Florida | WARREN DAVIDSON, Ohio |
| MICHAEL SAN NICOLAS, Guam | TED BUDD, North Carolina |
| CINDY AXNE, Iowa | DAVID KUSTOFF, Tennessee |
| SEAN CASTEN, Illinois | TREY HOLLINGSWORTH, Indiana |
| AYANNA PRESSLEY, Massachusetts | ANTHONY GONZALEZ, Ohio |
| RITCHIE TORRES, New York | JOHN ROSE, Tennessee |
| STEPHEN F. LYNCH, Massachusetts | BRYAN STEIL, Wisconsin |
| ALMA ADAMS, North Carolina | LANCE GOODEN, Texas |
| RASHIDA TLAIB, Michigan | WILLIAM TIMMONS, South Carolina |
| MADELEINE DEAN, Pennsylvania | VAN TAYLOR, Texas |
| ALEXANDRIA OCASIO-CORTEZ, New York | PETE SESSIONS, Texas |
| JESÚS "CHUY" GARCIA, Illinois | |
| SYLVIA GARCIA, Texas | |
| NIKEMA WILLIAMS, Georgia | |
| JAKE AUCHINCLOSS, Massachusetts | |

CHARLA OUERTATANI, *Staff Director*

(II)

# CONTENTS

―――――――

|                                                                                                    | Page |
|----------------------------------------------------------------------------------------------------|------|
| Hearing held on:                                                                                   |      |
|   May 6, 2021  .................................................................................................................... | 1    |
| Appendix:                                                                                          |      |
|   May 6, 2021  .................................................................................................................... | 69   |

## WITNESSES

### THURSDAY, MAY 6, 2021

| | Page |
|---|---|
| Bodson, Michael C., President and Chief Executive Officer, The Depository Trust & Clearing Corporation (DTCC)  ............................................................. | 6 |
| Cook, Robert W., President and Chief Executive Officer, Financial Industry Regulatory Authority (FINRA)  .......................................................................... | 8 |
| Gensler, Hon. Gary, Chairman, U.S. Securities and Exchange Commission (SEC)  ....................................................................................................................... | 5 |

## APPENDIX

| | Page |
|---|---|
| Prepared statements: | |
|   Bodson, Michael C.  .......................................................................................... | 70 |
|   Cook, Robert W.  ............................................................................................... | 76 |
|   Gensler, Hon. Gary  ......................................................................................... | 89 |

### ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

| | Page |
|---|---|
| Williams, Hon. Nikema:: | |
|   Written responses to questions for the record from Hon. Gary Gensler  ...... | 96 |

# GAME STOPPED? WHO WINS AND LOSES WHEN SHORT SELLERS, SOCIAL MEDIA, AND RETAIL INVESTORS COLLIDE, PART III

————————

**Thursday, May 6, 2021**

U.S. House of Representatives,
Committee on Financial Services,
*Washington, D.C.*

The committee met, pursuant to notice, at 12 p.m., via Webex, Hon. Maxine Waters [chairwoman of the committee] presiding.

Members present: Representatives Waters, Maloney, Sherman, Meeks, Scott, Green, Cleaver, Perlmutter, Himes, Foster, Vargas, Gottheimer, Lawson, Axne, Casten, Torres, Adams, Tlaib, Dean, Garcia of Illinois, Williams of Georgia, Auchincloss; McHenry, Lucas, Posey, Luetkemeyer, Huizenga, Wagner, Barr, Williams of Texas, Hill, Zeldin, Loudermilk, Mooney, Davidson, Budd, Kustoff, Hollingsworth, Gonzalez of Ohio, Rose, Steil, Timmons, and Taylor.

Chairwoman WATERS. The Financial Services Committee will come to order.

Without objection, the Chair is authorized to declare a recess of the committee at any time.

As a reminder, I ask all Members to keep themselves muted when they are not being recognized by the Chair. The staff has been instructed not to mute Members except when a Member is not being recognized by the Chair and there is inadvertent background noise.

Members are also reminded that they may only participate in one remote proceeding at a time. If you are participating today, please keep your camera on, and if you choose to attend a different remote proceeding, please turn your camera off.

Today's hearing is entitled, "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III."

I now recognize myself for 4 minutes to give an opening statement.

