UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

                    -v.-

COINBASE, INC. and COINBASE GLOBAL,
INC.,

                    Defendants.

23 Civ. 4738 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

The parties to this litigation all seek clarity on a novel, important legal

issue, but tussle over when and from what court that clarity is most properly

obtained.  The United States Securities and Exchange Commission (the "SEC"

or the "Commission") initially brought this enforcement action against

Coinbase, Inc. and Coinbase Global, Inc. (collectively, "Defendants" or

"Coinbase"), alleging that Coinbase intermediated transactions in crypto-assets

on its trading platform and through related services, in violation of federal

securities laws.  Believing that its conduct did not implicate those laws,

Coinbase moved for judgment on the pleadings, which motion the Court

granted in part and denied in part in an Opinion and Order dated March 27,

2024 (the "Order" (Dkt. #105)).  Coinbase now moves to certify the Order for

interlocutory appeal under 28 U.S.C. § 1292(b).  After careful consideration of

the submissions of the parties and *amici curiae*, the Court grants Coinbase's

motion and certifies the Order for interlocutory appeal.  Furthermore, the

Court stays proceedings in this matter pending resolution of the interlocutory appeal.

**BACKGROUND**[1]

**A.    The Underlying Litigation**

The factual background of this action is described in detail in the Order. (*See* Order 3-20).[2]  The Court incorporates by reference the background information contained therein, but nevertheless briefly summarizes the facts and procedural history relevant to certifying the Order for interlocutory appeal.

Section 2(1) of the Securities Act of 1933 (the "Securities Act") defines the term "security" to include, *inter alia*, "any ... investment contract."  15 U.S.C. § 77b(a)(1).  In the seminal case of *SEC* v. *W.J. Howey Co.*, the Supreme Court expounded on this definition of "security" and, in particular, interpreted the term "investment contract" to encompass transactions "involv[ing] an investment of money in a common enterprise with profits to come solely from the efforts of others."  328 U.S. 293, 301 (1946).  To regulate securities transactions in the secondary market, Congress established the SEC and

---

1    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)).  For ease of reference, the Court refers to Defendants' answer to the Complaint as the "Answer" (Dkt. #22); to Defendants' memorandum of law in support of their motion to certify the Order for interlocutory appeal as "Def. Cert. Br." (Dkt. #110); to the SEC's memorandum of law in opposition to Defendants' motion as "SEC Cert. Opp." (Dkt. #125); and to Defendants' reply memorandum of law as "Def. Cert. Reply" (Dkt. #128).

2    Throughout this Opinion, the Court refers to its March 27, 2024 decision as the Order and cites to its pages as assigned by the Court's electronic case filing ("ECF") system. The Court notes that the Order has also been published as *SEC* v. *Coinbase, Inc.*, 726 F. Supp. 3d 260 (S.D.N.Y. 2024).

2

"delegate[d] to [it] broad authority to regulate … securities." *SEC* v. *Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 789 (S.D.N.Y. 2018).

The SEC initiated the instant action by filing a complaint on June 6, 2023, alleging in relevant part that Coinbase's business of intermediating transactions in cryptocurrency (also referred to as "crypto-assets," "tokens," or "coins") (*see* Compl. ¶¶ 44-59) amounts to the operation of an unregistered brokerage, exchange, and clearing agency (*see id.* ¶ 3), in violation of federal securities laws. The Complaint further alleges that Coinbase acts like a traditional securities intermediary by, *inter alia*, soliciting customers, recruiting new investors, displaying promotional and market information useful for trading crypto-assets, holding customer funds and crypto-assets, and providing services that enable customers to place various types of orders and settle their trades, while charging fees for trades executed through its platform. (*See id.* ¶¶ 74-101).

Coinbase, the largest crypto-asset trading platform in the United States (Compl. ¶ 1), responded to the Complaint by filing its Answer on June 28, 2023 (Dkt. #22), as well as a pre-motion letter seeking leave to file a motion for judgment on the pleadings (Dkt. #23). Coinbase asseverated that the crypto-assets traded on its platform were "not within the SEC's authority because" they are not investment contracts and, therefore, not securities. (Answer ¶ 8). On August 4, 2023, Coinbase filed a motion for judgment on the pleadings. (*See* Dkt. #35-37). After full briefing by the parties and submissions from several *amici curiae* (*see* Dkt. #50, 53, 55, 59, 60, 62 69-70, 75-1, 77, 78-1, 83,

87, 98, 103), the Court heard oral argument on the motion on January 17, 2024 (*see* January 17, 2024 Minute Entry; Dkt. #101 (transcript)).

**B.    The March 27, 2024 Order**

"[A]t the heart" of Coinbase's motion for judgment on the pleadings was the definition of "investment contracts." (Order 24-25 (citing 15 U.S.C. § 77b(a)(1))). To determine whether something is an "investment contract" within the SEC's regulatory reach, courts in the Second Circuit and elsewhere apply the three-prong *Howey* test, under which an investment contract arises out of "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *accord SEC* v. *Terraform Labs Pte. Ltd. ("Terraform II")*, 708 F. Supp. 3d 450, 472 (S.D.N.Y. 2023). "[T]he parties acknowledge[d]" that "the SEC's ability to prevail on any of its claims depends in large part on th[is] threshold question." (Order 23). Accordingly, the Court reasoned that, "as a practical matter, resolution of th[e] motion hinge[d] on whether any of the transactions involving [certain] exemplar tokens qualifies as an investment contract." (*Id.* at 29). After deciding certain preliminary issues, including that the SEC was not barred by the Major Questions Doctrine, the Due Process Clause, or the Administrative Procedure Act from alleging that the crypto-assets transacted on Coinbase's platform were investment contracts (*see id.* at 31-39), the Court concluded that certain transactions involving crypto-assets qualified as investment contracts within the SEC's regulatory purview (*see id.* at 40-60).

In doing so, the Court followed the Supreme Court's directive that "in analyzing whether a contract, transaction, or scheme is an investment contract, 'form should be disregarded for substance and the emphasis should be on [the] economic reality' of the parties' arrangement." (Order 41 (alteration in original) (quoting *Tcherepnin* v. *Knight*, 389 U.S. 332, 336 (1967))). As it must, "in assessing economic realities," the Court "look[ed] at the 'totality of the circumstances' surrounding the offer of an investment contract, including the 'intentions and expectations of the parties at that time.'" (*Id.* (first quoting *Glen-Arden Commodities, Inc.* v. *Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974), then quoting *SEC* v. *Aqua-Sonic Prod. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (2d Cir. 1982))).