Today, this committee convenes for part three of our series of hearings focused on market volatility related to GameStop and other stocks. In our first hearing on those events, we received testimony from the CEOs of trading app, Robinhood; Wall Street firms, Citadel and Melvin Capital; and social media company, Reddit; as well as Keith Gill, a trader involved in WallStreetsBets on subreddit. We heard directly from those involved in the short squeeze and volatility and we got the facts.

(1)

2

In our second hearing, we received testimony from a number of capital markets experts and investor advocates to hear their views and begin to assess possible legislative and regulatory steps that may be necessary. We examined conflicts of interest in the market. We scrutinized payment for order flow, potential systemic risks to our financial system, the gamification of trading, the clearance and settlement process for trades, and the evolution of trading with the rising use of social media and new technologies.

Today, we will focus on the regulatory response to the market volatility. Specifically, we will hear testimony from the U.S. Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), and the Deposit Trust and Clearing Corporation (DTCC) about their responses to events we are examining. It is critical for our cops on the block at the SEC to protect investors and ensure that our markets are transparent and fair. Unfortunately, the previous Administration's appointees to financial regulatory agencies were often more interested in helping out Wall Street than protecting Main Street.

I am very pleased that, thanks to President Biden's strong leadership, we now have Gary Gensler at the helm of the SEC. Chair Gensler, I look forward to hearing your testimony and discussing your views on the short squeeze and surrounding events, as well as practices like payment for order flow.

I am also interested in hearing from Mr. Cook and Mr. Bodson, the CEOs of private-sector corporation, FINRA, which oversees broker-dealers; and DTCC, which provides clearing and settlement services to our securities markets, respectively.

Under my leadership, this committee is focused on ensuring accountability for Wall Street. I decided to convene this series of three hearings on this topic to ensure that Congress is well-informed on developments in and functioning of our capital markets, and to put Wall Street on notice that we are watching closely.

I yield back the balance of my time, and I now recognize the ranking member of the committee, the gentleman from North Carolina, Mr. McHenry, for 4 minutes.

Mr. MCHENRY. Thank you, Madam Chairwoman. I would like to talk about what was learned at our last hearing on GameStop, We learned that everyday Americans have a newfound interest in the markets, and that is positive. We learned that financial technology is here to stay, and it is providing more opportunities for retail investors to participate in our markets. That is positive. We learned that Reddit is powerful. And we learned that Roaring Kitty is indeed not a cat, and we know just as much as we did at the first hearing.

And I continue to hear the same policy solutions from my Democrat colleagues, the repackaged, old, outdated, policy failures wrapped in whatever is in the news this week to sell the American people on the idea that this time is different. Well, it is not. Like so many other bad progressive ideas sold under the guise of investor protection, which I think is important, Democrats' proposals will ultimately reduce access to investment opportunities and charge D.C. bureaucrats and give them control of investing decisions of everyday Americans. If this committee is interested in re-

3

sponding to late January's events, we need to expand the credit investor regime, not restrict it.

It is ridiculous that our securities laws force most everyday Americans to the sidelines of early-growth investment opportunities. We need to find innovative solutions that allow more people to invest in businesses they support, while retaining the flexibility our changing workforce needs and requires.

This week I reintroduced my bill, the Gig Worker Equity Compensation Act, to expand the category of workers that can benefit from equity compensation to include nontraditional workers. If you want to see the juxtaposition of Democrat and Republican priorities right now, just yesterday, the Biden Administration moved to dismantle past efforts to provide gig workers with the flexibility they demand, that they need, that they require. If a State as liberal as California can recognize that a one-size-fits-all mandate on gig workers would be destructive, it should be obvious that the Biden Administration should not take those same actions that went down at the ballot box in California, actions that hurt nontraditional workers, not help them.

I initially called for this hearing on GameStop to begin the process of fact finding to inform our policy discussions, and the bottom line is that we are still gathering a number of facts. That is why we have representatives from FINRA and DTCC testifying before us today. I think that is a good thing.

Additionally, the SEC's review of the events is ongoing, as is the committee's work behind-the-scenes in terms of document review and interviews. Despite the ongoing investigations and the testimony we will receive today, many Democrats have their so-called solutions. A lot of these things have been kicked around for a long time.