The Court began its analysis by noting that both the SEC and private litigants had successfully argued in other cases that crypto-assets could be "investment contracts" under *Howey* (*see* Order 42-47), and that satisfaction of the first *Howey* prong (regarding an "investment of money") was not in dispute (*see id.* at 47). It then addressed the remaining two factors in turn, ultimately concluding that the SEC had adequately alleged that "purchasers of certain crypto-assets" on Coinbase's platform "invested in a common enterprise and were led to expect profits solely from the efforts of others, thereby satisfying the *Howey* test for an investment contract." (*Id.*).

As for investment in a common enterprise, the Court concluded that the SEC had "plausibly alleged horizontal commonality" among "token issuers, developers, and promoters" to "further *develop the tokens' ecosystems*" with the

goal of "benefit[ting] all token holders by increasing the value of the tokens themselves." (Order 48 (emphasis added)). As for expectation of profits solely from the efforts of others, the Court found that the SEC had "plausibly alleged that issuers and promoters of the [c]rypto-[a]ssets," including Coinbase with respect to the secondary market, "repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset." (*Id.* at 51). Such "issuers publicized to investors in the primary and secondary markets that profits from the continued sale of tokens would be *fed back into further development of the token's ecosystem*, which would, in turn, increase the value of the token." (*Id.* at 53 (emphasis added)). Lastly, the Court found no need under the law to distinguish between transactions on the primary market (involving institutional investors) and those on the secondary market (involving other investors). (*See id.* at 54-55).

Of particular relevance to the instant motion, Coinbase argued that the transactions in question were not "investment contracts" because "an issuer [of a crypto-asset] owes no contractual obligation to a retail buyer" of the crypto-asset on Coinbase's platform. (Order 31 (citing Dkt. #36 at 6-7)). The Court rejected this argument as a mischaracterization of *Howey*, reasoning that "since *Howey*, no court has adopted a contractual undertaking requirement." (*Id.* at 58; *see also id.* at 58 n.11 ("A reading to the contrary would be in direct tension with *Howey*'s intentionally broad interpretation of 'investment contract' to encompass the sale and offer of securities in whatever form or manner they

6

[may] take.")).  Indeed, the Court found that this supposed requirement was "not formal, but formalistic, and cannot be fairly read into the *Howey* test." (*Id.* at 56).

The Court's rejection of this argument informed, but did not dictate, its conclusion that the challenged crypto-asset transactions satisfied the *Howey* test.  Rather, after considering "the totality of the circumstances — the economic reality — surrounding the offer and sale" of the crypto-assets, the Court found the *Howey* requirements satisfied.  (Order 57).  That finding, in turn, led the Court to reject Coinbase's proffered comparison to real estate transactions, which have been found not to be securities under *Howey*, because "real estate has 'inherent value,' whereas a crypto-asset 'will generate no profit absent an ecosystem that drives demand' — which is precisely what the issuers and promoters of the [c]rypto-[a]ssets here promised to design and build." (*Id.* at 58 (quoting *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020))).

Likewise, the Court distinguished the offer or sale of crypto-assets from that of commodities or collectibles like Beanie Babies; the latter "may be independently consumed or used," whereas the former "is necessarily intermingled with its digital network — a network without which no token can exist." (Order 59-60 (citing *Balestra* v. *ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (distinguishing crypto-assets from precious metals))).  In other words, in applying *Howey*, the Court rejected Coinbase's formalistic argument about contractual undertakings and embraced the value-creating

digital ecosystem surrounding crypto-assets as a point of distinction between such assets and other commodities. And having thus resolved the threshold issue, the Court declined to dismiss the counts in the Complaint alleging Coinbase's operation as an unregistered exchange, broker, clearing agency, and offeror/seller of securities in violation of federal securities laws. (*See id.* at 60-78).[3]

## C. Subsequent Motion Practice

After the Court issued the Order, on April 12, 2024, Coinbase filed the instant motion to certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (Dkt. #109), as well as a memorandum of law in support thereof (Dkt. #110). On April 19, 2024, the Court adopted the parties' proposed briefing schedule. (Dkt. #113). The SEC filed its memorandum of law in opposition to certification on May 10, 2024. (Dkt. #125). In turn, Coinbase filed a reply memorandum of law on May 24, 2024 (Dkt. #128), as well as the supporting Declaration of David P.T. Webb (Dkt. #129). Two *amicus curiae* briefs, each expressing a desire for clarity about the SEC's regulation of crypto-assets, were filed in support of Coinbase's motion. (*See* Dkt. #117 (Brief of John Deaton, on Behalf of 4,701 Coinbase Customers); Dkt. #120 (Brief of Blockchain Association)). Additionally, Coinbase filed a notice of supplemental authority on July 1, 2024 (Dkt. #134), to which the SEC responded on July 3, 2024 (Dkt. # 135). Finally, on October 4, 2024, Coinbase filed a letter advising

---

[3]    However, for reasons unrelated to the instant motion, the Court dismissed the SEC's claim that Coinbase acts as an unregistered broker through its Wallet service. (*See* Order 78-84).

the Court of the SEC's appeal in *SEC* v. *Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (S.D.N.Y.).  (Dkt. #167).

The parties have engaged in discovery since the Court issued its Order. On April 19, 2024, the Court entered a civil case management plan and scheduling order, requiring fact discovery to be completed by October 18, 2024, and expert discovery to be completed by December 20, 2024.  (Dkt. #116). Then, on May 28, 2024, the Court entered a protective order governing the handling of confidential material (Dkt. #131), and an order governing the inadvertent production of certain documents during the course of the proceeding (Dkt. #132).  One month later, the SEC requested a conference pursuant to Local Rule 37.1, and this Court's Individual Rules of Practice in Civil Cases, regarding another protective order and a contemplated motion to quash a subpoena issued by Coinbase to the Chair of the SEC.  (Dkt. #133). After holding a pre-motion conference (*see* July 11, 2024 Minute Entry), the Court endorsed the parties' proposed briefing schedule (Dkt. #140).  On July 23, 2024, the Court entered a protective order regarding the forthcoming motion to compel (Dkt. #144), which Coinbase filed (along with a memorandum of law and other supporting documents) on the same day (*see* Dkt. #145-149). On August 5, 2024, the SEC filed its memorandum of law, and other supporting documents, in opposition to the motion.  (*See* Dkt. #150-154). Coinbase filed its reply on August 12, 2024 (Dkt. #156), and the Court granted in part and denied in part the motion to compel on September 5, 2024, in an oral decision (Dkt. #161 (transcript)).  Thereafter, on September 19, 2024, the

Court granted the parties' request for an extension of the fact discovery deadline to February 18, 2025, and the expert discovery deadline to April 22, 2025 (Dkt. #165), and accordingly entered a revised civil case management plan and scheduling order (Dkt. #166). On November 14, 2024, Coinbase requested still another extension of the discovery deadlines (Dkt. #169), which request the SEC opposed (Dkt. #170), but which the Court granted in light of the volume of discovery at issue (Dkt. #173). As it stands, fact discovery must be completed on or before May 30, 2025, and expert discovery must be completed on or before August 1, 2025. (*See* Dkt. #173).