At our first GameStop hearing, I asked Democrats to side with everyday American investors. I will ask that same thing today. We should not punish everyday American investors with a Democrat agenda, a progressive agenda that results in fewer investment options or forces folks to start paying to make trades again. So, let's go off of what we have learned. Let's stand up for everyday investors and make it easier for them to invest, and let's tear down barriers keeping folks out of the market instead of throwing up new ones to impair their ability to be in the market. Let's stand up for equity—true equity—and that is ownership of the American economy, and ownership in our capital markets so we can remain the center of the free world's economic policies.

And with that, Madam Chairwoman, I yield back.

Chairwoman WATERS. Thank you very much, Mr. McHenry. I am pleased that you see something good about our hearing today.

I now recognize the gentleman from California, Mr. Sherman, who is also the Chair of our Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, for 1 minute.

Mr. SHERMAN. I thank Chairman Gensler for being here, and I hope he joins us often. The ranking member is concerned about whether gig workers in my State have the protection that we accord employees. It is a little far from the mandate of our committee. But within our committee's jurisdiction is to make sure that when investors trade stocks, they get the best possible deal and are

4

not told that there is zero transaction cost when the big transaction cost is the spread, and you are paying for the transaction unless you are getting the best possible price improvement. Price improvement may not be fully available if your broker is getting paid for order flow or if your broker is acting as a market-maker.

We also need to look at short-sale disclosures. Right now, there are disclosures filed with the SEC quarterly. That is so 1977. We would expect reports to be filed far more often, and we have to discuss what reports should be made public, and I look forward also to looking at margin selling.

Chairwoman WATERS. Thank you. I now recognize the ranking member of the subcommittee, the gentleman from Michigan, Mr. Huizenga, for 1 minute.

Mr. HUIZENGA. Thanks, Madam Chairwoman. Advancements in technology have improved access to our capital markets and created new opportunities for countless Americans to participate in our markets who were previously excluded. App-based interfaces, combined with zero commission trades, fractional share trading, and lowered account minimums, have ushered in a new generation of investors. However, instead of celebrating this new era of investment, how have my colleagues across the aisle responded for the most part? By falsely claiming that this increase in market participation has caused gamification in the experience, that markets are rigged, and some have even gone so far as to equating it to gambling in a casino.

As Rahm Emanuel famously said, "You never want a serious crisis to go to waste. It is an opportunity to do things that you think you could not do before." Well, that is exactly what my friends on the other side of the aisle are doing. They are exploiting a high-profile situation to push a radical progressive agenda of these proposed, small "D," democratic solutions that will only further prevent everyday American investors from accessing our capital markets, and deny them the opportunity to further save and invest for a more prosperous future.

I yield back.

Chairwoman WATERS. Thank you. I want to now welcome today's distinguished witnesses to the committee.

First, we have the Honorable Gary Gensler, who is the recently-confirmed Chair of the U.S. Securities and Exchange Commission. This is Chair Gensler's first time appearing before the committee in his current capacity. He has previously served as Chair of the Commodity Futures Trading Commission, and in several senior roles at the Department of the Treasury.

Second, we have Mr. Michael Bodson, who is the President and Chief Executive Officer of the Depository Trust & Clearing Corporation (DTCC).

And finally, we have Mr. Robert Cook, who is the President and Chief Executive Officer of the Financial Industry Regulatory Authority (FINRA).

Each of you will have 5 minutes to summarize your testimony. You should be able to see a timer on your screen that will indicate how much time you have left, and a chime will go off at the end of your time. I would ask you to be mindful of the timer, and quick-

5

ly wrap up your testimony if you hear the chime. And without objection, your written statements will be made a part of the record.

Chair Gensler, you are now recognized for 5 minutes to present your oral testimony.

### STATEMENT OF THE HONORABLE GARY GENSLER, CHAIRMAN, U.S. SECURITIES AND EXCHANGE COMMISSION (SEC)

Mr. GENSLER. Good afternoon, Chairwoman Waters, Ranking Member McHenry, and members of the committee. I am honored to appear before you today for the first time as Chair of the Securities and Exchange Commission. I have been in front of this committee multiple times in multiple Administrations, and I will say this: I look forward to the day when we can meet in person in your beautiful hearing room again.

Thank you for inviting me to testify about January's market volatility, and I am pleased to be here with Mike Bodson and Robert Cook, whom I have known for a number of years as well.

I would like to note that my views are my own, and I am not speaking on behalf of my fellow Commissioners or of the SEC staff.