## DISCUSSION

### A. Applicable Law

A district court may certify an order for interlocutory appeal where it finds that "such order [i] involves a controlling question of law [ii] as to which there is substantial ground for difference of opinion and [iii] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The party bringing the motion to certify an order for interlocutory appeal bears the burden of demonstrating that these criteria are met. *See Casey* v. *Long Island R.R. Co.*, 406 F.3d 142, 146 (2d Cir. 2005).

Courts must assess motions to certify an order for interlocutory appeal against the backdrop of the "basic tenet of federal law [that] delay[s] appellate review until a final judgment has been entered." *Koehler* v. *Bank of Berm. Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996). Indeed, "'[i]nterlocutory appeals are strongly

disfavored in federal practice'" because "'[m]ovants cannot invoke the appellate process as a vehicle to provide early review of difficult rulings in hard cases. Only exceptional circumstances will justify a departure from [this] basic policy[.]" *Glatt* v. *Fox Searchlight Pictures Inc.*, No. 11 Civ. 6784 (WHP), 2013 WL 5405696, at *1 (S.D.N.Y. Sept. 17, 2013) (quoting *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 282 (S.D.N.Y. 2010) (internal quotation marks omitted)); *see also Hèrmes Int'l* v. *Rothschild*, 590 F. Supp. 3d 647, 651 (S.D.N.Y. 2022) ("Interlocutory appeals are designed to be rare and reserved for exceptional circumstances, lest they disrupt the orderly disposition of lawsuits in their due course." (citing *SEC* v. *Citigroup Global Mkts., Inc.*, 827 F. Supp. 2d 336, 337 (S.D.N.Y. 2011))).  Accordingly, Section 1292(b) "must be strictly construed." *Wausau Bus. Ins. Co.* v. *Turner Constr. Co.*, 151 F. Supp. 2d 488, 491 (S.D.N.Y. 2001) (internal quotation marks omitted); *accord In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 530 (S.D.N.Y. 2014).

At the same time, "[w]hen a ruling satisfies [the Section 1292(b)] criteria and 'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'" *Balintulo* v. *Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (quoting *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 111 (2009)).  As the Second Circuit has explained, "Congress passed [Section 1292(b)] primarily to ensure that the courts of appeals would be able to 'rule on ... ephemeral question[s] of law that m[ight] disappear in the light of a complete and final record.'" *Weber* v. *United States*, 484 F.3d 154, 159 (2d Cir. 2007) (omission and second and third alterations in

11

original) (quoting *Koehler*, 101 F.3d at 864); *see also id.* ("[By enacting section

1292(b),] Congress also sought to assure the prompt resolution of knotty legal

problems." (citing Note, *Interlocutory Appeals in the Federal Courts Under 28*

*U.S.C. § 1292(b)*, 88 HARV. L. REV. 607, 609 (1975))).

Finally, "even where the three legislative criteria of [S]ection 1292(b)

appear to be met, district courts have unfettered discretion to deny certification

if other factors counsel against it." *Transp. Workers Union of Am., Loc. 100,*

*AFL-CIO* v. *N.Y.C. Transit Auth.*, 358 F. Supp. 2d 347, 351 (S.D.N.Y. 2005)

(internal quotation marks omitted). "Such unfettered discretion can be for 'any

reason, including docket congestion' and 'the system-wide costs and benefits of

allowing the appeal[.]'" *In re Facebook*, 986 F. Supp. 2d at 530 (quoting

*Klinghoffer* v. *S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990)).

## B.    Analysis

As explained in the remainder of this Opinion, the Court certifies the

Order for interlocutory appeal under Section 1292(b) because it presents a

controlling question of law regarding the reach and application of *Howey* to

crypto-assets, about which there is substantial ground for difference of

opinion, and the resolution of which would advance the ultimate termination of

the SEC's enforcement action.

### 1.    The Order Presents a Clear and Controlling Question of Law

To begin, the Court finds that the Order presents a clear and controlling

question of law: whether transactions involving crypto-assets of the kind

Coinbase intermediates are "investment contracts," and thus securities, for

purposes of the Securities Act. "To satisfy prong one of [Section] 1292(b), [the moving party] must demonstrate that the question is both controlling and a question of law." *Tantaros* v. *Fox News Network, LLC*, 465 F. Supp. 3d 385, 389 (S.D.N.Y. 2020). The term "question of law" "'refer[s] to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record.'" *Capitol Recs., LLC* v. *Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (quoting *Consub Del. LLC* v. *Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007) (internal quotation marks omitted)); *accord CBRE, Inc.* v. *Pace Gallery of N.Y., Inc.*, No. 17 Civ. 2452 (ALC) (SN), 2022 WL 683744, at *4 (S.D.N.Y. Mar. 8, 2022). A question of law is "controlling" where "'[i] reversal of the district court's opinion could result in dismissal of the action, [ii] reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or [iii] the certified issue has precedential value for a large number of cases.'" *Flo & Eddie, Inc.* v. *Sirius XM Radio Inc.*, No. 13 Civ. 5784 (CM), 2015 WL 585641, at *1 (S.D.N.Y. Feb. 10, 2015) (quoting *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997) (citing *Klinghoffer*, 921 F.2d at 24); *accord Tantaros*, 465 F. Supp. 3d at 389.

Unsurprisingly, the parties disagree as to many issues, including the threshold issue of whether a definable "question" is presented by the Order. For its part, Coinbase has alternatively defined the question as "whether the [SEC] may regulate as 'investment contracts' digital asset transactions that involve no obligation running to the purchaser beyond the point of sale" (Def.