These events are part of a larger story about the intersection of finance and technology, which have lived in a symbiotic relationship since antiquity. And one thing that I have come to believe is that technology can allow greater access to our capital markets. Our central question is this, though: When new technologies come along and change the face of finance, as they have done for decades, how do we continue to achieve our core public policy goals?

In my role, I will always be animated by thinking about working families in the SEC's three-part mission: protecting investors; promoting fair, orderly, and efficient markets; and facilitating capital formation. I am pleased to submit written testimony that goes into detail on several factors at play during January's events. I will just highlight a few of those key issues in this opening statement.

The first is gamification and user experience. I agree with the Members who have already said that these new user experiences have facilitated a lot of opportunity for investors. They have expanded access to capital, making it easier for investors to sign up, start trading, and learn about investing. These apps also use a host of features that have come to be familiar in our increasingly-online world such as gamification, behavioral props, and predictive data analytics. Many of these features, in essence, encourage investors to trade more frequently. This could have a substantial effect on a saver's financial position. Some academic studies suggest that the more actively you trade, the lower your returns, so while they are encouraging investing, they may also be encouraging active trading.

I have asked the staff to prepare a request for public comment on these issues. The SEC must remain attuned to rapidly-changing technologies with an eye to freshening up our rule set, where appropriate, to continue to achieve our mission. If we don't address this now, the investing public, those saving for future retirement and education, may shoulder the burden later.

The second topic I would like to discuss is this area around payment for order flow. This practice brings to mind a number of questions, including whether it creates inherent conflicts of interest be-

6

tween the broker-dealers on the one side, and their customers on the other, who want to achieve, under our rules, best execution. Now, it is important to consider this, I think, in the overall context of market structure. Currently, a significant amount of retail orders are routed to a small number of wholesalers. I detail this more in my written testimony, but I think it raises questions about whether the market structure best promotes fair, orderly, and efficient markets. Evolving market technologies, along with this payment for order flow, has also led to increasing market concentration, which we have found, and history and economics show, can lead to fragility in markets, deter healthy competition, and limit innovation.

The next issue is short selling and market transparency, and, again, as outlined in my written testimony, under the Dodd-Frank Act reforms, the SEC received mandates and authorities to increase transparency in the markets. So, I have asked SEC staff to prepare recommendations on transparency and short selling, stock loan markets, and something called total return swaps, which was at the center of this Archegos event in March, for Commission consideration. And the five of us Commissioners can take a look to see what to do next.

Next, today's social media tools have far greater reach, scale, and anonymity than previous technology. This raises the possibility that wrongdoers will attempt to use their powerful forums to hype certain stocks or manipulate markets. I am not concerned about regular investors exercising their free speech rights online; I am more concerned whether bad actors potentially take advantage of influential platforms.

Further, the decisions by some broker-dealers to redirect customer trading raised several issues around clearance and settlement. In essence, they stopped investors from investing, and this raises questions of the market, what I will call, "plumbing." Sorry to Mike Bodson if I call infrastructure, "plumbing," but investors were shut out. I do believe we can lower costs and risk in our market by shortening the settlement cycle. For instance, I have asked SEC staff to put together a draft proposal for the Commission on the possibility of shortening the settlement cycles.

Thank you. I look forward to your questions. It is good to be back with you, and, again, I look forward to doing this in person.

[The prepared statement of Chairman Gensler can be found on page 89 of the appendix.]

Chairwoman WATERS. Thank you, Chair Gensler. Next, we will go to Mr. Bodson. You are now recognized for 5 minutes to present your oral testimony.

**STATEMENT OF MICHAEL C. BODSON, PRESIDENT AND CHIEF EXECUTIVE OFFICER, THE DEPOSITORY TRUST & CLEARING CORPORATION (DTCC)**

Mr. BODSON. Chairwoman Waters, Ranking Member McHenry, and members of the committee, my name is Michael Bodson, and I am the CEO of The Depository Trust & Clearing Corporation (DTCC), a holding company that operates three SEC-regulated clearing agencies, including the National Securities Clearing Cor-

7

poration, or NSCC, of which I will speak to you today. I appreciate this opportunity to speak to the committee.