13

Cert. Br. 1); "whether an investment contract can arise from a transaction that imposes no post-sale obligations" (*id.* at 7); "whether some obligation past the point of sale is required for a transaction to involve an investment contract under *Howey*" (*id.* at 8 (citing Order 30)); and "*Howey*'s application to digital asset transactions" (*id.* at 10). The SEC argues that these "[v]arying formulations of the proposed question preclude finding a controlling issue." (SEC Cert. Opp. 9). Indeed, the SEC makes much of Coinbase's framing of the question as one of contractual obligations as opposed to the reach of *Howey*. (*See id.*). But the Court finds that these are all variations on a theme, *viz.*, whether transactions involving crypto-assets qualify as "investment contracts," and therefore "securities," within the meaning of the Securities Act. The statutory definition of "security" includes "investment contracts," 15 U.S.C. § 77b(a)(1), a term that the Supreme Court defined in *Howey*, 328 U.S. at 301. *See also Revak*, 18 F.3d at 87. In other words, as it was when this Court issued the Order, "[t]he central question … [remains] whether Coinbase intermediated transactions involving investment contracts, and thus securities." (Order 29).

Such framing is more than what Section 1292(b) requires. Indeed, the SEC mischaracterizes the law when it argues that certification here would be improper because Section 1292(b) "'authorizes certification of *orders* for interlocutory appeal, not certification of *questions*.'" (SEC Cert. Opp. 8 (quoting *Chechele* v. *Std. Gen. L.P.*, No. 20 Civ. 3177 (KPF), 2022 WL 766244, at *9 (S.D.N.Y. Mar. 14, 2022) (emphasis added) (quoting *Isra Fruit Ltd.* v. *Agrexco*

14

*Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986)))).  When the Second Circuit stated this basic proposition in *Isra Fruit*, it cited contemporaneous cases in which it had contrasted the certification of *orders* under Section 1292(b) with the certification of *legal questions* under other statutes.  804 F.2d at 25 (citing *United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1156-57 (2d Cir. 1986); *Chem. Bank* v. *Arthur Anderson & Co.*, 726 F.2d 930, 936 n.10 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984)).  By this, the Second Circuit merely meant that (i) district court judges need not "frame the controlling questions of law that the order involves," though it can be helpful for them to do so, *Banco Cafetero Panama*, 797 F.2d at 1157 & n.1 (further contrasting the procedure set forth in Section 1292(b) with that set forth in 28 U.S.C. § 1254(3), which "permit[s] a court of appeals to *certify a question of law* to the Supreme Court" (emphasis added)), and (ii) after certifying an order pursuant to Section 1292(b), the Court of Appeals is "free … to consider" legal questions in the order other than those teed up by the district court, *Chem. Bank*, 726 F.2d 930 at 936 n.10.  Consequently, the fact that the Order contains legal questions other than whether Coinbase's crypto-asset transactions are securities is no bar to certification.  (*Cf.* SEC Cert. Opp. 8).

Having so framed the question of law, the Court considers whether the question is a "pure" one, and finds that it is.  A question is a "pure question of law" if the Court of Appeals "could decide [it] quickly and cleanly without having to study the record."  *CBRE, Inc.*, 2022 WL 683744, at *4 (internal citation omitted).  By contrast, "[q]uestions regarding application of the

appropriate law to the relevant facts are generally not suitable for certification."
*In re Facebook*, 986 F. Supp. 2d at 536 (alteration in original) (internal
quotation marks omitted).  Hence, matters of statutory interpretation, divorced
as they are from the factual record, are typically considered appropriate for
certification.  *See, e.g.*, *Capitol Recs.*, 972 F. Supp. 2d at 552; *In re Actos End-
Payor Antitrust Litig.*, Nos. 13 Civ. 9244 (RA) & 15 Civ. 3278 (RA), 2020 WL
433710, at *2 (S.D.N.Y. Jan. 28, 2020).  The Court in its Order effectively
interpreted the meaning of "investment contract," 15 U.S.C. § 77b(a)(1),
through the lens of *Howey* and its progeny, based on the pleadings and
without a factual record.  (*See* Order 40-60).  Thus, the Court agrees with
Coinbase's observation that the Second Circuit, like the Court, would require
only "a limited universe of familiar legal texts" to answer what is, at bottom, a
matter of statutory interpretation.  (Def. Cert. Br. 8).

This contrasts sharply with the underlying order in *Ripple*, in which
Judge Torres declined to certify for interlocutory appeal an order granting in
part and denying in part a motion for summary judgment.  *See SEC* v. *Ripple
Labs., Inc. ("Ripple II")*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023).  As the nature of
the underlying order suggests, Judge Torres had "studied an extensive, heavily
disputed factual record and detailed expert reports," and concluded that
certain transactions were sales of securities, and that others were not.  *Id.* at
132.  As "the core of the SEC's argument [was] that the [c]ourt improperly
applied the *Howey* test to the facts in the undisputed record," Judge Torres
found that it would be inappropriate to certify the order for interlocutory

16

appeal. *Id.* at 132-33. Here, the Court's Order was based not on a factual record but on the allegations in the pleadings, as the Court resolved the motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (*See* Order 23 ("'On a [Rule] 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" (alteration in original) (quoting *L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks and citation omitted)))). The Court finds that the question to be certified here, unlike in *Ripple II,* is a purely legal one because it is largely a matter of statutory interpretation, rather than a matter of analyzing a factual record.

Next, the Court turns to whether the question is "controlling." The Court finds that it is because reversal on this question would significantly affect the course of the litigation. True, as the SEC argues, a question can be considered "controlling" for Section 1292(b) purposes if reversal on it could result in dismissal of the entire action (SEC Cert. Opp. 7 (citing *Klinghoffer*, 921 F.2d at 25)), which Coinbase concedes is not the case here (Def. Cert. Br. 9 ("[R]eversal on the question presented would dispose of the SEC's principal claims, which account for the bulk of the complaint's factual allegations.")). However, while "it is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action," it "need not necessarily terminate an action in order to be 'controlling.'" *Klinghoffer*, 921 F.2d at 24. In fact, a question can be "controlling" if reversal "could significantly affect the conduct of the action;

17

or, the certified issue has precedential value for a large number of cases." *Dev. Specialists, Inc.* v. *Akin Gump Strauss Hauer & Feld LLP*, No. 11 Civ. 5994 (CM), 2012 WL 2952929, at *4 (S.D.N.Y. July 18, 2012) (citation omitted). Coinbase characterizes these as, respectively, the "case-specific and broader senses" of controlling. (Def. Cert. Br. 7). The Court finds that the question is "controlling" in both senses.