In my line of work, the best days are those when nothing too exciting happens. That is because DTCC is, at its heart, a risk management organization enhancing efficiencies and reliability in the markets. On a normal day, we process about 200 million buys and sells for a value of nearly $2 trillion. Through netting, that is reduced to about $1 million in securities movement and $35 billion in cash movement, creating significant efficiencies in the market.

When you buy or sell a stock, it takes 2 days for the trade to be completed. This is called T+2 settlement: trade date plus 2 days. A lot could happen during those 2 days that could create a risk that the buyer or seller fails to deliver money or shares. Because of clearing, investors don't have to worry about that. Clearing protects both firms and their customers against default risk. Default risk can destabilize markets, particularly in volatile times. People are reluctant to trade if they aren't sure they will get what they agreed to. And imagine how inefficient it would be for every market participant to have to assess the creditworthiness of everyone else in the market.

That is where DTCC comes in. We are infrastructure. You can call us, "plumbing." We are not insulted. We operate behind the scenes to guarantee completion of virtually all equity trades. We do not trade or take positions or bet on the direction in the market. We do not give investment advice. We do not know who the customers are behind the trades or their reasons for trading. We simply process and risk-manage trades.

DTCC protects against default risk by collecting margin, which is money that clearing members post as collateral. If a declaring member defaults between trade date and settlement date, DTCC uses that collateral to complete the defaulting member's trades no matter how much prices may have changed.

Margin requirements are calculated using statistical models and model-based calculations that are set forth in our rules, which must be approved by the SEC. Margin requirements increase the risk, and the member's portfolio increases. In other words, the greater the potential loss the default could produce, the greater the need for collateral.

Volatility has a very large impact on margin requirements. We saw this play out during the week of January 25th. Both volume and volatility that week were extraordinary, exceeding the pandemic-related record volume from March 2020 by more than 100 million trades. The concentration of trading in a small number of meme stocks that week was also extraordinary. Applying those statistical models of formulas, margin requirements increased substantially for firms with large volumes in these stocks.

I appreciate that this committee is exploring ways to continue to improve our markets. I would like to describe one effort that DTCC has undertaken to date, which is shortening the settlement cycle for equities from 2 days to 1 day. That may sound like a small thing if it is just 1 day, but cutting the settlement period in half can make a difference. We believe that shortening the settlement cycle to T+1 would enhance market resilience, reduce margin requirements, and lower costs for investors. Following a multi-year,

8

industry-wide effort, settlements were shortened in 2017 from T+3 to T+2, achieving margin savings estimated at 25 percent. DTCC estimates that the volatility component of margin requirement could potentially be reduced by 40 percent when it moves to T+1. This could save our clearing members upwards of $6 billion per day during periods of extreme volatility.

While DTCC's technology can support T+1 today, changing the industry convention is a major undertaking that will require co-ordinated efforts across the whole industry. Over the past year, DTCC has engaged with a cross-section of the industry to assess readiness to further shorten the settlement cycle. In February, DTCC published a White Paper outlining the benefits associated with multiple changes to the settlement cycle, including a move to T+1. We are working with the Securities Industry and Financial Markets Association (SIFMA) and the Investment Company Institute (ICI) to accelerate this effort.

Thank you again for the opportunity to testify today. I look forward to your questions.

[The prepared statement of Mr. Bodson can be found on page 70 of the appendix.]

Chairwoman WATERS. Thank you very much, Mr. Bodson. Mr. Cook, you are now recognized for 5 minutes to present your oral testimony.

**STATEMENT OF ROBERT W. COOK, PRESIDENT AND CHIEF EX-ECUTIVE OFFICER, FINANCIAL INDUSTRY REGULATORY AU-THORITY (FINRA)**

Mr. COOK. Thank you, Chairwoman Waters, Ranking Member McHenry, and members of the committee for this opportunity to testify today, together with Chair Gensler and Mr. Bodson, regarding the January market events related to trading in GameStop and in other stocks. We commend the committee's review of these events and related investor protection concerns.

FINRA's mission is to protect investors and promote market integrity. We are a not-for-profit self-regulatory organization (SRO), and we support the SEC in overseeing one critical part of the securities industry: certain broker-dealers and the individuals they employ. To that end, we administer comprehensive regulatory programs, including surveillance, risk monitoring, examination, and enforcement. And we, in turn, are subject to comprehensive examination and oversight by the SEC.