As for the case-specific sense, the Court must evaluate the potential for reversal to "significantly affect the conduct of the action." *Dev. Specialists*, 2012 WL 2952929, at *4. The Court agrees with Coinbase that reversal here "would dramatically reduce the scope of this case" and, thus, significantly affect the conduct of it. (Def. Cert. Br. 10). This Court, and other district courts in this Circuit, have found questions to be "controlling" in the case-specific sense where reversal would so narrow the action's scope. For example, this Court found a question of law to be "controlling" where reversal could have led to the dismissal of four claims. *Pentacon BV* v. *Vanderhaegen*, No. 23 Civ. 2172 (KPF), 2024 WL 3835334, at *15 (S.D.N.Y. Aug. 15, 2024). The Court found it sufficient that "a definitive answer [to the question] would narrow and streamline the action in several key respects." *Id.* at *14 (internal quotation marks and alterations omitted). Other courts in this District have similarly found questions to be "controlling" where reversal would result in the dismissal of some, but not all, of the claims. *See, e.g.*, *Capitol Recs.*, 972 F. Supp. 2d at 552 (finding a controlling question where "[w]ith respect to many [but not all] of the videos, which party prevails on the copyright claims associated with each of

these recordings rests exclusively on the [question]"); *SEC* v. *Rio Tinto PLC*, No. 17 Civ. 7994 (AT) (DCF), 2021 WL 1893165, at *2 (S.D.N.Y. May 11, 2021) ("The [order] adjudicates a controlling issue of law that resulted in the dismissal of several of the SEC's claims, and reversal would significantly affect the conduct of the action." (internal quotation marks omitted)).  Because reversal here would "dispose of the SEC's principal claims, which account for the bulk of the complaint's factual allegations" (Def. Cert. Br. 9), the Court finds that the question of law is controlling in the case-specific sense.

Moreover, the question is controlling in the broader sense because it has precedential value for many other cases.  "[I]n weighing the potential impact of certification … courts look to the potential impact of an appeal on other pending and future cases." *Dill* v. *JPMorgan Chase Bank, N.A.*, No. 19 Civ. 10947 (KPF), 2021 WL 3406192, at *6 (S.D.N.Y. Aug. 4, 2021) (internal citation omitted).  Coinbase argues that "[t]he need for authoritative appellate guidance could not be more pressing," as *Howey*'s application to the crypto-asset transactions at issue "is being litigated in numerous cases pending in this [District] and across the country."  (Def. Cert. Br. 11 (collecting cases)).  And — as colors the Court's analysis of the second Section 1292(b) prong — Coinbase notes that courts have reached conflicting conclusions.  (*Id.* at 11-12).  In this District, for instance, Judge Rakoff concluded that certain crypto assets were "investment contracts" after applying the *Howey* test, *see SEC* v. *Terraform Labs Pte. Ltd. ("Terraform I")*, 684 F. Supp. 3d 170, 195-98 (S.D.N.Y. 2023), whereas Judge Torres appeared to draw a distinction (expressly not drawn by

this Court (*see* Order 54-55)) between sales of crypto-assets to sophisticated individuals and entities (which satisfied *Howey*) and sales to public buyers (which did not satisfy *Howey*), *see SEC* v. *Ripple Labs, Inc. ("Ripple I")*, 682 F. Supp. 3d 308, 324-30 (S.D.N.Y. 2023).

Although the Court does not appreciate, and will not co-sign, Coinbase's efforts to cast aspersions on the SEC's approach to crypto-assets (*cf.* Def. Cert. Br. 12-13), the fact remains that these conflicting decisions on an important legal issue necessitate the Second Circuit's guidance. *See Islam* v. *Lyft, Inc.*, No. 20 Civ. 3004 (RA), 2021 WL 2651653, at *4 (S.D.N.Y. June 28, 2021) (finding a controlling question of law where the Second Circuit's decision to hear the appeal "would provide valuable guidance to a great number of litigants and lower court judges" and "no appellate court has squarely answered the question, either"); *Flo & Eddie*, 2015 WL 585641, at *2 ("Receiving authoritative guidance from the Second Circuit … will help resolve [other] actions quickly and consistently."). Therefore, the Court concludes that the Order presents a controlling question of law in both the case-specific and broader senses of the term, and it moves to the second prong of Section 1292(b).

### 2. There Is Substantial Ground for Difference of Opinion

Substantial ground for difference of opinion on an issue exists when "[i] there is conflicting authority on the issue, or [ii] the issue is particularly difficult and of first impression for the Second Circuit." *In re Enron Corp.*, Nos. 06 Civ. 7828 (SAS) & 07 Civ. 1957 (SAS), 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007) (internal quotation marks omitted). After carefully

parsing its application of *Howey* to crypto-assets in the Order, the Court finds that there is substantial ground for difference of opinion because (i) conflicting authority exists regarding *Howey*'s application to crypto-assets, and (ii) the application of *Howey* to crypto-assets raises a difficult issue of first impression for the Second Circuit.

In determining whether there is conflicting authority on an issue, the question is, rather simply, whether there are "differing rulings [by district court judges] within this Circuit" on the issue. *Yu* v. *Hasaki Rest., Inc.*, 874 F.3d 94, 98 (2d Cir. 2017). Such conflicting authority exists here in the form of this Court's Order, compared with the above-discussed rulings in *Terraform I* and *Ripple I*. As Coinbase points out (*see* Def. Cert. Br. 14-15), Judge Rakoff in *Terraform I* expressly distinguished Judge Torres's reasoning in *Ripple I* by not differentiating among crypto-assets "based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not." *Terraform I*, 684 F. Supp. 3d at 197 (citing *Ripple I*, 682 F. Supp. 3d at 328). In Coinbase's words, "[t]his Court then deepened the split by adopting an analysis more congruent with that of *Terraform*." (Def. Cert. Br. 15 (citing Order 46, 49-60)).