This committee has heard already about the events of January, including the significant price swings and trading volume in GameStop and a limited number of other stocks. In this context, some broker-dealers restricted trading in these securities on a short-term basis. This led to confusion and frustration among some investors and concerns about the fairness of the markets. The event also focused attention on the growth of popular new retail trading platforms and services, changes in investor behavior, and the influence of social media on the markets.

Our markets are dynamic and are continually evolving. Market participants constantly innovate new technologies, methods of communication, and investment products and services. These innovations often benefit investors, such as by providing easier access to

9

the markets, lower costs, and a wider range of investment products and services to choose from, but they can also present new and sometimes unanticipated risks, so regulators must constantly review whether the rules governing the road need to be updated in light of new developments to better protect investors, while still facilitating vibrant and innovative markets and the opportunities these create. At FINRA, we are committed to doing just that. One important resource we rely on in this process is the research of the FINRA Investor Education Foundation, including recent research on new, inexperienced investors, and how they approach investing.

Since the events of January, FINRA has established an internal working group that is devoting significant resources to investigating whether its broker-dealer members comply with SEC and FINRA rules. We have also issued regulatory notices reminding firms of relevant duties and responsibilities in this area.

Although I cannot comment on specific firms or ongoing investigations or enforcement matters, generally speaking, we are reviewing order routing practices, the circumstances under which trading restrictions were imposed, any potential manipulative conduct, and compliance with short-sale requirements, among other matters. I can assure the committee that we will take all appropriate disciplinary or other remedial action as warranted if the facts indicate a violation of SEC or FINRA rules.

The upcoming SEC report on these market events will be critical in analyzing whether existing rules and standards should be updated. Many of the policy questions raised in your hearings to date involve areas in which the SEC has primary policymaking responsibilities such as market structure, payment for order flow, short sale regulation and disclosure, the settlement cycle, enhanced broker-dealer financial responsibility requirements, and whether certain communications with retail investors constitute recommendations that should be covered by the SEC's Regulation Best Interest. We will support the SEC in its review of these areas and then align FINRA's rules and oversight activities where necessary or appropriate.

My written testimony offers some further perspectives on key topics under the SEC's jurisdiction and also describes some areas where we are considering whether updates to guidance regarding our own rules would be appropriate. For example, we intend to review short sale position reporting by broker-dealers, as well as continue our review of the effects of gamification on retail investors. FINRA looks forward to working with this committee, the SEC, and our fellow regulators to review and learn from these recent market events so that we can strengthen investor protections and enhance confidence in our nation's capital markets.

Thank you, and I would be happy to answer your questions.

[The prepared statement of Mr. Cook can be found on page 76 of the appendix.]

Chairwoman WATERS. Thank you very much, Mr. Cook.

I now recognize myself for 5 minutes for questions, and my first question is for Chair Gensler. This committee has examined numerous issues that have arisen out of the GameStop short squeeze that took place earlier this year, including systemic risk arising from firms such as Citadel, who are executing close to 50 percent

10

of all U.S.-listed retail volume. During the first hearing, I questioned whether Citadel poses a systemic risk to our financial markets. I am also concerned about what Citadel's outsized market impact means for pricing and best execution, another market structure issue that this committee has examined as part of these hearings.

As the newly-confirmed Chair of the SEC, what will your approach be with respect to mitigating the risk associated with outsized market impact and understanding threats to our financial stability?

Mr. GENSLER. Thank you for that question. I think that at the heart of well-functioning markets and the mission of the SEC—fair, orderly, and efficient markets—is promoting competition in markets. It can be done through transparency, but it is also looking at our rule set to make sure that our rule set inspires more competition rather than concentration. And we have seen, as you noted in your hearing, an increasing concentration in market making, and also, separately, in brokerage, and particularly around retail order flow.

And so I have asked the staff from the Divisions of Economic Risk and Analysis, and Trading and Markets, to sort of give us a view, give internally the Commission a view of what we should be thinking about in our market structure to address this.

We have seen such concentration come in other markets. We know it is in search. When we all go online and search, there is really one dominant search engine. We know it is true in retail buying, retail products online. There is some dominance to that. And so, our modern 2020's economy does tend towards certain, what is called economics network effects. So, I have asked the staff just to think through that and to provide us with guidance as Commissioners on how do we promote competition in the face of these network economic effects that are leading to concentration.