Separately, Coinbase directs the Court to *SEC* v. *Binance Holdings Ltd.*, No. 23 Civ. 1599 (ABJ), 2024 WL 3225974 (D.D.C. June 28, 2024), in which Judge Jackson of the District Court for the District of Columbia recently gave credence to the primary-versus-secondary market distinction by indicating that

she was "inclined to agree with the approach of [Judge Torres] in" *Ripple I*, namely, that based on "the economic reality of the transaction," the SEC had not sufficiently alleged that any particular secondary sales of the crypto-asset in question "satisf[ied] the *Howey* test for an investment contract."  2024 WL 3225974, at *20-22.  To be more exact, Judge Jackson noted that Judge Torres "clarifie[d] that there is no holding in the *Ripple Labs* opinions with respect to secondary sales," as Judge Torres's view is "that the determination of whether any sale constitutes an investment contract must be based on the totality of the circumstances surrounding that sale."  *Binance*, 2024 WL 3225974, at *19 n.13 (citing *Ripple II*, 697 F. Supp. 3d at 136).

According to Coinbase, *Binance* is further evidence "that market participants now face different rules, not only in different courts in this District, but in different federal courts around the country."  (*See* Dkt. #134 at 1).  The SEC rejoins that "the main takeaway from the ruling's reasoning is the primacy of *Howey*," and that "the [*Binance* d]ecision addressed secondary sales of a crypto asset (BNB) that is not at issue here on a trading platform that is not at issue here."  (Dkt. #135 at 1).  True enough.  But, taking a less granular view, and viewing Judge Jackson's analysis as illuminative of the law in *this* District, the Court considers *Binance* to be further evidence of a persistent disagreement about how to apply *Howey* to crypto-assets.

Even if these cases were not considered conflicting authority, there is a second substantial ground for difference of opinion: *Howey*'s application to crypto-assets is a difficult issue of first impression for the Second Circuit.

"Courts have struggled with determining whether the difference of opinion as to a controlling question of law is 'substantial' or 'merely metaphysical.'" *Tantaros*, 465 F. Supp. 3d at 391 (quoting *Am. Tel. & Tel. Co.* v. *N. Am. Indus. of N.Y., Inc.*, 783 F. Supp. 810, 814 (S.D.N.Y. 1992)).  "'The mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion.'" *Capitol Recs.*, 972 F. Supp. 2d at 551 (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)); *see also Bellino* v. *JPMorgan Chase Bank, N.A.*, No. 14 Civ. 3139 (NSR), 2017 WL 129021, at *3 (S.D.N.Y. Jan. 13, 2017) ("Mere conjecture that courts would disagree on the issue or that the court was incorrect in its holding is not enough[.]").  Likewise, the mere "possibility of a different outcome on appeal is not sufficient to show a substantial ground for difference of opinion."  *Segedie* v. *The Hain Celestial Grp., Inc.*, No. 14 Civ. 5029 (NSR), 2015 WL 5916002, at *3 (S.D.N.Y. Oct. 7, 2015).  "Rather, the district court must 'analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute.'"  *Capitol Recs.*, 972 F. Supp. 2d at 551 (quoting *In re Flor*, 79 F.3d at 284).

The Court agrees with Coinbase that "[t]he conflict between *Ripple* on the one hand and *Terraform* and the Order on the other is symptomatic of the more fundamental difficulty of applying *Howey* to crypto transactions."  (Def. Cert. Br. 15).  On this point, Coinbase argues broadly that "the grounds for disagreement [with the Court's Order] are pronounced — starting with the

statutory text and decades of precedent." (*Id.* at 17).  In particular, it highlights that "no appellate court has found an investment contract absent a contractual undertaking in the 78 years since *Howey*" (Def. Cert. Reply 6), the significance of which fact the SEC contests (SEC Cert. Opp. 13 n.4).  The SEC, by contrast, views the Court's Order as the straightforward application of settled Supreme Court precedent to new set of facts.  (*Id.* at 14-15 (citing *Howey*; *SEC* v. *Edwards*, 540 U.S. 389 (2004); Order 50)).  Moreover, it casts Coinbase's argument as an attempt to "relitigate[] its losing argument" that *Howey* requires contractual undertakings.  (*Id.* at 11-12).

The Court begins, then, with what is *not* a difficult issue of first impression for the Second Circuit: the elements of *Howey*.[4]  *Howey* does not require a contractual undertaking (*see* Order 58), nor, as Coinbase phrases it, "some obligation past the point of sale" (Def. Cert. Br. 8).  *Howey* is binding law in the Second Circuit.  *See Terraform II*, 708 F. Supp. 3d at 472 ("*Howey*'s definition of 'investment contract' was and remains a binding statement of the law, not dicta.").  Its definition of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.  Accordingly, Coinbase's narrower, textualist interpretation of "investment

---

[4]    The Court also eschews matters not relevant to the second prong of Section 1292(b), including Coinbase's argument that the "question of the SEC's authority to regulate crypto has generated sharply divergent opinions *across and within the branches of government.*"  (Def. Cert. Br. 16 (emphasis added)).  The only branch of government relevant to the Court's analysis of the second prong is the judiciary.

contract" (*see* Def. Cert. Br. 15-17),[5] though a neat preview of an argument it is sure to make to the Circuit, distracts from the true issue about which there is substantial ground for difference of opinion.  Insofar as Coinbase seeks certification of the Order for interlocutory appeal to address this issue, the Court agrees with the SEC that it cannot.

As it happens, however, the issues about contractual undertakings and post-sale obligations are ancillary to the "central question" in the Order: how courts should apply *Howey* to crypto-asset transactions.  (Order 29).  The SEC maintains that there is nothing to see here: "[t]he courts that have analyzed whether secondary market transactions in crypto[-]assets were securities … have concluded *Howey* was satisfied."  (SEC Cert. Opp. 15 (citing *Patterson* v. *Jump Trading, LLC*, No. 22 Civ. 3600 (PCP), 2024 WL 49055, at *11-12 (N.D. Cal. Jan. 4, 2024); *SEC* v. *Wahi*, No. 22 Civ. 1009 (TL), 2024 WL 896148, at *6-7 (W.D. Wash. Mar. 1, 2024))).  It explains away the divergent decision in *Ripple I* by arguing that Judge Torres "specifically explained that [she] was *not* reaching the issue of how *Howey* applies in secondary market resale transactions," as that would be too fact-dependent.  (*Id.* (citing *Ripple I*, 682 F. Supp. 3d at 329 n.16)).  All of that may be true, and it may diminish the importance of the Court's decision not to distinguish between transactions on

---

the primary and secondary markets. But these, too, are constituent issues to the question "at the heart of" the Order. (Order 25).