Chairwoman WATERS. I want to thank you for that response, and I think what I am hearing from you is that there is real concern about concentration. And while you have instructed staff to do some additional research to determine the extent of it, it is something that we should be concerned about, is that correct?

Mr. GENSLER. Yes. I think that capital formation for issuers and for investors on the other side benefit from some broad competition amongst market actors. And as we get more concentration in the middle market, whether it is market making or brokerage, we could lose that concentration. It could lead to more fragile markets, meaning less orderly, and also more costly or less efficient markets. And that is what history and economics tell us when we get concentration.

Chairwoman WATERS. Thank you very much. I appreciate the concern that you are identifying as we talked about this concentration, and what could happen if, in fact, we are not aware of it and don't make an effort to deal with it.

I now recognize the ranking member, Mr. McHenry, for his questions.

Mr. MCHENRY. Thank you, Madam Chairwoman. Chairman Gensler, thank you for being here, and welcome back before the committee, and congratulations on your new role. I know that Act-

11

ing Chair Lee, at the time of this GameStop trade, emphasized that the core market infrastructure is quite resilient. Does the Commission intend to release any additional findings?

Mr. GENSLER. Thank you. And thank you for our meeting earlier this week. I look forward to doing those on a regular basis with the Chair, and you, and the subcommittee, and other members. We are looking at putting together a report. I am only in my 3rd week on the job, but our economists, our Trading and Markets folks have come together, and I think we will be releasing a report sometime this summer that will detail the range of activities out of the January events.

Mr. MCHENRY. Thank you for that. Small businesses right now are emerging from the pandemic just like everyone is, and these small businesses need access to capital. And, as you know, I have been focused on some of the burdensome requirements of the original Regulation Crowdfunding (Reg CF), which I helped legislate, and President Obama signed into law. There have been some helpful changes made to Reg CF to make it more efficient and to boost trading in Reg A and Reg CF securities, such as preemption under certain State regulations. Do you support these streamlining efforts for small businesses, and are you looking at additional steps?

Mr. GENSLER. I look forward to working with you and your staff to learn more about your initiatives and suggestions. But at the core, and maybe it is just a bit because my dad had a small business, never more than 30 employees, and didn't have access to the capital markets, but I think that small business, entrepreneur efforts are really kind of, if I might say, a bit of the backbone of American entrepreneurism and our economy. And so, access to the capital markets is a critical piece, whether it is accessing loans that might be securitized in the markets or accessing through equities. But I look forward to hearing more from you and your staff on ideas.

Mr. MCHENRY. Okay. But no comment on Reg CF?

Mr. GENSLER. Again, I'm just 3 weeks on the job, so I haven't looked closely at Reg CF yet or, frankly, done a detailed enough briefing to see how we can, as you say, and I really do believe this, facilitate capital formation up and down the issue or spectrum.

Mr. MCHENRY. Let's pivot to something that you spent some time out of government understanding. I think what we all have tried to seek is greater collaboration across agencies on the regulatory framework for digital assets, cryptocurrencies, notably. This includes more engagement from industry and appropriate regulators. In 2019, SEC staff produced the framework for investment contract analysis of digital assets. Since then, the staff has sought feedback on a number of issues, most recently on the evolving standards and the best practices for custody. This is progress, but I believe more concrete steps are necessary to further the crypto market. As you look at this issue, what steps can you outline to bring regulatory clarity so that we can have a vibrant digital asset marketplace with legitimate money and the rule of law?

Mr. GENSLER. Thank you for asking that. And I think that this market, which is close to $2 trillion, the crypto asset market, is one that could benefit from greater investor protection within the SEC's current authorities, our authorities around securities, and around

12

asset managers and products that might invest in these cryptocurrencies. As you mentioned, we put out a comment, I think it was in October or November, asking for feedback on custody. I would hope that we would move forward and provide greater clarity around custody.

I do think that working with Congress, and I think it is only Congress that could really address it, it would be good to consider, if you would ask my thoughts, to consider whether to bring greater investor protection to the crypto exchanges. And I think if that were the case, because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission, that could instill greater confidence. Right now, there is not a market regulator around these crypto exchanges, and, thus, there is really not a protection against fraud or manipulation or a—

Mr. MCHENRY. I have time for one final question, Chairman Gensler. I am encouraged by your comments on crypto. Last year, the Commission proposed to allow certain gig workers to have access to equity compensation under the SEC's rules. Will you commit to finishing this important rulemaking?