It is true that the Supreme Court formulated the *Howey* test so that it could be applied to different sets of facts. And, equally true, this Court applied *Howey* to Coinbase's crypto-asset transactions in the Order. But the application of *Howey* to crypto-asset transactions is itself a difficult legal issue of first impression for the Second Circuit. To see this, one need look no further than this Court's analysis of the "ecosystem" surrounding crypto-asset transactions and its relevance to the *Howey* test. As the Court explained, the term "ecosystem" has a few meanings. (*See* Order 6-7 n.4). Crypto industry participants use it "to describe a collection of interrelated components, often involved in or implicated by the development of a crypto-asset." (*Id.* at 7 n.4). In the Complaint, the SEC uses it to "refer to the coordinated enterprises contemplated by the issuers and promoters of the … crypto-assets at issue here." (*Id.*). Finally, the Court used it to determine whether crypto-assets qualify as securities under *Howey*. (*See id.*). Indeed, the Court concluded that crypto-asset transactions met the "common enterprise" prong of *Howey* because crypto-asset purchasers' ability to profit depends on the development and expansion of the ecosystem. (*See id.* at 49). And it found that purchasers had a reasonable expectation to profit from the efforts of others based on the continued development of the ecosystem surrounding a crypto-asset, increasing its value in turn. (*See id.* at 53). The SEC calls this the application of "80 years of case law interpreting *Howey* to the facts alleged in the

26

Complaint [and] as a result it can hardly be said that the Order disposes of an issue of first impression." (SEC Cert. Opp. 13 n.4). In support, it cites several cases in which district courts have referred to a crypto-asset's "ecosystem." (*See id.* (citing *Kik*, 492 F. Supp. 3d at 178; *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 362 (S.D.N.Y. 2020); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 218 (D.N.H. 2022); *Terraform I*, 684 F. Supp. 3d at 197)).

To the extent that this Court followed other district courts' lead by referring to a crypto-asset's digital ecosystem when analyzing *Howey* factors, *see, e.g.*, *Kik*, 492 F. Supp. 3d at 178-80 (finding that the digital "ecosystem was crucial" to the common enterprise and profits-expectation *Howey* prongs regarding a crypto-asset), it is nonetheless true that "neither the Supreme Court nor any federal appeals court has yet" has expressly used the term "ecosystem" in its application of *Howey*. (Def. Cert. Br. 18-19). Moreover, the Court used the ecosystem concept "to distinguish securities from commodities traded in an atmosphere of promotion." (*See* Def. Cert. Reply 7). Following the *Kik* court, the Court in its Order distinguished "the sale of real properties, which possess inherent value and utility," from "capital raises on Coinbase's platform by issuers and promoters, through the sale of fungible assets with no inherent value." (Order 58 (citing *Kik*, 492 F. Supp. 3d at 180)). The Court further distinguished the offer and sale of crypto-assets from commodities or collectibles like Beanie Babies on the ground that the latter "may be independently consumed or used," whereas the former "is necessarily intermingled with its digital network — a network without which no token can

27

exist."  (*Id.* at 59-60 (citing *Balestra*, 380 F. Supp. 3d at 357 (finding that there would be no market for a certain crypto-asset without the related blockchain, thus distinguishing it from a precious metal); *Friel* v. *Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 439 (S.D.N.Y. 2023) (rejecting a comparison of non-fungible token transactions to collectibles))).  The significance of a crypto-asset's digital ecosystem to the *Howey* analysis, particularly as a point of contrast with collectibles or other commodities, is a difficult issue of first impression for the Second Circuit.

Coinbase maintains that "plenty of commodities — carbon credits, emissions allowances, even expired Taylor Swift concert tickets — have no inherent value outside of the 'ecosystem' in which they are issued or consumed."  (Def. Cert. Br. 18).[6]  Without doubting its original conclusion that the challenged crypto-asset transactions *can* be distinguished from commodities or collectibles because crypto-assets lack inherent value absent the digital ecosystem (*see* Order 59-60), the Court nonetheless finds that Coinbase raises more than a "'simple disagreement on the issue' and an attempt to relitigate it" (SEC Cert. Opp. 15 (quoting *Chechele*, 2022 WL 766244, at *9)) by questioning whether the Court *must* draw such a distinction. There is indeed substantial ground to dispute how *Howey* is applied to crypto-assets and the role of the surrounding digital ecosystem in that analysis.

---

[6]     The Court also takes note of *amicus* Blockchain Association's argument that the offer and sale of crypto-assets cannot be distinguished from that of commodities or collectibles based on the former's lack of inherent value (*see* Dkt. #120 at 3-8), and its position that this view of crypto-assets could expand the SEC's regulatory reach to other industry players (*see id.* at 10-12).

Therefore, the Court agrees with Coinbase that the Order "meets not one but both independently sufficient tests under the second prong of Section 1292(b)." (Def. Cert. Br. 14).[7]

### 3. Immediate Appeal Would Materially Advance the Ultimate Termination of the Litigation

Moving on to the third and final prong of the analysis, the Court finds that immediate interlocutory appeal would materially advance the ultimate termination of the litigation because it could result in dismissal of the bulk of the SEC's claims against Coinbase. An interlocutory appeal materially advances the ultimate termination of a litigation when it "promises to advance the time for trial or to shorten the time required for trial." *Transp. Workers*, 358 F. Supp. 2d at 350; *see also Primavera Familienstifung* v. *Askin*, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001). In evaluating this factor, courts must consider the "institutional efficiency of both the district court and the appellate court." *Rio Tinto*, 2021 WL 1893165, at *2. Courts "place particular weight" on this third factor, *Transp. Workers*, 358 F. Supp. 2d at 350, which, in practice, is closely connected to the first factor, *see, e.g.*, *In re Facebook*, 986 F. Supp. 2d at 536; *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (RJH), 2012 WL 363118, at *2 (S.D.N.Y. Feb. 2, 2012) (citing *Askin*, 139 F. Supp. 2d at 571).

---

[7]    Additionally, Coinbase maintains that "[r]easonable minds may also debate the Court's ruling that the major questions doctrine has no application here." (Def. Cert. Br. 19 (citing Order 33-35)). Though the Court believes that there is no substantial ground for difference of opinion on that issue, it reiterates that it certifies orders, and not legal questions, for interlocutory appeal under Section 1292(b). Therefore, the Court does not address this issue, though the Second Circuit is free to consider it on interlocutory appeal.