Mr. GENSLER. Again, I'm in my 3rd week, so I need to get a briefing on it. I commit to work with the staff to understand what the comments were, because I don't know what comments came in, and to trying to understand the economics around that rule set.

Mr. MCHENRY. Thank you, and I wish you great luck in your tenure, and thank you for your testimony. Thank you for your outreach.

Mr. GENSLER. Thank you.

Chairwoman WATERS. I now recognize the gentlewoman from New York, Mrs. Maloney, for 5 minutes.

[No response.]

Chairwoman WATERS. We will go on to the gentlewoman from New York, Ms. Velazquez.

[No response.]

Chairwoman WATERS. The gentleman from California, Mr. Sherman, who is also the Chair of our Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets, is now recognized for 5 minutes.

Mr. SHERMAN. Responding to the ranking member, who wants to instill confidence in those buying and selling cryptocurrencies, the only confidence I have is the U.S. dollar is an outstanding good currency, but cryptocurrencies, if they succeed, will have unique appeal to only two groups: narco-terrorists; and tax evaders. And for us to channel the animal spirits that should be investing in the American economy into creating tools for those who want to evade U.S. taxes is a step toward a much weaker America.

Mr. Gensler, you talked about Archegos and the total return swap. The image I have of 1929 is investors jumping out of buildings on Wall Street because they bought stock at 7, 8, 9 times margin. And in the 1930s, we decided to protect the markets and say that if you want to buy stock, the most margin you could get was 1-time margins, sometimes a little more. But we then see that using a total return swap, the big guys, like Archegos, can get 7

13

times margin, can invest only one-seventh of the cash to control $100 million worth of this block of shares or that block of shares.

This raises the question, is 7-to-1 margin fine for everybody, and is that good for the markets? Should 1-time margin either rule for everybody and we should plug the loopholes, or should we continue to have a system where, if you are a family office, you can have 7 times margin by calling it a total return slot, and if you are the regular Robinhood investor, you can only get 1 time? What should the market rule be?

Mr. GENSLER. I think you raise some very important questions that came out of the market events late in March, not the January ones but the March events around a family office, Archegos. Family offices are outside of much of the SEC's remit, but not all of it.

Mr. SHERMAN. If I can clarify, this is not a question about family offices.

Mr. GENSLER. Oh, okay.

Mr. SHERMAN. Just that one investment company that has $1 billion and decides they want a 7-to-1 margin. The fact this was a family office, put that aside. Whether you disclose it or you don't, whether you are a family office or a hedge fund or a billionaire, should you be able to get 7-to-1 margin, and if so, why can't Robinhood?

Mr. GENSLER. I have asked staff to better understand—and, again, it is just the 3rd week—the rules that were adopted by the SEC that are yet to go into final implementation around the margin and for these securities-based swaps, and how they would have affected the circumstances.

Mr. SHERMAN. I look forward—

Mr. GENSLER. But you are right, sir, that they are different than the retail investor, and this is true across our markets. And I have asked staff to better inform me as to what are we seeing there.

Mr. SHERMAN. For Mr. Cook, when it comes to disclosing short selling, there are arguments on both sides as to whether to disclose what an individual investor is doing. Some say it is harmful, some say it is helpful, but there seems to be agreement that the aggregate information is helpful, but we ought to know in aggregate how many shares of GameStop are short. You generate that information, but you don't put it on your website. I am told that you provide it to the exchanges and they publish it if they want to, and, often behind a pay wall. Why doesn't FINRA disclose all this information to everybody for free as quickly as you can?

Mr. COOK. Thank you, Mr. Sherman. That is a great question. As we look at disclosure around short selling, I think there are some good arguments that we can do more here. I have asked our staff to prepare a regulatory notice to solicit comment on changes to FINRA's disclosure here to make it more frequent and more granular. And certainly as part of that, we can look at the way in which that disclosure is disseminated.

Mr. SHERMAN. Is there any justification for what is a regulatory agency generating this information and giving it to private companies for them to sell rather than disclosing it to the public?

Mr. COOK. I appreciate the gist of your question, sir, and I am inclined to be biased towards making it publicly available. I don't understand all the history behind how this developed. I think that