To the extent the third factor is coextensive with the first Section 1292(b) factor, as previously discussed, the Court reiterates that it finds the first factor satisfied. *See supra* pp. 12-19. Furthermore, the Court agrees with Coinbase that reversal would "substantially reduce the issues to be tried" as "fully three quarters of the SEC's allegations in this case pertain to its [Securities Exchange Act of 1934] claims." (Def. Cert. Br. 20). This would leave only "the unrelated Securities Act claim concerning [Coinbase's] Staking [Program]" (*id.*), through which the Court found the SEC had plausibly alleged Coinbase promotes crypto-asset investment contracts (*see* Order 61-78). Thus, the SEC puts the cart before the horse when it argues that "Coinbase's efficiency argument only gains some traction if the Second Circuit reverses" and sides with Coinbase. (SEC Cert. Opp. 19). Were the Second Circuit to affirm the Court on interlocutory appeal, in hindsight it might seem like a waste of judicial resources. However, it is the *possibility* of reversal, not the certainty of it, that weighs in favor of certifying the Order for interlocutory appeal. Reversal would substantially narrow the scope of this action. Conversely, were the Court *not* to certify the Order for interlocutory appeal, it is mindful that the Second Circuit will consider the issue of *Howey*'s application to crypto-assets in *Ripple*, wherein the SEC has taken a direct appeal following entry of final judgment. (*See* Dkt. #167 (citing No. 20 Civ. 10832 (AT), Dkt. #974, 978 (S.D.N.Y.))). In the meantime, "facts relating to the 'ecosystems' of the 12 tokens the SEC has identified promise to consume the bulk of the Court's and the parties' attention all the way to and through trial." (Def. Cert. Reply 9).

This burden is not "overstate[d]" (SEC Cert. Opp. 19), as the Court recently extended the discovery deadlines for the second time following its Order (*see* Dkt. #165, 173). Therefore, it would hardly be efficient for the action to proceed under this sword of Damocles. *Cf. Rio Tinto*, 2021 WL 1893165, at *2.

According to the SEC, certification portends "the prospect of piecemeal appeals." (SEC Cert. Opp. 19). The Commission fears further litigation on the remaining Staking Program claim, as well as a revival of Coinbase's Major Questions Doctrine line of attack. (*Id.*). These concerns are not unwarranted. After all, the Court certifies orders, not legal questions, under Section 1292(b), *see Isra Fruit*, 804 F.2d at 25, and therefore Coinbase can raise the Major Questions Doctrine argument on interlocutory appeal. Although the SEC thinks this weighs against certification, the Court finds that it weighs in favor of certification, with a concomitant stay pending resolution of the interlocutory appeal.

The SEC observes that "[t]he Order also narrowed the issues of law and areas of discovery to be litigated, noting that several of Coinbase's affirmative defenses are not viable as a matter of law." (SEC Cert. Opp. 20 (citing Order 32-39)). But the Second Circuit is within its right to disagree, possibly expanding the scope of litigation and discovery. Likewise, the fact that "Coinbase does not purport to certify" the grounds for the Court's decision not to dismiss the Staking Program claim does not mean the Second Circuit cannot address it. (*Id.* at 19; *see also* Order 61-78). In fact — especially since the Court also analyzed the Staking Program claim under *Howey* — the Second

Circuit might do so, and it would be a poor use of judicial resources for this Court either to forge ahead with the current discovery schedule, or to stay only those portions of discovery related to the non-Staking Program claims, despite the threat of reversal.

Accordingly, the Court finds that the third Section 1292(b) factor is satisfied. And in connection with its certification of the Order for interlocutory appeal, the Court will stay this action pending the resolution of the appeal. "'A district court's authority to stay a pending action is an aspect of its broad and inherent power over its own process, to prevent abuses, oppressions and injustice, so as not to produce hardship, and to do substantial justice. In issuing a stay, a court must weigh competing interests and maintain an even balance.'" *Flo & Eddie*, 2015 WL 585641, at *4 (quoting *Soler* v. *G & U, Inc.*, 86 F.R.D. 524, 526 (S.D.N.Y. 1980)); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (listing the following factors that courts must consider when deciding whether to stay a case during the pendency of an appeal: (i) the applicant's strong showing of likelihood of success on the merits; (ii) irreparable injury to the applicant absent a stay; (iii) substantial injury to other interested parties; and (iv) the public interest). For largely the same reasons as the Court finds that certification of the Order for interlocutory appeal will materially advance the termination of the action, the Court finds that the balance of interests weighs in favor of staying the proceedings pending resolution of the interlocutory appeal. *See, e.g., Flo & Eddie*, 2015 WL 585641,

at *4 ("[J]udicial economy strongly favors staying the proceedings pending resolution of the legal question at the core of this action.").

### 4.    Additional Factors Do Not Counsel Against Certification

Finally, the SEC argues that "the additional factors Coinbase invokes counsel against, not for, certification." (SEC Cert. Opp. 20).  To review, even where all three Section 1292(b) factors are met, courts retain "unfettered discretion to deny certification if other factors counsel against it." *Transp. Workers*, 358 F. Supp. 2d at 351 (internal quotation marks omitted).  The Commission argues that "Coinbase's claim to simply seek appellate level precedent rings hollow given the extensive body of case law applying *Howey* at every level of the judiciary." (SEC Cert. Opp. 21 (collecting cases)).  It believes that judicial economy concerns weigh in favor of the Second Circuit's considering "matters with fully developed factual records, rather than burdening its docket with unripe ones." (*Id.*).  The Court disagrees.  As the Court concluded when analyzing the second Section 1292(b) prong, at issue is more than how to apply *Howey* (about which, the Court agrees, there is an extensive body of case law); at issue is how to apply *Howey* to crypto-asset transactions, in the context of the surrounding digital ecosystems.  That is a difficult legal question of first impression for the Second Circuit — more than mere disagreement with the Court's Order.  *See supra* pp. 25-28.  And as the Court discussed in its analysis of the first prong, the lack of a factual record weighs *in favor* of certifying the Order for interlocutory appeal, not against it.

*See supra* p. 16.  After determining that all three Section 1292(b) factors are met, the Court finds no reason to exercise its discretion to deny certification.

## CONCLUSION

For the foregoing reasons, Defendants' motion to certify the Order for interlocutory appeal under 28 U.S.C. § 1292(b) is GRANTED, and the Court hereby STAYS proceedings in this action pending resolution of the interlocutory appeal.  The Clerk of Court is directed to terminate the pending motion at docket entry 109 and to stay this action pending further order of the Court.

The parties are further directed to submit a joint letter to the Court within five business days of any significant developments in the interlocutory appeal.

SO ORDERED.

Dated:      January 7, 2025
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge